1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF TENNESSEE

3    WESTERN DIVISION

4    ═══════════════════════════════════════════════════

5    ACLU of Tennessee, Inc.,

6              Plaintiff,

7    vs.                              NO. 2:17-cv-02120

8    City of Memphis, Tennessee,

9              Defendant.

10   _____

11

12

13   TRANSCRIPT OF PROCEEDINGS

14   NON-JURY TRIAL

15   VOLUME I

16

17   BEFORE THE HONORABLE JON P. MCCALLA, JUDGE

18

19   MONDAY

20   20TH OF AUGUST, 2018

21

22

23

      LISA J. MAYO, CRR, RMR
24    OFFICIAL REPORTER
      FOURTH FLOOR FEDERAL BUILDING
25    MEMPHIS, TENNESSEE 38103

1               A P P E A R A N C E S

2

3

4

5    Appearing on behalf of the Plaintiff:

6               THOMAS HAUSER CASTELLI
                AMANDA STRICKLAND FLOYD
7               American Civil Liberties Union Foundation of
                Tennessee
8               210 25th Avenue N. Suite 1000
                Nashville, TN 37212
9               (615) 320-7142

10

11

12   Appearing on behalf of the Defendant:

13              BUCKNER WELLFORD
                JENNIE VEE SILK
14              LAWRENCE LAURENZI
                R. MARK GLOVER
15              Baker Donelson Bearman Caldwell & Berkowitz
                165 Madison Avenue, Suite 2000
16              Memphis, TN 38103
                (901) 526-6000
17

18

19

20

21

22

23

24

25

1                    **W I T N E S S   I N D E X**

2 **WITNESS**                                        **PAGE**       **LINE**

3  HEDY WEINBERG

4          Direct Examination By Mr. Castelli      41        4

5          Cross-Examination By Ms. Silk           55        1

6          Redirect Examination By Mr. Castelli    103       1

7  TIMOTHY REYNOLDS

8          Direct Examination By Ms. Floyd         116       7

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            **E X H I B I T   I N D E X**

2     **EXHIBIT**                                           **PAGE**      **LINE**

3

| EXHIBIT | | PAGE | LINE |
|---|---|---|---|
| 1 | ACLU Charter September 18, 1968 | 43 | 9 |
| 2 | BY-LAWS OF THE ACLU of TENNESSEE, INC. (Revised March 1973) | 46 | 14 |
| 3 | Agenda and Minutes from the Board of Directors Meeting (October 4, 1975) | 50 | 3 |
| 4 | Minutes ACLU of Tennessee, Inc. (December 11, 1971) | 51 | 5 |
| 5 | Complaint in Case No. 76-449 | 53 | 2 |
| 6 | ORDER, JUDGMENT, AND DECREE in Case No. 76-449 (Kendrick et al. V. Chandler et al.) | 57 | 2 |
| 7 | Memo to Board of Directors and Chapter Presidents, Tennessee ACLU from John W. Cleland (September 2, 1969) | 65 | 5 |
| 8 | West TN ACLU Board of Directors Regular Meeting (May 12, 1980) | 76 | 12 |
| 9 | Minutes of Regular Meeting of Board of Directors of ACLU (January 15, 1979) | 77 | 15 |
| 10 | Minutes of Board Meeting (January 10, 1983) | 79 | 25 |
| 11 | West Tennessee ACLU Chapter Meeting Announcement for Thursday, February 11 at 7:00 pm | 83 | 9 |
| 12 | Memo to West Tennessee Chapter Board of Directors and Other Interested ACLU Members re: Next Board Meeting | 84 | 8 |
| 13 | MEMORANDUM OF DIRECTOR'S MEETING (JUNE 2, 1988) | 85 | 8 |
| 14 | Letter from Hedy Weinberg to Bruce Kramer (11 March 1991) | 86 | 15 |
| 15 | Letter from Hedy Weinberg to Mary Gibson (27 July 1994) | 87 | 15 |
| 16 | Agenda - Thursday, 14 March 1991 West Tennessee Chapter Reorganization Meeting | 88 | 13 |
| 17 | Letter from Andrew C. Branham to Hedy M. Weinberg 20, 1994) | 89 | 10 |

| 18 | Letter from Sheri Lipman to Hedy Weinberg (7 November 1994) | 90 | 2 |
| 19 | Memo from Hedy Weinberg to Sheri Lipman RE: Revitalizing the Memphis Chapter (24 October 1994) | 90 | 19 |
| 20 | Letter from Sheri Lipman to Andy Branham, et al. (December 1, 1994) | 92 | 1 |
| 21 | Letter from Sheri Lipman to Andy Branham, et al. (March 9, 1995) | 93 | 22 |
| 22 | letter from Sheri Lipman to Andy Branham, et al. (January 11, 1995) | 94 | 12 |

1           **MONDAY**

2        **August 20, 2018**

3           The trial of this case began on this date,

4    Monday, the 20th day of August, 2018, at 9:00 a.m., when

5    and where evidence was introduced and proceedings were had

6    as follows:

7           ----------------------

8

9        **THE COURT:**  I will allow a brief opening

10   statement on behalf of each side if they would like to do

11   that.  Of course, we start with the ACLU.

12           In connection with the subsequent request for

13   potential modification of the consent decree, that issue

14   has not been briefed by ACLU at this point in time, and I

15   assume you're not ready to proceed on that?

16       **MR. CASTELLI:**  No, Your Honor.

17       **THE COURT:**  Right.  And that's not an issue that

18   we'll be going into.  If it's necessary to go into that

19   issue at appropriate time, then we'll do that at another

20   proceeding.  I think that probably covers what we needed to

21   preliminarily.  Of course, we have the pretrial order and

22   it will govern the proceedings.

23           Counsel, any -- I think -- did you want to

24   introduce anyone for the record today?  I know that we went

25   through and got a list earlier.

1          **MR. CASTELLI:**  Certainly, Your Honor.

2          And is this picking up?

3          **THE COURT:**  Make sure your mic is on, and it's

4    actually close enough that it actually picks up.

5          **MR. CASTELLI:**  That may be better.

6          **THE COURT:**  That's an improvement.

7          **MR. CASTELLI:**  Your Honor, my name is Tom

8    Castelli, representing the ACLU, the Plaintiff in this

9    action.  I'm here with Mandy Floyd, who you'll be hearing

10   from today, and our executive director of the ACLU of

11   Tennessee, Ms. Hedy Weinberg, with us.  And then Ms. Lauren

12   Davis will be helping us out throughout the proceedings

13   this week.

14         **THE COURT:**  Certainly, that's fine.

15         **MR. CASTELLI:**  And if I may approach, I'll

16   deliver a brief opening.

17         **THE COURT:**  That's fine.  Why don't I let the

18   other side do any introductions they need to at this time

19   on the record, because I notice that Mr. McMullen came in.

20   And you may want him to sit up here.  I didn't want him to

21   be relegated -- or anybody else that needs to sit up.  In

22   fact, if there's anybody else who needs to be up at the

23   table or closer to the table for consultation, please let

24   them get in those positions.

25         Looks like they're going to let you come up,

1    Mr. McMullen, if you want to, or whoever else needs to be

2    here from the City, and anybody else that needs to be close

3    for the ACLU to consult with, also.

4          **MR. WELLFORD:**  Your Honor, can you hear me with

5    the microphone?

6          **THE COURT:**  Oh, it's perfect.

7          **MR. WELLFORD:**  Buck Wellford for the City with

8    Larry Laurenzi and Jenny Silk and Mark Glover as the

9    attorneys.  And we've got Mr. McMullen and Ms. Sink, if

10   you'd permit both, as representatives of the City, the city

11   attorney and the deputy city attorney.

12         **THE COURT:**  Absolutely.  Certainly.

13         **MR. WELLFORD:**  Your Honor, at what point do you

14   invoke the Rule?

15         **THE COURT:**  Now, at this time.  Before opening

16   statements, it's usually invoked.  The Rule is now called

17   for.  I think we talked about that earlier in pretrial.

18   And so if there's anyone who is a witness in the

19   proceeding, we'll let them go to the witness room and --

20   hope everybody's been shown where that is.

21         (Whereupon the Rule was invoked and witnesses

22   excused from courtroom.)

23         **THE COURT:**  All right.  All right, Counsel.  I

24   think we are now set.  Yes, sir.

25         **MR. CASTELLI:**  Thank you, Your Honor.

1        So there's been quite a bit of briefing already
2   in the case over the course of the almost two years this
3   case has been going on.  So I don't want to go into the
4   extensive background too much, but to frame the case,
5   Judge, as you're aware, this is a petition for contempt
6   based on a consent decree that was entered in the case
7   of -- that was filed in 1976.  The decree was entered
8   September 14th, 1978.  And the decree centers around
9   protecting the free speech rights under the First Amendment
10  of the US Constitution of people protesting in the city of
11  Memphis.

12        What sparked this particular petition was a list
13  of persons left at City Hall who were -- where the list
14  indicated they needed to have an escort at all times.
15  Originally, this case was filed by four individual
16  plaintiffs, who have since been dismissed.  And my client,
17  the ACLU of Tennessee, had moved to intervene and is the
18  sole remaining plaintiff in the case at this point.

19        The Court has ruled on several of the issues
20  already in this case, which has limited the issues that are
21  before us for the next few days, and the Plaintiff has
22  identified those issues as the following:  Under this
23  consent decree, whether the City is in contempt by learning
24  about protest events through the monitoring of social
25  media; whether the City operated an office, division,

1    bureau or unit for the purpose of gathering political

2    intelligence; whether the City infiltrated a group for the

3    purpose of gathering political intelligence; whether the

4    City disseminated derogatory or false information for the

5    purpose of political intelligence; whether the City

6    photographed participants at a public protest for the

7    purpose of chilling or affecting the First Amendment

8    rights; whether the City contacted organizers about events

9    for the purpose of chilling their First Amendment rights;

10   whether there was a different standard for applications of

11   protests through the City's permitting process than other

12   events; and whether the City has substantially complied

13   with the requirement that it refrain from disseminating

14   information about -- or disseminating political

15   intelligence to third parties.

16           All of those except for the last one, I believe

17   the Plaintiff bears the burden with regard to substantial

18   compliance; that's the City's burden to prove.

19           Through this case, the -- by agreement, the

20   parties have kind of taken a snapshot of -- you know, we've

21   got a 40-year-old decree here.  So rather than -- in that

22   40 years of information, we've limited a snapshot that

23   basically covers the time period before the escort list was

24   discovered and then subsequently revised, which was

25   May 2017.

1          So most of the evidence that the Court's going to

2    hear throughout the next few days is going to be focused on

3    the time period between probably the spring of 2016 through

4    the spring of 2017.  There may be information that is

5    presented that's before or after that time period, but I

6    just wanted the Court to be aware that most of the time

7    we're focusing on that time period, during which there were

8    several major protests, which the -- which occurred,

9    including a protest at the zoo for the Greensward where

10   arrests were made, a protest at an oil refinery here in

11   Memphis, the Valero oil refinery where some arrests were

12   made, the protest that blocked the bridge, the I-40 bridge,

13   which was in July of 2016, and a protest at Graceland,

14   which also resulted in some arrests.

15        There also -- the proof will discuss several

16   other free speech events that occurred during this time

17   period.  So we're not just focusing on these kind of big

18   flash spots, but also smaller events that occurred on

19   private property, public property throughout the course of

20   this about -- roughly year, year-and-a-half time period.

21        This is a -- as we have found over the course of

22   the -- of discovery, a fairly document-intensive case.  So

23   we expect that the Court will see a lot of what -- in

24   particular, the Memphis Police Department's

25   intercommunications about some of these events and about

1    its gathering of political intelligence, and then how

2    those -- those particular persons working for the police

3    department operated and what type of information they were

4    seeking and for what purpose.

5              And I think that's mainly what we're focusing on

6    for the hearing today, since the Court has ruled that the

7    City has -- or the police department did, indeed, gather

8    political intelligence in violation of the decree.  We hope

9    to focus more on these issues of purpose or intent.

10             The witnesses that the Court will hear from at

11   least from the Plaintiff -- and apologies, Your Honor,

12   there is one more outstanding issue that we're going to

13   hear, which involves the standing of the ACLU in Tennessee.

14        **THE COURT:**  I was going to ask about that.

15   That's an important one.

16        **MR. CASTELLI:**  Yeah, it is.

17             So we're going to start with that first, Your

18   Honor.  We're going to call the Ms. Weinberg, who is the

19   executive director of the ACLU of Tennessee and has been

20   for the past 30 plus years, to basically explain how the

21   organization has worked in her time period and then to

22   facilitate discussion of some of these historical documents

23   that the Court has, I believe, seen before, but we want to

24   put in the record and discuss and be able to argue about

25   their significance or their meaning, including minutes and

1    bylaws of the ACLU of Tennessee in its early stages in the

2    early 1970s before the filing of this -- the original

3    Kendrick case in 1976.

4          Then the Plaintiff will continue into our

5    substantive witnesses, Your Honor.  And we will plan to

6    call Sergeant Tim Reynolds, who was a -- at the time period

7    relevant was a detective with the Office of Homeland

8    Security, which is the office that is central in this case

9    as far as the collection of and dissemination of political

10   intelligence.

11         Mr. Reynolds -- we believe that the proof will

12   show that Mr. Reynolds was instrumental in collecting this,

13   was kind of the key figure as far as researching,

14   surveilling individuals and was the detective behind an

15   undercover or covert Facebook account that surveilled

16   protest groups or advocacy groups throughout Memphis.

17         We will then call Major Chandler, who at the time

18   was the -- one of the supervisors.  I believe he was a

19   lieutenant over the Office of Homeland Security.  So he

20   worked with Detective Reynolds in some of these research or

21   these surveillance endeavors in collecting the political

22   intelligence.  Often time, he was in a position of ordering

23   it and sometimes responding to a third witness that we will

24   call, who is Lieutenant Colonel Eddie Bass, who was

25   the colonel in charge of the Office of Homeland Security

1      during the relevant period.

2              So the three of those witnesses will be kind of

3      this unit that the Plaintiff is -- will prove was operating

4      for the purposes of political intelligence.

5              Plaintiff will also call the director, Michael

6      Rallings, to discuss his oversight of the entire police

7      department, his involvement in political intelligence,

8      policies that may have governed the Office of Homeland

9      Security during this time period, and just generally his

10     involvement in some of the political intelligence that was

11     gathered and disseminated.

12             Plaintiff will then call Sergeant Bradley

13     Wilburn, who is or was at the time an officer with the Real

14     Time Crime Center, which will be another unit that will be

15     important in our discussion over the next few days.  The

16     Real Time Crime Center, the Plaintiffs will show, worked

17     with the Office of Homeland Security in gathering this

18     political intelligence.

19             The Real Time Crime Center covers a whole host of

20     different things across the City, including surveillance

21     cameras that are disbursed across the City, but what I

22     think our evidence is going to focus on is the part of the

23     Real Time Crime Center that use what's called a social

24     media collator, which is a computer program that will

25     search through social media posts and -- based on key words

15

1    and pull them out.  So Sergeant Wilburn is familiar with

2    that, can explain what it is to the Court, how it works,

3    and then how he used it in conjunction with the Office of

4    Homeland Security in the gathering of political

5    intelligence.

6          And then finally, as far as the witnesses from

7    the Defendant, the Plaintiffs will call Mr. Aubrey Howard,

8    who is in charge of the City's permitting department.  And

9    Mr. Howard is the final authority on whether somebody who

10   seeks a permit will receive it, and so he can explain

11   the -- how permitting works in the City and also go through

12   some of the documents about what permits were granted

13   during this time period and for whom.

14         And then finally, the Plaintiff will call a few

15   of the citizens who were implicated in a lot of the

16   materials that have already been submitted to the Court and

17   will be submitted to the Court over the course of the next

18   several days.  We plan to call Mr. Paul Garner, Ms. Elaine

19   Blanchard, Mr. Earle Fisher, and Mr. Keedran Franklin to

20   discuss their interactions with the police, their knowledge

21   of some of these surveillance techniques and how that

22   affected their free speech.

23         After that and after the Defendant puts on their

24   proof -- and as we discussed in the pretrial, we anticipate

25   that Defendants will, through their cross-examinations of

1    especially the witnesses of -- that are employed by the

2    City, will take care of a lot of -- we won't have a lot of

3    overlap of calling the same witnesses.  But after that,

4    Your Honor, we'd ask the Court to consider the evidence and

5    find the City -- that the City has violated the order on

6    several other issues that I've covered in my opening, in

7    addition to those that the Court's already determined in

8    its order on our motion for summary judgment, and also find

9    that the ACLU of Tennessee does, indeed -- is a proper

10   party withstanding to enforce this decree.  So thank you.

11            **THE COURT:**  Thank you.  Mr. Wellford?

12            **MR. WELLFORD:**  Your Honor, may I cross in front?

13            **THE COURT:**  Oh, certainly.  Certainly.  No

14   problem at all.

15            **MR. WELLFORD:**  I assume the Court will tell me if

16   you have trouble picking me up, but -- or if I'm getting

17   too loud or too close.

18            **THE COURT:**  It's not a problem.  And, of course,

19   I can see everything on the screen.  It's no problem for

20   me.  Main thing is so that everyone in the room can hear

21   you.

22            **MR. WELLFORD:**  Yes, sir.

23            **THE COURT:**  Certainly.

24            **MR. WELLFORD:**  Your Honor, we will, of course,

25   contest the issue of standing, which is still an open issue

1    for trial, and that will be appropriately one of the first

2    issues addressed through witnesses.

3            We will be cross-examining.  We won't be putting

4    independent witnesses on, but we will be cross-examining

5    the witnesses that are put on by the Plaintiff and probably

6    presenting some of the documents that have been stipulated

7    in the record, whether or not it's with cross-examination,

8    and we'll address the standing issue at the close of

9    Plaintiff's proof.

10           We acknowledge that the Court's ruling on

11   August 10 has resolved some issues, unless evidence comes

12   before the Court in this hearing that would give rise to

13   some kind of a motion to alter or amend the Court's

14   previous ruling.  And our proof, as well, is going to be

15   heavily focused on the parts of the consent decree where

16   the motivations of the City of Memphis Police Department

17   personnel are at issue.  And we think that's what the Court

18   has identified as a key issue that the Court wishes to hear

19   evidence about, and that's where our evidence will be

20   focused.  We understand that the motion to modify is not

21   procedurally ripe.

22           **THE COURT:**  Right.

23           **MR. WELLFORD:**  But in the context of

24   demonstrating the motivation of some of the police

25   officers, especially from the director down, there will be

1   evidence presented on best practices because part of the

2   theme of the defense is that they were motivated by the

3   things that -- same things that motivate other police

4   departments throughout the country, and they were not

5   motivated in their actions by the content of the political

6   speech and associations that were being -- that were

7   involved on the part of the individuals whose -- who we'll

8   be studying through the course of the presentation.

