131

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF TENNESSEE

3                  WESTERN DIVISION

4   ═══════════════════════════════════════════════════

5   ACLU of Tennessee, Inc.,

6                  Plaintiff,

7   vs.                              NO. 2:17-cv-02120

8   City of Memphis, Tennessee,

9                  Defendant.

10  ─────────────────────────────────────────────────



13              TRANSCRIPT OF PROCEEDINGS

14                  NON-JURY TRIAL

15                    VOLUME II


17      BEFORE THE HONORABLE JON P. MCCALLA, JUDGE


19                     MONDAY

20             20TH OF AUGUST, 2018





23              LISA J. MAYO, CRR, RMR
24                OFFICIAL REPORTER
             FOURTH FLOOR FEDERAL BUILDING
25            MEMPHIS, TENNESSEE 38103

132

1              A P P E A R A N C E S

2

3

4

5     Appearing on behalf of the Plaintiff:

6              THOMAS HAUSER CASTELLI
               AMANDA STRICKLAND FLOYD
7              American Civil Liberties Union Foundation of
               Tennessee
8              210 25th Avenue N. Suite 1000
               Nashville, TN 37212
9              (615) 320-7142

10

11

12    Appearing on behalf of the Defendant:

13             BUCKNER WELLFORD
               JENNIE VEE SILK
14             LAWRENCE LAURENZI
               R. MARK GLOVER
15             Baker Donelson Bearman Caldwell & Berkowitz
               165 Madison Avenue, Suite 2000
16             Memphis, TN 38103
               (901) 526-6000

17

18

19

20

21

22

23

24

25

# **W I T N E S S   I N D E X**

| WITNESS | PAGE | LINE |
|---|---|---|
| TIMOTHY REYNOLDS | 150 | 08 |
| Direct Examination By Ms. Floyd | | |

1                    E X H I B I T   I N D E X

2    EXHIBIT _____    PAGE      LINE

3
     23      Compilations from Facebook         149    15
4            using undercover account
     24      Bob Smith Facebook Posts and       152    24
5            Apps and Websites
     25      Bob Smith Facebook Comments        154    19
6    26      Bob Smith Facebook Follow List     158    24
     27      Bob Smith Facebook Event           160    14
7            Invitations and Responses
     28      Bob Smith Facebook Your Group      163    1
8            Membership Activity
     29      Bob Smith Facebook Your Posts      165    12
9            and Comments
     30      Bob Smith Facebook Posts and       166    6
10           Comments
     31      Bob Smith Facebook Posts           168    23
11   32      E-mail: Jerry Blum to Timothy      171    17
             Reynolds (10/4/2016, 12:26:47
12           PM)
     33      E-mail:Timothy Reynolds Sgt.       175    8
13           Edwin Cornwell, et al.
             (3/3/2017, 7:30:12 AM)
14   34      E-mail: Major Eddie Bass to        178    15
             Interim Director Michael
15           Rallings (7/6/2016, 7:39:06
             PM)
16   35      E-mail: Major Eddie Bass to        180    2
             Caralee Barrett, et al.
17           (7/6/2016, 8:16:29 PM)
     36      E-mail: Major Eddie Bass to        181    24
18           Timothy Reynolds; Lt. Stephen
             Chandler (7/6/2016, 9:33:PM)
19   37      E-mail: Major Eddie Bass to        183    11
             Colonel Russell Houston; Major
20           Keith Watson, et al.
             (7/28/2016, 8:40 AM)
21   38      Database List                      187    9
     39      E-mail:Timothy Reynolds to         188    5
22           Colonel Gloria Bullock, Major
             Doreen Shelton (7/8/2016,
23           10:55:53 PM)
     40      E-mail: Lt. Stephen Chandler       188    25
24           to Bill Oldham (7/9/2016,
             12:13:24 AM)
25   41      Microsoft Exchange  on behalf      189    7
             of Colonel Gloria Bullock

| | | | | |
|---|---|---|---|---|
| 42 | E-mail: Major Eddie Bass to Timothy Reynolds, et al. (7/10/2016, 3:18:59 PM) | 191 | 1 |
| 43 | E-mail: Timothy Reynolds to Jerry Blum, et al. (7/10/2016, 5:07:59 PM) | 192 | 7 |
| 44 | E-mail:Timothy Reynolds to MEM MPD Executive Staff ,et al. (7/12/2016, 11:50:54 PM) | 193 | 9 |
| 45 | E-mail from Timothy Reynolds to Major Eddie Bass, et al. (7/14/2016,12:07:09 PM) | 194 | 1 |
| 46 | E-mail from Timothy Reynolds to Major Eddie Bass, et al. (7/14/2016,12:00:10 PM) | 194 | 25 |
| 47 | E-mail from Stephen Chandler to Timothy Reynolds (7/12/2016, 3:46:18 PM) | 197 | 20 |
| 48 | E-mail from Timothy Reynolds to Kevin Bebout (7/7/2016,12:47:21 PM) (REDACTED) | 198 | 24 |
| 48a | Shelby County Sheriff  Record (REDACTED) | 200 | 10 |
| 49 | E-mail from Timothy Reynolds to Phillip Penny (7/14/2016, 3:37:06 PM) | 206 | 3 |
| 50 | E-mail from Colonel Paul Wright to MEM MPD OCU, et al. (4/12/2016, 12:13:36 PM) | 207 | 3 |
| 51 | E-mail from Major Eddie Bass to Timothy Reynolds, et al. (7/15/2016, 12:41:32 PM) | 207 | 20 |
| 52 | E-mail: Jessica Grafenreed to MEM MPD Executive Staff, et al. (7/15/2016, 5:27:03 PM) | 208 | 9 |
| 53 | E-mail:Timothy Reynolds to Stephen Chandler, Phillip Penny (7/15/2018, 9:42:03 AM) | 209 | 16 |
| 54 | E-mail: Jessica Grafenreed to Major Eddie Bass, et al. (8/13/2016, 10:54:31 AM) | 210 | 7 |
| 55 | E-mail: Major Dana Sampietro to Timothy Reynolds (8/13/2016, 12:12:39 PM) | 211 | 16 |
| 56 | E-mail: Mr. Victor Torres to Aaron Anderson, et al. (7/27/2016, 3:50:53 PM) | 213 | 15 |
| 57 | E-mail: Major Eddie Bass to Colonel Russell Houston, et | 218 | 10 |

```
1          al. (7/23/2016, 4:09:16 PM)
    58     E-mail: Major William Freed to     223    6
2          Timothy Reynolds, et al.
           (SEALED)
3   59     E-mail: Timothy Reynolds to        228    17
           Sgr. Edwin Cornwell, et al.
4          (2/4/2017, 7:46:59 AM)
    60     E-mail: Timothy Reynolds to        229    5
5          Colonel Gloria Bullock
           (1/21/2017, 9:30:44 AM)
6   61     E-mail: Jessica Grafenreed to      230    8
           Timothy Reynolds, et al.
7          (7/16/2016, 1:56:38 PM)
    62     E-mail: Timothy Reynolds to        231    3
8          Timothy Reynolds (9/30/2016,
           8:12:06 PM)
9   63     E-mail: Timothy Reynolds to        231    25
           MEM MPD Executive Staff, et
10         al. (10/4/2016, 7:40:13 AM)
    64     E-mail: Timothy Reynolds to        232    16
11         Lt. Colonel Dana Sampietro
           (10/11/2016, 3:47:21 PM)
12  65     E-mail: Timothy Reynolds to        233    25
           MEM MPD Executive Staff, et
13         al. (10/12/2016, 7:30:41 AM)
    66     E-mail: Officer Bradley            234    16
14         Wilburn to Timothy Reynolds,
           et al. (7/21/2016, 9:14:22 PM)
15    67   E-mail: Timothy Reynolds to        235    11
           MEM MPD Executive Staff, et
16         al. (7/22/2016, 11:50:23 PM)

17

18

19

20

21

22

23

24

25
```

1                          **MONDAY**

2                     **August 20, 2018**

3          The trial of this case began on this date,

4    Monday, the 20th day of August, 2018, at 9:00 a.m., when

5    and where evidence was introduced and proceedings were had

6    as follows:

7                    -----------------------

8

9          **THE COURT:**  There has been an inquiry about the

10   policy of Judicial Conference regarding broadcast of the

11   court proceedings, so we've got a copy of that for each of

12   you and anybody else who wants it.  Basically, I'm going to

13   read a very brief part of it.  It says, "Judicial

14   Conference policy does not allow proceedings in civil and

15   criminal proceedings of the District Court to be broadcast,

16   televised, recorded or photographed for the purpose of

17   public dissemination."

18          It goes on, but basically that's what it says.

19   And it's basically -- as I understand it, the conference

20   policy does not authorize the contemporaneous transmission

21   of photographs, recordings or broadcast.  I think that was

22   a question that was asked, and I don't think that I've

23   heard that anybody was engaged in the contemporaneous

24   transmission of anything so far.  So I think that gives you

25   a copy.  If you want to get a copy of it, of course they'll

1    give you one.

2              All right.  I think we're ready with our witness.

3    Hopefully, they let you each lunch.

4              **THE WITNESS:**  Yes, sir.

5              **THE COURT:**  Absolutely.  We're ready to proceed.

6              **MR. CASTELLI:**  Your Honor, did you want to take

7    up the issue of standing witnesses?

8              **THE COURT:**  Yes.  I did want to check and see

9    where you were on that, and so where are we on that?

10             **MR. CASTELLI:**  Well, we've conferred and I've

11   confirmed -- we think it might be helpful for the Court to

12   hear from Mr. Kramer, who was the original counsel on the

13   Kendrick case and could maybe clear some of this up.

14             **THE COURT:**  It's your choice.

15             **MR. CASTELLI:**  But he was not on our witness

16   list.

17             **THE COURT:**  He was not on your witness list.

18             **MR. CASTELLI:**  So I mean, I'm sure that the --

19             **THE COURT:**  Any objection to Mr. Kramer

20   testifying in this matter?

21             **MR. WELLFORD:**  Yes, there is, because it's not --

22   he's not only not on the witness list, but he's been

23   sitting in the courtroom all morning and it would violate

24   the Rule of Exclusion under Federal Rule of Evidence 615.

25   Plus, he's still an attorney for a dismissed party but

1    nonetheless parties in this litigation.  And so, I mean,

2    there are multiple reasons we would object to that.

3            **THE COURT:**  I think that I understand that.  What

4    about that?  Now, anybody else besides -- obviously, you

5    are going to call Mr. Cody, right, tomorrow?

6            **MR. CASTELLI:**  Yes, sir, tomorrow morning.

7            **THE COURT:**  Okay.  Mr. Cody.

8            I think what would have to happen if we're going

9    to have Mr. Kramer testify, if you anticipate that that's

10   what you want to do, is that since you did not know that he

11   was a witness until this time and it's a little awkward,

12   but we could excuse him to the witness room.  I know he had

13   a different reason for being present.  He had a reason to

14   be present because he represented a dismissed party, and he

15   was here because there could be an appeal in connection

16   with the dismissal of the party.  Is that correct?

17           **MR. KRAMER:**  Yes.  And another reason is that the

18   City and the ACLU have subpoenaed those people and I

19   represent them.  And so if they were going to be called to

20   the witness stand, I'd want to be here.

21           **THE COURT:**  Sure.  They're entitled to have

22   counsel.  So you're here in the capacity as an attorney for

23   witnesses who are to be presenting testimony in the case.

24           **MR. KRAMER:**  Who may be.

25           **THE COURT:**  May be, as well as an attorney who

1   may be pursuing an appeal in connection with their

2   dismissal.

3           **MR. KRAMER:**  I did not know I was going to be

4   called or even suggest I be called, and that's why I sat

5   here.  But if Your Honor allows me to testify because,

6   frankly, I can clear up a lot of the stuff that took place

7   in the '70s and --

8           **THE COURT:**  The issue is whether or not -- one,

9   it would have to amend the pretrial order, which we

10  certainly can do.  That's -- you know, our interest is

11  always to have a merits determination.

12          And the second thing is whether or not

13  Mr. Wellford or the defense team would have needed to

14  obtain any information from you or deposition-type

15  information if they contemplated that you were going to be

16  a witness.  I don't know if they would or would not have

17  done that.

18          I suppose the third thing is, is there any issue

19  regarding attorney/client privilege, which is a different

20  issue, which is usually somewhat more complicated and not

21  been asserted.

22          So what I would prefer to do, because we do this

23  whenever we can in any case, is if we can deal with the

24  issue of the surprise, then -- and I know that you've been

25  sitting here, but you were not contemplated to be a

1   witness, we would allow you to be called if they're going

2   to give notice right now.

3            And if you're doing that, then you need to say

4   so, and then I would need to let the defense have an

5   opportunity -- if they want to take a brief deposition this

6   evening, they would be able to do that.  That's -- that

7   eliminates any surprise.  They may not want to do that, but

8   they might want to.  And then you would appear at some

9   point in the proceeding if that's what ACLU Tennessee wants

10  to do.  So you have to make a decision.

11           **MR. CASTELLI:**  I think given the testimony that

12  we've had today, I think that would be our decision to call

13  Mr. Kramer, so we would give that notice.

14           **THE COURT:**  Well, it's an element of unfairness

15  to Mr. Wellford and the defense team.  So the question is,

16  how do we remedy that?  I've already suggested one way,

17  which is -- we've done this before.  We've had brief

18  depositions given in the evening.  I hate to do that to

19  everybody.  But I don't hate to that much.  I mean, if it's

20  fair --

21           **MR. KRAMER:**  We did that in the case I was in

22  with Your Honor.

23           **THE COURT:**  Right.  We've actually done that.  We

24  have actually done that, and that's a way to be fair.  It's

25  always critical that we not have a trial by ambush or

1    surprise, and that would mean that we would try to stop

2    pretty close to 5:00 or 5:15 as opposed to going perhaps a

3    little later so that you would have the opportunity --

4    defense team would have an opportunity to make a decision

5    and then set that up.

6          Mr. Kramer, would you object to being deposed

7    briefly?  That also means if we're going to call you, we

8    may have to exclude you to the witness -- excuse you to --

9          **MR. KRAMER:**  I'll be excused, certainly.  And if

10   I'm not going to be called back, I'd rather go back to my

11   office.

12         **THE COURT:**  Oh, you can go back to your -- where

13   is your office?  It's like way out there in the --

14         **MR. KRAMER:**  West Nashville.

15         **THE COURT:**  West Nashville, that's right.  That's

16   West Nashville.  They would just need to be able to make

17   sure that they could -- Mr. Wellford's office is downtown.

18   And I would require that if they want to take your

19   deposition, they could do it at their office.  I wouldn't

20   require them to take it out of your office.

21         **MR. KRAMER:**  No, I don't mind coming back.

22         **THE COURT:**  Okay.  Mr. Wellford, under the facts

23   presented, I think that's what we ought to do.  It is an

24   important issue and we shouldn't have it be decided with an

25   incomplete record.

1              At the same time, you can arrange this any way

2      you want.  If you want to take that deposition or if

3      Ms. Silk wants to take that deposition -- is she the one in

4      charge here on that part of the case?

5              **MR. WELLFORD:**  I was going to depose -- I

6      would -- I will be cross-examining Mr. Cody and was

7      preparing to do that.  We'll have to consult on how to

8      handle Mr. Kramer.  And actually, I assume, under the

9      circumstances, we would want to depose him if he's going to

10     be allowed to testify.

11             **THE COURT:**  Sure.

12             **MR. WELLFORD:**  Although I don't think it's a

13     curable problem, but -- but we would like to --

14             **THE COURT:**  Absolutely.

15             **MR. WELLFORD:**  -- depose him, and I would ask

16     that we would both be entitled to examine him because we

17     haven't made a decision over who would handle him tomorrow.

18             **THE COURT:**  Sure.  I think it's really any -- any

19     way that we need to proceed to level the playing field is

20     absolutely appropriate.  I can't -- it's a little awkward.

21     I'm not -- you're saying that Ms. Silk and you would both

22     cross-examine him?

23             **MR. WELLFORD:**  Not necessarily --

24             **THE COURT:**  It'd be kind of odd.

25             **MR. WELLFORD:**  I don't want to be precluded.  I

1  guess I'd probably whisper in her ear or she'd whisper in

2  my ear.

