242

1                    IN THE UNITED STATES DISTRICT COURT

2              FOR THE WESTERN DISTRICT OF TENNESSEE

3                          WESTERN DIVISION

4  ════════════════════════════════════════════════════════

5  ACLU of Tennessee, Inc.,

6                      Plaintiff,

7  vs.                                    NO. 2:17-cv-02120

8  City of Memphis, Tennessee,

9                      Defendant.

10 ────────────────────────────────────────────────────────

11

12

13                    TRANSCRIPT OF PROCEEDINGS

14                        NON-JURY TRIAL

15                         VOLUME III

16

17       BEFORE THE HONORABLE JON P. MCCALLA, JUDGE

18

19                           TUESDAY

20                    21ST OF AUGUST, 2018

21

22

23
                    LISA J. MAYO, CRR, RMR
24                     OFFICIAL REPORTER
                 FOURTH FLOOR FEDERAL BUILDING
25               MEMPHIS, TENNESSEE 38103

1                  A P P E A R A N C E S

2

3

4

5   Appearing on behalf of the Plaintiff:

6            THOMAS HAUSER CASTELLI
             AMANDA STRICKLAND FLOYD
7            American Civil Liberties Union Foundation of
             Tennessee
8            210 25th Avenue N. Suite 1000
             Nashville, TN 37212
9            (615) 320-7142

10

11

12   Appearing on behalf of the Defendant:

13            BUCKNER WELLFORD
             JENNIE VEE SILK
14            LAWRENCE LAURENZI
             R. MARK GLOVER
15            Baker Donelson Bearman Caldwell & Berkowitz
             165 Madison Avenue, Suite 2000
16            Memphis, TN 38103
             (901) 526-6000

17

18

19

20

21

22

23

24

25

1                    **W I T N E S S   I N D E X**

2

3    **WITNESS**                                    **PAGE**    **LINE**

4

5    SERGEANT TIM REYNOLDS

6            Direct Examination By Ms. Floyd      249      6

7            Cross-Examination By Mr. Wellford    270      20

8            Cross-Examination (Resumed)          378      15

9    By Mr. Wellford

10           Redirect Examination By Ms. Floyd    386      9

11

12   MICHAEL CODY

13           Direct Examination By Mr. Castelli   361      6

14           Cross-Examination By Mr. Wellford    367      11

15           Redirect Examination By Mr. Castelli 376      5

16

17

18

19

20

21

22

23

24

25

245

1                         E X H I B I T   I N D E X

2

3    EXHIBIT _____  PAGE      LINE

4

     68        Email: Timothy Reynolds to         249    22
5              Stephen Chandler, et al
               (7/30/2016, 1:23:56 PM)
6    69        Email: Timothy Reynolds to MEM     250    25
               MPD Executive Staff, et al.
7              (7/30/2016, 3:45:04 PM)
     70        Email: Timothy Reynolds to MEM     251    23
8              MPD Executive Staff, et al.
               (9/29/2016, 7:30:01 AM)
9    71        Email: Timothy Reynolds to         253    13
               Christopher House (1/10/201,
10             1:58:14 PM)
     72        Facebook: Message to Spencer       255    14
11             Kaaz, Aug. 03, 2016
     73        Email: Lt. Colonel Eddie Bass      258    7
12             to Timothy Reynolds, et al.
               (12/31/2016, 3:33:20 PM)
13   74        Email: Lt. Stephen Chandler to     259    22
               Colonel Gloria Bullock, et al.
14             (7/10/2016, 5:11:43 PM)
     75        Email: Jeffery Sealey to           261    21
15             Timothy Reynolds (8/22/2016,
               2:57:25 PM)
16   76        Blue Suede Shoes Power Point       264    7
     77        Email: Timothy Reynolds to         266    11
17             Major Eddie Bass, et al.
               (8/23/2016, 5:49:10 AM)
18   78        Email: Major Stephen Chandler      273    3
               to Timothy Reynolds
19             (10/26/2016, 11:05:30 AM)
     79        Memphis Police Department          281    2
20             Policy and Procedure
               Information and Updates
21             December 20, 2010
     80        TURBULENT TIMES FOR LAW            286    19
22             ENFORCEMENT
     81        Kessler Associates Secret          289    8
23             Group Facebook Posts
     82        JOINT INTELLIGENCE BRIEFING        300    3
24             INTELLIGENCE UPDATE
     83        Tennessee Fusion Center            304    16
25             Briefing Outlook and
               Implications

| | | | | |
|---|---|---|---|---|
| 1 | 84 | Email: Aubrey Howard to Timothy Reynolds (7/5/2016, 4:21:04 PM) | 315 | 13 |
| 2 | | | | |
| | 85 | Email: Lt. Darren Goods to Darnell Gooch, et al. (Sat. 9 July 2016, 16:18:44) | 321 | 12 |
| 3 | | | | |
| 4 | 86 | Email: Major Eddie Bass to Timothy Reynolds, et al. (Mon. 11 July 2016, 15:24:17) | 333 | 11 |
| 5 | | | | |
| | 87 | Email: Major Eddie Bass to Deputy Chief Michael Hardy, et al. (7/12/2016, 3:35:11 PM) | 334 | 21 |
| 6 | | | | |
| 7 | 88 | Email: Major Eddie Bass to Colonel Mickey Williams, et al. (7/12/2016, 5:17:08 PM) | 335 | 24 |
| 8 | | | | |
| | 89 | Email: Michael R. Freeman to Timothy Reynolds (Fri 7/15/2016, 2:06:40 PM) | 338 | 15 |
| 9 | | | | |
| 10 | 90 | INCIDENT REPORT NUMBER 1609004302ME | 343 | 23 |
| 11 | 91 | TENNESSEE FUSION CENTER Suspicious Activity Report (9/23/2016) | 347 | 14 |
| 12 | | | | |
| | 92 | Email: Officer Bradley Wilburn to MEM MPD RTCC, et al. (9/27/216, 4:57:10 PM) | 349 | 2 |
| 13 | | | | |
| 14 | 93 | DVD: Abridged Version of Die-In at Mayor Jim Strickland's House | 354 | 7 |
| 15 | | | | |
| | 94 | DVD: Valero Refinery Demonstration Sit-In | 357 | 11 |
| 16 | | | | |
| 17 | 95 | CHARTER OF INCORPORATION OF THE WEST TENNESSEE CIVIL LIBERTIES UNION, INC. | 363 | 14 |
| 18 | 96 | Letter to W. J. Michael Cody from Delton Pickering (March 27, 1974) | 372 | 3 |
| 19 | | | | |
| | 97 | Email: Colonel Gregory Sanders to Major Eddie Bass, et al. (8/10/2016, 10:06:31 PM) | 388 | 18 |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

1                          **TUESDAY**

2                        **August 21, 2018**

3          The trial of this case resumed on this date,

4    Tuesday, the 21st day of August, 2018, at 8:38 a.m., when

5    and where evidence was introduced and proceedings were had

6    as follows:

7                    ----------------------

8

9          **THE COURT:**  All right.  We're ready to proceed.

10   And where is our witness?  Where is our witness?  Where is

11   our witness?  If he's not here, then we'll just strike his

12   testimony and go to the next witness.

13         **MR. WELLFORD:**  Ms. Tilton I think stepped outside

14   to get him.

15         **THE COURT:**  Is there any other witness here

16   present ready to proceed?  He's maybe in the jury room --

17   the witness room.  Want to go get him?  We'll find him.  We

18   lost our witness, but we won't do that again.  I think

19   everybody knows we're going to be a lot more brisk today.

20   We tried to focus the hearing yesterday so that we didn't

21   talk about irrelevant material with things that were not

22   important in the disposition of the case.  So now, we

23   should stay focused and move through it promptly.

24         Okay.  Our witness is late today.  So come on up.

25   They didn't tell you, did they?  Come on in here.  They

1    didn't tell to you do that.

2            **MR. WELLFORD:**  I think he was here, Judge.  He

3    was waiting to be called.

4            **THE COURT:**  You can always -- we're always glad

5    to have you here.  Get comfortable.  We're ready to go.

6    All right.  Yes, ma'am.  And I will watch your time today,

7    and you will need to conclude before 9:30.  If you're not

8    concluded at 9:30, I will tell you, thank you very much,

9    and you will be concluded.  So I know you're going to

10   finish, right?

11           **MS. FLOYD:**  Yes, Your Honor.

12           **THE COURT:**  You worked on it yesterday.

13   Apparently we need to follow some restrictions on time just

14   to make sure we get it all done.

15           **MS. FLOYD:**  Yes, Your Honor.

16           **THE COURT:**  No problem.  I think we're going to

17   be fine.

18           **MS. FLOYD:**  Yes, Your Honor.

19           **THE COURT:**  Ready to go.

20

21

22

23

24

25

1                          *   *   *

2

3                    **SERGEANT TIM REYNOLDS,**

4   **was called as a witness and having first been duly sworn**

5   **testified as follows:**

6                      **DIRECT EXAMINATION**

7   **BY MS. FLOYD:**

8     Q.   Good morning, Sergeant Reynolds.

9     A.   Good morning.

10    Q.   All right.

11         **MS. FLOYD:**  My next exhibit is an e-mail from

12   Reynolds on 7-30-2016.

13         **THE COURT:**  Marked and received as 68, and we're

14   going to try to do those markings just as fast as we can.

15         **MR. WELLFORD:**  May I ask, Your Honor, yesterday,

16   I'm not -- I think the witness didn't have an extra copy up

17   there with him after it was marked.  Can I ask that he have

18   a copy even when she shows him?

19         **THE COURT:**  It's not necessary.  I appreciate

20   that.  Thank you.

21              (WHEREUPON, the above-mentioned document was

22   marked as Exhibit Number 68.)

23   BY MS. FLOYD:

24    Q.   Is this an e-mail that you sent?

25    A.   Yes, ma'am.

1    Q.   All right.  And what is this e-mail discussing?

2    A.   Mary Stewart's Facebook page.

3    Q.   And who is Mary Stewart?

4    A.   Darrius Stewart's mother.

5    Q.   And who is Darrius Stewart?

6    A.   He was killed by -- in an officer-involved shooting

7    with Connor Schilling.

8    Q.   Okay.  And what was happening on Mary Stewart's

9    Facebook page that you shared with Lieutenant Chandler and

10   Major Bass?

11   A.   She's posting a video and trying to imply that it is

12   dash camera video from Officer Schilling's marked unit, but

13   it was a witness video that was circulating and showed two

14   individuals fighting, and it wasn't really clear who it

15   was.

16   Q.   And is this the type of information that Homeland

17   Security was looking for on Mary Stewart's Facebook page?

18   A.   This type of information usually got people excited,

19   and then we were having another demonstration.  So yes.

20   Q.   Okay.  All right.

21        **MS. FLOYD:**  My next exhibit is an e-mail from Tim

22   Reynolds on 7-30-2016.

23        **THE COURT:**  Exhibit 69.

24        (WHEREUPON, the above-mentioned document was

25   marked as Exhibit Number 69.)

DIRECT EXAMINATION OF T. REYNOLDS                    251

1  BY MS. FLOYD:

2     Q.   And --

3            **THE COURT:**  Marked and received.

4            **MS. FLOYD:**  Thank you.

5  BY MS. FLOYD:

6     Q.   Is this e-mail from you?

7     A.   Yes, ma'am.

8     Q.   And what is it?

9     A.   Is dated 7-30, and the subject is JIB July 30, 2016.

10    Q.   So this is a joint intelligence briefing?

11    A.   It is.

12    Q.   And what information is -- is this the information

13    that you shared with in the last exhibit --

14    A.   It is.

15    Q.   -- included in the JIB, in the joint intelligence

16    briefing?

17    A.   Yes, ma'am.

18    Q.   Okay.  All right.

19            **MS. FLOYD:**  My next exhibit --

20            **MR. WELLFORD:**  Pretrial, please.  Pretrial?

21            **THE COURT:**  That will be 70, marked and received.

22            (WHEREUPON, the above-mentioned document was

23    marked as Exhibit Number 70.)

24            **MS. FLOYD:**  That was beginning Bates number 9198.

25  BY MS. FLOYD:

DIRECT EXAMINATION OF T. REYNOLDS                    252

1    Q.   And my next exhibit is an e-mail from Tim Reynolds on

2    9-29-2016.

3         And what was the purpose of sharing photographs from

4    the events after they occurred?

5    A.   Show crowd size.  It was -- and that there was an

6    event.

7    Q.   Okay.  And is this an e-mail that you sent?

8    A.   Yes, ma'am.

9    Q.   And is it a joint intelligence briefing from

10   September 29, 2016?

11   A.   Yes, ma'am.

12   Q.   And what does this photo depict?

13   A.   It depicts three individuals, Frank Gotti seated in

14   rear, Ian Jeffries far right.

15   Q.   Do you recall why this photograph was included in the

16   joint intelligence briefing for that day?

17   A.   Because there was -- on Facebook there was going to be

18   a demonstration protest, whatever, near the law school, and

19   that was to show that that did -- there was some kind of

20   demonstration there.

21   Q.   Okay.  And is this a description of the event that

22   occurred?

23   A.   It appears to be, yes, ma'am.

24   Q.   Okay.  All right.

25        **MR. WELLFORD:**  May we ask that the pretrial be

DIRECT EXAMINATION OF T. REYNOLDS                253

1    designated so we know what it is.

2             **MS. FLOYD:**  Yes.  It's Bates number 15586.  Of

3    a -- it's a joint intelligence briefing.

4             **MR. WELLFORD:**  JIB.

5             **MS. FLOYD:**  Thank you.

6    BY MS. FLOYD:

7    Q.   All right.  On what occasions --

8             **MS. FLOYD:**  My next exhibit is a collective

9    exhibit of two e-mails from Tim Reynolds on 1-10-2017, and

10   it is pretrial 116 and 117.

11            **THE COURT:**  Marked as 71 and received.

12            (WHEREUPON, the above-mentioned document was

13   marked as Exhibit Number 71.)

14   BY MS. FLOYD:

15   Q.   On what occasions would the Office of Homeland

16   Security share information with other law enforcement

17   agencies about protest activity?

18   A.   You'll have to give me a specific example.

19   Q.   Is this an e-mail from you?

20   A.   It is.

21   Q.   And who is this e-mail going to?

22   A.   Christopher House@MinneapolisMinnesota.gov.

23   Q.   Do you recall who that is?

24   A.   No, ma'am.

25   Q.   Is that someone who is in law enforcement?

DIRECT EXAMINATION OF T. REYNOLDS                    254

1    A.   Yes, ma'am.

2    Q.   Is this the e-mail that you attached or the image that

3    you attached to that e-mail?

4    A.   Yes, ma'am.  We had moved to -- protests about the

5    fight for 15, $15 an hour, and after President Trump was

6    elected, inauguration day, there was a lot of rumors of

7    protest.  And if we got something on the feed that we were

8    getting in Memphis about an event in another city, we would

9    share that information with that law -- that department's

10   Office of Homeland Security or their counter part or

11   closest equivalent.

12   Q.   And so where was this event occurring?

13   A.   Minneapolis, Minnesota.

14   Q.   Okay.  And did you pull this information from the Bob

15   Smith account?

16   A.   I did.

17   Q.   And this demonstrates that someone is -- does this

18   demonstrate that someone is going to that event?

19   A.   No.  It just -- well, there's 398 interested and 107

20   going.

21   Q.   Okay.  When it says Spencer is interested, who does

22   that refer to?

23   A.   Spencer Kaaz.

24   Q.   Okay.  Is this also an e-mail that you sent to Mr. --

25   or Officer House?

DIRECT EXAMINATION OF T. REYNOLDS                    255

1    A.    Yes.  Yes, ma'am.

2    Q.    Okay.  And what is the subject?

3    A.    Spencer Kaaz.

4    Q.    And what is attached to that e-mail?

5    A.    His driver's license and -- driver's license

6    information.

7    Q.    And just for the record, these redactions were for

8    this lawsuit, were they not?

9    A.    Yes, ma'am.

10              **MS. FLOYD:**  My next exhibit is part of the Bob

11   Smith data file beginning Bates number 24434.

12              **THE COURT:**  Exhibit 72, marked and received.

13              (WHEREUPON, the above-mentioned document was

14   marked as Exhibit Number 72.)

15   BY MS. FLOYD:

16   Q.    And did you communicate with Spencer Kaaz using the

17   private message function of the Bob Smith account?

18   A.    I did.

19   Q.    And when did you begin those communications?

20   A.    Those communications started right after I sent a

21   friend request to Fergus Nolan.

22   Q.    And when was that?  Generally, what year?

23   A.    2016.

24   Q.    Okay.  All right.  Is this a direct message that

25   Spencer Kaaz sent to you on the Bob Smith account?

DIRECT EXAMINATION OF T. REYNOLDS                    256

1    A.   Yes, ma'am.

2    Q.   And what does it provide information about?

3         And while you're looking at that, the original Bates

4    number of this section begins 24434.

5         So what event was Spencer Kaaz sharing with you?

6    A.   He shared me some information about Elvis week at

7    first.  I'm asking about Elvis week, and he's providing me

8    information about Black Lives Matter.

9    Q.   Okay.  On August 3, 2016, at 10:21 a.m., what does

10   Spencer Kaaz send you information about?

11   A.   "There's information" -- "there's a BLM interest

12   meeting Sunday.  Thought you'd appreciate the heads-up if

13   you hadn't already seen it.  Best wishes."

14   Q.   Okay.  And then at -- on August 3, 2016, this is about

15   14 minutes later, 13 minutes later, what is your response

16   to him?

17   A.   I said:  "What's up, man?  Yeah, I heard about that

18   one.  I think it's a civil rights" -- "I think it's at the

19   Civil Rights Museum.  Is that it?  I'm working this Sunday.

20   Sucks, but I'll be around for Elvis week.  Ain't missing

21   that one.  Do we have plans where we're going to organize

22   before we hit the street?  I think this would" -- "I think

23   is would be best to show up for" -- "show up in a group

24   rather than a few at a time.  Greater show of force.

25   L-O-L."  Laugh out loud.

1    Q.   And is that a typo?  Should that read I think it would

2    be instead of I think is would be?

3    A.   Yes, ma'am.

4    Q.   Okay.  All right.  And later that day an August 3,

5    2016, at 2:31, you provide -- Bob Smith provides Spencer

6    Kaaz with a phone number for texting.  What is that phone

7    number?

8    A.   (404) 982-4994.

9    Q.   And is that your personal cell phone number?

10   A.   No, ma'am.

11   Q.   What is that cell phone number?

12   A.   It's an undercover phone number.

13   Q.   Okay.  Did you use that undercover phone number for

14   anyone other than Spencer Kaaz?

15   A.   No, ma'am.

16   Q.   All right.  My next exhibit is an e-mail from

17   Lieutenant Bass on 12-31-2016, and was there an incident

18   that occurred where protest groups were involved with the

19   Malco theater?

20   A.   There was gang activity and flash mobs.  This must be

21   around Christmas of 2016.  And some of the gang activity

22   and gang fights, the information we're getting was going to

23   incur at the Malco movie theaters.

24   Q.   Okay.  And what was the involvement of Keedran

25   Franklin in those with the Malco theater?

DIRECT EXAMINATION OF T. REYNOLDS                      258

1    A.   He posted something.  He wanted to buy movie tickets

2    for kids.

3    Q.   Okay.  So starting here --

4              **THE COURT:**  Right.  I believe that we had 73.

5    That was marked and received.

6              (WHEREUPON, the above-mentioned document was

7    marked as Exhibit Number 73.)

8              **MS. FLOYD:**  Thank you, Your Honor.

9    BY MS. FLOYD:

10   Q.   So starting here on December 30, 2016, Louis Brownlee

11   sends an e-mail.  Did you receive that e-mail?

12   A.   Yes, ma'am.

13   Q.   Okay.  And who is Louis Brownlee?

14   A.   He is the PIO.

15   Q.   What is PIO mean?

16   A.   Public information officer.

17   Q.   Okay.  And what information does he share with you?

18   A.   He says TNT is trying to get involved as well.

19   Q.   Okay.  And that refers to --

20   A.   Keedran Franklin.

21   Q.   -- what we just discussed about the movie tickets?

22   A.   Yes, ma'am, Keedran Franklin.

23   Q.   Okay.  And what was your response?

24   A.   "How about an AOA for Keedran Franklin on the Malco

25   properties?"

1    Q.   Okay.

2              **THE COURT:**  Let's make sure we understand what an

3    AOA is.

4              **MS. FLOYD:**  Thank you, Your Honor.

5    BY MS. FLOYD:

6    Q.   What is an AOA?

7    A.   It's an authorization of agency.  Businesses, private

8    property, you can have a list of people that are not

9    welcome on that property.  The AOA is the department's way

10   of notifying that individual that they are not allowed on

11   that property, and should they return, they'll be arrested

12   for trespassing.

13   Q.   Okay.  And that's the same procedure that was followed

14   with the mayor's residence and the city hall?

15   A.   And the direct -- the mayor's residence and the

16   director.

17   Q.   Okay.  All right.

18             **MS. FLOYD:**  My next exhibit is an e-mail from

19   7-10-2016 from Lieutenant Chandler.

20             **THE COURT:**  Exhibit 74, marked and received.

21             (WHEREUPON, the above-mentioned document was

22   marked as Exhibit Number 74.)

23   BY MS. FLOYD:

24   Q.   And --

25             **MR. WELLFORD:**  Pretrial, please.

1        **MS. FLOYD:**  Yes.  I believe it's 215.

