IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TENNESSEE

WESTERN DIVISION

===============================================================

ACLU of Tennessee, Inc.,

                Plaintiff,

vs.                          NO. 2:17-cv-02120

City of Memphis, Tennessee,

                Defendant.

_____


TRANSCRIPT OF PROCEEDINGS

NON-JURY TRIAL

VOLUME V


BEFORE THE HONORABLE JON P. MCCALLA, JUDGE


WEDNESDAY

22ND OF AUGUST, 2018


LISA J. MAYO, CRR, RMR
OFFICIAL REPORTER
FOURTH FLOOR FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103

1                    A P P E A R A N C E S

2

3

4

5    Appearing on behalf of the Plaintiff:

6            THOMAS HAUSER CASTELLI
             AMANDA STRICKLAND FLOYD
7            American Civil Liberties Union Foundation of
             Tennessee
8            210 25th Avenue N. Suite 1000
             Nashville, TN 37212
9            (615) 320-7142

10

11

12   Appearing on behalf of the Defendant:

13           BUCKNER WELLFORD
             JENNIE VEE SILK
14           LAWRENCE LAURENZI
             R. MARK GLOVER
15           Baker Donelson Bearman Caldwell & Berkowitz
             165 Madison Avenue, Suite 2000
16           Memphis, TN 38103
             (901) 526-6000
17

18

19

20

21

22

23

24

25

1 # W I T N E S S   I N D E X

2 **WITNESS**                                                     **PAGE**     **LINE**

3 DIRECTOR MICHAEL RALLINGS

4     Direct Examination By Mr. Castelli   565    17

5     Cross-Examination By Mr. Wellford    581    12

6     Redirect Examination By Mr. Castelli  637    7

7 MAJOR EDDIE BASS

8     Direct Examination By Ms. Floyd      648    6

9     Cross-Examination By Mr. Glover:     694    11

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

# E X H I B I T   I N D E X

2

| EXHIBIT NUMBER | | PAGE | LINE |
|---|---|---|---|
| 113 | Joint Intelligence Briefing INTELLIGENCE UPDATE | 579 | 6 |
| 114 | CHAPTER 12-52. PARADES AND PUBLIC ASSEMBLIES | 590 | 9 |
| 115 | Email: Lt. Michael Rosario to Lt. Alvert Bonner (7/21/2016, 5:45:46 PM) | 623 | 21 |
| 116 ID | INDEPENDENT REVIEW OF THE 2017 PROTEST EVENTS IN CHARLOTTESVILLE, VA | 627 | 17 |
| 117 | Photos of Valero Demonstration Sit-In | 629 | 22 |
| 118 | Email: Major Eddie Bass to Timothy Reynolds, et al. (7/19/2016, 7:54:42 AM) | 652 | 17 |
| 119 | Email: Major Eddie Bass, to M. Grafenreed, et al. (7/7/2016, 7:29:41 AM) | 656 | 18 |
| 120 | Email: Phillip Penny to Major Eddie Bass, et al. (7/13/2016, 3:23:29 PM) | 659 | 10 |
| 121 | Email: Major Eddie Bass to Deputy Chief Michael Hardy, et al. (7/12/2016, 3:35:11 PM) | 661 | 16 |
| 122 | Email: Timothy Reynolds to Caralee Barrett (7/13/2016, 11:07:01 PM) | 662 | 23 |
| 123 | Email: Major Eddie Bass to Stephen Chandler, et al. (7/13/2016, 11:48:15 AM) (REDACTED) | 664 | 12 |
| 123 A | Email: Major Eddie Bass to Stephen Chandler, et al. (SEALED) | 667 | 18 |
| 124 | Email: Colonel Mickey Williams to Major Eddie Bass et al. (7/17/2016, 8:14:59 AM) | 674 | 25 |
| 125 | Email: Major Joseph Smith to James Ryall et al. (7/16/2016, 10:20:01 PM) | 681 | 7 |
| 126 | Email: David Filsinger to Timothy Reynolds, et al. (7/17/2016, 12:40:57 PM) | 681 | 20 |
| 127 | Email: Major Eddie Bass to David Filsinger, et al. (7/17/2016, 12:42:01 PM) | 686 | 16 |

128   Email: Sgt. Phillip Penny to      687   11
      Major Mike Shearin, et al.
      (7/27/2016, 9:40:46 AM)
129   Email: Major Eddie Bass to        688   22
      Timothy Reynolds, et al.
      (8/6/2016, 3:47:09, PM)
130   Email: Lt. Colonel Eddie Bass     691   15
      to Colonel Russell Houston, et
      al. (10/28/2016, 11:57:49 AM)

1                          **WEDNESDAY**

2                        **August 22, 2018**

3              The trial of this case resumed on this date,

4    Wednesday, the 22nd day of August, 2018, at 8:35 a.m., when

5    and where evidence was introduced and proceedings were had

6    as follows:

7                    -----------------------

8

9              **THE COURT:**  All right.  Counsel may proceed.

10             **MR. CASTELLI:**  Thank you.

11             **THE COURT:**  Certainly.

12                      *    *    *

13

14              **DIRECTOR MICHAEL RALLINGS,**

15   **was called as a witness and having first been duly sworn**

16   **testified as follows:**

17                   **DIRECT EXAMINATION**

18   **BY MR. CASTELLI:**

19    Q.    Good morning, Director.

20    A.    Good morning.

21    Q.    I'm going to pick up where we left off yesterday.

22    A.    Okay.

23    Q.    So we were looking at what has been marked as

24    Exhibit 112, and just can you identify the exhibit for me

25    again?

1    A.    Yes.  This is After Action Review from 7-15-2016,

2    Tillman Station on a Black Lives Matter planned protest

3    held at Poplar and Highland.

4    Q.    Okay.  And I yesterday we had talked about this first

5    section, what significant event occurred, and you had

6    explained what that section was for.  Let's move on to

7    section, Section 2, what went well.  Can you explain what

8    that section is supposed to tell you in these After Action

9    Reviews?

10   A.    Yeah.  It's really the commander's notes.  So from the

11   person that prepared it, Major Mark Winters, he's going to

12   meet with his team and talk about what went well.  So

13   apparently, based on this After Actions Review, he said

14   that Tillman had a large presence with patrol task force

15   officers and different members of the police department,

16   had a well structured role call, disseminate a plan, good

17   staging area.  Command post was -- good facilities.

18   Cameras provided real time information.

19        I think it's important to note that there's a camera

20   right there at Poplar and Highland, you know, that was

21   placed there for crime but they did have access to it.

22   Units worked well together.

23        The task force members mobile to surrounding areas

24   using NYPD's counter terrorism strategy.

25        I think that's important to note.  As I said yesterday

1    we a lot of times we are doing -- you know, some groups

2    think that we're watching them, and we're really looking

3    for any problems, anyone that could be coming to harm them,

4    and that's what the NYPD's counter terrorism strategy was

5    about; getting out, patrolling the areas around any event

6    to make sure we can get a head's up on any problems or

7    trouble.

8        When protesters arrive, the minimum level of

9    engagement was used with only a uniform patrol supervisor

10   and an officer.  And so our philosophy is, if we don't have

11   to deploy and engage, we don't.  We want the supervisor to

12   go meet with whoever is organizing the protest and meet

13   with them and -- just so we can establish a rapport.

14   Q.   And then the last sentence, TF did not have to deploy.

15   Can you tell me what TF?

16   A.   Task force.

17   Q.   Task force?

18   A.   He's saying that the officers that were -- we normally

19   have officers that will be dedicated to respond to any type

20   of disturbance, but if there's no disturbance, we try to

21   keep them out of the way, out of sight, and they're only

22   needed if we call.  But if you go back to some things I

23   said yesterday, that's all in our philosophy of allocating

24   adequate manpower to these events, and that's why it's so

25   important that we know in advance that they're going to pop

1   up.

2   Q.   And Section 3, what needs improvement, what's the

3   purpose of that?  Without -- I don't need to know what's in

4   there, but can you tell me what the purpose of that section

5   is?

6   A.   So we can get better.  We want to improve every

7   operation.  That's why we review them.  We want -- I always

8   tell my folks, I'm not the easiest person to work for.  I

9   tell them I want an academy award-winning performance every

10  time, and the only way you get there is you review all your

11  incidents.  You talk about them.  You train them.  You find

12  best practices.  You read AAR from Charlottesville.  You do

13  all types of things to make sure that we don't have a

14  tragic situation in Memphis because I don't want us to be

15  breaking news.

16  Q.   And the last sentence in that section talks about the

17  scribe.  Can you explain what the scribe is?

18  A.   Yes.  The job of the scribe is kind of like the court

19  reporter.  The scribe's supposed to write down everything

20  that happens so we have a good log of anything significant

21  and that we know exactly what happened and what commands

22  were given, but again, it's just like the court reporter's

23  job is to record everything that happens.

24  Q.   Okay.  And then Section 4, recommendations, can you

25  explain what that's about?

1  A.   That's any recommendation that the commander can put

2  in there that he or she would think would have made the

3  event better.

4  Q.   And in this particular scenario, what was -- what were

5  the recommendations?

6  A.   The recommendations were along the best practices

7  within the nation, better use of gathering intelligence

8  from social media, using software where protesters posting

9  and tweets could immediately be read to determine their

10  intentions.  That comes from what we've seen.  I mean, this

11  is actually -- the first indication was probably in 2013.

12  We really start paying attention to what was going on

13  social media where individuals were communicating.

14  Counter-protesters, protesters were communicating and we

15  wanted to have a better awareness of what was going on.

16        You've seen the same type things in the After Actions

17  Review in Charlottesville where the commander in

18  Charlottesville, the precinct -- not the precinct but the

19  police chief thought that they needed a better awareness of

20  what was going on on social media so they could predict

21  events.

22        I think it's important to note that for us to be able

23  to protect the public, a lot of times we get focused on the

24  protesters but we still -- or the counter-protesters.  We

25  still have obligation to protect the public and get

1    information out to them so they know that something is

2    going on at Poplar and Highland or anywhere else because

3    they could choose to avoid the area.

4         So I think that's an important note, and it's critical

5    in modern times that we be able to monitor what is going

6    on.

7    Q.   And then Section 5, what's that section telling --

8    telling you through the action report?

9    A.   Again, what should we do differently next time?

10   Q.   Okay.  And this kind of brings back to something you

11   were talking about earlier, this NYPD counter-terrorism

12   unit strategy.  Can you describe that describe for me maybe

13   a little bit more detail than you had previously?

14   A.   Well, I know I'm talking from memory so let's look at

15   it.

16        I've been to New York a number of times meeting with

17   individuals there, and so if we just see what they say,

18   utilizing NYPD's counter-terrorism unit strategy, riding

19   through the various neighborhoods in and around protest

20   area with blue lights and sirens prior to the protest to

21   attract attention.  This was done during event but not

22   prior to.

23   Q.   So is the recommendation here to do that prior to

24   during and during the event instead of just during the

25   event?

1    A.   Without having it in front of me, I don't want to

2    speculate.  I don't remember exactly, but, you know, in

3    talking to the Commissioner O' Neal and NYPD and some of

4    his folks, NYPD obviously learned from 9-11.  They try to

5    maintain high visibility.  Obviously NYPD has a lot of --

6    you know, New York in itself every day is extremely

7    congested and crowded.  They try to maintain high

8    visibility.  They ride, you know, with blue lights.  They

9    may pop up on the corner, and they're just showing a high

10   police presence to deter any type of activity.

11       So, if there's a protest, we want to make sure that,

12   you know, someone that could be there to commit some type

13   of act of terror, someone that may not agree with what the

14   particular protesters' views are, we are there to protect

15   them, and one of the best ways we found to do that is to

16   have high visibility.

17       We always do bomb sweeps.  The last thing we want is

18   for someone to pull a permit and there be some type of

19   explosion or some type of WMD event, and we sweep and try

20   to hold the area for those individuals.

21       As I said, we want to support their ability to gather.

22   We want to support their ability to protest, but we're

23   always looking out for anything that could impede that

24   ability or that could impede public safety.

25   Q.   So who -- well, first of all, I guess, who prepared

1    this particular report?

2    A.   Major Mark Winters.

3    Q.   And do you know at the time this report was prepared

4    what his role in the department was?

5    A.   I think at the time Major Winters may have been the

6    Number 2, executive officer at Tillman Station, but he has

7    since retired.

8    Q.   Okay.  Who reviews the After Action reports after

9    they're submitted?

10   A.   Almost anyone can review them.  We encourage them to

11   talk with the officers that were involved in that

12   particular situation.

13       I'm pretty sure the precinct commander reviewed them

14   and probably members of the command staff.

15   Q.   Do you review these?

16   A.   You know, we do -- we had so many.  I would hope I

17   reviewed it, but I can't tell you I did --

18   Q.   Okay.

19   A.   -- because we had so many events, so many protests, so

20   many incidents in 2016 that it was very difficult to keep

21   up with those.

22   Q.   So, I mean, so you can't tell me this particular one

23   you reviewed, but in general, do you try to review these

24   After Action Reviews?

25   A.   I think I was there on the ground.  So if I remember

1    correctly, I spent some time there, but again, we just had

2    so many incidents, so many protests, I couldn't keep up.

3    It was too much going on.

4    Q.    Do you have any recollection of what this particular

5    event was concerning?

6    A.    Only thing I could do is look at his notes.

7    Q.    That's fine.  I just wanted to know if you had any

8    independent on this.

9    A.    Sir?

10   Q.    I'm sorry, I didn't mean to talk over you.

11         I just wanted to know if you had any recollections

12   independent of these notes.

13   A.    I don't remember.

14   Q.    Fair enough.  Thank you.

15         Director Rallings, are you familiar with something

16   called TRAC trainings?

17   A.    TRAC?

18   Q.    Yes, sir?

19   A.    So --

20   Q.    T-R-A-C?

21   A.    Yes, sir.  We meet -- the commanders meet every

22   Thursday at 9:00 at Airways Station to talk about crime,

23   and while we're there we often talk about any other events

24   that are important to the good of the department or public

25   safety.

1    Q.    Okay.  Is TRAC an acronym for something?

2    A.    Yes.  I think it is Tracking for Accountability.  I'd

3    have to write it down.  I don't know.  Am I allowed to make

4    notes up here?

5    Q.    That's fine by me.  If you want to -- if you want to

6    try to recall what that stands for.

7    A.    Pretty much, you know, Tracking for Accountability and

8    I think Credibility.  So that's just an acronym and I hope

9    that's correct.  We have a lot of acronyms.  Sometimes I

10   can't remember all of them.

11   Q.    That's all right.

12   A.    That's all about where we hold precinct commanders

13   accountable for crime trends.  That's what our data-driven

14   policing is all about.  I think Director Godwin when he

15   opened the Real Time Crime Center up in I think 2007, 2008,

16   it was made off the New York model.  I think Commissioner

17   Bratton brought CompStat to New York and really helped New

18   York reduce crime.  I think New York is experiencing some

19   historic low crime levels now.

20        So the Real Time Crime Center was developed and

21   implemented to support TRAC where we would provide

22   commanders with real time crime information.  The important

23   things about, you know, what supports TRAC in Blue CRUSH is

24   that we have information on when a crime occurs, where it

25   occurs, what time -- what time the crime occurred so the

1    commander can deploy resources to that particular area to

2    try to reduce crime.

3        And if you think about the value of that, we saw I

4    think even today, a 22% to 26% reduction in crime from 2006

5    to probably -- to present.

6    Q.   Do you regularly attend those trainings?

7    A.   As much as I possibly can, unless I'm pulled into

8    another meeting or I'm out of town.

9    Q.   Sure.  Do you -- well, I'm going to show you what's

10   been marked as Exhibit 76 which is a printout of a Power

11   Point presentation.  Do you recall this particular -- first

12   of all, do you recognize this Power Point presentation?

13   A.   It looks -- I think it's one of the many presentations

14   that we did.

15   Q.   And would this have been presented at that TRAC

16   training?

17   A.   I'm not 100% sure.

18   Q.   Do you recall whether you had requested this

19   particular presentation be prepared?

20   A.   On the particular, I'm not sure.  So I encourage my

21   commanders to do an After Actions Review.  I'm an

22   instructor so I like to see Power Points, and part of the

23   After Actions Review and part of our ongoing learning -- I

24   know the lawyers have to attend your ongoing training and

25   learning.  So we do the same thing.  We want to make sure

1    that officers are up to date, they're getting timely and

2    accurate information and that we're constantly training,

3    again, so we can get better.

4    Q.   Do you think -- I handed this to you so you can look

5    through it and  you might refresh your recollection about

6    this particular training.

7    A.   There's actually one sitting up here.

8    Q.   Oh, well, great.

9    A.   I mean, is this the one you want me to see?

10   Q.   I tell you what, let me hand you the actual court

11   exhibit so we can be sure they're the same thing.

12   A.   Yeah.

13   Q.   I think they are.

14        Have you had a chance to look through the exhibit?

15   A.   Oh, I didn't know you wanted me to.

16   Q.   Take a moment to look through it and see if you recall

17   whether or not you had asked for this particular training

18   or Power Point to be put together.

19   A.   Again, I mean, I manage a very large police

20   department.  So I encourage all of my commanders,

21   definitely the trainers, to you know put information

22   together for a crisp presentation.  I also do quite a bit

23   on my own.  So they definitely have been given blanket

24   instructions to document and prepare for future events, but

25   again, I can't remember specifically if I asked for this

1    particular one.

2    Q.   Okay.  Let me show you what's been marked as

3    Exhibit 77.  And Director, this is an e-mail from Sergeant

4    Reynolds to Major Chandler where he says, "This is the

5    project the Director had me start last week."

6         Do you recall any actual conversation or communication

7    with Sergeant Reynolds asking him to put this Power Point

8    together?

9    A.   Again, that was in 2016.

10   Q.   Sure.

11   A.   As I said before, I've given my commanders, our team,

12   blanket instructions on documenting, preparing, you know,

13   presentations so we all know exactly what's going on and

14   giving timely information.

15   Q.   Fair enough.  Thank you.

16        I'll take that exhibit back from you then.

17   A.   You gave me a stack of other stuff.

18   Q.   Just the one I handed you.

19   A.   You want the other stuff you gave me?

20        **THE COURT:**  Why don't we just take that back.

21   Retrieve that and see what we'll just hold on to them.

22   Okay.  Good.

23   BY MR. CASTELLI:

24   Q.   Director, are you familiar with Joint Intelligence

25   Briefings?

1    A.    Yes.

2    Q.    Can you tell me what those are?

3    A.    A Joint Intelligence Briefing?

4    Q.    Yes, sir.

5    A.    Yes.  So the JIB is just a report that provides

6    situational awareness.

7    Q.    Okay.  And do you know how long the Memphis Police

8    Department has been issuing the Joint Intelligence

9    Briefings?

10   A.    To my recollection, probably since 2014.

11   Q.    Okay.  I wanted to show you -- you're the -- the file

12   you had for your Standard Operating Procedures for Civil

13   Disturbances that we were talking about yesterday.

14   A.    Yes.

15   Q.    I wanted to show you a page from that file which is

16   Bates number 22394.

17         Do you recognize this as some of the collection of

18   information that you had in that file?

19   A.    Yes.  I mean, that's -- that looks like one of our

20   JIBS.  I definitely remember that caption because that's

21   when we were getting enormous amount of threats from the

22   FBI, from Tennessee Fusion, that individuals were planning

23   to target law enforcement, especially from some of our

24   local gangs.  Two gangs that were mentioned were the Vice

25   Lords and GDs had issued orders to target and to shoot at

1    or kill law enforcement.

2              **MR. CASTELLI:** My apologies, let's mark this as

3    the next exhibit.

4              **THE COURT:**  Marked and received as 113.

5              (WHEREUPON, the above-mentioned document was

6    marked as Exhibit Number 113.)

7    BY MR. CASTELLI:

8    Q.   While we're marking that, Director, can you explain

9    the purpose of the Joint Intelligence Briefing that go out?

10   A.   The purpose of the Joint Intelligence Briefing is

11   situational awareness so that law enforcement and, you

12   know, individuals within the Homeland Security community

13   could have awareness of what was being -- you know, either

14   circulating within the community.  We wanted to have

15   awareness of events.  We wanted to know threats of law

16   enforcement.

17        Like I said, at that time, Tennessee Fusion, FBI,

18   Shelby County Sheriff's and some of our local partners all

19   over the nation were putting out information that there

20   were a number of threats to public safety, threats to law

21   enforcement and that there were threats of individuals

22   infiltrating what would normally be seen as a peaceful

23   protest that may have nefarious intent or had intent to

24   harm law enforcement.

25   Q.   Was there a particular reason why you included this at

1    least first page?  I don't know.  It might have been the

2    complete Joint Intelligence Briefing, but this one in your

3    manual that you had put together for yourself.

4    A.    It's just an example of, you know, the reason why law

5    enforcement needs to pay attention what's being posted on

6    social media.

7         I think if we think about the importance of social

8    media today, school shootings are a great example where

9    individuals are posting threats on social media, and if law

10   enforcement does not pay attention, we end up having a

11   terrible situation and kids killed.  We've seen terrorist

12   attacks and we've also seen individuals injured at various

13   protests around the nation, such as in Dallas, Baton Rouge.

14   Q.    Certainly.

15        Can you tell me who prepared this particular one that

16   was from your file?

17   A.    The name's on there, so Caralee Barrett and deputy

18   David Lanigan.

19   Q.    And who is Caralee Barrett?

20   A.    At the time I think Caralee worked for us and Deputy

21   David Lanigan appears to be a Memphis of the Shelby County

22   Sheriff's Office.  This used to be a Joint Intelligence

23   Briefing with MPD and Shelby County Sheriff's Office.  And

24   at some point, I don't remember when, we started doing it.

