**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ACLU OF TENNESSEE, INC. | ) | |
| | ) | |
| Intervening Plaintiff, | ) | |
| v. | ) | No. 2:17-cv-02120-JPM-dkv |
| | ) | |
| THE CITY OF MEMPHIS, | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT'S POST-TRIAL BRIEF ON THE ISSUE OF STANDING**

---

The Defendant, the City of Memphis ("the City") hereby submits its Post-Trial Brief on the issue of the lack of standing of the Intervening Plaintiff, American Civil Liberties Union of Tennessee, Inc. ("ACLU-TN") to enforce the Consent Decree at issue in this case.

The Intervening Plaintiff failed to meet its burden of proving by clear and convincing evidence that it has standing to enforce the provisions of the Consent Decree entered into in the case of *Kendrick, et. al. v. Chandler*, Civil Action No. C76.449 W.D. Tenn. 1978) (hereafter the "Consent Decree"). Intervening Plaintiff further failed to prove that it is a successor in interest to the entity that was a party to the Consent Decree. Moreover, even if Intervening Plaintiff could be considered a successor in interest to the entity that was a party to the Consent Decree, a successor in interest lacks standing to enforce a consent decree in the Sixth Circuit.

I. **Background**

This case involves an action initially filed by now dismissed plaintiffs Elaine Blanchard, Keedran Franklin, Paul Garner, and Bradley Watkins (collectively, "the individual plaintiffs") to enforce the provisions of the Consent Decree. (ECF No. 1). On March 1, 2017, the City moved to dismiss the individual plaintiffs on the ground that they were not parties to the Consent

1

Decree, and thus lacked standing to enforce it. (ECF No. 9, PageID 37). The next day, on March 2, 2017, the ACLU-TN, which was not a party to the Consent Decree, filed a motion to intervene in the case. (ECF No. 12).

The original parties to the *Kendrick* Complaint were "Chan Kendrick, Mike Honey, John Doe, and the American Civil Liberties Union in Western Tennessee, Inc." (ECF No. 33-1, Page ID 381). Chan Kendrick was the Executive Director of the ACLU-TN. Mike Honey was the Southern Director of the National Committee Against Repressive Legislation. (ECF No. 33-1, Page ID 382). Both Kendrick and Honey alleged that they were the subject of unlawful surveillance by the Domestic Intelligence Unit. *Id.*

Although Chan Kendrick was the Executive Director of ACLU-TN, he did not sue in his official representative capacity as Executive Director (ECF No. 33-1, Page ID 382, 387). He chose to sue in his *individual capacity only*. *See id.* If ACLU-TN intended to be a party to the *Kendrick* litigation, Chan Kendrick could have easily sued both in his individual capacity and in his official capacity as Executive Director of ACLU-TN. He did not.

The *Kendrick* Complaint described the plaintiff listed as "American Civil Liberties Union in Western Tennessee, Inc." as follows: "The American Civil Liberties Union of West Tennessee, Inc. ("WTCLU") … a Chapter of the American Civil Liberties Union of Tennessee, Inc., which is an affiliate of the American Civil Liberties Union." (ECF No. 33-1, Page IDs 381-82). The WTCLU alleged that it was also the subject of unlawful surveillance by the MPD's Domestic Intelligence Unit. (ECF No. 33-1, Page ID 382). Notably, the *Kendrick* Complaint did not allege that ACLU-TN was the subject of unlawful surveillance by the Memphis Police Department. (ECF No. 33-1).

4840-1074-6481 v3
2545600-000213 09/14/2018

The party listed as John Doe was said to represent "all those persons and/or organizations who were engaged in conduct and activities protected by" the Constitution, and asserted that John Doe intended to continue in those activities in the future. (ECF No. 33-1, Page ID 382). The *Kendrick* complaint also attempted to bring a class action suit on behalf of "all persons similarly situated pursuant to Rule 23(a) of the Federal Rules of Civil Procedure." (ECF No. 33-1, Page ID 383).

The *Kendrick* complaint referenced one other individual who allegedly suffered at the hands of the Domestic Intelligence Unit, Eric Carter. (ECF No. 33-1, Page ID 386). In August 1976, Mr. Carter made a request for the file the Domestic Intelligence Unit allegedly kept on him. Instead of producing the file, the defendants burned it rather than allowing Mr. Carter to review it. *Id.* Despite his status as an alleged victim of the defendants' conduct, Mr. Carter was not a plaintiff to the *Kendrick* Complaint or the *Kendrick* Consent Decree. *See Id.*

Two years later, on September 14, 1978, the City and a more limited set of plaintiffs agreed upon a settlement memorialized in a consent "Order, Judgment, and Decree." (ECF No. 9-1, PageID 48). The only plaintiffs who were listed as parties on the *Kendrick* Consent Decree were: "Chan Kendrick, Mike Honey, and the American Civil Liberties Union in West Tennessee, Inc." (ECF No. 9-1).

