**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ACLU OF TENNESSEE, Inc. | ) | |
| | ) | |
| Intervening Plaintiff, | ) | |
| | ) | No. 2:17-cv-02120-jpm-DKV |
| v. | ) | |
| | ) | |
| THE CITY OF MEMPHIS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S BRIEF ON THE MERITS

Pursuant to the *Order Setting Briefing Schedules* (ECF No. 133), the American Civil Liberties Union of Tennessee ("ACLU-TN" or "Plaintiff") files its brief on the merits.

This contempt action arose out of the conduct of the City of Memphis through its police department (the "City" or "Defendant"). Defendant repeatedly violated the Consent Decree entered in *Kendrick v. Chandler*, Civil Action No. C76-449 (the "Decree"). The numerous violations, when viewed together as a whole, reveal a system designed to do exactly what the Decree was established to prevent — to gather, index, file, maintain, store, and disseminate information related to "beliefs, opinions, associations or other exercise of First Amendment rights."

In its August 10, 2018 Order, the Court granted Plaintiff's Motion for Summary Judgment in part and denied its Motion in part. (ECF No. 120.) The Court held that the City violated Section C(1) of the Consent Decree by engaging in "political intelligence" through gathering and disseminating information relating to associations protected by the First Amendment in at least the

following ways: (1) Creating the Authorization of Agency ("AOA") and adding the AOA's list of names to the City Hall Escort List; (2) Creating and circulating the Joint Intelligence Briefings ("JIB"); and (3) Deploying plainclothes police officers to photograph and identify participants at protest events. Id. at PageID 4880-82. The Court held that the City violated the Decree by failing to review and issue written authorizations for lawful investigations of criminal conduct that "may result in the collection of information about" or "interfere in any way with" the "exercise of First Amendment rights." Id. at PageID 4884-86.

With respect to the merits of Plaintiff's claims, the following factual issues remained for a determination at trial:

1.      Whether the City learned about particular lawful events by monitoring social media? The Court held that, if the City learned about lawful events by monitoring social media, then the City engaged in "political intelligence" not only in creating and circulating the JIBs, but in the online monitoring itself, which constituted the gathering of information about the exercise of First Amendment rights. Id. at PAGE ID 4881-82, fn. 15.

2.      Whether any of the following activities were conducted for the purpose of political intelligence in violation of Sections C(2), E, or F(1) of the Decree:

        a.      The operation of any MPD office, division bureau or any other unit; id. at PageID 4882.

        b.      The infiltration of any groups, id. at PageID 4883; or

        c.      The dissemination of any derogatory or false information about any individuals or groups. Id.

3.     Whether any of the following were conducted for the purpose of, or reasonably having the effect of, deterring any person from exercising First Amendment rights in violation of Section F of the Decree:

a.  Photographing participants at public protests "for the purpose of chilling the exercise of First Amendment rights or for the purpose of maintaining a record," id.

b.  Harassment or contacting individual organizers about planned events, id. at PageID 4884; or

c.  Application of a different standard for protests than other events. Id.

4.     Whether the City has substantially complied with the requirement found at Section H(2) of the Decree not to disseminate personal information "collected in the course of a lawful investigation of criminal conduct" to persons outside another governmental law enforcement agency then engaged in a lawful investigation of criminal conduct.  Id. at PageID 4886.

## I.     VIOLATION OF THE DECREE

The evidence, consisting of the testimony of MPD officers, testimony of community members, and internal MPD communications, proved clearly and convincingly multiple additional violations of the Consent Decree as part of a system operated for the purpose of engaging in political intelligence.

### A.  Legal Standard

As is true with any consent decree, the purpose of the parties is evidenced by the language of their agreement. United States v. Armour & Co., 402 U.S. 673, 681 (1971). The Decree, here, evidences an agreement between Plaintiff and Defendant to prioritize and protect the rights of the people of Memphis to communicate an idea or belief, to speak and dissent freely, to write and to

publish, and to associate privately and publicly for any lawful purpose. To this end: The parties agreed to stop the investigation and gathering of information about people's beliefs, opinions, and associations; to stop the indexing, filing, maintenance, and storage of that information; and to stop the trafficking of that information where not related to a lawful criminal investigation. The Decree provided protections beyond that which is provided by the Constitution alone.

Consent decrees "bear some of the earmarks of judgments entered after litigation" and "[a]t the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts." Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 519 (1986) (citations omitted). As the Supreme Court opined:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. . . . Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. *For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.*

Armour & Co., 402 U.S. at 681 (first and second emphases in original; third emphasis added). "A consent decree . . . should be strictly construed to preserve the bargained for position of the parties." Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir.1983).

