**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ACLU OF TENNESSEE, | ) | |
| | ) | |
| Intervening Plaintiff, | ) | |
| v. | ) | No. 2:17-cv-02120-JPM-dkv |
| | ) | |
| THE CITY OF MEMPHIS, | ) | |
| | ) | |
| Defendant. | ) | |

---

## DEFENDANT'S RESPONSE TO ACLU-TN'S BRIEF ON THE MERITS

---

The Defendant, the City of Memphis ("the City") hereby responds to the Intervening Plaintiff's, American Civil Liberties Union of Tennessee, Inc., ("ACLU-TN") post-trial Brief on the Merits (ECF No. 143).

The ACLU-TN has failed to prove by clear and convincing evidence that the City's activities related to the allegations in the ACLU-TN's Pre-Trial Memorandum (ECF No. 121) were conducted for the purpose of political intelligence or for the purpose of, or reasonably having the effect of, deterring any person from exercising First Amendment rights in violation of the Consent Decree entered into in the case of *Kendrick, et. al. v. Chandler*, Civil Action No. C76-449 W.D. Tenn. 1978) ("the Consent Decree").

The City has not operated any office, infiltrated any groups, or disseminated any derogatory or false information "for the purpose of political intelligence." Moreover, the City has not photographed protesters or contacted organizers of protests for the purpose of chilling the exercise of those persons' First Amendment rights. Finally, while the City disseminated some personal information about a few persons outside of the Memphis Police Department, that practice stopped in March 2017.

For these reasons, it is respectfully submitted that the Court should find that the City is not in contempt of the Consent Decree beyond the findings the Court has already made.

I.  **Background**

    A.    **The Court's Order held that a genuine dispute existed as to the motivations of the City pertaining to eight specific areas.**

In the Court's Order Granting in Part and Denying in Part the ACLU-TN's Motion for Summary Judgment and Denying the City's Motion for Summary Judgement on the Issue of Contempt (ECF No. 120) (hereafter "the Order"), the Court held that a genuine dispute existed as to whether the City's actions related to the following were done for a prohibited purpose.

1.    Whether the City operated any offices for the purpose of political intelligence (ECF No. 120 at PageID 4882);

2.    Whether the City infiltrated any groups for the purpose of political intelligence (ECF No. 120 at PageID 4882);

3.    Whether the City disseminated any derogatory or false information about persons or groups for the purpose of political intelligence (ECF No. 120 at PageID 4882);

4.    Whether the City photographed participants at public protests for the purpose of chilling the exercise of First Amendment rights or for the purpose of maintaining a record (ECF No. 120 at PageID 4883);

5.    Whether the City contacted organizers of protests for the purpose of deterring any person from exercising First Amendment rights (ECF No. 120 at PageID 4884);

6.    Whether the City imposed different standards for protest permits than other types of events (ECF No. 120 at PageID 4884);

4843-5603-2372 v6
2545600-000213 09/24/2018

7.      Whether the City did engaged in political intelligence by gathering information about First Amendment activities through social media collators (ECF No. 120 at PageIDs 4881-82);

8.      Whether the City's dissemination of personal information "collected in the course of a lawful investigation of criminal conduct" to persons outside "another governmental law enforcement agency then engaged in a lawful investigation of criminal conduct" was "truly inadvertent" and ended quickly.  (ECF No. 120 at PageID 4886).

The ACLU-TN failed to prove by clear and convincing evidence that the City's purpose and motivations related to the above-listed issues were for anything other than protection of public safety.  Further findings of contempt are not warranted.

**B.      The City's motivation to monitor protests focused on public safety concerns, not political intelligence.**

Starting in 2014 and continuing through 2016, the nation experienced a marked increase in spontaneous protests that often spiraled out of control.  (Trial Tr. Vol. 3, p. 279, PageID 5352).  The City of Memphis experienced such an event on July 10, 2016, when an unpermitted gathering at the FedEx Forum protesting the one-year anniversary of the shooting of an African American man in Memphis by a Memphis Police Officer, occurring less than two miles away from a permitted gathering of Civil War enthusiasts and white supremacists, turned into an unorganized mob of people who shut down interstate traffic on the bridge connecting Memphis to Arkansas for several hours (hereafter, "the Bridge incident"). (Trial Tr. Vol. 3, pp. 325-26, PageIDs 5398-99; Trial Tr. Vol. 4, pp. 511-14; PageIDs 5584-87).  Fortunately, due to the restrained reaction of the Memphis Police Department ("MPD") including the current Memphis Police Director Michael Rallings, a public safety disaster was averted and the protest ended peacefully.  (Trial Tr. Vol. 4, p. 530, PageID 5603).

3

Without question, however, this convergence of events, national and local, sparked an increased focus within the Memphis Police Department on the importance of being prepared for similar, potentially dangerous events in the future. (Trial Tr. Vol. 4, pp. 530-1, PageID 5603-04). In particular, it brought about a change in how the MPD utilized social media in order to prepare for the permitted and unpermitted protest events being planned in the City.

Major Stephen Chandler explained that this focus on social media and protests was done for the sole purpose of protecting public safety: "All in an effort of public safety. So we have to allocate resources in order to provide that public safety. Without knowing what the event was or the crowd size, we had to do intel or research and determine how best we could respond so that the event would go successfully, and in the event of counter-protesters, we had enough assets to deal effectively." (Trial Tr. Vol. 4, p. 534, PageID 5607).

Memphis Police Director Michael Rallings testified that the MPD's role in policing protests was to protect public safety while allowing the protests to go on.

> So, if there's a protest, we want to make sure that, you know, someone that could be there to commit some type of act of terror, someone that may not agree with what the particular protesters' views are, we are there to protect them, and one of the best ways we found to do that is to have high visibility.
>
> We always do bomb sweeps. The last thing we want is for someone to pull a permit and there be some type of explosion or some type of WMD event, and we sweep and try to hold the area for those individuals.
>
> As I said, we want to support their ability to gather. We want to support their ability to protest, but we're always looking out for anything that could impede that ability or that could impede public safety.

(Trial Tr. Vol. 5, p. 571, PageID 5647).

The Court also heard the testimony of Lt. Col. Eddie Bass, the supervisor of the Office of Homeland Security ("OHS") during the time of the Bridge incident, who explained that his entire life has been dedicated to the protection of public safety.

4

Let me say this: I've enjoyed serving the City. I've done it all my life. I come from a family of military and policemen. I'm a 7th generation police officer. We've been serving the city since 1968. In fact, what got us into law enforcement business, my uncle, my mother-in-law, they walked with Dr. King. When Dr. King got killed, he joined the Memphis Police Department. They were looking for African-Americans to join to beef up the reins. It influenced my generation to join the Memphis Police Department.

I love what I'm doing. When I signed up for this work, it was never about black lives or white lives. It was about all lives. I've dedicated all my life to doing public service and public safety. If I left here and said I was not offended, I would not be telling the truth. But my career is going to be down pretty soon, because I sit on the sunset of retirement, at some point real soon. And I would hate to leave and retiring with this leaving a bad taste in my mouth that I had participated or had been insinuated or alleged to have participated in violating someone's rights when I swore all my life and given duty to public safety.

