# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| ELAINE BLANCHARD, KEEDRAN FRANKLIN, PAUL GARNER, and BRADLEY WATKINS, | ) ) ) | |
| | ) | |
| Plaintiffs (dismissed), | ) | |
| | ) | |
| and | ) | Case No. 2:17-cv-2120-JPM-egb |
| | ) | |
| ACLU OF TENNESSEE, INC., | ) | |
| | ) | |
| Intervening Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF MEMPHIS, TENNESSEE, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff ACLU of Tennessee, Inc. ("ACLU-TN") brings this action against the City of Memphis ("the City") to enforce a Consent Decree.[1]  The Consent Decree in question is a 1978 agreement between the City and ACLU-TN, in which the City promised to refrain from specifically defined activities, including investigations into the free exercise of rights protected by the First Amendment.  (Consent Decree, Ex. 6.)  The Court has already found that the City violated the clear terms of its agreement by gathering information related to the First Amendment rights of Memphis residents.  (See O. Summ. J., ECF No. 120.)  The Court noted, however, that certain issues could only be decided by trial.  (Id.)

---

[1] For ease of reference, the Consent Decree is attached as an appendix to this order.

A bench trial was held from August 20 to 23, 2018 to address two remaining questions. (ECF Nos. 128-31.)  First, the Court heard testimony as to whether the ACLU-TN was the entity that entered into the 1978 agreement.  The Constitution requires the Court to dismiss any lawsuit brought by a plaintiff who cannot claim to have been harmed by the defendant.  The Sixth Circuit Court of Appeals has interpreted that Constitutional requirement as limiting the enforcement of Consent Decrees to the original entities that entered into the agreement.[2]  The Court cannot consider the merits of the ACLU-TN's case unless it was a party to the Consent Decree (or a successor-in-interest to such a party).

Second, the Court heard testimony on how and why the City may have violated its 1978 agreement.  The remedy in a lawsuit involving the violation of a court order, like the Consent Decree in this case, is not meant to punish a defendant, but rather to ensure future compliance with the order and to make the plaintiff whole again.  The City's actions, motivations, and internal operations are relevant to the ultimate question of the sanctions necessary to rectify the City's breach of the Consent Decree.

For the reasons set forth below, the Court finds that the ACLU-TN has demonstrated by a preponderance of the evidence that it was the entity that entered into the 1978 agreement with the City.  Thus, the ACLU-TN has standing to bring this lawsuit.  The Court, therefore, proceeds to an examination of the City's actions.  The Court finds that the ACLU-TN has shown by clear and convincing evidence that the City:

1) Conducted "political intelligence" as specifically defined and forbidden by the Consent Decree;

---

[2] The parties disagree whether Sixth Circuit precedent allows suits to enforce a Consent Decree by successors-in-interest.  The Court does not resolve the question of standing for legal successors at this time.

2) Operated the Office of Homeland Security for the purpose of political intelligence;

3) Intercepted electronic communications and infiltrated groups through the "Bob Smith" Facebook account;

4) Failed to familiarize MPD officers with the requirements of the Decree;

5) Did not establish an approval process for lawful investigations into criminal conduct that might incidentally reveal information implicating First Amendment rights;

6) Disseminated information obtained in the course of an investigation to individuals outside of law enforcement; and

7) Recorded the identities of protest attendees for the purpose of maintaining a record.

The ACLU-TN has failed to prove other violations of the 1978 agreement. The Court finds that these six violations stem from the City's failure to familiarize MPD officers with the Consent Decree. Sanctions for contempt of a Consent Decree should ensure future compliance. The Court, therefore, outlines future remedial actions that focus on MPD training and responsible use of social media tools.

In this order, the Court does not sanction the City or its officers for discriminating against certain points of view. For the most part, the officers of MPD have demonstrated their dedication to protecting First Amendment rights regardless of protester opinion. The City, however, must be held responsible for its failure to live up to the high standards it set for itself in 1978. In this order, the Court explains in detail how the City has violated its promises, in order to demonstrate how it may comply in the future. The Court recognizes that the requirements of the 1978 Kendrick Litigation Consent Decree impose significant burdens on the City and the MPD. The Court also notes that Memphis has an opportunity to remain the first, and perhaps

only, city in the country with an established policy for the protection of its residents' privacy in the face of ever-expanding techniques of electronic surveillance.

## I.    Standing

The Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." Const. art. III § 2. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).  "[T]he doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process." Whitmore v. Arkansas, 495 U.S. 149, 155 (1990).  To establish standing, a plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000) (citing Lujan, 504 U.S. at 561).  "The [plaintiff] bears the burden of establishing these elements." Lujan, 504 U.S. at 561.

### a.   The Underlying 1976 Case: Kendrick v. Chandler

On September 14, 1976, Chan Kendrick and other plaintiffs filed a lawsuit in this Court (the "Kendrick Litigation") alleging that they were the subjects of unlawful surveillance by the Domestic Intelligence Unit of the Memphis Police Department.  (ACLU-TN's Resp. to the City's Statement of Undisputed Material Facts ("Pl.'s Resp. Facts"), ECF No. 108-1 ¶ 1; Complaint in the Kendrick Litigation, ECF No. 33-1 at 381-83.[3])  See also Kendrick, et al. v. Chandler, et al., No. 2:76-cv-00449 (W.D. Tenn. 1978).  The plaintiffs in that case alleged that

---

[3]All citations to page numbers in docket entries are to the CM/ECF PageID number.

the City and the Memphis Police Department ("MPD") created the Domestic Intelligence Unit in 1965 to investigate and maintain files on citizens engaging in "non-criminal, constitutionally protected activities which were thought to be 'subversive' and/or advocating unpopular or controversial political issues." (Complaint in the Kendrick Litigation, Ex. 5.)  Two years later, on September 14, 1978, this Court closed the Kendrick Litigation by entering a Consent Decree agreed to by the City, the American Civil Liberties Foundation,[4] and the American Civil Liberties Union of West Tennessee, Inc.  (See Consent Decree, ECF No. 9-1 at 54.)  The terms of the City's agreement are analyzed in more detail in the Court's discussion of the merits.

The City argues that the ACLU-TN was not a party to the Consent Decree, so any breach would not cause the ACLU-TN the "injury in fact" that Article III standing requires.  (ECF No. 142 at 6113-19.)  One of the Kendrick Plaintiffs referred to itself as "The American Civil Liberties Union in West Tennessee, Inc." but no corporation with the name "American Civil Liberties Union in West Tennessee, Inc." was ever registered with the Tennessee Secretary of State.  Plaintiff ACLU-TN argues that "American Civil Liberties Union in West Tennessee, Inc.," meant the ACLU-TN's West Tennessee Chapter, a group which was legally indistinguishable from the statewide parent organization that brings today's lawsuit.  (ACLU-TN's Standing Brief, ECF No. 144 at 6163-68.) The City contends that "American Civil Liberties Union in West Tennessee, Inc." instead referred to some other organization which was completely independent from the ACLU-TN.  (City's Standing Brief, ECF No. 142 at 6113-19.) In the alternative, the City argues that lawsuits brought by chapters were not necessarily brought by the statewide ACLU-TN.  (Id. at 6119-20.)

---

[4] It is undisputed that the American Civil Liberties Union Foundation and the ACLU-TN are separate and distinct entities.

### b. Standard of Proof

The parties disagree as to how much proof is enough to demonstrate standing in this case. The Plaintiff has the burden of proving that the Court has jurisdiction. Varsity Brands, Inc. v. Star Athletica, LLC, 799 F.3d 468, 494 (6th Cir. 2015). ACLU-TN argues that it must prove it has standing by a preponderance of the evidence, i.e., that standing is more likely than not, because jurisdiction is normally proved by that level of evidence. See Smith v. Nationwide Prop. & Cas. Ins. Co., 505 F.3d 401, 404 (6th Cir. 2007). The City disagrees and argues that the ACLU-TN must demonstrate standing by clear and convincing evidence, which is a higher (and more difficult to define) standard of proof. See 21B C. Wright & K. Graham, Federal Practice & Procedure § 5122, pp. 405–411 (2d ed.2005). "Clear and convincing evidence is… not a light burden and should not be confused with the less stringent, proof by a preponderance of the evidence." Elec. Workers Pension Tr. Fund of Local Union # 58, IBEW v. Gary's Elec. Serv. Co., 340 F.3d 373, 379 (6th Cir. 2003). The City argues that this is an action for contempt of a court order and the standard of proof for contempt actions is clear and convincing evidence, so the standard of proof for the threshold standing question should be clear and convincing evidence as well. In support, the City cites Lujan, which states that "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." 504 U.S. at 561 (1992).

The City misreads the Supreme Court's holding. The cited section of Lujan refers to the "manner and degree" but not the standard "of evidence required at the successive stages of the litigation." Id. The Supreme Court's decision governs what a plaintiff must prove, not how she must prove it. Id. (governing the "nature and extent of facts that must be… proved.") Lujan sets

forth a rule that governs procedural burdens, like a plaintiff's burden to show the plausibility of her claims to overcome a motion to dismiss, not evidentiary burdens.  Id.

