## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| ELAINE BLANCHARD, KEEDRAN FRANKLIN, PAUL GARNER, and BRADLEY WATKINS | ) ) ) | |
| | ) | |
| Plaintiffs (dismissed), | ) | |
| | ) | |
| and | ) | No. 2:17-cv-2120-JPM-egb |
| | ) | |
| ACLU OF TENNESSEE, INC., | ) | JURY DEMANDED |
| | ) | |
| Intervening Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF MEMPHIS, TENNESSEE | ) | |
| | ) | |
| Defendant. | ) | |

## INDEPENDENT MONITOR SUBMISSION OF EDWARD L. STANTON III AND BUTLER SNOW LLP

### I.
### MONITORSHIP OVERVIEW

Edward L. Stanton III and Butler Snow LLP now submit this response to the Court's Orders of October 26 (ECF No. 151), October 29 (ECF No. 152), and December 12 (ECF No. 165), 2018. In those Orders, the Court determined that, despite exemplifying the character and commitment needed in law enforcement professionals, the Memphis Police Department (MPD) severally and significantly has violated a 1978 Consent Order that concerns "political intelligence." To help restore the MPD's compliance with the Consent Order "and to provide closer guidance on what constitutes political intelligence," the Court will appoint an Independent Monitor. (ECF No. 153 at 3-4.) Mr. Stanton should be that Monitor.

The Monitor will be charged with supervising the implementation of five sanctions imposed by the Court on the MPD and the City of Memphis:

- *First*, the City must revise Departmental Regulation (Reg.) 138 to meet the following three requirements:

    o (1)   It must define "political intelligence" to include "<u>any</u> investigation into the lawful exercise of First Amendment rights, even if the investigating officer or unit does not have a partisan political motive" (ECF No. 152 at 1-2);

    o (2)   It must "specify that political intelligence is not permissible as a goal of an investigation nor as the means to an end of an otherwise lawful investigation" (*id.* at 2); and

    o (3)   It must "inform officers that investigations into unlawful conduct that may incidentally result in the receipt of information relating to First Amendment rights are permissible, but require approval as set out in Consent Decree § G" (*ibid.*).

- *Second*, the City must design training for members of the Office of Homeland Security (OHS), Real Time Crime Center (RTCC), and MPD's Command Staff. The training must meet the same three requirements as the revisions to Reg. 138 and also operate as a prerequisite for assignment to OHS or RTCC or for promotion to Command Staff. (*Ibid.*)

- *Third*, the City must "establish a [written] process for the approval of investigations into unlawful conduct that may incidentally result in political intelligence" as set out by § G of the Consent Decree. (*Id.* at 3.) To the extent that the City delegates this approval process, it must be "administered by an officer outside of the direct chain of command of the unit or officer requesting authorization." (*Ibid.*)

- *Fourth*, the City must "establish written guidelines for the use of manual social media searches and of social media collators in compliance with the [Consent] Decree." The guidelines must be made "available to all officers with access to social media collators, and to all officers assigned to OHS and RTCC." (*Ibid.*)

- *Finally*, the City must (1) "maintain a list of all search terms entered into social media collators or otherwise used by MPD officers collecting information on

social media while on duty" (*ibid.*); and (2) file it under seal every quarter "until the Court orders otherwise" (*ibid.*).

To ensure that the Monitor will have the relevant capacity and expertise to fulfill its charge, the Court has ordered the Monitor candidates proposed by the parties to submit certain materials by noon on Wednesday, December 19, 2018: (1) the identity, qualifications, and rate of compensation of all Monitoring team members; (2) a concise recitation of the Monitoring Plan; and (3) exemplar forms for inspecting the City and MPD's compliance with the Court's Orders and for the Monitor's reports to the Court.  The required forms, a five-year budget projection, and curricula vitae for Mr. Stanton and his team are attached as **Exhibits A-D** to this submission. What follows here are a brief background of this matter; summaries of existing and contemplated team member identities, qualifications, and rates; and a concise recitation of Mr. Stanton's Monitoring Plan.

