# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | | |
|---|---|---|
| ACLU OF TENNESSEE, INC., | ) | |
| | ) | |
| | ) | |
| Intervening Plaintiff, | ) | |
| | ) | No. 2:17-cv-2120-JPM-jay |
| v. | ) | |
| | ) | |
| CITY OF MEMPHIS, TENNESSEE | ) | |
| | ) | |
| Defendant. | ) | |

## APRIL 2019 QUARTERLY REPORT OF THE INDEPENDENT MONITOR

### I.     Introduction.

In the December 19, 2018, submission by Edward L. Stanton III to serve as the Independent Monitor in this matter (Submission), Mr. Stanton "propose[d] both quarterly and annual reports to the Court." (ECF No. 180-1, PageID 6561.) Regular reporting, as Mr. Stanton explained, is a consistent feature of "successful monitorships in other major urban areas like Baltimore." (*Ibid.*)

Significant differences exist between this Monitorship and those in other areas. For one, violations of a federal consent decree—specifically, the 1978 *Kendrick* Consent Decree (*see* ECF No. 3, Case No. 2:76-cv-00449)—are at issue rather than violations of any federal constitutional guarantee.[1] Although the *Kendrick* Consent Decree "relate[s] to any person's beliefs, opinions, associations, or other exercise of First Amendment rights" (*id.* § B(4)), it confers on Memphis

---

[1] Whether, and, if so, to what extent, independent constitutional violations resulted from the conduct found by the Court to violate the *Kendrick* Consent Decree is beyond the scope of this Report and the Monitor's mandate.

residents, as this Court has recognized, "privacy rights above and beyond those guaranteed by the Constitution" (ECF No. 151, PageID 6276).  For another, in its Order finding that Defendant City of Memphis, Tennessee, has violated the *Kendrick* Consent Decree, the Court explained that the violations appeared to have been inadvertent, "stem[ming] from a shared misunderstanding of the Decree's requirements." (ECF No. 151, PageID 6272.) Testimony offered by the Monitoring Team at this Court's first hearing on the progress of the Monitorship (*see* ECF Nos. 189, 195), held on April 23, 2019 (April 23 Hearing), supports the initial assessment that the Memphis Police Department (MPD) "appears to lack the structural problems that have slowed compliance with consent decrees in other police departments elsewhere in the country." (ECF No. 203, PageID 7038.)

Despite these differences, this Quarterly Report, like the Interim Report that preceded it (ECF No.197) and later reports that will follow, tracks the City's efforts to remedy the violations identified in the Court's Orders (*see* ECF Nos. 120, 151 / 152) and details the Monitoring Team's assessment of those efforts. The City has worked extensively with this Team and with Intervening Plaintiff ACLU of Tennessee, Inc., to propose modifications to existing policies and practices and to create new ones as necessary to meet the Court's requirements. (*See generally* ECF Nos. 151 / 152.) This Report notes those areas where there is now agreement between the City and the ACLU, as well as those areas in which this Team recommends that more work be done.

Nothing in this Report is intended to suggest that the City or members of the MPD "in any way lack integrity or dedication to duty." (ECF No. 151, PageID 6267.) Rather, the Team has found, as this Court anticipated, that all of the City and MPD personnel with whom they have worked in this matter have "exemplified the character and commitment needed in law

enforcement professionals." (*Ibid.*) The recommendations included in this Report thus strictly adhere to the Monitor's mandate "to supervise the implementation of the sanctions" that this Court has imposed on the City and seek only to aid the Court in "ensur[ing] [the City's] compliance with the Decree . . . and provid[ing] closer guidance [to the City] on what constitutes political intelligence." (ECF No. 152, PageID 6290.)

## II.     Executive Summary.

This Report begins with a brief description of the Monitoring Team's members, some, but not all, of whom were identified in Mr. Stanton's Submission. (*See* ECF No. 180-1, PageID PageID 6555-59.) It then discusses the Team's activities over the past four months—from December 21, 2018, when Mr. Stanton was appointed (*see* ECF No. 176), to April 23, 2019, when Mr. Stanton and the other members of the Monitoring Team testified at the April 23 Hearing (*see* ECF No. 203). The Report next briefly summarizes the Team's findings to date. Finally, the Report concludes with an appendix of the documents that it references.

