# Exhibit 1

# MONITORING TEAM
## MEMPHIS POLICE DEPARTMENT



**FOR IMMEDIATE RELEASE**
Contact: Terri Wiseman (901) 680-7253
Terri.wiseman@butlersnow.com

## Independent Monitor Edward L. Stanton III Announces Website Launch and Community Engagement Forum to be held on July 11, 2019

**MEMPHIS, Tenn., July 2, 2019** – On Dec. 21, 2018, U.S. District Judge Jon P. McCalla appointed former U.S. Attorney Edward L. Stanton III as the Independent Monitor in litigation between the American Civil Liberties Union – Tennessee and the City of Memphis.

The mandate of Stanton and his team of subject-matter experts is to monitor the progress of the city's compliance with the 1978 *Kendrick* Consent Decree and to facilitate transparency and accountability to the public. To that end, Stanton and his team today have launched the Independent Monitor's website, https://www.memphispdmonitor.com.

The website includes information about the monitoring team and its reports, court filings, and opportunities for public engagement. **The first opportunity will take place at a Community Engagement Forum hosted by the Monitor and his team on July 11, 2019, from 6:00 – 7:30 p.m. at Mississippi Boulevard Christian Church (70 N. Bellevue Blvd., Memphis, TN 38104). This event will provide an opportunity for the Monitor to provide a status report as well as solicit input from the public.**

###

# MONITORING TEAM
## MEMPHIS POLICE DEPARTMENT



**FOR IMMEDIATE RELEASE**
Contact: Terri Wiseman (901) 680-7253
Terri.wiseman@butlersnow.com

## Court Appointed Memphis Police Department Monitor Announces Community Engagement Forum on July 11, 2019

**MEMPHIS, Tenn., July 11, 2019 –**Edward L. Stanton III, Court Appointed Monitor of the Memphis Police Department, invites you to attend **a Community Engagement Forum this evening, July 11, 2019, from 6:00 – 7:30 p.m. at the Mississippi Boulevard Christian Church (70 N. Bellevue Blvd., Memphis, TN 38104).**

The community forum will provide an opportunity for Stanton's Monitoring Team to update the public on their progress in monitoring the Memphis Police Department's (MPD) compliance with police surveillance policies and practices as set out in the 1978 *Kendrick* Consent Decree.

On December 21, 2018, U.S. District Judge Jon P. McCalla appointed former U.S. Attorney Stanton as the Independent Monitor over litigation between the American Civil Liberties Union of Tennessee (ACLU) and the City of Memphis.  The mandate of Stanton and his team of subject matter experts is to monitor the progress of the city's compliance with the 1978 *Kendrick* Consent Decree.  The Monitor is also responsible for facilitating transparency and accountability to the public.

Attendess to this event will be encouraged to ask questions of the Monitoring Team and provide feedback regarding the MPD's efforts to comply with the consent decree.

For more information, please visit the Independent Monitor's website at
https://www.memphispdmonitor.com.

48420549.v1

# Exhibit 2

**(Redacted - Filed Under Seal)**

# Exhibit 3

**(Partially Redacted - Full Document Filed Under Seal)**



*Confidential Attorney Work Product*

# M E M O R A N D U M

**To:**       The Monitoring Team

**From:**    Shanell L. Tyler

**Date:**    June 19, 2019

**Subject:**  City's Responses to Monitoring Team's Feedback

---

### OVERVIEW

As you are aware, the Monitoring Team and the ACLU-TN have had the opportunity to review and give feedback on several of the City of Memphis's policies and procedures that are implicated by the *Kendrick* Consent Decree. (*See* ECF Nos. 197, 205.) In addition to offering this feedback, the Team has also responded to the City's request for recommendations regarding eleven hypothetical scenarios. (*See* ECF 197-3.)

On June 7, 2019, the City sent the Monitor its latest responses to the Team's feedback on its revised policies and procedures and the recommendations made in response to the eleven hypotheticals. You have received these materials in an email from me. (*See* "ACLU v. City of Memphis: City's 6/7/2019 Responses to Monitoring Team's Feedback," dated 6/14/2019.) Included in my email is a letter from the City's counsel, Mark Glover, that summarizes the City's responses to all of the Monitoring Team's feedback, and there are copies of the City's revised policies and procedures. Please provide your feedback regarding the same as you did with the prior submissions. The feedback will be reconciled and provided to the Court.

I.       The City's Proposed Policies and Training Materials

### A. Departmental Regulation 138 Political Intelligence (Revised)

| Team's Prior Feedback to City of Memphis | City of Memphis's Response to Team's Prior Feedback | City of Memphis's Proposed Action in Response to Team's Prior Feedback | The Team's Response to the City's Proposed Action. | Recommendation(s) |
|---|---|---|---|---|
| The Team recommended that the definition of First Amendment rights expressly include the right to petition the government. (ECF 197-1, PageID 6853.) | ***Response***: The City accepts the recommendation. | The City adds the recommended language. | ***Response***: The Team agrees. | The Team does not recommend anything further. |

| The Team recommended adding language to the fourth paragraph of the policy as follows: "No member **shall knowingly, intentionally or recklessly facilitate or cause the interception, recording, transcription of— or otherwise interfere with or cause, any interference with any communications** by means of electronic or covert surveillance for the purpose of gathering political intelligence." (ECF 197-2, PageID 6866) | *Response*: The City accepts the recommendation. | The City adds the recommended language. | *Response*: The Team agrees, but it recommends revising this section for clarity. | Team recommends that this statement be revised as follows: "No member **shall knowingly, intentionally, or recklessly facilitate or cause the interception, recording, transcription of— or otherwise interfere with or cause any interference with— any communications** by means of electronic or covert surveillance for the purpose of gathering political intelligence." |
|---|---|---|---|---|
| The Team recommended revising the second sentence in the fourth paragraph as follows: "No member shall engage in any action or disseminate damaging, derogatory, false or anonymous information about any person which will deprive any individual of their First Amendment Rights; nor will any member encourage, cooperate with, or contract with any local, state, federal or private agency to plan or | *Response*: The City accepts the recommendation. | The City adds the recommended language. | *Response*: The Team agrees. | The Team does not recommend anything further. |

| | | | | |
|---|---|---|---|---|
| conduct any **investigation involving political intelligence or for the purpose, expectation or anticipation of political intelligence."** (ECF 205, PageID 7078.) | | | | |
| The Team recommended that Paragraph 3, which states that "any member conducting or supervising such an investigation must bring the matter to the attention of the Director of Police Services, or his/her designee, for review and written authorization," have a time limit for notification added – for instance, "…prior to initiating such an investigation, or, where the possibility of such incidental receipt is discovered after an investigation has commenced, no later than [X] days after such discovery." (ECF 197-1, PageID 6853.) | *Response*: The City accepts the recommendation. | The City proposes a time limit of ten days for bringing such an investigation to the attention of the Director or his/her designee. | *Response*: The Team mostly agrees, but it recommends shortening the time limit for bringing the investigation to the attention of the Director or his/her designee.<br><br>*Rationale*: The Team believes that ten days is too long to wait to notify the Director of Police Services or his/her designee. | The Team recommends that the City establish a time limit of five calendar days. |
| The Team recommended revising the fifth paragraph to include language that investigations into unlawful conduct **"that reasonably may be expected to result"** incidentally in | *Response*: The City accepts the Team's revised recommendation. | The City revises paragraph five to track the original language of revised DR 138.<br><br>"Investigations into unlawful conduct that may incidentally result | *Response*: The Team disagrees.<br><br>*Rationale*: After further consideration, the Team believes the objective "reasonable | Team recommends that the City adopt the "reasonably may be expected to result" language that it previously recommended. |

| | | | | |
|---|---|---|---|---|
| the receipt of political intelligence require approval, but then the Team revised its recommendation to track the original language in paragraph five. (ECF 205, PageID 7078). | | in the receipt of information relating to the First Amendment rights are permissible, but require approval by the Director of Police Services or his/her designee." | person" standard should be applied and explicitly stated. | |
| The Team recommended adding language to the fifth paragraph stating, "An extension may be granted in writing by the Director or his/her designee for periods of up to an additional ninety (90) days; **and in extraordinary circumstances where warranted, additional 90-day periods as documented and approved by the Director or his Designee**." <br><br> In the First Quarterly Report, however, the Team revised its recommendation as follows: "The Police Director or his / her designee may grant written extensions of the initial ninety (90)-day period of up to 90 days each when such extensions are justified by extraordinary circumstances. For each such extension, the following two | ***Response***: The City accepts the revised recommendation. | The City adds the recommended language. | ***Response***: The Team agrees. | The Team does not recommend anything further. |

| conditions must be satisfied: (1) The Director or his / her designee must consult with the City Attorney or the City Attorney's designee (who must be a lawyer in good standing with the Tennessee Board of Professional Responsibility); and (2) The investigating officer must complete the [Kendrick Consent Form] and state in writing either the persistent facts that establish extraordinary circumstances or new facts that do the same." (ECF 205, PageID 7078.) | | | | |
|---|---|---|---|---|

