**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ACLU OF TENNESSEE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:17-cv-02120-JPM-jay |
| v. | ) | |
| | ) | |
| CITY OF MEMPHIS, TENNESSEE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER DENYING DEFENDANT CITY OF MEMPHIS'S SEALED MOTION FOR IMMEDIATE MODIFICATION OF THE KENDRICK CONSENT DECREE

Before the Court is Defendant City of Memphis's (hereinafter "the City") September 25, 2019 Sealed Motion for Immediate Modification of the Kendrick Consent Decree. (ECF No. 227.) The City moves the Court pursuant to Federal Rule of Civil Procedure 60(b)(5) for "immediate relief from Section I of the September 14, 1978 Order, Judgment and Decree entered in the case of <u>Kendrick, et al v. Chandler, et al.</u>" (<u>Id.</u> at PageID 7699.) For the reasons set forth below, the City's Sealed Motion for Immediate Modification of the Kendrick Consent Decree is **DENIED**.

## I.      BACKGROUND

On September 14, 1976, a group of residents of the City of Memphis and the American Civil Liberties Union in West Tennessee filed an action against the City and several city officials. (Case No. 2:76-cv-00449, ECF No. 2.) The <u>Kendrick</u> Complaint asserted that the Memphis Police Department violated the plaintiffs' protected First, Fourth, Fifth, Sixth, Ninth,

and Fourteenth Amendment Rights by establishing a "Domestic Intelligence Unit whose purpose was to investigate and maintain files upon citizens engaged in non-criminal, constitutionally protected activities which were thought to be 'subversive' and/or advocating unpopular or controversial political issues." (Id. at ¶ 6.) The Kendrick plaintiffs further alleged that the City and the Memphis Police Department burned the Domestic Intelligence Unit's files rather than turning them over to the Court, following the Court and the plaintiffs' discovery of the Domestic Intelligence Unit's existence. (Id. at ¶ 9.)

On September 14, 1978, the District Court entered an Order, Judgment, and Decree with the consent of the Kendrick plaintiffs and defendants. (Case No. 2:76-cv-00449, Kendrick Consent Decree, ECF No. 16.) The Kendrick Consent Decree's "Statement of General Principles" provides:

> The provisions of this Decree prohibit the defendants and the City of Memphis from engaging in law enforcement activities which interfere with any person's rights protected by the First Amendment to the United States Constitution including, but not limited to, the rights to communicate an idea or belief, to speak and dissent freely, to write and to publish, and to associate privately and publicly for any lawful purpose.

> Furthermore, even in connection with the investigation of criminal conduct, the defendants and the City of Memphis must appropriately limit all law enforcement activities so as not to infringe on any person's First Amendment rights.

(Id. at § A.) The Kendrick Consent Decree generally provides the following: (1) it prohibits the City and the Memphis Police Department from engaging in conduct that impermissibly interferes with the exercise of First Amendment Rights; (2) it regulates the ways in which the City is permitted to interfere with its citizens' exercise of their First Amendment Rights; and (3) it further requires the City to publicize the Consent Decree and familiarize law enforcement personnel with its requirements. (Id. at §§ C–J.) Section I of the Kendrick Consent Decree

provides that the City "shall not encourage, cooperate with, delegate, employ or contract with, or act at the behest of, any local, state, federal or private agency, or any other person, to plan or conduct any investigation, activity or conduct prohibited by this Decree."  (Id. at § I.)  Section G of the Kendrick Consent Decree provides a detailed approval process by which the Memphis Director of Police is to review and authorize lawful criminal investigations that "may result in the collection of information about the Exercise of First Amendment rights, or interfere in any way with the exercise of such First Amendment rights."  (Id. at § G.)

On February 22, 2017, a group of individual plaintiffs, including Elaine Blanchard, Keedran Franklin, Paul Garner, and Bradley Watkins (collectively, the "Blanchard Plaintiffs"), filed a Complaint against the City to enforce the terms and conditions of the Kendrick Consent Decree, alleging that certain activities engaged in by the City, including an "escort list" that named the Blanchard Plaintiffs, violated the Decree.  (ECF No. 1.)  On March 2, 2017, the City filed a Motion to Dismiss the Blanchard Plaintiffs on the grounds that they lacked standing to enforce the Kendrick Consent Decree.  (ECF No. 8.)  On March 2, 2017, the American Civil Liberties Union of Tennessee (hereinafter "ACLU") filed its Motion to Intervene as Plaintiff in the litigation, and the Court granted the Motion shortly thereafter.  (ECF No. 12, 14.)  On March 3, 2017, the ACLU filed its Intervenor Complaint.  (ECF No. 16.)   On March 8, 2017, the City also filed a Motion to Dismiss the ACLU's Complaint, alleging that the ACLU was not a party to the Consent Decree and therefore lacked standing to enforce its terms and provisions.  (ECF No. 41.)  The Court granted the City's Motion to Dismiss as to the Blanchard Plaintiffs, but denied its Motion to Dismiss as to the ACLU.

On August 10, 2018, the Court granted in part and denied in part the ACLU's Motion for Summary Judgment.  (ECF No. 120.)  The Court found that the City had violated portions of the

Kendrick Consent Decree by gathering "'political intelligence' as defined and prohibited by the Decree" and by "fail[ing] to review and issue written authorizations for at least some lawful investigations of criminal conduct that 'may result in the collection of information about' or 'interfere in any way with' the 'exercise of First Amendment rights.'" (ECF No. 120 at PageID 4854–55.)

The Court held a four-day non-jury trial beginning on August 20, 2018. (ECF Nos. 128–131.) On October 26, 2018, the Court entered its Trial Order and Opinion, in which it found that the ACLU had proven by clear and convincing evidence that the City had violated the Kendrick Consent Decree in numerous respects. (ECF No. 151 at PageID 6242–43.) Such actions included the City's unlawful gathering of political intelligence in direct violation of the Decree, the City's unlawful maintenance of political intelligence gathered as a result of such investigations, its dissemination of such political intelligence to third-party non-law enforcement individuals and entities, its failure to adequately instruct Memphis Police Department officers on the Decree's requirements, and the City's failure to establish an investigative approval process as required by § G of the Decree. (ECF No. 151 at PageID 6242–43.) The Order also provided guidance as to how the City may comply with the Decree going forward, and recognized that "the requirements of the 1978 Kendrick Litigation Consent Decree impose significant burdens on the City and the MPD." (Id. at PageID 6243.)

On October 29, 2018, the Court issued its Order Memorializing Sanctions. (ECF No. 152.) The Court imposed five categories of sanctions on the City and appointed an Independent Monitor to "supervise the implementation of the sanctions." (ECF No. 152 at PageID 6289–90.) These categories of sanctions included: (1) that the City revise its departmental policies to include a definition of "political intelligence"; (2) that the City establish a training program for

4

members of the Memphis Police Department on the meaning of political intelligence and instruct the officers that "political intelligence is not permissible as a goal of an investigation nor as a means to an end of an otherwise lawful investigation"; (3) that the City create an approval process for investigations into unlawful conduct that may incidentally result in the gathering or collection of political intelligence, with the City to submit to the Court a proposed authorization mechanism in compliance with § G of the Decree; (4) that the City create and submit to the Court guidelines for officers on the use of social media searches and social media collators in compliance with the Decree; and (5) that the City submit a periodic list of all search terms entered into social media by Memphis Police Department officers.  (Id. at PageID 6287–90.) The Court, with the consent of the parties, appointed Edward Stanton III as the Independent Monitor to supervise the City's compliance with the Court's Order.  (ECF No. 176.)

On August 15, 2018, the City filed a Motion for Relief from Judgment or Order, seeking to vacate or modify the Kendrick Consent Decree.  (ECF No. 124.)  On October 9, 2018, the ACLU filed its Response in Opposition to the City's Motion for Relief from Judgment or Order. (ECF No. 149.)  The ACLU requested in its Response that if the Court did not deny the City's Motion, that the Court permit discovery and an evidentiary hearing to determine whether modification of the Consent Decree is appropriate.  (Id. at PageID 6218–19.)  On November 14, 2018, the Court entered a Consent Decree Modification Scheduling Order, which set an evidentiary hearing for July 8, 2019, and provided a discovery timeline as well as a public comment period.  (ECF No. 159.)  On December 20, 2018, the parties filed a Joint Motion to Stay the City's Motion to Modify and/or Vacate Judgment, in which the parties stated their belief that with the Independent Monitor's guidance could "significantly narrow, and possibly even eliminate, many of the disputed issues before the Court."  (ECF No. 175 at PageID 6257.)  The

Court granted the Motion and stayed all deadlines related to modification. (ECF No. 178.) The Court also set a telephonic status conference for January 2, 2020 to discuss the City's Motion for Relief from Judgment. (ECF No. 178.)

On August 27, 2019, the Court held a hearing to discuss the Monitor's Second Quarterly Report. (ECF No. 222.) During the hearing, the City requested an in-camera conference with the Court, to discuss certain time-sensitive, security-related issues that required prompt resolution by the Court. (ECF No. 224.) During the Conference, the City raised certain issues regarding outstanding requests for authorization ("RFA") submitted to the Independent Monitor. (Id.)

On September 25, 2019, the City filed its Sealed Motion for Immediate Modification of the Kendrick Consent Decree. (ECF No. 227.) The Motion addresses some of the issues raised by the City during the in-camera conference held on August 27, 2019. (Id.); see infra Sec. III.3. On October 9, 2019, the ACLU filed its Response to the City's Motion for Immediate Modification of the Consent Decree. (ECF No. 231.) The Court granted the City's Motion for Leave to Reply on October 16, 2019, requiring the City to file its Reply no later than October 31, 2019. (ECF No. 237.) On October 31, 2019, the City filed its Reply. (ECF No. 244.)

