# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | | |
|---|---|---|
| ACLU OF TENNESSEE, Inc. | ) | |
| | ) | |
|     Intervening Plaintiff, | ) | |
| v. | ) | No. 2:17-cv-02120-jpm-DKV |
| | ) | |
| THE CITY OF MEMPHIS, | ) | |
| | ) | |
|     Defendant. | ) | |

**DEFENDANT'S REPLY TO INDEPENDENT MONITOR'S JANUARY 8, 2020 LETTER**

The Defendant, the City of Memphis ("the City"), by and through counsel, respectfully submits the following Reply to the January 8, 2020 letter submitted to the Court by the Independent Monitor regarding three recent Foreign Intelligence Surveillance Act ("FISA") opinions (hereafter, "the Monitor's Letter"). A copy of the Monitor's Letter is attached as **<u>Exhibit A.</u>**

The Court granted the City's Motion for Leave to Reply "in order to highlight how the FISA-related opinions [provided by the Independent Monitor] are not relevant to the City's proposed social media policy or to the First Amendment generally." (ECF No. 281).

**I.    Background**

The Court imposed certain sanctions on the City in its October 27, 2018 Order. (ECF No. 151). "To ensure compliance with the Consent Decree generally, and especially with the requirement that the City familiarize its officers with the contents of the Decree," (ECF No. 152, PageID 6288), the Court ordered, *inter alia*, the following:

> The City shall establish written guidelines for the use of manual social media searches and of social media collators in compliance with the Decree. The City shall make these guidelines available to all officers with access to social media

1

collators, and to all officers assigned to OHS and RTCC. The City shall submit these guidelines to the Court no later than January 14, 2019 for review and approval.

(ECF No. 152, PageID 6289).

The Court also appointed an independent monitor to supervise the implementation of its sanctions. (ECF No. 152, PageID 6290).

The City, the Monitor, and the Intervening Plaintiff, ACLU of Tennessee, Inc. ("ACLU-TN"), worked together over the course of the past year to develop a proposed Social Media Policy. That policy was almost completely finalized by the time of the November 21, 2019 quarterly hearing on the Third Quarterly Report of the Independent Monitor.

At the November 21, 2019 hearing, the Court heard testimony from Ms. Rachel Levinson-Waldmen on the social media policies of various federal agencies, including, most notably, the FBI. After the hearing, the Court ordered the City and the Monitor to file the final draft of the proposed Social Media Policy for review by the Court. (ECF No. 259, PageId 8511).

Having heard the testimony of Ms. Levinson-Waldmen and having reviewed the materials of the various federal agencies referenced by Ms. Levinson-Waldmen, the City believed that the FBI's social media policy was reasonable and workable and comported with the tenets of the *Kendrick* Consent Decree.

Accordingly, the City submitted a revised proposed Social Media policy to the Monitor for review on November 25, 2019, which is attached as **Exhibit B**. This new version of the proposed Social Media Policy largely adopted the framework of the FBI's social media policy, as understood by the City, while keeping much of the substance of the original proposed policy agreed upon by the Monitor.

In a December 16, 2019 letter, however, the Monitor rejected the City's proposed policy. A copy of that letter is attached as **Exhibit C.** The City then submitted its competing version of the social media policy to the Court (ECF No. 268-1) which it continues to believe not only complies with the Consent Decree but is also more suitable for a large modern law enforcement agency.

Following the submission of the two competing social media policies, the Court expanded the scope of the January 2, 2020 Status Conference to include a discussion of the proposed social media policies. (ECF No. 269).

During the January 2, 2020 telephonic status conference with the ACLU-TN, the City, and members of the Monitoring team, the Court heard from Ms. Rachel Levinson-Waldman regarding certain recent Foreign Intelligence Surveillance Court opinions and the implications of those opinions on the City's proposed adoption of the FBI's multi-tiered investigative structure as part of its social media policy. The Court instructed the Monitor to provide those FISA-related opinions to the Court and the parties. (ECF No. 273, PageID 8685).

The Monitor submitted those opinions to the Court along with a legal analysis of the opinions. The Monitor (erroneously, the City contends) concluded that the FISA-related opinions bear negatively on the Court's consideration of the City's proposed social media policy. The FISA-related opinions are wholly irrelevant to the City's proposed social media policy.

