# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

|  |  |
|---|---|
| ACLU OF TENNESSEE, Inc. ) | |
|     Intervening Plaintiff, ) | |
| ) | No. 2:17-cv-02120-jpm-DKV |
| v. ) | |
| ) | |
| THE CITY OF MEMPHIS, ) | |
|     Defendant. ) | |
| ) | |

## PLAINTIFF'S PRE-HEARING BRIEF ON
## DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT OR ORDER

The Intervening- plaintiff, ACLU of Tennessee, Inc., hereby files its Pre-Hearing Brief on Defendant's *Motion for Relief from Judgment or Order* (ECF No. 124), which sought relief from the September 14, 1978 Order, Judgment and Decree entered into by the consent of the parties ("Consent Decree").

### I.    BACKGROUND AND PROCEDURAL HISTORY

On September 14, 1976, the Kenrick plaintiffs filed suit against the City, alleging that the Domestic Intelligence Unit of the Memphis Police Department was unlawfully investigating, surveilling, and maintaining files on them and on other citizens engaging in "non-criminal, constitutionally protected activities which were thought to be "subversive" and/or advocating unpopular or controversial political issues." Kendrick Compl.¶ 6, Trial Ex. 5. The plaintiffs claimed that this behavior violated their First, Fourth, Fifth and Fourteenth Amendment rights. *Id*. at ¶ 16.  After two years of litigation, the parties agreed to settle the case.

The Court entered the Consent Decree on September 14, 1978, which prohibited the City from "engaging in law enforcement activities which interfere with any person's rights protected by the First Amendment." (Consent Decree § A, Trial Ex. 6). The Consent Decree detailed the prohibition on gathering, maintaining, and disseminating political intelligence, and it provided for an exception for criminal investigations when authorized by the Director of Police. (*Id.* at §§ C-I.).

On February 17, 2017, documents listing people who must be escorted by police when visiting City Hall came to light. Trial Ex. 145. Four of the listed individuals filed suit on February 22, 2017 alleging that the Defendant was in violation of the Decree. ECF No. 1. ACLU-TN moved to intervene as a plaintiff and filed its intervening complaint on March 3, 2017. ECF No. 16.

On August 10, 2018, the Court granted partial summary judgement to ACLU-TN, finding that the City had violated the Consent Decree in several respects through its collection of political intelligence. ECF No. 120. On October 26, 2018, after a trial on the merits, the Court found the City to be in violation of several additional provisions of the Consent Decree. ECF No. 151. The Court imposed sanctions against the City to ensure its future compliance with the Consent Decree and appointed an independent monitor. *Id.* at Page ID 6272.

On August 16, 2018, a week before trial, the City filed a Motion for Relief from Judgement or Order seeking the modification of the Consent Decree. ("Motion for Relief") ECF No. 124. ACLU-TN opposed the City's motion and requested discovery on the issue. ECF No. 149. Following the Court's November 14, 2018 Order Setting Consent Decree Modification Schedule and Setting Public Comment Period ECF No. 159, the City concluded that its Motion to Modify was premature and the City and the ACLU-TN filed a Joint Motion to Stay the City's Motion. ECF

No. 175 The Court granted the joint motion, staying proceedings on the Motion to Modify until January 2, 2020. ECF No. 178.

On September 25, 2019, the City filed a Motion for Immediate Modification of the Kendrick Degree (Motion for Immediate Modification). ECF No. 227. The new motion sought immediate modification of only Section § I of the Consent Decree *Id*. at Page ID 7699. The Court denied this motion on November 12, 2019. ECF No. 250. A subsequent scheduling conference was held on January 2, 2020 and the Court issued an order setting a discovery schedule and a hearing for June 17, 2020. ECF No. 273.

On April 17, 2020, the parties requested mediation on points of potential agreement filed by Defendant in its Notice of Filing Pleading Regarding Jointly-Proposed Modifications to the Consent Decree. ECF No. 309. The Court granted the request for mediation and ordered that the Independent Monitor serve as mediator. ECF No. 311. The mediation between the parties took place over the course of several weeks, including three separate video conferences with all parties present and numerous phone conference, either among all parties or with the Monitor independently.

## II.     CONSENT DECREES GENERALLY

A consent decree is "essentially a settlement agreement subject to continued judicial policing." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983). Consent decrees are indeed "a strange hybrid in the law." *Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir. 1981). They are at once "a voluntary settlement agreement which could be fully effective without judicial intervention" and "a final judicial order . . . placing the power and prestige of the court behind the compromise struck by the parties." *Williams*, 720 F.2d at 920. Consent decrees "should be strictly construed to preserve the bargained for position of the parties." *Id.* Courts have an affirmative duty to protect

the integrity of its decree and ensure that the terms are effectuated. *See Stotts v. Memphis Fire Dep't*, 679 F.2d 541, 557 (6th Cir. 1982), *rev'd on other grounds sub nom.*, *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561 (1984).

