1

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF TENNESSEE

3                   WESTERN DIVISION

4   _____

5   ACLU of Tennessee, Inc.,

6                    Plaintiff,

7   vs.                                   NO. 2:17-cv-02120

8   City of Memphis, Tennessee,

9                    Defendant.

10  _____

11

12

13              TRANSCRIPT OF PROCEEDINGS

14

15       BEFORE THE HONORABLE JON P. McCALLA, JUDGE

16

17                      MONDAY

18               22ND OF JUNE, 2020

19

20

21

                 LISA J. MAYO, CRR, RMR
22                  OFFICIAL REPORTER
              FOURTH FLOOR FEDERAL BUILDING
23             MEMPHIS, TENNESSEE 38103

24

25

                  **UNREDACTED TRANSCRIPT**

1                A P P E A R A N C E S

2

3

4

5       Appearing on behalf of the Plaintiff:

6           THOMAS HAUSER CASTELLI
            American Civil Liberties Union Foundation of
7           Tennessee
            210 25th Avenue N. Suite 1000
8           Nashville, TN 37212
            (615) 320-7142

9

10

11

        Appearing on behalf of the Defendant:
12
            BRUCE McMULLEN
13          JENNIE VEE SILK
            Baker Donelson Bearman Caldwell & Berkowitz
14          165 Madison Avenue, Suite 2000
            Memphis, TN 38103
15          (901) 526-6000

16

17      Also Present:

18          EDWARD L. STANTON, III
            Butler Snow, LLP
19          6075 Poplar Avenue, Suite 500
            Memphis, TN 38119
20          (901) 680-7369

21

22

23

24

25

                    **UNREDACTED  TRANSCRIPT**

1          **W I T N E S S   I N D E X**

2   **WITNESS**                                              **PAGE**        **LINE**

3     ERIC DAIGLE

4          Direct Examination By Ms. Silk          10         6

5          Cross-Examination By Mr. Castelli       31         10

6          Cross-Examination By Mr. Stanton        37         4

7          Redirect Examination By Ms. Silk        51         17

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **E X H I B I T   I N D E X**

2  <u>**EXHIBIT NUMBER**</u>                              <u>**PAGE**</u>      <u>**LINE**</u>

3

         Exhibit Number 28                        **9**        **10**
4        Exhibit Number 29ID                      **14**        **6**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                              MONDAY

2                          June 22, 2020

3

4                   ----------------------

5

6           THE COURT:  Good morning, Mr. McMullen.

7           MR. McMULLEN:  Good morning, Your Honor.

8           THE COURT:  We're getting close.  I understand we

9     need to get Mr. Castelli on.  So I think that's slowing us

10    down just a tad.

11          MR. McMULLEN:  He was on earlier and had some

12    problems with his microphone, so he's logged out and is going

13    to log back in and see if that clears it up.

14          THE COURT:  That sounds good.  We've got our

15    witness.  How are you doing today?  I'm making sure everybody

16    can hear me okay.

17          MR. DAIGLE:  Good morning, Your Honor.

18          THE COURT:  Good morning.  Good morning,

19    Mr. Stanton, how are you today?

20          MR. STANTON:  Doing very well.  Good morning,

21    Your Honor.

22          THE COURT:  I'm going to leave mine on.  If I

23    close the mic, there's a problem.  So I'll just leave it on.

24          MR. CASTELLI:  Sorry about that.  I hope that

25    worked.
```

**UNREDACTED TRANSCRIPT**

1          **MR. McMULLEN:**  I can hear you.  Can you hear me,

2     Tom?

3          **MR. CASTELLI:**  There we go.

4          **THE COURT:**  I think we have Mr. Castelli now.

5     How are you this morning?

6          **MR. CASTELLI:**  I'm doing well.  Thank you.  A

7     little technical difficulty there, Judge.  Sorry about that.

8          **THE COURT:**  That's fine.  I think we're ready to

9     resume.  We're going to let Mr. Sample open court and we'll

10    proceed with the examination of the witness.  So, Mr. Sample,

11    we're going to open court.

12          All right.  We were in the examination of our

13    witness, and so we're ready to proceed.  The witness is back

14    on the stand.

15          **MR. McMULLEN:**  Your Honor?

16          **THE COURT:**  Yes, sir.

17          **MR. McMULLEN:**  Your Honor, I have a preliminary

18    matter before we get to the witness I would like to address

19    with the Court and all the parties.

20          **THE COURT:**  Sure, sure.

21          **MR. McMULLEN:**  Related to filing our post-trial

22    brief, I've been thoroughly taken to the woodshed by my team

23    and --

24          **THE COURT:**  Okay.

25          **MR. McMULLEN:**  -- and --

7

1          **THE COURT:**  Tell them to be careful.

2          **MR. McMULLEN:**  -- yes -- we would like to kind of

3    amend our proposal to say the five days after we receive a

4    copy of the transcript.  We're going to be --

5          **THE COURT:**  Have you ordered -- have you ordered

6    transcript?  If you've not ordered transcript, then you could

7    have ordered it last week.  Did you order it last week?

8          **MR. McMULLEN:**  No.  No, we did not, Your Honor.

9          **THE COURT:**  All right.  The way it typically

10   works -- and I'll think about it.  We may do that.  But if

11   you fail to order the transcript, then that -- or any party,

12   any party in any case then that's typically on them for

13   failure to do so.  And so you might want to remind staff that

14   they would want to do that in the future because they could

15   have ordered it on, you know, Thursday or Wednesday at the

16   end of the day or Friday, and that's the normal practice when

17   we have short deadlines, but we'll check right now.

18          So, Mr. Sample, let's check and see how quickly

19   those transcripts can be turned around.  They probably could

20   have had them for you today --

21          **THE CLERK:**  Probably.

22          **THE COURT:**  -- if you would have let them know.

23   So we'll check on that and then we'll take this up at the

24   end.  I'm sure we can adjust it a little bit, but let's see

25   if we can't get that moving.

**UNREDACTED TRANSCRIPT**