9           The motivations of a number of the protesters who

10  were involved in some of the events that are before the

11  Court is appropriately an issue.  The Court identified the

12  motivations of those involved in alleged First Amendment

13  activities as a relevant item, and we do think that that

14  will be a relevant subject for us to cover and we intend to

15  cover that as a part of our presentation.

16          Fundamentally, the most important thing that we

17  wish to demonstrate in our evidence is that the police,

18  from the director down, were attempting to enforce the laws

19  of the state of Tennessee and the Code of Ordinances of the

20  City of Memphis, and that that was a driving, motivating

21  factor behind much of what they did.

22          And with respect to that, can you pull up the

23  permit ordinance, please?

24          **THE COURT:**  Well, we've already had a discussion

25  about the permit in the materials.

1          **MR. WELLFORD:**  We've had a discussion --

2          **THE COURT:**  I don't know that it matters what the

3     permit ordinance is.  We can look at it, certainly.

4     Certainly not -- hope it's not the central part of the

5     City's case.

6          **MR. WELLFORD:**  Well, it is an important part of

7     the City's case because Your Honor has touched --

8          **THE COURT:**  Otherwise, the City could simply pass

9     ordinances and prohibit all sorts of things that are

10    protected by the United States Constitution.

11         **MR. WELLFORD:**  We acknowledge that, Your Honor,

12    but Your Honor's order has stated that simply because

13    someone appears at a rally or engages in speech in an

14    unpermitted ordinance doesn't categorically place it

15    outside the context of the First Amendment.  We understand

16    that.

17         **THE COURT:**  Okay.

18         **MR. WELLFORD:**  But the permit ordinance does go

19    through a number of obligations on the part of the police

20    director that we think are relevant to what motivated the

21    police director and the police.

22         **THE COURT:**  The question in so many ways in this

23    case, not entirely, is whether or not the City violated the

24    decree that it entered into in 1978, and so that has to be

25    a focus of the inquiry.  And to a degree, this could be

1    collateral and not central to the issues before the Court.

2    I'm not saying it's something we couldn't consider, but we

3    want to stay focused as much as we can on the decree and

4    what the City did.  That's the best way to do it.

5          I'm not -- I'm not going to -- I'm going to let

6    you have a lot of leeway, but it's not a policy decision as

7    to whether or not the City had a good idea or in some

8    respects was trying to do something that was for the

9    benefit of the public.  That's important, but the question

10   is, in a significant degree, did the City comply with the

11   order.  And it was -- I remind everybody, it was a consent

12   decree.  The City agreed to do these things.

13         So we don't want to get -- it's certainly okay to

14   submit materials and we're going to have them before the

15   Court and they may be of some importance, but we don't want

16   to move so far away from the central issue in the case that

17   it's confusing.

18         So I'm certainly -- I know you want to present

19   those things.  I did focus in and talk about some of those

20   things in the order, and I think it does matter, but we

21   kind of have to see what's -- just like the standing issue,

22   just like -- you're right about that.  If the -- both --

23   both of you are right to focus on that because if the

24   Plaintiff in the case doesn't have the ability to bring the

25   case, then the case would be over.

1           So it's a couple of very key general

2    propositions.  So go ahead and certainly if you want to

3    talk about it, but you be mindful that you can't ordinance

4    your way out of the consent decree.

5           **MR. WELLFORD:**  We understand that, and the

6    purpose of showing the parts of the ordinances that we're

7    going to spend time on is to demonstrate what was

8    motivating, right or wrong, whether it was a correct

9    motivation or not --

10          **THE COURT:**  Sure, sure.

11          **MR. WELLFORD:**  -- what was motivating the conduct

12   of the director.  And we'll -- but I get the Court's point.

13   Believe me, I've been in here before and I understand that

14   what you want to hear is where you want to focus the case.

15          **THE COURT:**  Sure, absolutely.

16          **MR. WELLFORD:**  But in terms of what we do intend

17   to present to demonstrate the motivations of the director

18   on down, would you please turn to the second page --

19   actually -- of the ordinance.  Actually, let's go ahead and

20   skip down to the third page with the director's

21   obligations, the next page.

22          The ordinance does have an entire section that

23   places responsibilities on the director, and then the

24   following page.

25          **THE COURT:**  Well, you know, it's just not about

1    the ordinance.

2          MR. WELLFORD:  I understand, Your Honor.  And if

3    I could just -- if I could get it in the record, we'll move

4    on.

5          THE COURT:  No, no, no, that's perfectly fine.  I

6    have no problem at all.  I just don't want to create

7    confusion about the central focus of the case.

8          MR. WELLFORD:  I understand.

9          We will be pointing to the specific sections of

10   the permit ordinance that, on the next page, Page 4,

11   require the police director, direct him -- not as a legal

12   defense, but as a motivation to attempt to do certain

13   things --

14         THE COURT:  Right.

15         MR. WELLFORD:  -- that were, we think the

16   evidence is going to show, active in his mind as his

17   purpose, as his motivation, not as a legal defense.  We

18   acknowledge completely that the permanent ordinance is not

19   a legal defense to compliance with the consent decree.  So

20   with that, we'll move on past the permanent ordinance.

21         Now, we also want to demonstrate -- can you pull

22   up the timeline -- that what motivated not just the

23   director but the Office of Homeland Security in particular,

24   the Real Time Crime Center in particular and the police

25   command staff and, indeed, the entire police department was

1    a concern over safety issues; and that meant public safety,

2    that meant the safety of protesters themselves, that meant

3    the safety of counter-protesters who increasingly,

4    especially since Ferguson in 2014 where a lot of events

5    occur where you have protesters and counter-protesters and

6    when you have a lot of realtime activity associated with

7    that, the motivations of the police to try to prevent these

8    types of conflicts at the events were important.  And we

9    think the Court will hear evidence that that was their

10    motivations, and so some of the events that were motivating

11    them, we will briefly go through.

12         If we could start with the -- the events in

13    Ferguson are well-known and will not be discussed in great

14    detail, but one of the most significant things about

15    Ferguson for law enforcement in Memphis and elsewhere was a

16    tactic of shutting down thoroughfares and streets became

17    something that the department was concerned about and

18    wanted to prepare for.

19         In 2015, fueled in part by social media, a number

20    of high profile events nationally, including the Freddie

21    Gray incident in Baltimore, and in Memphis particularly,

22    including the Darrius Stewart incident with a Memphis

23    police officer and a shooting incident and the death of

24    Darrius Stewart, crystallized within Memphis a lot of

25    national events that were focused on the same sorts of

1    issues, often associated with the national or local

2    chapter, Black Lives Matter, movements at the time which

3    increased tension between law enforcement and protesters

4    and counter-protestors.  And the Darrius Stewart event

5    brought that home in the Memphis community.

6            And what the Court will hear is that the Office

7    of Homeland Security, which was up until about the time of

8    the Darrius Stewart shooting, very much focused on the

9    types of things you read about with the Federal Office of

10   Homeland Security, working in conjunction with State and

11   Federal agencies, very much focused on domestic,

12   international terrorism-type issues.  And it started to

13   shift a bit in 2015, started to shift particularly after

14   the Darrius Stewart shooting, so that the necessity of

15   planning for and trying to avoid confrontations in often

16   unpermitted and spontaneous events that were springing up

17   around Memphis in the aftermath of the Darrius Stewart

18   shooting became something that the Homeland Security's

19   office started focusing more of its attention upon.

20           As we entered into 2016, what you're going to

21   hear that is the Office of Homeland Security and Real Time

22   Crime Center react to hot button issues of the time.

23   Situational awareness is a term that the Court will hear.

24   And during 2015 and much of 2016, much of that was

25   associated with Black Lives Matter events and with the

1    aftermath in Memphis of the Darrius Stewart shooting, but

2    it wasn't the only issue.

3        And, in fact, one of the earliest uses of an

4    undercover social media account that's been referred to as

5    a Bob Smith account was associated with protests at the

6    Greensward in Overton park.  And it generated quite a lot

7    of activity and concern over disruption to public

8    thoroughfares and access to zoo property and the police's

9    concern about protecting the rights, private property

10   rights and public property rights of the zoo and those who

11   wanted to go in it, the rights of protesters, and to avoid

12   confrontations between people who were parking in a place

13   where lots of activists didn't think they should be

14   parking.

15       And we will see that one of the first things that

16   the Bob Smith account uncovered was an overt threat to hack

17   into the computer system at the Memphis Zoo.  And we think

18   that the evidence on that point -- and we understand that

19   the Court has found that it violated another section of the

20   decree, failing to get written authorization from the

21   director, but in terms of the motivation of the

22   surveillance, the motivation of the followup that was done

23   in connection with the hacking threat, none of it had to do

24   with the content or the opinions themselves.  It all was

25   focused, as we believe the Court will see, on the clear

1    threat of a criminal violation that was about to be

2    committed in the Memphis City Zoo's computer system.

3         Your Honor will end up hearing that as followup

4    to the investigation, the zoo's systems were sound enough

5    that they didn't believe that they had or could be hacked,

6    but the concern was focused on that and not the content of

7    the opinions.

8         Your Honor will also see that in 2016, which is a

9    particularly fraught time and a lot of the evidence in this

10   case will focus on events occurring in 2016, once again,

11   situational awareness, the Pulse nightclub shooting was a

12   very significant event in June of 2016.  The Plaintiffs

13   will spend a lot of time in this case talking about JIBs,

14   Joint Intelligence Briefings.  Your Honor has addressed

15   them in your order already.  We'll hear a lot about them.

16        The very first JIB that was published by the

17   Office of Homeland Security and distributed within and

18   certainly for a period of time without the police

19   department didn't concern Black Lives Matter, didn't

20   concern the Greensward.  It was specifically caused, the

21   catalyst for it was the Pulse nightclub shooting.  And the

22   very first event that's described in that JIB is a gay

23   pride awareness series of events in Memphis in the

24   immediate aftermath of that shooting and the importance of

25   keeping everyone safe.  So that was the motivating factor

1    between the JIBs.

2            July 2016 was probably the most tumultuous month,

3    barring the assassination of Martin Luther King, that the

4    Memphis Police Department has maybe faced in modern times,

5    and it concerned events that were occurring in Memphis as

6    well as elsewhere.

7            On July 5th, we had a high profile shooting

8    incident involving a law enforcement encounter and an

9    African-American man, Alton Sterling.  In Baton Rouge in

10   July 6th, there were violent protests following the deaths

11   of another African-American man who was involved in an

12   encounter with a Minnesota police officer.

13           And on July 7th, at a peaceful Black Lives Matter

14   rally, and that's one of the points that you're going to

15   hear, just because the organizers actually want a peaceful

16   event, just because the vast majority of the people at the

17   event are peaceful does not mean that terrible things can't

18   happen at the event.  And what happened in Dallas was a big

19   concern with the Memphis Police Department in the aftermath

20   of these other high profile events.

21           And then, of course, we are getting to the

22   bridge, but there was another quite controversial event on

23   July 10, 2016.  It was a celebration of Nathan Bedford

24   Forrest birthday.  It was an annual celebration, and people

25   would come in who had certain points of view that were not

1    popular with a lot of other people in Memphis concerning

2    Nathan Bedford Forrest.  It was a permitted event, but it

3    nonetheless occasionally caused counter-protests, caused

4    disruption, and the Memphis City Police Department was

5    sufficiently concerned about it that they deployed

6    undercover agents to -- undercover operatives to watch what

7    was going on at that event.

8         By the way, Your Honor, although we understand

9    the permit ordinance is not central to the case, I will

10   point out that part of the series of tools that the permit

11   ordinance provides the director is to deploy undercover

12   officers in connection with events where the director

13   reasonably anticipates disruptions to public safety.

14        Right or wrong, that's what they did and that was

15   the motivation for what they did on July 10th.  There was a

16   particular concern that the people at that rally would come

17   into contact with the people who were having a Black Lives

18   Matter allowed -- it didn't require a permit, but it was

19   permitted by FedEx Forum -- who were having a rally at the

20   FedEx Forum.  There was great concern that those two groups

21   would come into contact with each other.  They didn't, but

22   there's a lot of social media traffic that contained overt

23   threats that was being bandied about that that was a

24   realistic possibility.

25        We will spend some time talking about the bridge

 1    because it was a pivotal event in terms of the Memphis

 2    Police Department.  It was a wake-up call, tangible wake-up

 3    call for the Memphis Police Department about danger to

 4    infrastructure and the importance of protecting the City,

 5    protecting the people involved in the protest from the

 6    consequences of unlawful activity at events such as what

 7    led to the bridge.

 8         We have distilled about five hours of video in

 9    the evidence that we'll present to the Court in 28 minutes,

10    but we do wish to have a two-minute spotlight right now,

11    because it's an important focus of the case, on the events

12    of the bridge and we would ask to play that.

13         **THE COURT:**  It's not in evidence, and normally if

14    you want to play it, it's an argument.  It's going to be

15    submitted as evidence and it can be considered as evidence.

16    This is not argument.

17         **MR. WELLFORD:**  Then we'll pass it by if Your

18    Honor doesn't want to hear it.

19         **THE COURT:**  Well, I mean, it's not that I don't

20    want to.  It relates to the fact of whether or not it's

21    appropriate for opening statement.

22         **MR. WELLFORD:**  It is in evidence.  It's been

23    stipulated that they are admissible.  But, Your Honor, I

24    don't -- I want to move on because we will see a broader

25    version of this in the evidence.

1          **THE COURT:**  It's not exactly a brief opening.

2          **MR. WELLFORD:**  So we'll move on from the bridge

3     incident.

4          Suffice it to say that it generated great concern

5     within the department about similar events that were likely

6     to occur and that were threatened to occur on social media

7     and elsewhere in the days and weeks following.

8          Two days later, there was an unpermitted,

9     spontaneous demonstration at Graceland, which shut down

10    traffic, and arrests were made.  Three days after the

11    event, there was a nonpermitted protest on the grounds of

12    the Commercial Appeal.  And by the way, the evidence is

13    going to be that Commercial Appeal was reaching out to the

14    police department to make sure they were quite aware of

15    that and --

16         **THE COURT:**  Sure.

17         **MR. WELLFORD:**  -- watch what was going on.

18         **THE COURT:**  Right.

19         **MR. WELLFORD:**  We had reports of a National Day

20    of Rage, which turned out to not be something that happened

21    but were widely circulated nationally where locations

22    including Memphis were identified by a group called

23    Anonymous as having violent and disruptive events, and the

24    police took it seriously here, as they took a lot of the

25    threats that were being made.

1          One of the difficulties that the Memphis Police

2     Department had during this period of time is telling

3     unverified rumors from verified and important rumors.  They

4     would get -- and the Court will hear it in evidence, people

5     from the DEA would send them during this time frame, we

6     have a reliable report of a man coming across from Arkansas

7     with an AK15 and he's going to exercise his Second

8     Amendment rights.  And then we would have reports that were

9     unverified and turned out to not happen of, there's going

10    to be six shutdowns of streets at -- they would identify

11    the intersections around the city.  And part of what the

12    Office of Homeland Security and Real Time Crime Center were

13    tasked to do was anticipate which of these were real and

14    which were unlikely to happen, and that was what was

15    motivating them at the time.

16         The week after the bridge incident, we had other

17    high profile incidents involving shootings in Baton Rouge

18    of police officers, which concerned the officers a great

19    bit because they were concerned about their own personal

20    safety.

21         There's a JIB that Your Honor will see from

22    July 19 which references five different police shooting

23    incidents in different parts of the country, which, once

24    again, is what was a motivating factor behind what was of

25    the most pressing concern for the department at the time,

1    safety of the public, sometimes safety of protesters as

2    well as -- and definitely counter-protestors, and the

3    safety of the officers themselves.

4            During this period of time, Your Honor will see

5    evidence that the director actually was instructing the

6    people within his department to wear their vests everywhere

7    they went.  There were firecrackers -- fireworks that had

8    been set up under officer's cars.  These threats were real

9    and tangible to the Memphis Police Department during this

10   time frame.

11           **THE COURT:**  Well, there's no question that there

12   are many issues that the police department has to deal

13   with.  I don't think anybody in this -- is the ACLU saying

14   that they don't have to deal appropriately with threats of

15   violence?  ACLU, are you going to speak up there?

16           **MR. CASTELLI:**  No, that's not what we're saying,

17   Your Honor.

18           **THE COURT:**  Does most of this have much to do

19   with what we're talking about today?

20           **MR. WELLFORD:**  Respectfully, Your Honor --

21           **THE COURT:**  Excuse me.  I didn't ask you that

22   question.

23           **MR. CASTELLI:**  Your Honor, the ACLU will take the

24   position that this is not particularly relevant to our

25   discussion today.  We have not taken the position that the

1    City is not able, because of the decree, to investigate

2    certain incidents or to provide public safety.  Our focus

3    is really more on incidents where the City's gathering of

4    political intelligence had nothing to do with this public

5    safety concern.

6           **THE COURT:**  I don't think anybody's saying that

7    the director or the department is not able to take

8    appropriate steps to protect the public.  No one is saying

9    that.  That's not a central issue in the case.  I think we

10   need to stay focused.

11          The environment in which things occur

12   immediately, locally can be important.  The fact that there

13   are large national issues is less relating -- relevant to

14   whether or not the City complied with the 1997 consent

15   decree.  I can't go back and say it enough times.  It was a

16   consent decree.  It's an agreement between the City and

17   interested parties, including the ACLU, if the ACLU is able

18   to establish standing, to not engage in certain conduct,

19   and this is not about some of the things that are being

20   brought up.

21          I'm not saying it's not something we're not going

22   to listen to, because we are, and it may be that it can be

23   shown to have some relevance to the immediate situation

24   here in the context of a consent decree.  Maybe it can be,

25   but it's a pretty big jump, and that's -- that's the

1    problem about discussing matters that happened in Missouri

2    or -- and the tragedy in these situations in Dallas and

3    Louisiana, but it's not central to the issues that we have

4    to address.

5            I just don't -- I fear that we will be on a

6    proceeding that is not a -- focused on legal matters.

7            **MR. WELLFORD:**  And, Your Honor, we believe that

8    Your Honor has identified the key legal issue in this case

9    as whether the City was taking certain action -- one of the

10   remaining issues, whether the City was taking certain

11   actions for the purpose of political surveillance, and --

12           **THE COURT:**  Right.  And let's make it clear,

13   there can be multiple reasons that entities engage in

14   conduct.  You might do it to engage in political

15   surveillance.  You might also do it to do something else,

16   to attempt to preserve public safety.  Public safety is

17   important, but we need to stay -- very important, but we

18   need to focus a little bit more; otherwise, we will -- we

19   lose sight of why we're here, and that's what I'm worried

20   about.