3          THE COURT:  I suggest you and Ms. Silk talk about

4  that and decide how you want to do that.

5          MR. WELLFORD:  Right.

6          THE COURT:  Is that okay?  And if it's necessary

7  because of a lack of preparation time, which I understand,

8  it's not easy to do, then we'll make an unusual -- that

9  would be an unusual accommodation, but we would make an

10  unusual accommodation.  That's what we'll do.  I'm not --

11  I'm not urging that.

12          MR. WELLFORD:  Respectfully, I don't believe it's

13  an -- from our point of view, the whole situation is

14  unusual and we do not believe that taking the deposition

15  cures the problem, but we would like to take the deposition

16  if the Court affords us an opportunity to do that, lacking

17  other options.

18          THE COURT:  We would typically allow an attorney

19  who is representing a dismissed party whose -- individuals

20  have been called as witnesses in the case to be present.

21  So that wasn't anything unusual.  The decision, though, to

22  possibly or appears likely now call Mr. Kramer appears,

23  honestly, not to have been made until --

24          MR. WELLFORD:  And I in no way -- look,

25  Mr. Castelli and Ms. Floyd, there's no blame placed there

1    at all.  Not at all.  We're just trying to deal with the

2    situation as it presents right now.

3              THE COURT:  Absolutely.  We're going to do as

4    much as we can to make this work properly.

5              Mr. Kramer, it looks like that you are excused

6    now.  If your clients are called, it's sort of an

7    interesting scenario there and you have -- you have someone

8    who can pitch in on that?

9              MR. KRAMER:  I heard Mr. Castelli's witness list.

10   And if we get through all of them by 4:00 or 5:00, you're

11   really moving fast.

12             THE COURT:  Oh, I don't -- I'm not worried about

13   getting through everybody in that time.  Absolutely.

14             MR. WELLFORD:  I do -- I would like to, if Your

15   Honor would permit, if Mr. Kramer has any documents that

16   are relevant --

17             THE COURT:  Sure, absolutely.

18             MR. WELLFORD:  -- we are assuming that he will

19   bring them or try to make them available.  And we don't

20   really want to be hearing about, well, I'm sure I've got

21   some documents back in my office somewhere tomorrow.

22             THE COURT:  Absolutely, absolutely.

23             MR. WELLFORD:  If there are documents that are

24   pertinent to the inquiries that have been made, we expect

25   that they will be brought with them tonight.  And we would

1    be prepared to start the deposition at 6:00.

2           THE COURT:  Absolutely.  Do you believe you have

3    any documents that might be relevant in the case?

4           MR. KRAMER:  I believe I do.

5           THE COURT:  Then we'll have -- we're going to

6    have to have essentially a rule.  Everything has to be a

7    little flexible in the system since we have to respond to

8    every situation.  But if the documents are not produced to

9    defense counsel, hopefully this evening, all this evening,

10   but certainly in advance of your testimony and hopefully

11   all this evening, then production at the trial would not be

12   permitted, and that would -- that would be unfair.

13          MR. KRAMER:  I understand.  I will also make

14   copies for the ACLU because they haven't seen these,

15   either.

16          THE COURT:  Okay.  Okay.  Well then, you'll

17   produce those to Mr. Wellford and his team and to

18   Mr. Castelli and his -- Castelli and his team at 6:00 this

19   evening at the offices of Baker Donelson.  Is that the

20   thought?

21          MR. WELLFORD:  If we're able to get them by 6:00,

22   maybe it might be easier to take the deposition at 7:00,

23   you know, we have some time to delve through them.

24          THE COURT:  He's going to have to be there at

25   6:00 anyway.

147

1          **MR. WELLFORD:**  Okay.  And that's fine.  That's

2    fine.

3          **MR. KRAMER:**  It's your downtown office and not

4    the one out east?

5          **MR. WELLFORD:**  Right, downtown.

6          **THE COURT:**  I think we've got all that covered.

7    I appreciate everybody's really cooperation and trying to

8    get the issue properly addressed.

9          All right.  I think we're ready to proceed,

10   though.  And, Ms. Floyd, I think we're ready for you to

11   come back up here.

12         I will remind everybody, because we have some

13   people coming in and out and, of course, the court security

14   officer knows and Mr. Freeman knows that no recording, no

15   photographs.  There's lots of good reasons for that, and we

16   certainly don't want to have an adverse effect on anybody

17   in terms of their testimony or anything else.  So we know

18   that's the way to handle that.

19         And, Mr. Freeman, if there's an issue and you

20   want to bring somebody -- if you're concerned about

21   something, you'll just tap them on the shoulder and ask

22   them.

23         All right.  And we've got Ms. Oliver back there.

24   Ms. Oliver is the deputy court clerk.  She's the one who

25   runs everything, and she will -- well, that's the truth.

1    And we appreciate -- if we haven't -- if somebody's got a

2    question about it, we've disseminated the Judicial

3    Conference policy and that's the one we're going to follow.

4    Thanks so much.  Appreciate it.

5              Yes, ma'am.  I think we're all set to go.

6              **MS. FLOYD:**  All right.  I'm ready.

7              **THE COURT:**  Okay.

DIRECT EXAMINATION OF T. REYNOLDS                    149

1                        **TIMOTHY REYNOLDS,**

2   **was called as a witness and having first been duly sworn**

3   **testified as follows:**

4

5                    <u>**DIRECT EXAMINATION (CONTINUED)**</u>

6   <u>**BY MS. FLOYD**</u>:

7     Q.   All right.  Welcome back.

8     A.   Thank you.

9           **MS. FLOYD:**  All right.  Let's see.  I am going to

10    mark the next exhibit.  It is a compilation of friendship

11    relationships from Facebook.

12          **THE COURT:**  All right.  That will be 23, marked

13    and received.

14          (WHEREUPON, the above-mentioned document was

15    marked as Exhibit Number 23.)

16          **MS. FLOYD:**  That's pretrial Number 161.

17  BY MS. FLOYD:

18    Q.   All right.  I'm going to --

19          **MS. FLOYD:**  May I approach the witness, Your

20    Honor?

21          **THE COURT:**  You may.

22  BY MS. FLOYD:

23    Q.   All right.  And do you recognize, Sergeant -- is it

24    Sergeant Reynolds, your title is now?

25    A.   Yes, ma'am.

1    Q.    Wonderful.

2         Sergeant Reynolds, do you recognize the document that

3    I have handed you?  If you have not seen it before, do you

4    recognize what it is generally?

5    A.    Yes, ma'am.  I recognize generally what it is.

6    Q.    Okay.  And can you explain for us what it is?

7    A.    It's a list of associations of my undercover account

8    with other people.

9    Q.    Okay.  Wonderful.  And I'll take that back from you

10   and put it on the projector.  Thank you.

11        All right.  And turning to the second page, does this

12   document indicate -- what does this page indicate?

13   A.    That my undercover account was friends with Paul

14   Garner.

15   Q.    All right.

16   A.    May I see that one again?  2015 was the year, wasn't

17   it?

18   Q.    Yes.  When does it indicate that the Bob Smith account

19   became friends with Paul Garner?

20   A.    August 2015.

21   Q.    All right.  And turning to Bates Number 5 -- let's

22   see -- 569, what does this page indicate?

23   A.    My undercover account was friends with Spencer Kaaz in

24   May of 2016.

25   Q.    Okay.  And does it indicate that there were

1    interactions between the Bob Smith account and Spencer Kaaz

2    that were public?

3    A.   Yes.  It's been redacted, but I wished Spencer a happy

4    birthday.

5    Q.   And I'll move on.

6         All right.  Bates Number 571, what does this page

7    indicate?

8    A.   That my undercover account is friends with Al Lewis.

9    I believe his proper name is Aaron Lewis.  And that was

10   July of 2016.

11   Q.   Okay.  And how many friends did you have in common

12   with Al Lewis, the Bob Smith account?

13   A.   We had 14 friends in common.

14   Q.   What does this page indicate, Bates Number 577?

15   A.   That my undercover account was friends with Tami

16   Sawyer, and we had 18 mutual friends in common in July of

17   2015.

18   Q.   So July 2015 was when you became friends with Tami

19   Sawyer?

20   A.   Yes, ma'am.

21   Q.   All right.  This is Bates Number 579, and what does

22   this page indicate?

23   A.   My undercover account was friends with Bradley

24   Watkins.  We had 19 mutual friends in common and we were

25   friends since November of 2015.

DIRECT EXAMINATION OF T. REYNOLDS                    152

1    Q.   All right.  And that's -- the pages that I have

2    referenced, that's just a sampling of the friends -- friend

3    associations the Bob Smith account had?

4    A.   Yeah.  Yes, ma'am.  It's just a sampling.  Yes, ma'am.

5    Q.   All right.  In all, prior to the Bob Smith account

6    being made public, how many friends did the Bob Smith

7    account have?

8    A.   When was it made public?

9    Q.   July -- around July 20th of this year.

10   A.   I don't know really how many friends.  It was in the

11   hundreds.

12   Q.   In the hundreds.  Was it more than 200?

13   A.   Possibly.

14   Q.   Was it more than 300?

15   A.   I don't know.

16   Q.   Okay.

17          **MS. FLOYD:**  All right.  The next exhibit I'll

18   mark is the posts from apps and website section of the Bob

19   Smith data file.  The next few will be from 139.  It was

20   just designated portions.

21          **THE COURT:**  All right.  That's 24, marked and

22   received.

23          (WHEREUPON, the above-mentioned document was

24   marked as Exhibit Number 24.)

25   BY MS. FLOYD:

1    Q.    Do you recognize what this document is?

2    A.    Not really.  Is this after the account was closed and

3    this is like an ART file, basically?

4    Q.    It's the data file produced by the City.

5    A.    Once my account was closed, I didn't see the data --

6    this document.

7    Q.    If you look on the last page of the document, it will

8    tell you the day it was prepared.

9    A.    July 26th of 2018.

10   Q.    Okay.  And what section of the data file is it, if you

11   look at the front page?

12   A.    Posts from apps and websites.

13   Q.    Okay.  And I'll put it up so everyone can see.

14         Okay.  And looking just at this first page, what are

15   the -- what is the first entry?

16   A.    It says, "Posts from the apps that you've given

17   permission to post on your behalf.  Bob Smith reviewed

18   Memphis Coalition of Concerned Citizens March 5th of 2018

19   at 11:55 a.m."

20         Is that all you wanted?

21   Q.    Then turning back to the time period at issue, and

22   that's still on the first page, what is the next entry

23   after the Coalition of Concerned Citizens?

24   A.    "Bob Smith likes an article, Protesters Arrested at

25   Meetings Over Jobs, Incarceration."

1    Q.   Okay.  And this data file doesn't capture -- does this

2    data file capture whether your friends -- Bob Smith's

3    friends interacted with these posts?

4    A.   I don't know, ma'am.

5    Q.   Do you see here where that information is indicated?

6    A.   There's -- are you talking about the computer link

7    there?

8    Q.   Is there any indication on this page whether someone

9    liked the post or commented on it?

10   A.   No, ma'am.  I don't see one.  "Bob Smith likes an

11   article," is that what you're -- that's the only like I see

12   on the page.

13   Q.   Okay.

14        **MS. FLOYD:**  The next exhibit will be the comments

15   section from the Bob Smith data file.

16        **THE COURT:**  Right.  Marked as the next-numbered

17   exhibit, 25.

18        (WHEREUPON, the above-mentioned document was

19   marked as Exhibit Number 25.)

20   BY MS. FLOYD:

21   Q.   All right.  Sergeant Reynolds, this is the same as

22   before.  Do you recognize this document?

23   A.   Yes, ma'am.

24   Q.   What section is it?

25   A.   It's the comments section of the ART file.

DIRECT EXAMINATION OF T. REYNOLDS                    155

1    Q.   Okay.  All right.  And when was the most recent

2    comment that's captured through this section?

3    A.   January 24th of 2018.

4    Q.   Okay.  Looking at the -- on the second page of this

5    exhibit, looking at the comment on the Southern Poverty Law

6    Center's link, what is the -- what is the nature of that

7    comment?

8    A.   I'll read the comments.  It says, "Entitlement

9    programs like welfare, food stamps and free cell phones has

10   crippled America.  Rather than be forced to find work,

11   people are staying and refusing to work.  As a man of

12   color, I choose to live in the area where I can give back.

13   Where crime is still rampant, I am trying to reach out --

14   to reach young people and young mothers.  My party, the

15   Democrat party, has turned its back on us helping us get

16   out.  Instead they have enabled us to stay down and have

17   brainwashed many to believe that the handouts are hand-ups.

18   They aren't when you never get up.  When you're always

19   down, how is this handout helping?"

20   Q.   Okay.  When was that comment from?

21   A.   Where was it?  Southern Poverty Law Center.

22   Q.   On what date?

23   A.   August 7th, 2016.

24   Q.   All right.  And just for the record, you are not a man

25   of color?

1    A.    No.

2    Q.    Okay.  But the Bob Smith account identified as a man

3    of color online?

4    A.    Okay.

5    Q.    I'm asking for your testimony.

6    A.    I was never asked what color I was.

7    Q.    Okay.  So in this comment where you say "a man of

8    color," you are not identifying as a man of color?

9    A.    I don't -- I might have cut and paste that from some

10   other place.  I don't know where I got that.  It's been a

11   while.

12   Q.    Okay.

13          **THE COURT:**  If you ask a little different

14   question, to whom was that comment attributed as an

15   individual, just so we'll be clear?

16   BY MS. FLOYD:

17   Q.    To whom was that comment attributed?

18   A.    I don't recall.

19   Q.    As -- was it attributed to Bob Smith?

20   A.    I -- Bob Smith posted it, but I don't know.  There was

21   no one in particular that was attributed to.

22   Q.    So what was the purpose of -- why was that important

23   to post from the Bob Smith account?

24   A.    At the time, I thought that needed to be posted.

25   Q.    For what reason?

1    A.   I don't -- I don't know.  Just needed to be posted.

2    Q.   Okay.

3              **THE COURT:**  I'm sorry, who posted it?

4              **THE WITNESS:**  I did.

5    BY MS. FLOYD:

6    Q.   So explaining the Bob Smith account, maybe let's zoom

7    out a little bit and explain what the Bob Smith account

8    was.

9    A.   It was my undercover account.  And part of the process

10   of having an undercover account is you have to -- you have

11   to post stuff in order to look like an active account.  And

12   that's just probably a post I wanted to make, to make it

13   look like it was still an active account.

14   Q.   Okay.  And turning to Bates Number 23882, does --

15   when -- I guess maybe I'll ask this before we go to this

16   page:  When did you begin posting to the Bob Smith

17   account -- when -- when did you start posting to the Bob

18   Smith account?

19   A.   Probably back when I first opened it.  When was it,

20   2010 or '09?

21   Q.   Okay.  And did the -- did your use of the Bob Smith

22   account change over time?

23   A.   It has.

24   Q.   Okay.  And can you explain that change?

25   A.   When I first opened the account, it was strictly --

1    well, it's always been a police account.

2    Q.    Okay.

3    A.    During the course of my duties as a police officer and

4    an investigator at a precinct and on the task force, we are

5    from time to time required to try to identify suspects,

6    gang members, and a few complaints that are made on social

7    media, and I wasn't going to use my account.  So I

8    developed this account for just about everything else other

9    than what I wanted to do personally.  So there's games on

10   it.  There's basic investigations being done on it, too.

11   Q.    Okay.  And you testified earlier that you used the

12   account to investigate protest activity.  When did you

13   begin to use the account in that capacity?

14   A.    Right around the time that the zoo protest started in

15   earnest.  That was probably in May of 2016.

16   Q.    Okay.

17          **MS. FLOYD:**  Okay.  I'll go to the next exhibit.

18          **THE COURT:**  Marked and received as 26.

19          **MS. FLOYD:**  The next exhibit will be the people

20   that the Bob Smith account was following, so the

21   "following" -- the "following" section from the Bob Smith

22   account, if that makes sense.

23          (WHEREUPON, the above-mentioned document was

24   marked as Exhibit Number 26.)

25   BY MS. FLOYD:

1    Q.   All right.  And do you recognize this section, this

2    Facebook section?

3    A.   Yes, ma'am.  This is from the archive file from

4    Facebook, and it's just a compilation of people I was

5    following.