2   BY MS. FLOYD:

3   Q.   And did you use the Bob Smith account to create the

4   authorization of agency for the mayor's residence?

5   A.   Not exclusively.

6   Q.   But in part?

7   A.   Partly, yes.

8   Q.   Okay.  Excuse me.

9        All right.  Is this an e-mail chain that you were a

10  recipient on?

11  A.   Yes, ma'am.

12  Q.   Okay.  All right.  Is this an e-mail from Officer

13  Bradley Wilburn that you received?

14  A.   It is.

15  Q.   And what does Officer Wilburn share with you and Jeff

16  Dickerson?

17       And sorry to interrupt my own question, but who is

18  Jeff Dickerson?

19  A.   He was at the time the lieutenant of the Real Time

20  Crime Center.  He's since retired.

21  Q.   Okay.  And what did Officer Wilburn share with the two

22  of you?

23  A.   That there's a possibility, there had been rumors that

24  the Klu Klux Klan or KKK was coming to the Black Lives

25  Matter rally.  And this was the day of the bridge.

1    Q.    Okay.  And what is the last sentence of that e-mail?

2    A.    "Tami Sawyer is active with Steve Cohen, post below."

3    Q.    Okay.  Is this the post from Tami Sawyer?

4    A.    No.  It's the one that Bradley got from Tami Sawyer,

5    and the picture shows Congressman Cohen.

6    Q.    Okay.  What is Tami Sawyer discussing in this post?

7    A.    "Tami Sawyer, Congressman Steve Cohen calling for

8    cultural training for police officers.  Says Black Lives

9    Matter is doing important work.  He also is addressing

10   crack and marijuana sentencing, disparities, and calls for

11   community sentences for people" -- "commuting sentences for

12   people imprisoned under the unfair sentencing guidelines.

13   The private prison industry is hatched in Tennessee, and

14   they are making a profit on people's lives.  This is what

15   awareness and work looks like" -- or "look like."

16   Q.    All right.

17         **MS. FLOYD:**  My next exhibit will be pretrial 82,

18   and it is an e-mail from 8-22 from Jeff Sealey.

19         **THE COURT:**  Marked as 75 and received.

20         (WHEREUPON, the above-mentioned document was

21   marked as Exhibit Number 75.)

22   BY MS. FLOYD:

23   Q.    And are you familiar with Snagit.  What is Snagit?

24   A.    Snagit is just the program that you can use on an IBM

25   kind of computer to snip posts that you want and send it.

1    Q.    Okay.  So you would have to be logged in to -- you

2    would have to see whatever you were trying to capture on

3    your own screen?

4    A.    It's a screen shot.

5    Q.    Okay.

6    A.    Yes, ma'am.

7    Q.    Is this an e-mail you received from Jeff Sealey?

8    A.    It is.

9    Q.    And is it in response to an e-mail that you sent him?

10   A.    Yes, ma'am.

11   Q.    Okay.  And who is Jeff Sealey?

12   A.    He's a police officer that works with Real Time Crime

13   Center.

14   Q.    Okay.  And what's the subject of your original e-mail

15   to Jeff Sealey?

16   A.    Snagit.

17   Q.    Okay.  And then what is this link here?

18   A.    It's a Facebook link to aktion kat.

19   Q.    Okay.  And then here there's a long list of exhibits.

20   Is this the first page of those attached exhibits?

21   A.    They are.  It is.

22   Q.    Okay.  And I'm going to zoom out.  Is this taken from

23   the Bob Smith account?

24   A.    It is.

25   Q.    So based on your testimony that you would have to be

DIRECT EXAMINATION OF T. REYNOLDS                    263

1    logged in to the account, Jeff Sealey was logged in to the

2    Bob Smith account in order to capture these images?

3    A.   I went around to Jeff Sealey's -- I didn't have Snagit

4    at the time.  I went around to Jeff Sealey's computer,

5    logged in to Bob Smith, and allowed him to Snagit for me

6    because I didn't have the program.

7    Q.   Okay.  So -- okay.  And then attached are the next few

8    pages the people who liked or reacted to that Facebook

9    post?

10   A.   Yes, ma'am.

11   Q.   And how many people liked or reacted to the Facebook

12   post?

13   A.   58.

14   Q.   And are all of those captured?

15   A.   It appears that they were.

16   Q.   Okay.  What is this Facebook page -- what is this

17   Facebook post about?

18   A.   This is for my PowerPoint presentation.  I needed this

19   post about Saul Alinsky for a PowerPoint presentation that

20   the director requested.

21   Q.   And why did you need this for the PowerPoint

22   presentation?

23   A.   This is after the bridge but explained some of the

24   reasons why we were having the type of protest from this

25   unlawful group that we were having.

DIRECT EXAMINATION OF T. REYNOLDS                    264

1    Q.   So the motivating factors for their actions and

2    protesting?

3    A.   And an explanation.

4    Q.   All right.  My next exhibit is pretrial 137.

5              THE COURT:  Marked as 76 and received.

6              (WHEREUPON, the above-mentioned document was

7    marked as Exhibit Number 76.)

8    BY MS. FLOYD:

9    Q.   Discussing the PowerPoint presentation, what was the

10   name of that presentation?

11   A.   Blue Suede Shoes maybe.  I don't know.  I don't

12   remember.

13   Q.   So the Blue Suede Shoes presentation, who instructed

14   you to prepare that presentation?

15   A.   Colonel -- Lieutenant Colonel Bass.

16   Q.   And do you know who instructed Colonel Bass to have

17   you prepare that presentation?

18   A.   You'll have to ask Colonel Bass.

19             MR. WELLFORD:  Excuse me, Your Honor.  It's a

20   multipage document.  I do think the witness is entitled to

21   have it in front of him if he's being examined on a

22   multipage document.

23             THE COURT:  Well, we need to show the page we're

24   talking about it.  That's for sure.  The reason that I

25   didn't say that I was going to require them to put one up

1    here was because opposite counsel doesn't really get to

2    dictate how we do this.  She can examine in ways as long as

3    it's fair.  And your point about that one is that's a

4    multipage document, and she needs to see that.  I think

5    that makes sense.  Single pages, it's not necessary really

6    because -- I'm going to leave that up to the lawyer.

7              **MR. WELLFORD:**  I agree with the Court on single

8    page.

9              **THE COURT:**  Right.  Otherwise we might be looking

10   at the wrong page.  You can see your screen okay, can't

11   you?

12             **THE WITNESS:**  Yes, sir.  That's okay.

13             **THE COURT:**  It helps us stay focused on what

14   we're talking about.  Sure.

15             **THE WITNESS:**  Okay.

16             **THE COURT:**  By the way, you can actually touch

17   the screen.  And if you mark something, you can, if you

18   want to emphasize or point out something, you can do that,

19   and we'll see it on our screens.

20             **THE WITNESS:**  Thank you, sir.

21             **THE COURT:**  You're allowed to do that.

22   BY MS. FLOYD:

23   Q.   Actually, before I move on to talking about this

24   exhibit, I wanted to see if this refreshes your

25   recollection about who ordered you to prepare this

DIRECT EXAMINATION OF T. REYNOLDS                        266

1    presentation.

2              **MS. FLOYD:**  This is pretrial Exhibit 310.

3              **THE COURT:**  You want to the mark another

4    document?

5              **MS. FLOYD:**  Yes, Your Honor.

6              **THE COURT:**  We'll mark that as 77, and it can be

7    marked and received.

8              **MS. FLOYD:**  It is an e-mail from Tim Reynolds

9    dated 8-23-2016.

10             (WHEREUPON, the above-mentioned document was

11   marked as Exhibit Number 77.)

12   BY MS. FLOYD:

13   Q.   And I'll only be discussing the first page, although

14   it is a multipage document.

15             **THE COURT:**  You can -- okay.  Go ahead.  You can

16   say you as opposed to the name if you want to.  It's fine.

17   Go right ahead.

18             **MS. FLOYD:**  Thank you, Your Honor.

19   BY MS. FLOYD:

20   Q.   Is this an e-mail from you to Major Bass, Major

21   Sampietro, and Lieutenant Chandler?

22   A.   It is.

23   Q.   And what did you say in that e-mail?

24   A.   I said:  "This is the project the director had me

25   start last week.  There have been some issues getting some

1  of the information I needed (arrests from July 12th)."

2      That was an unlawful assembly in Graceland that caused

3  delay.  We were having trouble getting those arrest tickets

4  and information that he requested.  It's almost done, but

5  here -- this is kind of my rough draft.

6  Q.   Does this refresh your recollection about who gave you

7  this assignment?

8  A.   It does.

9  Q.   And who gave you the assignment?

10 A.   The director.

11 Q.   And the director -- when you say "the director,"

12 you're referring to?

13 A.   Director Rallings.

14 Q.   And what was the purpose of this presentation?

15 A.   It was for a TRACK meeting, which is the meeting every

16 Thursday with the command staff, and the director wanted a

17 PowerPoint to show the trends in the compressed nature of

18 all these protests and events that were going on and to try

19 to explain why we're having a problem with a very small

20 unlawful group that tends to want to protest on private

21 property.

22 Q.   Okay.  I'm going to hand you a copy of this exhibit.

23 The staple is a little sharp on the back.  Please be

24 careful.

25 A.   Yes, ma'am.

1    Q.    All right.   Turning to page 22814, and we are on

2    Exhibit 76 now.   Is this phrase -- where does this quote

3    come from that's on the slide?

4    A.    It's a quote from the book from Saul Alinsky.  "Pick a

5    target.  Freeze it.  Personalize it.  Polarize it."

6    Q.    Okay.  And where did you get that quote?

7    A.    Alinsky Rules for Radicals, number 12.

8    Q.    Were you just familiar with that quote?

9    A.    I'm not familiar with the quote.  I had to do some

10   research myself on Saul Alinsky.

11   Q.    Okay.  Is that from Paul Garner's Facebook post?

12   A.    Paul Garner mentioned Saul Alinsky.  I went over the

13   broad strokes of the book so I can put that -- it seemed to

14   explain some of the actions of this group, so I put it in

15   there.

16   Q.    I apologize.

17         Is this another -- is this a slide that includes the

18   Facebook post we discussed in two exhibits ago from Paul

19   Garner's Facebook account?

20   A.    Yes, ma'am.  That's a Snagit that after I logged in to

21   Jeff Sealey's computer, he prepared that for me and

22   e-mailed it to me so I would have it for this presentation.

23   Q.    And who did you give the presentation to?

24   A.    The command staff at the TRACK meeting.

25   Q.    Okay.  You know, what does and TRACK -- what's TRACK

1    stand for?

2    A.   I don't -- it's TRACK.  They talk about crimes and

3    crime trends and -- I don't know what the acronym stands

4    for.

5    Q.   Okay.  But who is included in that meeting?

6    A.   The command staff.

7    Q.   And what does command staff mean?

8    A.   Chiefs, lieutenant colonels, colonels, and some majors

9    and the director and deputy director.

10   Q.   Okay.  And does this slide continue on with the theme

11   of -- talking about the motivations of the protesters?

12   A.   Yes, ma'am.

13   Q.   And this final slide of the presentation, why was this

14   important to include?

15   A.   It was my summary of the overall presentation.

16   Q.   A summary of the investigation?

17   A.   No, of the presentation.

18   Q.   Okay.  Can you tell us about what's included?

19   A.   Okay.  I'll read it.  "Conclusion, an expressed goal

20   of one of these" -- "of these smaller radical groups is to

21   embarrass law enforcement in order to undermine the bond

22   between law enforcement and the community.  For the most

23   part, these STRATAGEMS and these goals by these small

24   groups of radical individuals have not worked in Memphis,

25   Tennessee.  The citizens of Memphis are aware that officers

1    with the Memphis Police Department are not perfect, but

2    officers are doing the best to reduce crime, allow public

3    to make" -- "and allow the public to make their issues

4    known and to maintain order."

5    Q.   Okay.  And were your conclusions for this PowerPoint

6    presentation drawn from your work at the Office of Homeland

7    Security and your investigations?

8    A.   Right.  All the protests to that point, this is my

9    conclusion.

10    Q.   Okay.

11          **MS. FLOYD:**  I am finished with my questioning,

12    Your Honor.

13          **THE COURT:**  All right.  Good schedule.

14    Cross-examination?

15          And for lunch today, we will take a vastly

16    shorter break.  I think everybody's had enough time to get

17    into the rhythm.  So we'll take about a 55-minute break,

18    and we will -- if you need to make some arrangements,

19    you'll have time to do that.

20                       **CROSS-EXAMINATION**

21    **BY MR. WELLFORD:**

22    Q.   Sergeant Reynolds.

23    A.   Good morning.

24    Q.   Morning.

25          I wanted to take you briefly through your background

1    and training that kind of led you up into the Office of

2    Homeland Security, a little context on your training and

3    background.  How long have you been with the Memphis Police

4    Department?

5    A.    21 years.

6    Q.    And in what capacities?  Just kind of briefly walk us

7    through your different rolls within the department.

8    A.    I was a recruit in 1998.  Came on the department

9    February 16th.  I received my full commission in 1999.  I

10   was assigned to the then east precinct, uniform patrol,

11   answering calls just like any other uniform patrol officer.

12   While at the precinct, I was assigned to a robbery task

13   force after a few years.  I worked that and then worked my

14   way into the organized crime unit in 2003.  Spend -- from

15   2003 to 2007, in various teams inside the narcotics unit.

16   I was then assigned to the safe streets task force and

17   worked robberies with the FBI.

18        About a year of that.  I went back to the uniform

19   patrol and stayed there for about three years working the

20   precinct task force until I went back to the organized

21   crime unit and worked for one of the narcotics teams.

22   Q.    Now, when you were with the organized crime unit, did

23   you have occasion to periodically do undercover work there?

24   A.    I did.

25   Q.    And actually use undercover accounts periodically as a

1    part of those operations?

2    A.   I did.

3    Q.   Now when did you join the department -- the Office of

4    Homeland Security?

5    A.   In April of 2015.

6    Q.   In 2015.  And.

7         Who comprised the office at the time of your arrival?

8    A.   There was only one officer, Officer Stuart Frisch.

9    Q.   And what were the basic functions and actions of the

10   Office of Homeland Security during the first month or so

11   after your arrival?

12   A.   It was -- I wanted to bring a money laundering

13   component, an investigative component to the team.  There

14   was a lot of suspicious money coming from Memphis into the

15   middle east through criminal enterprises, and money

16   laundering was the mechanism.  And the suspicious --

17   specified unlawful activity was fraud, but Stuart --

18   Detective Frisch also had his side of the team, and that

19   was very much still kind of embedded in the post 2001 view

20   of terrorism, asymmetric threats in the middle east to see

21   if they're coming here and to track radical extremist

22   groups in the United States.

23        **MR. WELLFORD:**  Your Honor, I'd like to mark as

24   the next trial exhibit an in-service training PowerPoint

25   that is Plaintiff's 321.

1          **THE COURT:**  Certainly.  78, marked and received.

2          (WHEREUPON, the above-mentioned document was

3     marked as Exhibit Number 78.)

4   BY MR. WELLFORD:

5   Q.    Do you recall an in-service training presentation that

6   you -- was it -- what was detective --

7   A.    Detective Frisch.

8   Q.    -- Detective Frisch provided shortly after your

9   arrival at the Office of Homeland Security in April

10   of 2015?

11   A.    Yes, sir.

12   Q.    What was its purpose?  This is an e-mail of

13   October 26th where you're forwarding the presentation, but

14   the presentation itself was made shortly after your

15   arrival?

16   A.    Yes, sir.  At the academy every year, there's

17   in-service training, and it lasts for the majority of the

18   year.  And for this particular year, the Office of Homeland

19   Security had a block of instructions that went over what

20   the office did.

21   Q.    And the unit overview that appears at Bates Stamp 1952

22   of this document, is that an accurate overview of the

23   functions of the department -- of the office at the time?

24   A.    Yes, sir.

25   Q.    And if you could look at the first sentence that's

1   italicized, does that accurately reflect the mission of the

2   unit as of the time of your arrival?

3   A.   Yes, sir.

4   Q.   You mentioned asymmetric?

5   A.   Asymmetric threats, yes, sir.

6   Q.   Does the PowerPoint actually describe what you're

7   talking about when you reference asymmetric threats?

8   A.   Yes, sir.  And there's one acronym in there because

9   we're talking to police officers.  LEO is law enforcement

10   officers, if we needed to clear that up.

11   Q.   And at Bates Stamp Page 191 -- excuse me -- 19168,

12   does this accurately reflect the overview of the office as

13   of the time of your arrival and its partnerships with other

14   governmental law enforcement home security-type -- homeland

15   security-type operations?

16   A.   Yes, sir.

17   Q.   And which would they be?  Describe briefly what

18   each -- what the Office of Homeland Security had to do with

19   these divisions.

20   A.   They're state and local, FBI joint terrorism task

21   force, federal Office of Homeland Security, TSA, the air

22   Marshall service, and then Tennessee Fusion Center.  And,

23   of course, we do work with secret service, especially

24   during campaign years, to assist with the secret service

25   with dignitary protection, and the Shelby County Office of

1    Criminal Intelligence, Homeland Security.

2    Q.   Now at Bates Stamp Page 201, there's a section in the

3    report entitled "What Are We Working on Now?"

4         Do you see that?

5    A.   Yes.  Yes, sir.

6    Q.   Does that accurately reflect the level of activity

7    within the office very shortly after your arrival on the

8    types of focus that the office had at the time?

9    A.   Yes, sir.

10   Q.   Now there is a reference to violent sovereign citizens

11   militia.  Do you see that?

12   A.   Yes, sir.

13   Q.   And then to different threat assessments underneath

14   that.

15        At that point in time, very shortly after your

16   arrival, how much of a focus were sort of local protest

17   demonstrations, especially unpermitted demonstrations, at

18   this point in time?

19   A.   Very -- none hardly.  With the exception of the

20   violent sovereign citizens, because with the death of

21   Officer Pallard over in West Memphis, we were still kind of

22   concerned about the local impact of sovereign citizens

23   here.

24   Q.   What was the concern?

25   A.   It's an officer safety concern that there would be,

1    you know, threats to the lives of officers.

2    Q.   Now the report identifies certain intelligence gaps.

3    Do you see that?

4    A.   Yes, sir.

5    Q.   Now, do you -- explain what you mean or what you and

6    your colleague meant by intelligence gaps at the time.

7    A.   We searched a lot of open source stuff to get the

8    information that we need, but there was a lot of gaps.

9    There's a lot of threats that were slipping past us,

10   especially to like little churches and synogogues that we

11   just weren't getting.  The reports of suspicious

12   activities, we would get, you know, some just from tips

13   from the general public, but nothing we were

14   self-generating.  And the reports of suspicious activities

15   or incidents associated with mass gatherings and special

16   events, we didn't have anyway -- mechanism to figure out

17   what to expect on mass gatherings.

18   Q.   What was the most effective way to address those

19   intelligence gaps?

20   A.   One way was the collators, and the other way was for

21   me to start using my undercover account.

22   Q.   Now, was there an event that occurred fairly shortly

23   after your arrival in the city of Memphis that did ramp up

24   a lot of unpermitted, spontaneous-type demonstrations and

25   protests?

1    A.    Yes, sir.  The death of Darrius Stewart.

2    Q.    And what impact did that have on the office in which

3    you worked and how you attempted to address the

4    intelligence gaps that you had referenced on the section of

5    the slide we just looked at?

6    A.    We were receiving a lot of general threats all over

7    social media that were coming in from citizens, and to

8    Officer Schilling specifically.  So we felt we needed to

9    get a handle on these and start vetting these threats to

10   see if they're viable or not.

11   Q.    You were shown some trial exhibits yesterday, exhibits

12   23 through 31, that reference certain Facebook posts and

13   likes and other things that you did under the undercover

14   account Bob Smith starting in 2015.  Do you remember that?

15   A.    Yes, sir.

16   Q.    So tell us about how you started to use the Bob Smith

17   account in the aftermath of the Darrius Stewart shooting

18   and the activities and the concerns that were expressed

19   following that shooting incident?

20   A.    Once you make it -- the jump into social media, it's

21   not only just local, but national trends, like all the

22   protests that were going on nationally would filter their

23   way through certain people's Facebook page.  The most

24   popular people are the ones I started paying attention to.

25   The ones that are most vocal about the issues and topics

1    that are happening across the country.

2    Q.   Now, you were questioned about a lot of these

3    postings, specific postings yesterday, but that didn't

4    come -- those questions from Exhibits 23 through 31 -- from

5    some files you keep in your office, did they?  They came

6    from a Facebook dump that we produced in this litigation

7    from Facebook, right?

8    A.   Yes, sir.

9    Q.   So what types -- how did you decide what to save of

10   the Bob Smith just sort of general activity that you were

11   doing in the mid and latter part of 2015?  Or did you save

12   anything?

13   A.   No, we would always be able to go back to my Bob Smith

14   account and pull up whatever we needed.  We didn't need to

15   save anything because it's on social media.

16   Q.   Were you keeping files of some kind on specific

17   protesters or people who were prominent in the protests or

18   demonstrations that followed the Darrius Stewart shooting?

19   A.   No, sir.  That's the purpose of the account.  I can

20   just hop on and see who's talking about it.

21   Q.   And did you -- did you care which opinions were being

22   expressed by either side, the side that was quite critical

23   of the reaction of law enforcement and government agencies

24   to the shooting and those who tended to band around law

25   enforcement and support them at the time?