25   Q.    And do you know are these still prepared today?

1    A.    The JIB?

2    Q.    Yes, sir.

3    A.    Well, after we reviewed the Court's opinion or

4    decision on the -- on the Consent Decree and how it applied

5    to us today, I cancelled the JIB.

6    Q.    Okay.

7    A.    We didn't want to be in violation when the Judge, you

8    know, sent some clear instructions out.

9              **MR. CASTELLI:**  All right.  Thank you, Director

10   Rallings.  Those are my questions.

11             **THE COURT:**  All right.  Cross-examination?

12                        **CROSS-EXAMINATION**

13   **BY MR. WELLFORD:**

14   Q.    Good morning, Director Rallings.

15   A.    Good morning.

16   Q.    Let me start out by addressing that last point.  At

17   one point in time there would be a Joint Intelligence

18   Briefing that wasn't exclusively prepared by the Memphis

19   Police Department, it involved Shelby County Sheriff's

20   Department and the Memphis Police Department, right?

21   A.    That's correct.

22   Q.    And the testimony has been in June of 2016, the

23   Memphis Police Department specifically started preparing

24   Joint Intelligence Briefings, but it was exclusively

25   prepared by the Memphis Police Department.  Is that your

1   recollection?

2   A.   I think that's correct.

3   Q.   All right.  And do you recall the Pulse Nightclub

4   shooting being an impetus for the, I guess, institution or

5   reinstitution of the intelligence briefing exclusively

6   prepared by the Memphis Police Department?

7   A.   I think it was around that time.

8   Q.   Now, you've been asked some questions about the

9   Kendrick Consent Decree and your knowledge of it, and

10  Exhibit 79 as we've seen in evidence a DR.  What is a DR?

11  Department regulation?

12  A.   Yes, department regulation.

13  Q.   138.  We've had witnesses review that.  And what's

14  you're awareness generally of that DR and the Consent

15  Decree?  What is the level of your actual knowledge up to

16  this litigation of the contents of the Consent Decree and

17  specifically the definition of political intelligence in

18  it?

19  A.   Now, are you specifically speaking before the

20  litigation?

21  Q.   Yes, sir.

22  A.   As I said yesterday, before I had a general knowledge

23  of the Consent Decree, you know, I knew a little bit about

24  DR 138.  It said that, you know, we did not do political

25  intelligence.  It's kind of where we stopped.

1    I knew the Consent Decree, you know, had stuff about

2    spying on people and, you know, something about their

3    political beliefs and we didn't care about that.  We were

4    not -- and so we really didn't spend a lot of time on it.

5    We knew that we did not do -- the DR was very specific.

6    The Memphis Police Department does not conduct political

7    intelligence.  And so it was a general awareness of it, but

8    again, it was just something that we didn't do so we didn't

9    spend a whole bunch of time talking about it.

10   Q.   Now, the Consent Decree speaks for itself in terms of

11   what political intelligence is.  I'm focusing my questions

12   on what was going on in your head as the Memphis Police

13   Director and what was motivating you in doing the things

14   that Mr. Castelli covered with you during his examination.

15       And did the content of or the nature of the

16   associations with each other and the opinions that people

17   were expressing play any role whatsoever in the action

18   steps that you went over with Mr. Castelli for protecting

19   the public?

20   A.   Not at all.  We were not concerned about anyone's

21   beliefs or associations.  We were concerned about

22   protecting the public, protecting them, and allowing them

23   to express whatever first amendment rights they had.

24   Q.   Now in terms of what motivates you with respect to

25   investigations of, monitoring of, social media searchs

1    pertaining to protests or gatherings, large public events,

2    you talked about attending conferences and other things.

3    What's the purpose of doing that with respect to what

4    motivates you in those areas?

5    A.   Great.  I think that's so important that we are up to

6    date with the best practices.  Major City Chiefs has been

7    one of those great things.  So we think of the 77 largest

8    cities in the nation.  We met every quarter and I think

9    eight from Canada, and we talk about issues that are faced

10   by the major cities.  One of the only things we talked

11   about in 2016 was the large number of protests, the

12   ambushes to law enforcement officers.  We talked about the

13   importance of knowing what's going on with social media and

14   to think all this is before Charlottesville.  So we're

15   really focused on Ferguson.  We're looking at the Pulse

16   Nightclub shooting, thinking about -- I don't remember if

17   San Bernadino probably was in 2017.  We had a number of

18   ambushes, I think.  21 ambushes in 2016 to law enforcement,

19   the highest in two decades.

20       So we were really concerned about things going on in

21   the nation.  When we meet, we talk about it.  We hear

22   presentations from chiefs.  I've heard the Orlando chief

23   talk about the challenges with the Pulse Nightclub

24   shooting.  I've heard Commissioner O' Neal from New York

25   talk about ambushes being.  I've heard Janee Harteau from

1   Minneapolis talk about the shooting of Philandro Castille

2   and the siege of one of her precincts that occurred two

3   weeks.  So we learned best practices.

4       What's great about that, I can call chiefs after we

5   leave.  We can talk during that, meet with the seem.  So

6   it's all about best practices that we get from attending

7   ICP, Major City Chiefs, a number of other trainings that we

8   have available to us.

9   Q.   You mentioned something about a Klan meeting here in

10  Memphis at some point?

11  A.   Yes, sir.

12  Q.   When was that?

13  A.   So the first one was in 1998, and if we go back in

14  history, the Klan wanted to come to Memphis.  We were -- a

15  lot of detail planning went in place to try to keep the

16  Klan and the counter-protesters separated.  We didn't do

17  such a great job.  The counter-protesters really got upset.

18  They thought law enforcement was protecting the Klan, and

19  there was some clashes between law enforcement and the

20  protesters, and unfortunately tear gas to be deployed.

21      A lot of lessons were learned from that, and that was

22  really probably the first incident where I really started

23  paying close attention and preparing for future events.

24      The Klan returned in 2013 after the City of Memphis

25  renamed the confederate parks, and we really spent a lot of

1    time reviewing the ordinances, making sure we could protect

2    the Klan so they could, you know, express their rights just

3    like we've always done.  We wanted to protect the

4    counter-protesters and we wanted to make sure we kept

5    individuals separated.

6    Q.   Now what about -- again, I'm focused very much on your

7    motivations as a member of the command staff and later as

8    the Memphis Police Director in terms of what's motivating

9    your actions and your behavior.

10        What about -- forget for a moment about the Kendrick

11   Consent Decree or what you knew or didn't know about it.

12   What about just your knowledge of protesters and

13   counter-protesters' First Amendment Rights, the rights to

14   free speech?  How did that enter into your action

15   activities with respect to how you were planning for

16   dealing with these large scale, sometimes controversial,

17   public events?

18   A.   Yeah.  So my motivation goes way back.

19        Obviously I was born in 1966.  Growing up in Memphis,

20   you were very much aware of what happened during the Civil

21   Rights Movement.  So my motivations have always been that

22   my job as a police director, as a chief, as a lieutenant,

23   while I was at the Firearms Training Unit was to make sure

24   that we protect individuals' rights to protest.  We didn't

25   care what their individual beliefs were, but I have an

1   obligation of public safety.

2       What I did not want is something that would happen on

3   my watch where people would be harmed because we did not

4   properly prepare, we did not properly allocate resources.

5   And you know, we wanted to always be successful no matter

6   what group was coming, no matter what group wanted to do

7   something.  We wanted them to be protected.  We wanted the

8   event to be successful, but I felt that I needed to know

9   what was going on.

10      And so we definitely wanted to pay attention, and

11  that's why we encourage individuals to pull a permit so we

12  can allocate resources.

13      My staff today, I'm down over 500 and -- you know, 500

14  police officers from 2011.  So I don't have officers that I

15  can -- that are standing around waiting on something to

16  happen.  If something happens, I have to pull them from

17  patrol.  I have to pull them from their jobs.

18      So we need to know in advance and as far out in

19  advance that there's going to be an event.  And we're not

20  just focused on a protest.  We have other events that come

21  up.

22      You know, there are threats to malls.  There were

23  threats to shopping areas, threats on Beale Street.  You

24  know, besides the other large events, St. Jude Marathon,

25  Memphis in May, you know.  I think in the middle of all

1   that stuff in 2016, we're just prepared for the 4th of July

2   celebration.

3       So I think the police director has to know everything

4   that's going on all of the time so we can properly allocate

5   resources and prepare for these events.

6   Q.   Now, you were asked -- I'm going to talk about -- you

7   talked about pulling permits and I'm going to talk about

8   that in just a minute, but one of the exhibits that were

9   shown to you is Exhibit 76, the Blue Suede Shoes

10  presentation that was made by Sergeant Reynolds who has

11  testified already.  And you're familiar with this

12  presentation generally, aren't you?

13  A.   Yes.

14  Q.   And it is true that you are a very process-oriented

15  person.  You like to see things in writing?

16  A.   Yes.

17  Q.   You like to kind of study and learn lessons and apply

18  lessons learned to other events, things of that nature?

19  A.   Yes.  And I want to train up our commanders.

20  Q.   Now, on the first page of that presentation, is there

21  a reference to the department --

22          **THE COURT:**  You can blow that up.

23          **THE WITNESS:**  Yeah.  It would help because I

24  can't -- I was going to tell you I can't see it.  Thank

25  you.

1  BY MR. WELLFORD:

2  Q.   Is there a reference to the Department's desire to

3  provide public safety while still protecting people's right

4  to express their opinions?

5  A.   Let me look at it, and excuse me for reading out loud.

6  "Memphis Police Department has been working diligently to

7  accommodate groups that wish to voice their concerns over

8  issues that Memphis wants to address."

9       Yeah.  So here's our goal to provide public safety to

10  individuals that wish to voice their opinions and concerns.

11  The Memphis Police Department has information from various

12  sources that small groups of individuals use these

13  legitimate public venues to advance their own agenda.  The

14  Memphis Police Department has information from reliable

15  sources that these small groups intend to cause violence

16  and destroy property using these public venues.

17       So yes, I mean, we definitely wanted to support

18  anyone's ability to voice their opinions, and we just were

19  concerned about public safety.

20  Q.   Let me ask you whether it's true that in directives

21  such as After Action Reviews, operational plans, other

22  things that go out as a part of a process that you were in

23  charge of and you were aware of, is it repeatedly

24  emphasized that the commanders and the people on the scene

25  are encouraged to protect the First Amendment Rights of

1    protest?

2    A.    Without a doubt.

3              **MR. WELLFORD:**  Your Honor, I'd like to move into

4    evidence as the next exhibit the Parades and Public

5    Assemblies Ordinance for City of Memphis Chapter 12-52.

6    80.

7              **THE COURT:**  114 marked and received.

8              (WHEREUPON, the above-mentioned document was

9    marked as Exhibit Number 114.)

10   BY MR. WELLFORD:

11   Q.    For the record, it's Exhibit 114.  I was just

12   commenting to Counsel on the pretrial number.

13         You're familiar with the Parades and Public Assemblies

14   Ordinance generally?

15   A.    Generally.  It's also part of SOP.

16   Q.    And once again, I'm focusing on this, Director, not in

17   any way with respect to whether or not this ordinance can

18   change, override anything about the Kendrick Decree.  I'm

19   focused on what motivates you when were you trying to

20   provide operational plans to prepare for large scale public

21   events or events that would trigger the permitting

22   requirements.  All right.

23   A.    Yes.

24   Q.    Are we clear on that?

25   A.    Yes.

1    Q.    All right.  Now, you talked about how you wanted to

2    encourage people to get permits because of manpower issues.

3         Why is it important, from your standpoint, to

4    understand and know through a permitting process when

5    something's going to happen?

6    A.    Well, so I can allocate resources.  You know, my

7    motivation is to always be mindful that my obligation is to

8    provide for public safety.  So the -- you know, this

9    ordinance just puts a lot on the Police Director in making

10   sure these events are safe, and that individuals are able

11   to express their rights.

12        One thing about why the permit was so important, the

13   permit allows us to support your event in a more

14   professional and better manner so that we can allocate

15   manpower, we can determine if we need to block off streets,

16   we can alert the public or be prepared to alert the public;

17   but so that we can have a safe event.

18        And the parade ordinance on the permitting process

19   covers everything, you know, from the St. Jude Marathon,

20   Memphis in May, protest; but again, my motivation is so

21   that we get it right.

22        We respect the right of individuals to express their

23   First Amendment Right so they can protest or they can do

24   whatever they want, but we just want them to do in a

25   law-abiding manner.

1    I learned that many people did not know about the

2    permitting process.  It is also our job to educate them on

3    how to have a safe event.

4        **MR. WELLFORD:**  Your Honor, I apologize.  What I

5    have inadvertently marked as an exhibit has some markings

6    on it.  If I can substitute a clean copy.

7        **THE COURT:**  If we've got a clean one, that's

8    always better.  Sure, sure.

9        **MR. WELLFORD:**  I'm handing the Clerk to be marked

10   as Exhibit 80 a clean copy of the document -- sorry,

11   Exhibit 114 -- the document that we previously marked, and

12   should I hand the marked-up version to him?

13       **THE COURT:**  Just hand him the clean one.  It's

14   just to make sure we're looking at the whole document.

15   Sure, no problem.  We'll use the clean one.

16   BY MR. WELLFORD:

17   Q.   So Exhibit 114 which we were looking at, Director, the

18   parade ordinance involves situations that have a tendency

19   to interfere with the normal flow or regulation of traffic

20   upon the streets.  Why is that important?

21   A.   Well, it's my job to make sure that the public's

22   everyday well life is not impacted unnecessarily.  We have

23   a very busy city, and traffic is always a concern so that

24   we keep everything flowing.  We have a number of medical

25   facilities people are trying to get to, so we want to keep

1    everything moving so no one's negatively impacted.

2    Q.   Now, Director, as we're going -- we can go through any

3    part of this that you'd like or that Counsel would like to

4    raise in Redirect, but I'm particularly interested in

5    focusing on the sections that have police director

6    obligations.  And are you aware that there is a section of

7    the ordinance that specifically places certain

8    responsibilities on the police director?

9    A.   Yes.

10   Q.   Now you've mention that had people weren't pulling

11   ordinances at some point.  When did there become a trend

12   where people might not be pulling ordinances for events

13   that would trigger a permit requirement?

14            **THE COURT:**  Might not be pulling permits?

15   BY MR. WELLFORD:

16   Q.   Might not be pulling permits for where it would apply

17   under the parade and assembly ordinance?

18   A.   I think it really came to our attention after

19   Ferguson, when there were -- that's when protests started,

20   and definitely after the death of Darrius Stewart.

21   Q.   Was the death of Darrius Stewart, which has been

22   discussed in the courtroom previously in July of 2015, an

23   event that had some significance with respect to

24   challenging the resources of the Memphis Police Department

25   and trying to allocate resources that could address public

1   assemblies and demonstrations concerning that event?

2   A.   Yes, it did.

3   Q.   Was there a concern at all in your mind as to "I need

4   to weigh in one side or the other on this issue and the

5   people expressing opinions on one side or the other of the

6   issue"? Was that a matter of concern to you?

7   A.   No, not at all.  After -- I mean, myself and even

8   after Darrius Stewart was killed, myself and my Deputy

9   Director Ryall at the time who was the colonel over

10  Ridgeland went and visited Darrius Stewart's mother to

11  offer our condolences and really offer her support.  We

12  knew that, you know, in these events there could be an a

13  lot of media attention.  There could be people coming by

14  her home.  We asked her if there was something we could do

15  for her outside of obviously the investigation, but just to

16  try to help; and she, you know, did not ask for any of our

17  assistance, but, no, I didn't weigh in one way or the

18  other.

19       You know, losing anyone, especially in a law

20  enforcement interaction, a death is a very critical

21  incident.  It brings on all types of pressures for the

22  family, for the community, and we've almost seen the nation

23  unravel from police-involved shootings.  So I didn't weigh

24  in one way or the other.

25       You know, our job is to determine the facts, but at

1    the end of the day, I still have a responsibility to

2    protect the public.

3    Q.   Now with respect to your responsibilities, even

4    independently of whatever knowledge you had or didn't have

5    of the Kendrick Decree, the permit ordinance itself

6    provides that the speech content of the event should not be

7    a factor in the planning process.  Are you familiar with

8    that?

9    A.   Yes, sir.

10   Q.   Is that something you take seriously?

11   A.   Very seriously.

12   Q.   Now, Subsection C discusses certain measures that the

13   Police Director's entitled to take with respect to these

14   events, including but not limited to zoning in areas of

15   proximity, crowd control measures, metal detector searches

16   of all entrance to the event site, traffic rerouting,

17   cessation of street parking and use of undercover officers.

18   Any such measure shall be narrowly tailored to advance the

19   City's interest in public safety and protection of the

20   rights of free speech and assembly.

21        Do you see that section I just read?

22   A.   Yes.

23   Q.   Now, what was going through your mind when you were --

24   are addressing situations where there is a large scale

25   public event and there's controversy where you may be

1    concerned about protesters on one side, counter-protesters

2    on another and the use of some of these measures to help

3    manage the event?

4    A.    Yeah.  I think if I look and -- you know, this is a

5    legal document, but if you look, I think it was revised

6    3-19-2013.  And I think that was -- you know, there was

7    some revisions focused on the KKK rally.  We wanted to make

8    sure that we had a peaceful rally of anyone that came, but

9    we were focused on the Klan because that's what happened in

10   2013.  We were focused on no one being shot.  I mean,

11   that's always our first order of business.  That's why we

12   put metal detectors out.  We made individuals, you know --

13   we always search the Klan to make sure that no one's

14   bringing weapons, and we also search for anyone that wanted

15   to counterprotest in that particular event.

16        So a lot of the attention around this was focused on

17   the large Klan event.  Remember, I told you about what

18   happened in 1998.  We didn't want anything negative.

19        We had seen a number of events where groups with

20   opposing opinions had clashed.  We recovered guns from

21   individuals during the Klan rally.  Thank God that those

22   weapons weren't introduced to the rally, but we made an

23   arrest, stopped individuals that were coming to, from their

24   own admission, to probably inflict acts of harm against the

25   Klan.

1    We definitely did not want anyone to get shot at a

2    protest.  We didn't want, you know, it to break down like

3    we saw in 1998.  So we really wanted to make sure it was a

4    safe event.  And anything that we could put in to make it

5    safe, that was our responsibility, to include plain clothes

6    officers or undercover officers.

7    Q.   Now, Director Rallings, there's a spontaneous event

8    exception under the ordinance?

9    A.   Yes.

10   Q.   Are you familiar with that?

11       Now, again, in terms of your mind and planning and

12   operational tactics, did you take the permit ordinance

13   seriously?

14   A.   Very.

15   Q.   Now, however, with the series of events you started

16   describing where permits weren't being pulled as often

17   after the Darrius Stewart shooting, did you ever attempt to

18   just shut an event down because somebody did not have a

19   permit?

20   A.   No.  So it goes back to when all this started really

21   in, you know, 2014 when things were heating up around the

22   nation, here's what our philosophy was:  We sat down with

23   Director Armstrong to determine the commander intent.

24   Matter of fact, myself and two commanders I think and Chief

25   Landrum met at Tillman Station met to figure out how we're

1  going to handle things.

2      The permit ordinance says if you're going to have an

3  event in the public or somewhere that has access to the

4  public, if you're going to have more than 25 individuals,

5  that you need to pull a permit.  And so what we did was, if

6  someone didn't have a permit, we would have the supervisor

7  meet with them and say, look, just go meet with them and

8  say, look, how about if you put 25 on this side, 25 on this

9  side, as long as, you know, everything's peaceful we will

10  allow to you protest.  That's why we really encourage our

11  supervisor to go meet with the protest organizer.

12      It went so far to where I said, no, give them a copy

13  of the permitting process.  Give them a copy of Frequently

14  Asked Questions so we could help them.  So we want them to

15  express their right, but we want them to do it lawfully.

16      And what we saw almost every time is that an event

17  would somehow end up at the sidewalk.  Then it would end up

18  in the street, and we always wanted to have officers

19  present so we could block traffic if we had to shut down a

20  lane.

21      There have been times where we shut down a whole

22  street, and if it was a reasonable time, then we'd let them

23  do it and we never, until someone broke the law, ran out in

24  the street, tried to block -- purposely block traffic.  We

25  would allow the event to go on, and we would make arrests

1    and allow the event to go on just for the individuals that

2    may have violated.

3    Q.   Now, with respect to the Darrius Stewart event and the

4    aftermath and the permitting process, were there times that

5    you did have to deploy undercover officers for the purposes

6    that you've just indicated?

7    A.   Yes.

8    Q.   All right.  Now, Director, can you walk us through

9    this timeframe, specifically after the Darrius Stewart

10   shooting and leading up into late 2015 and early 2016, and

11   tell us what challenges were being presented to the Memphis

12   Police Department in managing sometimes permitted but often

13   unpermitted events that were occurring, specifically with

14   respect to that issue.

15   A.   So if you go back to 2015, I was a chief in uniform

16   patrol.  If you think when Ferguson, then Darrius Stewart

17   was killed.  Right after Darrius Stewart was killed, Sean

18   Bolton was killed, almost a month after that.  So not only

19   were we managing --

20   Q.   Just for the record, just briefly describe the -- who

21   was Sean Bolton and what was the mature of that incident?

22   A.   Thank.  Sean Bolton was an officer assigned to the

23   Mount Moriah Station Precinct.  He was a Marine Corps

24   veteran and he was killed while he made a traffic stop.