What is most notable about the named parties to the Consent Decree is <u>who could have been, but was not listed</u> as a party to the Decree, based upon the allegations in the *Kendrick* Complaint. The original plaintiff <u>"John Doe" was not a party</u> to the *Kendrick* Consent Decree. (ECF NO. 9-1). Similarly, <u>the class of plaintiffs</u> of "all persons similarly situated pursuant to Rule 23(a) of the Federal Rules of Civil Procedure" were <u>not included as parties</u> to the Consent Decree. (ECF NO. 9-1). Furthermore, <u>The National Committee Against Repressive Legislation,</u>

3

the entity for which plaintiff Mike Honey was the Southern Director, <u>was not a party</u> to the Consent Decree.  (ECF NO. 9-1).  Chan Kendrick <u>in his official capacity</u> as Executive Director of American Civil Liberties Union of Tennessee, Inc., <u>was not a party</u> to the Consent Decree. (ECF NO. 9-1).  <u>Eric Carter</u> <u>was not a party</u> to either the complaint or the Consent Decree.  (ECF NO. 9-1).  The <u>American Civil Liberties Union</u>, which is the national organization of the ACLU and was mentioned in the "PARTIES" section of the *Kendrick* complaint, <u>was not a party</u> to the Consent Decree.  (ECF NO. 9-1).  And most importantly, the <u>ACLU-TN was not a party to the 1978 *Kendrick* Consent Decree</u>.  (ECF NO. 9-1).  Moreover, there is nothing in the Consent Decree that preserves the right of enforcement to any successors of the American Civil Liberties Union of West Tennessee, Inc.  (ECF NO. 9-1).

Now, some forty years later, <u>the ACLU-TN</u>, who was indisputably <u>not a party</u> to the 1978 Consent Decree, seeks enforcement of the Consent Decree.  Notably, throughout the successive stages of this litigation, the ACLU-TN's theory of standing has changed several times.  ACLU-TN's first position on standing asserted in its Response to the Motion to Dismiss, was that the entity incorporated as the West Tennessee Civil Liberties Union, Inc. was the "chapter" of the ACLU-TN in West Tennessee (ECF No. 33, Page ID 373).  At the summary judgment stage of litigation, however, the ACLU-TN asserted that it was not the West Tennessee Civil Liberties Union, Inc. that was a chapter of the ACLU-TN in 1978, but rather the "American Civil Liberties Union in West Tennessee, Inc." that was the "West Tennessee Chapter" of the ACLU-TN at that time.  (ECF No. 90, Page ID 1699.)  Intervening Plaintiff then claimed that the ACLU-TN did not absorb the West Tennessee Civil Liberties Union, Inc. as it originally asserted, but it actually created "a new West Tennessee Chapter under the rules set out in the By-laws, and abandon[ed] the now unnecessary corporation."  (ECF No. 90, PageID 1701).

4

Finally at trial, and in spite of its previous assertion made at the summary judgment stage to the effect that ACLU-TN had formed the West Tennessee Chapter under the By-laws of the ACLU-TN, the ACLU-TN asserted for the first time that the regional chapters of ACLU-TN, including the West Tennessee Chapter, were actually just "loose networks of individuals located in those communities who were committed to ensuring that the promises of the Bill of Rights were protected in their communities." (Trial Tr. Vol. I, p. 44).

These clearly inconsistent assertions, completely unsupported by any documentary evidence, are simply not enough to establish standing to enforce a consent decree in the Sixth Circuit. The West Tennessee Chapter of the ACLU-TN was not formed according to the By-laws of the ACLU-TN. Moreover, the West Tennessee Chapter's activities were not later absorbed by ACLU-TN. In fact, the uncontroverted evidence at trial showed that the West Tennessee Chapter "died on the vine." (Trial Tr. Vol. IV, p. 438).

For these reasons and the reasons set forth below, this Court should find that the Intervening Plaintiff lacks standing to enforce or modify the provisions of the *Kendrick* Consent Decree.

## II. Intervening Plaintiff must prove it has standing by clear and convincing evidence.

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," and "[t]he doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The Supreme Court explained that "the 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan*, 504 U.S. at 560). A plaintiff "must have (1) suffered an

5

injury in fact, (2) that is fairly traceable to the challenged conduct of a defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*

Furthermore, when the suit is one that challenges "the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." *Lujan*, 504 U.S. at 561. "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Id.* (internal quotations omitted). Indeed, "[a]t bottom the Article III standing limitation prevents a plaintiff from bringing a federal suit to resolve an issue of public policy if success does not give the plaintiff (or one of an associational plaintiff's members) some relief other than the satisfaction of making the government comply with the law." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014).

Additionally, the evidentiary requirements for establishing Article III standing at trial increase substantially over what was required in earlier stages of litigation. "Although standing generally is a matter dealt with at the earliest stages of litigation, usually on the pleadings, it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 115, n. 31 (1979). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," for on a motion to dismiss the court presumes "that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citing *Lujan* v. *National Wildlife Federation*, 497 U.S. 871, 889 (1990)). "In response to a summary judgment motion, however,

6

the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting Fed. Rule Civ. Proc. 56(e)). "And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Id.* (*quoting Gladstone*, 441 U.S., at 115, n. 31).

Moreover, each element of standing must be supported by the same level of evidence as any other issue on which the plaintiff bears the burden of proof. "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, <u>each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation</u>." *Id.* (emphasis added). *See also Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014).

Here, the Intervening Plaintiff seeks a finding of civil contempt. The plaintiff's burden of proof in a case seeking a finding of civil contempt is <u>clear and convincing evidence</u>. *NLRB v. Cincinnati Bronze, Inc.,* 829 F.2d 585, 590 (6th Cir. 1987). Thus, to support a finding of contempt, each element of the Intervening Plaintiff's case, including each element of standing, must be supported <u>in the same way as any other matter on which the plaintiff bears the burden of proof</u>, i.e. by clear and convincing evidence. *See Fair Elections Ohio*, 770 F.3d at 459. "Clear and convincing evidence is a not a light burden and should not be confused with the less stringent, proof by a preponderance of the evidence." *Elec. Workers Pension Tr. Fund of Local Union |58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003).