Subjective assessment in determining an individual's "purpose" is "notoriously difficult to prove." See Kungys v. United States, 485 U.S. 759, 798–99 (1988). Accordingly, an objective inquiry into "purpose" is favored.[1] Michigan v. Bryant, 562 U.S. 344, 359–60 (2011). In an

---

[1] See, e.g., Michigan, 562 U.S. at 359–60 (applying objective analysis to officer's "primary purpose" in conducting interrogation); Kungys, 485 U.S. at 798–99 (adopting objective analysis regarding whether a false statement has been made "for the purpose of obtaining a benefit under the immigration and naturalization laws"); Whren v. United States, 517 U.S. 806, 813 (1996)

objective analysis, "[t]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Michigan, 562 U.S. at 359–60.

Likewise, Plaintiff respectfully submits that the Court should adopt an objective analysis here. The determination of whether MPD has acted "for the purpose" of engaging in political intelligence must be based upon, not the subjective or actual purpose of the individuals involved, but rather the purpose that can be ascertained objectively from the statements and actions of MPD and its individual officers.

**B.  Defendant's Violations of the Decree**

The evidence presented at trial proves that Defendant did not just violate the Decree, Defendant disregarded it entirely. Defendant created a system for gathering information about beliefs, opinions, and associations related to the exercise of First Amendment rights through a specialized unit for that purpose. That specialized unit gathered information, indexed and analyzed it, and used it to engage in further investigations of those exercising First Amendment rights.

Officers in the unit posed as members of community groups, and used covert and undercover means to collect names, photographs, and statements of individuals at free speech events.  The unit then systematically shared that information within MPD, to outside law enforcement agencies throughout the region, and to community members. The information shared

---

(refusing to evaluate Fourth Amendment reasonableness subjectively in light of the officers' actual motivations); New York v. Quarles, 467 U.S. 649, 655–656, and n. 6 (1984) (holding that an officer's subjective motivation is irrelevant to determining the applicability of the public safety exception); Rhode Island v. Innis, 446 U.S. 291, 301–302 (1980) (holding that a police officer's subjective intent to obtain incriminatory statements is not relevant to determining whether an interrogation has occurred).

was personal in nature, at times was damaging or derogatory, and pertained to ongoing and completed investigations, some of which were related to allegations of criminal activity and some of which were not. The information was disseminated because it pertained to the beliefs, opinions, associations, and expression of First Amendment rights. All of the unit's activity was conducted without appropriate oversight, without an analysis of whether the methods were overbroad or intruded upon First Amendment rights, and without consideration of whether the requirements of the Decree were met.

Each individual incident or activity violated the Decree, but more than that, each individual incident was part of a system of violations that resulted in the magnification of harm.

1. <u>Operation of a Unit for the Purpose of Collecting and Disseminating Political Intelligence</u>

Defendant violated Section C(2) of the Decree by operating the Office of Homeland Security ("OHS") as a unit with the purpose of collecting and disseminating political intelligence.

The testimony and evidence at trial demonstrated that a key purpose of the Office of Homeland Security was the development of intelligence regarding the beliefs and associations of those who were engaged in free speech activities. Lt. Col. Eddie Bass testified that the mission of OHS shifted in 2015, and as a result, much of OHS's time involved investigations of protest activity. (ECF 138 at 5727.[2]) Specifically, OHS spent time investigating "protests, permitted events and some of those that were not permitted" in real time and on social media. (<u>Id.</u> at 5777-79.) While OHS did have other responsibilities during the time period in question, such as

---

[2] Citation to the trial transcript will cite to the relevant PageID pursuant to the following format: (ECF __ at ___.)

investigating suspicious packages, those other responsibilities took up no more that 35% of OHS's time.[3] (ECF 137 at 5540.)

> a. *The Real Time Crime Center provided information to the Office of Homeland Security to further its purpose.*

The Real Time Crime Center ("RTCC") served as a research arm for OHS in investigating free speech activities. Major Chandler specifically enlisted analysts with RTCC to help monitor protests and requested that they conduct the preliminary research for JIBs with respect to protests, specifically focusing on Black Lives Matter. (Ex. 103; ECF 137 at 5533, 5538-39, 5542) In conducting these investigations, OHS would "ask RTCC to focus cameras in that particular location" and to search social media, using software known as a collator which can search social media platforms for key words, after hours regarding designated events. (ECF 138 at 5732-33.)

RTCC then circulated the results of those investigations back to OHS by e-mail. (Id.) Other than the direction it received from OHS, RTCC had no policies in place regarding search terms for use with the social media collator or which cameras to monitor, but rather just looked at social media "to see if anybody was saying anything." (ECF 138 at 5727; ECF 139 at 5861-62, 5880.) Evidence at trial demonstrated that RTCC targeted events specifically based on association to specific groups. (See, e.g., Ex. 66; ECF 139 at 5874 (Sgt. Wilburn testifying that the Black Lives Matter Youth Interest Meeting was sent to OHS because it was an event at the Civil Rights Museum and it also included Black Lives Matter); see also Ex. 137; ECF 139 at 5873.)

---

[3] Plaintiff notes that Major Chandler had no memory of OHS investigating international terrorist threats when he gave his deposition in this matter, but only had his "memory refreshed" in preparing for trial. Regardless of this inconsistency, Chandler testified that these other tasks made up a minority of OHS's responsibilities during the relevant period.