I almost got killed on this job in 2012. I walked with a rod right now. I walk with other -- denture help to help me eat. I've been shot 17 times. I've been bit. I've been hit by a car. I've done a lot in the name of public safety and law enforcement safety, and I would just hope that this wouldn't stain my reputation or even the department's reputation, because we work very hard and very diligently to protect all citizens. And especially considering how short-staffed the department is today, and I would hope that, again, this won't be a bad reflection on our department, as we will continue to do everything we can, considering that we're short-staffed, in the name of the public and law enforcement safety.

(Trial Tr. Vol. 6, pp. 733-35, PageIDs 5809-11).

The Court heard similar testimony from every City employee-witness that testified at trial. It is clear that, while the Court has found the City in contempt on certain specific activities considered to constitute "political intelligence" in violation of the Decree, the MPD took these actions for the purpose of protecting public safety and for no other purpose.

The Court's summary judgment Order finding the City in contempt on certain specific issues that the evidence submitted from the Intervening Plaintiff also found that the Intervening Plaintiff had not proven as a matter of law that City, acting through the MPD, acted "for the purpose of political intelligence."

4843-5603-2372 v6
2545600-000213 09/24/2018

Accordingly, viewed in the light most favorable to the City, the record does not establish that the City operated any offices for "the purpose of engaging in political intelligence." (See Consent Decree § C (2).) Similarly, the record does not establish that the City infiltrated any groups "for the purpose of political intelligence" or disseminated any derogatory or false information about individuals or groups "for the purpose of political intelligence." (See Consent Decree §§ E, F (1).) Instead, viewed in the light most favorable to the City, the purpose behind the City's actions was to promote public and police safety, not to gather or disseminate information relating to the exercise of First Amendment rights.

(ECF 120, PageID 4883).

The Court was not presented with any evidence at trial that should alter its initial assessment of the City's evidence submissions at the summary judgment stage.

## II.    The burden of proof in a contempt action is clear and convincing evidence.

In an action seeking a finding of contempt, the burden of proof on the petitioner is clear and convincing evidence. *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 590 (6th Cir. 1987). Courts have inherent authority to enforce their judgments and orders, including consent judgments, through their contempt powers. See *Spallone v. United States*, 493 U.S. 265, 276 (1990); *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983). A litigant may be held in civil contempt of court for violating a "definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Cincinnati Bronze, Inc.*, 829 F.2d at 591.

However, the burden of proof is on the petitioner, and it is a substantial burden. *See Cincinnati Bronze, Inc.*, 829 F.2d at 590. "Clear and convincing evidence is a not a light burden and should not be confused with the less stringent, proof by a preponderance of the evidence." *Elec. Workers Pension Tr. Fund of Local Union |58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003). To prove contempt, 'a degree of certainty is required which leaves no fair ground of doubt' as to the violation of the court's order. Whatever the precise language . . .

6

the petitioner in a civil contempt proceeding must overcome a heavy burden of proof." *Consolidation Coal Co. v. Local Union No. 1784, United Mine Workers of Am.*, 514 F.2d 763, 766 (6th Cir. 1975) (quoting *Schauffler v. Local 1291, International Longshoremen's Ass'n,* 292 F.2d 182, 189-190 (3rd Cir. 1961), *rev'g* 189 F.Supp. 737 (E.D.Pa.1960)).

In the absence of clear and convincing evidence of a defendant's noncompliance with a court order, the court must conclude that the plaintiff failed to meet its burden of showing why a defendant should be held in contempt. *See, e.g., Latino Officers Ass'n City of New York, Inc. v. City of New Yor*k, 558 F.3d 159, 165 (2d Cir. 2009) (finding that the plaintiff's submission of statistical data meant to show that within the New York City Police Department minority police officers were disciplined at a higher rate, and more severely, than were their white counterparts was not clear and convincing evidence to support a finding of contempt against the NYPD).

Here, the Intervening Plaintiff failed to produce clear and convincing evidence that the City is or was in contempt of the Consent Decree's provisions that prohibited the City from acting "for the purpose of political intelligence," or "for the purpose of, or reasonably having the effect of, deterring any person from exercising First Amendment rights."

## III.    <u>Subjective v. Objective approach to determining "for the purpose of"</u>

ACLU-TN asks the Court to disregard the "subjective or actual purpose of the individuals involved, and instead adopt an objective analysis" when determining whether the MPD has acted for the purpose of political intelligence. (ECF No. 143, PageID 6131).  However, the subjective and actual purpose of the City's actions as they relate to the unresolved issues in this case, is precisely what the Court should focus upon.  If subjective intent was irrelevant, what was the purpose of hearing evidence on this subject at the hearing?

4843-5603-2372 v6
2545600-000213 09/24/2018

The Court was not presented with one piece of evidence to support ACLU-TN's assertion that the City's actions that were for any purpose *other than* public safety. The testimony of all the MPD employee-witnesses confirms that position.

The proper analysis for the Court to employ is a subjective approach similar to the one used by courts when issuing "inherent power" sanctions. A finding of contempt is in essence the court sanctioning a party for its failure to adhere to a court order.

Courts have the inherent power to police those appearing before them. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). A court's inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 43 (citing *Link v. Wabash R.R.*, 370 U.S. 626, 630–31 (1962)). This power "must be exercised with restraint and discretion" and used "to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44–45. A court may exercise this power "to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013) (citation omitted). Thus, the imposition of inherent power sanctions requires a finding of bad faith, an inherently subjective determination. *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 517 (6th Cir. 2002) (citing *Lockary v. Kayfetz*, 974 F.2d 1166, 1174 (9th Cir.1992)). For a court to find bad faith, or as the Court is required to do in this case, the existence of an improper purpose, it must engage in a subjective analysis of the conduct at issue. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223–24 (11th Cir. 2017) (finding that the bad faith standard is a subjective one).

4843-5603-2372 v6
2545600-000213 09/24/2018

The ACLU-TN opposes the use of an objective standard because all the evidence in the record as to the subjective motivations of the City and its police department points to one conclusion: that the City's actions, particularly when viewed through the lens of the unsettled and frightening time period of mid- to late- 2016, were conducted entirely for the purpose of protecting the public, protecting officer safety, and for protecting protestor safety.

Even if viewed objectively, the overwhelming evidence points to that same conclusion. The City's actions related to the protest activity in mid- to late- 2016 were driven by a concern for public safety.

**IV.**     **If the City's actions were for the purpose of anything *other* than political intelligence, a finding of contempt is inappropriate.**

The ACLU-TN asks the Court to interpret the relevant provisions of the Consent Decree related to the City's purpose and motivations in a manner that is inconsistent with the plain language of the Consent Decree. ACLU-TN concedes that the Court heard testimony that MPD's "overarching goal [was] to keep the public safe." (ECF No. 143, PageID 6139). Nevertheless, the City's stated motivations, according to the ACLU-TN, should be wholly disregarded if their actions otherwise violated the Consent Decree.