The City's other cited case law does not support the reading of Lujan that the City advances.  In Fair Elections Ohio v. Husted, the Sixth Circuit found that a plaintiff had failed to make a sufficient showing of standing, not because there was an elevated evidentiary burden following from the nature of the underlying action, but because the evidence introduced by the plaintiff was simply not probative at all.  770 F.3d 456, 459-60.  Griswold v. Connecticut imposed strict factual requirements for standing but offered no guidance about how those facts must be proven.  381 U.S. 479, 481 (1965).  Coyler v. Smith, a case from the Central District of California, holds that standing to disqualify a co-defendant's lawyer should be proved by clear and convincing evidence because of the "potential abuses" that may arise from attempting to control another person's lawyers, but provides no guidance on the City's argument that the standard of proof for standing follows the standard of proof for the merits of the underlying action.  50 F.Supp 2d 966, 971; see also In re Appeal of Infotechnology, Inc., 582 A.2d 215, 221 (Del. 1990).

The default rule is that jurisdiction must be proved by a preponderance of the evidence.  Smith, 505 F.3d at 404.  The Court has encountered no case law that requires the standard of proof for standing to follow the standard of proof for the underlying lawsuit.  Hayes v. Equitable Energy Res. Co., 266 F.3d 560, 572 (6th Cir. 2001) (holding that amount-in-controversy must be proven by a preponderance of the evidence, without reference to the standard of proof for the underlying allegations); accord Iowa League of Cities v. E.P.A., 711 F.3d 844, 870 (8th Cir. 2013) (noting that "[p]arties seeking to litigate in federal court have the burden of establishing jurisdiction, including standing, by a preponderance of the evidence" but making no reference to

7

the standard of proof for the underlying action (internal citations and quotation marks omitted));
accord Lee v. City of Chicago, 330 F.3d 456, 468 (7th Cir. 2003).  The Court's jurisdiction over
this contempt action derives from its jurisdiction in the Kendrick Litigation.  Leman v. Krentler-
Arnold Hinge Last Co., 284 U.S. 448, 452–53 (1932).  If anything, the Court's standard of proof
for determining standing in this case should follow the standard of proof in the Kendrick
Litigation.

The Court also notes that judicial policy favors a preponderance of the evidence standard.
"The procedure to enforce a court's order commanding or forbidding an act should not be so
inconclusive as to foster experimentation with disobedience."  Maggio v. Zeitz, 333 U.S. 56, 69
(1948).  The imposition of a clear-and-convincing standard of proof for jurisdiction to enforce
this Court's orders would reduce the Court's ability to resolve cases by consent decree in the
future, because parties will have reason to doubt they can later enforce them.  When viewed *ex
ante*, the City itself benefits from a preponderance standard; had the standard been clear-and-
convincing evidence, the City would have had to initially offer more generous terms to ACLU-
TN to make up for the additional difficulty in future enforcement.  In the absence of case law to
the contrary and in consideration of the policy interests motivating this area of the law, the Court
finds no reason to depart from the default rule in this case.  The ACLU-TN needs only prove it
has standing by a preponderance of the evidence.

### c.  Findings of Fact

1.  <u>The "American Civil Liberties Union in West Tennessee, Inc." was a Chapter of the
ACLU-TN</u>

The Court begins with the Complaint in the Kendrick Litigation: "[t]he American Civil
Liberties Union of West Tennessee, Inc. ('WTCLU') is a Chapter of the American Civil

Liberties Union of Tennessee, Inc." (Kendrick Complaint, Ex. 5.) The City argues that the description offered in the Kendrick Complaint is inaccurate, and that just because the Kendrick plaintiff named itself a chapter of the ACLU-TN does not make it so. (City's Brief on Standing, ECF No. 142 at 6114.) Hedy Weinberg, the present Executive Director of the ACLU-TN, testified that regional chapter status required formal acknowledgement from the statewide organization. (Trial Transcript, ECF No. 134 at 5155.) The original charter of the ACLU-TN stated that "[b]y-laws for any Chapter shall not go into effect unless they have been approved by the Board of Directors of the [ACLU-TN]." (Ex. 2.) The City argues that there is clear evidence that the by-laws of other regional chapters were approved by the ACLU-TN, but no evidence has been introduced that shows that a West Tennessee Chapter's bylaws were ever made effective by a vote of the statewide board. (City's Brief on Standing, ECF No. 142 at 6114-15.) The City concludes that "no such documentation for the West Tennessee Chapter exists because it did not occur." (Id. at 6116.) The City proposes that the organization that referred to itself as a chapter of the ACLU-TN in the Kendrick Litigation was some other entity with no formal association with the ACLU-TN. (Id. at 6117-19; see also City's Pretrial Mem., ECF No. 123 at 5001.)

Notwithstanding the lack of an official document establishing a West Tennessee chapter of the ACLU-TN, the Court finds that the ACLU-TN has proved by a preponderance of the evidence that the "American Civil Liberties Union in West Tennessee, Inc." was its chapter. As stated above, the Kendrick Complaint explicitly says that the suit is brought by a chapter of the ACLU-TN. (Ex. 5.) The ACLU-TN's Executive Director in 1976, Chan Kendrick, affirmed when he filed the lawsuit that "he has read the… complaint and knows the contents thereof and that the same are true of his own knowledge." (Id. at page 12.) The corporate governance of the ACLU-TN supports the same conclusion. The ACLU-TN's Board of Directors was made up of

representatives from each "duly-charted" chapter, with boards seats roughly apportioned based on the size of each chapter.  (Testimony of Hedy Weinberg, ECF No. 134 at 5120; Ex. 2 at page 2).  In the 1970's, the West Tennessee Chapter was to appoint at least four members to the statewide Board of Directors.  (Ex. 99.)  The West Tennessee Chapter had five members on the statewide board in 1975, including Bruce Kramer, the lawyer who represented the American Civil Libertes Union in West Tennessee, Inc.  (Ex. 3 at page 2; see also Ex. 3 at pages 4, 7 (in which Kramer makes motions which are approved by the board).)  To summarize, the American Civil Liberties Union in West Tennessee, Inc. considered itself a Chapter of the ACLU-TN, members of a West Tennessee Chapter had seats on ACLU-TN's Board of Directors, and Chan Kendrick, the Executive Director of the ACLU-TN, swore that this West Tennessee Chapter was his co-plaintiff.  The Court finds that the entity that brought the original Kendrick Litigation was a chapter of the ACLU-TN.

### 2.  If One of its Chapters was a Party, then the ACLU-TN was a Party

The City argues that, even if an ACLU-TN chapter brought the Kendrick Litigation, that does not necessarily mean the ACLU-TN was a party.  (City's Standing Brief, ECF No. 142 at 6119-20.)   Hedy Weinberg testified that chapters often decided to initiate litigation independently of the statewide organization.  (Testimony of Hedy Weinberg, ECF No. 134 at 5150.)   If the decision to litigate can be made independently, the City argues, then the organizations are separate for the purposes of determining who was a party to the Kendrick Litigation.  (City's Standing Brief, ECF No. 142 at 6119-20.)

The ACLU-TN responds that it and its chapters are legally indistinguishable, and that the different chapters are "just names for the same entity" or labels by which "one refers to ACLU-

TN operations in that specific part of the state." (ACLU-TN's Standing Brief, ECF No. 144 at 6166.) As stated above, the chapters together governed the statewide organization; the ACLU-TN's Board of Directors was exclusively made up of representatives from each regional chapter. (Ex. 2 at page 2.) In turn, the ACLU-TN delegated the "authority to direct and govern activities of ACLU in their area" to each chapter "subject to the policies and regulations of the ACLU of Tennessee, Inc." (Id. at 3.) Michael Cody testified that "I don't know of anything that happened between '68 and '76 down here that wouldn't have been connected with the statewide organization." (Testimony of Michael Cody, ECF No. 136 at 5440.) Hedy Weinberg testified that, while the chapter model was in place, she saw "them as one entity because the West Tennessee Chapter doesn't exist without the ACLU of Tennessee." (Testimony of Hedy Weinberg, ECF No. 134 at 5129.) In other words, the ACLU-TN argues that whether a lawsuit was brought on behalf of a chapter or by the statewide affiliate was a distinction without a difference.