## II.
## BRIEF BACKGROUND OF THE KENDRICK LITIGATION, THE CONSENT DECREE, AND THE BLANCHARD / ACLU-TN CLAIMS

This matter arises from a lawsuit filed forty-one years before it. In 1978, this Court entered a Consent Order in *Kendrick, et al. v. Chandler, et al.*, No. 2:76-cv-00449 (Kendrick Litigation), that generally forbade the City of Memphis from conducting "political intelligence" and from "operat[ing] or maintain[ing] any office, division, bureau or any other unit for the purpose of engaging in political intelligence." (Consent Order, Kendrick Litigation, ECF No. 3, § C.) Among other things, the Consent Decree defined "political intelligence" in terms of First Amendment freedoms: "the gathering, indexing, filing, maintenance, storage or dissemination of information, or any other investigative activity, related to any person's beliefs, opinions, associations or other exercise of First Amendment rights." (*Id.* § B(4).) The Consent Decree exempted the limited conducting of political intelligence incident to "a lawful investigation of

criminal conduct" but provided that any such investigation must be brought "to the attention of the Memphis Director of Police for [written] review and authorization." (*Id.* § G.) It also allowed the City to share "personal information . . . collected in the course of a lawful investigation of criminal conduct" only with other law enforcement conducting its own investigation (*id.* § H(2)) and required the City to "familiarize each of its law enforcement personnel with the contents of th[e] Decree" (*id.* § J).

On February 22, 2017, Elaine Blanchard and three other Memphis citizens sued the City for violating these and other provisions of the Consent Decree. The Blanchard Plaintiffs were dismissed the following June for lack of standing (*see* ECF No. 41),[1] but the ACLU of Tennessee, Inc., which had intervened as a plaintiff in March 2017, remained (*see ibid.* & ECF Nos. 117 & 120).

On August 10, 2018, this Court partially granted summary judgment for the ACLU-TN, holding that the City had conducted political intelligence in three different ways. (*See* ECF No. 120 at 28-29.) First, the Court held, the City had gathered and shared information related to the Blanchard Plaintiffs' political associations.[2] Second, the City created and circulated Joint Intelligence Briefings (JIBs), which include information about lawful events and events on

---

[1]     The Blanchard Plaintiffs recently moved to re-enter this matter as intervenors. (ECF No. 168.)

[2]     Some of the Blanchard Plaintiffs participated in a "Die-In" protest at Memphis Mayor Jim Strickland's home on December 19, 2016. (*See* ECF No. 120 at 8.) In response to the protest, the mayor signed an Authorization of Agency (AOA), which notifies the police of known criminal trespassers and empowers them to arrest repeat offenders without telling the property owner. (*Ibid.*) This AOA's list of names was created by an officer with OHS, who identified both the protestors and their "associates in fact," amassed from the protestors' social-media contacts, arrest records, and sightings at unlawful assemblies. (*Ibid.*) Thus, the AOA included the names of people who did not participate in the protest. (*Ibid.*) Another MPD officer transferred the names on the AOA to the City Hall Escort List. (*Id.* at 9.)

private property, within and outside the MPD.[3] Third, the City sent plainclothes officers to photograph and identify participants at protests.  The Court also held on August 10 that the City had failed to review and issue written authorizations for some lawful investigations of criminal conduct that may incidentally have infringed on First Amendment freedoms. (*Id.* at 31-33.)

On October 26, 2018, after a bench trial, the Court held, additionally, that the City had operated OHS for the purpose of political intelligence, intercepted electronic communications and infiltrated groups using an alias Facebook account, and failed to familiarize MPD officers with the Consent Decree's requirements. (*See generally* ECF No. 151.) For all of these violations, the Court held the City in contempt. (*Ibid.*)

But the Court also concluded that the violations "appear[ed] to stem from a shared misunderstanding of the Decree's requirements, rather than political favoritism by individual officers." (*Id.* at 32.) As the Court explained, "[n]othing in [it]s [O]rder should be construed to suggest that [MPD] officers in any way lack integrity or dedication to duty. Each exemplified the character and commitment needed in law enforcement professionals." (*Id.* at 27.) "The failure," instead, "was one of training and inadequate direction over a sustained period of time." (*Ibid.*) Reg. 138, which was issued to familiarize officers with the Consent Decree, did not even define "political intelligence." (*Id.* at 33.)