## III.    The Monitoring Team.

Mr. Stanton's Submission identified roles for three categories of members on the Monitoring Team: (1) a monitor and deputy monitor; (2) four subject-matter experts (SMEs); and (3) legal and paralegal support. (ECF No. 180-1, PageID 6555-59.) Detailed descriptions and curricula vitae are available at Exhibits A-E to Mr. Stanton's Submission (*id.* at PageID 6564-97) and will be available on the Monitoring Team Website, discussed in § IV(F), below, once it goes live. Brief descriptions of each Team member follow here:

### A.     *Monitor & Deputy Monitor.*

*Monitor*.     Mr. Stanton is a Memphis native who brings vast civil, criminal, and investigative experience to the Monitorship. He is a Partner and Practice Group Leader for Commercial Litigation with Butler Snow LLP in Memphis, where his practice focuses primarily on complex litigation, government and internal investigations, civil rights,

fraud, and audits. From August 2010 to March 2017, Mr. Stanton was the U.S. Attorney for the Western District of Tennessee. In that role, he formed and launched a dedicated Civil Rights Unit; worked closely with a coalition of law enforcement officials to form a Multi-Agency Gang Unit; and supervised the prosecutions of hundreds of violent, white collar, and other high-profile criminal and civil matters. Mr. Stanton's prior experience includes nearly a decade as Senior Counsel for a Fortune 100 company, private practice with two of the City's most prominent law firms, and public service as an Assistant City Attorney. Mr. Stanton earned both a bachelor's degree and a law degree from the University of Memphis.

***Deputy Monitor***.     Jim Letten joined Butler Snow's New Orleans office as a Partner in 2015, after having served some 36 years as a federal prosecutor. As U.S. Attorney for the Eastern District of Louisiana, Mr. Letten was the longest-serving U.S. Attorney in the nation and one of only three appointed by successive Presidents of different political parties. He has litigated hundreds of jury and bench trials in both state and federal courts. Mr. Letten oversaw, from inception through negotiation, settlement, and implementation, the Department of Justice (DOJ) consent decree that concerned oversight of the New Orleans Police Department (NOPD). He is a 14-year faculty member of the NOPD Training Academy and a former Assistant Dean of Tulane School of Law. He also is a retired Commander in the U.S. Naval Reserve, where he served as an NCIS Agent and Foreign Counter-Intelligence Officer. Mr. Letten earned a bachelor's degree from University of New Orleans and a law degree from Tulane University.

### B. SMEs.

***Law Enforcement and Police Practices.***     Theron L. Bowman, Ph.D., is President and CEO of The Bowman Group, a consultancy of researchers, technicians, and professionals with expertise in police accountability and reform and community policing. He is the former Deputy City Manager, Director of Public Safety, and Chief of Police of Arlington, Texas, and serves as a Director for the National Commission on Crime and Delinquency. Dr. Bowman is the court-appointed Deputy Monitor for a consent decree in Baltimore, Maryland, and a law enforcement expert on the monitorship team for New Orleans. He has led and coordinated regional public safety efforts for the NFL Super Bowl, the MLB World Series, and the NBA All-Star Game. Dr. Bowman holds a bachelor's degree in biology, a master's degree in public administration, and a doctorate in urban and public administration from the University of Texas at Arlington.

***Public Policy and Social Media.***     Rachel Levinson-Waldman serves as Senior Counsel to the Liberty and National Security Program at the Brennan Center for Justice at New York University Law School. In addition to publishing reports and law review articles on issues related to the Fourth Amendment, privacy, surveillance, and national

4

security, she is a regular commentator for television, radio, and print media, and has been published in a wide array of popular media, including *The Washington Post, The Atlantic, and U.S. News & World Report*. Ms. Levinson-Waldman formerly served as counsel to the American Association of University Professors and as a Trial Attorney in the DOJ Civil Rights Division. She holds a bachelor's degree from Williams College and a law degree from the University of Chicago. She also is a former judicial law clerk for the Honorable M. Margaret McKeown of the U.S. Court of Appeals for the Ninth Circuit.

*Constitutional Law & the First Amendment.* John C. Henegan is a Partner with Butler Snow in Jackson, Mississippi, who represents broadcast, print, and entertainment media groups. He is a Fellow of the American Academy of Appellate Lawyers, the American Bar Foundation, and the Mississippi Bar Foundation, and has been listed in the First Amendment section of every edition of *The Best Lawyers in America* since 1988. Mr. Henegan has authored or co-authored articles for the Fifth Circuit Reporter, the Mississippi Press Association's *The Fourth Estate*, and the Media Law Resource Center's annual 50-State Surveys of the Law of Defamation and Privacy. He earned a bachelor's degree and a law degree (with honors) from the University of Mississippi, where he was Editor-in-Chief of the *Mississippi Law Journal*. He also is a former judicial law clerk for the Honorable Charles Clark of the U.S. Court of Appeals for the Fifth Circuit.