**B. Memphis Police Department Political Intelligence Training for the Office of Homeland Security, the Real time Crime Center, and the Command Staff**

| Team's Prior Feedback to City of Memphis | City of Memphis's Response to Team's Prior Feedback | City of Memphis's Proposed Action in Response to Team's Prior Feedback | The Team's Response to the City's Proposed Action. | Recommendation(s) |
|---|---|---|---|---|
| The Team recommended that the training plan incorporate the use of hypothetical examples. The Team also recommended that training options include the following: providing a one- | *Response*: The City accepts the recommendation. | The City adds four bullet points to the end of the Training Plan to address the Team's recommendation: ·All training on the *Kendrick* Consent Decree and its prohibition against political intelligence shall | *Response:* The Team agrees, but it recommends further revising the plan to include training on First Amendment topics as well. *Rationale:* | The Team recommends revising the training plan as follows: ·All training on the **First Amendment and the** *Kendrick* Consent Decree and its prohibition against political intelligence shall incorporate the use of hypothetical examples of |

| | | | | |
|---|---|---|---|---|
| to two-hour block taught by an instructor who prepares a lesson plan and course evaluations; building the training into existing training models; and using short officer training videos, known as video alerts. (ECF 197-1, Page ID 6854.) | | incorporate the use of hypothetical examples of permissible and prohibited conduct under the Kendrick Consent Decree.<br><br>·Training on the *Kendrick* Consent Decree shall be provided in blocks anticipated to be one- to two-hours long. The training will be conducted by an instructor with a written lesson plan. After each training session, the participants of the session will submit a course evaluation to the instructor.<br><br>·Training on the *Kendrick* Consent Decree shall also be incorporated into existing training models, such as routine training of police cadets at the Training Academy.<br><br>·Training on the *Kendrick* Consent Decree shall also be conducted via short officer training videos known as video alerts. | The Team believes that it is important for officers to understand First Amendment rights in order to understand what it is and is not permissible under the *Kendrick* Consent Decree. | permissible and prohibited conduct under the **First Amendment and the** *Kendrick* Consent Decree.<br><br>·Training on the **First Amendment and the** *Kendrick* Consent Decree shall be provided in blocks anticipated to be one- to two-hours long. The training will be conducted by an instructor with a written lesson plan. After each training session, the participants of the session will submit a course evaluation to the instructor.<br><br>·Training on the **First Amendment and the** *Kendrick* Consent Decree shall also be incorporated into existing training models, such as routine training of police cadets at the Training Academy.<br><br>·Training on the **First Amendment and the** *Kendrick* Consent Decree shall also be conducted via short officer training videos known as video alerts. |
| The Team | ***Response***: The City | The City adds a | ***Response:*** The | The Team recommends |

| | | | | |
|---|---|---|---|---|
| recommended adding a requirement that the training be updated annually to track changes in relevant laws and MPD policies. (ECF 197-2, PageID 6869.) | accepts the recommendation. | bullet point to the end of the Training Plan to address the Team's recommendation.<br><br>·Training on the *Kendrick* Consent Decree shall be updated annually to track changes in relevant laws and MPD policies. | Team agrees, but it recommends further revising the plan to include training on First Amendment topics as well.<br><br>*Rationale:* The Team believes that it is important for officers to understand First Amendment rights in order to understand what it is and is not permissible under the *Kendrick* Consent Decree. | revising the training plan as follows:<br><br>·Training on the **First Amendment and the** *Kendrick* Consent Decree shall be updated annually to track changes in relevant laws and MPD policies. |
| The Team recommended that training be provided to all officers and civilian employees working within or otherwise assigned or detailed to the Memphis Police Department. (ECF 197-1, PageID 6854.) | ***Response***: The City partially accepts the recommendation.<br><br>***Rationale***: While such a training program could be accomplished by use of the regular annual in-service training for officers, the City believes that the immediate training of such additional persons is outside the scope of the Order (ECF 151) listing groups to be trained | The City proposes that within 21 days after approval of the training materials by the Court, the City will begin training sessions for all officers and civilian employees of OHS, RTCC, and Command Staff. MPD will then begin to train all other MPD officers on the prohibitions of the Consent Decree. Due to the | ***Response***: The Team disagrees.<br><br>***Rationale***: The Team recognizes the potential logistical problems with the immediate training of all officers; however, it believes that such training is necessary to ensure that the entire police | The Team recommends that the following policy be adopted:<br><br>"Within 21 days after approval of the training materials by the Court, the City will begin training sessions for all officers and civilian employees of OHS, RTCC, and Command Staff. **The City will make every effort to complete these training sessions as soon as possible, but in no event later than December 31, 2019**. |

| | initially, and would not be possible in a short time frame, particularly the 21 day period suggested by the City in its original submission. | large number of officers (2000+), this training will be done on a rolling basis, with all officers and civilian employees of MPD to complete the training within 12 months. | department complies with the *Kendrick* Consent Decree. The Team also believes that such training is necessary to ensure that the topics become fully engrained within the entire MPD. | **Within 30 days after approval of the training materials by the Court, the City will provide and make available to all other MPD officers and employees a monitor-approved video alert on the First Amendment and the Consent Decree.** **MPD will also train all other MPD officers and employees on the Consent Decree. This training may be done on a rolling basis to be completed no later than December 31, 2020**. |

### C.  PowerPoint Presentation

| Team's Prior Feedback to City of Memphis | City of Memphis's Response to Team's Prior Feedback | City of Memphis's Proposed Action in Response to Team's Prior Feedback | The Team's Response to the City's Proposed Action. | Recommendation(s) |
|---|---|---|---|---|
| The Team recommended adding language to the seventh slide "Harassment and Intimidation Prohibited," stating that a valid law enforcement purpose is required. (ECF 197-1, PageID | *Response*: The City accepts the Team's recommendation. | The City adds the phrase "Absent a valid law enforcement purpose" to the third and fourth bullets on Slide 7. | *Response*: The Team agrees. | The Team does not recommend anything further. |

| | | | | |
|---|---|---|---|---|
| 6855.) | | | | |
| The Team recommended "MPD shall not record... for the purpose of chilling the exercise of First Amendment rights or for the purpose of maintaining a record of that gathering, or where such recording will reasonably have the effect of deterring any person from exercising First Amendment rights." (ECF 197-2,Page ID 6870.) | ***Response***: The City accepts the recommendation. | The City incorporates the reasonable effect language to Slide 7. | ***Response***: The Team agrees. | The Team does not recommend anything further. |
| The Team recommended updating Slide 4 with the revised DR 138. (ECF 197-2, PageID 6869-6870.) | ***Response***: The City accepts the recommendation. | The City updates as recommended. | ***Response***: The Team agrees. | The Team does not recommend anything further. |
| The Team recommended updating PowerPoint to include language about non-collator social media searches. (ECF 197-2, PageID 6871.) | ***Response***: The City accepts the recommendation. | The City updates Slide 12, Bullet 1 to include language about non-collator social media searches. "An MPD officer searches a social media collator **or platform** for all instances..." | ***Response***: The Team agrees. | The Team does not recommend anything further. |
| The Team | ***Response***: The City | The City | ***Response***: The | The Team does not |

| recommended revising the language of Slide 14 to provide: "An MPD officer wearing a body camera that has been activated pursuant to MPD policy does not have to cover the camera every time he or she passes..." (ECF 197-2, PageID 6871.) | accepts the recommendation. | includes the language. | Team agrees. | recommend anything further. |
|---|---|---|---|---|
| The Team recommended that the City's examples of community organizers not single out one or two named groups. (ECF 197-2, PageID 6872.) | *Response*: The City accepts the recommendation. | The City removes all references to any particular group in the PowerPoint. Specifically, the City changed all instances of "Black Lives Matter" to "activist group." | *Response*: The Team agrees. | The Team does not recommend anything further. |
| The Team recommended deleting the language on Slide 14 regarding "kill the police," because any search of that term could incidentally collect information related to First Amendment rights. (ECF 197-2, PageID 6871.) | *Response*: The City declines the recommendation.<br><br>*Rationale*: The City does not agree with the Monitor's recommendation, because the Court used the example "kill police" in its Opinion and Order. (ECF 151.) The Court stated that a police officer who queries a social media collator for the phrase "kill | None. | *Response*: The Team disagrees.<br><br>*Rationale*: The Team believes the First Amendment analysis to be more nuanced than the City's current position. The Team submits that collecting protected speech and considering its content is permissible so long as it is being done for a valid law | The Team recommends adding language to Slide 14 that states,<br><br>"Any use of this information, including its retention and dissemination, is governed by the Consent Decree." |

| | police," is not going out of her way to "gather" information related to First Amendment rights, even though her action is definitely investigative in nature. | | | enforcement purpose, in a manner that does not unduly infringe upon the ability of the speaker to deliver his or her message. In addition, there must be a reasonable relation between the collection and retention of the protected speech and the purpose of the investigation. | |

D.  **Guidelines for Delegation of Authority of Director of Police Services to Authorize Investigations That May Interfere with the Exercise of First Amendment Rights under Section G of the Kendrick Consent Decree**

| Team's Prior Feedback to City of Memphis | City of Memphis's Response to Team's Prior Feedback | City of Memphis's Proposed Action in Response to Team's Prior Feedback | The Team's Response to the City's Proposed Action. | Recommendation(s) |
|---|---|---|---|---|
| The Team recommended adding language to this policy that requires review of each selected designee be made by competent in-house counsel or authorized/assigned counsel (ECF 197-1, PageID 6857.) | *Response*: The City accepts the recommendation. | The City has designates Attorney Zayid Saleem as the appropriate in-house counsel for this role. | *Response*: The Team agrees. | The Team does not recommend anything further. |
| The Team expressed concern that the volume of these investigations would be too voluminous for the Director to oversee and suggested adding language that the | *Response*: The City agrees with the recommendation. | The City notes that the policy already provides for the designee's report. | *Response*: The Team agrees. | The Team does not recommend anything further. |