## II.    LEGAL STANDARD

"A consent decree is essentially a settlement agreement subject to continued judicial policing." Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir. 1983). A consent decree shares the characteristics and "attributes of both a contract and of a judicial act." Id. (citing United States v. ITT Cont'l Banking Co., 420 U.S. 223, 236 n.10 (1975)). "It is both 'a voluntary settlement agreement which could be fully effective without judicial intervention' and 'a final

judicial order . . . plac[ing] the power and prestige of the court behind the compromise struck by the parties.'" Vanguards of Cleveland v. City of Cleveland, 23 F.3d 1013, 1017 (6th Cir. 1994) (quoting Williams, 720 F.2d at 920).  Because a consent decree "memorializes the bargained for position of the parties," it should be "strictly construed to preserve the bargained for position of the parties."  Id.; see ITT Cont'l Banking Co., 420 U.S. at 238; see also Vogel v. City of Cincinatti, 959 F.2d 594, 598 (6th Cir. 1992).  Additionally, the "'scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it' or by what 'might have been written had the plaintiff established his factual claims and legal theories in litigation.'"  Vanguards, 23 F.3d at 1017 (quoting Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 574 (1984)).

However, because a consent decree also constitutes a final judicial order, "[o]nce approved, the prospective provisions of a consent decree operate as an injunction.'"  Waste Mgmt. of Ohio, Inc. v. City of Dayton, 132 F.3d 1142, 1145 (6th Cir. 1997).  This quality allows the district court to "retain jurisdiction over the decree during the term of its existence," to "protect the integrity of the decree with its contempt powers," and to "modify the decree should 'changed circumstances' subvert its intended purpose."  Williams, 720 F.2d at 920.  This judicial nature also implicates a court's interpretation of the decree, whereby the court is "not bound under all circumstances by the terms contained within the four corners of the parties' agreement."  Waste Mgmt. of Ohio, 132 F.3d at 1146.

Additionally, because of this judicial character, Federal Rule of Civil Procedure 60(b) applies to consent decrees.  Rufo v. Inmates of Suffolk Cty. Jail, 502 U.S. 367, 378 (1992).  Rule 60(b) sets out six grounds by which a party, upon motion, may be relieved of "a final judgment, order, or proceeding."  Fed. R. Civ. P. 60(b)(1)–(6).  Rule 60(b)(5) provides that a party may

seek relief from a final judgment, order or proceeding on the grounds that "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5).

Under Rule 60(b)(5), the "party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." Rufo, 502 U.S. at 383. Additionally, if "the party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." Id. "A party seeking modification of a consent decree may meet its initial burden by showing either a significant change either in factual conditions or in law." Id. at 384; Horne v. Flores, 557 U.S. 433, 457 (2009) (holding that Rule 60(b)(5) "provides a means by which a party can ask a court to modify or vacate a judgment or order if a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest" (internal quotations omitted)). "Modification of a consent decree may be warranted" under Rule 60(b)(5) "when changed factual conditions make compliance with the decree substantially more onerous," "when a decree proves to be unworkable because of unforeseen obstacles," and "when enforcement of the decree without modification would be detrimental to the public interest." Vanguards, 23 F.3d at 1018 (quoting Rufo, 502 U.S. at 367).

Although "[a] consent decree must of course be modified if, as it turns out later, one or more of the obligations placed upon the parties has become impermissible under federal law," a district court may, but not must, modify a consent decree "when the statutory or decisional law has changed to make legal what the decree was designed to prevent." Rufo, 502 U.S. at 388; see, e.g., Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright, 364 U.S. 642, 651 (1961) (noting that a court-ordered decree should be modified when "a change in law brings [the decree] in

conflict with statutory objectives").  In the context of consent decrees concerning constitutional rights, parties may "save themselves the time, expense, and inevitable risk of litigation" by entering into a settlement that does "more than the Constitution itself requires . . . but also more than what a court would have ordered absent the settlement." Id. at 389.  In such situations, a district court does not abuse its discretion by entering a decree that does more than is required by the Constitution when it "clearly was related to the conditions found to offend the Constitution." Id. (citing Milliken v. Bradley, 418 U.S. 717, 738 (1974)).  Further, "[t]o hold that a clarification in law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in institutional reform litigation." Id. (citing Plyler v. Evatt, 924 F.2d 1321, 1327 (4th Cir. 1991)).  To allow such a holding would "do violence to the obvious intention of the parties that the decretal obligations assumed by the state were not confined to meeting minimal constitutional standards," and would procedurally "make necessary . . . a constitutional decision every time an effort was made either to enforce or modify the decree by judicial action." Plyler, 924 F.2d at 1327.

Although a clarification of the law subsequent to the entry of the decree is not by itself sufficient grounds for modification, it can justify modification "if the parties had based their agreement on a misunderstanding of the governing law" at the time of the decree. Id.  For example, a district court should have modified a consent decree when the "parties had interpreted an ambiguous equitable decree in a manner contrary to District Court's ultimate interpretation and the District Court's interpretation was contrary to intervening decisional law." Id. (referencing Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 437–48 (1976)). Additionally, decrees "exceed appropriate limits if they are aimed at eliminating a condition that

does not violate [federal law] or does not flow from such a violation." Milliken, 433 U.S. at 282; Horne, 557 U.S. at 450.

The Supreme Court has also made clear that courts should take a flexible approach to modification under Rule 60(b)(5) in the context of institutional reform decrees. Horne, 557 U.S. at 450; Rufo, 502 U.S. at 381; Lorain N.A.A.C.P. v. Lorain Bd. Of Educ., 979 F.2d 1141, 1149 (6th Cir. 1992). A flexible approach is necessary in the context of institutional reform decrees because such decrees "remain in force for many years, and the passage of time frequently brings about changed circumstances . . . that warrant reexamination of the original judgment." Horne, 557 U.S. at 447–48. Additionally, such decrees implicate "sensitive federalism concerns" and involve dynamics not found in other types of litigation. Id.; Missouri v. Jenkins, 515 U.S. 70, 99 (1995). Public officials may "consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law," and binding later local officials to such decisions may "improperly deprive future officials of their designated legislative and executive powers." Horne, 557 U.S. at 448–49 (quoting Frew v. Hawkins, 540 U.S. 431, 441 (2004)). The court must "defer to local government administrators" when making modifications to an institutional reform decree, because such individuals have the "'primary responsibility for elucidating, assessing, and solving' the problems of institutional reform." Id. (quoting Brown v. Board of Education, 349 U.S. 294, 299 (1955)). While a decree may require such officials to "do more than is minimally requires by the Constitution, . . . a court should surely keep the public interest in mind on ruling on a request to modify based on a change in conditions making it substantially more onerous to abide by the decree." Id. at 392.

Although the Rule 60(b)(5) standard for modification of institutional reform consent decrees is "flexible," modification will not "be warranted in all circumstances." Rufo, 502 U.S.

at 383. "Rule 60(b)(5) provides that a party may obtain relief from a court order when it is no longer equitable that the judgment should have prospective application, not when it is no longer convenient to live with the terms of the decree." Id. (internal quotations omitted).

Finally, if the moving party establishes that a change in fact or law warrants a court-ordered modification of a consent decree, the court must still determine whether "the proposed modification is suitably tailored to the changed circumstances." Rufo, 502 U.S. at 391. In making such a determination, "three matters should be clear." Id. First, "a modification must not create or perpetuate a constitutional violation." Id. Second, "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor." Id. at 391. Third, "The Court should not turn aside to inquire whether [the plaintiff's claims] could have been opposed with success if the Defendants had offered opposition." Id. at 391–92 (quoting United States v. Swift & Co., 286 U.S. 106, 116–17 (1932)) (internal quotations omitted). This limited review is warranted because "a consent decree is a final judgment that may be reopened only to the extent that equity requires." Id.

## III. ANALYSIS

The City moves the Court pursuant to Rule 60(b)(5) "to modify the decree by vacating or significantly modifying Section I of the Decree, as interpreted by the Monitor, because it unduly burdens legitimate investigative activities and creates restrictions that are unnecessary for the protection of First Amendment rights." (ECF No. 227-1 at PageID 7704.) The City argues that § I unduly burdens legitimate law enforcement activities because "[t]he City has interpreted [§ I] to prohibit it from using other agencies or persons as 'surrogates' to do indirectly what it could

not do directly . . . [and] prevents inter-agency law enforcement information-sharing and cooperation." (Id.)

As grounds for its proposed modification, the City contends first that First Amendment decisional law has changed since the entry of the Decree in 1978, and, because of this change, the Decree "does not directly protect any federal right." (Id. at PageID 7704.) The City specifically relies on a line of Sixth Circuit decisions interpreting Laird v. Tatum, 408 U.S. 1 (1972), and in particular Gordon v. Warren Consol. Bd. of Educ., 706 F.2d 778, 781 (6th Cir. 1983), for the proposition that "investigation or surveillance does not violate First Amendment rights, even though the investigation or surveillance may be targeted at a particular socio-political group or at the group's First Amendment activities." (ECF No. 227-1 at PageID 7708.)

The City next argues that § I of the Consent Decree "hampers the City's exercise of its legitimate law enforcement functions and requires the City to expend scarce resources to assure compliance with restrictions that go well beyond that which is required by federal law." (Id. at PageID 7713.) The City relies primarily on a Seventh Circuit decision, Alliance to End Repression v. City of Chicago, 742 F.2d 1007, 1020 (7th Cir. 1984), which the City argues supports its position that modification is necessary because the decree at issue in Alliance also affected "the ability of the Chicago Police Department to effectively protect the public." All. to End Repression, 237 F.3d at 802. (ECF No. 227-1 at PageID 7714.)

The City finally argues that the Court must modify the Kendrick Consent Decree because § I of the Decree prevents the Memphis Police Department from participating in certain joint law enforcement activities and programs. (ECF No. 227-1.) The City in particular notes the detrimental effect of the Decree on the City's participation in certain intergovernmental and non-

governmental crime-prevention agencies and programs including: (1) the City's sharing of information with federal law enforcement agencies; (2) the City's continued participation in the Joint Terrorism Task Force and the Tennessee Fusion Center; (3) the City's participation in the Multi-Agency Gang Unit; (4) the City's participation in the CrimeStoppers program; and (5) the City's information sharing with the Shelby County Sheriff's Department and Shelby County Schools.  (Id. at PageID 7715.)  The City generally contends that the Kendrick Consent Decree effectively prevents its participation in these programs and bars the sharing and gathering of information in conjunction with other law enforcement agencies.  (Id.)  The City's argument relies on its reading of the Monitor's interpretation of § I of the Decree, which the City contends would require it to vet all information received in connection with these programs.  (Id. at 7715–31.)