The Court granted the City leave to reply to the Monitor's letter to highlight how the FISA-related opinions are not relevant to the City's proposed social media policy or to the First Amendment generally. (ECF No. 281).

## II. History of FISA and Section 702[1]

---

[1] The City provides this brief history of the FISA statute for the Court's convenience.

Because the FISA-related opinions deal with the statutory interpretation of the FISA and its amendments, a brief summary of the statutory framework is appropriate. Enacted in 1978, the FISA established a framework under which executive branch agencies may collect foreign intelligence information. *See United States v. Aziz*, 228 F.Supp.3d 363, 366 (M.D. Pa. 2017); 50 U.S.C. § 1801, *et seq*. As part of this framework, Congress created two specialized courts: the Foreign Intelligence Surveillance Court ("FISC") and the Foreign Intelligence Surveillance Court of Review ("FISCR"). 50 U.S.C. § 1803.

FISA, as amended in 2001 under the USA PATRIOT Act ("Patriot Act") and as amended again in 2008 under the FISA Amendments Act ("FAA"), consists of eight titles. As relevant here, Title I (codified at 50 U.S.C. §§ 1801 to 1813) deals with electronic surveillance, and Section 702 (part of Title VII and codified at 50 U.S.C. § 1881a) deals with the acquisition of foreign intelligence information from electronic communication service providers. Unlike surveillance under Titles I, Section 702 surveillance targets non-United States persons located abroad. *See* 50 U.S.C. §1881a(b).

As used in FISA, "foreign intelligence information" encompasses "information that relates to, and if concerning a United States person is necessary to, the ability of the United States to protect against—(A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power; [or] (B) ... international terrorism ... by a foreign power or an agent of a foreign power ...." 50 U.S.C. § 1801(e)(1); *see id.* § 1821(1). The term also encompasses "information with respect to a foreign power ... that relates to, and if concerning a United States person is necessary to—(A) the national defense or the security of the United States; or (B) the conduct of the foreign affairs of the United States." *Id.* § 1801(e)(2); *see id.* § 1821(1).

4

JVS 4835-1161-3363
2545600-000230

A "United States person" encompasses United States citizens and aliens lawfully admitted for permanent residence in the United States. 50 U.S.C. § 1801(i); *see id.* § 1821(1).

A "foreign power" includes any "group engaged in international terrorism or activities in preparation therefor." 50 U.S.C. § 1801(a)(4); *see id.* § 1821(1). And an "agent of a foreign power" encompasses "any person other than a United States person, who ... acts in the United States ... as a member of a foreign power ... irrespective of whether the person is inside the United States" or "engages in international terrorism or activities in preparation therefore," *Id.* § 1801(b)(1); *see id.* § 1821(1). An agent of a foreign power also encompasses "any person who ... knowingly engages in ... international terrorism, or activities that are in preparation therefore, for or on behalf of a foreign power" or "knowingly aids or abets any person in the conduct of [the activities just described] or knowingly conspires with any person to engages in [those] activities," *Id.* § 1801(b)(2); *see id.* § 1821(1).

### A. FISA Title I

Title I provides detailed procedures for authorization and execution of electronic surveillance. The Government typically must apply for and obtain an order from FISC before conducting electronic surveillance under Title I. *See United States v. Huang*, 15 F.Supp.3d 1131, 1136 (D.N.M. 2014); 50 U.S.C. § 1804(a); *see id.* § 1823(a). The application must contain a statement of facts to justify the applicant's belief that the target of the surveillance is a foreign power or an agent of a foreign power. 50 U.S.C. § 1804(a)(3)(a). The Attorney General must approve applications for electronic surveillance before they are presented to the FISC. *See id.* §§ 1804(a), 1823(a).

Also referenced in the application requirements above are "minimization procedures," which are specific procedures adopted by the Attorney General that are:

> …reasonably designed in light of the purpose and technique of the particular surveillance [or physical search], to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States person consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information.

50 U.S.C. § 1801(h)(1); *see id.*, § 1821(4)(A). Notably, minimization procedures allow "for the retention and dissemination of information that is evidence of a crime which has been, is being, or is about to be committed and that is to be retained or disseminated for law enforcement purposes." *Id.* §§ 1801(h)(3), 1821(4)(C).