While a consent decree "embodies an agreement of the parties and thus in some respects is contractual in nature," it is nonetheless subject to Rule 60(b) because it is "a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992). Accordingly, a district court may grant relief under Rule 60(b)(5) if "[1] the judgment has been satisfied, released or discharged; [2] it is based on an earlier judgment that has been reversed or vacated; or [3] applying it prospectively is no longer equitable." *Horne v. Flores*, 557 U.S. 433, 447 (2009).

### III. Plaintiff and Defendant's Proposed Changes to the Consent Decree

This Court noted in its October 26, 2018 Order and Decision that "[w]hile certain terms of the Consent Decree may be outdated, the concepts are not." ECF No. 151, PageID 6276. With that in mind, ACLU-TN engaged in discussions with the City to update the terms of the consent decree to modern standards, while striving to maintain the core concepts which the Decree was meant to protect. The Parties have agreed to several additions and updates to the Decree which preserve the original intent of the parties and protections afforded to the community while providing clarification and guidance to Defendant and its employees on how to stay in compliance with the Decree. In the request for mediation, the City provided the Court with seventeen areas which the parties were discussing for proposed alterations to the language of the Decree. The parties were able to resolve sixteen of those issues, leaving only a dispute of whether and to what extent Section I of the Decree warrants modification.

### a. Proposed additions and changes to the Decree's Definitions

The parties have proposed adding several definitions to the Decree to update the terms to comport with technological advances and the City's role in policing and the general administration and operation of a city. From ACLU-TN's perspective, the additional definitions were deemed warranted based on the activities for which the City was found in contempt in the August 2018 trial, mainly the issue of use of social media and undercover accounts for the gathering of political intelligence. To that end, the parties propose adding definitions for "Social Media," "Undercover Account" and "Legitimate Law Enforcement Purpose"

Based on testimony at trial and representations from the City, some officers apparently experienced some confusion over the term "political intelligence," conflating it with intelligence regarding partisan activity only. The Court noted that the original intention of the term "political intelligence" was not to limit the information to partisan political speech. *See* ECF No. 151 at PageID 6256. The parties agreed to change the name to "First Amendment Related Intelligence" to better capture the intent of the Decree to protect against the surveillance of individuals engaged in free speech activities and gathering of information about a person's beliefs or associations, regardless of whether the involved speech or actions are partisan or non-partisan in nature

### b. Proposed Changes to Section C

The parties propose on one addition to Section C of the Decree, which is to add a reference to Section G for clarity.

### c. Proposed Changes to Section D

The parties propose adding two new subsections to § D. The original language prohibiting the use of "electronic surveillance for the purpose of" political intelligence remains

intact. The proposed additions provide some explanation. The first subsection acknowledges that social media, by its very nature, raises the likelihood of encountering first amendment activities or associational information. The subsection makes clear that § D does not altogether prevent the City from viewing information posted to social media, but that it may not catalog and disseminate that information, as had been done in the past through the use of the Joint Intelligence Briefings. The Provision also makes clear, in keeping with the primary intentions of the Decree, that surveillance of persons or groups involved in the exercise of their First Amendment Rights is prohibited, unless expressly authorized by § G of the Decree.

The second proposed subsection to § D requires the City to destroy any intelligence it may be authorized to gather once there is no longer a legitimate reason to keep that information.

    **d. Proposed Changes to Section E**

For § E, the parties again propose retaining the original language of the Decree but adding explanatory material. Specifically, the parties propose adding a subsection that explains that while "undercover accounts" may be used by the City for criminal investigations, they may not create a social media account to conduct First Amendment Related Intelligence.. Further, any undercover account that may be authorized for criminal investigations must be subject to supervisory controls to ensure that they are not being abused in violation of the Decree. ACLU-TN believed that the addition of this language would directly address the use of social media accounts, like the "Bob Smith" Facebook account, that was used in violation of the Decree.

    **e. Proposed Changes to Section F**

The Parties again have elected to maintain the original language of § F but add explanatory subsections. The first proposed addition clarifies that police officers may be present at assemblies or gatherings of persons engaged in First Amendment related activities to engage

in public safety functions; however, any such presence may not have the effect of harassment or intimidation.  At the City's request, ACLU-TN also agreed to additional language that the provisions of this section would not interfere with the City's ability to implement reasonable time place and manner restrictions on First Amendment Activities.  ACLU-TN believes that this accurately reflects long standing Supreme Court precedent on time place and manner restrictions.