```
 1              You want to order all the transcripts, is that
 2   what you're saying?  I mean, I don't personally order them.
 3   So -- well, I mean, sometimes I do.  They're not personal.
 4   But I'll tell them that you're ordering them and then we'll
 5   let the rest of you figure out the best way you need to
 6   handle that, but we'll work it out.  We'll work it out so
 7   you've got enough time.
 8              Okay.  We'll do that.
 9         MR. McMULLEN:  Thank you, Your Honor.
10         THE COURT:  No problem.  We'll get that at the
11   very end after you've got a little more information.  Okay.
12         MR. McMULLEN:  Your Honor?
13         THE COURT:  Yes, sir.
14         MR. McMULLEN:  Ms. Silk will be handling the
15   witness.  I will move out of the screen.
16         THE COURT:  Okay.  All right.  We're glad to have
17   you.  Mr. Daigle, how are you today?
18         THE WITNESS:  Very well, thank you, Your Honor.
19         THE COURT:  All right.  We've got you back on the
20   stand.  Ms. Silk, you may proceed with the witness.
21         MS. SILK:  Good morning, Your Honor.  Good
22   morning, Mr. Daigle.  Can you hear me okay?
23         THE WITNESS:  I can.  Can you hear me okay?
24         MS. SILK:  I can, thank you.
25              Your Honor, in my haste to try to get through
```

**UNREDACTED TRANSCRIPT**

9

1  Mr. Daigle's examination on Thursday, I neglected to enter

2  his CV into evidence.  While it's attached to his report, we

3  would like to go ahead and mark it as an exhibit if that's

4  okay.

5              **THE COURT:**  Sure.  We'll mark that as exhibit --

6  should be Exhibit, I think, 28.  Is that right, Mr. Sample?

7              **THE CLERK:**  It is, yes, sir.

8              **THE COURT:**  Exhibit 28, marked and received.  It

9  was Exhibit A so now it's Exhibit 28.

10              (WHEREUPON, the above-mentioned document was

11  marked as Exhibit Number 28.)

12              **THE COURT:**  Yes, ma'am.  You may proceed.

13              **MS. SILK:**  Thank you.

14

15

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

1                        *    *    *

2

3                         **ERIC DAIGLE,**

4  **was called as a witness and having first been duly sworn**

5  **testified as follows:**

6                      <u>**DIRECT EXAMINATION**</u>

7  <u>**BY MS. SILK:**</u>

8   Q.   Mr. Daigle, I would like to talk to you for a few

9  minutes about social media policies for law enforcement

10 agencies generally.  Are there any best practices for the

11 creation or use of social media by law enforcement agencies?

12  A.   There are.

13  Q.   And you referenced a document in your report paragraph

14 36, page ID 9183 that's titled "Developing a policy on the

15 use of social media in intelligence and investigative

16 activity"?

17  A.   I did, yes.

18          **THE COURT:**  Mr. Daigle, they've asked that you

19 get a little closer to your mic and speak up.  Court reporter

20 needs a little help.

21          **THE WITNESS:**  Okay.  Is that better?

22          **THE COURT:**  Yes.  She indicated it is much

23 better.  We'll let you know if it becomes a problem.  Thanks

24 so much.

25          **THE WITNESS:**  Thank you, Your Honor.

                    **UNREDACTED TRANSCRIPT**

1              **THE COURT:**  Thank you.

2    BY MS. SILK:

3      Q.   We would like to publish on the screen for Mr. Daigle

4    to see the report that he referenced, the document that he

5    referenced in his report titled "Developing a policy on the

6    use of social media."  Do you see it there?

7      A.   I do, yes, ma'am.

8      Q.   Is this the report that you relied upon and reference

9    in your expert report?

10     A.   It is, yes.

11             **MS. SILK:**  We would like to enter this into

12   evidence and mark it as the next exhibit.

13             **THE COURT:**  Not properly introduced under the

14   rule.  Can you see if you can do that?  That was inadequate

15   background there.  So let's see if you can properly introduce

16   it.

17             **MS. SILK:**  Okay.

18   BY MS. SILK:

19     Q.   Well, in your report, Mr. Daigle, you reference this

20   report in Section F.  Could you tell us a little bit about

21   why and how you -- why you reference and included this

22   document in your report?

23     A.   Okay.  There has been -- you asked the question about

24   best practices in policy developing for social media.  There

25   has been a multi-year -- I would say we're going on about

**UNREDACTED TRANSCRIPT**

1    eight years of attempt by law enforcement associations to

2    develop a model social media policy, and to this point most

3    of the social media policies that are developed are directly

4    related to the use of social media by employees and the First

5    Amendment protection of an employee, a government employee,

6    and when and how a government employee can use social media.

7            The manner in which we're addressing the issues in

8    front of the Court, the decree, that has had little national

9    application.  Some agencies have attempted to formulate

10   policies on the search of social media, and I found this

11   document to be one of the most contemporaneous documents.

12   Since it was put out by Department of Justice and the Bureau

13   of Justice Affairs under a grant by the federal government, I

14   thought that was the best research mechanism that I had found

15   to this point to put some guidance on the issues of best

16   practices since this document talks about evaluating

17   different agencies, policies and their use of social media in

18   investigative capacity.

19   Q.   Do you consider this to be an authoritative document

20   on the use of developing a policy on the use of social media?

21   A.   I do.  It was published by the Bureau of Justice

22   Administration in conjunction with the Department of Justice,

23   and you know, there are many documents out there that we rely

24   upon that are published by these agencies since they're

25   funded in -- they are funded for the purposes of providing

**UNREDACTED TRANSCRIPT**

1    guidance on subjects that they publish about.

2    Q.    Great.  I want to --

3            **THE COURT:**    There are a couple of things you have

4    to go through to even have a chance to introduce it other

5    than to reference it.  Learned treatises are typically not

6    admitted unless there's certain admissions by counsel

7    opposite perhaps.  Also the age of the document, how long

8    it's been recognized as a document, the publisher of the

9    document, the type of scrutiny that document has received.

10   Typically they're not received as evidence.  They could be.

11   They could be.

12           We might want to get a few -- a little more

13   information there, but we can mark it -- what we'll do is

14   mark it as 29 for ID only, and at some point in time if it's

15   capable of being admitted for its substance then we can

16   consider that.

17           I'd like everybody to please look at that because

18   of course there are many documents out now that deal with the

19   use of social media, and so far the testimony wouldn't make

20   it admissible, but it would make it something that we would

21   mark for ID only.  We need to get a number on it, because

22   apparently we're going to talk about it some.  So ID only,

23   marked and received.

24           Anything else from anybody else -- Mr. Castelli,

25   anything on this at this point in time?

                    **UNREDACTED TRANSCRIPT**

TESTIMONY OF E. DAIGLE                                    14

1      **MR. CASTELLI:**  No, Your Honor.  I think I agree

2    with the Court's assessment at this point on its

3    admissibility.

4           **THE COURT:**  Okay.  Anybody else on that?  We've

5    got it then as ID only, but it's 29.

6           (WHEREUPON, the above-mentioned document was

7    marked as Exhibit Number 29ID.)

8           **THE COURT:**  Okay.  Counsel may proceed.

9           **MS. SILK:**  Thank you, Your Honor.

10   BY MS. SILK:

11    Q.   Mr. Daigle, when was this document created?

12    A.   The publishing date on the document is February 2013.

13    Q.   And you testified that it was created pursuant to a

14   grant.  Is that -- am I remembering correctly?

15          **THE COURT:**  You're welcome to attempt to, but it

16   doesn't appear that it's admissible.  It appears it's only an

17   ID document.

18          Do you understand the rule that we're going under

19   on this?  If you want to make reference to it, that would

20   probably help in the analysis if you want to pursue it.

21          **MS. SILK:**  Sure, Your Honor.  That's no problem.

22   I totally understand.

23          **THE COURT:**  Okay.  No problem.

24   BY MS. SILK:

25    Q.   Mr. Daigle, regarding the use of social media and

                        **UNREDACTED TRANSCRIPT**

1   social media policy, in your report, you describe three

2   levels of use of social media, and I would like for you to if

3   you can please explain those levels to us.

4        The first one is apparent/overt use.  What is

5   apparent/overt use of social media in a criminal or

6   intelligence-gathering capacity?

7   A.   That would be where the law enforcement officer's

8   identification does not need to be concealed in any way.

9   It's kind of correlating to a Fourth Amendment consensual

10  contact information application meaning it's just everyday

11  use and there's no need to conceal the fact that it was

12  looked at and/or the fact of who looked at it.

13  Q.   Is this type of apparent/overt use on what we call

14  open source?

15  A.   It could be.  It could be, yes.  And it could also be

16  an officer's use of their own private or, you know, a social

17  media where they come upon something just in their daily open

18  source review.

19  Q.   And that level of social media use by law enforcement

20  you described as discreet use; is that correct?

21  A.   Yes.

22  Q.   Could you please describe for the Court what the

23  discreet use engagement level entails?

24  A.   That would be the next step up.  That would be where

25  there might be a need to limit the interaction.  There is

1   no -- in discreet use, there's no interaction between the law

2   enforcement officer and any member of the public maintaining

3   the social media account.  It might be just a watching

4   application, but at some point where the -- there might be

5   some need to not show the law enforcement member's

6   identification and who is actually watching.

7            It's kind of like a middle ground where there is --

8   they're not interacting in any way but they're just one step

9   above just an open source review.

10  Q.    And then the third level that you've described which

11  I'm gathering is the most invasive level is what you call

12  covert use; is that correct?

13  A.    Yes, covert use.

14  Q.    And can you explain what covert use engagement level

15  is?

16  A.    So the covert use would be where a social media

17  account is being used for a covert perspective and the fact

18  that it's using another name or identity.  There may be

19  interaction between the covert account and other members of

20  society, and this is the part where when we talk about policy

21  development, this is the part where the most -- most

22  intensive guidelines or supervision controls need to be put

23  in place for the covert application.

24  Q.    So how would -- in your experience, how could a social

25  media policy for a law enforcement agency handle these

**UNREDACTED TRANSCRIPT**

TESTIMONY OF E. DAIGLE                                            17

1    different types of social media use engagement specifically

2    regarding authorization required for each type of engagement?

3     A.   So, interestingly, there is not a lot of guidance on

4    that in the country.  You are one of the first entities that

5    are addressing this in a national which I think will be

6    better understood by different agencies since most law

7    enforcement agencies do not have the guidance of the decree

8    that you guys are under.  Most of this all the way up to

9    covert is just general every day application.

10         We do encourage departments no different than they

11   would years ago with a covert operation or using a

12   confidential informant that there should be some policy

13   guidelines in place to ensure that there are some controls as

14   to who, what, when and where is occurring in a covert

15   operation.  The department should have knowledge of what

16   covert acts their department members are doing so that there

17   can be some oversight in ensuring the effectiveness of that

18   operation.

19    Q.   Great.  So you agree -- would you agree that it's --

20   it is appropriate for a social media policy to have differing

21   levels of engagement for differing levels of social media

22   use?

23    A.   I think that's the trend that we're starting to see,

24   and why I think it's appropriate is because it's -- again,

25   it's an understanding and we're trying to have officers doing

**UNREDACTED TRANSCRIPT**

1   investigations understand when and where they need to have

2   different levels of authority.

3        So, especially in the world of training, we try to

4   correlate it to what they're already familiar with in the

5   Fourth Amendment, and that would be the difference between

6   the three levels of consensual contact, reasonable suspicion

7   and probable cause.  Since they're already very familiar with

8   that aspect of the Fourth Amendment, we've tried to give them

9   the same form of guidance in the social media investigative

10  application.

11       And I'd like to be clear, when you say use of social

12  media, what is very apparent in the industry is that