21           **MR. WELLFORD:**  I understand, Your Honor.

22           **THE COURT:**  We wouldn't be here if the City had

23   not signed a consent decree.  We wouldn't be here in this

24   case in this context.

25           **MR. WELLFORD:**  I'm going to move on because --

1    based on the Court's admonition, we will attempt to focus

2    our evidence on what the motivating factors behind the

3    Memphis police officers and the executive level, Memphis

4    police --

5         **THE COURT:**  Sure.

6         **MR. WELLFORD:**  -- the director included, were

7    accused of doing, and we will demonstrate to the Court that

8    they were not motivated at all by political intelligence.

9    They were heavily motivated by these other things that I am

10   bringing up.

11        Let's move on to another -- so we'll play this in

12   evidence.  What I just skipped through was, you will hear

13   that there are videos of people in the weeks and months

14   following the event overtly threatening to take back the

15   bridge.  The department's concern over the bridge

16   specifically and other valuable parts of infrastructure was

17   a major motivating factor behind everything they were doing

18   during this time frame.  So I'll leave it at that and say

19   that the evidence will demonstrate that.

20        **THE COURT:**  And you're right, that's different

21   from talking about Dallas or Ferguson or someone else.

22        **MR. WELLFORD:**  And then with respect to the

23   die-in on Mayor Strickland's lawn and the AOA where the

24   Court -- we understand that -- and a lot of the evidence is

25   pre-permitted by the Court's order in terms of whether

1   that's political intelligence, but apparently the ACLU

2   still takes the position that the inclusion of the AOA list

3   by the chief of the mayor's security for a period of time

4   at the part of a security list at City Hall was motivated

5   for purposes of political intelligence and motivated by a

6   desire to intimidate and chill, and we think the complete

7   opposite is true.

8        It was motivated, frankly, by a desire to protect

9   the mayor and motivated by a desire to keep people from

10  coming back and trespassing on his private property.  It

11  morphed into something that, frankly, we think the evidence

12  is going to demonstrate it was not intended to be.  And

13  once that became obvious, that it had morphed into

14  something it wasn't intended to be, they pulled it off.

15  They pulled it back.

16       And the most pertinent fact is that during the

17  entire period of time, I think it was a six-week period

18  that the AOA list was included with a security list at City

19  Hall, no one was ever escorted the entire period of time,

20  which we think demonstrates that the motivation of the

21  department was not to chill, not to intimidate and not to

22  do anything for the purpose of political intelligence.

23       2017, events started occurring that were

24  unrelated to the -- a lot of the protests in 2016, but they

25  were overt threats to infrastructure.  The Valero Refinery

1    arrests, and the Court will see the photographs, the Court

2    will see the video, was an openly unlawful activity that

3    concerned an important part of Memphis infrastructure, and

4    the City took it seriously.  The director was personally

5    involved, directed an investigation into it, and the

6    motivations behind that had nothing to do with the content

7    of the political opinions that were being expressed.

8            What Your Honor is going to hear -- this is an

9    example of -- this is not a modification of the consent

10   decree, but one of the pieces of evidence that the Court's

11   going to hear with the removal of the Nathan Bedford

12   Forrest statue, that was another high profile event where

13   violence was anticipated, there was lots of chatter on

14   social media about people coming to town, what's going to

15   happen to them, what's going to happen to

16   counter-protestors who wish to confront them, what's going

17   to happen to the public.

18           And the City took its playbook, right or wrong,

19   the City took its playbook on how to address that situation

20   from the Charlottesville incident and a very thorough

21   report that was prepared that sort of summarized what went

22   right, what went wrong in Charlottesville.  And the City

23   was motivated to try to learn from that and try to protect

24   public order, not political intelligence in any manner or

25   respect whatsoever.

1         Some of the evidence that the Court is going to

2    see is quite alarming with respect to the blow-back from

3    that event, from the -- and you'll see the evidence of it.

4    Some of it is extremely strong language about threats to

5    the mayor, but we will also see that some of the evidence

6    that's coming forth on social media is more ambiguous.  And

7    part of what the Court will hear is that the department is

8    attempting, even as we speak, to react to the Court's

9    order.  The City is attempting to develop plans to

10   implement an effective system that can try to keep its

11   citizens safe while complying with the Court's order

12   because it takes it seriously.

13        **THE COURT:**  A consent order between the City and

14   the ACLU.

15        **MR. WELLFORD:**  You're correct, and I need to

16   withdraw that.

17        **THE COURT:**  I think suggesting that the Court

18   ordered that is simply not correct.

19        **MR. WELLFORD:**  Your Honor, I misspoke.  I

20   misspoke.

21        **THE COURT:**  Well, good.

22        **MR. WELLFORD:**  The Court's interpretation of the

23   consent decree is what the City's working with right now.

24        **THE COURT:**  You entered the consent decree,

25   Mr. Wellford.

1          **MR. WELLFORD:**  And the Court's going to hear how

2     we are attempting to comply with it right now.  At the end

3     of the case --

4          **THE COURT:**  If you enter into an agreement with a

5     party to do certain things and not do certain things,

6     that's important.

7          **MR. WELLFORD:**  It is.

8          **THE COURT:**  And the City -- that's the question.

9     It's not -- nobody's -- nobody forced the City to sign that

10    document.  The City did it on its own.  And everyone in

11    America would expect the City to live up to what it agreed

12    to do, and that's all that's being asked.

13          Now, I'm not sure it's going to come out, but the

14    mischaracterization of what occurred might be confusing to

15    others, and we don't want to do that.  We want to be

16    straightforward and honest about why we're here.

17          **MR. WELLFORD:**  At the end of the presentation, at

18    the end of the evidence, one of the things that the Court's

19    going to be asked to find is whether one of the remedies

20    for what you've already found or may find, depending upon

21    the evidence presented at the hearing, is whether a monitor

22    is going to be required.

23          **THE COURT:**  Sure.

24          **MR. WELLFORD:**  And so we are going to be

25    presenting evidence to demonstrate that the City takes its

1  responsibility seriously, the City is discussing and

2  putting into place plans that we believe would comply with

3  the Court -- with the consent decree, and that we have

4  moved to modify it and we will deal with that separately,

5  but unless and until it is modified, the City understands

6  that it is bound by the order, needs to follow the order,

7  and we believe --

8        **THE COURT:**  Bound by the consent decree.  We're

9  going to use the word "consent decree."  Is that okay?

10        **MR. WELLFORD:**  Well, I meant the consent decree.

11  The consent decree.  And that the City intends to follow it

12  and that there's not going to be a need for the Court to

13  appoint a monitor to ensure that the City complies with it

14  prospectively.

15        **THE COURT:**  Sure.

16        **MR. WELLFORD:**  That's going to essentially be our

17  evidence.

18        **THE COURT:**  Okay.  Well, I think we're all set

19  now.  And, Mr. Castelli, I think you need to call your

20  first witness.

21        **MR. CASTELLI:**  Thank you, Your Honor.  Plaintiff

22  calls Ms. Hedy Weinberg.

23

24

25

1                          *   *   *

2                    **HEDY WEINBERG,**

3  **was called as a witness and having first been duly sworn**

4  **testified as follows:**

5                  **THE COURT:**  We'll try to follow the same

6    procedure with every witness every time, which is, for the

7    sake of the reporter, every time asking the name and the

8    spelling of the name so that we're comfortable that we have

9    it the way it should be in the record.

10                 **MR. CASTELLI:**  Certainly.

11                    **DIRECT EXAMINATION**

12  **BY MR. CASTELLI:**

13   Q.   Could you state your name and spell your name for the

14   record, please?

15   A.   Sure.  Hedy Weinberg, H-E-D-Y, W-E-I-N-B-E-R-G.

16   Q.   Thank you.

17        Ms. Weinberg, what is your position with the ACLU of

18   Tennessee?

19   A.   I'm the executive director of the ACLU of Tennessee.

20   Q.   How long have you held that position?

21   A.   September 8th, 1984.

22   Q.   And can you explain kind of your obligations and duty

23   as executive director?

24   A.   Sure.  I am responsible for the overall operation of

25   the ACLU of Tennessee, and that involves oversight of the

DIRECT EXAMINATION OF H. WEINBERG                    42

1    administration, financial fundraising programs as well as

2    leading the staff in the design and implementation of our

3    campaigns and priorities to address and resolve current and

4    future civil liberties issues is.

5    Q.   And, Ms. Weinberg, in your role as executive director,

6    are you aware of when the ACLU of Tennessee was

7    established, what year?

8    A.   1978.

9          **MR. CASTELLI:**  I'd like to hand the witness an

10   exhibit for her to identify.

11         **THE COURT:**  You may approach the witness.

12         **MR. CASTELLI:**  Thank you.

13         **THE COURT:**  Certainly.

14   BY MR. CASTELLI:

15   Q.   Ms. Weinberg, can you look through that and then tell

16   -- identify the exhibit for me?

17   A.   Sure.  This is the Charter of Incorporation that was

18   signed and formally organized the ACLU of Tennessee.

19         **MR. CASTELLI:**  And for defense counsel, that was

20   pretrial Exhibit 184.

21         **THE COURT:**  Well, it's marked and received as

22   Exhibit 1 in the case?

23         **MR. CASTELLI:**  Yes, sir.  Yes, sir.  Just so they

24   can find it in their records.  Your Honor, we --

25         **THE COURT:**  Hopefully they'll have a full set,

1   which will be on the table up here, which will be marked 1

2   through the last one numbered.  So that will be Exhibit 1.

3   Have we got a sticker on it already?

4          **MR. CASTELLI:**  Let me retrieve it, Your Honor,

5   and get the sticker.

6          **THE COURT:**  That's fine.  We're going to get the

7   number on there.

8          (WHEREUPON, the above-mentioned document was

9   marked as Exhibit Number 1.)

10          **THE COURT:**  Of course, to the degree that it's

11   useful, we want things displayed on the screen, if

12   possible.

13          **MR. CASTELLI:**  Yes, sir.

14   BY MR. CASTELLI:

15   Q.   And so, Ms. Weinberg, you had just identified this as

16   the charter.  This was obviously a copy.  Was the original

17   charter -- where is the original charter kept?

18   A.   In our office in the file cabinet.

19   Q.   Okay.  And turning to Page 2, if you'll follow along

20   on your screen, can you tell the Court what the original

21   purpose was for the ACLU of Tennessee as reflected here in

22   this Exhibit Number 1?

23   A.   Sure.  This is before I was part of the ACLU of

24   Tennessee, but it states that the East Tennessee Civil

25   Liberties Union, Inc. and the Middle Tennessee Civil

1    Liberties Union, Inc. would merge and to become the ACLU of

2    Tennessee, and that in the future, at a future time, the

3    West Tennessee Civil Liberties, Inc. would, in fact, join

4    and become part of the statewide organization.

5    Q.   Can you describe just the relationship between the --

6    the term is used here, affiliate, with the ACLU with the

7    national organization?

8    A.   Yeah, the national organization is the umbrella

9    organization currently for our statewide affiliate, and

10   back then, the same -- it was the same.  So that if there

11   was a local chapter, branch, however they were referred to,

12   and it was loosely identified different ways, the national

13   ACLU was in relationship -- was in partnership with

14   those -- with those entities.

15   Q.   Can you explain to the Court what a chapter is?

16   A.   When I -- and I'm going to speak from my knowledge,

17   which is in 1984 when I came to the ACLU as ED, there were

18   about five chapters; one in the Memphis area, one in the

19   Chattanooga area, a Knoxville chapter, an Oak Ridge chapter

20   and a Chattanooga chapter.  And they were loosely -- loose

21   networks of individuals located in those communities who

22   were committed to ensuring that the promises of the Bill of

23   Rights were protected in their communities.

24   Q.   And when you came to the ACLU, how were chapters

25   formed?

1    A.   The ones I just identified were actually formed prior

2    to my coming.  If a community of people in a location

3    wanted to build a chapter, they would come to the ACLU of

4    Tennessee.  They needed approval.  They couldn't just sort

5    of formally organize.

6    Q.   And what would the approval -- what would determine or

7    what would tell you or the ACLU what was necessary to form

8    a chapter?

9    A.   Sure.  There was probably a lot of informal

10   conversation that took place before so that there was a

11   relationship that had already been developed, but the group

12   would have to prepare bylaws and -- which would describe

13   what their mission was and how they related to the

14   statewide organization.

15   Q.   Okay.  This might be quicker.  I can put this document

16   that is -- Ms. Weinberg, if you can -- let's see.  Pull it

17   down there.  Do you recognize this document that I've put

18   on your monitor?

19           **MS. SILK:**  Your Honor, what -- we need to know

20   what the exhibit is.

21           **THE COURT:**  Right, exactly.

22           **MR. CASTELLI:**  I'm sorry.  It's Exhibit --

23           **THE COURT:**  It will be Exhibit 2; is that

24   correct?

25           **MR. CASTELLI:**  We'll mark this -- yes, we'd ask

 1    this to be marked as Exhibit 2.

 2              **THE COURT:**  These are not disputed as to their

 3    authenticity or admissibility, as I understand it, and so

 4    we'll let you present it and just ask that it be marked.

 5              If there is a dispute as to either authenticity

 6    or admissibility, then we'll address it right then.

 7    Otherwise, most -- almost everything is going to be both

 8    authentic and admissible, as I understand the parties.

 9              **MR. CASTELLI:**  Yes, Your Honor.

10              **THE COURT:**  That's marked as 2, that's bylaws of

11    1973, I believe; is that right?

12              **MR. CASTELLI:**  Yes, sir.

13              (WHEREUPON, the above-mentioned document was

14    marked as Exhibit Number 2.)

15    BY MR. CASTELLI:

16    Q.   And I was going to ask the witness there at the top of

17    the page there, could you read the date for the record?

18    A.   As revived March 1973.

19    Q.   Is revived a typo, do you imagine?

20    A.   I think so.  It's revised.

21    Q.   Okay.  And turning here then to -- well, first of all,

22    turning to the next page, we'll talk about the discussion

23    about board of directors.  What role did the chapter

24    membership have in forming the ACLU of Tennessee's board?

25    A.   As I recall, the board was composed of chapter

1    representatives, and those -- the number of representatives

2    was based on the size of the membership at the time.

3        So I mean, again, relating to when I joined, there

4    were probably nine chapter representatives, there were,

5    from Memphis and there were actually nine from -- eight or

6    nine from Nashville.  Few were from Knoxville, Oak Ridge,

7    and Chattanooga.

8    Q.   And turning to the next page here at the bottom of the

9    page, can you identify Article 8 there for the record?

10   A.   Okay.  Article 8?  Oh yes.  That's very clear and, you

11   know, states that the chapters are chartered by the ACLU of

12   Tennessee board of directors where there's an interest and

13   a commitment to adhering to the mission of the

14   organization, and they presented bylaws to ensure that

15   they're, you know, adhering to that commitment.

16       And again, that the chapter's Section 2 speaks about a

17   chapter being disbanded, either being revoked for cause or

18   absence of activity.

19   Q.   And then that -- does that article continue on to the

20   second page, discussing the chapters?

21   A.   I'm sorry, which one?

22   Q.   On the -- on the next page there at the top of -- is

23   that the continuation of sections about chapters?

24   A.   Yeah.  Again, making it very clear, the chapters only

25   exist because they're part of the ACLU of Tennessee, and

1    the bylaws which formalize their establishment have to be

2    approved by the board of directors of the ACLU of

3    Tennessee.

4          There's additional conversation about requiring

5    proposed programs, activities and a budget that has to be

6    and had to be at the time submitted to the ACLU of

7    Tennessee in order for the ACLU of Tennessee to provide

8    funds to support those programs.

9          Yeah, the Section 5, we -- again, this is before my

10   time, but it was the same conversation that took place

11   besides just chapters, you know, based on members that the

12   student -- there could be student chapters, as well, and

13   again, that the ACLU of Tennessee had to formalize and

14   charter those chapters.

15   Q.   And so those would be chapters at universities,

16   student chapters?

17   A.   Exactly.

18   Q.   Okay.  As far as in the bylaws from 1973, can you read

19   Article 4 there about the -- who is a member of the ACLU of

20   Tennessee?

21   A.   All members in good standing of the American Civil

22   Liberties Union, Inc. resident within the state of

23   Tennessee shall be deemed members of the ACLU of Tennessee.

24   Q.   So a member of the national organization that is

25   within a resident of the entire state of Tennessee,

1    wherever they're found in Tennessee, would automatically

2    become a member of the ACLU of Tennessee?

3    A.    Exactly.  And that's right today.  If you're a member

4    of the ACLU of -- ACLU, you automatically become a member

5    of the affiliate in the state with which you reside --

6    within which you reside.

7    Q.    And here's an exhibit.

8          Speaking of today, are there chapters of the ACLU of

9    Tennessee currently?

10   A.    There are no chapters.  That's a model that's no

11   longer being used across the country.  There are just a

12   couple affiliates that still have chapters remaining, but

13   there's not a chapter structure that is part of the ACLU of

14   Tennessee.

15   Q.    And were you involved in phasing out that structure

16   for ACLU of Tennessee?

17   A.    Yes.  Those chapters were phased out.  I think

18   probably by 2000, there were no longer chapters.

19          **MR. CASTELLI:**  I'm going to ask to mark this as

20   Exhibit 3.

21          **THE COURT:**  Marked and received.  Announce what

22   it is very briefly.

23          **MR. CASTELLI:**  Sure.  Your Honor, these are

24   minutes from 1975 of the board of directors meeting.

25          **THE COURT:**  That's fine.  That's no problem.

1    Minutes 1975.

2              (WHEREUPON, the above-mentioned document was

3    marked as Exhibit Number 3.)

4    BY MR. CASTELLI:

5    Q.   And, Ms. Weinberg, do you recognize these -- this

6    document that I put on the screen?

7    A.   Yes.  That's an agenda from a meeting in the fall of

8    1975, the ACLU of Tennessee board of directors.

9    Q.   Okay.  And so then the second page, is that -- what is

10   that?

11   A.   And that's the list of board members at the time.  And

12   as you can see, they come from across the state.  There was

13   a commitment to always have members from across the state

14   compose the ACLU of Tennessee board of directors.  So there

15   were a list of various chapters representatives.

16   Q.   And the first chapter listed, Ms. Weinberg, is which

17   one?

18   A.   The West Tennessee chapter.

19   Q.   Okay.  And what was the date at the top of the

20   minutes?

21   A.   October 4, 1975.

22   Q.   And again, obviously this is a copy, but are the

23   original minutes -- where are they maintained?