6    Q.   Okay.  And when you say "I was following," do you --

7    A.   My undercover account, I was following through my

8    undercover account.

9    Q.   Okay.  This is the final page of the data file section

10   Bates Number 23917, and what does this entry indicate?

11   A.   I was following Thaddeus Matthews.

12   Q.   And when did you begin following Thaddeus Matthews?

13   A.   Mr. Matthews was assaulted at a club by Jeffries, and

14   that's when I started following Thaddeus Matthews.

15   Q.   And the question is when?

16   A.   Oh, September 13th, 2015.

17   Q.   Okay.

18        Okay.  And this is Bates Number 23916, and what does

19   this entry indicate?

20   A.   I was following Wendi Thomas, Wendi C. Thomas,

21   July 24th, 2016.

22   Q.   And who is Wendi Thomas?

23   A.   She used to be with the Commercial Appeal.

24   Q.   All right.  And what does this entry indicate?

25   A.   I was following Devante Hill, August 15th of 2016.

DIRECT EXAMINATION OF T. REYNOLDS                160

1    Q.   Okay.  And how did you decide on behalf of the Bob

2    Smith account to follow individuals through the Bob Smith

3    account?

4    A.   Usually we're following current events in Memphis, and

5    also, from time to time, complaints as a part of our normal

6    workload that required follow-up research on social media;

7    to be specific, Facebook.

8    Q.   Okay.

9         **MS. FLOYD:**  All right.  The next exhibit will be

10   the event invitation page data file section of the Bob

11   Smith Facebook account.

12        **THE COURT:**  Marked and received as 27.

13        (WHEREUPON, the above-mentioned document was

14   marked as Exhibit Number 27.)

15   BY MS. FLOYD:

16   Q.   All right.  And what does this section indicate?

17   A.   This is an archive file of Facebook invitations to

18   events --

19   Q.   Okay.

20   A.   -- that my undercover -- I, through my undercover

21   account, had received.

22   Q.   What was the final word you said?  I'm sorry, it was

23   muffled.

24   A.   I said, I, through my undercover account, had

25   received.

1    Q.   Okay.  There it is.

2         Okay.  Turning to Bates Number 23909, this section

3    also includes this page, and is this page different than

4    the first page you talked about?

5    A.   Just my responses.  What did the first one say?

6    Invitations, these are the ones I responded to?  Is that

7    what it was?

8    Q.   I'll show you the first page again.

9    A.   Thank you, ma'am.

10        All right.  The first page is my invitations, and then

11   the last one is my responses.

12   Q.   Okay.  So explain how that works in Facebook when you

13   receive an event invitation as a Facebook account.

14   A.    Invitations go out.  I'm not quite sure how, but they

15   go out all the time.  And then you pick the ones that

16   you're interested in going to.

17   Q.   Okay.  And so what events did Bob Smith indicate --

18   you, on behalf of Bob Smith, indicate you were going to go

19   to?

20   A.   Black Lives Matter in the Media with Shaun King from

21   September 30th, 2016, 5:00 p.m. to September 30th, 2016 to

22   7:30 p.m.  Fight for 15 rally, September 10th of 2015, 5:00

23   p.m.  The War on Blacks in the City of Memphis, Combined by

24   Rebuilding the Black Families, hashtag Justice for Darrius

25   Stewart, August 22nd, 2015, 3:00 p.m.

1      Do you want me to do the maybes and interested?

2    Q.   I'll just point out a few in particular.  This event

3    here?

4    A.   North Memphis voter registration, October 3rd, 2016,

5    5:00 p.m. to October 3rd, 2016, 6:00 p.m.

6    Q.   Why did the Bob Smith account indicate it was

7    interested in attending that event?

8    A.   Like I was telling you, you have to make this look

9    like a real person.  So a real person would be interested

10   in something, you know, from time to time, and these I

11   marked that I was interested in.

12   Q.   What does that -- what purpose does that serve?  Why

13   was that important for the Bob Smith account to like

14   that --

15   A.   To show that I'm active.

16   Q.   But why that particular event?

17   A.   It was nothing in particular about it.  It's just --

18   it was something I just at random decided that I wanted to

19   act like I was attending.

20   Q.   Okay.

21        **MS. FLOYD:**  All right.  The next exhibit will be

22   the group membership activity section of the Bob Smith data

23   file.

24        **THE COURT:**  Marked and received as 28.

25        (WHEREUPON, the above-mentioned document was

1    marked as Exhibit Number 28.)

2              **THE COURT:**  To the degree that dates can be

3    associated with a particular document, too, it's good.

4    Sure.

5              **MS. FLOYD:**  Yes, Your Honor.

6    BY MS. FLOYD:

7    Q.   And this data file was pulled on July 26th, 2018.  Do

8    you recognize it?

9    A.   Yes, ma'am.

10   Q.   So what are Facebook groups?

11   A.   Facebook groups are -- there's the public side, like I

12   said, and that -- on Facebook, that is indicated by a

13   globe.  So anybody in the public can read those posts.

14        More private groups are groups that are -- you know,

15   the distribution of posts have been limited.  Those are

16   what these groups are indicating, usually friends.

17   Q.   Okay.  So the groups on that list are groups that are

18   private; is that your testimony?

19   A.   Or you have to ask to join and are accepted.

20   Q.   Okay.  And how did you, on behalf of Bob Smith,

21   determine which groups to join?

22   A.   I'd have to see a specific example.  Some of them were

23   just random requests to join, to make the account look

24   active, like I mentioned before.  There may be some that

25   are in there specifically.

1    Q.    Okay.  And what specific reasons were there for

2    joining groups?

3    A.    Be part of an investigation.

4    Q.    Okay.  And when you say an investigation, does that

5    mean criminal investigation?

6    A.    Could be unlawful.  It can be criminal.

7    Q.    What's the difference there unlawful and criminal?

8    A.    Making a post that is detrimental to someone, threats

9    of violence or something like that, that's First Amendment

10   protected.  You can do that, but you're starting to get

11   into something that might be unlawful.

12        Events that are unpermitted or groups that meet in

13   places that should require a permit and don't get permit or

14   exceed the permit notices, those would be kind of unlawful.

15   Q.    Okay.  And turning to page Bates Number 24016, what

16   group is indicated -- am I indicating here?

17   A.    Darrius Stewart's Right for Justice has approved your

18   request to join this group, November 11th, 2015.

19   Q.    Okay.  And so you were acting on behalf of Bob Smith.

20   When did you begin acting on -- as -- when did you begin

21   using the Bob Smith to investigate protest activity?

22   A.    I didn't -- let's see.  The Connor Schilling shooting

23   of Darrius Stewart was probably -- is probably the first,

24   because there was a lot of officer safety concerns.  We

25   were receiving a lot of general threats to officers and

DIRECT EXAMINATION OF T. REYNOLDS                    165

1    officers specifically.  So -- and a lot of them had to do

2    with threats around the Darrius Stewart shooting, so that's

3    probably what prompted that -- my request to join that

4    group.

5    Q.   Okay.

6            **MS. FLOYD:**  All right.  The next exhibit will be

7    the data file section entitled Your Posts and Comments in

8    Groups that was prepared on July 26, 2018.

9            **THE COURT:**  All right.  Marked and received as

10   29.

11           (WHEREUPON, the above-mentioned document was

12   marked as Exhibit Number 29.)

13   BY MS. FLOYD:

14   Q.   Do you recognize what this section of the data file

15   indicates?

16   A.   Yes, ma'am.  Your posts in groups and comments --

17   comments and groups, and it's from the ART file of my

18   undercover account from Facebook.

19   Q.   Okay.  And what type of comments is that capturing in

20   that section?

21   A.   The comments I, as an undercover -- as Bob Smith,

22   would make.

23   Q.   In groups?

24   A.   In private groups.

25   Q.   Okay.  No questions on that exhibit.

1           **MS. FLOYD:**  Okay.  The next exhibit is the posts

2     and comments section of the Bob Smith data file from --

3     prepared on July 26, 2018.

4           **THE COURT:**  Marked and received as 30.

5           (WHEREUPON, the above-mentioned document was

6     marked as Exhibit Number 30.)

7           **MR. WELLFORD:**  Excuse me, Your Honor.  May I just

8     consult briefly with Ms. Floyd on that?

9           **THE COURT:**  Absolutely, sure.  Go right ahead.

10           **MS. FLOYD:**  Counsel have consulted and have

11     agreed to limit the data file back to 2015 to avoid some of

12     the older or more sensitive posts.

13           **THE COURT:**  That's certainly fine.  If it's

14     agreed upon, that's perfectly fine.  Will be limited and

15     will not go before 2015.

16           **MR. WELLFORD:**  Ms. Floyd will probably just

17     announce the start date on '15.

18           **THE COURT:**  Right.  Just make sure that it's not

19     submitted.

20           **MS. FLOYD:**  Yes, Your Honor.

21           **THE COURT:**  Okay.  Thank you.

22     BY MS. FLOYD:

23     Q.   The beginning Bates range will be 24029, and the

24     ending will be -- oh, and actually, it's already limited in

25     time.  All right.

1          **THE COURT:**  What's our last -- what's our last

2     Bates number?

3          **MS. FLOYD:**  And the last page number is 24269.

4          **THE COURT:**  Okay.

5          **MR. WELLFORD:**  Your Honor, would you permit me to

6     ask Ms. Floyd if she could just give the start date?  I

7     know we got the Bates number, but maybe the date.

8          **THE COURT:**  Absolutely the date.

9          **MS. FLOYD:**  The stop date or the start?

10         **MR. WELLFORD:**  The start.

11         **MS. FLOYD:**  The start date is -- it does contain

12    a few posts to 2012.  August 3rd, 2012 is the last full

13    date.

14         **THE COURT:**  Do you want us to delete those?

15         **MR. WELLFORD:**  If I could look at it real quick.

16         **THE COURT:**  Take a look at those.  Absolutely.

17    BY MS. FLOYD:

18    Q.   All right.  Sergeant Reynolds, what does this section

19    indicate?

20    A.   Posts and comments from me in my undercover account.

21    It's the ART file version from Facebook.

22    Q.   Okay.  And what is the -- well, I'll take it back from

23    you and put it up on the screen so everyone can see.

24         What is the date of the last post in the section?

25    A.   July 17, 2018 at 2:06 a.m.

1    Q.   Okay.  What is the -- on this last page, I -- you can

2    see there are spaces between the posts, and what does that

3    indicate?

4    A.   Spaces between the posts?

5    Q.   Well, time differences between the posts -- between

6    this post and this post.

7    A.   Okay.

8    Q.   Did the purpose of the account change between

9    June 3rd, 2014 and June 27th, 2015?

10   A.   No, ma'am.  I just didn't like anything from June 3rd,

11   2014 to July 27th, 2015.

12   Q.   Okay.  You testified earlier that the account began

13   investigating protest activity around the incident with

14   Darrius Stewart.  Does this correspond to that time frame,

15   this post here, the July 27th, 2015?

16   A.   That's previous to that.

17   Q.   Okay.  We can come back to this.

18        **MS. FLOYD:**  Okay.  The next exhibit will be the

19   Your Post data file section from the Bob Smith data file

20   prepared on July 26th, 2018.

21        **THE COURT:**  Marked and received as 31.

22        (WHEREUPON, the above-mentioned document was

23   marked as Exhibit Number 31.)

24   BY MS. FLOYD:

25   Q.   All right.  And what is this part of the data file

1    capturing?

2    A.   My photos, videos, texts, status updates that I

3    shared -- my undercover account has shared on Facebook.

4    Q.   Okay.  So where were those shared on Facebook?  Was it

5    on your own time -- on your own page as Bob Smith?

6    A.   Yes.  Yes, ma'am.

7    Q.   Okay.  And how did you determine what types of posts

8    you would share?

9    A.   I'd have to look more in those links, but there was

10   probably something that was timely or in the news or

11   topical.

12   Q.   Any particular subjects?

13   A.   No, ma'am.

14   Q.   No other questions on that one.

15        All right.  We'll come back to some of those

16   conversations, but I wanted to ask you about the different

17   records that were kept by the Office of Homeland Security.

18   What type of reports or records did the Office of Homeland

19   Security produce?

20   A.   Records and reports?  The reports are going to be

21   contained in our record management system, the Memphis

22   Police Department's RMS system.

23        From time to time, as far as my job is concerned, I'm

24   required to produce information or give advice.  Those are

25   e-mails.  And then from time to time, my bosses require

1    updates, and I produce those, as well.

2    Q.    Okay.  And how about the Joint Intelligence Briefings?

3    A.    That was a recommendation from my boss, and I produced

4    those.

5    Q.    Okay.  And when did the Office of Homeland Security

6    begin circulating the Joint Intelligence Briefings?

7    A.    It was right after the Pulse nightclub shooting.  We

8    were worried about a copycat shooting here in Memphis.  A

9    lot of the stuff that was coming out in the news that --

10   people were following it and we had to try to get a handle

11   on whether we're going to have a problem here in Memphis,

12   because at the time, it was Gay Pride Month in Memphis and

13   there were a lot of events scheduled.

14   Q.    Okay.  And who received the Joint Intelligence

15   Briefing?

16   A.    The distribution list was given a pretty wide berth at

17   first.  This -- I wanted to add, this had never been done

18   before, so we were kind of -- you know, it was kind of

19   crude at first.  We just kind of started putting things

20   together.  But the distribution list was mainly law

21   enforcement and some area -- areas of concern downtown

22   and -- that some of these events may have been occurring.

23   Q.    Okay.  And how did nonlaw enforcement agencies get

24   added to the circulation list?

25   A.    From time to time, there was -- people would make

1  request, and the request would be forwarded and approved.

2  But from time to time, we had some suspicious activity and

3  some unlawful activity going on.  And those people were

4  added to keep them apprised of the problem and to see if

5  they can contribute and help us with the solution.

6  Q.   Okay.  And when did nonlaw enforcement agencies stop

7  receiving the JIB?

8  A.   I don't recall the day.  Chief Hardy told me to cull

9  the list.  I'd have to see something a little more on the

10 timeline on that.  I can't remember.

11 Q.   Okay.

12      **MS. FLOYD:**  All right.  The next exhibit will be

13 an e-mail from Jerry Blum to Tim Reynolds on October 4th,

14 2016.

15      **THE COURT:**  Marked as 32 and received.

16      (WHEREUPON, the above-mentioned document was

17 marked as Exhibit Number 32.)

18      **MS. FLOYD:**  And this is Pretrial 97.

19 BY MS. FLOYD:

20 Q.   Do you recognize this e-mail?

21 A.   Yes, ma'am.

22 Q.   And what is it?

23 A.   It's an e-mail from Jerry Blum to me.  It's dated

24 October 4, 2016.  "Hello, Tim, can I be included" --

25 Q.   I'll ask you some questions about it.  Thank you so

1    much.

2         All right.  So where -- who is Jerry Blum?

3    A.   He's currently the director of security at AutoZone.

4    He was -- he is a retired chief.

5    Q.   Okay.  But he's not currently in law enforcement?

6    A.   No.

7    Q.   Okay.  And what is he asking for in this e-mail?

8    A.   "Can I be included in this daily JIB?"

9    Q.   Okay.  How did he receive the JIB?

10   A.   I'm not sure.  I'm not sure how he received it.

11   Q.   Okay.  This section right here, does this indicate how

12   Jerry Blum received the e-mail JIB?

13   A.   Frank McGowan.  Okay.  He got it from Frank McGowan.

14   Q.   Okay.  Who is Frank McGowan?

15   A.   Frank McGowan is also a retired police officer with --

16   who now works for FedEx.

17   Q.   And he now works for FedEx, okay.

18        And did you add Jerry Blum to the JIB recipient list?

19   A.   I asked my supervisor and he was added.

20   Q.   Okay.  Turning to the last page of the JIB, what

21   events were included in this Joint Intelligence Briefing?

22   A.   Upcoming events with high law enforcement presence and

23   a large public attendance, Wednesday, October 5th, 2016

24   from 1800 to 2345.  The rock/rap group Insane Clown Posse

25   will be performing in concert at The Hi Tone Cafe, 412

1    North Cleveland Street for their Riddle Box concert tour.

2    Friday, October 7, 2016, North Memphis Think Tank is

3    holding a neighborhood meeting at the Hollywood Community

4    Center, 1560 North Hollywood Street from 5:30 to 8:30 --

5    sorry, 7:30.