1   A.   The topic didn't matter.  It's just the popularity of

2   the topic.  And then with any one point of view, there's

3   always an opposing point of view.  And the purpose of that

4   was to see if these two opposing points of view are going

5   to have a clash and roped under some type of demonstration

6   or threat to officer safety or community or private

7   property.

8   Q.   Were there demonstrations and protest activity that

9   occurred following -- by the way, do you remember when the

10  Darrius Stewart shooting was?

11  A.   July -- it was in July of 2015.  I don't remember the

12  exact date.

13  Q.   All right.  And were there unpermitted protests and

14  demonstrations that occurred during that time frame?

15  A.   Yes, sir.

16  Q.   Is that something -- why would that be something that

17  would concern or that your office would need to be

18  interested in or concerned about?

19  A.   All across the country, major metropolitan areas were

20  having spontaneous protests that sometimes got out of hand.

21  And we wanted to make sure that these protests, A, because

22  of the gap of intelligence we knew about them; and, B, have

23  officer presence to ensure public safety and also to make

24  sure that the protesters themselves were not injured.

25  Q.   Were there threats during this time frame to the

1    officer who was involved in the shooting?

2    A.    Yes, sir.

3    Q.    Now, Sergeant, as you used the Bob Smith account, what

4    was your personal familiarity or your awareness with the

5    terms of the -- what's been called the Kendrick consent

6    order?

7              **THE COURT:**  It's consent decree.

8              **MR. WELLFORD:**  Consent decree.

9              **THE COURT:**  You want to get that terminology

10   right, okay.

11   BY MR. WELLFORD:

12   Q.    What was your level of personal knowledge of the

13   Kendrick consent decree as of the time you started to use

14   the Bob Smith undercover account and monitor unpermitted or

15   large public gatherings in the aftermath of the Darrius

16   Stewart shooting?

17   A.    I didn't know much about the 40-year-old decree.  I

18   just knew what was in the policy and procedure book and

19   like the brief version of what we needed to look out for.

20   Q.    It's pretrial defense 67.

21             **MR. WELLFORD:**  Your Honor, I would like to --

22             **THE COURT:**  Sure, mark that --

23             **MR. WELLFORD:**  -- move into evidence as the next

24   exhibit.

25             **THE COURT:**  Marked and received as 79.

1            (WHEREUPON, the above-mentioned document was

2      marked as Exhibit Number 79.)

3   BY MR. WELLFORD:

4      Q.   The policy and procedure dated December 20, 2010,

5      DR138, which is the posting of the summary of the Kendrick

6      decree on the Memphis city police department kiosk.

7            Now, were you aware of the posting of this document on

8      the kiosk at the time?

9      A.   I was.

10     Q.   Tell the Court what your general awareness was of the

11     policy and/or the Kendrick decree as of this time frame?

12     A.   When this policy came out, I was in the organized

13     crime unit in 2010, and we discussed the decree and -- very

14     briefly and this specifically.  And we don't gather

15     political intelligence anyway, so -- but -- it prohibited.

16     That was a prohibited thing to do.

17     Q.   Well, what I'm focusing on right now is what's in your

18     mind and not the legal import of what the consent decree

19     means.  I'm focusing upon what's in your mind.  So what was

20     in your mind with respect to the level of understanding or

21     awareness of all of the things that appear here in DR138?

22     A.   I felt that we were in compliance, especially with 28

23     CFR part 23.

24     Q.   Which is in the federal regulations down here?

25     A.   Yes, sir.

1   Q.   Now, do see the first paragraph and how that reads on

2   DR138?

3   A.   Yes, sir.

4   Q.   Do you think you ever read that, read it as opposed to

5   being briefed on it?

6   A.   I read it.

7   Q.   Okay.  And how did you interpret it?

8   A.   That as a police officer, I don't engage in political

9   intelligence.

10  Q.   Did you view anything that was happening with the Bob

11  Smith account and any intelligence-gathering operations

12  that were being conducted in association with protester

13  demonstration activity to be done for the purpose of

14  political intelligence gathering?

15  A.   No, sir.  The politics doesn't matter to me.  It's the

16  event.  It's a public safety aspect, and it's the officer

17  safety aspect of it.

18  Q.   Did you know exactly what political intelligence was

19  as described in the consent decree itself?

20  A.   No, sir.  It just says political intelligence.  I

21  don't know what -- I didn't -- I didn't know what to think

22  to investigate further what that was.

23  Q.   Now, as we are moving forward through 2015 -- and by

24  the way, does July 15, 2015, is that the date that Darrius

25  Stewart was shot?

1    A.    Yes, sir.  That was it.

2    Q.    It seemed like you were asked a question yesterday,

3    and I can't put my figurers on it, but it concerned some

4    your Facebook postings that are likes and groups that you

5    were attempting to join.

6    A.    Yes, sir.

7    Q.    I thought there was a question about whether you were

8    trying to join any of those groups in 2015 that -- before

9    the Darrius Stewart shooting that related in some manner to

10   Black Lives Matter or concerns about police relationships

11   with the African-American community.  So my question to you

12   is, did you do that before the Darrius Stewart shooting?

13   A.    No, sir.

14   Q.    All right.  Now, do you understand the level of

15   frustration and anger in large -- in large sections of the

16   African-American community and the community generally

17   associated with police-related shootings --

18   A.    Yes, sir.

19   Q.    -- of African-American men?

20   A.    Absolutely.  That's one of the reasons why, you know,

21   we went to the body-worn cameras.

22   Q.    What impact, if any, did other high profile similar

23   shootings that were occurring around the country of

24   African-American men following police encounters have upon

25   your office's focus and activities in this area?

1    A.    That was a little unusual.  I mean, normally we worry

2    about what happens in Memphis, but social media, things

3    that happen across the country, people get excited about it

4    in Memphis, so Alton Sterling in Louisiana.  I can't

5    remember the gentleman's name in -- that was killed live on

6    Facebook in an officer-involved shooting.  That was pretty

7    rough.  That went over everywhere, and just the news in

8    general, there was a lot of -- there was a lot of shootings

9    that were -- and news clips of shootings going around on

10   social media that kept everybody, you know -- it kept the

11   temperature level of protest high in Memphis.

12   Q.    Now, did there come a time in 2016 when you actually

13   tried to develop more of a background and base of knowledge

14   about the most effective manner and way to use social media

15   to try to track large public gatherings, especially

16   spontaneous ones?

17   A.    Yes, sir.  Since I was new to the -- to this

18   particular office or line of investigation, I went to

19   Nashville and hooked up with their Office of Homeland

20   Security because they had a more established, in my mind,

21   office.  And I learned a little bit about how to bridge

22   some of the gaps that we have in intelligence and using

23   undercover accounts and how to watch popular people to see

24   what's going on so you can anticipate rallies, protests,

25   and so forth in Memphis.

1   Q.   Well, tell us what you learned, what you observed when

2   you went to Nashville for that purpose.

3   A.   There was a Black Panther rally that was being

4   scheduled there, and I wanted to see how they handled it.

5   I was in the office, and he showed me his social undercover

6   account and how he kind of found out about the protest and

7   kind of gauged how big it was.  We go out on the ground,

8   observed the protest, and it should have had a permit.

9   They have a similar permit rule that we do.  The gentleman

10  stayed on the sidewalk, but there was -- it was impeding

11  traffic, and it did cause a lot of congestion there.  And I

12  asked them, I said, why aren't y'all breaking this up or

13  having to move along or whatever.  He says it's better just

14  to let them go and get -- you know, this is -- you know,

15  just make the traffic and the pedestrians work while he's

16  doing his demonstration, and then it will -- you know, it

17  will be over, and we can get back to business.

18  Q.   Were they using social media to try to track in real

19  time the level of interest in an activity associated with

20  that event?

21  A.   Yes, sir.  He had a very small group of people that he

22  was really watching, which was 25 or 30, and based on, you

23  know, the traffic between these 25 and 30 people, you kind

24  of knew what was going to go on the activism, whatever the

25  protest was or whatever the issue was in Nashville, and you

1    can anticipate and report back to the precincts or district

2    that they had that they were probably having an event there

3    so they can prepare.

4    Q.   Now, following your return from Nashville on that

5    trip, did your use of social media, specifically the Bob

6    Smith account, significantly increase?

7    A.   Yes, sir.  Right after the -- right after that visit,

8    I started friending some people that I thought were popular

9    or might have an idea of what's going on as far as social

10   activism in the community.

11           **MR. WELLFORD:**  Your Honor, I would like to mark

12   as the next exhibit a two-page time line --

13           **THE COURT:**  Sure.

14           **MR. WELLFORD:**  -- that I've shown Mr. Castelli

15   and stipulated.

16           **THE COURT:**  Without objection, that will be 80 in

17   the case, marked and received.

18           (WHEREUPON, the above-mentioned document was

19   marked as Exhibit Number 80.)

20   BY MR. WELLFORD:

21   Q.   Move this around some, but, Sergeant, I want to focus

22   now when we're moving into the 2016 time frame.  And do you

23   see where we're talking about here, in the 2016, when we're

24   moving into that area?

25   A.   Yes, sir.

1   Q.   All right.  Were all of the events and activities you

2   were following during this time frame, were they all Black

3   Lives Matter things?

4   A.   No, sir.

5   Q.   All right.  What was -- what other big topics or

6   issues of concern were there that were sort of generating

7   spontaneous sometimes unpermitted activity in 2016?

8   A.   The greensward and then the Pulse Nightclub shooting.

9   Q.   Let's talk about the greensward first.  What was the

10  essence of your office's involvement in what I guess has

11  been called the greensward controversy concerning the zoo's

12  use of certain parts of the greensward for zoo parking?

13  What was your office's involvement in monitoring that

14  activity and why?  Why would you be interested in that?

15  A.   Well, it was a local news story, and there was a very

16  opposing opinions about the use of the green space for

17  parking.  The zoo wanted one utility use, and there was a

18  good portion of people that didn't like the zoo's point of

19  view.  So that was kind of the test for the Bob Smith

20  account to see if we can anticipate if there's going to be

21  a protest or not, an unpermitted event.

22  Q.   Was there a protest and were there arrests made on

23  memorial day May 30, 2016, concerning the greensward

24  incident?

25  A.   Yes, sir.  Fergus Nolan and Maurice Green were

CROSS-EXAMINATION OF T. REYNOLDS                    288

1    arrested in that after they blocked the entrance to the

2    greensward.

3    Q.   Well, you don't know the details of exactly what they

4    did, do you?  You weren't on the scene when they got

5    arrested.

6    A.   I was not there.

7    Q.   But you know they were arrested at the time in

8    association with the demonstration there?

9    A.   Yes, sir.

10   Q.   Well, we've heard evidence of your use of the Bob

11   Smith account to get into a group, a private group

12   established by Mr. Nolan, and we heard some of that

13   yesterday.  I wanted to get into that.  Why were you

14   interested in seeing what Mr. Nolan and a private group was

15   having to say about the greensward incident?

16   A.   I was directed by my chief, Chief Hardy.

17   Q.   Who is Chief Hardy?

18   A.   Chief Hardy is the --

19   Q.   What's his name?

20   A.   He is the chief over -- Chief Michael Hardy.  I'm

21   sorry.  He is the chief over special ops, which is what the

22   department I fall under.

23          **MR. WELLFORD:**  Your Honor, I would like to mark

24   as the next exhibit what is Defense 107.

25          **THE COURT:**  All right.

1          **MR. WELLFORD:**  The series of exchanges between

2     Kessler Associates Group between Bob Smith and Fergus

3     Nolan.

4               **THE COURT:**  Marked as 81.

5               **MR. WELLFORD:**  June 2016.

6               **THE COURT:**  Right.  Marked as 81.

7               (WHEREUPON, the above-mentioned document was

8     marked as Exhibit Number 81.)

9     BY MR. WELLFORD:

10    Q.   Let me make sure I get this so that we can see it.

11    Can you explain to us basically what we are looking at

12    here, Sergeant.

13    A.   To put it in a little context, after I was given

14    vetting questions by Spencer Kaaz and Fergus Nolan accepted

15    my friend request, I was immediately taken to Kessler

16    Associates.  And the topic in there was how to -- Mr. Nolan

17    was calling DA, direct action, how to disrupt the zoo with

18    direct action.  So this was kind of interesting to me

19    because this is what I needed to report to the precinct

20    commander and the zoo that they were going to have some

21    type of protest that was going to disrupt the normal flow

22    of business for the zoo.

23              **MR. WELLFORD:**  And, Your Honor, because the

24    writing is a little bit small, may I approach the witness?

25              **THE COURT:**  You can blow it up.  All you got to

CROSS-EXAMINATION OF T. REYNOLDS                    290

1    do is blow it up.

2            **MR. WELLFORD:**  I'm trying to, but not sure this

3    date.

4            **THE COURT:**  We'll make it as large as possible.

5    BY MR. WELLFORD:

6    Q.   Do you see down here the date?

7    A.   June 5 of 2016.

8            **THE COURT:**  We'll show you how to use the

9    technology.  Rotate the little dial there, and it will make

10   it bigger.

11           **THE WITNESS:**  June 5th of 2016.

12           **THE COURT:**  Just pull it down.  Pull it down on

13   the screen.  Pull the paper down on the screen, gentlemen,

14   and center it.  Thank you.

15   BY MR. WELLFORD:

16   Q.   Was June 5, 2016, the time that you friended or were

17   accepted as a friend in this group?

18   A.   I was accepted to that group, yes, sir, June 5th.

19   Q.   Few days after the May 30th arrest?

20   A.   Yes, sir.

21           **MR. WELLFORD:**  Your Honor, we redacted names of

22   individuals who were not Mr. Nolan and Bob Smith who may be

23   referenced in these exchanges.

24           **THE COURT:**  There's no objection.  That's fine.

25   Sure.

1    **MR. CASTELLI:**  No objection.

2    **THE COURT:**  No objection.  Sure.  That's fine.

3    BY MR. WELLFORD:

4    Q.   This series of exchanges has to be sort of read from

5    the bottom up, does it not, starting with June 6th and then

6    working our way up toward the ones that would occur after

7    that --

8    A.   Yes, sir.

9    Q.   -- Sergeant?

10    A.   Yes, sir.

11    Q.   So is this the first exchange that we have with

12    Mr. Nolan on your part with respect to the Kessler

13    Associates Group and the greensward?

14    A.   It is.

15    Q.   And -- excuse me.  Sorry.

16    A.   I'm sorry.

17    Q.   All right.  Now let's just talk about the Bob Smith

18    persona for a minute.

19    A.   Yes, sir.

20    Q.   This is an undercover account?

21    A.   It was.

22    Q.   What is the nature of an undercover account and an

23    undercover identity?  What is it that you are attempting to

24    do?

25    A.   Infiltrate, infiltrate, to be a part of a group.

CROSS-EXAMINATION OF T. REYNOLDS                    292

1    Q.    Are you playing a role?

2    A.    I am playing a role.

3    Q.    Are you going to truthfully and honestly answer every

4    question somebody may ask you in association with that

5    role?

6    A.    No, sir.

7    Q.    What is the role that you are playing when you are

8    communicating with Mr. Nolan here as a part of the Kessler

9    Associates Group?

10   A.    One of the vetting questions Spencer asked me was my

11   real name.

12   Q.    Spencer?

13   A.    Spencer Kaaz.  I'm sorry.

14   Q.    What role did he have, if any, in sort of connecting

15   you with Mr. Nolan?

16   A.    He wanted to know my real name, so I gave him the

17   undercover name that was given to me in narcotics, Tim

18   Ryan.  So it starts off:  "Welcome Tim Ryan, who is

19   recommended by" -- "whom I trust.  Y'all talk among

20   yourselves.  Recruit a few more and decide on the type of

21   action.  I'll bring the outside resources, like attorney

22   backup, PR response, et cetera, when needed.  But as I

23   can't participate due to my bail conditions, I leave the

24   decisions to you guys.  We also have a bunch of guidelines

25   for direct action participants.  First thing" --

1    Q.   Let me ask you, what does this mean to you, direct

2    action, or DA as it's also referenced in this exchange?

3    A.   Well, I'm not familiar with what direct action is, so

4    I'm learning as we're going.  He's going to tell us what

5    direct actions are.  So I can -- but this is information I

6    need for my knowledge on a threat assessment for the zoo,

7    if he's planning to do something over there.

8    Q.   Now, is there a discussion here about the philosophy

9    behind Mr. Nolan's involvement in this issue or the pros

10   and cons of it?

11   A.   No, sir.

12   Q.   There's a lot of discussion about operational details

13   relating to the direct action that he is advocating for the

14   group?

15   A.   Yes, sir.

16   Q.   You see there near the bottom of it that the

17   statement:  "The memorial day direct action got us into

18   dozens of out-of-town media and every local media outlet.

19   DA is by far our most effective tool."

20   A.   Yes, sir.

21   Q.   Now, if we move into the next series of exchanges,

22   Bates Stamp Page 025378, we see some more communications

23   with Mr. Nolan and with you?

24   A.   Correct.

25   Q.   Do we see some photographs that Mr. Nolan has taken of

CROSS-EXAMINATION OF T. REYNOLDS                          294

1    the zoo site?

2    A.   Yes, sir.  Those were areas he planned to do his

3    direct action to impact the visitation to the zoo.

4    Q.   And he's calling it recognizance?

5    A.   Yes, sir, he is.

6    Q.   As of June 7th?

7    A.   Yes, sir.

8    Q.   There's actually a June 5 e-mail above that where he's

9    referencing some direct of action that coming Saturday.

10   A.   Yes, sir, June 11th.

11   Q.   You see that that includes some vehicle-related

12   action.  Do you see that?

13   A.   Yes, sir.  He was going to act like his cars were

14   breaking down to stop people from entering the zoo and also

15   have another group of people pay in pennies to really slow

16   down the speed in which the zoo can accept visitors.

17   Q.   Is that something you would consider to be lawful

18   action to deliberately have a vehicle break down as it's

19   attempting to enter the zoo?

20   A.   No, sir.

21   Q.   And you see Mr. Nolan following up with you on

22   June 7th where he's describing what police procedure is at

23   Overton park?

24   A.   Yes, sir.

25   Q.   And as we move into July -- June 11th, which was the

1    date that Mr. Nolan had referenced for certain action, did

2    you have a follow-up communication with him about what his

3    plans were at that time?

4    A.   Yes, sir.  In addition to the direct action, he wanted

5    to hack into the zoo computer and crash it.

6    Q.   Well, how do you know that?

7    A.   He starts mentioning that he is -- oh, this part right

8    here.  I'm sorry.  I jumped ahead of myself.

9              **THE COURT:**  You can touch the screen if you want

10   to put it out that way.  Just test that and see if that

11   works for you.  It should.  Let's make sure screens will

12   work.  There you go.  You can circle and put arrows and all

13   sorts.

14             **THE WITNESS:**  Thank you, Judge.

15             He's giving him kind of instructions on how to

16   act like their car is breaking down and gum up the --

17   BY MR. WELLFORD:

18   Q.   Well, you're talking about this down here, this part?

19   A.   Yes, sir.  I'm sorry.  We got kind of sidetracked.

20   What was your question?

21   Q.   Well, the question was about hacking into the zoo's

22   system.

23   A.   Oh, okay.

24   Q.   How did -- would that be a legal action that Mr. Nolan

25   or others could take?

1   A.   Now we're talking about criminal action.  No, sir.

2   That's not legal.

3   Q.   And he actually says, "We'll probably take that one

4   offline as illegalities are involved."

5   A.   Yes, sir.

6   Q.   Were you privy to any offline discussions that

7   Mr. Nolan may have had with others about that subject?

8   A.   No, sir.

9   Q.   Now, what follow-up, if any, did you have on that

10  matter if he describes the criminal investigation?  Let's

11  get one think out for the record.  You did not take that

12  issue to the director, did you?

13  A.   No, sir.  I took it to the deputy director.

14  Q.   Why didn't you take it to the director?  Did you know

15  the consent decree, the Kendrick consent decree requires

16  the director to authorize criminal investigations that have

17  something to do with first expression of first amendment

18  protected rights as well, or did you know anything about

19  that?

20  A.   I didn't consider this a political intelligence, even

21  if I had thought about that, but I was notifying my

22  supervisor in the best -- the best one to notify would be

23  the deputy director of this, because we're starting to get

24  into some criminal -- criminal -- a criminal case.

25  Q.   Well, did you even know in your mind -- you know, I'm

CROSS-EXAMINATION OF T. REYNOLDS                    297

1   supposed to have the director authorize these criminal

2   investigations?  Was that a part of your decision-making

3   process at all?

4   A.   No, sir.  No, sir.

5   Q.   All right.  So what did you do as a follow-up

6   investigation into this incident?

7   A.   I went to the zoo and talked to the -- their IT guy,

8   and I kind of explained myself and the purpose for my visit

9   and asked him if he had any problems with the zoo computer,

10  has anyone tried to hack it or have there been any hacking

11  attempts.  He told me there hadn't been, but there had been

12  some suspicious activity on the e-commerce side.  When you

13  try to buy something at the zoo on the internet, and you

14  hit the buy button, you are being redirected to anything

15  other than how to make a payment.  And I took that

16  information and reported it back.  And the zoo fixed the

17  problem, and this case kind of went dormant.

18  Q.   Was the zoo interested in pressing the matter further

19  at that point?

20  A.   No, sir.

21  Q.   All right.  Did you have enough at that point to try

22  to carry it forward after the conversation with the zoo and

23  their attitude so that it progressed as a criminal

24  investigation?