25        Note this is still going on where we're still getting

1    threats that individuals are targeting law enforcement

2    officers.  And then we started having a large number of

3    candlelight vigils, protest event.  Some permitted.  Many

4    not permitted.  They were popping up all over the city.

5    And, you know, our ability to manage that -- we're very

6    challenge today try to manage that with limited resources.

7         We're very concerned that -- I remember one particular

8    event surrounding Darrius Stewart where I was present where

9    individuals from opposing group came up and were agitating

10   the group that was there to support Darrius Stewart.  We

11   were very concerned that this would be an ongoing trend.

12   We're getting information from the FBI, from Tennessee

13   Fusion that individuals will try to infiltrate peaceful

14   protest and commit acts of violence or try to entire law

15   enforcement to do something to get a negative event, but

16   just our ability to manage those events we were extremely

17   strained, and we were, you know -- it was -- things were

18   really getting heated up.

19   Q.   By the way, you mentioned that when -- on several

20   occasions you were instructing your commanders to try to

21   get people information about the permitting process and

22   that kind of thing, break crowds up.  Do you remember an

23   unpermitted event, demonstration at Graceland during Elvis

24   Week in 2016 --

25   A.   Yes, yes.

1    Q.    -- where arrests were made?

2          Was there an attempt at that event to try to provide

3    an area where protesters could go and peacefully protest

4    without disrupting the event?

5    A.    Oh, yes, without a doubt.

6          We designated an area right next to the venue where

7    protesters could come and protest.  We, you know, tried to

8    work with Graceland.  We tried to work with the protesters

9    to say, yes, you know.  Because the information was coming

10   out that -- this was told to me to my face.  This is not

11   something I needed to go out and find out.

12         Certain individuals that are present told me to my

13   face we're going to disrupt Graceland.

14   Q.    Well let's -- we need to get that in the record.  Who

15   told you that?

16   A.    Keedran Franklin was very specific every time we met.

17   I think Al Lewis was part of that.  I think that the

18   Concerned Citizens Coalition posted information about

19   disrupting Graceland.

20         So, you know, I think some people think that these are

21   individuals that we don't know.  Many of them have my

22   personal cell number and they would call to meet prior to

23   an event, and my advice to them was always why does anyone

24   have to be arrested.  You know, I know that you want to

25   protest.  The news media is going to be there.  Our friends

1  are here now.  You're going to get your story, and then

2  just go.  Nobody has to be arrested.

3      Director, we want to commit acts of civil

4  disobedience.  Why?  You don't have to do that.  We don't

5  have to arrest anyone.

6      But there was some individuals that felt they had to

7  be arrested.  And again, we thought it was an attempt to

8  have a clash with them and law enforcement so it would

9  become a bigger story.  But if you notice the Memphis

10  Police Department exhibited an enormous amount of

11  restraint.  There was never any deployment of -- I don't

12  think we even pepper-sprayed anyone.  We definitely didn't

13  deploy tear gas.  There were minimum arrest.  We allowed

14  almost -- I don't remember a single incident where we broke

15  up a protest.  We made -- we arrested individuals that may

16  have violated the law, but I don't remember a single

17  incident where we ended a protest that was permitted or not

18  permitted because of something that happened.  We always

19  tried to use the minimum amount of force that was

20  necessary.

21      We wanted them to protest.  We wanted them to feel

22  that law enforcement was there to support them, but I still

23  have the obligation to keep them safe.

24      What you'll never see me do is to put out threats that

25  we may not have verified those and have the public panic.

1    We can put officers there.  We can deploy undercover

2    officers and make sure that things are kept safe, but we

3    don't overly alarm the public.

4         And when it's time to alert the public to something,

5    I'll be the first one to say that, hey, this is a problem;

6    we think you need to stay at home, but we just have not

7    done that.  We've been very successful, and I hope that we

8    can continue to be successful, but an awareness of these

9    events, we have to have that.

10        You know, individuals have to pull permits or, you

11   know, at least work with law enforcement so we can keep you

12   safe.

13   Q.   Now, let's forget about -- let's talk about a

14   situation where a permit requirement may not at least

15   exist.  Certainly if it's an event on private property and

16   it's not expected, reasonably anticipated it's going to

17   spill out into the public streets, you agree, you

18   understand there's no permitting requirement for that;

19   right?

20   A.   Correct.

21   Q.   Now there is evidence in the record that on occasion

22   that Memphis Police Department officers would reach out to

23   individuals who were helping to organize events on

24   controversial issues of the day that would be held on

25   private property, to ask them questions about how many

1    people do you think are going to show up and, you know, do

2    you anticipate that there might be issues that relate to

3    tying up the public thoroughfares, things of that nature.

4         Are you aware that that would sometimes occur?

5    A.   Without a doubt.  It's recommended.

6         So -- and gratned, the protest get all the attention

7    but we do this all the time.  We just did it with some back

8    to school book giveaways, and when we find out there's

9    going to be a large crowd.  I think a few weekends ago, we

10   had to shut down Hickory Hill on an event that was on

11   private property that spilled out into the street.  It was

12   posted on social media.  And you know, it just people

13   showed up from everywhere.

14        I give you another perfect one.  When it was posted

15   that Z'Bo was going to pay light bills, and people showed

16   up all over the city, and  people are calling me going,

17   Director, what is going on.  I'm like, I don't know what

18   you're talking about.

19        Well, they sent me a social media post where Z'Bo was

20   going to pay light bills.  I had to stop and deploy

21   officers all over the city because people were fighting

22   because they couldn't get in line.

23   Q.   You know, nobody in here needs to do it but for

24   purposes of the record, who is Z'Bo?

25   A.   Z'Bo was Zach Randolph.  He played for the Memphis

1    Grizzlies. People knew Zach had the money and that he could

2    do it.  People said I'm not leaving.  I'm going to let my

3    light bill paid.  So people were calling the police

4    department to private property saying people are fighting.

5    You need to do something about this.

6        I called the Mayor.  Ursula Madden called and said

7    what are we going to do.  We got to put something out and

8    tell people this is a hoax.  We put it out.  They still

9    would not go home.

10       So that's another great example.  You know, and

11   granted the protest get all the attention, but it's just

12   not true.  We worry about any event where there's going to

13   be a large presence of people and that someone could get

14   hurt, and the MLGW, the back to school, the book giveaway

15   that was just done a few weekends ago, Chief Don Crowe

16   spent all day preparing for that when we heard about it

17   because we knew that there could be rival gang members at

18   this event.

19       It was one with of our local rappers.  We would knew

20   there would be a lot of people at the event and we knew it

21   would spill out, but the Memphis Police Department shut

22   down Hickory Hill.  We inconvenienced the other public, but

23   we did it to make sure that event could be safe.  We wanted

24   the kids to go into a new school year saying that, wow, the

25   police let this event go down.  It turned out to be a

1    concert, something we should have shut down.

2         And so I spent my whole Saturday talking to Chief

3    Crowe going everything's cool.  Don't -- let it go.  We

4    want them to have their event.  The kids get their school

5    books and their backpacks.  And, you know, we spent a lot

6    of resources from that because we pulled officers from all

7    over the city to keep that event safe.  It lasted for four

8    hours.

9    Q.   Now let me focus back on one particular point.  Are

10   you confident that in these interactions, at least those

11   done at your direction and with your understanding and

12   based on your best practices approach, are you confident

13   that these outreach efforts that would be made to event

14   organizers on private property where there may not be a

15   permitting ordinance even required -- are you confident

16   they weren't done for the purpose of chilling or

17   intimidating these individuals from expressing their First

18   Amendment Rights?

19   A.   I am 100% confident.

20   Q.   Now let's go to an event that was scheduled to be on

21   private property on July 10, 2016.  You remember that date,

22   don't you?

23   A.   I will never forget that date.

24   Q.   Now, was there another event planned that day in the

25   city that was creating -- giving you a little heartburn as

1    the police director?

2    A.   Well, there were two events.  We knew that the Sons of

3    the Confederate Veterans were going to celebrate Nathan

4    Bedford Forest's birthday in Health Sciences Park.  They

5    had done that.  We weren't overly concerned.  I knew that

6    that event could turn into -- very rapidly it could turn

7    into a volatile event that was potential for volatility

8    because there was so much tension going on surrounding the

9    shooting of African-American men in the nation, and now you

10   have --

11   Q.   Was this -- were we approaching the one-year

12   anniversary of the Darrius Stewart shooting?

13   A.   We were.  We were.

14        But we were getting information that there could be a

15   threat to that event by someone showing up that did not

16   have the same views and there could be acts of violence.

17   So we made sure that we had officers present and that we,

18   you know, monitored that event, kept an eye on it to keep

19   it safe.  And at the same time, at the FedEx Forum, we knew

20   that the permission had been given by the FedEx Forum

21   officials to allow for a protest to occur on their

22   property.  And matter of fact, I was standing there when

23   the protest started, much to my surprise when the crowd

24   suddenly swelled from, you know, 20 to probably 220.  And I

25   was invited to speak at that particular event.

1  Q.   Now, can you -- we've seen some abridged footage that

2  we don't need to see again of the sort of march to the

3  bridge but can you give us an overview of how rapidly

4  things moved that day once the crowd started to spill out

5  from the FedEx Forum on to the public thoroughfares and

6  what you did in response?

7  A.   Well, that's an interesting day.  So, I mean, this was

8  a day unlike I've ever seen.

9       If you think I stopped by the FedEx Forum on the way

10  to WLOK.  I had an interview scheduled at 6:00 at WLOK,

11  which is the oldest black radio station in Memphis.

12      I stopped by and I was talking to two of my

13  commanders, Keith Watson and Gloria Bullock, that were

14  there, you know, trying to make sure that -- you know, we

15  knew we had two events.  We had a Black Lives Matter rally

16  at the FedEx Forum and a celebration of Nathan Bedford

17  Forrest very -- in close proximity.  So we were concerned

18  about the possibility for some type of spillover, either,

19  you know, someone that totally disagreed with what was

20  happening at the FedEx Forum and committing act of violence

21  or someone going to the park that was in total disagreement

22  with the Sons of the Confederate Veterans and some type of

23  act of violence occurring.

24      So while I was standing there talking to them, talking

25  to some other individuals, I heard a loud noise and

1   suddenly I think 200 individuals suddenly turned toward me

2   from Beale Street and walked up to the FedEx Forum, and I

3   remember saying, this could get interesting; and it did.

4   Q.   What was your reaction to the events that were

5   occurring that day?  Where did you go to try to help best

6   manage the situation?

7   A.   So I knew the Colonel Bullock, Keith Watson were very

8   capable.  They had officers stationed around the area to

9   keep the events peaceful.  So after I was asked to speak, I

10  think Frank -- most people know him as Frank Gotti.  Frank

11  Gibson asked me did I want to speak.  Here were my words to

12  Frank.  I said, Frank, it's your event.  I said I'm not

13  here to speak.  I just came by to check on things.  He

14  asked me to speak, and I think I started talking on the

15  little PA system.  I think some folks in the crowd yelled

16  me down, and I said well, I'm going to go ahead and go to

17  my interview.

18       So I went to the interview, and it was just so many

19  people downtown.  It was strange because on a Sunday it's

20  just not that many people downtown.

21       I called Deputy Director Ryall, and I said, hey, what

22  are you doing?  He said, nothing.  I said, put your uniform

23  on and get downtown.  He said, why.  I said, I don't know.

24  Something is not right.  Just come downtown.  And I grabbed

25  my radio which I rarely do to go into a news interview.  I

1    grabbed my radio, turned the radio on, and I was preparing

2    for my interview at 6:00.  And I distinctly remember Keith

3    Watson giving situational updates.

4        The crowd when I left was probably 220, and all of a

5    sudden Keith said 300, 400, 500.

6        I'm going, oh my God, where did all these people come

7    from.  Then I remember Keith saying, they're going mobile.

8    And I was about to go on the air and I told I think

9    Bobby -- I can't remember Bobby's last name right now.  I

10   said Bobby, I got to go.  I don't know what's going on but

11   it doesn't sound good, and I left and went to the Real Time

12   Crime Center.

13   Q.   Now did there come a time when you were, I guess,

14   observing the activities at the Real Time Crime Center that

15   you actually went down to the scene?

16   A.   So when I went to the Real Time Crime Center, we know

17   that there are a number of screens.  They have the ability,

18   Judge, to pull up all types of media, and I went into the

19   Real Time Crime Center and they were watching the news,

20   going -- you know, they're in awe with what's going on at

21   the bridge.  I'm going, y'all are watching the news.  We've

22   got cameras on the bridge.  There's critical

23   infrastructure.  Pull up the cameras, and they pulled up

24   the cameras and I just said oh my God, this is terrible.

25        A lot of people don't know, we shut that bridge down

1   all the time.  Judge, most of the time it's for a jumper.

2   Someone goes to the bridge.  They threaten to the jump or

3   it's a critical accident.  I've been on the bridge.  I know

4   that you can easily fall off the bridge.  I know that the

5   bridge is not made for pedestrian traffic.

6       I was worried about someone who did not want to be

7   inconvenienced by a protest shutting down the bridge and

8   they stepped on the gas and rammed and killed a large

9   number of people.

10      I just came back from Washington, DC with Sean

11  Bolton's family escorting them through National Police Week

12  where you honor all the fallen officers from all over the

13  nation.  I did not want to have to escort another family to

14  Washington DC.  Unfortunately did not happen.  Sergeant

15  Verdell Smith was ran over on Beale Street after an

16  individual shot people, three people.

17      So the whole issue of vehicle rammings, and people say

18  why are you worried about that, it was a real -- these were

19  real things going on and real time.  I didn't want anybody

20  to get killed that day.  And so I looked at that bridge and

21  to me that was my ah-ha moment, and I just couldn't believe

22  what I was saying.  I didn't want someone to die.

23      And a lot of people, you know, show up to places and

24  they don't really know the threat, but I knew the threat.

25  I've been on the bridge.  I knew that that could be a

1    catastrophic situation.  If it was a shoving and pushing

2    match that broke out with law enforcement and shots could

3    have been fired.

4    Q.   On that subject, on that subject, were you getting

5    intel -- did you have -- I think you said you had some

6    undercover officers observing the event at FedEx Forum?

7    A.   Well, there were plain clothes officers there, too.

8    Q.   That's what I meant, plain clothes.

9    A.   Again, I have to keep this in perspective of what was

10   going on at that time.

11   Q.   But had you received reports about --

12   A.   Yes.

13   Q.   -- possible weapons?

14   A.   Yes.  Officers had been killed in Dallas.

15   Q.   I'm talking about that day with a crowd.

16   A.   Yes.  There was information from I think some of our

17   multi-agency gang unit individuals that there were armed

18   individuals on the bridge.  When I got to the bridge, I saw

19   people that I recognize.  I assumed that they were armed.

20        I was probably the most unarmed person on the bridge.

21   I had a little five-shot revolver on my ankle because I had

22   my church clothes on.  We weren't prepared for an event of

23   that scale.

24        Let's go back to the bridge.  This is important.  That

25   we know the potential for an event to get out of control.

1    If a thousand people are on the bridge, on the bridge

2    between Memphis and Arkansas, it is totally out of control.

3        I did not want any of our officers deployed tear gas

4    or pepper spray.  I spent ten years at the Training

5    Academy.  I know what people do when you expose them to

6    tear gas.  I've exposed most of the department to tear gas,

7    sprayed them with pepper spray in their training.  I know

8    what could have happened.

9        We were very concerned about a catastrophic situation,

10   and I just did not want it to happen on my watch.  I did

11   not want us to rewrite Memphis history.  We already have

12   enough negative history.

13   Q.   Now, in terms of best practices, was it a best

14   practices recommended or even wise move for you to

15   personally go down to the scene?

16   A.   I'm a 30-year military veteran.  The commander is

17   never supposed to be on the ground in the middle of a

18   situation because the commander's supposed to command and

19   deploy resources, but when I saw what was going on, I

20   kidnapped a lieutenant and said, you're coming with me, and

21   I gave instructions for what I wanted the individuals at

22   Real Time Crime Center to do, to make sure that our

23   officers have situational awareness.

24       I think I may have called Deputy Director Ryall and

25   said get everybody down here that we possibly can and then

1    a lot of officers self deployed.  They saw what was going

2    on the news and went, oh my God, that looks bad.

3        So I originally went from the Real Time Crime Center

4    to declare the staging area at juvenile court.  I knew it

5    was a big parking lot.  We can get all of our officers

6    there, and then we tried to devise a plan and say, okay,

7    how can we mitigate this so that there's no loss -- no loss

8    of life and that no one's injured.

9    Q.   Did you have a vest on?

10   A.   I had a vest in my trunk that I carried for emergency

11   situations.  So I put my vest on and grabbed -- like I

12   said, I grabbed the lieutenant.  I think I kidnapped

13   another K-9 officer because, you know, he said how can I

14   help.  I said you can't help because we're not taking any

15   police dogs anywhere around this crowd.  There's not going

16   to be any fire trucks.  There's not going to be no water

17   hoses.  I said, we're not going to do any of that.  So park

18   your car, you come with me, too.

19       And I tried to, you know, grab a team together and

20   say, okay, let's get up there so we can -- because at that

21   time they're like 20, maybe 30, police officers pretty much

22   holding the line on the bridge between what I estimated to

23   be a thousand protesters on the bridge.

24       So the plan was to go up and try to go support them.

25   We got to the bottom of the bridge, and our plans changed

1    rapidly.  The protesters said,  Director, we respect you

2    but we ain't moving.  I said this is going to be

3    interesting.  But there were individuals beating on the --

4    on the windows of the cars trying to get to the white

5    police officers, and I told Colonel Hines, I said, you stay

6    with these guys, don't let them get out.

7         I picked two African-American police officers -- I

8    think Officer Ross, Officer Franklin -- and said we're

9    going to walk up.  We're going to walk through the crowd.

10   And they looked at me said we're going to do what.  I said,

11   we got to get from here to here.

12        Another young man came up that I didn't know, a very

13   large African-American male, said, Director, what do you

14   need?  I said I need to get from here all the way up to

15   here.  He said, I'm with you and he pretty much led the way

16   and helped us navigate through the crowd until we got up to

17   the top of the bridge.

18   Q.   All right.  And now once you got up to the top of the

19   bridge were you able to discern, I guess, a group of people

20   who maybe -- I don't know if in charge is the right word --

21   but at least seemed to be organizing or able to move people

22   one place to another?

23   A.   Well, individuals had told me they organized this

24   protest.  I specifically remember meeting Keedran.  Matter

25   of fact, me and Keedran walked off the bridge drinking from

1    the same water bottle.

2         I knew Earle Fisher before then.  Earle was my

3    fraternity brother.  I have seen Earle speak, a very

4    intelligent, articualte young man.  So me and Earle had

5    conversation.

6         I didn't really know Frank Gotti other than knowing

7    him from meeting him at the FedEx Forum.  I've heard about

8    him.  I knew he was doing some work.  Stopped I think put

9    your guns down, fight like a man, stuff in the community.

10        The other -- Davante Hill, so Davante Hill presented

11   himself as one of the key organizers of the event and I

12   just asked him some simple questions.  I met a bunch of

13   people that didn't want to talk to me and wanted to have

14   nothing to do with me and I immediately quit talking to

15   them and moved on.

16        But here was my question to the group.  I said, okay,

17   guys, tell me what you want to accomplish in the next hour.

18   Director, we want this.  We want this.  We want the Mayor

19   and we want this.

20        And I said, that is not going to happen in the next

21   hour.  I said, we have to get off this bridge.

22        What I did know is that Arkansas State Police,

23   Tennessee Highway Patrol, Shelby County Sheriff, I knew

24   there was talk between the governors of Arkansas and

25   Tennessee saying, get that bridge cleared.  You know, this

1    is critical infrastructure.  It is the major thoroughfare

2    between Memphis and Arkansas.  You can only cross the

3    Mississippi River in so many places.

4         Even with that going on, I did not want somebody to

5    die over something that we could do at another location.

6    And I asked, I said, Folks, can we take this somewhere

7    else? I said, let's go to 201 Poplar.  We'll block off both

8    sides of the street.  We'll talk night but we can't do it

9    on this bridge.

10         There were babies in carriages.  There were what I

11   call hand babies because the mothers are toting them.

12   There were toddlers.  I said, oh my God.  Y'all going to

13   get these kids killed.  This is no place for children to

14   be.

15         So a lot of people thought it was just a big old

16   party.  There were police officer children on the bridge.

17   There were all types of folks, clergy.  It was just a

18   mixture of folks that I think they really wanted to be part

19   of something.  They wanted their voices to be heard, but I

20   said, guys, I get it but you can't do it on this bridge.

21         I recommended that we would go to 201 Poplar.  That

22   didn't float at all.  I think I allowed Davante Hill to get

23   on our police PA system.  Davante asked the crowd about

24   going to 201 Poplar.  The crowd sent back some explicatives

25   and said we ain't going to 20 is Poplar.  I think they

1    thought we tried to set them up for an arrest event.  Said

2    how about the National Civil Rights Museum.  They didn't

3    like that, and then finally it was agreed that we go to the

4    FedEx Forum.

5    Q.   Let me interrupt for just a second.  People thought

6    you may be setting them up for an arrest event.

7         This was about as a clear a violation of permit

8    ordinances and various other ordinances and laws as you can

9    imagine; right?

10   A.   Yes.

11   Q.   And you actually were able to identify individuals who

12   openly associated themselves as being the leaders and

13   organizers of this march on the bridge; right?

14   A.   Yes, yes.

15   Q.   And did you direct that any of them be arrested for

16   this event, for this incident?