The Intervening Plaintiff failed to produce <u>*any*</u> evidence, much less evidence of a clear and convincing nature, that it was an original party to the Consent Decree; or that it should be

considered a successor in interest to the entity that was a party to the Consent Decree.

### III. In the Sixth Circuit, only an original party to a consent decree has standing to enforce it.

It is well-settled that "a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975) (citing U*nited States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *Buckeye Coal & R. Co. v. Hocking Valley Co.*, 269 U.S. 42, 46 S.Ct. 61, 70 L.Ed. 155 (1925)). The Sixth Circuit interpreted *Blue Chip Stamps* to mean that even *intended* third-party beneficiaries of a consent order lack standing to enforce its terms. *Aiken v. City of Memphis*, 37 F.3d 1155, 1168 (6th Cir. 1994). *See also S.E.C. v. Dollar Gen. Corp.*, 378 Fed. Appx. 511, 516, (6th Cir. 2010) ("Supreme Court and Sixth Circuit precedent are clear that nonparties to a consent order or, analogously, an agreed or consent judgment entered by the Court incorporating a settlement agreement or a consent order, do not have standing to enforce a judgment."); *Sanders v. Republic Servs. of Kentucky, LLC*, 113 Fed. Appx. 648, 650 (6th Cir. 2004)(a nonparty lacks standing to enforce a consent order even though that person was "within the zone of interests protected by the judgment.").

In order to examine whether a plaintiff has standing to enforce a consent order or decree, courts borrow the reasoning underlying contract law. A consent order "is a contract founded on the agreement of the parties." *Long v. City of Saginaw*, 911 F.2d 1192, 1201 n. 5 (6th Cir.1990) (emphasis added); *Vanguards of Cleveland v. City of Cleveland,* 753 F.2d 479, 484 (6th Cir.1985); *Williams v. Vukovich,* 720 F.2d 909, 920 (6th Cir.1983). A consent order "should be construed to preserve the position for which the parties bargained." *Vogel v. City of Cincinnati*, 959 F.2d 594, 598 (6th Cir. 1992) (emphasis added).

8

Because a consent order is the result of the parties to the lawsuit coming to a compromise, "[t]he decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power to achieve." *United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971). Thus, a consent order "[i]s not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it." *Blue Chip Stamps*, 421 U.S. at 750.

In fact, the Sixth Circuit has held that <u>an original party to a complaint that gave rise to a consent decree does not have standing to enforce the decree</u> if that party <u>is not a signatory</u> to the consent decree. *Sanders,* 113 Fed. Appx. at 651. In *Sanders,* Defendant Republic Services of Kentucky, LLC was the owner and operator of the Valley View Landfill. Republic's predecessor-in-interest, Valley View Landfill, Inc., brought a federal lawsuit in 1987, seeking an injunction against a state environmental agency and challenging the application of local ordinances adopted by the Trimble County Fiscal Court ("Fiscal Court") and other local agencies. Appellants Sanders and Thiemann intervened in the 1987 case, asking the district court to abstain from adjudicating Valley View's claims on the grounds that the matters involved state interests. Valley View and the Fiscal Court entered settlement discussions, and those parties ultimately entered into a consent decree that prohibited the landfill from expanding into certain areas. For reasons not apparent from the record, Sanders and Thiemann were not signatories to the consent decree, which was executed only by representatives of the landfill company and the Fiscal Court. *Id.* at 649-50.

Several years later, Sanders and Thiemann brought suit against the new owners of the landfill, Republic Services of Kentucky, seeking to enforce the consent decree. The district court

4840-1074-6481 v3
2545600-000213 09/14/2018

dismissed the suit because neither of the plaintiffs was a party to the consent decree, and therefore lacked standing to enforce its terms. *Id.* at 650. The Sixth Circuit upheld the district court's finding that even though Sanders and Thiemann were original parties to the suit that gave rise to the consent decree, because they were not parties to the consent decree itself, they did not have standing to enforce it.

> Sanders and Thiemann emphasize that they were parties to the original action, and they argue that they were "'within the specific 'zone of interests' protected under the Agreed Judgment.'" The fact remains, however, that none of the plaintiffs in this action was a party to the Agreed Judgment. Nor is it relevant that they may fall within the zone of interests protected by the Judgment. 'The plain language of *Blue Chip* indicates that even intended third-party beneficiaries of a consent decree lack standing to enforce its terms.' *Aiken v. City of Memphis*, 37 F.3d 1155, 1168 (6th Cir.1994). It also is worth noting that the plain text of the Agreed Judgment itself reserves the right of enforcement solely to Valley View and its successors. The Judgment does not grant any rights of enforcement to, or even make any mention of, the plaintiffs in the present case. Under these circumstances, we must affirm the district court's dismissal of the case."

*Id.*

This makes sense. A consent decree should be narrowly construed against the party agreeing to be bound by the decree. In this case, the City of Memphis entered into a specific agreement with specific parties when it agreed to the Consent Decree. In executing the Consent Decree, the City <u>did not agree</u> to be bound by "John Doe," or by the class of plaintiffs of "all persons similarly situated pursuant to Rule 23(a) of the Federal Rules of Civil Procedure," or by the ACLU-TN. Facts ¶¶ 9,10,11,15.