*b. OHS's purpose was made clear through its conduct.*

In pursuing its mission, OHS collected and disseminated intelligence regarding political activists and individuals who participated in protests, rallies, or other free speech activities in the City. As found at summary judgment, OHS conducted research on individuals based on their associations and prepared the AOA for the Mayor's residence and City Hall, and in addition, prepared and distributed dossiers on each of the members of the list. OHS prepared and circulated the JIBS, created and maintained a database of protests, and conducted power point presentations regarding activists and protest groups.

The collection, indexing, and dissemination of political intelligence was not an unintentional or inadvertent byproduct of OHS's work — it was its central purpose. For example, the sheer volume and level of detail found in the JIBs, which were distributed three times per day, demonstrates their importance to the work of OHS. Producing the JIBs, requires the collection, indexing, and dissemination of political intelligence. Often, information about past events were included in the JIBs, demonstrating that the JIBs served a purpose beyond providing notice of future events. (Ex. 39; Ex. 59; Ex. 70).

The JIBs also served as a record for later reference in OHS's investigation of free speech activities. (ECF 137 at 5542.) Given their wide distribution, JIBs also effectively communicated to precincts, executive and command staff, and RTCC analysts that OHS was responsible for the collection, investigation, and dissemination of intelligence about protest movements, including the identities of those involved, their beliefs, their associations, and their activities, no matter how small. (See, e.g. Ex. 104.)

In connection with the central mission of their work, OHS operated to identify protest leadership and participants both before, during, and after events. (ECF 137 at 5532-33.) In

conducting investigations of protest activities, Sgt. Timothy Reynolds testified that he used investigative techniques born from his experience in the Organized Crime Unit. (ECF 136 at 5459-60.) This purpose is evident in an October 28, 2016 e-mail, where Lt. Col. Bass, then commander over OHS, ordered his unit to take photographs of "those spearheading the demonstration . . . for future reference and documentation. (Ex. 130.) OHS regularly identified individuals based on their participation in free speech events, mapped their associations, and shared information regarding their beliefs. See Section I(B)(4)(a). OHS engaged in electronic surveillance and investigation of public and private social media accounts, ground surveillance of public free speech events through uniformed and undercover officers, and covert surveillance of private events. (See, e.g., Ex. 109; ECF at 5768-69.) OHS devoted significant time to the operation of undercover social media accounts in an effort to infiltrate and gain access to information about individuals and groups, such as their beliefs, their associations, and their expressions of free speech. See Section I(B)(3).

OHS functioned as a hub for gathering, indexing, and disseminating intelligence between command staff, RTCC, precincts where events were to take place, the City's permits office and other specialized units. Both through JIBs and through individual communications, OHS was in regular communication with precinct commanders regarding free speech events. These communications extended far beyond a discussion of crowd size, staffing of events, or risks posed by or to participants. (See, e.g., Exs. 64, 76, 104, 123.)

Other units within the MPD relied upon OHS as the experts on community groups, members, and their associations — essentially, as the repository for political intelligence. For example, community group Memphis Voices for Palestine was scheduled to hold a permitted event on October 26, 2016. (Ex. 64.) Several weeks in advance, Lt. Colonel Dana Sampietro sent an e-mail to station supervisors stating, "I am having OHS look into this particular group." (Id.) In

response, Sgt. Reynolds responded to Sampietro with a summary of the group's popularity on social media and the identification of which community organizers "often support [the group] on their pages"; further, Reynolds stated that he would "ask our source" whether other groups were interested in the event. (Id.) Reynolds testified that he knew that the community members supported Memphis Voices for Palestine "[t]hrough my undercover account, Bob Smith. You can see the association." (ECF 135 at 5306.) Identifying and disseminating the associations of Memphis Voices for Palestine and community members named was the intended purpose of the Office of Homeland Security in this exchange.

Director Michael Rallings also relied upon OHS to provide intelligence regarding community members and groups. With respect to the Blue Suede Shoes presentation, Sgt. Reynolds testified that Director Rallings instructed him to prepare a PowerPoint presentation for the command staff to show the "trends in the compressed nature of all these protests and events that were going on and to try to explain why we're having a problem with a very small unlawful group that tends to want to protest on private property." (ECF 136 at 5340.) The presentation itself did not simply provide information about individuals who were arrested. Instead, it included associations between individuals identified as "leaders" of the movement, a private social media post from an individual who was not arrested at the demonstration at issue, characterization of individuals as having a "radical agenda" (such as reducing zoo attendance), and incorrect speculation regarding motivations of community members such as Paul Garner. (Ex. 76.) The purpose OHS in preparing the Blue Suede Shoes Presentation, and in conducting the investigation that produced it, was to collect, index, and disseminate information about the associations, beliefs, and free speech activities of the community members profiled.