> The documents, testimony, and overall evidence proves, clearly and convincingly, however, that the Office of Homeland Security <u>also</u> operated for the purpose of political intelligence. The central inquiry is not whether a desire for public safety justifies purposefully violating the Consent Decree at issue. The question is whether the Office of Homeland Security deliberately and intentionally operated for the purpose of gathering, indexing, filing, maintaining, storing, or disseminating information — or engaging in any other investigative activity — relating to any person's beliefs, opinions, associations or other exercise of First Amendment rights, including the rights to communicate, speak, dissent, write, publish, and associate privately or publicly for any lawful purpose.

> (ECF No. 143, PageID 6139).

4843-5603-2372 v6
2545600-000213 09/24/2018

Neither the Consent Decree, nor the Court's Order (ECF No. 120), point to such an interpretation.  Importantly,  the Consent Decree § C(2) states: "The defendants and the City of Memphis shall not operate or maintain any office, division, bureau or any other unit for *the* purpose of engaging in political intelligence."  (ECF No. 3, PageID 17)  (emphasis added).  It does not state that if the City of Memphis is found to have conducted political intelligence by an office or a bureau, that the office or bureau in question should be considered as existing for the purpose of political intelligence.  It does not say, "among which purposes is political intelligence."  The Consent Decree is focused on activities done for the *exclusive purpose* of engaging in political intelligence.

The Court's own interpretation of the Consent Decree in the Order suggests that if *any* purpose other than political intelligence is found, then the City has not acted "for the purpose of political intelligence."

> Although the City engaged in "political intelligence," it does not follow that it acted for the purpose of "political intelligence."  As discussed earlier in the Court's analysis, the City is correct that this case "is based upon several sections of the Consent Decree which focus heavily upon the underlying motivations of both the individuals purportedly exercising First Amendment rights . . . as well as the MPD."  (ECF No. 112 at 4524; see also Consent Decree §§ C (2), E, F (1).)  With respect to those sections of the Consent Decree, the distinction between methods and motivations is critical.  Just as a protest organizer might violate an ordinance without doing so for an unlawful purpose, a police department might gather and disseminate information about citizens' speech-related activities without acting "for the purpose of political intelligence."

The ACLU-TN presented no document or any credible evidence proving that OHS's primary directive was to keep files on protestors, a document or testimony indicating that OHS was trying to suppress a political movement, or that the MPD wanted to punish the exercise of political speech.  There was no witness who testified that he was directed to monitor a group of persons engaged in First Amendment activities in order to prevent them from expressing

10

opinions.  In sum, there was <u>no evidence</u> presented to support the ACLU-TN's erroneous assertion that the City acted "for <u>the</u> purpose of political intelligence."  Instead, the ACLU-TN asks the Court to infer an improper purpose -- largely based on the subjective fears and concerns expressed by a handful of protesters --  where an inference is simply not enough.  The ACLU-TN <u>must prove by clear and convincing evidence</u> that the City acted for the purpose of political intelligence, <u>and it failed to do so</u>.

## V.    <u>Intervening Plaintiff failed to come forward with clear and convincing evidence that the City acted for an improper purpose.</u>

### A.    The City operated no offices for the purpose of political intelligence.

In the Order, the Court declared that the record in front of it at that time "did not establish that the City operated any offices for 'the purpose of engaging in political intelligence.'"  (ECF 120, PageID 4883).  At trial, it was the burden of the ACLU-TN to prove by clear and convincing evidence that the City operated any offices for the purpose of political intelligence, but it did not.

#### 1.    The Office of Homeland Security was not created or operated for the purpose of political intelligence.

OHS's initial mission, as counsel for ACLU-TN pointed out, was "the terrorism threat" related to the World Trade Center."  (Trial Tr. Vol. 4, p. 467, PageID 5540).  This is corroborated by the testimony of Major Stephen Chandler, the supervising lieutenant over OHS in mid-2016, who stated that OHS spent "probably 35 percent of our time" on the threat of international terrorism.  *Id.*  Major Chandler further testified that OHS's mission included dealing with domestic terrorism.  "We've seen a rise in homegrown violent extremists."  (Trial Tr. Vol. 4, p. 495).

11

Major Chandler testified that is was also OHS's responsibility to monitor and respond to potential threats to the City's "soft targets," which include the bridges, St. Jude Children's Hospital, Dupont, the St. Jude Marathon, and the Liberty Bowl. (Trial Tr. Vol. 4, p. 498, PageID 5571).

Lt. Col. Eddie Bass, the supervisor of OHS from 2015 to 2016, testified that the duties of OHS were: "terrorism, criminal activity, and extreme weather, and as time went on, as events were emerging throughout the country, protests involved much of our time." (Trial Tr. Vol. 5, p. 651, PageID 5727). He testified that even though the focus of OHS shifted to deal with the critical threats to public safety post-Ferguson, OHS continued to retain responsibility for terrorism threats.

Q. Okay. Was your mission abandoned to do any of the other kinds of original work that Homeland Security was set up for?

A. It was never abandoned.

Q. So -- I'm trying to get specific because I think our language may be passing one another, but if there were terroristic threats that might be out there on social media about someone from a foreign country targeting a target in Memphis, would that be something that your Department of Homeland Security investigators would be charged with trying to understand and provide intelligence on?

A. Absolutely, with the fact that we would also work with the Joint Terrorism Task Force, Tennessee Department of Safety and Homeland Security and other fusion centers and other law enforcement agencies that this would also impact.

Q. And is it -- I think there's been some testimony in this trial about the Tennessee Fusion Center passing information to Department of Homeland Security; is that correct?

A. That's correct.

Q. And are there federal agencies that likewise pass information to Department of Homeland Security?

A. Yes, sir.

4843-5603-2372 v6
2545600-000213 09/24/2018

Q. And are those things that are generally or often from outside the Tennessee region?

A. It would go out into the law enforcement agencies within this region and emergency management.

Q. So usually it would have at least some implication for our region of the country if you received it?

A. Yes, sir.

Q. Okay. And do you -- did you, your officers during 2016 look into those matters that were passed along by either Tennessee Fusion or the federal government?

A. Yes, sir.

Q. Okay. And that didn't stop in 2016 and 2017?

A. It continued.

(Trial Tr. Vol. 5, p. 703-04, PageID 5779-80).

Moreover, Trial Exhibit 78, a 2015 MPD In-Service Training Presentation explained that the mission of OHS "…is to be the single, Agency-wide focal point for coordinating the Department's efforts to prevent or reduce the vulnerability to terrorist attacks and man-made or natural disasters." (Trial Ex. 78, p. 5). It further states:

> Additionally, the Office of Homeland Security will provide coordination with other local, state and federal agencies enabling a proactive response to criminal events or terrorist activities with connections to the City of Memphis or that may impact, or adversely affect the citizens of the City of Memphis. Since 9/11/01 Local communities have increasingly faced an adaptive enemy in an asymmetric threat environment. Events since May 2009 have demonstrated that the threat to the homeland is not abating. The Memphis Police Department Office of Homeland Security is uniquely situated to empower front-line law enforcement, public safety leaders, emergency response personnel, and private sector security personnel to lawfully gather and share information to identify emerging threats. The Memphis Police Department Office of Homeland Security will assist with Special Events and coordinate with Federal, State and local law enforcement agencies as a catalyst for the mitigation of asymmetrical threats pertaining to the safety of the citizens of Memphis and Shelby County. The OHS will assist in

4843-5603-2372 v6
2545600-000213 09/24/2018

development and coordination in Special Events Planning stages as they relate to
the asymmetrical threat paradigm.
*Id.*

Indeed, nowhere in the 135-page presentation from 2015 about the OHS are the words
"protests" or "protesters" ever mentioned. Thus, the OHS is, and has always has been, a division
of MPD that is focused only on protecting public safety, and not "for the purpose of political
intelligence."