The City has not introduced evidence of any policy or regulation in effect at the initiation of the Kendrick Litigation that would limit the West Tennessee Chapter's ability to bring this suit with the full authority of the ACLU-TN. Instead, the City relies on the national ACLU's "Policy [for] Court Awarded Attorneys Fees" as adopted in March 1979. (ECF No. 142 at 6119; see also Policy for Court Awarded Attorneys' Fees, Ex. 100.) This policy establishes a distinction between "state cases," which are approved by the state board, and "local cases." (Policy for Court Awarded Attorneys' Fees, Ex. 100 at page 2.) The policy required that "[a]ttorneys' fees received for cases and turned over to the ACLU that are jointly sponsored by chapters and state (affiliates) shall be split 60/40 with 60% of the monies going to where sponsorship originates and work is done." (Id.) This policy was not in effect when the West

Tennessee Chapter started the Kendrick Litigation in 1976 or when the Consent Decree was entered in 1978. It was, however, in effect when Bruce Kramer, the attorney for the West Tennessee Chapter, filed a request for an award of attorney's fees. (See Kendrick Mot. Attorney's Fees, Ex. 101.) When questioned, Bruce Kramer could not remember whether he had turned over any of the attorneys' fees to the ACLU-TN. (Testimony of Bruce Kramer, ECF No. 137 at 5520-21.) So, the City argues, there is no evidence that the Kendrick Litigation was an ACLU-TN case.

The City's argument is based on a limited reading of the attorney's fee's policy. Bruce Kramer testified that the Kendrick Litigation received national funding, and the policy states that "a local case will not be eligible to receive state and national monies unless it is also sponsored by the state." (Id. at 5519; Policy for Court Awarded Attorneys' Fees, Ex. 100 at page 2.) The City's argument that the ACLU-TN was not awarded attorney's fees also ignores a critical portion of the policy, namely that the sixty-forty sharing scheme "applies only to monies over costs and attorneys' fees." (Policy for Court Awarded Attorneys' Fees, Ex 100 at page 2.) In other words, the policy applied to those situations where a court awards fees above and beyond the actual labor and expenses incurred by the attorney. There is no indication in the record that Kramer received "monies over costs and attorneys' fees," so he was not obligated to turn over any fees to the statewide ACLU-TN.

The Court finds that the regional chapters were legally indistinct from the statewide ACLU-TN, and that the ACLU-TN delegated to those chapters the power to litigate on its behalf. To the extent that the attorneys' fees sharing policy was in effect for part of the Kendrick Litigation, the Court finds that national funding also shows that the Kendrick Litigation was

sponsored by the statewide affiliate.  The ACLU-TN has proven by a preponderance of the evidence that it has standing to bring this case.

## II.   Contempt

### a.   Consent Decrees Generally

The Kendrick Litigation was resolved by a Consent Decree. "A consent decree is essentially a settlement agreement subject to continued judicial policing."   Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir. 1983).  "[C]onsent decrees bear some of the earmarks of judgments entered after litigation. At the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts."  Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501, 519 (1986). Since it resembles a contract, "[t]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." United States v. Armour & Co., 402 U.S. 673, 682 (1971).  "A consent decree… should," in other words, "be strictly construed to preserve the bargained for position of the parties." Williams, 720 F.2d at 920.

"A consent decree, however, is also a final judicial order," Williams, 720 F.2d at 920, and carries with it the full power of the Court.  Pedreira v. Sunrise Children's Servs., Inc., 802 F.3d 865, 871 (6th Cir. 2015). The "provisions of the consent decree operate as an injunction… The injunctive quality of consent decrees compels the court to: 1) retain jurisdiction over the decree during the term of its existence… 2) protect the integrity of the decree with its contempt powers… and 3) modify the decree should 'changed circumstances' subvert its intended purpose." Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir. 1983); but see Armour & Co., 402

U.S. at 681–82 ("[T]he decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.").

So long as the decree is definite and clear, the Court's contempt power may be exercised on those who "choose to ignore [the decree's] mandate." Gascho v. Glob. Fitness Holdings, LLC, 875 F.3d 795, 800 (6th Cir. 2017) (citing Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76 (1967)).  The Court may hold in contempt anyone who "willfully" disobeys a court order but cannot enforce an order that is vague or that imposes literally impossible requirements on the parties.  Marx v. Gen. Revenue Corp., 568 U.S. 371, 382 (2013); Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. at 76; United States v. Rylander, 460 U.S. 752, 757 (1983).  Contempt sanctions must be restorative and must ensure future compliance with a consent decree, but they are not intended to punish the breaching party.  McComb v. Jacksonville Paper Co., 336 U.S. 187, 193 (1949).

The City argues that the Court can only enforce its orders if they are maliciously disobeyed, citing First Bank of Marietta v. Hartford Underwriters Ins. Co., 307 F.3d 501, 517 (6th Cir. 2002).  First Bank applies to exercises of the Court's inherent power where there is no Court order being violated; the restraint required in that situation is not necessary where the Court has laid out its requirements in an order.  307 F.3d at 516 (considering sanctions for "impermissible conduct that adversely impacts the entire litigation").  For contempt of a court order, the standard is clear: "the [plaintiff] must produce clear and convincing evidence that shows that [the defendant] violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order."

Elec. Workers Pension Tr. Fund of Local Union |58, IBEW v. Gary's Elec. Serv. Co., 340 F.3d 373, 379 (6th Cir. 2003).

### b. The 1978 Consent Decree's General Principles

In pertinent part, the Consent Decree's "Statement of General Principles" provides as follows:

> The provisions of this Decree prohibit the defendants and the City of Memphis from engaging in law enforcement activities which interfere with any person's rights protected by the First Amendment to the United States Constitution including, but not limited to, the rights to communicate an idea or belief, to speak and dissent freely, to write and to publish, and to associate privately and publicly for any lawful purpose.

> Furthermore, even in connection with the investigation of criminal conduct, the defendants and the City of Memphis must appropriately limit all law enforcement activities so as not to infringe on any person's First Amendment rights.

(Consent Decree, Ex. 6 at § A.)  Accordingly, the Consent Decree (1) prohibits the City from engaging in certain conduct that would impermissibly interfere with the exercise of First Amendment rights,[5] (2) regulates the manner in which the City is *permitted* to interfere with the exercise of First Amendment rights, and (3) requires the City to publicize the Consent Decree and familiarize law enforcement personnel with its requirements.  (See id. §§ C-J.)  The Court notes that the City agreed to obligations above and beyond those required by the Bill of Rights; the City may violate the Consent Decree without violating the Constitutional rights of its residents.  The Court next considers each of the Consent Decree's provisions in turn.

---

[5] The Consent Decree addresses four categories of prohibited conduct: (1) political intelligence, (2) electronic surveillance for political intelligence, (3) covert surveillance for political intelligence, and (4) harassment and intimidation.  (See Consent Decree §§ C-F.)

### c. What "Political Intelligence" Means

The City agreed that it "shall not engage in political intelligence." (Consent Decree, Ex. 6 at § C(1)). The City and the ACLU-TN agreed to specifically define political intelligence as "the gathering, indexing, filing, maintenance, storage or dissemination of information, or any other investigative activity, relating to any person's beliefs, opinions, associations or other exercise of First Amendment rights." (Consent Decree, Ex. 6 at § B(4).) First, the Court notes that the Parties did not include any language in the Consent Decree that defines "political intelligence" in partisan terms. An investigation into Black Lives Matter is a violation of the Consent Decree even if the inquiring officer does not care about that organization one way or the other. Similarly, an investigation by the City into the opinions and associations of a group that opposes certain policies violates the Decree even if the City also investigates another group that supports those same policies. Both of these activities would still constitute the "gathering… of information… relating to any person's beliefs, opinions, associations or other exercise of First Amendment rights." In other words, bipartisan or nonpartisan political intelligence is still political intelligence.

The intent relevant to the definition of political intelligence is whether police activities are "investigative." The Director of Police does not conduct political intelligence by collecting the phone numbers of local activists for future dialogues, if those numbers are openly asked for and freely given. Even though the Director would have "indexed" "information… relating to… [the] exercise of First Amendment rights," the indexing in question would not be an "investigative activity." If, on the other hand, the Director instructs officers to datamine social media for activist phone numbers, he commits political intelligence by conducting an investigative gathering of information related to political beliefs.

16

The Consent Decree also has an action requirement.  Gathering, for example, requires affirmative acts, but simply receiving or inadvertently finding information does not.  A police officer does not have to cover his body camera every time he passes someone with a political t-shirt, because the information received by the camera about political activities was not affirmatively sought out by the officer.  Similarly, a police officer who queries a social media collator for the phrase "kill police," is not going out of her way to "gather" information related to First Amendment rights, even though her action is definitely investigative in nature.  If her search returns information related to a lawful assembly titled "Do Not Kill Police," her action does not become political intelligence because First Amendment rights were not the focus or subject of her investigative activity.  In other words, she inadvertently discovered information related to First Amendment rights, but she was not "gathering" it.  On the other hand, an officer who searches for "Black Lives Matter" gathers information related to First Amendment rights, because political beliefs are the subject of his investigative activity.  A discovery of a potential criminal act in that search does not change the fact that the information he was gathering related to First Amendment rights.[6]

The other examples of "investigative activity" provided by the consent decree also evidence an action requirement in the definition of political intelligence.  (Consent Decree, Ex. 6 § B(4).) It is difficult to imagine an officer accidentally creating an index of information relating to First Amendment rights.[7]   The Court notes that given the current state of electronic

---

[6] Many investigations present a grey area.  The Consent Decree contemplates this and imposes an approval requirement for lawful investigations of criminal conduct that may implicate First Amendment rights.  (See Consent Decree, Ex. 6, § G.)  As explained below, the City did not implement the approval process required by the decree.