Thus, in issuing the five sanctions discussed above, and consistent with the restorative, rather than punitive, nature of civil contempt (*see id.* at 14 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949)), the Court sought "[t]o ensure compliance with the Consent Decree generally, and . . . [to] familiarize [MPD] officers with the contents of the Decree" (*id.* at 33). The Court recognized that "certain terms of the Consent Decree may be outdated" and that

---

[3]     JIB recipients included Shelby County Schools, FedEx, AutoZone, and St. Jude.

"[i]t may be impossible for the Court to provide legal guidance on every situation that MPD will face that may implicate the Consent Decree." (*Id.* at 35-36.) It further acknowledged that the Consent Decree confers on Memphis residents "privacy rights above and beyond those guaranteed by the Constitution." (*Id.* at 36.) But the Court reaffirmed its intent to hold the City to the Consent Decree's intended purpose, even if that purpose imposes "a heavy burden." (*Id.* at 38.)

### III.
### PROPOSED MONITORING TEAM

Mr. Stanton and Butler Snow propose a Monitoring Team that consists of a Monitor and a Deputy, with support from one to two other Butler Snow counsel and paralegals as appropriate, and subject-matter experts in (1) Constitutional Law and the First Amendment; (2) Public Policy and Social Media; and (3) Law Enforcement and Police Practices.[4] We have filled, partly filled, or are working to fill each category as follows:

> *Monitor*.        Mr. Stanton is a Memphis native who will bring vast civil, criminal, and investigative experience to the Monitorship. He is a Partner and Practice Group Leader for Commercial Litigation at Butler Snow (Memphis), where his practice focuses primarily on complex commercial disputes, government investigations, civil rights, fraud, and audits. Last year, Mr. Stanton was selected to lead an independent investigation into certain allegations of fraudulent misconduct at Trezevant High School and other Shelby County Schools. The "Stanton Report" (available here) produced at the investigation's conclusion, was widely credited for its thoroughness, transparency, and clarity. From August 2010 to March 2017, Mr. Stanton was the U.S. Attorney for the Western District of Tennessee. In that role, he formed and launched a dedicated Civil Rights Unit, worked closely with a coalition of law enforcement officials to form a Multi-Agency Gang Unit, and supervised the prosecutions of hundreds of violent, white collar, and other high-profile criminals. His prior experience includes nearly a decade as Senior Counsel for a Fortune 100 company, private practice at two of the City's most prominent law firms, and public service as an Assistant City of Memphis Attorney. He earned both his

---

[4]        Proposed rates for each team category are specified in the Summary of Budget Projection in § IV, *infra*.

undergraduate and law degrees from the University of Memphis. For a more complete review of Mr. Stanton's qualifications and accomplishments, please see the professional biography and Curriculum Vita attached as **Exhibit A** to this submission.

***Deputy Monitor***.          Jim Letten joined Butler Snow (New Orleans) as a Partner in 2015, after having served some 36 years as a federal prosecutor. As U.S. Attorney for the Eastern District of Louisiana, he was the longest-serving U.S. Attorney in the nation and one of only three appointed by successive Presidents of different political parties. He has litigated hundreds of jury and bench trials in both state and federal courts. Mr. Letten also oversaw, from inception through negotiation, settlement, and implementation, the DOJ consent decree that concerned oversight of the New Orleans Police Department. That consent decree was the broadest and most sweeping consent decree of a local police department in U.S. history. Mr. Letten is a 14-year faculty member of the New Orleans Police Department's Training Academy and a former Assistant Dean of Tulane School of Law. He also is a retired Commander in the U.S. Naval Reserve, where he served as an NCIS Agent and Foreign Counter-Intelligence Officer. Mr. Letten earned a bachelor's degree from University of New Orleans and his law degree from Tulane University. For a more complete review of Mr. Letten's qualifications and accomplishments, please see the professional  biography and Curriculum Vita attached as **Exhibit B** to this submission.