*Compliance and Auditing.* David N. McGriff, Sr., is the former Deputy Commissioner and Chief of Staff of the Tennessee Department of Safety and Homeland Security. In those roles, he was responsible for managing the Highway Safety Office and the Office of Homeland Security and supervised the administrative functions of the Department's Internal Audit, Budget, Fiscal Affairs, Driver Services, and Talent Management Divisions. Mr. McGriff had a 44-year career in law enforcement, serving as an officer in the Washington, D.C., and Memphis Police Departments; as director of the West Tennessee Drug Task Force; and as the Chief Criminal Investigator for the Shelby County District Attorney's Office. He is a graduate of the FBI National Academy and a veteran of the U.S. Marine Corps.

## C. Legal & Paralegal Support.

*Counsel.* Gadson W. Perry, a Partner with Butler Snow in Memphis, specializes in complex commercial disputes, catastrophic events and major claims, and appeals. He has represented corporate, governmental, and insurance clients in 12 states and the territory of Puerto Rico, and his experience includes bench and jury trials and arbitrations; state and federal appeals; and class-action, multi-party, and multi-state litigation. Mr. Perry has been selected a Mid-South Rising Star in business litigation by *Super Lawyers*® every year since 2015 and was named "Ace Associate" by the *Memphis Business Journal* in 2018. He holds bachelor's and master's degrees from Wake Forest University and a law

5

degree from the University of Tennessee, where he was a legal writing fellow and Chair of the Moot Court Executive Board. He also is a former judicial law clerk for the Honorable Bernice Bouie Donald of the U.S. Court of Appeals for the Sixth Circuit.

*Counsel.* Shanell L. Tyler, an Associate with Butler Snow in Memphis, represents commercial clients in disputes involving personal injury, breach of contract, labor and employment, internal investigations, and construction. Her experience includes state and federal election law and higher education compliance. Ms. Tyler earned both her bachelor's degree (*summa cum laude*) and law degree (*magna cum laude*) from the University of Memphis, where she interned for the Office of Legal Counsel for the University and the Shelby County Schools Board of Education.

*Paralegal.* Terri L. Wiseman, a Senior Litigation Paralegal with Butler Snow in Memphis, has more than 20 years' experience in the legal field, including service as Executive Assistant to the U.S. Attorney for the Western District of Tennessee. Ms. Wiseman provides a suite of services that span the entire litigation process, from initial information-gathering, through discovery and trial, to the archiving of case material.

## IV. Overview of the Monitoring Team Activities.

Three Core Principles, originally identified in Mr. Stanton's Submission, govern the Monitoring Team's activities and interactions with the ACLU and the City: (1) respect for the limited role of the Monitor; (2) clarity, consistency, and accountability in all communications with the MPD; and (3) rigorous transparency. (*See* ECF No. 180-1, PageID 6559.) As to the first Core Principle, Mr. Stanton has taken steps to make clear the boundaries of the Monitoring Team's role and to preserve the ultimate authority of the Court. (*See, e.g.,* ECF No. 197-3, PageID 6942-43 (Letter of February 22, 2019); Letter of April 22, 2019, attached as **Exhibit 1**.) Similarly, with respect to the second Core Principle, all analyses, recommendations, and other work product prepared by the Monitoring Team have been filed or otherwise submitted to the Court in the first instance; nothing has gone directly to the parties until it first has been reviewed and approved by the Court. The Team's fidelity to the third Core Principle is reflected in its preparation and submission of a budget (*see* ECF No. 180-1, PageID 6558) and submission of

monthly invoices to the Court, each of which describes the work completed by each member of the Monitoring Team and tracks that member's time to the nearest tenth of an hour (*see* ECF Nos. 184, 187, 190, 193, 204).

The following data points are useful for understanding the work that the Monitoring Team has undertaken since the appointment of Mr. Stanton on December 21, 2018 (*see* ECF No. 176):

- Requested, received, and reviewed 1.46 GB of data from the City—the equivalent of between 125,000 and 175,000 pages of text.

- Exchanged more than 1200 internal and external emails.

- Conducted 15 weekly Monitoring Team conference calls and additional ad hoc calls as necessary, as well as more than a dozen weekly and ad hoc calls with legal counsel for the City and MPD.