11

| | | | | |
|---|---|---|---|---|
| Designee submit a report to the Director. (ECF 197-1, PageID 6857.) | | | | |
| The Team recommended revising the last sentence of the policy to state as follows: "The Director shall have the authority to rescind authorization for any investigation that the Director deems **to violate the letter or intent of the department prohibition against the gathering of political intelligence, or in cases in which either the initial, authorized investigative goals or purposes no longer exist; or when political intelligence collection is no longer merely incidental**." (ECF 197-2, PageID 6873.) | ***Response:*** The City accepts the recommendation. | The City includes this language. | ***Response***: The Team agrees. | The Team does not recommend anything further. |
| The Team recommended changing the temporal reporting requirement to the last Friday of every month **that is a regular business day**. (ECF 197-2, PageID 6873.) | ***Response***: The City declines the recommendation. ***Rationale:*** The City requests that the monthly reporting requirement not fall on a day certain, but rather just "monthly" due to the varying work schedules of those involved. | None. | ***Response***: The Team disagrees. ***Rationale***: The Team believes that the directive should be specific enough that it's complied with and that accountability is possible. | The Team recommends changing the temporal reporting requirement to the last day of the calendar month. If the last day of the month is a weekend or state or federal holiday, the report should be due by the end of the next business day. |

    **E.   Authorization for Investigations Which May Incidentally Result in the Collection of Information Related to the Exercise of First Amendment Rights Under Section G**

| Team's Prior Feedback to City of Memphis | City of Memphis's Response to Team's Prior Feedback | City of Memphis's Proposed Action in Response to Team's Prior Feedback | The Team's Response to the City's Proposed Action. | Recommendation(s) |
|---|---|---|---|---|
| The Team recommended that the policy define "situational assessment." (ECF 197-1, PageID 6858.) | **_Response_**: The City accepts the recommendation. | This definition is included in footnote 2. | **_Response_**: The Team agrees. | The Team does not recommend anything further. |
| The Team recommended adding a discussion of whether situational assessment reports should be excluded from the authorization process. (ECF 197-1, PageID 6858.) | **_Response:_** The City accepts the recommendation. | The City seeks to clarify this by changing the term "Situational Assessment Report" to "After Action Review." Accordingly, Number 6 is suggested to be revised as follows: "After Action Review (AAR)" is defined as a report following an incident describing the incident and analyzing MPD's preparation for and response or reaction to the incident. | **_Response_**: The Team agrees. | The Team does not recommend anything further. |
| The Team asked for clarification about what policy governs the dissemination of First Amendment information to law enforcement | **_Response_**: The City adds language to clarify. | The City adds the following language to the "Dissemination" section:

"If the information collected related to | **_Response_**: The Team disagrees and recommends additional language. | The Team recommends amending the language as follows:

"If the information collected related to the exercise of First Amendment rights, as a |

| | | | | |
|---|---|---|---|---|
| referenced in the "Dissemination" section on page 3. (ECF 197-2, PageID 6874.) | | the exercise of First Amendment rights as a result of an authorized investigation identifies a threat or potential disruption to a private entity, that information may be shared with the private entity's security and/or other joint law enforcement agencies as reasonably necessary." | ***Rationale:*** The Team believes that the language, as written, is too broad. | result of an authorized investigation, identifies a threat **of violence or unlawful activity that poses a substantial risk to public safety** of a private entity, that information may be shared with other joint law enforcement agencies pursuant to 28 C.F.R. Pt. 23, or with the private entity's security on a need-to-know basis, with specific justification for the sharing of any information that reveals the identity of an individual person or group or reveals First Amendment-protected activity." |
| The Team recommended adding the following note at the end of the "Exclusions" section: "There may be times when an investigation starts out in one of the excluded categories and evolves into something that does not implicate First Amendment rights. Accordingly, officers involved in an investigation should remain vigilant for any changes that would trigger the need for | ***Response***: The City accepts the recommendation. | The City adds the recommended language. | ***Response***: The Team agrees. | The Team does not recommend anything further. |

| | | | | |
|---|---|---|---|---|
| authorization." (ECF 197-2, PageID 6875.) | | | | |
| N/a | N/a | N/a | N/a | The Team recommends adding the language of DR138 that explains the granting of written extensions past the initial ninety (90)-day investigation period. Thus this policy would include the following:<br><br>"The Police Director or his/her designee may grant extensions of the initial ninety (90)-day period of up to 90 days each when such extensions are justified by extraordinary circumstances. For each such extension, the following two conditions must be satisfied:<br><br>(1.)The Director or his/her designee must consult with the City Attorney or the City Attorney's designee (who much be a lawyer in good standing with the Tennessee Board of Professional Responsibility); and (2.) The investigating officer must complete [the Kendrick Consent Form] and state in writing either the persistent facts that establish extraordinary circumstances or new facts that do the same." |

### F. Form: Authorization for Investigations That May Incidentally Result in Political Intelligence

| Team's Prior Feedback to City of Memphis | City of Memphis's Response to Team's Prior Feedback | City of Memphis's Proposed Action in Response to Team's Prior Feedback | The Team's Response to the City's Proposed Action. | Recommendation(s) |
|---|---|---|---|---|
| Some members of the Team expressed concern that the ACLU-TN's recommendation that the Authorization Form include a separate section for the Director/Designee to list the precautions and techniques to be employed during the investigation to certify that they are the least intrusive means available might involve law enforcement sensitive methods, some of which could be secret or necessarily confidential. (ECF 197-2, PageID 6876.).<br><br>The Team revised this recommendation with a request for clarification about the kinds of information that would be provided by the City as | *Response*: The City accepts the prior, unrevised recommendation and responds to the request for clarification.<br><br>The City responds to the request for clarification about types of precautions and techniques to be listed.<br><br>"An example of a confidential technique that might be used in an investigation is the use of an undercover social media account aimed at accessing the private social media account of a criminal suspect. Another law-enforcement sensitive technique that might be used during an investigation is the use of a court-ordered wiretap | The City deletes the section for the Director/Designee to list precautions and techniques to be employed during the investigation. | *Response*: Some of the Team agrees, but the Team withholds its final recommendation pending a discussion with the ACLU about the ACLU's concerns. | ==The Team withholds its final recommendation pending a discussion with ACLU on this topic.== |

| | | | | |
|---|---|---|---|---|
| precautions and techniques. (ECF 205, PageID 7079.) | to monitor the phone calls between known gang members."<br><br>Examples of precautionary techniques include the following:<br>· Instructing the officer(s) conducting the search, after consultation with Atty. Zayid Saleem, to immediately destroy any materials obtained that do not have value in the criminal investigation.<br>· where the search uncovers information pertinent to the criminal investigation but implicating a citizen's First Amendment rights, limiting the dissemination of that information to MPD "personnel with a need to know", and that group of recipients would be approved by the Director or his designee.<br>· Using only open source, publicly available | | | |

| | | | | |
|---|---|---|---|---|
| | information. Investigating a closed account or use of an undercover account requires a compelling reason subject to additional prior approval by the Director or his designees. Once the investigation is over, the undercover account must "unfriend" or "unfollow" the person being investigated. | | | |
| N/a | N/a | N/a | N/a | The Team recommends adding the language of DR138 that explains the granting of written extensions past the initial ninety (90)-day investigation period. Thus this policy would include the following:<br><br>"The Police Director or his/her designee may grant extensions of the initial ninety (90)-day period of up to 90 days each when such extensions are justified by extraordinary circumstances. For each such extension, the following two conditions must be satisfied:<br><br>(1)The Director or |

|  |  |  |  | his/her designee must consult with the City Attorney or the City Attorney's designee (who much be a lawyer in good standing with the Tennessee Board of Professional Responsibility); and (2)The investigating officer must complete [the Kendrick Consent Form] and state in writing either the persistent facts that establish extraordinary circumstances or new facts that do the same." |

**G. Written Guidelines for the use of Manual Social Media Searches and of Social media Collators**

| Team's Prior Feedback to City of Memphis | City of Memphis's Response to Team's Prior Feedback | City of Memphis's Proposed Action in Response to Team's Prior Feedback | The Team's Response to the City's Proposed Action. | Recommendation(s) |
|---|---|---|---|---|
| The Team agreed with the ACLU-TN that the Social Media Policy should apply to all MPD officers. (ECF 197-1, PageID 6860.) | *Response*: The City accepts the recommendation. | The policy applies to all MPD officers. | *Response*: The Team agrees. | The Team does not recommend anything further. |
| The Team recommended adding the following language regarding when | *Response*: The City accepts the recommendation. | The City adds the recommended language. | *Response*: The Team agrees. | The Team does not recommend anything further. |

| | | | | |
|---|---|---|---|---|
| the Social Media Guidelines are applicable: "The officer's personal use of the social media platform and any searches conducted for personal reasons are nevertheless subject to this reporting requirement, when: ·The information searched, gathered, collected, stored or disseminated involves, includes, intersects or overlaps with, or otherwise relates to or has direct or derivative use in any investigation, inquiry or matter involving official law enforcement or department interest; and ·The officer has knowledge of such investigation, inquiry, or matter, or should reasonably have such knowledge." (ECF 197-1, PageID 6860.) | | | | |
| The Team recommended that the | *Response*: The City accepts the recommendation. | The City revises the section as follows: | *Response*: The Team agrees but recommends | The Team recommends amending the language |

| "Documentation and Retention" Section be revised for clarity. (ECF 197-1, PageID 6861.) | | "Information gathered from a social media site by MPD related to First Amendment activity shall not be retained, unless for a legitimate law enforcement purpose, for more than thirty days.<br><br>All social media searches by an MPD officer shall be retained until reported to the Command Staff, which shall occur approximately every 90 days. At the end of each 90-day period, each MPD officer who conducted a search on social media must submit a list of search terms used to search the particular social media platform related to the officer's duties and responsibilities as an officer of the MPD. These reports shall be submitted to the officer's commander.<br><br>Unannounced | amending the language for clarification. The Team also requests clarification about whether MPD has a policy section that generally authorizes audits of an officer's files? | ==as follows:==<br><br>=="Unannounced **internal** audits of an officer's social media searches, etc."== |