The ACLU does not consent to the modification and rejects the City's assertion that modification of § I of the Decree is warranted.  (ECF No. 231 at PageID 7954.)  The ACLU argues that First Amendment caselaw addressing the constitutionality of police surveillance has not changed in the intervening years so as to warrant modification of the Decree.  (Id.)  It further contends that the City "provides little in the way of specific evidence of the burden it claims to be suffering due to the restrictions on joint operations," and therefore fails to meet its burden justifying modification under Rule 60(b)(5).  (Id. at PageID 7954.)  The ACLU also asserts that the City "has offered no alternative interpretation of § I from the one it argues is the position of the Monitor," and has "failed to propose any modification to the language of § I which would be 'suitably tailored' to the change in circumstances for which it complains."  See Northridge Church v. Chapter Twp. Of Plymouth, 647 F.3d 606, 613–14 (6th Cir. 2011).  (Id. at PageID 7970.)  The ACLU additionally contends that it "should be afforded discovery and an evidentiary

13

hearing" as is required when assessing the merits of a non-consensual motion for modification of a consent decree. See United States v. Wayne Cty., 369 F.3d 508, 511 (6th Cir. 2004). (Id. at PageID 7971.) Finally, the ACLU points out that the City has not demonstrated why it is entitled to "immediate review" of the Motion in advance of the currently scheduled January 2, 2020 status conference addressing modification. (Id. at PageID 7971–72.)

The City argues in its Reply that, contrary to the ACLU's interpretation of § I of the Decree, both the Monitor and the Court have interpreted § I to require the full vetting of all information received from any source outside of the Memphis Police Department. (ECF No. 244 at PageID 8157.) The City relies on the Court's instruction in the August 27, 2019 in-camera conference addressing the September 11, 2019 National Public Safety Partnership Symposium and a series of correspondences from August 2019 between the Monitor and the City. (Id. at PageID 8156–8160.) The City's Reply provides a proposed Modification to § I, which would strike certain language including "cooperate with," "or contract with, or act at the behest of" other local, state, federal, or other private entities and law enforcement agencies to violate the Decree. (Id. at PageID 8160.) The City's requested modification would also add language to § I, allowing the receipt of information from outside law enforcement entities free from the review and authorization process mandated by § G of the Decree. (Id. at PageID 8160.) Finally, the City's Reply reiterates its arguments that the Kendrick plaintiffs would not have been able to bring their claim today, as they would lack standing to sue under Laird, Gordon, and its progeny. (Id. at PageID 8060–61.)

### 1. **Laird, Gordon, and "Subjective Chilling"**

The City argues that Laird and its Sixth Circuit progeny, specifically Gordon, establish that "if an undercover investigation or surveillance is conducted in good faith and is not designed

to regulate or constrain a person or group's First Amendment activities, then that investigation or surveillance does not violate First Amendment rights, even though the investigation or surveillance may be targeted at a particular socio-political group or at the group's First Amendment activities." (ECF No. 227-1 at PageID 7708.) The City contends that these cases stand for the proposition that "subjective chilling" of one's First Amendment rights does not amount to a constitutional violation, and that "surveillance targeting First Amendment activity as part of a good faith investigation is permissible so long as Fourth Amendment protections are observed." (ECF No. 7710, 7712 (citing Gordon, 706 F.2d at 780–81, 781 n.3).) The City specifically asserts, "In short, it is now plainly legal to engage in much of the surveillance activity the Decree was designed to prevent, making continued enforcement of most aspects of the Decree inequitable" following Gordon. (Id. at PageID 7712.)

The ACLU disagrees with the City's interpretation of these cases. It disputes the City's assertion that because "the Decree requires it to go above the constitutional floor" the Court must relieve it from the obligations of the Decree; the ACLU contends that such an assertion "is not the standard for modification or relief from a consent decree." (ECF No. 231 at PageID 7957.) The ACLU argues that although consent decrees may be modified when decisional law or statutory law makes legal the conduct that a decree was meant to prevent, "modification is not authorized simply because the parties agreed to obligations that would not necessarily be required had the case been adjudicated by the Court." Rufo, 502 U.S. at 388, 391; United States v. Michigan, 1995 WL 469430, at *14 (6th Cir. Aug. 7, 1995). (Id. at PageID 7958.) The ACLU specifically notes that the Supreme Court "rejected the defendants' claim that a clarification in the law, by itself, justified the modification," and the City must demonstrate that in addition to a change in law the "parties based their agreement on a misunderstanding of the

governing law" at the time they consented to the decree. (Id. at PageID 7958 (quoting Rufo, 502 U.S. at 390).)

Applying this standard to the Kendrick Consent Decree, the ACLU provides various arguments in support of its contentions. The ACLU argues that: (1) Laird and Gordon do not stand for the proposition that surveillance and intelligence gathering by law enforcement do not violate First Amendment rights, and instead expressly reserved ruling on whether such actions violated the plaintiffs' First Amendment rights; (2) because Laird was decided before the Kendrick Consent Decree was entered, the parties did not misunderstand First Amendment law; (3) contrary to the City's assertion, First Amendment caselaw addressing the lawfulness of police surveillance following Laird has not changed; and (4) the Kendrick Consent Decree was not so limited as to only address surveillance of protected political activities but also encompassed "law enforcement activities that interfere with any person's rights protected by the First Amendment." (Id. at PageID 7959–64.)

The City has not properly set forth the correct standard governing modification of a consent decree. A change in decisional law, alone, does not justify modification of a valid consent decree. Rufo, 502 U.S. at 388. A change in decisional law, coupled with facts demonstrating that the parties misunderstood the relevant caselaw at the time the parties entered in to the decree, may warrant modification. Id. Additionally, "[t]o hold that a clarification in law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in institutional reform litigation." Id. (citing Plyler, 924 F.2d at 1327). It is also true that modification may be warranted if the decree was "aimed at eliminating a condition that

does not violate [federal law] or does not flow from such a violation." Milliken, 433 U.S. at 282 (1977); Horne, 557 U.S. at 450.

Applying this standard to the Kendrick Consent Decree, the Court disagrees with the City's interpretation of Laird. Laird does not directly stand for the proposition that surveillance of political activities is "plainly legal" under the First Amendment. See Laird, 408 U.S. at 3. In Laird, the plaintiffs alleged that the Department of the Army was illegally surveilling "lawful and peaceful civilian political activity" and additionally was cataloguing, reporting, and disseminating information that was "thought to have at least some potential for civil disorder." Id. at 3–6.

The Court in Laird limited its holding to the question of "whether the jurisdiction of a federal court may be invoked by a complainant who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose." Id. at 10. The Court also recognized that "governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights." Id. at 13. But the Court's holding was not grounded on the lawfulness or unlawfulness of such actions. Instead, the Supreme Court based its decision on the fact that the plaintiffs failed to allege that they had "sustained, or [were] immediately in danger of sustaining, a direct injury as the result of that action." Id. at 13. The Court distinguished the facts of Laird from the facts of other cases in which it previously had found that allegations of surveillance's "chilling" effect on the plaintiffs' First Amendment-protected activities constituted an injury-in-fact for purposes of standing. Id. at 11. It noted that the "chilling" effect alleged in those cases "did not arise merely from the

individual's knowledge that a government agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual." Id. at 11. Instead, the plaintiffs' harms in those cases involved governmental action that was "regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." Id.; see, e.g., Baird v. State Bar of Arizona, 401 U.S. 1 (1971); Keyishian v. Bd. of Regents, 385 U.S. 589 (1967).

Thus, the Supreme Court did not definitively hold that the "chilling" of one's First Amendment rights was categorically *not* a cognizable claim. Instead, the Court *only* held that the plaintiffs did not have a justiciable claim because they had failed to adduce facts demonstrating they were suffering a present or imminent injury-in-fact. The Supreme Court explicitly limited its holding to this issue and did not pass judgment on the lawfulness of the defendants' actions. See id. at 15–16 ("[O]ur conclusion is a narrow one, namely, that on the record the respondents have not presented a case for resolution by the courts . . . there is nothing in our Nation's History, or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities . . . would go unnoticed or unremedied.").

The Sixth Circuit's decision in Gordon also does not affect the Court's reading of Laird's limited holding. 706 F.2d at 778–81. Gordon involved an action brought by a group of students and teachers who alleged that an undercover policewoman's investigation of potential drug trafficking, which involved in-class surveillance, violated the students' and teachers' First Amendment rights. Id. at 779–80. The police officer did not find evidence of drug trafficking or

sales, and the plaintiffs did not become aware of the investigation until over a month after the investigation ended.  Id. at 779.  The plaintiffs' complaint alleged that the "covert police surveillance and its threatened use in the future allegedly injured the plaintiff sociology and psychology teachers" and that "[t]he surveillance chilled their speech."  Id. at 780.

The Sixth Circuit affirmed the district court's decision to dismiss the complaint for "failure to state a cause of action," relying on Laird.  Id. at 780–81.  The Sixth Circuit recognized that "the mere possibility of improper use of information gained from police surveillance of unlawful activities is not itself actionable."  Id. at 780 (citing Philadelphia Yearly Meeting of the Religious Soc'y of Friends v. Tate, 519 F.2d 1335, 1337 (3d Cir. 1975)).  The court found that the plaintiffs' complaint failed to assert a "single allegation that the covert operation in and of itself resulted in tangible consequences."  Id.  Specifically, "the surveillance did not disrupt classroom activities or the education of students . . . [and] [t]he mere presence of an intelligence data-gathering activity in the classroom does not create a justiciable controversy."  Id.  The court therefore concluded that the "vague general allegations that students and teachers were harmed when news of the covert operation spread throughout the community" constituted only "a 'subjective' chilling of the First Amendment rights."  Id.  at 781.