After reviewing the Government's application, the FISC will issue an order authorizing electronic surveillance or physical searches if it finds, *inter alia*, that (a) the target of the surveillance or search is a foreign power or an agent of a foreign power; and (b) each of the facilities or places at which the surveillance or search is targeted is or is about to be owned, used, possessed by, or is in transit to or from a foreign power or an agent of a foreign power. *See* 50 U.S.C. §§ 1805(a)(2), 1824(a)(2).

B. **FISA Section 702**

As originally enacted, FISA defined "electronic surveillance" to cover four types of domestically-focused foreign intelligence collection activities. *See* 50 U.S.C. § 1801(f); *United States v. Hasbajrami*, No. 11-CR-623, 2016 WL 1029500, at *4 (E.D.N.Y. Mar. 8, 2016). Because the definition did not apply to surveillance conducted outside the United States, Congress decided to modernize FISA by enacting, in 2007, the Protect America Act ("PAA"). *Hasbajrami*, 2016 WL 1029500, at *4. Under the PAA, the Director of National Intelligence ("DNI") and the Attorney General could authorize the acquisition of foreign intelligence information concerning persons reasonably believed to be outside the United States. *Id.* To authorize an acquisition, the DNI and the Attorney General had to certify (i) that

6

there were reasonable targeting procedures in place to ensure that the surveillance targeted persons reasonably believed to be outside the United States, (ii) that the minimization procedures in place satisfied FISA's requirements, and (iii) and that a significant purpose of the acquisition was to obtain foreign intelligence information. *Id.* The PAA expired in February 2008, and Congress enacted the FISA Amendments Act in July 2008. *Id.* at *5.

Section 702 of the FAA, codified at 50 U.S.C.§ 1881a, "supplements pre-existing FISA authority by creating a new framework under which the Government may seek the FISC's authorization of certain foreign intelligence targeting the communications of non-U.S. persons located abroad." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 404, 133 S. Ct. 1138, 1144, 185 L. Ed. 2d 264 (2013).

Section 702, unlike FISA Title I, allows for foreign intelligence acquisition without a requirement that the Government first demonstrate probable cause that the target of the collection is a foreign power or agent of a foreign power. *Id.* Also unlike the surveillance and searches conducted under Title I, under Section 702, the Government can engage in foreign intelligence collection without first specifying the nature and location of each of the facilities or places at which the acquisition will occur. *Id.*

In contrast to FISC approval of surveillance and searches conducted under FISA Title I, FISC approval of Section 702 acquisitions does not entail an individualized court order for each person to be targeted. *Hasbajrami*, 2016 WL 1029500, at *5. Rather, the FISC approves annual submissions by the Attorney General and the DNI, thereby authorizing the acquisition of foreign intelligence information through the targeting of non-U.S. persons reasonably believed to be located outside the United States. *See* 50 U.S.C. § 1881a(a), (i)(3); *Hasbajrami*, 2016 WL 1029500, at *5.

7

Section 702 surveillance targets non-U.S. persons located outside of the United States. *See* 50 U.S.C. § 1881a(b). This does not mean, however, that under Section 702 the Government acquires only foreign communications. If a U.S. person communicates with a targeted individual, the U.S. person's communication will be incidentally acquired.

To protect U.S. persons, Section 702 requires that, at least every six months, the Attorney General and the DNI periodically assess the Government's compliance with the targeting procedures, minimization procedures, and relevant compliance guidelines. 50 U.S.C. § 1881a(m)(1). The Attorney General and the DNI must submit those assessments to the FISC and to congressional oversight committees. *Id.*

Additionally, the Inspector General of the Department of Justice and the Inspector General of each element of the intelligence community authorized to acquire information through Section 702 must, among other things, review the number of Section 702 targets that were later determined to be located in the United States. 50 U.S.C. § 1881a(m)(2). The head of each element of the intelligence community conducting Section 702 acquisitions must, annually, conduct a similar review. *Id.* § 1881a(m)(3).