### f. Proposed Changes to Section G

Perhaps the most robust additions to the decree are found in the proposed changes to Section G.  Again, the core language of § G remains intact.  Investigations conducted by the City may still be authorized as long as they meet four criteria:

   a.   The investigation does not violate the provisions of this Decree; and

   b.   the expected collection of information about, or interference with, First Amendment rights is unavoidably necessary for the proper conduct of the investigation; and

   c.   Every reasonable precaution has been employed to minimize the collection of information about, or interference with, First Amendment rights; and

   d.   The investigation employs the least intrusive technique necessary to obtain the information.

Consent Decree § G.  Following the Court's October 2018 Opinion, the parties have also proposed that the Director of Police be allowed to appoint designees to review the requests for authorization.  This change should reduce any burden on the Director to authorize investigations and allow the City to have Designees available to law enforcement officers around the clock.

The parties have proposed additional language to clarify when § G applies.  Specifically, the additional language makes clear that § G applies only to those investigation where the

collection of First Amendment Related Intelligence is likely.  Not every investigation will entail access to media or information that touches on First Amendment concerns.  Such investigation would be outside the scope of the Decree.  The additional language also makes clear that should an investigation begin with no threat of collection of First Amendment Related Intelligence, but the likelihood arise mid-investigation – authorization to continue the investigation must be granted.

### g.  Proposed Changes to Section H

The original language of Section H also remains in the decree.  The parties have agreed to additional langue governing the use of cameras by the City.  The additions clarify that video cameras and body worn cameras are permissible; however, they may not be used to intentionally save or catalog data that would be considered First Decree Related Intelligence.  Data that is stored on a camera that is never accessed or downloaded will be erased according to the particular camera's specification.  The proposed language also requires the City to maintain written retention policies for information downloaded from any camera, a deficiency noted during the trial in this matter.

ACLU-TN believes that the jointly proposed revisions are common sense additions to the decree that will update it from its original inception over forty years ago.  Importantly, the originally language of the Decree remains intact, except in a few exceptions.  The additional language serves to provide explanation of the provision of the Decree, which hopefully will provide some level of comfort to the City and its employees going forward about what conduct is prohibited.  For ACLU-TN, the clarifications would foreclose the City, or its employees, from asserting that they were confused by the language of the Decree or that they had trouble applying it to modern technology.

### IV. Modification is not warranted on Section I of the Consent Decree.

The only remaining issue between the parties is the Defendant's desire to modify Section I of the Decree. ACLU-TN asserts that § I is important to the overall function of the Decree. As this Court noted "Vacating § I would detrimentally affect one of the core principles of the Decree. Removing that section would allow the City to accept and gather political intelligence at the behest of other government law enforcement agencies in ways contrary to the core principles of the Kendrick Consent Decree." ECF No. 250 at PageID 8410. For that reason, ACLU-TN asserts that Section I should remain intact. Any modifications should take the form of other proposed changes, where the original language of the Decree remains, but some explanatory information is appended. The parties are continuing conversations in this regard.

#### a. Standard for modification of a Consent Decree

Modification of a consent decree is appropriate: (1) "when changed factual conditions make compliance with the decree substantially more onerous," (2) "when a decree proves to be unworkable because of unforeseen obstacles," or (3) "when enforcement of the decree without modification would be detrimental to the public interest." But "modification should not be granted where a party relied upon events that actually were anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 384-85; see also *United States v. State of Mich.*, 62 F.3d 1418 (6th Cir. 1995) (citing *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017–18 (6th Cir. 1994). Under Rule 60(b)(5), a court may modify a consent judgment when "it is no longer equitable that the judgment should have prospective application." Fed. R. Civ. P. 60(b)(5). "This rule does not allow modification simply 'when it is no longer *convenient* to live with the terms of a consent decree,' but solely when there is 'a significant change either in factual conditions or in law.'" *Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606, 613–14 (6th Cir. 2011) (quoting *Rufo*, 502 U.S. at 383–84). The party seeking to show such a change "bears the burden of

9

establishing that a significant change in circumstances warrants revision of the decree." *Id.* If that party carries its burden, then the district court "should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.* "[M]odification of a consent decree is an extraordinary remedy that should not be undertaken lightly." *East Brooks Books*, 633 F.3d at 465 (internal quotation marks omitted).