13  everybody directly relates that to an officer using social

14  media for their own purposes, not from what you're talking

15  about here today which is in addition to that, the

16  investigative arm of using social media.

17  Q.   Great.  Thank you.

18       Now I'd like to talk for a second about one of the

19  proposed modifications that the parties have proposed in

20  their Proposed Modified Consent Decree which is Trial

21  Exhibit 21, and I would like to share the screen so everyone

22  can see it.  This is Section F(1).  Can you see it there?

23  A.   I do, yes.

24  Q.   Okay.  So in Section F(1), the original language of

25  the Decree -- you can read it there and I won't read it for

**UNREDACTED TRANSCRIPT**

1    you -- but the parties have modified this provision to

2    specifically allow for -- excuse me.  Scroll down just a

3    little bit.  F(3).  The parties have added a paragraph that

4    expressly allows for the Memphis Police Department to have

5    officers present at gatherings of persons engaged in First

6    Amendment activity for the purpose of ensuring public safety

7    as long as the Memphis Police Department's presence is not

8    for the purpose of or may reasonably have the effect of

9    harassment or intimidation.

10        Mr. Daigle, how has First Amendment related gatherings

11   changed since 1978?

12   A.   Well, the gathering is -- probably hasn't changed but

13   the mechanism -- because it's still a gathering of people,

14   but the mechanisms to gather those people in the -- in the

15   way law enforcement responds to the gathering of people has

16   dramatically changed since 1978.

17   Q.   And how has the nature of responding to and preparing

18   for those activities changed since 1978 by law enforcement?

19   A.   Well, by law enforcement, we now have more clearly

20   established law guiding what law enforcement can and can't

21   do, and it gives us better principles to teach our officers

22   on, you know, the content-neutral time, place and manner

23   restrictions since there's been court cases across the

24   country that have interpreted that for us.  It gives us

25   better ability.  And over the years there has been a

UNREDACTED TRANSCRIPT

1    significant change in the mechanisms in the way law

2    enforcement responds to crowd control, crowd management

3    aspects, protests, unlawful -- declaring unlawful assemblies.

4    Some of the ways that these things occurred over the years

5    were not effective, and history -- based on history and court

6    cases, they have attempted to modify a lot of the practices

7    in order to ensure that there is an effectiveness of

8    maintaining public safety while ensuring individuals have the

9    freedom to protest under the First Amendment rights.

10   Q.   And in today -- in modern society, can crowd size

11   typically quickly increase because of technological advances

12   like social media more so than they could in 1978?

13   A.   Absolutely.  We've seen that across the country.

14   Q.   Is it your opinion that law enforcement officers

15   should be present at First Amendment gatherings to ensure

16   public safety?

17   A.   Yes.

18          THE COURT:  I'm sorry.  Do you mean all First

19   Amendment gatherings?  They should be at the church to make

20   sure public safety occurs there?  That's a First Amendment

21   gathering.

22          THE WITNESS:  I think there should be a need to

23   have law enforcement there not for the purpose of law

24   enforcement itself but the purpose of today's day and age

25   where we're in a new era where --

**UNREDACTED TRANSCRIPT**

1    **THE COURT:** You made a broad statement that they

2  should be present at First Amendment gatherings. You don't

3  mean that? You mean only certain events? Is that right or

4  wrong or all First Amendment gatherings?

5    **THE WITNESS:** The example you gave, Your Honor,

6  in the church I guess that would be a no.

7    **THE COURT:** What about at, you know, you want to

8  express yourself on abortion rights on Union Avenue or Poplar

9  Avenue in Memphis and there are five people have expressing

10 themselves at First Amendment gathering, picket signs? They

11 can be on either side of the issue. They should be present

12 there?

13   **THE WITNESS:** If there -- it is possible, Your

14 Honor, just for the protection of those individuals.

15   **THE COURT:** So if there are five people on Poplar

16 Avenue near the intersection of Poplar and Parkway, they

17 should -- they should have police presence even though all

18 they're doing is carrying a picket sign?

19   **THE WITNESS:** I guess the difficulty, Your Honor,

20 is what is a police presence. Should an officer stop by and

21 make sure everybody is okay? Yes, I think they should.

22 Should they --

23   **THE COURT:** Why should an officer do that? He's

24 not needed. There's nothing going on. They're just walking

25 around or maybe just standing there with a sign. Do you

**UNREDACTED TRANSCRIPT**

TESTIMONY OF E. DAIGLE                                    22

1    think they should still go by and say something to people who

2    are expressing themselves in a First Amendment way, just

3    because they're expressing themselves in a First Amendment

4    way?

5              THE WITNESS:  Your Honor, what I'm saying is that

6    they should stop by community interaction and make sure

7    everything is okay.  We encourage --

8              THE COURT:  So that means that if you have a

9    Black Lives Matter event and you have three people with a

10   sign that says Black Lives Matter, an officer should come by

11   and, quote, see if they're okay.

12             THE WITNESS:  You keep reducing the size, Your

13   Honor, so as the size reduction goes down, the safety goes

14   down.

15             THE COURT:  Does the First Amendment change when

16   the size goes down?

17             THE WITNESS:  No, Your Honor, but the threat

18   might change.

19             THE COURT:  Okay.  So if there are ten people he

20   should stop by, but if there are three he shouldn't stop by?

21             THE WITNESS:  I would actually like the officers

22   to always stop by and check in with the individuals to make

23   sure everything is okay.

24             THE COURT:  And particularly if it's a Black

25   Lives Matter protest, is that right?

TESTIMONY OF E. DAIGLE                                    23

1              THE WITNESS:  No.  I'm saying all protests, Your

2    Honor.

3              THE COURT:  So if it's an abortion proponent they

4    should definitely stop by?

5              THE WITNESS:  There's no -- it's consistent

6    across the board.  They should always stop by, Your Honor, in

7    my opinion in community policing to make sure there's open

8    communications in case there is a safety issue that comes

9    forward.

10             THE COURT:  That's your interpretation of how the

11   First Amendment works, is that right?

12             THE WITNESS:  I don't know that that's a First

13   Amendment issue, Your Honor, because they're not addressing

14   the time, place and manner restrictions.  It's a community

15   policing issue of ensuring that there is open communication

16   in case an issue presents itself in the future.

17             THE COURT:  So they should just always stop by no

18   matter what or how peaceful you are, how limited number of

19   people there are because you're out there with a sign?

20             THE WITNESS:  It's not the sign that initiates

21   it, Your Honor.  It's the group and gathering the attention.

22   I think the community policing officer should stop everything

23   that occurs in their area.

24             THE COURT:  Okay.  I think we understand your

25   position.  I think you can go right ahead.  Thank you.

                    UNREDACTED TRANSCRIPT

1             **THE WITNESS:**  Okay.

2             **MS. SILK:**  Thank you.

3    BY MS. SILK:

4     Q.   Mr. Daigle, I would like to now move to Section H of

5    the Proposed Modified Consent Decree.  Specifically, I want

6    to direct your attention to the second paragraph which

7    paraphrases restricts the defendants City of Memphis from

8    disseminating personal information about any person collected

9    in the course of a lawful investigation of criminal conduct

10   except that such information may be disseminated to another

11   government law enforcement agency engaged in a lawful

12   investigation of criminal conduct.

13            In your experience with other law enforcement

14   agencies, is it common or best practice that a law

15   enforcement agency might share personal information about a

16   person collected in the course of a criminal investigation

17   with a private entity like a security force of a private

18   company?

19    A.   It is very possible and does happen, yes.

20    Q.   So you work with Oakland Police Department; is that

21   correct?

22    A.   Yes, yes.

23    Q.   And so, for example, if Oakland Police Department

24   received a tip that someone -- a particular person was

25   planning a large demonstration against the local children's

1  hospital for whatever reason, would Oakland PD likely share

2  that tip with the security of the local children's hospital?

3      A.    In my experience, yes.

4      Q.    But here in Memphis, Section H would prohibit MPD from

5  sharing that information.  Is that your interpretation of

6  Section H?

7      A.    It would prohibit anything that is personal in nature.

8  So the difficulty is what is the information.  You obviously

9  couldn't identify the people you got that information from a

10  law enforcement entity.  So that would be a challenge to

11  notifying any type of corporate security.

12     Q.    Okay.  Thank you.

13           Now I'd like to pull up on the screen Trial

14  Exhibit 19, which is I believe the original Consent Decree.

15  We're going to talk about Section I on the restriction on

16  joint operations.

17     A.    Okay.

18     Q.    Give us one second and we'll pull it up.  Are you

19  familiar with Section I?

20     A.    Yes, I've reviewed it.

21     Q.    Okay.  When you first read this, as somebody that has

22  no experience with the Decree, a newbie so to speak, how did

23  you interpret this?

24     A.    I found it to be very restrictive to any interaction

25  or joint operations with anybody, any other law enforcement

1   working with the City of Memphis.

2   Q.   How has collaboration between law enforcement agencies

3   like local, state and federal changed since 1978?

4   A.   Significant changes and improvements in the

5   collaboration of sharing information.  A lot of the witnesses

6   had testified about the things that have occurred, but we've

7   seen now more than ever, which was a detriment to law

8   enforcement over the years, collaboration and sharing

9   information in the early '70s through the '80s was a

10  challenge, and now it is something that is an everyday

11  application such as, you know -- such as the continuous

12  information that a fusion center or other federal entities

13  can share with the location -- the law enforcement the

14  location that information is obtained from.

15  Q.   What happens when agencies do not effectively

16  collaborate?  Do you have any examples?

17  A.   I use two examples in my report.  Obviously 9-11 is a

18  great example of a lack of information sharing and actually

19  became the foundational -- foundation for change in that

20  collaboration.  And I always find one very interesting to use

21  as an example and that would be the serial killer

22  investigation of Ted Bundy.  It was a great example of how

23  collaboration or lack of collaboration between entities

24  allows people to continue heinous crimes without being

25  caught.

**UNREDACTED TRANSCRIPT**

1    Q.    Regarding 9-11 that you mentioned, would you describe

2    that as a significant change in circumstances related to

3    inner-agency sharing of information?

4    A.    Since 9-11, yes.

5    Q.    Okay.  I would like to show the witness Trial

6    Exhibit 25, which is the part -- which is the City's proposed

7    modification to Section I, and I just want to ask Mr. Daigle

8    if he has had an opportunity to review this.

9    A.    I have, yes.

10    Q.    In your opinion, what does this modification allow the

11    City to do expressly?

12    A.    Well, I think it allows the City to continue in a

13    practice of maintaining the safety of the citizens in the

14    City while ensuring that the amendments -- while ensuring

15    that the Decree standards are still in play.

16         One of my simple responses to this is when I first

17    read it I kind of was asking, well, what is the intent of the

18    Decree here; and the intent of the Decree as I could

19    interpret it was not to allow the City of Memphis to use

20    other third party agencies to do the things that the Decree

21    prohibited.  And one of my responses to that was, well, why

22    doesn't it just say that.  Just -- the Decree is very

23    specific on what it allows -- what has been allowed, and I

24    think it's direct enough to be able to ensure that you're

25    just telling the City of Memphis and its employees that we're

**UNREDACTED TRANSCRIPT**

1  not going to tolerate you using anybody else as a subrogate

2  to get that information.  That still applies in your

3  interaction.

4       And what it will do here is it will allow the City of

5  Memphis and the Memphis Police Department to interact with

6  other law enforcement entities and still understand that they

7  have the -- they have to maintain the requirements of the

8  agreement as it's -- as it will be interpreted.

9  Q.   Great.  Now I want to go back to something you said

10 just a minute ago regarding the Ted Bundy investigation.  Can