24   A.   Yes.  They sit in our office in a very old folder.

25   Q.   Thank you.

DIRECT EXAMINATION OF H. WEINBERG                51

1           **MR. CASTELLI:**  We'll mark this as Exhibit 4.

2           **THE COURT:**  Certainly, marked and received as 4

3    without objection.

4               (WHEREUPON, the above-mentioned document was

5    marked as Exhibit Number 4.)

6    BY MR. CASTELLI:

7    Q.   And, Ms. Weinberg, here's another document,

8    unfortunately not quite as clear at the beginning as the

9    last one.  But can you identify it, please, for the record?

10   A.   Again, minutes of the ACLU of Tennessee dated

11   December 11th, 1971.

12   Q.   And you had talked earlier about how chapters needed

13   to submit bylaws to the ACLU of Tennessee.  Can you read --

14   I believe it's like -- under the part that is obscured --

15   well, actually, I can use this.  Can you read this

16   paragraph that I've marked there?

17   A.   Sure.  The Chairman reported on the new Upper East

18   Tennessee Chapter.  The bylaws of this group have been

19   adopted and approved.

20   Q.   And was there an Upper East Tennessee Chapter when you

21   came to the ACLU in 1984?

22   A.   I don't recall one.

23   Q.   Okay.  But this is an example of the chapter formation

24   process; is that correct?

25   A.   That's correct.

DIRECT EXAMINATION OF H. WEINBERG                    52

1    Q.    Okay.

2    A.    But we have members across the state, so you didn't

3    have to be affiliated necessarily.

4    Q.    Okay.  So if you weren't a member or affiliated with a

5    chapter, you could still be a member of the ACLU of

6    Tennessee?

7    A.    Exactly.

8              THE COURT:  Can you go down to the last page of

9    the minutes?

10             MR. CASTELLI:  Your Honor, I'm sorry?

11             THE COURT:  The last page of the minutes?

12             Go ahead.  I'm not sure if there's a reference to

13   the ACLU West Tennessee or not, not necessarily on the last

14   page.  I was just -- I don't have the document in front of

15   me.

16             MR. CASTELLI:  I don't believe there is in this

17   document, Your Honor.

18             THE COURT:  Okay.

19             MR. CASTELLI:  And we'll mark this document as

20   Exhibit Number 5.

21             THE COURT:  Certainly, marked and received as 5.

22   Try to announce briefly what it is.

23             MR. CASTELLI:  Which is the complaint to the

24   Kendrick V. Chandler case.

25             THE COURT:  No problem.

1           (WHEREUPON, the above-mentioned document was

2    marked as Exhibit Number 5.)

3  BY MR. CASTELLI:

4    Q.   Ms. Weinberg, do you recognize the document that I've

5    put on the screen?

6    A.   I do.

7    Q.   What is it?

8    A.   It's the complaint from the Kendrick case.

9    Q.   Were you aware of this case when you became executive

10   director?

11   A.   I'm pretty sure we discussed it and I learned about it

12   possibly even at the interview.  Bruce Kramer was one of

13   the people who interviewed me for the position, and this

14   always stood out as an important case, probably starting --

15   the Scopes case and this case were important cases to the

16   ACLU.

17   Q.   Of course, ACLU of Tennessee did not exist when the

18   Scopes case was tried.

19   A.   It did not.  I apologize.

20   Q.   Turning to the section here about the parties in the

21   case, could you read for the record the beginning of

22   Paragraph C there?

23   A.   Sure.  The American Civil Liberties Union of West

24   Tennessee, Inc. is a chapter of the American Civil

25   Liberties Union of Tennessee, Inc., which is an affiliate

1   of the American Civil Liberties Union, all being nonprofit,

2   nonpartisan organizations dedicated to the preservation of

3   citizens rights and liberties guaranteed by the

4   Constitution and the laws of the United States.

5   Q.   Thank you.

6        Are you aware of an organization known as the West

7   Tennessee Civil Liberties Union, Incorporated?

8   A.   No, I don't know that organization.

9   Q.   Have you become aware of it because of this case?

10  A.   I have certainly become aware of it, but I never had

11  thought about it or heard about it prior to that or thought

12  about it really.

13  Q.   Do you know whether the West -- whether there was any

14  kind of corporation called the American Civil Liberties

15  Union in West Tennessee, Incorporated -- or of West

16  Tennessee, Incorporated?

17  A.   No -- incorporated?

18  Q.   Yeah.

19  A.   No.

20       **MR. CASTELLI:**  Your Honor, those are all my

21  questions for Ms. Weinberg.

22       **THE COURT:**  All right.  Cross-examination.  Ms.

23  Silk, yes, ma'am.

24       **MS. SILK:**  Good morning, Your Honor.

25       **THE COURT:**  Good morning.

1                          **CROSS-EXAMINATION**

2  **BY MS. SILK:**

3  Q.   Good morning, Ms. Weinberg.

4  A.   Good morning.

5  Q.   Ms. Weinberg, you were not affiliated with the ACLU of

6  Tennessee in 1976 when the Kendrick complaint was filed,

7  were you?

8  A.   I was not.

9  Q.   And you were not affiliated with the ACLU of Tennessee

10  when the Kendrick consent decree was entered in 1978, were

11  you?

12  A.   I was not.

13  Q.   So you have no personal knowledge of the Plaintiff or

14  the group of people that made up the Plaintiff that was the

15  party to the 1978 Kendrick consent decree, do you?

16  A.   I know Mr. Kendrick.  I haven't seen him for many,

17  many years, but he was a colleague, because he left

18  Tennessee and went to another affiliate.

19  Q.   Okay, but I should have been more clear.  You don't

20  have any personal knowledge of the entity that was also a

21  Plaintiff of the 1978 Kendrick consent decree, the American

22  Civil Liberties in West Tennessee, Inc.?  I believe you

23  stated that earlier.  Is that correct?

24  A.    I don't -- I only know the West Tennessee Chapter of

25  the ACLU of Tennessee.

1    Q.   Okay.  So it's your position that the Plaintiff in the

2    Kendrick case was the West Tennessee Chapter; is that

3    correct?

4    A.   My understanding was that it was the ACLU of Tennessee

5    because typically -- I mean, the West Tennessee Chapter was

6    very engaged in it and part of it, but I see them as one

7    entity because the West Tennessee Chapter doesn't exist

8    without the ACLU of Tennessee.

9    Q.   Let's take a look at the Kendrick consent decree

10   itself.  This is known as Plaintiff's Trial Order 182.

11           THE COURT:  Do you want to just mark one so you

12   can -- so you can display it?  Will that be easier?  Might

13   be easier.  I know it's part of the record, but...

14           MS. SILK:  I'm sorry?

15           THE COURT:  Why don't we mark one --

16           MS. SILK:  Okay.

17           THE COURT:  -- so that everybody can use the same

18   document.

19           MS. SILK:  Okay.  Let's mark the --

20           THE COURT:  Right.

21           MS. SILK:  Let's mark the Kendrick --

22           THE COURT:  That will be 6.

23           MS. SILK:  Number 6.

24           THE COURT:  No problem.  That way, you can show

25   it and be -- everybody can use the same document.

CROSS-EXAMINATION OF H. WEINBERG                    57

1            (WHEREUPON, the above-mentioned document was

2      marked as Exhibit Number 6.)

3            **THE COURT:**  Okay.  That will be marked as 6, and

4      that's the consent decree ACLU.

5  BY MS. SILK:

6      Q.   Ms. Weinberg, is the ACLU of Tennessee listed as a

7      party in the heading of the 1978 consent decree?

8      A.   In the heading -- well, it says et al.

9            **THE COURT:**  Why don't you put it up?  I mean,

10     that's the idea of putting it on the screen.

11           **MS. SILK:**  I'm sorry.  Oh, I thought he was going

12     to pull it up.

13           **THE COURT:**  Just lay it down.  I think you've got

14     it.  You're in good shape.  That's very easy.  Sure.

15           **MS. SILK:**  Okay.

16  BY MS. SILK:

17     Q.   So is the ACLU of Tennessee listed here as a party?

18     A.   The highlighted part or the heading?

19           **THE COURT:**  Well, let's use the one that's in the

20     evidence and not the one on the screen, because it has

21     highlighting and that constitutes an argument.  So we won't

22     be using that.

23           **MS. SILK:**  Okay.

24  BY MS. SILK:

25     Q.   So do you see on this page in the first paragraph or

1    in the heading the ACLU of Tennessee, Inc. listed in the

2    consent decree?

3    A.   Well, it reads American Civil Liberties Union in West

4    Tennessee.

5    Q.   But it does not read American Civil Liberties Union in

6    Tennessee, Inc.?

7    A.   It does not.

8    Q.   Thank you.

9         Now, let's go back to the entity that was listed in

10   the exhibit, I believe it was 5, the Kendrick complaint.

11        **THE COURT:**  You should have all the exhibits

12   right there at the table.

13        **MS. SILK:**  Okay.

14        **THE COURT:**  And that's -- if we use the same

15   document every time, we don't have to worry about what

16   we're using.

17        **MS. SILK:**  Yes, Your Honor.

18   BY MS. SILK:

19   Q.   So as opposing counsel has pointed out, the Plaintiff

20   in the complaint is the American Civil Liberties Union in

21   West Tennessee, Inc.; is that correct?

22   A.   That's what it says, correct.

23   Q.   Okay.  You don't know when that entity was formed, do

24   you?

25   A.   My understanding was there was never an American Civil

CROSS-EXAMINATION OF H. WEINBERG                    59

1    Liberties Union in West Tennessee, Inc.  It was the

2    American Civil Liberties Union of Tennessee, Inc.

3    Q.   But you weren't affiliated with the ACLU of Tennessee

4    at this time, so you wouldn't necessarily have any

5    knowledge of this entity, the American Civil Liberties

6    Union of West Tennessee, Inc., would you?

7    A.   I understand what you're saying.  There's always been

8    an understanding that the American Civil Liberties Union of

9    Tennessee, when it was incorporated, was a statewide

10   organization that included whatever past organizations had

11   been engaged in ACLU work in the state.

12   Q.   So you testified earlier that to become a chapter of

13   the American Civil Liberties Union of Tennessee, Inc., that

14   you would have had to have bylaws; is that correct, the

15   chapter would have had to have bylaws?

16   A.   That was the requirement and what we assumed happened

17   at the time.

18   Q.   And you have not and cannot provide any documents

19   reflecting the creation of the American Civil Liberties

20   Union of West Tennessee, Inc. as a chapter of the ACLU of

21   Tennessee, Inc., can you?

22   A.   No.  That's -- I don't know that it existed with that

23   name.

24   Q.   Okay.  Can you -- you can't provide any bylaws of a

25   West Tennessee Chapter that existed during the time of the

1    Kendrick consent decree or complaint, can you?

2    A.   I don't recall any.

3    Q.   Well, I will submit to you that in response to the

4    request for production, the ACLU of Tennessee supplied 561

5    pages of documents, none of which contained the bylaws of

6    the West Tennessee Chapter of the ACLU of Tennessee, nor

7    did they include the bylaws of the Plaintiff, American

8    Civil Liberties Union of West Tennessee, Inc.

9         So I'm asking, I guess, one last time, if you have any

10   documentation at all that the -- either of these two

11   entities' bylaws were ever formally adopted, pursuant to

12   your own bylaws, to become an official chapter of the ACLU

13   of Tennessee, Inc.

14   A.   Again, as you said, I wasn't there then.  And

15   sometimes what is officially required doesn't always --

16   because it was a very informal network.  And so whether or

17   not they were ever shared with the board, I don't know.

18   Q.   Okay.  Let's take a look at Exhibit 4 again.  So your

19   attorney noted to the Court that in 1971, that the bylaws

20   for the Upper East Tennessee Chapter had been adopted and

21   approved.  So there was obviously some sort of recording of

22   the type of when this event would occur, correct?

23   A.   Correct.

24   Q.   Do you have any minutes in your possession, custody or

25   control that evidence when the bylaws for the West

1    Tennessee Chapter were ever adopted and approved?

2    A.    If they were not submitted to you, we must not have

3    them.

4    Q.    Please look at Exhibit 3.  I'm going to go to Page 2.

5    Exhibit 3 is the minutes of the meeting of the American

6    Civil Liberties Union of Tennessee from October 4th, 1975.

7    And if you go down to the bottom here, you can see that the

8    Middle Tennessee Chapter distributed copies of the bylaws

9    of the Middle Tennessee Civil Liberties Union, Inc. and

10   they were approved.  Do you see that there?

11   A.    I do.

12   Q.    So in 1971, you have minutes showing that the East --

13   the Upper East Tennessee Chapter's bylaws were approved.

14   And then four years later, you see that the Middle

15   Tennessee Chapter's bylaws were approved.  But yet, we

16   don't have any bylaws or minutes showing that the West

17   Tennessee Chapter's bylaws were ever approved; is that

18   correct?

19   A.    That's correct.

20   Q.    Let's talk for a second about the entity that your

21   attorney mentioned to you, the West Tennessee Civil

22   Liberties Union, Inc.  Now, you testified that you don't

23   have any personal knowledge of that entity; is that

24   correct?

25   A.    Correct.

1          **MS. SILK:**  So if you could pull up stipulated

2     fact Number 9 and 12, Matt, please.

3  BY MS. SILK:

4     Q.    So these are stipulated facts from the pretrial order

5     that governed this hearing.  And you can see here that the

6     ACLU of Tennessee, Inc. has stipulated that the entity

7     known as West Tennessee Civil Liberties Union, Inc. existed

8     in 1967, and that if we go to Number 12, which is above it,

9     that that entity was dissolved as a corporate entity in

10    1983.

11    A.    Uh-huh.

12    Q.    Do you see that?

13          So it's been stipulated that the West Tennessee Civil

14    Liberties Union, Inc. was operating from 1967 until 1983,

15    correct?

16    A.    When you say operating, I'm not sure what you mean.  I

17    don't --

18    Q.    Well, it existed as a corporate entity.

19    A.    It existed, uh-huh.

20    Q.    And then your position is that there's also a second

21    entity known as the West Tennessee Chapter, unrelated to

22    this entity, that was also operating during this same time

23    frame; is that correct?

24    A.    The West Tennessee Chapter was engaged with the ACLU

25    of Tennessee.  I don't know that the West Tennessee Civil

1    Liberties Union, Inc. was engaged in activity during this

2    time period after 1968.

3    Q.   But you acknowledge that it existed as a corporate --

4    A.   It says that here, yes.

5    Q.   So since you've stipulated that the West Tennessee

6    Civil Liberties Union, Inc. existed from '67 to 1983 but

7    now you're asserting that a different entity that was a

8    party to the consent decree, that that was -- you're saying

9    it was the West Tennessee Chapter although the document

10   says American Civil Liberties Union of West Tennessee,

11   Inc., it follows that in the '70s, there were clearly at

12   least two groups of people who were acting in the name and

13   the spirit of the ACLU in West Tennessee; is that correct?

14   A.   I just don't know that.

15   Q.   But you can -- but you've stipulated that the West

16   Tennessee Civil Liberties Union existed and then you've

17   asserted that you had your own chapter.

18   A.   Again, I wasn't here, so I can't speak to what was

19   actively happening.  I see on what paper what you're

20   referencing.

21   Q.   Understood.

22        So if, indeed, the West Tennessee Civil Liberties

23   Union, Inc. was at one time a chapter of the ACLU or

24   operating in the name of the ACLU but it never became a

25   part of the ACLU of Tennessee, it's possible, isn't it,

1    that the American Civil Liberties Union in West Tennessee,

2    Inc., which was a party to the Kendrick decree, also chose

3    to never become an official chapter of the ACLU of

4    Tennessee?

5    A.   I don't think that's correct because if you look at

6    the signed order and Jack Novac, who's part of the American

7    Civil Liberties Union Foundation, their relationship with

8    the ACLU of Tennessee was such that that's why the ACLU of

9    Tennessee was, in fact, a party to this case.  Does that

10   make sense?

11   Q.   It does -- I understand what you're saying, but the

12   Plaintiff that is listed on the consent decree is not Jack

13   Novac; is that correct?

14   A.   Correct.  He's not the Plaintiff.  He's the attorney

15   who would have been engaging with Mr. Kramer and Mr. Herder

16   on behalf of the ACLU of Tennessee.

17           **MS. SILK:**  I would like to mark Plaintiff's Trial

18   Number 195 as the next exhibit.

19           **THE COURT:**  We don't have -- we're just going to

20   call them Exhibit 7.  How is that?

21           **MS. SILK:**  Okay.

22           **THE COURT:**  And just identify the document versus

23   the other number unless it -- it's okay to do it, but

24   it's a -- we want to avoid confusion if we can.

25           **MS. SILK:**  Understood.

1      **THE COURT:**  No, that's fine.  And you can display

2      that when you're ready.  And, of course, we'll use the

3      overhead and not the computer.

4           (WHEREUPON, the above-mentioned document was

5      marked as Exhibit Number 7.)

6    BY MS. SILK:

7      Q.   At the time of the Kendrick decree in --

8      **THE COURT:**  You can display that on the ELMO.

9      **MS. SILK:**  I'm sorry, Your Honor.

10     **THE COURT:**  That's fine.

11   BY MS. SILK:

12     Q.   So these are the board of director meetings from --

13     the meeting minutes from September 2nd, 1969 and it looks

14     to be the Tennessee -- the ACLU of Tennessee.

15          So if we scroll down here to the bottom, to the last

16     paragraph, a chapter of the ACLU of Tennessee owed some

17     fairly significant responsibilities to the state affiliate;

18     is that correct?

19     A.   It did, uh-huh.

20     Q.   So let's read through here in this paragraph.  It

21     states, "The chapters must sacrifice income, raise money

22     for local problems and even consider the prospect of

23     raising local moneys as to support the state affiliate

24     office.  Mr. Clayton concluded that the Tennessee -- the

25     TACLU might consider or be forced by economics to give up

1    the state office unless the chapters were willing to make

2    the sacrifices necessary."

3        Is that what the document says?

4    A.   That's what the document says, yes.

5    Q.   So it's possible then, isn't it, that the American

6    Civil Liberties Union in West Tennessee, Inc. that was a

7    party to the Kendrick consent decree could have reasonably

8    decided that it was not willing to make the sacrifices

9    necessary --

10           **THE COURT:**  Possible is not a relevant standard.

11   It's probable or improbable.

12           **MS. SILK:**  Yes, Your Honor.

13           **THE COURT:**  You know, it's possible that anything

14   happened.  So that's not a relevant standard.  We'll let

15   you rephrase your question, just so we have some relevant

16   evidence.

17           **MS. SILK:**  So it's not improbable.

18           **THE COURT:**  That's fine.  No problem.