6    Q.   And hold on one second, Sergeant Reynolds.  This is

7    the Pretrial 138.  It's in the designated JIBs.

8         Continue, and you can read it to yourself and then

9    just tell us what the events are.

10   A.   There's several upcoming events just prior to

11   Halloween of 2016.

12   Q.   Okay.  And what was the second event?

13   A.   It was North Memphis Think Tank is holding a

14   neighborhood meeting.

15            **MR. WELLFORD:**  Excuse me, Judge, I'm sorry to

16   interrupt, but this is a 230-page collective exhibit.  So

17   if we get the Bates stamp number, we can --

18            **THE COURT:**  Sure, absolutely.  Let's do that.

19            **MS. FLOYD:**  Sure, absolutely.

20            Okay.  The starting Bates number is 15667.  The

21   ending Bates number is 15672.

22            **MR. WELLFORD:**  And this is Exhibit 33?

23            **MS. FLOYD:**  Exhibit 32.

24            **MR. WELLFORD:**  32, okay.  It's attached.  I see.

25   BY MS. FLOYD:

DIRECT EXAMINATION OF T. REYNOLDS                    174

1   Q.   Okay.  And the third event?

2   A.   The third event is October 8, 2016, 1300 at a local

3   chapter of Black Lives Matter is holding a community

4   cookout at Pilgrim Rest Baptist Church.

5   Q.   Okay.  And so looking to the first page, this was --

6   what is the original e-mail right here, if you could

7   describe that for us?

8   A.   The original e-mail?

9   Q.   Yeah.  It's -- now you can see the subject.

10  A.   It's -- the subject is JIB Sunday, October 4, 2016 at

11  8:00 in the morning.

12  Q.   Okay.  And is this original e-mail from you?

13  A.   Yes.

14  Q.   And did it have the JIB attached?

15  A.   It did.

16  Q.   And was Frank McGowan a recipient of that e-mail?

17  A.   He was.

18  Q.   Okay.  And then he forwarded that to Jerry Blum?

19  A.   Looks like it.

20  Q.   Who asked you to be added to the daily e-mail?

21  A.   Yes.

22  Q.   Okay.  Oh, and just to close the loop on that, the JIB

23  we just described with the events, the three events, that

24  was attached to the original e-mail to Frank McGowan?

25  A.   Yes.

DIRECT EXAMINATION OF T. REYNOLDS                    175

1    Q.   Okay.

2         **MS. FLOYD:**  All right.  And the next exhibit is a

3    Joint Intelligence Briefing from March 3rd, 2017,

4    0800 hours.  The beginning Bates range is 17998, and the

5    ending Bates range is 18003.

6         **THE COURT:**  Marked and received as 33.

7         (WHEREUPON, the above-mentioned document was

8    marked as Exhibit Number 33.)

9  BY MS. FLOYD:

10   Q.   All right.  Do you recognize this document?

11   A.   Yes, ma'am.  It's an e-mail from me.  The subject is

12   The JIB for the Day, which is March 3rd, 2017 at 8:00 in

13   the morning.

14   Q.   And without -- you can look through it to familiarize

15   yourself, but without reading it, what document is attached

16   to that e-mail?

17   A.   The JIB for the day.

18   Q.   Okay.  So as of 3-3-2017, who was receiving this JIB?

19   And you don't have to read all of them by name but just by

20   general category.  What types of people were receiving the

21   JIB?

22   A.   I would -- that's the JIB distribution list.  I mean,

23   is there anyone in particular you want me to point out?

24   Q.   Was Shelby County Sheriff's Department receiving the

25   JIB?

DIRECT EXAMINATION OF T. REYNOLDS                    176

1    A.    They were.

2    Q.    Okay.  Who does Stephanie Juno work for?

3    A.    The Tennessee Fusion Center.

4    Q.    Who is J. Whitfield?

5    A.    A police officer with the Germantown Police

6    Department.

7    Q.    Okay.  Who is A. Rosser?

8    A.    A retired Memphis police colonel.  He now works for

9    MLGW.

10   Q.    And David Martello?

11   A.    Retired Memphis police officer, now works for FedEx.

12   Q.    Okay.  And Frank McGowan?

13   A.    Retired Memphis police officer, now works for FedEx.

14   Q.    And I'm asking where they currently work, not where

15   they worked before.  So Cole SR?

16   A.    I'm not sure who that is, ma'am.

17   Q.    Do you know what organization that e-mail ending is

18   for?

19   A.    Shelby County Schools.

20   Q.    Okay.  George Mavromatis?

21   A.    I don't know who that is, but he's with the Department

22   of Justice.

23   Q.    Okay.  Tony Armstrong?

24   A.    At St. Jude.

25   Q.    Stuart Frisch?

1    A.   St. Jude.

2    Q.   St. Jude?

3         Jerry Blum?

4    A.   AutoZone.

5    Q.   Okay.  So from October 4th, 2016 of the last exhibit

6    until 3-3-2017, which was the last JIB produced in

7    discovery in this case, Jerry Blum still was on the

8    distribution list?

9    A.   Yes, ma'am.

10   Q.   Okay.  Do you know if Jerry Blum was ever removed from

11   the distribution list?

12   A.   He was.

13   Q.   When?

14   A.   I don't remember the date.  Chief Hardy called us to

15   his office and gave us limitations on who the list can go

16   out to, and it was culled.

17   Q.   Okay.  And was that in the past two weeks?

18   A.   No.  It was before that.

19   Q.   Was it in the last month?

20   A.   It's been longer than that.

21   Q.   Was it in the last six months?

22   A.   It's probably a little longer than that.

23   Q.   Was it in the last year?

24   A.   It's sometime between six months and a year.

25   Q.   Okay.  How did OHS collect the information that it put

DIRECT EXAMINATION OF T. REYNOLDS                    178

1    in the Joint Intelligence Briefing?

2    A.   Open sources.  A lot of it's from the news for the

3    day.  Things that we got from the Real Time Crime Center as

4    far as events that are coming in from the collator, and

5    then things that we could find that looked like real events

6    on Facebook.

7    Q.   Okay.  And did you -- did you use the Bob Smith

8    account to collect information for the Joint Intelligence

9    Briefing?

10   A.   Yes.

11            **MS. FLOYD:**  All right.  The next exhibit will be

12   Pretrial 2.  It is an e-mail from Major Bass from 7-6-16.

13            **THE COURT:**  Marked and received as 34.

14            (WHEREUPON, the above-mentioned document was

15   marked as Exhibit Number 34.)

16   BY MS. FLOYD:

17   Q.   All right.  Was this an e-mail that you received?

18   A.   Yes, ma'am, from Major Eddie Bass.

19   Q.   Okay.  And what was happening in this e-mail?

20   A.   There was a complaint from the precinct that there was

21   a lot of people gathering at 1701 Jackson, and we didn't

22   know that that was -- how that happened.  We didn't -- we

23   didn't anticipate any -- any large gathering there.  I

24   think it's called the Kings Grocery there at 1701.  So I

25   went over there to see if there was really a large

1    gathering there.

2    Q.   Okay.  And so in collecting intel about this event,

3    did you keep track of who attended or led the protest?

4    A.   This one in particular, afterwards I did, but not

5    before or anything.  Like I said, this came out of the

6    blue.  Alton Sterling had just been killed in Louisiana,

7    and this was just kind of impromptu.

8    Q.   Okay.  And why did you keep track of who organized

9    this event?

10   A.   Because that was a name I was not familiar with.

11   Q.   Okay.  How did you keep track of who led the protest?

12   A.   It's usually a mental note.  I mean, you can just

13   verify it with going to the actual social media platform

14   and confirming what your recollection is.

15   Q.   And did you -- did you keep something to help you

16   remember?  I mean, there were a lot of events, so how did

17   you remember?

18   A.   The JIBs.

19   Q.   So the JIBs helped you to remember?

20   A.   Yes.

21   Q.   Okay.

22   A.   Categories, chronological.

23        **MS. FLOYD:**  The next exhibit will be an e-mail

24   from Bass on 7-6-16.  It's Pretrial 3.

25        **THE COURT:**  Marked and received as 35.

1          (WHEREUPON, the above-mentioned document was

2     marked as Exhibit Number 35.)

3   BY MS. FLOYD:

4     Q.   All right.  Is this an e-mail that you received?

5     A.   Yes.  Yes, ma'am.  It's from my major, Colonel Bass.

6     The date is 7-6 of 2016.

7     Q.   All right.  And do you know what this is in regards

8     to?

9     A.   Subject is A Vigil in Progress.

10    Q.   Okay.  Is this the same event that we were just

11    talking about?

12    A.   Yes, ma'am.

13    Q.   Okay.  And so this is the e-mail earlier.  And what's

14    happening here?  Who is Caralee Barrett?

15    A.   She's an analyst, part time works for the Memphis

16    Police Department and also works for the Shelby County

17    Sheriff's Department as an analyst.

18    Q.   Okay.  And what information is she sending out?

19    A.   I don't -- I need to see the -- "please see the

20    attached document for the information regarding the vigil

21    in progress.  This information has been provided to

22    Detective Reynolds on the scene.  I'm still monitoring from

23    the Real Time Crime Center.  Let me know if you need

24    anything."  But I don't see what the attachment is.

25    Q.   What I'd like to focus on is just the role of Caralee

1    Barrett in communicating information to you.  So when she

2    says she was monitoring from the RTCC, what does that mean

3    generally when they monitor?

4    A.    The RTCC is Real Time Crime Center, and they have

5    cameras up all over the city and most of them have feeds to

6    the Real Time Crime Center.  So you can pull those up and

7    find out what's going on.

8    Q.    Okay.  So in this case, Ms. Barrett was monitoring the

9    protest from the Real Time Crime Center in real time?

10   A.    Apparently.

11   Q.    Okay.  And what was Major Bass's followup?

12   A.    He said, "Thank you very much.  We have Crump station

13   cars en route."

14   Q.    And what does that mean?

15   A.    There was uniform officers heading that way.

16   Q.    Okay.  And at that event, were you uniformed or in

17   plain clothes?

18   A.    Plain clothes.

19   Q.    Okay.

20           **MS. FLOYD:**  All right.  The next exhibit will be

21   an e-mail from Major Bass dated 7-6-2016.  It's Pretrial 4.

22           **THE COURT:**  Marked and received as 36.

23           (WHEREUPON, the above-mentioned document was

24   marked as Exhibit Number 36.)

25   BY MS. FLOYD:

1    Q.    Okay.  Is this an e-mail you received?

2    A.    Yes, ma'am.  Excuse me.  It's from my colonel, Eddie

3    Bass, to me and he said good job.

4    Q.    Okay.  What is that in reference to?

5    A.    I was out and reported that there was a very large

6    event there and everything was going well and good job.

7    Q.    Okay.  And was there anything attached to that e-mail?

8    A.    I'm not sure.

9    Q.    Here where it says attachments, what was attached?

10   A.    Alton Sterling rally 7-6-2016, 1701 Jackson.

11   Q.    Okay.  And this is the same event we were just

12   discussing?

13   A.    Yes, ma'am.

14   Q.    All right.  Do you recognize this document?  It's a

15   little difficult to get the whole thing on, but here is the

16   language.  What is this document?

17   A.    My -- Major Bass asked me to send an e-mail about this

18   event.  So I -- that was my -- that was my summary of the

19   event.  Would you like me to read that?

20   Q.    No.  No.  Thank you.

21         So this rally was -- how did you characterize that

22   rally after having attended it, in the last paragraph?

23   A.    "The crowd totaled somewhere between a hundred and 150

24   and moved to the southwest corner of Jackson Avenue and

25   Evergreen.  Crump station dispatched several task force

1    cars and a supervisor on the scene.  Officers posted on the

2    Mapco lot, observed a peaceful protest.  Although the

3    department had short notice about the rally, MPD provided

4    enough police presence to ensure a safe and peaceful

5    rally."

6    Q.   Okay.

7              **MS. FLOYD:**  Okay.  The next exhibit is Pretrial

8    8.  It is an e-mail from Bass on 7-8-16.

9              **THE COURT:**  Exhibit 37, marked and receive.

10             (WHEREUPON, the above-mentioned document was

11    marked as Exhibit Number 37.)

12   BY MS. FLOYD:

13   Q.   All right.  Is this an e-mail that you received?

14   A.   Yes, ma'am, from my major.

15   Q.   Okay.  Was it in response to an e-mail that you sent?

16   A.   Yes.

17   Q.   Okay.  I want to draw your attention to a screen shot

18   that was included.  And do you recognize this language

19   here?

20   A.   It's computer language from Facebook.

21   Q.   Okay.  I think it might help if you look at the e-mail

22   first.

23        Okay.  So what is this e-mail discussing?

24   A.   This is a post from Allison Truly on Facebook, see

25   attachment.  If you remember, Truly was the organizer of

1   the event two days ago at 1701 Jackson at Kings Grocery.

2   In this post, this location is chosen because it's private

3   property.  It would appear that Truly is attempting to

4   circumvent the permit process.  This event has the

5   potential to attract a crowd similar to the crowd assembled

6   on Jackson.

7   Q.  Okay.  And do you see the post is attached?  What did

8   the language of the post say?  And not this part here, this

9   part right here is the text.

10  A.  Okay.  "So let's do this community meet-up at the den.

11  The address is 656 Marshall Avenue.  It was a black-owned

12  private -- it is black-owned and private, which means if

13  you need to cry, then" --

14  Q.  You don't need to read the expletive.

15  A.  "If you need comfort, I got you.  If you want to make

16  some solid plans, let's do that.  If you just need to be

17  around good energy, it's there.  So see you at 5:00."

18  Q.  Okay.  And then Major Bass responded to you.  And

19  without reading it, what was his response, just generally?

20          **MR. WELLFORD:**  Your Honor, the response speaks

21  for itself, so I --

22          **MS. FLOYD:**  Okay.

23          **THE COURT:**  That's fine.  It's on the screen

24  anyway.

25  BY MS. FLOYD:

1    Q.   So the event -- so when you wrote to Major Chandler

2    and Major Bass, you talked about Allison Truly and that she

3    was the organizer of the event at Kings Grocery?

4    A.   I did.

5    Q.   And Bass's response was that it was an adverse

6    gathering -- it had the potential for another adverse

7    gathering.  What made the Kings Grocery gathering an

8    adverse gathering?

9    A.   Those are colonel -- Major Bass's words, not mine.  I

10   don't know what he meant by that, but I do know the context

11   that we're talking about.  We had several -- we had a young

12   man die on Facebook Live from an officer shooting.  Alton

13   Sterling had just been killed down in Louisiana, so there

14   were starting to be protests around.  The major might have

15   been confused because we had a lot of talk about

16   protesting.  He might have been confused about which one

17   that Ms. Truly had put together.

18   Q.   Okay.  And when you said that Allison Truly was trying

19   to circumvent the permit process, what does that mean?

20   A.   Well, there's a group of people that like to pick

21   either government property like the library or private

22   property to hold a protest or a gathering, and we weren't

23   sure that this wasn't done with the knowledge of the

24   property owner.  And they were trying do that, it appeared,

25   on social media because they didn't want to get a permit

1    for that.

2          But even though it's on private property, there's

3    still roads and things that have -- that can be affected if

4    the -- if these rallies and protests or gatherings get

5    outside of the private property and onto public streets and

6    public thoroughfares.

7    Q.   But an event on private property doesn't require a

8    permit?

9    A.   Not necessarily.  But if some people have a tendency

10   to take that private property event and go mobile, then it

11   would need a permit.

12   Q.   Okay.

13         **THE COURT:**  Why don't we take a short break and

14   maybe we can move a little faster.  We'll just take a break

15   until 25 'til and everything -- how far do we have to go

16   for the witness?

17         **MS. FLOYD:**  We have quite a bit more to go

18   through, but we can --

19         **THE COURT:**  We'll just try to move a little

20   faster and let me give you a little time to put your papers

21   together.  No problem.  Come back at 25 'til the hour.

22   Thanks very much.

23         (Brief Recess)

24         **THE COURT:**  All right.  And we're ready to

25   proceed.  We will need to pick the pace up as much as we

DIRECT EXAMINATION OF T. REYNOLDS                    187

1    can.

2              **MS. FLOYD:**  Yes, Your Honor.