25  A.   No, sir.

CROSS-EXAMINATION OF T. REYNOLDS                          298

1    Q.   How would you characterize that investigation as of

2    the present?

3    A.   It's still dormant.

4    Q.   Dormant.

5         Do you care -- did you care at any point during your

6    communications with Mr. Nolan or Mr. Kaaz or anybody else

7    about the greensward who is right or wrong on the

8    controversy?

9    A.   No, sir.

10   Q.   Or what the substance of their opinions were?

11   A.   No, sir.

12   Q.   Did it motivate any aspect of your follow-up and

13   communications with respect to the greensward issue?

14   A.   No, sir.

15   Q.   The substance of the opinions they were expressing?

16   A.   No, sir.

17   Q.   Who they want to associate with in connection with

18   those protests?

19   A.   No, sir.

20   Q.   You mentioned the Pulse Nightclub shooting, and that

21   subject was brought up yesterday.  I think it's been

22   established that the Pulse Nightclub shooting occurred on

23   June 12, 2016.

24   A.   Yes, sir.

25   Q.   Now, you were asked some questions yesterday about the

CROSS-EXAMINATION OF T. REYNOLDS                          299

1   significance of that.  Did you mention that in your

2   deposition?  Do you remember that?

3   A.   I didn't get to mention the Pulse Nightclub because we

4   started in July at the deposition, but I did mention it

5   yesterday.

6   Q.   Well, my question was to you was going to be as a part

7   of the discovery process in this case, did we produce a

8   bunch of documents from your files?

9   A.   Yes, sir.

10   Q.   And what was the start date of when we start --

11   produced those documents?

12   A.   June 12, 2016.

13   Q.   Was it July 1, 2016, or did it start in June?

14   A.   Started in June.

15   Q.   In June, all right.

16        Well, let me show you the first -- the JIB that you

17   mentioned yesterday on the Pulse Nightclub shooting.

18        **MR. WELLFORD:**  I'm sorry, Your Honor.  I want to

19   mark this as the next exhibit, please.

20        **THE COURT:**  Sure.

21        **MR. WELLFORD:**  The June 17 and 18 joint

22   intelligence briefing.

23        **THE COURT:**  Marked as 82.

24        **MR. WELLFORD:**  And it's defendant's 114.

25        **THE COURT:**  No problem.  Marked as 82 and

1    received.

2              (WHEREUPON, the above-mentioned document was

3    marked as Exhibit Number 82.)

4    BY MR. WELLFORD:

5    Q.   Is this the joint intelligence briefing that was

6    prepared at the time concerning the Pulse Nightclub

7    shooting?

8    A.   It is.

9    Q.   And that was prepared at the time, pretty much at the

10   time?

11   A.   Yes, sir, the day after, or relatively close.

12   Q.   Did joint intelligence briefings within the Memphis

13   Police Department exist before this one that we're looking

14   at?

15   A.   No.  This had never been done before, and I was tasked

16   to do it.

17   Q.   Who tasked you to do it?

18   A.   Major Bass.

19   Q.   What was the concern, the specific concern, about the

20   Pulse Nightclub shooting and how that might impact an event

21   that's described as a gay pride awareness event on June 17

22   and 18?

23   A.   We were in the middle of gay pride month, and we were

24   very concerned about copycat shootings.  There were a lot

25   of events planned with large public gatherings, and we

1    wanted to get ahead of that and make sure that we didn't

2    have a similar problem like they had in Orlando.

3    Q.   And were there other issues that were doing addressed

4    in the JIB and concerns that were expressed sometimes by

5    members of the public such as the one that's described here

6    in the bottom paragraph of this JIB?

7    A.   Yes, sir.  The Memphis Jewish Community Security

8    Council.  They were having an event, and they were

9    concerned about safety there.

10   Q.   When you would receive reports such as this -- "you"

11   meaning the Homeland Security office and, to your

12   knowledge, the Memphis Police Department -- were they taken

13   seriously during this time frame?

14   A.   Yes, sir.

15   Q.   Was it always possible to verify the accuracy of these

16   reports on short notice?

17   A.   It was -- it was very difficult to verify the accuracy

18   of these on such short notice.

19   Q.   And so what -- if you know, what type of follow-up or

20   protection or awareness was associated with the gay pride

21   awareness week in the aftermath of the Pulse shooting?

22   A.   Those significant officer presence at all of these --

23   all these events.  Also, Ramadan was going on, and the

24   mosques in town had directed patrols, and the Jewish

25   community centers and Jewish properties in town, religious

1   properties.

2   Q.   Let's move into July 2016.  Do you see the different

3   references to the events that were occurring in July 2016

4   on the time line?

5   A.   Yes, sir.

6   Q.   Now, the first question is, there are references to

7   events, you've mentioned a couple of them, that occurred in

8   other jurisdictions.

9   A.   Yes, sir.

10  Q.   Now, why would that at all be relevant to what the

11  Office of Homeland Security is thinking about or worrying

12  about as of this time frame?

13  A.   Well, the Dallas shooting was under -- at a Black

14  Lives Matter protest.  Now the guy that did it wasn't with

15  the Black Lives Matter, but this is the very type of thing

16  that we're concerned about.  As much as we could possibly

17  do, there's a lot of events that were claiming to be either

18  associated with or sanctioned by Black Lives Matter that's

19  all over Facebook.  We first got to figure out which ones

20  are, you know, like the real events or just some people

21  just trying to be a part of a movement.

22       And then once we focus on the actual events that

23  are -- look like they're actually going to collate into an

24  actual event, in other words, jump from the social media

25  sphere into reality and into Memphis.  Then we got to start

1    trying to figure out if there's going to be a kind of

2    protest or some threat to public safety or officer safety.

3    Q.   You were asked a series of questions that were

4    reflected in trial Exhibits 34 through 37 yesterday

5    concerning an event at I think it was Kings Grocery Store.

6    Do you remember that?

7    A.   Yes, sir.

8    Q.   In July of 2016?

9    A.   Yes, sir.

10   Q.   And did that event -- was it an unpermitted event?

11   A.   It was.

12   Q.   Did it have a large turnout?

13   A.   It did.

14   Q.   And what was the specific driver or catalyst behind

15   that event as described by the people who were

16   participating with it?

17   A.   Philando Castile was killed live on Facebook, and

18   Alton Sterling -- these are all right next to one another.

19   They're all kind of compressed in there.

20   Q.   I'm not going to go through each of the exhibits, but

21   trial Exhibit 34, I'll just ask you to assume, has a

22   July 6th date.  And what type of investigation or

23   monitoring were you doing within the Office of Homeland

24   Security relating to that event?  Did you go on social

25   media?

1    A.    Yes, sir.

2    Q.    What was the purpose?

3    A.    To gauge the size of these events so we can give the

4    command -- the people at the precinct level accurate or

5    what we would consider accurate gauges of how big these

6    protests are going to be, and then any signs of any counter

7    protest and how big the counter protest was going to be.

8    And then there's also discussions sometimes with comments

9    and everything, of people bringing weapons or things that

10   might be of a concern to a police officer.

11            **MR. WELLFORD:**  Your Honor, I would like to mark

12   Tennessee fusion report of -- update as of July 8, 2016, as

13   the next exhibit.  This is Defense 72.

14            **THE COURT:**  Marked and received as 83.

15            (WHEREUPON, the above-mentioned document was

16   marked as Exhibit Number 83.)

17   BY MR. WELLFORD:

18   Q.    Now, were there other law enforcement agencies that

19   were putting out sort of -- whether they were called

20   intelligence briefings or not -- similar documents to their

21   own agencies and others during this time frame?

22   A.    Yes, sir.  Most of the fusion centers are sending out

23   information all on Black Lives -- anything that's in the

24   news, and Black Lives Matter was the main topic post Dallas

25   was being sent by the fusion center.

1    Q.   And it's hard to read up here, but that's -- does that

2    state Black Lives Matter protest 8 July 2016?

3    A.   Yes, sir.

4    Q.   This is coming to the Memphis Police Department from

5    the fusion center.

6    A.   It is.

7    Q.   And does it actually reference an event in Memphis,

8    100 to 150 attendees present, Kings Grocery, and describes

9    it as a peaceful protest, right?

10   A.   Yes, sir.

11   Q.   That's an accurate description of it, wasn't it?

12   A.   It was.

13   Q.   Just because it was a peaceful protest, I mean, was

14   there some way for you to determine what -- whether it was

15   going to be or not in advance of the event?

16   A.   No, sir.

17   Q.   What's the point?  What's the purpose, in your mind as

18   a law enforcement officer, to people getting a permit for a

19   large-scale event that -- whether it's on private property

20   or not, may spill out into public thoroughfares?

21   A.   That's one of the -- there have been a lot of

22   terroristic type of incidents where people have driven

23   vehicles into crowds or mass shootings into crowds.  And

24   getting out in public, getting out into traffic is also --

25   hampering the flow of traffic is also a kind of a concern

1    for everyone.

2    Q.    This state fusion center briefing actually also

3    references an event which did -- people knew about, and

4    nobody was making a secret.  And that was July 10th

5    gathering at FedExForum, right?

6    A.    Yes, sir.

7    Q.    Which would be on private property?

8    A.    Yes, sir.

9    Q.    And wouldn't require a permit, would it?

10   A.    No, sir.

11   Q.    Well, why would an event on private property such as

12   that warrant attention on anybody's part at all?

13   A.    There seemed to be a lot of interest in the Black

14   Lives Matter protest on the FedExForum on that day, and so

15   that's why we got concerned with it.

16   Q.    Well, I mean, the Tennessee Fusion Center was

17   expressing at least they wanted awareness of it as well,

18   correct?

19   A.    Yes, sir.  Yes, sir.

20   Q.    All right.  Now, under information gaps, do you see

21   where that's listed by the fusion center?

22   A.    Yes, sir.

23   Q.    Did you think these were legitimate concerns?

24   A.    Yes, sir.

25   Q.    When they reference the possibility of counter

1    protests, how do counter protests at events such as the

2    ones we've been describing play into your motivations for

3    planning, what you're looking for on social media as you

4    are trying to investigate an event that's coming up?  What

5    relevance does that have?

6    A.   As to my job, the threat level of this event, if

7    there's -- especially a counter protest, the threat level

8    is going up because now you've got two opposed points of

9    view.  And if you don't, you know, treat that the correct

10   way, you could have a lot of problems from both police and

11   the public.

12   Q.   Trial Exhibit 43 that was introduced yesterday during

13   your testimony is a JIB -- or it is -- it's the

14   distribution list for the joint intelligence briefings at

15   the time, and it's dated July 10, 2016.  Do you see that?

16   A.   Yes, sir.

17   Q.   By the way, at our request, after the Court's

18   August 10th summary judgment ruling indicating an interest

19   in how long the JIBs were distributed outside the confines

20   of the Memphis Police Department, did you go seek to see,

21   to determine, when this big broad distribution list, which

22   included entities outside the Memphis Police Department,

23   ended?  Were you able to figure that out?

24   A.   I was, but I forgot the date.

25   Q.   Does your partner, Sergeant Cornwell, know the date?

1    Do you know whether he would know the date that that larger

2    distribution list actually stopped?

3    A.   He may.

4    Q.   He's listed as a may call.

5         I want to the go through this JIB, joint intelligence

6    briefing, and it's multiple pages, is it not?

7    A.   It is.

8    Q.   Did the JIBs during this time frame tend to be

9    multiple pages talking about lots of different events?

10   A.   Yes, sir.  We had a lot of protesting going on.

11   Q.   As time went on, did the focus of the JIBs tend to get

12   tighter and shorter?

13   A.   Yes, sir.  As I mentioned before, this had never been

14   done in the Memphis Police Department, so we started that

15   as the base line.  So we put everything out there that we

16   thought that the might be important in there.  So they were

17   lengthy communications.

18   Q.   Now, one of the first things you talk about here is

19   the event, it's called the sniper event in Dallas.

20   A.   Yes, sir.

21   Q.   Why is it relevant?

22   A.   Because it happened at a Black Lives Matter event.

23   Q.   Now, you're also referencing upcoming events with high

24   LE presence.  What does that mean?

25   A.   High law enforcement presence.

1    Q.   You've got a reference to an event, which is not a

2    Black Lives Matter event --

3    A.   No, sir.

4    Q.   -- involving the Nathan Bedford Forrest and a birthday

5    celebration that is planned for Health Sciences Park.

6    That's what it was known as at the time.  Do you see that?

7    A.   Yes, sir.  We started getting to a perfect storm.

8    Everything is downtown, and there's a lot of different

9    things that are going on that don't really go together.

10   Q.   And there's obviously not just interest on the part of

11   those who want to celebrate Nathan Bedford Forrest's

12   birthday, but there's strong and vocal opposition to the

13   fact that that statue is even there at that time frame,

14   right?

15   A.   Yes, sir.

16   Q.   And someone had actually vandalized the statue at the

17   time?

18   A.   Yes, sir.

19   Q.   Now, so the Nathan Bedford Forrest event, was that a

20   permitted event?

21   A.   It was.

22   Q.   Were you still investigating it and paying attention

23   to it and monitoring social media traffic surrounding it?

24   A.   Yes, sir.  Because the year prior, that permit event

25   was kind of taken over by outlaw -- outlaw motorcycle gangs

1    and got to be very dangerous because some of the members

2    inside the motorcycle gang came armed.

3    Q.   Now, when you're continuing with this joint

4    intelligence briefing, as we move into Bates Stamp

5    Page 05100, you are providing some social media postings

6    that relate to events that are associated with Black Lives

7    Matter planned events in Memphis during this time frame,

8    right?

9    A.   Yes, sir.

10   Q.   And you are -- are you characterizing them, or are you

11   simply posting what they are saying about themselves?

12   A.   It's just a Snagit of what they say about themselves.

13   Q.   And part of what they were saying, and they're making

14   it clear, Black Lives Matter does not consent or condone

15   violence against the police.  This is what the social media

16   posts were saying, and this is what you were putting in the

17   joint intelligence briefing, was it not?

18   A.   It was.

19   Q.   Now, simply because no violence was being planned and

20   the organizers of the event had the utmost good faith and

21   simply because in the Forrest park situation a permit had

22   been pulled, does that end the inquiry from the standpoint

23   of what you do in your job in the Office of Homeland

24   Security?

25   A.   No, sir.

CROSS-EXAMINATION OF T. REYNOLDS                          311

1    Q.   Why not?  Why not take people at their word,

2    everything's going to be okay?

3    A.   When it's a matter of public safety, you can't take

4    that for granted.

5    Q.   Was this a tense time between law enforcement and

6    particularly large segments of the African-American

7    community in Memphis in the aftermath of these shootings?

8    A.   It was.

9    Q.   And was there misconduct occurring within the Memphis

10   Police Department that would occasionally occur in

11   connection with those incidents?

12   A.   Yes, sir.

13   Q.   And when it happened, was it investigated?

14   A.   It was.

15   Q.   And was one such report made by a columnist who

16   captured a post -- and it's a pour quality photograph, but

17   it appeared to be someone purporting to be a Memphis police

18   officer pretending like he's aiming a gun at somebody down

19   the hall?

20   A.   Yes, sir.

21   Q.   And that was forwarded to the attention of the police

22   department to investigate?

23   A.   It was.

24   Q.   And did the police department investigate it?

25   A.   They did.

CROSS-EXAMINATION OF T. REYNOLDS                          312

1    Q.   Did the police department think that was funny, that

2    was a joke?

3    A.   No, sir.

4    Q.   Was the officer involved disciplined?

5    A.   He was terminated.

6    Q.   And was there personal information that was put in

7    about threats or concerns about activities that could occur

8    at large-scale public events, including one described at

9    Page 102 of the JIB?

10   A.   Yes, sir.

11   Q.   And why was personal information about this individual

12   put in the JIB?

13          **THE COURT:** Let's just make sure we have the

14   reference to the exhibit number also.

15          **MR. WELLFORD:**  I'm sorry.  It's Page 05102 of the

16   JIB.

17          **THE COURT:**  Exhibit number?

18          **MR. WELLFORD:**  The exhibit number is 43.

19          **THE COURT:**  Right.  We just need to be sure we

20   have that in there.

21   BY MR. WELLFORD:

22   Q.   Why was this information put in the JIB at the time?

23   A.   This gentleman here, we had received a crime stopper

24   tip that he was going to conduct a sniper-style attack at a

25   Black Lives Matter event in Memphis.

CROSS-EXAMINATION OF T. REYNOLDS                       313

1    Q.   Is that the kind of threat that the department took

2    seriously?

3    A.   Yes, sir.

4    Q.   Whether it turned out to be real or not?

5    A.   Correct.

6    Q.   On the next page, at Page 103, is there another

7    complaint that the Memphis Police Department received, not

8    that you found, but that the police department received via

9    Facebook post, which is referenced here?

10   A.   Yes, sir.  We received that one through the Real Time

11   Crime Center.  I used Bob Smith to figure out who the

12   poster was.  Courtney Triggs.  Once I found the correct

13   identity, we sent officers out to discuss his statements

14   during this live stream that he could probably snipe these

15   officers while they're out in the cars.

16   Q.   Someone saw a Facebook post, forwarded it to the

17   Memphis Police Department, about an individual during this

18   time frame who made a comment about sniper involving the

19   Memphis Police Department.  And this individual posted:

20   "LOL.  That's what's up." And then a little I think --

21   somebody's going to have to explain to me what they call

22   these things, memes or whatever, a gun.

23   A.   Emojies.

24   Q.   Emojies.  All right.  That shows my age.

25        So posted an emoji of a gun, right?

CROSS-EXAMINATION OF T. REYNOLDS                          314

1    A.    Yes, sir.

2    Q.    Did the Memphis Police Department and the Office of

3    Homeland Security assume that that might be a threat?

4    A.    Yes, sir.

5    Q.    Why not just assume it's just a joke; somebody's just

6    trying to be funny on social media?

7    A.    You got to put it in the context of the time that

8    we're in.

9    Q.    And did somebody go talk to that gentleman?

10   A.    They did.

11   Q.    Who?

12   A.    The Multi-Agency Gang Unit went to visit him.

13   Q.    And he made it clear that he was not serious and did

14   not intend to do anything, and it didn't go any further?

15   A.    And he published a retraction.

16   Q.    All right.  So Exhibit 43 that we've just gone through

17   was the joint intelligence briefing that was actually

18   prepared before what's been known as the bridge incident;

19   is that right?

20   A.    Yes, sir.

21         **MR. WELLFORD:**  Your Honor, I'm just trying to

22   speed this up, so I'm trying to decide which exhibits I

23   don't need to get into.

24         **THE COURT:**  That's fine.  No problem.  I tell you

25   what, why don't we take a break so you can do that.

CROSS-EXAMINATION OF T. REYNOLDS                    315

1              **MR. WELLFORD:**  Thank you.

2              **THE COURT:**  This will be our morning break.  It

3     will be about 12 minutes.  We'll see everybody at about

4     28 minutes to the hour.  Well, I'm sorry, about 10:30.

5              (Brief Recess.)

6              **THE COURT:**  All right.  We're ready to proceed.

7              **MR. WELLFORD:**  Your Honor, I would like to move

8     into evidence e-mail exchange between Aubrey Howard at the

9     City of Memphis starting July 5, 2016, and Detective

10    Reynolds, the same date, Bates Stamp 18044.

11             **THE COURT:**  Marked and received as 84.

12             (WHEREUPON, the above-mentioned document was

13    marked as Exhibit Number 84.)

14    BY MR. WELLFORD:

15    Q.   Detective, this is an e-mail exchange between you and

16    Aubrey Howard at the City of Memphis.  Do you know who

17    Aubrey Howard is?

18    A.   Yes, sir.  He's in charge of the permits office.

19    Q.   And this is Exhibit 84.

20             And it's an e-mail exchange concerning whether there's

21    going to be protests at the park.  Does this sound the

22    Nathan Bedford Forrest event we just talked about, the

23    birthday celebration?

24    A.   Yes, sir.  At Health Science Park.

25    Q.   It turned out it was a permitted event.  People do it

1    every year.  And they applied for a permit, didn't they?

2    A.   Yes, sir.

3    Q.   What was your question?

4    A.   Any kind of protests scheduled around Sunday July 10,

5    2016.

6    Q.   We talked about the significance of counter protests.

7    We saw a reference to it in the Tennessee fusion report.

8    Here's a reference to it with respect to your own level of

9    concern.

10   A.   Yes, sir.

11   Q.   What is the concern over counter protests at that

12   event or any other event during that time frame?

13   A.   It's just -- it raises the level of possible threats

14   at each one of those venues.  If there's large -- there was

15   a lot of interest in the one at FedExForum spillover, just

16   the protection of both parties being able to carry out

17   their events without anyone getting injured.

18   Q.   Trial Exhibit 74 was introduced during your testimony,

19   and it starts with an e-mail exchange with Lieutenant

20   Stephen Chandler -- at the time that was your supervisor?

21   A.   It was.

22   Q.   -- with a bunch of other, and you're copied in on

23   this.  And what the specific inquiries focused upon in this

24   multipage document was a bunch of social media captures

25   that have been forwarded to you by Real Time Crime Center,

1   including one with Congressman Cohen, and it references

2   Tami Sawyer being present, and the photo is of Congressman

3   Cohen.  Do you remember being questioned about that?

4   A.    Yes.  Yes, sir.

5   Q.    Okay.  Now, but the multipage document is referencing

6   and is focusing upon the potential confluence between the

7   Nathan Bedford Forrest birthday celebration and the

8   scheduled event on July 10th that we've been talking about

9   for the last few minutes, right?