17   A.   No.  That wasn't the time and place for that.

18   Q.   Did you do it afterwards?  Were they ever charged with

19   a criminal -- any type of criminal act relating to the

20   takeover of this bridge?

21   A.   No.

22   Q.   They could have been, couldn't they?

23   A.   Yes.  It was considered.

24   Q.   And by the way, applying best practices law

25   enforcement -- you've seen the video of the bridge, haven't

1   you?

2   A.   Yes.

3   Q.   Helicopter video.

4   A.   Yes.

5   Q.   Applying best practices, there could have been several

6   occasions where law enforcement deployed things such as

7   tear gas or other types of measures to disperse the crowd

8   on that bridge?  Is that not true?

9   A.   That would be a tough one.

10      When we got on that bridge, if we deployed tear gas,

11  some folks would have jumped off the bridge.  Some of them

12  would have been police officers.  I have no doubt that

13  someone would have got pushed off the bridge.

14      What a lot of people don't know that -- you know, I

15  was there, and I've trained all the officers on how to

16  deploy tear gas.  I would consider myself probably the most

17  educated or the most -- the person with all the

18  certifications, with military, with all my law enforcement

19  training.  I know how things should be and how they should

20  not be deployed.   That was really not an option.

21      And then there were another group of what I estimated

22  a thousand more people coming to the bridge.  So that could

23  have been catastrophic.

24  Q.   And I'm not for a second saying it should have been

25  done.

1    My point is that it -- applying conventional law

2    enforcement tactics, not being on the scene, it could have

3    been something someone else decided, maybe we need to do

4    this; right?

5    A.   Yes.

6    Q.   And what about the -- if the Tennessee Highway Patrol

7    had shown up, if the Shelby County Sheriff's Department had

8    sent -- deployed a team to come disperse the bridge, could

9    that have led to some significant disruption and problems

10   in that crowd?

11   A.   Yes.  I thought that that situation could make Selma,

12   Alabama look like a day at the park.  We would have

13   rewritten history for the City of Memphis and possibly the

14   nation, and I did not want that to happen.

15        So were we authorized to deploy tear gas?  Yes, a

16   number of times.  When officers were trying to block the

17   individuals from taking over the bridge, officers showed an

18   enormous amount of restraint.

19        The group went around the officers to another entrance

20   and got on the bridge.  Were officers authorized to deploy

21   pepper spray when individuals were jumping up and down on

22   someone's cars threatening their safety, when the

23   individuals did not abide by the orders of the officers,

24   without a doubt they're authorized by policy, by best

25   practices, but sometimes what's authorized is not the best

1    decision and I'll stand by what we did that day.   That was

2    not the day to rewrite Memphis history.

3        And I'll give some of the individuals on that bridge

4    credit because I think we got to a point where many of us

5    wanted to resolve this.

6        So the people that I walked off that bridge with, I

7    commend them for us working together.  I just wish we were

8    still -- I just wish the unity we had at that moment we

9    still had it today because we would be accomplishing a lot

10   of more positive things and Memphis would not be

11   experiencing the level of violence that we are today.

12   Q.   Well, I was just going to address that point.

13       The fact of the matter is, these individuals who

14   identified themselves as the leaders of the group that went

15   on the bridge, at the point you got there, they were quite

16   helpful in resolving the situation, weren't they, at that

17   point in time?

18   A.   Yes.

19   Q.   And appeared to have very good motivations and

20   intentions.  They did not appear to want any violence up on

21   that bridge, did they?

22   A.   No.

23   Q.   All right.  But large scale events like that, when

24   they get out of control, sometimes can't be controlled; is

25   that a fair statement?

1    A.    Oh, that event was not control.  So there could have

2    been any spark.  An accident.  If someone would have

3    accidentally fell over the rail, I do believe that someone

4    would have thought the police pushed someone over and all

5    heck would have broke loose on that bridge.

6    Q.    Let's move on from past the bridge.  During the days

7    and weeks after this encounter of July 10, 2016, describe

8    for us what the atmosphere was with respect to the Memphis

9    Police Department and how it intended to manage large scale

10   protests and demonstrations and spontaneous events, many of

11   them unpermitted as the record reflects?

12   A.    So it was tense before the bridge.  You know, Dallas

13   officers had been killed.  The same day that the Dallas

14   officers were killed during a protest event an individual

15   in Bristol, Tennessee fired upon four individuals.  One was

16   killed.  Two other individuals were shot, and a police

17   officer responding to that incident was shot.

18        So you had all these incidents were constantly getting

19   information that threats to law enforcement.  Poster being

20   posted.  So it was tense.

21        We went to -- after the bridge incident, we went to a

22   Level 3 in my -- that's the only time, maybe after

23   Hurricane Elvis I think we went to a Level 3.  After

24   Hurricane Elvis went to a Level 3, if I recall, but the

25   only other time in my 28-year law enforcement career we

1    went to a Level 3 is after the bridge.

2         Here's what a Level 3 is:  Days off are cancelled for

3    everybody.  Everybody was required to wear their uniform,

4    if they were detectives or no matter where they were

5    assigned, they were in uniform.  I ordered all uniform

6    patrol officers to be doubled up, meaning that there would

7    be no one-man cars.  Everybody was required to wear their

8    body armor, and we stayed on a Level 2 from the 11th to the

9    24th of July.

10             **THE COURT:**  Stayed on Level 3 or Level 2?

11             **THE WITNESS:**  Level 3.  I'm sorry, Judge.  It was

12   a Level 3.

13             **THE COURT:**  Sure.

14             **MR. WELLFORD:** I'd like to move into evidence the

15   July 21, 2016, memorandum from Lieutenant Michael Rosario

16   to Lieutenant Albert Bonner containing references to the

17   director's instructions.

18             **THE COURT:**  Without objection, we'll mark and

19   receive that.

20             (WHEREUPON, the above-mentioned document was

21   marked as Exhibit Number 115.)

22             **THE COURT:**  It will be marked as 115 and

23   received.

24   BY MR. WELLFORD:

25   Q.   You referenced this time frame in your orders about

1    wearing vests and other things.  This is a memorandum from

2    Lieutenant Michael Rosario to Lieutenant Darren Goods on

3    July 21, 2016, and actually it's from Rosario to Bonner of

4    2016 forwarding an e-mail from Rosario to Lieutenant Darren

5    Goods, and it references a weekly staff meeting.

6        What are these weekly staff meetings?  Is this

7    something that you're involved in?

8    A.    Yeah.  I think that was a TRAC meeting that the

9    attorney was speaking about earlier.

10   Q.    All right.  And so here we've got as of July 21, as

11   noted, there's reference to "The director emphasizes

12   everyone where their vest."  Do you see that?

13   A.    Yes.

14   Q.    And you think that was pretty much the case at least

15   for the next several days?

16   A.    Without a doubt.  I encourage them to wear their vest

17   all the time, but definitely during that time it was

18   mandated.  Our current policy says that uniform patrol

19   officers are required to include uniform patrol

20   supervisors, and we don't require that, you know, our

21   commanders like myself, you know, wear a vest every day;

22   but during certain times we will require that you wear it

23   and that was one of those times.

24   Q.    And there's a reference here to "GD and VLs have made

25   unverified threats."  What is that reference?

1    A.    That's a great one.  It goes back to what I was saying

2    that Tennessee Fusion, FBI was reporting that, you know,

3    they had unverified threats that the Gangster Disciples and

4    the Vice Lords had made unverified threats to shoot law

5    enforcement.  But if you look, I mean, this really puts it

6    in -- really puts it in perspective.  There was an incident

7    where fireworks had been set off under an officer's car.

8    If I remember during that time a squad car from the North

9    Precinct had been shot with gunfire that we discovered.  We

10   know that a fake bomb had been thrown under a squad car in

11   New York.  We wanted to review and make sure officers were

12   safe.

13       We were telling officers, look, door not wear a

14   uniform to and fro work.  Don't go out in shopping areas.

15   You know, we're saying if you got a take-home car, you may

16   not want to take it home.  You don't want to bring it

17   attention to yourself.  People are targeting law

18   enforcement.  We don't want you to be targeted.

19       And remember in 2016, 21 officers were ambushed, the

20   highest number of ambushes in two decades.  So '16 was a

21   very volatile year.

22       Inspect everyone's vest and all their equipment.  We

23   wanted the supervisors to check and make sure that the

24   officers wore their vests and they had their equipment.

25   Q.    All right.  Now even after you came off of the Level

1    3, was there a heightened level of concern and urgency

2    associated with trying to understand who is going to have a

3    protest on a hot-button issue, where and how many people

4    might come -- might show up for the next several months?

5    A.   Without a doubt, until today we are still concerned,

6    especially after Charlottesville on who can show up and

7    making sure that we deploy adequate resources to prepare

8    for events that you don't necessarily think would happen

9    but you know that there's always a potential that things

10   could turn volatile.

11   Q.   Okay.  Now you mentioned Charlottesville.  And did the

12   events in Charlottesville which occurred in 2017 actually

13   inform -- have you read the Charlottesville report?

14   A.   Yes.

15   Q.   And did it inform you and help you guide you toward

16   developing operational plans which the Department's

17   actually put in place for hot-button issues, specifically

18   the removal of the Nathan Bedford Forrest statue?

19   A.   Yes.

20   Q.   And is the motivating factor behind these operational

21   plans and studying these other jurisdictions, is it to

22   enable you to try to protect -- protect the public, protect

23   protesters, protect counter-protesters?

24   A.   Without a doubt.

25        **MR. WELLFORD:**  Your Honor, I would like to move

1    into evidence the independent review of the 2017 protest

2    events in Charlottesville which is Defendant's 81.

3              **MR. CASTELLI:**  Actually, Your Honor, I object to

4    the relevance of this.

5              **THE COURT:**  It's irrelevant, Counsel.  That's

6    simply not relevant in the case.  All this is important but

7    it's not relevant.  So objection sustained.

8              **MR. CASTELLI:**  Thank you, Your Honor.

9              **MR. WELLFORD:**  We would like to mark it for

10   identification for purposes of the record.

11             **THE COURT:**  Sure.  That's always fine.  We'll

12   mark it as 116 for ID only.

13             We do need to take a break in a couple minutes so

14   we're going to go for about another 15 minutes and we will

15   take a break at that time, maybe 20.

16             (WHEREUPON, the above-mentioned document was

17   marked as Exhibit Number 116ID.)

18             **THE COURT:**  Are you about to wrap up?

19             **MR. WELLFORD:**  Yes, sir, I'm not far.

20             **THE COURT:**  Maybe we can conclude the Director's

21   testimony.  That would be good.

22   BY MR. WELLFORD:

23   Q.   Do you recall, was there a heightened concern in the

24   aftermath of the bridge over threats to infrastructure,

25   critical infrastructure in the City of Memphis?

1    A.    Yes.

2    Q.    Can you give me some examples of what those types of

3    threats were that you would be concerned about after the

4    bridge incident?

5    A.    I'll give you a great example.  During that time

6    period we were receiving threats that the utility grid

7    could be attacked.  There were threats -- and I'm not sure

8    if they were attempts to hack our computer system.  That

9    definitely happened in Ferguson.  We knew that was a

10   possibility.  And also there was some vandalisms in -- to

11   some MLGW sites.  One in particular was out off Germantown

12   Parkway.  Individuals threw some very large rocks inside

13   the gate toward one of the transformers or -- you know, I

14   don't know all the MLGW, you know, terminology of how they

15   manage the grid, but that was a definitely heightened

16   concern about some threats to public safety and

17   infrastructure.

18       We're always concerned about the bridge.  The bridge

19   has always been an issue because, you know, after 9-11

20   there was some information that terrorists could possibly

21   target the bridge with a vehicle-bourne IED, and if we know

22   that if the bridge was damaged or became impassable, we

23   could -- if either bridge that you attack, especially the

24   old bridge, you could cripple interstate commerce, railroad

25   commerce.  We know that there are lines of communication,

1    fiber optics, all throughout the bridge.  So the bridge is

2    always of concern to us because of its importance.

3         And Memphis is part of the port safety, the national

4    infrastructure defense kind of plans.  So we're always

5    concerned about being able to protect infrastructure within

6    the city.

7    Q.   Do you recall an event on January 16, 2017, where

8    protesters needless to say without a permit appeared at

9    the -- and shut down the entranceway to the Valero Refinery

10   in Memphis?

11   A.   Yes.

12   Q.   Is the Valero Refinery considered a critical part of

13   infrastructure in Memphis?

14   A.   Valero is not only critical to Memphis but the entire

15   Mid-South area.  So that was deeply concerning to us

16   initially because we did not know what was in the barrels.

17        **MR. WELLFORD:**  Your Honor, I'd like to move into

18   evidence -- we've had a video already marked into evidence.

19   I've got photographs of the Valero protest which was --

20        **THE COURT:**  Sure.  We'll mark that as 117.

21        (WHEREUPON, the above-mentioned document was

22   marked as Exhibit Number 117.)

23   BY MR. WELLFORD:

24   Q.   Did you personally get involved in investigating and

25   directing an investigation into the Valero incident?

1    A.    I definitely authorized an investigation into the

2    Valero when I heard what was going on.  I think I

3    immediately dispatched my personal assistant.  I knew that

4    he had received training on defeating these types of

5    devices, and I didn't think that members of the Memphis

6    Fire Department had received any training.

7         We sent people down to Addison, Alabama, Center For

8    Domestic Preparedness, to learn how to deal with these

9    devices.  So he immediately went down there.  I sent Chief

10   Garrett down there and made sure that we first -- and also

11   the first thing I said, slow down, get a bomb dog, notify

12   fire haz-mat because, those barrels, we don't know what's

13   in those barrels.  Make sure that it's safe for our first

14   responders before we get deep -- deeply involved in this

15   because there have been some instances where protesters

16   have put biological waste.  Some have left explosive

17   materials in these devices, and I didn't want them to

18   suddenly unhook, leave and then there would be a detonation

19   at Valero because, I mean, that could have easily shut down

20   Valero.

21   Q.    What are we looking at right here in this photograph,

22   if you know?

23   A.    From what I recall, that's the fire -- you see all

24   those sparks.  This particular protest device has what's

25   called a sleeping dragon inside.  It's a metal tube or a

1    plastic tube with a bolt where the protester can connect in

2    with a carabiner.  It connects them with the chain.  So law

3    enforcement can't pull them out of there.

4         The protesters can release if they so choose or like

5    this individual who refused to release had to have fire

6    come with a cutting device and cut them out of that

7    particular device.

8    Q.   Did the fire department officials and the Memphis

9    Police Department officials responding to the scene here

10   know what was in those barrels?

11   A.   No.  You don't know until you -- well, we had the bomb

12   dogs.  We have some other devices that can help detect

13   explosive material.  Fire, haz-mat.  We have one of the

14   best haz-mats in the nation, and they had also received

15   training on how to defeat these devices, but I also heard

16   that they may have gone up on YouTube and learned also

17   before they started.

18        Like I said, my assistant was there to help them, but

19   no one knew what was inside those barrels.  You don't know

20   until you cut them open, and actually since that incident

21   has occurred, we brought FEMA back here to train fire and

22   police on how to defeat these devices.

23   Q.   And I'm showing the second page of the collective

24   exhibit and turning to the third page of the collective

25   exhibit.  I'm not going to go through these except to the

1     extent you need to comment specifically on them.  This is

2     the third page of the collective exhibit.  The fourth page

3     of the collective exhibit.  And feel free if there's

4     something that you want to comment on with respect to the

5     safety or cost of the operation, feel free to do so.

6     A.   Well, you know again, when these events happen, we

7     shot down something.  We effectively shut down the Airways

8     Station.  We have limited number of officers patrolling so

9     we're pulling commanders.  We're pulling fire out of their

10    normal duties.  That Valero incident lasted quite a while

11    from start to finish.  We pulled quite a bit and I don't

12    remember the exact cost of that, but some reason I'm

13    thinking it was around 30 to $40,000 for just that one

14    single event because we pulled so many resources just to

15    deal with that.

16    Q.   Move to the fifth page of the photographs.

17    A.   As I said, this is one of the things we learned in

18    training is that, you know, you have to cut these things

19    open to find out.  If you see in this one -- and this was

20    probably one of the nicer ones.  They got trash, rebar, you

21    know, concrete; and these first responders can get hurt

22    while they're doing it.

23         A first responder could make a mistake and injure one

24    of the protesters, and we definitely don't want that to

25    happen.  We don't want to incur any additional liability.

1    We definitely don't want a first responder to get injured.

2    These folks are using cutting tools.

3         And if you notice that the Tennessee Highway Patrol is

4    standing behind them.

5    Q.   Excuse me.  Is that the previous photograph?

6    A.   No, no, the one you just showed.  I was trying to

7    figure out who those individuals were, and I just realized

8    that's Tennessee Highway Patrol.

9    Q.   This is the sixth page of the handout.

10   A.   And Memphis police officers, everybody is in awe

11   because we've not seen this.  This is something that folks

12   have done up north where they've down interstates in New

13   Jersey.  You see a lot in Washington, DC area where

14   different groups that are, you know, normally environmental

15   protesters are there, and I think we learned that some of

16   these individuals were what we call professional protesters

17   that go around.

18        We know that there was also a big standoff I think in

19   North Dakota with federal -- with federal agencies, and

20   that was a big standoff there for a while.  So this was a

21   pretty big deal.  This was another kind of ah-ha moment

22   what we thought would come, and then the protesters I think

23   told some our officers that they would be coming back.  We

24   thought we would see more of this.

25   Q.   And this Page 9 of the handout.  I'm not going to show

1    all of them.  I'm happy to pass it up if you would like.

2    But does this more or less show the scene after protesters

3    have finally been disengaged from the barrels?

4    A.   Yes.

5    Q.   All right.  Now do incidents such as the bridge

6    incident, such as the Valero shutdown that we've just

7    discussed, the threats to the infrastructure, is that a

8    motivating force behind concerns that you have about the

9    importance of monitoring social media, having boots on the

10   ground to figure out what's going on with threat and

11   protests, deploying on occasion plain clothes officers to

12   observe what's going on in the protest?  Is that what is

13   driving your behavior and your motivation with respect to

14   these incidents?

15   A.   Without a doubt.  I mean, we have to know what is

16   going on so we can deploy resources, so we can train, so we

17   can prepare because at the end of the day, our obligation

18   is to maintain public safety.

19   Q.   Last topic.  Director, Trial Exhibit 90 has previously

20   been marked as an exhibit in the case is an incident report

21   that concerns the establishment of a fake Twitter account.

22   That's what the record reflects, and an investigation into

23   the establishment of a fake Twitter account with the

24   complaint purporting to have been made by you.

25        Are you familiar with this incident?

1  A.   Yes, I am.

2  Q.   The third page of that exhibit references that

3  Mr. Rallings advised that a Twitter account was created, et

4  cetera.  Is that you that is making the complaint?

5  A.   Oh yes, that's me taht's making the complaint.  That

6  definitely was not me on the fake Twitter account.

7  Q.   Did you have a Twitter account at the time?

8  A.   No, I did not.

9  Q.   And can you -- what was the nature of this fake

10  Twitter account and why was it giving you heartburn at the

11  time?

12  A.   So if you go back -- well, the President is a great

13  example of the power of Twitter.  So I was concerned that

14  if someone had a fake Twitter account -- and I'll give them

15  credit.  The account looked good.  It looked legitimate.

16  And if they posted something inflammatory on that account,

17  that the city could suddenly erupt into something by

18  something that someone thought I said or some type of

19  belief that I had.  And we've seen all over the nation

20  where police chiefs are police officers.  We relieved

21  several officers of duty in 2016 for posting inflammatory

22  things on social media.  We discipline officers for that.

23      I did not want someone to post something where the

24  public thought it was me or something that was an official

25  position of the Memphis Police Department that could

1   inflame or cause more problems between us and the

2   community.

3        We already have enough challenges.  So I didn't need

4   anyone posting something on a fake Twitter account.

5        I'm very aware of what our role is in communicating

6   information in a timely fashion, accurate and important

7   information to the public.  We have official social media

8   pages.  We put out message throughout our PIO office.  I do

9   a large number of news interviews.  I'm very mindful of the

10  power of the words that could come out of my mouth because

11  I'm not speaking for Mike Rallings.  I'm speaking for the

12  Memphis Police Department.  I'm speaking for the City of

13  Memphis.  I'm speaking for law enforcement nationwide.  And

14  that's very important.

15       I was very concerned that someone would have the gal

16  and the audacity to open up a fake Twitter account and make

17  it look like an official account for the Memphis Police

18  Department.  That was very serious in my mind, and it still

19  is.  It's still an ongoing investigation.

20  Q.   I was going to ask, did you direct a criminal

21  investigation to be performed?

22  A.   I sure did, and I hope that when we find the person

23  responsible for that that they are prosecuted to the full

24  extent of the law.

25            **MR. WELLFORD:**  That's all I have.  Thank you, Your

1    Honor.

2              **THE COURT:**  Redirect?  Is this going to take ten

3    minutes or do you want a break at this time?

4              **MR. CASTELLI:**  I think we can get it done in less

5    than ten minutes.

6              **THE COURT:**  Then go ahead.  That's fine.

7                       **REDIRECT EXAMINATION**

8    **BY MR. CASTELLI:**

9    Q.   Director Rallings, just a few follow-up questions.

10             One, you had mentioned a term I was unfamiliar on and

11   I may be the only person, but Hurricane Elvis?

12   A.   Okay.  I'm sorry.  I should not have.  I think the

13   media gave it that name.

14             **THE COURT:**  I think everybody else knows what it

15   means.