The City certainly <u>could have</u> entered into an agreement with ACLU-TN in its settlement of the *Kendrick* litigation, especially considering Chan Kendrick was the Executive Director of ACLU-TN at that time, <u>but it did not</u>. Indeed, **<u>the Consent Decree does not mention American Civil Liberties Union of Tennessee, Inc. at all.</u>** The City agreed to be bound to only

one entity: The American Civil Liberties Union of West Tennessee, Inc., an entity that no longer exists and was never "absorbed" by the ACLU-TN.

Moreover, a successor in interest to an original party of a consent decree lacks standing to enforce that decree. *Bauman v. City of Cleveland*, No. 1:04-CV-1757, 2015 WL 893285 (N.D.Ohio Mar. 3, 2015). *Bauman* involved a landfill in the City of Cleveland. A 2006 Consent Decree provided that a construction and demolition debris license was to be reinstated for the entity, Bradley Rd., Inc. The consent decree ruled that, with respect solely to the 2006 construction and demolition license, it was to be modified to designate Edgerton Holdings LLC ("Edgerton") as the Landfill operator. Several years later, Bradley Rd., Inc. joined forces with an entity called Landsong, which replaced Edgerton as the landfill operator. Landsong sought to enforce the terms of the 2006 consent decree, and the district court found it lacked standing as a successor in interest to the consent decree.

> While Landsong readily concedes that it was not a party to the 2006 Consent Decree, it claims to have standing to enforce the decree by virtue of the fact that it is the "successor to the prior operator" of the Landfill. "The Supreme Court has held, however, that 'a well-settled line of authority ... establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it.' " *S.E.C. v. Dollar Gen. Corp.,* 378 F. App'x 511, 514 (6th Cir.2010) (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 750, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)); *see Sanders v. Republic Servs. of Ky., LLC,* 113 F. App'x 648, 650 (6th Cir.2004) ("Following Blue Chip Stamps, we have held that third parties, even intended third-party beneficiaries, lack standing to enforce their interpretations of agreed judgments."); *Vogel v. City of Cincinnati,* 959 F.2d 594, 598 (6th Cir.1992) ("A consent decree is not enforceable ... by those who are not parties to it.") (quotation marks and citation omitted). Because Landsong was not a party to the underlying federal litigation, or the Consent Decree that grew out of it, it lacks standing to bring the present motion.

*Bauman v. City of Cleveland*, No. 1:04-CV-1757, 2015 WL 893285, at *4 (N.D. Ohio Mar. 3, 2015).

Unlike in *Bauman*, where Landsong was indisputably the successor in interest to

11

Edgerton as the operator of the landfill, the ACLU-TN cannot reasonably be considered a successor in interest to American Civil Liberties Union in West Tennessee, Inc. at all. But even if ACLU-TN is considered to be the successor in interest to American Civil Liberties Union in West Tennessee, Inc., it still does not have standing to enforce the Consent Decree based on the reasoning in *Bauman* and the law in the Sixth Circuit: "even intended third-party beneficiaries of a consent decree lack standing to enforce its terms." *Aiken*, 37 F.3d at 1168.

In the case at bar, ACLU-TN's only clearly stated basis for federal court jurisdiction in its suit against the City is that it was at one time loosely affiliated with the party that brought suit against the City in the *Kendrick* action. Based upon the uncontroverted fact that ACLU-TN was not a party to the *Kendrick* Consent Decree, coupled with the probative testimony and documents introduced at trial, this Court should find that ACLU-TN lacks standing to enforce the provisions of the *Kendrick* Consent Decree.

## IV. Intervening Plaintiff failed to prove that it was a party to the Consent Decree.

### A. The ACLU-TN was not a party to the *Kendrick* Consent Decree.

It is indisputable that <u>ACLU-TN was not listed as a party</u> to either the *Kendrick* Complaint (ECF No. 33-1) or the *Kendrick* Consent Decree (ECF No. 9-1). Intervening Plaintiff's own witness, Executive Director of ACLU-TN, Ms. Hedy Weinberg, conceded that the ACLU-TN was not listed as party in the Consent Decree (Trial Ex. 6) or the *Kendrick* Complaint (Trial Ex. 5; Trial Tr. Vol I, p. 60).

Moreover, the signature page of the Consent Decree also evidences that the ACLU-TN was not a party to the Consent Decree. Listed as "Attorneys for Plaintiffs" on the Consent Decree are: Jack D. Novik for American Civil Liberties Union Foundation, Bruce S. Kramer,

12

American Civil Liberties Union in West Tennessee Inc., and Alex Hurder.[1]"  (Trial Ex. 6, ECF 9-1).  Because ACLU-TN was not a signatory to the Consent Decree, it lacks standing to bring an action to enforce the consent decree.  *See Sanders,* 113 Fed. Appx. at 651.

      **B.**      **The entity that was a party to the Consent Decree was not an official chapter of the ACLU-TN.**

To become a chapter of ACLU-TN certain procedures were proscribed by the by-laws of the ACLU-TN. (Trial Ex. 2, ECF No. 33-8 at PageID 426).  The Executive Director of the ACLU-TN, Hedy Weinberg, testified that the ACLU-TN's bylaws in effect in 1973 (Trial Ex. 2) were "very clear" that "the chapters are chartered by the ACLU of Tennessee board of directors where there's an interest and a commitment to adhering to the mission of the organization, and they presented bylaws to ensure that they're, you know, adhering to that commitment." (Trial Tr. Vol I, p. 47).  She went on to explain that "the chapters only exist because they're part of the ACLU of Tennessee, and the bylaws which formalize their establishment have to be approved by the board of directors of the ACLU of Tennessee." (Trial Tr. Vol I, pp. 47-48).