OHS provided political intelligence as a matter of course when free speech events were scheduled to occur. For example, during the Commercial Appeal demonstration, OHS circulated detailed information regarding Paul Garner, a community member who was "tagged" in a social media post about the planning of the demonstration. (Exs. 104, 50.) Major Keith Watson, Acting-Lieutenant Colonel of North Main Station, requested information regarding the demonstration and asked that the "Intel section" contact the interested employee of the Commercial Appeal. (Ex. 104 at 1963.) Lt. Col. Bass, in turn, forwarded the request to Major Chandler. (Id.) In response, Chandler stated that the event was "verified to be the same event staged by Paul Garner." (Id. at 1962.) Chandler then provided the following detailed information regarding Garner's beliefs and associations:

> Garner is one of our regular antagonists usually associated with the CLERB push and the $15/hr minimum wage protest. This is the info from the latest intel summary:
>
> - Paul Garner is calling for a BLM protest at the Commercial Appeal . . . . Garner (one of the members of CLERB) is not happy about the coverage the CA has given the BLM movement in the newspaper. This call to action is on Garner's Facebook page.

(Ex. 104.) The information provided at the bullet point was also included in JIBs distributed before the event.[4] (See, e.g. Ex. 50.)

This example illustrates that OHS operated for the purpose of political intelligence. OHS's purpose, as evidenced by its actions and statements, was to serve as the "Intel Section" of the Memphis Police Department. While Major Chandler defended collection and inclusion of this

---

[4] Much of this information, included in Maj. Chandler's e-mail and the JIBs, was false. The original post was written by Earle Fisher, not Paul Garner. (Ex. 104.) After the event, Paul Garner was identified in a photograph as having attended the demonstration, when he did not, in fact, attend. (Ex. 105; ECF 139 at 5909.) Further, Paul Garner has never been a member of the Civilian Law Enforcement Review Board (CLERB). (ECF 139 at 5913.)

information as "context." Such a characterization does not change its substance as information regarding a person's beliefs, associations, or other free speech activities and does not obscure the intent of OHS to collect and disseminate this information throughout the MPD and Memphis community.

OHS investigated and circulated information about free speech events even when its own assessment concluded that there was no threat to public safety. For example, a community member posted on his social media account the following: "843 W. Raines rd. Meet me at 9 35 a.m. Sunday morning and watch a brother get saved. Doors open to everyone Come as you are." (Ex. 125.) In response, Lt. Col. Bass circulated an e-mail stating that "there is no adverse information that would suggest the potential for civil disorder." (Ex. 124 at 3948.) Despite this assessment, the Raines Station Commander surveilled the church the next morning and reported back with photographs. (Id.)

Similarly, OHS investigated and circulated information about extremely small events. The Official Black Lives Matter – Memphis Chapter held a free lunch program for children at a local park. (Ex. 128.) A social media post advertised the event as "let's feed the children, youth." (Id.) OHS officer Sgt. Phillip Penny forwarded a screenshot of the social media post with the subject line "BLM Update." (Id.) Bass responded with the instruction to Penny that he "make sure" that he called the Colonel or Acting-Lieutenant of the precinct where the event was occurring. (Id.) When asked whether this was the type of event that OHS focused on at the time, Bass testified that due to the "heightened sense of alert . . . pretty much any information that we ran across open source media that we believe would be a detriment to public and officer safety we did want to make an inquiry just to make sure that everything was pretty much above board or a permitted event." (ECF 138 at 5764.)

These communications serve as a small sample of many similar communications and documents that were admitted into evidence at the trial in the matter. They illustrate that a central purpose of OHS was to gather, index, file, maintain, store, or disseminate information — or engage in any other investigative activity — relating to any person's beliefs, opinions, associations or other exercise of First Amendment rights, including the rights to communicate, speak, dissent, write, publish, and associate privately or publicly for any lawful purpose.

The testimony of some MPD employees was that it was their overarching goal to keep the public safe. Plaintiff does not contest that it is and should be the goal of police departments to do exactly that. The documents, testimony, and overall evidence proves, clearly and convincingly, however, that the Office of Homeland Security <u>also</u> operated for the purpose of political intelligence. The central inquiry is not whether a desire for public safety justifies purposefully violating the Consent Decree at issue. The question is whether the Office of Homeland Security deliberately and intentionally operated for the purpose of gathering, indexing, filing, maintaining, storing, or disseminating information — or engaging in any other investigative activity — relating to any person's beliefs, opinions, associations or other exercise of First Amendment rights, including the rights to communicate, speak, dissent, write, publish, and associate privately or publicly for any lawful purpose. Based upon the evidence presented at trial, the answer is - yes, it did.