> ## 2. The Real Time Crime Center is not an office created for the purpose of political intelligence.

The Real Time Crime Center (RTCC) is, likewise, not an office or bureau whose
existence is for the purpose of political intelligence. The ACLU-TN asserts that the RTCC
"served as a research arm for OHS in investigating free speech activities." (ECF No. 143,
PageID 6133). While ACLU-TN did not explicitly state that RTCC is an office maintained for
the purpose of political intelligence, the implication is clear, and erroneous.

Major Chandler, the commander of RTCC, testified that the RTCC is a multi-faceted
division of the Memphis Police Department that "has a bunch of units that encompass it. It is
responsible for the blue light cameras that you see around town. It's also responsible for body-
worn camera, in-car video. We have a phone forensics lab, a crime analyst unit. And we also
have the people that do actually put the cameras on poles." (Trial Tr. Vol. 4, p. 455-56, PageID
5528-29).

Director Rallings explained that the purpose of Real Time Crime Center was to reduce
crime by providing precincts with real time crime information, and that it did, in fact, drastically
reduce crime.

> So the Real Time Crime Center was developed and implemented to support
> TRAC where we would provide commanders with real time crime information.
> The important things about, you know, what supports TRAC in Blue CRUSH is

14

that we have information on when a crime occurs, where it occurs, what time -- what time the crime occurred so the commander can deploy resources to that particular area to try to reduce crime.

And if you think about the value of that, we saw I think even today, a 22% to 26% reduction in crime from 2006 to probably -- to present.

(Trial Tr. Vol. 5, p. 574-75, PageIDs 5650-51).

To the extent that RTCC assisted OHS by monitoring social media for spontaneous events and protests, any such assistance was given for the purpose of public safety. Major Lambert Ross, the commander of RTCC from 2014 to 2017, explained how and why RTCC began using the search term "Black Lives Matter" to obtain information about potential unpermitted events in order to protect public safety.

Q. Now I'm going to point you -- let's go to July of 2016, and can you tell me, are you aware that that term [Black Lives Matter] was being used for searches?

A. Early July of 2016, I heard the term across the nation, but were we using it, I can't tell you we were.

Q. What about after July the 10th?

A. Yes.

Q. Why would you be using it more after July the 10th of 2016?

A. It was on everything, TV, the newspaper.

Q. We're talking the bridge.

A. Yes. It became a part of what Memphis was, and as far as -- I'm not going to say we chose that term, Your Honor. I feel like that term chose us, because it was -- it became a part of what this city was involved with. And, you know, this was -- this is the country that we live in, and differences of opinion change. That's where things had gotten to, and -- but when it came down to the right to protest, I'm okay with it. No one's going to stop their right to protest.

Q. And when you went to search certain search terms, you were looking to where you might find the most material; is that correct?

A. Yes.

15

Q. And what specifically was law enforcement looking for as it was going through these terms in 2016?

A. What we were trying to -- before the event would take place, how many people may be involved in the event.

Q. Why was that important?

A. If -- we have to look at two things: Public safety, how many people, how many people we would need to put in an area to make sure that the people at the event were safe. The same time we were doing searches for Black Lives Matter, we also have to look at a counter-search for anyone else who was adverse to the Black Lives Matter movement. It's not just we have to protect them, but you got to make sure that that neighborhood, every protest event, every major event in the city, St. Jude Marathon, we have to make sure that we're protecting that route, those runners from counter-protesters. This goes from everything we do.

Q. And was that the same thing for BLM?

A. Yes, sir. It was. Every protest that BLM did or Fight for $15, every protest that they were involved in, we also had to look to see who would be out to target them.

Q. Was it ever used to find out who was involved in Fight for $15?

A. No.

Q. Was it involved to find out who was involved with the Black Lives Matter chapter here in Memphis?

A. No.

Q. Would you have allowed that?

A. No.

Q. Why?

A. The First Amendment Right is protected, precious.

(Trial Tr. Vol. 7, pp. 966-68, PageIDs 6045-47).

Thus, the uncontested evidence presented at trial proves that the RTCC had numerous

missions and purposes unrelated to the gathering of information related to First Amendment

16

activities.  Moreover, whenever RTCC's technology was deployed to gather information related to First Amendment activities, it was not done "for the purpose of political intelligence," but simply to provide real time information about potential events to the precincts in order to protect the public and the protestors' safety.

### 3. OHS had a responsibility to gather information about unpermitted, unlawful protests.

To the extent that OHS and RTCC gathered and collected information related to protest events, it was almost entirely related to unpermitted, and therefore, (in the eyes of the MPD) "unlawful"[1] protests for which the City needed to prepare.  While the Court has made it clear that an unpermitted protest is not necessarily an unlawful protest, that does not diminish the good faith belief of the MPD officers to the contrary.

For example, Sgt. Timothy Reynolds explained that he used his undercover Facebook account to join certain Facebook groups to gather information about potentially unlawful protests.

Q. Okay.  And what specific reasons were there for joining groups?

A. Be part of an investigation.

Q. Okay.  And when you say an investigation, does that mean criminal investigation?

A. Could be unlawful.  It can be criminal.

Q. What's the difference there unlawful and criminal?

A. Making a post that is detrimental to someone, threats of violence or something like that, that's First Amendment protected.  You can do that, but you're starting to get into something that might be unlawful.

---

[1] The Court's conclusion in its summary judgment Order that unpermitted events did not, for that reason alone, make participation in the event "unlawful" does not change the fact that the credible evidence presented at trial was that MPD officials <u>believed</u> that the events were unlawful.

Events that are unpermitted or groups that meet in places that should require a permit and don't get permit or exceed the permit notices, those would be kind of unlawful.

(Trial Tr. Vol. 2, p. 164, PageID 5237).

Lt. Col. Bass further explained why OHS would attempt to gather information related to unpermitted protests.

Q. Why would you be looking at them at all if you're aware that you're not to do what you would think of as political intelligence?

A. Well, prior to the July 10th incident on the bridge takeover, there were also small protests throughout the city and also larger scale protests throughout the country that influenced some of the citizens here in Memphis to gather up and conduct their own sometimes unsanctioned unpermitted protest. Locations like Poplar and Highland, South Parkway and Poplar, Poplar and Tucker downtown, several locations throughout downtown.

So again, if we received that type of information we wanted to make sure that it was credible, that it could materialize, and we just wanted to make sure we had enough manpower to adequately manage it.

(Trial Tr. Vol. 5, p. 707, PageID 5783).

Because these MPD officers operated under the good faith belief that unpermitted protests were not only unlawful, but also potentially dangerous, their intelligence-gathering related to those unpermitted protests should not be considered as having been conducted "for the purpose of political intelligence."