[7] Given the current state of technology, that is.  The Court discusses the prospect of applying the Consent Decree in the face of changing technology below.

information storage, "maintenance" and "storage" may now be passive.  In 1978, however, the maintenance and storage of information was an active step that did not happen inadvertently or by accident.  The Court's task in the context of this case is to protect the original intent and purpose of the parties as memorialized in the Consent Decree.  Williams, 720 F.2d at 920.  The maintenance and storage of information was an active task in 1978, like gathering and indexing still are today.  The purpose of the parties as memorialized in the Consent Decree to forbid affirmative investigative acts has not changed, even if what exactly is active and passive has changed with the state of technology.

### d.   What "for the Purpose of Political Intelligence" Means

Other provisions of the Consent Decree forbid the City from taking actions "for the purpose of political intelligence."  (Consent Decree, Ex. 6 at §§ C.2, D, E, F.)  Unlike the blanket ban on political intelligence described above, these provisions necessarily require an inquiry into the motivations of the MPD.  The Parties disagree as to whether the Court must determine the purpose of the MPD by objective or subjective evidence.  (ACLU-TN's Merits Brief, ECF No. 143 at 6130-31; City's Merits Brief, ECF No. 145 at 6179-81.)  In other contexts, the Court is not to determine the "purpose" of law enforcement agents by trying to literally deduce the actual thoughts of an officer at the time.  Michigan v. Bryant, 562 U.S. 344, 360 (2011).  Instead, the Court is to objectively consider the facts and statements in evidence, including testimony, to determine "the purpose that reasonable participants would have had" if they had made the statements, experienced the circumstances, and taken the actions that the subjective person at the center of the inquiry did in fact take.  Id.  The Court cannot truly know the thoughts of MPD officers, so it will determine motive from the evidence in the record.

The City points out that the Consent Decree bans certain actions taken for "the purpose of political intelligence" and argues that violations of these provisions therefore require a finding that political intelligence was MPD's exclusive purpose, rather than one of many motivations. (City's Merits Brief, ECF No. 145 at 6183.)  This interpretation would lead to several problems. First, more than 2,000 individuals make up the MPD, and it seems unlikely that each of them has the exact same purpose at all times.[8]  To adopt the City's interpretation would ultimately require the Court to hold that the "purpose" provisions can never be violated, because the MPD can nearly always be said to have more than one purpose.  Second, one purpose may lead to another. An officer may sit in his car, for example, for the purpose of observing traffic, which is done for the purpose of writing speeding tickets, which in turn is for the purpose of maintaining safe roads.   The MPD may take an action for the purpose of political intelligence while simultaneously being motivated by a genuine desire to preserve public safety.  Third, the Court notes that infringements on personal liberty are often accompanied by appeals to public safety.

The City introduced testimony about a July 10, 2016 protest that resulted in a prolonged occupation of the Hernando de Soto Bridge, where Interstate 40 crosses the Mississippi River. (See Testimony of Michael Rallings, ECF No. 137 at 5623-24; Testimony of Stephen Chandler, ECF No. 137 at 5584-5604; see also Ex. 110.)  The City argues that many of the actions at issue in this case were undertaken for the purpose of preventing similar incidents that might jeopardize public safety.  (City's Merits Brief, ECF No. 145 at 6175-78.)  The Court notes that MPD acted commendably in handling the July 10, 2016 protest, and that there has been no evidence in this case which suggests that public safety was not MPD's overall objective.

---

[8] See Kenneth A. Shepsle, Congress is a "They," not an "It": Legislative Intent as Oxymoron, 12 Int'l Rev. L. & Econ. 239 (1992) (describing the difficulties in ascertaining the motivations of multi-member organizations).

The Consent Decree, however, is clear and unequivocal in its language. Understood in its entirety, the Consent Decree bans investigative activity into the exercise of First Amendment Rights by Memphis residents. Political Intelligence is impermissible as the means of investigation, as the ends of investigation, or as an intermediate step in a larger investigation.[9] The City has agreed that it will not engage in certain activity and is bound by that agreement.

### e. Violations of the Consent Decree

Once it proved standing, the ACLU-TN only needed to prove one violation of the Consent Decree in order to support a finding of contempt. The Court has already found that the City violated the prohibition on political intelligence by creating and populating a City Hall Escort List based on political affiliations, by disseminating information about lawful gatherings through its Joint Intelligence Briefings, and by deploying plainclothes police officers to photograph and identify participants at political protests. (O. Summ. J., ECF No. 120 at 4880-82.) The next few pages of the Court's Opinion have no effect on the whether the ACLU-TN is successful.

The Court discusses specific violations below in detail for two reasons. First, specific Consent Decree violations are relevant to the Court's determination of what steps are necessary to ensure future compliance. Second, the Court explains what actions violated the decree and why in order to guide future MPD policy.

---

[9] As explained in footnote 6 above, the Consent Decree is not without a procedural framework to address the complexity of criminal investigation. Specifically, Consent Decree § G sets out the procedural steps required to protect First Amendment rights when a lawful criminal investigation "may result in the collection of information about the exercise of First Amendment rights." The presence of § G does not alter the Statement of General Principles set out in § A and the unequivocal language that the "City of Memphis shall not engage in political intelligence." (Consent Decree, Ex. 6 at § B.)

i.   The City Violated the Prohibition on Political Intelligence

At trial, the ACLU-TN proved other violations of the blanket prohibition on political intelligence by clear and convincing evidence.  MPD's Real Time Crime Center ("RTCC") conducted political intelligence when an officer searched its social media collator for all instances of the term "Black Lives Matter," because the information gathered related to First Amendment Rights.  (Ex. 136; Testimony of Bradley Wilburn, ECF 139 at 5867-68.)  MPD officers gathered and circulated social media posts about potential boycotts and boycotts are squarely within the protection of the First Amendment.  (Exs. 107, 122; Testimony of Eddie Bass, ECF No. 138 at 5738-39.)  MPD gathered information on journalists based on their associations with Black Lives Matter.   (Testimony of Eddie Bass, ECF No. 138 at 5736-37; Ex. 120 "Below are three twitter accounts for two freelance journalist[s] and one *Commercial Appeal* journalist who apparently have the trust of the BLM protesters.  These accounts seem to provide good real-time information during a protest event.")  MPD indexed information relating to the leadership of lawful protests.  (Ex. 38; Testimony of Timothy Reynolds, ECF No. 135 at 5260.) Major Lambert Ross ordered social media monitoring for a "BLM Rally" and a "Community Organizers Cookout."   (Ex. 150.)  Each of these represents an affirmative investigative act focusing on First Amendment rights in violation of the Consent Decree.

ii.   The City Violated the Consent Decree by Operating an Office for the Purpose of Political Intelligence

The City also promised that it would "not operate or maintain any… unit for the purpose of engaging in political intelligence."  (Consent Decree, Ex. 6 at § C(2)).  Unlike the blanket ban on political intelligence above, the City's intent matters for this provision.  To determine the

purpose of a unit's operation, the Court examines the objective evidence of that unit's role within the MPD, with a special emphasis on its interaction with other units.

The evidence clearly and convincingly shows that the Office of Homeland Security ("OHS") was operated for the purpose of political intelligence. The City has introduced evidence that OHS was initially dedicated to counter-terrorism. (Testimony of Stephen Chandler, ECF No. 137 at 5540-41; 5571, 5727.) The Court finds that this purpose was eventually refocused on political intelligence. Commander Chandler testified that terrorism threats only took up around 35% of OHS's time when he supervised it in 2016 and 2017. (ECF No. 137 at 5541.) Major Eddie Bass testified that "protests involved much of our time" while he was assigned to OHS in 2016 and 2017. (ECF No. 138 at 5727)

The evidence shows that officers throughout MPD came to view OHS as a resource for all investigations into lawful political activity. Lieutenant Colonel Dana Sampietro asked OHS to investigate Memphis Voices for Palestine ahead of a permitted protest, and OHS Sergeant Timothy Reynolds responded with an estimation of Memphis Voices for Palestine's social media following and a report of their associations with other political activists. (Ex. 64.) Director Rallings ordered OHS officers to prepare a powerpoint presentation for MPD's command staff. (Testimony of Timothy Reynolds, ECF No. 136 at 5339-5342; Ex. 77). This presentation discussed the beliefs and identities of political activists. (Testimony of Timothy Reynolds, ECF No. 136 at 5342; Ex. 76.) After learning of a potential rally on *Commercial Appeal* property, Major Watson asked the "Intel section" to investigate. (Ex. 104.) Then-Major Stephen Chandler responded by identifying a political activist as a "regular antagonist usually associated with the CLERB push and the $15/hr minimum wage protest" and provided additional information from

an OHS "intel summary."  (Id.)  OHS was asked to compile a list of boycotts.  (Testimony of Stephen Chandler, ECF No. 137 at 5554.)