***Constitutional Law & the First Amendment.***[5]          John C. Henegan is a Partner with Butler Snow (Jackson, MS) who represents broadcast, print, and entertainment media groups. He is a Fellow of the American Academy of Appellate Lawyers, the American Bar Foundation, and the Mississippi Bar Foundation. He also holds an AV-Preeminent rating with *Martindale Hubbell* and has been rated by *Chambers, Benchmark Litigation, and Super Lawyers* in Appellate and Commercial Litigation. Mr. Henegan has been listed in the First Amendment section of every edition of *The Best Lawyers in America* since 1988. *Best Lawyers* rated him Appellate Lawyer of the Year (Mississippi) in 2016, Antitrust Lawyer of the Year (Mississippi) in 2014, and has rated him in Bet-the-Company Litigation, Antitrust Litigation, and Communications Law since 2010. Mr. Henegan has authored or co-authored articles for the Fifth Circuit Reporter, the Mississippi Press Association's *The Fourth Estate*, and the Media Law Resource Center's annual 50-State Survey of the Law of Defamation. He earned bachelor and law degrees from the University of Mississippi, where he was Editor-in-Chief of the *Mississippi Law Journal*. He also is a former judicial law clerk for the Honorable Charles Clark of the U.S. Court of Appeals for the Fifth Circuit. For a more complete review of Mr.

---

[5]     We hope to retain one other subject-matter expert in this space, preferably a law professor who specializes in First Amendment and Public Policy issues, and are in conversation with several candidates.

Henegan's qualifications and accomplishments, please see the professional biography and Curriculum Vita attached as **Exhibit C** to this submission.

***Public Policy and Social Media***.      We have been in conversation with and hope to retain Rachel Levinson-Waldman as our consultant in this space. Ms. Levinson-Waldman expressed a "strong interest" in the role but has requested more time to consider it. She serves as Senior Counsel to the Brennan Center for Justice at New York University Law School. Ms. Levinson-Waldman is a regular commentator for television, radio, and print media on issues of national security, privacy, and surveillance. She has been published in a wide array of popular media, including *The Washington Post, The Atlantic, and U.S. News & World Report*. Ms. Levinson-Waldman's recent publications include *Government Access to and Manipulation of Social Media: Legal and Policy Challenges*, which was published in the Howard Law Journal earlier this year and cited by the Court in its October 26, 2018 Order. Ms. Levinson-Waldman formerly served as counsel to the American Association of University Professors and as a Trial Attorney in the DOJ's Civil Rights Division. She holds an undergraduate degree from Williams College and a law degree from the University of Chicago. She also is a former judicial law clerk for the Honorable M. Margaret McKeown of the U.S. Court of Appeals for the Ninth Circuit. For a more complete review of Ms. Levinson-Waldman's qualifications and accomplishments, please see the Curriculum Vita attached as **Exhibit D** to this submission.

***Law Enforcement and Police Practices.***      Theron L. Bowman, Ph.D,, is the former Deputy City Manager, Director of Public Safety, and Chief of Police for Arlington, Texas.  He is a police and city management professional with more than thirty years of experience leading sophisticated police and public safety operations  around the world.- Dr. Bowman is the court-appointed Deputy Monitor for a consent decree in Baltimore, MD; a law enforcement expert on the monitorship team for New Orleans, LA; and the current President and CEO of The Bowman Group (website here), a consultancy of researchers, technicians, and professionals with expertise in police reform, police accountability, police civilianization, and community policing. He also serves as the Advisory Board Chair for the Institute of Law Enforcement Administration and as a Director for the National Commission on Crime and Delinquency. Dr. Bowman has led and coordinated regional public safety efforts for NFL Super Bowl XLV, the MLB World Series, and the NBA All Star Game.  He holds a bachelor's degree in biology and master's and doctoral degrees in public and urban administration from UT Arlington. For a more complete review of Dr. Bowman's qualifications and accomplishments, please see the professional biography and Curriculum Vita attached as **Exhibit E** to this submission.