- Attended two in-person meetings on February 11-12 and April 22-23, 2019, and two video conference meetings on March 5 and March 27, 2019.

- Met in-person with more than a dozen members of the MPD Command Staff, Real Time Crime Center, and Training Academy.[2]

- Tracked more than 500 hours of Monitoring Team time in tenths of an hour. (*See* ECF Nos. 184, 187, 190, 193, & 204.)

- Coordinated with Legility, LLC (formerly Counsel on Call, website available here), Three(i) (website available here), and other vendors to establish a document management system accessible to the entire Monitoring Team and to design and

---

[2] Specific MPD personnel with whom the Monitoring Team has met are Police Director Michael Rallings; Deputy Director James M. Ryall; Deputy Chiefs Frank Garrett, Terry Landrum, Michael Shearin, Michael Hardy, Don Crowe, and Sharonda Hampton; Majors Stephen Chandler and Sharon Cunningham; Lieutenant Tracey Washington; and Manager John Williams. (ECF No. 197-1, PageID 6852 n. 1.) Additional meetings are being scheduled with Lt. Col. David L. Rudolph, who oversees the MPD Training Academy, and other MPD personnel as appropriate.

establish the Monitoring Team Website, which will go live, with the Court's approval, in the next ninety (90) days.[3]

- Produced three separate sets of analyses (*see* ECF Nos. 197-1, 197-2 & 197-3), and two reports (including this one) (*see* ECF No. 197).

- Presented a progress report by Mr. Stanton and testimony from Mr. Letten and every SME at the April 23 Hearing on the state of the Monitorship and the City's efforts to comply with the *Kendrick* Consent Decree.[4] (*See* ECF Nos. 189, 195, 203; *see also* Summary of April 23, 2019, Hearing, attached as **Exhibit 2**.)

### A. *Actions Taken by the MPD and Degree of Engagement with the* Kendrick *Consent Decree and the Court's Orders.*

Please see the Monitor's Interim Report, submitted on April 1, 2019 (ECF No. 197), and the revised recommendations attached as **Exhibit 3** to this Report, for the Monitoring Team's assessment of the actions taken thus far by the MPD to bring it into compliance with the *Kendrick* Consent Decree and the Court's other Orders.

### B. *Data Analysis and Auditing Findings.*

As discussed at the April 23 Hearing, this Monitorship has not yet reached the auditing and data analysis phase. The Monitor expects to submit *in camera* or to file under seal, as the Court prefers, an auditing and compliance program that includes an auditing methodology and protocols within the next ninety (90) days.[5]

---

[3] *See infra* note 4 and accompanying text.

[4] At the April 23 Hearing the Court set several new deadlines, including May 7, 2019, when the Monitor must submit a list of goals to be achieved within the next ninety (90) days, and July 24, 2019, when the Monitor must submit his second quarterly report. (*See* ECF No. 203, at 2.)

[5] *See supra* note 4 and accompanying text and forthcoming Joint Report of the Monitor and the parties.

8

      **C.**      *Degree of Progress, or Lack Thereof, for the Quarter and Any Proposed Timelines for Compliance with Each Section of the Court's Orders.*

The City's progress, as reported by the Monitor at the April 23 Hearing, is consistent with the Court's expectation that the MPD will continue to "exemplif[y] the character and commitment needed in law enforcement professionals." (ECF No. 151, PageID 6267.) The City and the ACLU have engaged in a robust exchange about the adequacy of the City's Court-ordered submissions (*see generally* ECF No. 152) and other efforts, and the Monitoring Team likewise has made recommendations regarding the City's efforts. The Team's understanding is that the City is working to remedy all remaining areas of disagreement between it and the ACLU and to resolve all outstanding questions of the Monitoring Team. (*See* generally ECF No. 197.) Additional timelines for compliance will be detailed in the Joint Report of the Independent Monitor and the Parties on or before May 7, 2019. (*See* ECF No. 203 at 2.)

      **D.**      *Areas That Are Not Currently in Compliance with Proposed Timelines for Compliance.*

None.[6] (*See generally* ECF No. 197.)

      **E.**      *Summary of Plaintiff's Positions During The Quarter.*

Please see generally ECF No. 197.