| | | audits of an officer's social media searches are permissible at any time for any reason when authorized by a member of the Command staff." | | |
|---|---|---|---|---|
| The Team recommended defining "Special Events." (ECF 197-1, PageID 6862.) | *Response:* The City accepts the recommendation. | The City defines "special events" as the following: "Events, both planned and unplanned, that involves groups of people gathering in public which require the presence and planning of the City and/or MPD officers." | *Response*: The Team disagrees. *Rationale*: The City's Public Assemblies and Application process uses different terms (special events, spontaneous events, and alternative events) than the proposed definition. This policy should be consistent with the City's Ordinance. | <mark>The Team recommends revising the definition to be consistent with the City's Ordinance on public assemblies.</mark> |
| The Team recommended adding a disciplinary requirement in the event of an officer's failure to adhere to the Social Media Policy as well as an auditing procedure. (ECF 197-1, PageID 6863.) | *Response*: The City accepts recommendation. | The City revises as requested. | *Response*: The Team agrees. | The Team does not recommend anything further. |
| The Team recommended that the policy state that an undercover social media account | *Response*: The City accepts the recommendation. | The City revises as requested. | *Response*: The Team agrees but revises its recommendation. | The Team recommends revising the sentence "Under no circumstances may an officer impersonate an actual person |

| | | | | |
|---|---|---|---|---|
| may not impersonate an actual person known to the subject of an investigation. (ECF 197-1, PageID 6863.) | | | | known to the subject of an investigation through the use of an undercover social media account" to say "Under no circumstances may an officer impersonate an actual person through the use of an undercover social media account." |
| The Team recommended that a section regarding Juveniles be added. (ECF 197-1, PageID 6863.) | *Response*: The City accepts the recommendation. | The City adds the following language:<br><br>ONLINE MONITORING OF JUVENILES ON SOCIAL MEDIA "Any and all restrictions regarding the monitoring of juveniles included in MPD's practices, policies, or procedures, are incorporated into this Social Media Policy." | *Response*: The Team agrees but asks that the City share MPD's policies relating to juveniles so the Team can see how they would apply in the social media monitoring context. | <mark>The Team does not recommend anything further.</mark> |
| The Team recommended clarifying a "situational assessment report" vs. a "situational awareness report." (ECF 197-2, PageID 6879.) | *Response:* The City accepts the recommendation. | The City revises the policy as follows:<br><br>"Situational awareness reports may be prepared for special events management, including First Amendment-protected activities. At the conclusion of the | *Response*: The Team mostly agrees but recommends that the City adds language to the situational awareness report policy. | The Team submits that any MPD investigation that uses social media as an investigative technique must have a lawful purpose and must not unlawfully infringe the First Amendment Rights of the individual(s) or groups subject to the investigation— meaning, the social |

| | | situation or First Amendment-protected event that was the catalyst for generation of a situational awareness report, and where there was no criminal activity related to the information gathered, the information obtained from social media or from a social media monitoring tool will be retained for no more than thirty (30) days.<br><br>After Action Reviews may be prepared using information gathered from social media. "After Action Review" (AAR) is defined as a report following an incident describing the incident and analyzing MPD's preparation for and response or reaction to the incident. These reviews are aimed at department self-improvement. The information obtained from social media may | | media investigation should employ the least intrusive means upon exercise of those First Amendment rights. Further, if the investigation infringes on First Amendment rights, a reasonable rational connection between the collection of information about the individuals or groups and the purpose of the investigation should be documented. |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | | be retained within the AAR indefinitely, but the names, photos, and identifying information of individuals not suspected of criminal activity must be redacted." The City added in a footnote: "situational awareness report is report of intelligence gathered by law enforcement related to public safety surrounding a planned gathering of people in public. The purpose of a situational awareness report is to provide MPD with information so that it can adequately prepare for and protect the public before, during, and after a special event." | | |
| The Team recommended a shorter retention period for information about First Amendment | *Response*: The City accepts the recommendation. | The City includes the following language: "Information gathered from a social media site | *Response*: The Team agrees. | The Team does not recommend anything further. |

| | | | | |
|---|---|---|---|---|
| activities. (ECF 197-2, PageID 6879.) | | by MPD related to First Amendment activity shall not be retained, unless for a legitimate law enforcement purpose, for more than thirty days." | | |
| The Team requested clarification as to why the City made the change from allowing First Amendment information gathered on social media to be distributed only to the Command Staff versus "to MPD officers and staff as necessary." (ECF 197-2, PageID 6880.) | *Response*: The City responds to request for clarification.<br><br>The City made this change based on the ACLU-TN's suggestion. Moreover, the City envisions a situation in which some officer below the level of Command Staff would be required to take an action (such as make an arrest) where access to the information would be critical. | None. | *Response*: The Team is satisfied with the explanation. | The Team does not recommend anything further. |
| The Team recommended that there be audits of an officer's social media searches. (ECF 197-1, PageID 6863.) | *Response:* The City accepts the recommendation. | The City adds the following language to its policy:<br><br>"Unannounced audits of an officer's social media searches are permissible at any time for any reason when authorized by a member of the Command Staff." | *Response*: The Team agrees but recommends amending the language for clarity. | The Team recommends amending the language of the policy as follows:<br><br>"Unannounced **internal** audits…" |
| N/a | N/A | N/a | N/A | The Team |

| | | | | |
|---|---|---|---|---|
| | | | | recommends revising the title of the social media policy, which is currently "Utilizing Social Media for Investigations," to "Law Enforcement Utilization of Social Media," because the policy covers more than investigations. |
| N/a | N/a | N/a | N/a | The Team recommends changing all instances of "MPD officers" to "MPD employees" in the social media policy. |
| N/a | N/a | N/a | N/a | The Team recommends the revising the sentence, "All searches of social media by a MPD officer, through the use of a social media account or social media collator…" to "**All searches of social media by an MPD employee, including but not limited to those through the use of a social media collator, shall be based on a valid law enforcement purpose**…." |
| N/a | N/a | N/a | N/a | On top page four of the social media policy, after the term "shoot the police," the Team recommends adding a sentence stating, " However, the use, retention, or dissemination of information collected |

| | | | | |
|---|---|---|---|---|
| | | | | by searches that relate to the exercise of First Amendment rights is governed by the Consent Decree." |
| N/a | N/a | N/a | N/a | On page four of the social media policy, the current policy says "Only searches of open-sources (non-private) should be used." The Team recommends revising this to say, "Only searches of open source (non-private) information should be used." |
| N/a | N/a | N/a | N/a | On page five of the social media policy, the current policy states, "Information gathered from a social media site by MPD related to First Amendment activity shall not be retained, unless for a legitimate law enforcement purpose, for thirty days." The Team recommends shortening this to fourteen days. The Team also recommends revising the language under situational awareness reports, as stated on page six of the policy, to reflect this fourteen day retention requirement. |
| N/a | N/a | N/a | N/a | The Team recommends revising the last two paragraphs on page five of the |

| | | | | |
|---|---|---|---|---|
| | | | | social media policy to clarify the distinction between keeping information for a limited period (currently 30 days) and keeping the searches themselves for up to 90 days. The Team recommends adding language such as, "The terms used by an MPD officer to conduct social media searches shall be retained…" |
| N/a | N/a | N/a | N/a | The Team recommends revising the situational awareness reports language as follows:<br><br>"Situational awareness reports may be prepared for special events management, including First Amendment-protected activities, where necessary for the furtherance of public safety. Employees preparing such reports must take special care to collect no more information than necessary regarding the exercise of First Amendment-protected rights. Employees should further document that there is a relationship between the incidental collection of information about First Amendment-protected activities and the |

| | | | | purpose of the report, which is the protection of public safety. At the conclusion of the situation or First Amendment-protected event … the information obtained from social media or from a social media monitoring tool will be retained for no more than fourteen days." |
|---|---|---|---|---|
| N/a | N/a | N/a | N/a | With respect to After Action Reviews, the Team recommends adding "organization" to the final sentence – so it would say "…the names, photos, and identifying information of individuals **and organizations** not suspected of criminal activity should be redacted." |

## H. Social Media Search Terms

| Team's Prior Feedback to City of Memphis | City of Memphis's Response to Team's Prior Feedback | City of Memphis's Proposed Action in Response to Team's Prior Feedback | The Team's Response to the City's Proposed Action. | Recommendation(s) |
|---|---|---|---|---|
| The Team expressed concerns about the certification process for social media searches by MPD officers. In particular the Team recommended that the MPD certify that each term has | *Response*: The City requests follow-up information.<br><br>The City would like clarification as to whether the Team is suggesting a certification be made for each individual search term as it is | The City suggests that it maintain the current practice of reporting social media search terms from the limited set of phones as outlined in its pleadings to the Court (OHS, RTCC, General Investigative Unit, | *Response*: The Team disagrees and requests more information about how many officers outside the officers covered by the policy also use social media | ==The Team recommends that the City create an internal audit system to ensure compliance.== |

| | occurring in real time, or if a "blanket group certification" be made by each officer when he/she submits his/her search terms quarterly. To this point, the City notes that certifying each search term in real time would be incredibly onerous. The City is also doubtful whether the Court intended that every MPD officer's phone be subject to the social media search term reporting requirement. | Homicide, Sex Crimes, and Command Staff). It also expresses concern that to require all 2000+ officers to submit search terms quarterly would be onerous. | for work. | |
| a valid law enforcement purpose. (ECF 197-1, PageID 6864.) | | | | |
| The Team requested an explanation for the use of the word "protest" as a search term in conjunction with the words "St. Jude" and "marathon." (ECF 197-1, PageID 6864.) | *Response*: The City responds to request for information.<br><br>The City states that those terms were used by Sergeant Eddie Cornwell from the Office of Homeland Security. The searches in question were performed around the time of the marathon to identify anyone who might be preparing to engage in acts threatening the safety of the event. | None. | *Response*: The Team is satisfied with the explanation. | The Team does not recommend anything further. |

# Exhibit 4

**(Redacted - Filed Under Seal)**

# Exhibit 5

**(Partially Redacted - Full Document Filed Under Seal)**



**BAKER DONELSON**
BEARMAN, CALDWELL & BERKOWITZ, PC

2000 FIRST TENNESSEE
BUILDING
165 MADISON AVENUE
MEMPHIS, TENNESSEE 38103

PHONE:   901.526.2000
FAX:        901.577.2303

www.bakerdonelson.com

R. MARK GLOVER
**Direct Dial**: 901.577.2222
**Direct Fax**: 901.577.0732
**E-Mail Address**: mglover@bakerdonelson.com

June 7, 2019

Ed Stanton
Butler Snow
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
Edward.stanton@butlersnow.com

Re:     *Blanchard/ACLU-TN v. City of Memphis*
         Summary of suggested changes to be made in City's proposed policies in
         accordance with the Monitor's suggestions and analysis of the eleven scenarios

Ed,

This letter outlines the City's suggested amendments to its proposed policies and training materials made in an attempt to address the issues raised in your Interim Report of Independent Monitor (ECF No. 197) filed with the Court on April 5, 2019, and in your First Quarterly Report of Independent Monitor (ECF No. 205) ("May 2 Report"). This letter also addresses the eleven scenarios posed to you by the City, and the City's response to the Monitoring Team's comments regarding those scenarios.