However, the Sixth Circuit in Gordon provided some guidance as to under what circumstances allegations of chilling of one's First Amendment-protected activities may be justiciable.  Id. at 781 n.2.  The court distinguished the facts of plaintiffs' case from the facts of Philadelphia Yearly Meeting of the Religious Society of Friends v. Tate, which involved the public disclosure of "intelligence files" by the police.  Id. (citing Tate, 519 F.2d at 1335).  Such a disclosure, the court noted, "created a justiciable cause of action."  Id.  The court also distinguished the facts of Gordon from the facts of another Third Circuit case, Paton v. LaPrade,

524 F.2d 862 (3d Cir. 1975), which held that "a justiciable controversy was present where the FBI investigated a single high school student." Id. Such comparisons demonstrate that surveillance *can* constitute a justiciable First Amendment claim, so long as the complaint provides more than speculative, unspecific allegations of the chilling of plaintiffs' First Amendment rights.

Therefore, both Laird and Gordon do not make it "plainly legal" for the police to engage in open surveillance of its citizens' political activities. These cases only stand for the limited proposition that plaintiffs lack standing to challenge police surveillance when they fail to allege facts demonstrating a particularized, discrete action taken against them by the police, when they cannot demonstrate that they were singled out for surveillance, or when they fail to allege that law enforcement disclosed to the general public or third parties information gathered pursuant to police surveillance. See Gordon, 706 F.2d at 781 n.2.

Moreover, Supreme Court decisions since Laird have strongly suggested that political surveillance activities that "objectively chill" First Amendment-protected activities can overcome the standing hurdle presented by Laird. See Meese v. Keene, 481 U.S. 465 (1987). In Meese v. Keene, the Court clarified its use of the term "subjective chilling" in Laird and held that a California politician presented a justiciable First Amendment claim by providing evidence in the form of affidavits and public polling results that the Department of Justice's use of the term "political propaganda" in connection with three short films he hoped to present to the public would cause him reputational injury. Meese, 481 U.S. at 473–74. The Court found that his injury was "distinct and palatable" and amounted to more than a "subjective chilling" of his First Amendment rights. Id. at 473. The Court explained that the alleged negative impact of the requirement on Plaintiff's "personal, political, and professional reputation," as demonstrated by

public polling on how the term's association with his showing of the films would affect his personal and professional career prospects, amounted to a cognizable injury-in-fact for purposes of standing. Id. at 473–74.

The holding of Meese strongly supports a finding that a plaintiff can overcome the standing challenge presented by Laird if the plaintiff supports his claim with specific facts and evidence demonstrating that an individual's personal or professional reputation is, or likely will be, adversely affected by police surveillance of his First Amendment-protected activities. Additionally, although the Sixth Circuit has not directly addressed this issue, other circuits have applied Meese to find that such claims do, in fact, constitute cognizable First Amendment claims. See Riggs v. City of Albuquerque, 916 F.2d 582, 585–86 (10th Cir. 1990); see also Presbyterian Church (U.S.A.) v. United States, 870 F.2d 518, 522–23 (9th Cir. 1989) (applying Meese to find that the plaintiffs had standing to challenge the INS's covert, undercover videotaping and surveillance of church services after records of such information gathering was included in court filings). For example, the Tenth Circuit in Riggs v. City of Albuquerque found that the plaintiffs had sufficiently alleged "more than a chilling of their First Amendment rights." 916 F.2d at 585. The court found that the plaintiffs had alleged "harm to their personal, political, and professional reputations in the community" in connection with the discovery of a municipal police department's gathering, cataloguing, and dissemination of information related to residents' political activities. Id. The court further held, "Discovery is particularly appropriate in this case because plaintiffs do not have access to the investigative files which contain the details of the specific investigations conducted by the defendants." Id. at 586. See also Palmer v. Chicago, 755 F.2d 560, 573 (7th Cir. 1985) (stressing the importance of discovery when plaintiffs did not have access to undisclosed secret police files that were "essential in proving

[their] injury").  These cases therefore demonstrate that, contrary to the City's assertion, courts will find plaintiffs to have standing to bring their First Amendment claims when they allege only that they suffered reputational and "chilling" harms as a result of police surveillance of First Amendment-protected activities.

The line of cases cited to by the City that rely on Laird and Gordon also do not support the City's contention that "it is now plainly legal to engage in much of the surveillance activity the Decree was designed to prevent."  (ECF No. 7711–12.)  These cases, much like Gordon, refused to pass judgment on the legality of police surveillance and only addressed the question of whether the plaintiffs in those cases had standing to challenge the police surveillance of their First Amendment-protected activities in federal court.  See Am. Civ. Liberties Union v. Nat'l Sec. Agency, 493 F.3d 644, 660–61, 661 n.3 (6th Cir. 2007) (holding that plaintiffs lacked standing to challenge warrantless wiretaps and surveillance under Laird, but refusing to hold that while "there is . . . a certain view that this is not a First Amendment issue at all . . . this distinction is a merits issue that I need not—and indeed cannot—address at this stage"); see also Ghandi v. Police Dept. of City of Detroit, 747 F.2d 338, 347 (6th Cir. 1984) (finding that although the plaintiffs could not present a cognizable constitutional violation by alleging only the use of informants by the police, "Citizens are protected [] against excesses and abuses when the government engages in surveillance activities"); Handschu v. Special Servs. Div., 349 F. Supp. 766, 769–70 (S.D.N.Y. 1972) (finding that plaintiffs had sufficiently alleged an injury-in-fact by alleging that Defendant New York Police Department went beyond mere surveillance and engaged in "abusive tactics and activities with the purpose and effect of sowing distrust and suspicion among plaintiffs and others who espouse unorthodox or dissenting political and social views").  One of these Sixth Circuit cases directly cited to by the City explicitly states that the

question of whether surveillance violates the First Amendment is a "merits issue" that courts will not address after finding that a plaintiff lacks standing. <u>Am. Civ. Liberties Union</u>, 493 F.3d at 660 n.20. The Court therefore agrees with the ACLU in its Response, that "<u>Laird</u> and <u>Gordon</u> do not create new law, or clarify old law, to allow the City to use whatever surveillance it chooses without concern for the First Amendment rights of its targets. The cases merely set a threshold which a plaintiff must meet to bring a challenge based on the chilling effect of government surveillance." (ECF No. 231 at PageID 7962.)

The City also argues that <u>Gordon</u> makes legal police surveillance of political activities so long as the surveillance is part of a good faith investigation into ongoing or imminent criminal activity and complies with the Fourth Amendment. (ECF No. 227-1.) This is accurate, as <u>Gordon</u> makes this point clear. <u>See</u> <u>Gordon</u>, 706 F.2d at 781 n.3. The Kendrick Consent Decree was not designed to prevent good-faith law enforcement investigations into criminal activity within the boundaries of the Fourth Amendment. (<u>See</u> Case No. 2:76-cv-00449, Kendrick Consent Decree, ECF No. 16.) The Decree was meant only to prohibit the City's surveillance, capture, cataloguing, maintenance, and dissemination of political intelligence unrelated to any legitimate law enforcement activities. (<u>Id.</u>) However, modification of § I would erode the barrier put in place by the Decree; it acts as a bulwark, ensuring that the City's surveillance practices do not cross the line from being a powerful weapon in the fight against crime to becoming an intrusive tool that improperly interferes with its residents' First Amendment-protected activities.[1]

---

[1] <u>See</u> Matthew Wasserman, <u>First Amendment Limitations on Police Surveillance: the Case of the Muslim Surveillance Program</u>, 90 N.Y.U. L.R. 1786, 1814–15 (2015) (noting that the First Amendment acts as an "Independent Break" on police behavior, as various Supreme Court decisions have suggested that the "First Amendment offers independent protections where Fourth Amendment doctrine fears to tread"); <u>see also</u> Rory Van Loo, <u>The Missing Regulatory State</u>, 72 V<span style="font-variant:small-caps">AND</span>. L.R. 1563, 1630–31 (2019) (arguing that there needs to be a clearer line between "regulatory monitoring" and "personal surveillance" in cyberspace regulation).

The Court also reiterates that modification is not warranted just because the decree provides protections above the constitutional floor of the First Amendment's protections. See Rufo, 502 U.S. at 391. Even assuming the City's assertion to be correct, that the First Amendment permits the surveillance of political activity, the Court would not be inclined to accept a modification that "strive[s] to rewrite a consent decree so that it conforms with the constitutional floor." Id. Moreover, even if the Court agreed with the City in its assertion that Sixth Circuit precedent forecloses a finding that surveillance of political activities alone violates the First Amendment, the cataloguing and dissemination of protected political information gathered as a result of police surveillance would more readily approach a cognizable First Amendment claim. See Gordon, 706 F.2d at 781 n.2. The Decree was designed to prevent the cataloguing and dissemination of political intelligence for purposes unrelated to legitimate criminal investigations. (Case No. 2:76-cv-00449, Kendrick Consent Decree, ECF No. 16.) The circumstances that prompted the Decree were the Memphis Police Department's targeted surveillance of certain political groups and actions that went beyond surveillance alone. See supra at 20. It therefore is not correct to say that the Decree "exceed[s] appropriate limits" by "aiming at eliminating a condition that does not violate [federal law] or does not flow from such a violation." Milliken, 433 U.S. at 282; Horne, 557 U.S. at 450.

Finally, the City failed to provide evidence that the parties in Kendrick misunderstood the law at the time they agreed to the Kendrick Consent Decree. Rufo, 502 U.S. at 388. The Supreme Court decided Laird in 1972. The Kendrick Complaint was filed on September 14, 1976, approximately four years after the Supreme Court decided Laird. While the City contends that although at the time the Court entered the Decree "the plaintiffs may have had a valid federal claim . . . any such claim could not be maintained in the present day following Laird"

(ECF No. 227-1 at PageID 7712), this statement ignores the fact that the parties in <u>Kendrick</u> must have been aware of <u>Laird</u> and likely did not misunderstand the implications of the decision. Moreover, even if the City was aware that plaintiffs may have lacked standing to bring their First Amendment claims under <u>Laird</u>, it voluntarily consented to the Decree. The parties may have "save[d] themselves the time, expense, and inevitable risk of litigation" by settling the dispute, even if that Consent Decree did "more than the Constitution itself requires" and "more than what a court would have ordered absent the settlement." <u>Rufo</u>, 502 U.S. at 389. "The court should not 'turn aside to inquire whether . . . [the] action could have been opposed with success if the defendants had offered opposition.'" <u>Id.</u> at 391–92 (quoting <u>Swift</u>, 286 U.S. at 116–17).