On January 19, 2018, Congress adopted the FISA Amendments Reauthorization Act of 2017 (the "2017 Reauthorization Act"), which made several changes to Section 702. First, the 2017 Reauthorization Act added a new section, 702(f)(1), which requires "[t]he Attorney General, in consultation with the Director of National Intelligence, [to] adopt querying procedures consistent with the requirements of the [F]ourth (A)mendment." Such querying procedures must "include a technical procedure whereby a record is kept of each United States person query term used for a query." The 2017 Reauthorization Act does not define the phrase "United States person query term." But the procedures submitted in connection with the

8

certifications that are subject of this appeal construe it to mean "a term that is reasonably likely to identify one or more specific United States persons," which "may be either a single item of information or information that, when combined with other information, is reasonably likely to identify one or more specific United States persons."

Second**,** the 2017 Reauthorization Act added another new section, 702(f)(2), which states that, "in connection with a predicated criminal investigation ... that does not relate to the national security of the United States, the [FBI] may not access the contents" of Section 702 information that was "retrieved pursuant to a query made using a United States person query term that was not designed to find and extract foreign intelligence information," unless authorized to do so by an order of the FISC. In other words, this section permits the FBI to query Section 702 data for domestic law enforcement purposes, and to review the metadata of communications returned thereby, but not to review the substance of those communications absent approval by the FISC.

Finally, the 2017 Reauthorization Act added a new reporting requirement directed to the FBI's querying practices. Specifically, the Inspector General of the Department of Justice must, within one year after the FISC first approves the querying procedures adopted by the FBI pursuant to Section 702(f), provide a report to certain committees of the Senate and House of Representatives. This report must include information concerning "[a]ny impediments, including operational, technical, or policy impediments, for the [FBI] to count … the total number of ... queries that used known United States person identifiers." The 2017 Reauthorization Act did not, however, alter an existing FISA provision exempting the FBI from certain public disclosure obligations related to its use of United States persons query terms.

III. **A summary of the FISA opinions submitted by the Monitor**

9

The Monitor relies on three FISC and FISCR opinions concerning a single issue: the Attorney General's 2018 Certifications ("2018 Certifications") under Section 702, which authorized the acquisition of foreign-intelligence information pursuant to the targeting procedures, minimization procedures, and querying procedures adopted therein. As noted *supra*, these certifications must be submitted to the FISC and approved annually to authorize the acquisition of foreign intelligence information through the targeting of non-U.S.-persons located outside of the United States. *See* 50 U.S.C. § 1881a(a), (i)(3).

The first FISA-related opinion submitted by the Monitor was FISC's review of the 2018 Certifications (hereafter, "October 2018 FISC Opinion"), which is attached as **Exhibit D**. In October 2018, the FISC approved the 2018 Certifications with two exceptions. The FISC determined that Section 702 requires federal agencies to adopt a recordkeeping practice of documenting whether a query term relates to a United States person. The FISC then concluded that the FBI's proposed procedures did not comply with Section 702(f)(1)(B)'s requirement that the querying procedures include a technical procedure whereby a record is kept of each United States person query term used for a query. Because the FBI proposed satisfying the record-keeping requirement by keeping a record of <u>all</u> queries of unminimized Section 702 information, the FISC found that the proposed system would not distinguish between U.S.-person and non-U.S.-person query terms as required by the statute.

The Court also examined the prevalence of non-compliant queries conducted by FBI personnel to return information about U.S. persons from Section 702-acquired data. The FISC independently found that the FBI's repeated non-compliant queries of Section 702 information precluded a determination that its minimization and querying procedures were reasonably designed to minimize the retention, and prohibit the dissemination, of private information

10

concerning U.S. persons, consistent with the government's foreign intelligence needs. The FISC ultimately found that the FBI's querying and minimization procedures, as implemented, to be inconsistent with statutory minimization requirements and the requirements of the Fourth Amendment. Specifically, the FISC noted that the Government self-reported a large number of FBI queries that were not reasonably likely to return foreign-intelligence information or evidence of a crime.

In the face of the October 2018 FISC opinion, the Government elected to appeal the FISC's decision to the FISCR, rather than implement the corrective measures the FISC proposed.