### b.  Modification is not warranted on Section I of the Consent Decree.

The City, in its prior motions, have relied on two bases for its assertion that the Court should modify the language of § I.  First, that, "the law and circumstances surrounding surveillance and the First Amendment have changed significantly since the time of the original *Kendrick* lawsuit." ECF No. 227-1 at PageID 7704.  Second, that, "Section I should be modified or vacated because, as interpreted, it creates an undue burden on law enforcement." *Id.*.   The City argues that a change or clarification in the law or a misunderstanding of the law at the time of the original decree, warrants modification of § I.  The Court has already ruled on this issue, finding "the City has not demonstrated that First Amendment decisional law has changed in the intervening years since the parties consented to the Kendrick Consent Decree, nor has the City produced evidence demonstrating that the parties misunderstood [the law] at the time they consented to the Decree." ECF No. 250 at PageID 8406.

### c.  To justify modification, the City must meet its burden to prove that there has been a change in the facts that make § I unworkable or detrimental to public safety.

The City also argues that § I is "unworkable for a modern police force," because it limits sharing information with other governmental agencies and private entities that would violate the Decree.  See City's Motion for Immediate Modification, ECF No. 227-1 at PageID 7713.  The

10

City has pointed to the operations of several programs where information is shared and must produce evidence at the hearing to support its claim that there it is substantially more onerous for the City to participate in information sharing while holding true to the Decree's requirements.

The City asserts that a change in facts warrants modification of Section I. Modification of a consent decree is appropriate: (1) "when changed factual conditions make compliance with the decree substantially more onerous," (2) "when a decree proves to be unworkable because of unforeseen obstacles," or (3) "when enforcement of the decree without modification would be detrimental to the public interest." But "modification should not be granted where a party relied upon events that actually were anticipated at the time it entered into a decree." *See Rufo*, 502 U.S. at 384-85; *United States v. State of Mich.*, 62 F.3d 1418 (6th Cir. 1995).

Rule 60(b)(5) "does not allow modification simply 'when it is no longer convenient to live with the terms of a consent decree,' but solely when there is 'a significant change either in factual conditions or in law.'" *Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606, 613-14 (6th Cir. 2011) (quoting *Rufo*, 502 U.S. at 383–84). The party seeking to show such a change "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id*. If that party carries its burden, then the district court "should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id*. "'[M]odification of a consent decree is an extraordinary remedy that should not be undertaken lightly.'" *East Brooks Books, Inc. v. City of Memphis*, 633 F.3d 459, 465 (6th Cir. 2011) (quoting *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 132 F.3d 1142, 1147 (6th Cir. 1997) (Jones, J., concurring)).

As the Court has expressed, the City has not been able to meet its burden to demonstrate that § I is unworkable or detrimental to public safety. ECF No. 250 at PageID 8406-18. Specifically, the Court has rejected the notion that "the burdens imposed on the City by the Decree

11

prevent it from practicing modern police techniques and from participating in intergovernmental agency task forces and crime-prevention programs" *Id.* at PageID 8410 and found that the City has failed to provide "concrete examples of how such a process would delay the Memphis Police Department's response time to serious public safety threats." *Id.* at PageID 8418.

The City's Motion for Immediate Modification asserts that joint operations are hampered by the Consent Decree, including information exchanged with federal agencies, participation in the Joint Terrorism Task Force, receipt of information from the Tennessee Fusion Center, participation in the Multi-Agency Gang Unit, participation in CrimeStoppers, and information sharing with the Shelby County Sherriff's Department. ECF No. 227-1 at PageID 7715.

Joint operations and information sharing among law enforcement agencies no doubt existed in some form before the entry of the Consent Decree. The concept that the City might want to exchange information with other law enforcement agencies or private entities is not a recent development unique to modern law enforcement. Any burden that the City claims exists was within the original understanding of the Consent Decree and was entered into voluntarily by the City. The Court acknowledged this regarding the entire Decree in its Order and Opinion in this case:

> Every community must determine how much of its citizens' privacy it is willing to sacrifice in the name of public safety. The idea that police should be limited in their powers predates 2018 and 1978. The Court's duty is to preserve the Consent Decree's central bargain. In this case, the compromise struck by the ACLU-TN and the City was a specific limitation on the subject matter for police investigations. The Court recognizes that the City granted its residents privacy rights above and beyond those guaranteed by the Constitution, but that may be the Consent Decree's intended purpose.

(ECF No. 151 at Page ID 6276 (citations omitted)). The City cannot now rely on the existence of such programs alone to justify modification of § I. It must present evidence that there has been a

change in circumstances that makes compliance with § I substantially more onerous than what was originally contemplated.