11 you elaborate on that a little bit in regards to how the --

12 the way that the agencies were not able to share information

13 effectively and kind of give us a little bit of explanation?

14 A.   Sure.  Having spent my career in homicide, I always

15 watch these type of investigations, and I spent a lot of time

16 evaluating the Ted Bundy investigation with Sheriff Ken

17 Katsaris who was the sheriff that first placed him in custody

18 and had him in his jail for many years.  And one of the

19 things that was very prominent that we use as a teaching tool

20 for law enforcement is that Mr. Bundy continually said I knew

21 how the system worked and I knew how to work around it.  And

22 what he would do is he would kidnap in one jurisdiction.  He

23 would murder in another jurisdiction and he would deposit the

24 remains in a third jurisdiction because he knew based on his

25 experience that law enforcement was not good at collaborating

UNREDACTED TRANSCRIPT

1    and was not good at discussing and they would hold their

2    crime scenes close to themselves and not share information,

3    which meant that it would be longer for them to track him

4    down than if they worked together on that information.  So he

5    was using the system to his benefit, and that was a system

6    that we've learned over the years did not work effectively,

7    and law enforcement has done -- put a tremendous amount of

8    effort into ensuring open collaboration for the purposes of

9    sharing information so that they could prevent things that,

10   you know, are significant from happening again.

11       Q.   Great.  Thank you.

12            Now, back to -- back to the City's proposed

13   modification that you're looking at on the screen here for

14   Section I.  So you mentioned that when you first -- when you

15   were evaluating Section I that you wondered why Section I

16   just didn't say what the parties' intent for it to mean,

17   which you interpreted it to be that the City may not direct

18   another agency to act as a surrogate to violate the Consent

19   Decree.

20            Now is the proposed modification you're looking at

21   now -- does it reflect that?

22       A.   The language that you have in blue there, it does

23   reflect that exact intent which is, you know, the City may

24   not direct an agency -- other agency to violate any portion

25   of the Decree as a get-around to the Decree.

**UNREDACTED TRANSCRIPT**

1    Q.   And the second paragraph, the second proposed

2    paragraph to Section I, this language -- I'm sure you're

3    familiar -- came from the Court's own order interpreting

4    Section I.  Would modification of Section I to include the

5    proper interpretation of Section I be important for law

6    enforcement so that they have one document?

7    A.   I agree that it would be.  And again, the underlying

8    implication here is to ensure that the officers working on

9    patrol understand what they can and cannot do in the Decree.

10   Like I said in my testimony the first day, the more specific

11   that we can get in policy and in legal standards the more

12   another officer is able and capable to interpret and ensure

13   that they're meeting those requirements.

14        So anything that clarifies, like the second paragraph

15   does here, anything that clarifies what is allowed and what

16   is not allowed makes it easier for the officers to deal with

17   when they're faced with the situation.

18   Q.   Okay.  Thank you.

19        Mr. Daigle, you've heard me use the phrase the entire

20   Proposed Modified Consent Decree, is that correct?

21   A.   I have, yes.

22   Q.   And is it your opinion that the modification that the

23   parties propose comport with best police practices for the

24   most part?

25   A.   As I said on day one, I think the parties have done a

1    good job of finding a happy medium and the language that's

2    there to ensure the Decree still has the guidance necessary,

3    and I think it's to a point where officers can understand

4    what certain words mean and how they should interpret that

5    implication.

6            **MS. SILK:**  Thank you.  No further questions.

7            **THE COURT:**  Cross-examination?

8    Mr. Castelli?

9            **MR. CASTELLI:**  Yes.  Thank you, Your Honor.

10                      **CROSS-EXAMINATION**

11   **BY MR. CASTELLI:**

12   Q.    Good morning, Mr. Daigle.  I'm Tom Castelli with ACLU

13   of Tennessee.  Just a couple of follow-up questions first

14   from your testimony from Thursday.

15          I believe you had testified about the need to conduct

16   threat assessments by the police department.  Do you recall

17   that testimony?

18   A.    Yes.  Good morning, sir.  And yes, I do recall.

19   Q.    All right.  Thanks.

20          And I just want to -- would you agree with me that a

21   lot of the threats that law enforcement need to assess are

22   threats of some kind of criminal conduct; is that right?

23   A.    I don't know that I can agree with that, sir, because

24   a threat -- there are hundreds of threats that -- you've

25   heard the witnesses testify as an example that are perceived

**UNREDACTED TRANSCRIPT**

1   as a threat that later turned out to be nonthreatening.  So I

2   don't know that there's a direct correlation between the two.

3   Q.   Well, sure.  I mean, it may be that the investigation

4   doesn't turn up actual criminal conduct, but what I'm asking

5   are -- is whether the threats are threats of someone causing

6   someone else injury, for example.  That would be one of the

7   threats you're trying to assess, correct?

8   A.   Yes, sir.  So that the -- sorry.

9   Q.   And so that would be trying to assess whether or not

10  someone's going to commit a violent type crime that might

11  cause physical injury, correct?

12  A.   Yes, sir.

13  Q.   All right.  And then regarding social media, I think

14  you've testified some today and some last week about the

15  use -- law enforcement's use of social media.  And to make

16  sure I understand, your opinion is that there is useful

17  information for conducting criminal investigations found on

18  social media?  Is that your opinion?

19  A.   I don't understand sir.  I'm sorry.

20  Q.   Is it your experience and your opinion that there is

21  useful information to law enforcement when they're conducting

22  criminal investigations on social media?

23  A.   Yes, sir.

24  Q.   Okay.  But you also would agree, though, that there's

25  also -- social media has also become a platform for the

**UNREDACTED TRANSCRIPT**

1    expression of free speech?

2    A.   Yes, sir.

3    Q.   So you would agree that the government in general just

4    has to be careful with what kind of data they're collecting

5    off of social media?

6    A.   Yes, sir.

7    Q.   All right.  And I believe you just testified, though,

8    that some of these modifications that the parties have

9    jointly proposed would take into account law enforcement's

10   need to use social media; is that correct?

11   A.   Yes, sir.

12   Q.   But also leave in place the protections to make sure

13   that they're not kind of abusing their access to it?

14   A.   Yes, sir.

15   Q.   Okay.  And you testified today about Section I of the

16   Decree.  So would you agree just the original language -- and

17   I can put it back up if you need me to.  I believe it was

18   Exhibit 19, and let me share that with the Court.

19        Okay.  Could you read that, Mr. Daigle?  I'm not sure

20   exactly.  Maybe make it a little bigger.  Is that legible on

21   your screen?

22   A.   Yes, sir, it is.

23   Q.   Okay.  Great.  So I believe your testimony was that

24   when you read this, you thought it was very restrictive on

25   joint operations between law enforcement agencies.  Am I

**UNREDACTED TRANSCRIPT**

1    right that that was your testimony earlier?

2      A.    Yes, sir.

3      Q.    All right.  You would agree with me that even this

4    language doesn't restrict all exchanges of information

5    between law enforcement agencies?

6      A.    I would agree with that, yes, sir.

7      Q.    And it doesn't prevent or prohibit all collaboration

8    between the Memphis Police Department and other law

9    enforcement agencies?

10     A.    It does not prevent it, no.

11     Q.    And it doesn't prevent collaboration from the Memphis

12   Police Department and a private security agency -- all

13   collaboration between the Memphis Police Department and a

14   private security agency?

15     A.    I guess what the challenge is that word collaboration,

16   sir, that's the problem with I is the definitions are what's

17   important.  So they could talk to private security, yes, but

18   to what level and what information can be shared is what is

19   unclear.

20     Q.    Well, I mean, certainly you would agree that what it

21   is prohibiting is any type of collaboration that would

22   violate the Decree, correct?

23     A.    In sum, in theory, yes, I agree with that.  That is

24   what the issue is, though.

25     Q.    So if the collaboration is purely about a criminal

1  investigation and doesn't touch on any of these First

2  Amendment issues, then Section I wouldn't have any ^ effect

3  on that collaboration?

4     A.    You are correct, sir.

5     Q.    And you talked some about the Ted Bundy case and some

6  of the problems that law enforcement ran into with their

7  level of collaboration.  That was a murder and kidnapping

8  investigation, am I right, or were there other crimes that

9  were being investigated there?

10    A.    Ted Bundy had -- it's just not murder, but it was

11 significant, you know, rape and kidnapping and murder from,

12 you know, Oregon all the way through to Florida over a period

13 of time.

14    Q.    Multiple jurisdictions, multiple different types of

15 crimes that were committed in various jurisdictions across

16 the country?

17    A.    Yes, sir.

18    Q.    Were there any free speech type concerns in that

19 particular case?

20    A.    Not that I'm aware of, sir, no.

21    Q.    Are you -- have you had a chance to review the Court's

22 order which is -- the Court's order that was issued in

23 November of 2019 that we've talked about throughout the

24 hearing, ECF number 250?

25    A.    I did review it during the time of preparing the

TESTIMONY OF E. DAIGLE                                    36

1   report and preparing for this.  It's been a little bit.  You

2   might want to show it to me.

3       Q.   Well, I think -- really my question is generally after

4   you reviewed that order did that give you a better

5   understanding of how Section I functions under the Decree?

6       A.   It gave me a better understanding of how Your Honor

7   had interpreted Section I, and that it did, yes.

8       Q.   And you would agree with me that once the Court weighs

9   in on a Consent Decree and interprets it, that's how it

10  functions going forward, right?

11      A.   Yes and no.  That is the Court's interpretation.  The

12  difficulty is that those are not the words on the page of the

13  Decree.  So that's the challenge.  So while the Judge's

14  interpretation has to be shared with the members of the

15  police department, it's another level of understanding for

16  the officers.

17      Q.   And some of that would be what training on the Decree

18  would need to entail is bringing in various court

19  interpretations of the Decree and examples of how the Decree

20  has functioned in the past; is that correct?

21      A.   Yes.  That's how we -- that's how we train in a

22  scenario-type application.

23             MR. CASTELLI:  Those are my questions, Your

24  Honor.  Thank you.  Thank you, Mr. Daigle.

25             THE WITNESS:  Thank you, sir.

                    **UNREDACTED TRANSCRIPT**

1          THE COURT:  Any questions from the Monitor?

2          MR. STANTON:  Good morning, Your Honor, yes, a

3     few.

4                    **CROSS-EXAMINATION**

5     **BY MR. STANTON:**

6     Q.   Good morning, Mr. Daigle.

7     A.   Good morning, sir.

8     Q.   I want to start with kind of a preliminary inquiry.

9     You're aware that the City has withdrawn the portion of its

10    morning that is directed to vacator of the Consent Decree?

11    You're aware of that, right?

12    A.   Yes, sir, I am.

13    Q.   And I believe Ms. Silk asked you that last week if the

14    withdrawal of the request to vacate the Consent Decree moots

15    any part of your report, and your response to that was no; is

16    that right?

17    A.   That was my response, yes.

18    Q.   Okay.  I'd like to look at Paragraph 40 of your

19    report.  If we can pull up that report.  It's ECF 306, and I

20    think it's Trial Exhibit 23.  Let's scroll down to numbered

21    Paragraph 40.  I just -- now Mr. Daigle, I want to direct

22    your attention to the last sentence of Paragraph 40 there.

23    I'm going to read it.  I want you to tell me if I read it

24    correctly.

25          It says, in 2020 there's no need for a decree to

1   protect citizens' rights.  The law and effective operation of

2   the department does that already.

3        Now that's no longer the City's position; is that

4   right?

5   A.   That is no longer the City's position is my

6   understanding, yes.

7   Q.   So that would moot this portion of your report, right?

8   A.   Well, that's still my opinion.

9   Q.   Well, that's not the question.  The question isn't

10  what your opinion is.  The question is does the City's

11  withdrawal of this request to vacate the Consent Decree moot

12  this portion of your report for purposes of this case?

13  A.   I don't -- I'm not the City, but I would say that the

14  statement is still accurate; that clearly established law is

15  the guiding principle there.  I know that they're not