19   BY MS. SILK:

20   Q.   It's not improbable that a group of people acting as a

21   chapter of the ACLU of Tennessee, including the party that

22   was an entity listed on the Kendrick complaint, could have

23   decided that they were not willing to make the sacrifices

24   necessary to be an official chapter of the ACLU of

25   Tennessee, right?

1    A.    I don't know who Mr. Clayton is.  I do know that once

2    the ACLU -- whenever a state affiliate is organized and

3    incorporated, they then become the formal entity.  So I'm

4    not quite sure if a chapter in and of itself could exist

5    and be identified with ACLU.

6    Q.    Well, my question is, you know, if the chapter decided

7    that it did not want to raise money for the affiliate, the

8    Tennessee -- the ACLU of Tennessee, then it would no longer

9    be considered a part of the ACLU of Tennessee; is that

10   correct?

11   A.    But it would also not be part of the ACLU, I don't

12   think, because of the way the structure was formulated,

13   because the goal back then was to build statewide

14   affiliates.  So chapters existed --

15   Q.    Understood.

16         So if a group decided that it was not willing to make

17   the sacrifices necessary and it was not a part of the state

18   affiliate or the national affiliate, then it couldn't

19   reasonably be considered at a later time to be a part of

20   the entity that it decided to disassociate itself with; is

21   that correct?

22   A.    Well, one, I don't think that happened.  And number

23   two, I think they're talking here about giving up the state

24   office, not necessarily changing the relationship with the

25   affiliate.

1   Q.   Right.  But my question is that they -- they were

2   going to have to give up the state office unless the

3   chapters were willing to make the sacrifices necessary?

4   A.   I understand what you're saying, and perhaps that's

5   what they meant.  I don't read it exactly like that.  I

6   think there was a lot of relationships between chapters and

7   the state affiliate and who kind of, you know, made -- how

8   decisions were made, and it was a new relationship that was

9   forming because there was a staff person and new director

10   in that position.

11   Q.   Okay.  I want to go back to Exhibit 5.  This is the

12   complaint filed in the Kendrick V. Chandler case in 1976.

13   Let's flip to Page 3 of the document.

14       So here for a moment, we're -- it should be noted that

15   the designation WTCLU is referring to the entity the

16   American Civil Liberties Union of West Tennessee, Inc.  And

17   here it says, "On information and belief, the WTCLU alleges

18   that it has been the subject of unlawful surveillance by

19   the Memphis Police Department's Domestic Intelligence

20   Unit."  Is that correct?

21   A.   Yes.

22   Q.   Does it say in here that the American Civil Liberties

23   Union of Tennessee alleged that it had been the subject of

24   unlawful surveillance by the Memphis Police Department?

25   A.   It doesn't say there -- say that there.  The use of

1    acronyms changes throughout a lot of these documents in a

2    lot of our history.

3    Q.   Okay.  Now, flip to Page 12 if you will, please.

4    That's the wrong page.  I apologize.

5         Flip to Page 7.  I'm sorry.  Okay.  In Paragraph 12,

6    it states that, "Prior to 2:30 p.m. on September 10th,

7    1976, the Plaintiff Chan Kendrick, individually and in

8    official capacity as executive director of the American

9    Civil Liberties Union of Tennessee, and Plaintiff WTCLU

10   requested that the Defendants not destroy, alter or

11   disseminate any of the files maintained by the Domestic

12   Intelligence Unit."  Is that what it says?

13   A.   It says that, yes.

14   Q.   Okay.  So it seems to me and does it seem to you that

15   there's -- that this paragraph is drawing a distinction

16   between American Civil Liberties Union of Tennessee, and

17   the Plaintiff WCLU, does it not?

18   A.   I understand what you're saying, but just given the

19   history of the organization, WTCLU or West Tennessee

20   Chapter would be part of the ACLU of Tennessee at that

21   time.

22   Q.   But just for the record, the American Civil Liberties

23   Union of Tennessee is not designated as a Plaintiff in this

24   paragraph, is it not?

25   A.   It's not designated in that paragraph.

1    Q.    Thank you.

2          So as I'm sure you're aware, the Kendrick complaint,

3    as you can see on the first page, was filed in 1976?

4    A.    Uh-huh.

5    Q.    And I will submit to you that the Kendrick consent

6    decree was filed in 1978.  You don't have any personal

7    knowledge of what transpired within the organizational

8    structure of the ACLU of Tennessee, Inc. between the time

9    of 1976 and 1978, do you?

10   A.    I do not.

11   Q.    It's not improbable, is it, that the organizational

12   structure could have changed between 1976 and 1978?

13   A.    It might have.  Again, I don't have that knowledge.

14   Q.    Chapters were coming and going all the time during

15   this time; is that correct?

16   A.    Right.  There were casual relationships, I suppose.

17   But there was also some commitment to try to engage and

18   energize people within the various communities and the

19   excitement about being part of the ACLU of Tennessee, the

20   newly formed -- you know, formed in 1968, kind of drew

21   people together.

22   Q.    Does the ACLU of Tennessee have any evidence that the

23   party that was here on the complaint in 1976 was the same

24   entity that the City entered into an agreement with in

25   1978?

1   A.   I don't know that, except to say the history I always

2   learned both from people within the organization in

3   Tennessee and then from Mr. Kendrick, who was an executive

4   director and a different affiliate, was that this was an

5   ACLU of Tennessee case.

6   Q.   Thank you.

7        I'm going to go back to the bylaws from 1973.  That's

8   Exhibit 2.  Opposing counsel showed this document to you as

9   the bylaws for the ACLU of Tennessee, Inc. from 1963.

10            **THE COURT:**  We're actually going to take our

11   morning break right now.

12            **MS. SILK:**  Okay.

13            **THE COURT:**  And then we'll come back.  We'll be

14   out for about 12 minutes.  We'll see everybody in

15   12 minutes.  Of course, don't discuss the case with anybody

16   else.  And we'll see you at that time.  This is our morning

17   break.  And we'll probably take our lunch break close to

18   12:15 or 12:20.  Thanks very much.

19            (Brief Recess)

20            **THE COURT:**  Okay.  We're ready to proceed.  I

21   probably need to remind everybody that the Judicial

22   Conference rules prohibit broadcasting from a courtroom,

23   just so everybody knows.  And there's only one official

24   record, and that is the record prepared by the court

25   reporter.

1            So I think everybody knows that.  We don't make

2     those rules, but we are obligated to follow them, so --

3     just like in every other case, we're going to follow the

4     rule in that regard.  I think that covers it.

5            Yes, ma'am.

6            **MS. SILK:**  I'm ready to proceed if you are.

7            **THE COURT:**  Are you examining from there?  You're

8     welcome to come back up.  That's fine.  No problem at all.

9  BY MS. SILK:

10    Q.   We left off at trial Exhibit 2.  Do you have that in

11    front of you there, Ms. Weinberg?

12    A.   I do.

13    Q.   Could you please flip to the Page 3, which you've

14    already read, Article 8, Chapters, Section 1, 2, and then

15    we're actually going to read from Section 3 of that article

16    on Page 4.  And there it says, "Bylaws for any chapter

17    shall not go into effect until they have been approved by

18    the board of the directors of the affiliate."  Is that

19    correct?

20    A.   That's what it says, yes.

21    Q.   And in Section 4, it states, "Each chapter shall

22    submit a proposed program and budget and a review of the

23    previous year's activities each year within one month

24    following the annual meeting of the affiliate.  The board

25    of directors shall allocate funds to the chapter as it

1    deems appropriate."  Is that what it says?

2    A.   It does.

3    Q.   So those are fairly specific requirements for a

4    chapter; is that correct?

5    A.   Yeah, and it's on paper, not necessarily always

6    happens that way, but yes.

7    Q.   But the ACLU of Tennessee has not provided any bylaws

8    for the West Tennessee Chapter at any time, much less the

9    time pertinent to the Kendrick complaint; is that correct?

10   A.   That's what I understand.

11   Q.   And what about this requirement that each chapter

12   submit a proposed program and budget annually?  Did the

13   West Tennessee Chapter -- the West Tennessee Chapter didn't

14   provide this to you, or you would have provided it to us in

15   the document production; is that correct?

16   A.   If we had it, we would have.  I will say just from my

17   owner experience that that didn't even happen when I was --

18   that just didn't necessarily happen with chapters when I

19   joined the organization in '84.

20   Q.   But you were not a part of the organization during the

21   time of the Kendrick complaint; is that correct?

22   A.   I was not.

23   Q.   So during the time that these bylaws were in effect,

24   you really have no way of knowing whether the requirement

25   of Section 4 was enforced or not, do you?

CROSS-EXAMINATION OF H. WEINBERG                    74

1  A.   I don't know that, but I do know it was a part-time

2  director -- or a full-time director at that point, but that

3  these requirements -- they should have been required, but

4  whether they were or not -- whether or not they were, I

5  don't know.

6          MS. SILK:  Your Honor, I left my exhibits over

7  here.  Do you mind if I --

8          THE COURT:  Oh, absolutely.  In fact, they're

9  supposed to stay here with the exhibits.

10          MS. SILK:  I'm talking about the ones I'm --

11          THE COURT:  Oh, sure.  That's fine.  Sure.  No

12  problem at all.

13          MS. SILK:  This one may already be admitted.  I

14  apologize for the delay.

15  BY MS. SILK:

16  Q.   Okay.  Now we're going to look at Exhibit 3.

17  Exhibit 3 is the agenda for the meeting of the American

18  Civil Liberties Union of Tennessee, Inc. from October 4th,

19  1975; is that correct?

20  A.   It is.

21  Q.   And these are the types of meeting minutes that were

22  kept by the ACLU of Tennessee through the regular course of

23  business throughout the history of the organization, to

24  your knowledge --

25  A.   Correct.

1    Q.   -- correct?

2         So in this exhibit, as we've noted, the -- on Page 2,

3    that the Middle Tennessee Chapter's bylaws were approved in

4    these minutes.  So is this the type of thing that would be

5    memorialized in typed meeting minutes when bylaws of a

6    chapter were approved?

7    A.   Again, I wasn't there and I don't know who was taking

8    the minutes, but --

9    Q.   But clearly from the documents you produced, this is

10   something that occurred?

11   A.   Certainly, these minutes show that for the Middle

12   Tennessee Chapter minutes -- yes, bylaws.

13   Q.   But in all the pages of documents that you produced to

14   the City, there's no instance in the minutes where the

15   bylaws of the West Tennessee Chapter were approved; is that

16   correct?

17   A.   If they were not submitted to you, we don't have

18   record of them.

19   Q.   Now, I would like to talk for a few minutes about how

20   a chapter would initiate litigation in the '70s around the

21   time of the Kendrick complaint.  It was the chapters who

22   decided what cases to litigate and not the state affiliate;

23   is that correct?

24   A.   Again, I wasn't there.  The chapters existed only --

25   exist and existed only because they were part of the ACLU

1     of Tennessee, which was the formal entity.

2     Q.    But to your knowledge, it was the chapter that made

3     the decision?

4     A.    I imagine sometimes chapters did and sometimes the

5     affiliate did and sometimes they made the decision in

6     partnership.  I just don't -- I don't know.

7     Q.    Okay.  Let's take a look at a couple of exhibits.

8             **MS. SILK:**  I'm going to mark the next exhibit.

9             **THE COURT:**  Right.  Marked and received as 8

10    without objection.  You can briefly identify it.

11            (WHEREUPON, the above-mentioned document was

12    marked as Exhibit Number 8.)

13    BY MS. SILK:

14    Q.    Exhibit 8 is the regular meeting minutes of the West

15    Tennessee ACLU board of directors; is that correct?

16    A.    Correct.

17    Q.    And it's from May 12th -- I'm sorry, May 12, 1980?

18    A.    Uh-huh.

19    Q.    Now, let's go down to the next to the last paragraph,

20    and it says, "Wilson wages reported on the Brownsville

21    police false arrest case.  The consensus of the group was

22    that we should not take the case because the damages were

23    slight and the impact value would apparently be limited.  A

24    letter rejecting the case will be sent to the client."  Is

25    that what it states?

1    A.    That's what it says, yes.

2    Q.    Does it state anywhere in this -- it doesn't state

3    anywhere in this letter that the West Tennessee ACLU had to

4    consult with the American Civil Liberties Union of

5    Tennessee, Inc. before deciding not to take this case, did

6    it?

7    A.    And typically, I think that's how it happened.  If

8    they weren't taking a case, it didn't have to be discussed

9    with the ACLU of Tennessee.

10   Q.    Okay.

11            MS. SILK:  I'd like to mark the next exhibit.

12            THE COURT:  Marked as 9.  And, of course, you can

13   identify it.

14            (WHEREUPON, the above-mentioned document was

15   marked as Exhibit Number 9.)

16   BY MS. SILK:

17   Q.    Okay.  Exhibit 9 is the minutes of the regular meeting

18   of the board of directors of the West Tennessee Chapter,

19   correct?

20   A.    Yes.

21   Q.    And it's from January 15, 1979.

22   A.    Uh-huh.

23   Q.    Now, if you could please turn to Page 2, the second

24   paragraph, "Phil Arnold reported that in accordance with

25   the previous board decision, he had prepared a letter

1    indicating that the American Civil Liberties Union

2    willingness to undertake representation of the family of an

3    individual killed by the Memphis Police Department while

4    fleeing the scene of a burglary.  Upon motion duly made,

5    seconded and unanimously carried, the board authorized

6    Mr. Arnold to proceed with the case."

7         So is this another example -- this is another example

8    of a chapter approving a case; is that correct?

9    A.   It says he had prepared a letter indicating that

10   American Civil Liberties Union willingness to undertake

11   representation.  So again, it was the ACLU as an entity.

12   Q.   These are the minutes from the West Tennessee Chapter,

13   correct?

14   A.   Correct, but of the ACLU.

15   Q.   Now, the West Tennessee Chapter that existed at some

16   point in the '70s, '80s and '90s -- the West Tennessee

17   Chapter that existed in the '70s and '80s, it ceased

18   existing around 1987; is that correct?

19   A.   I don't know if that was the -- I just don't know the

20   formal date.

21   Q.   Okay.  If you could pull up stipulated fact Number 13,

22   please.

23        So the ACLU of Tennessee has stipulated that the

24   Memphis field office of ACLU of Tennessee was closed

25   because the budget was inadequate to support it on

1    December 11th, 1987.  Do you see that there?

2    A.    Yeah, but that doesn't refer to the West Tennessee

3    Chapter.  That refers to just closing the second office.

4         When I came to Tennessee -- when I took this position,

5    there was an office in Memphis.  They had opened a new

6    office in Nashville with the intent of closing, I

7    understood, the Memphis office, not because we didn't want

8    two offices but because it was costly.  So it had nothing

9    to do with specifically the West Tennessee Chapter.

10   Q.    But the West Tennessee Chapter was struggling for

11   several years before it was finally shuttered; is that

12   correct?

13   A.    When you say shuttered, do you mean the chapter or the

14   office?

15   Q.    The chapter.

16   A.    The chapter -- as you know, chapters stay alive as

17   long as there are people who can stay active.  So there

18   were many attempts to keep the chapter open, but the work

19   still took place in Memphis.  We still have representation

20   on our state board of individuals who lived in Memphis.

21            **MS. SILK:**  I'd like to mark the next exhibit.

22            **THE COURT:**  Marked and received as 10.  Can you

23   just identify the document.

24            (WHEREUPON, the above-mentioned document was

25   marked as Exhibit Number 10.)

1    BY MS. SILK:

2    Q.    This document, Exhibit 10, is the West Tennessee

3    Chapter meeting minutes from the board meeting on

4    January 10th, 1983; is that correct?

5    A.    Correct.

6    Q.    And I would like for you to please -- give me one

7    second.  If you look here in this paragraph denoted as

8    fundraising, it says that, "Cathy reported that the West

9    Tennessee fundraising in 1982, although not a loss, was

10   insufficient to adequately support the chapter.  The

11   Memphis office depends on raising enough money to support

12   it."  Is that what it says?

13   A.    That's what it says.

14   Q.    So in 1983, it's clear from this document that the

15   West Tennessee Chapter was struggling to meet its

16   obligations?

17   A.    Again, my understanding is that the support of the

18   money raised in Memphis was part -- you know, it was part

19   of the ACLU of Tennessee and that there couldn't exist a

20   chapter without an office in the city, and so it's a little

21   bit complicated how this is expressed.  It's not

22   necessarily just because the office closed, the chapter

23   dies.

24   Q.    This doesn't reference the office, though.  This just

25   references the organization that is the chapter; is that

1    correct?

2    A.   Right.  I was reading ahead to the second.

3    Q.   So in 1983, they reported that fundraising was

4    insufficient to adequately support the chapter, and the

5    Memphis office depends on raising enough money to support

6    it.  So as early as 1983, it appears that the -- this is an

7    ACLU of Tennessee document, but whatever entity was a

8    chapter in 1982 was flailing, for lack of a better word?

9    A.   Yeah, I -- I can't speak to that.

10   Q.   And there were several unsuccessful attempts at

11   reorganizing the West Tennessee Chapter in the '80s; is

12   that correct?

13   A.   There were.

14   Q.   And it looks like maybe from 1983 to 1988, there

15   really wasn't a West Tennessee Chapter presence at all; is

16   that right?

17   A.   There were West Tennessee representatives that sat on

18   our board from the chapter, but the -- there was not a

19   robust chapter.  That's maybe the better way to put it.

20   They weren't actively engaged in programming and things of

21   that nature.

22   Q.   Now, it looks like you had a big push in 1988 to

23   reorganize the West Tennessee Chapter, but that ultimately

24   failed, as well, did it not?

25   A.   Well, again, I think at that point -- you know,

1    chapters were one model that affiliates, state affiliates

2    had been used to working with.  And then as the chapters --

3    as things moved away, it was understood that it would be

4    centralized statewide organization and still have cases and

5    work with legislatures and do fundraising across the state

6    with or without chapters, frankly.

7    Q.   So what you're saying is that there was a -- there was

8    really no official structure as to who could be a chapter

9    or who could not be a chapter?

10   A.   No.  What I'm saying is, you still had to be formally

11   identified through, you know, relationships with the

12   affiliate.  You had to be affiliated with the ACLU of

13   Tennessee in order to have a chapter.  Sometimes there were

14   groups who wanted to create chapters but they weren't part

15   of the ACLU, so they could not use the ACLU designation.

16   Q.   Could such a group be the party that was a party to

17   the Kendrick consent decree?  The American Civil Liberties

18   Union in West Tennessee, Inc., I mean, you've testified

19   that --

20            **THE COURT:**  I think the "could" is the problem.

21   Why don't we just change that to something that has

22   evidentiary value?  Is it probable?