3              **THE COURT:**  Sure.

4              **MS. FLOYD:**  The next exhibit is a Memphis protest

5    demonstrations and flash mobs database from 2016 to 2017.

6              **THE COURT:**  Marked and received as 38.

7              **MS. FLOYD:**  And that's Pretrial 31.

8              (WHEREUPON, the above-mentioned document was

9    marked as Exhibit Number 38.)

10   BY MS. FLOYD:

11   Q.   All right.  And on this database -- did you prepare

12   this database along with the Office of Homeland Security

13   team?

14   A.   I participated in it.  This was actually prepared by

15   my partner, Sergeant Cornwell.

16   Q.   Okay.  And do you see on here an event that occurred

17   at 1701 Jackson?

18   A.   I do.

19   Q.   Is that the Kings Grocery event?

20   A.   It is.

21   Q.   And what does it list under --

22   A.   Allison Trully and Paul Garner.

23   Q.   And they're designated as the key personnel for that

24   event?

25   A.   Yes.

DIRECT EXAMINATION OF T. REYNOLDS                    188

1          **MS. FLOYD:**  All right.  The next exhibit is an

2     e-mail from Tim Reynolds on 7-8-16.  Pretrial 10.

3               **THE COURT:**  Marked and received as 39.

4               (WHEREUPON, the above-mentioned document was

5     marked as Exhibit Number 39.)

6     BY MS. FLOYD:

7     Q.   Is this an e-mail you sent?

8     A.   Yes, ma'am.

9     Q.   Okay.  And without reading it, who are you

10    communicating with and why?

11    A.   The precinct commanders about a Civil Rights Museum

12    tonight, an event there.

13    Q.   Okay.  And were you asking them to get photographs of

14    the crowd?

15    A.   I was tasked to follow up on the vigil, and we were

16    having problems getting photos of that vigil.

17    Q.   Okay.  And you wanted to add photos of the vigil to

18    the JIB after the event?

19    A.   Correct.

20    Q.   Okay.

21              **MS. FLOYD:**  All right.  The next exhibit is an

22    e-mail from Chandler on 7-9-16.

23              **THE COURT:**  That's 40, marked and received.

24              (WHEREUPON, the above-mentioned document was

25    marked as Exhibit Number 40.)

DIRECT EXAMINATION OF T. REYNOLDS                    189

1          **MS. FLOYD:**  It's Pretrial 15.  Hold on.

2          I'm sorry, Your Honor.  The next exhibit is an

3      e-mail from Gloria Bullock on 7-11-16.  I apologize.

4          **THE COURT:**  That's okay.  Marked and received as

5      41.

6          (WHEREUPON, the above-mentioned document was

7      marked as Exhibit Number 41.)

8          **MS. FLOYD:**  This is Pretrial 15.

9          **MR. WELLFORD:**  This is 15?

10         **MS. FLOYD:**  Yes.  Thank you.

11         **MR. WELLFORD:**  Excuse me, Your Honor.  I'm off on

12     the exhibit numbers, Your Honor.  That's 42 that just got

13     marked, correct?

14         **THE COURT:**  That's 41 that just got marked.

15         **MR. WELLFORD:**  41 just got marked, all right.

16         **THE COURT:**  Right.  You'll get a complete

17     printout at the end of the day.

18     BY MS. FLOYD:

19     Q.   All right.  This is an e-mail from Gloria Bullock.

20     Did you receive it?

21     A.   Apparently, yes, ma'am.

22     Q.   All right.  And do you recognize this document?  Is it

23     an After Action Review sent by Gloria Bullock?

24     A.   It is.

25     Q.   And what is the event, without reading?

DIRECT EXAMINATION OF T. REYNOLDS                    190

1    A.   The birthday celebration that's held annually at the

2    Health Sciences Park for General Forrest.

3    Q.   Okay.  And what does this last section discuss?

4    A.   It has some investigators, about ten, show up

5    trying to --

6    Q.   Does that say instigators?

7    A.   Instigators, about ten show up, trying to agitate.  We

8    monitored them closely and moved them out of the area.

9    They came in a gray Nissan, had Minnesota tags, that's been

10   redacted.  Was witnessed a male and another male, a sum of

11   money, and tell them thanks for coming down.  We paid

12   instigators from out of town, possibly.  They were paid

13   instigators from out of town, possibly.

14   Q.   Okay.  And this is a photo of them and a photo of

15   their license plate?

16   A.   It appears to be two photos.  Yes, ma'am.

17   Q.   Okay.  And just so the record is clear, the redactions

18   were not present in the original document, that's been --

19   those redactions are for the lawsuit?

20   A.   Okay.  Yes, ma'am.

21   Q.   Okay.

22        **MS. FLOYD:**  All right.  The next exhibit is an

23   e-mail from Major Bass on 7-10-2016.

24        **THE COURT:**  Should be 42, marked and received.

25        (WHEREUPON, the above-mentioned document was

DIRECT EXAMINATION OF T. REYNOLDS                191

1   marked as Exhibit Number 42.)

2   BY MS. FLOYD:

3   Q.   All right.  Is this an e-mail that you sent?

4   A.   It looks like it.  Yes, ma'am.

5   Q.   Okay.  And who is Mr. Howard?

6   A.   I'll have to see the address line.  I'm not sure who

7   that is offhand.

8        Aubrey Howard.  He runs the permits department.

9   Q.   Okay.  And is this the post -- what is this post that

10   was attached?

11   A.   It is -- looks like a Facebook post from Paul -- Earle

12   Fisher and Paul Garner and 80 others discussing an upcoming

13   event.

14   Q.   Do you know what that event was?

15   A.   I do not.  I do not remember.

16   Q.   Okay.  And so what is the description of the event

17   that you gave to Mr. Howard?

18   A.   Oh, it's a -- it was a protest that had been planned

19   in front of the Commercial Appeal, has given the BLM

20   movement.  Garner is planning to protest at the CA at noon

21   on Wednesday, July 13, 2016 at 495 Union Avenue.

22   Q.   Okay.  And then Major Bass, what does he say in the

23   response?

24   A.   "Thank you.  Please include in our 4:00 p.m. brief,

25   too."

DIRECT EXAMINATION OF T. REYNOLDS                    192

1    Q.   And is the brief the Joint Intelligence Brief?

2    A.   Yes.

3          **MS. FLOYD:**  The next exhibit is an e-mail from

4    Tim Reynolds on 7-10-2016.

5          **THE COURT:**  Marked and received as 43.

6          (WHEREUPON, the above-mentioned document was

7    marked as Exhibit Number 43.)

8    BY MS. FLOYD:

9    Q.   And this is a JIB Bates range 5096 through 5106.  What

10   is this document?

11   A.   It's an e-mail from me to Jerry Blum at AutoZone, and

12   it was a post-intelligence -- it was a post-intelligence

13   summary or -- that's -- might have been what the JIB was

14   called before it was called the Joint Intelligence

15   Briefing.

16   Q.   Okay.  And on Page 5099, is this the same information

17   that you sent to Aubrey Howard?

18   A.   It is.

19   Q.   Okay.

20         **MS. FLOYD:**  I think I failed to mark this.  Thank

21   you.

22         All right.  The next exhibit is an e-mail from

23   Tim Reynolds on 7-11 -- actually, I'll skip forward.

24         **THE COURT:**  Are you ready on that one?

25         **MS. FLOYD:**  I'm going to discard that.  I

DIRECT EXAMINATION OF T. REYNOLDS                    193

 1   apologize, Your Honor.

 2            THE COURT:   Okay.   That's fine.   We'll just go to

 3   the next item.

 4            MS. FLOYD:   All right.   The next exhibit will be

 5   an e-mail from Tim Reynolds on 7-12-2016.

 6            THE COURT:   All right.   Marked and received as

 7   44.

 8            (WHEREUPON, the above-mentioned document was

 9   marked as Exhibit Number 44.)

10            MS. FLOYD:   And the Bates range is 5593 through

11   5614.

12   BY MS. FLOYD:

13   Q.   And so this is two days later.   Is this an e-mail that

14   you sent?

15   A.   Yes, ma'am.

16   Q.   And is this, again, the information that you sent to

17   Aubrey Howard?

18   A.   It is.

19   Q.   And just so the record's clear, the screen grab of the

20   Facebook post is also included?

21   A.   It is.

22            MS. FLOYD:   Okay.   The next exhibit is an e-mail

23   from Tim Reynolds on 7-14-2016.

24            THE COURT:   Marked and received as 45.

25            (WHEREUPON, the above-mentioned document was

DIRECT EXAMINATION OF T. REYNOLDS                    194

1   marked as Exhibit Number 45.)

2            **MS. FLOYD:**  And it is Pretrial 22.

3   BY MS. FLOYD:

4   Q.   Is this an e-mail that you sent?

5   A.   Yes, ma'am.  It's from me to my boss, Colonel Bass,

6   and Jimmy Johnson with Tennessee.gov and to my lieutenant,

7   Stephen Chandler.

8            **THE COURT:**  You're going to need to speak up a

9   little more.  I can hear you okay, but I know you can speak

10  up more than that.

11           **THE WITNESS:**  Yes, sir.

12  BY MS. FLOYD:

13  Q.   All right.  And what is the event that you shared?

14  A.   It's a Black Lives Matter event that was posted on --

15  looks like it was Twitter.  So this came from the Real Time

16  Crime Center off the collator, and the Social Construction

17  of Violence in Black Communities on Saturday July 16, 2016,

18  from 2:00 to 4:00 on Millbranch.

19  Q.   Okay.  And that was a town hall style meeting?

20  A.   It appears to be so.

21           **MS. FLOYD:**  Okay.  The next exhibit is Pretrial

22  23.  It is an e-mail from Reynolds to -- on 7-14-2016.

23           **THE COURT:**  Marked and received as 46.

24           (WHEREUPON, the above-mentioned document was

25  marked as Exhibit Number 46.)

1  BY MS. FLOYD:

2  Q.   All right.  So was this the earlier e-mail?  I guess

3  just to describe what -- is this an e-mail that you sent?

4  A.   Yes, ma'am.  It's from me to the same three people on

5  the previous slide.

6  Q.   Okay.  And what types of events are included in

7  this -- in this e-mail, in the circulation?

8  A.   There's a column of Black Lives Matter demonstrations,

9  and there's two on Friday and -- well, three on Friday; one

10  at Wolfchase, one at Health Sciences Park, no permit, and

11  then there's one on the Kroger lot.  And then the second

12  column is boycotts.

13  Q.   Okay.  And this section here, you talk about

14  individuals that are being targeted on social media.  What

15  is your recollection of why individuals were being

16  targeted, why that was something that Office of Homeland

17  Security was looking into?

18  A.   It's in the JIB, but is there any way I can see the

19  attached photos?

20  Q.   Yes.

21  A.   Okay.  This all came from the Real Time Crime Center,

22  but we were asked to assist.  We were worried about --

23  there's a lot of protests going on.  This is two -- a

24  couple days after the bridge, two days after the bridge,

25  and everybody is talking about protest.  And there's

1    protest and counter-protests, you know, not paying

2    attention to what the actual subject of the protests are.

3    We were worried about the two groups coming into contact,

4    and we're looking for officer safety, public safety and

5    threats to each individual group from one protest group to

6    another.

7         That's -- that was my contribution, trying to figure

8    out if we're going to have a -- it was a threat assessment,

9    basically.

10   Q.   So do you recall who Wanda Dobbs is?

11   A.   I don't know who that is.

12   Q.   Does this refresh your recollection?

13   A.   Yes, ma'am.  She made a -- apparently looks like a pro

14   police post, and everybody else is targeting her and looks

15   like they're trying to -- it -- there looks like it could

16   be something getting started there.

17   Q.   Okay.  So the concern was social media posts about

18   Wanda Dobbs?

19   A.   Yes, ma'am.  Somebody apparently is -- it's called in

20   the business doxing.  They're saying that she works for the

21   Chiozza Law Firm and they're trying to out her and get her

22   fired.

23   Q.   And that was something that the Office of Homeland

24   Security would investigate?

25   A.   I'm worried about groups.  One group is to trying to

DIRECT EXAMINATION OF T. REYNOLDS                    197

1  get another group fired, is that going to spill over into a

2  protest.

3  Q.   But this was attached to an e-mail that you sent?

4  A.   It was.

5  Q.   And who received that e-mail?

6  A.   My boss and Lieutenant Chandler and Jimmy Johnson with

7  Tennessee.gov.

8  Q.   Who is Jimmy Johnson?

9  A.   I don't know.

10  Q.   Does he work for the Tennessee Highway Patrol?

11  A.   You know as good as I.  I don't know who that person

12  is.

13  Q.   Okay.  And what is the subject?

14  A.   MPD BLM event list.

15          **MS. FLOYD:**  The next exhibit is an e-mail sent by

16  Stephen Chandler on 7-12-2016, and the Bates number is

17  5549.

18          **THE COURT:**  Marked and received as 47.

19          (WHEREUPON, the above-mentioned document was

20  marked as Exhibit Number 47.)

21          **MS. FLOYD:**  Through 5569.

22  BY MS. FLOYD:

23  Q.   All right.  So this was an intelligence brief that you

24  received?

25  A.   It is.

1    Q.   Okay.  Is this the town hall style meeting you

2    attached to the previous e-mail?

3    A.   It is.

4    Q.   Okay.  All right.  Going back to Exhibit 46.  Here at

5    the bottom, you include information about Devante Hill, who

6    is one of the BLM spokesmen, having active warrants.  When

7    did you discover that Devante Hill had active warrants?

8    A.   Someone must have asked me to check Devante Hill for

9    warrants, and I reported back that he had active warrants.

10   Q.   Do you recall when that was?

11   A.   I would have to see the date on the e-mail.  It was

12   probably that day, whatever day that was.

13   Q.   Was it before or after the bridge?

14   A.   I'm not sure, ma'am.  May I see the date on the

15   e-mail?

16   Q.   I'm just asking what you remember.

17   A.   I don't remember.

18   Q.   Oh, the date on this e-mail?

19   A.   Yes.  It was after the bridge.

20        **MS. FLOYD:**  The next exhibit will be an e-mail

21   from Tim Reynolds on 7-7-16.

22        **THE COURT:**  Marked and received as 48.

23        (WHEREUPON, the above-mentioned document was

24   marked as Exhibit Number 48.)

25        **MS. FLOYD:**  Your Honor, I have some -- there's

1    some information on this exhibit that's potentially

2    sensitive, but it is also important that it was circulated.

3    How would the Court like us to treat --

4          **THE COURT:**  Let me take a look at it.  Just hand

5    it to up to me.

6          **MS. FLOYD:**  Yeah.  All right.

7          **MR. WELLFORD:**  We need to know what that is.

8          (Bench conference between the attorneys and the

9    Court.)

10          **MS. FLOYD:**  Yeah.  The bottom line of Devante

11   Hill's jail history has information about when he was the

12   victim of a crime, when he was not, this one, but the next

13   one, Your Honor.  It's one more page.  It has information

14   that he was -- oh, this one is redacted.  Hold on.

15          **THE COURT:**  This has been taken out.  Sure.  No

16   problem.

17          (Bench conference between the attorneys and the

18   Court concluded and the proceedings continued as follows:)

19          **THE COURT:**  Exhibit 48 marked and received.  It's

20   already been redacted.

21          **MS. FLOYD:**  Oh, Your Honor, this is the -- the

22   unredacted version is the one that I'd like to ask

23   questions about.  I'm sorry to be unclear.

24          **THE COURT:**  What you do -- well, we marked the

25   redacted one --

1           **MS. FLOYD:**  Excellent.

2           **THE COURT:**  -- but it's the public exhibit.

3           **MS. FLOYD:**  Yes, Your Honor.

4           **THE COURT:**  And then you seal the unredacted one

5    and it becomes 48 -- it can be 48A or B, and it will be

6    marked as sealed so that personal information that's not

7    appropriate and allowed to be disclosed is not disclosed.

8    So we'll have 48 and then usually it's 48A, just a new one.

9           (WHEREUPON, the above-mentioned document was

10   marked as Exhibit Number 48a.)

11          **THE COURT:**  So it's sealed, and 48 is the public

12   version.

13          **MS. FLOYD:**  Collective Exhibit -- or, I'm sorry,

14   Pretrial 5.

15          **THE COURT:**  You will need to hand it to me and

16   make sure it's proper for sealing.