10  A.    Yes, sir.

11  Q.    At the FedExForum --

12  A.    Yes, sir.

13  Q.    -- a Black Lives Matter event.  And Lieutenant

14  Chandler is concerned about some traffic and reports that

15  the KKK may want to show up unannounced and essentially

16  cause trouble, right?

17  A.    Yes, sir.  And there was even posts by Frank Gibson

18  that the Klan was coming, so regardless if they are not,

19  once it gets out there that they're coming, people are

20  going to act like they're coming, even if they're not.

21  Q.    Was Congressman Cohen speaking at an event that was

22  somewhere near where all of these activities were

23  happening?

24  A.    Yes, sir.  That's another -- that's another --

25  Congressman Cohen gets a lot of threats.  That was a

1   concern of mine also.

2   Q.   Is it a specific concern of yours with the KKK and

3   Congressman Cohen?

4   A.   Yes, sir.  Yes, sir.

5   Q.   Is there something going on in your mind when you're

6   forwarded this photograph of an event and a post from Tami

7   Sawyer's post of an event with Congressman Cohen that we

8   don't like Steve Cohen, we don't like Tami Sawyer, we need

9   to keep an eye on them?

10  A.   No, sir.  This focus on this e-mail is shaping up to

11  be a bad day on July 10th for all of us, busy day, too.

12  Q.   And among the multipage document references, which

13  included that snapshot, are a bunch of references that

14  being picked up on social media about people wanting to

15  take their gun and their blade and going, you know -- they

16  could try if they want, all kinds of stuff like that,

17  right?

18  A.   Yes, sir.

19  Q.   Is this the core function of your office to try to

20  anticipate and stop problems like this from occurring?

21  A.   It's a situational awareness.  It's to make the

22  officer on the ground and the commanders on the ground

23  aware that this might be an issue.

24  Q.   Now, in fact, was there a confrontation between these

25  groups that day?  I mean, did the KKK go down and descend

1    on FedExForum?  Did we have a big large-scale riot?

2    A.   No, sir.

3    Q.   Well, then was what you were doing just stupid and

4    unreasonable, or what, in your thought process -- how do

5    you determine what's a real threat and what's just social

6    media chatter?

7    A.   It's very difficult to do that.  Perception sometimes

8    is reality when it comes to social media.  You have to take

9    these people at their word that they're coming down and

10   they're going to be armed, and you got to put that just out

11   to the officers at the field and the commanders at the

12   field so they will be aware that there may be armed parties

13   inside, inside these protests.

14   Q.   Now, I know it wasn't even in your mind to be asking

15   the investigator -- to be asking the director to authorize

16   some type of written investigation into all this series of

17   social media chatter.  That was not even in your mind, was

18   it?

19   A.   We're moving way too fast for that.

20   Q.   But in a scenario such as this one, is it even

21   possible to do that and still engage in good police work?

22   A.   I would imagine the director's time is very limited

23   during this.  Everybody's probably wanting his attention

24   for other things.

25   Q.   Now, we have -- we've all -- we've heard some

1    discussion -- I've referenced it in my opening statement --

2    about the events which occurred on July 10th, 2016, where

3    the interstate for a period of several hours was

4    essentially shut down.  Do you remember that incident?

5    A.    Yes, sir.

6    Q.    Tell us where you were and what you did in response to

7    that incident.  What was your job?  What was your function

8    on that day?

9    A.    I was at the Real Time Crime Center.  The director did

10   show up there to see the macro view because inside the Real

11   Time Crime Center, all the cameras and the local news are

12   all playing on the screens along the wall.  So the best

13   place for him he thought probably --

14   Q.    Can I pause you for just a minute?

15   A.    Sure.

16   Q.    Were you ever at the FedExForum?

17   A.    No, sir.

18   Q.    Okay.

19   A.    Prior to the -- prior to the event.

20   Q.    I kind of want to walk all the way through the events

21   of that afternoon.

22   A.    We're getting close to the time of the Black Lives

23   Matter rally.  Lieutenant Chandler directed me to go down

24   there and try to get a feel of what was going on to see if

25   this is going to be a big protest or a huge protest.  So I

CROSS-EXAMINATION OF T. REYNOLDS                    321

1    went down there in plain clothes.

2    Q.   Based on what you just said -- I apologize for

3    interrupting you.

4    A.   Yes, sir.

5    Q.   But I want to show you one more document that relates

6    to your going down there.

7              **MR. WELLFORD:**   Your Honor, this is Defense 110,

8    an e-mail exchange between Lieutenant Darren Goods and a

9    number of others within the department on July 9, 2016.

10             **THE COURT:**   Marked and received as 85.

11             (WHEREUPON, the above-mentioned document was

12   marked as Exhibit Number 85.)

13   BY MR. WELLFORD:

14   Q.   This is an e-mail exchange between -- who is

15   lieutenant Darren Goods?

16   A.   He's a lieutenant over the Multi-Agency Gang Unit.

17   Q.   And Eddie Bass is your supervisor at the department --

18   Office of Homeland Security?

19   A.   He is.

20   Q.   And were you aware of this report?

21   A.   Vaguely, yes, sir.  Yes, I was.

22   Q.   And this is a summary of the anticipated event at the

23   FedExForum, and Detective Gooch had been requested to reach

24   out to one of the organizer, Mr. Frank Gotti.  Frank Gibson

25   is his name.

1    A.    Yes, sir.

2    Q.    Gotti, G-O-T-T-I, also?

3    A.    That's his Facebook handle name.

4    Q.    And had an encounter, kind of just a discussion about

5    what are you planning on doing down here, because there's

6    some Facebook chatter from Mr. Gotti about reaching out to

7    gang members and come together, et cetera, at this event,

8    true?

9    A.    Yes, sir.

10   Q.    But Mr. Gotti assured Lieutenant Goods that this was

11   going to be a peaceful event and that everybody was just

12   trying to get together.  And Mr. Goods actually reported

13   that I believe he's sincere about finding solutions to the

14   senseless homicides that plague our city.  Do you see that?

15   A.    Yes, sir.

16   Q.    And you have no reason to think that he wasn't sincere

17   about that, do you?

18   A.    No, I do not.

19   Q.    But did that stop you and others from monitoring the

20   event to see what might happen?

21   A.    No, sir.  Human nature is human nature.

22   Q.    All right.  So back to your being tasked to go down

23   there and just kind of see what's going on at this rally.

24   Walk us through that.

25   A.    I get down there, and I see a lot of vehicle traffic,

1    much more than anticipated, almost congested, and then a

2    lot of pedestrian traffic.  The vehicle traffic looked --

3    was looking at the pedestrian traffic and trying to find

4    places to park.  Everybody was dressed in either a similar

5    fashion or almost similar fashion, some type of black

6    clothing, and many had signs.  And they were all walking

7    toward the general direction of the FedExForum.

8         I reported back to my lieutenant.  I said this is

9    going to be a really big demonstration.  And I was told to

10   go back to the Real Time Crime Center and make sure -- to

11   get on my Bob Smith account and make sure that there's

12   no -- if the Klan is coming, any other kind of protest,

13   that there's going to be erupting that we're not really

14   able to see at this point.

15   Q.   And so describe to us what happened from your

16   perspective down at the Real Time Crime Center as the

17   events started to unfold.  Walk us through it.

18   A.   Okay.  The Nathan Bedford Forrest event was crowded,

19   but it was -- it was not more than expected.  There was no

20   obvious signs of the Klu Klux Klan coming.  And then the

21   concentration -- and this was also in the Day of Rage, and

22   there's supposed to be a different protest down there.

23   That apparently did not even materialize.  That was more of

24   a social media phenomenon.  And even state and federal

25   agencies were more concerned about the Day of Rage on a

CROSS-EXAMINATION OF T. REYNOLDS                    324

1    national level.  We were concerned about what was going on

2    locally.

3         And then I was in there trying to figure out if

4    there's anything that was about to go on in front of the

5    FedExForum that would disrupt the protest that's going on

6    at the FedExForum.

7    Q.   And were you able -- Real Time Crime Center actually

8    have cameras mounted which would enable you to kind of see

9    what's going on in downtown Memphis, including the

10   FedExForum?

11   A.   Yes, sir.

12   Q.   So who is there?  Who is watching this?

13   A.   We have all -- a lot of the police officers and

14   analysts.  The director's there.  And we're watching local

15   news and also all the cameras.

16   Q.   If you know, why was the director there?

17   A.   There was -- I don't know.  That was a good place for

18   him to be.  If you wanted over -- the best possible

19   overview, that would have been the best place to be.

20   Q.   Okay.  So keep going.  So what are you observing?

21   A.   Well, we're seeing that the crowd is much bigger than

22   expected, and we have officers that are embedded in the

23   crowd in plain clothes.  And we're getting directions that

24   they're taking this demonstration in front of the

25   FedExForum to 201 Poplar.

1    Q.   Time out.  You got plain clothes officers embedded in

2    the crowd.

3    A.   Yes, sir.

4    Q.   What's the purpose of having them there?

5    A.   Plain clothes officers embedded in the crowd are a

6    little safer than uniform officers.  They can get in, and

7    their goal is to see any kind of evidence of something

8    erupting inside the -- inside the group, armed parties,

9    people that might be officer safety -- are potentially

10   hazardous to the demonstration that's going on.

11   Q.   Were you getting any reports back from close plain

12   clothes officers as to what they were seeing?

13   A.   We were.  There were armed people inside the protest,

14   people with guns.

15   Q.   So were you able to see any part of when the crowd

16   started to move from the FedExForum into other parts of

17   downtown Memphis?

18   A.   Not too far after we had the text that they're moving

19   to 201 Poplar, the crowd started to move.  And then the

20   whole crowd took a detour and went straight onto Front

21   Street and up the bridge.  And we had a small contingency

22   of organized crime unit officers that were prepared to --

23   in the appropriate gear to try to stop people once they got

24   on the bridge.  Or we were trying to get to them -- we

25   weren't anticipating them going on the bridge, but we tried

CROSS-EXAMINATION OF T. REYNOLDS                         326

1   to stop them.  We didn't make it in time.

2        Once they got on the bridge, then we had a line on the

3   bridge that we were able to maintain.

4   Q.   So the original social media chatter was that the

5   crowd seems headed toward 201 Poplar?

6   A.   That was the information we were getting from embedded

7   officers inside the protest in plain clothes.

8   Q.   But the crowd sort of shifted and moved somewhere

9   else?

10  A.   Yes, sir.

11  Q.   Anybody thinking they might be headed to the bridge

12  when the day started?

13  A.   No, sir.

14  Q.   Do you feel like you were prepared in retrospect?  Do

15  you think that the Memphis Police Department was prepared

16  for an event like that to occur?

17  A.   We were prepared, but not -- not like -- not for that

18  specific turn of events.

19  Q.   Was the monitoring of social media and would the

20  monitoring of social media be helpful in the event of a

21  similar event?

22  A.   Yes, sir.

23  Q.   All right.  Now, so you're at Real Time Crime Center.

24  The event starts to move in the direction that you talked

25  about.  What involvement, if any, did you have in the

CROSS-EXAMINATION OF T. REYNOLDS                    327

1    events which occurred on the bridge?  Did you go down

2    there?

3    A.    No, sir.

4    Q.    Okay.  Did you see from -- by the way, you're looking

5    at footage not just from Real Time Crime Center, but

6    there's helicopter footage from news media and real time

7    conventional media reports about this.

8    A.    Yes, sir.  In addition to that, on social media there

9    are a lot of people going live.  And that's also another

10   on-the-ground view of what's going on.

11   Q.    And are you able to monitor some of the social media

12   traffic of people posting live Facebook posts from the

13   bridge?

14   A.    I was.

15   Q.    And was there a phenomenon which occurred more than an

16   hour after the original group actually got onto the bridge

17   where another entire group of hundreds of people arrived on

18   the scene?

19   A.    It was people that had been watching it on social

20   media wanted to be part of it, and additional people showed

21   up for the protest.

22   Q.    Where were they coming from?

23   A.    They were coming from the south along Front Street,

24   and they went straight on to the on-ramp.

25   Q.    What impact did this event have on the activities of

1    the Office of Homeland Security in your responsibilities as

2    directed by your superiors in the days and the weeks to

3    come?

4    A.   Well, some of the stuff that I was receiving from the

5    things I was able to glean from my undercover account kind

6    of panned out.  There were armed people in the crowd.  The

7    crowd was going to be large.  We didn't know it was going

8    to be that large.  And that the -- most of the events that

9    we were able to predict we were able to do so fairly

10   accurately.

11   Q.   Well, in the days and the weeks to come, how did the

12   bridge incident impact your sense of concern, awareness,

13   monitoring of social media activity?

14   A.   There was additional protests that were promised right

15   after the bridge, and we were in the middle -- we were

16   coming up on Elvis week.  And there was protests at the

17   bridge that they were going to disrupt Elvis week.

18   Q.   You were shown a document that was marked yesterday as

19   Trial Exhibit 44?

20   A.   Yes, sir.

21   Q.   Which attached the joint intelligence briefing, the

22   acronym JIB --

23   A.   Yes, sir.

24   Q.   -- which attached that on July 12, 2016, where you're

25   transmitting it to a number of other individuals?

1    A.    Yes, sir.

2    Q.    Let's walk through that.  This is another one of these

3    joint intelligence briefings that's quite long, is it not?

4    A.    Yes, sir.  It was a lot of protesting.

5    Q.    The structure of these things tended to be that you

6    might have three of them come out in the same day in a hot

7    button scenario, but maybe 80% of the information is just

8    sort of repeated, and then there's new information added to

9    it.

10   A.    Yes, sir.  I was directed by my boss, Major Bass.

11   Q.    I mean, the first thing we see here is describing the

12   Dallas shootings, et cetera.  What we saw a few minutes

13   ago, all this information was already in a JIB that was

14   prepared before the bridge, right?

15   A.    Yes, sir.

16   Q.    Okay.  So we're looking for kind of new information

17   that is referencing events that occur after the bridge in

18   this JIB, and so Bates Stamp 55 -- 05594 reflects at least

19   some of the events that is a follow-up to the bridge, is

20   that not?  Is that not true?

21   A.    Yes, sir.

22   Q.    All right.  And so one of these events was a

23   threatened shutdown of a Piccadilly's near Graceland, and

24   there's a quote about Graceland.  And they're talking about

25   something that's going to happen July 12th, right?

1    A.   Yes, sir.

2    Q.   And you're tracking that information?

3    A.   Yes, sir.

4    Q.   Why?

5    A.   Well, it's another planned protest.  Piccadilly is

6    private property, and we weren't sure if that was going to

7    disrupt the business.  How big is this event going to be?

8    Is there going to be armed people there?  Should the

9    officers be attuned to them shutting down either Elvis

10   Presley Boulevard or any other things in the general area.

11   And they could be disrupting the business at Graceland.

12   Q.   And so as we continue forward in this lengthy joint

13   intelligence briefing, which is actually prepared after the

14   bridge, there's references to other social media chatter

15   about protests that are being planned within days of that.

16   One of them being at the Kroger's at Poplar near Poplar and

17   Highland, right?

18   A.   Yes, sir.  As you see, there's a Black Lives Matter.

19   That's indicative of a lot of people would put Black Lives

20   Matter, even though we weren't quite sure it was really

21   part of Black Lives Matter.

22   Q.   But you take all the threats and all of the reports of

23   we're going to have a protest seriously?

24   A.   Yes, sir.

25   Q.   Now, you mentioned this Day of Rage.  Was there a lot

1    of chatter at the time about a national Day of Rage by a

2    group called Anonymous that was going to break out protests

3    that were intended to be violent, were going to be breaking

4    out in cities across the country?

5    A.   Yes, sir.  And Memphis was listed on the list of

6    cities that those protests were going to occur.

7    Q.   And, actually, was there a fair amount of concern

8    about the possibility of something like this happening in

9    Memphis?

10   A.   Yes, sir.  Because a lot of the -- I mean, just about

11   every one of the federal agencies, state agencies were

12   convinced that that was going to happen, and they happened

13   to pick the area that they were going to have a protest

14   where the Nathan Bedford Forrest celebration was going on

15   adjacent to the Black Lives Matter protest that we were

16   having at the FedExForum.

17   Q.   And at Bates Stamp 0557 of this document, there's

18   continued references to social media chatter about Day of

19   Rage events and relationship to Ferguson and Ferguson

20   officers being threatened, and then there's a reference to

21   a Black Lives Matter event that's scheduled for a church on

22   Saturday, July 16th, correct?

23   A.   Yes, sir.

24   Q.   And it references that it may have something to do

25   with a protest from last year involving Darrius Stewart.

1    No permit has been applied for or approved for this event.

2    Why are you interested in tracking the activities at this

3    event on private property?

4    A.    Well, in one of the previous e-mails, Frank Gibson,

5    Frank Gotti, was encouraging people to attend some of these

6    events, and we were getting information that some of the

7    gangs may be trying to attend some of these events and that

8    any kind of gang involvement raises the threat level to

9    that event.

10   Q.    And so this JIB that we're looking at, at Bates Stamp

11   Page 05605, actually does reference the event, which

12   occurred in downtown on the bridge on July 12th, does it

13   not?

14   A.    Yes, sir.

15   Q.    Referencing that the bridge was blocked for a period

16   of approximately five and one-half hours.  Is that what

17   your recollection was?

18   A.    Yes, sir.

19   Q.    Is that a lawful event?

20   A.    No, sir.

21   Q.    Nobody got hurt, did they?

22   A.    Nobody got hurt.

23   Q.    No harm done?

24   A.    No harm.

25   Q.    Does that mean you don't have any concern about a

1   similar event creating mass chaos and damage to property

2   and potentially life in the future if something like it

3   occurred again?

4   A.   No, sir.

5            **MR. WELLFORD:**   Your Honor, I would like to mark

6   as the next exhibit e-mail exchange between Major Bass and

7   Sergeant Reynolds on July 11th, the day after the bridge

8   incident, which would be Defense 111.

9            **THE COURT:**   Marked and received as 86.

10            (WHEREUPON, the above-mentioned document was

11   marked as Exhibit Number 86.)

12  BY MR. WELLFORD:

13  Q.   This is Exhibit 86, and it's referencing -- it starts

14  out as an e-mail chain to and from you and Lieutenant

15  Chandler on July 11th.  Do you see that?

16  A.   Yes, sir.

17  Q.   Day after the bridge.

18  A.   Yes, sir.

19  Q.   And then when you go down to the bottom of the page

20  and you kind of see what the report has been, do you see

21  that?

22  A.   Yes, sir.

23  Q.   There's a report from a task force officer with the

24  drug enforcement administration of a potential kind of

25  copycat shut down of the bridge in West Memphis, right?

1    A.    Yes, sir.

2    Q.    Did you tend to take such reports from individuals,

3    such as a drug enforcement administration agent, seriously?

4    A.    Yes, sir.  Especially when weapons are involved like

5    this e-mail suggested that this individual was going to

6    have an AK-47.

7    Q.    Did you deploy resources, meaning were you trying to

8    track social media and other sources of information to

9    determine whether this was a real event?

10   A.    I was.

11   Q.    Did it turn out to happen?

12   A.    No, sir.

13   Q.    Did you feel like it needed to be checked out?

14   A.    Yes, sir.

15          **MR. WELLFORD:**  Plaintiff's 223.  This next e-mail

16   I'd like to move into evidence, Your Honor, is an e-mail

17   from Major Bass, July 12, 2016, to Deputy Chief Hardy and

18   others, including Sergeant Reynolds.

19          **THE COURT:**  Marked and received as 87.

20          (WHEREUPON, the above-mentioned document was

21   marked as Exhibit Number 87.)

22   BY MR. WELLFORD:

23   Q.    Sergeant, is this an e-mail chain that you're included

24   on two days after the bridge?  Right?

25   A.    Yes, sir.  Yes, sir.

1    Q.   July 12th, referencing unconfirmed information that

2    this list of private residences and businesses is possibly

3    targeted by protesters.  Do you see that?

4    A.   Yes, sir.

5    Q.   Now, that's a lot of locations.  How do you prioritize

6    and try to figure out what's real, what's not real, where

7    do we deploy our resources?  What tools do you use to do

8    that?

9    A.   Well, the tools at my disposal, and I went to my Bob

10   Smith account and tried to vet some of this information

11   that we're receiving.  Also, the Real Time Crime Center is

12   working diligently on their side to do the same thing.

13   Q.   Did these events materialize at least at the time?

14   A.   No, sir.

15   Q.   Did you take them seriously?

16   A.   We did.

17           **MR. WELLFORD:**  Plaintiff's 224.  I'd like to mark

18   as the next exhibit, e-mail from Major Bass to Sergeant

19   Reynolds and others, same date, July 12, 2016, concerning a

20   threat and protest at Graceland Enterprises.

21           **THE COURT:**  Marked as 87 -- I'm sorry -- 88 and

22   received, 88.

23           (WHEREUPON, the above-mentioned document was

24   marked as Exhibit Number 88.)