16   BY MR. CASTELLI:

17   Q.   It may just be the Nashville lawyer that doesn't know

18   what that is?

19             **THE COURT:**  You want to tell him what it is,

20   Director.

21             **THE WITNESS:**  So I can't remember the exact year,

22   but we had what was called a windstorm, and it knocked down

23   a bunch of trees, power lines, and maybe Mike gave it that

24   name and called it Hurricane Elvis.  They started calling

25   it Hurricane Elvis, and it was a big deal for us because it

1    knocked down so many power lines.  So many people were left

2    where they had to either evacuate their homes because of

3    lack of utilities, but it was a big deal for us.

4         We put officers on a heightened state of alert

5    because we had so many intersections without power.  We had

6    neighborhoods that were being burglarized because

7    individuals took advantage of people not being in their

8    homes,  and so that was Hurricane Elvis.

9         **THE COURT:**  It was probably the largest sheer

10   storm ever to occur in this area and most of the city was

11   out of the power probably an average of 7 or 8 days.  Some

12   were not affected, and one person was killed.

13        **THE WITNESS:**  I can't remember.

14        **THE COURT:**  Employee of the University of

15   Memphis, I believe, died as a result of a tree crushing his

16   car.  But it was a very widespread event and is well known

17   in the area.

18        **MR. CASTELLI:**  Thank you.  That clears that up.

19        **THE COURT:**  It does sort of show the issue about

20   not knowing what's going on in other parts of the state.

21   BY MR. CASTELLI:

22   Q.  Well, Director, you -- also you had mentioned in your

23   examination an event for -- a Darrius Stewart event where

24   some agitators --

25   A.  Yes.

1    Q.   -- showed up.

2         Do you recall when that event was?

3    A.   It was in 2015.  In 2015 I was deputy chief over

4    Uniform Patrol District 1.  Mount Moriah precinct and

5    Ridgeway were two of my precincts.  So if I recall, I was

6    there.  I actually talked to -- I think may have spoken to

7    Tami Sawyer at that event.  We wanted to make sure that the

8    event -- I think a permit was pulled for that event.

9    Again, we were there and we actually ended up shutting down

10   a lane of the street because, you know, the protesters

11   started getting, you know, close to the sidewalk, started

12   getting close to the street.  We did not want anyone to --

13   I think we have 33,000 crashes in Memphis almost every

14   year.  We didn't want someone to veer off looking at the

15   crowd and run into the crowd or purposely try to target the

16   crowd.  So we had officers shut down a lane of traffic.

17   Q.   Thank you.

18        Just want to talk to you a little bit about the Valero

19   protest that you were going over with -- during your prior

20   examination.  We'll put these pictures back up.

21        This is a pretty interesting kind of sight.  What's

22   this blanket here for?

23   A.   To protect the protester.

24   Q.   Okay.  I just want to make sure that that's what's

25   going on.

1   A.   Yeah.  Let me explain more.

2   Q.   Clear it up.

3   A.   So what you don't see is on the other side is another

4   individual underneath that tarp, and I'm pretty sure Fire

5   didn't have two tarps or they would have tried to

6   completely cover this other individual, but here's what's

7   so important is that this individual can release and leave.

8   This individual is refusing to release from the device.  So

9   they're putting themselves at risk and also the

10  firefighters at risk by not releasing.

11  Q.   And we can agree that this type of conduct is criminal

12  behavior; correct?

13  A.   Without a doubt.

14  Q.   And they were charged criminally, were they not?

15  A.   Yes.

16  Q.   Have those charges resolved or are they still pending?

17  A.   I don't know.  I know that there was a lot going on in

18  court, but I don't know exactly the outcome of the trial or

19  the case.

20  Q.   Now outside of the individuals that had chained

21  themselves to these barrels, were there other people at the

22  protest observing or supporting them?

23  A.   Yes.

24  Q.   And they were -- were they -- where were they

25  positioned?

1    A.   I wasn't there.  I don't think I went down to that

2    particular incident.  Reviewing documents, I think there

3    was some individuals that went on social media live and

4    were encouraging more individuals to come down.

5         So, you know, without reviewing all that, there were

6    people all around in front of the Valero pretty much

7    supporting or helping to organize the protest.

8    Q.   Okay.  This was an incident where the protest was

9    declared unlawful?

10   A.   Yes.

11   Q.   And there's kind of a script that's read when that

12   happens by someone in the police department?

13   A.   Yes.  Correct.

14   Q.   And then the crowd that was -- that had gathered,

15   whether they were chained to a barrel -- well the ones

16   chained to a barrel obviously couldn't disperse but the

17   rest of the crowd was disbursed?

18   A.   I think it's important to note that the ones chained

19   to a barrel could disperse.  The could release from the

20   device whenever they're ready.  They chose not to release

21   from the device.  So anyone else, they could choose to

22   leave or they could choose to stay.

23   Q.   Are you aware --

24   A.   They were smoking in front of a gas refinery which is

25   just ridiculous and dangerous.

1    Q.    Are you aware of whether -- what actions the Memphis

2    Police Department took with regard to anyone from the media

3    trying to film the incident?

4    A.    I'm not aware.

5    Q.    Okay.  Just moving on.  There was an Exhibit 115 that

6    you were going through about -- I believe this is about the

7    Level 3 event that you had established.  I just had a

8    question on the second page of it.

9         Can you just explain to me what this entry is in this

10   document?

11   A.    Overtime?

12   Q.    Yes, sir.

13   A.    Obviously you'd have to ask Lieutenant Rosario what

14   the note was, but it says over 100K in Black Lives Matter

15   events.  Limit overtime when possible.  So as I said before

16   and I think that -- I think it's important to note that

17   there's been a lot of focus on Black Lives Matter events.

18   That focus was just a term that a lot of the event

19   organizers were calling themselves.  I think there are a

20   number of permits where someone, you know, pulled and said

21   it's going to be Fight for $15 and a Black Lives Matter

22   march.  And we were paying attention to the amount of

23   overtime.

24        I think the Council has continued today to scrutinize

25   my overtime.  Members of the media love to talk about the

1    amount of overtime that Memphis Police are spending to try

2    to keep people safe.  So we talk about overtime every

3    single week if not every single day, and we want to be good

4    stewards of the taxpayer dollars.

5          That brings up a great point about why --

6    Q.   Let me stop you there because I told the Judge I'd be

7    through in ten minutes and I want to move us along.

8                **THE COURT:**  Okay.

9    BY MR. CASTELLI:

10   Q.   Kind of -- you know, I'm jumping back and forth here

11   but back to the Valero protest.  There was a discussion

12   about sometimes the barrels or the barrels could possibly

13   have some kind of hazardous material or explosive material

14   in it?

15   A.   Yes.

16   Q.   And you had mentioned that there were instances of

17   this elsewhere in the country?

18   A.   Yes.

19   Q.   Do you recall specifically where those events

20   occurred?

21   A.   As I said, most of them in the Washington state area.

22   There was an event that occurred in New Jersey where

23   individuals suddenly stopped in the middle of traffic,

24   pulled off barrels.

25                **THE COURT:**  Let me just see, was it Washington

1    state or DC?

2              **THE WITNESS:**  Washington state.

3              **THE COURT:**  In the West Coast?

4              **THE WITNESS:**  Yes, sir.  Washington state and

5    definitely New Jersey, but a quick search on Google you can

6    pull up all types of information.  Actually we had an

7    incident similar that just occurred in Nashville where

8    individuals were using the sleeping dragon.  They didn't

9    use the barrel but part of the barrel's construction is the

10   tubes that they connect in Nashville.  I think Chief

11   Anderson sent out some information where he pulled like 70

12   police officers in to deal with that particular protest,

13   and his situation is similar to ours where we pulled

14   resources away from the public to deal with these incidents

15   and it jeopardizes public safety.

16   BY MR. CASTELLI:

17   Q.   Yes, sir.

18        My question was instances where they found explosive

19   or hazardous material inside these devices.  Can you -- do

20   you know which particular events?

21   A.   So I know from actually the trainers from the Center

22   for Domestic Preparedness which is a FEMA government funded

23   program to train first responders, they were just here a

24   few weeks ago at our Training Academy.  They spent several

25   days training our local first responders, fire and police,

1  on these devices.  They have told us I think inside their
2  instructional manual there are references to incidents
3  where protesters have put biohazard material or could have
4  put explosive-type materials inside of a barrel that could
5  threaten first responders.  The mere construction of these
6  devices are there --
7  Q.  I'm sorry to cut you off, but what I'm asking is if
8  you know of a specific?
9  A.  I can't remember a specific incident, but a quick
10  search on Google could get you the information you're
11  looking for.
12  Q.  Thank you.
13  And there was -- were there any materials or explosive
14  materials or hazardous materials found in the barrels at
15  the Valero protest?
16  A.  So I don't know the exact contents.  I don't know if
17  we sent them off to the lab, but there were things placed
18  in the barrel that could be hazardous to law enforcement.
19  Q.  Sure.
20  And then finally, there was the discussion about this
21  Twitter account.  Were the things posted from this
22  account -- I mean, they obviously -- were they -- were they
23  things you wouldn't have said?
24  A.  I didn't follow everything on that Twitter account.  I
25  think I asked my PIO to keep an eye on that account.  I'm

1    not on social media.  I've got too much stuff to do than to

2    worry about, you know, every single account.  I knew that

3    it was concerning to me.  I knew that I authorized an

4    investigation.  I know that the investigation is ongoing,

5    and I do know that if we can identify the individual

6    responsible we will prosecute them to the fullest extent of

7    the law.

8    Q.   Do you know who was -- do you have an idea of who was

9    responsible?

10   A.   I certainly do have an idea.

11   Q.   And who is that?

12        **THE COURT:**  That may be actually -- if it was

13   part of an ongoing investigation, we normally wouldn't

14   require that to be disclosed publicly, and Director, I just

15   don't know the situation there.

16        **MR. CASTELLI:**  We can just skip it.

17        **THE COURT:**  If it's on going, we typically --

18        **MR. CASTELLI:**  I think there's been other

19   testimony about it, so we can just skip it.

20        **THE COURT:**  Sure, sure.  I think we probably

21   ought to do that unless it's publicly known.

22        **THE WITNESS:**  I don't know, Judge.  I try not to

23   put out information that's not out in the public venue.

24   The individual knows who he is, and he knows that I know

25   that it's him.  And I just want him to know that we're

1    going to prosecute him to the fullest extent of the law if

2    we get the evidence that's required by the federal

3    government or the state government.

4         **MR. CASTELLI:**  I think those are my questions,

5    Your Honor.

6         **THE COURT:**  All right.  Well, Director, looks

7    like we're going to get you back to work.  So thanks very

8    much for being here.  We're going to let you be excused and

9    of course you can step down.  Thanks very much.

10        **THE WITNESS:**  Thank you.

11             (Witness excused.)

12        **THE COURT:**  We're going to take a break, our

13   morning break.  Hopefully we will pick the pace up a little

14   bit.  We will continue to have a shortened lunch break

15   until we're -- for today.  We'll see how we're doing the

16   rest of the time.  So we'll see everybody in at ten 'til

17   the hour and we'll see you at that time.  Thanks very much.

18             (Brief Recess.)

19        **THE COURT:**  All right.  We're ready for our next

20   witness.

21        **MS. FLOYD:**  Plaintiff calls Eddie Bass.

22        **THE COURT:**  All right.  If you would stand to the

23   podium and raise your right hand, you'll be sworn in.

24

25

1                              *   *   *

2

3                       **MAJOR EDDIE BASS,**

4   **was called as a witness and having first been duly sworn**

5   **testified as follows:**

6                        **DIRECT EXAMINATION**

7   **BY MS. FLOYD**:

8   Q.   Good morning.

9   A.   Good morning.

10  Q.   Can you state your name and spell it for the record?

11  A.   My name is Eddie Bass, E-D-D-I-E, B-A-S-S.

12  Q.   And what is your current role with the Memphis Police

13  Department?

14  A.   I am a lieutenant colonel assigned to the North Main

15  Station Police Precinct, where I'm assistant commander.

16  Q.   And how long have you been with the Memphis Police

17  Department?

18  A.   For 34 years.

19  Q.   And what did you -- tell us about how you joined the

20  Memphis Police Department.

21  A.   I joined the Memphis Police Department 34 years ago.

22  I started out as a police service technician.  I was one of

23  the originals in the first class and I progressed to police

24  officer in 1987, and subsequently I worked several

25  precincts throughout the city including Organized Crime

1    Unit and I ended up being promoted to sergeant in 2000, and

2    I subsequently got promoted to lieutenant in 2009, major in

3    2012, lieutenant colonel in 2016.

4    Q.   And focusing -- at a point during your career, did you

5    work with the office of Homeland Security?

6    A.   I did while I was assigned to the Special Operations

7    Unit.

8    Q.   And during that time what units did you supervise?

9    A.   During that time I supervised, when I first inherited

10   the Homeland Security team, the harbor patrol, the mounted

11   patrol -- harbor patrol, mounted patrol, office of Homeland

12   Security and the courts division.

13   Q.   And throughout the time at Homeland Security did you

14   gain any other units to supervise?

15   A.   I did.  I was elevated to active lieutenant colonel

16   special operations, and I then inherited the traffic

17   portion of it as well, which consisted of special traffic

18   investigation squad, the motorcycle division, the canine

19   unit, the tactical unit, the school crossing guards and the

20   police service technician division.

21   Q.   All right.  And so what percentage of your time was

22   dedicated to the Office of Homeland Security between 2016

23   and 2017?

24   A.   I would say probably 25-30% of my time was dedicated

25   to Office of Homeland Security.

1    Q.   And what did your team on the Office of Homeland

2    Security look like at the time? Who was it composed of?

3    A.   When I first inherited the unit it was a three-man

4    team.  It was two patrolmen and myself, which was then

5    Detective Stuart Frisch and Detective Philip Penny.

6    Q.   And over time, did the composition of your team

7    change?

8    A.   It did.  Detective Philip Penny was transferred to

9    investigations.  We brought over Tim Reynolds and over time

10   Detective Frisch retired and went to St. Jude, and we

11   brought in Sergeant Cornwell.

12   Q.   Did Penny come back to the unit for a period of time?

13   A.   He never did.

14   Q.   He didn't.

15        Okay.  And who supervised team directly?

16   A.   At the time it was Lieutenant Chandler because I

17   needed a lieutenant because my other duties became so

18   overwhelming I needed them to have direct supervision and

19   they would keep me abreast of what was going on.

20   Q.   And where was the Office of Homeland Security, the

21   physical office? Where was it located?

22   A.   We actually operated from the Air Support Unit, but I

23   believe when I inherited the team they were operating out

24   of Real Time -- had an office inside of Real Time Crime

25   Center.

1    Q.   And who did you report to in your chain of command?

2    A.   At that time I reported to Colonel Patricia Burnett

3    and then Deputy Chief R Lee Knight who heed up getting

4    promoted, then subsequently deputy chief Michael Hardy.

5    Q.   And between the period of 2016 to 2017 describe your

6    investigation, describe the Office of Homeland Security's

7    investigations into protest activity that was occurring.

8    A.   During that time we had duties, and I would say we

9    would address from three different standpoints.  We were

10   tasked with dealing with terrorism, criminal activity and

11   extreme weather and as time went on, as events were

12   emerging throughout the country, protests involved much of

13   our time.

14   Q.   Okay.  And when did that shift occur?

15   A.   Probably late 2015, going into late 2016.

16   Q.   Okay.  And was there any sort of -- was there any

17   policy for the Office of Homeland Security about what

18   type -- what events received the Office's attention?

19   A.   No policy, no, ma'am.

20   Q.   Okay.  And in the course of the operation of the

21   Office of Homeland Security, was there Joint Intelligence

22   Briefings that went out?

23   A.   There were.

24   Q.   And describe those for me.

25   A.   The Joint Intelligence Briefings initially began as a

1    format that was shared with the Shelby County Sheriff's

2    Department with any adverse information that would entail

3    criminal activity, terrorism, protest, any other potential

4    threats to law enforcement and the public.

5    Q.   Okay.  And did those Joint Intelligence Briefings

6    focus on any specific groups?

7    A.   No, ma'am.

8    Q.   Did they include events put on by Black Lives Matter?

9    A.   Some of them did.

10   Q.   My next exhibit will be an e-mail from you on

11   7-19-2016, and it is Pretrial 43.

12        Who determined -- who in the Office of Homeland

13   Security --

14            **THE COURT:**  Let's go ahead and give that a

15   number.  That will be 118.

16            (WHEREUPON, the above-mentioned document was

17   marked as Exhibit Number 118.)

18   BY MS. FLOYD:

19   Q.   And who in the Office of Homeland Security determined

20   the recipients of the Joint Intelligence Briefing?

21   A.   Once information was given to me from the team, I

22   would look it over, vet it, get with them, discuss it and I

23   would put it out based on the importance of it.

24   Q.   And but who -- how did you determine who received the

25   Joint Intelligence Briefing?

1    A.   Based on the area where we would determine where there

2    was a potential gathering and the commanders that ran that

3    particular area, and also we put the executive staff on

4    notice about what was forthcoming.

5    Q.   And were there individuals outside of law enforcement

6    who received the Joint Intelligence Briefing?

7    A.   Yes, ma'am.

8    Q.   And who decided to add -- how would someone who wasn't

9    within law enforcement get added to the Joint Intelligence

10   Briefings?

11   A.   Well, based on the location of some of the activities,

12   and there was a public safety law enforcement concern for

13   those respective businesses, and some of the information

14   was based on information put out on Facebook where the

15   demonstration would occur and what had planned.  They would

16   name businesses where these locations would take place at.

17   Q.   And so if someone -- if someone outside of law

18   enforcement -- if their business was not implicated by any

19   of the events in the Joint Intelligence Briefing, they

20   shouldn't have received the Joint Intelligence Briefing?

21   A.   Restate that again.

22   Q.   Should individuals outside of law enforcement only

23   have received a Joint Intelligence Briefing if their

24   business was affected by the events contained in it?

25   A.   Yes.

1    Q.   Okay.  So this is Exhibit 118 that we've just marked.

2    Is this an e-mail sent by you?

3    A.   It is.

4    Q.   And who received this e-mail? Not their specific

5    names, but what category of people is this that received

6    this e-mail, if it is one?

7    A.   This went to pretty much the law enforcement.  From

8    what I can tell, it went to the executive staff, to the

9    command staff, special operations.  It went to the Training

10   Academy.  It went to communications supervisors, the public

11   information officers, some commanders with particular would

12   have occurred.  It also went to emergency management

13   commanders and also other intelligence commanders in the

14   county and the state level and the state Homeland Security

15   Department.

16   Q.   Is this the list of individuals who received the Joint

17   Intelligence Briefing day to day?

18   A.   Yes, ma'am.

19   Q.   Okay.  And in this e-mail, are you responding to a JIB

20   that was sent out -- or a Joint Intelligence Briefing that

21   was sent out?

22   A.   I was.

23   Q.   And what is your comment about it?

24   A.   I was thanking Detective Reynolds and Chandler for

25   putting out this Joint Intelligence Briefing, and again I

1   commented "which served as a regional guide to area law

2   enforcement for current and historical intel reference to

3   the BLM encounters that we are often challenged to mitigate

4   public safety."

5   Q.   Thank you.

6        All right.  During your time at the Office of Homeland

7   Security did your unit submit training materials to the

8   Training Academy?

9   A.   We did.

10  Q.   And did your unit present Power Point presentations as

11  a part of that training?

12  A.   We did.

13  Q.   And did you provide presentations about protest

14  movements in Memphis as a part of those Power Point

15  presentations?

16  A.   We discussed that was part of some of our operations.

17  Q.   And did those events -- did those Power Point

18  presentations reflect on certain events within the protest

19  movement?

20  A.   I don't know in particular if they focus on certain

21  events, but I know they focused on the protest in general

22  as one of our responsibilities and duties.

23  Q.   Okay.  Do you recall giving a deposition in this

24  matter?

25  A.   I do.

1    Q.   And do you recall testifying that you believed that

2    some of the events -- some of the Power Point presentations

3    did go back and reflect on certain events?

4    A.   I believe so.

5    Q.   Okay.  Does that refresh your recollection about

6    whether you gave trainings on particular events?

7    A.   To a certain degree, unless I could actually review

8    that particular page of the deposition.

9    Q.   Well, what is your testimony today, whether you did

10   cover them or did not?

11   A.   I believe I did cover it, but I don't know to what

12   degree you're referring.

13   Q.   Okay.  Okay.

14        And my next exhibit will be an e-mail from you on

15   7-7-2016.

16              **THE COURT:**  Marked and received as 119.

17              (WHEREUPON, the above-mentioned document was

18   marked as Exhibit Number 119.)

19   BY MS. FLOYD:

20   Q.   How did the office -- thank you.

21        And how did the Office of Homeland Security interact

22   with the Real Time Crime Center in its day-to-day

23   functions?

24   A.   If we knew a particular gathering was going to take

25   place, whether it was permitted or not, we would ask Real

1  Time Crime Center to focus cameras in that particular

2  location, and maybe after hours, after our work hours ended

3  if they came across any other additional information from

4  Facebook or social media or any other open source material,

5  if they would send it to us in e-mail so we could go back

6  and revisit it and vet it to make sure that the information

7  is credible.

8  Q.   And did -- with the Court's permission, I'll approach

9  and let you look at this exhibit before we discuss.  It's

10  pretrial 104 -- 204.  I apologize.  204.

11      If you'll look up when you're ready.

12  A.   I'm ready.

13  Q.   I'll put it up on the screen for us to look at

14  together.  Is this an e-mail that you sent -- that you

15  sent?