Ms. Weinberg explained that a group "still had to be formally identified through, you know, relationships with the affiliate.  You had to be affiliated with the ACLU of Tennessee in order to have a chapter.  Sometimes there were groups who wanted to create chapters but they weren't part of the ACLU, so they could not use the ACLU designation." (Trial Tr. Vol I, p. 82).

Ms. Weinberg further explained that the minutes of the ACLU-TN board meeting from December 11, 1971 (Trial Ex. 4), which recorded that the bylaws of the Upper East Tennessee Chapter had been adopted and approved, showed an example of the chapter formation process. (Trial Tr. Vol I, p. 47).  Ms. Weinberg admitted, however, that ACLU-TN has no evidence of

---

[1] Bruce Kramer testified in his deposition that Alex Hurder was the attorney representing Mike Honey in the *Kendrick* case.  (ECF No. 141-1, PageID 6099).

when the West Tennessee Chapter or the American Civil Liberties Union in West Tennessee, Inc. ever complied with those "very clear" procedures for chapter formation.  (Trial Tr. Vol I, p. 61).

Furthermore, Ms. Weinberg admitted that she had no personal knowledge of the entity that was a party to the Consent Decree, the American Civil Liberties Union in West Tennessee, Inc. (Trial Tr. Vol I, p. 55).

Not only did Ms. Weinberg not have any evidence or personal knowledge of if or when the American Civil Liberties Union in West Tennessee, Inc. or the West Tennessee Chapter formally became affiliated with the ACLU-TN, neither did Bruce Kramer, the attorney for American Civil Liberties Union in West Tennessee, Inc. and the West Tennessee Chapter during the *Kendrick* litigation.[2]  Mr. Kramer testified he did not remember drafting any by-laws for the West Tennessee Chapter.  (Trial Tr. Vol IV, p. 432).  Mr. Kramer further testified that he had no records or evidence of if or when the bylaws, to the extent that any bylaws of the West Tennessee Chapter existed, were adopted by the ACLU-TN. (Trial Tr. Vol IV, pp. 435-36).

In contrast to this complete dearth of evidence related to the ACLU-TN's adoption of the bylaws of the West Tennessee Chapter, there is ample evidence in the record of the ACLU-TN adopting other chapters' bylaws during the 1970s.  For example, meeting minutes from the ACLU-TN December 11, 1971 meeting reported "on the new Upper East Tennessee Chapter. The bylaws of this group have been adopted and approved."  (Trial Ex. 4, ECF No. 90-3, PageID 1733).  To take another example, the October 4, 1975 Minutes of the ACLU-TN Board Meeting

_____

[2] Mr. Kramer was allowed to testify over the City's objection and the City renews its objection to his testimony.  Mr. Kramer was not identified as a witness in written disclosures or in the Pre-Trial Order (ECF No. 122).  Mr. Kramer was permitted to testify with the benefit of hearing and witnessing the trial testimony of Hedy Weinberg despite the invocation of Rule 615 of the Federal Rules of Civil Procedure at the outset of trial.

4840-1074-6481 v3
2545600-000213 09/14/2018

reported that the "Middle Tennessee Chapter distributed copies of the BT LAWS OF THE MIDDLE TENNESSEE CIVIL LIBERTIES UNION, INC. After discussion of the said by laws, it was m/s/c to approve." (Trial Ex. 3, ECF No. 33-9, PageID 428). However, no such documentation for the West Tennessee Chapter exists because it did not occur.

### C. Existing as an official chapter of ACLU-TN carried with it significant and onerous responsibilities.

The West Tennessee Chapter likely made a deliberate decision not to become an official chapter of the ACLU-TN because local chapters had significant obligations to the state affiliate. (Trial Tr. Vol. I, p. 65). In a September 2, 1969, letter from the then-President of the ACLU-TN, John W. Cleland to the Board of Directors and Chapter Presidents, Mr. Cleland explained that "Chapters must sacrifice income, raise money for local problems and even consider the prospect of raising local moneys as to support the state affiliate office. Mr. Clayton concluded that the Tennessee -- the TACLU might consider or be forced by economics to give up the state office unless the chapters were willing to make the sacrifices necessary." (Trial Ex. 7; ECF No. 90-2, PageID 1731) (emphasis added). *See also* Trial Tr. Vol IV, p. 436.

While ACLU-TN submitted no evidence explaining why the group acting as the West Tennessee Chapter never became an official chapter of the ACLU-TN, there are reasonable grounds on which the group could have made the decision against becoming an official chapter. Primarily, that the West Tennessee Chapter was not willing to make the sacrifices necessary to support the ACLU-TN.

Regardless of the reason the group chose not to become an official chapter of ACLU-TN, the fact remains that the group acting as the West Tennessee Chapter was not "a part of" the ACLU-TN at the time of the *Kendrick* litigation or at any time beyond.