2. <u>Prohibition of Political Intelligence</u>

*a. Gathering Political Intelligence through Online Monitoring*

In addition to the specific findings of the Court, MPD, and specifically OHS and RTCC, violated Section C(1) by collecting information about political activists, protests, and groups through public and private sources online. (<u>See, e.g.</u>, Ex. 119.) The Court held that if the City

learned about lawful events through social media collators, then it had engaged in political intelligence "not only in creating and circulating the JIBs, but in the online monitoring itself, which constituted the gathering of information about the exercise of First Amendment rights." (ECF No. 120 PageID 4881.) The evidence submitted at trial demonstrated that OHS and RTCC used social media collators and manual online monitoring to collect political intelligence in violation of the Consent Decree.

Sgt. Wilburn testified that RTCC used social media collators to conduct searches of Twitter and Instagram through key words; in contrast, Facebook required manual searches. (ECF at 139 at 5856-57.) Wilburn testified that RTCC was responsible for "casting a wide net to locate events or find out about them." (ECF at 5858; see also Ex. 135; ECF 139 at 5870.)

This casting of a wide net captured expressions of dissent and speech as well as events. RTCC, at Maj. Bass's request, monitored social media, in part, for "any posts trying [to] organize protests." (Ex. 119.) Despite reporting no posts "regarding rioting or civil disturbance," the RTCC officer included "[a] sample of the Twitter traffic" she was viewing. (Id.) The captured speech was circulated not only within MPD, but also to the Federal Bureau of Investigation, Tennessee Highway Patrol, and Shelby County Sheriff Department. (Id.) RTCC captured not just physical events but calls to action, such as "wear all black day," through the social media collator based on search terms such as Black Lives Matter. (Ex. 136; ECF 139 at 5871-72.) In that instance the social media post merely called for people to wear black clothing in solidarity to the cause, and implicated no protest, gathering or other event. (Id.)

   b.  *Additional Violations of Section C(1) of the Consent Decree*

The trial also revealed numerous additional violations of Section C(1) of the Consent Decree. The following are a sample of those violations:

- Capturing and circulating social media posts about potential boycotts (Ex. 122; ECF 138 at 5739-40; Ex. 107.)

- Using e-mail system to store past gathered political intelligence (ECF 135 at 5242-43);

- Using JIBs as records of investigations (ECF 135 at 5252);

- Circulating a party flyer as "possible protest" because it included a reference to "Black Lives Matter" on the flyer (Ex. 61; ECF 135 at 5303);

- Using social media to investigate protest leaders and keeping record of protest leadership (Ex. 38; ECF 135 at 5252);

- Taking "snags" or screenshots from camera feeds during free speech events (ECF 140 at 6066);

- Creating folders to keep still photos of protest attendees (Ex. 149).

- Investigating and monitoring journalists' accounts based on their association with Black Lives Matter. (Ex. 120; ECF 138 at 5736-37).

In addition to the violation of Section C, the exchange of political intelligence with law enforcement agencies, not in the course of a lawful criminal investigation, also violates Section I of the Decree.

3. Prohibition of Covert Surveillance, Informants, and Undercover Work

Defendant violated Section E of the Decree by covertly surveilling groups engaged in free speech activities for the purpose of gathering and disseminating information relating to any person's beliefs, opinions, associations or other exercise of First Amendment Rights. Defendant engaged in covert electronic surveillance through the Facebook account under the pseudonym "Bob Smith."[5] Defendant used the "Bob Smith" account to communicate with community members, to view private posts, to infiltrate private groups, and otherwise to pose as a member of

---

[5] Sgt. Reynolds testified that he also operated an Instagram account under the pseudonym Bob Smith. This account was not revealed in discovery and no data was produced from it. (ECF 136 at 5460.)

the activist community.

Sgt. Reynolds testified that an undercover account and undercover identity is intended to "[i]nfiltrate, infiltrate, to be a part of a group." (ECF 136 at 5364.) And that is precisely what Defendant accomplished through its prolific use of the Bob Smith social media account. (See, e.g., Exs. 23-31.)

The Bob Smith account was also used as a repository of political intelligence. (ECF 136 at 5351.) Sgt. Reynolds testified that they "would always be able to go back to my Bob Smith account and pull up whatever we needed.  We didn't need to save anything because it's on social media." (Id.)  When asked whether he kept files on "specific protesters, or people who were prominent in . . . protests or demonstrations," Reynolds testified, "No, sir. That's the purpose of the account." (Id.)

Defendant used the Bob Smith account to amass hundreds of friends. (ECF 135 at 5225.) OHS, and to a certain extent RTCC, used the Bob Smith account to conduct targeted investigations of individuals engaged in free speech activity and to capture private social media messages. (Ex. 75; ECF 135 at 5231; ECF 136 at 5335-37.) Sgt. Reynolds testified that his purpose in capturing private social media posts was to explain the beliefs and motivations of the community activists.[6] (ECF 136 at 5336-37.) As discussed above, OHS also used the Bob Smith account to draw associations between people. (Ex. 64; ECF 135 at 5306.) OHS used the account to collect information for the JIBs. (ECF 137 at 5535.)

OHS used the Bob Smith account to join private groups related to community groups and to communicate by private message with community members while posing as a fellow activist.