**B.      The City did not infiltrate any groups for the purpose of political intelligence.**

As noted above, the Court stated in the Order that the record before it at the summary judgment stage did not establish "that the City infiltrated any groups 'for the purpose of political intelligence,'" and that "the purpose behind the City's actions was to promote public and police safety."  (ECF 120, PageID 4883).

18

The ACLU-TN, however, asserts that the use of the undercover Facebook account known as the "Bob Smith account" was for the purpose of political intelligence.[2] The ACLU-TN failed to prove, however, by clear and convincing evidence, that the Bob Smith account was used "for the purpose of political intelligence."

Sgt. Timothy Reynolds testified that the Bob Smith account was created and first used in 2009 to be his "police account" on Facebook.

> During the course of my duties as a police officer and an investigator at a precinct and on the task force, we are from time to time required to try to identify suspects, gang members, and a few complaints that are made on social media, and I wasn't going to use my account. So I developed this account for just about everything else other than what I wanted to do personally.

(Trial Tr. Vol. 2, p. 158, PageID 5231).

Starting in 2015, Sgt. Reynolds testified that he used the Bob Smith account to identify possible spontaneous protests with potential to turn into large gatherings by viewing the pages of the most popular people.

> Once you make it -- the jump into social media, it's not only just local, but national trends, like all the protests that were going on nationally would filter their way through certain people's Facebook page. The most popular people are the ones I started paying attention to. The ones that are most vocal about the issues and topics that are happening across the country.

(Trial Tr. Vol. 3, pp. 277-78, PageID 5350-51).

Moreover, the Bob Smith Facebook account was not deployed at any particular topic or group, but rather at all topics or groups that were popular at that time in an effort to predict when

---

[2] The ACLU-TN noted that Sgt. Reynolds testified at trial that "Bob Smith" also had an Instagram account for which no documentation was produced during discovery. Counsel for the City learned of the Bob Smith Instagram account for the first time at trial during Sgt. Reynolds's testimony. Because counsel for the City was unaware of this account, it did not produce any data or files from the account in discovery. The Bob Smith Instagram account has been deactivated as of the date the City learned of it. The very limited historical information from the Bob Smith Instagram account is being produced to ACLU-TN, which is free to reference it or to seek supplemental discovery concerning it.

19

and what type of potentially unlawful gatherings might "pop up" in support of or opposition to that popular topic or group.

> A. The topic didn't matter. It's just the popularity of the topic. And then with any one point of view, there's always an opposing point of view. And the purpose of that was to see if these two opposing points of view are going to have a clash and roped under some type of demonstration or threat to officer safety or community or private property.
>
> Q. Were there demonstrations and protest activity that occurred following -- by the way, do you remember when the Darrius Stewart shooting was?
>
> A. July -- it was in July of 2015. I don't remember the exact date.
>
> Q. All right. And were there unpermitted protests and demonstrations that occurred during that time frame?
>
> A. Yes, sir.
>
> Q. Is that something -- why would that be something that would concern or that your office would need to be interested in or concerned about?
>
> A. All across the country, major metropolitan areas were having spontaneous protests that sometimes got out of hand. And we wanted to make sure that these protests, A, because of the gap of intelligence we knew about them; and, B, have officer presence to ensure public safety and also to make sure that the protesters themselves were not injured.
>
> Q. Were there threats during this time frame to the officer who was involved in the shooting?
>
> A. Yes, sir.

(Trial Tr. Vol. 3, pp. 279-80, PageID 5352-53).

The Bob Smith account was also used in criminal investigations. It successfully uncovered a conspiracy by Fergus Nolan to hack into the Memphis Zoo's computer system. (Trial Tr. Vol. 3, pp. 291-98, PageIDs 5364-71; Trial Ex. 81).

To the extent that "Bob Smith" interacted with persons only tangentially involved with potential protests or criminal activity, Sgt. Reynolds also explained that he interacted with

persons and groups on Facebook as his "Bob Smith" persona in an effort to make the Bob Smith account "look active." (Trial Tr. Vol. 2, p. 163, PageID 5236).

Thus, the MPD's use of the Bob Smith account was not for the purpose of political intelligence, but rather as a vehicle for obtaining critical information related to possibly unlawful activities that might not otherwise be available to MPD because the posts were made only to the "friends" of the person posting. It is well-settled that a person has no reasonable expectation of privacy in anything he posts on social media. See *United States v. Meregildo*, 883 F. Supp.2d 523, 526 (S.D.N.Y. 2012) (reasoning that the "legitimate expectation of privacy ended when he disseminated posts to his 'friends'" because those "friends" were free to share that information "with the Government."). The use of a fake Facebook persona to capture such information does not violate the First Amendment or any provision of the Consent Decree— so long as it was not obtained for the purpose of political intelligence.

**C.     The City did not disseminate any derogatory or false information about individuals or groups for the purpose of political intelligence.**

The Court explained in the Order that there was no evidence in the record at the summary judgement stage that the City "disseminated any derogatory or false information about individuals or groups 'for the purpose of political intelligence.' Instead, viewed in the light most favorable to the City, the purpose behind the City's actions was to promote public and police safety, not to gather or disseminate information relating to the exercise of First Amendment rights." (ECF 120, PageID 4883).

It was, therefore, up to the ACLU-TN to prove by clear and convincing evidence that the City disseminated derogatory or false information about persons or groups for the purpose of political intelligence. The ACLU-TN offered no evidence, however, regarding the purpose of the City's very limited dissemination of any information related to individuals or groups

21

exercising their First Amendment rights, and in fact only point to two instances of the dissemination of "false" information. The ACLU-TN points to Trial Exhibit 104, a Joint Intelligence Briefing ("JIB") that incorrectly attributes a post written by Earle Fischer to Paul Garner. ACLU-TN also points to Trial Exhibit 105, a JIB that included a photo of a person mistakenly identified as Paul Garner. In both of these instances, the "false information" disseminated were simply mistakes made in the course of creating the JIB. Moreover, the fact that no one within OHS could immediately recognize that the person in the photo attributed as being Mr. Garner, was not in fact Mr. Garner, evidences how little attention MPD focused on this issue.

The purpose of the Joint Intelligence Briefing ("JIB") was not to disseminate false or derogatory information, but "to share information related to police shootings, deaths, both locally and national, riots, protests, both locally and nationally…." (Trial Tr. Vol. 4, p. 466, PageID 5539). Major Stephan Chandler testified that the purpose of the JIB was to share "information that was passed to local law enforcement about incidents that had implications to law enforcement and the city of Memphis." (Trial Tr. Vol. 4, p. 464, PageID 5537). Director Rallings testified that the JIB was "just a report that provides situational awareness." (Trial Tr. Vol. 5, p. 578, PageID 5654).

To the extent that the City disseminated any derogatory or false information related to First Amendment activities in the Joint Intelligence Briefing ("JIB"), it was unintentional, sporadic, and not done for the purpose of political intelligence. Moreover, Major Stephen Chandler testified that when he realized the JIB sometimes contained "too much" personal information, he ordered personal information removed from the JIB after consulting with the command staff. (Trial Tr. Vol. 4, p. 494, PageID 5567).