MPD officers also supplied political intelligence to OHS for further analysis and dissemination within the Department.  Even though the event had "no incidents" of violence, a colonel from MPD's North Main Station sent pictures from a 30-person protest to OHS officers, who identified three activists present as the "usual players."  (Testimony of Stephen Chandler, ECF No. 137 at 5551-53; Ex. 106.)  MPD Public Information Officer Louis Brownlee notified OHS officers that a political activist would be present to buy tickets for children at a Malco movie theater.  (Ex. 73; Testimony of Timothy Reynolds, ECF No. 136 at 5330-32.)  Real Time Crime Center ("RTCC") officer Grafenreed sent OHS a flyer posted on a political activist's Facebook page, writing "due to the 'black lives matter' on the flyer [I] wanted to pass it along." (Ex. 61; Testimony of Timothy Reynolds, ECF No. 135 at 5303.)

Taken together, the evidence clearly and convincingly shows that OHS was operated for the purpose of political intelligence.  By the admission of former OHS officers, the original counter-terrorism mission of the unit took up a smaller percentage of its time as protests became the primary subject of investigation.  MPD, including its command staff, identified OHS as the "intel" unit for any matters related to the practice of rights protected by the First Amendment. (See Ex. 124 (containing an email from an OHS officer with the subject line "Intel for BLM").) When Officers obtained information related to First Amendment rights, they passed it along to OHS.  OHS was maintained for the purpose of political intelligence, because within MPD it was viewed as the source and the processer of information related to First Amendment rights.

On the other hand, the evidence does not clearly and convincingly show that RTCC was operated or maintained for the purpose of political intelligence.  While RTCC officers conducted political intelligence through social media searches, the evidence does not show that RTCC took on a political intelligence role within MPD.  Additionally, no evidence has been submitted that suggests that political intelligence took up a significant portion of RTCC's time or resources.

    iii.   <u>The City Violated the Consent Decree through the Use of the "Bob Smith"</u>
          <u>Account</u>

In the 1978 Consent Decree, the City promised it would "not intercept, record, transcribe or otherwise interfere with any communication by means of electronic surveillance for the purpose of political intelligence." (Consent Decree, Ex. 6 at § D.)  It also agreed that no "officer, employee or agent of the City," would, "for the purpose of political intelligence, infiltrate or pose as a member of any group or organization exercising First Amendment Rights."  (<u>Id.</u> at § E.)  In the context of social media, these two provisions are closely intertwined.

Sergeant Timothy Reynolds created a Facebook page using the alias "Bob Smith" in 2009 in order to investigate gang-related activity through social media.  (Testimony of Timothy Reynolds, ECF No. 135 at 5230-31.)  Beginning in 2016, however, the Bob Smith account was used as a tool to investigate protests on behalf of OHS.  (<u>Id.</u> at 5231.)  Sergeant Reynolds managed the Bob Smith page "to look like an active account."  (<u>Id.</u> at 5230.)  He became Facebook friends with hundreds of individuals, including political activists: "I started friending some people that I thought were popular or might have an idea of what's going on as far as social activism in the community."  (<u>Id.</u> at 5223-25; Testimony of Timothy Reynolds, ECF No. 136 at 5359.)  The Bob Smith account was used to identify political activists who support Memphis Voices for Palestine.  (Testimony of Timothy Reynolds, ECF No. 135 at 5306.)  It was also used

to request information on future protests: "Do we have plans where we are going to organize before we hit the street?" (Ex. 72; Testimony of Timothy Reynolds, ECF No. 136 at 5329.) The Bob Smith account was used to "infiltrate" the private "Kessler Associates" Facebook group by winning the approval of political activist Spencer Kaaz. (Testimony of Timothy Reynolds, ECF No. 136 at 5362, 5364-65.)

In its post-trial brief, the City does not contest that the activity of Bob Smith constituted the use of electronic surveillance to record communications, or that Sergeant Reynolds (and, occasionally, other officers) used the Bob Smith account to infiltrate a group exercising First Amendment rights. (See City's Merits Brief, ECF No. 145 at 6190-93; see also Consent Decree at §§ D, E.) Instead, the City argues that these actions were not undertaken for "the purpose of political intelligence," because the background motivation for any political intelligence was public safety. (City's Merits Brief, ECF No. 145 at 6193.)

Sergeant Reynolds testified that the Bob Smith account was used in order to gather information related to First Amendment rights. The infiltration of the Kessler Associates Facebook group was "the test for the Bob Smith account to see if we can anticipate if there's going to be a protest or not, an unpermitted event." (Testimony of Timothy Reynolds, ECF No. 136 at 5360.) Sergeant Reynolds infiltrated the Kessler Associates group at the direction of the Chief of Special Operations Michael Hardy. (Id. at 5361.) When he discovered that members of that group were planning "to disrupt the zoo," Sergeant Reynolds found that "this was kind of interesting to me because this is what I needed to report to the precinct commander and the zoo, that they were going to have some type of protest that was going to disrupt the normal flow of business for the zoo." (Id. at 5362.) Thus, the evidence is that on the command of his superior, a member of the MPD infiltrated a Facebook group and intercepted their communications to

determine if they would disrupt the business of the zoo by exercising their First Amendment rights.  The ACLU-TN has shown by clear and convincing evidence that the activities of the Bob Smith Facebook account violate the Consent Decree.[10]

### iv.   The City Failed to Familiarize Officers with the Contents of the Decree

The City's other violations are traceable to the City's failure to police itself.  The Consent Decree requires that "the City of Memphis shall familiarize each of its law enforcement personnel with the contents of this Decree in the same manner in which those personnel are instructed about other rules of conduct governing such personnel."  (Consent Decree, Ex. 6 at § J.) The Consent Decree was published on the MPD's internal website, and Commander Chandler testified that former MPD Director Goodwin "mandated that all officers become familiar with the decree."  (Testimony of Stephen Chandler, ECF No. 137 at 5565.)  Guidance on the Consent Decree was provided as a one-page Departmental Regulation in a "voluminous policy and procedural manual." (Ex. 79; Testimony of Director Rallings, ECF No. 137 at 5615.)

The evidence shows the steps taken were insufficient to comply with the Decree, because MPD officers were not familiar with its contents.  Director Rallings testified to only a "general knowledge of the Consent Decree" prior to this litigation.  (Testimony of Director Rallings, ECF No. 138 at 5659.)  Sergeant Timothy Reynolds did not know what "political intelligence" meant under the Consent Decree.  (Testimony of Timothy Reynolds, ECF No. 136 at 5355.)  Major Eddie Bass did not believe that OHS was engaged in political intelligence, because the specific

---

[10] The Court has previously noted that, when viewing all facts in the light most favorable to the City, the investigation into "Kessler Associates" appeared to have been a lawful investigation of criminal conduct, namely an attempted hacking into Memphis Zoo Computers.  (ECF No. 120 at 4885.)  The evidence shows, however, that the hacking incident was discovered <u>after</u> the Bob Smith account had already infiltrated the Kessler Associates group in order to gather information related to future protests. (ECF No. 136 at 5361-65, 5368.)

beliefs of protesters did not motivate its investigations.  (Testimony of Eddie Bass, ECF No. 138 at 5782-83.)  Commander Chandler testified that while he supervised OHS he attempted to comply with the requirements of the Consent Decree, but he personally conducted political intelligence during his time there.  (Testimony of Stephen Chandler, ECF No. 137 at 5566-67; Ex. 104.)

Nothing in this order should be construed to suggest that these officers in any way lack integrity or dedication to duty.  Each exemplified the character and commitment needed in law enforcement professionals.  The failure was one of training and inadequate direction over a sustained period of time.

MPD officers did not understand that the Consent Decree provided a specific definition of "political intelligence," because the City failed to tell them.  Departmental Regulation 138, which was the only material available to officers about the Decree, does not define "political intelligence."  (Ex. 79.)  The Court finds that the failure to familiarize the officers in OHS and RTCC represents a serious violation of the Consent Decree.  As the Court notes more fully in its sanctions section, even simple, selective training given to these units may have completely prevented all violations in this case.[11]

> v.  The City failed to Review Lawful Investigations of Criminal Conduct that "may result in the collection of information about" First Amendment Rights

The Consent Decree also requires the MPD Director to formally approve lawful investigations that may incidentally result in the gathering of information related to First

---

[11] The Court notes that Consent Decree training is only required in "the same manner in which those personnel are instructed about other rules of conduct governing such personnel."  (Consent Decree, Ex. 6 at § J.)  For patrol officers, inclusion in the general policy and procedures manual may be sufficient.