*Compliance and Auditing***.**            We expect to retain one subject-matter expert, likely a retired and well-respected former police officer  or sheriff's deputy with the necessary expertise, as a consultant in this space.

**IV.**
**SUMMARY OF BUDGET PROJECTION**

Because we do not yet have our entire team assembled and will need to consult with them, and as the Court's Orders contemplate ongoing reporting by the City, the proposed budget for this submission will include estimates that are subject to change. One of the most significant variables is the City's technology inventory and capacity and need for technical assistance, as approved by the Court. Our Monitoring Team's prior experience suggests that technological capacity is a key driver of budget outcomes.

The Monitoring Team will submit an initial five-year budget projection, with the following hourly fees:[6]

| POSITION | RATE |
|---|---|
| Monitor | $350.00 |
| Deputy (& other Butler Snow counsel as appropriate) | $295.00 (blended) |
| Constitutional Law & First Amendment (2) | $275.00 |
| Public Policy and Social Media Expert | $275.00 |
| Law Enforcement and Police Practices Expert | $250.00 |
| Compliance and Auditing Expert | $200.00 |
| Paralegal Support | $175.00 |

---

[6]        We anticipate annual COLA increases of 2%.

9

Mr. Stanton will provide the full initial budget projection to the Court during his scheduled interview on December 20, 2018.

## V.
## PROPOSED MONITORING PLAN

Aside from the Monitoring Team, our proposed Monitoring Plan consists of the following: (1) Core Principles, (2) Areas of Emphasis, (3) and Reporting.

### A.      Core Principles.

Three Core Principles will guide this Monitoring Team:

- *Principle One*:     Respect for the Limited Role of the Monitor—to support and advise the Court, not to substitute its judgment for or replace the Court or the MPD.

- *Principle Two:*     Clarity, Consistency, and Accountability in all Communications with the MPD. We want the Command Staff and officers alike who work with us always to know what they are being asked to do, why they are being asked to do it, and when it should be done.

- *Principle Three:*   Rigorous Transparency. We want the Court, the MPD, the ACLU-TN, and the public to know what we are doing, why we are doing it, and how much it costs.

### B.      Areas of Emphasis.

We have identified five areas of emphasis for this Monitorship, each of which corresponds to one or more of the five sanctions that the Court has imposed:

- Communications with the Court, ACLU-TN, and the Public

Without a clear and consistent communications protocol, the Monitoring Team cannot effectively assist the Court and supervise the MPD in complying with the Consent Order or the Court's other Orders. The Monitoring Team proposes the following guidelines to facilitate clear and consistent communications between and among all relevant stakeholders:

*First*, the Monitoring Team will work with Command Staff to identify the primary person at the MPD with whom the Team will communicate. This person will be a Liaison between the Team and the MPD for administration and implementation of the Consent Decree. The Liaison should facilitate unfettered access for the Monitoring Team to all MPD officers and staff, without prior authorization. To that end, we recommend that the Monitoring Team be provided computer user credentials to allow them independently to access database and online information for purposes of auditing and review. The Liaison also should encourage MPD officers and staff to cooperate fully with the Monitoring Team.

*Second*, the MPD liaison will identify someone within the MPD who can address the department's technological capacity. We will need an inventory of the City's technology relevant to the Consent Decree (e.g. social media collaters).

*Third*, the Monitoring Team will to create a Monitor's Website, to which all reports approved by the Court, invoices, and all other non-sensitive material related to the Monitorship will be posted. A portion of the website should be dedicated to complaints or other comments from the public on new policies, training, and other issues related to the Consent Decree. The Monitoring Team also will establish an electronic Sharefile site, where all proposed policies and necessary work materials will be stored so that the Court, the parties, and the Monitor will have access.

*Fourth*, the Monitoring Team will work with the MPD to dedicate a portion or a page of its own website to the Consent Decree. All new policies related to the Consent Decree should be published here.