      **F.**      *Reports on Community Engagement and Any Comments or Reports of Complaints Received by the Monitoring Team.*

To date, the Monitoring Team has not received any comments or complaints. That said, the Monitoring Team Website, which the Team anticipates will be its primary means of interacting with the public, is not yet live. Mr. Stanton expects to implement a plan for soliciting public input as to the City's efforts to comply with the *Kendrick* Consent Decree. He and the

---

[6]   *See supra* note 4 and accompanying text and forthcoming Joint Report of the Monitor and the parties.

parties jointly will prepare and present the plan to the Court no later than May 23, 2019. (*See* ECF No. 203 at 2.) Consistent with testimony at the April 23 Hearing, the plan may include focus groups and town-hall style meetings, and all public engagement will be preceded by appropriate notice and held in spaces that are easily accessible to the public. Information about public-engagement opportunities also will be available on the Monitoring Team Website, which the Monitor expects to be live within the next ninety (90) days.[7]

### V. Findings.

The Interim Report submitted by Mr. Stanton on April 1, 2019, largely contains the findings and recommendations of the Monitoring Team to date. (*See generally* ECF No. 197.) Minor revisions to those recommendations are included in an internal Monitoring Team memorandum of April 22, 2019. (*See* **Ex. 3**.)

### VI. Appendix of Documents Referenced in this Report

| Doc. | Description | Page |
|---|---|---|
| **Ex. 1** | Letter of April 22, 2019 | 6 |
| **Ex. 2** | Summary of April 23, 2019, Hearing | 8 |
| **Ex. 3** | Revisions to Interim Report (ECF No. 197) | 8, 10 |
| ECF No. 3, Case No. 2:76-cv-00449) | *Kendrick* Consent Decree | 1 |

---

[7] *See supra* note 3 and accompanying text and forthcoming Joint Report of the Monitor and the parties.

| Doc. | Description | Page |
|---|---|---|
| ECF No. 120 | Order of August 10, 2019 | 2 |
| ECF No. 151 | Opinion and Order of October 26, 2018 | 1, 2, 8 |
| ECF No. 152 | Order Memorializing Sanctions (October 29, 2018) | 2-3, 8 |
| ECF No. 176 | Order Appointing Independent Monitor | 3, 6 |
| ECF No. 180-1 | Independent Monitor Submission of Edward L. Stanton III and Butler Snow LLP | *passim* |
| ECF No. 184 | Sealed Order on Costs of Monitor Selection Process | 7 |
| ECF NO. 187 | Sealed Order on Costs of Independent Monitor | 7 |
| ECF No. 189 | Order on City of Memphis Materials | 2, 8 |
| ECF No. 190 | Order on Costs of Monitor Selection Process | 7 |
| ECF No. 193 | Sealed Order on Costs of Independent Monitor | 7 |
| ECF No. 195 | Order Expanding Scope of Hearing | 2, 8 |
| ECF No. 197 | Interim Report of Independent Monitor | *passim* |

| Doc. | Description | Page |
|---|---|---|
| ECF No. 197-1 | Ex. 1 to Interim Report | 7-8 |
| ECF No. 197-2 | Ex. 2 to Interim Report | 8 |
| ECF No. 197-3 | Ex. 3 to Interim Report | 8 |
| ECF No. 197-3, PageID 6942-43 | Letter of February 22, 2019 | 6 |
| ECF No. 203 | Order Following Conference | *passim* |
| ECF No. 204 | Sealed Order on Costs of Independent Monitor | 7 |

47337032.v1



*Privileged and Confidential*

# MEMORANDUM

**To:** Monitoring Team

**From:** Edward L. Stanton III

**Date:** April 29, 2019

**Subject:** April 23, 2019, Hearing Summary

## INTRODUCTION

On April 23, 2019, the ACLU, the City of Memphis, and the court-appointed independent monitor, Edward L. Stanton III, appeared before the Honorable Jon P. McCalla, United States District Judge for the Western District of Tennessee. The hearing primarily consisted of a presentation from Mr. Stanton and his team of subject-matter expert witnesses (the "Monitoring Team"), who informed the Court and the public about the City of Memphis's efforts to come into compliance with the Kendrick Consent Decree and the Monitoring Team's experiences and observations to date. During the hearing, Judge McCalla asked the Monitoring Team questions and gave the ACLU and the City the opportunity to examine each member of the Monitoring Team as he or she gave testimony before the Court. At the close of the hearing, Judge McCalla instructed the ACLU, the City, and the Monitoring Team to collaborate and submit a joint report detailing their goals for the upcoming 90 days and to propose several potential dates at the close of the 90-day window to again appear before the Court and give an updated progress report regarding the stated goals.[1] Finally, Judge McCalla also clarified that the Monitoring Team's authority to give day-to-day guidance to the City as it works through issues that may implicate the Kendrick Consent Decree and, where necessary, to seek guidance from the Court.