The Court anticipated that the parties and the Monitoring team would continue to work together to narrow the number of issues that can be agreed upon before bringing any unresolved issues to the Court. Below is a summary of your recommendations and the City's suggestions concerning revisions in response to each recommendation. We would appreciate your review and comments.

## I.     The City's Proposed Policies and Training Materials

### A.     DR 138

You recommended adding language to the definition of First Amendment rights to expressly include the right to petition the government. The City has made that change.

You also recommended adding language to the fourth paragraph to state as follows: "No member shall knowingly, intentionally or recklessly facilitate or cause the interception, recording, transcription of— or otherwise interfere with or cause, any interference with any communications by means of electronic or covert surveillance for the purpose of gathering political intelligence." Additionally, you recommended adding the phrase "or conduct any investigation involving political intelligence or for the purpose, expectation or anticipation of political intelligence"" to the last sentence of the fourth paragraph. The City has now added that language.

You further recommended adding language to Paragraph 5, which states that "any member conducting or supervising such an investigation must bring the matter to the attention of the Director of Police Services, or his/her designee, for review and written authorization," have a time limit for notification added – for instance, "…prior to initiating such an investigation, or, where the possibility of such incidental receipt is discovered after an investigation has commenced, no later than [X] days after such discovery." The City has accepted that suggestion and proposed a time limit of ten days for bringing such an investigation to the attention of the Director or his/her designee.

You further recommended revising the fifth paragraph to include the language that investigations into unlawful conduct "that reasonably may be expected to result" incidentally in the receipt of political intelligence require approval, but then revised it back to its original language in the May 2, 2019 First Quarterly Report of Independent Monitor (ECF No. 205, PageID 7078). The phrase now reads: "Investigations into unlawful conduct that may incidentally result in the receipt of information relating to First Amendment rights are permissible, but require approval by the Director of Police Services or his/her designee."

You also suggested adding language to the last sentence of the fifth paragraph that explains: "An extension may be granted in writing by the Director or his/her designee for periods of up to an additional ninety (90) days; and in extraordinary circumstances where warranted, additional 90-day periods as documented and approved by the Director or his Designee." The City has made those revisions. In the May 2 Report, however, you asked that the City revise the last sentence to read as follows:

> The Police Director or his / her designee may grant written extensions of the initial ninety (90)-day period of up to 90 days each when such extensions are justified by extraordinary circumstances. For each such extension, the following two conditions must be satisfied:
>
> (1) The Director or his / her designee must consult with the City Attorney or the City Attorney's designee (who must be a lawyer in good standing with the Tennessee Board of Professional Responsibility); and
>
> (2) The investigating officer must complete the [Kendrick Consent Form] and state in writing either the persistent facts that establish extraordinary circumstances or new facts that do the same.

The City has made those changes.

## B.  Training Plan

You recommended that the Training Plan incorporate the use of hypothetical examples. You also recommended that training options include the following: providing a one- to two-hour block taught by an instructor who prepares a lesson plan and course evaluations; building the training into existing training models; and using short officer training videos, known as video alerts.

You further recommended adding a requirement that the training be updated annually to track changes in relevant laws and MPD policies.

The City has attempted to incorporate your suggested language into various sections of the Training Plan, including adding several bullet points to the end of the training plan as follows:

- All training on the *Kendrick* Consent Decree and its prohibition against political intelligence shall incorporate the use of hypothetical examples of permissible and prohibited conduct under the Kendrick Consent Decree.

- Training on the *Kendrick* Consent Decree shall be provided in blocks anticipated to be one- to two-hours long. The training will be conducted by an instructor with a written lesson plan. After each training session, the participants of the session will submit a course evaluation to the instructor.

- Training on the *Kendrick* Consent Decree shall also be incorporated into existing training models, such as routine training of police cadets at the Training Academy.

- Training on the *Kendrick* Consent Decree shall also be conducted via short officer training videos known as video alerts.

- Training on the *Kendrick* Consent Decree shall be updated annually to track changes in relevant laws and MPD policies.

You also recommended that training be provided to **all** officers and civilian employees working within or otherwise assigned or detailed to the Memphis Police Department. In creating the initial Training Plan, the City followed the Court's guidance in its Opinion and Order [151], which states in part that:

"the City shall design training for members of OHS, RTCC, and MPD's Command Staff. The new training shall define "political intelligence" ...No officer may be assigned to RTCC or OHS or be promoted to the Command Staff without receiving this training." [ECF No. 151. Page IDs 6273-73]

When the City submitted the City's Training Plan to the Court, it was anticipated that the groups listed in the Court's Order were the groups to receive the intensive training, and not all 2,000 officers of MPD. For that reason, the City suggested that it could implement that training within 21 days of the Court's approval of the final materials constituting the training program. While such a training program could be accomplished by use of the regular annual in-service training for officers, the City believes that the immediate training of such additional persons is outside the scope of the Order listing groups to be trained initially, and would not be possible in such a short time frame, particularly the 21 day period suggested by the City in its original submission. The City, of course, is happy to discuss this issue with you and your Team, and is confident that we can arrive at an agreeable timeframe and procedure for training the bulk of MPD's 2000+ officers.

In the interim, the City has revised the proposed Training Plan to state as follows:

- Within 21 days after approval of the training materials by the Court, the City will begin training sessions for all officers and civilian employees of OHS, RTCC, and Command Staff.

- MPD will then begin to train all other MPD officers on the prohibitions of the Consent Decree. Due to the large number of officers (2000+), this training will be done on a rolling basis, with all officers and civilian employees of MPD to complete the training within 12 months.

## C.     Training PowerPoint

You recommended adding language to the seventh slide "Harassment and Intimidation Prohibited," stating that a valid law enforcement purpose is required. In response, the City added the phrase "Absent a valid law enforcement purpose" to the third and fourth bullets on Slide 7.

The City also made the following changes suggested by the Monitor to the PowerPoint:

- Incorporated the "reasonable effect" language on Slide 7: "MPD shall not record… for the purpose of chilling the exercise of First Amendment rights or for the purpose of maintaining a record of that gathering, **or where such recording will reasonably have the effect of deterring any person from exercising First Amendment rights**."

- Updated Slide 4 with the updated DR 138.

- Updated Slide 12, Bullet 1 to include language about non-collator social media searches. "An MPD officer searches a social media collator **or platform** for all instances…"

- Revised the language of Slide 14 to provide: "An MPD officer wearing a body camera **that has been activated pursuant to MPD policy** does not have to cover the camera…."

- Removed all references to any particular group in the PowerPoint. The City changed all instances of "Black Lives Matter" to "activist group." In the May 2 Report, you noted that "the Team recommends that the City's examples not single out one or two named groups, because it may be interpreted to limit the scope of this prohibition, which applies to any assembly or group of individuals whose purpose is to exercise rights protected by the First Amendment and the Consent Decree." Please let us know if the City's use of the term "activist group" in its examples satisfies this latest point of concern.

You also recommended deleting the language on Slide 14 regarding "kill the police," because any search of that term could incidentally collect information related to First Amendment rights. The City does not agree with the Monitor's recommendation because the Court used the example "kill police" in its Opinion and Order. It stated:

> Similarly, a police officer who queries a social media collator for the phrase "kill police," is not going out of her way to "gather" information related to First Amendment rights, even though her action is definitely investigative in nature. If her search returns information related to a lawful assembly titled "Do Not Kill Police," her action does not become political intelligence because First Amendment rights were not the focus or subject of her investigative activity. In other words, she inadvertently discovered information related to First Amendment rights, but she was not "gathering" it. On the other hand, an officer who searches for "Black Lives Matter" gathers information related to First Amendment rights, because political beliefs are the subject of his investigative activity. A discovery of a potential criminal act in that search does not change the fact that the information he was gathering related to First Amendment rights. [ECF No. 151. Page ID 6257].

For that reason, the City has not deleted the "kill the police" discussion from Slide 14, but welcomes discussion on the topic with the Monitoring Team.

### D. Guidelines for Delegation of Authority of Director of Police Services to Authorize Investigations

You recommended adding language to this policy that requires review of each selected designee be made by competent in-house counsel or authorized/assigned counsel. The City has designated Zayid Saleem as the appropriate in-house counsel for this role, assuming this is agreeable to you as Monitor.

You also expressed concern that the volume of these investigations would be too voluminous for the Director to oversee and suggested adding language that the Designee submit

a report to the Director. The City agrees with the Monitor on this point, but notes that the policy already provides for the designee's report.