In sum, the Court finds that the City has not demonstrated that First Amendment decisional law has changed in the intervening years since the parties consented to the Kendrick Consent Decree, nor has the City produced evidence demonstrating that the parties misunderstood <u>Laird</u> at the time they consented to the Decree. Therefore, the City is not entitled to modification of the Decree pursuant to Rule 60(b)(5) on the grounds that a change in intervening law makes the Decree inequitable.

### 2. <u>Alliance to End Repression v. City of Chicago</u>

The City next argues that the Court should modify the Kendrick Consent Decree because "it is unworkable for a modern police force . . . [by] hamper[ing] the City's exercise of its legitimate law enforcement functions and requir[ing] the City to expend scarce resources to assure compliance with restrictions that go well beyond that which is required by federal law." (ECF No. 227-1 at PageID 7713.) As stated previously, the Decree does not go "well beyond that which is required by federal law." <u>See</u> <u>supra</u> Sect. III.1. The City relies on <u>Alliance to End Repression v. City of Chicago</u>, 742 F.2d 1007, 1020 (7th Cir. 1984). The City argues that the

burden imposed on the City and the Memphis Police Department by the Kendrick Consent Decree mirrors the burden imposed on the City of Chicago by the decree at issue in <u>Alliance</u>, and therefore, just like in <u>Alliance</u> where the court deemed modification appropriate under the factual circumstances of the case, the Court similarly should modify the Kendrick Consent Decree. (<u>Id.</u> at PageID 7714–15.) Finally, the City's Motion provides specific illustrations detailing the ways in which the Decree has impeded vital law enforcement activities, topics the Court will discuss <u>infra</u>. <u>See</u> <u>infra</u> Sec. III.3.

The ACLU's Response denies the City's argument that the Kendrick Consent Decree unduly burdens legitimate law enforcement activity and is "unworkable for a modern police force." (ECF No. 231 at PageID 7694–7966.) Specifically, the ACLU contends that the City's reliance on <u>Alliance</u> is misplaced, and that the <u>Alliance</u> decree is distinguishable from the Kendrick Consent Decree. (ECF No. 231 at PageID 7695–96.) The ACLU denies that the City has met its burden for modification of the Decree and has failed to demonstrate how § I of the Consent Decree "is so draconian in its restrictions that it should be compared to provisions of the decree at issue in <u>Alliance</u>." (<u>Id.</u> at PageID 7966.)

"[M]odification of a consent decree is an extraordinary remedy that should not be undertaken lightly." <u>East Brooks Books, Inc. v. City of Memphis</u>, 633 F.3d 459, 465 (6th Cir. 2011) (quoting <u>Rufo</u>, 502 U.S. at 383 n.7). Although Rule 60(b)(5) requires the Court to take a flexible approach when considering the modification of institutional reform consent decrees, Rule 60(b)(5) warrants relief only when "it is no longer equitable that the judgment should have prospective application, not when it is no longer convenient to live with the terms of the decree." <u>Rufo</u>, 502 U.S. at 383.

The Court is not persuaded that Alliance warrants modification of the Kendrick Consent Decree. Alliance addressed the district court's refusal to modify a consent decree agreed to by the City of Chicago in 1982. 237 F.3d at 799–800. Although, like the Kendrick Consent Decree, the decree in Alliance "forbids investigations intended to interfere with or deter the exercise of the freedom of expression that the First Amendment protects," and institutes an audit system to monitor such investigations, much like § G of the Kendrick Consent Decree, the decree in Alliance involved "a dizzying array of highly specific restrictions on investigations of potential terrorists and other politically or ideologically motivated criminals." Id. at 800. Such restrictions included provisions that required the City of Chicago to have at least "reasonable suspicion" of unlawful conduct before investigating conduct that potentially implicated First Amendment rights, and provisions that prevented the collection of membership information in political groups unless it was "unavoidably necessary to the investigation of a reasonably suspected crime." Id. Additionally, the Decree required that such investigation "terminate as soon as reasonable suspicion of criminal conduct is dispelled" and that the police destroy any related documents. Id. at 800. The decree in Alliance further placed serious restrictions on the use of undercover informants and prevented police from engaging in more than a "brief preliminary inquiry" into "advocacy of violent conduct." Id.

The Kendrick Consent Decree does not provide such stringent and onerous requirements, nor does it prevent legitimate law enforcement investigations or the collection of information in connection with legitimate criminal investigations. (Case No. 2:76-00449, Kendrick Consent Decree, ECF No. 16.) The Kendrick Consent Decree specifically states that the prohibition on the "Maintenance and Dissemination of Information" does not apply to information "collected in the course of a lawful investigation of criminal conduct" that "is relevant to such investigation."

(Id. at PageID 19.)  Moreover, the authorization process detailed by the Decree is not an external, independent audit of all investigative activities.  See Alliance, 237 F.3d at 800.  (Id. at PageID 18–19.)  The authorization process is internal to the Memphis Police Department and permits investigations that may incidentally involve protected First Amendment activities, so long as it is "unavoidably necessary for the proper conduct of the investigation."  (Id. at PageID 18.)  Although the City is correct that § G limits the use of such information, it does not require a minimum showing of reasonable suspicion like the Decree in Alliance.  Moreover, unlike that decree, § G does not prohibit the use of undercover law enforcement informants, nor does it prevent investigation of activities advocating for violence.  (Id. at § G.)

Additionally, the Court is not persuaded by the City's argument that the Consent Decree "impedes the Memphis Police Department's ability to 'cope with the problems of today' because earlier generations of police were found by this Court to have acted improperly with the problems of the 1970s."  (ECF No. 227-1 at PageID 7714–15.)  In Alliance, the City of Chicago had "been in compliance with the decree throughout the almost two decades in which the decree has been in force."  Id. at 801.  The Seventh Circuit's decision heavily relied on this fact: "The states and their subdivisions have a right to the restoration of control over the institutions of state and local government upon proof that decades of compliance with a decree that had shifted that control to a federal judge."  Id. at 801 (citing Missouri, 515 U.S. at 99).  The same cannot be said of the Memphis Police Department.  (See ECF Nos. 120, 151.)  The Court's Order and Opinion following the contempt trial in this case found that many officers of the Memphis Police Department were either unfamiliar with the Decree's contents or did not understand what the Decree required of Memphis Police Department officers.  (ECF No. 151 at PageID 6266–67.)  Moreover, the Court found the City had engaged in conduct that infringed on First Amendment-

protected rights in violation of the Decree, which occurred only within the last year and a half. (Id.) Such facts prevent Alliance's analysis from readily applying to this case.

Finally, the City of Chicago requested only a modification of the "periphery" of the decree, rather than requesting the abrogation of its core principles and restrictions. All. to End Repression, 237 F.3d at 800, 802. The City requests that the Court either vacate or modify § I of the Consent Decree. (ECF No. 227 at PageID 7699.) Vacating § I would detrimentally affect one of the core principles of the Decree. Removing that section would allow the City to accept and gather political intelligence at the behest of other government law enforcement agencies in ways contrary to the core principles of the Kendrick Consent Decree. In contrast to the City's requested modification, the City of Chicago's proposal in Alliance was limited to modifications of the mechanisms by which the Chicago Police Department could investigate terrorist groups, and the exception to the audit and authorization mechanism was limited only to the investigations of documented terrorist groups once the groups had "advocated for violence." Id. at 802. Such a modification is much narrower than the City's requested modification, which would either remove, or effectively remove, § I of the Kendrick Consent Decree. See infra at Sec. III.3.a.

In sum, the Court is not persuaded that the reasoning in Alliance should apply to the Kendrick Consent Decree and the City's request for modification of § I of the Decree. The facts of Alliance and the facts of this case differ in critical ways. Moreover, as will be demonstrated infra, the Court does not find that the burdens imposed on the City by the Decree prevent it from practicing modern police techniques and from participating in intergovernmental agency task forces and crime-prevention programs.

### 3. Intergovernmental Information Sharing and § I's Burden on the City

The City additionally provides five specific issues that it argues "trigger the City's need for immediate modification or vacation of § I of the Consent Decree." (ECF No. 227-1 at PageID 7715.) These include: (1) "the City's need to receive and share intelligence with federal agencies"; (2) "the need to continue participation in the Joint Terrorism Task Force and to receive information from the Tennessee Fusion Center"; (3) "the need to continue participation in the Multi-Agency Gang Unit"; (4) "the need to continue participation in CrimeStoppers"; and (5) "the need to share information with the Shelby County Sheriff's Department which operates security within Shelby County Schools." (Id. at PageID 7715.) The City also argues that the Court, during the August 27, 2019 in-camera conference, "apparently acknowledged, in interaction with counsel for the City, that even if the intelligence gathered by the federal agency was related to a lawful criminal investigation, the City's receipt of that information would violate the Consent Decree because the federal criminal investigation was not approved by the Director under Section G of the Consent Decree." (ECF No. 244 at PageID 8158.)

The Court construes this as the City's attempt to demonstrate that changed factual circumstances warrant modification of the Decree. See Horne, 557 U.S. at 457. The Court will therefore address each of the City's arguments, and the ACLU's response to those arguments, in turn.