The next FISA-related opinion submitted by the Monitor as an attachment to the Monitor's Letter was the adjudication by the FISCR of the aforementioned appeal by the Government (hereafter, "July 2019 FISCR Opinion"), which is attached as **Exhibit E**. In the July 2019 FISCR Opinion, the FISCR agreed that the FBI's proposed querying procedures did not comply with Section 702(f)(1)(8) insofar as they did not include a procedure whereby FBI personnel document, to the extent reasonably feasible, whether a particular query term related to a United States person or a non-United States person. Because that conclusion necessarily required the Government to amend the FBI's proposed procedures, however, the FISCR declined to address whether the FBI's proposed querying and minimization procedures complied with the requirements of FISA and the Fourth Amendment to the United States Constitution.

After entry of the July 2019 FISCR opinion, the Government amended the 2018 Certifications and submitted them to the FISC for review. The final FISA-related opinion relied on by the monitor, issued in September 2019, contained the FISC's review of those amended certifications and the Revised FBI Querying Procedures submitted therewith (hereafter, the September 2019 FISC Opinion"), which is attached as **Exhibit F.**

JVS 4835-1161-3363
2545600-000230

The FISC found that because the Revised FBI Querying Procedures submitted to the FISC contained a requirement that the FBI must generate and maintain a written record of each United States person query term used, they comported with the technical requirements of Section 702(f)(1)(B).

Moreover, to address the FISC's original concern that the FBI's querying procedures did not comply with the Fourth Amendment, the Government adopted a procedure in the Revised FBI Querying Procedures requiring FBI personnel to provide a written statement of facts showing that the query of a U.S.-person was reasonably likely to retrieve foreign intelligence information or evidence of a crime prior to reviewing the unminimized contents of section 702-acquired information retrieved from such a query. Additionally, the FBI must maintain those statements in a manner that would enable oversight.

In response to the Government's revisions, the FISC found "[a]s written, the Revised FBI Querying Procedures remedy the previously found deficiency regarding documentation of the basis for U.S.-person queries."

IV. **The FISA opinions are irrelevant to the City's proposed social media policy and the First Amendment**

The FISA opinions cited by Ms. Levinson-Waldmen have no relevance to the City's proposed social media policy. First, the controversy surrounding the FBI's querying procedures arises out of the distinction between U.S. persons and non-U.S. persons. Essentially, the FBI proposed that it not be required to distinguish between searches of U.S persons versus non-U.S. persons in its recordkeeping, but the FISC determined that the statute required such a distinction. That controversy does not exist in the matter currently before the Court.

Second, the controversy surrounding the FBI's querying procedures pertains to the Fourth Amendment, not the First Amendment. The FISA-related opinions addressed whether the FBI's

Proposed Querying Procedures contained adequate Fourth Amendment protections. Because those queries are, in effect, warrantless searches of private communications, Congress expressly requires that the various governmental agencies provide adequate Fourth Amendment protections. *See* § 702(b)(6); 50 U.S.C. § 1881a(b)(6). The FISC examined the prevalence of non-compliant queries conducted by FBI personnel to return information about U.S. persons from Section 702-acquired data, and found that the FBI's querying and minimization procedures, as implemented, were inconsistent with statutory minimization requirements and the requirements of the Fourth Amendment. In response, the FBI ultimately amended its proposed procedures to include a provision requiring that, before FBI personnel may examine contents information retrieved by using U.S.-person-query terms, FBI personnel must provide a written statement of facts showing that the query satisfied that standard, unless it came within the parameters of Section 702(f)(2).

Here, there is no allegation before the Court that the City has violated the Fourth Amendment, or that its proposed social media policy does not afford adequate Fourth Amendment protections. The Consent Decree is aimed at protecting First Amendment rights, and none of the FISA-related opinions pertain to the First Amendment.