The City complains that compliance with § I would require it "to expend scarce resources to assure compliance with the restrictions;" that it "impedes" the City's "ability to 'cope with the problems of today,'" that it would delay "transmission of an urgent price of intelligence that could stop a mass shooting," and the time it would take to vet received information would be impractical or impossible. ECF No. 227-1 at PageID 7713-7718. The City's Motion is unclear on exactly what information is affected by § I. Presumably, only a portion of the information which is exchanged would be affected. Because the Consent Decree prohibits the City from gathering and maintaining political intelligence outside the confines of an approved investigation, we can assume that the City's complaint is not with information that it is sharing with other law enforcement agencies. That leaves information received from these agencies.

In interpreting the Consent Decree in its October 26, 2018 opinion, this court noted:

> The Consent Decree also has an action requirement. Gathering, for example, requires affirmative acts, but simply receiving or inadvertently finding information does not. A police officer does not have to cover his body camera every time he passes someone with a political t-shirt, because the information received by the camera about political activities was not affirmatively sought out by the officer. Similarly, a police officer who queries a social media collator for the phrase "kill police," is not going out of her way to "gather" information related to First Amendment rights, even though her action is definitely investigative in nature. If her search returns information related to a lawful assembly titled "Do Not Kill Police," her action does not become political intelligence because First Amendment rights were not the focus or subject of her investigative activity. In other words, she inadvertently discovered information related to First Amendment rights, but she was not "gathering" it.

ECF No. 151 at PageID 6257. Applying the Court's interpretation to § I, it would not appear to require that the City eschew receipt of all information offered by other law enforcement agencies or categorically prohibit the City's cooperation with those agencies

13

Information that is not political intelligence would be outside the scope of the Consent Decree and would require no or little vetting. The City cites, as an example of information that it may not be able to acquire, information that could stop a mass shooting.  It does not, however, identify how receipt of such information would potentially violate the Decree.  Intelligence related to a true threat of violence or plans to commit a shooting, or any other criminal activity for that matter, would not be political intelligence and not fall within the prohibitions of the Decree.

Information that is political intelligence or related to free speech activities, but that is part of a criminal investigation, may be subject to § I and require more vetting on the part of the City. Section G would allow the City to collect such information so long as the procedures are followed, and an investigation is authorized.  Only political intelligence that is given to the MPD, but which has no connection to a criminal investigation, would need to be outright refused.

Presumably, some form of review and vetting would be required for any information received from any source, to ensure its accuracy and utility to the City's law enforcement goals and to determine whether its roots may have been extra-constitutional — like a coerced confession or warrantless search that would be subject to the exclusionary rule.  For example, one would assume that a tip received from CrimeStoppers would not be catalogued and acted upon without some level of review as to the content of the tip, whether it relates to a law enforcement function and its general reliability.  Notably, the Criminal Intelligence Operating Policies attached to the City's Motion for Immediate Modification as Exhibit G contain their own restraints on the collection of political intelligence, banning the collection of intelligence on "political, religious or social views, associations or activities  . . . unless such information directly relates to criminal conduct or activity and there is reasonable suspicion that the subject of the information is or may

14

be involved in criminal conduct or activity." 28 CFR § 23.20(b); ECF No. 227-8.  Section I's restrictions are not, therefore, outside of the norm for law enforcement agencies.

The City bears the burden to produced evidence of what onerous burden is imposed by § I in addition to any normal procedures conducted with shared information.  It must also present information about what delays might occur. The City may not rely on claims that these burdens exist and that they are insurmountable.

**I.      CONCLUSION**

For the foregoing reasoning, ACLU-TN asks the Court to consider the proposed joint changes to the Consent Decree but deny the relief sought by the City regarding separate I.

Respectfully Submitted,

/s/ Thomas H. Castelli
Thomas H. Castelli, BPR# 24849
Stella Yarbrough, BPR # 33673
ACLU Foundation of Tennessee
P.O. BOX 120160
Nashville, TN 37212
615.320.7142
tcastelli@aclu-tn.org

Mandy Strickland Floyd, BPR#31123
Bone McAllester Norton PLLC
511 Union Street, Suite 1600
Nashville, TN 37219
615.238.6302
mfloyd@bonelaw.com

ATTORNEYS FOR PLAINTIFF
ACLU of Tennessee, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2020 a true and correct copy of the foregoing document has been served via the Court Electronic Case Filing system to:

Attorneys for Defendant, City of Memphis

R. Mark Glover
Jennie Vee Silk
Mary Wu Tullis
Bruce A. McMullen
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
mglover@bakerdonelson.com
jsilk@bakerdonelson.com
mtullis@bakerdonelson.com
bmcmullen@bakerdonelson.com

/s/ Thomas H. Castelli
Thomas H. Castelli