16  attempting to vacate it, but that is the challenge that we're

17  faced with here in the Decree is the conflict between clearly

18  established law, operational standards and the 1978 Decree.

19  Q.   All interesting but not responsive to my question.

20       At issue is the City's -- the parties' joint effort to

21  modify the Consent Decree, not to vacate it.  So this portion

22  of your report and any other portions directed to vacating

23  the Consent Decree are moot, right?

24            MS. SILK:  I object, Your Honor.  It's asked and

25  answered.

                        **UNREDACTED TRANSCRIPT**

1           THE COURT:  Objection is overruled.

2           THE WITNESS:  I don't believe they are because

3    I'm not saying in that statement that it needs to be vacated.

4    BY MR. STANTON:

5    Q.   Well, you are saying that there is no need for a

6    decree to protect citizens' rights and that's the equivalent

7    of vacator, right?

8    A.   In your interpretation, yes, sir.

9    Q.   Okay.  We can move on.

10          I want to talk a little bit about -- I tell you what.

11   Let's stick with your report.  Let's go to Paragraph 27 of

12   your report, and we'll talk generally and may get

13   specifically to that paragraph.

14          You have testified I think on Direct and in response

15   to Mr. Castelli that lots of police departments or law

16   enforcement agencies use social media in their

17   investigations; is that right?

18   A.   That is true, yes.

19   Q.   And I think the statistic you gave is that 76% of law

20   enforcement agencies use social media; is that right?

21   A.   That is the statistic I put in my report, yes.

22   Q.   So this Paragraph 27 that's on the screen, you've got

23   four examples of -- you've got four examples of things that

24   might have been discovered by law enforcement on social

25   media.  Is that what these things are meant to indicate?

TESTIMONY OF E. DAIGLE                                    40

1    A.   Those bullet points are meant as a demonstrative of my

2    examples, yes.

3    Q.   Okay.  So I want to go to the first one, the one in

4    Ortonville, Michigan, threats on the after-school app.  Now

5    the app, that's not social media, right?

6    A.   It is, sir.

7    Q.   An app is social media?

8    A.   It is, sir, yes.

9    Q.   Okay.  And threats, can you tell us a little bit more

10   about the nature of the threats at issue.  I see the footnote

11   there says, teen arrested for using app to threaten

12   classmates.

13        That would have criminal implications, wouldn't it?

14   A.   That language would have criminal implications, yes,

15   sir.

16   Q.   And the Consent Decree expressly allows the Memphis

17   Police Department to investigate criminal matters, even when

18   those matters may incidentally implicate First Amendment

19   rights, right?

20   A.   I would say it's not as clear as you've just

21   articulated it, sir.

22   Q.   Well, okay.  Well, let's look at the Consent Decree

23   then and see how clear it is.

24        Let's pull up -- I believe the Consent Decree was

25   Trial Exhibit 19.  Let's go to Section G of the Consent

**UNREDACTED TRANSCRIPT**

1    Decree.  Stop there first.  I'm going to read that.  That's a

2    little blurry.  Mr. Daigle, I'll read the first paragraph of

3    G for you there.  Let me know if I read that correctly.

4         Any police officer conducting or supervising a lawful

5    investigation of criminal conduct which investigation may

6    result in the collection of information about the exercise of

7    First Amendment rights or interfere in any way the exercise

8    of such First Amendment rights must immediately bring such

9    investigation to the attention of the Memphis Director of

10   Police for review and authorization.

11        Did I read that correctly?

12   A.   It appears you did, yes, sir.

13   Q.   So Section G expressly allows the police to conduct

14   criminal investigations that may incidentally affect First

15   Amendment rights?

16   A.   With authority from the Director of Police, yes.

17   Q.   Right.  And that sets out a protocol for obtaining

18   that authority and what the authority and the review must

19   contain, right?

20   A.   I agree, yes, sir.

21   Q.   Okay.  Now let's go back to Paragraph 27 of your

22   report.

23        So with that understanding, the Memphis Police

24   Department could investigate this matter because it's got

25   criminal implications even though it may incidentally involve

**UNREDACTED TRANSCRIPT**

TESTIMONY OF E. DAIGLE                                    42

 1   First Amendment rights; right?

 2     A.   With the authority of the Director, yes, sir.

 3     Q.   Okay, great.

 4          The same is true for the second example there about a

 5   publishing advertisement that depicted children who

 6   authorities believe to be sex trafficking victims.  Sex

 7   trafficking is a crime, right?

 8     A.   Yes, sir.

 9     Q.   So Section G would allow the Memphis Police Department

10   to investigate that, wouldn't it?

11     A.   With the authority of the Director, yes, sir.

12     Q.   Okay.  Let's go to the third one there.  Sarasota

13   County sheriff detectives arrested 25 people during a

14   four-day initiative focused on protecting Sarasota County

15   children from online predator and human trafficking.

16          Again, that's a crime Memphis Police Department can

17   investigate it under the Consent Decree as it's written right

18   now, right?

19     A.   It depends on -- that's not as clear as all of them

20   were actually criminal applications at the time they started

21   to look at that four-day initiative.  So the answer to your

22   question is yes, because with the authority of the Director

23   they could, but when and where they obtained knowledge of

24   that is part of the investigation aspect.

25     Q.   Okay.  And then the fourth, the fourth example I think

                     UNREDACTED TRANSCRIPT

1   you called it demonstrative there, that one concerns a gun

2   fight themed mannequin challenge, seizure of guns, body

3   armor, marijuana and ammunition.  Criminal, right?

4   A.   Yes, sir.

5   Q.   I want to talk about another -- let's move to

6   Paragraph 32 of your report, and I have to say I'm confused

7   by part of that, and I want you to help me clear it up.

8        In 32 and you see kind of in the middle there you pose

9   a rhetorical question.  You say, the average citizen can

10  search social media for readily available information but a

11  Memphis police officer may not.

12       I mean, that's not exactly an extraordinary

13  proposition, right.  It's a fundamental concept of

14  constitutional law that there are things government cannot do

15  that individuals can, right?

16  A.   That's not -- that's not true, sir.  That's not true.

17  Q.   That's not true?

18  A.   No.  What we're talking about here is the fact that

19  the limitations of an officer having the ability to search

20  social media just as a general everyday officer with -- but

21  the fact that they're employed by the Memphis Police

22  Department they can't use open source in their private life

23  and they can't use open source in their law enforcement life,

24  that doesn't meet the standard set forth on the use of social

25  media by citizens in today's world.

**UNREDACTED TRANSCRIPT**

TESTIMONY OF E. DAIGLE                                    44

1    Q.   Perhaps you didn't understand my question.

2         The First Amendment restrains government generally.

3    It does not generally restrain individuals, correct?

4    A.   I don't understand your question, sir.

5    Q.   Well, okay.  I'll try it again.  We'll do it in two

6    parts.

7         The First Amendment applies to governmental actors,

8    correct?

9    A.   It applies to everybody, but in this case it's

10   governmental interpretation of First Amendment, yes.

11   Q.   Okay.  It restrains governmental actors?

12   A.   Yes, I agree with that, sir.

13   Q.   Okay.  It does not generally restrain individuals who

14   are not governmental actors, correct?

15   A.   Yes.

16   Q.   So it is not a remarkable thing that the average

17   citizen might be able to search social media in ways that a

18   Memphis police officer can't; right?

19   A.   I still don't agree, sir, because the aspect of the

20   collision of the First Amendment and the Fourth Amendment and

21   the expectation of privacy that applies, the sharing of

22   information is so volumus that the simple search on open

23   source by an officer should not be something that implicates

24   the First Amendment.

25   Q.   Well, I tell you what, we can -- there's a language in

                      **UNREDACTED TRANSCRIPT**

TESTIMONY OF E. DAIGLE                                           45

1   your report that might even give us greater clarity.  Let's

2   go to Paragraph 67.  I'm going to start reading there near

3   the bottom.  You can see kind of on the right side of that

4   paragraph, there's a Supreme Court case, Boyd versus United

5   States.

6         Do you see where I am?

7   A.   I do, sir, yes.

8   Q.   Okay.  I'm going to read there and let me know if I

9   read this correctly.  First that the amendment seeks to

10  secure the privacies of life against arbitrary power.  Did I

11  read that correctly?

12  A.   That's what's said, yes, sir.

13  Q.   Okay.  And then second and relatedly, that a central

14  aim of the framers was to place obstacles in the way of a

15  too-permeating police surveillance.  That's language from the

16  Supreme Court in United States versus Di Re.  Is that

17  correct?

18  A.   That's correct, yes, sir.

19  Q.   It's at least clear to the Supreme Court that the

20  First Amendment operates to restrain government and not

21  individuals, right?

22  A.   From conducting surveillance, yes.

23  Q.   Okay.  I want to talk a little bit about the new

24  exhibit that was offered for identification today.  I think

25  it's this developing a policy on the use of social media, and

1    I have that down as Exhibit 29 for ID only.  I just have a

2    few questions.  We don't need to go through that policy as

3    it's not been admitted.

4         I just -- I believe you testified when you were

5    talking to Ms. Silk that there is little national application

6    of kind of a single social media policy; is that right?

7    A.   As to the investigation of social media, yes, sir.

8    Q.   Okay.  So that means, you know, each law enforcement

9    agency is sort of figuring out for itself; right?

10   A.   At this point, yes, sir.

11   Q.   Okay.  Now this particular policy that's Exhibit 29

12   for ID, that was prepared I believe you testified by the

13   Bureau of Justice Administration; is that right?

14   A.   Yes, sir.

15   Q.   That's a federal entity?

16   A.   It is -- I don't know whether it's actually a federal

17   entity or a nonprofit application of the Department of

18   Justice.

19   Q.   Okay.  So you're not sure who created this report?

20   A.   I am sure of the people who created it.  It's the

21   Bureau of Justice Assistance.  I'm just not sure how they're

22   formed, sir.

23   Q.   You're not sure if it's the government or not?

24   A.   Yes, sir.

25   Q.   Okay.  Would you agree with me, though, that different

**UNREDACTED TRANSCRIPT**

1    legal requirements operate against state and federal law

2    enforcement agencies?

3        A.   It's possible, yes, sir.

4        Q.   Well, it's necessary, right?  For example, the FBI and

5    FBI agents are not constrained by the Tennessee constitution,

6    right?

7        A.   They are not, no.

8        Q.   But police officers in Tennessee are constrained by

9    the US constitution and the Tennessee constitution, right?

10       A.   They are, yes, sir.

11       Q.   Okay.  So necessarily, different legal obligations

12   apply to state and federal law enforcement entities?

13       A.   Like I said, sir, it is possible, yes.

14       Q.   It's necessary, not possible, right?

15       A.   Well, it's necessary to the point that the entity must

16   follow its law in the area that it's governing.  So I agree

17   with you in that aspect, but most of this is federal law

18   which is a national application.

19       Q.   Well, right, but state law enforcement entities are

20   bound by federal law just like federal law enforcement

21   entities.  State law enforcement entities also are bound by

22   state law, and federal law enforcement entities are not;

23   correct?

24       A.   I agree with that, yes, sir.

25       Q.   Okay.  And then the case of Memphis, there are three

1    layers.  Memphis police officers are bound by the Federal

2    constitution, the Tennessee constitution and also by the

3    Kendrick Consent Decree; is that right?

4        A.   That is true, yes.

5        Q.   Neither the Tennessee constitution nor the Kendrick

6    Consent Decree would apply to, for example, the FBI?

7        A.   No, sir.

8        Q.   This report, this developing a policy on the use of

9    social media, does it make any specific mention of law

10   enforcement entities under consent decrees?

11       A.   Under Consent Decree for First Amendment, I do not --

12   it does not because I do not think -- if there is one or two

13   others.  I think you are one of the elite in this area.

14       Q.   Right.  Okay.  So even if this report makes reference

15   to law enforcement entities under consent decrees, which you

16   just testified it doesn't, would have limited application to

17   Memphis because the Kendrick Consent Decree is unique?

18       A.   That is true.

19       Q.   Okay.  And, in fact, I think you testified when you

20   were talking to Ms. Silk that most law enforcement agencies

21   don't have the guidance that the Kendrick Consent Decree