23   BY MS. SILK:

24   Q.   Is it probable that the entity that was a party to the

25   1978 Kendrick consent decree was exactly the type of group

CROSS-EXAMINATION OF H. WEINBERG                    83

1    you just referenced in your testimony that was somehow

2    acting or affiliated with the ACLU of Tennessee but not

3    formally a part of the ACLU of Tennessee?

4    A.   No, I don't believe it could.

5              **MS. SILK:**  I'd like to mark the next exhibit.

6              **THE COURT:**  11, marked as 11.  Identify the

7    document.

8              (WHEREUPON, the above-mentioned document was

9    marked as Exhibit Number 11.)

10   BY MS. SILK:

11   Q.   This document is a document from the ACLU of

12   Tennessee, Inc., February 1st, 1988.  It says, "The West

13   Tennessee Chapter is at a crossroads."

14         Now, you were executive director during that time.

15   What -- that signifies to me that the West Tennessee

16   Chapter was about to stop existing.

17   A.   Again, as I recall, there were -- it was hard to get a

18   chapter -- it was hard to get individuals engaged in

19   chapter activities, be it fundraising or pub ed programs,

20   probably mostly from -- because of lack of time and people

21   engaged in other activities.

22         And so we wanted to still keep a presence, keep our

23   members in West Tennessee in the Memphis area engaged if

24   they wanted to meet with and organize activities.  So we

25   were continuing to try to, based on one or two or three

CROSS-EXAMINATION OF H. WEINBERG                    84

1   people's interest, organize meetings.  And that's what this

2   is a result of, this particular memo.

3   Q.   Thank you.

4            **MS. SILK:**  I'd like to mark the next exhibit.

5            **THE COURT:**  That will be 12, marked and received,

6   without objection.  If you'll identify it.

7            (WHEREUPON, the above-mentioned document was

8   marked as Exhibit Number 12.)

9  BY MS. SILK:

10  Q.   This document is from the ACLU of Tennessee, and it's

11  to the West Tennessee Chapter board of directors and other

12  interested members.  And it states that -- it's from

13  June 2nd, 1988, and it states, "Exciting plans are underway

14  to revitalize the West Tennessee Chapter."  Is that

15  correct?

16  A.   It does say that, yes.

17  Q.   So on June 2nd, 1988, there was no West Tennessee

18  Chapter, was there?

19  A.   There was a West Tennessee Chapter, but they didn't

20  have -- they were not organized and there were not enough

21  people engaged to organize programs and others, but there

22  were people involved in the statewide organization.

23  Q.   So there were people in West Tennessee that were

24  affiliated with the ACLU of Tennessee, Inc., but there was

25  no formal chapter?

CROSS-EXAMINATION OF H. WEINBERG                    85

1    A.   It's hard for me to -- operation-wise, formal.  There

2    were people who were part of the West Tennessee Chapter who

3    wanted more people to get involved.

4              **MS. SILK:**  I'd like to mark the next exhibit.

5              **THE COURT:**  It will be 13, marked and received

6    without objection.

7              (WHEREUPON, the above-mentioned document was

8    marked as Exhibit Number 13.)

9    BY MS. SILK:

10   Q.   This Exhibit 13 is the memorandum of that meeting that

11   was referenced in Exhibit 12 on June 2nd, 1988.

12        Now, if you flip to Page 2, it says in the second

13   paragraph, "A successful annual meeting is the first step

14   in the reorganization and revitalization of the West

15   Tennessee Chapter.  It is incumbent on us to put a

16   successful program and meeting together."  Is that correct?

17   A.   Yes, that says that.

18   Q.   So when a chapter is being reorganized and

19   revitalized, that's because it no longer was a chapter?

20   A.   Well, the people present at that meeting who were

21   named on the first page remained active in the organization

22   as a chapter, but they needed more people involved.

23   Q.   But if a chapter was vital and viable, there would be

24   no need to reorganize it, would there?

25   A.   Reorganization is an interesting word.  I think

1   revitalization really refers to wanting more people to be

2   part of the formal structure.

3   Q.   But it does say reorganize, does it not?

4   A.   It does say that, yes.

5   Q.   It's true, isn't it, that there was no ACLU of

6   Tennessee presence in the form of a chapter in West

7   Tennessee from 1988 to 1996, was there?

8   A.   I just don't know offhand.  I know that the chapter --

9   well, there was interest -- the chapter was not actively

10  engaged.  And many of the chapters were not as actively

11  engaged as they once were at that time.

12          **MS. SILK:**  I'd like to mark the next exhibit.

13          **THE COURT:**  14.

14          (WHEREUPON, the above-mentioned document was

15  marked as Exhibit Number 14.)

16          **THE COURT:**  Let's try to follow the practice of

17  stating what it is and then just ask for it to be marked.

18  BY MS. SILK:

19  Q.   The next exhibit is -- I'll wait until he marks it --

20  is a March 11th, 1991 letter from the ACLU of Tennessee,

21  Inc. to Bruce.

22          Okay.  This is a letter, appears to be from you; is

23  that correct?

24  A.   Yes.

25  Q.   And it's from March 11, 1991, so three years after the

1   last set of documents that we looked at where we were

2   trying to reorganize the West Tennessee Chapter.  Three

3   years later, you wrote to Bruce, "I am excited about the

4   response we have received from people about the West

5   Tennessee Chapter reorganization meeting."

6        Is that what it says?

7   A.   That's what it says, yes.

8   Q.   Okay.  So in 1991, it's clear that the West Tennessee

9   Chapter had still not been reorganized; is that correct?

10  A.   That's what it appears.

11          **MS. SILK:**  The next exhibit I'm going to mark is

12  the agenda from March 14th, 1991, West Tennessee Chapter.

13          **THE COURT:**  Marked as 15.

14          (WHEREUPON, the above-mentioned document was

15  marked as Exhibit Number 15.)

16  BY MS. SILK:

17  Q.   So this is a document from the ACLU of Tennessee, and

18  it's an agenda, appears, from the March 14th, 1991 West

19  Tennessee Chapter reorganization meeting; is that correct?

20  A.   Yes, it is.

21  Q.   Okay.  And then here in Number 4, it lays out the

22  plans for the West Tennessee Chapter, which includes

23  identifying a board and a president, establishing a legal

24  committee, discussing ideas for future public education and

25  selecting two chapter representatives, plus a president to

1    serve on the state board.

2         So it's true, is it not, that in 1991, there was

3    absolutely no entity that could reasonably be described as

4    a chapter of the ACLU of Tennessee in West Tennessee?

5    A.    Yeah, it appears that way and it's -- it was happening

6    with all the chapters.  They were moving away from that

7    model, but there was an effort and some resistance and we

8    were still trying to build a chapter in West Tennessee.

9              **MS. SILK:**  The next document I'd like to mark is

10   a July 27th, 1994 letter to Mary Gibson from Hedy Weinberg.

11             **THE COURT:**  Marked as 16 and received.

12             (WHEREUPON, the above-mentioned document was

13   marked as Exhibit Number 16.)

14   BY MS. SILK:

15   Q.    This letter is from you, is it not, Ms. Weinberg?

16   A.    It is.

17   Q.    And it's a letter to a Mary Gibson; is that correct?

18   A.    It is, yes.

19   Q.    And in this letter, it says, "I'm delighted in your

20   interest in becoming involved in the Memphis area.  We hope

21   to revitalize our Memphis Chapter in the fall, and I will

22   contact you when an organized meeting is planned."  That's

23   that second paragraph there; is that correct?

24   A.    Yes.

25   Q.    So this letter that you sent on July 27th, 1994,

1    that's three years after the last document that we looked

2    at.  So in 1994, it's still evident that the West Tennessee

3    Chapter had still yet to be reorganized; is that correct?

4    A.   That's what it appears.

5             **MS. SILK:**  The next document I'd like to mark is

6    a September 20th, 1994 letter to you, Ms. Weinberg, from

7    Andrew Branham.

8             **THE COURT:**  Marked without objection as 17.

9             (WHEREUPON, the above-mentioned document was

10   marked as Exhibit Number 17.)

11   BY MS. SILK:

12   Q.   This letter is from September 20th, 1994, and it's a

13   letter to you.  And it says that you "are excited to be a

14   part of the coming together of what will hopefully be a

15   new -- what hopefully will be a new chapter of the ACLU for

16   Memphis and Greater West Tennessee."

17        So in September 20 of 1994, it is evident from this

18   that there was no West Tennessee Chapter?

19   A.   I think the chapters had -- again, across the state,

20   there had just been an absence of energy and we were

21   centralizing more.

22             **MS. SILK:**  The next exhibit I would like to mark

23   is a letter to the Honorable Judge Lipman from

24   November 17th, 1994.

25             **THE COURT:**  Marked as 18.

CROSS-EXAMINATION OF H. WEINBERG                    90

1              (WHEREUPON, the above-mentioned document was

2      marked as Exhibit Number 18.)

3  BY MS. SILK:

4      Q.    This letter is from November 17th, 1994, and it's a

5      letter from you, it looks like, to the now Honorable Judge

6      Sheri Lipman.  And if you look down at the bottom here, you

7      state, "Our work is clearly cut out for us, and I

8      appreciate your willingness to coordinate the effort to get

9      things going in Memphis."

10             So in November of 1994, there was still no West

11     Tennessee Chapter; is that correct?

12     A.    There was not -- appears there was not a formal

13     chapter.

14             MS. SILK:  I'd like to mark the next exhibit,

15     which is an October 24th, 1994 letter to Judge Lipman from

16     you.

17             **THE COURT:**  Marked as 19 and received.

18             (WHEREUPON, the above-mentioned document was

19     marked as Exhibit Number 19.)

20  BY MS. SILK:

21     Q.    This is a letter -- predates the one -- I got out of

22     order a little bit -- but it says from -- to Sheri from

23     Hedy.  Subject, Revitalizing the Memphis Chapter.  It says,

24     "As promised, here is the information on those people

25     attending the September 12th event at Bruce's home who

CROSS-EXAMINATION OF H. WEINBERG                    91

1    expressed an interest in helping to revitalize the Memphis

2    Chapter."

3         And the Bruce you're referring to there, I presume, is

4    Bruce Kramer; is that correct?

5    A.   Correct.

6    Q.   So Bruce Kramer was affiliated with the Kendrick

7    litigation, was he not?

8    A.   He was, yes.

9    Q.   But here he is trying to organize a West Tennessee

10   Chapter in 1994, is it not?

11   A.   Well, Bruce stayed involved with the organization

12   from -- you know, from Kendrick on.  He was involved prior

13   to Kendrick.  So he was always engaged and always served on

14   our board and always represented the ACLU of Tennessee and

15   was also very active in the West Tennessee Chapter, which

16   was part of the ACLU of Tennessee.

17   Q.   But at this time, there was no chapter of the ACLU of

18   Tennessee in West Tennessee?

19   A.   There was not a formal chapter, but there was activity

20   and interested parties.

21        **MS. SILK:**  The next exhibit I would like to mark

22   is a letter from December 1st, 1994 to -- which you were

23   copied on from the Honorable Judge Lipman.

24        **THE COURT:**  Marked as 20 and received.

25        (WHEREUPON, the above-mentioned document was

CROSS-EXAMINATION OF H. WEINBERG                    92

1    marked as Exhibit Number 20.)

2  BY MS. SILK:

3    Q.   This letter is from the Honorable Judge Lipman?

4          **THE COURT:**  Actually, it may be a little

5    confusing.  She certainly was not a judge at the time, and

6    I think you just --

7          **MS. SILK:**  I just wanted to be respectful.

8          **THE COURT:**  I think you're being confusing.

9          **MS. SILK:**  Okay.  I apologize.

10         **THE COURT:**  I don't think she'll be offended.

11    And it would also be improper for a judge to be in those

12    communications, as you know.

13         **MS. SILK:**  Okay.  That was not my intent.  I

14    apologize.

15         **THE COURT:**  She wouldn't want us to incorrectly

16    state her status at the time.

17         **MS. SILK:**  Okay.  I apologize.

18         **THE COURT:**  No.  Apologize to her, not me.

19         **MS. SILK:**  Well, don't tell her.

20  BY MS. SILK:

21    Q.   And you were copied on this letter; is that correct?

22    A.   Yes.

23    Q.   Okay.  And if you go back to the first page, it says,

24    "I realize that it's been a while since we first met in

25    Bruce's office to discuss the revitalization of the Memphis

1   Chapter.  As you will recall, our final plan was to have a

2   gathering for those interested in restarting the Memphis

3   Chapter of the ACLU of Tennessee, and I hope we get a few

4   people out of that group who are willing to put some work

5   in to accomplishing that goal.  Pass along to the others in

6   attendance the good work that the ACLU has been doing."

7          So here it seems like Sheri Lipman is also trying to

8   get the West Tennessee Chapter going again because it did

9   not exist in December 1st, 1994.  Is my understanding of

10  that correct?

11  A.   Yeah.  It seems like the chapters did not exist.  I

12  totally agree with you, but there was activity taking place

13  and lawsuits being filed across the state on behalf of the

14  ACLU of Tennessee of which chapters, if they existed, were

15  part of that organization.  It was a way to engage people.

16          **MS. SILK:**  Okay.  The next exhibit I would like

17  to mark is from March 9, 1995, and it's a letter from Sheri

18  Lipman to "the gang."  Please mark that.

19          **MS. FLOYD:**  Thank you.

20          **THE COURT:**  Marked as 21 without objection.

21          (WHEREUPON, the above-mentioned document was

22  marked as Exhibit Number 21.)

23  BY MS. SILK:

24  Q.   So here we are now in 1995, this letter you were

25  copied on and it says, "Dear gang, as you each have

1      probably guessed by now, our kick-off event will not take

2      place on Sunday, March 12th, 1995."

3           So from this communication, it appears that this 1994

4      effort to revitalize and reorganize the Memphis or West

5      Tennessee Chapter was unsuccessful; is that correct?

6      A.   It certainly appears that way.

7           **MS. SILK:**  The next exhibit I would like to mark

8      is a letter from January 11th, 1995 from Sheri Lipman,

9      which you were copied.

10          **THE COURT:**  22, marked and received.

11          (WHEREUPON, the above-mentioned document was

12     marked as Exhibit Number 22.)

13     BY MS. SILK:

14     Q.   Now, this letter, as I stated, was from January 11th,

15     1995.  And it's a letter again to "the gang" from Sheri

16     Lipman, CC Hedy Weinberg.  Now, in this one, if we flip to

17     Page 2, Number 4, it reads, "Hedy Weinberg will give an

18     enthusiastic talk about the work of the ACLU of Tennessee

19     and other chapters in the state, including a sampling of

20     fascinating quality programs which have been put on by

21     other chapters.  We will have sign-up sheets and literature

22     available."

23          So in this document, it stated that you were giving a

24     talk, an enthusiastic talk, trying to enlist enough people

25     to be -- well, to be interested in forming another West

1   Tennessee Chapter.  Is my reading of that correct?

2   A.   Yeah.  The goal was to have chapters, if they were so

3   engaged, to organize public education programs as a way of

4   staying visible outside of just pursuing litigation in our

5   legislative work.  So it -- and a way to increase

6   awareness.  So that was the goal of chapters --

7   Q.   Okay.

8   A.   -- at this time, and there was a -- the goal was to

9   ensure that chapters had information about how they could

10  go about organizing pub ed programs.

11  Q.   And this meeting in which you gave an enthusiastic

12  talk, was it to the same group of people that were -- it

13  was not to the same group of people that were the entity

14  that was the West Tennessee Chapter in 1978, was it?

15  A.   There might have been similar people there, but I have

16  no idea who was part of the -- this particular January 9th

17  meeting.  I just don't recall.

18  Q.   But it certainly -- it couldn't have been the same

19  group of people or you wouldn't have had a need to have the

20  meeting at all; is that correct?

21  A.   It might have been trying to reengage people.  I don't

22  know.  Certainly Bruce Kramer was part of the organization

23  in 1978.

24  Q.   And on the first page, it says, "We had a meeting

25  yesterday to organize our kick-off gathering."  So it seems

1    that this kick-off gathering was trying to kick off the

2    still yet reorganized West Tennessee Chapter.

3    A.    It sounds -- that's what it sounds like.

4    Q.    Now, you've stated that the ACLU of Tennessee, Inc. no

5    longer operates with chapters; is that correct?

6    A.    Yeah.  The ACLU of Tennessee, including most of the

7    affiliates across the country, do not use chapters anymore.

8    More centralized.  And again, as you might imagine, because

9    of e-mail and other kinds of ways to communicate, we don't

10   have chapters formally engaged.

11   Q.    Now, the party that was listed in the Kendrick consent

12   decree, the American Civil Liberties Union of West

13   Tennessee, Inc., that was not -- well, let me back up.

14         So it's been stipulated, stipulated fact Number 18 --

15   so in May 1996, the West Tennessee Chapter was reformed.

16   That's been stipulated by both parties.  It's true, isn't

17   it, that the West Tennessee Chapter that was re-formed in

18   May 1996 was not the same entity that was the American

19   Civil Liberties Union of West Tennessee, Inc.; is that

20   correct?

21   A.    Is that the -- what you've referred to as the West

22   Tennessee Civil Liberties Union, Inc.?

23   Q.    No, ma'am.  I'm referring to the American Civil

24   Liberties Union in West Tennessee, Inc. that's listed on

25   the Kendrick complaint and consent decree.

CROSS-EXAMINATION OF H. WEINBERG                    97

1    A.   I just -- I don't know.  Can you rephrase that -- ask

2    me that question again?  I'm not sure I'm hearing what

3    you're asking.

4    Q.   Sure.  I'm asking you if the May 1996 version of the

5    West Tennessee Chapter that was finally formed after eight

6    years of fix and starts, if that was the same entity,

7    legally and organizationally, as the American Civil

8    Liberties Union in West Tennessee, Inc.

9    A.   These chapters are informal entities.  I mean, they

10   exist because they're part of the ACLU of Tennessee, which

11   was the same with the West Tennessee group that's mentioned

12   in the complaint.

13   Q.   But they're not informal if they have to have bylaws,

14   right?

15   A.   They exist only, though, because they're part of the

16   ACLU of Tennessee.  They don't exist separate from the

17   state entity.

18   Q.   That was not my question.

19        My question is, was the entity that was the West

20   Tennessee Chapter in May 1996 the same entity as the

21   American Civil Liberties Union in West Tennessee, Inc.; and

22   I mean, the answer was it was not, correct?

23            **MR. CASTELLI:**  Objection, Your Honor.

24            **THE COURT:**  Is that a question?  It sounded like

25   testimony.

1          **MS. SILK:**  Let me rephrase.