17          **MS. FLOYD:**  Yes, Your Honor.

18          **THE COURT:**  Just hand it to me.

19          **MS. FLOYD:**  I apologize.

20          **THE COURT:**  Show me the other one.  I can't

21   really do much without the right one.

22          **MS. FLOYD:**  I believe the other has been marked.

23          **THE COURT:**  Oh no.  How are you doing?

24          **THE WITNESS:**  Good.

25          **THE COURT:**  All right.  That's -- this is the

1    unsealed one.  Wait a minute.  Which one is supposed to be

2    the sealed version?  These two both look alike.

3           **MS. FLOYD:**  The bottom line of the color photo,

4    there is a line that is redacted.

5           **THE COURT:**  Okay.  Sure.  And just so I -- it's

6    not a mystery, this is another individual as to whom the

7    information should not be disclosed.  It would be a privacy

8    question, and certainly that's fine.

9           So this is actually 48 right here.  Let me make

10   sure.  This is 48A.  I'll let you make sure and check them.

11   And this is 48 because it's redacted.  Some pages -- extra

12   pages there and it's a little confusing, but that will be

13   okay.

14          Okay.  Well, we're going to have to speed up or

15   we'll be here the same time next month.

16          **MS. FLOYD:**  I'm sorry, Your Honor.  I was just

17   waiting for the exhibits to be ready.

18          **THE COURT:**  No, no, no, no, I understand that.

19   I'm talking generally about increasing the pace.  We're

20   just taking a little too long.

21          How are you doing?  How close are we?

22          **MS. FLOYD:**  We're about halfway done.

23          **THE COURT:**  Halfway?

24          **MS. FLOYD:**  Yes, Your Honor.  This is our longest

25   direct.

1        **THE COURT:**  I understand.  Okay.  We're okay.  I

2   know the witness is glad to hear that.

3   BY MS. FLOYD:

4   Q.   All right.  You testified that --

5        **THE COURT:**  You can put 48 up, and that will help

6   everybody.  Sure.

7   BY MS. FLOYD:

8   Q.   Okay.  You testified that Devante Hill's warrant

9   information was collected after the bridge.  What is the

10  date on this e-mail?

11  A.   7-7-16.

12  Q.   Was that before the bridge?

13  A.   Yes.

14  Q.   And what information is attached?

15  A.   It is from WASP, and it has the open for and the

16  section where someone would expect to see warrants.

17  Q.   Okay.  And is there information about juvenile crime

18  history on this unredacted version?

19  A.   Are you asking like juvenile court warrants or

20  juvenile arrests?

21        **MS. FLOYD:**  Your Honor, I'd like to ask about

22  this, but I want to respect Mr. Hill's privacy.

23        **THE COURT:**  No, I understand.

24        **MS. FLOYD:**  What is the best --

25        **THE COURT:**  You can actually hand the sealed

1    document up so he can look at it.

2            **MS. FLOYD:**  Thank you, Your Honor.

3            **THE COURT:**  Ladies and gentlemen, this is

4    something we -- it is not typically public information.  I

5    think we're all aware of that.

6            **MS. FLOYD:**  Thank you, Your Honor.

7            **THE COURT:**  Sure.  We just won't read the line.

8            **MS. FLOYD:**  Yep.

9    BY MS. FLOYD:

10   Q.   On the showing -- the front page in the bottom line,

11   does that include information about Mr. Hill's juvenile

12   history with the criminal justice system, without saying

13   what it is?

14   A.   I'm not sure what your question is, ma'am.  His

15   arrests or police reports?

16           **THE COURT:**  Okay.  I think you're going to have

17   to remember that if you don't back up, I'm not going to

18   ever let you get that close again.

19           **MS. FLOYD:**  Yes, Your Honor.

20           **THE COURT:**  The reason is to keep the voices up

21   because it becomes a private conversation and --

22           **MS. FLOYD:**  Yes, Your Honor.

23           **THE COURT:**  -- you don't want private

24   conversation.

25           **MS. FLOYD:**  Yes, Your Honor.

1    **THE COURT:**  Okay.  I think that -- go ahead and

2    rephrase the question.  There's a -- if you compared the

3    two -- does he have both exhibits?

4    **THE WITNESS:**  No.

5    **THE COURT:**  Why don't we give you both exhibits,

6    and you can see the one that's been redacted and then she's

7    going to ask about that line and would that contain a

8    typically nonpublic information.

9    BY MS. FLOYD:

10   Q.   Without saying what it is, does the last line contain

11   nonpublic information?

12   A.   The last line of this?

13   **THE COURT:**  You'll be able to see one's got a

14   blacked-out line.  That's redacted public version.

15   **THE WITNESS:**  I see.

16   **THE COURT:**  And then one has one that you can

17   actually see.  It's very small print, though.

18   **THE WITNESS:**  Okay.  So it's a police report.

19   And your question was, ma'am?

20   BY MS. FLOYD:

21   Q.   Does the last line contain nonpublic information about

22   Devante Hill?

23   A.   No, ma'am.  You can ask for your own police reports.

24   You can ask -- you know, anyone can ask for a police

25   report.

DIRECT EXAMINATION OF T. REYNOLDS                    205

1    Q.   Does that --

2              **THE COURT:**  Would it -- go ahead and let's

3    rephrase.

4    BY MS. FLOYD:

5    Q.   Does the last line include information about when

6    Mr. Hill was a minor, when he was under 18 years old?

7    A.   He was a victim of a --

8              **THE COURT:**  Doesn't want you to read that.

9              **MS. FLOYD:**  Yeah.  I'm sorry, Your Honor.

10

11             **THE COURT:**  I tell you what, I've seen it.  We

12   know what it is.  Don't worry about it.  Go ahead.

13             And counsel has seen it, too.  Is that okay?

14             **MR. WELLFORD:**  Yes, sir.  I think that may be the

15   point.

16             **THE COURT:**  That's fine.  We certainly want to

17   handle it that way.  Okay.  That's fine.

18             **MS. FLOYD:**  Here we are.

19             **THE COURT:**  Are you relieved to hear you're going

20   to be the longest witness we have?

21             **THE WITNESS:**  I am relieved.

22             **THE COURT:**  Okay.

23             **MS. FLOYD:**  All right.  The next exhibit is an

24   e-mail from Reynolds on 7-14-2016.  It is Pretrial 24.

25             **THE COURT:**  All right.  And that's going to be

DIRECT EXAMINATION OF T. REYNOLDS                     206

1    49, marked and received.

2              (WHEREUPON, the above-mentioned document was

3    marked as Exhibit Number 49.)

4    BY MS. FLOYD:

5    Q.   All right.  Is this an e-mail that you sent?

6    A.   It is, from me to my partner at the time, Phillip

7    Penny.

8    Q.   All right.  And do you recall this incident?

9    A.   Yes, ma'am.  We discussed this at the deposition.

10   It's about a complaint from Appling Farms station and the

11   Colonel Sheffield wanted us to see what we can do about

12   locating this individual.

13   Q.   Okay.  So Colonel Sheffield sent you this post?

14   A.   He did.

15   Q.   And you found information to identify?

16   A.   Jon Jizzle.

17   Q.   Jon Jizzle.  And it's attached to this e-mail to

18   Penny?

19   A.   It is.

20   Q.   And this is -- what is this document?

21   A.   It's a photo and his driver's license information.

22              **MS. FLOYD:**  All right.  The next exhibit is an

23   e-mail from Colonel Wright on 7-12-2016.

24              **THE COURT:**  Marked as 50 and received.

25              **MS. FLOYD:**  And the Bates number is -- begins

DIRECT EXAMINATION OF T. REYNOLDS                    207

1    5530.

2              (WHEREUPON, the above-mentioned document was

3    marked as Exhibit Number 50.)

4    BY MS. FLOYD:

5    Q.   All right.  So Colonel Wright has forwarded a Joint

6    Intelligence Briefing sent by Major Chandler?

7    A.   Yes, ma'am.

8    Q.   Does this contain the information about the real

9    identity of Jon Jizzle?

10   A.   It does.

11   Q.   Jonathan Jones?

12   A.   It does.

13   Q.   Okay.  And is this a summary of it, along with the

14   Facebook posts?

15   A.   Yes, ma'am.

16             **MS. FLOYD:**  All right.  The next exhibit is an

17   e-mail from Bass on 7-15-2016.

18             **THE COURT:**  Marked as 51 and received.

19             (WHEREUPON, the above-mentioned document was

20   marked as Exhibit Number 51.)

21             **MS. FLOYD:**  And it is Pretrial 29.

22   BY MS. FLOYD:

23   Q.   Okay.  And this is an e-mail from Major Bass in

24   response to an e-mail that you sent.  And in this e-mail,

25   you're discussing contacting Jonathan Jones?

DIRECT EXAMINATION OF T. REYNOLDS                    208

1    A.    Yes, ma'am.

2    Q.    And Jonathan Jones was no longer holding the boycott

3    after he spoke with you on the phone?

4    A.    Correct.

5             **MS. FLOYD:**  All right.  The next exhibit is an

6    e-mail from Jessica Grafenreed on 7-15.

7             **THE COURT:**  Marked as 52.

8             (WHEREUPON, the above-mentioned document was

9    marked as Exhibit Number 52.)

10            **MS. FLOYD:**  And it's Pretrial 30.

11   BY MS. FLOYD:

12   Q.    Who is Jessica Grafenreed?

13   A.    She's a police officer, but she's assigned to the Real

14   Time Crime Center.

15   Q.    Okay.  And what was it that -- and this is what she

16   attached?

17   A.    Yes, ma'am.

18   Q.    And this is a memorial for Darrius Stewart?

19   A.    It is.

20   Q.    Did you request that Ms. Grafenreed send this

21   information to you?

22   A.    No, I don't -- I don't remember, but I don't think so

23   because -- am I the only recipient?  There's a whole lot of

24   people that are getting this.  I think I was just

25   inadvertently in the e-mail stream.

DIRECT EXAMINATION OF T. REYNOLDS                    209

1    Q.   Did the Office of Homeland Security investigate this

2    event?

3    A.   No, we didn't investigate the event.  It was kind like

4    of notice of the event.

5    Q.   Did the Office of Homeland Security send anyone to

6    this event for surveillance?

7    A.   I didn't send anyone to that event.

8    Q.   Are you aware of whether anyone went to this event for

9    surveillance?

10   A.   I don't know.

11           **MS. FLOYD:**  The next exhibit is an e-mail from

12   Tim Reynolds on 7-15-2016.

13           **THE COURT:**  Marked as 53.

14           **MS. FLOYD:**  Pretrial 27.

15           (WHEREUPON, the above-mentioned document was

16   marked as Exhibit Number 53.)

17   BY MS. FLOYD:

18   Q.   Okay.  Is this an e-mail that you sent to Chandler,

19   your lieutenant?

20   A.   Uh-huh.  This is from the Alpha shift.  We've been

21   expecting something for Darrius Stewart's anniversary, but

22   we'll see if we can -- what we can find on this.

23   Q.   And when it says Alpha shift, does that mean the Real

24   Time Crime Center?

25   A.   The midnight shift at the Alpha -- midnight shift at

DIRECT EXAMINATION OF T. REYNOLDS                    210

1    the Real Time Crime Center.  Yes, ma'am.

2              **MS. FLOYD:**  The next exhibit -- going to -- yeah.

3    The next exhibit is an e-mail from Jessica Grafenreed on

4    8-13-2016.

5              **THE COURT:**  Marked and received as 54.

6              (WHEREUPON, the above-mentioned document was

7    marked as Exhibit Number 54.)

8    BY MS. FLOYD:

9    Q.   This is an e-mail -- is this an e-mail from Jessica

10   Grafenreed to the Office of Homeland Security team and to

11   Real Time Crime Center?

12   A.   Yes, ma'am.

13   Q.   Okay.  What is -- without reading it out loud, what --

14   was this where Frank Gotti was -- the person known as Frank

15   Gotti was arrested in a protest that was happening outside

16   of the jail?

17   A.   Looks like it.  His real name is Frank Gibson.

18   Q.   Okay.  And then attached are these photographs.  It

19   says, "Attached are people who are in the video who are

20   currently at 201 Poplar outside."

21   A.   Okay.

22   Q.   And then it has photos of the people who were there.

23   A.   Okay.

24   Q.   Is that right?

25   A.   It looks -- it appears to be photos of people and it

1   doesn't look like they're at the protest, yes.  They're

2   photos of people.

3   Q.   So this is an e-mail sent from a Real Time Crime

4   Center analyst to the rest of the team to investigate?

5   A.   She's a police officer with the Real Time Crime Center

6   and she sent that out to everybody, including me.

7            **MS. FLOYD:**  All right.  So these next e-mails can

8   be a collective exhibit if the Court allows.

9            **THE COURT:**  Certainly.  Collective Exhibit 55,

10  set of e-mails marked and received, and give us the date of

11  the first e-mail.

12           **MS. FLOYD:**  The first e-mail is 8-13.  They are

13  all e-mails from 8-13.

14           **THE COURT:**  All right.

15           (WHEREUPON, the above-mentioned document was

16  marked as Exhibit Number 55.)

17           **MS. FLOYD:**  And they are 299, 303, 71, 72, 304

18  and 305 from Plaintiff's pretrial exhibits.

19           **MR. WELLFORD:**  Your Honor, do you mind if I --

20  may I come look at those since they're several exhibits now

21  collective?  I think I know what they are.  I wanted to get

22  my head around it.

23           **THE COURT:**  Absolutely.  Please free to come take

24  a look.  It's no problem at all.

25  BY MS. FLOYD:

1    Q.   All right.  Is this -- this is an e-mail from you to

2    Dana Sampietro, Chandler and others about the demonstration

3    that was described in the last e-mail?

4    A.   Yes, ma'am.  Okay.

5    Q.   And at the same time, the second e-mail is from the

6    Real Time Crime Center, sharing a post from Melmane McVay,

7    who is posting on Gotti's page while he's in jail.  Is this

8    the post?

9    A.   It appears to be.

10   Q.   So he's just saying that he's trying to collect bond

11   for Frank Gibson and ask everyone to come down for support.

12   A.   Okay.  Yes, ma'am.  That's what it says.

13   Q.   All right.  And here is -- I'll have to take these

14   apart.  Here is a post from you saying that you've

15   identified the person that's filling in for Gotti.  Is

16   Gotti another name for Frank Gibson?

17   A.   It is.

18   Q.   And then you've attached driver's license information

19   for Melmane McVay?

20   A.   Yes, ma'am, to my partner, Phillip Penny.

21   Q.   Okay.  There's actually an extra.

22        And this is another update provided by Dana Sampietro

23   with pictures of individuals that were at the protest?

24   A.   Yes, ma'am.  They appear to be pictures of the people

25   in front of 201 Poplar.

DIRECT EXAMINATION OF T. REYNOLDS                    213

1   Q.   And then this is the final e-mail, an update from

2   Keith Watson saying that Frank Gibson has been released and

3   that D. Golden -- who is D. Golden?

4   A.   That's going to be Detrick Golden.

5   Q.   Okay.  And that he loaded Gotti up and that they left

6   201 Poplar; is that correct?

7   A.   Yes, ma'am.  Yes, ma'am.

8           **MS. FLOYD:**  The next exhibit will be another

9   collective exhibit of two e-mails; one from victor Tores on

10  7-27-16 and one from Sergeant Reynolds to -- excuse me, one

11  from Eddrick Williams on 9-19-2016.  Those are Pretrial 57

12  and 93.

13          **THE COURT:**  Marked and received as 56.

14          (WHEREUPON, the above-mentioned document was

15  marked as Exhibit Number 56.)

16  BY MS. FLOYD:

17  Q.   Is this an e-mail about the i2 Analyst Notebook?

18  A.   It is.

19  Q.   And what was the i2 Analyst Notebook?

20  A.   That e-mail is to me, but I never really used -- I

21  know of -- what it is.  It's a tool to collate information

22  into a visual format, but I've never used it.  Victor

23  Torres is trying to get us some training on that.

24  Q.   And Victor Torres is from the Real Time Crime Center?

25  A.   He is.

DIRECT EXAMINATION OF T. REYNOLDS                    214

1    Q.   Okay.  Turning to the second e-mail, this is an e-mail

2    from Eddrick Williams to you, correct?