25   BY MR. WELLFORD:

1    Q.   Series of e-mail exchanges and follow-up from Major

2    Bass, same date, July 12th, correct?

3    A.   Yes, sir.

4    Q.   And this one concerns, does it not, a report from

5    another entity that more protesters are coming back to

6    Graceland and northbound to I-55.  Do you see that?

7    A.   Yes, sir.

8    Q.   Who is -- boy, my handwriting is awful.

9    A.   Shelby County sheriff --

10   Q.   What is that entity we're looking at?

11   A.   The Shelby County sheriff's department Office of

12   Homeland Security.

13   Q.   So on Exhibit 88, the SCSD, Shelby County?

14   A.   Sheriff's department.

15   Q.   And OHS?

16   A.   Office of Homeland Security.

17   Q.   They're reporting to you that this is a threat, right?

18   A.   Yes, sir.  They get it from a confidential informant.

19   Q.   And did you investigate it?

20   A.   Yes, sir.

21   Q.   Now, in point of fact, was there an unpermitted event

22   and protest at Graceland on that day?

23   A.   There was.

24   Q.   This turned out to have some level of legitimacy,

25   didn't it?

1    A.   It did.

2    Q.   And what actually happened that day is that a group of

3    protesters, unpermitted, sat down in the street and blocked

4    traffic at Graceland, right?

5    A.   Yes, sir.

6    Q.   Do you happen to recall whether any of them showed up

7    down at the Piccadilly restaurant that we saw in an earlier

8    post?

9    A.   No, sir, didn't.

10   Q.   But they went and blocked the traffic at Graceland?

11   A.   They did.

12   Q.   Arrests were made?

13   A.   There were.

14   Q.   Unlawful to sit down in the middle of the street and

15   block traffic, is it not?

16   A.   It is.

17   Q.   Shortly after that event happened, were you also

18   seeing indications on social media from some of the same

19   individuals involved in the July 12th event that they

20   planned a bigger protest at Graceland during Elvis week?

21   A.   Yes, sir, they did.

22   Q.   And so the record's clear, although we all know what

23   we're talking about, when is Elvis week?  Don't tell me you

24   don't know.

25   A.   I'm not an Elvis fan.  Second week in August.

CROSS-EXAMINATION OF T. REYNOLDS                    338

1    Q.   All right.  And is that something that was of

2    concern --

3    A.   It is.

4    Q.   -- to you?

5    A.   Even though I'm not an Elvis fan, there's a lot of

6    Elvis fans around here.  And it's a big event citywide, for

7    the city.

8    Q.   Now there continued to be --

9              **MR. WELLFORD:**  Excuse me, Your Honor.  I'm going

10   to mark as an e-mail from Michael R. Freeman with the FBI,

11   July 15, 2006, to Sergeant Reynolds, an e-mail concerning

12   threats of agitators of Nathan Bedford Forrest.

13             **THE COURT:**  Marked and received as 89.

14             (WHEREUPON, the above-mentioned document was

15   marked as Exhibit Number 89.)

16   BY MR. WELLFORD:

17   Q.   Same time frame, within days of the bridge incident,

18   you continue to receive reports of sort of bridge fallout,

19   do you not?

20   A.   Yes, sir.

21   Q.   This one from an agent with the FBI, federal task

22   force officer with the US Department of Justice.

23        And the nature of this threat is maybe some agitators

24   traveling to the Nathan Bedford Forrest protest in favor of

25   the Confederacy.  One male may possibly be armed with an

1    AR-15 assault rifle with one hundred rounds of ammunition

2    and plans to exercise his second right to open carry it.

3    Unfortunately, there's no other info other than this.

4         What did you do when you received this information?

5    A.   I went out and saw if I could find a similar --

6    something to support that and to corroborate that

7    information.

8    Q.   It's true you didn't go to the director and seek

9    written instruction to do that, did you?

10   A.   No, sir.

11   Q.   In your mind at this time frame still, just factually,

12   whether you should have been or not, you were unaware

13   that's what is associated with a criminal investigation if

14   it has something to do in some way with first amendment

15   rights?

16   A.   Now I know.  But I didn't back then.

17   Q.   Do you have an opinion as to whether that, even

18   knowing now, knowing now what you know, would that be the

19   kind of thing that you would think would take you to the

20   director, or do you know?

21   A.   I really don't know.

22   Q.   Okay.  Let's move on -- I'm not going to show you

23   exhibits.

24        Is it true that these are representative samplings of

25   social media reports and memos that exist within the Office

1    of Homeland Security in July and well into August

2    concerning what I'll call a fallout from the bridge,

3    threats of unpermitted protests, threats of counter

4    protests or people upset at what happened at the Forrest

5    park or the bridge or Forrest statue where that was, coming

6    into town and causing trouble?  Was other such activity

7    occurring during that time frame?

8    A.   Yes, sir.

9    Q.   All right.  And was this a matter of concern within

10   the Office of Homeland Security?

11   A.   It was.

12   Q.   And yesterday you were shown a collective exhibit,

13   Plaintiff's 49 -- or Trial Exhibit 49, and I must have

14   written the number down wrong.  Do you remember a series of

15   questions asked yesterday about a group of young men,

16   July 24th, couple of weeks after the bridge incident, where

17   there was video and follow-up and questioning because they

18   had "I am a man" written on them --

19   A.   Yes, sir.

20   Q.   -- kind of body paint?

21   A.   At an eatery, Wendy's or something like that,

22   McDonald's.

23   Q.   But what you weren't shown is the entire stream e-mail

24   of communications, and the exhibit will speak for itself.

25   But do you recall that that whole thing got started because

CROSS-EXAMINATION OF T. REYNOLDS                           341

1    these individuals were blocking traffic, reported to have

2    blocked traffic at Cooper and Madison?

3    A.   Yes, sir.

4    Q.   Were your motivations during this time frame at all

5    related to the content or the opinions themselves that were

6    being expressed by people upset on one side or the other

7    about everything going on in Memphis in July of 2016?

8    A.   No, sir.

9    Q.   What was your concern and your focus?

10   A.   Private property, threats to the public, threats to

11   officers and public safety.

12   Q.   Similarly, you were asked questions as reflected in

13   Trial Exhibit 54 yesterday about a situation where

14   Mr. Gotti, Frank Gotti, had been arrested in August

15   of 2016, and there was some chatter back and forth about

16   people who were demanding that he be let out or given bail.

17   Do you recall those questions?

18   A.   I do.

19   Q.   Do you recall the incident?

20   A.   I do.

21   Q.   And was this occurring within a short period of time

22   of the social media traffic that was threatening a complete

23   shutdown of Graceland during Elvis week?

24   A.   It was.

25   Q.   Was Mr. Gotti one of those who was making those posts?

CROSS-EXAMINATION OF T. REYNOLDS                        342

1    A.    Mr. Gibson was making those posts.

2    Q.    Now, what was your concern about the impact of

3    Mr. Gotti being in jail and people wanting him to be out of

4    jail?  What was motivating you to even be interested in

5    that?

6    A.    The same thing.  A big protest in front of 201 Poplar.

7    It would disrupt traffic, or there's a lot of police

8    officers back and forth over there doing police work.

9    Officer safety was also included in that.  Threats from a

10   crowd.  They might be mad at the officers because

11   Mr. Gibson was arrested.

12   Q.    Now, let's move on into September 2016.  We talked

13   about the Bob Smith account.  Did there come a time when

14   Bob Smith was asked to become involved in a criminal

15   investigation concerning a possible fake Twitter account

16   set up in the name of the police director?

17   A.    I was.

18   Q.    And who directed you to become involved in that

19   matter?

20   A.    The director.

21   Q.    Personally?

22   A.    I received that from -- information from -- via my

23   boss, Colonel Bass.

24   Q.    Describe what was going on in terms of what had been

25   relayed to you about that situation and what your -- your

1  role was as Bob Smith or from using the Bob Smith account

2  in trying to assist in the investigation?

3  A.   Economic crime was fielding a complaint from a

4  director and mayor about a fake Twitter account.  The

5  existence of and the use of violated Tennessee state law

6  under identity theft, and the -- they had a really good

7  case with a lot of circumstantial evidence.

8  Q.   You don't need to characterize it, but factually I am

9  interested in you describing what you were asked to do and

10  what the nature of the investigation was that you had

11  access to.

12  A.   Yes, sir.  They asked me, based on my experience with

13  my social media experience with Paul Garner, to see if some

14  of the tweets that were made under the director and the

15  mayor were consistent with some things that Paul Garner

16  would say.  And after a review, I was unable to give a

17  conclusive decision.

18          **MR. WELLFORD:**  Defendant's 103.  I'd like to mark

19  the incident report and accompanying materials provided to

20  Sergeant Reynolds as a part of that investigation.

21          **THE COURT:**  Sure.  90, marked and received.

22          (WHEREUPON, the above-mentioned document was

23  marked as Exhibit Number 90.)

24  BY MR. WELLFORD:

25  Q.   So as a part that investigation, were you provided

CROSS-EXAMINATION OF T. REYNOLDS                           344

1    with the incident report that's reflected here in

2    Exhibit 90?

3    A.   I was.

4    Q.   And did it concern events that were alleged to have

5    happened --

6              **THE COURT:**  Will you blow it up a little bit at

7    the top?  Thank you.

8              **MR. WELLFORD:**  Yes.

9    BY MR. WELLFORD:

10   Q.   -- in September of 2016 --

11   A.   Yes, sir.

12   Q.   -- on the 8th -- well, it says from the 8th to the

13   8th, right?

14   A.   That's when it was reported, yes, sir.

15   Q.   That's when it was reported.

16        And at Bates Stamp 23718 was the narrative that had

17   been provided as a part of the investigation that you were

18   involved in that Mr. Rallings -- is that Director Rallings?

19   A.   It is.

20   Q.   -- that a Twitter account had been created and

21   activated in his name, he says, by using his personal

22   information.  That he never had a Twitter account nor gave

23   anybody permission to use it, right?

24   A.   Correct.

25   Q.   On the following page, 23719, Bates stamp, that

1    contains the summary of the investigation materials that

2    were made available to you?

3    A.   Yes, sir.

4    Q.   And what the investigation revealed at that point was

5    that subpoenas had been issued, and it reflected

6    information about a fake Twitter account and locating the

7    computer from which that information had been posted,

8    correct?

9    A.   Yes, sir.

10   Q.   And it included referencing a Twitter account aktion

11   kat, you've referenced that account, have you not?

12   A.   I have.

13   Q.   You knew that belonged to Paul Garner, did you not?

14   A.   I did.

15   Q.   And it references that account from 9-6 to 9-20-2016,

16   on 26 occasions that the Twitter account belonging to

17   aktion kat, Paul Garner was used at the same date, time,

18   location, and IP address that the fraudulent account for

19   the fake Twitter account was used, right?

20   A.   Correct.

21   Q.   Your role in that was to actually look at the

22   postings, and just from your own familiarity, you had been

23   following Mr. Garner's social media feeds with respect to

24   certain events as of that time frame?

25   A.   Yes, sir.  Yes, sir.

CROSS-EXAMINATION OF T. REYNOLDS                              346

1   Q.   And you were asked to see, can you match up the tone

2   and the grammar and all of that.

3   A.   Correct.

4   Q.   You were -- it was inconclusive from your standpoint

5   as to your role there.

6   A.   Yes, sir.

7   Q.   Do you know what the status of that investigation is

8   at the present time?

9   A.   It's dormant.

10  Q.   All right.  Is it over?

11  A.   I don't think so.  No, sir.

12  Q.   Let's move into late September 2016, and I'm putting

13  the time line, which is Exhibit 80, back up on the screen

14  to acclimate our time frame.  The second page of the time

15  line references events that start in September 2016.  Do

16  you see that over there?

17  A.   I do.  I do.

18  Q.   All right.  There's a date that I've circled here on

19  that time line, September 27, 2016, DA announces no charges

20  against MPD officer involved in Stewart shooting.  Do you

21  know what that references?

22  A.   Those are Connor Schilling was -- the case against

23  Connor Schilling.

24  Q.   And who is Connor Schilling?

25  A.   He is the officer that shot and killed Darrius

CROSS-EXAMINATION OF T. REYNOLDS                       347

1    Stewart.

2    Q.   All right.  And so what was -- what was the

3    significance in your world, the Office of Homeland

4    Security, of the decision by the DA not to pursue criminal

5    charges against Officer Stewart -- I apologize -- Officer

6    Schilling?

7    A.   Impromptu protests, officer safety threats, threats to

8    the attorney general and Officer Schilling specifically.

9              **MR. WELLFORD:**  Your Honor, this is Defense 44,

10   Tennessee Fusion Center report, September 23, 2016.  I'd

11   like to mark that as the next exhibit.

12             **THE COURT:**  Marked and received as 91.

13             (WHEREUPON, the above-mentioned document was

14   marked as Exhibit Number 91.)

15   BY MR. WELLFORD:

16   Q.   Now, that decision about not to indict that we talked

17   about actually occurred on September 27th, but even before

18   that, even before that decision was made, as of

19   September 23rd -- by the way, you periodically get these

20   Tennessee Fusion Center reports, the same way you were

21   distributing them for at least a period of time outside the

22   department, right?

23   A.   Yes, sir.  Yes, sir.

24   Q.   And the -- my question is, had these threats that we

25   talked about previously, from one group or another, in the

CROSS-EXAMINATION OF T. REYNOLDS                        348

1    aftermath of the bridge incident, were they continuing to

2    be made?

3    A.    They were.

4    Q.    Including the fusion center forwarding comments made

5    on Facebook by someone calling for the blood of police

6    officers.

7    A.    Yes, sir.

8    Q.    And these threats taken seriously, continued to be

9    taken seriously?

10   A.    Yes, sir, they are.

11   Q.    So then we're into the aftermath of the decision made

12   not to proffer criminal charges against Officer Stewart.

13   What types of activity, protest, demonstration, and

14   particularly unpermitted protest or demonstration activity

15   did that generate?

16   A.    So many dates.  I'm not sure if there were any

17   specific ones about that.  There might have been one or two

18   in front of 201 Poplar, the Criminal Justice Center, but I

19   don't think there was -- I don't think there was any other

20   ones.

21            **MR. WELLFORD:**  It's Plaintiff's 314.  I want to

22   move into evidence e-mails from Bradley Wilburn to the

23   department of Homeland Security mailing list, September 27,

24   2016.

25            **THE COURT:**  Marked and received as 92.

CROSS-EXAMINATION OF T. REYNOLDS                      349

1          (WHEREUPON, the above-mentioned document was

2     marked as Exhibit Number 92.)

3   BY MR. WELLFORD:

4   Q.   Exhibit 92 references an e-mail from Bradley Wilburn.

5   We've heard his name before.  He was -- worked in the Real

6   Time Crime Center.

7   A.   He did.

8   Q.   And by the way, I'm not sure you've ever really

9   explained this, but how did you -- did Homeland Security,

10  Office of Homeland Security, work with Real Time Crime

11  Center?  I'm talking about what types of information were

12  you sharing?  How often were you meeting?  Did you know

13  what they were doing?  Did they know what you were doing?

14  That kind of thing.

15  A.   We shared the same building.  We shared the same

16  floor.  The projects we work on together are task specific.

17  Q.   And so that meant that he would periodically forward

18  you -- or Real Time Crime Center would just periodically

19  forward you things that they thought might be of interest

20  to you?

21  A.   Yes, sir.

22  Q.   And maybe you do the same thing back?

23  A.   Yes, sir.  Yes, sir.

24  Q.   And they tended to focus more on the social media

25  collator tool than you do?

CROSS-EXAMINATION OF T. REYNOLDS                          350

1    A.    They did.

2    Q.    Did you use that social media collator tool?  You were

3    asked a lot of questions about that too.

4    A.    No.  I used my -- the social -- my undercover account,

5    Bob Smith, to kind of vet the information that the social

6    media collator was getting.

7    Q.    Well, Page 2 of -- I'm trying to figure out how to

8    clear this.  I need some help.  Thank you.

9          Page 2 of the Exhibit 92 contains a screen shot that

10   Real Time Crime Center had obtained, which Officer Wilburn

11   wanted you to be aware of, right?

12   A.    Yes, sir.

13   Q.    During that same -- during that time frame?

14   A.    Yes, sir.

15   Q.    And this included a social media exchange between

16   Keedran Franklin and others about what to do about it.

17   What was "it" on September 27th?

18   A.    About the decision from Attorney General Weirich, and

19   he wanted to shut it down.

20   Q.    Do you have any idea what he meant by "shut it down"?

21   A.    Well, shut down the bridge is the way we took it.

22          **MR. WELLFORD:**  I don't know why this is not

23   working with me, other than I'm not good with technology,

24   but I apologize for you having to clear it.

25          **THE COURT:**  We'll work on it later.

CROSS-EXAMINATION OF T. REYNOLDS                    351

1    BY MR. WELLFORD:

2    Q.   So when you and Homeland Security heard the term "shut

3    it down" in the aftermath of the July 10th incident, what

4    are you thinking?

5    A.   We're going to have another bridge shutdown.

6    Q.   And we mentioned the threatened event at Graceland

7    during Elvis week.  Was there -- were there -- was there

8    disruption at Graceland during Elvis week that resulted in

9    arrests being made?

10   A.   Yes, sir.

11   Q.   All right.  Were you investigating and monitoring

12   social media chatter leading up to that to try to figure

13   out what was going on?

14   A.   Yes, sir.  Yes, sir.

15   Q.   What were you picking up about the nature and plans

16   for such a protest or a demonstration?

17   A.   It was definitely plans to disrupt Elvis week, and the

18   candlelight vigil specifically.

19   Q.   How?

20   A.   That, we weren't sure.  It was going to be some type

21   of large protest.

22   Q.   Did you get some information as to whether protesters

23   were instructed to bring bullhorns or signs?

24   A.   Yes, sir.  There was some information that they were

25   supposed to -- well, that's kind of what they do most of

CROSS-EXAMINATION OF T. REYNOLDS                         352

1   the time.  When the protest actually started, we got

2   information from -- during the -- that they were asking

3   participants not to bring bullhorns and signs.

4   Q.   What would be the significance of a request that they

5   not bring bullhorns and signs from your world?

6   A.   Well, to me it would appear like they were trying to

7   infiltrate the zoo, get into the candlelight vigil where

8   they were actually holding the vigil and then cause a

9   disruption.

10  Q.   And were the arrests actually at Graceland made

11  associated with individuals who wanted to get into private

12  property and then were not allowed in, and there was some

13  type of disruption and arrest occurred?

14  A.   Yes, sir.

15  Q.   Now let's fast-forward to December 2016.  Were you

16  involved at all in the investigation of an incident where

17  it's been stipulated in this case that the coalition of

18  concerned citizens and Keedran Franklin staged a die-in on

19  the front lawn of Mayor Jim Strickland's personal

20  residence?

21  A.   Yes, sir, I was.

22  Q.   Tell us about what your involvement in that incident

23  and the follow-up from it was.

24  A.   Other than the e-mail from Colonel Bass much earlier

25  that the director -- that the mayor was a possible target,

CROSS-EXAMINATION OF T. REYNOLDS                          353

1    we didn't have a lot of advance notice of this particular

2    protest.  So the day after, we were looking on Facebook,

3    after we were told that there was a die-in on his lawn.

4    And we were trying to figure out who all was involved with

5    the die-in at the mayor's house.

6    Q.   And as a part of that process, were you asked to

7    review a Facebook live post that Mr. Franklin himself made

8    at the event?

9    A.   Yes, sir.

10   Q.   All right.

11            **MR. WELLFORD:**  Your Honor, we've abridged it.  We

12   have an abridged version that we've shown to counsel.

13            **THE COURT:**  Sure.

14            **MR. WELLFORD:**  And we have downloaded it onto a

15   CD to mark it in evidence.

16            **THE COURT:**  Sure.

17            **MR. WELLFORD:**  And we've talked to Mr. Castelli

18   about this.

19            **THE COURT:**  Sure.

20            **MR. WELLFORD:**  And he understands that we've got

21   the chain of custody established.  I'd like to mark as the

22   exhibit --

23            **THE COURT:**  Let's mark it as 93, a CD.

24            **MR. WELLFORD:**  -- CD of an abridged version of

25   the die-in video and ask that we be allowed to play it on

CROSS-EXAMINATION OF T. REYNOLDS                    354

1    the monitor.

2              **THE COURT:**  Sure.  Sure.  No problem.  It's

3    marked and received as 93, the abridged version of the

4    December events at the mayor's house.

5              **MR. WELLFORD:**  December 19, 2016.

6              (WHEREUPON, the above-mentioned document was

7    marked as Exhibit Number 93.)

8              **THE COURT:**  Lower the lights.

9              (Exhibit No. 93 played.)

10   BY MR. WELLFORD:

11   Q.   That's almost three minutes of a 24-minute video that

12   I'll ask you to assume that Mr. Franklin posted on

13   Facebook.  You viewed the whole 24 minutes?

14   A.   Yes.

15   Q.   And you were able to determine that one of the

16   individuals was Keedran Franklin?

17   A.   I was.

18   Q.   Were you able to determine anybody else in the video

19   that you could identify with particularity?

20   A.   Al Lewis or Aaron Lewis.

21   Q.   Al Lewis and -- excuse me?

22   A.   Al Lewis is the Facebook moniker.  His real name is

23   Aaron Lewis.

24   Q.   Is it legal to stage a protest activity such as that

25   at somebody's front lawn about at 6:00 in the morning?

CROSS-EXAMINATION OF T. REYNOLDS                          355

1    A.    At the minimum, that's a misdemeanor.

2    Q.    Legal to go walk up to somebody's window and look into

3    it where his wife and children are at about 6:00 in the

4    morning?

5    A.    No, sir.

6    Q.    Go up to his door?

7    A.    No, sir.

8    Q.    Is it a criminal act?

9    A.    It is a criminal act.

10   Q.    Did the director personally ask you to get involved in

11   that investigation?