16  A.   It is.

17  Q.   And is it in response to an e-mail from M. Grafenreed?

18  A.   It is.

19  Q.   Okay.  Let's go down and talk about this e-mail first.

20  Who is M. Grafenreed?

21  A.   That is an officer that is assigned to the Real Time

22  Crime Center.

23  Q.   And is it Mr. Grafenreed or Officer?

24  A.   Officer.

25  Q.   Officer Grafenreed, what is he sharing in this e-mail?

1    A.   She's sharing information from her work I guess in

2    attempt to monitor social media for any potential protest

3    or civil unrests that could occur in the Memphis area.

4    Q.   Okay.  And if you could start -- and just what does

5    this part of the e-mail indicate?

6    A.   "It seems based on their efforts, except for the most

7    part, Twitter users in Memphis are asking when the next

8    protest in Memphis is going to occur.  As of this writing

9    no information has been posted to Twitter about any planned

10   protest or any other event.  I did not see any posts

11   regarding rioting or civil disturbance.  Most seems to only

12   urge a call to action but nothing is specific."

13       And apparently they've attached a sample of the

14   Twitter traffic that they were reviewing.

15   Q.   Okay.  So this is the second page of the exhibit.  Is

16   this information or screenshot of that Twitter traffic?

17   A.   I believe so.

18   Q.   And is this a screenshot of a Facebook page similarly?

19   A.   It appears to be.

20   Q.   And who received -- who is on the recipient list of

21   the e-mail from Officer Grafenreed?

22   A.   The Homeland Security mailing list, the command staff,

23   Lieutenant Chandler, Detective Reynolds, Detective Freeman

24   from the joint -- from the JTT, Joint Terrorism Task Force;

25   Captain Jimmie Johnson from the Tennessee Highway Patrol;

1    Deputy Chief Collin Burress from the Special Operations

2    Fire Department; Dale Lane, the Commander of the Office of

3    Emergency Preparedness; and Mr. Keith Richard from Office

4    of Emergency Management; and Lieutenant Jerry Collard from

5    the Real Time Crime Center.

6    Q.   And my next exhibit will be an e-mail from Philip

7    Penny on 7-13-2016?

8             **THE COURT:**  Marked and received as 120.

9             (WHEREUPON, the above-mentioned document was

10   marked as Exhibit Number 120.)

11   BY MS. FLOYD:

12   Q.   And did the Office of Homeland Security detectives

13   investigate specific social media accounts?  What was the

14   basis for investigating specific social media accounts?

15   A.   The possibilities exist if there was a threat to law

16   enforcement or the possibility of another unpermitted

17   protest or gathering.

18   Q.   And this is Pretrial 234.

19        Is this an e-mail that Philip Penny sent to you and

20   others?

21   A.   It is.

22   Q.   And there's a second page here but it's just a seal.

23   I just wanted to show you there was nothing more in this

24   bottom e-mail before we go over it.

25        And can you describe this e-mail the beginning of the

1    thread, what's happening in this e-mail?

2    A.    Apparently there's information that the Office of

3    Preparedness had received, I guess, because of their

4    monitor they were submitting to us in Homeland Security.

5    Q.    And the Office of Preparedness, that's from Shelby

6    County?

7    A.    Shelby County, yes.

8    Q.    Okay.  And what's the subject line of this e-mail?

9    A.    It seems like they were -- it seemed like they were

10   monitoring Twitter accounts and it says for two freelance

11   journalists, one Commercial Appeal journalist who

12   apparently had the trust of BLM protesters.

13   Q.    And are these the Twitter handles of -- or the profile

14   names of those Twitter accounts discussed in the e-mail --

15   A.    I believe so.

16   Q.    -- of the journalists.

17         Okay.  So your next e-mail is -- is this an e-mail

18   from you -- and you state you're going to forward this

19   e-mail.  So why was this an e-mail that you forwarded to

20   your team to investigate?

21   A.    It was something to bring to their awareness based on

22   the information that had been discovered by the Office of

23   Emergency Preparedness.

24   Q.    And my question is why was that important for them to

25   investigate?

1    A.    During this period, ma'am, we were receiving

2    information from many people and what we would get we would

3    try to vet to see if it was credible or not.

4    Q.    And what is the -- what is the threat contained in

5    this e-mail that is being investigated?

6    A.    It doesn't appear to be a threat based on that

7    information.

8    Q.    Okay.  And this is the response that Philip Penny

9    provided to -- summarizing his investigation?

10   A.    Yes, ma'am.

11   Q.    Okay.  Thank you.

12         And my next exhibit is an e-mail from you on

13   7-12-2016.  It is Plaintiff's Pretrial 234.

14              **THE COURT:**  Marked as 121 and received.

15              (WHEREUPON, the above-mentioned document was

16   marked as Exhibit Number 121.)

17              **MS. FLOYD:**  My apologies, it's 223.

18              **THE COURT:**  It's marked as 121, just so the

19   record is not confused.

20              **MS. FLOYD:**  Thank you.

21   BY MS. FLOYD:

22   Q.    Is this an e-mail that you sent -- who received this

23   e-mail, what category of people?

24   A.    That is an e-mail that I sent to the Special

25   Operations commanders and the particular commanders of a

1    certain area where we received information where a

2    potential protest was going to gather or occur.

3    Q.   Okay.  And this is another e-mail but the second page

4    is blank.  So nothing is missing from the first e-mail.

5         And so you had forwarded on it appears this e-mail

6    from below.  And is this -- can you explain what this list

7    is?  Just what is this list?

8    A.   Apparently that was information that we received from

9    social media where there was alleged -- where information

10   had alleged that particular protests would occur at Raines

11   Station, Fred Smith's house, Mayor Strickland's home, City

12   Hall, FedEx headquarters, Memphis airport, Oak Court Mall,

13   Wolfchase Mall and Forest Park.

14   Q.   Okay.  And do you recall where that information came

15   from?

16   A.   I believe it came off Facebook.

17   Q.   But you don't recall this specific place?

18   A.   I can't remember, ma'am.

19   Q.   My next exhibit is an e-mail from Detective Reynolds

20   on 7-13-2016.  It's Pretrial 237.

21            **THE COURT:**  Marked as 122 and received.

22            (WHEREUPON, the above-mentioned document was

23   marked as Exhibit Number 122.)

24   BY MS. FLOYD:

25   Q.   Did there come a time when the Office of Homeland

1    Security investigated boycott activity?

2    A.    Strong possibility.

3    Q.    All right.  And is this -- and I'm really showing you

4    this e-mail to refresh your recollection about where that

5    list may have come from and ask you if this is where it

6    came from?

7    A.    Show it to me.

8    Q.    Okay.  Is this a Facebook post or text that's been

9    drawn -- I'll take that off.  Just mark it here.

10        Is this a Facebook post or a text that's been drawn

11   from a social media site from Al Lewis?

12   A.    It appears to be.

13   Q.    Okay.  And what does he say in this post?

14   A.    He said "we don't have any leaders and we don't even

15   know what we will target to protest.  We may go out to the

16   FedEx headquarters, perhaps the Raines station police

17   station, maybe Fred Smith's house, Strickland's home or

18   City Hall, the airport?  How about Oak Court,  Wolfchase

19   chase or maybe we go and eat water melon at Forest Park.

20   How many highways lead into Memphis?  Hell, we are like

21   wasps, no telling who we will sting."

22   Q.    And is that -- I think I can put these.  This is the

23   prior exhibit I'm placing.  Let's see if I can get them

24   both on the screen at the same time.

25        Is this where you got the list -- is this Facebook

1   post where you got the list that you sent out?

2   A.   That was information that was sent to me and I

3   forwarded it out.

4   Q.   Okay.  Is this -- they're the same list, though, is

5   that correct, the same list of places in both of these

6   exhibits in the same order?

7   A.   It mentions -- it does mention them to a certain

8   degree, yes.

9   Q.   And the next exhibit is a collective exhibit --

10              **THE COURT:**  We'll mark it as 123.

11              (WHEREUPON, the above-mentioned document was

12   marked as Exhibit Number 123.)

13              **THE COURT:**  No objection.  Received.

14              **MS. FLOYD:**  Thank you, Your Honor.  It is

15   Plaintiff's Pretrial 227, 228, 230 and 232.  If Your

16   Honor -- if we could approach about part of this e-mail, I

17   think I'm anticipating that defense may want to omit

18   certain pages from the e-mail.

19              **THE COURT:**  Sure.  Come around.

20              (Bench conference between the attorneys and the

21   Court.)

22              **MS. FLOYD:**  In the first e-mail, there -- so in

23   this attachment, there are operational overlays of where

24   the staging areas are, and I'm anticipating that you guys

25   might want us to not include that.

1          **MS. SILK:** Yes.

2          **MS. FLOYD:** But I wanted to bring the entire

3     exhibit to Your Honor's attention, and we can omit these

4     three pages by agreement.

5          **MR. GLOVER:** We have no objection.

6          **MS. SILK:** Are there any other operational?

7          **THE COURT:** Okay. Only one person gets to speak

8     for a party at the side bar. We had this discussion a long

9     time ago. Apparently one of you has to elect.

10          **MR. GLOVER:** It will be my witness so I'll speak.

11     We have no objection to those three particular pages being

12     omitted as long as the Court understands that it's a

13     partial exhibit, and I think it's a valid question to ask

14     is that the only operational information you --

15          **MS. FLOYD:** So there is the operational plan as

16     well attached to this exhibit. I would like Your Honor to

17     have access to this operational plan because --

18          **THE COURT:** You can file it under seal or you can

19     file the entire exhibit under seal and not have to delete

20     it. It's not a good idea in a proceeding -- it's better to

21     take it out just like we suggest it.

22          **MS. FLOYD:** Yes, Your Honor.

23          **THE COURT:** So I'm going to agree with you on

24     that. I'm going to take three pages out and they are Bates

25     numbers -- I'm going let you read them -- there's a number

1    you can read at the bottom.

2              **MS. FLOYD:**  Yes, Your Honor.

3              **THE COURT:**  Those will be simply taken out.

4              **MR. GLOVER:** It's my understanding that the other

5    operational details will likewise come out when we get to

6    those.

7              **MS. FLOYD:**  That's up to Your Honor.  I would

8    like the Court to have the opportunity to --

9              **THE COURT:**  If you want to put them -- if you

10   want to put a portion of the material under seal, you will

11   have to file a public document and a nonpublic, the one

12   that has all the material in it.  You can have one

13   that's -- in fact, you can do that with all of these.  You

14   can just have the redacted copy which would include the --

15   this material and then you'll file a public copy which will

16   not include that material.  I think that's the easiest way

17   to do it and certainly preferable because we certainly

18   don't want to hide anything, but we want to also respect

19   their planning and strategy which would not.  Let's do

20   that.

21             **MS. FLOYD:**  Thank you.

22              (Bench conference between the attorneys and the

23   Court concluded and the proceedings continued as follows:)

24             **THE COURT:**  This exhibit will have a public

25   version and a nonpublic version.  When a document contains

1    operational strategies that are currently in effect for a

2    law enforcement department then we don't include those in

3    the public document, but they're included in the sealed

4    document because they may be appropriate for the Court to

5    considerate some point.  It's just a few things that need

6    to be taken out.  I don't think anybody would question that

7    they are operational, current operational information, and

8    would provide data that is not publicly available.

9            So we're going to have 123 which will be our

10   public document, and 123A which will be our sealed

11   document.  It just excludes basically three pages of

12   operational information, and then it will have some

13   redacted materials that will actually appear in the public

14   document.  They'll just have black lines.

15           So that should take care of that.  It shouldn't

16   be a problem.  Okay.

17           (WHEREUPON, the above-mentioned document was

18   marked as Exhibit Number 123A.)

19           **THE COURT:**  Marked as 123 for the -- I don't

20   think you have the public document ready, do you?

21           **MS. FLOYD:**  No, Your Honor.

22           **THE COURT:**  So we're going to re serve that

23   number and then 123A.  Hopefully we can get that ready

24   during the lunch hour, and 123A is the sealed document.

25   Can you use the sealed one but we obviously shouldn't

1  direct the examination to the operational data.

2          **MS. FLOYD:**  Yes, Your Honor.

3          **THE COURT:**  All right.

4  BY MS. FLOYD:

5  Q.   Do you recall an event that occurred at the Commercial

6  Appeal in July of 2016?

7  A.   Yes.

8  Q.   Okay.  And is this an e-mail from you to the Office of

9  Homeland Security team?

10 A.   It is.

11 Q.   And is this from the day of the protest or the

12 gathering at the Commercial Appeal?

13 A.   Yes, ma'am.

14 Q.   Okay.  And what have you forwarded?  What is this

15 e-mail that you forwarded?

16 A.   I forwarded to them information I had received from

17 lieutenant colonel -- from Major Watson at the time some

18 photos and information he put out with concerns of a

19 protest at 495 Union Avenue, which was the Commercial

20 Appeal at that time.

21 Q.   Okay.  And attached to your e-mail there are several

22 documents.  What are the documents that are attached, if

23 you can tell from their titles here?

24 A.   It was an operations order with concerns on how to

25 manage or mitigate that particular gathering for public and

1   officer safety.

2   Q.   Okay.  And it looks like there are also photos

3   attached and Officer Watson -- Major Watson -- my

4   apologies -- has provided a description.

5        What are those photos that are attached?  And I can

6   show you the photos larger after you tell me what the

7   report was.

8   A.   Okay.  It appears to be photos of some of the activity

9   at 495 Union at that time.

10  Q.   And right here, where it says "currently the

11  family/lawyers of the Darrius Stewart case are at Second

12  and Adams, announcing the lawsuit they have filed against

13  the City of Memphis, photos attached, "is this photo --

14  I'll show it you larger in just a second.  Is that photo a

15  picture of Second and Adams, if you can tell?

16  A.   I can't tell, ma'am.

17  Q.   Let me show you a larger photo.

18       **THE COURT:**  Let's be careful.  If you disclose

19  information then it becomes public.  So if you -- as you go

20  through it, if you show a page that's been sealed it will

21  become public.

22       **MS. FLOYD:**  Okay, yes, Your Honor.  I'll be more

23  cautious.

24       **THE COURT:**  Be careful.  I think you're getting a

25  little close there.

1      **MS. FLOYD:**  Here.  I'll pull them apart so we

2    don't have that happen.

3          **THE COURT:**  I think that's a good idea.

4          **MS. FLOYD:**  Thank you.

5    BY MS. FLOYD:

6    Q.   Is this a photo of the family and attorneys of Darrius

7    Stewart at Second and Adams?

8    A.   I don't know the family attorney.  I just see the

9    individuals in the photo standing in front of the

10   courthouse.

11   Q.   All right.  Let me zoom back in.  This next e-mail in

12   the collective exhibit, is this another e-mail that you

13   forwarded to the Office of Homeland Security?

14   A.   I did.

15   Q.   And that also attaches two images.  And what was Major

16   Watson's second report?

17   A.   Major Watson put out another e-mail apparently with

18   some photos, and he categorized as "Stewart's father just

19   arrived at the Commercial Appeal site.  Crowd with media is

20   approaching 35-40 people."

21   Q.   Okay.  Is this a photo of the Commercial Appeal

22   protest?

23   A.   I can't recognize.  I just see activity.  I see some

24   Black Lives Matter signs and the crowd.

25   Q.   Okay.  So in the e-mail there are two images attached

1    about the Commercial Appeal protest and these are the

2    attached images.  So these are the images of the Commercial

3    Appeal protest?

4    A.   Are those images attached to that e-mail?

5    Q.   Yes.

6    A.   Okay.  If they were attached to the e-mail then those

7    are the images that you're describing.

8    Q.   Okay.  Do you have any independent knowledge -- do you

9    remember the Commercial Appeal protest?

10   A.   I do remember it.

11   Q.   And do you remember receiving these reports?

12   A.   We received it from Major Keith Watson as an awareness

13   at which time we distributed to the department, and those

14   were the concerns.

15   Q.   Okay.  And who is Major Watson?

16   A.   Major Watson at that time was the acting lieutenant

17   colonel of the North Main Station Precinct.

18   Q.   And was that fairly typical for the commander to

19   report back to the Office of Homeland Security about the

20   events in their precinct to provide that awareness to you

21   all?

22   A.   Ma'am, I don't think he was just reporting to us, but

23   he did report to us as an awareness, but it was a

24   situational awareness that was put out to the department.

25   Q.   Okay.  Looking at the next report.  Who all did Major

1    Watson send this update to?

2    A.    MEM MPD executive staff, MEM MPD command staff, MEM

3    MPD  colonels, MEM MPD lietenant colonels.

4    Q.    What category of people in the executive staff  versus

5    command staff?  How is that different ?

6    A.    The command staff of the Mmephis Police Department

7    executive commanders, chiefs, and above.

8    Q.    Okay.

9    A.    Executive staff would be comprised of anybody that's a

10   part of government that would I guess be able to be in the

11   know regarding police operations that works in a support

12   capacity.

13   Q.    Is that within and outside of the Memphis Police

14   Department?

15   A.    Yes, ma'am.

16   Q.    So who would be included in that list?

17   A.    It could be all division directors, general services,

18   permits, special events.

19   Q.    Okay.  And what does the second report from Major

20   Watson -- and actually, there is one -- there are a few

21   more reports.  So I'm going to start earlier in the thread

22   so we can pick up the entire conversation.

23       Okay.  So you can see here at the bottom of the

24   thread, this is the e-mail we've already discussed about --

25   you'll recognize this language here about additional

1    information on the subject.

2          Then we come up to the next part of the thread where

3    the second report is Darrius Stewart's father just arrived

4    at the Commercial Appeal site.

5          And then now we're to the -- to a third report.  And

6    what did Keith Watson report?

7    A.   It said "the media has positioned a speakers mic and

8    appears that a press release or something will occur.  I'm

9    being told that Stewart's father will speak at some point.

10   Thank you."

11   Q.   And then the next report in the thread is here at the

12   bottom of the screen.  What is that report?

13   A.   This is again from Major Keith Watson.

14   Q.   And what does he state?

15   A.   It is another thread.  It states "the TNT guy is here

16   in the crowd."

17   Q.   Who does that refer to?

18   A.   I believe a gentleman by the name of Franklin, I

19   believe.

20   Q.   Is that Keedran Franklin?

21   A.   Yes.

22   Q.   Okay.  All right.  And then that brings us to the top

23   of the document and the next report.  And what does Major

24   Watson provide?

25   A.   He gave a situational update "12:48 hours, protesters

1    are conducting a second announcement.  Still peaceful and

2    orderly.  At this time I'm not allowing any additions to

3    the crowd.  We have designated a second site directly

4    across from the street for late arrivals."

5  BY MS. FLOYD:

6    Q.   All right.  And then the final report here provides

7    you can see here this is the report we've just discussed,

8    and then traveling to the top of the document, what does

9    this final report state?

10   A.   It states "at 13:05 hours, no issues.  They are

11   conducting a question and answer session.  Gotti with a

12   suit coat attire."

13   Q.   Who is Gotti?  What does that refer to?

14   A.   I'm assuming he's one of the activists that was at

15   that particular location.

16   Q.   Does the activist -- does the community member Frank

17   Gibson go by the name Gotti?

18   A.   Yes, ma'am.

19   Q.   Okay.  And is this a photograph of him?

20   A.   He is in that picture.

21   Q.   Okay.  All right.  My next exhibit is a collective

22   exhibit of Pretrial 38 and 39.

23          **THE COURT:**  Marked as 124.

24          (WHEREUPON, the above-mentioned document was

25   marked as Exhibit Number 124.)

1  BY MS. FLOYD:

2    Q.   And it is an e-mail from Colonel Williams on

3    7-17-2016.  All right.

4         All right.  And while on the same procedure, just

5    starting at the bottom of the e-mail thread and you'll see

6    again there's nothing on the second page.  Is this an

7    e-mail from you?

8    A.   Yes.  Can I see the whole -- the full document?

9    Q.   I'd like you to answer a question about what is on the

10   screen.

11   A.   It's an e-mail from me.

12         **MR. GLOVER:** Your Honor, may I approach.

13         **THE COURT:**  You may.

14         (Bench conference between the attorneys and the

15   Court.)

16         **MR. GLOVER:** Obviously I have no objection -- I

17   have no objection to her asking him to identify a single

18   page but if she's going to question him about a multi-page

19   document he's asked to look at it, I would appreciate if

20   Your Honor would consider letting him look at the entire

21   document for the substantive questions.

22         **THE COURT:**  Well, I mean, depends on the content

23   of the question.

24         **MR. GLOVER:**  It does.

25         **THE COURT:**  Sometimes it's necessary to view the

1    document.  If he needs to review it, if he asks to review

2    it, he's entitled to.

3            **MR. GLOVER:**  He has asked.

4            **THE COURT:**  It's a multi-page document.  Just to

5    be clear, he may not ask to, then it doesn't really matter.

6            **MS. FLOYD:**  Okay.

7            **THE COURT:**  You'll cover on Redirect or Cross.

8            **MR. GLOVER:**  If I'm not mistaken, he just asked

9    for the document.

10           **THE COURT:**  Right.

11           **MS. FLOYD:**  Just so I'm clear, even though I'm

12   only questioning him about the matters --

13           **THE COURT:**  We talked about that earlier.  If

14   it's a single page and may be more efficient to do exactly

15   what you're doing what we've been doing so far.

16           **MS. FLOYD:**  I might separate the document then

17   into two parts.  It's two separate e-mails and I'd rather

18   question him about them separately.

19           **THE COURT:**  Is it an e-mail chain or what?