4840-1074-6481 v3
2545600-000213 09/14/2018

**D.     At least one other group in West Tennessee acting in the name of the ACLU chose not to become a chapter of the ACLU-TN.**

An entity known as the West Tennessee Civil Liberties Union, Inc. existed in the late 1960s as an incorporated entity.  (Pre-Trial Order, Stipulated Fact No. 9, ECF 122, PageID 4927).  The ACLU-TN did not exist at the time the West Tennessee Civil Liberties Union, Inc. was chartered.  (Pre-Trial Order, Stipulated Fact No. 10, ECF 122, PageID 4927).  When the ACLU-TN was chartered in 1968, it was formed "for the purpose of (1) consolidating the affairs and activities of the previously existing East Tennessee Civil Liberties Union, Inc., and Middle Tennessee Civil Liberties Union, Inc., and continuing the previous operations of said corporations," and (2) [t]o also absorb at a future time, if agreed to by the membership and/or Board of Directors of both corporations, to assume and continue the operations of the West Tennessee Civil Liberties, Inc., a Tennessee corporation."  (Doc. 33-4, PageID 405) (Pre-Trial Order, Stipulated Fact No. 11, ECF 122, PageID 4927).

Intervening Plaintiff introduced the testimony of Mike Cody who, along with his law partners, created the entity known as the West Tennessee Civil Liberties Union, Inc. in 1968. (Trial Tr. Vol. III, pp. 362).  While Mr. Cody confirmed that his organization, the West Tennessee Civil Liberties Union, Inc. was not involved with the *Kendrick* case (Trial Tr. Vol. III, pp. 366), he offered further enlightening testimony regarding why his group decided not to become affiliated with the ACLU-TN.

Mr. Cody explained that the West Tennessee Civil Liberties Union, Inc. referred to itself "as an affiliate or a chapter of the national ACLU, and that would have been the case until the Tennessee ACLU came upon the scene and the others didn't function anymore, as far as I know." (Trial Tr. Vol. III, pp. 366).  Despite the fact that it considered itself a chapter of the ACLU, Mr. Cody's group chose not to become officially affiliated with the ACLU-TN.  Mr. Cody's

16

testimony on this issue is quoted below:

> Q. Okay. And that's all right. That's all I have about that. Now, your -- you talked about when the state organization, ACLU in Tennessee Inc. was formed. After the organization you formed West Tennessee Civil Liberties Union, ACLU in Tennessee Inc. was formed?
>
> A. Yes.
>
> Q. And but before it was formed, there were chapters around the state affiliated with the ACLU, West Tennessee Civil Liberties Union Inc. being one of them, right?
>
> A. I think so.
>
> Q. There was an east Tennessee chapter and a middle Tennessee chapter, right?
>
> A. I remember working with something that I thought was the east Tennessee chapter on some cases involving University of Tennessee in Knoxville while we were all separate and before we were part of the -- they became all part of one organization.
>
> Q. All right. And actually you thought it was a bad idea at the time to try to centralize things in one location in Nashville?
>
> A. I did, and I complained about them doing it.
>
> Q. But they did it anyway?
>
> A. I guess, yeah, they did it anyway.
>
> Q. And I think you actually predicted to them that this is going to make it harder for people to be organized around here to generate much activity locally on the scene, right?
>
> A. Yeah. My experience just being down here in Memphis is any time that they created an organization and locate it in Nashville, the enthusiasm of people driving to Nashville to go to a Saturday morning meeting and whatever else diminished the activity of the people in the various regions of the state, and I thought it would be probably the end of the west Tennessee operation.

(Trial Tr. Vol. III, pp. 374).

If Mr. Cody's group decided that it was a bad idea to formally affiliate with the ACLU-

TN, there is no basis to presume that other groups acting in the name of the ACLU — such as the

4840-1074-6481 v3
2545600-000213 09/14/2018

American Civil Liberties Union in West Tennessee, Inc. or the West Tennessee Chapter — made a different decision.

## V.    The West Tennessee Chapter initiated and litigated cases independently of ACLU-TN.

The West Tennessee Chapter acted entirely independently of the state affiliate, ACLU-TN when choosing which cases it would litigate.  In the meeting minutes from a "West Tennessee ACLU Board of Directors Regular Meeting May 12, 1980," it was reported that the "consensus of the group was that we should not take the case because the damages were slight and the impact value would apparently be limited."  (Trial Ex. 8).  Ms. Weinberg confirmed that the West Tennessee Chapter would not have to consult with the ACLU-TN when deciding not to take a case.  (Trial Tr. Vol. I, p. 77).

Not only did the local chapters have the authority to litigate their own cases, it was very important which entity —— the chapter or the affiliate — brought a lawsuit.  Shortly after the commencement of the *Kendrick* litigation, the ACLU National affiliate adopted a policy on court-awarded attorney's fees.  (Trial Ex. 100).  It explained that cases could be sponsored by either the affiliate or the chapter.  If a case was sponsored by the state affiliate, then it became a "state case" and all legal papers must list state general counsel for the plaintiff.  The benefit of becoming a "state case" was the availability of state and national affiliate funding.  In contrast, a "local case" would not be eligible to receive state and national ACLU monies.

If a state affiliate sponsored a case or co-sponsored it with a local chapter, then any attorney's fees would be split 60/40 with the state affiliate.  A chapter-sponsored "local case," however, would be under no such fee-splitting burden.  Mr. Kramer confirmed that just after this policy was adopted, he filed for the attorney's fees in the *Kendrick* litigation.  (Trial Tr. Vol. IV, pp. 447).  Notably, Mr. Kramer was awarded attorney's fees on behalf of the American Civil

18

Liberties Union in West Tennessee, Inc. <u>and not</u> the ACLU-TN. (Trial Tr. Vol. IV, pp. 448).