---

[6] Reynolds testified that Paul Garner's social media post regarding Saul Alinsky was captured due his desire to explain the Bridge protest; the post, however, does not mention the Bridge or even protesting generally. (See Ex. 75.)

(ECF 135 at 5236; ECF 136 at 5329.) In one message with Spencer Kaaz, "Bob Smith" advocates for community members to "show up in a group rather than a few at a time. Greater show of force. LOL." (ECF 136 at 5329.) With respect to Spencer Kaaz, Reynolds also obtained an undercover phone to use for communications with him. (ECF 136 at 5330.)

The evidence presented at trial makes clear that the Bob Smith account was not created or often used for criminal investigations. (See, e.g., Exs. 23-31.) The account was created and used to surveil and pose as a community activist prior to any tangential use in criminal investigations. Even more, OHS continued to use the account to infiltrate groups and pose as an activist after the any criminal investigation became dormant. In fact, in the case of the parody Twitter account established by Paul Garner, OHS, through Sgt, Reynolds, was only brought in to the "criminal" case because of Sgt. Reynold's *preexisting* familiarity with Garner's social media posts. (ECF 136 at 5416.)

Defendant also used the Bob Smith account to collect political intelligence regarding Memphis community members and share it with other cities. (Ex. 71; ECF 136 at 5327.) For example, using the Bob Smith account, Defendant discovered that Spencer Kaaz had indicated on Facebook that he may attend an event in Minnesota. (Ex. 71.) The event was described in its Facebook event page as a strike organized by janitors against their cleaning contractor. (Ex. 71.) Sgt. Reynolds took a screenshot of the event page and sent it to an officer in the Minneapolis, Minnesota police department. (Ex. 71; ECF 136 at 5327.) Reynolds also sent the officer the driver's license information for Spencer Kaaz. (Ex. 72.) Reynolds testified that "if we got something on the feed that we were getting in Memphis about an event in another city, we would share that information with . . . that department's Office of Homeland Security or their counterpart or closest equivalent." (ECF 136 at 5327.)

In all of these ways, Defendant violated the Consent Decree when it covertly surveilled and infiltrated groups engaged in free speech activities for the purpose of gathering and disseminating information relating to any person's beliefs, opinions, associations or other exercise of First Amendment Rights.

4.  <u>Prohibition of Harassment & Intimidation</u>

Defendant violated Section F of the Decree by circulating personal and confidential information about individuals involved in the exercise of their free speech rights, including but not limited to arrest and mental health records and information regarding ongoing investigations. This information was circulated in the JIBs multiple times a day both within MPD, outside of MPD to regional law enforcement, and even to members of the community. JIBs also included information that was damaging, derogatory, and mere rumor. Defendant's purpose in disseminating this information related directly to the beliefs, opinions, associations or other exercise of First Amendment Rights expressed.

a.  *Naming and Photographing Individuals Exercising their First Amendment Rights.*

Defendant also violated Section F of the Decree by specifically engaging in conduct used as an example of a violation; Defendant regularly named and photographed individuals exercising their First Amendment rights by attending meetings and free speech events. Defendant engaged in this conduct "for the purpose of chilling the exercise of First Amendment rights" and "for the purpose of maintaining a record."

For example:

- Col. Gloria Bullock took photos of individuals who came to the Nathan Bedford Forrest Celebration and their license plate and placed that information in an After Action Review of the event. (Ex. 41; ECF 135 at 5262-64.) The After Action Review states that the men were "moved . . . out of the area." (<u>Id.</u>)

- In response to a demonstration by 10-12 people regarding the arrest of Frank Gibson, RTCC viewed the demonstration by live feed, identified the people in the video and shared those identifications with the Office of Homeland Security. (Ex. 54.) RTCC also identified the individual who was "posting on Frank Gotti's page while he's in jail" and shared screenshots of the posts. (Ex. 55.) Sgt. Reynolds then pulled the driver's license for the man identified by RTCC. (Ex. 55 at 11178.) Several of the individuals identified in this demonstration were later placed on the i2 Analyst notebook map of associations and relationship to events. (Ex. 56.)

- On January 31, 2017, Col. Bullock sent photos to Sgt. Reynolds of "photos of yesterday's march." (Ex. 60.) Col. Bullock identified "TNT, Paul Garner, and one other male with bike, who I recognized in the Valero incident, were in the crowd." (Id.) The photos attached included close-up individual photographs and photographs of a license plate. (Id.)

- On September 27, 2016, included in the Joint Intelligence Briefing were photographs taken of several demonstrators, who were identified in the briefing. (Ex. 70.) Sgt. Reynolds testified that the photograph and identifications were included "to show that . . . there was some kind of demonstration there." (ECF 136 at 5325.)

- Identifications of individuals at the Commercial Appeal demonstration described above. (Ex. 105; ECF 137 at 5551; ECF 138 at 5746-48);

- Photographs and identification of individuals at a protest in front of the Memphis Chamber of Commerce. (Exs. 106-07; 479-480, 5552-53.)