4843-5603-2372 v6
2545600-000213 09/24/2018

The ACLU-TN, therefore, failed to prove that the JIB, and any personal, derogatory, or false information contained in the JIB, was created or disseminated "for the purpose of political intelligence."

**D.    The City did not photograph participants at public protests for the purpose of chilling the exercise of First Amendment rights or for the purpose of maintaining a record.**

ACLU-TN contends that the City violated Section F of the Consent Decree by naming and photographing persons exercising their First Amendment rights.  (EFC No. 143, PageID 6144).  However, as the Court explained in the Order, the Consent Decree does not prohibit the City from photographing participants at public protests, so long as it is not doing so in an effort to chill those persons' First Amendment activities or for maintaining a record.  (ECF No. 120, PageID 4883).

The ACLU-TN lists several instances where the City took photos of persons and groups protesting or otherwise exercising their First Amendment rights.  (ECF No. 143, PageIDs 6144-45), but the ACLU-TN presented no evidence of the City's improper purpose in doing so. Instead, it asserts that the "intent to chill the exercise of First Amendment rights is evidenced by the way in which the individuals are discussed within the documents presented as evidence at trial."  *Id.* at PageID 6145.

ACLU-TN notes a few examples of photographs produced during discovery of protest activity, but it failed to elicit any testimony or further provide any evidence as to the City's motivations in taking those photographs.  For example, the ACLU-TN presented Sgt. Timothy Reynolds with Trial Exhibit 41, an "After Action Review:" containing photographs of counter protest activity.  ACLU-TN did not ask Sgt. Reynolds why the photographs were taken, or even

try to draw an inference of the City's purpose in taking those photographs. (Trial Tr. Vol. 2, pp. 189-90, PageIDs 5262-63).

The same goes for Trial Exhibits 55 and 60, which were also shown to Sgt. Reynolds at trial. He was not questioned as to why the City took the photos in the exhibits, and he offered no testimony to that effect. (Trial Tr. Vol. 2, pp. 212-213, PageIDs 5285-86; pp. 229-230, PageIDs 5302-03). When the ACLU-TN finally did question Sgt. Reynolds as to the City's purpose in sharing photographs from events after they occurred, Sgt. Reynolds testified that it was to "show crowd size." (Trial Tr. Vol. 3, p. 252, PageID 5325).

The testimony of Major Stephen Chandler corroborates Sgt. Reynolds' statement. When shown and questioned about Trial Exhibit 105, which contained a photo of a protest on July 13, 2016[3], Major Chandler testified that MPD was "trying to show the size of the crowd." (Trial Tr. Vol. 4, p. 476, PageID 5549).

Moreover, it is clear from the documents produced in discovery and those selected by ACLU-TN to be admitted into evidence, that the City did not "maintain records" on individual protestors. If that were the case, the City would have necessarily have had more than just the few select photographs submitted by Intervening Plaintiff at trial.

In sum, the ACLU-TN presented no evidence of the City's motivations in taking the few photographs of protest events and protestors that it did in 2016. The burden is on the ACLU-TN to prove that the City's act of photographing persons at protests was done to chill those persons from speaking in the future, by clear and convincing evidence, and it has failed to do so.

**E. The City did not contact organizers of protests for the purpose of deterring any person from exercising First Amendment rights.**

---
[3] July 13, 2016 was just three days after the Bridge Incident.

4843-5603-2372 v6
2545600-000213 09/24/2018

In its summary judgment Order, the Court acknowledged the possibility that the City contacted individuals to remind them that they would need to apply for a permit if they were planning a rally for over 25 participants, but that the City "likely did this in order to discourage those organizers from holding large rallies without first obtaining permits, but even so, the City's 'purpose' was not necessarily to discourage the organizers from exercising their rights. Instead, the City might have been concerned that the organizers were planning disruptive and/or dangerous events that were not protected by the First Amendment." (ECF No. 120, PageIDs 4883-84). As such, the onus was on the ACLU-TN to prove, by clear and convincing evidence, that the City's contact with individual organizers was done "for the purpose of . . . deterring any person from exercising First Amendment rights."

The ACLU-TN offered no evidence that the City's contact with these persons was for any improper reason. Instead, the testimony of several MPD witnesses evidenced why MPD might contact a certain individual about a planned event. For example, Major Stephan Chandler contacted the organizer of an event celebrating the life of Nathan Bedford Forrest to suggest that he move the event to a different day due to other protests planned in the area on that same day. (Trial Tr. Vol. 4, p. 512, PageID 5585).

To take another example, Lt. Col. Bass instructed his team to find out the nature of an event that was planned three days after the Bridge incident so that they could "find out what exactly was going to be about and should we send officers to go find out what the real gathering was going to be about." (Trial Tr. Vol. 5, p. 692, PageID 5768).

Thus, it is clear from the evidence that the City's purpose in occasionally contacting the organizers of unpermitted events was to encourage them to get permits and to ascertain the

25

nature of the event so that it could adequately prepare for the event, and not for the purpose of political intelligence.

**F.      The City did not impose different standards for protest permits than other types of events.**

The ACLU-TN presented absolutely no evidence that the City enforced different standards for obtaining a permit for protests than for obtaining one for other types of events.  The two pieces of evidence ACLU-TN submitted simply do not support their argument at all.  For example, Trial Ex. 132 is evidence of an instance when a permit for a protest *was granted* outside the bounds of the normal restrictions of the permitting ordinance, i.e. 14 business days.

Trial Ex. 132 is an email chain between the City's permitting coordinator, Aubrey Howard, Deputy Chief Terry Landrum, and Col. Gloria Bullock.  Col. Bullock explains to Dep. Chief Landrum that she just received notice of a protest scheduled for the following day.  She states that she will have to hire overtime and get officers to come in early to cover the event, and she complains that the Permits Office did not give her enough notice to prepare a detail.

Dep. Chief Landrum then forwards the email to Mr. Howard asking for the "time line to obtain a permit" and stating that one day did not give them much time to prepare.  Mr. Howard responded that the permits office asks for "14 days for a known protest."  This sentence does not imply that Mr. Howard asks for less than 14 days for any other type of event, and the ACLU-TN's implication that it does is groundless.  Indeed, Trial Ex. 132 shows the opposite of what ACLU-TN suggests.  It shows that the City granted a permit for a protest organized by the Mid-South Peace and Justice Center with just one day's notice, and in contravention of the Parade and Public Assembly Ordinance, which required 14 business days' notice.  *See* Trial Ex. 114.

ACLU-TN also asserts that the Permit's Office's spreadsheet tracking the permits granted and denied (Trial Ex. 133) demonstrates that protests were treated differently than other events.

26

The spreadsheet, however, shows no such unequal treatment. In fact, Trial Ex. 133 shows that the vast majority of permits — whether for protests or other events — were granted. Moreover, Mr. Howard testified that his office would only deny an application permit for an event, protest or otherwise, if it was not submitted per the time restrictions in the Permit Ordinance. (Trial Tr. Vol. 6, p. 764, PageID 5840).

The ACLU-TN failed to prove by any measure of evidence, much less evidence of a clear and convincing nature, that the City enforced permits for protests differently than for other events.