Amendment rights.  (Consent Decree, Ex. 6 at § G.)  As the Court has previously noted, Director Rallings testified that he could not recall approving any such investigation.  (See Rallings Dep., ECF No. 107-53 at 3489; O. Summ. J., ECF No. 120 at 4885.)  Investigations of Criminal Conduct that may result in the collection of information about First Amendment rights occurred, such as in the case of the investigation of attempted hacking into the Memphis Zoo.[12] (Testimony of Timothy Reynolds, ECF No. 136 at 5361-65, 5368.)  The City violated the Consent Decree by failing to implement a centralized process for the approval of lawful investigations that may incidentally result in political intelligence.  In a separate motion, the City argues that it is impossible for Director Rallings to approve every lawful investigation that may incidentally result in political intelligence.  (City's Mot. Vacate J., ECF 124-1 at 5023-24.)  This may be a good argument for delegation of this responsibility, but it is not a defense to neglecting it altogether.

> vi.  The City Violated the Consent Decree by Disseminating Information Related to First Amendment Rights to Outsiders

The Consent Decree forbids the dissemination of personal information "collected in the course of a lawful investigation of criminal conduct" to persons outside of "another governmental law enforcement agency then engaged in a lawful investigation of criminal conduct."  (See Consent Decree § H(2).)  The Court has previously found that such information was in fact disseminated to persons unaffiliated with law enforcement.  (O. Summ. J., ECF No. 120 at 4887.)  The Court noted that "If this practice was truly inadvertent and ended quickly,

---

[12] As noted above, the hacking attempt was incidentally discovered during an infiltration of Kessler Associates undertaken for the purpose of political intelligence.  The subsequent investigation of the hacking attempt was, however, lawful and would have been permissible under the Consent Decree had the Director approved it.

28

however, the City may be in substantial compliance with Section H of the Consent Decree." (Id.)

The ACLU-TN has shown by clear and convincing evidence that dissemination was not inadvertent.  OHS shared personal information with certain outside individuals, including Autozone's Head of Security, upon request and supervisor approval.  (Ex. 32; ECF No. 135 at 5245.)  While this does not excuse the violation, Major Stephen Chandler testified that he was concerned that Joint Intelligence Briefings might violate the Consent Decree and eventually established a process for limiting the dissemination of personal information.  (Testimony of Stephen Chandler, ECF No. 137 at 5567.)

> vii.  The City Violated the Consent Decree by Recording the Identities of Protest Attendees for the Purpose of Maintaining a Record

The Consent Decree orders that the City:

> shall not engage in any action for the purpose of, or reasonably having the effect of, deterring any person from exercising First Amendment rights.  As an example, the City of Memphis shall not, at any lawful meeting or demonstration, for the purpose of chilling the exercise of First Amendment rights or for the purpose of maintaining a record, record the name of or photograph any person in attendance, or record the license plate numbers of any person in attendance.[13]

Consent Decree, Ex. 6 § F(2).  ACLU-TN introduced significant evidence that individuals were identified at protest events to create a record of attendance.  RTCC officers identified individuals at a protest through a live camera feed and an individual posting on Facebook, and then placed them into a visual relationship map.  (Exs. 54, 55, 56.)  At a protest

---

[13] The Supreme Court has repeatedly held that revealing a person's identity may chill the free exercise of First Amendment rights.  "The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible."  McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 341-342 (1995). This principle applies even when the person identified exercises their First Amendment rights in public. Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton, 536 U.S. 150, 166 (2002); Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182 (1999).

march, MPD Colonel Bullock took photographs of individuals, identified participants, and recorded a license plate.  (Ex. 60.)  Lieutenant Colonel Bass ordered OHS officers to "take photos of those spearheading the demonstrations… for future reference and documentation." (Ex. 130.)  The ACLU-TN has shown by clear and convincing evidence that MPD catalogued participants of peaceful protests as prohibited by the Consent Decree.

### viii.   The ACLU-TN did not Prove that the City Harassed Anyone

The Consent Decree requires that the City "shall not disrupt, discredit, interfere with or otherwise harass any person exercising First Amendment Rights."  (Consent Decree, Ex. 6 at § F(1).)  The ACLU-TN argued that the City discriminated against protests when issuing public assembly permits.  (ACLU-TN Merits Brief, ECF No. 143 at 6146.)   The evidence does not sufficiently support this argument.  The City was flexible with at least one protest, which it approved even though the permit application was late.  (ECF No. 139.)  The ACLU-TN has submitted evidence that the only two permit denials from October 2015 through August 2016 were both for protest events.  (Ex. 133.)  The evidence also shows, however, that the City approved the vast majority of public assemblies, including protests.  (Id.)  An employee of the City's permitting office testified that the City approved all permits that complied with statutory safety requirements, and that most denials were for failure to file an application in time. (Testimony of Aubrey Howard, ECF No. 139 at 5840.)  Without proof that tends to connect the two protest permit denials with an MPD practice, ACLU-TN has not shown that the City interfered with First Amendment rights by imposing a double-standard for protest permitting.

The ACLU-TN offered testimony of community members who described negative experiences with MPD.   Keedran Franklin said that he has refrained from visiting family

members for fear of surveillance.  (Testimony of Keedran Franklin, ECF No. 139 at 5941-420.)
Reverend Blanchard testified that she was worried about police surveillance and felt targeted.
(Testimony of Elaine Blanchard, ECF No. 140 at 5985-86.)  "Clear and convincing evidence is a
not a light burden." Gary's Elec. Serv. Co., 340 F.3d at 379.  While an individual may have a
negative subjective reaction to MPD, the ACLU-TN has specifically failed to prove by clear and
convincing evidence that MPD's actions constituted disruption or harassment, or discredited
individuals, or otherwise interfered with the exercise of First Amendment rights.

ix.   The ACLU-TN did not Prove that the City Disseminated Information for
the Purpose of Political Intelligence

The Consent Decree orders that the City "shall not disseminate damaging, derogatory,
false or anonymous information about any person for the purpose of political intelligence, or
attempt to provoke disagreement, dissention, or violence between persons."  (Consent Decree,
Ex. 6 at § H(2).)  The ACLU-TN introduced evidence that suggests MPD may have disseminated
false information on at least two occasions: first, by stating that Paul Garner was a member of
CLERB; second, by misidentifying a man at a protest as Paul Garner.  (See Exs. 104, 105.)  The
ACLU-TN did not, however, demonstrate that this information was disseminated in order to
collect additional information related to First Amendment rights or as part of an attempt to
provoke the public.  The ACLU-TN has failed to prove that the City violated this section of the
decree.

III.   **Sanctions**

a.  **Legal Standard**

The Court has a responsibility to enforce its orders through civil sanctions.  United States
v. State of Mich., 62 F.3d 1418 (6th Cir. 1995).  Civil sanctions for contempt of a court order are

31

not meant to punish a party.  <u>N.L.R.B. v. Aquabrom, Div. of Great Lakes Chem. Corp.</u>, 855 F.2d 1174, 1187 (6th Cir.), order amended and supplemented, 862 F.2d 100 (6th Cir. 1988).  When the Court imposes civil sanctions, it has two goals.  First, a contempt sanction should ensure future compliance with the violated order.  <u>McComb v. Jacksonville Paper Co.</u>, 336 U.S. 187, 193 (1949).  Second, a sanction should provide full remedial relief to the party harmed by the breach.  <u>Id.</u>

### b.  Remedies and Steps for Future Compliance

The Court first considers the remedial relief for ACLU-TN.  The Plaintiff has spent considerable time and resources litigating a case that arose from the City's violation of its legal obligations.  The Court finds that the ACLU-TN is entitled to an award of attorney's fees at the conclusion of this litigation.

The Court turns to the sanctions necessary to ensure compliance with the Consent Decree in the future.  The Court notes that the violations in this case appear to stem from a shared misunderstanding of the Decree's requirements, rather than political favoritism by individual officers.  Several officers testified that they did not believe they were conducting political intelligence at OHS.  (Testimony of Timothy Reynolds, ECF No. 136 at 5355; Testimony of Eddie Bass, ECF No. 138 at 5782-83; Testimony of Stephen Chandler, ECF No. 137 at 5566-67; Ex. 104.)  These MPD officers understood "political intelligence" to mean politically motivated or partisan intelligence.  (<u>See</u> Testimony of Timothy Reynolds, ECF No. 136 at 5355; Testimony of Stephen Chandler, ECF No. 137 at 5608.)  As explained above, the Consent Decree forbids <u>any</u> investigation into the lawful exercise of First Amendment rights; bipartisan or nonpartisan political intelligence is still political intelligence.  The Court acknowledges that this

misunderstanding predates Director Rallings; former Director Godwin issued a Departmental Regulation about the Consent Decree that did not define its central phrase, "political intelligence." (Departmental Regulation 138, Ex. 79.) To ensure compliance with the Consent Decree generally, and especially with the requirement that the City familiarize its officers with the contents of the Decree, the Court ORDERS the following:

1) The City shall revise Departmental Regulation 138. (Ex. 79.) The new regulation shall define "political intelligence." The new regulation shall specify that "political intelligence" includes <u>any</u> investigation into the lawful exercise of First Amendment rights, even if the investigating officer or unit does not have a partisan political motive. The new regulation shall specify that political intelligence is not permissible as a goal of an investigation nor as the means to an end of an otherwise lawful investigation. The new regulation shall inform officers that investigations into unlawful conduct that may incidentally result in the receipt of information relating to First Amendment rights are permissible, but require approval as set out in Consent Decree § G. The City shall submit the revised Departmental Regulation to the Court no later than January 14, 2019 for review and approval.