*Fifth*, the Monitoring Team will not communicate with the press without prior Court approval. To the extent that the Court is persuaded that meetings with community groups and other community engagement will benefit the Monitorship, the Monitor will participate in such meetings to explain the requirements of the Consent Order, and discuss the progress of the department.

*Sixth*, all oral or otherwise informal communications between the Monitoring Team and the MPD or the ACLU-TN related to the Monitoring Plan or the Consent Decree will be memorialized via email or some other writing and preserved for the duration of the Monitorship.

- Comprehensive Review & Crafting of Policies & Procedures

11

This Area of Emphasis concerns the Court's **first**, **third**, and **fourth** sanctions. It should begin with a comprehensive review of the MPD's code of conduct policies, chain of command, and reporting procedures and subsequently should allow for appropriate revising and crafting of new proposed policies by the Monitoring Team.

- Comprehensive Review & Design of Training

This Area of Emphasis concerns the Court's **second** sanction. It should begin with a comprehensive review of the MPD's entire onboarding, training, and continuing education curricula and any related policies and procedures. Subsequently this review should allow for appropriate revising and crafting of new proposed policies by the Monitoring Team. A key concern is to ensure that officers can access and be exposed to both existing law and real-time changes in the law.

- Comprehensive Review of MPD Technology Use

This Area of Emphasis concerns the Court's **fifth** sanction. It should begin with a comprehensive review of all uses, proper and improper, public and covert, that the MPD is making of the technology at its disposal. The inventory of technology reference in the first Area of Emphasis will be critical to this overview. Only once the Monitoring Team has surveyed the current practices of the MPD can it put forward recommendations that are consistent with best practices and comply with the Consent Decree and the Court's other Orders.

- Comprehensive Review of Current Social Media Use

This Area of Emphasis also concerns the Court's **fifth** sanction. Generating and producing the required list of search terms every quarter will require a comprehensive knowledge and understanding of the MPD's social media uses. Facebook accounts are ubiquitious now, but what other social media platforms are officers using, and how might the nuances of each platform affect the department's ability to comply with the Consent Decree and the Court's other Orders?

**C.     Reporting.**

Consistent with successful monitorships in other major urban areas like Baltimore, the Monitoring Team proposes both quarterly and annual reports to the Court. The format of the reports is reflected in the forms attached as **Exhibits F & G**, but the reports differ only in that the quarterly reports largely will be self-contained, and the annual reports will contain both cumulative data for the first three quarters and self-contained reporting for the final quarter of

each year. The Monitoring Team suggests using the quarterly reporting form to collect data and
assess the MPD's compliance with relevant benchmarks as the Monitor's findings will be
reported out in that format. All reports will be submitted to the Court for approval and then
uploaded to the Monitoring Website for public viewing (with appropriate redactions for sensitive
information, such as the locations of certain cameras).

Each report, quarterly and annual, will include exhibits of the data analyzed during the
relevant period by the Monitoring Team. Such exhibits may include (1) forms or authorizations
required by MPD policy for monitoring individuals' online presence; (2) copies of any
authorizations for lawful criminal investigations that incidentally may result in the conducting of
political intelligence; (3) surveillance logs and reports; and (4) written and electronic
communications related to the Consent Decree or the Court's other Orders.

## VI.
## CONCLUSION

This submission presents an efficient, comprehensive plan to restore the MPD's
compliance with the Consent Order "and to provide closer guidance on what constitutes political
intelligence" to this Court's satisfaction. (ECF No. 153 at 3-4.) Mr. Stanton and Butler Snow
therefore respectfully request that the Court select Mr. Stanton to serve as the Independent
Monitor for this matter.

RESPECTFULLY SUBMITTED, this 19th day of December 2018,


/s/ *Edward L. Stanton III*
Edward L. Stanton III (TN BPR #18904)
BUTLER SNOW LLP
6075 Poplar Avenue, 5th Floor
Memphis, TN  38119
Telephone:  (901) 680-7200
Facsimile: (901) 680-7201

edward.stanton@butlersnow.com

45540194.v1