## PRESENTATION OF THE MONITOR

Mr. Stanton provided the opening presentation. He gave an overview about the Monitoring Team and its work and experiences to date. He stated that the Team has met with the Memphis Police Department Command Staff, toured the Real Time Crime Center, engaged in active discussions about the City's policies and training materials, participated in video conferences, and engaged in weekly calls. He also commended the City of Memphis for its cooperation so far and its willingness to meet the Monitoring Team's requests.

---

[1] The joint report is due by May 7, 2019. We have offered to prepare a draft and circulate it to the City and the ACLU.

**EXHIBIT 2**

April 29, 2019
Page 2

## PRESENTATION OF WITNESSES

***Theron Bowman.***     The presentation of witnesses began with testimony from Theron "T" Bowman, Ph.D., the Team's law enforcement practices expert. Dr. Bowman testified to his extensive law enforcement background and his current role on the monitoring teams of two other police departments, New Orleans and Baltimore. He also gave a report about observations and experiences as a member of this Monitoring Team. Overall, he reported that the Team was organized, collaborative, and committed to the task of helping the City come into compliance with the Kendrick Consent Decree.

Judge McCalla was particularly interested in learning how the City of Memphis police department compared to those in New Orleans and Baltimore. Specifically, the judge asked whether there are structural challenges in the Memphis Police Department similar to those in the NOPD and BPD. Dr. Bowman stated that he believed the City of Memphis's issues were narrowly focused on activities and policies that may implicate the First Amendment, while the other two cities were grappling with much larger systemic issues. Dr. Bowman also reported that he found the City of Memphis to be receptive and willing to make efforts towards compliance.

The parties then asked follow-up questions about Dr. Bowman's qualifications and his observations.

---

***Rachel Levinson-Waldman.*** Next, attorney Rachel Levinson-Waldman, the Team's social media and policy expert, testified to her work with the Brennan Center's Liberty and National Security Program and her work in the area of civil rights. She also gave a report about the City's past actions of using covert social media accounts to monitor the activities of persons and groups who had been identified as being involved in certain activist activities. Ms. Levinson-Waldman testified that using covert social media accounts to monitor the activities of these persons and groups and other similar policing techniques can have a chilling effect on the public's First Amendment rights. She expressed her concern about maintaining a community where the public felt free to exercise their rights.  To that end, Ms. Levinson-Waldman called for an auditing function so that the City could track its progress towards compliance the Kendrick Consent Decree.

Judge McCalla asked Ms. Levinson-Waldman about her experience with drafting national legislation on police departments' use of social media and Congress's current thoughts on the topic. Ms. Levinson-Waldman reported that much of the Brennan Center's proposed legislation centered on making sure that the public was adequately informed about local police departments' social media policies and potential use of covert accounts to gain access to members of the public. Regarding Congress, Ms. Levinson-Waldman reported that while Congress is currently interested in social media usage, she did not believe that there was much overlap in the issues that pertain to this case—the use of covert social media accounts by police departments.

April 29, 2019
Page 3

The parties asked Ms. Levinson-Waldman about her testimony that the City has made progress towards compliance with the Kendrick Consent Decree. Ms. Levinson-Waldman replied that so far the City has been cooperative in its approach to revise its policies and training materials per the ACLU's concerns.[2] She also said that the City has complied with the Monitoring Team's requests for documents and answered the Monitoring Team's questions.

---

*John Henegan.*   Mr. Stanton then called the Team's First Amendment expert, attorney John Henegan. Mr. Henegan testified that the City of Memphis needs to do a comprehensive review of its uniform standard operating policies, training, and various other city ordinances to make sure that they are aligned with the Kendrick Consent Decree and the Court's Order regarding the Decree. Specifically, Mr. Henegan noted that the police department plays a role in issuing permits for public demonstrations and that this implicates the public's First Amendment rights. Examples such as this, Mr. Henegan opined, highlight the need for the City to take a broad approach to coming into compliance. Mr. Henegan suggested working with the ACLU in their efforts. He also suggested that the City keep abreast of case law and best practices materials.