You further recommended revising the last sentence of the policy to state as follows: "The Director shall have the authority to rescind authorization for any investigation that the Director deems to violate the letter or intent of the department prohibition against the gathering of political intelligence, or in cases in which either the initial, authorized investigative goals or purposes no longer exist; or when political intelligence collection is no longer merely incidental." The City has made that revision.

You suggested changing the temporal reporting requirement to the last Friday of every month that is a regular business day. The City has respectfully requested that the monthly reporting requirement not fall on a day certain, but rather just "monthly" due to the varying work schedules of those involved.

### E. Authorization for Investigations Which May Incidentally Result in the Collection of Information Related to the Exercise of First Amendment Rights Under Section G

You recommended that the policy define "situational assessment." This definition is included in footnote 2. You further recommended adding a discussion of whether situational assessment reports should be excluded from the authorization process. The City seeks to clarify this by changing the term "Situational Assessment Report" to "After Action Review." Accordingly, Number 6 is suggested to be revised as follows:

"After Action Review (AAR)" is defined as a report following an incident describing the incident and analyzing MPD's preparation for and response or reaction to the incident.

You also asked what policy governs the dissemination of Frist Amendment information to law enforcement referenced in the "Dissemination" section. The City added the following language to the "Dissemination" section:

If the information collected related to the exercise of First Amendment rights as a result of an authorized investigation identifies a threat or potential disruption to a private entity, that information may be shared with the private entity's security and/or other joint law enforcement agencies as reasonably necessary.

While we are willing to discuss and adjust this language, the purpose is to allow MPD to alert a private entity of threats, so as to minimize risk to the entity and the public.

You further recommended adding the following note at the end of the "Exclusions" section:

There may be times when an investigation starts out in one of the excluded categories and evolves into something that does not implicate First Amendment

rights. Accordingly, officers involved in an investigation should remain vigilant for any changes that would trigger the need for authorization.

This change has been made.

### F. Authorization Form

You expressed concern that the ACLU-TN's recommendation that the Authorization Form include a separate section for the Director/Designee to list the precautions and techniques to be employed during the investigation to certify that they are the least intrusive means available might involve law enforcement sensitive methods, some of which could be secret or necessarily confidential. Based on your comments, the City deleted that section; however, I am sure that the ACLU-TN would like to be heard on this issue. In the May 2 Report, you asked for clarification about the kinds of information that would be provided by the City as precautions and techniques. An example of a confidential technique that might be used in an investigation is the use of an undercover social media account aimed at accessing the private social media account of a criminal suspect. Another law-enforcement sensitive technique that might be used during an investigation is the use of a court-ordered wiretap to monitor the phone calls between known gang members.

Additionally, the City is very concerned that these Authorization Forms will be subject to open records requests pursuant to the Tennessee Public Records Act. The City is willing to address this issue with the Court if the ACLU-TN insists on the change, but welcomes guidance from the Monitoring Team.

### G. Social Media Policy

Your Team made several suggested revisions to the Social Media Policy. First, you agreed with the ACLU-TN that the Social Media Policy should apply to all MPD officers.

You further suggested adding the following language regarding when the Social Media Guidelines are applicable:

The officer's personal use of the social media platform and any searches conducted for personal reasons are nevertheless subject to this reporting requirement, when:

- The information searched, gathered, collected, stored or disseminated involves, includes, intersects or overlaps with, or otherwise relates to or has direct or derivative use in any investigation, inquiry or matter involving official law enforcement or department interest; and

- The officer has knowledge of such investigation, inquiry, or matter, or should reasonably have such knowledge.

You also recommended that the "Documentation and Retention" Section be revised for clarity. The City revised the section to state:

> Information gathered from a social media site by MPD related to First Amendment activity shall not be retained, unless for a legitimate law enforcement purpose, for more than thirty days.

> All social media searches by an MPD officer shall be retained until reported to the Command Staff, which shall occur approximately every 90 days. At the end of each 90-day period, each MPD officer who conducted a search on social media must submit a list of search terms used to search the particular social media platform related to the officer's duties and responsibilities as an officer of the MPD. These reports shall be submitted to the officer's commander.

> Unannounced audits of an officer's social media searches are permissible at any time for any reason when authorized by a member of the Command staff.

You also recommended defining "Special Events." The City defined "special events" as: "events, both planned and unplanned, that involve groups of people gathering in public which require the presence and planning of the City and/or MPD officers."

You further recommended adding a disciplinary requirement for an officer's failure to adhere to the Social Media Policy as well as an auditing procedure. You also recommended that the policy state that an undercover social media account may not impersonate an actual person known to be the subject of an investigation. The City has made those additions.

You also requested that a section regarding Juveniles be added. To that end, the City added the following language:

ONLINE MONITORING OF JUVENILES ON SOCIAL MEDIA

> Any and all restrictions regarding the monitoring of juveniles included in MPD's practices, policies, or procedures, are incorporated into this Social Media Policy.

You further suggested clarifying a "situational assessment report" vs. a "situational awareness report." The City revised the policy as follows:

> Situational awareness reports[1] may be prepared for special events management, including First Amendment-protected activities. At the conclusion of the situation or First Amendment-protected event that was the catalyst for generation of a situational awareness report, and where there was no criminal activity related to

---

[1] A situational awareness report is report of intelligence gathered by law enforcement related to public safety surrounding a planned gathering of people in public. The purpose of a situational awareness report is to provide MPD with information so that it can adequately prepare for and protect the public before, during, and after a special event.

the information gathered, the information obtained from social media or from a social media monitoring tool will be retained for no more than thirty (30) days.

After Action Reviews may be prepared using information gathered from social media. "After Action Review" (AAR) is defined as a report following an incident describing the incident and analyzing MPD's preparation for and response or reaction to the incident. These reviews are aimed at department self-improvement. The information obtained from social media may be retained within the AAR indefinitely, but the names, photos, and identifying information of individuals not suspected of criminal activity must be redacted.

You also recommended a shorter retention period for information about First Amendment activities. To address that concern, the City included the following language:

Information gathered from a social media site by MPD related to First Amendment activity shall not be retained, unless for a legitimate law enforcement purpose, for more than thirty days.

The Monitoring Team requested clarification as to why the City made the change from allowing First Amendment information gathered on social media to be distributed only to the Command Staff versus "to MPD officers and staff as necessary." We made this change based on the ACLU-TN's suggestion. Moreover, we can envision a situation in which some officer below the level of Command Staff would be required to take an action (such as make an arrest) where access to the information would be critical.

## H.    Social Media Search Terms

You expressed concerned about the certification process for social media searches by MPD officers. Your report stated:

The filing certifies that none of the names searched for were "associated with a protest or other scenario in which First Amendment rights were being exercised." Each search must also have a valid law enforcement purpose, however. The current certification is important but not sufficient; the Monitoring Team recommends that for future search term productions, the police department also certify that each search had a valid law enforcement purpose. The Monitoring Team also recommends that the police department certify that each search term produced in this submission had a valid law enforcement purpose; if that certification is not possible, the Monitoring Team recommends that the department provide an explanation.

The Monitoring Team also recommends that the department provide an explanation for the use of the word "protest" as a search term in conjunction with the words "St. Jude" and "marathon."

It is unclear to us whether you are suggesting a certification be made for each individual search term as it is occurring in real time, or if a "blanket group certification" be made by each officer when he/she submits his/her search terms quarterly. Certifying each search term in real time would be incredibly onerous. It is also unclear if the Court intended that every MPD officer's phone be subject to the social media search term reporting requirement.

The City suggests that it maintain the current practice of reporting social media search terms from the limited set of phones as outlined in its pleadings to the Court (OHS, RTCC, General Investigative Unit, Homicide, Sex Crimes, and Command Staff). If the Court intended that every officer's phone be subject to this search term reporting requirement, then the City submits that while it can technically require all 2000+ officers to submit search terms quarterly, it would be untenable, extremely burdensome, and a costly waste of police resources. We welcome the Monitor's thoughts on this and hope we can reach a workable process.

Regarding your request for more information about the use of the word "protest" as a search term in conjunction with the words "St. Jude" and "marathon," those terms were used by Sergeant Eddie Cornwell from the Office of Homeland Security. The searches in question were performed around the time of the marathon to identify anyone who might be preparing to engage in acts threatening the safety of the event. The City believes that such a search is appropriate and allowed under the Court's Opinion and Order [151], because it was not done for the purpose of gathering information related to First Amendment rights, but rather for the valid law enforcement purpose of protecting public safety. *See* ECF No 151, Page ID 6257-6258. The Boston Marathon terrorist bombing is certainly a part of the backdrop for that search.

Attached are redlined versions of the policies discussed that show the changes the City made.