### a. Information Sharing with Federal Authorities

The City asserts that its concerns arise out of the Monitor's interpretation of § I of the Decree in his August 21, 2019 correspondence with the City, and the Court's consideration of these issues at the August 27, 2019 in-camera conference. (ECF No. 227-1 at PageID 7716; ECF No. 227-3.) The City argues that, under its reading of the Monitor's proposed interpretation of §

30

I, the Memphis Police Department would be required to fully vet *all* information it receives from federal law enforcement agencies to ensure that the gathering of such information complied with the Decree. (ECF No. 227-1 at PageID 7717–18.) This requirement, the City contends, effectively prevents it from receiving any such information from federal law enforcement agencies and forces the Memphis Police Department to operate with a "blind spot." (Id. at PageID 7717–18.) The City's Motion specifically refers to the Monitor's August 21, 2019 interpretation of § I of the Decree in his response to the City's July 16, 2019 request for authorization ("RFA") to coordinate with the FBI and the Secret Service. (See ECF No. 227-3 at PageID 7812–13.) The Monitor addressed two issues that, in his opinion, were raised by the RFA:

> First, to the extent that "coordinat[ing]" with the FBI or the Secret Service includes sharing personal information, the City may not coordinate with those agencies, or any others, in planning for the symposium. Section H of the Kendrick Consent Decree1 prohibits the City from "maintain[ing] personal information about any person unless it is collected in the course of a lawful investigation of criminal conduct." § H(1). It also prohibits the City from sharing "personal information . . . collected in the course of a lawful investigation of criminal conduct" unless the recipient is "another governmental law enforcement agency then engaged in a lawful investigation of criminal conduct." § H(2). I read this language to impose two applicable restrictions: (1) entirely against the sharing of personal information collected in any way other than via lawful criminal investigation (as such information may not be maintained in the first instance); and (2) against the sharing of personal information collected via lawful criminal investigation unless such sharing is with another governmental law enforcement agency and that agency already is engaged in a lawful criminal investigation. . . .

> Second, the City may not "benefit from the Intel" acquired by the FBI, the Secret Service, or any other law enforcement agencies unless the City first verifies that the information was not acquired in any way that the consent decree prohibits the City from using. Section I of the Kendrick Consent Decree forbids the City to "encourage, cooperate with, delegate, employ or contract with, or act at the behest of, any local, state, federal or private agency, or any person, to plan or conduct any . . . activity . . . prohibited by th[e] decree." I read this restriction to place the onus on the City to verify that any information it receives from governmental law enforcement agencies, non-law enforcement agencies, public and private entities,

and individuals satisfies the same standards as information lawfully collected by the City itself.

(ECF No. 227-3 at PageID 7812–13.)

The Monitor further addressed the City's concerns that "the [Kendrick] Consent Decree might prohibit the City from receiving intelligence collected by other law enforcement agencies, *e.g.* Shelby County Sheriff's Department, TBI, or FBI, that would otherwise be prohibited by the Consent Decree if obtained by the MPD." (Id. at PageID 7813.) The Monitor provided the following response:

> The City's receipt of intelligence collected by the Shelby County Sherriff's Department, the TBI, the FBI, or other law enforcement agencies would violate the consent decree unless the City first verified that the information was not acquired in any way that the consent decree prohibits, as explained in the second section of my response to the first question above. In responding to this inquiry on a conference call on June 14, 2019, I stated that the City's receipt of such intelligence would <u>not</u> violate the consent decree. Upon further review of the consent decree and the court's orders in this litigation, I continue to believe that this answer is correct—but <u>only</u> so long as all intelligence properly is verified <u>before</u> the City receives it. If intelligence collected by governmental law enforcement agencies is <u>not</u> verified before the City receives it, then the City's receipt of that intelligence <u>would</u> violate the consent decree. Moreover, if the City receives criminal intelligence from a governmental law enforcement agency for the purpose of conducting or supervising the MPD's own investigation of criminal conduct, then the City's receipt of that information also may be subject to the authorization and reporting requirements of § G of the consent decree.

(Id. at PageID 7813.)

The City's Reply argues that during the August 27, 2019 in-camera conference, the Court adopted the Monitor's interpretation and required that any information received from other agencies, "even if the intelligence gathered by the federal agency was related to a lawful criminal investigation," required full vetting in order to ensure the City's compliance with the Decree. (ECF No. 224 at PageID 8158.) Such an interpretation, the City argues, justifies modification of § I because the "[Memphis Police Department] cannot require that a federal agency, such as the

FBI or DOJ, certify that the information it shares with [Memphis Police Department] was obtained in such a way that is not violative of the Consent Decree," and that such a requirement would "have the effect of delaying the transmission of an urgent piece of intelligence that could stop, for example, a mass shooting." (Id. at PageID 7719.) Moreover, the City argues that any restrictions imposed on the "open and contemporaneous sharing of information and intelligence with federal agencies will severely hamper the ability of federal law enforcement and the MPD to prevent potential crimes in the Memphis area." (Id.) The City contends that compliance with the Decree will jeopardize its receipt of law enforcement funding from federal grants. (Id. at PageID 7720–22.) The City further justifies its argument for modification by asserting that the Court's attributed interpretation of § I of the Decree, and the effect this interpretation would have on modern law enforcement information sharing, constitute changed circumstances warranting modification of § I under Rule 60(b)(5). (ECF No. 244 at PageID 8159.)

The ACLU responds by denying that the City has met its burden demonstrating that a change in factual circumstances warrants modification, as applied to all five of the information-sharing programs specified by the City in its Motion. (ECF No. 231 at PageID 7967.) First, the ACLU contends that joint operations and information sharing between law enforcement agencies are not a new phenomenon, and it argues that the City has failed to demonstrate how such information sharing has changed in the last 40 years to justify modification of the Decree. (Id. at PageID 7967.) Next, the ACLU asserts that the City has failed to provide any concrete evidence bearing out its claims that §§ I and G of the Decree requires significant expenditure of "scarce resources to ensure compliance" with the Decree. (Id. at PageID 7967–68.) It further contends that the City has failed to demonstrate how the Decree prevents *all* information sharing with federal law enforcement agencies. (Id. at PageID 7967–68.) The ACLU explains, "Information

that is not political intelligence would be outside the scope of the Consent Decree and would require no or little vetting . . . Intelligence related to a true threat of violence or plans to commit a shooting, or any other criminal activity for that matter, would not be political intelligence and not fall within the prohibitions of the Decree."  (Id. at PageID 7969.)  The ACLU further explains that only information constituting pure political intelligence would have to be outright refused.  (Id.)  Additionally, the ACLU compares the vetting of information to the vetting of unconstitutional confessions or unlawfully obtained evidence, and that the City has "not produced evidence of what additional burden would be added to vet information for compliance with the Consent Decree in addition to any normal procedures conducted with shared information."  (ECF No. 231 at PageID 7970.)

The Court first rejects the City's assertion that it has either previously interpreted the language of § I of the Decree in the way attributed to it by the City, or that it definitively ruled on the matter during the August 27, 2019 in-camera conference.  The Court made clear that it was not ruling on any matters during the in-camera conference outside of the "narrow" issue before it, namely the September 11, 2019 Law Enforcement Symposium.  (ECF No. 232 at PageID 7894:7–15; 7996:4–22.)  The City's argument regarding the Court's previous ruling on any such matters is therefore inaccurate and incorrect.

Moreover, the Court made clear that the Independent Monitor also serves as a special master, allowing him to make preliminary determinations on certain issues brought to his attention by the parties.  (See Hearing Transcript, ECF No. 207, PageID 7819:16-25.)  The Court stated at the April 23, 2019 Hearing that although the City's "first step is always to go to the Monitor's team and seek their input," in the event that the City disagrees with the Monitor's determination, the City must, "like an appeal," file a motion or objection with the Court

requesting a final resolution of the disagreement.  See Fed. R. Civ. P. 53(f)(2) ("A party may file objections to—or a motion to adopt or modify—the master's order, report, or recommendations no later than 21 days after a copy is served, unless the court sets a different time.").  (Id.)  The time period for the City to file a motion objecting to the Monitor's interpretation of § I, and this interpretation's effects on the various programs addressed by the City in its Motion, lapsed on September 19, 2019.  Id.  The City's filing of the Motion for Modification on September 25, 2019 is therefore untimely.  (ECF No. 227.)  Despite the untimeliness of its objections, the Court will consider the merits of the City's arguments.

The Court does agree with the City that the Monitor's interpretation could plausibly be construed to require the vetting of all information received from federal law enforcement agencies to ensure the City's compliance with the Decree.  See supra at 31–33.  The Court notes that the Monitor has appropriately proceeded with caution in interpreting § I's limitations on intergovernmental information sharing, given the purposes of the Decree.  The Court's reading of the Monitor's August 21, 2019 interpretation of § I's limitations differs from the City's reading of the Monitor's interpretation.  The Monitor specifically states that under the requirements of § I of the Decree, "[t]he City's receipt of intelligence collected by . . . other law enforcement agencies would violate the consent decree unless the City first verified that the information was not acquired in any way *that the consent decree prohibits, as explained in the second section of my response to the first question above*."  (ECF No. 227-3 at PageID 7813 (emphasis added).)  The Monitor's Second Section of his response to the City's first question specifically provides that the "City may not '*benefit from the Intel*' acquired by . . . any other law enforcement agencies unless the City first verifies the information was not acquired in any way that the consent decree prohibits the City from using."  (Id. at PageID 7812 (emphasis added).)

The Monitor's reference to "Intel" is significant. Specifically, this language refers to the City's gathering and maintenance of political intelligence, which the Court defined in its Order and Opinion. (See ECF No. 151 at PageID 6256–58.) This reading of the meaning of "Intel" is supported by the Monitor's summary of the types of information that cannot be gathered, or received, by the City per the terms of § H of the Decree. (Id. at PageID 7812.) This reading is further supported by the Monitor's continued reference to "intelligence" in his description of the types of information received from federal law enforcement agencies that would require vetting under §§ I and G of the Decree. (See id. at PageID 7812–13.)

Therefore, reading these two sections of the Monitor's August 21, 2019 interpretation of § I together, the Court disagrees with the City's broad reading of the Monitor's interpretation of § I's limitations. The better reading of the Monitor's interpretation, which better comports with the purposes and protections of the Kendrick Consent Decree, would require the City to reject outright *only* information constituting political intelligence that is unrelated to any legitimate law enforcement activities, as is prohibited by § H of the Decree. Section I further requires the City to vet only information that implicates § G of the Decree, that is, information gathered as part of a legitimate law enforcement investigation that incidentally, or may incidentally, implicate protected First Amendment activities.