Moreover, the communications swept up by the FBI at issue in the FISA opinions were not social media postings, but actual private communications between individuals, which implicate the Fourth Amendment. Unlike the FBI's review of private communications, the City's viewing and searching of social media does not implicate the Fourth Amendment because there is no reasonable expectation of privacy in information posted on social media. *See United States v. Meregildo,* 883 F.Supp.2d 523, 525 (S.D.N.Y.2012) ("When a social media user disseminates his postings and information to the public, they are not protected by the Fourth

Amendment."); *Roasio v. Clark Cnty. Sch. Dist.,* 2013 WL 3679375, at *5–6 (D. Nev. July 3, 2013)(explaining that when a person shares information with a third party—such as Twitter messages with friends—that person takes the risk that the third party will share it with the government); *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511 (1967)("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); *Smith v. Maryland,* 442 U.S. 735, 743–44, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)("[a] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties,"); *Disner v. United States,* 2013 WL 1164502, at *1 (D.C.Cir. Feb. 20, 2013) (explaining that appellants "had no reasonable expectation of privacy in records allegedly stored on a third party's computer").

Third, the FISA opinions submitted and relied upon by the Monitor concern whether the FBI's Proposed Querying Procedures met the specific statutory requirements of FISA Section 702, *i.e.* that the querying procedure must include a technical procedure whereby a record is kept of each United States person query term. Obviously, the City is not bound by FISA, nor must it even consider FISA when developing its proposed social media policy.

Finally, and most importantly, in none of the FISA-related opinions submitted by the Monitor did a FISA court opine as to propriety of the FBI's tiered levels of investigations or its social media policy.

Moreover, the Monitor relies on a **2014** report by the Privacy and Civil Liberties Oversight Board to suggest that it is "common" for FBI agents to query § 702 data in connection with criminal investigations, including during pre-investigation assessments. This report was written before the FISA Amendments Reauthorization Act of 2017, which made several significant changes to § 702, including adding the technical requirements at issue in the very

14

FISA opinions submitted by the Monitor. Thus, in support of his argument that the FISA opinions suggest that the FBI's tiered investigation structure is flawed (which they do not suggest), the Monitor relies on a report written before the relevant statute being litigated in those FISA opinions was enacted.

Lacking any basis to draw a correlation between the FISA opinions and the City's proposed social media policy, the Monitor instead attempts to draw a correlation between the FBI's misguided statutory interpretation of two technical requirements of the FISA statute and the propriety of the City incorporating the FBI's multi-tiered social media investigative structure into its social media policy. In doing so, the Monitor relies upon a "slippery slope" argument, alleging that by using the FBI's protocol as a base for the city's social media policy, that it "would crest a slippery slope" because the FBI is not bound by the Consent Decree. It is unclear how the City's reliance on the protocols of one of the largest, most sophisticated, and most regulated law enforcement agencies in the United States would put the City on a slippery slope to violation of the Consent Decree. Indeed, the opposite is true. Adopting the structure and oversight of the FBI-model would offer more protections to the citizens of the City of Memphis than what is currently in place.

Finally, and with all due respect, the Monitor seemingly imputes the FBI's alleged "demonstrated resistance to oversight" and "spotty compliance" regarding a technical provision of the FISA statute onto the Memphis Police Department's future conduct relative to its proposed social media policy. Respectfully, the City sees no basis for such an imputation.

In short, the manner in which the FBI interpreted a federal statute regarding foreign intelligence has no bearing on the City's proposed social media policy, the City's compliance with the Consent Decree, or the First Amendment.

JVS 4835-1161-3363
2545600-000230

Respectfully Submitted,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.

s/ Mark Glover
R. Mark Glover (#6807)
Bruce McMullen (#18126)
Jennie Vee Silk (#35319)
Mary Wu Tullis (#31339)
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Telephone (901) 526-2000
E-mail: mglover@bakerdonelson.com
bmcmullen@bakerdonelson.com
jsilk@bakerdonelson.com
mtullis@bakerdonelson.com

*Attorneys for Defendant, The City of Memphis*

JVS 4835-1161-3363
2545600-000230

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of February 2020, a copy of the attached pleading was filed electronically. Notice of this filing will be served by operation of the Court's electronic filing system to all counsel of record.

Thomas H. Castelli
ACLU Tennessee, Inc.
P.O. Box 120160
Nashville, TN 37212
tcastelli@aclu-tn.org

Mandy Strickland Floyd
Bone McAllester Norton PLLC
511 Union Street, Suite 1600
Nashville, Tennessee 37219
mfloyd@bonelaw.com

*Attorneys for Intervening Plaintiff*

s/ Mark Glover

JVS 4835-1161-3363
2545600-000230