22   offers Memphis; is that right?

23       A.   That is true.

24       Q.   Okay.  So a generic social media policy or generic

25   guidelines for creating social media policy would be of

UNREDACTED TRANSCRIPT

1    limited use in framing a social media policy for Memphis;

2    right?

3    A.   It would not -- if there is some clearly established

4    law in the Kendrick Decree would be the guiding principles,

5    but you do have to pay attention to national application

6    because we're -- this national application in law enforcement

7    always has a part in ensuring consistency on interpretation.

8         So while you are correct that the law matters in your

9    area, there is also a national application which is what this

10   document appears to attempt to provide some guidance on.

11   Q.   Well, now I'm confused because I thought you began

12   your testimony about this policy by saying there's little

13   national application?

14   A.   There is not any -- there is not any guiding policies

15   that you can use in this country as an example on this issue

16   because you guys are the first ones to address under the

17   Kendrick Decree the issues of using social media

18   investigation.  I believe there's one or two other agencies,

19   but nobody else has the standards or the requirements placed

20   on them that you do in the City of Memphis under the Kendrick

21   Decree.

22   Q.   Okay.  Couple more questions.  I want to pull up the

23   original Consent Decree again in Trial Exhibit 19.  It's Demo

24   E for us.  Let's go to Section H.  There, that's good.  Let's

25   stop there.

1      Now, Mr. Daigle, I thought I heard you testify when

2  you were speaking to Ms. Silk -- and I may have misheard so I

3  want you to help me here.  I thought I heard you testify that

4  this section prevents the City from sharing any personal

5  information.  Was that your testimony?

6  A.   It could prevent the City from sharing information,

7  and it probably does.  So I'm going to go with yes, it does

8  prevent because of the inability to identify the requirements

9  of personal information and how far does that allow Memphis

10 police officers to go in sharing information.

11 Q.   Now see, that's confusing to me, right, because

12 Section H (1) there says that the City shall not maintain

13 personal information about any person unless it is collected

14 in the course of a lawful investigation of criminal conduct

15 and is relevant to such investigation.

16      So if personal information is gathered in the course

17 of a criminal investigation and it's relevant to that

18 investigation, the City can maintain that and share it;

19 right?

20 A.   That is true, but what we were talking about here is

21 the collection of information where it's unknown whether or

22 not a criminal matter is occurring, and that seems to be

23 coming up in the interpretation portion here, which is a

24 threat is a threat is a threat.  A threat could be like

25 counsel for the ACLU has said could be a criminal

1   application, but if you share that, if you share the

2   information directly related to that threat and it's not yet

3   a criminal act and/or it doesn't become a criminal act, does

4   that violate Section H (1) of the application of the Decree.

5   Q.   Okay.  So I'm not really sure whether that was

6   responsive to my question.  I guess I'll try again.

7        If the personal information is gathered in the course

8   of a lawful investigation of criminal conduct and it's

9   relevant to that investigation, Section H does not prohibit

10  the City from sharing that information, right?

11  A.   If it is lawful criminal conduct, yes, it does not

12  prohibit.

13             MR. STANTON:  I think that's off all I've got for

14  you, Mr. Daigle.

15             THE WITNESS:  Thank you, sir.

16             THE COURT:  Redirect?

17                      REDIRECT EXAMINATION

18  BY MS. SILK:

19  Q.   Mr. Daigle, I'm going to work backwards.  I believe

20  counsel for the monitoring team may have inadvertently

21  characterized your testimony regarding Section H.  If we can

22  pull back Section H on the Decree, exhibit -- Trial

23  Exhibit 19, I believe.

24        When you and I were discussing section H, we were

25  specifically referencing the dissemination of information to

                      **UNREDACTED TRANSCRIPT**

1   nongovernmental law enforcement agencies, is that correct?

2   A.    That is correct, yes.

3   Q.    So Section H as it's currently worded prohibits the

4   City from disseminating personal information collected during

5   the course of a law enforcement -- a lawful investigation of

6   criminal conduct to any nongovernmental law enforcement

7   agencies.  That was your testimony; is that right?

8   A.    Yes, that was my testimony.

9   Q.    Thank you.

10        Now, let's go back to the document that was discussed

11  that's been marked for identification as Exhibit 29,

12  developing a policy on the use of social media.

13  A.    Yes, ma'am.

14  Q.    And I'd like to publish that on the screen, please.

15          **THE COURT:**  This is ID only.  Go ahead.

16  BY MS. SILK:

17  Q.    I just want to direct you to Page 3 of that policy --

18  excuse me -- of that document.  We'll blow it up a little bit

19  here.  The second full paragraph here, could you read that

20  aloud?  This is the second full paragraph beginning with "the

21  developing a policy"?

22  A.    The developing a policy on the use of social media in

23  intelligence and investigative activities:  Guidance and

24  recommendations is designed to guide law enforcement agency

25  personnel through the development of a social media policy by

**UNREDACTED TRANSCRIPT**

1   identifying elements that should be considered when drafting

2   a policy as well as issues to consider when developing a

3   policy, focusing on privacy, civil rights and civil liberties

4   protections.  This resource can also be used to modify and

5   enhance existing policies to include social media

6   information.  All law enforcement agencies regardless of size

7   and jurisdiction can benefit from the guidance identified in

8   this resource.

9   Q.   Thank you.

10       So this document that you're reading from, this was

11  not created for the FBI or for any particular federal law

12  enforcement agency; correct?

13  A.   No, ma'am.  It appears to be a white paper, a research

14  paper.

15  Q.   And in that vain, counsel for the monitoring team made

16  it clear that not every law enforcement agency is bound by

17  the same laws.  For example the Tennessee FBI is not bound by

18  the Tennessee constitution.  But is it fair to say that all

19  law enforcement agencies are bound by the US constitution?

20  A.   Yes, ma'am.

21  Q.   Now to be clear, going back to counsel for the

22  monitoring team's original question, when you wrote this

23  report in support of the City's motion to modify or vacate

24  the Consent Decree, you wrote it with the motion to vacate in

25  mind; is that right?

**UNREDACTED TRANSCRIPT**

1    A.   That is true, yes.

2    Q.   And while -- and I believe it was your testimony that

3    you don't necessarily agree with the City's decision to

4    withdraw its motion to vacate; is that right?  Did I remember

5    that correctly?

6    A.   Yes.

7    Q.   But had you written this report with only the City's

8    motion to modify the Consent Decree, would the report

9    possibly have taken a different tenor?

10   A.   I would have probably not used the word "vacate" in

11   the course of the report.  I think the issues are broken up

12   individually for the purposes of identifying the concerns in

13   national standards that apply to each issue.  If there was

14   not a motion to vacate at that time I just would not have

15   said that as a conclusion in any aspect of the report.

16   Q.   Thank you.

17        And one last thing on your report.  Counsel for the

18   monitoring team referenced Paragraph 27 in your report?

19   A.   Yes, ma'am.

20   Q.   Do you have that in front of you?  We can pull it up

21   on the screen.

22   A.   I have it, yes, ma'am.

23   Q.   Okay.  Counsel for the monitoring team kind of

24   slow-walked you through several examples of law enforcement's

25   use of social media.  Do you recall that?

1    A.   I do.

2    Q.   And the implication there is that Section G covered

3    all of these examples that you list because they're crimes,

4    but I believe you testified earlier and I'd like for you to

5    tell us again is social media -- is an investigation on

6    social media implicates the First Amendment because it is a

7    platform for speech?

8    A.   No, ma'am.

9    Q.   So let me rephrase that.  Is social media a platform

10   for speech?

11   A.   It is, yes.

12   Q.   Okay.  And because it is a platform for speech, any

13   investigation into it would necessarily implicate the First

14   Amendment, right?

15   A.   It could, yes.

16   Q.   And so the parties in their Proposed Modified Consent

17   Decree, Section G -- if we can please pull that up, that is

18   Trial Exhibit 21 in these modifications -- the parties have

19   attempted to recognize the fact that social media does

20   implicate speech but allows for investigation into criminal

21   conduct that are not directly related to First Amendment

22   rights to prevent having to get director authorization every

23   time they look on social media.  Do you think that

24   clarification is important for modern law enforcement agency

25   like Memphis Police Department?

**UNREDACTED TRANSCRIPT**

56

1    A.   I do think it's important, and the one thing that the

2    counsel didn't address was the fact while the officers were

3    investigating this, if they had opened up any of these social

4    media pages and was faced with other -- well other types of

5    speech that might implicate the First Amendment it would have

6    to take their time and get Director's approval and that could

7    delay some of the significant response that was necessary

8    there.  So that's the challenge that this issue is faced

9    with, and that is all of these social media platforms are

10   intended to be speech.  So the difficulty of separating the

11   speech from the criminal act is the challenge that the Decree

12   is dealing with in modification.

13   Q.   Do you believe that the parties' jointly proposed

14   modifications related to Section D are sufficient to allow

15   Memphis Police Department to properly protect public safety,

16   investigate crime while retaining the core tenets of the

17   Consent Decree?

18   A.   As I said, I think the parties have done a good job of

19   trying to meet the happy medium while protecting the tenets

20   of the Decree.  I think it will be more effective for the

21   officers that are interpreting it.

22          **MS. SILK:**  Thank you.  No further questions.

23

24

25

**UNREDACTED TRANSCRIPT**

57

1          **THE COURT:**  I think concludes the witness's

2  testimony and we appreciate you being here, and we're going

3  to let you be excused at this time.  Thanks so much.

4          **THE WITNESS:**  Thank you, Your Honor.

5          **THE COURT:**  Now let me go to the City and ask --

6  I think we know the answer, but will there be any additional

7  witnesses or offers of proof in connection with this matter?

8          **MS. SILK:**  No, Your Honor.

9          **THE COURT:**  Okay.  The City has rested.  Let's go

10  back -- let's go then to ACLU.  This is the opportunity for

11  the ACLU to present any evidence that you would like to.

12          Mr. Castelli, do you wish to present any evidence

13  on behalf of the ACLU?

14          **MR. CASTELLI:**  No additional evidence, no, Your

15  Honor.

16          **THE COURT:**  Okay.  The ACLU having rested, does

17  the Monitor wish to present any additional evidence in

18  rebuttal in this matter?  Anything, Mr. Stanton?

19          **MR. STANTON:**  No, Your Honor, nothing further

20  from the Monitor.

21          **THE COURT:**  All right.  That concludes all of the

22  evidence in this matter, and what we'll do is we understand

23  that there will be closing statements in a moment by counsel,

24  and I want to make sure that we know the sequence of them.

25  Logically in accordance with our order of proof, we might

**UNREDACTED TRANSCRIPT**

1  start with the City, but I'm going to ask and see if that's

2  what you wish to do.  Of course the other thing is that there

3  will be an opportunity for some closing remarks by the

4  Monitor although it's not necessary.  So let me check.

5          Mr. Castelli, any problem with -- I'm going to

6  ask the City, any problem with you're going first.  You may

7  not want to go first, but it is your burden on this matter.

8  Any problem with the City going first in connection with

9  closing statements?

10         **MS. SILK:**  We would actually like to hear from

11  the Monitor since he's neutral first.

12         **THE COURT:**  Sure, that's perfectly fine.  And

13  that's what I was checking.  And the Monitor I know was

14  initially probably going to go first.  Any -- is that

15  satisfactory with the Monitor?

16         **MR. STANTON:**  Yes, Your Honor.  We're happy to

17  proceed as the Court deems necessary and appropriate.

18         **THE COURT:**  That's fine.  The Monitor will go

19  first, then the Movant, the City of Memphis, and then

20  Mr. Castelli.  And then it's a little awkward but normally

21  the party with the burden would have a chance for rebuttal

22  argument.  What we'll do is then we'll go back to the Monitor

23  briefly and then we'll go back to the City briefly.  It may

24  not be any need to make any further statement but that's the

25  order on which we'll proceed.  So we'll go Monitor, City,

**UNREDACTED TRANSCRIPT**

59