2     BY MS. SILK:

3     Q.    The West Tennessee Chapter that was re-formed in 1996

4     was not the same entity as the American Civil Liberties

5     Union in West Tennessee, Inc., right?

6     A.    There were new people involved in this.

7     Q.    And it's true, then, that the West Tennessee Chapter

8     in 1996 did not have the same set of bylaws as the West --

9     what you're referring to as the West Tennessee Chapter in

10    1996; is that correct?

11    A.    I just don't know about the bylaws.  I mean, I don't

12    have memory of those.

13    Q.    So if the ACLU of Tennessee had subsumed, as your own

14    pleadings and filings with this Court have alleged, if it

15    had subsumed the entity that was the ACLU of West

16    Tennessee, Inc., it wouldn't need to form a new chapter in

17    1996, would it?

18    A.    I think the goal of the chapter was to engage people

19    to be present.  I mean, you can talk about a chapter but a

20    chapter without people, so you wanted to ensure that there

21    were people doing the work and, you know, being ambassadors

22    for the ACLU.

23    Q.    And so, from the time when there wasn't a West

24    Tennessee Chapter, it follows, doesn't it, that there

25    weren't enough people interested in the efforts of the ACLU

1    of Tennessee, Inc. to support an entity that could bring,

2    for instance, a lawsuit or enforce a consent decree?

3    A.   No, that's not correct, because it was the

4    responsibility of the ACLU of Tennessee to do that.  So we

5    were still filing lawsuits and engaging with the

6    legislature and doing pub ed programs, and we had members

7    in Memphis and the West Tennessee area who were ACLU of

8    Tennessee members and our -- yeah.

9    Q.   So I want to just go back to one exhibit.  Sorry, I

10   have to find it.

11        And this is Exhibit 1, the charter of the ACLU of

12   Tennessee.  And this is going back to -- there we go.  This

13   is going back to the entity that was known as the West

14   Tennessee Civil Liberties Union, Inc.

15        So Number 2, it says that the -- your attorney

16   presented this to you, and it states that the purpose of

17   the Charter of Incorporation was to consolidate the affairs

18   and activities of the previously existing East Tennessee

19   Civil Liberties Union, Inc. and Middle Tennessee Civil

20   Liberties, Inc. and continue the previous operations of

21   said corporations and to also absorb at a future time, if

22   agreed to by the membership and/or board of directors of

23   both corporations, to assume and continue the operations of

24   the West Tennessee Liberties, Inc., a Tennessee

25   corporation.

1      So I just want to get the record straight that the

2   Charter of Incorporation did not consolidate the affairs of

3   the West Tennessee Civil Liberties Union, Inc. at its

4   inception, but it only stated that it would do so if agreed

5   to at a later time by both boards; is that correct?

6   A.   Right.  The anticipation was that they would join with

7   the ACLU of Tennessee, merge into that organization.   I

8   guess in its absence, that they would cease not to

9   function.

10  Q.   So it's probable, isn't it, that the West Tennessee

11  Civil Liberties Union, Inc. that was never officially a

12  chapter of the American Civil Liberties Union of Tennessee,

13  Inc. was actually the party that initiated the Kendrick

14  litigation?

15  A.   I don't think it was probable.

16  Q.   But you don't have any knowledge?

17  A.   My understanding is it was part of the ACLU of

18  Tennessee.

19  Q.   But you have no evidence that the party was not the

20  WTCLU, using the acronym for West Tennessee Civil Liberties

21  Union, Inc.?

22  A.   My knowledge is that the West Tennessee Civil

23  Liberties Union or Civil Liberties, Inc. was no longer a

24  formal entity.

25  Q.   So my last question is, if there was here a group

1   known as the West Tennessee Civil Liberties Union, Inc. and

2   also a West Tennessee Chapter, operating around the same

3   time, it's probable that there could have been a third or

4   fourth group of people also operating in the name of ACLU;

5   and you, yourself, testified that this was a very fluid and

6   loose structure?  Is that correct?

7   A.   Let me step back from that.  There could not be other

8   entities operating with ACLU in the state.  And if there

9   were, they would not -- ACLU would not have supported them.

10   We would probably challenge their existence because the

11   ACLU sort of name and presence.

12        So when I said that they were fluid, I meant chapters,

13   as part of the organization, were alive as long as the

14   people who were engaged in those chapters -- or as long as

15   people were engaged in those chapters.  That's what I meant

16   by fluid.

17   Q.   Did the ACLU of Tennessee, Inc. ever challenge the

18   West Tennessee Civil Liberties Union, Inc. as not being

19   formally affiliated?

20   A.   My understanding is the West Tennessee Civil

21   Liberties, Inc., like the East Tennessee Civil Liberties

22   Union, Inc. and the Middle Tennessee Civil Liberties Union,

23   Inc., were entities prior to the ACLU of Tennessee being

24   incorporated.  And once it became clear that there was

25   going to be a state affiliate, the movement, while it took

REDIRECT EXAMINATION OF H. WEINBERG                    102

1    some time, was to -- those organizations were going to

2    blend and become part of the ACLU of Tennessee.

3         That was my understanding when you -- just with my

4    knowledge of the national ACLU and watching statewide

5    affiliates incorporate.

6    Q.   But you've asserted that the -- well, if the WTCLU was

7    never absorbed at a later time by the ACLU of Tennessee,

8    Inc., would the -- it seems like the ACLU of Tennessee,

9    Inc. would have challenged them and their authority to act

10   in the name of the ACLU, wouldn't they?

11        I mean, you just stated if some group were acting in

12   the name of ACLU that wasn't officially affiliated with the

13   state affiliate, that you would have challenged it; but you

14   didn't challenge the West Tennessee Civil Liberties Union,

15   Inc. that existed from 1967 to 1983, did you?

16   A.   I don't think they were engaged in activities

17   independent of the ACLU of Tennessee.

18   Q.   But you don't know?

19   A.   I don't know --

20   Q.   But what we do know is that it did exist?

21   A.   They were not actively involved.

22            **MS. SILK:**  I have nothing further.  Thank you.

23            **THE COURT:**  Redirect?

24            **MR. CASTELLI:**  Yes, Your Honor.

25

1                       **REDIRECT EXAMINATION**

2      **BY MR. CASTELLI:**

3      Q.   Let's start, Ms. Weinberg, those -- the records that

4      you've talked about earlier where these minutes and the --

5      were found, do you have every document that was created by

6      the ACLU of Tennessee or its chapters since 1968?

7      A.   I don't.  And our office has moved.

8      Q.   How many times has the office moved since you came to

9      the ACLU?

10     A.   I think we're in our fifth space.  Plus, we closed the

11     office in Memphis and I'm afraid things were probably lost

12     when we moved.

13     Q.   Do you know where the office was located in 1976 when

14     the Kendrick complaint was filed for the ACLU of Tennessee?

15     A.   I think it was in Memphis.

16     Q.   Okay.  Was that the only statewide office?

17     A.   That was the only statewide office, yes.

18     Q.   And then a second office was opened in Nashville at

19     some point?

20     A.   Yeah, I think in '83, '82 or '83.

21     Q.   And then as you've covered a minute ago, that Memphis

22     office was then closed down at some point?

23               **MS. SILK:**  Objection, leading.

24               **THE COURT:**  Objection sustained.

25     BY MR. CASTELLI:

1    Q.   What happened to the Memphis office?

2    A.   Right.  When I was hired, it was my understanding that

3    the state office would be in Nashville, central part of the

4    state, ability to be -- we would be more accessible to the

5    state legislature and that we would have to close the

6    Memphis office, which had been the state office.  And so

7    that office was closed, I think, in '86 or '87.

8    Q.   Do you know, in your role as executive director,

9    whether there was ever any formal dissolution of the West

10   Tennessee Chapter?

11   A.   There was no formal dissolution that I'm aware of.

12   Q.   Was there a board of directors meeting during your

13   tenure where the West Tennessee Chapter was dissolved?

14   A.   No.

15   Q.   For any reason?

16   A.   No.

17   Q.   Can you explain how the West Tennessee Chapter wound

18   down?

19   A.   I think people -- the Daniels, Carol and Tom Daniels,

20   moved to Alaska.  Various people moved out of state.  There

21   was still some great energy in Memphis, but people were

22   getting busy with their careers, families and so things

23   slowed down.  The statewide office was getting stronger and

24   we were able to do more work and engage more people.  And

25   so it was not out of disinterest but just out of people

REDIRECT EXAMINATION OF H. WEINBERG                    105

1    having a lot of other commitments.

2    Q.    And when the West Tennessee Chapter began to -- when

3    people began to lose interest in working with the West

4    Tennessee Chapter, did -- how did that affect the ACLU of

5    Tennessee's work in the region?

6    A.    I don't believe it affected our work.  We were still

7    engaged in the courts and in -- we had media -- a presence

8    in the media.  We had, you know, a good membership for the

9    longest time.  Our membership base, the largest base was in

10   Memphis.  And so our work began taking place statewide but

11   certainly had a strong presence in Memphis.

12   Q.    Let's look at Exhibit Number 5.  Now, there -- at the

13   bottom of the page, you were asked during your

14   cross-examination about this exhibit.  Can you tell us what

15   this acronym, WTCLU that's in Paragraph 5, what that is

16   being referenced to in the complaint?

17   A.    My sense is that it references the chapter of the ACLU

18   of Tennessee.

19   Q.    And the word -- what's -- can you just read after that

20   acronym appears what the next -- the text says?

21   A.    Sure, WTCLU, which is in quotes, is a chapter of the

22   American Civil Liberties Union of Tennessee, which is an

23   affiliate of the American Civil Liberties Union.

24   Q.    And then the last sentence there at the bottom of the

25   page, I think earlier I had asked you to read part of this

1    but I don't think I got to the last sentence.  Could you

2    read that, please?

3    A.    The West Tennessee Chapter?

4    Q.    Yes.

5    A.    "The West Tennessee Chapter is comprised of

6    approximately 500 members."

7    Q.    And then continuing on to the next page?

8    A.    "Residing in the Western District of Tennessee, each

9    of whom is dedicated to and involved in activities and

10   conduct protected by the First, Fourth, Fifth, Sixth, Ninth

11   and Fourteenth Amendments to the Constitution of the United

12   States.  And the corporate entity itself is dedicated to

13   and involved in such Constitutionally protected

14   activities."

15        Do you want me to go ahead?

16   Q.    No, that's good.  That's fine.

17        I'm going to look at Exhibit 22.  And I believe on

18   your cross-examination, you were asked to read the first

19   paragraph that's on Page 2 of Exhibit 22.  Could you read

20   the second paragraph?

21   A.    "Hedy is sending a list of Memphis area members for

22   anyone who would like to review and to get ideas of people

23   to target.  Also, we will try to send you the invitations

24   for the people on your list so that you can write a

25   personal note to people you know."

REDIRECT EXAMINATION OF H. WEINBERG                    107

1    Q.   And this was, again, during a period of time where the

2    Memphis Chapter was -- there were efforts to revitalize or

3    reorganize the Memphis Chapter?

4    A.   Correct.

5    Q.   Or the West Tennessee Chapter?

6    A.   Yes.

7    Q.   Were there still members, though, in West Tennessee at

8    this point in time?

9    A.   Oh, of course.  There have been all -- always been

10   several hundred members at a minimum in the Memphis area.

11   Q.   And is that what Ms. Lipman was referencing there?

12   A.   Yes.

13          **MS. SILK:**  Objection, leading.

14          **THE COURT:**  Objection is sustained.  That

15   suggests the answer.  You know, those yes/no questions, it

16   could be yes or no, but I'm going to sustain the objection.

17          **MR. CASTELLI:**  That's fine, Your Honor.  I'll

18   rephrase.  Thank you.

19          **THE COURT:**  Thank you.

20   BY MR. CASTELLI:

21   Q.   Ms. Weinberg, that paragraph I asked you to read, can

22   you tell me what this list of area members, what that's

23   referencing?

24   A.   Sure.  We -- we have members statewide and we were

25   able to break up our membership to identify who resided in

1    what part of the state.  So this would have been a list of

2    those folks who were ACLU of Tennessee/ACLU members, and we

3    would have shared them in order for that group of people to

4    identify if they knew the people who they could reach out

5    to.

6    Q.   So when a chapter dissolves or wanes, what happens to

7    the membership privileges of the members of the chapter?

8    A.   Well, the members are always ACLU of Tennessee members

9    and also members of the national organization, and that's a

10   formal entity always.

11   Q.   And the word "entity" was used quite a bit to refer to

12   the West Tennessee Chapter, is a chapter a formal

13   incorporated entity?

14   A.   The chapters are not and never have been, you know,

15   since the ACLU of Tennessee incorporated, formal

16   incorporated entities.  And, you know, in fact, that was

17   sometimes difficult for chapter members to recognize

18   because they were -- they existed because they were part of

19   the ACLU of Tennessee and they couldn't exist on their own.

20   Q.   Thank you.

21   A.   And wouldn't have access to the member list and things

22   like that.

23           MR. CASTELLI:  Thank you.  Those are my redirect

24   questions.

25           THE COURT:  All right.  Well, thanks very much,

REDIRECT EXAMINATION OF H. WEINBERG                    109

1   and we're going to let you step down.

2            **THE WITNESS:**  Thank you, Your Honor.

3            **THE COURT:**  We're going to see who our next

4   witness is going to be.  Who will our next witness be?

5            **MR. CASTELLI:**  Ms. Floyd has our next witness.

6            **THE COURT:**  Certainly, that's fine.

7            **MS. FLOYD:**  Plaintiff will call Sergeant Tim

8   Reynolds.

9            **THE COURT:**  That's fine.  We'll have him come to

10  the stand and be sworn in.  Anything else?

11           **MR. WELLFORD:**  Your Honor, before we get to

12  Detective -- Sergeant Reynolds --

13           **THE COURT:**  Well, where is Sergeant Reynolds?

14  We'll let him come in and be sworn.  I mean, what do we

15  need to talk about?

16           **MR. WELLFORD:**  We wanted to raise a motion under

17  Rule 56 -- under Rule 52C, a judgment on partial findings

18  on the standing issue, since it doesn't appear that there's

19  any more evidence that's being presented on the standing

20  issue and all of --

21           **THE COURT:**  Sure.

22           **MR. WELLFORD:**  And the record is sufficient for a

23  ruling.

24           **THE COURT:**  No, I agree.  I agree.

25           Okay.  Well, that's appropriate.  Let's just make

1    sure we've got the witness close by.  I think that we --

2    this is a really important issue in the case.  And I

3    certainly don't want to try to rule on it from the bench.

4    I think that's not a good idea.  I do think it would be

5    useful to rule on it as quickly as possible.  I agree with

6    that.

7          Do you -- do you want to brief that a little

8    further, because now we have a complete record?

9          **MR. WELLFORD:**  We could brief it based on the

10   testimony this morning and these exhibits over the lunch

11   hour if the Court wanted to take that.

12         **THE COURT:**  Right.  That would be better, because

13   I think we need to be thoughtful about that.  And I would

14   anticipate that we'll need at least some time to give it --

15   to complete the analysis on that.

16         So I don't want to -- I don't want to -- I

17   certainly think it's an important issue.  Don't get me

18   wrong.  I think it's very important.  I just don't -- I

19   would prefer that we get a little more briefing on it now

20   that we have the record complete, because we didn't have it

21   complete before and now we do, and I think you probably

22   want to get the transcript here.  What do you think?

23         **MR. WELLFORD:**  Well, Your Honor, of course, has

24   discretion under Rule 52C to defer the ruling, and that's

25   completely within Your Honor's discretion.

REDIRECT EXAMINATION OF H. WEINBERG                    111

1              **THE COURT:**  Sure.

2              **MR. WELLFORD:**  We thought it was appropriate.

3              **THE COURT:**  I think you nailed it down correctly.

4     I'm agreeing with you.

5              **MR. WELLFORD:**  So I mean, we frankly think

6     it's --

7              **THE COURT:**  I have the right to defer.

8              **MR. WELLFORD:**  And we're ready for you to rule on

9     it if you -- right after lunch, but your --

10             **THE COURT:**  No, I'm not waiting to rule on it

11    right after lunch.  There's an optimist in every room, but

12    I think we need to -- I think it's more important to get it

13    right than to get it fast.

14             Besides, I think that there were some interesting

15    things that came up at the end of the testimony.  I do not

16    know if the ACLU of Tennessee anticipates calling anyone

17    that was discussed in the testimony at any point in the

18    proceeding that might have personal knowledge of the

19    events.  Have you given that any consideration?

20             **MR. CASTELLI:**  Well, we can and we have actually

21    listed --

22             **THE COURT:**  I'm not telling you what to do.  You

23    don't have to do it at all.

24             **MR. CASTELLI:**  Well, no.  And obviously, I need

25    to respond to the motion that was made.  I mean, our proof

1    hasn't closed, so we do have that option, Your Honor, of

2    putting on more evidence if we choose to.

3             **THE COURT:**  I think that's correct, but it's a

4    little awkward situation because if you fail on the

5    standing question, then nothing else would be before the

6    Court.  That would resolve all issues.  So I agree with you

7    in that regard.

8             **MR. WELLFORD:**  May I --

9             **THE COURT:**  Absolutely.

10            **MR. WELLFORD:**  The only pretrial order witness

11   that's been identified as a may call witness to offer any

12   further evidence by the ACLU is Mr. Cody, and they could

13   call Mr. Cody.

14            **THE COURT:**  They could.

15            **MR. WELLFORD:**  But barring that, there -- we

16   would object to new witnesses being called.  But, Your

17   Honor, that said, we've made the motion.  We will

18   immediately start briefing it.

19            **THE COURT:**  Absolutely.

20            **MR. WELLFORD:**  And just wanted to make sure it

21   was on the record and we proceed as Your Honor wishes us to

22   proceed.

23            **THE COURT:**  No, absolutely.  And I -- well, what

24   about that?  You do have another witness that you indicated

25   you might call.

1        **MR. CASTELLI:**  Yes, Your Honor, and we may reach

2    out to that witness and see if we can get him here to

3    testify.

4        **THE COURT:**  He's just down the street.  He's not

5    very far away.

6        **MR. CASTELLI:**  So I mean, that -- so that

7    certainly -- if Mr. Cody is available and willing, since we

8    have not subpoenaed him, you know, we may bring him in to

9    testify and maybe clear up some of the things that we heard

10   today, but --

11       **THE COURT:**  Well, okay.  I think that everybody

12   knows it's a very important issue in the case, and I'm not

13   disagreeing at all.  I think we want to go through the rest

14   of the day at least, through the rest of this day, and make

15   sure that we have any proof that ACLU of Tennessee is going

16   to submit.