3    A.   Yes, ma'am.

4    Q.   And he says -- and what does he say in this e-mail,

5    without reading it, just generally?

6            **THE COURT:**  He can read it if you want him, too.

7    It doesn't matter.

8            **THE WITNESS:**  "We've all been playing around with

9    i2 Analyst Notebook, just trying to see how to make it real

10   time effect.  Attended data analysis including predictive

11   policing, social media investigations in Nashville,

12   Tennessee, and I've learned new ways to use Accurint LE

13   Plus and i2 Analyst Notebook.  Working with the rep and the

14   president of the company to make social media research

15   better.  So you might like this PDF that was created with

16   i2.  It's a painstaking -- it's painstaking right now due

17   to the fact that everything must be entered manually, but I

18   will update you when we get this monster off the ground."

19   BY MS. FLOYD:

20   Q.   Okay.  And do you recall receiving this e-mail?

21   A.   No.  I received the e-mail, but there wasn't enough

22   licenses for the Memphis Police Department for me to use i2

23   Notebook.

24   Q.   Okay.

25   A.   They were trying to get that for me, but it didn't

1   work.

2   Q.   Okay.  So the Real Time Crime Center used the i2

3   Analyst Notebook?

4   A.   Yes.  Yes, ma'am.

5   Q.   Okay.  And they provided their work product to the

6   Office of Homeland Security?

7   A.   If requested, yes, ma'am.

8   Q.   Okay.  Do you recognize this map that was produced by

9   the i2 Analyst Notebook?

10  A.   Was this in the e-mail?

11          **MR. WELLFORD:**  Excuse me, can we approach briefly

12  on that?  Pull it off for a minute?

13          **THE COURT:**  Sure.  Sure.

14          (Bench conference between the attorneys and the

15  Court.)

16          **MR. WELLFORD:**  I thought that we had redacted the

17  personal information in there after we had a conference

18  with the Court and that that was redacted.

19          **MS. FLOYD:**  We did redact it.

20          **MR. WELLFORD:**  Everything except the photographs,

21  I thought.

22          **MS. FLOYD:**  We have redacted the birth dates and

23  the home addresses and the Court's orders.

24          **THE COURT:**  I think that's correct.

25          **MR. WELLFORD:**  Is this correct?

DIRECT EXAMINATION OF T. REYNOLDS                    216

1              **THE COURT:**  I think so.

2              **MS. SILK:**  I think in the --

3              **THE COURT:**  Speak up.

4              **MS. SILK:**  Sorry.

5              **THE COURT:**  Don't be shy.

6              **MS. SILK:**  When we were speaking on the phone, I

7     thought you indicated that you wanted us to redact the

8     names of the people to protect their identities.

9              **THE COURT:**  No.  I really -- the main thing was

10    to get rid of the personal identifiers, which would be

11    Social Security number, birth date or other such numbers,

12    because those can be misappropriated; whereas, the name is

13    not in the same category.  I don't -- I think it meets what

14    we said we were going to do.

15             **MS. FLOYD:**  Okay.  Thank you.

16             (Bench conference between the attorneys and the

17    Court concluded and the proceedings continued as follows:)

18             **THE COURT:**  And this document shows -- typically,

19    we redact Social Security numbers, birthdays and so forth,

20    personal identifiers because typically those can be

21    misused, but that's the only things that had to be

22    redacted.

23    BY MS. FLOYD:

24    Q.   Do you recognize this work product?

25    A.   Was this attached to the e-mail, ma'am?

1    Q.    Yes, it was.

2    A.    I don't recognize it, but if it was attached to the

3    e-mail, then okay.

4    Q.    So this is the map that William said he thought you

5    would like?

6    A.    Just how it looks, he's just showing me what

7    potential -- this is a specimen, what a work product would

8    look like.

9    Q.    And he said it was very painstaking to put the

10   information into --

11   A.    Manually.

12   Q.    What is the subject of -- excuse me.  What is the

13   subject of this e-mail?

14   A.    Black Lives Matter PDF.

15   Q.    Okay.  And so this includes Frank Gibson, who we just

16   discussed in the prior exhibit?

17   A.    Yes.

18   Q.    Devante Hill, who we've discussed?

19   A.    Yes.

20   Q.    Detric Golden, who is in the prior exhibit?

21   A.    Yes.

22   Q.    Memale McVay?

23   A.    Yes.

24   Q.    And what other -- what events are on this map?

25   A.    Bridge protest, town hall meeting, BLM protest at

DIRECT EXAMINATION OF T. REYNOLDS                    218

1    Graceland, back to school community carnival, and I think

2    that's it.

3    Q.   Okay.

4         **MS. FLOYD:**  My next exhibit is another collective

5    exhibit.

6         **THE COURT:**  We'll mark that as 57.

7         **MS. FLOYD:**  It's e-mails from 7-23 and 7-24, and

8    it's Pretrial 48, 49 and 50.

9         (WHEREUPON, the above-mentioned document was

10   marked as Exhibit Number 57.)

11        **THE COURT:**  All right.

12   BY MS. FLOYD:

13   Q.   All right.  Okay.  And this is an e-mail sent by Major

14   Bass.  Is it an e-mail you received?

15   A.   Yes, ma'am.  I'm in there somewhere, I think.  Yes,

16   ma'am, I see where I am.

17   Q.   Okay.  We're going to start a little earlier in the

18   thread.  And this is an earlier e-mail from Colonel

19   Houston, talking about -- actually, let's start a little

20   earlier.

21        So Colonel Houston said that there were six to eight

22   men without shirts on and went inside a Lenny's restaurant.

23   Then Director Rallings responded, thank you.  And then they

24   went and spoke to the men and -- they went and spoke to the

25   men and said they were leaving, and the officers would try

1   to get better intel on their vehicles?

2   A.   Yes, ma'am.

3   Q.   And then Major Bass sends this out and said that he

4   would have OHS monitor this development.  And do you recall

5   why you were monitoring that development?

6   A.   Well, apparently they entered the restaurant and it

7   was -- they were not allowed there, and if we could see if

8   they were going to disrupt further.  That's the only thing

9   I could think of my boss wanting me to do.

10  Q.   Okay.  And then so the next e-mail is from Major

11  Shelton.  And did you receive this e-mail, as well?

12  A.   Yes, ma'am.  I see my name.  Yes, ma'am.

13  Q.   Okay.  And Major Shelton spoke with the lieutenant and

14  the protesters disassociating themselves from Black Lives

15  Matter.  They had "I am a man" painted on their bodies and

16  just wanted their voices to be heard.  Do you recall that

17  update?

18  A.   No, but now that you show me, I see I was updated.

19  Q.   And did OHS take any other action after this update

20  e-mail?

21  A.   I don't recall.  I don't think so.

22  Q.   Does this refresh your recollection?

23  A.   That is from me to Colonel Houston.  I said thank you.

24  Chief Landrum said, "See below, unsuccessful attempts to

25  obtain video from last night 'I am a man' protesters at

1    Madison and Cooper."  That's -- that was Colonel Houston.

2    I didn't -- that doesn't help me at all.  No, ma'am.

3    Q.   Okay.  So was Colonel Houston trying to get video of

4    the protesters who had their shirts off and their bodies

5    painted that we discussed in the prior e-mail?

6         **MR. WELLFORD:**  Your Honor, I object.  This is a

7    collective exhibit involving strings of e-mails, some of

8    which Sergeant Reynolds is on and some of which he's not,

9    and she's not examining him on all the e-mail strings that

10   he's on.  And so, if she is examining on -- him on some

11   that he may not be, so --

12        **THE COURT:**  Is there any question about the

13   authenticity of any of these e-mails?

14        **MR. WELLFORD:**  Not the authenticity, but his

15   knowledge base of what Colonel Houston was doing and why.

16        **THE COURT:**  Do you know why Colonel Houston was

17   doing what he was doing?

18        **THE WITNESS:**  No, sir.  They don't -- they're not

19   like me.  They don't tell me everything.

20        **THE COURT:**  Okay.  What we're going to do,

21   though, is, I don't think there's any problem admitting

22   them.  I agree that if it doesn't have meaningful

23   information about it, then it won't be very helpful, but

24   that's a different question.  You know, they're going to be

25   received --

 1          **MR. WELLFORD:**  I suppose I have an objection akin

 2    to the completeness objection like when you're

 3    cross-examining a witness with a deposition --

 4          **THE COURT:**  I'll set aside another week.  I think

 5    we're going to be here a while.  I think that's okay.  If

 6    you want to -- what do you want her to do, take them apart?

 7          **MR. WELLFORD:**   There's a -- she hadn't referenced

 8    the start of the e-mail chain in this exhibit which

 9    references these individuals blocking traffic in the

10    street.

11          **THE COURT:**  Well, that's part of cross-examine.

12    We can do it that way if you want to, but I think what

13    we're trying to do is get material admitted in the record

14    as to which the witness has some knowledge, asking about

15    his knowledge of the information.  And I assume that other

16    information -- others will put in additional information.

17    Is that right?

18          **MS. FLOYD:**  Yes, Your Honor.

19          **THE COURT:**  If that's not done, then we can move

20    to strike those portions of the record which are incomplete

21    and we'll handle it that way.  I think that may be the most

22    efficient way, but I do get Mr. Wellford's point that

23    it's -- we can -- I know we have to get a lot of

24    preparatory material in.  Is that what's going on here to

25    some degree?

1          **MR. WELLFORD:**  My concern is it actually takes

2     longer when we're not getting -- instead of me having to

3     wait under the doctrine of completeness, if she would

4     examine him with a collective exhibit on all of his

5     communications that are in the collective exhibit, I may

6     not need to cross-examine.

7          **THE COURT:**  Well, we're not required to --

8     counsel is allowed to conduct her case in the way in which

9     she would like to within the rules, and that's how she

10    would like to proceed.  I don't think it's anything

11    improper about it, and so I'm going to let you go ahead.

12    I'm not going to require you to conduct their examination,

13    also.

14         **MS. FLOYD:**  Thank you, Your Honor.

15         **THE COURT:**  Okay.

16    BY MS. FLOYD:

17    Q.   One follow-up question on this e-mail:  Does this

18    e-mail indicate that you had -- or did you request from

19    Colonel Houston that he obtain video of the "I am a man"

20    protesters?

21    A.   No, ma'am.

22    Q.   Why did you reply "thank you" to him?

23    A.   The e-mail was sent to me and it's from my -- I

24    just -- a thank you is an acknowledgment that I received

25    this e-mail.

DIRECT EXAMINATION OF T. REYNOLDS                    223

1    Q.   Okay.

2              **MS. FLOYD:**  The next exhibit is an e-mail from

3    Major Freed on 2-6-17, Pretrial 132.

4              **THE COURT:**  Marked as 58.

5              (WHEREUPON, the above-mentioned document was

6    marked as Exhibit Number 58.)

7    BY MS. FLOYD:

8    Q.   I'm going to allow you to look through this e-mail

9    before I begin to ask you questions about it.

10   A.   Thank you, ma'am.

11        Okay.

12   Q.   All right.  Is this --

13             **MR. WELLFORD:**  Excuse me.  I'm sorry.  May we

14   approach with this one?

15             **THE COURT:**  Sure.

16             (Bench conference between the attorneys and the

17   Court.)

18             **MR. WELLFORD:**  This one, Your Honor, is

19   attorney's eyes only and we -- we were going to address --

20   they would have to bring that up so we would have to have

21   an opportunity, and there's some that's fine but there's

22   some operational details that relate to some of the first

23   few pages that we had concerns over, and I'm not sure

24   which -- what the key part is that she wants to be using.

25             **MS. FLOYD:**  My examination will cover only the

DIRECT EXAMINATION OF T. REYNOLDS                    224

1    situation description and this final image.

2                **THE COURT:**  Okay.  Then I'll --

3                **MS. FLOYD:**  I wanted to admit the complete

4    document.

5                **THE COURT:**  What's the problem?

6                **MR. WELLFORD:**  If we're going to get the

7    situation -- the second page in, then on the execution

8    section, which is our concern, the execution section of the

9    actual details, and then we took it out up until -- are you

10   talking about the last couple of pages?

11               **MS. FLOYD:**  Yes.

12               **MR. WELLFORD:**  Or where?  It is -- for the

13   record, it is Pages 23136 through 23144 that has

14   operational details that relate to this event that was our

15   concern in designating the attorney's eyes only.

16               **MR. LAURENZI:**  Under law enforcement privilege.

17               **THE COURT:**  Right.

18               **MS. FLOYD:**  I would like the Court to have access

19   to it because it goes to the response -- level of response

20   to the event in question.

21               **THE COURT:**  I understand.  Obviously, this can be

22   marked under seal.  It's not such a great thing to do in

23   the proceeding, but I can see that you've got some issues

24   there.

25               **MR. LAURENZI:**  Very detailed.

DIRECT EXAMINATION OF T. REYNOLDS                     225

1          **THE COURT:**  So we can mark that under seal and

2      that will be under court's eyes only, as long as we're not

3      doing that very much.

4          **MR. WELLFORD:**  In displaying it, if we stay away

5      from displaying those pages.

6          **MS. FLOYD:**  Sure.  If I ask about those pages,

7      I'll just hand it.

8          **THE COURT:**  Just hand it.

9          **MS. FLOYD:**  Wonderful.

10          (Bench conference between the attorneys and the

11      Court concluded and the proceedings continued as follows:)

12          **THE COURT:**  This next document has some

13      confidential information in it; and therefore, it will have

14      to be marked as a document under seal.  I might explain to

15      everybody that if you put it in the general record and it's

16      not marked under seal, it's available to everybody, and

17      sometimes there's a problem in that regard.  And so this is

18      one of those -- we had a couple of documents under seal.

19      Most of them will not be.

20          We may ask later on that a public version be

21      prepared.  So I'm going to put -- I'm going to set aside

22      58A, it's going to be kind of odd, as a public version, but

23      that will just -- reserving the number for a public version

24      of a sealed document.  Okay.  58 is under seal and there

25      will be a 58A.  It may take a little while to get that, but

DIRECT EXAMINATION OF T. REYNOLDS                    226

1    it won't take that long.  Okay.

2              You may proceed, and then she may hand you up

3    something to look at.  That means that that has something

4    on it that we're not going to disclose to everybody at this

5    time.

6              **THE WITNESS:**  Thank you, sir.

7              **THE COURT:**  Sure.

8    BY MS. FLOYD:

9    Q.   Okay.  This is an e-mail to you from Major Freed.  And

10   who is Major Freed?

11   A.   That was when we had promotions, Lieutenant Chandler

12   was no longer my lieutenant and I answered to Major Freed.

13   Q.   Okay.  And he's asking you for anything new on this?

14   A.   Yes, ma'am.

15   Q.   Okay.  And what are the attachments to this e-mail?

16   Right here.

17   A.   They're screen shots sent from -- to Major Freed to

18   me.

19   Q.   Okay.  Is there also an ops plan?

20   A.   Yes, ma'am.

21   Q.   And a protest handouts with the directors' intent and

22   tactical recommendations?

23   A.   Yes, ma'am.

24   Q.   Okay.  Is this the Fight for 15 ops plan?

25   A.   I wasn't privy to that, ma'am, but it looks -- that's

1   what it -- that's what the specimen says.  Yes, ma'am.

2   Q.   Okay.  So this was sent to you, but you did not review

3   it?

4   A.   No.  The question was anything new on this.  And what

5   my boss is asking me, are there similar protests about to

6   show up?  Are there officer safety concerns?  Are there any

7   officer threats that we need to be worried about or public

8   safety threats?  And I probably replied back to him either

9   by phone or e-mail that there -- you know, if there was or

10  wasn't.

11  Q.   Okay.  And were you aware of this event?

12  A.   Yes, ma'am.  Well, we discussed it.  I mean, it might

13  have been in one of the JIBs, yes, but just overall concept

14  that there was going to be a demonstration.

15  Q.   Okay.  And looking here at the outline, was it a

16  demonstration?

17  A.   It looks like it was.  It was protesting the labor

18  secretary.

19  Q.   And where was it located?

20  A.   First Congressional Church on 1000 South Cooper.

21  Q.   Okay.  And -- all right.  And what does it say here,

22  starting with social media?  What does that sentence say?