12   A.    No, sir.

13   Q.    How did you get involved?

14   A.    That was on the to-do list.  As soon as we got there,

15   we were notified by the -- some of the people in the Real

16   Time Crime Center that a die-in had occurred.  I think it

17   was even on a local news channel, but we started -- I went

18   to my Bob Smith account and started working on reviewing

19   this to see if we can assist with the criminal

20   investigation.

21   Q.    Let's move on to the events that occurred in 2017.

22   Were you involved at all in a criminal investigation into

23   an attempted shutdown of the entranceway to the Valero

24   refinery?

25   A.    I was.

1   Q.    What do you remember about that?

2   A.    Prior, in November of the previous year, we started

3   getting some information -- well, the hot topic that we

4   started to fall on was the Dakota pipeline.  It was a

5   regional issue and sometimes national issue.  There were

6   protests all along the pipeline and also the route of the

7   projected pipeline.  So we started focusing some attention

8   on those type of protests in other states.

9         Once we found out that the Valero pipeline -- the

10  Dakota pipeline was going to end in Valero, we kind of put

11  that in our -- one of the things we were looking at.  We

12  received an e-mail from Valero that had been some vandalism

13  and protest activity and just reminding us that it was

14  coming to Memphis.

15        So we started looking out for potential protests

16  around Valero.

17  Q.    And did an incident occur at Valero, such as the one

18  I've described, on January 17, 2017?

19  A.    17th, yes, sir.

20  Q.    Might be January 16th.  But you were involved in the

21  follow-up investigation of that?

22  A.    Yes, sir.  Yes, sir.

23  Q.    Even prepared a PowerPoint for the director?

24  A.    I did.

25  Q.    Reviewed the videos and photographs associated with

CROSS-EXAMINATION OF T. REYNOLDS                    357

1    it?

2    A.   Yes, sir.  It was MLK day that year.  MLK birthday

3    that year.

4         **MS. FLOYD:**  Your Honor, we'd like to mark as the

5    next exhibit the Valero videos that detective Reynolds

6    reviewed in connection with his investigation.  We had the

7    same process that we followed and would like to mark the

8    CDs of them as the next exhibit.

9         **THE COURT:**  Marked and received as 94.

10        (WHEREUPON, the above-mentioned document was

11   marked as Exhibit Number 94.)

12        **MR. WELLFORD:**  It is a collective exhibit, two

13   separate CDs of the same incident.

14        **THE COURT:**  All right.

15        **MR. WELLFORD:**  And would like authority to play

16   them now.

17        **MR. CASTELLI:**  Before we play those, Your Honor.

18        **THE COURT:**  Sure.

19        **MR. CASTELLI:**  I just wanted to inform the Court

20   Mr. Cody is here.  I know we talked about interrupting

21   testimony.

22        **THE COURT:**  How close are we?

23        **MR. WELLFORD:**  Ten minutes.

24        **MR. CASTELLI:**  I don't know how long these videos

25   are.

CROSS-EXAMINATION OF T. REYNOLDS                    358

 1              **MR. WELLFORD:**  The videos themselves, they are a

 2      total of about eight minutes.  And I probably got about ten

 3      minutes.

 4              **THE COURT:**  Why don't we do this -- if we can

 5      finish the testimony, it's desirable.  Or do you want to --

 6      it's both of you.  Do you want to interrupt and let him

 7      testify, or do you want to wait a second?

 8              **MR. WELLFORD:**  I tell you, if Your Honor would

 9      permit it, if we could play the video, and then we could

10      put Mr. Cody on and I've got cleanup.

11              **THE COURT:**  And then we'll take a break, and then

12      we'll let Mr. Cody testify.  We're going to finish the

13      video, and I think that's the right thing.  Thank you very

14      much.

15              I'm sorry, the date of the video is January the

16      16th?

17              **MR. WELLFORD:**  Of 2017.

18              **THE COURT:**  Certainly.

19              (Exhibit 94 played.)

20              **MR. WELLFORD:**  Your Honor, I can stop it right

21      there.

22              **THE COURT:**  That's fine.

23              **MR. WELLFORD:**  Just a couple of follow-up from

24      that before we stop.

25      BY MR. WELLFORD:

CROSS-EXAMINATION OF T. REYNOLDS                      359

1    Q.   Now, the Valero refinery, is that an important part of

2    the infrastructure that supplies oil and gasoline to a lot

3    of the retail gasoline station establishments in the city?

4    A.   It's not only the city.  It's the region.  It's a

5    regional infrastructure.

6    Q.   Was the Office of Homeland Security particularly

7    concerned after the bridge shut down with threats to

8    anything involving infrastructure within the city?

9    A.   Absolutely.

10   Q.   Which would include locations such as the Valero

11   refinery?

12   A.   Yes, sir.

13   Q.   FedEx?

14   A.   Yes, sir.

15   Q.   Airport?

16   A.   Airport.

17   Q.   Things of that nature.

18            **MR. WELLFORD:**  Your Honor, we can pause at this

19   time.

20            **THE COURT:**  That's fine.  I'm going to ask one

21   question.  Would you identify the young man who is speaking

22   at the beginning?

23            **THE WITNESS:**  That's -- his last name is Cohen,

24   but I can't remember his first name.

25            **THE COURT:**  That's fine.  We're going to take --

1    I'm going to let you step down, if you don't mind.  We're

2    not going to let you -- we're going to keep you around.

3    Unfortunately, you will have to actually go to the witness

4    room at this time.

5               **THE WITNESS:**  Okay.

6               **THE COURT:**  And we'll have you come back as soon

7    as practical.  And I understand --

8               **MR. WELLFORD:**  I'll collect my materials.

9               **THE COURT:**  Mr. Castelli, we agreed that we would

10   allow you to call Mr. Cody when he was available.  Who do

11   you wish to call as your next witness?

12              **MR. CASTELLI:**  We'll call Michael Cody, Your

13   Honor.

14              **THE COURT:**  All right.  And if you'll let

15   Mr. Cody know to come in.

16              Mr. Cody, if you would step to the podium.  I

17   know you've been here before, and raise your right hand --

18   in a different capacity, and so we'll let you be sworn in.

19              We will follow the same procedure every time we

20   have a witness as you know.

21

22

23

24

25

DIRECT EXAMINATION OF M. CODY                          361

1                          *    *    *

2

3                          **MICHAEL CODY,**

4    **was called as a witness and having first been duly sworn**

5    **testified as follows:**

6                      <u>**DIRECT EXAMINATION**</u>

7    <u>**BY MR. CASTELLI:**</u>

8       Q.   Could you state your name and spell your name for the

9    record, please?

10      A.   WJ Michael Cody.

11      Q.   Could you spell it for the record?

12      A.   Oh, I'm sorry.  C-O-D-Y.

13      Q.   Thank you.

14      A.   You'll have to speak up.  The one thing I hope to

15   remember was to have my hearing aids, but I just brought

16   the batteries.

17           **THE COURT:**  Don't feel bad.  I've been asking him

18   to speak up the whole time.  We're going to work on that.

19           Counsel, I want to make sure you speak into your

20   mic real carefully.  And obviously if you have any

21   difficulty hearing --

22           **THE WITNESS:**  I can hear.  I can hear.

23           **THE COURT:**  -- let us know.

24   BY MR. CASTELLI:

25      Q.   Absolutely.  Yeah, if you can't hear me, please let me

1    know.

2        Mr. Cody, can you explain to the Court what your

3    involvement with the American Civil Liberties Union was in

4    the decade of the 1960s, please?

5    A.   Yes.  I graduated from the University of Virginia law

6    school in the spring of 1961 and went in the Army for six

7    months and began work with my current firm Burch, Porter &

8    Johnson in December of the '61, really basically the start

9    of the year 1962, and Mr. Burch who was the reason I came

10   with this firm had been active in the segregation matters

11   and really civil liberties matters going back many years,

12   and he had encouraged me to come here.

13       And naturally when I started working with him, I began

14   to be involved with the ACLU because with voting rights and

15   other civil liberties issues, they were active here, and so

16   in -- from 1962 until 1968, I was what I guess you would

17   call -- I think we called ourselves cooperating attorneys,

18   the national office if they got complaints or things of

19   that sort, they would find someone on a pro bono basis that

20   would represent that person.  And that's what I did up

21   until 1967.  And in 1967 David Caywood, who was Mr. Burch's

22   son-in-law and one of my partners, and I and Russell

23   Sugarman, apparently from what I've seen that the lawyers

24   have given me, we incorporated the ACLU of West Tennessee.

25       Prior to that time, I had worked with ACLU lawyers,

DIRECT EXAMINATION OF M. CODY                              363

1   cooperating lawyers like Bernie Bernstein in Knoxville on

2   cases over there, and there were also people in Nashville,

3   but it was very loose organization.  I can't tell you why

4   we set up a 501c3.  My guess is it was so we could raise

5   money.

6              **MR. CASTELLI:**  Let me have this exhibit marked as

7   the next-numbered exhibit.

8              **THE COURT:**  Yes.

9              **MR. CASTELLI:**  This is the charter for the West

10  Tennessee Civil Liberties Union.

11             **THE COURT:**  Certainly.  Marked and received as

12  95.

13             (WHEREUPON, the above-mentioned document was

14  marked as Exhibit Number 95.)

15  BY MR. CASTELLI:

16  Q.   Mr. Cody, do you recognize this document we put up on

17  the screen? Should be in front of you.

18  A.   I recognize what it is.  I didn't see it until y'all

19  showed it to me, but obviously I was involved in it as one

20  of the -- I'm going to read -- one of the founders, I

21  guess, or the incorporators of that group in 1967.

22  Q.   And so that's your name there at the beginning of this

23  charter?

24  A.   Yes, it is.

25  Q.   And is that your signature there on Page 3 of the

DIRECT EXAMINATION OF M. CODY                          364

1    charter?

2    A.   Yes, it is, April 15, 1967.

3    Q.   Okay.  And so how long were you involved with this

4    corporation?

5    A.   I was -- I continued to sort of do the same things I

6    was doing earlier, but I guess until about April 1968,

7    which was I -- to my memory the last time I recall doing

8    anything regarding the ACLU, and that would have been when

9    the national office and the southern office asked our firm

10   to represent Dr. King in April of 1968.

11   Q.   What is your recollection about the entity known as

12   the ACLU of Tennessee?

13   A.   I don't know exactly the current -- the dates of

14   things right in there, but I do know that by August of 1968

15   I had learned that there was -- whether it's because the

16   national office wanted to do it or whatever, they were

17   going to have one group and no longer the three affiliates

18   in east and middle and west Tennessee.  It was all going to

19   be handled by one ACLU affiliate in Tennessee, which would

20   be located in Nashville, and that would be the Tennessee

21   ACLU chapter or affiliate.

22   Q.   And quickly, kind of stepping back a minute, based on

23   conversation that you and I had recently, to be clear, you

24   were scheduled to present at an ACLU of Tennessee event

25   some time in the fall?

DIRECT EXAMINATION OF M. CODY                              365

1   A.   They called and asked if I would speak at the 50th

2   anniversary and talk about Dr. King's representation, and I

3   think that's in September or October of this year in

4   Nashville.

5   Q.   Okay.  And just -- but other than that, have you had

6   any formal relationship with ACLU of Tennessee?

7   A.   Yes.  In '68, David Caywood took my place as the

8   president of the local affiliate, and the national board,

9   which I was a member of, assumed that David was going to

10  take my place on the national board, and David wrote a

11  letter in April of 1968 saying that he wanted me to stay on

12  the national board.

13       So I was apparently on the national board sometime

14  after '68, but I think that next year Walter Bailey took my

15  place, and so that would have been as far as I know, the

16  last time that I had any kind of position or responsibility

17  with anything to do with the ACLU.

18  Q.   And what's your knowledge about what activities that

19  this West Tennessee Civil Liberties Union had after the

20  ACLU, the statewide organization was formed?

21  A.   I have no memory that they had any involvement.  I

22  can't remember ever going to any meetings.  I've never seen

23  a piece of stationery that was later than the one David

24  used on his April 10, 1968, letter.  That is the 1967 ACLU

25  letterhead, and I never saw anything later than that.

DIRECT EXAMINATION OF M. CODY                          366

1  There may have been things that went on, but I was not

2  involved in it.

3  Q.   And what's your recollection about -- or do you know

4  anything about a west Tennessee chapter of the ACLU?

5  A.   Well, for that period in 1967-68, I think we referred

6  to ourselves as an affiliate or a chapter of the national

7  ACLU, and that would have been the case until the Tennessee

8  ACLU came upon the scene and the others didn't function

9  anymore, as far as I know.  Now, they may have had meetings

10  and things of that sort, but I'm not aware of them.

11  Q.   Okay.

12  A.   I didn't have any participation.

13  Q.   Okay.  And as far as the 1976 Kendrick case, were you

14  involved in that case?

15  A.   No.  In 1976 I had been elected to the Memphis City

16  Council, and so I was on the city council then, and the

17  only -- I couldn't say it's involved in this case.  I

18  remember that we were holding a hearing on a committee to

19  look at the police records from surveillance in the '60s,

20  and the mayor advised us that those records had been burned

21  up.  So to that extent, I was sort of involved in this

22  issue, but only sort of to see where the records were.  I

23  had no involvement with the ACLU or the lawsuit or any of

24  that business.

25  Q.   And to your knowledge or recollection, did the entity

CROSS-EXAMINATION OF M. CODY                          367

1    that you created, this West Tennessee Civil Liberties

2    Union, did it have any involvement in that 1976 Kendrick

3    case?

4    A.   I wouldn't have thought so because I don't know of

5    anything that happened between '68 and '76 down here that

6    wouldn't have been connected with the statewide

7    organization.

8              **MR. CASTELLI:**  Thank you, Mr. Cody.  Those are my

9    questions.

10             **THE COURT:**  Cross-examination?

11                      **CROSS-EXAMINATION**

12   **BY MR. WELLFORD:**

13   Q.   Good morning, Mr. Cody.

14   A.   Good morning.

15   Q.   Don't worry.  That big book is not for you.  It's for

16   everything.  I've got a big book.

17   A.   Oh, okay.

18   Q.   You and I have also spoken about this case on two or

19   three occasions, have we not?

20   A.   Yes, we have.

21   Q.   And just to sort of acclimate everybody to the

22   appropriate time frame.  In the late '60s, this

23   organization called the West Tennessee Civil Liberties

24   Union, one that you were involved in incorporating --

25   A.   Yes.

CROSS-EXAMINATION OF M. CODY                                    368

1    Q.   -- that preexisted the ACLU of Tennessee Inc., right?

2    A.   I think -- I'm pretty sure it did, yes.

3    Q.   And just for your benefit, we've stipulated to a

4    number of facts in the case, and among them being that -- I

5    hope I can -- among them being that this organization West

6    Tennessee Civil Liberties Union, Inc., filed its formation

7    papers with the state in 1967, and then you see on number

8    10, that the ACLU of Tennessee did not exist at that time.

9    So that's been stipulated, and it's actually in accordance

10   with your recollection?

11   A.   Yes.  Yes.  That's right.  They were getting ready to

12   do it in late '67 or early '68, and I knew about it, was

13   going to happen, but that's the last memory I have of it.

14   Q.   And this West Tennessee Civil Liberties Union Inc.,

15   the organization you were involved in incorporating, was

16   known by the acronym WTCLU.  Do you see that?

17   A.   Yes.

18   Q.   All right.  Now, and so as I understand it, even

19   before you and others formed this entity known by the

20   acronym WTCLU, you personally had done some legal work for

21   the national ACLU organization, sort of as an informal

22   affiliate, you've been engaged to help them in legal action

23   before?

24   A.   Just as an individual, yes, uh-huh.

25   Q.   And part of what you were attempting to do and others

CROSS-EXAMINATION OF M. CODY                          369

1    was to form a structure for that relationship with the

2    national ACLU when you and others founded this

3    organization, WTCLU?

4    A.   Like I said, I don't have any independent recollection

5    of why this organization was formed.  I can only assume

6    it's because I had learned that there were other sort of

7    regional affiliates in east Tennessee and middle Tennessee,

8    and that if we were going to do any organizing or

9    fundraising we needed to have some corporation.  But I'm

10   just assuming that, Bucky.  I don't really remember it as a

11   fact.

12   Q.   And it's okay to call me Bucky in the courtroom.

13   A.   I'm sorry.

14            **THE COURT:**  Well, nobody else is going to do it.

15            **THE WITNESS:**  I'm sorry.  Mr. Wellford.

16   BY MR. WELLFORD:

17   Q.   You can get away with it.

18        Another stipulated fact in the case at number 12 is --

19   and I know you don't have personal recollection of this,

20   Mr. Cody, but it's been stipulated that this entity, the

21   WTCLU, this W was actually legally in place until 1983?

22   A.   Yes.

23   Q.   I'll ask you just to assume that's a stipulation.

24   A.   Yes.  I see that.

25   Q.   You really kind of -- especially starting around 1976

CROSS-EXAMINATION OF M. CODY                                    370

1   and afterwards, really your involvement in this entity, the

2   WTCLU or ACLU generally, it diminished considerably

3   personally?

4   A.   It pretty much was gone.  I don't think I had anything

5   to do with it, that I can recall.

6   Q.   Right.  But you have actually taken -- done me the

7   favor of sending me some of the documents that were in your

8   file such as they are relating to back in these days and

9   times, have you not?

10  A.   Yes.  Yes.  I have the two letters that I had that

11  I've shared with you.

12  Q.   Right.

13          **MR. WELLFORD:**  And, Your Honor, may I approach

14  him and give him one of the letters that he --

15          **THE COURT:**  That's fine.

16          **THE WITNESS:**  I have it, I think.

17  BY MR. WELLFORD:

18  Q.   Well, I've got one from March 27, '74.

19  A.   No, I don't have that.

20          **MR. WELLFORD:** May I approach with that?

21          **THE COURT:**  You may.

22  BY MR. WELLFORD:

23  Q.   And the letter I've handed you, a letter to you,

24  March 27, 1974, from Delton Pickering, president ACLU in

25  west Tennessee, this is from your file?

CROSS-EXAMINATION OF M. CODY                          371

1    A.   Is it? I don't -- did I give it to you?

2    Q.   I thought you did.  And if you don't recall it, that's

3    fine.

4    A.   I don't -- I don't recall it, Mr. Wellford.

5    Q.   All right.

6    A.   The only two I remembered were the letters in '68.

7    Let me just read it --

8    Q.   Okay.

9    A.   -- a second.  To my knowledge, I haven't seen this.

10   It certainly came to me.

11   Q.   If it refreshes your recollection, I've got a few

12   questions about it as well.

13   A.   Let me just -- bear with me one minute.

14   Q.   I'm advised by my colleague that we obtained that from

15   the archives --

16   A.   Okay.

17   Q.   -- of the library.

18   A.   All right.  There are a probably a whole lot of other

19   stuff out there that I don't know about, but you're welcome

20   to see it.  Yes, I see what they're -- I guess they're

21   telling me I'm being purged.

22   Q.   Not really.

23        **MR. WELLFORD:**  May I mark as the next exhibit,

24   Your Honor, the March 27, 74 letter that Mr. Cody just

25   identified?

CROSS-EXAMINATION OF M. CODY                          372

1              **THE COURT:**  Yes.  Marked and received as 96.

2              (WHEREUPON, the above-mentioned document was

3      marked as Exhibit Number 96.)

4  BY MR. WELLFORD:

5  Q.   Mr. Cody, what I'm particularly interested in, this is

6  during a time frame, by the way, where you're doing lots of

7  other things, including I think you ended up becoming an US

8  attorney in 1976, didn't you?

9  A.   '77, I became US attorney.  '75, I ran to the city

10  council and was elected and started serving '76 to '77.

11  Q.   What I'm interested in in particular is the name on

12  this letterhead, West Tennessee Civil Liberties Union.

13  A.   Yes.

14  Q.   The address.  So I mean, we've seen previously the

15  organization that you and others incorporated, the West

16  Tennessee Civil Liberties Union.  This is some entity

17  that's not called by a corporate name, but it's calling

18  itself West Tennessee American Civil Liberties Union, and

19  then it's actually signed by a gentleman, Mr. Pickering,

20  ACLU in west Tennessee?

21  A.   Yes.

22  Q.   Did you -- did you know what either of those entities

23  were at the time?  I mean, we've seen a lot of names, is my

24  point.

25  A.   Right.  No, I know that in April of 1968, the letter

CROSS-EXAMINATION OF M. CODY                          373

1    that David wrote says West Tennessee American Civil

2    Liberties Union, which is the same as this letter, West

3    Tennessee Civil Liberties Union, and the reason I said

4    earlier, the last sort of letterhead that had officers or

5    whatever that I ever saw was in '68.

6    Q.   Right.

7    A.   And I don't -- I don't independently recall this

8    letter in '74.

9    Q.   Do you know what the entity called ACLU in west

10   Tennessee was -- or who was Mr. Pickering?  That may help

11   us.

12   A.   I have no idea.  He says he was the president.

13   Q.   Okay.  And that's all right.  That's all I have about

14   that.

15        Now, your -- you talked about when the state

16   organization, ACLU in Tennessee Inc. was formed.  After the

17   organization you formed West Tennessee Civil Liberties

18   Union, ACLU in Tennessee Inc. was formed?

19   A.   Yes.

20   Q.   And but before it was formed, there were chapters

21   around the state affiliated with the ACLU, West Tennessee

22   Civil Liberties Union Inc. being one of them, right?

23   A.   I think so.

24   Q.   There was an east Tennessee chapter and a middle

25   Tennessee chapter, right?

CROSS-EXAMINATION OF M. CODY                           374

1    A.   I remember working with something that I thought was

2    the east Tennessee chapter on some cases involving

3    University of Tennessee in Knoxville while we were all

4    separate and before we were part of the -- they became all

5    part of one organization.