20           **MS. FLOYD:**  It's the first e-mail and then

21   there's a second e-mail so Your Honor can see here.

22           **THE COURT:**  If there's a first e-mail and you

23   only asked him about the first one, you can simply ask him

24   about the first one and don't show the second one.

25           **MS. FLOYD:**  Okay.

1          **THE COURT:**  If it's a second e-mail and you read

2     the first one for context.

3          **MS. FLOYD:**  I was trying to avoid any appearance

4     of unfairness showing the second page of this first e-mail

5     is simply a signature line.

6          **THE COURT:**  Well I'm not sure.  Let me see that.

7          **MS. FLOYD:**  I'm happy to show it to him.

8          **THE COURT:**  Go ahead.  We really don't want to

9     slow -- you're right.  I'm going to let you go ahead with

10    the way you've got it set up.  No problem.

11         **MS. FLOYD:**  Okay.  Thank you.

12              (Bench conference between the attorneys and the

13    Court concluded and the proceedings continued as follows:)

14         **THE COURT:**  All right.  Are we on track to

15    conclude the witness in the next 20 minutes, 25? 30, before

16    lunch?

17         **MS. FLOYD:**  30.

18         **THE COURT:**  I just know we have to be -- we

19    agreed we would go as fast as we could.  The goal will be

20    hopefully get you concluded maybe before we get to the

21    lunch hour.

22    BY MS. FLOYD:

23    Q.   The second part of the document, because it's a

24    separate e-mail, I'm going to show you this first e-mail

25    first but I'm happy to show you the entire first page if

1    that assists you in having context?

2    A.   Scoot all the way down.   There you go.

3    Q.   Can you read it?   Is it too small?

4         Okay.   At the bottom of this page, is this an e-mail

5    from you at the bottom?

6    A.   It is.

7    Q.   And what does that -- what -- is this about -- is this

8    e-mail concerning Mr. Frank Gibson?

9    A.   Yes, ma'am.

10   Q.   Okay.   And what's happening?   What are you sharing in

11   this e-mail?

12   A.   I'm sharing information regarding some other social

13   media information about a gathering at a church at 843 West

14   Raines on Sunday morning, and I believe this -- I think

15   there's still part of this e-mail is still missing because

16   we're responding in partial to what you're presenting, but

17   based on what you presented, I put out to Colonel Williams

18   after I put out information that there was no adverse

19   information that was going to suggest a civil disorder at

20   this location.   Colonel Williams responded a few minutes

21   later that his station would be monitoring.

22   Q.   Okay.   When he said he was going to be monitoring it,

23   the situation, what does that mean?

24   A.   I believe again like I said it's more parts to this

25   e-mail that's missing, that cars would be out and just

1    making sure there wasn't any type of disruption or anything

2    that would be adverse to public safety or officer safety.

3              **THE COURT:**  Is that the entire e-mail you have?

4              **MS. FLOYD:**  Yes, Your Honor.

5              **THE COURT:**  Okay.

6              **MS. FLOYD:**  I believe what Major Bass is saying,

7    correct me if I'm incorrect, is that there's a later

8    e-mail, and we are going to discuss that now.

9              **THE COURT:**  Understand.  Okay.

10             **MS. FLOYD:**  Thank you, Your Honor.

11             **THE COURT:**  No problem.

12   BY MS. FLOYD:

13   Q.    All right.  Is this the e-mail you were discussing?

14   This is a follow-up e-mail from Colonel Williams?

15   A.    Well, there's a follow-up to what he said -- indicated

16   earlier, but I thought there was some more information

17   prior to that which led up to this conversation and that

18   discussion.

19   Q.    There may be.  This is the entire e-mail thread --

20   A.    That you have?

21   Q.    -- that I have about this exchange.

22   A.    That you have.

23             **THE COURT:**  Well the point is, are you saying

24   that the City's failed to produce an e-mail, because it

25   looks like that would be the only other answer was that the

1    city has failed -- there's something -- Mr. Glover, is

2    there an e-mail that's not been produced?

3            **MR. GLOVER:** There's not.  There's not an e-mail

4    that has not been produced.  There are e-mails that she's

5    not handing him, but there are e-mails that I have been

6    produced.

7            **THE WITNESS:** And, Judge, the reason being I

8    responded in kind, adding that there was no potential for

9    civil discord or unrest or whatever, there was some other

10   conversation that happened that would have compelled me to

11   make that statement in that e-mail chain.

12   BY MS. FLOYD:

13   Q.   Okay.  What I want to discuss right now is just

14   specifically what Colonel Williams reported back about this

15   particular event?

16   A.   Yes, ma'am.

17   Q.   What did he report back?

18   A.   As of 9:30 a.m. there were only 15 vehicles parked on

19   the lot at 843 west Raines.  Everybody went inside the

20   church which is located at the southeast corner of the

21   Westmont and Raines.  This is Thaddeus Matthews' church

22   known as the Ivory Place.

23   Q.   I think what you might have been discussing earlier is

24   my next exhibit -- one more question about that exhibit.

25   What is the subject line of this e-mail?

1    A.    It says intel for BLM.

2    Q.    Okay.  Thank you.

3          All right.  My next exhibit is a collective exhibit.

4    It is Plaintiff's Pretrial 25 -- 253 and 256.

5                THE COURT:  Marked and received as 125.

6                (WHEREUPON, the above-mentioned document was

7    marked as Exhibit Number 125.)

8    BY MS. FLOYD:

9    Q.    And I'll let you review this entire document.  Is this

10   the event that you were discussing in your --

11   A.    Let me finish reviewing it, please.

12               MS. FLOYD:  Okay.  Yes.  And while he's

13   reviewing, Your Honor, could I mark my next exhibit?

14               THE COURT:  Sure.

15               MS. FLOYD:  It is an e-mail from David Filsinger

16   on 7-17-2016.

17               THE COURT:  7-17-2016 e-mail.  It's marked and

18   received.

19               (WHEREUPON, the above-mentioned document was

20   marked as Exhibit Number 126.)

21               MS. FLOYD:  That was pretrial 40.

22               THE COURT:  It is marked as 126.

23               MS. FLOYD:  253 and 256 is the prior exhibit.

24               THE WITNESS:  I'm ready.

25   BY MS. FLOYD:

1    Q.    Thank you.

2          Is this -- is this event that we were referring to in

3    the prior e-mail, the prior exhibit?

4    A.    It is.

5                **THE COURT:**  Make reference to the exact exhibit

6    number.  We got two going at one time.  Let's make sure.

7                **MS. FLOYD:**  Yes, Your Honor.  This is

8    Exhibit 125. And we are referring to the color version of

9    Bates number 3933.

10   BY MS. FLOYD:

11   Q.    Returning back to the e-mail thread, is this a -- this

12   attached document was originally circulated by Officer

13   Bradley Wilburn?  And you can see this is the bottom of the

14   exhibit?

15   A.    Uh-huh.

16   Q.    If you recall?

17   A.    Yes, I do remember it.  It was information originally

18   put out from Wilburn to us and additional information put

19   forth by Major Smith in addition.

20   Q.    Okay.  And is this Lieutenant Jeff Dickerson's

21   instruction and response to receiving the information from

22   the Real Time Crime Center officer?

23   A.    Yes, ma'am.

24   Q.    And he's instructing this information to be sent out

25   to the NM commanders.  What does NM stand for?

1    A.    North Main Station.

2    Q.    North Main Station.  Is that where the church was

3    located?

4    A.    No, ma'am.  Based on what you just presented, that

5    was -- based on what you just presented, based on the

6    information from Mr. Frank Gibson at the time, it was put

7    out as an alert and the awareness to North Main Station

8    commanders, but that church is in Raines Station Precinct.

9    Q.    Okay.  Was it sent to North Main Station because of

10   the second post on that page on the second post on 3933

11   about Beale Street?

12   A.    I believe so.

13   Q.    Okay.  And then one of the North Main Station

14   commanders responded to that e-mail?

15   A.    That's correct.  Major Joseph Smith responded.

16   Q.    And what did he respond?

17   A.    According to his post, the latest post is regarding

18   church 9:35 a.m. on tomorrow.  Nothing new about Beale

19   Street past some discussion about coming to Beale or going

20   to a club.  We will remain vigilant for the evening but it

21   appears as though they may not show.

22   Q.    Okay.  And then turning to the second e-mail,

23   following the same procedure, you can see that this is an

24   additional e-mail in the same thread.  It starts with the

25   e-mail from Officer Wilburn.  The next is from Lieutenant

1    Dickerson.  It's forwarded to North Main Station and

2    receives a response.

3        And did Director Rallings respond to that e-mail?

4    A.   Yes.

5    Q.   And what did he say?

6    A.   "His bail conditions say not drugs or alcohol. "

7    Q.   Okay.  And then what does lieutenant -- Major Smith

8    respond?

9    A.   Major Smith says "if we see him we will keep that in

10   end mind.  We are also keeping an eye out for him driving."

11   Q.   Okay.  Thank you.

12       My next exhibit which has already been marked as

13   Exhibit 126.  Ask this an e-mail from David Filsinger to --

14   who is this e-mail to? Is it to the Office of Homeland

15   Security team and Major Ross?

16   A.   Yes, ma'am.

17   Q.   Okay.  And who is Major Ross?

18   A.   Major Ross was assigned to the Real Time Crime Center

19   at the time.  He was commander and supervisor of

20   operations.

21   Q.   Okay.  And what was the event that was the subject of

22   this forward?

23   A.   The subject says Facebook post 7-17, and below says

24   remembering Darrius Stewart.

25   Q.   Okay.  And there's an attachment.  Is this the

1    attachment?

2    A.   It appears to be a Facebook attachment.

3    Q.   Okay.  And what is the event?

4    A.   It appears to be an event where it says remembering

5    Darrius Stewart.  Public neighborhood by justice

6    rightfully.  Again, it mentions the time Sunday 2:00 p.m.

7    to 330 at Abyssinian Missionary Baptist Church at 3890

8    Millbranch.

9    Q.   Okay.  And is this the kind of event you would add to

10   the attachment briefing?

11   A.   I believe so at that time.

12   Q.   And what's is the attachment name?

13   A.   The subject says Facebook post 7-17.

14   Q.   What is the attachment name underneath?

15   A.   Remembering Darrius Stewart.

16   Q.   No, right here?

17   A.   I'm sorry.  I'm sorry.  BLM.

18   Q.   Okay.  My next exhibit -- here you are.  My next

19   exhibit --

20            **THE COURT:**  It will be 127.

21            **MS. FLOYD:**  One more question before I add my

22   next exhibit.

23            **THE COURT:**  Sure.

24   BY MS. FLOYD:

25   Q.   Was that event added to the Joint Intelligence

1    Briefing?

2    A.   Was what event added?

3    Q.   The event from the last exhibit about the remembering

4    Darrius Stewart?

5    A.   I can't remember if it was actually added, per se.  I

6    would need to see a copy of that JIB.

7    Q.   Does this refresh your recollection about whether it

8    was added to this e-mail?

9    A.   Yes.  According to my e-mail I did indicate we would

10   add it in the joint intel brief at 16:00.

11        **MS. FLOYD:**  Excellent.  I'll go ahead and add

12   this as my next exhibit.  It is an e-mail from Major Bass

13   on 7-17-2016.

14        **THE COURT:**  127 marked and received.

15        (WHEREUPON, the above-mentioned document was

16   marked as Exhibit Number 127.)

17        **MS. FLOYD:**  And that was pretrial 41.  And I

18   won't need it anymore. Thank you.

19   BY MS. FLOYD:

20   Q.   My next exhibit is Plaintiff's Pretrial 271.  Sorry.

21        My next exhibit is Plaintiff's Pretrial -- I'm sorry,

22   Your Honor.  Just one moment.

23        **THE COURT:**  Take your time.  We have 127 that's

24   been marked and we're getting ready to mark 128.  Is that

25   right?

1          **MS. FLOYD:**  I skipped a page.  Yes, Your Honor.

2     This is 128.

3          **THE COURT:**  Let's make sure we know what 128 is

4     again.

5          **MS. FLOYD:**  Okay.  This is an e-mail from Major

6     Bass on 7-27-2016 and it is Plaintiff's Pretrial 271.

7     There was an extra e-mail attached to the top of that

8     pretrial exhibit that I've discarded.

9          **THE COURT:**  Okay.

10          (WHEREUPON, the above-mentioned document was

11     marked as Exhibit Number 128.)

12   BY MS. FLOYD:

13   Q.   Is this an e-mail Sergeant Penny sent to you?

14          **THE COURT:**  Let's make sure we know which exhibit

15     we're looking at since we've had a couple.

16          **MS. FLOYD:**  Yes.  We're looking at 128?

17          **THE COURT:**  That's fine.

18          **THE WITNESS:**  Yes.  Yes, it is.

19   BY MS. FLOYD:

20   Q.   Okay, excellent.

21          And you'll see attachment in reference to the BLM

22     Memphis Chapter, and this is the attachment.

23          Do you recall this event?

24   A.   I don't recall it.

25   Q.   Okay.

1    A.    Obviously there was some discussion about it.

2    Q.    Okay.  Is this the type of event that the Office of

3    Homeland Security was investigating during this time

4    period?

5    A.    I wouldn't say investigating, but probably an inquiry

6    was made based on what had transpired days before.  The

7    City was still on heightened sense of alert and pretty much

8    any information that we ran across open source media that

9    we believe would be a detriment to public and officer

10   safety we did want to make an inquiry just to make sure

11   that everything was pretty much above board or a permitted

12   event.

13   Q.    What was this event?

14   A.    According to an e-mail, a Black Lives Matter lunch.

15   Q.    Okay.  It was a free lunch program and what's under

16   the why?

17   A.    It says, "let's feed the children, youth."

18   Q.    Okay.  All right.  My next exhibit is an e-mail from

19   you on 8-6-2016?

20             **THE COURT:**  Marked as 129 and received.

21             (WHEREUPON, the above-mentioned document was

22   marked as Exhibit Number 129.)

23             **MS. FLOYD:**  It is Pretrial 65.  Thank you.

24   BY MS. FLOYD:

25   Q.    All right.  Is this an e-mail that you sent?  Is this

1    an e-mail that you sent?

2    A.   It is.

3    Q.   Okay.  And do you recall the event that is discussed

4    in this e-mail?

5    A.   Obviously it was going to be some type of event that

6    was going to take place, and based on me discussing it with

7    Reynolds, I thought maybe it was something that we probably

8    want to go back and revisit, refocus on, to make sure that

9    we pretty much had all of the exact information that would

10   make this a credible event.

11   Q.   Who is Lieutenant Goods?

12   A.   Lieutenant Goods was assigned to the multi-agency gang

13   unit at the time.

14   Q.   Okay.  And do you recall what you meant by "it may

15   attract the wrong crowd that may want to hijack the event

16   from its original intent and turn it into let's say a BLM

17   event"?  Do you recall what you meant?

18   A.   Obviously there was some more language or some more

19   e-mails in addition to this.

20   Q.   And those we do not have.  I think there was a

21   corruption in the data, but go ahead.

22   A.   Which made me respond in a particular manner that I

23   did.  Obviously it was a concern of Lieutenant Goods that

24   he forwarded to me or the team.  And based on the

25   information he conveyed to us or relayed to us, I want to

1   make sure that it was what it was.  If there was going to

2   be a particular event deal with what it needed to be dealt

3   with, that it wouldn't turn into something else.

4   Q.   Like a BLM event?

5   A.   It wouldn't turn into any other event that would need

6   police resources or intervention.

7   Q.   That's not what you said in this -- excuse me.  I'm

8   sorry.  Finish.

9   A.   That's all right.

10  Q.   That's not what this e-mail says, though.

11  A.   Well, according to the e-mail, says, Tim, after

12  thought on this, we need to include on the JIB which is

13  what I said because of the very nature that this represents

14  during adversarial times that we are in today.  The problem

15  that we may run into is this event obtaining media and

16  social media coverage and attraction the wrong crowd.  They

17  may want to hijack the event from its original intent and

18  turn it into, let's say, a Black Lives Matter event.

19  That's why I'm referring to what was the original event

20  that he was trying to convey to me.

21  Q.   That's what I was asking in your testimony.

22  A.   That's why I say there was obviously other information

23  missing from this which made we respond in that manner with

24  that type of concern.

25  Q.   Do you recall what the event was?

1    A.   I can't remember, ma'am, but obviously, again, it was

2    a concern of Lieutenant Goods and the gang unit to bring to

3    our attention to see if it was something we may to look

4    into or just be prepared to make an inquiry about.

5    Q.   All right.  Referring to -- now to Exhibit 109 was

6    previously admitted, and I'm happy to let you look at this

7    entire e-mail.

8    A.   Okay.

9          **MS. FLOYD:**  And Your Honor for timing, I have one

10   more exhibit.

11         **THE COURT:**  Marked as 130 and received.

12         **MS. FLOYD:**  It is an e-mail from Lieutenant Bass

13   on 10-28-2016.

14         (WHEREUPON, the above-mentioned document was

15   marked as Exhibit Number 130.)

16         **MS. FLOYD:**  It is Pretrial 101.

17         **THE WITNESS:**  I'm ready.

18   BY MS. FLOYD:

19   Q.   Thank you.

20        All right.  And this -- the bottom of this thread is

21   split between two pages, and so I'll just start here.  Is

22   this an e-mail from Major Chandler --

23   A.   It is.

24   Q.   -- to you and the rest of the Office of Homeland

25   Security team?

1    A.    Yes, ma'am.

2    Q.    Okay.  And do you recall this event?

3    A.    I do.

4    Q.    And what was the event?

5    A.    It was actually a community gathering dealing with

6    some of the social ills and causes and some of the tensions

7    between the citizens and the police, and again, this was

8    three days after the bridge incident, and again, there was

9    still heightened tension and concerns regarding public law

10   enforcement safety and the fact that other traffic

11   disruptions and other similar social upheaval could occur.

12        After Lieutenant Chandler sent me that, I wanted the

13   team to take a second look, find out what exactly was going

14   to be about and should we send officers to go find out what

15   the real gathering was going to be about.

16   Q.    Okay.  And so is that what you were discussing here at

17   the bottom of the next page?

18   A.    That's correct.

19   Q.    Okay.  And would that be in a plain clothes presence?

20   A.    Yes, ma'am.

21   Q.    Okay.  And so moving on to the next response -- well,

22   going back to this, so it's just a clear story.  So this is

23   your instruction to Major Chandler?

24   A.    Yes.

25   Q.    And what were you instructing him to do, just in this

1    first sentence?

2    A.    Find out who had been organizing -- who the event

3    organizer is and what was on the agenda.

4    Q.    And then we've already discussed the second sentence.

5          And what was Major Chandler's response, not word for

6    word, but what does he do in response?

7    A.    He obviously made contact with the person that was in

8    charge of the event.  Come to find out, it was something

9    totally different from our perception and that it was law

10   enforcement members that were going to be in attendance.

11   Some of them attended that church, and they were just

12   wanting to have a community dialogue about the timings.

13   Q.    Okay.  And then this is the exhibit we previously

14   marked as Exhibit 130, and it's just a single page.

15         And starting at the bottom of the thread, is this an

16   e-mail from you?  It may be necessary for you to look at

17   the entire e-mail to understand what's happening.

18         Okay.  Is this an e-mail from you to Colonel Houston?

19   A.    Yes, sir.

20   Q.    And who is Colonel Houston?

21   A.    He's the commander of the Crump Station Precinct.

22   Q.    Okay.  And what are you instructing Major Chandler to

23   do at the top of this e-mail?

24   A.    I'm instructing him to have air support to conduct

25   area patrols of Crump Station's airspace and area.

1    Q.   And then what are you discussing in this last sentence

2    here?  Starting -- sorry.  I've made it so you can't read

3    it.  Starting there.

4    A.   It was for him to give the orders to OHS to enjoin in

5    the detail and have them take photos of those spearheading

6    the demonstrations if it materializes for future reference

7    and documentation.

8            **MS. FLOYD:**  Okay.  Thank you.  That's all my

9    questions, Your Honor.

10           **THE COURT:**  Cross-examination?

11                        **CROSS-EXAMINATION**

12   **BY MR. GLOVER:**

13   Q.   Good afternoon, Lieutenant Colonel Bass.

14   A.   Good afternoon, sir.

15   Q.   We talked a little bit or you talked on your direct

16   examination about your service with the police force.

17           Has your entire professional career been spent with

18   the Memphis Police Department?

19   A.   Only job I've ever had.

20   Q.   How old were you when you first became a technician?

21   A.   I was 18.

22   Q.   And as soon as you were old enough at 21 you became a

23   police officer; is that correct?

24   A.   That's correct.

25   Q.   And that's the only job you've held, although through

1    various positions, up until now?

2    A.    Up until this present day.

3    Q.    All right.  At some point there was questioning about

4    the time period I think that you took over for --

5    responsibility for Department of Homeland Security.  Do you

6    know specifically when that happened?

7    A.    January 2015.

8    Q.    All right.  Was that some time around -- if I may, I

9    want to put a timeline.  If I can get Exhibit 80 because

10   we're going to refer to a few things that were happening.

11        Sir, this is a document that has previously been

12   introduced into evidence, and I'll represent to you that it

13   is a time line of events that have been discussed and

14   testified to in this trial, and I'll make it large enough

15   that we may have to scoot it over as we go.

16        Again, you said you became the -- you had

17   responsibility for Homeland Security beginning in what

18   time?

19   A.    January 2015.

20   Q.    Okay.  And were you aware at the time you came in to

21   that position that events had occurred in Ferguson,

22   Missouri that had heightened awareness across the country

23   with regard to events that might need to be provided for by

24   different Homeland Security departments?