Indeed, Mr. Kramer clarified that <u>it was the national affiliate of the ACLU</u>, represented by Jack Novik, that co-sponsored and co-funded the *Kendrick* litigation (Trial Tr. Vol. IV, p. 446) ("So I mean, that -- that -- I mean, I'm working with the lawyers for the foundation on a case that basically they funded.") This is further supported by the Motion of Plaintiffs for an Award of Attorney's Fees, Costs and Expenses (Trial Ex. 101; Case 2:76-cv-00449, ECF No. 36) and subsequent Award of Attorney's Fees (Trial Ex. 102; Case 2:76-cv-00449, ECF No. 37). The Court determined that two attorneys were entitled to attorney's fees in the *Kendrick* litigation: Bruce Kramer, attorney for the American Civil Liberties Union in West Tennessee, Inc. (s*ee* Trial Ex. 101, Case 2:76-cv-00449, ECF No. 36, PageID 1501) and Jack Novik, attorney for the American Civil Liberties Union Foundation (*see id.* at PageID 1500. *See also* Trial Ex. 102, Case 2:76-cv-00449, ECF No. 37, PageID 1502). Moreover, and most importantly, <u>the ACLU-TN was not awarded attorney's fees</u> for the *Kendrick* litigation.

Interestingly, even though the national ACLU Foundation co-funded and co-sponsored the *Kendrick* litigation, the <u>ACLU Foundation was not a party</u> to the *Kendrick* complaint or the Consent Decree. If *any* entity had a colorable right to intervene in the present lawsuit, it would have been the ACLU Foundation, and not the ACLU-TN.

Intervening Plaintiff has presented <u>no evidence</u> that the entity that was a party to the Consent Decree was ever officially a part of the ACLU-TN. Furthermore, it is clear from the evidence that the West Tennessee Chapter did not consult with the ACLU-TN or rely upon funding from ACLU-TN to bring the *Kendrick* litigation. Indeed, this Court found that only two entities were entitled to attorney's fees in the *Kendrick* litigation, and neither of those entities was the ACLU-TN, because the ACLU-TN was not legally involved with the *Kendrick* case at all.

4840-1074-6481 v3
2545600-000213 09/14/2018

**VI.**   **ACLU-TN is not a successor in interest to the entity that was a party to the *Kendrick* Consent Decree.**

Intervening Plaintiff should not be considered a successor in interest to the American Civil Liberties Union in West Tennessee, Inc. or the West Tennessee Chapter because the chapter "died on the vine" in the 1980s. (Trial Tr. Vol. IV, p. 438).

"A successor in interest is one who follows in ownership or control of property." *AXA Equitable Life Ins. Co. v. Grissom*, No. 3:11-CV-0618, 2012 WL 5879772, at *3 (M.D. Tenn. Nov. 21, 2012) (citations and quotations omitted). *Black's Law Dictionary* defines "successor-in-interest" as follows: "One who follows another in ownership or control of property." *Acme Printing Ink Co. v. Menard, Inc.*, 812 F. Supp. 1498, 1523 (E.D. Wis. 1992), *as amended* (Nov. 5, 1992) (quoting Black's Law Dictionary 1283 (5th ed. abr. 1979)).

Because a "successor in interest" relationship is based upon the premise of successive ownership, it is inapplicable to an organizational structure that involves a "head organization" and its local chapters. Even if the American Civil Liberties Union in West Tennessee, Inc. was a chapter of the ACLU-TN, then the "successor in interest" analysis is inapplicable to that relationship because a "successor in interest" analysis presumes that ACLU-TN "acquired" the ownership of the West Tennessee Chapter. This was not the case.

Although its bylaws were never formally adopted by ACLU-TN, the West Tennessee Chapter that existed in the 1970s was affiliated with the ACLU-TN around the time of the *Kendrick* litigation. However, it is clear from the evidence that the American Civil Liberties Union in West Tennessee Inc./West Tennessee Chapter remained a separate entity from ACLU-TN, including being largely responsible for funding itself and choosing its own litigation, until the time that it finally ceased existing in the early 1990s.

4840-1074-6481 v3
2545600-000213 09/14/2018

During the 1970s and 1980s, each chapter of the ACLU-TN was largely responsible for its own fundraising, including the West Tennessee Chapter, which was having difficulties with its fundraising. In 1983, the West Tennessee Chapter's fundraising efforts in the prior year were "insufficient to adequately support the Chapter. The Memphis office depends on raising enough money to support it." (Trial Ex. 10, ECF No. 80-5).

As a result of this lack of fundraising, in December 1987, the ACLU-TN announced that the "Memphis field office" was "officially closed" because the "budget is currently not able to support two offices." (ECF 80-13). Mr. Kramer testified that the ACLU-TN was headquartered in Memphis, Tennessee when the *Kendrick* litigation concluded and that the ACLU-TN did not maintain an office in Nashville. (Trial Tr. Vol. IV, p. 427). However, the testimony of both Mr. Cody and Ms. Weinberg refute that assertion. Mr. Cody had previously testified that the very purpose of forming the ACLU-TN was to centralize the organization's activities in Nashville. (Trail Tr. Vol. III, p. 364). In fact, Mr. Cody explained that it was precisely because the national ACLU affiliate chose to headquarter the ACLU-TN in Nashville that his group decided against partnering with the ACLU-TN. (Trail Tr. Vol. III, p. 374). Ms. Weinberg then confirmed that the ACLU-TN maintained offices in both Nashville and Memphis, until the Memphis office closed in 1987. (Trial Tr. Vol I, p. 79; Trial Tr. Vol. VI, pp. 770-71; Trial Ex. 134).