These photographs and identifications were undertaken for the purpose of keeping a record, as demonstrated by the After Action Reviews, JIBs, and stored e-mail correspondence. Further, in one example, Lt. Col. Bass specifically ordered OHS to "take photos of those spearheading the demonstrations . . . for future reference and documentation." (Ex. 130.) The intent to chill the exercise of First Amendment rights is evidenced by the way in which the individuals are discussed within the documents presented as evidence at trial. (See, e.g., Exs. 41, 60, 118, 129.) Further, as testified to by community members such as Keedran Franklin, the officers who took photographs at these events were often obvious to the event's participants. (See Section B(4)(c))

## b. *Permitting Events*

Defendant discouraged the exercise of First Amendment rights by enforcing different standards for obtaining a permit for protests than other types of events. As presented at trial, different standards were applied based on whether an event was a protest or not. (Ex. 132.) In correspondence, Deputy Chief Landrum chastised Aubrey Howard for issuing a permit to the Mid-South Peace and Justice Center. (Id.) In response, Mr. Howard assured the Deputy Chief that "We have asked for 14 days for known protest. I will be more vigilant!" (Id.) The Permit Office spreadsheet submitted at trial demonstrates that uneven standard. (Ex. 133.)

## c. *Harassment of Community Members*

At trial, several community members testified regarding the ways in which they have been impacted by the Memphis Police Department's treatment of them following the exercise of their free speech rights. Each community member testified that they had negative, harassing interactions as a result of their expression of protest or dissent. (ECF 139 at 5901, 5908-09, 5939-42; ECF 140 at 5975, 6013.) They also testified about their knowledge that they were being electronically surveilled. (Tr. at 834-35.)

Keedran Franklin, in particular, testified that he had an impactful interaction with MPD while he was at a movie theater organizing a movie ticket giveaway for children.[7] (ECF 139 at 5938.) While at the event, Franklin noticed a plain clothes officer taking photos of the group from his vehicle. (Id. at 5939-40.) Once the Escort List was made public, Franklin noticed that the group of individuals he was with at the Malco ticket giveaway were grouped together on the list. (Id.)

---

[7] Sgt. Reynolds, after discovering that Mr. Franklin was planning the ticket giveaway, suggested to other officers that they obtain an Authorization of Agency for Franklin at all Malco Theaters. (Ex. 73, ECF 136 at 5330-31.)

Rev. Elaine Blanchard testified that her experience with the Memphis Police Department

have negatively impacted her life. She testified:

> Q. And how has this experience with the Memphis Police Department impacted you?
>
> A. It's made me feel paranoid in some ways, certainly about social media, and I'm much more careful now about when and what I put on social media. It has been a regular question to myself to get rid of Facebook, but that's the way I put pictures of my grandson up and talk with him
> face-to-face on the Facebook message thing. So it has value to me, even though it makes me nervous.
>
> Q. And why are you nervous specifically?
>
> A. Well, because I do support the work of Black Lives Matter and social justice activity, and I don't want to become a target again of the police department. I may need the police department some time to help me. So it's an uncomfortable situation to feel like I may be antagonizing the people I would need to protect me if something happened.

(ECF 140 5985-86.)

Franklin described a system of constant surveillance over the past two years. (ECF 139 at

5941.) When asked how the surveillance has affected him and his family, he replied:

> A lot. I limit things I say. I limit where I go. My mom and I are super close like. I don't even go see my mom a lot because I'm afraid that, you know, they'll start getting caught up in some of this. Friends that don't even want to come around because they're afraid, you know. So isolate me purposely by scaring people, scaring my family, you know. It has done a lot, it has.
>                                 ***
> **THE WITNESS:** Like my wife, my mom, great aunty, grandma ma, you know. It's one thing for your family to check on you and it's another thing for them to be terrified to have to call you every day, you know, and I have family that's the police and they're afraid to claim me because they feel they're going to lose their job.

(ECF 139 at 5941-42.)

     5. <u>Substantial Compliance with Section H(2) of the Consent Decree</u>

At summary judgment, the Court held that there was no dispute that the City disseminated

personal information "collected in the course of a lawful investigation of criminal conduct" to

persons outside of law enforcement. ECF No. 120, PageID 4886. Therefore, the Court held that it was the City's burden to prove at trial that its claims that such dissemination was inadvertent and quickly ended were true in order to show that it is in substantial compliance with Section H(2) of the Consent Decree. Respectfully, Plaintiff submits that the City cannot meet its burden.

MPD intentionally added the persons outside of law enforcement to the JIB's circulation intentionally and those individuals remained on the recipient's list for a significant period of time. On October 4, 2016, Jerry Blum, an employee of AutoZone wrote to Reynolds by e-mail requesting that he be added to the daily Joint Intelligence Briefing. (Ex. 32.) The evidence at trial proved that significant numbers of non-law enforcement individuals received the Joint Intelligence Briefing regularly and consistently through March 3, 2017, the final Joint Intelligence Brief produced in this action, including Blum. (Ex. 33.) Accordingly, the City cannot meet its burden with respect to the dissemination of personal information.