## VI. __The City did not engage in political intelligence by gathering information about First Amendment activities through social media collators.__

The ACLU-TN asserts that the City engaged in political intelligence through its practice of using social media collators to gather information related to First Amendment activities (ECF No. 143, PageIDs 6139-40). The Court expressly stated in its summary judgment Order, however, that the City's use of social media collators to search for specific threats to police and public safety, "was not 'political intelligence' because the purpose of such threats is unlawful and they are not protected under the First Amendment. The Consent Decree does not prohibit the City from monitoring social media altogether; it simply prohibits the City from casting too wide a net." (ECF No. 120, Page IDs 4881-82).

The evidence presented at trial shows that the City's use of the social media collators was not "political intelligence" because it was directed at uncovering threats. Sgt. Bradley Wilburn, an analyst in the RTCC during the time relevant to this case, testified as follows:

Q. Okay. And, again, it was up to you to decide whether or not you were going to use that particular word; is that correct?

A. That's correct.

4843-5603-2372 v6
2545600-000213 09/24/2018

Q. And, again, what you were really trying to do were to try to find events, correct?

A. Yes.

Q. You were trying to find threats?

A. Yes.

Q. And when we say "threats," that would be threats to people who may be involved in a peaceful protest or event; is that correct?

A. Yes.

Q. You were looking for threats to officers?

A. Yes.

Q. And were you also, of course, also concerned about how it may impact the public, traffic?

A. Yes.

Q. So being aware of that, it was up to you and other people who did your job, okay, to come up with search terms that they thought are relevant at the time?

A. That is correct.

(Trial Tr. Vol. 6, p. 805, PageID 5881).

Regarding the RTCC's use of the search term Black Lives Matter in the social media collator, Sgt. Bradley Wilburn explained that the term was used solely in an effort to identify potentially violent events.

Q. Now, again, you were shown a number of exhibits that mentioned Black Lives Matter during certain -- a certain period of time, three or four-month period, okay. And can you tell the Court why Sergeant Wilburn had decided to use that search term in doing his searches during that period?

A. There was a period of time -- during that time was a period of time where there was a lot of protests nationwide going on involving people that either were Black Lives Matter or claimed to be. Violence had been historically seen with that. So we were trying to capture information locally if there was any regarding that.

28

(Trial Tr. Vol. 6, p. 818, PageID 5894).

Because the MPD's use of the social media collators was for the purpose of identifying potential threats to the public, to officer safety, and to the protestors themselves, its use related to First Amendment activities does not constitute political intelligence.

## VII. The City only briefly disseminated personal information to a limited number of persons outside traditional law enforcement, but that practice stopped in March 2017.

The Court stated in the Order that there was no dispute that the MPD disseminated personal information "collected in the course of a lawful investigation of criminal conduct" to persons outside "another governmental law enforcement agency then engaged in a lawful investigation of criminal conduct." (ECF No. 120, PageID 4886). The Court explained that if "this practice was truly inadvertent and ended quickly, however, the City may be in substantial compliance with Section H of the Consent Decree. This is a factual issue to be examined at trial."[4] *Id.*

At the hearing the City presented evidence that the MPD stopped the practice of distributing the JIB outside of law enforcement on or around March 10, 2017. *See* Coll. Trial Ex. 147. Moreover, the vast majority of "non-law enforcement" who received the JIB during that limited time period were either retired police officers and acting in a "law enforcement capacity" at their respective companies. For example, Jerry Blum of AutoZone received the JIB for a brief time, and he is a retired chief of the MPD. (Trial Tr. Vol. 2, p. 172, PageID 5245). The same is true of Toney Armstrong of St. Jude, Frank McGowan of FedEx, Mr. A. Rosser of

---

[4] The ACLU-TN asserts that the Court stated that it was the City's burden to prove at trial that its claims that this dissemination was inadvertent and it quickly ended. (ECF No. 143, PageID 6148). The Court's Order does not state that it is the City's burden, but rather that "[t]his is a factual issue to be examined at trial." (ECF No. 120, PageID 4886).

29

MLGW, David Martello of FedEx, Stuart Frisch of St. Jude — they are all former MPD officers.

*Id.*

The City, therefore, has been in substantial compliance with Section H of the Consent Decree.

## VIII.   <u>The ACLU-TN failed to prove that the City harassed persons exercising their free speech rights.</u>

The ACLU-TN offered the testimony of several persons for the apparent purpose of proving that MPD harassed and intimidated them as a result of their exercise of their First Amendment rights, and that their rights were effectively chilled by the MPD.  As a threshold matter, it should be noted that the ACLU-TN, while seeking an objective standard of assessing the MPD's actions when it comes to determining whether they took place "for the purpose of political intelligence", asks the Court to consider the *subjective* feelings of each of these persons as it relates to MPD's conduct.  *See* ECF No. 143, PageID 6146 ("Each community member testified that they had negative, harassing interactions as a result of their expression of protest or dissent.").

The correct approach for determining whether a person's First Amendment rights have been chilled by government action is clearly an *objective* standard.  *Laird v. Tatum*, 408 U.S. 1, 10 (1972).

> In recent years this Court has found in a number of cases that constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.  In none of these cases, however, did the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual.

> *Id.* at 11 (internal citations omitted) (emphasis added).

30

Paul Garner testified about his subjective feelings regarding MPD's alleged and uncorroborated actions taken toward him. He said that he knew that MPD was "screen shotting my stuff" and that it was "shared with the Memphis Police Association Facebook page." (Trial Tr. Vol. 6, pp. 834-35, PageID 5910-11). He testified that "one time I was out at a bar and actually had a guy tell me watch your back." (Trial Tr. Vol. 6, p. 835, PageID 5911). When Mr. Garner was questioned by counsel for ACLU-TN if his awareness of "any of this" changed how he operates on social media, Mr. Garner replied: "I post a lot less frequently now. I mean, I kind of have to be on there for work. Honestly would probably delete my page if I didn't have to be on there for work." *Id.*

Cross-examination, however, revealed that Mr. Garner's speech has not been chilled by any measure. His actions have been, rather, for lack of a better term, defiant to toward any form of authority. Mr. Garner was shown, and testified to, a video he made and posted on social media of an illegal and potentially dangerous protest at the Valero Refinery where he was actively incited people to appear at the refinery "in solidarity with the water protectors." (Trial Tr. Vol. 6, pp. 841-44, PageID 5917-20; Trial Ex. 139).

Mr. Garner's free speech activities were certainly not curtailed when he created a fake Twitter account using the name and likeness of Memphis Police Director Michael Rallings. (Trial Tr. Vol. 6, p. 845, 848-49; Trial Ex. 140). At trial Mr. Garner claimed that the account was a satirical parody account (Trial Tr. Vol. 6, p. 845, PageID 5921), but he did not assert this "parody" defense to the officer investigating the criminal complaint filed in the matter. He simply chose not to comment. (Trial Tr. Vol. 6, p. 852, PageID 5928). Even if the account was a "satirical parody account," its very creation and maintenance by Mr. Garner proves that his speech was in no way chilled by the alleged actions of the MPD.