2) The City shall design training for members of OHS, RTCC, and MPD's Command Staff. The new training shall define "political intelligence." The new training shall specify that "political intelligence" includes <u>any</u> investigation into the lawful exercise of First Amendment rights, even if the investigating officer or unit does not have a partisan political motive. The new training shall specify that political intelligence is not permissible as a goal of an investigation nor as the means to an end of an otherwise lawful investigation. The new training shall inform officers that

investigations into unlawful conduct that may incidentally result in the receipt of information relating to First Amendment rights are permissible, but require approval as set out in Consent Decree § G.  No officer may be assigned to RTCC or OHS, or be promoted to the Command Staff without receiving this training.  The City shall submit a training plan to the Court no later than January 14, 2019 for review and approval.

3) The City shall establish a process for the approval of investigations into unlawful conduct that may incidentally result in political intelligence.[14]  While the Court does not decide at this time whether the Consent Decree permits delegation of this task,[15] the City's proposal may, for the time being, proceed as though delegation is permitted.  If the City does seek to delegate the approval process set out by § G of the Consent Decree, it shall provide that the process is administered by an officer outside of the direct chain of command of the unit or officer requesting authorization.  The City shall establish this process through a proposed written policy that shall be submitted to the Court no later than January 14, 2019 for review and approval.

4) The City shall establish written guidelines for the use of manual social media searches and of social media collators in compliance with the Decree.  The City shall make these guidelines available to all officers with access to social media collators,

---

[14] A police officer may, for example, need to "friend" a suspected drug dealer on Facebook as part of an investigation.  The officer in question would not be conducting political intelligence, because while he may incidentally obtain information relating to the suspect's exercise of First Amendment rights, he is not "gathering" that information.  This officer does, however, need to seek formal approval, because the investigation "may result in the collection of information about the exercise of First Amendment rights."  (Consent Decree, Ex. 6 at § G.)

[15] An amendment to the Consent Decree may be required in this regard.

and to all officers assigned to OHS and RTCC. The City shall submit these guidelines to the Court no later than January 14, 2019 for review and approval.

5) The City shall maintain a list of all search terms entered into social media collators or otherwise used by MPD officers collecting information on social media while on duty. This list shall be filed under seal every three months until the Court orders otherwise. The first filing shall be submitted no later than January 14, 2019 and shall reflect all such social media searches conducted from November 1, 2018 through December 31, 2018.

Plaintiff ACLU-TN shall, within 21 days of receipt of materials submitted by the City pursuant to 1, 2, 3, 4, and 5 above, file any objections to said proposals or, if there are no objections, a document stating that there are no objections.

It may be impossible for the Court to provide legal guidance on every situation that MPD will face that may implicate the Consent Decree. To ensure compliance with the Decree and to provide closer guidance on what constitutes political intelligence, the Court will appoint an independent monitor to supervise the implementation of the sanctions described above. The Parties shall submit proposed monitors, including a brief statement of qualifications and experience, by December 10, 2018. Even if the Parties confer and agree on a proposed independent monitor, the Parties shall submit at least two candidates in total. The City shall bear the monitor's fees and expenses.

## IV.   The Consent Decree's Age

The City has separately moved to vacate the Consent Decree, in part because of the substantial societal change that has occurred since 1978. (City's Mot. Vacate J., ECF No. 124.)

While the Court will rule separately on that motion, the Court writes to note its awareness of technological change. When the decree was first drafted, MPD's files were predominately made up of paper records, and the maintenance and storage of information represented a conscious investigative step. Today, the City's Blue Crush Cameras, through which the MPD maintains and stores terabytes of video footage, do not seem to conduct "investigative activity" by themselves. The Consent Decree's definition of "maintenance" and "storage" as "investigative activity" is likely outdated.

While certain terms of the Consent Decree may be outdated, the concepts are not, and the dilemma faced by the City is not new. Every community must determine how much of its citizens' privacy it is willing to sacrifice in the name of public safety. The idea that police should be limited in their powers predates 2018 and 1978. The Court's duty is to preserve the Consent Decree's central bargain. See Armour & Co., 402 U.S. at 681-82; Williams, 720 F.2d at 920. In this case, the compromise struck by the ACLU-TN and the City was a specific limitation on the subject matter for police investigations. The Court recognizes that the City granted its residents privacy rights above and beyond those guaranteed by the Constitution, but that may be the Consent Decree's intended purpose. See Williams, 720 F.2d at 920.

The Court notes that the increasing pace of technological change will present challenges for future application of the Consent Decree. Facial recognition technology, "stingray" cell-site imitation technology, and monitoring of existing electronic means of communication all provide police departments across the country with increasingly unfettered means of observing individuals.[16] In the future, algorithmic analysis of public surveillance may turn some

---

[16] See Andrew Guthrie Ferguson, The "Smart" Fourth Amendment, 102 Cornell L. Rev. 547 (2017); Andrew Guthrie Ferguson, The Internet of Things and the Fourth Amendment of Effects, 104

investigations into passive affairs, eroding the distinction that underpins the definition of "political intelligence."

Difficulties in applying privacy-protecting doctrines to new technology are not unique to this Decree.  See Carpenter v. United States, 138 S. Ct. 2206, 2217 n.3 (2018) (holding that a request for seven days of cell-site location information ("CSLI") is a search but withholding a ruling on "whether there is a limited period for which the Government may obtain an individual's historical CSLI free from Fourth Amendment scrutiny, and if so, how long that period might be.")  Some judges and lawyers have suggested that these challenges should be resolved in favor of more stringent privacy doctrines.  See Id. at 2262 (Gorsuch, J., dissenting) ("Can the government demand a copy of all your e-mails from Google or Microsoft without implicating your Fourth Amendment rights? Smith and Miller say yes it can--at least without running afoul of Katz. But that results strikes most lawyers and judges today--me included--as pretty unlikely.") See also, generally, Gerald S. Reamey, Constitutional Shapeshifting: Giving the Fourth Amendment Substance in the Technology Driven World of Criminal Investigation, 14 Stan. J. Civ. Rts. & Civ. Liberties 201, 207–08 (2018) ("The Supreme Court has struggled to find a single, overarching mode of analysis that faithfully accounts for the 18th Century language and concepts of the Fourth Amendment while recognizing the ever-changing investigative techniques

---

Cal. L. Rev. 805 (2016); Sabrina A. Lochner, Saving Face: Regulating Law Enforcement's Use of Mobile Facial Recognition Technology & Iris Scans, 55 Ariz. L. Rev. 201, 228 (2013) (considering legislation to govern the use of facial recognition technology by police); Nicole B. Cásarez, The Synergy of Privacy and Speech, 18 U. Pa. J. Const. L. 813, 859 (2016) (arguing that modern government activity that is not barred by the First Amendment may nonetheless chill speech).

of the 21st Century.").[17]  The Court cannot anticipate every change that may require a different understanding of the Consent Decree, but that alone is an insufficient reason for setting it aside.

Memphis is unique in having imposed a higher standard on itself by adopting the 1978 Consent Decree, but it is not alone in confronting the questions presented by modern surveillance.  Every community must decide how to ensure an appropriate balance between public safety and protecting personal rights.  That balance is determined not only by the text of the policies, but also by the actions taken to enforce them.  By successful implementation of the Consent Decree, MPD has the opportunity to become one of the few, if only, metropolitan police departments in the country with a robust policy for the protection of privacy in the digital age. See generally Rachel Levinson-Waldman, Government Access to and Manipulation of Social Media: Legal and Policy Challenges, 61 How. L.J. 523 (2018) (detailing the widespread use of social media monitoring by police on lawful protesters).[18]  The Court recognizes this may be a heavy burden; being a pioneer usually is.

## V.      Conclusion

For the reasons set forth above, the Court finds that the ACLU-TN was an original party to the Kendrick Litigation Consent Decree and therefore has the standing necessary to proceed with this litigation.  The ACLU-TN proved by clear and convincing evidence that the City is in violation of that Order.  Specifically, the City failed to familiarize MPD officers with "political

---

[17] The technological leap caused by automobiles also transformed Fourth Amendment doctrine. See Sarah A. Seo, The New Public, 125 Yale L.J. 1616, 1667-71 (2016) (contemplating a division of police's regulatory and law enforcement responsibilities).