Judge McCalla asked Mr. Henegan about the potential for use of materials from law schools such as University of Memphis, University of Mississippi, and Vanderbilt to help guide these efforts.[3] Mr. Henegan agreed that these items could be helpful.[4]

The ACLU asked follow-up questions about Mr. Henegan's suggestions that it work with the City to do a comprehensive review. The City of Memphis asked Mr. Henegan whether he thought that best practices materials and cases could really be applicable given the confines of the Kendrick Consent Decree. Particularly, they asked whether, in his opinion, the Consent Decree obligated the City to do more than best practices and the First Amendment requires. Mr. Henegan replied that the judge had already ruled on the applicability of the Consent Decree and the First Amendment. Mr. Henegan then added that the City should review its policies and training in light of the Court's Order and the Consent Decree.

---

[2]   *See infra* note 5 and accompanying text.

[3]   Judge McCalla also cautioned that the Team's inquiry should not be too broad. And in questioning Mr. Henegan, the City's counsel highlighted the differences between the *Kendrick* Consent Decree, constitutional requirements, and best practices.

[4]   Mr. Henegan also echoed suggestions made by Dr. Bowman about the International Association of Chiefs of Police (IACP), which has training materials and recommendations for constitutional policing and best practices. Additionally, MPD already participates in "PSP," which provides national technical training and subject-matter experts and could make useful resources for the Team.

April 29, 2019
Page 4

*David McGriff.* Mr. David McGriff, the Team's auditing and compliance expert, took the witness stand next. He reported that he looked forward to implementing an auditing system once the time for audits arises. He also reported that the he believed that the Monitoring Team and the parties have so far been collaborative. Judge McCalla noted the sensitivity around the auditing process and requested that the Monitoring Team submit *in camera* its upcoming auditing plans. The ACLU and the City did not have any questions for Mr. McGriff during the hearing.

---

*Jim Letten.* Lastly, attorney Jim Letten, the deputy monitor, presented on his background in law enforcement as a federal prosecutor and his experiences with the New Orleans police department consent decree. He also testified to his observation that the City of Memphis appeared to be collaborative and cooperative.

Judge McCalla asked Mr. Letten about the Team's goals for the next 90 days. Mr. Letten stated that he felt that the Team could finalize its suggestions for scenarios previously asked by the City and that the team could meet with the City's training instructor, Lt. Col. David Rudolph. Judge McCalla then instructed the City and the Monitoring Team to promptly schedule this meeting.

## ROLE OF THE MONITORING TEAM

Not only did the hearing consist of the Monitoring Team's presentation, Judge McCalla also answered the City's request for clarification about the Monitoring Team's role in giving guidance on the City's day-to-day issues. Judge McCalla stated that the Monitoring Team is a resource for the City's pressing matters and, in the event that there is a need for more guidance, the Court is willing to take up issues, provided that they are not requests for mere advisory opinions. In addition to granting the Monitoring Team the authority to make day-to-day decisions, Judge McCalla referred to Mr. Stanton as the Court's "Special Master" for this matter.

## NEXT STEPS

Before closing the hearing, the Judge ordered the parties and the Monitoring Team to submit a joint 90-day goal plan to the Court within the next two weeks—by May 7, 2019. Judge McCalla stated that the goals should include the following:

- a date and central, easily accessible place to hold a community engagement meeting;[5]

- Monitoring Team interviews with Lt. Col. Rudolph, rank-and-file MPD officers, and other City and MPD personnel as appropriate;

---

[5] Judge McCalla noted that community engagement should include focus groups as well as town-hall type meetings and that all meetings to be preceded by appropriate notice and provide broad access to the public.

April 29, 2019
Page 5

- A date by which the parties will have created a process for the approval of investigations that may incidentally result in the collection of First Amendment information.

- A date by which the parties will have designed an approved, interactive training process;

- A timeline for training on Kendrick Consent Decree topics

- Monitoring Team website completion;

- Final reviews and proposed revisions of City / MPD ordinances and policies; and

- submission of an auditing/compliance plan;[6]

- other topics that the parties agree upon.

The submission must also propose hearing dates for the Monitoring Team to come present again to the Court at the close of the 90 days. Judge McCalla said that the parties should propose three different dates, over three different weeks that work for all parties. Judge McCalla also ordered the parties to submit a joint proposed Community Engagement Plan within thirty (30) days—by May 23, 2019.[7] Finally, the Court ordered that the Monitoring Team submit a report no later than July 24, 2019, regarding the progress towards meeting the stated goals.

47317675.v1

---

[6] Submitted *in camera* or filed under seal. According to Judge McCalla, the plan must include (1) auditing approach, (2) protocols, and (3) methods of review. Ms. Levinson-Waldman noted during her testimony that the New York Police Department has installed an Inspector General's Office (OIG). She recognized that the NYPD is unique among police departments in that it is essentially a counter-terrorism department, but our auditing plan should consider whether instituting a similar office for MPD would make sense and, if not, the alternative safeguards that will ensure ongoing compliance with the consent decree.