# Exhibit 6

## Police department policies regarding use of social media for investigative purposes and situational assessment

| Police department | Title & link to policy | Approved uses for social media (other than public-facing use) & requirements for use in investigations | Prohibitions on use of social media | Specific rules for situational assessment/ awareness or other non-investigative efforts? | Authorization required for non-covert uses? | Specific language on undercover/covert activity? | Language governing use of personal device or account? | Discussion of constitutional rights? |
|---|---|---|---|---|---|---|---|---|
| **Annapolis, MD** | General Order: Social Media Policy (2014) https://www.annapolis.gov/DocumentCenter/View/4865/I-11-Social-Media-Policy-July-2014-PDF | "Social media is a valuable investigative tool when seeking evidence or information about: <br> a. Missing persons <br> b. Wanted persons <br> c. Gang participation <br> d. Crimes perpetrated online (i.e., cyberbullying, cyberstalking); and <br> e. Photos or videos of a crime posted by a participant or observer." <br><br> No additional guidance regarding investigative use. | | | | | Use of personally owned devices in the course of official duties is prohibited without "express permission." | |
| **Austin, TX** | Social Media for Official Use (Lexipol 2017) https://www.austintexas.gov/sites/default/files/files/Current_APD_Policy_Manual_2017-1.5_issued_7-20-2017.pdf | Social media may only be used for a valid law enforcement purpose: <br> 1. Pre-employment background investigations; <br> 2. Crime analysis & situational assessment reports; <br> 3. Criminal intelligence development; or <br> 4. Criminal investigations. <br><br> Specifically, employees may only use social media to seek or retain information that: <br> • Is based on a criminal predicate or threat to public safety, or <br> • Is based on reasonable suspicion that an identifiable individual or organization: <br> ○ Has committed identifiable criminal | Social media may not be used to seek or retain information about: <br> • Individuals or organizations solely on the basis of religion, political association, social views or activities; <br> • Individual's participation in particular non-criminal organization or lawful event; <br> • Individual's race, ethnicity, citizenship, place of origin, disability, gender, or sexual orientation, unless relevant to individual's criminal conduct or activity or if required for identification; <br> • Individual's age, | Crime analysis & situational assessment reports may be used for "special events management, including First Amendment-protected activities." If no related criminal activity, social media info must be deleted within 14 days. | No authorization required for "general research, topical information, or other law enforcement uses that do not require" an online alias. | Use of an online alias requires: <br> • Criminal predicate or threat to public safety, or <br> • Reasonable suspicion that an identifiable individual or organization has committed a crime or is involved in or is planning criminal conduct or activity that presents a threat to an individual, the community, or the nation, and the information is relevant to the criminal conduct or activity. <br><br> Employees must get approval from supervisor to use online alias, based on evaluation of whether online alias would serve valid law enforcement purpose. Policy sets out specific approval process, and requires deconfliction through the local fusion center (Austin Regional Intelligence Center). <br><br> All approved undercover activity | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | offense or is involved in criminal conduct or activity presenting a threat to an individual, the community, or the nation, and the information is relevant to the criminal conduct or activity, or<br>• Is relevant to the investigation & prosecution of suspected criminal incidents, resulting justice system response, enforcement of sanctions, orders, or sentences, or the prevention of crime; or<br>• Is useful in crime analysis or situational assessment reports for administration of criminal justice & public safety.<br><br>[Note: in the written policy, the last two bullet points are inserted under the second, referring to an identifiable individual, but that doesn't make sense and doesn't track with how the identical language appears in other policies.]<br><br>Social media info will be evaluated for source reliability and content validity. | other than to determine if person is a minor. | | | requests must be reviewed at least every 90 days by a supervisor, and will be discontinued if the activity does not provide information regarding a valid law enforcement purpose.<br><br>Employees with approved online alias can use it to "make false representations in concealment of personal identity in order to establish social media accounts."<br><br>Note that online undercover activity = interaction with person online (not just surveillance/monitoring from afar). May only undertake online undercover operations "when there is reason to believe that criminal offenses have been, will be, or are being committed (e.g., internet chat rooms where child exploitation occurs)." | |
| **Baltimore, MD** | Order: Social Media (2016)<br>https://www.baltimorepolice.org/604-social-media | When it's believed that social media would assist in an ongoing investigation or intelligence collection effort, the chief of the criminal investigation division must consult with the MRS [?] director.<br><br>No additional guidance on use for investigative purposes. | | | | "It may be appropriate for members to use non-official BPD social media accounts in the course of a legitimate criminal investigation, or in the course of intelligence collection efforts, related to public safety or potential criminal activity."<br><br>The police commissioner must approve in writing the use of non-official BPD social media accounts | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | by investigative units, who must keep a log of all postings. Acceptable uses "for legitimate law enforcement purposes includes a member creating and/or using a fictitious social media account, user profile, avatar or similar form of online identification."<br><br>(Note: it's not clear from the policy whether "non-official BPD social media account" is the same as a fictitious account.) | |
| **Champaign, IL** | Use of Social Media (2012) https://champaignil.gov/police/about-us/policies-and-procedures/ | "Social media is a valuable investigative tool when seeking evidence or information about:<br>f.  Missing persons<br>g.  Wanted persons<br>h.  Gang participation<br>i.  Crimes perpetrated online (i.e., cyberbullying, cyberstalking); and<br>j.  Photos or videos of a crime posted by a participant or observer."<br><br>No further guidance regarding use for investigative activity. | | | | | |
| **Cincinnati, OH** | Social Media (2013) https://www.cincinnati-oh.gov/police/assets/File/Procedures/14205.pdf Real Time Crime Center Information Requests (2012): https://www.cincinnati-oh.gov/police/assets/File/Procedures/14210.pdf Note: the PD's policy references a City of Cincinnati | Introduction states that "social media provides a new and potentially valuable means of assisting the Department and its personnel" in various objectives, including investigative.<br><br>No specific language governing investigative use. | | | | Only people authorized by section/bureau commander may post on social media sites in covert capacity.<br><br>(Note: the RTCC's policy states the same thing: "No Department member will engage in covert data mining without the consent of his/her commander. This includes using covert accounts on social media."<br><br>Individuals acting in covert capacity must use designated computers/devices, and may not use privately owned devices. | Use of personally owned devices to conduct official duties is prohibited without prior approval. Personnel may never conduct covert social media investigations from privately owned devices. | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Administrative Rule No. 59 on Social Media, but I haven't been able to locate it. | | | | | With respect to impersonation, personnel "may not take on the identity or use the personal information or likeness/photograph of another without that person's consent." | | |
| **Delaware Valley Intelligence Center (DVIC or PPD/DVIC – the fusion center under the Philadelphia police department)** | Guidelines for the Use of Social Media by the PPD/DVIC (2015) https://www.muckrock.com/foi/philadelphia-211/philadelphia-pd-social-media-surveillance-23628/#file-84574 Note: portions of the policy are redacted. The policy begins on page 17 of the documented embedded at the link. | PPD/DVIC personnel can use social media "for a valid law enforcement purpose" – specifically: 1. Crime analysis & situational assessment reports; 2. Criminal intelligence development; 3. Criminal investigations; and 4. Public safety. Employees may only use social media to seek or retain information that: 1. Is based upon a criminal predicate or threat to public safety; or 2. Is based upon reasonable suspicion that an identifiable individual or organization has committed a crime or is involved in or is planning criminal conduct or activity that poses a threat to an individual, the community, or the nation, and the information is relevant to the criminal conduct or activity; or 3. Is relevant to investigation & prosecution of suspected crimes, the resulting justice system response, the enforcement of | Social media may not be used to seek or retain information about: • Individuals or organizations solely on the basis of religion, political association, social views or activities; • Individual's participation in particular non-criminal organization or lawful event; • Individual's race, ethnicity, citizenship, place of origin, disability, gender, or sexual orientation, unless relevant to individual's criminal conduct or activity or if required for identification; • Individual's age, other than to determine if person is a minor. | A section on Documentation and Retention notes that "crime analysis and situational assessment reports may be prepared for special events management, including First Amendment-protected activities." A subsequent portion of that section is redacted. | No authorization needed for "general research, topical information or other law enforcement uses" in the public domain. Entire remainder of section of policy titled "Authorization to Access Social Media Websites," which covers "the authorization necessary to utilize social media and access social media websites for crime analysis and situational awareness or assessment reports; intelligence development; and criminal investigations" is redacted. | | | "Given the ease with which information can be gathered from public internet searches, tracking services, and other computer analytic technology, the use of employee's personal or family internet accounts, social media or internet service for official PPD/DVIC business is prohibited." |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | sanctions, orders, or sentences, or the prevention of crime; or 4. Is useful in crime analysis or situational assessment reports for the administration of criminal justice and public safety.<br><br>Note that the policy also addresses the use of social media monitoring tools – that language is not included here, as the MPD has represented that they are no longer using collators. | | | | | |
| **Denver, CO** | Social Media (approx. 2018) https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf | "Social media assists the department in meeting community outreach, problem-solving, investigations, and crime prevention objectives. Additionally, social media is a valuable tool when seeking evidence or information regarding missing persons, wanted persons, gang activity, crimes perpetuated online and/or photographs or videos of a crime to assist in case solvability."<br><br>The policy has little additional specific information or guidance; most of the policy is focused on public-facing use, and it appears that even for investigations, primarily what's contemplated is finding information about potential suspects that could be posted as leads to the department's social media account. Note that it does envision the use of personal accounts for investigations. | | | | "Investigative units may use non-official social media accounts for investigative purposes with the written permission of the Chief of Police." | |
| **El Paso County** | Investigative Use | No guidance on how social | | | No supervisory | If an officer finds | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Sheriff's Office** | of Social Media and Internet Sources (Lexipol, 2019) http://shr.elpasoco.com/sites/default/files/assets/Documents/Policy/300/334_Social_Media.pdf | media may be used for investigative purposes. | | | approval required to access information that doesn't require an account, password, email address, alias, etc. (eg, publicly available Tweets), when used for "legitimate investigative purposes." Supervisory approval required when accessing information from an internet source that requires an account, password, email address, alias, etc. | | | information relevant to a criminal investigation while off-duty or using his or her own equipment, he or she should "note the dates, times, and locations of the information and report the discovery to his/her supervisor as soon as practicable." Someone should then "attempt to replicate the finding when on-duty and using department equipment." | |