The Kendrick Consent Decree only prohibits the City from engaging in the collection, maintenance, and dissemination of political intelligence. (Case No. 2:76-cv-00449, ECF No. 16 at §§ C, H, J.) Under the Court's reading of § I, the Decree does not prohibit the police from receiving information gathered as the result of legitimate criminal investigations, supported by reasonable suspicion or probable cause, and unrelated to any protected First Amendment activities. Nothing in the Consent Decree would prohibit, to use the City's example, the City's

acceptance of credible information regarding the threat of a mass shooting. (See ECF No. 227-1 at PageID 7704.) Nor does the Monitor's August 21, 2019 interpretation suggest otherwise. (See ECF No. 227-3 at PageID 7811–12.)

Although § I does not require the City to reject *all* information received in the course of legitimate law enforcement investigations but that implicate, or may implicate, First Amendment-protected activities or political intelligence, § I *may* prevent the City from receiving such information from federal law enforcement agencies unless it engages in the review and authorization process required by § G of the Decree. The Court noted in its October 26, 2018 Order and Opinion that many criminal investigations present a "gray area" and require further review and authorization as contemplated by § G of the Decree. (See ECF No. 151 at PageID 6257, n.6.) That being said, the City has failed to provide the Court with any evidence to support its claim that *all* the information it receives from federal law enforcement agencies would potentially implicate First Amendment-protected activities, requiring substantial vetting pursuant to § G's authorization process. Nor is the Court persuaded that the City's review of such information, as required by § G, would be so onerous as to delay or prevent the City from acting on credible threats to public safety. The City has failed to provide evidence demonstrating that the authorization procedures mandated by § G of the Decree would impose an undue burden on the City and prevent it from receiving information from federal agencies, nor has the City provided concrete examples of how such a process would delay the Memphis Police Department's response time to serious public safety threats.

Additionally, the City attached as Exhibit G to its Motion the Department of Justice's Criminal Intelligence Operating Policies, which set out limitations on the sharing of criminal intelligence among federal law enforcement agencies and state and local law enforcement

agencies that receive federal funding.  See 28 C.F.R. § 23.20(b).  The Code specifically provides,

"A project shall not collect or maintain criminal intelligence information about the political, religious or social views, associations, or activities of any individual or any group . . . unless such information directly relates to criminal conduct or activity and there is reasonable suspicion that the subject of the information is or may be involved in criminal conduct or activity."  Id. The City, as a recipient of federal law enforcement funds, must already comply with these requirements, absent § G of the Decree's authorization process.  See 28 C.F.R. § 23.20(b).  The City must therefore already comply with provisions of the Code of Federal Regulations that closely track the language of the Kendrick Consent Decree as part of its receipt of federal funding.  Further, any federal agency or Tennessee state law enforcement entity that receives federal funds must also comply with such restrictions, making it even less likely that information shared with the Memphis Police Department would require onerous vetting.

Finally, the City has not provided evidence demonstrating how compliance with § I of the Decree would jeopardize the City's receipt of federal funding, nor has the City demonstrated that § I will prevent it from using any and all information provided to the Memphis Police Department by federal law enforcement agencies.  The anti-commandeering principle and federalism-derived limitations on Congress's Spending Power also likely prevent the federal government from withholding valuable law enforcement grants because of the City's continued need to comply with a federal court order.  See Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 577–78 (2012); Printz v. United States, 521 U.S. 898, 933 (1997); New York v. United States, 505 U.S. 144, 161, 180 (1992).

In sum, the Court finds that the City's arguments regarding the asserted detrimental effect § I of the Kendrick Consent Decree has, and will continue to have, on the City's continued

participation in federal law enforcement information sharing programs do not support modification under Rule 60(b)(5). The Court does not read § I of the Decree to require the City to reject all information received by federal law enforcement agencies unless the City engages in extensive vetting of such information pursuant to § G of the Decree. Section I only outright prohibits the City's receipt of political intelligence as defined in the Court's October 26, 2018 Order and Opinion (ECF No. 151), and it only requires the vetting of information received in the course of police investigations that incidentally implicate First Amendment-protected activities. See supra at 34–37. It does not prevent the City from receiving, and acting upon, information concerning ongoing or imminent criminal activities or threats that do not implicate any political intelligence or First Amendment-protected activities.

### b. The City's Participation in the Joint Terrorism Task Force and the Tennessee Fusion Center

The City relies on the same arguments already addressed by the Court, see supra at Sec. III.3.a., to support its assertion that the Kendrick Consent Decree prevents its continued participation in both the FBI's Joint Terrorism Task Force and the Tennessee Fusion Center. (ECF No. 227-1 at PageID 7723–25.) While the Court recognizes that such groups serve important public purposes, especially in their successful prevention of terrorist operations at home and abroad, the Court is not persuaded by the City's arguments that §§ I and G of the Kendrick Consent Decree impede the City's ability to share information with and participate in these joint law enforcement programs. Nor is the Court persuaded by the City's assertion that the Kendrick Consent Decree will be "putting not only the local public safety at risk, but [will] jeopardiz[e] the safety of the greater region, and, potentially, the nation." (Id. at PageID 7724.)

For the reasons stated above, the City has failed to provide evidence demonstrating that § I of the Decree prohibits the City from receiving information gathered in the course of legitimate law enforcement investigations aimed at preventing terrorism in Tennessee and across the Nation. Further, contrary to the City's assertion, § I does not require the City to reject all information received from the Joint Terrorism Task Force or the Tennessee Fusion Center, unless it reviews any and all such information pursuant to § G of the Decree's review and authorization procedure. Even assuming that the City was correct and the Decree prevented its participation in these two programs, the City's inability to use political intelligence would not prevent the FBI, the Department of Homeland Security, the Department of Immigration and Customs, or other members of the Joint Terrorism Task Force and the Tennessee Fusion Center from making use of such information, assuming they could do so without violating either the U.S. Constitution or federal statutes or regulation. But see 28 C.F.R. § 23.20(b). It would therefore not be correct to argue that the Decree prevents the City and other law enforcement agencies from thwarting credible terrorist threats or other significant public safety concerns.

Thus, for the reasons already stated by the Court, the City has not met its burden of demonstrating that a change in factual circumstances with regard to the City's participation in the Joint Terrorism Task Force or the Tennessee Fusion Center make the Kendrick Consent Decree inequitable, by placing an undue burden on the City or by significantly threatening public safety.

### c. The City's Participation in the Multi-Agency Gang Unit

The City applies the same arguments as discussed above, see supra at Sec. III.3.a., III.3.b., to support its contention that the Decree prevents its participation in the Multi-Agency Gang Unit. (ECF No. 227-1 at PageID 7727.) The City argues that it can no longer participate in the Multi-Agency Gang Unit because "the Consent Decree, as interpreted by the Monitor,

prohibits [the Memphis Police Department]'s receipt of intelligence from another law enforcement agency unless vetted prior to its receipt to ensure it was obtained in a manner not violative of the Consent Decree." (Id.) For the same reasons as discussed above in connection with the other joint law enforcement operations, the Court finds that the City has not demonstrated that changed circumstances with respect to the City's participation in the Multi-Agency Gang Unit require modification of § I of the Kendrick Consent Decree. Nor does the Court find that § I prohibits the City's receipt of all information from the Multi-Agency Gang Unit unless it engages in the review and authorization process as required by § G of the Decree.

### d. The City's Participation in CrimeStoppers

The City applies similar logic as it employed with respect to its participation in the already-addressed law enforcement programs to the CrimeStoppers program, arguing that the Kendrick Consent Decree effectively prevents its continued participation in the program. The City's argument relies on its reading of the Monitor's August 21, 2019 interpretation of § I of the Decree, and the Monitor's August 26, 2019 application of that interpretation to the City's participation in the CrimeStoppers program. (ECF No. 227-1 at PageID 7728–29.) On August 23, 2019, the City submitted an RFA to the Monitor to allow the City to continue its participation in the CrimeStoppers program. (ECF No. 227-4 at PageID 7836.) The Monitor responded as follows:

> This request implicates § I of the consent decree. Section I forbids the City to "encourage, cooperate with, delegate, employ or contract with, or act at the behest of, any local, state, federal or private agency, or any person, to plan or conduct any . . . activity . . . prohibited by th[e] decree." As stated in the August 21, 2019, Coordinate Opinion, I read this restriction to place the onus on the City to verify that information it receives from governmental law enforcement agencies, non-law enforcement agencies, public and private entities, and individuals satisfies the same standards as information lawfully collected by the City itself.

**Information collected by civilian residents of the City, shared with CrimeStoppers, and then shared with the [Memphis Police Department] ordinarily would not implicate the First Amendment**. The First Amendment restrains only the government, and not private individuals or organizations. Thus, the practices of private individuals and organizations do not offend the First Amendment even when those same practices, employed by the government, would violate it.

Section I of the decree, however, forbids the City to coordinate both with governmental entities—"any local, state, [or] federal" entity—<u>and</u> with any "private agency, or any person, to plan or conduct any . . . activity . . . prohibited by th[e] decree." As a result, the practices of individuals or organizations may offend the consent decree if the City "encourage[s], cooperate[s] with, delegate[s], employ[s] or contract[s] with, or act[s] at the behest of" such private individuals or organizations "to plan or conduct any . . . activity . . . prohibited by th[e] decree." § I.

The only way to ensure that the City does not offend the consent decree in working with private individuals or organizations is to require the same verification process for information received from private individuals and organizations as I understand the consent decree to impose for receiving information from the FBI, the Secret Service, or any other law enforcement agencies. (*See generally* August 21, 2019, Coordinate Opinion.) The City's ability to receive information from private citizens, either through CrimeStoppers or directly, is thus subject to verification that the information satisfies the same standards as information lawfully collected by the City itself.

(ECF No. 227-4 at PageID 7835–36.)

Based on the Monitor's response, the City contends that "[i]t would be literally impossible for the City to determine whether the information it receives from anonymous tipsters via CrimeStoppers was obtained in such a way that does not violate the Consent Decree," because such vetting would require the City to determine the identity of the tipster, thereby undercutting the tipster's anonymity which, the City asserts, is a vital part of the program's success. (Id.) The City further asserts that such a result would "effectively end the program, resulting in fewer prosecutions of crimes." (Id.) The ACLU argues in its Response that the City fails to demonstrate "what additional burden would be added to vet information for compliance with the Consent Decree in addition to any normal procedures conducted with shared

information . . . Instead, the City claims that these burdens exist and that they are insurmountable." (ECF No. 231 at PageID 7970.)