```
 1   ACLU and then back to the Monitor and then back to the City,
 2   and of course again not necessary to offer rebuttal, but
 3   we'll follow that sequence.
 4              Now that we know the order, we've been on air
 5   really or in court session for almost an hour and a half, and
 6   so we would normally take a break at this time.  We
 7   understand the timelines on this.  Mr. Stanton, we still
 8   anticipate that this will be relatively brief?  Is that what
 9   you still anticipate?
10              MR. STANTON:  That's correct, Your Honor, very
11   brief.
12              THE COURT:  About how long, just so I can make a
13   note?
14              MR. STANTON:  I would say, Your Honor, certainly
15   less than ten minutes, five to 10 minutes.
16              THE COURT:  Okay.  That's fine.  I'm going to
17   check briefly with the City, and I'm not sure, Mr. McMullen,
18   are you handling this?
19              MS. SILK:  Mr. McMullen said it would be about
20   15 minutes or less.
21              THE COURT:  About 15 minutes or less.  That's
22   perfectly fine.
23              Then we're going to go to ACLU.  About how long?
24              MR. CASTELLI:  Five to 10 minutes, Your Honor.
25              THE COURT:  Five to ten, okay.  That's probably
```

**UNREDACTED TRANSCRIPT**

1    what I need to know.

2           Now we will take that break as we would before

3    any close.  We always have a short restroom break.  That's

4    normal.  It's at least ten minutes.  In this case it will be

5    12 minutes.  Don't mute your mic.  If you mute your mic then

6    we'll have to reinvite you to the meeting so you'll have a

7    live mic here.  Remember, you have a live mic, and so if you

8    step away you want to keep that in mind.

9           We'll see everybody at 20 til 11:00 for closing

10   arguments.  Thank you very much.

11           (Brief Recess).

12           **THE COURT:**  All right.  I think we're about

13   ready.  I just want to make sure we have everyone.

14           We have Mr. Castelli and we have Ms. Silk and

15   we've got Mr. McMullen and we've got Mr. Stanton.  So we have

16   everyone.

17           This is an opportunity to hear from each entity

18   including the Monitor in connection with the proposed

19   modifications and of course the -- particularly that one

20   issue that relates to Section I, but I think we certainly

21   need to hear from you on the idea of modification as well,

22   which there's pretty much a consensus we but we might want to

23   confirm that, and then of course we want to go into specific

24   discussion on any sections that we need to be particularly

25   alerted to in terms of disagreements.

**UNREDACTED TRANSCRIPT**

1          So Mr. Stanton, are you ready?  You may proceed.

2          **MR. STANTON:**  Yes, sir.  Thank you, Your Honor,

3    and certainly to counsel.  May it please the Court.

4          In the order finding that City of Memphis was in

5    contempt of the Consent Decree and providing for the

6    employment of an independent monitor, it was this Court that

7    noted the unique opportunity that confronts the City of

8    Memphis.  As the Court explained in its order by saying this,

9    by successful implementation of the Consent Decree, the

10   Memphis Police Department has the opportunity to become one

11   of the few if only metropolitan police departments in the

12   country with the robust policy for the protection of privacy

13   in the digital age, end quote.

14         In withdrawing its previous request to vacate the

15   Consent Decree and instead working with the ACLU of Tennessee

16   to agree upon 16 of 17 proposed modifications to clarify the

17   consent decree's meaning, the City appears to have now

18   embraced its opportunity.  My team and I fully support the

19   parties' compromise.  Ultimately we defer to the Court to the

20   bargain struck by the parties to whatever extent that bargain

21   is approved by this Court.

22         It should be noted that the Consent Decree as

23   written does not prevent the Memphis Police Department from

24   policing.  The City's witnesses offered a number of

25   illustrations including kidnapping, mall shootings and the

**UNREDACTED TRANSCRIPT**

1    killing of an undercover operative by the members of a gang,

2    but all of these examples are crimes, and as this Court has

3    pointed rather than preventing the police from investigating

4    crimes, the Consent Decree provides an explicit procedure for

5    the review and approval of criminal investigations in Section

6    G.  And likewise, as the Court explained two years ago, while

7    certain terms of the Consent Decree may be outdated, the

8    concepts -- the concepts are not and the dilemma faced by the

9    City is not new.

10          After all that has been mentioned even today, the

11    US and Tennessee constitution's ratified and adopted in 1787

12    and 1796 are far older than the Consent Decree and police

13    officers faithfully executed upholding them every day.  The

14    real issue that appears to be less about clarity or age and

15    more about awareness, training, the Memphis Police Department

16    integrating the tenets and embracing the tenets of the

17    Kendrick Consent Decree into the core fabric and culture of

18    the Memphis Police Department going forward.

19          Now this acknowledgment brings us finally to the

20    one section of the Consent Decree on which the parties do not

21    agree.  We all know that's Section I.  Section I governs the

22    City's ability to work with and receive information from

23    other law enforcement agencies and third parties.  The ACLU

24    of Tennessee maintains that Section I may remain as it is.

25    The City contends that it must be changed but everyone

1   agrees, Your Honor, that Section I as clarified by this

2   Court's order of November 13, 2019 is clear.  And in fact,

3   since this Court's order providing greater guidance and

4   context to the Kendrick Consent Decree, not one -- not one of

5   the 12 requests for authority that my team and I have

6   received since that order was entered has resulted in a

7   denial under Section I.

8           And to the extent that the parties agree

9   codification of the Court's order at Section I, my team and I

10  support that effort.  Now my team and I, we look forward to

11  transitioning to the auditing and functions phase of our

12  responsibilities once the Court has ruled in this matter.  To

13  the extent the Court approves the parties proposed

14  modifications, previously proposed policies and training to

15  implement the Consent Decree will need to be revised,

16  reviewed and resubmitted to this Court.  The same is true of

17  the monitor's team audit and compliance plan approved by this

18  Court earlier this year.

19          In sum, Your Honor, in my role as the independent

20  monitor, I support the parties' request for modification.  I

21  also support codification of the Court's orders providing

22  greater guidance.  It is the opinion of the Monitor, Your

23  Honor, that modification and codification would provide

24  greater clarity, consistency and also, Your Honor, it would

25  provide for the City to fully adopt, embrace and lawfully

1   implement the core spirit and purpose of the Kendrick Consent

2   Decree for years to come.  Similarly modification with

3   codification would squarely address the one issue that

4   remains unresolved between the parties, and that is Section

5   I.

6               I want to end by quoting something the Court said

7   that I think is relevant here as we conclude this trial and

8   this hearing and that is the Court when it ruled in 2018, it

9   said this, every community must decide how to ensure an

10  appropriate balance between public safety and protecting

11  personal rights.  That balance is determined not only by the

12  tenets of the policies but also by the actions taken to

13  enforce them.

14              Your Honor, thank you for allowing me to be a

15  part of this vital phase of this process.  My team and I

16  stand ready to act on the Court's orders.

17              **THE COURT:**  Thank you very much, Mr. Stanton.

18  Thank you.

19              And, Mr. McMullen, does the City wish to make a

20  final argument?

21              **MR. McMULLEN:**  Yes, Your Honor.

22              **THE COURT:**  Counsel may proceed.

23              **MR. McMULLEN:**  Okay.  As we're all aware by now,

24  in 1978 City of Memphis entered into a Consent Decree with

25  ACLU in federal court.  The impetus to that was behavior by

**UNREDACTED TRANSCRIPT**

1    the Memphis Police Department that was unacceptable which

2    violated the constitutional rights of some of its citizens.

3    After entering into that Consent Decree, since entering into

4    that Consent Decree, modern technology has exploded in ways

5    that could not have been imagined in 1978.  We go from having

6    telephones being the major form of communication to social

7    media.  We go to Polaroids -- we go from Polaroids and

8    cameras where photos have to be developed to a time when the

9    digital photos that are developed immediately and immediately

10   stored in the cloud or on some device.  We go to our -- one

11   of our primary forms of communication is not face-to-face

12   talking, not talking on the telephone, but social media.

13   Along with that comes unique crimes that involve using social

14   media and the internet.

15          All of these technological advances were

16   predicated on the invention of the internet.  That has also

17   led to certain types of crimes that are unique with respect

18   to the internet, and it is very important for a modern-day

19   police department to evolve to the point where they could

20   fight crime where they can fight crime.  The challenge for us

21   was how do we deal with this with a Consent Decree that was

22   written prior to this form of technology.

23          The City initially filed a motion to vacate the

24   Consent Decree and/or to modify the Consent Decree.  As I

25   stated in my opening, the City has withdrawn its motion to

66

1    vacate the Consent Decree but wish to clarify modernize and

2    codify the Consent Decree so that there's less ambiguity

3    among the rank and file police department how to execute

4    within that Consent Decree, and also so that there is more

5    clarity with the public as to what the police officers are

6    allowed to do and what they're not allowed to do.

7            The law in this case for modification has

8    three -- one of three things have to be shown.  When the

9    change of factual conditions make compliance with the Consent

10   Decree more onerous that is a basis for modification.  When a

11   decree proves to be unworkable because of unforeseen

12   obstacles, that in and of itself is a basis for modification.

13   Or when enforcement of the Consent Decree without

14   modification would be detrimental to public safety, that in

15   and of itself alone is the basis for modification.

16           And I say to the Court that what we've heard from

17   the proof that you've heard in this case I think under any

18   one of those three scenarios we could prove that there is a

19   basis for modifying the Consent Decree.  No one can argue

20   that the internet itself, the invention of the internet

21   itself put forth a factual condition that made compliance

22   with the Consent Decree somewhat onerous.  No one can deny

23   that when a decree proves to be unworkable because of

24   unforeseen obstacles, the internet itself, the way people

25   communicate today, the way people network, the advent of the

**UNREDACTED TRANSCRIPT**

1    social media as a major form of communication, these things

2    have impacted how the Consent Decree can be applied, the

3    types of crimes that can be fought within the parameters of

4    the Consent Decree.

5            And I do agree with Mr. Stanton, that reading of

6    the Consent Decree and after getting guidance from the Court,

7    particularly the Court's order 250 that was filed on November

8    13, 2019, things became clearer for the ones who worked in

9    the legal industry interpreting the Consent Decree.  If you

10   look at RFA, request for authorities that the City of Memphis

11   asked the Monitor for, if you look at all the requests for

12   authorities after November 13, 2009, there was very little

13   disagreement about what the Consent Decree meant at that

14   point and particularly when supplemented with the Court's

15   guidance.  Probably the biggest misunderstanding came prior

16   to that involving the condition that involved one of the

17   local professional sports teams, but once the Court issued

18   its guidance and particularly in document 250, the subsequent

19   RFA really were a confirmation, a request for -- a

20   confirmation from the City as applying certain facts as to

21   what we could do.  In very few of those was there any real

22   disagreement with us and the Monitor.

23           I take great length to go into that because that

24   supports our need for codification, and as the Court knows

25   codification is taking language that's explanatory and

**UNREDACTED TRANSCRIPT**

1  putting in the document so that a person reading it would not

2  have to refer back to language that is not in the document,

3  and I am very mindful that the parties participating,

4  particularly the lawyers that are participating now, may not

5  be around to give the total history of the Consent Decree.

6  The Consent Decree we think should be a document that stands

7  on its own where someone should be able to read it and

8  clearly -- it clearly state what it states, and it's clear to

9  most people whether they have a law degree or not.