17            And then you're right, Mr. Wellford, at some

18   point, I think they have to -- with all due respect,

19   Counsel, at some point, Mr. Castelli, you have to complete

20   the record on that issue.  I think what Mr. Wellford is

21   asking is that we complete that record first, and we didn't

22   really organize it that way.  That's what he would like for

23   us to do.  It's not a bad idea.

24            But obviously, you can't do that on such short

25   notice, so we're going to go ahead and let you call your

1    first witness, but you will need to complete that record.

2    And we may have a discussion at the end of the day about

3    the fact that if you have no other witnesses to present on

4    the issue, then we would perhaps be able to resolve the

5    question.

6              **MR. WELLFORD:**  Thank you, Your Honor.

7              **THE COURT:**  Sure.

8              **MR. GLOVER:**  Your Honor, just a point of order

9    before we bring in the witness, we're coordinating to get

10   witnesses here when counsel wants them.

11             **THE COURT:**  Sure.  Sure.

12             **MR. GLOVER:**  And there was a little confusion

13   about the way Mr. Castelli described who would be on next.

14   And we want to make sure we have our officers available for

15   your testimony at the time, so if --

16             **THE COURT:**  Absolutely.

17             **MR. GLOVER:**  To get a better understanding who

18   would come after --

19             **THE COURT:**  You're just asking who -- what's

20   their sequence of witnesses.

21             **MR. GLOVER:**  Who's after Director Reynolds so we

22   can get the --

23             **THE COURT:**  Absolutely appropriate.  Your next

24   witness would be --

25             **MR. CASTELLI:**  Our next witness is going to be

1    Mr. Reynolds or Sergeant Reynolds.

2              **THE COURT:**  Right, Sergeant Reynolds.

3              **MR. CASTELLI:**  And after Sergeant Reynolds, we

4    will be calling Major Chandler.

5              **THE COURT:**  Okay, Major Chandler.  And who after

6    that?

7              **MR. CASTELLI:**  After that, if we have time today,

8    we would call Sergeant Wilburn.

9              **THE COURT:**  Okay.  Well, that's important.

10   You're certainly entitled to have that list, and let me see

11   if there's anything else that we need to check there.

12             I think we're ready for our next witness.  We'll

13   go for another 15 minutes or so.

14             **MS. FLOYD:**  Plaintiff calls Sergeant Timothy

15   Reynolds.

16             **THE COURT:**  Sure.  That's fine.  We'll have him

17   come in.  If you would stop there and raise your right

18   hand.

19

20

21

22

23

24

25

1                          *    *    *

2

3                          **TIMOTHY REYNOLDS,**

4  **was called as a witness and having first been duly sworn**

5  **testified as follows:**

6

7                    **DIRECT EXAMINATION**

8  **BY MS. FLOYD:**

9     Q.   Good morning.

10    A.   Good morning.

11    Q.   Could you --

12              THE COURT:  You've got your lapel mic on.

13              MS. FLOYD:  Yes, Your Honor.

14              THE COURT:  That'll be fine.  Just speak up a

15    little more and we'll be fine.

16  BY MS. FLOYD:

17    Q.   Good morning.

18    A.   Good morning.

19    Q.   Could you please state your name for the record and

20    spell it?

21    A.   Timothy, T-I-M-O-T-H-Y, Reynolds, R-E-Y-N-O-L-D-S.

22    Q.   And what is your role within the Memphis Police

23    Department?

24    A.   I'm a sergeant with the Memphis Police Department.

25    Q.   All right.  And what position do you hold at this

DIRECT EXAMINATION OF T. REYNOLDS                          117

1    time?

2    A.    I'm in the Office of Homeland Security.

3    Q.    And what role did you hold in the Memphis Police

4    Department between 2016 and 2017?

5    A.    Detective in the Office of Homeland Security.

6    Q.    And how large an office was the Office of Homeland

7    Security at that time?  How many people worked there?

8    A.    Two officers.

9    Q.    Two officers.

10         And what was the supervision structure of the Office

11   of Homeland Security?

12   A.    We report to a lieutenant and then there was a major.

13   Q.    Okay.  And who was your lieutenant at that time?

14   A.    At that time, it was Lieutenant Chandler.

15   Q.    And who was your major?

16   A.    At that time, it was Major Bass, Eddie Bass.

17   Q.    And did the Office of Homeland Security investigate

18   protest activity between 2016 and 2017?

19   A.    Yes, ma'am.

20   Q.    And what was the nature of those investigations?

21   A.    It started right after the Pulse nightclub.  We were

22   worried about large public gatherings and the safety --

23   public safety therein.

24   Q.    Now, do you recall giving a deposition in this matter?

25   A.    I do.

DIRECT EXAMINATION OF T. REYNOLDS                    118

1    Q.    And do you recall whether you mentioned the Pulse

2    nightclub during that deposition?

3    A.    No, ma'am.  I didn't.

4    Q.    You did not mention it?

5    A.    No.

6    Q.    So why did you not mention it at that time?

7    A.    The time frame was within the 2016.  When I got to

8    read a lot of material that was being put in as an exhibit,

9    it refreshed my memory.

10   Q.    Okay.  And so when was your memory refreshed?

11   A.    There's lots of stuff to go over.  It was a lot of

12   memory to be refreshed, but the whole process was a nice

13   refresh for me.

14   Q.    When in time?

15   A.    Recently.

16   Q.    How recently?

17   A.    Like within the past two weeks.

18   Q.    Within the past two weeks, okay.

19         What is the Real Time Crime Center?

20   A.    Real Time Crime Center is Memphis Police Department's,

21   like, real time analysis.  There's officers and analysts

22   inside.  They do a lot of number crunching for Part I

23   crimes to get back to the precinct.

24   Q.    And what was the interaction between the Office of

25   Homeland Security and the Real Time Crime Center?

DIRECT EXAMINATION OF T. REYNOLDS                    119

1    A.   We occupy the same building.  And sometimes when the

2    task requires it, we collaborate.

3    Q.   And how would you collaborate?

4    A.   When a directive would come in that a certain event is

5    coming up, they had social media collators, and we would

6    try to get a handle on upcoming threats in large public

7    gatherings.

8    Q.   And when you say "they," do you -- are you referring

9    to the Real Time Crime Center?

10   A.   Yes.

11   Q.   Okay.  And so how did -- did you request that they use

12   the social media collator?

13   A.   That's above my pay grade.  It was -- it was

14   already -- the request was made already.

15   Q.   Who would make the request?

16   A.   People in charge.

17   Q.   Okay.  And so there was never an occasion where you

18   would make a request of the Real Time Crime Center?

19   A.   From time to time, yes.  Yes, ma'am.

20   Q.   Okay.  And what was the nature of that request?

21   A.   There's tips from CrimeStoppers, public complaints,

22   tips from the precinct.  We have to collaborate sometimes,

23   and especially when it comes to follow-up investigations in

24   social media.  So you have to go to them to see what they

25   have, what the nature of the complaint to see if we can

DIRECT EXAMINATION OF T. REYNOLDS                    120

1    assist.

2    Q.    And with respect specifically to protest activity, how

3    did RTCC help OHS?

4    A.    They --

5              **THE COURT:**  Do not use act acronyms.

6              **MS. FLOYD:**  Yes, Your Honor.

7              **THE COURT:**  Because that is not the way human

8    beings actually speak.  Let's use real words so everybody

9    can understand what's being said.

10             **MS. FLOYD:**  Yes, Your Honor.

11             **THE COURT:**  Do you want to get that and try it

12   again?

13             **MS. FLOYD:**  Yes, Your Honor.

14             **THE COURT:**  Sure.

15   BY MS. FLOYD:

16   Q.    How did the Real Time Crime Center assist the Office

17   of Homeland Security with respect to protest events

18   specifically?

19   A.    They monitor -- the Real Time Crime Center monitors a

20   lot of social media platforms.  There's a lot of them out

21   there.  And they have a larger net than we do.  There --

22   that's -- this is not all we do over there, but that's --

23   they have a broader selection than what we would have.  We

24   are a narrow -- more narrow focus.

25   Q.    Okay.  And you're more narrow in what way?

DIRECT EXAMINATION OF T. REYNOLDS                    121

1    A.   Specific threats.

2    Q.   Specific threats?

3    A.   Yes, sir -- yes, ma'am.

4    Q.   Okay.  And so the Real Time Crime Center handles

5    general casting a net?

6    A.   Yes, sir -- yes, ma'am.

7    Q.   Okay.  All right.  So what tools did the Real Time

8    Crime Center use to investigate protest activity other than

9    the social media collators?

10   A.   As I mentioned before, there's tips from the public.

11   There's open source from news media --

12           **THE COURT:**  We're going to get you to pull the

13   mic.  I can hear you fine, but I think people probably want

14   to -- pull it a little closer.

15           **THE WITNESS:**  Okay.

16           **THE COURT:**  Just make it comfortable.

17           **THE WITNESS:**  Yes, sir.

18           **THE COURT:**  Thank you.

19           **THE WITNESS:**  Open sources from media across the

20   country, tips from the public, and also complaints from

21   like CrimeStoppers and the precincts and the bureaus.

22   BY MS. FLOYD:

23   Q.   Okay.  And when you say open source, what does that

24   mean?

25   A.   Open to the public.  I mean, in public domain.

DIRECT EXAMINATION OF T. REYNOLDS                    122

1  Q.   Okay.  With respect specifically to social media

2  platforms, what does open source mean?

3  A.   A lot of social media has an open source component.

4  In other words, as long as you have access to that

5  platform, you can see posts that are made to the public.

6  Q.   Okay.  And where a post is private, how would -- how

7  did the Office of Homeland Security access those posts?

8  A.   Through UC accounts, undercover accounts.

9  Q.   So through undercover accounts.  What undercover

10  accounts did the Office of Homeland Security use?

11  A.   Bob Smith.  A Facebook platform, Bob Smith.

12  Q.   You said -- you said undercover accounts with an S.

13  Was there -- were there accounts other than the Bob Smith

14  account?

15  A.   No, ma'am.  Not that I had access to.

16  Q.   Who had access to the Bob Smith Facebook account?

17  A.   I did.

18  Q.   Who else had access?

19  A.   Occasionally, my supervisor when I'm -- like I said,

20  there's only two of us.  When I was on vacation or if I

21  needed to illustrate something that was going on, my boss

22  had access to my -- that account.

23  Q.   And when you say your boss, who are you referring to?

24  A.   Lieutenant Chandler.

25  Q.   Would the other detective within the Office of

1    Homeland Security have access to the Bob Smith account?

2    A.   If -- well, it's -- if he walked around to my side of

3    the desk, yes, ma'am, he would have access to it.

4    Q.   Did anyone within the Real Time Crime Center have

5    access to the Bob Smith account or any other undercover

6    accounts?

7    A.   Not to my knowledge.

8    Q.   Okay.

9         **THE COURT:**  I tell you what, it looks like we may

10   be at a transition point.  We'll go ahead and take our

11   lunch break at this time.  I will make it a little longer

12   since we have more people here.  So we'll come back at a

13   quarter 'til 2:00.  That should be enough time.

14        And I do need to know from ACLU Tennessee if

15   there will be any additional proof at this time.  If you

16   can tell me -- I understand you might not be able to.

17        **MR. CASTELLI:**  I can.

18        **THE COURT:**  If you can tell me when we come back,

19   then we will know if the record is complete on the standing

20   issue.  If it's not complete, that's okay, but you will

21   need to --

22        **MR. CASTELLI:**  I can tell you right now, Your

23   Honor.  We had planned to call Mr. Mike Cody.  He'll be

24   available tomorrow morning.

25        **THE COURT:**  Okay.  Then that answers that

DIRECT EXAMINATION OF T. REYNOLDS                    124

1    question.

2              Now, I will want to know and I think that, just

3    as a matter of efficiency, I will want to know if you

4    contemplate that there might be anyone you would be adding

5    to the list.  And I understand that that will be within my

6    discretion to allow you to do so, but I think that both

7    Mr. Wellford and I want to know when this record is closed

8    on that issue.

9              If you think that you will need to add someone

10   else, you will need to tell us because I'll need to decide

11   if they can be added to the list and I'll need to give the

12   defense team a chance to be prepared as to that witness.

13   So I'm not going to ask you to tell me right now, but I

14   think that Mr. Wellford is correct that that issue will

15   need -- we'll need to have at least that much notice as to

16   where we are on that issue.  Is that something we can

17   accomplish?

18             **MR. CASTELLI:**  We can do that after lunch.  We

19   can have an answer to the Court and to the defense on --

20             **THE COURT:**  Mr. Wellford, I think that was a good

21   suggestion on your part, and we'll try to complete that

22   record so we can get the issue wound up if we can.

23             **MR. WELLFORD:**  Thank you, Your Honor.

24             **THE COURT:**  Sure.  Absolutely.

25             **MR. WELLFORD:**  Before we adjourn, can we approach

DIRECT EXAMINATION OF T. REYNOLDS                    125

1    briefly on a matter?

2              **THE COURT:**  Sure, absolutely.  Absolutely.  But

3    yeah -- and -- well, looks like we get to see you after

4    lunch.  Nice thing is you don't have to -- you cannot talk

5    to anybody about -- you know that.  You cannot talk to

6    anybody about your testimony, and so we'll see you at a

7    quarter 'til 2:00.  I think we'll be on that schedule

8    unless they hold me here really late.

9              Okay.  Thank you.

10             All right.  Then I'll have at least a

11   representative counsel come up.  You don't all have to come

12   up unless you just really want to.

13             (Bench conference between the attorneys and the

14   Court.)

15             **MR. WELLFORD:**  I don't want to make too big a

16   deal of it, but I will report that my paralegal has thought

17   she saw somebody on the back row --

18             **THE COURT:**  We have already stationed an officer

19   and they're not supposed to be videoing.  They're not

20   supposed to be photographing, and it is a policy of the

21   Judicial Council.  So I can't -- I mean, even if I wanted

22   to change that, I can't change that.  So that's -- please

23   let everybody know.

24             **MR. WELLFORD:**  Now I understand why the Court

25   made its comment.

1        **THE COURT:**  Mr. Laurenzi and I have had this on

2    more than one occasion in his previous life and absolutely,

3    certainly no photographs of any witness, no photographs of

4    anybody, absolutely no photographs of any witness or the

5    Court or the Court staff or you guys.

6        I mean, really, you know, if somebody wanted

7    background when nobody's here and they want to take a

8    picture of the seal, that's fine.  That's when nobody's

9    here except a court officer will allow that, but we don't

10   really -- there's no exception to that rule.  I know you're

11   familiar with that, too.

12       **MR. CASTELLI:**  Absolutely.

13       **THE COURT:**  Please let everybody know because

14   that's a security issue.  It's also process issue and it's

15   an order of the Judicial Council and none of us in this

16   group want to run counter to that order.

17       **MR. WELLFORD:**  And one other thing while we're

18   just --

19       **MR. CASTELLI:**  Should the Court make an

20   announcement that no one can be videoing in here.

21       **MR. WELLFORD:**  Frankly, the Court made the

22   announcement.  I didn't appreciate the why.

23       **THE COURT:**  I think I've said it once.

24       **MR. LAURENZI:**  I would simply ask the CSO be put

25   on alert.

1    **THE COURT:**  He is.  And we know that's a very

2    serious matter.  We just can't do it that way.  I know it

3    seems odd to people who see Court TV, but it's not allowed

4    and none of us can have -- we can't run counter to the

5    rule.

6    **MR. WELLFORD:**  And Mr. Castelli and I talked

7    about this briefly.  It's a very logistical point, I wanted

8    the Court to understand why, with all of the exhibits that

9    we got and we're not using them all.

10   **THE COURT:**  That's okay.  We just recently had a

11   case in Nashville and they identified about 400 exhibits,

12   and we used -- I'd have to go back and look -- 83, I think,

13   something in that range.

14   **MR. WELLFORD:**  Since we don't know which, the way

15   we are keeping up is we know them by the pretrial order

16   number, so what we're trying to do is avoid saying the word

17   exhibit, 114.

18   **THE COURT:**  Can do that, but we want to be

19   careful because I want that stack up there to be the

20   official stack and not cause people confusion.

21   **MR. CASTELLI:**  Once we reference that one,

22   another we'll refer to exclusively as the other exhibit.

23   **THE COURT:**  And Mr. Sample will print that out

24   for you as you need it.

25   **MR. WELLFORD:**  We just wanted you to know why

1    we're doing it.

2              **THE COURT:**  Do you want me to say?

3              **MR. CASTELLI:**  Maybe turnover and people coming

4    in, so it may not hurt.

5              (Bench conference between the attorneys and the

6    Court concluded and the proceedings continued as follows:)

7              **THE COURT:**  Counsel have asked me to explain one

8    thing, which is that the Judicial Council of the United

9    States does not allow the filming or photographing of any

10   proceeding in a United States courtroom.  I don't make that

11   rule.  That is -- it is a rule that they have promulgated

12   and we are obligated to respect.  So just like a rule in

13   any other circumstance, we must do that.

14        There are many reasons for it, but that's simply

15   an important rule.  The courtroom deputy will remind

16   anybody if that's confusing.  It's not meant to impinge on

17   anybody or do anything else.  It relates more to respecting

18   the process.  It's very important that everyone feel free

19   within this environment, just like we don't in any other

20   environment, to proceed in an effective way.  And we

21   certainly wouldn't want anyone's ability to do that to be

22   impaired; and therefore, there's no broadcasting.  There's

23   no filming and there are no photographs.

24        So I just urge everyone, please respect that.

25   That's an important rule.  I think we're having a case

129

1    about people not wanting to be photographed and filmed, et

2    cetera, we ought to respect the same thing for the Court,

3    and I'm going to ask everybody to be careful in that

4    regard.

5            All right.  We're going to let everybody be

6    excused.  We'll look forward to seeing everybody back -- I

7    tell you what, because we got started here, there are a

8    good many people here, lunch is not so easy to do since

9    there's no facility in the building.  We'll come back at

10   2:00, and that will give everybody, including counsel, who

11   has an important announcement to make, to give him a chance

12   to make sure he's made it and he's content with that, both

13   of you.  Thank you very much.  We'll see you at 2:00.

14   Thank you.

15            (Lunch break.)

16            (End of Volume 1.)

17

18

19

20

21

22

23

24

25

130

**C E R T I F I C A T E**

          I, LISA J. MAYO, do hereby certify that the
foregoing 130 pages are, to the best of my knowledge, skill
and abilities, a true and accurate transcript from my
stenotype notes of the trial, on 20th day of August, 2018, in
the matter of:


ACLU of Tennessee

vs.

City of Memphis, Tennessee


Dated this August 28, 2018




                              _____S/Lisa J. Mayo_____

                              LISA J. MAYO, LCR, RMR, CRR
                              Official Court Reporter
                              United States District Court
                              Western District of Tennessee