23  A.   Social media calls this a teach-in to discuss the

24  state of the movement.

25  Q.   Okay.  And is this -- this is the attached screen shot

DIRECT EXAMINATION OF T. REYNOLDS                    228

1    you were discussing?

2    A.   Yes.

3    Q.   And how many people were going to this event?

4    A.   Well, eight expressed on Facebook that they were going

5    and 11 expressed interest.

6    Q.   Okay.  And where does it say that this was going to be

7    a demonstration, outside of a private property?

8    A.   I don't see anything that's says it's a demonstration.

9    Q.   Okay.  And I'm going approach to give you -- okay.

10   I'm going to actually skip that because you did not have

11   knowledge of this.

12        **MS. FLOYD:**  Okay.  And my next exhibit will be an

13   e-mail from Tim Reynolds on 2-4-2017, and it's a JIB Bates

14   Number 17689.

15        **THE COURT:**  Marked and received as 59.

16        (WHEREUPON, the above-mentioned document was

17   marked as Exhibit Number 59.)

18   BY MS. FLOYD:

19   Q.   Is this a JIB -- or a Joint Intelligence Briefing

20   that's circulated on February 4th at 0800 hours?

21   A.   Yes, ma'am.  2017.  Yes, ma'am.

22   Q.   And is this entry for the event that we just

23   discussed?

24   A.   It is.

25        **MS. FLOYD:**  My next exhibit will be an e-mail

1    from Tim Reynolds on 1-21-17.

2                  **THE COURT:**  60, marked and received.

3                  **MS. FLOYD:**  It is Pretrial 127 -- 129.

4                  (WHEREUPON, the above-mentioned document was

5    marked as Exhibit Number 60.)

6    BY MS. FLOYD:

7    Q.   Is this an e-mail that you received from Gloria

8    Bullock?

9    A.   I sent that to Colonel Bullock, the North Main station

10   commander.

11   Q.   Were you responding to an e-mail she had sent to you?

12   A.   I don't --

13   Q.   Does this --

14   A.   Yes, I responded -- I just told her thank you, you

15   know, as in I received this.

16   Q.   Okay.  And what did Colonel Bullock send you?  Did she

17   send you photos of a march that had occurred the day

18   before?

19   A.   Yes, ma'am, it looks like it.

20   Q.   Did she identify two individuals that were there?

21   A.   Paul Garner and TNT, which is Keedran Franklin.  Yes,

22   ma'am.

23   Q.   Are these the photos that were attached?

24   A.   Yes, ma'am.

25   Q.   Is this the photo of someone's license plate?

DIRECT EXAMINATION OF T. REYNOLDS                    230

1    A.    It appears to be.

2    Q.    Do you know who this is?

3    A.    Paul Garner.

4         **MS. FLOYD:**  My next exhibit is an e-mail sent by

5    Grafenreed on 7-16-2016.  It's Pretrial 249.

6         **THE COURT:**  Marked as 61 and received.

7         (WHEREUPON, the above-mentioned document was

8    marked as Exhibit Number 61.)

9    BY MS. FLOYD:

10   Q.   Is this an e-mail from you -- from Officer Grafenreed

11   from the Real Time Crime Center about a flyer that was

12   posted on Frank Gotti's page?

13   A.   Yes, ma'am, dated July 16th, 2016.

14   Q.   And why does she state she sent it to you?

15   A.   She said someone posted this on Frank Gotti's page due

16   to the Black Lives Matter on the flyer, wanted to pass it

17   along, scheduled for July 23rd, 2016.  Standridge and

18   Peres.  No time listed.  It's an upcoming possible protest

19   on the 23rd.

20   Q.   Okay.  Was this -- is this the flyer that was

21   attached?

22   A.   It appears to be.

23   Q.   Okay.

24        **MS. FLOYD:**  My next exhibit, Pretrial 316, is an

25   e-mail from Reynolds dated 9-30-2016.

DIRECT EXAMINATION OF T. REYNOLDS                    231

1          **THE COURT:**  Marked and received as 62.

2                (WHEREUPON, the above-mentioned document was

3     marked as Exhibit Number 62.)

4     BY MS. FLOYD:

5     Q.   Is this an e-mail that you sent to yourself?

6     A.   Yes, ma'am.

7     Q.   Is this the attachment?

8     A.   Yes, ma'am.

9     Q.   Why did you send this to yourself?

10    A.   I must have been doing a followup to see if I could

11    what Grafenreed had sent so I can remind myself to follow

12    this to see if there's any threats, counter-protests or

13    other similar protests scheduled for that day, as a

14    reminder, a reminder e-mail.

15    Q.   Did you access this information through the Bob Smith

16    account?

17    A.   It -- it's quite possible.  I don't know what she -- I

18    can't remember what she sent me, but yes, it's quite

19    possible.

20          **MS. FLOYD:**  The next exhibit is an e-mail from

21    Tim Reynolds on 10-4-2016.  It is a JIB that begins with

22    the Bates range 15661.

23          **THE COURT:**  Marked and received as 63.

24                (WHEREUPON, the above-mentioned document was

25    marked as Exhibit Number 63.)

DIRECT EXAMINATION OF T. REYNOLDS                    232

1   BY MS. FLOYD:

2   Q.   Is this the JIB you prepared on 10-4-2016?

3   A.   It is.

4   Q.   Is this the event that you sent yourself in the last

5   exhibit?

6   A.   Yes, ma'am.

7   Q.   Would you -- when you prepared the JIBs, did events

8   remain on the JIB for multiple days until the event

9   occurred?

10  A.   They did.

11       **MS. FLOYD:**  Okay.  Next exhibit is Plaintiff's

12  Pretrial 98, and it is an e-mail from Tim Reynolds on

13  10-11-2016.

14       **THE COURT:**  Marked and received as 64.

15       (WHEREUPON, the above-mentioned document was

16  marked as Exhibit Number 64.)

17  BY MS. FLOYD:

18  Q.   Is this an e-mail you sent to Colonel Sampietro in

19  response to an e-mail she sent to you?

20  A.   Yes.

21  Q.   And is this an e-mail about Memphis Voices for

22  Palestine?

23  A.   It is.  That was part of a national protest, but it

24  was also here locally and that Kroger had just opened, so

25  Colonel Sampietro was kind of concerned about traffic and

DIRECT EXAMINATION OF T. REYNOLDS                              233

1    new customers to the Kroger and how big this crowd was

2    going to be and if there's going to be any, you know,

3    impeding traffic or officer safety threats.

4    Q.    Okay.  So Colonel Sampietro asked OHS to look into

5    Memphis Voices for Palestine?

6    A.    She did.

7    Q.    And this was what you responded?

8    A.    Yes, ma'am.

9    Q.    And in the second sentence, you're talking about

10   community organizers?

11   A.    Uh-huh.

12   Q.    And you indicate that Keedran Franklin, Al Louis, Paul

13   Garner and Tami Sawyer support MVP on their pages?

14   A.    They do.

15   Q.    How do you -- how did you know that?

16   A.    Through my undercover account, Bob Smith.  You can see

17   the association.

18   Q.    Okay.

19              **MS. FLOYD:**  My next exhibit --

20              **THE COURT:**  We'll mark as 65.  Let's get the --

21              **MS. FLOYD:**  My next exhibit is an e-mail from Tim

22   Reynolds on 10-12-2016.

23              **THE COURT:**  Okay.

24              (WHEREUPON, the above-mentioned document was

25   marked as Exhibit Number 65.)

DIRECT EXAMINATION OF T. REYNOLDS                    234

1       **MS. FLOYD:**  It starts 15920 for the Bates range.

2       **MR. WELLFORD:**  15 what?

3       **MS. FLOYD:**  15920.

4    BY MS. FLOYD:

5    Q.   Is this the JIB for October 12, 2016?

6    A.   It is.

7    Q.   And does the final page include the Memphis Voices for

8    Palestine event we just discussed?

9    A.   It does.

10   Q.   And this was a permitted event?

11   A.   It was.

12       **MS. FLOYD:**  My next exhibit is an e-mail from

13   Officer Wilburn on 7-21-16.  It is Plaintiff's Pretrial 46.

14       **THE COURT:**  Marked as 66 and received.

15       (WHEREUPON, the above-mentioned document was

16   marked as Exhibit Number 66.)

17   BY MS. FLOYD:

18   Q.   This is an e-mail that Officer Wilburn sent to you, is

19   it not?

20   A.   It is.

21   Q.   And what is it?

22   A.   The subject line is, Do you have this one yet?  And

23   we're back in July, and --

24   Q.   What is the event?

25   A.   It is a Black Lives Matter event, and Officer Wilburn

DIRECT EXAMINATION OF T. REYNOLDS                          235

1    is wanting me to make sure that I'm aware of this possible

2    event because it's on social media.

3    Q.   Why was it important for Officer Wilburn to send this

4    to you?

5    A.   I don't know.  You'll have to ask him.

6         **MS. FLOYD:**  And the next exhibit is an e-mail

7    from Tim Reynolds on 7-22-16.  It's a JIB beginning with

8    the Bates range beginning 18586.

9         **THE COURT:**  Marked and received as 67.

10        (WHEREUPON, the above-mentioned document was

11   marked as Exhibit Number 67.)

12        **THE COURT:**  We're not going to stay much longer

13   because you have a 6:00 turnover data and you have a 7:00

14   potential deposition, but we will come in tomorrow and ask

15   everybody to be here -- frankly, be here about a quarter

16   'til 9:00.  As soon as everybody's together, then we'll go

17   ahead.

18        The only question is whether or not we need to

19   interrupt witness's testimony, which I hope not but we

20   might, if Mike Cody is available.  So that would be

21   something we would consider doing if we need to.  So we'll

22   see you at a quarter 'til 9:00 and you can all discuss

23   about the best way to handle that so we can inconvenience

24   the least number of people possible.  Somebody's going to

25   be inconvenienced no matter what.  I'll let you talk about

DIRECT EXAMINATION OF T. REYNOLDS                    236

1    that.

2            Now, I'm going to check -- I'm going to -- we'll

3    see tomorrow.  Probably want to get here a little bit

4    before quarter 'til, if that's okay, so that we're all set

5    to go.  I'm going to let you step down and then we'll see

6    you tomorrow.  I'm going to just check on our schedule.  We

7    said we would do that every day.  And we do want to make

8    sure where we are with our witnesses.  Of course, we have a

9    witness list, but we want to make sure because it's changed

10   a little bit, and so let's go through that.

11           Our witnesses for tomorrow will be -- we'll be

12   concluding the testimony that we have now from Sergeant

13   Reynolds tomorrow, so you can rest.  They can't talk to you

14   about the case.  It's wonderful, you know.  Just have a

15   pleasant evening.

16           **THE WITNESS:**  Thanks.

17           **THE COURT:**  We'll finish that testimony.  Do you

18   think we'll finish that, because the cross is going to take

19   a while?  Let me ask about that.

20           **MR. WELLFORD:**  I was hoping that I have overnight

21   because can I cut down on a number.

22           **THE COURT:**  Sure.

23           **MR. WELLFORD:**  So it -- but an hour, you know.

24           **THE COURT:**  I would think so.  I understand.

25           Now, you're going to wrap this up within

DIRECT EXAMINATION OF T. REYNOLDS                       237

1    45 minutes tomorrow?  Make the train move faster.

2           **MS. FLOYD:**  Yes.  I can go through the exhibits

3    tonight and mark them.

4           **THE COURT:**  Just try to get us -- and move on.  I

5    know the first day, always a little more working out some

6    details, so that's not a problem.  So we'll plan on

7    finishing -- you -- and you're going to talk -- who is

8    going to tell me whether or not we're going to take

9    Mr. Cody as the next witness or whether we're going to

10   interrupt or not?

11          **MR. WELLFORD:**  I don't have an objection.  We

12   will accommodate Mr. Cody's schedule.

13          **THE COURT:**  That would be my thought, too.

14          **MR. CASTELLI:**  And I'll ask him what's best for

15   him, if he -- 9:00 we can put him on, that's --

16          **THE COURT:**  We'll start at a quarter 'til.

17          **MR. CASTELLI:**  Or a quarter 'til, yes, sir.

18          **THE COURT:**  Quarter 'til.  I'm just thinking that

19   we don't know his schedule.  We're going to be interrupting

20   that, but you will need to tell each other that before the

21   end of the evening.  I know you're going to be together

22   anyway.  So we will assume that we will have Mr. Cody

23   either out of the box or we'll have -- Mr. Reynolds will

24   finish, then we'll have Mr. Cody can come over probably

25   after the break, about 10:30.  That might work.  But you'll

DIRECT EXAMINATION OF T. REYNOLDS                    238

1   tell me the first thing in the morning.  You'll tell each

2   other tonight.

3           Now, after Mr. Cody's testimony, let's go quickly

4   back through that again to make sure we're still -- how

5   we're doing on the schedule.  So are you in charge of this

6   part?

7           **MS. FLOYD:**  Of how long is left on Sergeant

8   Reynolds?

9           **THE COURT:**  No.  I already know that.  It's

10  45 minutes.

11          **MS. FLOYD:**  Okay.  Okay.

12          **THE COURT:**  I'm going to actually time that a

13  little bit.  We have to be a little stricter.  First day,

14  everybody gets a little bit of a break.  Second day, we'll

15  pick up the pace a little bit.  Is that okay?

16          **MS. FLOYD:**  Okay.

17          **THE COURT:**  I'm sure you can do that.  I'm sure

18  it will be fine.

19          And so after the first two witnesses tomorrow, we

20  finish Sergeant Reynolds and we have Mr. Cody, who is going

21  to now be our next witness?

22          **MR. CASTELLI:**  I think then we would go with

23  Mr. Kramer.

24          **THE COURT:**  Okay.  Well, that's what I needed to

25  know.

DIRECT EXAMINATION OF T. REYNOLDS                    239

1           **MR. CASTELLI:**  We've got the standing issue.

2           **THE COURT:**  Okay.  That's what I needed to know,

3       because that's -- and that's what Mr. Wellford needs to

4       know.

5           **MR. WELLFORD:**  That makes sense.

6           **THE COURT:**  Okay.  Then we'll do Mr. Kramer.  And

7       then after Mr. Kramer, assuming there's an after, what will

8       be next?

9           **MR. CASTELLI:**  Next would then be Major Chandler.

10          **THE COURT:**  Okay.  Major Chandler.  We're just

11      going to rehearse again who we had before and after

12      Chandler.

13          **MR. CASTELLI:**  Then after Chandler, I think we

14      would like to get the director on, Director Rallings.

15          **THE COURT:**  Okay.  That's probably enough for us

16      to get through tomorrow.

17          **MR. WELLFORD:**  I think so.

18          **MR. CASTELLI:**  I would imagine.

19          **THE COURT:**  Okay.  So -- but tomorrow, we'll -- I

20      think everybody understands, we'll move as fast as we can.

21          Mr. Laurenzi, you need to have a discussion with

22      everybody.  He knows how to move a case quickly, so --

23          **MR. LAURENZI:**  I will do my best, Your Honor.

24          **THE COURT:**  If you'll do the best you can on

25      that, we'll work on it.

240

1            Okay.  Well, we'll see everybody tomorrow at what

2    time?  What time will you be here tomorrow?

3            **MR. CASTELLI:**  Probably about 8:00, Your Honor.

4            **THE COURT:**  Okay.  You're good.  You're good.

5    That sounds -- want to get here early so you're all set and

6    ready to go.

7            **MR. CASTELLI:**  That's the plan.

8            **THE COURT:**  Thank you all very much.  I know

9    you've got work to do this evening.  We'll let y'all be

10   excused.

11           **MR. CASTELLI:**  Thank you.

12           (Adjournment.)

13           (End of Volume 2.)

14

15

16

17

18

19

20

21

22

23

24

25

241

# C E R T I F I C A T E

      I, LISA J. MAYO, do hereby certify that the foregoing 110 pages are, to the best of my knowledge, skill and abilities, a true and accurate transcript from my stenotype notes of the trial, on 20th day of August, 2018, in the matter of:

ACLU of Tennessee

vs.

City of Memphis, Tennessee

Dated this August 28, 2018

                                  _____ S/Lisa J. Mayo _____

                                  LISA J. MAYO, LCR, RMR, CRR
                                  Official Court Reporter
                                  United States District Court
                                  Western District of Tennessee