6    Q.   All right.  And actually you thought it was a bad idea

7    at the time to try to centralize things in one location in

8    Nashville?

9    A.   I did, and I complained about them doing it.

10   Q.   But they did it anyway?

11   A.   I guess, yeah, they did it anyway.

12   Q.   And I think you actually predicted to them that this

13   is going to make it harder for people to be organized

14   around here to generate much activity locally on the scene,

15   right?

16   A.   Yeah.  My experience just being down here in Memphis

17   is any time that they created an organization and locate it

18   in Nashville, the enthusiasm of people driving to Nashville

19   to go to a Saturday morning meeting and whatever else

20   diminished the activity of the people in the various

21   regions of the state, and I thought it would be probably

22   the end of the west Tennessee operation.

23   Q.   And it kind of was for a period of time, wasn't it?

24   A.   Well, see, I don't know after '68 because '68 is the

25   last time that I sort of maintained my interest in what was

CROSS-EXAMINATION OF M. CODY                        375

1   going on.

2   Q.   All right.  Do you know whether there was more than

3   one -- at the time of the Kendrick case, 1977?

4   A.   Kendrick case?

5   Q.   The Kendrick consent decree.

6   A.   Okay.

7   Q.   The case that resulted in the consent decree.

8   A.   1977?

9   Q.   Yes, sir.

10  A.   Okay.

11  Q.   I may have misspoken, but I know, for example, you

12  said you were on city council in '76?

13  A.   I was US attorney in '77.

14  Q.   Right.  In '76 you were still on the city council?

15  A.   Yes.

16  Q.   I think you said I remember being on the council when

17  we were dealing with that issue?

18  A.   Yes.

19  Q.   At that time, '76, how many local groupings were there

20  that sort of were affiliating themselves with the ACLU of

21  Tennessee Inc., if you know?

22  A.   I don't know.

23  Q.   All right.  There could have been more than one,

24  right?

25  A.   I just -- I just have no way of -- I wasn't in the

REDIRECT EXAMINATION OF M. CODY                          376

1    loop anymore.

2    Q.   All right.  That's all I have.  Thank you, Mr. Cody.

3              **THE COURT:**  Any redirect?

4              **MR. CASTELLI:**  Briefly.

5                        **REDIRECT EXAMINATION**

6    **BY MR. CASTELLI:**

7    Q.   Mr. Cody, Mr. Wellford had shown you the stipulations

8    and referred to an acronym, WTCLU?

9    A.   Yes.

10   Q.   And I know that was up on the screen.  Is that

11   something that you did -- when you were involved in the

12   West Tennessee Civil Liberties Union, was that acronym in

13   common usage?

14   A.   No.

15   Q.   Okay.  And if we could look at the exhibit, the

16   letter, the last marked exhibit.

17   A.   The one from Pickering?

18   Q.   Yes.  Yes, sir.

19   A.   Uh-huh.

20   Q.   I don't see 96 up here.

21             **THE COURT:**  Exhibit 96.

22             **MR. WELLFORD:**  I apologize.

23             **THE COURT:**  Sure.

24   BY MR. CASTELLI:

25   Q.   Your purge letter here, if you could confirm with me,

REDIRECT EXAMINATION OF M. CODY                          377

1    reference here is, here -- the second paragraph there, the

2    membership that they're saying is that -- what does that

3    say, if you could read it for me?

4    A.    "You will be interested" -- second paragraph?

5    Q.    Beginning of the second paragraph.

6    A.    "You will be interested in knowing that membership in

7    the west Tennessee chapter increased 43% this year."  We're

8    really pleased with this growth.

9    Q.    I don't need you to read the whole thing.

10          And the term "west Tennessee chapter" appears again in

11   the letter here, and that may be it, but do you have an

12   understanding of what west Tennessee chapter in 1974, what

13   that was referring to?

14   A.    Just in looking at this letter, I suppose it would be

15   referring to the chapter here of the statewide

16   organization.

17   Q.    Okay.  Thank you.

18          No further questions, Your Honor.

19          Thank you, Mr. Cody.

20          **THE COURT:**  All right.  We appreciate your coming

21   down here.

22          **THE WITNESS:**  Thank you, Judge.

23          **THE COURT:**  Certainly we're going to let you be

24   excused.

25          (Witness excused.)

CROSS-EXAMINATION OF T. REYNOLDS                          378

1          **THE COURT:**  We'll let the witness come back

2     around and hopefully we can we finish the witness before we

3     have our lunch break, and then we'll come back.

4               And I understand Mr. Kramer will be our next

5     witness; is that correct?

6          **MR. CASTELLI:**  Yes.  Yes, Your Honor.

7          **THE COURT:**  All right.  We're about set.

8          **MR. WELLFORD:**  Proceed, Your Honor?

9          **THE COURT:**  Yes, sir.

10                         *   *   *

11                  **SERGEANT TIM REYNOLDS,**

12    **was called as a witness and having previously been duly sworn**

13    **testified as follows:**

14

15                  **CROSS-EXAMINATION (resumed)**

16    **BY MR. WELLFORD:**

17    Q.   Sergeant Reynolds, moving on forward from the Valero

18    incident, have there been other hot-button topic issues in

19    2017 bleeding into 2018 that have generated activity,

20    investigative activity and concern on the part of the

21    Office of Homeland Security?

22    A.   Yes, sir.  The removal of the confederate statues at

23    Health Science Park.

24    Q.   We'll talk about that in a minute, but a lot of time

25    and attention has been focused on the questions that have

1    been asked you about particularly this time frame that we

2    spent a fair amount of time on this morning, this sort of

3    July through September time frame 2016.  A lot of attention

4    and questions have been asked of you about Black Lives

5    Matter, protests, investigative activities.

6        In 2017 and going forward, were there other events

7    that had little to nothing to do with Black Lives Matter

8    that involved your attention and your focus?

9    A.   Confederate 901 is one of them.  We also do stuff for

10   big events like Memphis in May.  There's always preparation

11   for that.

12   Q.   Well, let me ask you this, what did the -- did the

13   election of President Trump generate much reaction in the

14   part of protests and demonstrations and planned events?

15   A.   Oh, yes, sir.  Thank you for -- yeah, that generates a

16   lot of protest, especially right after he got elected and

17   around inauguration.

18   Q.   You used the term "situational awareness."  Does the

19   Office of Homeland Security react to what's going on at the

20   time as a potentially hot topic?

21   A.   Yes, sir.

22   Q.   And have the hot topics, do they change in nature and

23   focus over time?

24   A.   Yes, sir.

25   Q.   You mentioned in particular the removal of the Nathan

CROSS-EXAMINATION OF T. REYNOLDS                              380

1    Bedford Forrest statue in December of 2017, right?

2    A.   Yes, sir.

3    Q.   Did you have advance knowledge that that statue was

4    going to be removed?

5    A.   No, sir.

6    Q.   But before the statue was removed, were the issues and

7    concerns surrounding the statue a matter that you in your

8    capacity as Sergeant Reynolds as well as Bob Smith

9    undercover identity, were you concerned about that and

10   tracking it?

11   A.   Yes, sir.

12   Q.   Did there come a time when you actually left Memphis

13   and went to another location to kind of check out white

14   supremacist type associated activity that was a level of

15   concern to you about possible bleeding over action into

16   Memphis?

17   A.   Yes, sir.  There was a Charlotte, North Carolina type

18   protest scheduled in Shelbyville in Murphysboro --

19   Q.   When you say Charlotte, North Carolina, are you

20   talking about Charlottesville, Virginia?

21   A.   Charlottesville, Virginia.

22   Q.   Keep going.

23   A.   That was scheduled for Memphis in Shelbyville and

24   Murphysboro.  They filed permits, and I wanted to go up

25   there to see how those activities were handled and if there

CROSS-EXAMINATION OF T. REYNOLDS                          381

1   was any difference from how they handle those type of

2   protests and what we do.

3   Q.   Was the director aware of your interest in that?

4   A.   Yes, sir.

5   Q.   Did he support it?

6   A.   Yes, sir.

7   Q.   So did you go up there and see what you could learn

8   about how to track and monitor fast moving events

9   associated with that hot-button topic?

10  A.   Yes.

11  Q.   And develop relationships with some of the groups that

12  were making social media posts on that topic?

13  A.   Yes, sir.

14  Q.   On both sides?

15  A.   Yes, sir.

16  Q.   Now, when the statue removal occurred in December

17  of 2017, the Nathan Bedford Forrest statue was removed,

18  what role, if any, did you have to play in the fallout from

19  that?  That was a very poor question.  What was the fallout

20  from that removal in terms of your world at the Office of

21  Homeland Security?

22  A.   There were a lot of threats to our elected officials,

23  both the city council and the mayor specifically, that were

24  coming in after the statues had been removed.

25  Q.   And some of those threats were being publicly posted

CROSS-EXAMINATION OF T. REYNOLDS                              382

1    on the City or the Mayor's Facebook page?

2    A.    Absolutely.

3    Q.    Ranging in degrees of the emphatic nature in which

4    what they were saying was communicated?

5    A.    Very hostile, very hostile posts.

6    Q.    Some of them being overt, "I will kill you," and some

7    of them just being more troubling?

8    A.    Yes, sir.  Implied and overt.

9    Q.    What, if anything, was your role in connection with

10   planning for after the statue removal events in Memphis?

11   Was there a plan, a planned event in Memphis, following the

12   statue removal from some groups that were upset about the

13   removal of the statue?

14   A.    Yes, sir.  Right after that, the Confederate 901

15   protest or rumors of those type of protests started coming.

16   Q.    And was there an operations plan developed to

17   anticipate and respond to that event if it occurred?

18   A.    Yes, sir.

19   Q.    Were you part of that team?

20   A.    I was.

21   Q.    What was your role?

22   A.    Threat mitigation and to verify all the social media

23   traffic regarding threats from that group.

24   Q.    And was that at the direct instruction of the police

25   director, Michael Rallings that you be involved in that

CROSS-EXAMINATION OF T. REYNOLDS                                    383

1    investigation?

2    A.    Yes, sir.

3    Q.    And was there, in fact, a protest or activities in an

4    organized way that occurred following the statue removal in

5    Memphis, Tennessee?

6    A.    Yes, sir.

7    Q.    What happened?

8    A.    Groups from out of town started threatening to come to

9    town, and we had to first familiarize ourself with those

10   type of groups because, like I said, they were from out of

11   state and we didn't -- only what we knew about them was

12   what was projected on social media.  So we had to put --

13   make sure we had the right people.  Social media handles

14   are not always the true person's name.  So a lot of time

15   and effort was coming in to figure out who these people

16   actually are and if they posed a threat.

17        So we reached out to a lot of other law enforcement

18   agencies around there, discussed these individuals, are

19   they a threat.  They're talking about coming to Memphis.

20   Do y'all have any information?  And we were sharing

21   information along the lines so we can get a proper threat

22   assessment to deliver to the command staff for the

23   operational plan.

24   Q.    And when these groups came to Memphis and were driving

25   around the expressway and doing other things, were they

CROSS-EXAMINATION OF T. REYNOLDS                              384

1    being tracked by the Memphis Police Department?

2    A.    Yes.   They were.

3    Q.    In real time?

4    A.    Yes, sir.

5    Q.    Sergeant Reynolds, the activities that we've been

6    discussing and the questions that were asked to you by ACLU

7    attorney and by me, were any of those investigative

8    activities done because of an opinion or a concern over the

9    content of what the individuals were expressing in social

10   media posts or otherwise?

11   A.    No, sir.   It's just the fact we're trying to see if

12   that event is actually going to make its way from social

13   media into the real world, and then the threats of

14   counter-protests, our public safety or officer safety will

15   follow it if that should happen.

16   Q.    In the instances of which you were aware, where there

17   was follow-up communication with individuals reported to

18   have made a threatening statement or comment or troubling

19   statement or comment or where an event organizer was

20   approached before an event and questioned, in the events

21   with which you were aware -- of which you were aware, did

22   you have as your purpose, to your knowledge, did the

23   department have its purpose an attempt to chill or

24   intimidate the free and open expression of those opinions?

25   A.    No, sir.

CROSS-EXAMINATION OF T. REYNOLDS                          385

1   Q.   The Blue Suede Shoes PowerPoint, which was marked as

2   an exhibit earlier, Plaintiff's Exhibit 76, do you recall

3   that?

4   A.   Yes, sir.

5   Q.   You were shown a couple of pages of it, but you were

6   not shown the introduction to it and some of the other

7   statement where your preface states what the goal of the

8   department is.  Is that an accurate statement of what your

9   goal is?

10  A.   Yes, sir.

11  Q.   And did the department do its best to your knowledge,

12  and did you personally do your best to allow and permit the

13  free and open expression of opinions, whether a rally was

14  permitted or unpermitted?

15  A.   Yes.

16  Q.   Were unpermited rallies during 2015, '16 and

17  continuing on to the present time routinely allowed to

18  occur?

19  A.   Yes, sir.

20  Q.   Without interference?

21  A.   Yes, sir.

22  Q.   Are you presently seeking legal advice with respect to

23  the appropriate parameters that you need to follow in order

24  to be in strict conformance with the Kendrick consent

25  decree in this case?

REDIRECT EXAMINATION OF T. REYNOLDS                          386

1    A.    Yes, sir.

2    Q.    And you intend to follow that legal advice going

3    forward?

4    A.    I do.

5    Q.    To do your job?

6    A.    Yes, sir.

7              **MR. WELLFORD:** No further questions.

8              **THE COURT:**  All right.  Redirect?

9                        **REDIRECT EXAMINATION**

10   **BY MS. FLOYD:**

11   Q.    So you were asked a few questions about the

12   presentation prepared by Stuart Frisch.  Am I pronounce

13   that correctly?

14   A.    Yes, ma'am, Frisch.

15   Q.    Frisch.

16         The investigative techniques described in that

17   PowerPoint, were those the investigative techniques that

18   you were trained on by Stuart Frisch when you came into the

19   department, into the Office of Homeland Security?

20   A.    It was limited training because Stuart left the

21   department and went to the private sector, but we were --

22   we were in the process of doing that type of training, yes,

23   ma'am.

24   Q.    And so was that the same type of investigative

25   techniques that you applied to your investigations of

1    protest activities?

2    A.   Somewhat.  Mostly I brought my investigative

3    techniques from the organized crime unit because that was

4    more of my field of expertise and specialty.

5    Q.   So one of the things you mentioned in that PowerPoint

6    was sovereign citizens.  Just for the record, will you just

7    tell us very briefly what a sovereign citizens is?

8    A.   Sovereign citizens do not believe that they are a part

9    of the legal system of the United States and they are free

10   people, and they don't conform to our laws.  They have

11   their own set of laws that they would like to adhere to.

12   Q.   Okay.  And I did have one more question about the

13   undercover accounts.  Did Bob Smith as -- not as an entity

14   but as a personality that you developed, was there an

15   Instagram account in operation also under the Bob Smith

16   name?

17   A.   I believe there was, but I didn't -- I really

18   didn't -- it might have came with the Facebook account, but

19   I didn't really check that a whole lot.

20   Q.   Okay.  And are you aware of whether any data for that

21   Instagram account was pulled for this lawsuit?

22   A.   I'm not aware of any.

23   Q.   Okay.  And moving on to the investigation -- actually,

24   I'm going to -- moving on to the investigation of Fergus

25   Nolan and with the zoo hacking incident.  When in time did

REDIRECT EXAMINATION OF T. REYNOLDS                    388

1    you conclude your investigation or decide to move that

2    into -- that investigation into a dormant status?

3    A.   I don't remember the date, but that's -- the dormant

4    status is up to the zoo.  If they decided they want to

5    prosecute then it won't be dormant anymore.

6    Q.   About how long did the investigation last?

7    A.   A few weeks.

8    Q.   Okay.  And did you -- did you obtain any warrants in

9    connection with that investigation?

10   A.   We didn't -- if you don't have a victim that wants to

11   prosecute, I didn't -- there's no need in warrants.

12   Q.   Okay.

13        Just one additional exhibit, which will be an e-mail

14   from Colonel Sanders to Major Bass on 8-10 -- and others,

15   on 8-10-2016?

16             **THE COURT:**  Marked and received as 97.

17             (WHEREUPON, the above-mentioned document was

18   marked as Exhibit Number 97.)

19   BY MS. FLOYD

20   Q.   And you testified that there were concerns about

21   protest and counter-protests during the Graceland

22   celebrations and the responses to the Graceland vigil?

23   A.   Yes, ma'am.

24   Q.   So is this an e-mail you received?

25   A.   I did.

REDIRECT EXAMINATION OF T. REYNOLDS                    389

1  Q.   And does this e-mail from Colonel Sanders indicate

2  some of those concerns about growing tension between

3  Graceland fans and BLM supporters on social media?

4  A.   Yes, ma'am.  We're very concerned that an impromptu

5  protest in the middle of certain events inside the week.

6  Some of these fans -- I don't know if you know a lot of

7  Elvis fans, but they're pretty sincere about the week, and

8  we were concerned for the protesters' safety, that the fans

9  would be a threat to them.

10 Q.   And attached is a screenshot from -- where is this

11 taken from, this screenshot?  What page on the internet?

12 A.   I don't -- that looks like it may have come from the

13 collator, but it came from Facebook.

14 Q.   It came from Facebook.  And what is -- what is this

15 interaction between Bob Williamson and the coalition?

16 A.   Bob Williams -- would you like me to read that?

17 Q.   If you could read -- you may read it if you'd like to

18 or you could read it and summarize it for us.

19 A.   Okay.  That post from Bob Williams was indicative of

20 the type of things we were watching from -- in relation to

21 a counter-protest or a threat to the protesters that would

22 disrupt the events at Graceland.

23 Q.   And did you reach out to Bob Williamson?

24 A.   I don't think I did.  We may not have had time.  I

25 don't know if I did or not.

1   Q.   And did you place any information about Bob Williamson

2   in the joint intelligence briefing?

3   A.   I did not.

4   Q.   Okay.  Did you take his comment as "I foresee two

5   lines facing each other just as the British and the

6   Americans did so many years ago," -- is that something that

7   the Memphis police would be concerned about?

8   A.   Yes.

9   Q.   Okay.  Do you know if you ever located the true

10  identity of Bob Williamson?

11  A.   That was -- I'm going from memory.  That's a very

12  common name, and it is very difficult to actually get the

13  true identity of that person.

14  Q.   Did you attempt to get the identity of him?

15  A.   Yes, ma'am.

16  Q.   And in the documents about the Paul Garner

17  investigation for the Twitter account he set up on behalf

18  of -- under the name of the director -- of Director

19  Rallings, how did you know that Paul Garner's IP address

20  was the same as the Rallings Twitter -- as was -- let me

21  start over on my question.

22       How did you know that Paul Garner's Twitter account

23  handle was used at the same IP address as the Rallings

24  Twitter account?

25  A.   That's a question for the investigator.  I wouldn't

REDIRECT EXAMINATION OF T. REYNOLDS                    391

1    know that.

2    Q.    Okay.  That's all I have.

3          No further questions, Your Honor?

4          **THE COURT:**  All right.  That concludes the

5    examination.  So thanks very much.  We'll let you step

6    down.  We're going to take our lunch break.  It will be

7    basically 55 minutes.  So everyone should be back here at

8    20 after the hour, ready to proceed.  That's 20 after 1:00,

9    and let me recheck just really quickly as to our sequence

10   of witnesses.  I think we've gone over that a couple of

11   times, but I think we want to be sure because we probably

12   will get through a couple of witnesses, maybe some we've

13   not gotten to on the list yet.

14         **MR. CASTELLI:**  Our sequence, Your Honor, will be

15   Mr. Kramer when we get back from lunch, and then Major

16   Chandler will follow him, and then depending on our time,

17   we will call Director Rallings.

18         **THE COURT:**  Right.  And the reason I'm going over

19   it real quickly is I think we should be able to get to the

20   director today.

21         **MR. CASTELLI:**  Yes, sir.

22         **THE COURT:**  That will be our goal and to let him

23   start his testimony.  All right.  Well, we'll see everybody

24   no later than 20 after the hour.  Of course if you're not

25   early, you are late.  So we'll see everybody.

1          **MR. WELLFORD:** Your Honor, may I ask, since it is

2     the police director, can I have a little bit of leeway so I

3     can get him on quick on-call and not have him sit down

4     here.

5              **THE COURT:**  Absolutely.  We need to coordinate

6     and make sure we've got that ironed out.  We don't want to

7     take him away from his duties anymore than necessary.

8     Absolutely.  Thank you.

9                  (Lunch break.)

10                 (End of Volume 3.)

393

# C E R T I F I C A T E

I, LISA J. MAYO, do hereby certify that the
foregoing 152 pages are, to the best of my knowledge, skill
and abilities, a true and accurate transcript from my
stenotype notes of the trial, on 21st day of August, 2018, in
the matter of:


ACLU of Tennessee

vs.

City of Memphis, Tennessee


Dated this August 28, 2018



                        _____S/Lisa J. Mayo_____

                        LISA J. MAYO, LCR, RMR, CRR
                        Official Court Reporter
                        United States District Court
                        Western District of Tennessee