25   A.    Yes, sir.

1    Q.    So when you came into that position, one of the issues

2    that is enforcement were dealing with was protests of

3    important and emotional issues; correct?

4    A.    That's correct.

5    Q.    And officer safety in connection with those events; is

6    that right?

7    A.    Yes, sir.

8    Q.    Okay.  So the fact that you have been testifying today

9    about a great number of things that involved protests such

10   as Black Lives Matter or gatherings that related to events

11   surrounding perhaps the death of individuals at the hands

12   of a police officer or indictments or lawsuits regarding

13   those things, that was the part of the world you were

14   living in when you came into this department; is that

15   correct?

16   A.    That is correct.

17   Q.    Okay.  You indicated, though, that you spent just

18   about maybe 25 to 35% of your time, I think is what you

19   said, in Homeland Security responsibilities.  What else

20   were you doing at the time?

21   A.    At that time I was trying to help manage other units

22   under my command in Special Operations and the traffic

23   division.

24   Q.    Did you also have things going on in Homeland Security

25   in addition to the protests that were occurring and the

1   officer shooting concerns that were popping up?

2   A.   Yes, sir.  Again, responsible for managing operations

3   of the traffic division which was the motorist, the police

4   service technician, the crossing guards, special traffic

5   division, special events, and then tactical unit, the

6   canine unit and then air support, mounted patrol, harbor

7   patrol, in addition to Office of Homeland Security.

8   Q.   Okay.  And in Office of Homeland Security in

9   particular, was that department still even at this time

10  responsible for issues relating to terrorism and

11  terroristic threats?

12  A.   Absolutely.  We pretty much tried to monitor or if we

13  received information we would like to alert the department

14  regarding anything that was dealing with terrorism,

15  criminal activity and also extreme weather.

16  Q.   And was it also responsible for looking at events such

17  as security surrounding the St. Jude Marathon?

18  A.   Yes, sir.

19  Q.   Memphis in May?

20  A.   Yes, sir.

21  Q.   Liberty Bowl?

22  A.   Absolutely.

23  Q.   Southern Heritage Classic?

24  A.   Yes, sir.

25  Q.   Things of that type regardless of whether it was

1    protest related or not?

2    A.   Yes, sir.

3    Q.   Okay.  And so the fact that you've been given

4    e-mails -- and most of them were from a seven-day period

5    after the bridge event, but in addition to those kinds of

6    issues you were dealing with in July and August of 2016,

7    you were dealing in Homeland Security with other kinds of

8    issues, too, were you not?

9    A.   Yes, sir.

10   Q.   If there were suspicious package issues did you deal

11   with that?

12   A.   Suspicious package issues, threats within schools, all

13   types of information that would be of a real concern or

14   threat to the public, the private and law enforcement

15   safety.

16   Q.   So if I look at when you've been testifying about

17   today and the documents you've introduced, it appears to be

18   all focused on protest and Black Lives Matter, but was that

19   the primary job you had at the time?

20   A.   No, sir.

21   Q.   Was that -- was the fact that at this time the country

22   and this time in Memphis there were more protests than

23   usual happening?

24   A.   Absolutely.

25   Q.   Okay.  If you also look at the timeline you'll see

1    that in July of 2015 is the date I believe has been

2    identified that Darrius Stewart died in an altercation

3    involving a Memphis police officer, were you aware of that?

4    A.   Yes, sir.

5    Q.   Was that a part of what colored your decision making

6    about what sorts of things needed to be looked at and on

7    heightened awareness for the police department and Homeland

8    Security?

9    A.   It did because the department had received a lot of

10   disturbing e-mail about threats to harm law enforcement

11   officers in addition to the officer that was responsible

12   for the death of Darrius Stewart.

13   Q.   All right.  Did you -- are you aware of actual death

14   threats that were made against police officers arising out

15   of that incident?

16   A.   I am familiar with it.

17   Q.   All right.  And specific death threats made to

18   specific officer and his family members?

19   A.   I believe it was Conner Shilling, absolutely.  We saw

20   the e-mail, the threats.  In fact, someone went so far as

21   to take a picture of his home he lived at and attached

22   disturbing e-mail about if they wanted to do something they

23   could, and I know subsequent, later on, there were

24   operations made to remove him for his safety to an

25   undisclosed location.

1    Q.    So there's no doubt that during your tenure in

2    Homeland Security attention was being given to potential

3    threats to officers?

4    A.    That's correct.

5    Q.    And is it your testimony that those -- the attention

6    being given to those events was based on real intelligence

7    that you had about specific and real threats?

8    A.    Yes, sir.

9    Q.    During the time you were taking over the Department of

10   Homeland Security responsibility did you have a lieutenant

11   working under you who had the day-to-day responsibility?

12   A.    Yes, sir.

13   Q.    And who was that?

14   A.    Lieutenant Chandler.

15   Q.    All right.  And you obviously on some of these e-mails

16   were reporting information that came from Homeland Security

17   to some of the other executive staff at Memphis Police

18   Department; is that correct?

19   A.    That's correct.

20   Q.    And who was responsible for supervising the

21   individuals who were actually doing the collection of

22   information?

23   A.    I was.

24   Q.    Okay.  And at any time did you indicate to the people

25   doing those investigations that you wanted them to focus on

1    particular protest causes or protest issues that were

2    perhaps going to arise?

3    A.    No, sir.

4    Q.    There is a lot of mention of Black Lives Matter events

5    in what has been handed to you.  Why do you think that is?

6    A.    Well, based on what I have seen today, it doesn't

7    reflect the full duties and responsibilities of the Office

8    of Homeland Security and our duties and responsibilities at

9    that time.

10   Q.    Okay.  So what you're saying is there was a lot more

11   going on than that?

12   A.    Yes, sir.

13   Q.    A lot more communication from and to you on issues

14   other than that?

15   A.    Yes, sir.

16   Q.    And the fact that we're seeing those here today is not

17   indicative that that was your focus; is that right?

18   A.    That's correct.

19   Q.    Did the purpose and mission of the Department of

20   Homeland Security basic mission change during the time that

21   you were overseeing that department?

22   A.    It did.  And it changed based on the events occurring

23   across the country at the time.

24         We started focusing on terrorism and criminal

25   activity, and because of the events in Ferguson which

1    evolved to other events -- which later involved and

2    included other events across the country allowed us to

3    spend more time on social media dealing with protests,

4    permitted events and some of those that were not permitted.

5    Q.   Why would you be even interested in knowing about or

6    looking at protest events?

7    A.   Basically it was a safety factor, just pretty much a

8    safety factor for those who were protesting or

9    demonstrating, and then for the public and then for the

10   police as well and then those that could have counterviews

11   to issues that the protesters were trying to convey and

12   imply.

13   Q.   All right.  And did you during the entire time you

14   were there continue to retain the responsibility for

15   looking at terrorism threats?

16   A.   Absolutely.

17   Q.   Both national and international?

18   A.   Absolutely.

19   Q.   How about extreme weather events?

20   A.   Absolutely.  And we decided to include extreme weather

21   because Memphis sits in an area where we have pop-up storms

22   and straight line winds, and generally we notice over the

23   years that storms have become much more intense, and if we

24   are unfortunately the victims of such adverse weather,

25   power lines are down or whatever, we still want to know the

1  locations of power outages and other activity as far as

2  traffic reroute, what stations are affected, do we need to

3  go ahead and start a station damage report.  Are there any

4  type of injuries, whatever, so on and so forth that we need

5  from the police department and networking general services

6  and/or emergency management and/or Office of Emergency

7  Preparedness that can bring resources to help us out in

8  case of such events.

9  Q.    All right.  And so when we talk about the mission of

10  OHS, is it your testimony that the focus was changing

11  because of the events that were actually occurring but that

12  you maintained the same responsibilities that you had had

13  all along?

14  A.    The responsibilities did change due to the protest.

15  Q.    Okay.  Was your mission abandoned to do any of the

16  other kinds of original work that Homeland Security was set

17  up for?

18  A.    It was never abandoned.

19  Q.    So -- I'm trying to get specific because I think our

20  language may be passing one another, but if there were

21  terroristic threats that might be out there on social media

22  about someone from a foreign country targeting a target in

23  Memphis, would that be something that your Department of

24  Homeland Security investigators would be charged with

25  trying to understand and provide intelligence on?

1   A.   Absolutely, with the fact that we would also work with

2   the Joint Terrorism Task Force, Tennessee Department of

3   Safety and Homeland Security and other fusion centers and

4   other law enforcement agencies that this would also impact.

5   Q.   And is it -- I think there's been some testimony in

6   this trial about the Tennessee Fusion Center passing

7   information to Department of Homeland Security; is that

8   correct?

9   A.   That's correct.

10  Q.   And are there federal agencies that likewise pass

11  information to Department of Homeland Security?

12  A.   Yes, sir.

13  Q.   And are those things that are generally or often from

14  outside the Tennessee region?

15  A.   It would go out into the law enforcement agencies

16  within this region and emergency management.

17  Q.   So usually it would have at least some implication for

18  our region of the country if you received it?

19  A.   Yes, sir.

20  Q.   Okay.  And do you -- did you, your officers during

21  2016 look into those matters that were passed along by

22  either Tennessee Fusion or the federal government?

23  A.   Yes, sir.

24  Q.   Okay.  And that didn't stop in 2016 and 2017?

25  A.   It continued.

1    Q.   Okay.  Tell me about the manpower situation as one of

2    the senior officials in the police department during 2016

3    and 2017.  Were you dealing with staff shortage issues?

4    A.   Absolutely, sir.

5    Q.   Was it your understanding as the senior person over

6    Department of Homeland Security that the intel that you

7    were providing for events was crucial to allowing the

8    operations folks to plan for manpower and resources?

9    A.   Absolutely, because based on the current staffing

10   levels, we still wanted to make sure information was

11   credible so it would allow commanders or the precinct

12   commanders where the event may materialize to go ahead and

13   maybe call in officers for overtime that may be needed to

14   help manage the particular location for safety purposes.

15   Q.   Let me ask you quickly before we get into some more

16   substance an important question.  Are you and were you in

17   2016 aware of the existence of something we call the

18   Kendrick Consent Decree?

19   A.   Yes, sir.

20   Q.   How did you become aware of that?

21   A.   I read it on -- well, not social media, but I read at

22   the on the City of Memphis's website.

23   Q.   All right.  And have you had not in connection with

24   this trial, but previously have you had conversations with

25   other members of executive staff of the police department

1   about that decree?

2   A.    No, sir.

3   Q.    Okay.  Did you have an understanding of it?

4   A.    Vaguely.  Again, it was from 1978.  I read some of it

5   but not an in-depth, solid understanding, but pretty much

6   understood what it was geared toward.

7   Q.    Was there also a department regulation, I believe 138,

8   that addressed some of what were the same topics in the

9   Kendrick Consent Decree?

10  A.    Yes, sir.

11  Q.    Tell me what your general understanding is of that

12  Department Regulation 138?

13  A.    In general it prevented us from conducting political

14  intelligence gathering.

15  Q.    All right.  Did you have the opinion when you took

16  over as Department of Homeland Security's senior person or

17  thereafter that your department was engaged in the

18  gathering of political intelligence?

19  A.    No, sir.

20  Q.    All right.  Well, some of the folks that you are

21  getting chatter from and seeing e-mail pages on were

22  engaged in free speech activities, were they not?

23  A.    That's correct.

24  Q.    Okay.  Well, were you looking at them because of that

25  speech?

1    A.   No, sir.

2    Q.   Why would you be looking at them at all if you're

3    aware that you're not to do what you would think of as

4    political intelligence?

5    A.   Well, prior to the July 10th incident on the bridge

6    takeover, there were also small protests throughout the

7    city and also larger scale protests throughout the country

8    that influenced some of the citizens here in Memphis to

9    gather up and conduct their own sometimes unsanctioned

10   unpermitted protest.  Locations like Poplar and Highland,

11   South Parkway and Poplar, Poplar and Tucker downtown,

12   several locations throughout downtown.

13       So again, if we received that type of information we

14   wanted to make sure that it was credible, that it could

15   materialize, and we just wanted to make sure we had enough

16   manpower to adequately manage it.

17   Q.   All right.  Was there ever any communication to you or

18   from you within the department about trying to discourage

19   or prevent gatherings that were for the purpose of

20   expressing political beliefs?

21   A.   No, sir.

22   Q.   Did you ever have any conversations with anyone about

23   specific political or social opinions being expressed being

24   negative, where things we didn't want to have here in

25   Memphis?

1    A.    No, sir.

2    Q.    There is obviously a part of the conversation around

3    the Black Lives Matter movement involves, you understand it

4    to be the loss of life of young African-American men at the

5    hands of police officers in altercations?

6    A.    Yes, sir.

7    Q.    You're aware of that; right?

8    A.    Yes, sir.

9    Q.    And did you have the opinion or did you personally

10   have antagonism toward that cause because it was somehow

11   antipolice?

12   A.    No, sir.

13   Q.    Did you behave any differently with regard to the

14   information gathering in the Office of Homeland Security

15   because that cause was something that was being espoused at

16   any of these meetings?

17   A.    No, sir.

18   Q.    If it had been the National Square Dance Convention

19   having a gathering of 600 people at the corner of Elvis

20   Presley Boulevard, would you have likewise looked into that

21   for operational safety?

22   A.    We would have.

23   Q.    Are you familiar with the Pulse Nightclub shooting

24   incident in Orlando?

25   A.    Yes, sir.

1    Q.    Okay.  Do you know whether that had any influence on

2    the reinstitution of the JIBS, I'm going to call them, by

3    the Memphis Police Department?

4    A.    Yes, sir.

5    Q.    Tell me what you know about that.

6    A.    Our JIB changed as a result of the Pulse shooting.  We

7    wanted to be more specific and we wanted to add different

8    layers of information which was concerning incidents of

9    local matter, national matter, and incidents having

10   projected to be forthcoming.

11   Q.    Was there in fact an event, a Gay Pride event planned

12   in Memphis within day or two after the Pulse shooting event

13   in Orlando?

14   A.    Yes, sir.

15   Q.    Did that create concern at the department that they

16   needed to look at security measures?

17   A.    Yes.

18   Q.    Did the Memphis Police Department receive requests of

19   organizers of some of the Gay Pride events for security to

20   be tightened in connection with those events?

21   A.    Yes, sir.

22   Q.    And in response to that did you look at social media

23   posts or other sources that you might have to gather

24   information about potential threats?

25   A.    Yes, sir.

1    Q.   And did you post information in the joint intelligence

2    bulletin that then came out about those potential threats

3    and those issues?

4    A.   Yes, sir.

5    Q.   Okay.  And from there some of the events that began to

6    happen in Memphis did change, and there was a heightened

7    frequency, increased frequency of protests, particularly

8    around the summer of 2016; is that right?

9    A.   Yes, sir.

10   Q.   Did people have instructions in your department to

11   look for specific kinds of gatherings that express specific

12   kinds of beliefs?

13   A.   No, sir.

14   Q.   What was the basic instruction that you would give to

15   your folks about what intel was needed and for what

16   purpose?

17   A.   Well basic concern because of all the activity after

18   July 10th, any type of gatherings that would be of a

19   disruption to traffic, to businesses that would infringe on

20   the privacy of those trying to conduct their normal way of

21   life, and if there were some that were going to take place

22   but pretty much concern for the protest safety,

23   demonstrator safety, the safety law enforcement and safety

24   other that could be in the area of that particular event.

25   Q.   All right.  There was some -- let's stay with the

1   July 10th timeframe since you raised that.  That was a time

2   when there was an event that moved there the FedEx Forum

3   became mobile and ultimately a number of people ended up on

4   the I40 bridge; is that correct?

5   A.   That's correct.

6   Q.   Tell me what your involvement on that day was with

7   that unfolding event?

8   A.   On that particular day I received a call from then

9   Major Watson.  He called me and he said, Bass, I need help.

10  He said the streets are being overrun.  They trying to take

11  the bridge.  What do you mean?  He said, I got a lot of

12  protesters and everything.  They come back on Second Street

13  from the FedEx Forum and he said things are out of control.

14  I need help.  I told him, we'll do.  I get on the radio.  I

15  call everybody and we'll get help started that way.

16       And so what I did, I got on the radio and I got there

17  probably in ten minutes.  I lived in Harbor Town.  I got

18  there within ten minutes.  I saw the mass amount of people.

19  I instructed aviation, harbor, all units in my authority to

20  converge in the area.

21       We did put out, for lack of better words, emergency

22  broadcast to dispatchers about what we were having.  I

23  called the Tennessee Highway Patrol and Shelby County

24  Sheriff's Department for additional resources, and I also

25  called the Arkansas State Police.

1    Q.   And why did you call the Arkansas State Police?

2    A.   Because seeing what was going on the bridge, they

3    needed to be made aware of so that they could help us out

4    to manage or reroute traffic, but at that point it was too

5    late but they did show up and just pretty much help their

6    own while we try to manage things on the Memphis side of

7    the bridge.

8    Q.   All right.  Let me ask you, did you actually go out on

9    to the bridge at some point?

10   A.   I was on that bridge within 20 minutes after receiving

11   that phone call.  It took me ten minutes to get there.  I

12   went on the bridge with Major Watson, and at that point we

13   started getting other area commanders that were summoned

14   in -- that was called in, and they brought other additional

15   officer resources from throughout the city, throughout the

16   county.

17   Q.   When we look -- have looked at a film, and I won't

18   show it to you, but when we have looked at a film of the

19   bridge event, a number of protesters, at least beginning

20   with protesters but a number of people, went on to the

21   bridge and there was quite a gathering up there, and I saw

22   there was a small but visible element of the police

23   department on the bridge.  Were you one of those people

24   after the first 20 minutes?

25   A.   Yes, sir.

1    Q.    I saw some places where the lines kind of -- police

2    lines were established to try to keep people from moving

3    further on to the bridge?

4    A.    Yes, sir.

5    Q.    Were you a part of helping direct that effort?

6    A.    No. I was in another particular spot, watching from a

7    distance and still trying to get my team and other officers

8    there to do what they could to help manage it.

9    Q.    Were you continually trying to bring in forces and

10   assistance to deal with the matter?

11   A.    Yes, sir.  I was also receiving calls from the

12   Governor's office and from the state Homeland Security

13   office.  In fact, the Director Commissioner Perkins called

14   me several times that night and wanted to know what

15   resources were needed.  I told him pretty much we had what

16   we thought was adequate at that time and to continue to

17   allow Director Rallings to help manage the situation.

18   Q.    What was conversation with the Arkansas governor's

19   office?

20   A.    They had concerns because I understand the traffic had

21   backed up to Little Rock.  And everybody had concerns about

22   what was going to be the timeframe that Memphis was going

23   to clear the bridge.  And I pleaded both sides from

24   Arkansas and Tennessee, let Director Rallings continue to

25   manage.  He was doing a great job, making leeway, let him

1   continue to manage it.

2   Q.   Were you getting pressure from the governor's office

3   in Arkansas and/or the governor's office in Tennessee to

4   take some more action to clear the bridge?

5   A.   They had real concerns.

6   Q.   Did they indicate that they were considering putting

7   resources on the bridge?

8   A.   That was discussion about that.

9   Q.   All right.  And that's -- that's with reference to

10  which you indicated, let this continue to unfold and let us

11  handle it?

12  A.   Absolutely.

13  Q.   Okay.  At that time or about that time was there a

14  decision made or were you aware of a decision that Director

15  Rallings would come on to the bridge himself and engage in

16  conversation?

17  A.   We saw him later on that evening.

18  Q.   How long do you think you were out there?

19  A.   Probably six hours.

20  Q.   Okay.  Did you personally observe children on the

21  bridge?

22  A.   Yes.

23  Q.   Babies on the bridge?

24  A.   Yes, sir.

25  Q.   Did you observe people climbing up on top private

1   vehicles from the crowd?

2   A.   Yes, sir.

3   Q.   Did you observe people banging on windows of folks in

4   the private vehicles?

5   A.   Yes, sir.

6   Q.   Did you have concerns that you weren't aware of what

7   the thoughts or intentions of the people in the vehicles

8   might be and that they might become unruly?

9   A.   Yes, sir.

10  Q.   And that they might offer actions that would be

11  dangerous to themselves or the protesters or to the

12  officers?

13  A.   Yes, sir.

14  Q.   Okay.  Was that an event, in your opinion, that

15  changed the kind of tone that the Memphis Police Department

16  director was sending out to the rest of the staff and

17  officers about the vigilance that needed to take place with

18  regard to intelligence about events and what might unfold

19  from them?

20  A.   Yes, sir.

21  Q.   You were handed some exhibits that dealt with what I'm

22  going to say look like fairly innocuous --

23  A.   Hold on.

24  Q.   Excuse me.

25  A.   Chest pressure.

1          **MR. GLOVER:**  Your Honor, may we take a short

2     break?

3          **THE COURT:**  Absolutely.  Why don't we go ahead

4     and take our lunch break.  We'll be back in 45 minutes.

5     Thank you.

6               (Lunch break.)

7               (End of Volume 5.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T E**


    I, LISA J. MAYO, do hereby certify that the
foregoing 158 pages are, to the best of my knowledge, skill
and abilities, a true and accurate transcript from my
stenotype notes of the trial, on 22nd day of August, 2018, in
the matter of:



ACLU of Tennessee

vs.

City of Memphis, Tennessee


Dated this August 28, 2018




                        _____S/Lisa J. Mayo_____

                        LISA J. MAYO, LCR, RMR, CRR
                        Official Court Reporter
                        United States District Court
                        Western District of Tennessee