Just as the Memphis Field Office closed due to lack of resources, so did the West Tennessee Chapter. In 1988 there was some effort to "reorganize and revitalize" the West Tennessee Chapter. (Exs. 11, 12). However, those efforts to reorganize and revitalize the defunct West Tennessee Chapter failed.

Ms. Weinberg confirmed that there was no West Tennessee Chapter of ACLU-TN from 1988 to 1996. While "there was interest -- the chapter was not actively engaged." (Trial Tr. Vol.

4840-1074-6481 v3
2545600-000213 09/14/2018

I, p. 86). When questioned whether the West Tennessee Chapter existed in 1991, Ms. Weinberg

confirmed that the chapter had not been reorganized by that point.

> Q. Okay. So in 1991, it's clear that the West Tennessee Chapter had still not been reorganized; is that correct?
>
> A. That's what it appears.
>
> (Trial Tr. Vol. I, p. 87).

When Ms. Weinberg was shown a document that was titled "Agenda - Thursday, 14

March 1991 West Tennessee Chapter Reorganization Meeting," (Trial Ex. 15), she re-confirmed

that no West Tennessee Chapter existed at that time.

> Q. So this is a document from the ACLU of Tennessee, and it's an agenda, appears, from the March 14th, 1991 West Tennessee Chapter reorganization meeting; is that correct?
>
> A. Yes, it is.
>
> Q. Okay. And then here in Number 4, it lays out the plans for the West Tennessee Chapter, which includes identifying a board and a president, establishing a legal committee, discussing ideas for future public education and selecting two chapter representatives, plus a president to serve on the state board.
>
> So it's true, is it not, that in 1991, there was absolutely no entity that could reasonably be described as a chapter of the ACLU of Tennessee in West Tennessee?
>
> A. Yeah, it appears that way and it's -- it was happening with all the chapters. They were moving away from that model, but there was an effort and some resistance and we were still trying to build a chapter in West Tennessee.
>
> (Trial Tr. Vol. I, pp. 87-88).

Ms. Weinberg then confirmed that the West Tennessee Chapter had not been reorganized

by 1994. She stated that "there was not a formal chapter" in West Tennessee at that time. (Trial

Tr. Vol. I, p. 90). Mr. Kramer also stated that no West Tennessee Chapter existed in 1994.

"There were a couple of people, but yeah, for the most part, we did not have a big enough core

group of membership to function effectively by 1994." (Trial Tr. Vol. IV, p. 442).

22

While Ms. Weinberg explained that a West Tennessee Chapter was reformed in 1996, she also testified that it was a different group of people than the people that made up the West Tennessee Chapter in 1978.

> Q. The West Tennessee Chapter that was re-formed in 1996 was not the same entity as the American Civil Liberties Union in West Tennessee, Inc., right?
>
> A. There were new people involved in this.
>
> (Trial Tr. Vol. I, p. 98).

Thus, the entity that was functioning as the West Tennessee Chapter in 1978 ceased existing around late-1987 and early-1988. No West Tennessee chapter existed from late-1987 until mid-1996, and no West Tennessee chapter exists today. In sum, it is indisputable that the entity that was a party to the *Kendrick* Consent Decree stopped existing in 1987, and ACLU-TN did not subsume and continue the operations of that entity.

For these reasons, the ACLU-TN cannot be considered the successor in interest to either the American Civil Liberties Union in West Tennessee, Inc. or the group of people functioning as the 1978 West Tennessee Chapter. Even if the Court were to consider the ACLU-TN a successor in interest to that entity, a successor in interest lacks standing to enforce the provisions of a consent decree. See Section III *supra.*

## CONCLUSION

Intervening Plaintiff failed to meet its heavy burden of proving by clear and convincing evidence that it has standing to enforce the Consent Decree. The only evidence ACLU-TN presented in support of its assertion that it is functionally the same entity that was a party to the Consent Decree was the confusing and contradictory testimony of three witnesses. Moreover, ACLU-TN failed to provide any documentary evidence to support its standing claims at all.

The evidence that was presented, however, proves that the ACLU-TN was not a party to

4840-1074-6481 v3
2545600-000213 09/14/2018

the Consent Decree, and the entity that was a party to the Consent Decree was not formally affiliated with the ACLU-TN. The ACLU-TN did not initiate or fund the *Kendrick* litigation, nor did it benefit from the Court's award of attorney's fees. Finally, the ACLU-TN cannot reasonably be considered a successor in interest to the entity that was a party to the Consent Decree. For these reasons, the Court should find that the Intervening Plaintiff lacks standing to enforce or modify the provisions of the Consent Decree.

Respectfully Submitted,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.

s/ Jennie Vee Silk
Buckner Wellford (#9687)
R. Mark Glover (#6807)
Lawrence Laurenzi (#9529)
Jennie Vee Silk (#35319)
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Telephone (901) 526-2000
E-mail: bwellford@bakerdonelson.com
          mglover@bakerdonelson.com
          llaurenzi@bakerdonelson.com
          jsilk@bakerdonelson.com

*Attorneys for Defendant, The City of Memphis*

24

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2018 the foregoing will be served by this Court's ECF system to:

Thomas H. Catelli, Esq.
Mandy Floyd, Esq.
Legal Director
ACLU Foundation of Tennessee
Post Office Box 120160
Nashville, Tennessee 37212

/s Jennie Vee Silk
Jennie Vee Silk

4840-1074-6481 v3
2545600-000213 09/14/2018