## II.     CONCLUSION AND REMEDIES

The Court has an "affirmative duty to protect the integrity of a [consent] decree." United States v. State of Mich., 62 F.3d 1418 (6th Cir. 1995) (quoting Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir. 1985). In doing so, the Court enjoys broad discretion to determine what sanctions will best enforce the Decree. "The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief." McComb v. Jacksonville Paper Co., 336 U.S. 187, 193, 69 S. Ct. 497, 500 (1949). The only limitation is that the Court's remedy must not be punitive in nature. N.L.R.B. v. Aquabrom, Div. of Great Lakes Chem. Corp., 855 F.2d 1174, 1187 (6th Cir.), order amended and supplemented, 862 F.2d 100 (6th Cir. 1988).

The record shows that Defendant violated multiple provisions of the Decree.  The record also shows that the leadership of the MPD has little to no working knowledge of the prohibitions

set forth in the decree. Director Rallings admitted that since he joined the command staff in 2009, he participated only general conversations about the Decree (ECF 137 at 5613.) Officers are not routinely trained on the requirements set forth in the decree. (Id. at 5614.) Director Rallings, spent approximately 12 years in some capacity at the police training academy and served as its commander in 2008. (Id. at 5611.) He testified that he could not recall the Decree being taught to new recruits at the academy. (Id. at 5613.) Lt. Colonel Bass testified that he only had a vague understanding of the Decree. (ECF 138 at 5782.) He had not previously had conversations with other members of executive staff about the Decree prior to this lawsuit. (Id. at 5781-82.) Sgt. Reynolds, whose responsibilities were the most sensitive to the prohibitions in the Decree, testified that he "didn't know much about the 40-year-old decree. I just knew what was in the policy and procedure book and like the brief version of what we needed to look out for." (ECF 136 at 5353.) When asked about his understanding of political intelligence, Sgt. Reynolds testified:

> Q. Did you know exactly what political intelligence was as described in the consent decree itself?
>
> A. No, sir. It just says political intelligence. I don't know what -- I didn't -- I didn't know what to think to investigate further what that was.

(Id. at 5355.) Sgt. Reynolds also stated that he was unaware of the Decree's requirement that the Director authorize criminal investigations that implicated political intelligence. (Id. at 5369-70.)

Compounding this ignorance of the Decree is a complete lack of meaningful oversite on the officers working in the RTCC and OHS who are most likely to need the most training on the definitions of political intelligence and the prohibitions on its gathering and dissemination. Overall, the record shows that Defendant demonstrates an unwillingness to abide by the terms and restrictions of the Consent Decree and has engaged in pervasive and willful violations of almost every provision.

To achieve "full remedial relief," Plaintiff asks the Court to use its contempt powers to effectuate compliance with those provisions in the short term and ensure compliance in the long term. Respectfully, Plaintiff requests that the Court order Defendant to conduct an immediate training for all law enforcement personnel on the Decree and institute policies and procedures to include training in the academy and during annual in-service training. Personnel who work in departments that are engaged in activity that are more likely to implicate the Decree, such as OHS and RTCC, should receive advanced training to ensure their understanding and compliance with the Decree.

Plaintiff also requests that the Court appoint an independent monitor to oversee compliance with the Decree's restrictions on gathering and disseminating political intelligence. The monitor should have access to information necessary to determine whether Defendant continues to violate the Decree, including files and data associated with social media collators and police actions that involve free speech events. The monitor should also ensure that criminal investigations, which implicate political intelligence, are properly authorized by the Director of Police. The monitor should remain in place for a reasonable period of time to ensure continued compliance by Defendant with the Decree. During the monitoring period, the Defendant should promulgate policies and procedures for the use of surveillance techniques and technologies to ensure compliance with the Decree. The monitor should report to the Court and parties on a quarterly basis. The Defendant should be charged with paying the costs of the monitor, as well as the costs and attorneys' fees associated with this action.

Respectfully submitted,

 /s/ Thomas H. Castelli
Thomas H. Castelli (BPR#24849)
Mandy Strickland Floyd (BPR# 31123)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, Tennessee 37212
Phone: (615) 320-7142
Fax: (615) 691-7219
mfloyd@aclu-tn.org
tcastelli@aclu-tn.org

*Attorneys for Plaintiff*


## CERTIFICATE OF SERVICE

I certify that on September 14, 2018 the foregoing document was electronically filed with

the Clerk of the Court using CM/ECF and served via electronic mail to:

Buckner Wellford, Esq.
Mark Glover, Esq.
Jennie Vee Silk, Esq.
Lawrence J. Laurenzi
BAKER, DONELSON, BEARMAN,
 CALDWELL, & BERKOWITZ, P.C.
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103

*Attorneys for Defendant*

/s/ Thomas H. Castelli
Thomas H. Castelli