4843-5603-2372 v6
2545600-000213 09/24/2018

ACLU-TN also presented the testimony of Keedran Franklin, in part to prove a "chilling" of First Amendment activity. (ECF No. 143, PageID 6146). Mr. Franklin testified that he noticed someone taking photos of him and other persons "flash mobbing" at a movie theater and that has always "stuck in [his] mind."

> Yes. I actually left because it was a bit chilly. I actually left to get coffee and doughnuts -- coffee and chocolate chip cookies from the McDonald's. Once I got back I noticed a brown Jeep Cherokee backing into a space where it can look directly at all of our people. They didn't notice me sitting in my truck because I had just gotten back. I was backed up, but I could see him out of my right side. So I saw him actually reach over and pull up his camera and start taking pictures. I actually went up -- back up there, and I'm like hey, you guys, they're out there taking pictures and stuff. A lot of us start just dancing and flash mobbing. And a lot of people that was on the list like Trevon Tony, Antoine Williams, Felicia Scarepete, Jasmine, Jason, all of those people was at the Malco. I notice when they grouped all these people together. So I can look at the list and say oh, this is from this from the Malco because of all that. Those people never been at another protest. So that's how I knew, you know this was from Malco in looking at the list. So that's something that always stuck out in my mind.

> (Trial Tr. Vol. 6, p. 864-65, PageID 5940-41).

Mr. Franklin further testified that MPD followed him with live officer surveillance as well as "electronic surveillance" through the use of the Bob Smith account, and that as a result, he does not "even go see my mom a lot because I'm afraid that, you know, they'll start getting caught up in some of this. Friends that don't even want to come around because they're afraid, you know. So isolate me purposely by scaring people, scaring my family, you know. It has done a lot, it has." (Trial Tr. Vol. 6, p. 865, PageID 5941).

Mr. Franklin's speech, just like Mr. Garner's, has not been quelled by any objective form of measurement. Mr. Franklin admitted that he was one of the leaders of the unlawful and extremely dangerous Bridge incident. (Trial Tr. Vol. 6, p. 867, PageID 5943). He further admitted that he created the organization called the Coalition of Concerned Citizens ("CCC") a few days after the Bridge incident. (Trial Tr. Vol. 6, p. 868, PageID 5944).

4843-5603-2372 v6
2545600-000213 09/24/2018

Mr. Franklin then admitted that the CCC, at his behest, and several months after the Bridge incident, "staged" the criminal trespass known as the "Die-In" at the Mayor's home. (Trial Tr. Vol. 6, p. 869, PageID 5945). *See also* Trial Ex. 141. Cross examination focusing on this incident, which was not protected First Amendment activity in any way, in addition to demonstrating a completely defiant attitude toward the Mayor and Director Rallings, also raised significant issues regarding his credibility. *Id.*

When questioned whether he believed strongly in nonviolent protest, Mr. Franklin strongly agreed, and further testified that he "wouldn't hurt a fly." (Trial Tr. Vol. 6, p. 873, PageID 5949). Mr. Franklin's credibility on this issue was drawn into question with a video he created and shared on his Facebook page of him engaging in an unhinged, profanity laced tirade including a threatened assault of a store owner for not turning over the store's videotape footage of a police shooting incident. (Trial Tr. Vol. 6, p. 874-75, PageID 5950-51; Trial Ex. 144).

The Court heard testimony from Reverend Elaine Blanchard that her interactions with MPD have negatively impacted her life including making her "feel paranoid." (Trial Tr. Vol. 7, p. 906, PageID 5985). Ms. Blanchard also testified that she suffered negative consequences out of her inclusion on the escort list at City Hall, including losing her contract as a program director at Thistle and Bee. She stated that she felt her contract was not renewed because "because it's an important thing to be connected positively with the city and the police department in that organization", and that she felt like the decision was made not to renew her contract was made because of her placement on the escort list. (Trial Tr. Vol. 7, pp. 901-02, PageID 5980-81). Ms. Blanchard admitted, however, that Thistle and Bee did not renew her contract because "they hired a licensed clinical social worker." (Trial Tr. Vol. 7, pp. 902, PageID 5981). Thus, when

4843-5603-2372 v6
2545600-000213 09/24/2018

viewed objectively, the testimony of Ms. Blanchard shows a purely subjective, and totally unfounded belief, that she was a target of MPD surveillance.

The ACLU-TN also submitted the testimony of Reverend Earle Fischer who testified that his First Amendment rights were chilled when an unknown police officer greeted him in a theater.

A. I've experienced some encounters that I think where -- can be interpreted as intended to discourage me from speaking out.

Q. Intentions are a bit hard to judge.

A. True.

Q. So what event in specific terms are you referring to or thinking of?

A. There have been times -- one instance I remember in particular that made me feel -- I wouldn't say intimidated but I did feel awkward. It was the week of the MLK50 events. There was a panel discussion at the University of Memphis at the Rose theater. We were asked to set up a table about voter registration and voter engagement and during the panel I stepped in and I sat in the back row. It's a dark theater because the spotlight was on the stage. Police officer walked by, tall slender white brother, and as he walked back, he just nodded and say Reverend Fisher. I didn't know him. So I didn't exactly know how he knew me, and it gave me a vibe as if, yes, we're watching you.

(Trial Tr. Vol. 7, p. 934, PageID 6013).

Reverend Fischer's testimony on this subject was equivocal at best.

The ACLU-TN presented no other witness to support its argument that MPD harassed community activists in an attempt to chill their free speech. It is clear, when viewed objectively, that the MPD's actions in no way rise to the level of harassment that the ACLU-TN suggests, certainly not when viewed under the "clear and convincing evidence" standard.

4843-5603-2372 v6
2545600-000213 09/24/2018

## CONCLUSION

For the reasons state above, the ACLU-TN has failed to prove by clear and convincing evidence that the City acted for the purpose of political intelligence or for the purpose of, or reasonably having the effect of, deterring any person from exercising First Amendment rights. The Court should decline to hold the City in further contempt of the Consent Decree. To the extent the Court has already found the City in contempt, the City respectfully disagrees that an appropriate remedy for the violation would be the appointment of a Monitor, and asks instead that the Court defer consideration of that potential remedy pending the Court's disposition of the City's pending Motion to Vacate or Modify the Consent Decree.

Respectfully Submitted,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.

s/ Jennie Vee Silk
Buckner Wellford (#9687)
R. Mark Glover (#6807)
Lawrence Laurenzi (#9529)
Jennie Vee Silk (#35319)
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Telephone (901) 526-2000
E-mail: bwellford@bakerdonelson.com
        mglover@bakerdonelson.com
        llaurenzi@bakerdonelson.com
        jsilk@bakerdonelson.com

*Attorneys for Defendant, The City of Memphis*

4843-5603-2372 v6
    2545600-000213 09/24/2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 24, 2018 the foregoing will be served by this Court's ECF system to:


    Thomas H. Catelli, Esq.
    Mandy Floyd, Esq.
    Legal Director
    ACLU Foundation of Tennessee
    Post Office Box 120160
    Nashville, Tennessee 37212

/s <u>Jennie Vee Silk</u>
Jennie Vee Silk

4843-5603-2372 v6
    2545600-000213 09/24/2018