[18] But see Office of the Inspector General for The NYPD, An Investigation Of NYPD's Compliance with Rules Governing Investigations of Political Activity at Appendix B (Aug. 23, 2016), http://www1.nyc.gov/assets/oignypd/downloads/pdf/oig_intel_report_823_final_for_release.pdf (requiring that "investigations not be based solely on activities protected by the First Amendment" in compliance with a consent decree); but see also at 1 (summarizing NYPD violations of policy).

intelligence" as specifically defined and forbidden by the Consent Decree. This failure led to a shared misunderstanding of the Decree's requirements and a significant number of violations. The Court imposes sanctions that are designed to ensure future compliance with the bargain struck by the Parties.

**IT IS SO ORDERED**, this 26th day of October, 2018.

 /s/ Jon McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE

## VI.    Appendix – Kendrick Litigation Consent Decree

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| CHAN KENDRICK, ET AL., | § | |
| Plaintiffs, | § § § | |
| VS. | § § | CIVIL ACTION NO. C 76-449 |
| WYETH CHANDLER, et al., | § § | |
| Defendants. | § § | |

ORDER, JUDGMENT AND DECREE

Plaintiffs, Chan Kendrick, Mike Honey, and the American Civil Liberties Union in West Tennessee, Inc., having commenced this action on or about September 14, 1976, against defendants Wyeth Chandler, Mayor or the City of Memphis, W. O. Crumby, Chief of Police and Acting Director of Police of the City of Memphis, P. T. Ryan, Captain of the Intelligence Section of the Memphis Police Department, and George W. Hutchison, Deputy Chief of Operations of the Memphis Police Department, individually and in their official capacities, and the court having determined by Order dated September 23, 1977 that the pleadings are sufficient to state a cognizable claim for relief, and the parties having waived hearing, findings of fact and conclusions of law, and defendants having consented to entry without further notice of the within Order, Judgment and Decree (hereinafter "Decree"):

NOW, THEREFORE on application of Jack D. Novik, Esquire, American Civil Liberties Union Foundation, Bruce S. Kramer, Esquire, American Civil Liberties Union in West Tennessee, Inc., and Alex Burder, attorneys for the plaintiffs, and upon consent of defendants, it is ORDERED, ADJUDGED and DECREED as follows:

40

A.  Statement of General Principles

The defendants herein deny that they have acted illegally in any manner but agree to the term hereafter set out in order to dispose of the controversy between the parties.

The provisions of this Decree prohibit the defendants and the City of Memphis from engaging in law enforcement activities which interfere with any person's rights protected by the First Amendment to the United States Constitution including, but not limited to, the rights to communicate an idea or belief, to speak and dissent freely, to write and to publish, and to associate privately and publicly for any lawful purpose.

Furthermore, even in connection with the investigation of criminal conduct, the defendants and the City of Memphis must appropriately limit all law enforcement activities so as not to infringe on any person's First Amendment rights.

B.  Definitions

1.  "First Amendment rights" means rights protected by the First Amendment to the Constitution of the United States including, but not limited to, the rights to communicate an idea or belief, to speak and dissent freely, to write and to publish, and to associate privately and publicly for any lawful purpose.

2.  The "City of Memphis" means all present and future officials, employees and any other agents, and all departments, divisions and any other agencies, of the City of Memphis, Tennessee.

3.  "Person" means any individual, group or organization.

4.  "Political Intelligence" means the gathering, indexing, filing, maintenance, storage or dissemination of information, or any other investigative activity, relating to any person's beliefs, opinions, associations or other exercise of First Amendment rights.

5.   "Defendants" means defendants Chandler, Crumby, Ryan and Hutchinson and their successors in office.

C.   Political Intelligence

1.   The defendants and the City of Memphis shall not engage in political intelligence.

2.   The defendants and the City of Memphis shall not operate or maintain any office, division, bureau or any other unit for the purpose of engaging in political intelligence.

D.   Prohibition Against Electronic Surveillance for Political Intelligence

The defendants and the City of Memphis shall not intercept, record, transcribe or otherwise interfere with any communication by means of electronic surveillance for the purpose of political intelligence.

E.   Prohibition Against Covert Surveillance for Political Intelligence

The defendants and the City of Memphis shall not recruit, solicit, place, maintain or employ an informant for political intelligence; nor shall any officer, employee or agent of the City of Memphis, for the purpose of political intelligence, infiltrate or pose as a member of any group or organization exercising First Amendment rights.

F.   Harassment and Intimidation Prohibited

1.   The defendants and the City of Memphis shall not disrupt, discredit, interfere with or otherwise harass any person exercising First Amendment rights.  Among other things, the City of Memphis shall not disseminate damaging, derogatory, false or anonymous information about any person for the purpose of political intelligence, or attempt to provoke disagreement, dissention or violence between persons.

2.   The defendants and the City of Memphis shall not engage in any action for the purpose of, or reasonably having the effect of, deterring any person from exercising First

42

Amendment rights. As an example, the City of Memphis shall not, at any lawful meeting or demonstration, for the purpose of chilling the exercise of First Amendment rights or for the purpose of maintaining a record, record the name of or photograph any person in attendance, or record the automobile license plate numbers of any person in attendance.

G. <u>Criminal Investigations Which May Interfere With</u>
<u>the Exercise of First Amendment Rights</u>

1. Any police officer conducting or supervising a lawful investigation of criminal conduct which investigation may result in the collection of information about the exercise of First Amendment rights, or interfere in any way with the exercise of such First Amendment rights, must immediately bring such investigation to the attention of the Memphis Director of Police for review and authorization.

2. The Director of Police shall review the factual basis for the investigation and the investigative techniques to be employed. The Director of Police shall issue a written authorization for an investigation for a period not to exceed ninety (90) days only if the Director of Police makes written findings that:

a. The investigation does not violate the provisions of this Decree; and

b. the expected collection of information about, or interference with, First Amendment rights is unavoidably necessary for the proper conduct of the investigation; and

c. Every reasonable precaution has been employed to minimize the collection of information about, or interference with, First Amendment rights; and

43

d. the investigation employs the least intrusive technique necessary to obtain the information.

3. The Director of Police may authorize an extension of such investigation for an additional period specified by the Director of Police not to exceed ninety (90) days. The Director of Police shall authorize each such extention only if the Director of Police re-evaluates the factual basis for the investigation and the investigative techniques to be employed, and makes current written findings as required in Paragraph 2, above.

H. __Maintenance and Dissemination of Information__

1. The defendants and the City of Memphis shall not maintain personal information about any person unless it is collected in the course of a lawful investigation of criminal conduct and is relevant to such investigation. Information which has been collected in violation of this Decree shall be destroyed.

2. The defendants and the City of Memphis shall not disseminate personal information about any person collected in the course of a lawful investigation of criminal conduct to any other person, except that such information may be disseminated to another governmental law enforcement agency then engaged in a lawful investigation of criminal conduct.

I. __Restriction on Joint Operations__

The defendants and the City of Memphis shall not encourage, cooperate with, delegate, employ or contract with, or act at the behest of, any local, state, federal or private agency, or any person, to plan or conduct any investigation, activity or conduct prohibited by this Decree.

J. __Dissemination and Posting of this Decree__

The defendants and the City of Memphis shall familiarize each of its law enforcement personnel with the contents of

44

this Decree in the same manner in which those personnel are instructed about other rules of conduct governing such personnel. In addition, defendants and the City of Memphis shall disseminate and make known the contents of this Decree through publication, public posting and other means.

K. **Effective Date**

This Decree shall be effective when approved and entered by the Court as fair, reasonable and adequate.

L. **Binding Effect**

This Decree, providing prospective relief only, constitutes a full and final adjudication of all the named plaintiffs' claims for injunctive and affirmative relief as stated in the Complaint. However, it shall have no binding effect upon any claims for damages that have been, might have been, or might in the future, be asserted by any other individual. Any statutes of limitations that apply to any such claims are hereby tolled from September 14, 1976 to the date of this Decree.

M. **Retention of Jurisdiction**

The Court will retain jurisdiction of this action, including any issue which might arise regarding payment of attorneys' fees to counsel for plaintiffs, pending disposition of all matters contained in this Decree and for the purpose of issuing any additional order required to effectuate this Decree.

SO ORDERED.

UNITED STATES DISTRICT JUDGE

45

APPROVED FOR ENTRY:

ARTHUR J. SHEA
Deputy Asst. City Attorney
City Hall, Room 314
125 N. Main Street
Memphis, Tennessee   38103


Attorney for Defendants


JACK D. NOVIK   JH
American Civil Liberties Union
     Foundation
22 East 40th Street
New York, New York   10016
212/725-1222



BRUCE S. KRAMER
American Civil Liberties Union
     in West Tennessee, Inc.
P. O. Box 3070
Memphis, Tennessee   38103
901/525-6361



ALEX HURDER
Attorney at Law
111 North Maple Street
Covington, Tennessee   38019


Attorneys for Plaintiffs

46