[7] *See supra* note 5 and accompanying text.

# BUTLER | SNOW

*Confidential Attorney Work Product*

# MEMORANDUM

**To:** Monitoring Team

**From:** Edward L. Stanton III

**Date:** April 22, 2019

**Subject:** Minor Revisions to Interim Report

### OVERVIEW

The Interim Report submitted by this Monitoring Team on April 1, 2019 (ECF No. 197), contained three sets of recommendations: (1) recommendations regarding the City's submissions to the Court of January 14, 2019, and the ACLU's objections to those submissions (*see* ECF Nos. 183, 185, 186, 197-1); (2) recommendations regarding the revised submissions that the City sent to the ACLU after receiving the ACLU's objections and the ACLU's response to the City's revisions (ECF Nos. 197, PageID 6847-50; 197-2, PageID 6865-84); and (3) recommendations regarding eleven hypothetical situations put forward by the City on February 19, 2019 (ECF Nos. 197, PageID 6850; 197-3, PageID 6924-39).

At our meeting earlier today, the Team made minor revisions to the second set of recommendations (ECF No. 197-2) as follows:

1. **Departmental Regulation 138 Revised**

   - Points 1-3 no changes.

   - Point 4 revised as follows: the Team recommends revising the second sentence in the fourth paragraph as follows: "No member shall engage in any action or disseminate damaging, derogatory, false or anonymous information about any person which will deprive any individual of their First Amendment Rights; nor will any member

**EXHIBIT 3**

April 22, 2019
Page 2

encourage, cooperate with, or contract with any local, state, federal or private agency to plan or conduct any **investigation involving political intelligence or for the purpose, expectation or anticipation of political intelligence**." (PageID 6866-67.)

- Point 5 revised to track original language of DR 138, Para 5 as follows:

    o "Investigations into unlawful conduct that may incidentally result in the receipt of information relating to First Amendment rights are permissible, but require approval by the Director of Police Services or his/her designee." (PageID 6867-68.)

- Point 6 revised final sentence of Revised DR 138, Para 5 as follows (PageID 6868):

    o "The Police Director or his / her designee may grant written extensions of the initial ninety (90)-day period of up to 90 days each when such extensions are justified by extraordinary circumstances. For each such extension, the following two conditions must be satisfied:

        ▪ (1) The Director or his / her designee must consult with the City Attorney or the City Attorney's designee (who must be a lawyer in good standing with the Tennessee Board of Professional Responsibility); and

        ▪ (2) The investigating officer must complete the [Kendrick Consent Form] and state in writing either the persistent facts that establish extraordinary circumstances or new facts that do the same."

2. **Memphis Police Department Political Intelligence Training for the Office of the Homeland Security, the Real Time Crime Center, and the Command Staff:**

- 2(a) Training Plan

    o No changes

- 2(b) PowerPoint Presentation

    o Points 1-5 no changes

    o Point 6

        ▪ Now states: "more generally, the Team recommends that the City's examples not single out one or two named groups, **because it may be interpreted to limit the scope of this prohibition, which applies to any assembly or group of individuals whose purpose is to exercise**

April 22, 2019
Page 3

**rights protected by the First Amendment and the Consent Decree.** (PageID 6871-72.)

3. **Authorization for Investigations that May Incidentally Result in the Collection of information Related to the Exercise of First Amendment Rights under Section G of the Kendrick Consent Decree**

   - 3(a) Policy and Guidelines for Delegation of Authority of Director of Police Services to Authorize Investigations Which May Interfere with the Exercise of First Amendment Rights under Section G of the Kendrick Consent Decree

     o No changes

   - 3(b) Policy and Procedure: Authorization for Investigations Which May Incidentally Result in the Collection of Information Related to the Exercise of First Amendment Rights Under Section G of the Kendrick Consent Decree

     o No changes

   - 3(c) Form: Authorization for Investigations That May Incidentally Result in Political Intelligence.

     o Revised recommendation: The Team would like clarification about the kinds of information that would be provided by the City as precautions and techniques. (PageID 6876.)

4. **Written Guidelines for the use of Manual Social Media Searches and Social Media Collators**

   - Points 1-3 no changes.

   - Point 4: correct quotation to say, "Any information gathered and retained **from** social media..." (PageID 6879-80.)

5. **Social Media Terms**

   - No changes

47178381.v1
47293821.v1