| **Gaithersburg, MD** | General Order: Social Media (2011) http://apps.gaithersburgmd.gov/general_orders/12021_Social_Media.pdf | Introduction states that "social media provides a new and potentially valuable means of assisting the Department and its personnel" in various objectives, including investigative. Policy states that "Social media can be a valuable investigative tool when seeking evidence or information about: a. Missing persons b. Wanted persons c. Gang participation d. Crimes perpetrated online (i.e., cyberbullying, cyberstalking); and e. Photos or videos of a crime posted by a participant or observer." No further language governing investigative use. | | | | | | | |
| **Los Angeles** | Social Media User | Social media may be used for | | | | A *Fictitious Online Persona* (FOP) is a | | "Department personnel | First |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **(LAPD)** | Guide (2015) http://michaelkohlhaas.org/wp/2019/04/22/presenting-copies-of-lapd-social-media-policies-and-guidelines-including-comprehensive-handbook-promulgated-in-2015-by-charlie-beck-explaining-how-to-use-social-media-in-investigations/ Note that there is also a set of Intelligence Guidelines for Major Crimes Division, Anti-Terrorism Intelligence Section (2012). I did not include information from those here, since they apply only to terrorism investigations, not criminal investigations. | "listening": "reviewing social media for items of importance." Three primary recognized uses of social media: 1. Situational awareness: "passive and active searching for information impacting operations." 2. Investigations: use of social media to collect evidence for criminal case. SM use can be covert and/or clandestine. 3. Community relations and engagement. | | | | "fictitious identity created on the Internet." *Online Investigative Activity* (OIA) is the use of a FOP to "engage in investigative activity." Use of FOPs to look at trends & tactics or to conduct research does **not** constitute Online Investigative Activity. *Online Undercover Activity* (OUA) involves using a FOP to "engage in ongoing interactive communication existing over the Internet with an identified person or group" in relation to an ongoing investigation. The policy sets out a process for obtaining approval from a commanding officer to use a FOP or conduct OUA. It does not set a time limit on use of FOPs or require a review at set intervals. | may use personal equipment to access information via social media sites when performing an authorized law enforcement mission with prior approval from the employee's commanding officer." | Amendment: Social media sites are primarily a platform for expression, & the department recognizes this right. Employees shouldn't interfere with rights to free speech, except for non-constitutionally protected speech (eg, bomb threats), and may not act as agent provocateurs. Fourth Amendment: employees should comply with Fourth Amendment protections re: password-protected or otherwise private social media sites or forums. Case law is still developing. Many posts are public, but employees must be mindful of both legal issues & community expectations. |
| **Lower Merion Township, PA** | General Order: Social Media (2014) https://www.lowermerion.org/home/showdocument?i | "Social media provides a potentially valuable means of assisting the Department and its personnel" in meeting various objectives, including investigative. | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | d=15012 | Policy adds that "social media is a valuable investigative tool when seeking evidence or information about missing, wanted or endangered persons, gang participation, crimes perpetrated online (i.e., cyber bullying, cyber stalking) and photographs or videos of a crime posted by a participant or an observer."<br><br>No additional language governing use for investigative purposes. | | | | | |
| **New York Police Department (NYPD)** | Use of Social Networks for Investigative Purposes – General Procedure (2012) https://assets.documentcloud.org/documents/1507881/responsive-documents.pdf; Revised Handschu Guidelines for Investigations Involving Political Activity (2017) https://www.aclu.org/legal-document/raza-v-city-new-york-exhibit-order-approving-stipulation-settlement-revised-handschu | "Data contained within social network sites may assist law enforcement in gathering timely information in furtherance of crime prevention, preservation of public order, and the investigation of criminal activity, including suspected terrorist activity." | Under the *Handschu* decree, any NYPD investigation involving political activity must be initiated by and under the supervision of the Intelligence Division. Members "shall not conduct investigations on social networks involving political activity without the express written approval of the Deputy Commissioner, Intelligence." | | "No prior authorization is ever required for information contained on publicly available internet sources."<br><br>"No conferral or authorization is required for general research, topical information or other general uses that do not require the acquisition of an online alias/online alias access."<br><br>The Handschu guidelines further state that the department "is authorized to carry out general topical research, including conducting online searches and accessing online sites and forums as part of such research on the same terms and conditions as members of the | Where an online alias would serve an investigative purpose (other than suspected terrorist activity), policy sets out a process for obtaining approval from commanding officer with notice to bureau chief/deputy commissioner.<br><br>Where application for an online alias involves suspected terrorist activity, the Intelligence Division must be notified and given a chance to take over the investigation. | Because of ease of gathering information from an internet search, NYPD recommends that members not use "personal, family, or other non-Department Internet accounts or ISP access for Department business." | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | public generally." "General topical research" is defined as "research concerning subject areas that are relevant for the purpose of facilitating or supporting the discharge of investigative responsibilities. **It does not include online searches for information by individuals' names or other individual identifiers**, except where such searches are incidental to topical research, such as searching to locate writings on a topic by searching under the names of authors who write on the topic, or searching by the name of a party to a case in conducting legal research." (emphasis added) | | | |
| Pasadena, CA | Investigative Use of Social Media and Internet Sources (Lexipol 2017) https://www.cityofpasadena.net/wp-content/uploads/sites/28/Policy-605-Investigative-Use-of-Social-Media-and-Internet-Sources.pdf | No explicit approved or disapproved uses. "Use of social media … to access information for the purpose of criminal investigation shall comply with applicable laws, city's internet use policy and policies regarding privacy, civil rights and civil liberties. The Pasadena Police Department will continually balance the use of investigative tools against concerns regarding unwarranted government surveillance. Information gathered via the Internet should only be accessed by | | | No supervisory approval required to access information that doesn't require an account, password, email address, alias, etc. (eg, publicly available Tweets), when used for "legitimate investigative purposes." Supervisory approval required when accessing information from an internet source that requires | | If an officer finds information relevant to a criminal investigation while off-duty or using his or her own equipment, he or she should "note the dates, times, and locations of the information and report the discovery to his/her supervisor as soon as practicable." Someone should then "attempt to replicate the finding when on-duty and using department equipment." | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | members while on-duty and for purposes related to the mission of this department." | | | an account, password, email address, alias, etc. | | |
| **Philadelphia, PA** | Social Media and Networking (2012) https://www.phillypolice.com/assets/directives/D6.10-SocialMediaAndNetworking.pdf | "Social media provides a contemporary and potentially valuable means of assisting the department and its personnel in meeting several police strategies," including investigations.<br><br>No additional guidance regarding use in investigations. | | | | |
| **Salt Lake City, UT** | Investigative Use of Social Media and Internet Sources (Lexipol 2019); First Amendment Assemblies (Lexipol 2019) http://www.slcdocs.com/police/ppm.pdf | During course of an investigation, if officer finds social media profile of a victim, witness, or suspect, he or she can use social media to contact the person, using the officer's own name (but *not* a personal account) or an alias. "If contact is established:<br>a. A member will immediately identify themselves and provide contact information.<br>b. Members must consider whether contacting the subject in this manner will reveal an individual's cooperation with law enforcement and whether that will pose an undue risk to that individual's personal safety.<br>c. Members must consider the implications of this type of contact for the case being investigated.<br>d. Members shall not use personal accounts to make such contacts." | From First Amendment Assemblies policy:<br><br>"In order to properly assess the potential impact of a public assembly or demonstration on public safety and order, relevant information should be collected and vetted" – including "assessing social media outlets." | | An online alias can only be used to seek or retain information that:<br>a. Is based upon a criminal predicate or threat to public safety; or<br>b. Is based upon a reasonable suspicion that an identifiable individual or organization has committed a crime or is involved in/is planning criminal conduct/activity that presents a threat to an individual/ community/ the nation, and the information is relevant to the criminal activity; or<br>c. Is relevant to investigation & prosecution of suspected criminal incidents or prevention of crime;<br>d. Is useful in crime analysis or situational assessment reports for the administration of criminal justice and public safety.<br><br>Immediate supervisors must authorize use of online alias.<br><br>(Note that the language above mirrors the language in other policies, but here it is only with respect to use of aliases, whereas in the other policies it applies to use of social | If an officer finds information relevant to a criminal investigation while off-duty or using his or her own equipment, he or she should "note the dates, times, and locations of the information and report the discovery to his/her supervisor as soon as practicable." Someone should then "attempt to replicate the finding when on-duty and using department equipment."<br><br>Members may not use personal accounts to make contacts with victims/ witnesses/ suspects. | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | media overall. In addition, the situational assessment language is quite broad & offers a lot of latitude for collection of information via fictitious accounts.<br><br>Online undercover activity (OUA) occurs when a member using an online alias interacts with someone via social media. OUA may only occur "when there is a reason to believe that criminal offenses have been, will be, or are being committed" – that is, members may not interact with people online via an alias for the purpose of situational assessment. | |
| **Seattle, WA** | Social Media (2016) http://www.seattle.gov/tech/about/policies-and-directors-rules/social-media-use-policy | No particular guidance on use for investigative purposes. | | | | "Any employees using non-official social media accounts for investigative purposes will obtain written permission from the Chef of Police, regardless of duty assignment." They must maintain a log of all postings. | |
| **Topeka, KS** | Social Media (2016) https://s3.amazonaws.com/cot-wp-uploads/wp-content/uploads/police/policies/3.11SocialMedia.pdf ; Investigations and Crime Scenes (2018) https://s3.amazonaws.com/cot-wp-uploads/wp-content/uploads/police/policies/4.16InvestigationsandCrimeScenes.pdf | "Access and use of social media may be valuable investigative tools and may be used in conformance with this order to assist with investigations and intelligence gathering, including but not necessarily limited to:<br>1. Missing persons;<br>2. Wanted persons;<br>3. Gang participation;<br>4. Criminal activity generally;<br>5. Crimes perpetrated online (e.g., cyber bullying, cyber stalking); and<br>6. Photos or videos of a crime posted by a participant/ observer."<br><br>Few additional details, except that Manual on Investigations and Crime Scenes states that | | | | Bureau Commander must authorize prior to using a fictitious account/identity as part of an investigation.<br><br>No details provided regarding authorization process. | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | "public domain computer searches" are a potential source of background information during a follow-up investigation on a crime scene. | | | | | |