The Monitor's August 26, 2019 letter was correct in stating that tips from private individuals do not generally implicate the First Amendment, as such action is not "state action" triggering the Amendment's protections. See, Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1928 (2019). The Monitor was also correct that the receipt of information from private, non-law enforcement individuals and entities would implicate § I of the Consent Decree.

However, the Court does not agree with the City's assertion that § I, as it is currently written, makes it "literally impossible" for the City to continue its participation in the CrimeStoppers program. The City has not demonstrated how much information received via CrimeStoppers would require vetting and authorization as outlined by § G of the Decree. Nor is the Court persuaded by the City's argument that the Monitor's interpretation of § I requires the Memphis Police Department to review and authorize the use of *every* tip it receives via CrimeStoppers. As stated above, see supra at Sec. III.3.a, although the Monitor's cautious application of his August 21, 2019 interpretation of § I's limitations to the Memphis Police Department's use of information received by it via CrimeStoppers was appropriate, the Court does not read § I to require the City to vet *every* tip it receives via CrimeStoppers. See supra at Sec. III.3.a. The Kendrick Consent Decree only bars the collection, maintenance, and dissemination of political intelligence by the City. (Case No. 2:76-cv-00449, ECF No. 16.) Only political intelligence received via CrimeStoppers that has no relevant connection to legitimate law enforcement ends must be outright rejected by the City. And while some criminal investigations represent a gray area, thus requiring additional vetting as to the information's source, the Court is not persuaded that an anonymous tip providing the Memphis Police

Department with information regarding imminent or ongoing criminal activities would require any significant vetting under § G of the Decree. Review and authorization pursuant to § G would only be required if the tip, which provided information of ongoing or threatened criminal activity or conduct, also included or referenced political intelligence as defined, or otherwise incidentally implicates, or may incidentally implicate, First Amendment-protected activities. The City has not presented evidence that any of the tips it receives via the CrimeStoppers program fall into the latter category of information requiring vetting pursuant to § G of the Decree.

In sum, § I of the Decree only prohibits the City from receiving information from outside law enforcement or private entities that would otherwise violate the Consent Decree. Section I only outright prohibits the City's receipt of political intelligence or information relating to First Amendment-protected activities gathered as a result of investigations lacking any legitimate law enforcement purpose. Vetting and authorization pursuant to § G would only be required for tips received via CrimeStoppers that incidentally implicate First Amendment-protected activities or political intelligence. However, because the City has failed to provide any evidence demonstrating that most if not all of the information it receives via CrimeStoppers would incidentally implicate protected First Amendment activities, the Court finds that the City has failed to demonstrate how § I of the Decree so unduly burdens its participation in the CrimeStoppers program as to prevent the Memphis Police Department's continued participation in the program. Therefore, the Court finds that the City has failed to meet its burden that changed factual circumstances with regard to the City's participation in the CrimeStoppers program warrants immediate modification of § I of the Kendrick Consent Decree pursuant to Rule 60(b)(5).

### e. The Memphis Police Department's Sharing of Information with Shelby County Sheriff's Department and Shelby County Schools

The City argues that the Decree prevents its continued participation in several programs aimed at assessing and preventing security threats within the Shelby County School systems. (ECF No. 227-1 at PageID 7729–30.)  Relying on similar arguments raised with respect to § I's effect on the City's participation in CrimeStoppers, the City contends that the anonymity of student tipsters, which is of critical importance to information sharing programs led by the Shelby County Sheriff's Department, prevents the Memphis Police Department from "determining if the intelligence contained in the tips was collected in a permissible manner under the Consent Decree."  (Id. at PageID 7729–30.)  The City contends that the investigation review and authorization requirements of § G of the Decree, as applied to these programs by § I, effectively prevent the City from assisting with such programs as well as other similar anonymous, information-gathering programs such as the "Trust Pays" program, an offshoot of CrimeStoppers, and the Department of Homeland Security's "If You See Something, Say Something" campaign.  (Id. at PageID 7729–31.)

The Court finds that its conclusions with respect to the CrimeStoppers program and other federal and state law enforcement information-sharing programs apply equally to the City's concerns regarding ongoing information-sharing policies with the Shelby County Sheriff's Office and Shelby County Schools.  See supra at Sec. III.3.a–III.3.d.  The Court reiterates that the Decree only prevents the City from collecting, maintaining, and disseminating political intelligence.  (Case No. 2:76-cv-00449, Kendrick Consent Decree, ECF No. 16.)  It does not prevent the City's use of information obtained as a result of legitimate law enforcement activities that do not implicate political intelligence or information regarding First Amendment-protected

activities. (Id.) Although, as stated previously, some investigations present gray areas that may require vetting in compliance with § G of the Decree in situations where legitimate police investigations incidentally implicate the gathering of political intelligence or other First Amendment-protected activities, the City has not presented evidence that any of the tips received from Shelby County students actually fall into this gray area. Nor is the Court persuaded that the review and authorization procedure imposed by § G of the Decree would be more burdensome than vetting processes already used to assess the validity of a student tip. Additionally, the City has not demonstrated how certain information detailing potential criminal or public safety threats in the Shelby County Schools, such as, to use the City's example, a school shooting, would implicate § I, and therefore § G, of the Kendrick Consent Decree.

For the reasons stated above, the Court finds that the City has failed to demonstrate how § I, and therefore § G, of the Decree would be so unduly burdensome as to prevent the City's continued participation in any of the law enforcement information-sharing programs specified by the City. The Court therefore finds that § I does not render the Decree inequitable so as to justify its vacation or modification under Rule 60(b)(5).

Moreover, the Court notes that the City has provided a proposed modification to the language of § I of the Decree. (ECF No. 244 at PageID 8159–60.) If a party meets its burden demonstrating that Rule 60(b)(5) warrants modification of a consent decree, the court must still determine whether "the proposed modification is suitably tailored to the changed circumstances." Rufo, 502 U.S. at 391. Even assuming the City can meet its burden under Rule 60(b)(5), such a significant modification as proposed by the City in its Reply should be responsive to a change in factual circumstances. The City's modified § I would read as follows:

> Restrictions on the Use of Third Parties as Surrogates [changed from "Restrictions on Joint Operations"][2]
>
> The defendants and the City of Memphis shall not encourage, delegate, or employ any local, state, federal or private agency, or any person, to plan or conduct any investigation, activity or conduct prohibited by this Decree. The City may receive information from local, state, federal, and private agencies, or from any person, as long as the City of Memphis does not initiate the conduct giving rise to the gathering of the intelligence.

(ECF No. 244 at PageID 8159–60; compare Case No. 76-cv-00449, Kendrick Consent Decree, ECF No. 16 at PageID 19:§ I.)

The City's requested modification, which would allow the use of political intelligence that is gathered by third parties, has the potential to eviscerate the core goals of the Kendrick Consent Decree. Any modification would need to be carefully crafted after a thorough review of evidence and a finding of sufficiently changed circumstances to compel a modification. A change would need to achieve the goals of the Kendrick Consent Decree while providing the City and the Memphis Police Department flexibility to engage in the sharing of information for legitimate law enforcement purposes.

A Rule 60(b)(5) motion requesting modification without the full consent of all the parties subject to the decree generally requires discovery and an evidentiary hearing. Wayne Cty., 369 F.3d at 511–12 ("Recognizing the significance of modifying the terms of a consent decree over the objection of one of the parties, this Court has required district courts to hold a 'complete evidentiary hearing' and to make appropriate findings of fact before making such modifications." Id. at 512 (quoting Vanguards of Cleveland v. City of Cleveland, 23 F.3d 1013, 1017 (6th Cir.

---

[2] The current language is as follows:

I.    Restriction on Joint Operations

The Defendants and the City of Memphis shall not encourage, cooperate with, delegate, employ or contract with, or act at the behest of, any local, state, federal or private agency, or any person, to plan or conduct any investigation, activity or conduct prohibited by this Decree.

1994))); but see Wayne Cty., 369 F.3d at 512 ("When a motion does not raise a serious challenge to the consent decree and merely appears to be a 'post-judgment attempt by a party to escape from the obligations it had voluntarily assumed,' it may well be appropriate for a trial court to reject the motion without holding a formal hearing." (quoting Del. Valley Citizens' Council for Clean Air v. Pennsylvania, 674 F.2d 976, 981 (3d Cir. 1982)). The Sixth Circuit has recognized only limited exceptions to these requirements. See Gonzalez v. Galvin, 151 F.3d 526, 534 (6th Cir. 1998) (recognizing an exception to the hearing requirement for modification when "the parties' briefs clearly set forth the relevant facts and arguments of a case such that a hearing would not add anything to the briefs, and where the court has sufficient evidence before it to make detailed factual findings").

The City requests an immediate modification of the Kendrick Consent Decree but has not requested an evidentiary hearing. (ECF No. 227-1.) The parties previously agreed to stay all modification proceedings, and the Court entered an Order staying such proceedings until January 2, 2020, when the parties are to appear for a telephonic status conference to discuss the City's previous Motion for Modification and the Modification Scheduling Order. (ECF No. 227-1 at PageID 7703; Order Staying Proceedings, ECF No. 178.) The Court is not inclined to grant modification in the absence of a full evidentiary hearing, and the movant has not provided sufficient evidence for the Court to decide in favor of modification in the absence of an evidentiary hearing. See Gonzalez, 151 F.3d at 534. Although the Court may deny the current Motion without an evidentiary hearing, see Wayne Cty., 369 F.3d at 512, the Court in this case should not grant modification without first holding an evidentiary hearing following a period of discovery by the parties.

The parties will therefore appear for the telephonic status conference on January 2, 2020, to discuss a discovery timeline and schedule for an evidentiary hearing on the issue of modification of the Kendrick Consent Decree.

## IV. CONCLUSION

For the foregoing reasons, the City's Motion for Immediate Modification of the Kendrick Consent Decree is **DENIED**. The parties shall appear for a telephonic status conference on January 2, 2020, to discuss the schedule for any future evidentiary hearing on the City's Motion for Modification.

**SO ORDERED**, this 13th day of November, 2019.

/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT COURT JUDGE