10         I do want to address one thing about Section I.

11  I don't think it's disputed if there's a crime, if Memphis

12  Police Department receives information about a crime that

13  there is a procedure that's articulated in the Consent Decree

14  and the Court's orders in which the Memphis Police Department

15  can take action to act on that crime.  I think that that is

16  undisputed.  What the City of Memphis struggles with were the

17  gray area threats, threats that do not rise to the level of

18  being a crime, what you call veiled threats, threats that

19  schools would call in, that the school enforcement picked up

20  these threats on social media by certain social media,

21  threats of saying things like something will be done on this

22  day.

23         Even if you found the person who made the threat,

24  you have no criminal charge for saying something like that.

25  That is too veiled.  We struggle with those gray area --

**UNREDACTED TRANSCRIPT**

1    those gray area threats.  We also struggle with monitoring

2    the internet in order for preparedness -- to be prepared and

3    ready when there are protest groups and counterprotest

4    groups.  Part of the job of the police department is to

5    maintain safety, not to in anyway react one way or the other

6    to what the group's protesting, but to be content neutral in

7    providing.  Those were the areas in which we struggle with,

8    and I think with the proof that has come in today, the

9    explanation from the Court and I think some of the

10   suggestions that the City of Memphis and ACLU came to with

11   help -- with the help of a monitor kind of clarified those

12   things and take away as many of those gray areas as possible.

13             We are -- we understand that every document will

14   have to be interpreted as fact situations change and the --

15   no matter how we draft the Consent Decree there will always

16   be questions.  There will be questions.  And as long as the

17   Consent Decree is in place the Court will be there for us to

18   answer those questions, but for 90% of the things with which

19   we need to act quickly on we think the modifications we have

20   put in the Consent Decree along with some definitions,

21   legitimate law enforcement purposes, that's something that

22   wasn't really defined in the former Consent Decree.

23             And also with modifying the definition of First

24   Amendment, changing the phrase from political intelligence

25   which offered a significant amount of confusion in the

1   community and in the police department, to First Amendment

2   related intelligence and that definition.  We think those

3   modifications along with the codification of language from

4   the Court's order would give clarity to the police

5   department.  It will give clarity to the public and it

6   squarely falls on Item Number 3, one of the items -- one of

7   the three items that are a basis for modification with

8   enforcement of the Consent Decree without modification will

9   be a detriment to the public.  We think without the

10  modifications and the clarifications from the Court it will

11  detrimentally affect the public; therefore, we ask this Court

12  to adopt the agreement between the ACLU and the City of

13  Memphis with respect to the modifications, and we ask the

14  Court under Section I, which there was a disagreement, we

15  have submitted some clarifying language that we refer to the

16  Court and we attach to our supplemental brief.  We think this

17  language adds adequate protection and does not go outside the

18  character of the current Consent Decree but it adds clarity

19  so that police officers, police department can know the

20  boundaries in which they have to stay within and the public

21  at large will understand and know what the police department

22  can and cannot do, and we say more than anything that is very

23  important.

24          Thank you for your time, Your Honor.

25          **THE COURT:**  Thank you very much, always,

**UNREDACTED TRANSCRIPT**

1   Mr. McMullen.

2            Mr. Castelli, does the ACLU wish to make a

3   closing statement?

4            **MR. CASTELLI:**  A brief closing statement, Your

5   Honor, thank you.  And I'm going to endeavor not to reiterate

6   some of the things that Mr. McMullen and Mr. Stanton have

7   both said.  I think I'll just kind of hit on the high notes,

8   and particularly with regard to the proposals that the

9   parties have jointly made of the Court, I think where the

10  ACLU agrees with the City is that there is -- there is a

11  benefit to providing some updated definitions and in

12  providing some materials from the Court's recent orders on

13  the Decree, into the Decree to provide clarity.  And from the

14  ACLU's perspective, our reason for that is probably little

15  different from the City.  Our reason for that is so that it

16  is clear and there cannot be misunderstandings and the

17  training will be facilitated so that if there are future

18  violations to the Decree it is not because of a

19  misunderstanding or lack of training but clear because those

20  are violations made that are known and we can address that.

21  So, you know, perhaps we won't have any further violations if

22  we do that.

23            I believe the Court's order in this case found

24  that a lot of the problems and the contempt of the Decree

25  came from a lack of information and a lack of training and a

**UNREDACTED TRANSCRIPT**

1    lack of understanding on the part of the officers, not from

2    the any ill intent, and that's what we're hoping to avoid in

3    the future.  I think that the proposals that we made are all

4    in that vain, and I think what's important to us is that none

5    of the protections that the Decree has offered for 40 years

6    should be lessened, that the Decree still prohibits the City

7    from using social media or the internet to draw associations

8    between people, any attempt to create an escort list as was

9    done and found to be a violation of the Decree, using

10   undercover accounts for the purpose of infiltrating groups

11   that are free -- that are conducting protected First

12   Amendment activity which was one of the issues found by the

13   Court in this original action to violate the Decree.

14          All of that remains intact, and what we're adding

15   would clarify that that type of conduct is prohibited by the

16   Decree and also adds in this case -- some of the proposals

17   would add responsibilities to the City to create controls for

18   those undercover accounts so they know what officers are

19   utilizing those tools and when they're utilizing them in a

20   way that might violate this Decree or First Amendment rights

21   in general.  I think that's a good thing.

22          Section I is where we disagree, and I will say

23   our position is not that we think that Section I might not

24   benefit from additional language from this Court's

25   November 2019 order.  We disagree with the proposed language

**UNREDACTED TRANSCRIPT**

1  particularly, and this will I'm sure be much -- filled out in

2  much greater detail by the briefs of the parties, but

3  particularly the City has proposed striking language from the

4  original decree of "cooperate with" which the ACLU disagrees

5  with and thinks that that's an essential concept that the

6  City and the Memphis Police Department need to understand

7  about what Section I should be restricting with regard to

8  joint operations, that they can't ask another party or direct

9  another party to do what they cannot do under the Decree.

10         They also can't cooperate with someone they know

11  are taking steps that would violate the Decree, and we think

12  that that is essential to the integrity of the entire Decree.

13  In addition to the language that the City has proposed

14  generally we think goes a little bit beyond what the Court

15  said in its order so that's why we have proposed the proposed

16  language -- the language that has been proposed by the City.

17         In particular, the last sentence saying, nothing

18  in this section precludes the city from receiving tips from

19  nonlaw enforcement agency or individuals lacks some context

20  of what this Court ruled and what Section I was meant to do.

21  It almost creates an exception that might the rule, and so

22  our primary objection to the proposed modification by the

23  City of Section I is that we believe it really goes beyond

24  what this Court -- how this Court interpreted Section I and

25  the guidance this Court offered on Section I, and we would

**UNREDACTED TRANSCRIPT**

1    want any type of modification or -- first of all, we would

2    ask that the original language remain intact as we have tried

3    to do in a lot of the proposed modifications that we've

4    offered to the Court that we could agree to, but then also

5    any explanatory or additional words -- I think the term has

6    been used codifying of the orders of the Court into the

7    Decree to reflect precisely what the Court ruled in the

8    November 2019 order.  So that position as I said will be

9    developed in more detail in the briefing that comes, but I

10   guess in conclusion, though, the ACLU's position overall in

11   this is that we believe that the City has come to the table

12   with the intent of not trying to remove itself from the

13   requirements of the Decree but instead in an attempt to make

14   the Decree something more workable for its police officers.

15              I will say, though, that nothing that the parties

16   agreed to, nothing -- no modifications that are made will

17   replace the importance I believe going forward of good

18   training on this Decree like pretty much anything else.  Law

19   enforcement as the evidence has shown during this case -- law

20   enforcement officers have to know and interpret a lot of law.

21   They have to deal with the entire constitution, the state --

22   US constitution and state constitution, all the statutes, and

23   that's going to involve some degree on the officer's

24   individual level of interpreting that law, deciding how it

25   applies to the situation in front of them; and that is going

**UNREDACTED TRANSCRIPT**

1    to be no different with this Decree modified or no.

2              So training going forward is going to be very

3    important if not essential to ensuring compliance.  So

4    hopefully some of these proposed modifications will enable

5    that training and enable the City to stay in compliance with

6    the Decree moving forward.

7              Thank you, Your Honor, for the opportunity to

8    present ACLU's argument today and we look forward to the

9    briefing.

10             **THE COURT:**  Thank you, Mr. Castelli.

11             I said we would then come back to the Monitor for

12   any further comments if you wish to make them and then of

13   course go to the City.

14             Anything else from the Monitor?

15             **MR. STANTON:**  Nothing further, Your Honor.

16             **THE COURT:**  All right.  And thank you,

17   Mr. Stanton.

18             Mr. McMullen, anything else from the City?

19             **MR. McMULLEN:**  Nothing, Your Honor.  Thank you.

20             **THE COURT:**  Well, that will conclude the hearing,

21   and I was trying to get a readout on when the transcripts

22   would be available.  I'm not sure I've gotten that yet.  What

23   we're going to do is we will -- I'm checking here.  We will

24   have the time periods run from the date of the delivery of

25   the last transcript.  We'll also check with the reporters so

**UNREDACTED TRANSCRIPT**

76

1    that that can be delivered as promptly as possible,

2    understanding that the parties are ordering that transcript

3    which of course is appropriate.

4              These are important matters, and it is fair to

5    say that in so many ways the City, the Monitor and the ACLU

6    have been a model of how to handle matters in a constructive

7    way.  That is much appreciated by the Court, and I don't

8    often get a chance to say that, but it's certainly worth

9    saying in this case.

10             These are important issues.  They're important

11   issues throughout the United States, but these of course are

12   the issues that apply to the City of Memphis, and everyone

13   would concede that working as a cooperative group it has been

14   the right legal approach and is much, much appreciated.

15             Now we will look forward to getting the briefs.

16   We know we still have some unresolved issues, and as soon as

17   we get all the briefing in, we will proceed to prepare and

18   enter an order in the matter.  Again, to all the attorneys

19   involved, I really do appreciate the hard work that is

20   evident in the quality presentations that you have all made.

21   Thank you all very much.

22             Mr. Sample, you may place the Court in

23   adjournment for today.  Thank you.

24             (Adjournment.)

25

**UNREDACTED TRANSCRIPT**

77

1                    **C E R T I F I C A T E**

2

3

4            I, LISA J. MAYO, do hereby certify that the

5    foregoing 77 pages are, to the best of my knowledge, skill

6    and abilities, a true and accurate transcript from my

7    stenotype notes of the TRIAL on 22nd day of June, 2020, in

8    the matter of:

9

10

11   ACLU of Tennessee, Inc.

12   vs.

13   City of Memphis, Tennessee

14

15   Dated this 06.25.2020.

16

17

18

19                          _____S/Lisa J. Mayo_____

20                          LISA J. MAYO, LCR, RDR, CRR
                            Official Court Reporter
21                          United States District Court
                            Western District of Tennessee
22

23

24

25

                        **UNREDACTED TRANSCRIPT**