1

1        IN THE UNITED STATES DISTRICT
    FOR THE WESTERN DISTRICT OF TENNESSEE
2                WESTERN DIVISION

3   ====================================================

4   ACLU OF TENNESSEE, INC.,

5                    Plaintiff,

6   vs.                          No. 2:17-cv-02120-JPM

7   THE CITY OF MEMPHIS,

8                    Defendant.

9   _____

10

11              MODIFICATION HEARING

        BEFORE THE HONORABLE JON PHIPPS MCCALLA
12
            (Via Zoom Videoconference)
13

14                  Wednesday
              17th of June, 2020
15

16

17

18

19

20

21

22

23
            CANDACE S. COVEY, RDR, CRR
24              OFFICIAL REPORTER
          FOURTH FLOOR FEDERAL BUILDING
25           MEMPHIS, TENNESSEE 38103


              UNREDACTED TRANSCRIPT

1        A P P E A R A N C E S

2

3        Court-Appointed Monitor/Special Master:

4            MR. EDWARD L. STANTON, III
             Butler Snow, LLP
5            6075 Poplar Avenue
             Suite 500
6            Memphis, TN 38119
             (901) 680-7369
7
             MR. GADSEN WILLIAM PERRY
8            Butler Snow, LLP
             201 St. Charles Avenue
9            Suite 2700
             New Orleans, LA 70170
10           (504) 299-7777

11

12       Appearing on behalf of the Plaintiffs:

13           MR. THOMAS H. CASTELLI
             MS. STELLA YARBROUGH
14           American Civil Liberties Union
             Foundation of Tennessee
15           210 25th Avenue North
             Suite 1000
16           PO Box 120160
             Nashville, TN 37212
17           (615) 320-7142

18

19
         Appearing on behalf of the Defendant:
20
             MR. BRUCE MCMULLEN
21           MR. R. MARK GLOVER
             MS. JENNIE V. SILK
22           MS. MARY WU TULLIS
             Baker Donelson Bearman
23           Caldwell & Berkowitz - Memphis
             165 Madison Avenue
24           Suite 2000
             Memphis, TN 38103
25           (901) 577-2356

                    UNREDACTED TRANSCRIPT

1                    **W I T N E S S   I N D E X**

2    **WITNESS**                                        **PAGE**     **LINE**

3    RACHEL LEVINSON-WALDMAN
          Direct Examination By Mr. Perry            30        7
4         Cross Examination By Mr. McMullen          74        19
          Cross Examination By Mr. Castelli          89        7
5
     THERON BOWMAN
6         Direct Examination by Mr. Stanton          101       10
          Cross Examination By Mr. McMullen          132       18
7         Cross Examination by Mr. Castelli          153       17
          Redirect Examination by Mr. Stanton        159       9
8
     DAVID MCGRIFF
9         Direct Examination By Mr. Perry            161       7
          Cross Examination By Mr. Glover            175       11
10        Redirect Examination By Mr. Perry          182       22
          Further Cross Examination By               185       10
11        Mr. Glover
          Cross Examination by Mr. Castelli          189       12
12
     SHEILA PETERS
13        Direct Examination By Mr. Stanton          193       11
          Cross Examination By Mr. McMullen          204       10
14        Redirect Examination by Mr. Stanton        207       9

15   EDWARD STANTON, III
          Direct Examination By Mr. McMullen         212       16

16

17

18

19

20

21

22

23

24

25

                    UNREDACTED TRANSCRIPT

1                      **E X H I B I T   I N D E X**

2    **EXHIBIT NUMBER**                              **PAGE**  **LINE**

3    1      Selected Recent Publications of    39     12
            Rachel Levinson-Waldman
4
     2      Chart of Local Social             46     11
5           Media-Policies

6    3      Chart of Federal Social           50     3
            Media-Policies
7
     4      Independent Monitor's Letter      57     2
8           To the Court of 1/8/20

9    5      Independent Monitor's Letter      63     23
            To the Court 2/28/20
10
     6      Proposed Modifications to         88     4
11          Consent Decree

12   7      Curriculum Vitae of Dr. Bowman    104    5

13   8      Tennessee Fusion Report           153    9

14   9      Narrative Biography of            165    7
            Mr. McGriff
15
     10     Monitoring Team Audit             170    5
16          And Compliance Plan

17   11     Guidelines on Tennessee Fusion    192    2
            Bulletin Preparation
18
     12     Update Re: Focus Group            199    18
19

20

21

22

23

24

25

1                    Wednesday

2                    June 17, 2020

3          The Zoom Modification hearing in this case began on

4  this date, Wednesday, 17th day of June, 2020, at 9:30 a.m.,

5  when and where evidence was introduced and proceedings were

6  had as follows:

7

8                    ----------------------

9

10         THE COURT:  All right, ladies and gentlemen.

11  Today we are here in connection with a hearing concerning the

12  motion to modify the Kendrick decree, the Kendrick Consent

13  Decree that was entered many years ago.  Of course, during

14  the November 21, 2019 hearing, the Court set today as the

15  trial date for the City's motion for modification, which was,

16  of course, filed some -- in August of 2018, initially.

17         The hearing will include individuals from both

18  the Monitor's team, and it will include individuals for the

19  City of Memphis and, of course, with participating Plaintiff

20  is the ACLU.

21         I understand the ACLU today will have one person

22  with them today, which will be Ms. Yarbrough; is that

23  correct, Mr. Castelli?

24         MR. CASTELLI:  Yes, Your Honor.  Ms. Yarbrough

25  will be here on behalf of ACLU, and then Ms. Weinberg,

UNREDACTED TRANSCRIPT

 1  executive director, will be here as the client

 2  representative.

 3          THE COURT:  Certainly.  And now I know,

 4  Mr. McMullen, we have you here today.  And I've seen several

 5  of your colleagues during the morning.  Who will be assisting

 6  you today?  Will you unmute your mic, and then we'll be able

 7  to hear you.  And just the touch screen up in the bottom --

 8  or the bottom left corner.  I see Ms. Jeffreys is there.

 9  She's muted but she's got her picture up.  So that's

10  perfectly fine.  All right.  So there we go.  I think we've

11  got -- Ms. Silk is helping out there, and hopefully we can

12  hear everybody.

13          Yes, sir.  Test how are we doing.

14          MR. MCMULLEN:  Okay.  Your Honor, can you hear me

15  now?

16          THE COURT:  Yes, that's fine.  And who is

17  assisting you today?

18          MR. MCMULLEN:  Assisting me today is Mr. Mark

19  Glover.  Ms. Jennie Silk.  Ms. Mary Tullis.  And the client

20  representative is chief legal officer for the city, Jennifer

21  Sink.

22          THE COURT:  All right.  Well, thank you.  And

23  then of course, we've gone over -- we have not gone to the

24  Monitor yet, and he's going to tell us who is going to be

25  with him today and who will be the first witness.  We're

1    going to go through the witness list in just a moment.

2            We do need to go over a couple of details.  For

3    everyone who is listening in, this is a court proceeding, and

4    according to the judicial council of the United States and

5    Judicial Conference of the United States, there can be no

6    recording of this proceeding.  The official record is the

7    record that is prepared by the court reporter, who is here

8    with us.  That is the only official record.  And video

9    recordings and audio recordings are not allowed.  Please

10   respect that, recognizing that the Court is bound by the

11   determinations of the Judicial Conference, and we must make

12   that announcement.  And we ask for your cooperation in that

13   regard.

14           Certainly it's a public proceeding, but it's no

15   different than if we were in court and you were all sitting

16   in the gallery.  You would obviously not be recording there.

17   You would not be taking photographs.  Those things are simply

18   not allowed under the rules of the United States as

19   articulated by the judicial council.

20           Now, the second thing is that there may be some

21   documents that may be introduced.  And we need to be mindful

22   of privacy rights of every individual.  One of the things

23   that we do not allow in federal court are the listing of

24   personal addresses, social security numbers or other personal

25   identifiers.  So if any document that you have contains that

UNREDACTED TRANSCRIPT

1   information as to any individual, that particular document

2   will have to have that portion redacted before it can be

3   displayed or shown or marked as an exhibit.

4         If it's important to have that information at

5   some point, it can only be received under seal and cannot be

6   unsealed without a motion and an order of the Court.

7   Typically, personal identifiers in cases such as this are not

8   appropriate to be disclosed.  And so we'll need to follow

9   that, and that will allow individuals who are supporting

10  every part of every team to make sure that any document does

11  not contain that type of information.

12        Now, for those who are watching, you may then see

13  a document which will have some blacked-out material on it.

14  The Court will, of course, look at that if necessary to make

15  sure that it is information that should not be publicly

16  disclosed.  But I hope everyone understands that that is

17  important and, of course, this is a case about, in many ways,

18  protecting First Amendment rights, association rights and

19  other rights.  So we all would understand that that is not

20  something that would be available publicly for any of you

21  without certainly some substantial review.

22        Now, we're going to go to Mr. Stanton.

23        And Mr. Stanton, how are you this morning?

24        MR. STANTON:  I'm doing very well, Your Honor.

25  Good morning.

UNREDACTED TRANSCRIPT

1        THE COURT:  Good morning.  And I am going to ask

2   you the sequence of witnesses today.  We went over that in

3   part in our initial conference.  But we indicated that at the

4   end of every day and, of course, in this circumstance at the

5   beginning of the day, we would go through the sequence of

6   witnesses so that every party would be well prepared for

7   their portion of the cross examination when they have that

8   opportunity.

9        What will be our sequence of witnesses that you

10   anticipate presenting today or even partially tomorrow?

11        MR. STANTON:  Yes, Your Honor.  The sequence,

12   first witness from the monitoring team will be Rachel

13   Levinson-Waldman.  I'm happy to share her title with you, if

14   you want it, as well or just the name.

15        THE COURT:  The name is fine.

16        Professor, I think that we have you on the line

17   somewhere, and so when each person takes the stand, we will

18   ask them to repeat their name so it's clear in the record.

19        And our second witness?

20        MR. STANTON:  Our second witness, Your Honor, is

21   Dr. Theron Bowman.  It's T-H-E-R-O-N.  Bowman, B-O-W-M-A-N.

22        THE COURT:  All right.  And our anticipated third

23   witness?

24        MR. STANTON:  That's Mr. David McGriff.

25   M-C-G-R-I-F-F.  David McGriff.

1          THE COURT:  All right.  And the next witness?

2          MR. STANTON:  Will be Dr. Sheila Peters, Your

3  Honor.

4          THE COURT:  All right.  If you know the next

5  witness, the fifth witness?

6          MR. STANTON:  That would be John Henegan.  Your

7  Honor, we mentioned that may have to go out of order,

8  depending on how far we get today.  It may be our first

9  witness tomorrow, but he is anticipated to be our final

10  witness.

11          THE COURT:  All right.  I think that's certainly

12  enough so everybody will be well prepared.  In this

13  proceeding it is agreed that, of course, the Monitor will

14  make a presentation first and present witnesses.  Those

15  witnesses as they're presented will be subject to cross

16  examination by the City of Memphis and, of course, by the

17  ACLU.

18          The City has the burden of demonstrating that the

19  modification in this case or any modification in this case is

20  appropriate in the case and without adequate showing, then no

21  modification will be made, even though the parties have

22  agreed on a number of modifications.  And I'm assuming that

23  there will be sufficient evidence submitted on each one of

24  those.  But we will, of course, wait and see.

25          I am also going to ask if you wish to make brief

1    opening statements, you're certainly allowed to do so.  This

2    is a trial on these issues.  You're not required to.  And we

3    tell everyone it's not necessary, but it's certainly allowed.

4           Because the Monitor will be going first, I will

5    go to the Monitor first on that.  It's interesting, we would

6    normally go to ACLU second, and in this case I think we

7    agreed to reorder virtually everything.  So we will actually

8    go to the City of Memphis second and then ACLU.  I point out

9    that that is a reordering of the presentation because of the

10   burden of proof that rests on the City in these matters.  And

11   it was agreed upon in conference that we would actually

12   reorder the normal order of presentation and proof.

13          So Mr. Stanton, do you wish to make an opening

14   statement in this matter?

15          MR. STANTON:  Your Honor, I do have a brief

16   presentation to make.  I'm happy to proceed there.  Of

17   course, if there's other, I guess, opening statements from

18   the parties I could defer to whatever the Court would like,

19   but I do have a brief presentation I'd like to make on behalf

20   of the monitoring team.

21          THE COURT:  I think that we're ready to proceed

22   with that.  And of course, Mr. McMullen will be second and,

23   of course, Mr. Castelli third in that regard.  These should

24   be relatively short, and I understand that no one's

25   anticipating something more than probably -- I'm not sure how

 1   long.  How long, Mr. Stanton?  I guess I should ask that

 2   first.

 3                 MR. STANTON:  We'll try to be as brief as

 4   possible, Your Honor, I think 10 to 15 minutes.  Closer to

 5   maybe 15 minutes, just kind of a brief update to the Court

 6   and then to the observers, Your Honor.

 7                 THE COURT:  That's certainly fine.  And you may

 8   proceed.

 9                 MR. STANTON:  Thank you, Your Honor.  And may it

10   please the Court and certainly to counsel for both parties,

11   Plaintiff and Defendants in this case.  Your Honor, my team

12   and I, we're here today to present testimony and evidence

13   that chiefly concerns two issues.  First, the reasons that

14   have been offered for modifying the Kendrick Consent Decree

15   and secondly, the proposed modifications themselves.  And

16   getting to this point, Your Honor, as you know, has not been

17   easy.  As the Court is aware, the lawsuit that brings us here

18   today alleged that the City violated the Kendrick Consent

19   Decree, which was designed to protect freedom of speech,

20   freedom of expression and other First Amendment freedoms in

21   several ways.

22                 Now, there were allegations, Your Honor, as

23   you're aware, of fake or undercover social media accounts,

24   spying on activists who were doing nothing illegal and

25   sharing community members personal information with other law

UNREDACTED TRANSCRIPT

13

1    enforcement and non law enforcement agencies.  And in an age,

2    Your Honor, of rapidly increasing technology and rapidly

3    diminishing privacy, these allegations were indeed troubling.

4          And so when the evidence established at the trial

5    before this Court, Your Honor, in 2018 that many of these

6    allegations were, in fact, true, the Court imposed five

7    sanctions and appointed me as the independent monitor and the

8    monitoring team of experts that you will hear from on today

9    and throughout this hearing.  And to assist with restoring

10   Your Honor, you appointed us to assist with restoring the

11   City to full compliance with the Kendrick Consent Decree.

12         And to that end I'd like to just take a brief

13   moment, Your Honor, to provide a synopsis of the work of the

14   monitoring team.  Since our appointment by this Court in

15   December of 2018, Your Honor, we have been very active and

16   engaged.  We have filed seven reports, six of which have been

17   made available to the public.

18         We requested and received and reviewed --

19   reviewed nearly two gigabytes of data from the City and the

20   ACLU of Tennessee, and I'm told, Your Honor, that that's the

21   equivalent of more than 250,000 pages of text.  Your Honor,

22   we've exchanged more than 5800 internal and external e-mails.

23   We've conducted more than 70 weekly monitoring team

24   conference calls and additional ad hoc calls as necessary.

25         Likewise every week, Your Honor, we have been on

UNREDACTED TRANSCRIPT

1   calls, over 70 calls since our inception, Your Honor, with

2   the City of Memphis and counsel for the City.  And we've also

3   had the ACLU, the Plaintiffs in this case, to join in on ad

4   hoc calls as well and as needed for both parties.

5           Your Honor, we've conducted seven in-person

6   monitoring team members, as you're aware.  The testimony will

7   show that we have experts, nationally-renowned experts from

8   across the country on our team.  Those meetings took place in

9   February, April and July and August and November of 2019, as

10  well as most recently, Your Honor, March 10th of this year,

11  2020.

12          We've met in person or telephonically or

13  virtually with the following, Your Honor, the following

14  Memphis Police Department personnel.  Beginning with Police

15  Director Michael Rallings.  We've met with Lieutenant Colonel

16  David Rudolph.  Numerous times with Deputy Chief Don Crowe

17  and Major Darren Goods, who's head of the Multi-Agency Gang

18  Unit.  We've also met on a number of occasions, Your Honor,

19  with police counsel and advisor Zayid Saleem more than a

20  dozen members of the MPD's command staff.

21          We've taken a tour of the Real Time Crime Center

22  at the Memphis Police Department's Training Academy.  And

23  speaking of the Training Academy, Your Honor, we've actually

24  been boots on the ground and observed consent decree

25  trainings at the Memphis police academy.  We've consulted

UNREDACTED TRANSCRIPT

1    with social media platforms, such as facebook and facebook's

2    legal and public policy and law enforcement teams as well as

3    law enforcement at the agencies such as the FBI.

4              Your Honor, we've watched and maintained the

5    monitoring team's website known as memphispdmonitor.com.  I'm

6    happy to report, Your Honor, we've seen an uptick in traffic

7    to the website.  We've engaged with the community in sharing

8    vital information and trying to be as transparent, as I know

9    that's important to this Court as possible with proceedings

10   in our work.  In fact, we posted public comment procedures

11   and protocols in our new, quote, trial and public comment

12   page on our website, and we've notified the media and

13   community contacts about those protocols.

14             We've appeared before this Court, as you're

15   aware, Your Honor, either in person or telephonically or

16   otherwise brought matters to this Court's attention on more

17   than 20 occasions.  We've conferred via e-mail, telephone and

18   even through our website, met in person with dozens of

19   community members.  And I will say, Your Honor, that I'm

20   unaware of that every individual -- there's not one

21   individual that I'm aware of or community or organization

22   group that has reached out to us, many telephonically, via

23   e-mail or our website that wanted to sit down and meet with

24   us, share concerns, share information, share their thoughts

25   about the Consent Decree that we did not provide that

1    opportunity to.

2              And many of those individuals -- organizations

3    we've shared those names.  There were others that wanted to

4    remain anonymous, Your Honor.  And so again, we're very

5    pleased with the outreach in the community and those who have

6    contacted us to share their opinions as we do our work.

7              Your Honor, we've actually done things

8    untraditionally.  As an example, I participated in a Facebook

9    Live interview with a grassroots organizer here in the City

10   of Memphis to share the information that we are -- we have

11   and the work that we're doing.  Numerous interviews with

12   local media and national media, Your Honor, that has gotten

13   attention of this case.

14             Your Honor, we've hosted three community

15   engagement forums, the first being in July of 2019, the

16   second in November of 2019 and the most recent March 10th of

17   this year.  If I could just take a moment, Your Honor, these

18   community engagement forums have been vitally important to

19   the work that we do.  And again, I have to commend the

20   citizens, those that have taken their time out on a Tuesday

21   or Wednesday evening and come out and shared, listened in and

22   quite frankly told us how they really feel about the Consent

23   Decree and their experiences.

24             We've learned a lot from our -- between the first

25   community engagement forum and the second, Your Honor.  In

UNREDACTED TRANSCRIPT

17

 1    fact, we saw an uptick of nearly threefold in participants,

 2    and a lot of that, Your Honor, was simply because of the

 3    advice and a lot of the suggestions that we received from

 4    members of the community.  And so we again, took more of a

 5    atypical approach.  We were told that some people don't go to

 6    the Internet, or oftentimes people won't read a press release

 7    or look at the general media to find out what's going on.

 8    And so we've utilized a lot of the partnerships and contacts

 9    and community members to notify their contacts, and we did

10    see an uptick.

11         We provided more information.  We didn't want to

12    assume that people had been to our website.  So we had

13    materials in hand at that second meeting.  And we were very

14    pleased with the turnout.  I want to say thank you to

15    Dr. J. Lawrence Turner, who provided his facility at the

16    church, Mississippi Boulevard Christian Church, which is

17    centrally located and was very accessible to the Memphis

18    community as a whole.

19         We did see, Your Honor, a downtick for our

20    March 10th community forum, which was held at the Ben Hooks

21    library, main library on Poplar.  We believe, Your Honor,

22    amongst a number of things that the looming pandemic was one

23    of the reasons on March 10th that we did not have as large of

24    a turnout and participation at the third community forum.

25         Your Honor, we've met with persons and members of

UNREDACTED TRANSCRIPT

1    Memphis, a number of groups, I've named just a couple.  I've

2    highlighted here the Memphis Shelby County Crime Commission

3    and their leaders as well as the Memphis Interfaith Coalition

4    and hope organization, also known as MICAH.

5              Your Honor, we've submitted to the Court comments

6    from community members on four separate occasions.

7    September, October of 2019 as well as in May of this year,

8    Your Honor.  You've made that abundantly clear to the

9    community in court and certainly to the monitoring team and

10   the parties that you want to hear from the members of the

11   community, and we're pleased that a number of organizations

12   or individuals have shared that information with us or

13   directly with you, Your Honor, via e-mail, via US mail, as

14   well as, you know, we've received multiple information,

15   pieces of information in submission to audio and video format

16   from members of the community.

17             Your Honor, we've retained and worked with

18   Dr. Sheila Peters of Fisk University to schedule and conduct

19   focus groups.  We provided realtime responses to requests for

20   authority or authorization, also known as RFAs for discreet

21   MPD activity or clarifications regarding the same on 25

22   occasions just for the observers.  Again, these are items,

23   Your Honor, that you set up.  The Court called them framework

24   for when the City has realtime issues.

25             You've designated me and authorized me to serve

UNREDACTED TRANSCRIPT

1    in a special master capacity, so we've had a number of

2    issues, over two dozen, Your Honor, whether it's two o'clock

3    in the afternoon or sometimes as early as two o'clock in the

4    morning that the Memphis Police Department and its counsel

5    wanted clarification on were they within the framework and

6    the tenets of the Kendrick Consent Decree.  And again, we

7    have a process that you designed that we were able to turn

8    around and give them realtime information and the authority

9    so not to impede upon public safety.

10             We've also communicated, Your Honor, to the

11   Court, and you've heard me say this before.  I think it's

12   worth repeating again.  One of the recommendations that we've

13   consistently heard from the community, and that is that the

14   Court considers adding one or more members of the community

15   to the monitoring team.  Your Honor, obviously we will remain

16   deferential to the Court in this regard.  It may be that once

17   this hearing is concluded and these proceedings are concluded

18   and as this team transitions into an audit and compliance

19   phase that the Court may consider that request from the

20   community.

21             Now, during this trial you will hear testimony

22   from all four subject matter experts on the monitoring team

23   as well as from Dr. Sheila Peters.  Dr. Peters is a clinical

24   psychologist and professor at Fisk University and facilitator

25   and lead investigator for the focus groups in this matter.

UNREDACTED TRANSCRIPT

```
 1              The City and the ACLU, as you know, Your Honor,

 2   they've recently completed several sessions of mediation

 3   sanctioned by this Court.  I'm pleased to report that there

 4   were a very robust, thorough series of dialogue, discourse

 5   and even a debate, meaningful debate.  The parties now will

 6   be walked into 17 disputed issues as it relates to the

 7   Consent Decree and were able, Your Honor, after a series of

 8   more than four mediation sessions and nearly three and a half

 9   weeks of, again, very robust dialogue were able to come to an

10   agreement on all but one issue.  And that issue, Your Honor,

11   is Section I.  And that is something obviously that we will

12   take up in our presentation, Your Honor, on behalf of the

13   monitoring team.

14              But again, I want to commend the ACLU, having --

15   you appointed me to serve as the mediator, Your Honor, and

16   having served and worked closely along and put a lot of long

17   hours in, Your Honor, for both the ACLU and the City for

18   making such a strong and good faith effort in working in a

19   very collaborative manner to find common ground without, most

20   importantly, Your Honor, compromising the tenets and the

21   spirit of the Kendrick Consent Decree.

22              But, again, my team on today and throughout these

23   proceedings will present testimony regarding all aspects of

24   the Consent Decree, as well as the parties' proposed

25   modifications to assist this Court in determining whether,
```

UNREDACTED TRANSCRIPT

1   and if so, to what extent modification of the Consent Decree

2   is appropriate.

3          So first, Your Honor, you'll hear from, as I

4   mentioned earlier, Rachel Levinson-Waldman.  Ms. Waldman is a

5   lawyer with the Brennan Center for Justice and the team's

6   public policy and social media expert.  She will testify

7   regarding the City's proposed social media policy.  The

8   City's compliance with its social media reporting obligations

9   under Sanction 5 of this Court's order and impressions from

10  community members.

11         Next, Your Honor, you'll hear from Dr. Theron

12  Bowman.  Dr. Bowman is a former police chief of Arlington,

13  Texas and a professor and the team's law enforcement and

14  police practices expert.  Dr. Bowman will discuss where the

15  Kendrick Consent Decree fits within the national context of

16  consent decrees as well as address some of the offered

17  rationales for modifying the Consent Decree.

18         As I mentioned earlier, next you'll hear, Your

19  Honor, from David McGriff.  Mr. McGriff is the former deputy

20  commissioner of the Tennessee Department of Safety & Homeland

21  Security.  And Mr. McGriff will discuss the monitoring team's

22  audit and compliance plan.

23         And finally, Your Honor, you'll hear from John

24  Henegan, the First Amendment lawyer and the team's

25  constitutional law expert, who will discuss each of these

1   party's proposed modifications to the Kendrick Consent

2   Decree.  Finally, Your Honor, we trust that our presentation

3   will be helpful to the Court and informative to the public.

4   Thank you, Your Honor.

5            THE COURT:  Thank you, Mr. Stanton.

6            Mr. McMullen, do you wish to make a brief opening

7   statement on behalf of the City?  And again, you're not

8   required to.  It's entirely up to you.

9            MR. MCMULLEN:  Yes, Your Honor.  I would like to

10   make a brief three to five-minute statement on behalf of the

11   City.

12            THE COURT:  Yes, sir.

13            MR. MCMULLEN:  18 months ago we filed a motion

14   for modification.  We came to the conclusion that we did not

15   want to base that motion on hypotheticals.  We asked the

16   Court to delay the motion in order for us to live under the

17   Consent Decree as interpreted.  We realized we needed clarity

18   for the officers and the citizens and to modernize the

19   Consent Decree to give the officers the clarity on how to

20   operate and allow all the citizens to know what the Consent

21   Decree meant in laymen's terms.

22            We realize today there's a nationwide distrust of

23   the police, and we therefore withdrew the part of our motion

24   asking to vacate the Consent Decree.  What we have before us

25   today is our motion to modify the Consent Decree to

UNREDACTED TRANSCRIPT

1   incorporate 21st century policing, to match 21st century

2   policing with the 1978 Consent Decree.

3          We operated under the Consent Decree for over a

4   year and had a number of issues that we addressed with the

5   Monitor, with the Court and with the ACLU.  That time period

6   that -- which caused us to work together and allowed the ACLU

7   to see the issues that we faced, allowed us to understand

8   better the issues that the ACLU had with police operations,

9   and with input with the Monitor, we were able to mediate most

10   of the issues.  I think the Monitor mentioned in his

11   statement, there were about 17 issues of disagreement, and we

12   came to an agreement on about 16 of those.  And we put

13   together a joint proposed modification of the Consent Decree.

14          And there were three things, overarching things,

15   that we considered in modifying the Consent Decree.  One, we

16   wanted clarity.  We wanted a layperson to be able to read the

17   Consent Decree and know exactly what it meant.  We wanted to

18   modernize it.  We wanted to be able to use 21st century

19   policing and still comply with the 1978 Consent Decree.  And

20   then we wanted to codify that information and those practices

21   into a document that everyone could read and understand.

22          As I said before, we mediated those issues, and

23   we came to an agreement on all issues except Section I, which

24   is a restriction on joint operations.  And we are here today

25   to put on proof of the need for modifications, the reasons

UNREDACTED TRANSCRIPT

1   for the modifications that we face and to put on proof as to

2   how we think Section I should be applied today in the 21st

3   century -- in 21st century policing.  I'm hopeful that the

4   Court will consider the agreement we have had with the ACLU,

5   and we're hopeful that the Court will consider our

6   recommendations for Section I under the Consent Decree.

7   Thank you, Your Honor.

8                    THE COURT:  Certainly.  Thank you.

9                    And then, Mr. Castelli, on behalf of ACLU?

10                   MR. CASTELLI:  Yes, Your Honor.  A brief

11  statement.  I think it's important at the beginning of this

12  week's proceedings for the Court to understand kind of the

13  ACLU's approach to the proposals that we've agreed to with

14  the City and with the help of the Monitor.  So you know,

15  first of all, the original action grew out of the enforcement

16  action, and this Court found that indeed, the City had

17  violated the decree and filed several instances of contempt.

18                   And I think that demonstrated at the time and

19  demonstrates now the importance of this Consent Decree and

20  the constitutional rights that it protects.  But when the

21  Court rendered its order in October 2018, the Court

22  recognized that the decree was old.  It was 40 years old.

23  The terminology was somewhat outdated.  But recognized the

24  importance of the concepts that the decree stood for and the

25  protections, the constitutional rights that it afforded.

1          We took the Court's words to heart about some of

2   the outdated language of the Consent Decree, the discussion

3   about the advances in technology since 1978, that the decree

4   probably didn't or certainly didn't consider at the time

5   because they didn't exist.  And we took that approach into

6   any negotiations and discussions or debates we had with both

7   the monitoring team and with the City.

8          I think we benefitted from the year of the

9   monitoring team's work when the City asked for the stay of

10  this to really see what the issues were, how they played out

11  in real time.  Benefitted from the Monitor's ability to go in

12  and get the information without having to get that

13  information through a discovery process.  And then get the

14  benefit of the experts on the monitoring team, who could

15  analyze that information and then let us know how this works,

16  how it works in other departments around the country.  Those

17  presentations have been made to the Court over the course of

18  the last year in certain areas.

19         So our approach to the proposals that we've

20  submitted to the Court has really been about trying to

21  preserve the original protections and the original language

22  of the Consent Decree.  But to identify areas where there

23  needed to be updated language to take into account new

24  technologies or new ways of doing things.  For example, the

25  way information may have been gathered and cataloged in 1978

1    has certainly changed in the digital age.  And dealing with

2    things like the use of cameras, Blue CRUSH cameras, the use

3    of Internet and social media.

4            And so we took -- we went in with the approach of

5    instead of totally reconstructing the Consent Decree, let's

6    keep as much of this original language as we can, original

7    protections as we can, but add to it so that we're taking

8    into account what is happening in today's society with regard

9    to those technological advances and changes.

10           Several -- both the Monitor and Mr. McMullen

11   mentioned the 17 items that were in dispute.  I think it's

12   important to know that we didn't come to an agreement that

13   led to an actual change on all 17.  Some of those we agreed

14   that there didn't need to be a change.  So the parties agreed

15   no, we do not need to add something to the Decree to resolve

16   that issue.  We need to leave it as is.

17           And again, as has been mentioned, the one issue

18   that we were unable to come to an agreement on is Section I,

19   which is about joint operations.  The ACLU's position on that

20   is simply the language in the Decree we feel should remain

21   intact.  That that language is clear.  And the Court has

22   interpreted that language.  So we believe that the -- with

23   regard to any concerns about there being any

24   misunderstandings of what Section I does, that has already

25   been resolved by the Court through the interpretation of the

 1   Decree and this Court's various orders over the course of the

 2   last year.

 3            And so what we're asking the Court is with regard

 4   to Section I, to leave the language as is.  But with regard

 5   to some of the proposals that the City and the ACLU have

 6   presented, that the Court accept those.  Thank you, Your

 7   Honor.

 8            THE COURT:  Thank you, Mr. Castelli.  We are now

 9   ready to proceed with our first witness.  Let me tell you

10   about the schedule for the day.  We have to be mindful, but

11   we will take breaks during the day.  We will take a break

12   approximately every hour and a half.  It may be a little

13   different.  And when we take those breaks, we will probably

14   take a 15-minute break.  That may seem a little long, but

15   there are a lot of people involved in the proceeding, and

16   that seems appropriate.  So you'll be able to plan on breaks

17   at an appropriate time.

18            We're going to go, of course, until about 11:00

19   on our first witness.  And when we find a natural time to

20   stop, then we will stop as to that witness, take that

21   15-minute break and then resume about 11:15.  And of course,

22   we'll go about -- and it's going to be about 45 minutes to an

23   hour in that next session.  So you'll have to have a way to

24   think about that.

25            We will take a short lunch break because people

```
 1    need to have a break at that time.  And it -- but it will be

 2    relatively short.  It will probably be about 40 to

 3    45 minutes, depending on our exact timing.  That's some

 4    guidance for you.

 5              We will conclude the day at approximately

 6    five o'clock and will resume tomorrow at nine o'clock if that

 7    is feasible so that we can conclude the case in a reasonable

 8    time frame.  But for everyone who's not familiar with court

 9    proceedings -- I know all of the parties are -- there are

10    always breaks because we have staff, and we have people who

11    are working around us all the time.  And people need a short

12    break at those times.  So that's how that will work.  And

13    that may help assist those who are listening and thinking

14    about how they want to think about their day.

15              Now, Mr. Stanton, you may call your first

16    witness, and we will have the witness sworn in.

17              MR. STANTON:  Thank you, Your Honor.  And at this

18    point, Your Honor, I'm going to turn things over for the

19    first witness for examination by counsel to the monitoring

20    team.  He's been a tremendous asset and credit to our team

21    over the last 18 months and that's Mr. Will Perry, Attorney

22    Will Perry, Your Honor.

23              THE COURT:  Certainly.  Mr. Perry, and you may

24    call your first witness.

25              MR. PERRY:  Thank you, Your Honor.  We would like
```

UNREDACTED TRANSCRIPT

                                                                29

1   to call Rachel Levinson-Waldman.

2               THE COURT:  All right.  And Ms. Levinson-Waldman,

3   we will need to see you on the screen in just a moment, at

4   which time you'll need to raise your right hand, and you will

5   be sworn in by Mr. Sample.

6               Mr. Sample, you may proceed.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                    30

1                           *   *   *

2                     **RACHEL LEVINSON-WALDMAN,**

3    **was called as a witness and having first been duly sworn**

4    **testified as follows:**

5                 THE COURT:  Counsel may proceed.

6                 MR. PERRY:  Thank you, Your Honor.

7                         **DIRECT EXAMINATION**

8    QUESTIONS BY MR. PERRY:

9    Q.     Ms. Levinson-Waldman, what do you do for a living?

10   A.     I'm a lawyer.

11   Q.     Where did you go to law school?

12   A.     I went to the University of Chicago Law School.

13   Q.     Before that, where did you go to college?

14   A.     I attended Williams College.

15   Q.     What did you study at Williams?

16   A.     I was a religion major.

17   Q.     Did you know when you were in college that you wanted

18   to be a lawyer?

19   A.     I started to think about it then.  I actually took

20   some classes on constitutional law while I was in college

21   that I found really interesting.  I wanted to take some

22   (inaudible) in college and my next step, so I was out of

23   school for about four years after college.

24   Q.     What did you do during that interim period between

25   college and law school?

                        UNREDACTED TRANSCRIPT

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                              31

1   A.      I worked in Seattle and primarily focusing on domestic

2   violence-related issues.

3   Q.      What made you leave that work and go to Chicago to law

4   school?

5   A.      You know, I was sort of ready for the next step, and I

6   was ready to do something maybe that wasn't direct services,

7   and pursuing a law degree seemed like a good way to sort of

8   think about, you know, the next avenue of public service.

9   Q.      How did you know -- did you know anything about

10  University of Chicago's reputation when you chose that law

11  school?

12  A.      I did.  My father is a constitutional law professor.

13  He was a long time professor at the University of Texas law

14  school.  So when we were talking about law schools, he

15  certainly would have been very happy if I returned home to

16  Texas.  But he was very enthusiastic about Chicago and about

17  sort of its reputation for being (inaudible ).

18  Q.      Did your dad encourage you to attend law school?

19  A.      I can't say he encouraged it.  There were certainly a

20  lot of conversations around the dinner table about law and

21  justice, so it probably wasn't a huge surprise that I ended

22  up going.

23  Q.      Other than your dad, have you got any other lawyers in

24  your family?

25  A.      My husband is a lawyer as well.  We met in law school.

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                    32

1    Q.      What kind of work does your husband do?

2    A.      So he's done a variety of things.  He formerly served

3    in the labor department under President Obama.  And he helped

4    run the D.C. attorney general's office for about five years.

5    He currently -- he founded several years ago and runs an

6    organization called Tzedek DC, which provides free civil

7    legal aid to poor residents of the District of Columbia who

8    are in debt crisis.

9    Q.      You and your husband have any children,

10   Ms. Levinson-Waldman?

11   A.      We do.  We have a son Eli, who just turned six and a

12   daughter Sarah, who's just about nine.

13   Q.      Do you think Eli and Sarah will continue the family's

14   legal traditions?

15   A.      Unclear but I will say they are certainly honing their

16   negotiating skills.

17   Q.      Now, Ms. Levinson-Waldman, what's your present

18   employer?  Where do you work right now?

19   A.      I work for the Brennan Center for Justice at NYU law

20   school.

21   Q.      Did you start at the Brennan Center immediately after

22   you graduated from law school?

23   A.      I did not, no.

24   Q.      What did you do first?

25   A.      I clerked for a federal judge, for Margaret McKeown,

UNREDACTED TRANSCRIPT

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                      33

 1   who's a judge on the US Court of Appeals for the Ninth

 2   Circuit.

 3   Q.     What does it mean to clerk for a judge?

 4   A.     When you clerk for a judge, you are assisting them in

 5   their management of the cases.  So for an appeals court

 6   judge, a federal appeals court judge, which is who I was

 7   clerking for, it means a lot of research and writing.  So

 8   researching the cases that are coming before the judge.  The

 9   cases that the lawyers are relying on.  Writing memos for the

10   judge and his or her colleagues on the bench to prepare them

11   for oral arguments.  And then helping to draft opinions,

12   concurrences, dissents, things like that.

13   Q.     How long did you clerk?

14   A.     I clerked for a year, which is sort of a fairly

15   standard clerkship term.

16   Q.     Was the Brennan Center your next job after your

17   clerkship?

18   A.     No.

19   Q.     Where did you go in between?

20   A.     My clerkship -- my first position after my clerkship

21   was with the US Department of Justice.  I served in the civil

22   rights division as a trial attorney.

23   Q.     How long were you with the DOJ?

24   A.     I was with DOJ for about two and a half years.

25   Q.     What kinds of cases did you work on there?

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                34

1   A.      So I was in a section of the civil rights division

2   called the Housing and Civil Enforcement Section.  And so

3   primarily we were working on Fair Housing Act cases.  So what

4   that means is circumstances where people were being

5   discriminated against in housing on the basis of race, color,

6   national origin, religion, familial status or disability.

7   The Department of Justice could sue or intervene to vindicate

8   the rights of people who were being discriminated against.

9   Q.      How did you enjoy that experience?

10  A.      It was really gratifying to work for the civil rights

11  division.  It was really a huge honor to have the opportunity

12  to work there.  Despite the fact that I'm in court today, I

13  did not love litigating, so I was looking for another way to

14  use my legal training and use my legal degree.

15  Q.      Did you find such a way?

16  A.      I did.

17  Q.      Where did you go after DOJ?

18  A.      So from DOJ I joined an organization called American

19  Association of University Professors, which is a membership

20  organization for faculty members at colleges and universities

21  across the country.  It's dedicated really to the

22  preservation and defense of academic freedom.

23  Q.      What did you do for the association?

24  A.      I was in-house counsel.  So the organization had a

25  fairly small in-house counsel's office.  I was associate

UNREDACTED TRANSCRIPT

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                    35

1  counsel for the first year that I was there.  And then I was

2  senior counsel also working with an outside general counsel

3  for the remainder of my time at the AAUP.

4  Q.      How long was that time?  How long were you there?

5  A.      I was there for almost exactly five years.

6  Q.      When you left AAUP, is that when you joined the

7  Brennan Center?

8  A.      Yes.  Right after my maternity leave.  So I was on

9  maternity leave, then I joined the Brennan Center in January

10  of 2012.

11  Q.      Have you been there ever since?

12  A.      I have.

13  Q.      Ms. Levinson-Waldman, what is the Brennan Center?

14  A.      Brennan Center was founded about 25 years ago.  It was

15  founded when Justice William Brennan was stepping off the

16  Supreme Court.  And his friends and family and former clerks

17  wanted to establish a center that was dedicated to his

18  progressive vision of the Constitution, so the Brennan Center

19  was set up.

20          It's affiliated with NYU law school, although I'm in

21  D.C.  It's a nonpartisan law and policy institute.  It's, I

22  would say, about 130 employees probably split between our New

23  York office, which is where the majority of the employees are

24  in our D.C. office.  A lot of lawyers and also economists,

25  researchers, things like that.

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                    36

1  Q.     Do you work in a specific program or division of the

2  Brennan Center?

3  A.     I do.  So the Brennan Center has three different

4  programs overall.  There's our democracy program, which

5  focuses on the ballot, free and fair elections, campaign

6  finance reform, independent judiciary.  There's our justice

7  program which focuses on ending mass incarceration.  And then

8  I'm in our Liberty & National Security Program, also called

9  shorthand LNS program.

10  Q.     What does that program focus on?

11  A.     So historically, the LNS program has focused on post

12  9/11 civil liberty issues.  So privacy, secrecy,

13  surveillance, domestic intelligence gathering, overt

14  classification, Islamophobia, kind of the range of civil

15  liberties issues that arose and certainly were sharpened in

16  the wake of 9/11.  I would say in the last probably six years

17  or so our work has expanded also to cover a number of issues

18  relating to policing and technology, civil liberties and

19  civil rights policy issues surrounding the use of policing

20  and technology.

21  Q.     What is your specific role with LNS?

22  A.     Sure.  So my title with the LNS program is senior

23  counsel.

24  Q.     What does that role entail?

25  A.     It entails a variety of things.  So one of the Brennan

1   Center's kind of stock-in-trade is reports.  Policy reports

2   to educate.  Policy makers to educate the public, to educate

3   kind of other interested experts on issues.  So they do

4   research and writing for reports and law review articles.  We

5   put out white papers.  I do writing for more sort of popular

6   audiences, you know, op-eds and explainers to do public

7   education on our issues.

8        We often submit comments to federal agencies, if an

9   agency is considering putting a rule in place or initiating

10  some kind of information collection, we would send the

11  comments through a notice-and-comment process.  We submit

12  public records requests on a variety of issues.  And I also

13  assist in overseeing the junior staff and some of the work in

14  the program.

15  Q.      As senior counsel to the LNS program, does the Brennan

16  Center put you forward as an expert in any particular areas?

17  A.      It does, yes.

18  Q.      What are those areas?

19  A.      Primarily issues relating to use of technologies and

20  especially sort of -- not -- especially but not exclusively

21  surveillance technologies.  So I would say that's been

22  predictive policing technologies, use of body-worn cameras,

23  social media monitoring and then things like license plate

24  readers, cell phone trackers, surveillance cameras, kind of a

25  range of other surveillance tools and technologies used by

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                          38

1    police.

2    Q.      Have you participated in any media interviews about

3    the subjects that you mentioned?

4    A.      I have, yes.

5    Q.      What are some of those?  By what medias?

6    A.      Sure.  So some of the outlets that I've spoken to and

7    been quoted in have included the New York Times, the

8    Washington Post, the Wall Street Journal, Wired and Ars

9    Technica.

10   Q.      Has any of your written work been published?

11   A.      Yes, it has.

12   Q.      What are some examples of places where your work has

13   been published?

14   A.      So they include Washington Post as well.  Wired, the

15   Atlantic, The New Republic and USA Today.

16   Q.      Ms. Levinson-Waldman, have you specifically authored

17   any scholarly publications as part of your work at the

18   Brennan Center?

19   A.      I have, yes.

20   Q.      Thank you.  Now, Ms. Levinson-Waldman, did you receive

21   a set of premarked exhibits earlier this week?

22   A.      I did.

23   Q.      I'd like you to look at MT trial Exhibit 1.  Just take

24   a look at that for a moment.

25   A.      I'm pulling it up.  Okay.  I've got it.

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                    39

1  Q.      Do you recognize that document?

2  A.      I do.

3  Q.      What is it?

4  A.      The title is Selected Recent Publications of Rachel

5  Levinson-Waldman.

6  Q.      Did you help prepare that document?

7  A.      I did.

8          MR. PERRY:  Your Honor, I'd like to move MT trial

9  Exhibit 1 into evidence.

10          THE COURT:  It's marked and received as one in

11  the case without objection.

12          (WHEREUPON, the above-mentioned document was

13  marked as Exhibit Number 1.)

14          MR. PERRY:  Thank you, Your Honor.  With your

15  permission, I'm going to share my screen with the Court now

16  so that all viewers can see MT trial Exhibit 1.

17          THE COURT:  Yes, sir.  Thank you.

18  BY MR. PERRY:

19  Q.      Now, Ms. Levinson-Waldman, Exhibit 1 lists six

20  publications.  Have you written all of those publications

21  during your time with the Brennan Center?

22  A.      Yes, I have.

23  Q.      Are you the sole author of these publications, or did

24  you have coauthors?

25  A.      I'm the sole author on five of them.  On the second

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                              40

1   publication that's listed, I had several coauthors who are

2   colleagues at the Brennan Center.

3   Q.      Would you read the title of the first listed

4   publication.

5   A.      Yes.  It's Private Eyes, They're Watching You:  Law

6   Enforcement's Monitoring of Social Media.

7   Q.      And where was that article published?

8   A.      That was published in the University of Oklahoma Law

9   Review.

10  Q.      If you would go ahead and read the title of the

11  remaining publications on that exhibit.

12  A.      The second publication is a Brennan Center report

13  titled Social Media Monitoring, published in 2019.  The third

14  one is a law review article titled Government Access to and

15  Manipulation of Social Media:  Legal and Policy Challenges,

16  published in the Howard University Law Review in 2018.  Below

17  that is a white paper I authored for the Brennan Center

18  titled Cellphones, Law Enforcement, and the Right to Privacy.

19  How the Government is Collecting and Using Your Location

20  Data, published in 2018.

21          The next is a law review article published in the

22  Emory Law Journal in 2017, titled Hiding in Plain Sight:  A

23  Fourth Amendment Framework For Analyzing Government

24  Surveillance in Public.  And the final one is a report that

25  was published by the Brennan Center titled What the

UNREDACTED TRANSCRIPT

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                          41

1    Government Does With Americans' Data, published in 2013.

2    Q.      Thank you.  Ms. Levinson-Waldman, do any themes

3    connect these six articles?

4    A.      Yes.  So the theme that connects these, you know, in

5    some ways, the titles show a major theme, which is the use of

6    surveillance technologies by the Government.  And sort of

7    generally the development of technologies and legal and

8    policy issues surrounding those.  I think also more

9    generally, they address the notion of kind of the proper

10   balance of information sharing between the Government and the

11   people in the democratic society and the notion that the

12   people should be able to get information about what the

13   Government is doing and the Government gets limited

14   information about what the people are doing unless there's,

15   you know, a reason to conduct something like a criminal

16   investigation.

17   Q.      I understand.  As far as you are aware, have any of

18   the articles listed here been cited by courts when the courts

19   deal with the subject that the articles discussed?

20   A.      Yes.

21   Q.      Which of those articles?

22   A.      The third one listed, the article in the Howard Law

23   Journal was cited by Judge McCalla in his opinion in

24   October 2018 finding the City in violation of the Kendrick

25   Consent Decree.

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                    42

1   Q.      Very briefly, what is that article about?

2   A.      That article is looking at how police use or can use

3   social media.  So looking at sort of different mechanisms or

4   different tools for using social media to collect

5   information.  To watch what people are doing.  To gather

6   information, whether it's criminally related or not.  It

7   looks at the constitutional issues that are raised, so

8   focusing especially on First Amendment and Fourth Amendment

9   questions.  And then also it sets out some policy

10  recommendations in terms of what appropriate use might look

11  like.

12  Q.      Thank you.  Now, Ms. Levinson-Waldman, are you here

13  today to testify on behalf of the Brennan Center?

14  A.      I am not, no.

15  Q.      What brings you here today?

16  A.      I am here today as a member of the monitoring team.

17  Q.      How did you come to be a member of the monitoring

18  team?

19  A.      In probably November of 2018, I received a call from a

20  friend and colleague in D.C., a gentleman named Roy Austin.

21  Mr. Austin is a lawyer, now a lawyer at a law firm in town.

22  He had served as a lawyer in several roles in the previous

23  presidential administration.  And he reached out because he

24  knew from Mr. Stanton that Mr. Stanton was under

25  consideration as a potential monitor for this case and that

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                    43

 1   Mr. Stanton was looking to potentially bring somebody onto

 2   the team who would bring some expertise on issues related to

 3   social media and policing and policy questions.

 4          And so Mr. Austin reached out to connect me with

 5   Mr. Stanton to have a conversation about that.  Him and I

 6   spoke in probably early December of 2018 and learned more

 7   about the case, about the Consent Decree and Judge McCalla's

 8   opinion and the history of the case.  And once Mr. Stanton

 9   was appointed as the Monitor and we were able to have more

10   conversations about what my role would look like and what the

11   monitoring team was going to be doing and then I received

12   approval from the Brennan Center to join the monitoring team.

13   I joined officially in probably late January of 2019.

14   Q.     What is your role on the monitoring team?

15   A.     My title is Subject Matter Expert on Public Policy and

16   Social Media.

17   Q.     Will you describe for the Court some of the work that

18   you have done in fulfilling that role.

19   A.     So as with all of the members of the monitoring team,

20   I have been part of weekly phone conversations.  The

21   monitoring team has a weekly call where we're able to touch

22   base about issues that have arisen, questions that are coming

23   in, documents we may be working on.  There are documents that

24   we've traded back and forth with the City and with the ACLU,

25   draft policies.  And so I've had an opportunity to give input

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                    44

1    on and suggestions on those policies.

2          There are times when Mr. Stanton has reached out to

3    the monitoring team to solicit input on requests for

4    authorization or requests for information that he has

5    received from the City.  I've also worked on providing input

6    on some communications from Mr. Stanton and the team to the

7    City.  And I've also conducted research that I've shared with

8    the team on several different issues on policies around use

9    of body-worn cameras at First Amendment-protected events or

10   First Amendment events.  Research on social media policies in

11   use by police departments around the country.  And also

12   research on policies regarding use of social media by various

13   federal agencies.

14   Q.    Have you facilitated meetings with any outside groups

15   or people to help inform the monitoring team's work?

16   A.    I have.

17   Q.    What groups of people have those been?

18   A.    Sure.  I helped facilitate a meeting with

19   representatives from facebook to understand more about

20   facebook's policies with respect to law enforcement access to

21   user data as well as policies around use of undercover

22   accounts, use of multiple accounts and generally

23   understanding the different kind of privacy settings and

24   independent access to data up to this point.

25   Q.    Did you find that meeting helpful in your work with

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                    45

1   the monitoring team?

2   A.      I did, yes.

3   Q.      And did that meeting help inform the testimony that

4   you're giving today?

5   A.      It did, yes.  In terms of understanding particularly

6   the limitations that facebook sets on use of undercover kind

7   of alias accounts and the limits on the numbers of accounts

8   that any one individual can have.

9   Q.      Now, Ms. Levinson-Waldman, the monitoring team has

10  submitted, as you heard Mr. Stanton say in his opening

11  remarks, several periodic reports to update the Court and the

12  public on its work.  As the monitoring team's subject matter

13  expert on public policy and social media, have you prepared

14  any specific documents in connection with those reports?

15  A.      I have, yes.

16  Q.      I'd like you to refer back to the set of documents

17  that you received earlier this week and take a look at MT

18  trial Exhibit 2.  Let me know when you have it in front of

19  you.

20  A.      Yes.  I have that in front of me.

21  Q.      Do you recognize that document?

22  A.      I do.

23  Q.      What is it?

24  A.      It's a chart entitled Police Department Policies

25  Regarding Use of Social Media For Investigative Purposes and

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                46

1    Situational Assessment.

2    Q.      Did you prepare that document?

3    A.      I did.

4    Q.      Was it submitted as part of the monitoring team's

5    reports?

6    A.      Yes.

7            MR. PERRY:  Your Honor, at this time I'd like to

8    move MT trial Exhibit 2 into evidence.

9            THE COURT:  Marked and received without objection

10   as two.

11           (WHEREUPON, the above-mentioned document was

12   marked as Exhibit Number 2.)

13           MR. PERRY:  Thank you, Your Honor.  With your

14   permission, I'm going to share my screen with the Court now

15   so that all viewers can see MT trial Exhibit 2.

16           THE COURT:  Yes, sir.  Go right ahead.

17   BY MR. PERRY:

18   Q.     Ms. Levinson-Waldman, can you explain for the Court

19   what this exhibit is?

20   A.      Yes.  This is an exhibit that compares, I believe,

21   about 17 different policies that are in use by local police

22   departments or sheriff's offices or in one case a fusion

23   center that govern how the department uses social media to

24   collect information.  So not for outward-facing kind of

25   public education or public communication purposes, how the

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                    47

1   department can use social media to gather information or

2   intelligence, conduct criminal investigations, do situational

3   assessment, things like that.

4   Q.     Will you take a few moments and help me walk through

5   the different categories in this chart.  So the leftmost

6   column is police department.  What's that chart?  What's that

7   column cover?

8   A.     Sure.  So that's just showing the name of the

9   particular department that I was looking at to which that

10  specific policy relates.

11  Q.     Are all of the departments listed in that column

12  specific to cities?

13  A.     So it's cities and counties.  It's a combination of

14  police departments and sheriffs' departments.  And then

15  there's one fusion center that's listed as well.

16  Q.     Okay.  We're moving one column to the right.  The next

17  title is Title and Link to Policy.  What's that?

18  A.     That just shows the title of the particular policy

19  that that department uses.  And insofar as I was relying on

20  information that was publicly available, so information that

21  was available on line.  It shows the link to the particular

22  policy to allow the reader to go and access that original

23  policy itself.

24  Q.     We're going to move one, two, three policies to the

25  right to the column that says Specific Rules For Situational

1    Assessment/Awareness Or Other Non Investigative Efforts.

2    What information does that column contain?

3    A.      That column was distinguishing between use of social

4    media as part of a criminal investigation to gather

5    information as part of, you know, crime protection or

6    investigating a crime that's being committed or being planned

7    as opposed to what's in this column, the circumstances in

8    which social media might be used to do some kind of other

9    situational assessment, risk assessment, event planning,

10   things like that, where it's not necessarily related to a

11   crime that's in process or being planned, but a more general

12   kind of situational awareness.

13   Q.      I'm going to move two more columns to the right.  To

14   the column that says, specific language on undercover/covert

15   activity.  What information does that column contain?

16   A.      That column covers if the policy had language

17   specifically relating to use of an online undercover account.

18   So if they're governed, provided permission for or imposed

19   restrictions on use of alias or other kinds of undercover.

20   Q.      Thank you.  Now, Ms. Levinson-Waldman, is the Memphis

21   Police Department one of the law enforcement departments

22   that's included on this chart?

23   A.      It's not, no.

24   Q.      Why not?

25   A.      Because there's not yet a finalized publicly available

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                    49

1   policy on using social media.

2   Q.      Have you worked with the City to help develop such a

3   policy?

4   A.      Yes.  Through the monitoring team, yes.

5   Q.      Did the information in this chart inform the work that

6   you and the rest of the monitoring team did as you worked

7   with the City on its own policy?

8   A.      Yes.

9   Q.      Thank you.  I want you to refer back to the set of

10  exhibits that you have there.  And I want you to pull up MT

11  trial Exhibit 3.

12  A.      Yes.  I have that up.

13  Q.      Do you recognize that document?

14  A.      I do.

15  Q.      What is it?

16  A.      This is a document that's a chart of federal social

17  media policies.  Policies in use by different federal

18  agencies.

19  Q.      Did you prepare that chart?

20  A.      I did with assistance of a counsel from Butler Snow.

21  Q.      Was that chart submitted as part of the monitoring

22  team's reports?

23  A.      Yes.

24          MR. PERRY:  Your Honor, at this time I'd like to

25  move MT trial Exhibit 3 into evidence.

 1          THE COURT:  Marked and received as three in the

 2   case without objection.

 3          (WHEREUPON, the above-mentioned document was

 4   marked as Exhibit Number 3.)

 5          MR. PERRY:  Thank you.  With your permission,

 6   I'll share my screen, I'll share that document with the

 7   Court.

 8          THE COURT:  Certainly.  Go right ahead.

 9          MR. PERRY:  Scroll down one more page for me.

10   Thank you.  That's great.

11   BY MR. PERRY:

12   Q.     Now, Ms. Levinson-Waldman, it looks like this chart

13   includes a cover memo from Mr. Stanton to the Court.  Did you

14   help prepare that memo?

15   A.     Yes, I did.

16   Q.     According to that memo, what is the chart that follows

17   it?  What does that chart cover?

18   A.     Sure.  So the title of the chart is Federal Agency

19   Policies Regarding Use of Social Media For Investigative

20   Purposes and Situational Awareness.  It covers the social

21   media modeling policies of various federal agencies.

22   Q.     Which federal agencies does it cover?

23   A.     I'll list them out.  The Bureau of Alcohol, Tobacco,

24   Firearms and Explosives, ATF.  The Drug Enforcement

25   Administration.  The Department of Homeland Security.  FBI or

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                    51

1    the Federal Bureau of Investigation.  The Federal Emergency

2    Management Agency or FEMA.  The Internal Revenue Service, IRS

3    Criminal Investigations division.  The U.S. Marshals Service.

4    The U.S. Postal Inspection Service.  The U.S. Secret Service.

5    And the Social Security Administration.

6    Q.     Now, Ms. Levinson-Waldman, do all of the agencies

7    listed there have publicly available social media policies?

8    A.     They do not, no.

9    Q.     Which agencies do have public or available policies?

10   A.     The ones that did were DHS, the Department of Homeland

11   Security, IRS, FEMA and FBI, Federal Bureau of Investigation.

12   Q.     Now, I'd like you to look at page 2 of that memo.

13            MR. PERRY:  Pull up page 2 on the screen.

14   BY MR. PERRY:

15   Q.     Now, it looks like quite a bit of page 2 discusses the

16   FBI policies in particular.  Why is there so much information

17   here about the FBI policies?

18   A.     We focus significantly on the FBI for a couple of

19   reasons.  In part, Judge McCalla had posed some questions

20   about the FBI and what their policies were.  I think there

21   was a sense that as an agency that focuses on investigation

22   and intelligence, the policies that the FBI has in place

23   could offer a guide or information as to appropriate social

24   media policies.  And the FBI has quite a bit of language.  So

25   there was also a lot to cover in terms of the description of

1   the FBI policies.

2   Q.      Do you have any opinions about the FBI policies?

3   A.      I do, yes.

4   Q.      Have you testified about those opinions before?

5   A.      Yes, I have.

6   Q.      What are those opinions?

7   A.      My opinion is, you know, it's helpful that the FBI

8   does have a publicly available policy.  There are certainly a

9   number of agencies that we've looked at that we were fairly

10  sure do use social media, for which there was nothing that

11  was publicly available.  At the same time, I had concerns

12  about the substance of the FBI's policy in terms of what's

13  reflected on page 2 here and also reflected in the chart.

14          The FBI has kind of a structure of investigations, and

15  this dates to the post 9/11 period that includes something

16  called preassessments and also assessments.  And these are

17  investigations that are not criminally predicated.  There's

18  no individualized suspicion of wrongdoing that's necessary.

19          And at the same time, they allow for the use of fairly

20  intrusive surveillance and other investigative techniques.

21  And so both for the preassessment and for the assessment,

22  there are various kinds of sort of social media monitoring or

23  social media use that are enabled for these categories.

24  Q.      Ms. Levinson-Waldman, I'm going to share on the screen

25  now a document called MT trial Demonstrative A.  I'm going to

1   scroll to the second page of that document.

2              MR. PERRY:  Perfect.  That's good.  Thank you.

3   BY MR. PERRY:

4   Q.     Ms. Levinson-Waldman, do you recognize that document?

5   A.     Yes, I do.

6   Q.     What is it?

7   A.     This is Judge McCalla's sanctions order following on

8   his order finding the City in violation.

9   Q.     Now, you can see we're going to scroll slowly from

10  pages 1 to 3 of that document.  There are several numbered

11  paragraphs there.

12             MR. PERRY:  Let's scroll to numbered

13  paragraph 5 -- sorry 4.  Make that 4.  Let's stop when we get

14  to 4.  Yeah.  Let's pull that into the center of the screen

15  if we can do that.  That's great.

16  BY MR. PERRY:

17  Q.     Now, would you -- I would like you to read number

18  paragraph 4 aloud, please, Ms. Levinson-Waldman.

19  A.     Sure.  So paragraph 4 says, "The City shall establish

20  written guidelines for the use of manual social media

21  searches and of social media collators in compliance with the

22  Decree.  The City shall make these guidelines available to

23  all officers with access to social media collators and to all

24  officers assigned to OHS and RTCC.  The City shall submit

25  these guidelines to the Court no later than January 14th,

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                              54

 1  2019, for review and approval."

 2  Q.      Has the City proposed a social media policy that

 3  contains the written guidelines that paragraph 4 requires?

 4  A.      Yes.

 5  Q.      Have you had an opportunity to review that proposed

 6  policy?

 7  A.      Yes.

 8  Q.      How, in your opinion, does the City's proposed policy

 9  compare with the FBI guidelines that you were discussing in

10  Exhibit 3?

11  A.      The City's proposed policy incorporates the FBI's

12  language in a couple of different ways.  One of the most

13  significant elements is that it incorporates the use of the

14  preassessment and assessment categories of investigations,

15  and it pulls the FBI's language of what the categories mean

16  and the kinds of surveillance or other investigative tools

17  that are permitted in them.  It also uses some of the FBI's

18  language relating to limitations on or procedures for

19  accessing First Amendment-related information.

20  Q.      Does the incorporation of the FBI's policies into the

21  City's proposed policies raise any concerns for you?

22  A.      It does, yes.

23  Q.      What are those concerns?

24  A.      So speaking again to the concern about the use of

25  assessments generally, both assessments and preassessments,

 1   these are a combination of low level investigations, in that

 2   criminal predication isn't required.  But as I said, it does

 3   enable the use of pretty wide varieties of tools.  I'm not

 4   aware of other local law enforcement agencies that

 5   incorporate this structure.  And I think insofar as we've had

 6   concerns about the FBI's use of assessments and in fact those

 7   concerns have been borne out.  There are examples of the FBI

 8   misusing assessments to target First Amendment-protected

 9   speech.

10        So I think in light particularly of what the Consent

11   Decree is meant to do in terms of protecting the exercise of

12   First Amendment rights, I would have a very significant

13   concern about incorporating the FBI's approach in this way.

14   In addition with respect to the FBI's language about

15   restrictions on accessing First Amendment-protected speech,

16   it does have that language.  The FBI has that language, but I

17   believe it's a lower standard.  It's a lower floor than the

18   one that the Kendrick Consent Decree already sets out.  And

19   that language would be intention with the requirements of the

20   consent.

21   Q.    Thank you, Ms. Levinson-Waldman.  Aside from the

22   concern that you've mentioned about assessments, does

23   anything else bother you about the incorporation of the FBI

24   policies into the City's proposed social media policy?

25   A.    I mean, I think in general in terms of concerns about

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                          56

 1   the social media policy, it also would authorize the use of

 2   impersonating accounts.  I think of impersonating an account

 3   as being one that pretends not just to be somebody that I'm

 4   not.  Not just a situation where, for instance, if I were

 5   setting up an account I would make up a name and find, you

 6   know, some picture out there to try to connect with somebody

 7   on social media.  But where I actually pretend to be somebody

 8   else entirely.  A person that's known to the person I'm

 9   trying to connect with.  And I have a concern that the policy

10   doesn't require that impersonating accounts only be used

11   where the person being impersonated has given their consent.

12   Q.      Ms. Levinson-Waldman, I want you to refer to the list

13   of exhibits that we sent you earlier this week again, and I

14   want you to take a look at MT trial Exhibit 4.

15   A.      Yes.  I have that up.

16   Q.      Do you recognize that document?

17   A.      I do.

18   Q.      What is it?

19   A.      This is a letter that Mr. Stanton sent to Judge

20   McCalla on January 8th, 2020.

21   Q.      Did you help prepare that letter?

22   A.      I did.

23           MR. PERRY:  Your Honor, I'd like to move MT trial

24   Exhibit 4 into evidence.

25           THE COURT:  It's been marked and received without

UNREDACTED TRANSCRIPT

1   objection as 4.

2                   (WHEREUPON, the above-mentioned document was

3   marked as Exhibit Number 4.)

4                   MR. PERRY:  Thank you.  With your permission, I'm

5   going to share that document --

6                   THE COURT:  You may.

7                   MR. PERRY:  -- on my screen.

8                   THE COURT:  Certainly.

9                   MR. PERRY:  Thank you.

10                   Scroll down to the first page, please.  Great.

11   Thank you very much.

12   BY MR. PERRY:

13   Q.     Now, Ms. Levinson-Waldman, does Exhibit 4 capture

14   concerns that you were expressing a moment ago about using

15   the FBI's policies as a baseline for the City's social media

16   policies?

17   A.     It certainly reflects an aspect of that concern, yes.

18   Q.     Would you explain to the Court what aspect of that

19   concern this letter addresses?

20   A.     Sure.  So this letter is in relation to several

21   opinions that were released in October of 2019 from the

22   Foreign Intelligence Surveillance Court, which oversees

23   issues related to kind of implementation and use of the

24   Foreign Intelligence Surveillance Act.  And what these

25   opinions demonstrate really revealed for the first time

1   because often very little is known about what's occurring in

2   the context of what I'll also call FISA cases.  What it

3   revealed was a couple of things that the FBI had done, had

4   done in violation of the law and guidelines.

5        One was that the FBI had searched information that was

6   collected for national security purposes.  So information

7   that's targeted at foreigners overseas but that's known to

8   collect a fair amount of information about Americans.  FBI

9   had searched those databases of information, specifically

10  looking for data about Americans but without meeting the

11  required standard of individualized suspicion.

12       So that was a fairly significant violation of both the

13  Fourth Amendment and the limitations in place under FISA.

14  The FBI also had failed to comply with certain documentation

15  and other procedural requirements that had been put into

16  place about how it was going to log and report out the

17  searches that it was doing.

18  Q.   Ms. Levinson-Waldman, pending before the Court right

19  now and held in abeyance for these proceedings are two

20  versions of a proposed social media policy for the City.  One

21  version incorporates the FBI's policies.  The other version

22  does not.  Have you reviewed both versions?

23  A.   I have.

24  Q.   Do you have an opinion about which version the Court

25  should approve?

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                     59

1   A.      I believe the Court should approve the version that

2   does not incorporate the FBI policy information.

3   Q.      Thank you, Ms. Levinson-Waldman.  I'd like to return

4   us, if I may, to MT trial Demonstrative A, the Court

5   sanctions order.  I'm going to put that document back on the

6   screen.  We're going to move from paragraph 4 to paragraph 5.

7   We're going to scroll down to paragraph 5.

8           If you would, Ms. Levinson-Waldman, please read that

9   paragraph aloud.

10  A.      That paragraph states, "The City shall maintain a list

11  of all search terms entered into social media collators or

12  otherwise used by MPD officers collecting information on

13  social media while on duty.  This list shall be filed under

14  seal every three months until the Court orders otherwise.

15  The first filing shall be submitted no later than January

16  14th, 2019 and shall reflect all such social media searches

17  conducted from November 1st, 2018 through December 31st,

18  2018.

19  Q.      Now, Ms. Levinson-Waldman --

20          MR. MCMULLEN:  Your Honor, this is Bruce

21  McMullen.

22          THE COURT:  Yes, sir.

23          MR. MCMULLEN:  I'd like to object.

24          THE COURT:  All right.

25          MR. MCMULLEN:  And the basis is this sanction is

1    already before the Court and is not relevant to a

2    modification hearing.  Whether or not -- the only three

3    things that are relevant to the modification hearing is when

4    there's a change of factual conditions making compliance with

5    the Consent Decree onerous.  The second is when a Consent

6    Decree proves to be unworkable because of unforeseen

7    obstacles and whether enforcement of the Decree without

8    modification would be detrimental to the public interest.  To

9    the extent to whether the City was alleged to have deviated

10   from the Consent Decree are not -- is not relevant.

11           THE COURT:  Let's hear from counsel opposite.

12   Yes, sir.  Mr. Perry?

13           MR. PERRY:  Thank you, Your Honor.  I'll say two

14   things in response to that objection.  First, as Mr. Stanton

15   outlined in his opening remarks, the first portion of the

16   monitoring team's presentation is about whether the Consent

17   Decree should be modified at all.  The City's current level

18   of compliance with the Decree and with the Court's orders is

19   necessarily relevant to that inquiry.

20           Secondly, with respect to the second kind of

21   parameter that Mr. McMullen mentioned, whether the City has

22   complied with the Court's order so far speaks directly to

23   whether its compliance is onerous or not, whether compliance

24   with the Consent Decree is onerous or not.  So I think by the

25   City's own admission, this information is relevant to the

1   matters that the Court is discussing today.

2               THE COURT:  And reply on that from the City, if

3   any?

4               MR. MCMULLEN:  Yes.  Yes, Your Honor.  If we were

5   seeking to vacate the Consent Decree, it is relevant to the

6   extent whether we substantially complied with the Consent

7   Decree.  But as the Court knows, we withdrew our motion to

8   vacate the Consent Decree, and there are only three matters

9   to be considered for modification.  And I've enumerated those

10  three matters before.  And so whether or not there was

11  alleged deviation from the -- from your Court's order, which

12  is not the Consent Decree, issue a Court's order, whether

13  there was alleged deviation from the Court's order is not

14  relevant to modification.

15              THE COURT:  It appears that it's necessary for

16  the purpose of adequate context of our -- and also put on the

17  issue of previous compliance.  I understand that the City's

18  objection is on a strict relevance question.  However, that

19  is interpreted broadly.  And I'm going to allow Mr. Perry's

20  broad leeway or some leeway in that regard, assuming that we

21  don't spend our whole time on this issue.  Is this something

22  we can handle relatively efficiently and reasonably promptly,

23  Mr. Perry?

24              MR. PERRY:  Thank you, Your Honor.  This

25  discussion of this matter will be rather brief.

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                          62

1              THE COURT:  Go right ahead.

2              MR. PERRY:  Thank you, Your Honor.

3              THE COURT:  Certainly.

4    BY MR. PERRY:

5    Q.     Ms. Levinson-Waldman, I'm going to have you read that

6    paragraph again.  It's still on the screen there.  What I

7    would like you to do is refer to that set of documents that

8    we sent you earlier this week.  And I want you to look at MT

9    trial Exhibit 5.  Let me know when you have that document

10   before you.

11             MR. MCMULLEN:  Your Honor, I have no objection to

12   the document in substance, but as we spoke before, under the

13   subject of investigation, there are a number of names that we

14   feel should be redacted.

15             THE COURT:  Right.  I don't disagree.  We need to

16   be thoughtful in terms of that, and the Court's initial

17   comments dealt with the issue of redaction.  I'm looking to

18   make sure at this time we not display anything that should be

19   redacted.  And then -- but we can go ahead as long as we can

20   avoid displaying materials that have redactable information,

21   so --

22             MR. PERRY:  Your Honor, we'll only be showing the

23   cover letter --

24             THE COURT:  Sure.

25             MR. PERRY:  -- that's a part of that exhibit, and

UNREDACTED TRANSCRIPT

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                    63

1    it has no personal information in it.

2              THE COURT:  The cover letter is certainly fine.

3    And to the degree that there's other material, I was looking

4    quickly to the degree that there may be some other material,

5    we will allow the redacted version to be submitted, which

6    will be publicly available.  All right.  Counsel may proceed.

7              MR. PERRY:  Thank you, Your Honor.

8              THE COURT:  Certainly.

9    BY MR. PERRY:

10   Q.    Ms. Levinson-Waldman, we're looking at MT trial

11   Exhibit 5.  Do you recognize that document?

12   A.    I do.

13   Q.    What is it?

14   A.    It is a letter that Mr. Stanton sent to Judge McCalla

15   on February 28, 2020.

16   Q.    Did you help prepare that letter?

17   A.    I did.

18             MR. PERRY:  Your Honor, I'd like to move MT trial

19   Exhibit 5 into evidence.

20             THE COURT:  Marked and received and certainly

21   we'll peruse the material and make sure that there's nothing

22   ultimately received that should be redacted.

23             (WHEREUPON, the above-mentioned document was

24   marked as Exhibit Number 5.)

25             THE COURT:  Yes, counsel may proceed.

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                    64

1          MR. PERRY:  Thank you, Your Honor.  I'm going to

2    share my screen with the Court, share that document with the

3    Court.

4          THE COURT:  That's fine.

5          MR. PERRY:  Thank you, Your Honor.  Scroll down

6    past the cover page, please.  That's perfect.  Thank you very

7    much.

8    BY MR. PERRY:

9    Q.     Ms. Levinson-Waldman, please read aloud and for the

10   Court the first paragraph of that letter.

11   A.     That paragraph says, "Dear Judge McCalla."  Then says,

12   "My team and I recently determined that the City of Memphis

13   has been departing from Sanction 5 of your October 26th and

14   29th, 2018 orders.  ECF Numbers 151 and 152.  The City has

15   done so without seeking permission or guidance from my team

16   or from the Court and does not dispute the departure.  After

17   having given the City an opportunity to explain itself and

18   gathered input from the ACLU-TN, which takes the same view as

19   my team, I am bringing this matter before the Court."

20   Q.     Does that paragraph reflect your views about

21   Sanction 5 and the City's compliance with it?

22   A.     Yes.

23   Q.     Can you explain briefly why you feel that the City's

24   reports do not comply with Sanction 5?

25   A.     Well, Sanction 5, as we previously read, obligates the

1    City to provide social media search terms by all of the

2    officers at the MPD.  But the terms offered by MPD officers

3    who were part of the Multi-Agency Gang Unit, and undercover

4    officers were not part of the search terms that were provided

5    to the team.

6    Q.    We'll talk about this a little bit more shortly, but

7    in your time on the monitoring team, have you had any

8    discussions with community members specifically about the

9    Multi-Agency Gang Unit?

10   A.    I have, yes.

11   Q.    Can you share with us not the specifics of those

12   conversations but your impression based on those discussions

13   about how the community members with whom you spoke feel

14   about a multi-agency gang unit?

15   A.    So my impression, my takeaway from those conversations

16   was a real depth, breadth of concern about and mistrust of

17   both the agency gang units, the role that it was playing and

18   the City and particularly with respect to protesters and

19   activists.

20   Q.    Thank you, Ms. Levinson-Waldman.  I think you

21   mentioned that the City's Sanction 5 reports also did not

22   include the search terms of MPD officers who operate

23   undercover social media accounts; is that right?

24   A.    Correct.

25   Q.    Did you have any concerns about that omission, given

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                          66

1   what you have explained about facebook's real-name policy?

2   A.     Sure.  So in the context of facebook's real-name

3   policy -- and facebook has sent letters to this effect as

4   well -- the policy is that if you have an account on

5   facebook, it is supposed to reflect who you actually are.

6   Your name.  Your picture.  The policy doesn't provide for

7   alternate uses.  It doesn't provide -- there's a specific ban

8   on having more than one account.  And so as one area of

9   concern, it appears that the City's use of undercover

10  facebook accounts didn't comply with facebook's policy, and

11  the failure to provide those search terms, I think, leads to

12  concerns not just with the policy but also generally the

13  ability to oversee the use of those accounts, the use of

14  social media and to ensure that it's within the bounds of the

15  Consent Decree and the Constitution.

16  Q.     Thank you.  Ms. Levinson-Waldman, now, the Court held

17  a video hearing about Sanction 5 last month.  Were you able

18  to attend that hearing?

19  A.     Yes.  I attended by video.

20  Q.     Did you hear the presentations and testimony by the

21  City and the ACLU at that hearing?

22  A.     I did.

23  Q.     Did any of the information that you heard at the

24  hearing change your opinion that the City has failed to

25  comply with Sanction 5?

UNREDACTED TRANSCRIPT

 1  A.      No.

 2  Q.      Did you have an opportunity to review the post hearing

 3  brief by the City?

 4  A.      Yes.

 5  Q.      Anything in that brief change your opinion that the

 6  City has failed to comply with Sanction 5?

 7  A.      No.

 8  Q.      Ms. Levinson-Waldman, I'm going to move to the last

 9  kind of portion of your testimony today.  Last year after a

10  hearing in August, the Court invited members of the public to

11  submit comments.  Members of the public who had attended the

12  August hearing.  Did you have an opportunity to review those

13  comments?

14  A.      Yes, I did.

15  Q.      Earlier this year the Court adopted a public comment

16  procedure, during which it allowed members of the public to

17  submit their opinions regarding the City's proposed

18  modifications to the Consent Decree.  Did you have a

19  opportunity to review those comments?

20  A.      Yes.

21  Q.      Mr. Stanton mentioned in his opening remarks that the

22  monitoring team has held three community engagement forums

23  since it has been appointed.  One last July, one last

24  November and one in March of this year.  Were you able to

25  attend and participate in those forums?

1  A.      I attended and participated in the two forums in 2019

2  in July and November.  The one in March of this year,

3  unfortunately, I wasn't able to attend due to COVID travel

4  restrictions and public health restrictions coming into play.

5  And that forum was not live streamed, so I didn't attend that

6  forum.

7  Q.      Ms. Levinson-Waldman, the monitoring team's public

8  website provides information for contacting the monitoring

9  team directly.  Have you had the opportunity to speak

10 directly with members of the Memphis community about the

11 Consent Decree?

12 A.      I have, both through those forums and through meetings

13 that the team has had with community members.

14 Q.      What is your impression, based on these interactions,

15 which you've described with community members of public

16 sentiment in Memphis regarding the City's proposed

17 modifications to the Consent Decree?

18 A.      So my impression, my takeaway from what we heard in

19 those forums and from other conversations is a concern about

20 making modifications to the Consent Decree and a real desire

21 to ensure that the Consent Decree remained in place with all

22 of the current sort of robust restrictions that it currently

23 includes.

24 Q.      Ms. Levinson-Waldman, do you have any specific

25 opinions about the proposed changes to the Consent Decree

 1   that the City and the ACLU have put forward?

 2   A.      There are --

 3            MR. MCMULLEN:  Your Honor?  Your Honor?  Your

 4   Honor, I would like to object.  I think the question is kind

 5   of broad.  I think Mr. Perry has established Ms.

 6   Levinson-Waldman as a social media expert.  Giving an overall

 7   opinion on it should be limited to the social media aspect of

 8   it, not the overall document or her interpretation of the

 9   language.

10            THE COURT:  Counsel opposite?

11            MR. PERRY:  Your Honor, if you'll allow me to

12   proceed a bit.  I don't think Ms. Levinson-Waldman is going

13   to stray beyond her expertise.  And in fact, she will defer

14   to another expert on the team to talk in detail about the

15   specific modifications that the parties are proposing.

16            THE COURT:  Certainly with that limitation, go

17   ahead and be mindful that as soon as we get the responses to

18   that series of questions, we'll take our first 15-minute

19   break.

20            MR. PERRY:  Your Honor, that will be perfect.

21   That will wrap up my direct.

22            THE COURT:  That would be perfect.  Let's go

23   ahead and let you make inquiry.

24            MR. PERRY:  Thank you, Your Honor.

25            Let's pull up MT trial Demonstrative B.  Scroll

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                    70

1    down to those.

2    BY MR. PERRY:

3    Q.      Ms. Levinson-Waldman, these are short summaries of

4    your -- of the concerns that you have about the proposed

5    changes of the Kendrick Consent Decree; is that right?

6    A.      Yes, that's correct.

7    Q.      Would you briefly describe each one of these.

8    A.      Sure.

9            MR. MCMULLEN:  Your Honor, I'm going to object

10   again.  A legitimate law enforcement purpose, she's never

11   been established as an expert in law enforcement practice or

12   procedures.

13           THE COURT:  Right.  I understand this is going to

14   be a very limited inquiry.  I may be incorrect in

15   understanding that.

16           Mr. Perry, just a limited inquiry as to issue

17   identification?

18           MR. PERRY:  Absolutely.  Very limited and also

19   I'll point out that some of the publications offered in our

20   first exhibit address not just social media but policing and

21   the use of policing in the context of social media as a --

22           THE COURT:  I understand.

23           MR. PERRY:  -- this testimony is relevant.

24           THE COURT:  No, I do understand.  And I

25   understand this is more issue spotting.

 1            MR. PERRY:  Yes, Your Honor.

 2            THE COURT:  If that's what that is, then we're

 3    certainly going to allow it.  I understand that someone else

 4    may address some aspects of this; is that correct?

 5            MR. PERRY:  That's correct, Your Honor.  This

 6    will be a brief issue spotting and a brief description.

 7            THE COURT:  That's fine.  Then go ahead.

 8            MR. PERRY:  Thank you, Your Honor.

 9    BY MR. PERRY:

10    Q.    Please proceed, Ms. Levinson-Waldman, into your first

11    and final thought, the new proposed definition for legitimate

12    law enforcement purpose.

13    A.    That's correct.  And specifically the concern that it

14    could allow the MPD to take action for perceived but low

15    level threats to police officers.

16    Q.    Thank you.  Let's move to the second proposed changes

17    there.  Proposed change to the definition of political

18    intelligence.  What is your concern there?

19    A.    My concern there with respect to the possibility that

20    investigations could be undertaken that are due in part to

21    First Amendment-protected activity.  But that if there's

22    another justification to point to, that other justification

23    could be used essentially as pretext to also focus on First

24    Amendment-protected activity.

25    Q.    Thank you.  Let's move to the third proposed.  It's

                        UNREDACTED TRANSCRIPT

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                    72

1    the proposed second paragraph in Section D of the Consent

2    Decree.  What is your concern about that paragraph?

3    A.      My concern there is about the incorporation of a

4    reference to threat assessments.  And a concern specifically

5    about potential use for threat assessments as certainly an

6    issue that has come up in social media and other contexts.

7    Q.      Thank you, Ms. Levinson-Waldman.  Fourth and finally,

8    do you have a concern about the proposed 8th paragraph to

9    Section G of the Consent Decree?  What is your concern there?

10   A.      My concern here, this is a paragraph that refers to

11   types of crimes that are described as essentially taking

12   place solely on the Internet and not necessarily having First

13   Amendment implications.  And the incorporation of a reference

14   to cyberbullying as one of those types of investigations,

15   which I believe could have significant First Amendment

16   issues.

17   Q.      Thank you, Ms. Levinson-Waldman.  Have you previously

18   communicated these concerns to the City and to ACLU-TN?

19   A.      Yes.  We, the team had meetings with the City and the

20   ACLU yesterday.

21              MR. PERRY:  Thank you, Ms. Levinson-Waldman.

22              Your Honor, I have no more questions at this

23   time.

24              THE COURT:  All right.

25              We are going to take our morning break.  It is

                       UNREDACTED TRANSCRIPT

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                    73

1    three minutes after the hour.  And so we will make that a

2    break for 12 minutes, if that works for everyone.  And you

3    can disable your -- you can mute your site, and you can also

4    take your video off.  But you'll remain in the conference.

5    So we'll see everyone at 15 after the hour.  Thank you very

6    much.

7                (Short break.)

8                THE COURT:  I think that we have everyone.  And

9    so Mr. McMullen, if you're ready for any cross examination of

10   the witness, we'll let our witness come back on with unmuted

11   and live.

12               MR. MCMULLEN:  Yes, Your Honor.

13               THE COURT:  There we go.

14               MR. MCMULLEN:  Your Honor, Ms. Tullis is going to

15   share her screen with an exhibit that has already been

16   produced.

17               THE COURT:  That's fine.  I just need to make

18   sure we can see it okay.

19               MR. MCMULLEN:  Ms. Tullis, can you just pull up

20   the top of that letter.  Go to the top address part of it.

21   Can the Court see that letter?

22               THE COURT:  Certainly.  Yes.  And we can mark

23   that.  I'm looking to see if we have it already as an

24   exhibit.

25               MR. MCMULLEN:  It's in Exhibit 5, Your Honor.

UNREDACTED TRANSCRIPT

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                    74

1          THE COURT:  That's what I thought.  So we'll just

2    go to page -- here it is.  Here it is.  Exhibit 3 in this

3    document, which is Exhibit 5.  And so we're all set.  Yes,

4    sir.  Absolutely.

5          MR. PERRY:  Your Honor, this is Will Perry.

6    That's not MT trial Exhibit 5.  I think that's one of the

7    City's exhibits.

8          THE COURT:  It is as to 5, and there were a

9    number of documents attached to 5.

10         MR. PERRY:  I see.

11         THE COURT:  And it appears to be in that group of

12   materials.

13         MR. PERRY:  That's fine.  Thank you, Your Honor.

14         THE COURT:  Okay.  I think everybody is together

15   now.  I think, counsel, I think we're ready to proceed then.

16   Is the witness ready?

17         THE WITNESS:  Yes, Your Honor.  Thank you.

18         THE COURT:  Thank you.

19                    **CROSS EXAMINATION**

20   **QUESTIONS BY MR. MCMULLEN:**

21   Q.    How are you doing, Ms. Levinson-Waldman?

22   A.    I'm good.

23   Q.    All right.  I want to go back to you read from a

24   letter from the monitoring team discussing the disclosure of

25   certain search terms from certain agencies; do you remember

1  reading from that letter?

2  A.      Yes.

3  Q.      Did you also read the City's response to that letter?

4  A.      No, I did not.  Not out loud.

5  Q.      Were you also aware that when we provided those search

6  terms, we were very clear about what divisions we were not

7  providing search terms for with the Monitor?

8  A.      I understand that in the letter accompanying the

9  search terms, you listed the agencies from which those search

10 terms were drawn.

11 Q.      And we did not list -- we did not provide terms with

12 sex crimes, did we?

13 A.      That's correct.

14 Q.      Because on those that they involved certain

15 investigations where those terms are provided and produced

16 would compromise those investigations; isn't that correct?

17 A.      I don't think I can express an opinion on the reason

18 that those weren't provided.

19 Q.      Okay.  I want to go to the end of the document to

20 page 6.  Do you see Section C at the bottom of page 6?  Can

21 you read that, Ms. Levinson-Waldman.

22 A.      Yes.  Beginning right under C?

23 Q.      Okay.  Can you go ahead and read C withholding or

24 reporting of social media terms by undercover accounts.  Can

25 you go ahead and read what the City responded to the Monitor

1   with.

2   A.      Yes.  The paragraphs under C read, "The letter

3   directed the City to explain why it has not reported the

4   search terms from the undercover social media accounts used

5   by MPD.  The City attempted to be clear in its November 20th,

6   2020 letter."  Although I believe that would be November

7   20th, 2019 letter.  "That it objected to the inclusion of

8   social media searches of undercover accounts in its quarterly

9   reporting due to the danger of exposing the undercover

10  accounts, as well as potentially compromising the undercover

11  officers' identities and safety."

12          Should I keep reading?

13  Q.      Continue on.

14  A.      "For the same reasons as explained in Section 1B,

15  supra, the City is very concerned about potential disclosure

16  of the search terms that would be reported from undercover

17  accounts.  The concern is even greater regarding the search

18  term used by a person who is, quote/unquote, deep undercover,

19  disclosure of which could out the undercover officer and

20  potentially endanger his or her life."

21  Q.      Were you aware that was our response to that letter?

22  A.      I was aware of your letter responding to the team,

23  yes.

24  Q.      And so you were aware that -- were you aware that we

25  offered the monitoring team an opportunity to come in and

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                    77

 1  view those search terms?

 2  A.      Yes.

 3  Q.      And our trepidation was producing it in a paper form

 4  that may be inadvertently disclosed?  Were you aware that

 5  that was our trepidation?

 6  A.      I understand that that's what was represented in the

 7  letter, yes.

 8  Q.      Okay.  You do agree that exposing certain undercover

 9  police officers could endanger their lives?  You do agree

10  with that general proposition?

11  A.      I'm not sure that that's something on which I can

12  express an opinion, but I certainly do understand --

13  Q.      I agree.  I agree.  I'll withdraw the question.  I

14  agree with you.  All right.  Did you -- have you ever -- who

15  have you talked to from the Multi-Agency Gang Unit?

16  A.      We had a meeting collectively, the team and the City

17  with Major Darren Goods.

18  Q.      Okay.  Did you have any one-on-one or any questions

19  with Major Goods when the team met with him collectively?

20  A.      I believe I did have a couple of questions for Major

21  Goods.

22  Q.      What questions did you have?

23  A.      I would need to refer to my notes to pull up those

24  specific questions.

25  Q.      Okay.  Do you know how the Multi-Agency Gang Unit

                    UNREDACTED TRANSCRIPT

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                              78

1   operates?

2   A.      I understand, based on the information the City has

3   provided, the overall structure of the Multi-Agency Gang

4   Unit.

5   Q.      Let me ask you this.  Do you agree that police

6   departments can have undercover accounts with certain types

7   of investigations or should have undercover accounts with

8   certain types of investigations?

9   A.      I recognize that there are certain types of

10  investigations in which undercover accounts would serve a

11  purpose.  I think that they are also susceptible to misuse

12  and abuse.

13  Q.      I understand that.  So is it fair to say you don't

14  think any police department should have any undercover

15  accounts?

16          THE COURT:  That's not what the witness said.

17  I'll let counsel -- I don't think that's what you said, was

18  it, Ms. Levinson-Waldman?

19          THE WITNESS:  No, Your Honor.

20          THE COURT:  So there's no predicate for the

21  question.  It can be rephrased.  That was simply not said.

22  That would not be a productive question.

23  BY MR. MCMULLEN:

24  Q.      I think your response to me was you can see there

25  could be a purpose for a undercover account, but your fear is

                    UNREDACTED TRANSCRIPT

**_TESTIMONY OF RACHEL LEVINSON-WALDMAN_**                              79

1   the abuse of that account; am I quoting you or paraphrasing

2   you pretty correctly?

3   A.     That's accurate.

4   Q.     So tell me, tell me the situations in which you think

5   undercover accounts should be used.

6   A.     I don't think that we have discussed a -- an

7   exhaustive list, specific list of kinds of cases where

8   matters in which undercover accounts would be appropriate or

9   wouldn't be appropriate.

10  Q.     Okay.  I realize we haven't discussed it.  I was just

11  asking you, in your opinion, in what situations do you think

12  it's appropriate to use undercover accounts?

13  A.     I think my concerns and my opinions on undercover

14  accounts go in large part to the framework of protections

15  built around the use of undercover accounts.  So I think one

16  of the issues that would come up would be clearly

17  articulating if there are going to be undercover accounts.

18  The circumstances in which those undercover accounts would be

19  used.  The types of investigations.  Limitations on using

20  those accounts to infringe upon or shield the exercise of

21  First Amendment-protected activity.  Super (inaudible)

22  control regarding accounts.  Oversight and auditing and

23  potentially some sort of judicial oversight for use of

24  undercover accounts.

25  Q.     I understand.  If I understand you correctly, you're

 1  explaining some of the things.  You're fearful about abuse,

 2  and you're explaining certain types of oversight that you

 3  would like to see.  But I was trying to get more

 4  fundamentally what types of investigations do you think

 5  undercover accounts have a purpose?

 6  A.    I don't think that that's something that I can come up

 7  with here on the stand, a list of kinds of investigations in

 8  which undercover accounts would be appropriate.  And again, I

 9  think it's difficult to have that conversation in a vacuum

10  without also incorporating the procedural and other

11  protections that would need to be in place.

12  Q.    You said you talked to the community members, you

13  talked to people in the community about the Consent Decree;

14  is that correct?

15  A.    Well, we had the forums, and then we had some

16  one-on-one sessions with community members.

17  Q.    Did you find a lot of community members were confused

18  by the language in the Consent Decree and what that really

19  meant?

20  A.    I did not find that there was confusion about the

21  language of the Consent Decree itself.  Not that I recall.

22  There certainly may have been, but I don't recall that being

23  a substantial threat in those -- in the comments.

24  Q.    You don't recall any citizens having trouble

25  understanding what -- how it applied in the community forums?

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                            81

1   A.      Well, certainly there are questions about how it

2   applied.  I think maybe most significantly there were

3   questions about the monitoring team's role.  What the role is

4   of the Monitor and the team overall with respect to

5   overseeing and helping to facilitate the implementation of

6   the Consent Decree and what that meant with relation to the

7   language of the Consent Decree and the case.

8   Q.      You spent some time talking about the social media

9   policy of the FBI.  I gleaned from your testimony that you

10  don't think the social media policy of the FBI is

11  appropriate?

12  A.      I don't think it would be appropriate to -- certainly

13  to incorporate into a local police department's policies.

14  And if I had my way, there would be changes to the FBI's

15  policies for the bureau itself, but I do not have that

16  authority.

17  Q.      Okay.  And you said you reject some of the ideas you

18  felt came from the FBI social media policy, and you

19  recommended that they incorporate social media policies that

20  you developed; did I understand correctly?

21  A.      Well, I think -- so that's correct that I recommend

22  that the proposed policies that incorporates the FBI's

23  policies, that that not be approved.  With respect to the

24  reference to the policy that I developed, the other policy

25  that's available was one that was developed back and forth

TESTIMONY OF RACHEL LEVINSON-WALDMAN                          82

1   with input from the monitoring team, the City and the ACLU.

2   Q.      Have you ever developed any social media policies for

3   any law enforcement agency in the country?

4   A.      I have not been a part of developing other social

5   media policies.

6   Q.      Okay.  And when you -- you put forth a graph, and I

7   think you used the term outward facing on Exhibit 3.  What do

8   you mean by that was outward-facing research?  What does that

9   mean?

10  A.      I was distinguishing -- I'm not sure I referred to

11  outward-facing research.  What I was distinguishing between

12  was I was particularly interested in publicly available

13  policies that govern the use of social media by police

14  departments to view and collect information and I was

15  distinguishing that from policies which are much more sort of

16  commonly available that govern how a police department where

17  individual officers might use social media for outward-facing

18  public engagement, education, things like that.

19          So an example might be using a police department or

20  using an officer's Twitter account to say, we're looking for

21  a person of interest.  We're having a block party on

22  such-and-such date.  This precinct is going to be closed

23  during this week.  Things like that.  I would see that as

24  outward facing as opposed to collecting information from

25  social media.

UNREDACTED TRANSCRIPT

1  Q.     You listed a number of agencies.  Did you talk to

2  anyone in those agencies that were listed in that chart?

3  A.     I did not reach out to those agencies.

4  Q.     Okay.  So that information was done by a Google search

5  with certain search terms to pull up that information?

6  A.     Yes.

7  Q.     Okay.  All right.  You do recall a request for

8  authority -- we call them RFAs -- that exchanged between the

9  City and the monitoring team on various situations?

10 A.     Yes.

11 Q.     Okay.  And to explain what an RFA is, that's when the

12 City comes to a situation where they're unclear or have some

13 question about how they can proceed, then they would reach

14 out to the Monitor; is that correct?

15 A.     Correct.

16 Q.     And would you be a part of the decision making on

17 whether the situation the City described implicates the

18 Consent Decree or not?  Would you be a part of that

19 discussion?

20 A.     Not in every circumstance.  There were some times, I

21 believe, when the timing necessitated an immediate response

22 from the Monitor.  But when there was sufficient time to

23 solicit input from the monitoring team, then I would be part

24 of those.

25 Q.     Was there ever any disagreements or different

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                    84

1   interpretations of what was allowed and not allowed in those

2   RFAs from members of the monitoring team?

3   A.      There was certainly discussions among the monitoring

4   team about what was permitted and what wasn't.

5   Q.      So is it fair to say even among the monitoring team,

6   who are highly educated, specialized experts in certain

7   areas, there was some confusion or some difference in

8   interpretation as to what was allowed in the Consent Decree

9   and what was not allowed; is that a fair statement?

10  A.      I wouldn't say that there was confusion.  But there

11  were times when there were differences of opinion about the

12  parameters of the Consent Decree.

13  Q.      And your understanding globally of the Consent Decree

14  is it's a document that will basically describe how police

15  would interact with First Amendment protesters or with the

16  public; is that correct?

17  A.      Well, my understanding from the Consent Decree is that

18  it's broader than that.  That it's not just how police

19  interact specifically with protesters, for instance, people

20  who are on the street exercising their First

21  Amendment-protected activity, but also even in the conduct of

22  criminal investigations, that when those investigations could

23  implicate or infringe upon First Amendment-protected rights,

24  that it sets out procedures to ensure that that infringement

25  is necessary and is as limited as possible.  And that, of

 1  course, it has other provisions as well speaking to things

 2  like exchanges of information among law enforcement entities.

 3  Q.     And that Consent Decree is what the patrolman

 4  is supposed to be -- patrolman guide with dealing with the

 5  public with First Amendment issues; isn't that fair to say?

 6  A.     I'm sorry.  That it's supposed to be part of the

 7  patrolman's guide, you said?

 8  Q.     Yes.

 9  A.     Well, I'm not sure if by patrolman's guide you're

10  referring to a specific document.  So I'm not sure that I

11  tend to opine on that.  Certainly the Consent Decree requires

12  that officers be trained on the provisions of the Consent

13  Decree.

14  Q.     Okay.  Now, you mentioned Sanction 5.  And under

15  Sanction 5, that was a sanction of a court order.  Well, the

16  deviation that the monitoring team allege happened was a

17  deviation from the Court's order, not the Consent Decree; is

18  that correct?

19  A.     Correct.  From the Court's order setting out remedies

20  for the violation, yes.

21  Q.     And that has been appealed to Your Honor, and there

22  has been no ruling on that; is that correct?

23  A.     Correct.

24  Q.     Okay.  And that has been briefed by both sides; is

25  that correct?

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                          86

1   A.      Yes, that's correct.

2   Q.      Have you had an opportunity to read the brief on

3   behalf of the City?

4   A.      Yes.

5   Q.      So at this point it is alleged violation of the

6   Monitor's -- alleged violation alleged by the monitor team;

7   is that correct?

8   A.      I believe that ACLU has submitted materials on this as

9   well.  But that's correct, that it's an alleged violation.

10  Q.      Okay.  I'm glad you brought up the ACLU.  Do you think

11  the ACLU has adequately represented its clients in this

12  litigation?

13  A.      I believe Mr. Perry is trying to speak but is maybe on

14  mute.  Or no.  I'm not sure how to answer that.

15          MR. PERRY:  Your Honor, I object.  I object to

16  that, Your Honor, on grounds of relevance.

17          THE COURT:  Objection sustained.

18          MR. MCMULLEN:  Your Honor?

19          THE COURT:  We need to go to the next matter.

20          MR. MCMULLEN:  Okay.

21          THE COURT:  It would not be relevant in the

22  matter.

23          MR. MCMULLEN:  Your Honor, I have one or two more

24  questions.  Then I'll be finished.

25  BY MR. MCMULLEN:

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                    87

1  Q.    Ms. Levinson-Waldman, the demonstrative that you gave,

2  Demonstrative B that set out four different areas that you

3  have some complaint -- some objection to changes in the

4  Consent Decree, are these the only areas that you have any

5  objection to modification?

6  A.    These are the areas that I had raised.  I can't speak

7  for other members of the monitoring team who are going to be

8  addressing the proposals in more detail.

9          MR. MCMULLEN:  Your Honor, at this time I would

10 like to enter into evidence the proposed modified Consent

11 Decree.

12         THE COURT:  That can be marked as 6 in the

13 matter.  I don't think -- it's part of the record, but it's

14 certainly okay to have it in this hearing.  I don't see

15 any --

16         MR. MCMULLEN:  It's a part -- thank you, Your

17 Honor.

18         THE COURT:  Right.  We can mark it though.  And

19 we just need to make sure that we have that available

20 electronically, if possible.  But we'll mark that as --

21 without objection, we'll mark that as 6 in the case.

22         MR. PERRY:  Your Honor, may I confirm that we're

23 referring to Document ECF 327-1?

24         THE COURT:  I believe that's it.  And we're

25 checking that right now just to make sure we have the right

UNREDACTED TRANSCRIPT

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                    88

 1  document.  But we will make sure that we have the correct

 2  document.  So that will be 6 in the case.  The proposed

 3  Consent Decree submitted by the parties in the matter.

 4              (WHEREUPON, the above-mentioned document was

 5  marked as Exhibit Number 6.)

 6              MR. MCMULLEN:  I have one final question.  Hold

 7  on, Your Honor.  I'm sorry.

 8              THE COURT:  Certainly.

 9              MR. MCMULLEN:  Okay, Your Honor.  Yeah.  We

10  wanted to make sure that was in evidence because it was at

11  least marked because we discussed the modified -- proposed

12  modified Consent Decree.

13  BY MR. MCMULLEN:

14  Q.     Is it your understanding that the ACLU and the City of

15  Memphis has come to an agreement on the modification except

16  for Section I?

17  A.     Yes.

18  Q.     Do you oppose using undercover accounts in the ICAC

19  unit, Internet Crimes Against Children?

20  A.     I would need to know more about the specifics

21  regarding the function and methods of the unit and how

22  undercover accounts are used specifically.

23  Q.     Have you found at any time MPD did not honor the

24  monitor team's request to come visit, to come look at or to

25  interview anybody at MPD?

                        UNREDACTED TRANSCRIPT

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                              89

 1  A.      No.   I believe that we've been able to visit and

 2  interview individuals we've requested.

 3              MR. MCMULLEN:  No further questions, Your Honor.

 4              THE COURT:  Mr. Castelli, are there any questions

 5  from ACLU?

 6              MR. CASTELLI:  Yes, Your Honor, a few questions.

 7                        **CROSS EXAMINATION**

 8  **QUESTIONS BY MR. CASTELLI:**

 9  Q.      Good morning, Ms. Levinson-Waldman.

10  A.      Good morning.

11  Q.      I want to go back to the discussion about undercover

12  accounts.  I believe in your direct testimony, you had

13  discussed impersonator or impersonation accounts.  And I want

14  to make sure I understand what that is.  My understanding is

15  that that would be wherein someone has created an account

16  that is impersonating an actual, real-life person.  So if I

17  create an account that was -- and said I am Bruce McMullen,

18  that would be an impersonation account; is that how you are

19  identifying it?

20  A.      Correct, yes.

21  Q.      Okay.  So there would be other types of undercover

22  accounts that a law enforcement agency might use?

23  A.      Yes.

24  Q.      And so such as creating an entirely fake identity, an

25  account that is not an individual that actually exists but is

                        UNREDACTED TRANSCRIPT

 1   a fake identity; would that be a type of undercover account?

 2   A.      Correct.

 3   Q.      Okay.  And then perhaps are there accounts where

 4   people are not really purporting to be someone else or

 5   purporting to be a fictional individual, but they're just a

 6   double account?

 7   A.      Right.  Maybe somebody has two accounts because in

 8   order to connect with different people, but they're not

 9   purporting to be somebody else.

10   Q.      All right.  Just in your estimation and your

11   experience, would that type of like double account where you

12   know whose account it is, is that an undercover account, or

13   is that just another entity -- another type of social media

14   account?

15   A.      So it's a little fuzzy, but I wouldn't call -- as long

16   as it's not purporting to be someone else, whether it's an

17   actual defined person or a fictitious person, kind of along

18   the lines of the Bob Smith account that was used in this

19   case.  I suppose I wouldn't call that an undercover account

20   per se.

21   Q.      That's a good point.  So the Bob Smith account that

22   was part of the original enforcement proceedings, that would

23   be one of these -- that's not an impersonator account.

24   That's the other type of kind of fictitious account, correct?

25   A.      That's right.

1    Q.     Okay.  But just so I understand the testimony then but

2    all of these types of accounts, these undercover accounts,

3    whether it's an impersonator account or a fictitious account,

4    your opinion is that they need to be under some kind of

5    supervisory control if they're going to be used by law

6    enforcement?

7    A.     I think that from the point of view of good policy and

8    accountability, the police use of social media accounts that

9    any kind of undercover account used, whether it's an

10   impersonating account or the use of a fictitious account to

11   connect with people on line that follow that would need to be

12   subject to oversight and supervision.

13   Q.     The Exhibit 6 that has been marked, the proposed

14   modifications, you've reviewed that document, correct?

15   A.     I'm sorry.  You said that's trial Exhibit 6?  I just

16   want to be sure.

17   Q.     Yes, trial Exhibit 6.

18   A.     I'm sorry.  I think we might be talking about

19   something different.

20          MR. PERRY:  It's ECF 327-1.  It's the joint

21   proposed.

22          THE WITNESS:  I'm sorry.  Thank you.  Yes.  I am

23   familiar with that.

24   BY MR. CASTELLI:

25   Q.     Okay.  And are you aware of in the proposed changes of

 1  proposals that there be supervisory controls established for

 2  any type of undercover account?

 3  A.    Yes.  I believe that -- well, I'm sorry.  Actually, I

 4  think I would ask you to direct me to the place.  I don't

 5  want to speak unless I can take a moment to review the

 6  exhibit.

 7  Q.    Well, let me see if I can share my screen then and put

 8  that up for everyone to see.  If you'll --

 9            MR. CASTELLI:  If the Court is okay with that?

10            THE COURT:  Certainly.

11            MR. CASTELLI:  Sorry.  I can't see it on my

12  screen.  Are we seeing what's this proposed modified judgment

13  and decree?  Is that what is showing?

14            THE COURT:  Yes, it is.

15            MR. CASTELLI:  All right.

16  BY MR. CASTELLI:

17  Q.    And then if you'll look, I believe, it's in the -- in

18  Exhibit 6 in the proposed modified Consent Decree Section

19  E2(b) is what I was referring to.  So if you can review that

20  and then answer the question.

21  A.    Yes.  And could you just repeat the question so I'm

22  sure I'm answering.

23  Q.    Yes.  I think my question was, was it your

24  understanding from your review of this document that there

25  was a proposal to implement supervisory controls over any

UNREDACTED TRANSCRIPT

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                    93

 1  type undercover account utilized by the City?

 2  A.      Yes.  Yes.

 3  Q.      Okay.  Would you agree that that is something that

 4  would be -- if undercover accounts are going to be used in

 5  law enforcement practices, that this is something, in your

 6  opinion, is necessary?

 7  A.      Absolutely.  I think this is critical.

 8  Q.      Thank you.  You had also outlined, I think, four areas

 9  that you have raised some concerns with some of the

10  proposals.  It's my understanding that we might get more

11  in-depth information about that from Mr. Henegan when he

12  testifies later; is that correct, about your concerns as

13  well?

14  A.      Yes.  And I believe also from Mr. Bowman.

15  Q.      Okay.  Great.  Then I won't -- I can certainly defer

16  to them.  One that I think falls particularly within your

17  expertise I wanted to ask about is a concern regarding

18  cyberbullying.  Is that cyberbullying is kind of an on line

19  or activity on social media; is that right?

20  A.      My understanding of cyberbullying -- and this is

21  without sort of having a definition in front of me -- and you

22  know, that would end up being helpful, but that

23  cyberbullying, right, would involve basically online

24  bullying.  So use presumably primarily of social media but

25  maybe other kind of online sources or tools as well to bully

 1  another person.

 2  Q.      So is your concern with keeping that in this list of

 3  kind of Internet crimes -- well, I guess, can you tell me

 4  more about what your concern with including that particular

 5  type of crime is in the list of Internet crimes?

 6  A.      Yes.  I can send my concern, and I do want to note

 7  that I think Mr. Henegan will get into this in more detail.

 8  Q.      Okay.

 9  A.      But my concern here is that it's listed specifically

10  as being among the kinds of crimes that I believe the

11  language is -- essentially take place exclusively online and

12  may not -- are not likely to implicate First

13  Amendment-protected activities.  And because bullying often,

14  especially when we're talking about through online activity

15  through social media, so bullying through speech essentially,

16  seems likely to raise First Amendment concerns, at least in

17  some circumstances.  Not in all, but it seems to potentially

18  tread more into the First Amendment.

19  Q.      Okay.  I think another concern you raised was

20  regarding the revised definition of political intelligence or

21  First Amendment-related intelligence.  My understanding and

22  concern was that some of the language you felt might be

23  interpreted to mean that investigating -- if the sole reason

24  wasn't for political intelligence, then it might not be

25  covered by the Decree; am I getting that right?

UNREDACTED TRANSCRIPT

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                                    95

1  A.     Would it be possible to pull up the language or the

2  definition, and then I could refer to that in --

3  Q.     Yes.  Absolutely.  It would be very helpful.  Let me

4  do that.  And again, can you see the definition in this,

5  again, is in trial Exhibit 6.  I believe it's Number 5 there

6  on the screen.

7  A.     Yes.

8  Q.     If I'm doing this right.  And I believe the language

9  that you had taken some issue was "undertaken view" or "on

10 the basis of."  Is that the language that you had some

11 concerns about?

12 A.     That's right.

13 Q.     Okay.  And can you just explain to me again briefly

14 what your concerns were that you had articulated earlier?

15 A.     Sure.  So the concern, as you say, is arising from

16 this language "investigative activity," which is undertaken

17 due to or on the basis of a person's beliefs, opinions,

18 associations, et cetera, and a concern that if there is some

19 other justification articulated for whatever kind of

20 investigative activity it is, that it won't necessarily be

21 categorized or classified as activity undertaken due to or on

22 the basis of the First Amendment-protected activity.  Like

23 maybe that is one ground.

24        But there could be another ground that's pointed to

25 where legitimate or pretextual but sort of help insulate that

UNREDACTED TRANSCRIPT

*TESTIMONY OF RACHEL LEVINSON-WALDMAN*                           96

1   activity in circumstances where it does implicate First

2   Amendment-protected activity but can be described as not

3   technically being, you know, strictly on the basis of or only

4   on the basis of that activity.

5   Q.     So if this definition were interpreted as or read, or

6   if language was added to say that if it were in part

7   undertaken due to on the basis of a person's beliefs, that

8   might resolve your concern?

9   A.     I think if it said something like "due in whole or in

10  part to," then I think that would resolve the concern.

11  Q.     Okay.  Thank you.

12          MR. CASTELLI:  Those are my questions for the

13  witness, Your Honor.

14          Thank you, Ms. Levinson-Waldman.

15          THE WITNESS:  Thank you.

16          THE COURT:  Redirect?

17          MR. PERRY:  I have no redirect, Your Honor.

18          THE COURT:  I need the witness to go through the

19  last concern in connection with proposed paragraph 5 on

20  page ID 9960 -- which we'll ask to put back on the screen,

21  Mr. Castelli -- and again, discuss what you have considered

22  in terms of the language that you think would be necessary to

23  assure that there's no improper gathering, indexing, filing,

24  maintenance, storage or dissemination of information.  So let

25  the witness go back through that one more time.  I think

1    everybody is now on the page.  I think we're ready.

2              THE WITNESS:  And sorry, Your Honor.  Just to

3    specify the specific language that I would recommend?

4              THE COURT:  Well, also you've expressed a concern

5    which we've noted.  And it's in the record, but I wanted to

6    give you a chance to just explain that a little bit more.

7              THE WITNESS:  Sure.  With respect to the

8    definition of First Amendment-related intelligence.

9              THE COURT:  Yes.  Exactly.  And you can talk

10   about alternative language because there might be more than

11   one way to say what you said initially.  I'm not sure you

12   have other alternative language.

13             THE WITNESS:  Thank you, Your Honor.  From my

14   perspective, it could be fairly straightforward.  So taking

15   this specific language, First Amendment-related intelligence

16   is the gathering, indexing, filing, maintenance, storage or

17   dissemination of information or any other investigative

18   activity, which is undertaken due to or on the basis of a

19   person's beliefs, opinions, associations or the content of

20   the speech or expression protected by the First Amendment.

21   My concern is that that can be read effectively to mean which

22   is undertaken solely due to or on the basis of these various

23   exercises of the First Amendment.  And that there could be

24   some ambiguity there about what the standard is for the point

25   at which investigative activity would trigger this definition

1   of First Amendment-related intelligence.

2              And so one proposal that I think would suffice to

3   fix this would be picking up with any other investigative

4   activity, which is undertaken, in whole or in part, due to or

5   on the basis of a person's beliefs, et cetera, which would

6   clarify that it doesn't have to be the sole reason, but if it

7   is a reason, then it would fall under the category of First

8   Amendment-related intelligence.

9              THE COURT:  That concept is one that exists in

10  other areas of the law.  Is there any specific reference that

11  you would make to other areas of the law where that concept

12  is used?

13             THE WITNESS:  Well again, in part, I would point

14  back to FBI policies as -- and not to overly criticize the

15  FBI, but looking at policies the FBI has in place that have

16  made individuals in groups vulnerable to targeting on the

17  basis of First Amendment-protected activity.  The FBI's

18  policies prohibit -- I would have to look at the precise

19  language, but essentially prohibit investigation where that

20  investigation is solely due to First Amendment-protected

21  activity.  And despite that language or maybe because the

22  language includes that solely limitation, there are multiple

23  examples of FBI investigations that have targeted First

24  Amendment-protected speech.  Investigations that haven't

25  followed appropriate procedures.

 1              And so I think that's one of the sort of red

 2    flags or warning signals in thinking about potential

 3    weaknesses here and wanting to be sure that that's shored up

 4    to ensure the strongest possible protection of First

 5    Amendment-protected activities while, of course, allowing the

 6    MPD also to carry out its law enforcement mission.

 7              THE COURT:  Let's go back to the parties.

 8    Certainly the Court wanted to make inquiry there.  Is there

 9    any followup from the Monitor on this question as to this

10    witness?

11              MR. MCMULLEN:  Not from the City, Your Honor.

12              THE COURT:  Okay.

13              MR. CASTELLI:  Not from the ACLU, Your Honor.

14              THE COURT:  And what about the Monitor?

15              MR. PERRY:  No further questions, Your Honor.

16              THE COURT:  Now let's go to the City.

17              The witness then is excused.  Of course, you're

18    certainly welcome to stay on.  But we appreciate, always

19    appreciate your being here.

20              THE WITNESS:  Thank you, Your Honor.

21              THE COURT:  And I think everyone appreciates your

22    expertise.  It's much appreciated.  I think we're ready now

23    for -- this issue may come up again.  So we will probably

24    deal with it with some other witnesses also.

25              Now let's go to the Monitor as to our next

UNREDACTED TRANSCRIPT

1    witness.  And we certainly have a list.  I understand that

2    this will be Dr. Bowman.  But let me reconfirm that.

3              MR. PERRY:  It will, Your Honor, and I'm going to

4    defer to the independent Monitor, Mr. Stanton.

5              THE COURT:  All right.  Mr. Stanton, you may call

6    your next witness.

7              MR. STANTON:  Thank you, Your Honor.  We call

8    Dr. Theron L. Bowman, Your Honor.

9              THE COURT:  Dr. Bowman, if you would raise your

10   right hand, Mr. Sample will administer the oath.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*TESTIMONY OF THERON BOWMAN*                                    101

1                          *   *   *

2                      THERON BOWMAN,

3    **was called as a witness and having first been duly sworn**

4    **testified as follows:**

5               THE COURT:  Counsel may proceed.  We've got the

6    list of the spelling of the names, but I am going to let you

7    also make sure that everyone understands how Dr. Bowman's

8    name is spelled.

9               MR. STANTON:  Thank you, Your Honor.

10                      **DIRECT EXAMINATION**

11   **QUESTIONS BY MR. STANTON:**

12   Q.     Would you please state and spell your name for the

13   record, sir.

14   A.     Yes.  It's Theron, T-H-E-R-O-N.  Bowman, B-O-W-M-A-N.

15              THE COURT:  And Dr. Bowman, I'm going to ask you

16   to move just a little closer to your mic.  We can hear you

17   fine, but it's a little faint.  And I'll let counsel from now

18   on be mindful that we need to be able to hear just a little

19   better.

20              MR. STANTON:  Yes, Your Honor.

21              THE COURT:  Thank you.

22   BY MR. STANTON:

23   Q.     And Dr. Bowman, if you wouldn't mind speaking up just

24   a little bit more.  Would you share with the Court what it is

25   that you do for a living?

                        UNREDACTED TRANSCRIPT

1   A.      Yes.  I am currently a police practices consultant, a

2   police practices expert working on police practices cases in

3   the US and in the UK.

4   Q.      And Dr. Bowman, how long have you worked in the areas

5   of policing and police practices?

6   A.      I'm in my 37th year of policing and police practices

7   work.

8   Q.      And do you have any formal education in those areas?

9   A.      Yes, sir.  I have a master's degree in public

10  administration with a minor in criminology and criminal

11  justice.  I also have a doctorate degree in urban and public

12  administration.

13  Q.      If you don't mind, would you share with the Court,

14  Dr. Bowman, when and where that you obtained those degrees,

15  master's and doctoral degrees?

16  A.      Yes.  I obtained the master's degree and the doctorate

17  degree both from the University of Texas at Arlington.  The

18  master's degree in 1991.  The doctorate degree in 1997.

19  Q.      And Dr. Bowman, did you have to write a dissertation

20  for your doctorate?

21  A.      Yes, sir.  I did.  I wrote a dissertation.  In fact,

22  my dissertation topic was the predictive value of policies in

23  determining police officer actions.

24  Q.      Okay.  And aside from your dissertation, Dr. Bowman,

25  have you authored any publications in the areas of policing

1  and police practices?

2  A.      Yeah.  I've authored many, many publications.  Clearly

3  in excess of 50 of my publications have been published in

4  various textbooks and books and magazines and journals.

5  Q.      Thank you, Dr. Bowman.

6               MR. STANTON:  At this time I would like to pull

7  up a document that's been marked as MT trial Exhibit 6.

8  BY MR. STANTON:

9  Q.      Dr. Bowman, if you could look on the screen there.  Do

10  you recognize this document?

11  A.      Yes, sir.  I do.

12  Q.      And can you tell the Court, tell us what this document

13  is.

14  A.      That document on the screen is my -- is a portion of

15  my bio.  A biographical representation consolidated of my

16  career.

17  Q.      And Dr. Bowman, does this document detail the

18  educational as well as publication information that we've

19  discussed?

20  A.      It does.  This cover letter, the cover letter with the

21  text on it as well as the subsequent pages of my vitae do

22  detail my career and working comprehension.

23  Q.      Thank you, Dr. Bowman.

24               MR. STANTON:  Your Honor, if there's no

25  objection, I'd like to move MT trial Exhibit 6 into evidence.

UNREDACTED TRANSCRIPT

*TESTIMONY OF THERON BOWMAN*                                    104

1              THE COURT:  Yes.  Marked and received.  That

2    should be our Number 7.

3              MR. STANTON:  Thank you.

4              THE COURT:  Yes.  Received without objection.

5              (WHEREUPON, the above-mentioned document was

6    marked as Exhibit Number 7.)

7              MR. STANTON:  Thank you, Your Honor.

8              THE COURT:  Certainly.

9    BY MR. STANTON:

10   Q.     Now, Dr. Bowman, have you done any teaching in the

11   areas of policing and police practices?

12   A.     Yes, sir.  I've taught mostly graduate courses at

13   Division 1 colleges and universities for most of the last

14   30 years.  I've taught a number of classes on a range of

15   criminology and criminal justice and policing topics.

16   Q.     And your CV, does it provide more detail about your

17   teaching experience and educational background?

18   A.     Yes, sir.  It does.

19   Q.     Dr. Bowman, do you also conduct research on specific

20   subjects within the areas of policing and police practices?

21   A.     Yes, I do.

22   Q.     Okay.  Can you give us some details about that

23   research?

24   A.     Sure.  My vitae details just some of the areas of

25   research I focused in.  One area in particular is UASs or

1   unmanned aerial systems, where I've not only conducted a

2   great amount of research, but in many ways for many years was

3   considered a world authority on unmanned aircraft systems.

4   In fact, as a part of that work created the first urban

5   police department and received the first FAA authorization of

6   any urban police department in the US to fly in Class B

7   airspace.  And so I've conducted a lot of research in UASs,

8   but I've also conducted other research coronary to policing.

9          In particular in collaboration with the Police

10  Foundation in Washington, D.C., we've researched the effect

11  of shift work on police officer performance.  I created a

12  fellowship program with UTA, University of Texas at Arlington

13  criminal justice department to implement what we call a

14  teaching police department concept based on the medical

15  model, where doctors and nurses actually learn from problems

16  and mistakes and diagnoses.  And I've also, as part of my

17  research, partnered with the UTA department of engineering to

18  obtain a number of National Science Foundation grants on wave

19  forms and bandwidth compression, video compression

20  technologies.  And that's to name a few.

21  Q.     Thank you, Dr. Bowman.  You mentioned earlier, you

22  said UASs, unmanned aerial systems.  Is that drones, just for

23  the record, just to be clear?

24  A.     Yes, sir.  Yes, sir.  The common vernacular for UASs

25  today is drones.

1   Q.      Thank you, Dr. Bowman.  Now, turning to your

2   professional experience, Dr. Bowman.  Have you ever been a

3   law enforcement officer?

4   A.      Yes, sir.  I am.

5   Q.      And where have you served as a law enforcement

6   officer, Dr. Bowman?

7   A.      I've served a total of 34 years as a law enforcement

8   officer, all within the City of Arlington.  The first

9   29-plus, almost 30 years, I served in the Arlington Police

10  Department in various capacities.  The last 14 of those years

11  as the chief of police in Arlington, Texas.  And Arlington is

12  one of the 50 largest cities in the country.  It has a

13  population of approximately 400,000 people, with about 700

14  officers.  250 are nonsworn.

15          But I also spent about five years -- the last five

16  years of that time as the public safety director in Arlington

17  overseeing both the police and fire departments, as well as

18  many other city services that dealt with the public safety.

19  And so between the public safety director position and the

20  police chief, I have almost 35 years of public service

21  experience.

22  Q.      And that director position that you just mentioned, if

23  you would explain to the Court your duties there, what that

24  entailed, public safety director.

25  A.      Sure.  As the director of public safety, I was an

1    assistant city manager in the city.  I was the number two,

2    right behind the city manager in running the city.  As the

3    public safety director, I had management and executive

4    oversight over the police department, fire department, the

5    parks and recreation department, code compliance department,

6    as well as many other functions, the animal services, animal

7    control function, the public library system as well fell

8    underneath my control.  Underneath my control.  So as the

9    public safety director, I also have primary responsibility

10   for managing public safety of the 2015 NCAA National

11   Championship football game and the NCAA 2014 Final Four

12   tournament.  Some of the games were in my city as well.

13   Q.      Thank you, Dr. Bowman.  On your CV it's noted that

14   there is a -- something that's called The Bowman Group.

15   Dr. Bowman, can you explain what The Bowman Group is.

16   A.      Sure.  In 1998 I incorporated my business,

17   Theron L. Bowman, Inc., also known as The Bowman Group and

18   began serving clients in the capacity as a consultant.  That

19   work started in 1998 and continues today, some 22 years

20   later.

21   Q.      Thank you, Dr. Bowman.  And are you a member of any

22   professional law enforcement or public safety organizations?

23   A.      Sure.  I have, over the years, either held or

24   maintained membership in a number of law enforcement/public

25   safety organizations.  For many years, almost ten years, I

1   was a commissioner in accreditation of law enforcement

2   agencies.  I've served in the International Association of

3   Chiefs of Police in many positions and capacities there at

4   IACP.  I continue my membership in IACP today as well.

5           I'm a member of the board of directors of John Jay

6   College of Criminal Justice.  Christian Regenhard Center for

7   Emergency Response Studies.  And I've held that association,

8   that position for more than ten years now.  And I retain

9   membership with the National Organization of Black Law

10  Enforcement Executives.  Again, just to name a few.

11  Q.      Thank you, Dr. Bowman.  And is a more complete list of

12  your professional affiliations included in your CV, which has

13  been marked as an exhibit?

14  A.      Yes, sir.

15  Q.      Now I want to turn, Dr. Bowman, to why you're here

16  today.  Would you share on this afternoon the capacity of why

17  you're here to testify today.

18  A.      Sure.  I am a law enforcement expert on the monitoring

19  team for the pending Consent Decree.

20  Q.      And do you recall, could you share with the Court,

21  Dr. Bowman, how you became a member of this monitoring team.

22  A.      Sure.  To the best of my knowledge, I was referred to

23  the team by a former assistant US attorney named Steve

24  Parker.  I met Steve Parker when -- in 2009 and '10.  I

25  served on the US Department of Justice site team, the

1   investigative team that went into New Orleans to conduct a

2   pattern and practice investigation of the New Orleans Police

3   Department following the Katrina incidents.  I was one of the

4   lead experts in that investigation.  I compiled quite a

5   voluminous amount of work.

6       Steve Parker worked with the USDOJ team on that

7   particular investigation.  And then after a Consent Decree

8   was established between the USDOJ and the New Orleans Police

9   Department, I was asked to serve on that monitoring team and

10  work with Steve Parker on that team as well.

11      So Steve had become familiar with my work, both as an

12  investigator serving as an SME with USDOJ but also my work as

13  a police monitor in New Orleans.  And so Steve provided my

14  name to the Memphis team, and I had a conversation with the

15  Monitor.  And I was asked to join the team, and here I am

16  now.  I am honored to be a member of this team.

17  Q.    Thank you.  And Steve Parker, as you mentioned, the

18  former assistant US attorney, he was a former AUSA here in

19  Memphis, and to your recollection and the chief of the civil

20  rights unit in the office; is that your recollection?

21  A.    That is my recollection.  Yes.

22          THE COURT:  Gentlemen, we've reached the time

23  where we did say we would take a lunch break.  And so we will

24  do that.  We're going to try to stay on schedule so

25  individuals who are watching and participating will know when

*TESTIMONY OF THERON BOWMAN*                                    110

1  we're on and when we're in session and when we're not.  So

2  we're going to take that 45-minute break.  This is the only

3  lunch break and of course, restroom break for those, and then

4  we will resume promptly at 1 o'clock.

5            Now, Mr. Sample is going to tell us whether we

6  should disconnect or whether we should -- you should remain

7  in place.  And Mr. Sample, I understand the plan was that

8  people would remain -- can remain but simply mute and

9  disconnect their video, that is, and then resume promptly at

10 1 o'clock.  Otherwise, we would have to start over.  It's

11 just like as if we were in court.  So Mr. Sample, if I'm

12 correct about that, you can say yes.  If I'm not correct,

13 please help us know what to do.

14            THE CASE MANAGER:  You are indeed correct, Your

15 Honor.  Thank you.

16            THE COURT:  All right.  That's fine.  Well, this

17 is our lunch break.  We recognize that we'll see hopefully

18 everyone promptly at 1 o'clock.  Thank you all very much.

19 And we will simply mute and disconnect our video.  But stay

20 on the Skype for government call -- not the Skype.  I'm

21 sorry.  Zoom for Government.  We changed technologies the

22 last two days.  Thank you.

23            (Lunch break.)

24            THE COURT:  This is Judge McCalla.  I think we

25 have everyone again.  I'm looking for a couple of individuals

UNREDACTED TRANSCRIPT

```
 1   on the screen.  Okay.  I think we are.  I've got to wait on

 2   the Monitor to activate his video.

 3             MR. STANTON:  I'm sorry, Your Honor.  It looks

 4   like I was on mute.  Can you see and hear me now?

 5             THE COURT:  I can hear you and see you now.  So

 6   we are ready to proceed.  Counsel may proceed.  And I see our

 7   witness.  Of course, our witness is up already.  So counsel

 8   may proceed.

 9             MR. STANTON:  Thank you, Your Honor.

10   BY MR. STANTON:

11   Q.    Dr. Bowman, you had mentioned how it was that you

12   became, before the break, a member of the monitoring team.  I

13   want to follow up with that line of questioning.  Can we go

14   back to what is your role -- since you've joined the

15   monitoring team, can you share with the Court exactly what's

16   your role on the team?

17   A.    Sure.  My role clearly is one of the law

18   enforcement/policing experts on the team.  So my role is to

19   essentially review the information for us, more from the ends

20   of --

21             THE COURT:  Right.  Doctor, let me ask you.  The

22   court reporter indicates that once again, you faded a little

23   on the volume.  And if you don't mind speaking up just a

24   little bit more, a little more and that will take care of it.

25   So I'm going to let you start over.  I know you were
```

1    explaining your role.  I think I heard that, but let's make

2    sure that it's easy for the court reporter.

3              THE WITNESS:  Okay.  I certainly will.  I

4    apologize, Your Honor.  It's just my mild-mannered self being

5    a police chief over the years.

6              THE COURT:  I understand.  Thank you.

7              THE WITNESS:  Certainly.  Yeah.

8    A.     My role on the monitoring team is as a police

9    practices/law enforcement policing expert on the team.  My

10   role is to look at the information that's provided to review

11   it through the law enforcement lens, make sure that I can

12   interpret what I see and communicate with the rest of the

13   team what I see, how I perceive it from the law enforcement

14   perspective.

15   BY MR. STANTON:

16   Q.     Thank you, Dr. Bowman.  And do you have any previous

17   experience actually serving on monitoring teams?

18   A.     Yes, sir.  I do.  I have quite a bit of monitoring

19   team service experience.

20   Q.     Would you share that with the Court this afternoon.

21   A.     Sure.  Well, in fact, I currently serve on four

22   monitoring teams.  Memphis is included.  But I serve on three

23   other teams.  I mentioned New Orleans previously, and I've

24   served on the New Orleans team since 2012.  In New Orleans, I

25   have primary oversight over stops, searches, arrests, as well

1    as bias-free policing, but I've also had oversight over

2    recruitment, hiring and retention, as well as public

3    integrity.

4           In Baltimore, the team in Baltimore, I have primary

5    oversight over all policy work.  All of the department

6    policies will go through my area, as well as stops, searches

7    and arrests.  I have secondary oversight over bias-free

8    policing and First Amendment rights in the City of Baltimore.

9           And then on the other Consent Decree that I work on in

10   the City of Chicago, Chicago is interesting.  It's the newest

11   Consent Decree.  I'm a member of the monitoring team, but I

12   actually did not -- was not part of the proposal of the

13   current monitoring team.  I was brought on to the team after

14   the selection process for the monitoring Chicago because the

15   City of Chicago, who is the Defendant in the suit, as well as

16   the Plaintiff, which is the state attorney general's office

17   in Chicago, along with the federal judge there, insisted that

18   I be a part of the Chicago team.

19          And I so I am a part of the Chicago monitoring team.

20   And in Chicago I review all policies related to training.

21   I'm primarily responsible for all of the training function,

22   including recruit inservice training as well.  I am primarily

23   responsible for all of the oversight of the stops, searches

24   and arrests for the City of Chicago as well.

25          And then again, in Memphis, I'm law enforcement expert

*TESTIMONY OF THERON BOWMAN*                                                      114

1   over the Kendrick Consent Decree work.

2   Q.      Needless to say, Dr. Bowman, you're busy between

3   Memphis, New Orleans, Baltimore and Chicago Consent Decree

4   teams; is that a fair assessment?

5   A.      Yes, sir.

6   Q.      Dr. Bowman, have you ever been involved in police

7   practices investigations or audits?

8   A.      Yes, I have.

9   Q.      And would you share just that work and where you've

10  done and where you've performed those activities, those

11  investigations.

12  A.      Right.  I have been involved in a number of police

13  practices investigations and audits in places like Maricopa

14  County, Arizona.  In Cleveland, Ohio.  In Los Angeles County,

15  California.  Seattle, Washington.  Albuquerque, New Mexico.

16  Newark, New Jersey.  New Orleans, as I mentioned previously.

17  Aiken, South Carolina.  Meridian, Mississippi.  Wilmington,

18  Delaware.  And a number of places in Texas as well.  So I

19  would characterize my involvement in this type of work as

20  being extensive.

21  Q.      Okay.  As you would say just to name a few; is that

22  right, Dr. Bowman?

23  A.      Yes, sir.

24  Q.      And awards, have you won any awards or otherwise been

25  recognized for your extensive work in this area, Dr. Bowman?

1    A.      Sure.  Yes.  I have been recognized and inducted into

2    the Evidence-Based Policing Hall of Fame.  That's at George

3    Mason University in Washington, D.C.  I've won the UTA

4    distinguished Alumni Award.  That's my alma mater.  I've been

5    awarded the Gary P. Hayes Award by the Police Executive

6    Research Forum.

7            I've been named the award winner for the W.E.B. Dubois

8    Award for Leadership.  I've been named the University Scholar

9    by my alma matter.  The NAACP has presented me with the

10   Harold Washington Heritage Award for Government Service and

11   then many others as well.  So I've been recognized for my

12   commitment to the work that I do, as well as the quality of

13   the work.

14   Q.      Thank you, Dr. Bowman.  And with all of this

15   experience, has this experience in those areas, have they

16   helped to form the testimony that you've giving, providing

17   for the Court today?

18   A.      Yes, sir.

19   Q.      Now I want to turn to what we call the Kendrick

20   Consent Decree, Dr. Bowman.  It's questions with regard to

21   the Decree.

22   A.      All right.

23   Q.      I'd like to first begin by asking you to help place

24   the Kendrick Consent Decree into context.  So first,

25   Dr. Bowman, roughly how many US law enforcement agencies are

*TESTIMONY OF THERON BOWMAN*                                          116

1   there in the United States?

2   A.      There are approximately 15,000 state, local and

3   federal law enforcement agencies in the US.

4   Q.      Roughly, how many of those law enforcement agencies

5   are currently under a Consent Decree?

6   A.      I don't know the exact number but certainly fewer

7   than 20 of those 15,000 agencies are currently under a

8   Consent Decree.  So if you look at the numbers, 20 into

9   15,000 is far less than the one percent of all police

10  agencies in the country fall under any kind of Consent Decree

11  currently.

12  Q.      And based on those numbers and statistics, Dr. Bowman,

13  is it fair to say that Memphis is fairly unique with this

14  Decree?

15  A.      Sure.  Sure.  Absolutely.  I mean, just look at the

16  numbers alone.  20 or fewer than 20 out of 15,000 agencies,

17  Memphis is one of those 20 out of 15,000.  And then Memphis

18  is the only of the 15,000 agencies that fall underneath the

19  Kendrick Consent Decree.  So Memphis is very, very unique.

20  Q.      With your experience, Dr. Bowman, what about the age

21  of the -- are you familiar with the age of the Kendrick

22  Consent Decree?

23  A.      Sure.  The Kendrick Consent Decree is 1976, I believe.

24  Q.      '78?

25  A.      Yeah.  '78.  And so it's been around longer than most

1   other Consent Decrees.  It may have been around longer than

2   any other currently active Consent Decree.  Most of the other

3   Consent Decrees have come about since 1994, following the

4   SAFE Streets Act, which authorized the justice department to

5   sue police departments under Sanction 14141 of the US code,

6   commonly known as patterns and practice investigations.  So

7   most of the Consent Decrees have come about as a result of

8   USDOJ patterns and practice investigations since 1994.

9   Q.     Thank you.  And when we talk in context of Consent

10  Decrees.  If you would share, Dr. Bowman, when a city is

11  placed under a Consent Decree, what does that communicate to

12  you as a former law enforcement officer, police practices

13  expert?

14  A.     Sure.  Cities under a Consent Decree have entered into

15  an agreement with a plaintiff because they have been accused

16  of being engaged in extralegal practices that rise to the

17  level of needing typically federal court intervention.  And

18  so again, that doesn't happen every day.  It doesn't happen

19  to many jurisdictions around the country.  And as I just

20  stated, fewer than 20 of 15,000.

21         But when I see an agency under a Consent Decree, it

22  tells me that that agency has agreed to subject itself to a

23  set of standards to bring it into compliance with an area

24  that is problematic and typically extralegal than that

25  agency.

1  Q.     And is it appropriate in such cases, Dr. Bowman, to

2  impose higher standards on law enforcement or on a law

3  enforcement agency than would otherwise be dictated by best

4  practices?

5  A.     Yeah.  Yeah.  Absolutely.  And in many cases and I

6  think the same is likely to be the case in Memphis, the

7  results, the product of the Consent Decree will actually

8  itself establish a new best practice in a particular area.

9  But typically higher standards are established for an agency

10  that has agreed to and accepted and is under a Consent

11  Decree, and then those standards typically are then applied

12  across the field as a best practice.

13  Q.     And in his order, the Court's order holding the City

14  of Memphis in contempt of the Decree, Judge McCalla explained

15  that and I am quoting, Memphis is unique in having imposed a

16  higher standard on itself than the First Amendment, but it is

17  not alone in confronting the questions presented by modern

18  surveillance.

19              MR. STANTON:  And for counsel, that's ECF

20  Number 151, page ID Number 6278.

21  BY MR. STANTON:

22  Q.     Dr. Bowman, have the monitoring teams in New Orleans

23  and Baltimore, the teams that you've worked on, have they had

24  to deal with problems presented by modern surveillance?

25  A.     Yes, yes.  I think every city that I'm in address --

1   every city with a Consent Decree in the US and then some

2   cities who are not, as well as a place in the UK, have very

3   significant issues concerning modern surveillance.

4   Q.      Could you share what some of those maybe most common

5   of those issues or problems that you've observed?

6   A.      I think many of the Consent Decrees address these,

7   quote/unquote, surveillance issues from what I would call the

8   community perspective, whereas they restrict the police

9   departments or police agencies from taking actions against

10   citizens who were engaged in First Amendment activity.  For

11   example, Section E of the New Orleans Consent Decree is

12   actually titled First Amendment Right to Reserve and Record

13   Officer Conduct.  And the language in that section prohibits

14   the New Orleans Police Department from abridging the First

15   Amendment rights of citizens and community members who are

16   trying to record NOPD or who are trying to engage in First

17   Amendment activity.

18        So most of the Consent Decree, the modern Consent

19   Decrees will establish some type of protective First

20   Amendment purpose and a requirement that the police agencies

21   protect the First Amendment rights.  The Kendrick Consent

22   Decree is a little bit different.

23   Q.      And has there been a range of responses by police

24   officers in these different cities to these problems, or have

25   the responses all been the same or similar?

1  A.      No.  Every city is different and unique.  Every set of

2  facts, circumstances is different and unique to that city.

3  So there isn't one playbook.  There isn't one set of best

4  practices.  Each city will take a look at what options are

5  available and then typically will employ the options that are

6  most appropriate for the unique circumstances in that

7  jurisdiction.  So no.  There's not a one-size-fits-all

8  approach to this area, but each city has to custom tailor the

9  right prescription for its situation.

10 Q.      And you mentioned not a one size fits all.  So in that

11 regard, Dr. Bowman, would you say that there are any,

12 quote/unquote, best practices that would emerge from some of

13 these responses you've seen across the country?

14 A.      Again, there's not a one size fits all.  There's a

15 huge amount of literature out there.  In fact, I would

16 characterize the literature as being voluminous.  But the

17 literature also is often contradictory.  The prescriptions

18 are varied.  Sometimes they're conflicting, and even the

19 experts in the industry don't always agree what's best for

20 one city versus another.  So there's a lot of information,

21 but it often conflicts.  And there is not one standard

22 prescription that can apply across the field to every police

23 agency.

24 Q.      Thank you, Dr. Bowman.  And so as a general matter, to

25 talk about the Kendrick Consent Decree, is it your opinion

1   that the Kendrick Consent Decree prevents the Memphis Police

2   Department from implementing any of those best practices?

3   A.      No.

4   Q.      And does the Consent Decree, Kendrick Consent Decree,

5   that is, for example, prevent the MPD from using social

6   media?

7   A.      No.

8   Q.      Now, I mentioned best practices.  I want to go back to

9   were you -- I just want to confirm that you were able to

10  listen to and hear the testimony earlier this morning from

11  expert Rachel Levinson-Waldman; is that correct?

12  A.      That's correct.

13  Q.      And did you hear the testimony where she had some

14  concerns as it relates to the definition of legitimate law

15  enforcement purpose?

16  A.      Yes, sir.  I did.

17  Q.      And Dr. Bowman, along those lines of that definition

18  -- and I'm referring to the definition that's been cited in

19  referring to both parties' proposed modified Consent Decree.

20  The new definition of legitimate law enforcement purpose.  Do

21  you have concerns with that definition, the new definition?

22  A.      I do.

23          MR. STANTON:  And I believe that's been marked,

24  Your Honor, as trial Exhibit 6.

25          THE COURT:  Yes, sir.

UNREDACTED TRANSCRIPT

1         MR. STANTON:  And I want to see, do we have that?

2   It may be easier for opposing counsel of Baker Donelson to

3   introduce that if we can get that on the screen, or we have

4   it under a different number, Demonstrative G, if you would.

5   And Your Honor, this should be the same exhibit as trial

6   Exhibit Number 6.

7         THE COURT:  Yes, it is.

8         MR. STANTON:  Okay.  And if you would go to

9   page 3, please.  Or just keep going down.  Yes, Number 3.

10  BY MR. STANTON:

11  Q.    Dr. Bowman, do you see Item Number 3, definition

12  Number 3 entitled Legitimate Law Enforcement Purpose?

13  A.    I do.

14  Q.    And you just shared with the Court that you have some

15  concerns with this proposed definition, that the definitional

16  language proposed by the parties; is that correct?

17  A.    That is correct.

18  Q.    And could you share with the Court what your concern

19  is first and then if there is a fix or what you would

20  recommend with your professional experience and expert

21  experience of how -- what you would recommend to the Court

22  this could be remedied.

23  A.    Okay, sure.  First, you know, I hesitate a little bit

24  because this language, I believe, represents the combined

25  product and agreement between the Plaintiff and the

UNREDACTED TRANSCRIPT

1    Defendant.  But when I look at just the text of this

2    language, legitimate law enforcement purposes means an

3    activity conducted for the purpose of furthering the

4    prevention of crime.  I really believe that furthering the

5    prevention of crime is all-encompassing.  That language is

6    really all of this part of that sentence needs.

7         But then when you add "and/or ensuring the safety of

8    the public," that opens up other potential interpretations of

9    what this means.  That language is less problematic than this

10   last piece "and law enforcement personnel."  So if you read

11   that together, the prevention of crime and/or ensuring the

12   safety of the public and law enforcement personnel, I'm

13   concerned that really public safety and law enforcement

14   personnel safety can really be encompassed within those

15   prevention of crime words and that adding the additional

16   language isn't necessary.

17        But furthermore, when you add "law enforcement

18   personnel safety" -- or "ensuring the safety of law

19   enforcement personnel," it could also be interpreted as

20   meaning ensuring the safety of law enforcement personnel who

21   place themselves in officer-created jeopardy situations.  Or

22   who because of situations they create are now their purpose

23   is legitimized when the situation should have been

24   deescalated or presented -- or prevented otherwise.  So that

25   additional language, "ensuring the safety of law enforcement

1   personnel," I think not only is it unnecessary, but it also

2   opens up the potential, the potential understanding and

3   interpretation of this to include illegitimate situations

4   including -- in addition to some legitimate law enforcement

5   situations.

6       My fix would be to just end it at "prevention of

7   crime."  Scratch out "and/or ensuring the safety of the

8   public and law enforcement personnel."  And then continue

9   "while adhering to law and agency policy designed to protect

10   privacy, free speech, association and other civil rights and

11   civil liberties of all people."

12  Q.      Thank you, Dr. Bowman.

13          MR. STANTON:  You can take that down.

14  BY MR. STANTON:

15  Q.      I want to turn now, Dr. Bowman, to some of the

16  rationales that's been offered by the City for modifying the

17  Consent Decree.  The City has explained that, quote,

18  technology, criminals' use of technology and police practices

19  have changed significantly in the time since the Consent

20  Decree was entered.  I just quoted from the City's pretrial

21  brief at ECF Number 324, page ID 9940.

22      So I'd like to take those three items, Dr. Bowman.

23  Technology, criminals' use of technology and police practices

24  have changed significantly in the time since the Consent

25  Decree was entered.  I want to take those items, if you will,

1   in reverse.  So let's start first with police practices.  The

2   City maintains that there is a large body of knowledge and

3   literature regarding the practices and standards that modern

4   (inaudible) reasonably (inaudible) and administer law

5   enforcement agencies should follow; is that correct?

6   A.      There is a large body of knowledge, but even the

7   writers don't agree.  There isn't a standard set of knowledge

8   or prescriptions that apply to every law enforcement

9   situation in even remotely similar circumstances.  So that's

10  partially correct.  There is a large body of knowledge, but

11  the knowledge is often not coherent, and you can't just

12  accept what's out there at face value without looking at the

13  unique circumstances for a particular city or jurisdiction.

14  Q.      And to the extent that any generally accepted

15  practices can be derived from this body of knowledge and

16  literature that the City refers to, how should those

17  practices apply to law enforcement agencies that are under a

18  Consent Decree?

19  A.      Again, agencies that are under a Consent Decree are

20  under that Consent Decree for a reason.  And that means that

21  they have been engaged in extraordinarily -- or they have

22  admitted that there is something about their activity that

23  they consent to fix it through the mechanism of a Consent

24  Decree.  So the fact that they're under a Consent Decree

25  indicates that there are real problems in one or more areas,

1    in that particular area.  And that you cannot paint and

2    repair those problems with a broad brush.  You must be

3    absolutely specific and apply the right fix to the unique

4    situation and characteristics within that jurisdiction, and

5    here we're talking about Memphis.

6    Q.     And that gets to the second item, Dr. Bowman.  And

7    that's criminals' use of technology.  Again, according to the

8    City and with respect to the criminal investigation, social

9    media provides law enforcement with a treasure-trove of

10   information, resources and tips; do you agree?

11   A.     A treasure-trove, no.  No.  That's just -- that's not

12   -- in my opinion, not the right characterization of what

13   social media does.  Social media is just one form of open

14   source information, and most of what's out there on social

15   media has no legitimate law enforcement value whatsoever.  So

16   I would not agree that social media provides a treasure-trove

17   of information for law enforcement.

18   Q.     And that gets us to the third item, and that is

19   changes in technology, Dr. Bowman.  According to the City,

20   quote, the Kendrick Consent Decree is outdated, and is not

21   serving to protect the citizens of Memphis as it was intended

22   to do.  In fact, it is causing them increased harm and a

23   substantial decrease in overall safety, end quote.

24          Dr. Bowman, is that view consistent with your

25   observations?

1   A.      I can't -- I cannot say that that is the case.   The

2   Kendrick Consent Decree is a document only shared between the

3   Plaintiff and the Defendant.   What I do know is technology

4   has changed over the years.   It continues to change, but as

5   far as the impact on the Consent Decree and the citizens of

6   the City of Memphis, the impact of a Consent Decree on the

7   citizens of the City of Memphis, I don't know if the Consent

8   Decree itself is having that negative impact.   But I think it

9   is within the rights of the parties to the Consent Decree to

10  look at it, to provide and prescribe and to recommend changes

11  to it.   And over time, that process problem should be

12  recognized as valid.

13  Q.      One area that the City claims the Consent Decree

14  restricts it in performing and you mentioned this term

15  earlier, Dr. Bowman, and that's the, quote/unquote, open

16  source searches.   You mentioned this term earlier, open

17  source searches.   Can you explain what they are?

18  A.      Well, sure.   A lot of times police departments and

19  even some writers will conflate the term open source searches

20  or open source information with the term social media.   And I

21  think it's important to know that at least according to the

22  2001 NATO Open Source Intelligence Handbook, there are at

23  least four distinct categories of open source information and

24  intel.

25          And the handbook would say that those are open source

UNREDACTED TRANSCRIPT

1    data, which essentially is the raw print from a primary

2    source.  And it can be anything like a tape recording, a

3    photograph or some other item.  Open source information

4    that's edited raw data to provide some type of validation and

5    filtering.  A third category would be open source

6    intelligence.  We've heard that word a few times.  And open

7    source intelligence is edited.  It's information that has

8    been deliberately discovered, distilled and disseminated to a

9    select audience of people.  And then finally, validated open

10   source intel is information to which a high degree of

11   certainty can be attributed.

12         So when we use the term open sources, open sources

13   include newspapers and the Internet.  It includes books and

14   phone books, journals, radio broadcasts.  It includes TV.

15   Individuals and other sources.  So social media sites are

16   just a fraction of the open sources that law enforcement

17   agencies can access.

18         And even when we talk about Internet sites, Internet

19   sites do not equate to social media.  And real quickly, for

20   example, we talk about Internet.  Open source information on

21   the Internet includes search engines like Google, Bing,

22   Yahoo, America Online, Ask, Lycos, Dogpile, search.com,

23   Volunia and other specialized directories like Yellow Pages,

24   Yelp, Manta, Hotfrog and jade.com.  And there are many other

25   Internet open sources.

1      But Internet open sources also include e-commerce and

2   auction sites and classified sites like eBay, and Craigslist.

3   Classifiedads.com.  And key GG provide some open source

4   information as well.

5      And then there are other image hosting platforms.

6   Platforms like Flickr, Shutterfly would be one, Snapfish.

7   And then video hosting sites like YouTube, Vimeo, Hulu, and

8   Ustream.  All are Internet open source sites that are not

9   necessarily social media sites.  And so it's important that

10  when we talk about open source, we don't conflate the

11  definition of open sources with social media.

12  Q.      Thank you, Dr. Bowman.  And just one other question as

13  it relates to open sources, open source searches and that is,

14  in your view, does the Consent Decree, the Kendrick Consent

15  Decree prevent the City from performing open source searches?

16  A.      No.

17  Q.      Now, I've referenced this before, the fact that the

18  City and the ACLU, the parties have come to an agreement on

19  several proposed modifications to the Kendrick Consent

20  Decree.  But there's one aspect of the Kendrick Consent

21  Decree on which they have not agreed to.  That's been

22  discussed earlier today, but I want to go there to that

23  section, and it's the amount and nature of proposed

24  modification of Section I.  I would like to take just a few

25  minutes to talk about that section.

1        MR. STANTON:  If we could have the monitoring

2   team Demonstrative correct.  Exhibit correct.

3   BY MR. STANTON:

4   Q.     Can you take a look at this.  I'm going to read it

5   aloud, if you could take a look, Dr. Bowman, at Section I of

6   the Kendrick Consent Decree.  It reads, "The Defendants and

7   the City of Memphis shall not encourage, cooperate with,

8   delegate, employ or contract with or act at the behest of any

9   local, state, federal or private agency or any person to plan

10  or conduct any investigation, activity or conduct prohibited

11  by this Decree."

12       Are you familiar with this section, Section I, of the

13  Kendrick Consent Decree?

14  A.     Yes.

15  Q.     And I believe you've seen the City's position that

16  Section I prevents the City from participating in operations

17  with joint task forces such as the Joint Terrorism Task

18  Force, or it's called the JTTF or the Multi-Agency Gang Unit,

19  also known as MGU.  Is that your opinion, or do you have a

20  opinion with regard to whether Section I prevents the City

21  from participating in operations with joint task forces?

22  A.     Nowhere in Section I does it say the City is

23  prohibited from participating in joint task forces or in the

24  multi-agency gang units.  So absolutely not.

25  Q.     And Dr. Bowman, along those lines, would you expect

1   that the -- and I'm using the acronym JTTF or MGU, would you

2   expect those task forces to share information with MPD

3   officers that is unrelated to any legitimate law enforcement

4   activities?

5   A.       No.

6   Q.       Okay.  And why is that?

7   A.       Well, because JTTF, the Joint Terrorism Task Force and

8   typical task forces or multi-agency units, they are focused

9   on a crime prevention or crime-fighting mission.  They're not

10  focused on a mission outside of law enforcement.  And so I

11  would not expect information coming from either one of those

12  entities that are not legitimate law enforcement information.

13  That falls outside of the mission of either one of those

14  types of operations, as I know them, as they are operated in

15  places around the country.

16           MR. STANTON:  And I am going to -- just for

17  counsel, I want to cite to where the Court in ECF Number 250,

18  just the citation to a quote from Judge McCalla, ECF 250,

19  page ID 8417 and 8418.

20  BY MR. STANTON:

21  Q.    If you would just follow along with me, Dr. Bowman,

22  where the Court says Section I, quote, may prevent the City

23  from receiving information from federal law enforcement

24  agencies that implicates or may implicate First

25  Amendment-protected activities or political intelligence

*TESTIMONY OF THERON BOWMAN*                                    132

1  unless it engages in the review and authorization processes

2  required by Section G of the Decree.

3          And my question to you, Dr. Bowman, in reviewing that

4  order from the Court, in your opinion, is it good practice to

5  require the MPD to engage in a review and authorization

6  process before it can accept information about First

7  Amendment-protected activity?

8  A.      Not only is it good practice as a chief executive

9  officer of a law enforcement agency, I would insist that that

10 would occur.  And it's also legally required.

11          MR. STANTON:  Dr. Bowman, those are all the

12 questions that I have for you at this time.  Thank you so

13 much.

14          Your Honor, we'll tender the witness.

15          THE COURT:  Mr. McMullen, you may cross examine.

16          MR. MCMULLEN:  Thank you, Your Honor.

17                     **CROSS EXAMINATION**

18 **QUESTIONS BY MR. MCMULLEN:**

19 Q.      Dr. Bowman, while we have you on Section I,

20 restriction on joint operations --

21          MR. MCMULLEN:  Could we put that up on the

22 screen, Mary.

23          It's the same section that you read through with

24 Mr. Stanton.

25          MR. STANTON:  Mr. McMullen, if it's okay, we'll

                        UNREDACTED TRANSCRIPT

1   have them put that up just for...

2               MR. MCMULLEN:  Okay.  I think we got it up.

3   BY MR. MCMULLEN:

4   Q.     So Dr. Bowman, just so I'm clear, you think that MPD

5   can accept information and intel from other police agencies

6   that are not bound by the Consent Decree nor do they operate

7   within the confines of the Consent Decree?

8   A.     What my interpretation of this section is saying is

9   that the Defendants cannot cooperate or act at the behest of

10  any organization that plans to conduct any investigation or

11  activity or conduct that's prohibited by the Consent Decree.

12  So they can't engage in prohibited conduct, and they can't

13  receive information that's prohibited by the Consent Decree.

14  But this does not bind the City from participating with a

15  task force or participate in a multiunit agency that derives

16  information of law enforcement criminal value.

17  Q.     But -- well, let's talk about law enforcement and

18  criminal value.  What if they receive information that

19  identified threats or situation awareness bulletins in which

20  another organization obtained by doing social media searches

21  and doing certain searches and operations that are prohibited

22  by this Consent Decree?  Is it your reading that MPD can

23  receive that information and potentially act on it?

24  A.     The police department cannot receive, they can't

25  encourage, they can't cooperate with any information that's

1   derived from a process that is not consistent with Consent

2   Decree requirements.

3   Q.      Okay.  So in the Multi-Agency Gang Unit, you're

4   familiar with that; is that correct?

5   A.      Yes, sir.

6   Q.      Do you know the different police agencies that are

7   part of that?

8   A.      I don't know every agency that's a part of the local

9   Multi-Agency Gang Unit.  I like Ms. Levinson-Waldman had an

10  opportunity to interact with Major Goods, and so I've heard

11  this description of the agencies that are a part of that

12  agency and the work that that organization does, but I can't

13  quote the names of all of the participating agencies.

14  Q.      Okay.  Let's assume the Multi-Agency Gang Unit works

15  with the sheriff's department also, and they work as a unit.

16  And the sheriff's department is not bound by this Consent

17  Decree.  And if they receive information about a possible

18  threat, not a crime, about a possible threat in the

19  Multi-Agency Gang Unit, it is your belief that they could

20  share that with the MPD officer who's in the Multi-Agency

21  Gang Unit?

22  A.      It is my belief that that information must be vetted

23  to ensure that it is consistent with Consent Decree

24  requirements before it can be viewed by the MPD.

25  Q.      Okay.  So how is the Memphis Police Department

1    supposed to vet the information that comes in?  If they're

2    still working there in the unit, it's a number of them

3    working there in a unit.  They're working together in a unit,

4    and there's information coming in from the sheriff's

5    department, maybe information coming in from other agencies,

6    is it your belief that the MPD officer that works in that

7    unit has to vet that information, meaning go to each of those

8    agencies, show them the Consent Decree and go through it and

9    make sure they did not obtain it inconsistent with the

10   Consent Decree?  Is that your testimony?

11   A.      No, sir.

12          MR. STANTON:  I'm sorry.  Your Honor, before

13   Dr. Bowman answers this line of questioning, I'm trying to be

14   flexible, but I'd like to object.  The Court has already

15   opined and weighed in on what is permissible by the

16   Multi-Agency Gang Unit or task forces as its relates to

17   Section I.  So I'm going to object that this matter has been

18   adjudicated and addressed by the Court.

19          THE COURT:  Well, I understand that.  It is cross

20   examination.  A lot of latitude is given.  I'm going to allow

21   the question, but it does not affect the prior rulings of the

22   Court.

23          MR. STANTON:  I understand.

24          THE COURT:  Sure.  We can allow the question

25   because it goes to different issues.

1   BY MR. MCMULLEN:

2   Q.      Okay.  You can go ahead and answer the question, sir.

3   I'm sorry.  I didn't hear you.

4   A.      No.  That's not my interpretation.

5   Q.      Okay.  So I'm having trouble understanding.  If we're

6   part of a joint task force, if MPD is a part of a joint task

7   force who is circulating information -- and I want to put

8   this up on the screen for you.  This is the Tennessee Fusion

9   Center.  And this is a bulletin that would come in.  It's a

10  situation awareness bulletin that comes from the Tennessee

11  Safety & Homeland Security.  Can you see that?  Can you see

12  that entire document?

13  A.      I can see most of the document.

14  Q.      Okay.  Now, can you see it now to read it, to be able

15  to read it?

16  A.      I can see most of the document.  I can see it

17  satisfactorily.

18  Q.      Okay.  This is a situation awareness document that

19  comes in from the Tennessee -- from the Fusion Center,

20  Tennessee Fusion Center, which is under the Tennessee

21  Safety & Homeland Security.  Okay.

22          MR. MCMULLEN:  Go down in to details, Mary.

23  BY MR. MCMULLEN:

24  Q.      Well, let's start at the top.  I'll read the first

25  part.  Under scope, "The Tennessee Fusion Center, TFC, is

1    releasing this situation awareness bulletin to inform law

2    enforcement and public safety personnel about the possible

3    risk of violence to COVID-19 demonstrations by individuals

4    supporting boogaloo, a term referencing a second US civil

5    war."   And I want to toggle down to details.  And it

6    referenced the FBI arrested two members charged -- and if you

7    go down.

8                MR. MCMULLEN:  Highlight, Mary, "according to."

9    BY MR. MCMULLEN:

10   Q.    According to open source media, it's reportedly a

11   member of an anti-government/anti-authority violent extremist

12   group, supports boogaloo and boasts on social media that he

13   would bring high-powered weapons to and cause trouble at a

14   rally.  Now -- and then after that, you can go to the last

15   page.  And I'm skipping around just to save time.  And

16   they'll talk about -- when you go to under U, they talk about

17   the hashtags that are emerging on line.  And those hash tags

18   are used with social media posts, not like Google search or

19   anything of that nature.  And at the end of the note, they

20   list the hashtags.

21               MR. MCMULLEN:  Go to the hashtags.  Highlight

22   them.

23   BY MR. MCMULLEN:

24   Q.    Now, you're saying your reading of the Consent Decree,

25   we can or cannot accept this information and act on it?

1   A.     I have not evaluated that information, but what I

2   believe, Mr. McMullen, is that it's incumbent upon the

3   Memphis Police Department to review, to review, to vet the

4   information, to ascertain whether or not it's restricted

5   under the Consent Decree.  Any information that goes out to

6   the Memphis PD or that is circulated through the Memphis PD

7   should be vetted before it's circulated.

8          And so I'm not the one to tell Memphis PD how they

9   should vet that.  I'm not the one to tell them what resources

10  they should apply to that process or who in the agency should

11  have that responsibility.  That's not my role as the law

12  enforcement expert.  But I am saying that this information

13  should be vetted before it's accepted or viewed by the MPD,

14  regardless of how that process is designed and undertaken.

15  Q.     Well, okay.  Let me pose this to you.  The Tennessee

16  Fusion Center doesn't have a director authorization, and they

17  don't get authorization from Director Rallings here before

18  they do their social media searches, which is required by the

19  Consent Decree.  So assuming that is correct, then we

20  couldn't accept that information.

21  A.     That sounds like a statement to me.  And I won't

22  refute that statement if that's your opinion.

23  Q.     Well, let me ask you this.  This is a question.

24  Hypothetically, if the Tennessee Fusion Center did not get

25  authorization from Director Rallings from MPD to do a social

```
 1   media search and the Tennessee Fusion doesn't have a director

 2   authorization process that we know of, is it your opinion

 3   that we could not accept this information?

 4   A.    Mr. McMullen, I'm trying to be as concise in

 5   responding to your question as I can be.  I think that the

 6   best way that I can, the most concise response is to say that

 7   those fewer than 20 police agencies who currently fall under

 8   Consent Decrees in the US all have restrictions and

 9   conditions placed upon them that are unique to the

10   circumstances addressed in their Consent Decree.

11         And they are required to prescribe solutions that will

12   bring them into compliance.  Sometimes the solutions are

13   multimillion dollar technology systems.  Sometimes the

14   solutions are personnel systems.  But it's incumbent upon the

15   Plaintiff to prescribe those solutions.

16         And so while I hear what you're saying, what you're

17   not saying is that it's not possible to comply.  And I

18   believe it is possible to comply.  With the requirements of

19   this Consent Decree, it's incumbent upon the MPD to determine

20   how to comply.

21   Q.    Okay.  Let me ask you another question.  When a

22   dignitary from the Government, former president or something

23   comes into town with his own secret service detail with

24   information they may have that may be of some threat to that

25   dignitary, that if they obtained that information through
```

 1   social media searches without the approvals or without the

 2   restrictions of a Consent Decree, is it your testimony that

 3   we could accept -- that MPD can accept that information and

 4   cooperate with them and coordinate with them for the safety

 5   of that individual?

 6   A.     Is it reasonable suspicion or probable cause that a

 7   crime is occurring?

 8   Q.     No.  When you do a threat assessment, you just

 9   identify.  It's not probable cause.  It's not to the point at

10   which you could activate arrests.  You're doing threat

11   assessments.  Let me ask you.  Let me withdraw that question.

12          Do you believe police departments should do threat

13   assessments?

14   A.     I believe many, if not most, police departments do

15   threat assessments, yes.

16   Q.     So you believe they should do threat assessments?

17   A.     I think they do as a matter of practice.  Many, if not

18   most, police departments do.

19   Q.     Are threat assessments beneficial?

20   A.     Because I don't know and understand the processes that

21   every police department that conducts threat assessments, I

22   don't understand the process they -- processes they undertake

23   to perform those processes, I don't know if they're engaged

24   in the legal or extralegal or totally legal activity.  I

25   don't know what information they are accessing or where or

1    how.  I can't tell you that it's beneficial.

2         Typically the end does not justify the means.  And so

3    the means must be legal.  The means must be constitutional.

4    And when there are special conditions like the Consent Decree

5    applies and the means also should fall within the

6    restrictions imposed by the Consent Decree and state law and

7    so on and so forth.  So I don't know what every department is

8    doing, and so I don't know that what they're doing is

9    beneficial or not.  But certainly threat assessments can be

10   beneficial if performed the right way and constitutionally.

11   Q.    Okay.  And you haven't engaged anybody at MPD about

12   how they do threat assessments or some of the assessments and

13   some of the challenges they have with whether or not to

14   accept information from outside sources?

15   A.    We've interviewed MPD personnel.  I don't -- just

16   without reviewing my notes, I don't recall the specific

17   questions or the specific nature of the complete discussion,

18   but we have interviewed MPD personnel who have spoken along

19   those lines and on those topics.  I've been chief, one of the

20   chiefs, for example, one who has articulated that.

21   Q.    Do you recall an RFA or request for authority sent to

22   the Monitor, Ed Stanton, having to do with a law enforcement

23   symposium that was going to be here in Memphis, Tennessee,

24   and it involved several law enforcement agencies coming here?

25   And the question to the Monitor, Mr. Stanton, was whether or

1   not we could receive information from them or share

2   information with them.  Were you part of that decision

3   making?

4   A.     Yes.  I remember the RFA coming through, and I

5   remember the monitoring team having a discussion on the

6   Memphis RFA.

7   Q.     And was it your opinion that we could not receive or

8   share information with those agencies?

9                  MR. STANTON:  Your Honor, if I may.  And again,

10  this is cross examination, but just for the record, I would

11  like to renew my objection that these are matters that have

12  been adjudicated by the Court.

13                 THE COURT:  Objection sustained.

14                 We need to move on.  This matter has been

15  resolved.

16                 MR. MCMULLEN:  Okay.

17  BY MR. MCMULLEN:

18  Q.     You do believe in the use of technology in law

19  enforcement; is that fair to say?

20  A.     Absolutely.

21  Q.     Okay.  And you testified earlier that this may be one

22  of the oldest Consent Decrees in the country; is that

23  correct?

24  A.     That's correct.

25  Q.     And it was entered into before the technology that's

1    commonly used in police practice was even invented; isn't

2    that correct?

3    A.     I think it would be, Mr. McMullen, more correct to say

4    that it came into existence prior to most of the modern

5    technology that's being used in police departments.  But I'm

6    in some police departments that are using technology that's

7    dated pre Kendrick Consent Decree.  So it would not be

8    accurate for me to say most technology in departments.  And

9    certainly the modern technology it does predate that.

10   Q.     Okay.  The technology that's used and that's

11   considered best practices today for police departments; is

12   that fair to say?

13   A.     I think modern technology is a better characterization

14   of it.

15   Q.     Okay.  And that modern technology, just so we're

16   talking about the same thing, the Consent Decree was entered

17   into before the Internet was used in law enforcement; is that

18   fair to say?

19   A.     I think that's a fair statement.

20   Q.     Before you had the speed and storage of digital

21   photographs; is that fair to say?

22   A.     I think that's fair to say as well.  Yes, sir.

23   Q.     Before you had open source searches such as Google,

24   Yahoo, things of that nature; is that fair to stay?

25   A.     Well, certainly those are Internet-based searches that

1  did not occur prior to the Internet.

2  Q.      And social media websites; is that fair to say?

3  A.      I think that's fair to say as well.  Yes, sir.

4  Q.      Wouldn't you say since -- isn't it fair to say since

5  the Consent Decree, there's a variety of crimes now that

6  require a modern-day technological fighting tool?

7  A.      I would say that there are crimes whose solution, in

8  some cases identification, would be better facilitated using

9  modern-day technology.  But at the same time, there are many

10  police departments around the country who don't have modern

11  technology who are still on paper and pencil and pen systems

12  who find a way to serve their citizens to the best of their

13  ability, using little to no technology.  And those cities

14  tend to not be among the highest crime per capita cities in

15  the country.  Those cities and towns tend to not be among the

16  highest per capita crime areas nor the most violent crime

17  areas.

18       And so technology is a force multiplier.  Technology

19  can certainly facilitate identification in solving crimes.

20  But technology in itself, I think, is not an absolute

21  necessity to be able to investigate and resolve crime and

22  crime issues.

23  Q.      I'm sorry, Dr. Bowman.  I was on mute.  You do agree

24  that modern-day technology is best practices today for

25  fighting crime?  The use of modern-day technology is the best

*TESTIMONY OF THERON BOWMAN*                                    145

1    practices today for fighting crime?

2    A.     Again, Mr. McMullen, I can't paint the whole police

3    arena with a broad brush because it's not just the technology

4    or how that technology is applied, what kinds of training

5    goes with the technology.  And even once the technology is

6    deployed, how that technology is deployed and actually used.

7    What is the uptake in the organization or an agency and are

8    they maximizing the use of that technology, based on its

9    intended use.

10        So just having a modern records management system

11   won't protect you from modern records if what goes into the

12   system is junk.  Or if you don't have the person operating

13   the system who knows how to retrieve the data from the

14   system.  So technology itself is not the answer, but it's how

15   it's used, which technology and so on and so forth.  So I

16   apologize for the long answer, but that's the most concise.

17   Q.     I want to share the screen here.  Your consulting

18   firm, you advertise technological solutions with fighting

19   crime; is that correct?

20   A.     I advertise technology solutions for police agencies.

21   Q.     Right.  And what you're advertising is best practices;

22   is that fair to say?

23   A.     Yeah.  As I advertise, it's an opportunity for

24   organizations to work with my company to understand what

25   technology solutions are out there and how to best apply

*TESTIMONY OF THERON BOWMAN*                                    146

1   those solutions to both modernize their agency and make their

2   agency operations more effective and efficient.

3   Q.      Okay.  I want to go back to the exhibit when you were

4   talking about the definition of legitimate law enforcement

5   purposes.  And before we get to that, I just have one quick

6   question, while we find that.  The Consent Decrees that you

7   have been involved in previously were primarily excessive

8   force and race discrimination; is that fair to say?

9   A.      No.

10  Q.      Okay.  What other Consent Decrees besides excessive

11  force and discrimination?

12  A.      Well, the Consent Decree in Baltimore, for example,

13  also has a large technology component.  Stops, searches,

14  arrests, technology, bias-free policing, promotions,

15  recruitment, hiring, detention, internal affairs, the public

16  integrity.  They cover a wide range of topics.  And each

17  agency where those topics are covered, those areas were

18  identified as problematic.  And for most agencies, there's a

19  technology nexus in the Consent Decree.

20  Q.      All right.  Let's look at -- you were looking at the

21  definition of legitimate law enforcement purpose, and I think

22  you said if you put a period after "prevention of crime,"

23  that would be an adequate definition of legitimate law

24  enforcement purposes.

25  A.      I would put a comma after "prevention of crime" and

1   strike out the rest of that sentence.  And start back up with

2   "while adhering to law and agency policy designed to protect

3   the privacy, free speech, association and other civil

4   rights."

5   Q.      What about how does the City hear when a crime has

6   been committed and you're going after the perpetrator?

7   That's not prevention of crime.  If you leave it right there,

8   you'll leave that out of legitimate law enforcement purpose,

9   wouldn't you?

10  A.      I think when you look at one of the reasons or one of

11  the rationales for making an arrest so that you take a

12  criminal or potential criminal off the street, you adjudicate

13  that criminal.  If he or she is found guilty, then you take a

14  person off the street who was potentially a repeat offender.

15  And so if you look at the profile of crimes, you find

16  typically based on prior research that seven percent of

17  crimes are committed by repeat offenders.  And so by making

18  that arrest, you theoretically, at least, reduce the

19  opportunity for that person to further engage in future

20  criminal offenses.  So obviously, making arrests is a crime

21  prevention effort.  You're preventing further victimizations.

22  Q.      Okay.  So that's what you interpret prevention of

23  crime to encompass threat assessments, make an arrest after a

24  crime.  What about public safety that doesn't have a lot to

25  do with a crime?  An area that's over crowded, where people

1  may be trampled?  That may not be a crime but someone may be

2  hurt.  It may be public safety.  Is that subsumed in your

3  definition of prevention of crime?

4  A.     I think in most cities and states, they have

5  disorderly conduct rules and laws and regulations.  They have

6  laws that mandate peaceably assembly that do go to crime.  So

7  yeah.  I think that is covered under crime prevention.

8  Q.     So any public safety prevention activity, in your

9  mind, is preventing crime?

10 A.     No.

11 Q.     No?

12 A.     No.

13 Q.     Okay.  Tell me what public safety measures -- well,

14 actually, I agree with you.  In your mind are there any

15 public safety measures that police departments do that does

16 not prevent crime?

17 A.     I can't think of one.  I can't think of one that would

18 not also fall under the definition of prevention of crime.

19 Q.     If they are responding to a car accident or some type

20 of natural disaster, you would put that under the prevention

21 of crime?  And when I say they, if Memphis Police Department?

22 A.     Okay.  So responding to a natural disaster, you can

23 characterize it however you want, but you're protecting the

24 peace.  You're positioning the units to prevent loitering.

25 To prevent theft.  To prevent the consequences thereof.  So I

1    think that crime prevention also applies in that particular

2    hypothetical that you're proposing now.  So yeah.

3    Q.      What about an auto accident?

4    A.      When -- well, it's hard for me to imagine how an auto

5    accident would be the source of information coming from an

6    agency that's transmitted against the requirements of the

7    Consent Decree.  But an auto accident, just like many other

8    things police officers do when they get there, they get there

9    to make sure that the people who are there have a proof of

10   financial responsibility, which is a law.  They're there to

11   make sure that people who are involved in the accident

12   exchange identification, which is the law.  They are there to

13   make sure that nobody hits and run or leaves the scene

14   without leaving information, which also is a law.  So even in

15   terms of traffic accidents, yeah, I think there is a crime

16   prevention function and mission, even in responding to a

17   traffic accident or a traffic situation.

18   Q.      So in your definition of legitimate law enforcement

19   activity, you include that under prevention of crime?

20   A.      Yes, sir.

21   Q.      Okay.  You mentioned something about NATO in 2001.

22   You were talking in particular about NATO use of the

23   Internet?

24   A.      No.  I was just referring to the NATO Open Source

25   manual from 2001, which is one of the more concise

1  publications I've found that deal with the open sources.

2  Q.      So in open source, you're talking about technology,

3  search engines and things like that?

4  A.      Yeah.  Open sources, as I've characterized them,

5  includes search engines but also includes newspapers, TVs,

6  radios, Internet, books, journals, you know, broadcasts,

7  social media sites as well.  So open sources include a number

8  of different categories of information.

9  Q.      You know, that manual is 19 years old.  You will agree

10  that it's a little outdated to be dealing with technology

11  that we're having today?  You will agree with that?

12  A.      No.

13  Q.      You don't?

14  A.      No.

15  Q.      Do you know when facebook was invented, when facebook

16  became a regularly used social media site?

17  A.      I can't quote the year.

18  Q.      Okay.  But from your viewpoint, NATO 2001 Open Source

19  technology is the most -- is relevant to open source of

20  searches and use of social media today in 2020?

21  A.      NATO defines open sources, and I've referenced that to

22  provide NATO's definition of open sources.  That's versus the

23  tendency to conflate social media with open sources.  And I

24  think the NATO Open Source manual does a good job of

25  distinguishing between what's social media and what's an open

 1   source.  And so I think it's a good reference.

 2           And though as far as its being a 2001 publication, you

 3   know, Sir Robert Peel created the Peelian Principles for

 4   policing, you know, 280-something years ago.  So -- and

 5   they're still relevant.  So the age itself doesn't make the

 6   document irrelevant.

 7   Q.      Now, if I heard you correctly earlier in your

 8   testimony, you said social media really doesn't provide a lot

 9   of useful information for law enforcement; was that your

10   statement?  I don't want to mischaracterize it, but was that

11   your statement?

12   A.      No.  No.  Social media was -- the quote was "social

13   media is a treasure-trove of information."  My statement is

14   that it is not.

15   Q.      Okay.  In 2001, that's when 9/11 occurred.  That's my

16   memory.  Does that jibe with your memory?

17   A.      Yes, sir.

18   Q.      And the NATO book written in 2001, most of -- it

19   didn't take into consideration the changed circumstances

20   after 9/11 occurred; wouldn't that be fair to say?

21   A.      I think that would be fair to say.  It was written in

22   November of 2001.  And it was, you know, September 11th is

23   when 9/11 occurred.  So I don't know that it incorporated the

24   events from two months prior.  It could.  But I think it's

25   fair to say it certainly didn't incorporate the two-year

*TESTIMONY OF THERON BOWMAN*                                        152

1    aftermath of 9/11.

2    Q.      Definitely, I think we can agree this Consent Decree

3    was entered into before 9/11; we're in agreement on that?

4    A.      Certainly, sir.

5             MR. MCMULLEN:  All right.  I have no further

6    questions.  I have no further questions.

7             THE COURT:  All right.

8             Mr. Castelli, any questions?

9             MR. CASTELLI:  First, kind of a housekeeping

10   measure.  There was a Fusion report that was shared to the

11   witness.  Are we going to make that an exhibit, Mr. McMullen?

12            MR. MCMULLEN:  Yes.

13            THE COURT:  We can mark that as 8.  The Fusion

14   report.  And we need to make sure we have one here.  I think

15   we do.  So I think we're okay.  We will check and make sure

16   that we've got -- I know we do, but it may take a second.

17            MR. CASTELLI:  I believe it was Defendant's

18   Number 6.

19            THE COURT:  It is.

20            MR. MCMULLEN:  It's going to be part of a

21   cumulative exhibit, and we're going to get it into evidence

22   through Director Rallings.

23            THE COURT:  All right.  Well, I think they're

24   asking to use it in the cross examination; is that right,

25   Mr. Castelli?

                        UNREDACTED TRANSCRIPT

1        MR. CASTELLI:  Yeah.  I see no reason.  We're not

2   going to object to it.  Unless the Monitor has any objection,

3   go ahead and admit it so it can be used.

4        THE COURT:  Without objection then, the Fusion

5   report may be necessary to call on IT at one or more offices

6   to help display that for Mr. Castelli.  So we've given that a

7   number, which is Number 8.  And refer to it as Fusion report.

8        (WHEREUPON, the above-mentioned document was

9   marked as Exhibit Number 8.)

10       THE COURT:  Counsel, you may proceed if you're

11  able to do that with this information.

12       MR. CASTELLI:  I am, Your Honor.  Thank you.

13       THE COURT:  We will take our break at 2:30, so

14  you may have a little bit of time.

15       MR. CASTELLI:  Thank you, Your Honor.

16                    **CROSS EXAMINATION**

17  **QUESTIONS BY MR. CASTELLI:**

18  Q.    Dr. Bowman, good afternoon.  I wanted to start -- I

19  think Mr. McMullen has asked you many questions about the

20  definition of crime prevention, so I'm not going to add

21  anything there.  But I did want to just kind of come back to

22  the concerns that you had about including in this definition

23  of legitimate law enforcement purpose, the terms "public

24  safety and law enforcement safety."  Can you tell me why --

25  what reason you think those terms should be removed as you've

1    suggested?

2    A.      Well, Mr. Castelli, I think that public safety and

3    crime prevention are redundant.  Those two terms in

4    particular are redundant.  I think crime prevention covers

5    public safety in the iterations that would apply to the MPD

6    in the Consent Decree.  I'm sorry.  The law enforcement or

7    safety of law enforcement personnel, I believe that's a

8    broader category that could be construed to include

9    situations where law enforcement personnel create their own

10   requirement for additional safety.

11           I used the term "officer-created jeopardy," which is a

12   topic of current events today.  And that's essentially where

13   officers have the opportunity, if not the obligation, to

14   deescalate a situation.  But because of decisions that they

15   make to not deescalate, they move themselves into a situation

16   where deadly force or greater force then becomes necessary.

17   So I think by including officer safety as a part of this

18   definition also includes situations where officer-created

19   jeopardy is covered under the definition of legitimate law

20   enforcement purpose.  And I think that's really conflicting

21   when we do that.

22   Q.      Okay.  So if I'm understanding you correctly, the

23   parts of law enforcement personnel safety that you would

24   consider to be legitimate, part of a legitimate law

25   enforcement purpose you also believe would be included under

1   prevention of crime?

2   A.      Absolutely.  Absolutely.

3   Q.      Okay.

4   A.      Absolutely.

5   Q.      And so your concern is really that this may allow

6   other things that you would not consider legitimate law

7   enforcement purposes to creep into this definition?

8   A.      That is absolutely correct.  The safety of law

9   enforcement personnel is essential, I mean, that the cops

10  must be safe.  They must be protected.  But I can't envision

11  a scenario where law enforcement personnel safety doesn't

12  also fall upon the definition of crime prevention.

13  Q.      And I just wanted to clarify that.  It's the concept

14  of keeping law enforcement and the public safety, you're not

15  objecting to that?

16  A.      No.

17  Q.      You're just saying prevention of crime covers that?

18  A.      That's correct.

19  Q.      Okay.  I think I understand your position.  Thank you.

20  Moving on to Section I.  And I will put up the demonstrative

21  exhibit that we were looking at earlier.  Do you see the

22  definition on your screen or the excerpt from the Consent

23  Decree on your screen?

24  A.      Yes.

25  Q.      All right.  So my understanding of your testimony,

UNREDACTED TRANSCRIPT

1   both on direct and with Mr. McMullen, is that it's your

2   opinion that this does not in any significant way hinder the

3   Memphis Police Department from performing its function; am I

4   correct?  Is that a good summary of what your opinion is?

5   A.      Yes.

6   Q.      I think discussions we've had in the past, I think you

7   have mentioned the just vast amount of information that is

8   out there that would be available to Memphis.  Do you have an

9   opinion about what information this may actually be limiting

10  or prohibiting Memphis from having and what effect that might

11  have on its ability to perform its functions?

12  A.      I think by design this limits the amount of what the

13  Consent Decree calls First Amendment intelligence or

14  political intelligence.  It mimics the amount of that

15  information that they can receive and operate from.  I think

16  it mimics the social media information that's not related to

17  a criminal offense or not related to a crime.  It prohibits

18  them from receiving that information if it's not related to a

19  criminal offense.  But I think that's it.

20          Again, most information in social media is -- it's not

21  valid and cannot be verified.  There's a lot of information

22  out there, but any police department has to have the

23  apparatus to evaluate information and then responsibly use

24  whatever information that they push into their crime-fighting

25  apparatus.  And so this is no different.  And I think it does

1    not significantly hinder the MPD's ability to be a successful

2    crime-fighting organization.

3    Q.      So are you saying that generally, any information you

4    receive, whether it's First Amendment-related or not should

5    go through some sort of vetting or analysis to determine what

6    its worth is to crime prevention or crime fighting?

7    A.      Absolutely.  Absolutely.

8    Q.      I wanted to, if I can, have you look at one more

9    thing.  Going back to the Fusion Center report that's now

10   been marked as Exhibit 8.  Can you see that on the screen?

11   I'll roll back up to the top.

12           I think Mr. McMullen had read some of this or this may

13   be the -- yes.  Had read some of this during your

14   examination.  But would you agree with me that these, this

15   information coming from the Fusion Center is concerning

16   criminal conduct or potential criminal conduct?

17   A.      You know, I really can't tell.  It looks like that's a

18   30-page document.

19   Q.      Yeah.

20   A.      I don't know what pages that I haven't seen.  I

21   haven't had an opportunity to see or evaluate the contents of

22   this document prior to right now.  And so I really don't

23   know.  And it would not be fair for me to --

24   Q.      Sure.

25   A.      -- make an assumption because I really don't know.

1   Q.      Well then, maybe more generally and just putting aside

2   then this document, you know, would you agree that Section I

3   certainly allows law enforcement agencies to share

4   information about crime interagency, between the agencies?

5   A.      Yes, it does.

6           MR. CASTELLI:  Your Honor, those are my

7   questions.

8           Thank you, Dr. Bowman.

9           THE WITNESS:  Yes, sir.

10          THE COURT:  Any redirect?  We're about to our

11  break time, but I am going to inquire of the Monitor.  Any

12  additional questions for Dr. Bowman, or should we take our

13  break now?

14          MR. STANTON:  Your Honor, I have maybe three to

15  five minutes just to clarify a few things.  Maybe a break now

16  would be sufficient.

17          THE COURT:  We'll take a short break.  That may

18  help everybody review their notes.  And it's basically 2:30.

19  This is a 15-minute break for the afternoon.

20          And of course, we'll come back, and we will be

21  here for a substantial period of time.  So I'll see everybody

22  again.  You can remain connected, but just go to mute, and

23  also you can disconnect your video.  Thank you.

24          (Short break.)

25          THE COURT:  All right.  I think we have everyone.

1    Counsel may proceed.  Let's make sure everybody can hear.

2    There we go.

3                    MR. CASTELLI:  Can you --

4                    MR. STANTON:  Can you hear me now, Judge?

5                    THE COURT:  There we go.  You're good.

6                    MR. STANTON:  Thank you, Your Honor.  Just very

7    briefly.

8                          **REDIRECT EXAMINATION**

9    **QUESTIONS BY MR. STANTON:**

10   Q.     Dr. Bowman, there were a series of questions on cross

11   examination from Mr. McMullen, and I believe a couple from

12   Mr. Castelli asking for your opinion or interpretation as to

13   the Kendrick Consent Decree; do you remember those questions?

14   A.     Yes, I do.

15   Q.     Yeah.  And is it fair or safe to say that when you

16   provided your interpretation, that interpretation also

17   included the opinions of Judge McCalla, this Court?

18   A.     That's correct.

19                    MR. STANTON:  I have nothing further, Your Honor.

20                    THE COURT:  All right.  If there's nothing else

21   then, Dr. Bowman, always good to see you and thank you very,

22   very much.  Of course, so you're welcome to stay with us, but

23   you're also welcome to go to the non video portion and mute.

24   So thank you so much.

25                    THE WITNESS:  You're welcome.

UNREDACTED TRANSCRIPT

*TESTIMONY OF THERON BOWMAN*                                    160

 1            THE COURT:  Absolutely.  Who will our next
 2    witness be?
 3            MR. STANTON:  The next witness, Your Honor, will
 4    be Mr. David McGriff.  And counsel to the monitoring team,
 5    Mr. Perry.
 6            THE COURT:  Yes.
 7            All right, Mr. Perry.  And I see Mr. McGriff.  I
 8    see Mr. McGriff.  I think we've got Mr. McGriff here.  We'll
 9    go ahead and swear him in and then let counsel proceed.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                        UNREDACTED TRANSCRIPT

1                           *   *   *

2                    **DAVID MCGRIFF,**

3    **was called as a witness and having first been duly sworn**

4    **testified as follows:**

5                 THE COURT:  Counsel may proceed.

6                 MR. PERRY:  Thank you, Your Honor.

7                       **DIRECT EXAMINATION**

8    **QUESTIONS BY MR. PERRY:**

9    Q.      Good afternoon, Mr. McGriff.

10   A.      Good afternoon.

11   Q.      Please introduce yourself.

12   A.      My name is David McGriff.

13   Q.      What do you do for a living, Mr. McGriff?

14   A.      Currently I'm the deputy commissioner with the

15   Department of Children's Services, State of Tennessee.

16   Q.      How long have you held that position?

17   A.      About five months.

18   Q.      What are your responsibilities at DCS?

19   A.      I oversee the division of juvenile justice for the

20   State of Tennessee.

21   Q.      Do you have any supervisory responsibilities?

22   A.      I do.

23   Q.      About how many employees do you oversee?

24   A.      The juvenile justice division has approximately 300

25   employees.  I have about 15 direct reports to me.  Those are

UNREDACTED TRANSCRIPT

*TESTIMONY OF DAVID MCGRIFF*                                          162

1   the directors in the division.

2   Q.      You said that you've been at DCS for about five

3   months?

4   A.      That's correct, sir.

5   Q.      What were you doing before you got there?

6   A.      Happily retired.

7   Q.      How long had you been retired?

8   A.      Approximately a year.

9   Q.      What line of work were you in before you retired?

10  A.      I actually retired from the Tennessee Department of

11  Safety & Homeland Security.

12  Q.      Mr. McGriff, before we get to that, would you tell the

13  Court please where are you from?

14  A.      Born in Nashville, Tennessee.  Spent most of my adult

15  life in Memphis and Shelby County.

16  Q.      Did you go to high school in Memphis?

17  A.      No, sir.

18  Q.      Where did you go to high school?

19  A.      I went to high school in Upstate New York.

20  Q.      How did you wind up in New York?

21  A.      My father was transferred in his business.

22  Q.      Okay.  Was he in the military?

23  A.      No, sir.

24  Q.      Okay.  Did you graduate from high school in New York?

25  A.      I did not.

1   Q.      Why not?

2   A.      Well, I was 17 years old, and I joined the United

3   States Marines.

4   Q.      How long did you serve in the Marines?

5   A.      Four years.

6   Q.      Did you complete your high school education?

7   A.      I did, sir.

8   Q.      When did you do that?

9   A.      While I was in the US Marine Corps.

10  Q.      Did you see combat while you were in the Marines?

11  A.      I served in the Republic of South Vietnam.

12  Q.      Thank you for your service.

13  A.      Yes, sir.

14  Q.      Mr. McGriff, what rank did you hold when you left the

15  Marine Corps?

16  A.      Sergeant E-5.

17  Q.      Now, what was your first job after you left the Marine

18  Corps?

19  A.      I made application with the Metropolitan Police

20  Department in Washington, D.C.

21  Q.      What that application successful?

22  A.      It was, sir.

23  Q.      What did you do -- how long were you in D.C.?

24  A.      Approximately five years I served with the

25  Metropolitan Police Department.

*TESTIMONY OF DAVID MCGRIFF*                                      164

1   Q.      What did you do after that?

2   A.      I took a lateral entry position with the Memphis

3   Police Department in 1974 in Memphis, Tennessee.

4   Q.      What made you come back to Memphis from D.C.?

5   A.      My wife.

6   Q.      Is she from Memphis?

7   A.      That's correct, sir.

8   Q.      How long did you serve as an officer with the MPD?

9   A.      A little over two and a half years.

10  Q.      What rank did you have when you left the MPD?

11  A.      I left as a patrol officer.

12  Q.      Mr. McGriff, I sent you a set of documents earlier

13  this week of a set of exhibits.  I would like you to pull up

14  MT trial Exhibit 7.  MT trial Exhibit 7 when you have a

15  moment.  Let me know when you have it in front of you.

16  A.      Yes, sir.

17  Q.      Do you recognize it -- do you recognize that document?

18  A.      It appears to be a picture of me.

19  Q.      Is there anything else on that document that you

20  recognize?

21  A.      Yes, sir.  The contents of this page has to do with

22  me, and it all appears to be correct.

23  Q.      Does it summarize your work history and experience in

24  law enforcement?

25  A.      Yes, sir.

1          MR. PERRY:  Your Honor, I'd like to make MT trial

2   Exhibit 7 the next trial exhibit.

3          THE COURT:  That's fine.  Marked and received as

4   9 without objection.  Will you make sure we also have the

5   Fusion report, which I think we've now located, so that was 8

6   and previously marked.

7          (WHEREUPON, the above-mentioned document was

8   marked as Exhibit Number 9.)

9          THE COURT:  Counsel may proceed.

10          MR. PERRY:  Thank you, Your Honor.  I want to

11   share my screen so that everyone can see MT trial Exhibit 7.

12          Thank you.  We'll scroll down a bit.  That's

13   great.

14   BY MR. PERRY:

15   Q.     Now, Mr. McGriff, you mentioned that at some point

16   after you worked for the MPD as a patrol officer, you

17   became -- well, immediately before you retired, what was your

18   job?

19   A.     I was the deputy commissioner and chief of staff with

20   the Tennessee Department of Safety & Homeland Security, State

21   of Tennessee.

22   Q.     Can you, based on this exhibit and your memory, can

23   you give us just kind of a brief rundown of the jobs that you

24   held in between working for MPD and becoming chief of staff

25   and deputy commissioner of the Department of Safety &

*TESTIMONY OF DAVID MCGRIFF*                                              166

1    Homeland Security?

2    A.      Yes, sir.  I left the Memphis Police Department

3    towards the end of 1976 and took a position as a criminal

4    investigator with the district attorney general in Shelby

5    County, Tennessee.  I left the district attorney's office in

6    2013.  During the time that I was with the district

7    attorney's office, I was assigned as a task force supervisor

8    with the Drug Enforcement Administration, the federal drug

9    task force in Memphis for approximately ten years.

10           I was then reassigned as a deputy director of the

11   state Violent Crime and Drug Task Force in West Tennessee.  I

12   later was promoted to director of that drug task force.  And

13   then subsequently to that, I was promoted as the chief

14   criminal investigator in the district attorney's office.

15   Q.      During that time, did you receive any specialized

16   training in law enforcement strategies or tactics?

17   A.      Just about every year.

18   Q.      Can you describe some of that training and where you

19   got it from?

20   A.      I underwent inservice training.  I underwent

21   specialized training in organized crime, investigative

22   techniques.  I was selected and attended the FBI National

23   Academy in Washington, D.C., which is a management course.

24   And I continued to take classes and additional training in

25   the area of law enforcement.

1   Q.      I want to get back to your previous job as deputy

2   commissioner and chief of staff with the Department of

3   Safety & Homeland Security.  What were your responsibilities

4   there, Mr. McGriff?

5   A.      Well, I was the -- I oversaw the day-to-day operations

6   of the department.  And specifically was an oversight in

7   certain divisions of the department, which were internal

8   audit, budget, Tennessee Highway Safety Office, Homeland

9   Security and Driver Services division.

10  Q.      All right.  Did you have -- well, about how many

11  employees did you oversee?

12  A.      The department has approximately 2,000.  I oversaw

13  approximately a thousand.

14  Q.      How many direct reports did you have?

15  A.      Approximately 25.

16  Q.      Was the training and experience that you've described

17  both before and after you were deputy commissioner of the

18  Department of Safety & Homeland Security inform the testimony

19  that you're here to give today?

20  A.      It did, sir.

21  Q.      Now, Mr. McGriff, since you've retired from your law

22  enforcement career now working for DCS, are you here to

23  testify on behalf of DCS today?

24  A.      Absolutely not.

25  Q.      Why are you here to testify today?

1  A.     I'm a member of the consulting and monitoring team

2  assigned by the Court and the chief Monitor, Ed Stanton.

3  Q.     How did you come to be a member of the monitoring

4  team?

5  A.     I was contacted by Mr. Stanton approximately 18 months

6  ago, while I was happily retired.  And he asked if I would be

7  interested in assisting him in the monitoring of the Memphis

8  Police Department as it relates to the Kendrick Consent

9  Decree.

10  Q.     Did you know Mr. Stanton before he contacted you about

11  the monitoring team?

12  A.     I did, sir.

13  Q.     How did you know him?

14  A.     I knew him as the United States attorney for the

15  Western District of Tennessee.

16  Q.     And were you at the Department of Safety & Homeland

17  Security at that time?

18  A.     I was, sir.

19  Q.     What is your role on the monitoring team?

20  A.     I'm with the -- I say I'm with.  I'm a part of the

21  audit and compliance of the team itself.

22  Q.     Are you the subject matter expert in that area?

23  A.     That's correct, sir.

24  Q.     Are the responsibilities that you have as the audit

25  and compliance expert on the monitoring team similar to the

1   work that you did at the Department of Safety & Homeland

2   Security?

3   A.      It is, sir.  I had the occasion to not only supervise

4   the director of internal audit, but I collaborated with them

5   on pre-audits and certainly reviewed each and every audit

6   that this unit had conducted in the department.

7   Q.      Can you talk about what are your responsibilities on

8   the monitoring team?

9   A.      I had the initial responsibility of putting together

10  the audit and compliance plan with the collaboration and

11  assistance of the rest of the team, however, with my

12  responsibility to initially formulate it.

13  Q.      Mr. McGriff, I want you to look at that stack of

14  documents that you've got.  I'd like for you to pull up

15  MT trial Exhibit 8.

16  A.      Yes, sir.

17  Q.      Do you recognize that document?

18  A.      I do, sir.

19  Q.      What is it?

20  A.      This is the audit and compliance plan that was

21  prepared by myself and the rest of the monitoring team

22  submitted to the Court.

23  Q.      Does that document appear accurate as you and the rest

24  of the monitoring team prepared it?

25  A.      It does, sir.

*TESTIMONY OF DAVID MCGRIFF*                                                170

1          MR. PERRY:  Your Honor, I'd like to move MT trial

2   Exhibit 8 into evidence.

3          THE COURT:  Marked and received as 10 in the

4   case.  Marked and received as 10 without objection.

5          (WHEREUPON, the above-mentioned document was

6   marked as Exhibit Number 10.)

7          MR. PERRY:  Thank you, Your Honor.  I'd like to

8   share my screen with the Court.  I'm going to pull up

9   MT trial Exhibit 8.  Let's scroll down to the first page

10  there.  Great.

11  BY MR. PERRY:

12  Q.    Now, Mr. McGriff, I'd like you to walk me through the

13  organization of this plan.  First, how many sections does it

14  consist of?

15  A.    Seven.

16  Q.    And what does each section cover?

17  A.    It covers the requirements and the order of the Court

18  as it relates to the Kendrick Consent Decree.

19          MR. PERRY:  I want to scroll up a little bit on

20  this first page.  I'm sorry.  Scroll down.  That's good.

21  Yeah.  Go down enough so we can see Subsection A.  That's

22  perfect.  Okay.

23  BY MR. PERRY:

24  Q.    So I see here in Subsection A, it says Consent Decree

25  requirements.  And then we're going to scroll up a little bit

UNREDACTED TRANSCRIPT

1   so we can see B.  And B is just compliance and auditing

2   protocols.  Does each section of this audit and compliance

3   plan have those two subsections?

4   A.      They do, sir.

5   Q.      And what do those two subsections cover?

6   A.      The first subsection in each section covers the

7   requirements of the Consent Decree.  And the second

8   subsection in each section covers the audits and compliance

9   of each one of those requirements.

10  Q.      Okay.  Now, Mr. McGriff, have you reviewed the audit

11  and compliance plans for any other cities, under Consent

12  Decrees?

13  A.      I did, sir.

14  Q.      What other cities?

15  A.      I reviewed preliminarily the audit and compliance

16  reports of the City of New Orleans.

17  Q.      What made you look at New Orleans?

18  A.      It's a current Consent Decree city.  And I asked

19  Dr. Bowman, who was affiliated with the City and that Consent

20  Decree, if he could possibly forward to me the audit and

21  compliance report and plan.

22  Q.      How does the New Orleans audit and compliance plan

23  compare to the one that we have now?

24  A.      The City of New Orleans is voluminous.  They're

25  covering every single phase of police service.  However, if

*TESTIMONY OF DAVID MCGRIFF*                                        172

1    you look at their audit and compliance plan, it's similar to

2    the one that was prepared here for the Consent Decree.  And

3    they compare favorably.

4    Q.      You mentioned that the New Orleans plan is voluminous;

5    is that right?

6    A.      That's correct, sir.

7    Q.      In your view should the proposed plan for Memphis,

8    should it be expanded so that it's as large as the New

9    Orleans plan?

10   A.      I don't think so.  I think the plan, as it stands

11   right now, is -- it's on point.  It may very well change,

12   depending on the outcome of this hearing and the orders of

13   the Court.  We may have to revise it somewhat.

14   Q.      Because the plan may change, based on the outcome of

15   this hearing and some other matters, is the plan ready to be

16   implemented right now?

17   A.      No, sir.

18   Q.      Okay.  Are there any things that need to happen other

19   than the Court rulings in this hearing?  Are there any other

20   things that need to happen before the auditing plan can be

21   implemented?

22   A.      Well, the Court would have to approve any of the

23   revisions for the plan as it stands right now.

24   Q.      Would you plan to have anyone vet the plan before we

25   implement it?

*TESTIMONY OF DAVID MCGRIFF*                                      173

1   A.      Yes, sir.  We would have the ACLU take a look at the

2   new plan with the new revisions, if any.

3   Q.      Thank you, Mr. McGriff.  Once the plan has been

4   revised, that is, approved by the Court, explain to the Court

5   what you will need from the police department in order to

6   implement the plans.

7   A.      Well, the first order of business, once the Court

8   approves this, would be to contact the command staff of the

9   Memphis Police Department and request that a member of the

10  command staff be appointed as a liaison to the monitoring

11  team so that we could then begin our audit approach to those

12  areas in the Consent Decree, the sections.  And the liaison

13  could then act as a go-between for the monitoring team and

14  the commanders in the field of the Memphis Police Department

15  that we would have to have interaction with.

16  Q.      And Mr. McGriff, are you aware that there already

17  exists a legal liaison to the Memphis Police Department,

18  that's Mr. Saleem, and the monitoring team has worked

19  frequently with Mr. Saleem and the rest of the City's legal

20  team?  Is Mr. Saleem a sufficient person to serve as the

21  liaison that you were mentioning there?

22  A.      Not in my judgment.

23  Q.      Why is that?

24  A.      Because I was a police officer, and I know what

25  happens when you go into a precinct if you don't have

*TESTIMONY OF DAVID MCGRIFF*                                    174

1   someone, namely a commander to go with you, then you're not

2   going to get anything done quickly.

3   Q.      So in your view, the liaison that you want to help

4   implement this audit plan would be someone on the command

5   staff?

6   A.      That's correct, sir, yes.

7   Q.      Will you need anything else from the MPD to

8   effectively implement the audit and compliance plan?

9   A.      Yes, sir.  And to explain a little further, the audit

10  and compliance plan deals with the monitoring team to review

11  files, review records and certainly computerized records.

12  And the plan at this point requires that these records be

13  reviewed on a quarterly basis.  We would need credentials in

14  order to look at these computerized records on a quarterly

15  basis should we decide to do so.

16  Q.      Why do you need access credentials?  Why couldn't you

17  just sit with the MPD liaison and look at the records with

18  that person?

19  A.      Because we want to conduct our audit when we want to

20  do it and not wait for someone to be assigned from the police

21  department.

22  Q.      Why is it important that the monitoring team be able

23  to independently access the files and the databases in

24  implementation from the police department?

25  A.      Continuing of the audit for compliance of the audit.

UNREDACTED TRANSCRIPT

1  Q.      Thank you, Mr. McGriff.

2              MR. PERRY:  Your Honor, I have no further

3  questions at this time.

4              THE COURT:  Cross examination?  And that's, of

5  course, the City of Memphis.

6              MR. GLOVER:  Thank you, Your Honor.  This is Mark

7  Glover for the record.  So the court reporter will

8  understand, we've changed counsel who's doing the

9  examination.  That's G-L-O-V-E-R.

10             THE COURT:  Thank you.

11                     **CROSS EXAMINATION**

12  **QUESTIONS BY MR. GLOVER:**

13  Q.      Mr. McGriff, just to follow up a little bit on the

14  comment that you made on the audit plan that has been

15  submitted, I take it that your indication that if this

16  hearing results in His Honor's decision to modify any portion

17  of the plan, you would need to submit -- excuse me -- any

18  portion of the Consent Decree you would need to submit

19  modifications to your plan, is that because your plan tracks

20  the various pertinent provisions of the Consent Decree?

21  A.      That's correct, sir.

22  Q.      And so you would submit a modified plan if there were

23  a modification of the Decree to reflect any changes in

24  procedure or areas of inquiry that might be brought about by

25  any modification of this decree; is that correct?

1   A.      Yes, sir.  Once approved by the Court.

2   Q.      All right.  You made some comments earlier about your

3   previous employment and one, of course, was your employment

4   with the department -- Tennessee Department of Safety &

5   Homeland Security.  There has been other testimony in this

6   case, Mr. McGriff, about Exhibit 8, which was a situational

7   awareness bulletin example that was put on the screen for a

8   couple of other witnesses.

9           MR. GLOVER:  And I would like to ask if our folks

10  can pull Exhibit 8 up onto the screen for you to review, if

11  the Court please.

12          THE COURT:  Sure.  Go right ahead.

13  BY MR. GLOVER:

14  Q.      Mr. McGriff, when this comes up onto the screen, my

15  question to you is going to be whether this type of

16  situational awareness bulletin is something the format of

17  which you are familiar from your prior employment?

18  A.      This is the Fusion Center comes under the Homeland

19  Security division of the Department of Safety.

20  Q.      All right.  So you saw -- you've seen these many times

21  while employed with the Tennessee Department of Safety &

22  Homeland Security; is that correct?

23  A.      Yes, sir.

24  Q.      Okay.  And apropos of some of the other testimony and

25  questioning, my question to you is do you know how the

1    information that is in the situational awareness bulletins

2    was gathered and put into the bulletins that were sent out

3    during the time you were there?

4    A.      From many, many sources.  It could be public records

5    information.  It could be legitimate information forwarded

6    via Teletype or Internet by other law enforcement agencies.

7    It could come from social media.  Any variety ways of this

8    information is compiled and forwarded to the Fusion Center,

9    vetted and then sent out to law enforcement agencies across

10   the state.  This information also comes from other states.

11   Q.      Okay.  So would it be accurate to say that even when

12   you were employed in a high position with the Tennessee

13   Safety & Homeland Security department, you would not have

14   been able to know exactly how every bit of information that

15   appears in this situational bulletin form was gathered; is

16   that fair to say?

17   A.      Now, if I understand your question, you mean if I

18   happened to pick one of the bulletins up and look at it?

19   Q.      Yes, sir.

20   A.      I wouldn't know, no.

21   Q.      Okay.  So if the Memphis Police Department received a

22   situational awareness bulletin of the kind that we're looking

23   at as Exhibit 8 and wanted to call the Tennessee Department

24   of Safety & Homeland Security and inquire to try to vet and

25   understand how the information in here was assembled and

1    obtained, the Department of Safety & Homeland Security could

2    not necessarily give them all that information, could they?

3    A.      Contrary.  They could call the Fusion Center and speak

4    to one of the intel analysts that puts these bulletins

5    together and get the back story to it.

6    Q.      Would they -- then those people would know how each

7    different state obtains their own information?

8    A.      Well, they could get the information on how the Fusion

9    Center in Tennessee came about receiving the information.  Of

10   course, if it was an instate from one of the police

11   departments within Tennessee, they would have a little bit

12   more information if it came via an instate law enforcement

13   agency versus one out of state.

14   Q.      All right.  Let's assume for a moment that some

15   information would be included on all these reports that did

16   come from out of state.  Let's just say a police department

17   in Iowa.  Would your folks at the Department of Safety &

18   Homeland Security have contact information to be able to

19   trace how that information was obtained in Iowa?

20   A.      They could get ahold of the authorities in Iowa if

21   they had to.  Yes, sir.

22   Q.      Based on the volume of information that is funneled

23   through these situational awareness bulletins, would that be

24   an onerous task to vet each and every bit of information

25   that's in one?

1  A.      Well, I guess to answer your question, if they had to

2  do that to each and every one, it would depend on how many

3  bulletins came in on a particular day or a particular week or

4  a particular month.  The Fusion Center is a rather large law

5  enforcement operation, and it's serviced by the Tennessee

6  Bureau of Investigation as well as the Homeland Security

7  division.  So I couldn't give you an accurate answer of how

8  onerous it would be.  It would depend on how much work was

9  going on at the time.

10 Q.      Is it true that on some days, multiple situational

11 awareness reports come out from the Department of Safety &

12 Homeland Security?

13 A.      That's a fair statement.

14 Q.      All right.  Are you aware of any law enforcement

15 agency inquiries asking the Department of Safety & Homeland

16 Security to identify all of the sources of information and

17 how the information was obtained as a part of receiving

18 information from the Tennessee Department of Safety &

19 Homeland Security?

20 A.      I couldn't answer that question.  I had the director

21 of the Homeland Security division, it was -- had oversight

22 over that division.  I didn't get that deep in the weeds, to

23 be quite honest with you.

24 Q.      Okay.  So you're not aware of that in your own

25 personal knowledge?

1  A.     No, sir.

2  Q.     Okay.  You have indicated that it would be possible to

3  trace some information, although you didn't say how onerous

4  it would be to do all of it.  My question to you next is

5  would any of the information that came into the situational

6  reports from any source other than Memphis Police Department

7  have been vetted by the director of the Memphis police in

8  order to ensure compliance with the Consent Decree before the

9  situational awareness report goes out?

10 A.     I wouldn't have any knowledge about that, sir.

11 Q.     Okay.

12         MR. GLOVER:  That's all the questions I have,

13 Your Honor.

14         THE COURT:  ACLU, any questions?

15         MR. CASTELLI:  No questions, Your Honor.

16         THE COURT:  Redirect for our witness?

17         MR. PERRY:  None, Your Honor.

18         THE COURT:  Probably need to check on a couple of

19 things.  Mr. McGriff, I need a little background in terms of

20 are there clues that you would look for to determine the

21 reliability of the information that you received in a Fusion

22 bulletin?

23         THE WITNESS:  Well, Your Honor, if it was coming

24 from a law enforcement agency, these bulletins will come out

25 with wanted parties, individuals wanted on arrest warrants,

1   descriptions of suspects involved in a burglary, let's say,

2   in East Tennessee, and witnesses saw a red car with a partial

3   license plate leaving the scene of a crime.  A lot of times

4   they will put information out like that.  And on a

5   be-on-the-lookout.  Other departments across Tennessee would

6   have received that information and certainly use it in an

7   enforcement measure and should they see a car fitting a

8   description or having that kind of information come to them.

9          THE COURT:  So is it typical -- and you may or

10  may not know -- but is it typical that these bulletins tend

11  to usually be ones that are specific as to facts such as the

12  ones you just described:  Red car, two suspects, something of

13  that nature?

14         THE WITNESS:  If that type of information becomes

15  available and is forwarded to the Fusion Center.  Not every

16  department forwards all that information to them.  But if it

17  is forwarded, they will then release that to agencies within

18  the state.

19         THE COURT:  Right.  But is the bulletin -- just

20  so we'll understand to some -- understand the scope of the

21  universe.  Is the bulletin usually one -- usually one that

22  relies on specific facts such as the ones you described?

23  Event happens, you know, a robbery of whoever it is.  Car

24  description.  Time.  You know, last seen at location.  Armed

25  or not armed.  I mean, is this typical or atypical?  It could

*TESTIMONY OF DAVID MCGRIFF*                                          182

1   be completely atypical.  I just don't know.

2              THE WITNESS:  I would say, Your Honor, that it's

3   far more typical for the Fusion Center to release general

4   information that it's received from agencies within the state

5   or from out of state about nonspecific type information other

6   than what I described a few minutes ago.

7              THE COURT:  So is it sort of a rumor mill?

8              THE WITNESS:  I would say it was a little higher

9   than that.  It's coming from law enforcement agencies.  And

10  they provide as much information that they have at the time.

11             THE COURT:  Okay.  I need someone to followup on

12  this to help us understand the nature of the information

13  that's typically received.

14             It sounds a little bit like a Hollywood gossip

15  column, but I'm not sure.  Hopefully it's not that, but it

16  doesn't sound terribly specific.  So I'm going to let the

17  counsel for the Monitor follow up.  Let's just understand

18  what these typically are because we've gone to a particular

19  illustration, which may or may not be typical of what is

20  received.

21             MR. PERRY:  I can follow up, Your Honor.

22                      **REDIRECT EXAMINATION**

23  **QUESTIONS BY MR. PERRY:**

24  Q.    Mr. McGriff, in your experience at the Department of

25  Safety & Homeland Security, when a situational awareness

                      UNREDACTED TRANSCRIPT

*TESTIMONY OF DAVID MCGRIFF*                                                    183

1   report was being prepared by the Fusion Center, how were they

2   assembled?

3   A.      An intel analyst would assemble it and take the

4   information they had received either via phone, Internet,

5   computer or what have you.

6   Q.      Are there any parameters at the Fusion Center or at

7   the Department of Safety & Homeland Security that instruct

8   the analysts on what sort of information they can accept?

9   A.      They receive training and instructions on how to put

10  together these bulletins.  Yes, sir.

11  Q.      All right.  Does that training, to your knowledge,

12  include how to assess the veracity of information and whether

13  it's worth accepting and passing on or whether it should be

14  left out?

15  A.      Yes, sir.  They receive training on how to prepare

16  these bulletins and how to put this information on the

17  bulletins as they receive it.

18  Q.      Is there any sort of publicly available like training

19  handbook or guidelines that we could get from the department

20  or maybe from the department's website and provide to the

21  Court as a supplement to the exhibits that already have been

22  presented?

23  A.      I don't know if there's a handbook or not, but I can

24  certainly inquire with the department and give the Court as

25  much information that's available and have one of the intel

*TESTIMONY OF DAVID MCGRIFF*                                                184

1   analysts or one of the supervisors appear in the Court if

2   that's what the Judge wants.

3          MR. PERRY:  Your Honor, if it's all right with

4   you, we'll have Mr. McGriff follow up with the department,

5   gather what information we can about the situational

6   awareness reports, and we can present that information to the

7   Court and to the parties as a supplement to the information

8   that's already been provided.

9          THE COURT:  Right.  That might help us assess the

10  degree to which they rely on some type of Internet search

11  activity or something of that nature.  I'm going to ask

12  Mr. McGriff, then we'll let the others cross.

13         Are you aware of situations where information has

14  been received and then subsequently very substantially

15  discredited?

16         THE WITNESS:  I can't think of an example right

17  this minute, Your Honor.  But I'm sure there has been.

18  There's a vetting process and to some degree at the center.

19  And I would have to say that there have been occasions when

20  information has been vetted in this county.  Yes, sir.

21         THE COURT:  Are there questions then from the

22  City?

23         MR. GLOVER:  Thank you, Your Honor.  Just a

24  couple of followups.

25              **FURTHER CROSS EXAMINATION**

UNREDACTED TRANSCRIPT

*TESTIMONY OF DAVID MCGRIFF*                                      185

1   **QUESTIONS BY MR. GLOVER**:

2   Q.      Mr. McGriff, there is information in many of these

3   situational awareness bulletins that it's not just reporting

4   of crimes but is what we would call threat assessments or

5   situational awareness reports; is that right?

6   A.      Yes, sir.

7   Q.      And in fact, the Exhibit 8 includes some discussion of

8   what's being identified by whoever gathered it as violent

9   opportunities likely to use the Juneteenth events to engage

10  in civil unrest.  So that was not reporting an event.  That

11  was a crime where we're looking for a particular suspect to

12  solve the crime; is that right, if you know?

13  A.      Frankly, I haven't read the bulletin.  I've just heard

14  some testimony about it.  I don't know that I have enough

15  information to answer the question.

16  Q.      But I am correct in understanding correctly though

17  that there are bits of information that are reported through

18  the Fusion Center in these reports that have to do with

19  potential threats or concerns, but they're not actually

20  reporting a crime that has occurred; is that right?

21  A.      That is absolutely correct.  Yes, sir.

22  Q.      Okay.  But they also include things like FBI warrants

23  that have been issued, right?

24  A.      That's correct.

25  Q.      Okay.  So it's a mix of both of those things?

1   A.      That's correct.

2   Q.      What's the reason for sending these out to law

3   enforcement agencies?  I assume that the Department of

4   Safety & Homeland Security believes there's some efficacy to

5   doing that; do you know their purpose?  Why that department

6   sends them out?

7   A.      Well, yes.  It's to inform other law enforcement

8   agencies of this information in the event that they come

9   across a hostile group that has rifles in a particular truck,

10  and they're camped out in Downtown Memphis, as an example.

11  Q.      Okay.  Tell me that if this is beyond your knowledge,

12  but if you were a command staff officer with the Memphis

13  Police Department trying to look at one of these things and

14  comply with what you understand paragraph I of the Consent

15  Decree to require, in terms of ensuring that the department

16  not receive things that would otherwise be violative of the

17  Decree if they had done it themselves, how would you go about

18  trying to ensure that compliance?

19  A.      I'm not going to speak for the Memphis Police

20  Department and how they would handle a situation on one of

21  these bulletins, to be quite honest with you.  That comes

22  under the heading of their business.

23  Q.      Well, I understand.  But you have been a part of the

24  team that's in our business, if I may say so and with the

25  Court's blessing.  And so what I'm asking is, do you have an

UNREDACTED TRANSCRIPT

1   opinion on how you would go about trying to carry out that

2   process to vet this information?

3   A.      You mean the information as it's contained in the

4   bulletin in front of us today?

5   Q.      Yes.  Let's use that for example.  In order to ensure

6   that you're not receiving something that was gathered in a

7   way that would have violated the Consent Decree if we did it.

8   A.      I don't think I can speak to and answer your question

9   as it relates to that.

10  Q.      If you don't have an opinion on that or answer, that's

11  fine.  I'm not going to press that.  I'm just trying to

12  understand, since you worked there, whether there are

13  mechanisms that can be -- that you know about that can be

14  followed up in order to try to -- what we've called vet or

15  verify this information in a way that would ensure we don't

16  inadvertently violate Subsection I.  And I hear you saying

17  you don't really have the knowledge or background to give

18  that opinion; is that right?

19  A.      I don't, other than what I've testified to previously.

20  And that is the Fusion Center will be glad to answer any

21  inquiry from any law enforcement agency as it relates to a

22  particular bulletin.  They're trying to gather the

23  verification on anything or additional information.

24  Q.      Okay.  But just this very one that we looked at is

25  30 pages long.  To go through each and every item of that, I

```
1   know you declined to say it would be an onerous task, but it
2   would be time consuming to get each and every item in here
3   vetted in that way, would it not?
4   A.      I would agree with that.
5   Q.      Okay.
6               MR. GLOVER:  I have no further questions unless
7   Your Honor wants me to follow up on something.
8               THE COURT:  Well, let's see if the ACLU has some
9   additional information.  The one that they're showing on the
10  screen, however, just looks like somebody watched TV and then
11  wrote something up, with all due respect.  It doesn't look
12  very -- it's not specific.  It just says obvious things and
13  looks like somebody could go to the calendar and figure out
14  what day it was.  So it doesn't look very -- just it's kind
15  of odd.  I hope all of them are not like that.  Are most of
16  them like that, Mr. McGriff, or most of them this sort of --
17  that was certainly not bad information to get out but not
18  very specific and sort of gossipy.
19              THE WITNESS:  I think some are a little bit
20  more -- have a little bit more information than others, Your
21  Honor.  It just depends on the intel analyst that put that
22  together and how much information they had at the time.
23              THE COURT:  All right.  You remember when we were
24  both overseas and we got intelligence reports?  I mean, I
25  don't know what you thought of them, but I kind of remember
```

1  what I thought of them.

2                 THE WITNESS:  Yes, sir.  It did look like

3  something out of Hollywood.

4                 THE COURT:  All right.  Well, we're just trying

5  to figure out what this material is.

6                 Mr. Castelli, I don't know what we do with this.

7  This is kind of an issue.  You want to ask -- we've got a

8  witness who knows a lot.  There's time to ask him if you ever

9  want to ask him something.

10                 MR. CASTELLI:  Yeah.  Thank you, Your Honor.

11  I've got a few questions for Mr. McGriff.

12                        **CROSS EXAMINATION**

13  **QUESTIONS BY MR. CASTELLI**:

14  Q.    Good afternoon.  As far as the intention of the

15  information in these Fusion reports, I mean, how are law

16  enforcement agencies around Tennessee meant to be utilizing

17  this information?

18  A.    Well, first of all, there's no legal requirement for

19  them to use the Fusion Center.  When I was with the

20  department of homeland security and safety, we encouraged all

21  law enforcement to provide information to the Fusion Center

22  so that we could get it out to all the agencies in the state.

23  But there's no legal or statutory requirement that the law

24  enforcement agencies in Tennessee has to provide the Fusion

25  Center any information.

1   Q.      And would it be fair to say that the idea here is that

2   to provide the information and let the law enforcement

3   agencies decide whether it's worth following up on or even

4   paying attention to after they read the report?

5   A.      That's exactly correct.

6   Q.      So any law enforcement agency would be free to look at

7   this, go well, this is not worth anything and not send it

8   around to any of their patrol officers or detectives or

9   anything, just kind of throw it in the trash or hit delete,

10  as it were?

11  A.      It would depend on the agency and the department as to

12  what they wanted to do with it at the time.  Yes, sir.

13  Q.      And my understanding from your earlier testimony is

14  that there may be some and maybe not in the one, in the

15  example we're looking at, but there may be some times where

16  there's information like these suspects have been identified

17  committing a particular crime.  Here's their description.  Be

18  on the lookout in case they come into your jurisdiction.

19  There may be information like that?

20  A.      Yes, sir.  That's correct.

21  Q.      And law enforcement in that case would be free to look

22  at that and say well, that's something maybe we need to let

23  our patrol officers and people on the street know so they'll

24  know who to look out for.  They may have committed a crime

25  somewhere else or may be likely to commit a crime here?

*TESTIMONY OF DAVID MCGRIFF*                                    191

1   A.       That's correct, sir.

2   Q.       Okay.  But -- and then just to kind of circle back

3   around though.  From your first answer to my first question,

4   it's not something where it's some directive from the

5   Department of Safety to the Tennessee individual law

6   enforcement agencies that they must assess this information

7   and act on it?

8   A.       Generally speaking, that's correct, sir.  This is

9   intelligence information.

10  Q.       Okay.

11              MR. CASTELLI:  I think those are my questions,

12  Your Honor.

13              THE COURT:  Redirect?

14              MR. PERRY:  None, Your Honor.

15              THE COURT:  All right.

16              Anything else then for the City?

17              MR. GLOVER:  No, thank you, Your Honor.  Other

18  than we have no objection to the submission that Mr. Perry

19  suggested we might be able to get that would provide any

20  guidelines that are available.

21              THE COURT:  That would probably be very helpful.

22  So we'll receive that as a late-marked exhibit.  And we can

23  actually reserve a number for that if we think we can get

24  that recently soon.  And we will reserve the Number 11 for

25  that.  It will be a late-marked exhibit on the guidelines as

UNREDACTED TRANSCRIPT

1   to actually what guides the preparation of this material.

2   Okay.  Guidelines on Fusion bulletin preparation.

3                   (WHEREUPON, the above-mentioned document was

4   marked as Late-Filed Exhibit Number 11.)

5                   THE COURT:  All right.  Well, Mr. McGriff, always

6   good to see you, and we appreciate everything you've done.

7   And we're going to certainly let you be excused.  You're

8   welcome to stay with us.  You're also welcome to not,

9   whichever works best for you.  Thank you very much.

10                  THE WITNESS:  Thank you, Your Honor.

11                  THE COURT:  Thank you.  Absolutely.

12                  And our next witness then?

13                  MR. PERRY:  Your Honor, our next witness will be

14  Dr. Sheila Peters.  I will defer to Mr. Stanton.

15                  THE COURT:  Certainly.  And Dr. Peters, hopefully

16  will show up in just a second.  Mr. Stanton, you may call

17  your witness.

18                  MR. STANTON:  Thank you, Your Honor.  Your Honor,

19  we call Dr. Sheila Peters' testimony.

20                  THE COURT:  And Dr. Peters, I've got to locate

21  you so we can have you sworn in.  Okay.  If you'll raise your

22  right hand then, Mr. Sample will administer the oath.

23

24

25

1                              *   *   *

2                          **SHEILA PETERS,**

3     **was called as a witness and having first been duly sworn**

4     **testified as follows:**

5                 THE COURT:  There you are.  Okay.  Good to see

6     you.

7                 THE WITNESS:  Yes, sir.

8                 THE COURT:  Absolutely.

9                 Counsel may proceed.

10                MR. STANTON:  Thank you, Your Honor.

11                      **DIRECT EXAMINATION**

12    **QUESTIONS BY MR. STANTON:**

13    Q.     Good afternoon.  Would you please introduce yourself

14    to the Court and spell your first and last name.

15    A.     Good afternoon.  I am Sheila Peters.  My first name,

16    S-H-E-I-L-A.  And last name Peters, P-E-T-E-R-S.

17    Q.     Thank you, Dr. Peters.  And Dr. Peters, where do you

18    reside?

19    A.     I reside in Nashville, Tennessee.

20    Q.     Okay.  And can you tell the Court and tell us what it

21    is that you do for a living?

22    A.     I am associate professor of psychology at Fisk

23    University.  I also have a part-time private practice because

24    I am a licensed psychologist in the state of Tennessee.

25    Q.     Okay.  I think most know this, but just for the

                        UNREDACTED TRANSCRIPT

1  record, can you tell where Fisk University is located?

2  A.      Fisk University is located in Nashville, Tennessee.

3  It is the oldest institution, founded in 1866.  And founded

4  to educate newly freed slaves as well as others.

5  Q.      Thank you, Dr. Peters.  And how long have you been a

6  professor at Fisk?

7  A.      This is my 22nd year at Fisk University.

8  Q.      Okay.  And I'd like you to take a moment, if you

9  would, Dr. Peters, and just describe your educational

10  background.

11  A.      Certainly.  My educational background, if I begin with

12  high school, I attended Garinger High School in Charlotte,

13  North Carolina.  I then went on to the University of North

14  Carolina at Chapel Hill, where I received a bachelor's degree

15  in psychology.  I came to Nashville and I received a master's

16  and a Ph.D. in clinical psychology, with a concentration in

17  community psychology at Vanderbilt.

18  Q.      Okay.  Thank you, Dr. Peters.  You mentioned that you

19  -- did you have to write a dissertation for your doctorate?

20  A.      Yes.

21  Q.      Could you tell us what that was about.

22  A.      My dissertation was focused on, as my early training,

23  on children and youth.  And my particular dissertation was

24  focused on intentional functioning in learning disabled

25  educably mentally retarded children.  We no longer use that

*TESTIMONY OF SHEILA PETERS*                                            195

1    term.  As well as children who are not in special education

2    classes.

3    Q.      Thank you.  And aside from your dissertation,

4    Dr. Peters, have you authored any publications?

5    A.      Yes.  Some of my initial research has been on

6    gender-specific programming for girls and boys entering the

7    juvenile justice system.  I also, being at Fisk, have written

8    short articles around culture and a variety of different

9    encyclopedias related to African-American culture.

10   Q.      And any of those articles and that background address

11   the issues about which you're here today to testify to?

12   A.      Those specific articles do not, but in my training as

13   well as the work that I do, I am not only associate professor

14   of psychology, but I'm the director of graduate studies.  We

15   have a master's program at Fisk University in clinical and

16   general psychology.  And in that context, I teach and

17   supervise research conducted by both undergraduate and

18   graduate students.  I have also served on doctoral committees

19   at other universities, particularly in Nashville.

20   Q.      Thank you.  Dr. Peters, at this point I'd like to turn

21   to the issues for which you're here today to testify.  If you

22   would explain your role in this case.

23   A.      I would be happy to.  I am contracted by the

24   monitoring team to engage a component of the community

25   engagement plan.  A portion of that and a significant portion

1   are the community forums.  I have observed the second

2   community forum, and I participated in the third community

3   forum.

4          I was initially contacted by the monitoring team

5   because I, along with colleagues at Vanderbilt University,

6   along with the behavioral services unit of the Metropolitan

7   Nashville Police Department conducted a study called

8   Bias-Based Policing, in which we conducted a series of focus

9   groups.  A subset of them were conducted at Fisk,

10  particularly so that persons of color would be comfortable in

11  that context.  But a team of researchers at Fitz and at

12  Vanderbilt conducted that study.  That study evaluation

13  report can be easily Googled and accessed online.

14         And so I was contacted about that study.  I had a

15  interview and discussion with the monitoring team to explain

16  and to share my information about focus groups.  Subsequent

17  to that, the monitoring team contacted me again, and we

18  discussed what would be the likelihood if Fisk were to take

19  on this project.  And then subsequent to that discussion, the

20  monitoring team contacted me about the Fisk research team

21  actually conducting the study.

22  Q.     Thank you, Dr. Peters.  You've mentioned that there

23  were -- you attended multiple community forums that the

24  monitoring team sponsored here in Memphis.  Can you share

25  your impressions that you gathered as it relates to community

1  sentiments regarding the Kendrick Consent Decree, your

2  personal observations in attending those forums?

3  A.    I would say my personal observations are that people

4  that are aware of the Kendrick Consent Decree are often

5  passionate about it and are concerned.  I believe the second

6  community forum, there were over 150 individuals who were in

7  attendance.  And the monitoring team did a great job in

8  dividing up into subgroups to allow people to have the

9  opportunity to understand the process, to understand the

10  monitoring team's role and to ask questions and to hear from

11  the various experts on the monitoring team.

12       The second one that I attended, which was the third

13  one, which has already been alluded to was on March the 10th,

14  and we were preCOVID-19 as we now understand, which

15  potentially impacted the attendance level at that particular

16  forum.  I participated within that and tried to be responsive

17  to individuals within the community who are -- I would say

18  the community and those who are most motivated want to be

19  heard, want to have a voice and has already been stated in

20  this hearing, many push for wanting to have a community

21  individual as a part of the monitoring team.  I do believe

22  that the efforts are reasonable and are a great effort in

23  opening up an opportunity for the community to have a voice

24  and learn about the process.

25  Q.    You mentioned your involvement obviously in Nashville

1    and focus groups as it relates to law enforcement and you

2    being engaged for similar work here in Memphis as it relates

3    to focus groups.  Can you describe, Dr. Peters, to the Court

4    your efforts that you've made regarding the focus groups

5    since you've been engaged.  Obviously, you've mentioned

6    attending the community forums but any additional information

7    you can share?

8    A.    Yes.  In addition to that, attending both of those

9    community forums, one as an observer and another as a

10   participant, I received information from the monitoring team

11   regarding individuals who were interested in the process and

12   wanted to know more and more about how the community could be

13   engaged.  The City was helpful in also providing a list of

14   community partnerships that met on a specific day, usually

15   once a month, as well as other entities and organizations

16   within the Memphis area.  Our research team took all of the

17   individuals on both lists, as well as other lists that we

18   were able to develop through our professional networks and

19   contacted many of those folks in regard to that.

20       In our -- what is now our first phase, the majority of

21   individuals who were willing to participate in the focus

22   group -- and Attorney Stanton, let me just share that the

23   focus group itself runs anywhere from 60 to 90 minutes.

24   Depending on what side of Memphis you're coming from,

25   ultimately an individual may give up to two and a half to

1   three hours of time travel to participate and return in that

2   regard.  So these are highly motivated individuals who are

3   coming.  The City was instrumental in helping us with --

4   along with the monitoring team to set up our focus groups in

5   community centers throughout the Memphis area.

6   Q.      Thank you, Dr. Peters.  I want to take this time now,

7   I want to pull up a document that's been marked MT trial

8   Exhibit 9.  And I want to see if you -- for you to take a

9   look and see if you recognize this document, Dr. Peters.

10  A.      I do.

11  Q.      And did you prepare this document?

12  A.      I did.

13          MR. STANTON:  Your Honor, if there's no

14  objection, I'd like to move MT trial Exhibit 9 as the next

15  exhibit into evidence.

16          THE COURT:  Without objection it'll be marked

17  as 12 in the case.

18          (WHEREUPON, the above-mentioned document was

19  marked as Exhibit Number 12.)

20          MR. STANTON:  Thank you, Your Honor.  With your

21  permission, I'd like to share on the screen with the Court

22  now so that all the viewers can see this next exhibit.

23          THE COURT:  Certainly.  Go right ahead.

24          MR. STANTON:  Thank you, Your Honor.

25  BY MR. STANTON:

1  Q.      Dr. Peters, again this is a document that you

2  prepared, correct?

3  A.      Yes.

4  Q.      Would you just take a moment and share what the basis

5  of this document and the synopsis of what it says.

6  Obviously, it's dated June 15th, but if you would just share

7  with the Court the contents of this letter, this document.

8  A.      This document outlines how we were -- we utilized the

9  lists that were provided to us, as well as additional lists

10 that we were able to put together.  And our research team

11 contacted various individuals.  There were some individuals

12 who did not want to participate and were not as interested

13 within the process, and we understand that.

14         Right before the second community meeting that I

15 attended, we were in the process of continuing to complete

16 many of our focus groups.  As COVID-19 has changed things for

17 all of us, certainly we had to suspend the last phase of our

18 data collection because of the sheltering-in order.  And by

19 no means were we expecting people to participate in that

20 capacity.

21         I will certainly say being an academic, most of the

22 time I have used Zoom on occasion, but over the last two

23 months, I have had Zoom fatigue.  I have done my share of

24 Zoom.  However, we are now finding it is a useful tool, and

25 we are now in the process of collecting additional focus

1    groups through virtual meetings.

2          This cuts the time for individuals and in looking at

3    the first segment of our data, which is outlined in this

4    document, many of the people that were most likely to

5    participate in what we now call Phase 1 were more likely to

6    have serious concerns because they were associated in some

7    fashion or another with local community activist groups.

8          Our effort now is to continue to draw a broad stroke.

9    And we are recruiting individuals who do not know a great

10   deal necessarily about the Kendrick Consent Decree but are

11   willing to participate.  As I outlined within this, in the

12   course of this brief research study, two unusual things have

13   occurred.  COVID-19 as well as our national and global

14   protests in regard to police brutality.

15         So even as we collect this second phase of data, we do

16   ask questions in general about positive experiences as well

17   as negative experiences with the police.  However, the

18   protocol focuses primarily on the Kendrick Consent Decree.

19   And so we realize that we may get individuals that are

20   responding to the current sentiment in our society right now,

21   and we will factor that in as we analyze the data.

22   Q.    Thank you, Dr. Peters.  You've mentioned some of the

23   challenges that you faced along the way with your work on the

24   focus group to your team, including COVID-19.  As far as next

25   steps, can you share with the Court, you've mentioned some of

1   the items, Zoom and taking advantage of technology moving

2   forward.  But could you share the plan to complete the work

3   and an estimated time frame for your final report to be

4   completed and submitted?

5   A.     Yes.  Our final report should be completed and

6   submitted by no later than the middle of July.  We are

7   finalizing the data collection and are in a position to

8   analyze the new data and to provide what is the standard for

9   focus group research to provide an understanding of the broad

10  things across the focus group research, as well as a few

11  outliers.  There are always individuals that may have a

12  viewpoint that is a little different from others.

13         Some focus groups are, as I initially talked to the

14  monitoring team, are set up as homogeneous groups, people

15  that are from same area, may have similar attitudes or

16  perceptions.  Because our research team is located in

17  Nashville, we scheduled the focus groups in blocks of time.

18  We came down in early February.  We spent a week at the end

19  of February.  And so we were dealing with scheduling people.

20  Some people might miss a session, and we would add them on to

21  another session.

22         The handicap for us is because we are not located in

23  Memphis, and we are not a full-time research organization or

24  company, is that if someone missed a session and they could

25  not come in that block of time that we were in Memphis, we

1    were limited.  We have followed up with some of those cases

2    and are able now to do individual interviews.

3            The beauty of the focus group is that a discussion

4    that is generated may encourage other people to share

5    additional information.  However, our interviews that we are

6    also using are based upon the focus group and have the same

7    identical questions.  The only thing they don't have is the

8    participant hearing from others, and their memory or their

9    thoughts or impressions might be enlightened by other

10   peoples' presence.

11   Q.     Thank you, Dr. Peters.  And I know that we've shared

12   this information on the monitoring team's website.  But I

13   think this may be a good opportunity for yet another PSA.  If

14   you don't mind, of those the Court mentioned, there are a

15   number of individuals throughout this community that are

16   observing and participating in this hearing.  And if you

17   could share the information, your contact information for

18   those that may be listening and watching, may be interested

19   in participating in some of the upcoming focus groups that

20   you just referenced, would you just share your contact

21   information?

22   A.     Yes.  My contact information is Sheila Peters.  My

23   e-mail is drsrpeters@gmail.com.  I believe, though I have not

24   checked recently, that some of that information may be on the

25   website.  I will ensure that that information is available.

UNREDACTED TRANSCRIPT

*TESTIMONY OF SHEILA PETERS*                                        204

 1  And a direct phone number for anyone that is interested is

 2  area code (615)497-2963.

 3              MR. STANTON:  Thank you so much, Dr. Peters.

 4              Your Honor, I have no further questions for the

 5  witness.

 6              THE COURT:  The City of Memphis, cross

 7  examination?

 8              MR. MCMULLEN:  Yes, Your Honor.  I have a few

 9  questions.

10                      **CROSS EXAMINATION**

11  **QUESTIONS BY MR. MCMULLEN:**

12  Q.     Good afternoon, Dr. Peters.

13  A.     Good afternoon.

14  Q.     Just for clarification, you were conducting the focus

15  groups, and I see on your letter, they're small in size,

16  three to four.  How many different groups had you done before

17  COVID came or before you had to discontinue them?

18  A.     I believe we had conducted eight groups.  Now, that

19  also, we had some individual sessions also.  Individual

20  interviews.

21  Q.     So would you say it's fair to say eight groups would

22  be, what, 32?

23  A.     Yeah.  We are around 40 to 50 participants.  Yes, sir.

24  Q.     Okay.

25  A.     At this point.  But we are still collecting data.

*TESTIMONY OF SHEILA PETERS*                                          205

1   Q.      Okay.  And you're not seeking those people based on

2   any statistical analysis to represent the broader 650,000

3   people in the Memphis community, are you?

4   A.      We did not utilize a statistical analysis.  We are

5   seeing this as individuals who are interested and concerned

6   and want to participate, whether they know about the Kendrick

7   Consent Decree or not.

8   Q.      And did I get this right?  You said it was a

9   homogeneous group, pretty much people who felt that they were

10  negatively impacted by the Memphis police?

11  A.      No.  What I was trying to say is that our -- in my

12  initial discussion with the monitoring group in describing

13  different kind of focus groups, often they are homogeneous,

14  where one group from particular characteristic or setting is

15  brought together.  Because of the way in which we had to

16  conduct them, coming from out of town, that meant that we had

17  different people coming in to the same group.  In most of the

18  cases, people had some similar thoughts but not all the same

19  thoughts.  So the groups were more heterogeneous than

20  homogeneous.

21  Q.      Okay.  And in reading your report, I understand that

22  there were some highly motivated individuals who felt they

23  had been negatively impacted.  And I'm reading from your

24  report by potential political surveillance and were

25  knowledgeable about Consent Decree.  That was one kind of

UNREDACTED TRANSCRIPT

*TESTIMONY OF SHEILA PETERS*                                        206

1   segment of the group?

2   A.      Yes, sir.

3   Q.      Okay.  Those who wasn't that familiar, did you find

4   that they had a difficulty in really understanding the

5   Consent Decree as it was written?

6   A.      Not really.  Most persons, even the ones that didn't

7   know much, had a general awareness.  Again, people have to be

8   motivated to take that time out of their schedule to

9   participate.  And yet there were those who participated that

10  had an awareness but also have an appreciation for the police

11  role, particularly within Neighborhood Watch and keeping

12  their communities safe.  So just because people might be

13  highly motivated, all of them were not anti, against the City

14  or the police.

15          MR. MCMULLEN:  No further questions.

16          Thank you, Dr. Peters.

17          THE WITNESS:  Thank you.

18          MR. MCMULLEN:  Oh, one other question.

19          THE WITNESS:  Yes, sir.

20  BY MR. MCMULLEN:

21  Q.      I just want for the record, your report is not

22  complete at this time; is that fair?

23  A.      Yes, sir.

24  Q.      I think you stated that.

25          MR. MCMULLEN:  Thank you very much for your time.

                    UNREDACTED TRANSCRIPT

*TESTIMONY OF SHEILA PETERS*                                                    207

1              THE WITNESS:  Thank you.

2              THE COURT:  ACLU counsel?

3              MR. CASTELLI:  No questions, Your Honor.  Just

4    looking forward to reading Dr. Peters' report when it is

5    completed.

6              THE COURT:  Certainly.  Redirect?

7              MR. STANTON:  Yes.  Just one other question, Your

8    Honor, for Dr. Peters.

9                    **REDIRECT EXAMINATION**

10   **QUESTIONS BY MR. STANTON:**

11   Q.    And that is, Dr. Peters, did you provide an

12   opportunity for both parties to submit potential contacts of

13   their affiliates or members or individuals who may be

14   interested?  Did you submit to both parties an opportunity

15   for them to give that information to you?

16   A.    Yes, sir.  Yes, sir.  And that was facilitated through

17   the monitoring team.

18             MR. STANTON:  No further questions, Your Honor.

19             THE COURT:  All right.

20             Dr. Peters, we certainly appreciate your

21   participation and look forward to getting the final report.

22   And I know we have indicated all along that this is basically

23   identifying themes or issue spotting to some degree for us.

24             THE WITNESS:  Yes, sir.

25             THE COURT:  And it's not submitted as evidence,

1    as the City points out and everyone agrees.  It's not a

2    statistical analysis, but it's very important.  And we know

3    that, and we're looking forward to getting your report again.

4    So thanks so much.

5                    THE WITNESS:  Thank you, sir.

6                    THE COURT:  Certainly.  We're going to let you be

7    excused.

8                    Let me ask the Monitor, are we ready on our next

9    witness?  I know we've moved pretty efficiently today.

10                   MR. STANTON:  We did, Your Honor.  We have one

11   more -- one other witness, Your Honor, if you recall, that

12   witness due to -- he had another court --

13                   THE COURT:  Right.

14                   MR. STANTON:  -- matter is still in that

15   proceeding, I understand.  So we had discussed perhaps taking

16   that individual, and that's Mr. John Henegan, our

17   constitutional law expert out of order.

18                   THE COURT:  Yes.

19                   MR. STANTON:  He'll be prepared first thing

20   tomorrow or whenever the Court deems fit to accommodate him

21   into the schedule, but otherwise, Your Honor, we have

22   completed our witnesses.

23                   THE COURT:  All right.

24                   MR. STANTON:  Presentation.

25                   THE COURT:  We certainly will hear from him

1    tomorrow, and we'll start here at 9:00.

2           The next question is, we're going to go to the

3    City.  Obviously we have, for efficiency purposes, an

4    opportunity to hear from a witness from the City of Memphis

5    today.  Is there someone who you're prepared to present at

6    this time?  I understand that we've been quite efficient, and

7    it's actually worked pretty well, I hope.  Anything else,

8    Mr. McMullen, that we can cover from the City's point of view

9    today?

10          MR. MCMULLEN:  Your Honor, we would like to call

11   the Monitor, Ed Stanton.  And we have some inquiries we want

12   to make with Mr. Stanton.

13          THE COURT:  That is certainly fine.  We've got a

14   request here for a short break.  About 12 minutes, coming

15   back at ten after the hour.

16          And Mr. Stanton, at that time you'll be prepared,

17   if you don't mind, to be -- you're really an officer of the

18   Court, but we're going to let you be sworn in anyway --

19          MR. STANTON:  Yes, Your Honor.

20          THE COURT:  -- when we come back.  So we will see

21   you at ten after 4:00.  And we'll proceed in that way.  So

22   thank you all very much.  And of course, again, don't leave,

23   just mute and also disconnect your video for the time being.

24   Thank you.

25          (Short break.)

1          THE COURT:  Time to resume and see who we've got.

2          MR. MCMULLEN:  Your Honor, the City is on line.

3          THE COURT:  Right.  Now we have everyone.  I

4    think we do.  We're missing our witness.  So Monitor?

5          MR. STANTON:  Can you hear me, Your Honor, or can

6    you see me?

7          THE COURT:  I will be able to in a minute,

8    hopefully.

9          MR. STANTON:  Testing, testing, one, two.

10         THE COURT:  Have we got the video on that?

11         MR. STANTON:  Your Honor?

12         MR. MCMULLEN:  Your Honor, I need some guidance

13   from the Court.  Two exhibits we're going to talk about were

14   marked under seal.

15         THE COURT:  Oh, sure.  What do we need to do on

16   that?

17         MR. MCMULLEN:  I think -- can we docket it as

18   under seal?  I think Mr. Stanton is very familiar with it.

19   I'm very familiar with it.  I think the Court is.  If the

20   Court and Mr. Stanton could see it and the Court could decide

21   at another time to the extent it needs to be released.

22         THE COURT:  Sure.  What we'll do is -- I think

23   that's not a problem.  If Mr. Stanton is familiar with the

24   document and you are, then we can mark it as an under-seal

25   document for now.  Anticipating that the public version will

*TESTIMONY OF SHEILA PETERS*                                      211

1   be made available as soon as any material that should not be

2   disclosed.  We talked about that at the beginning.  There may

3   be a few things that we know are not proper to disclose for

4   anybody.  And we can clean that up and get that ready for

5   release.  We want to do that quickly.

6          MR. PERRY:  Your Honor, to which document are we

7   referring?  I was getting Mr. Stanton's camera corrected.

8          MR. MCMULLEN:  Defendant's 12 and Defendant's 13

9   -- no. Defendant's 12.

10         THE COURT:  Okay.  Well, we'll have it out here

11  in a second.  That will be all set.  So I think we are ready

12  though other than that.

13         So Mr. Stanton, you know, there's sort of an

14  argument about -- not argument -- question -- do we need to

15  swear you in?  Of course, but we're going to do it so

16  everything is consistent, and if you'll raise your right

17  hand, Mr. Sample is going to administer the oath.

18

19

20

21

22

23

24

25

1                              *   *   *

2                        **EDWARD STANTON, III**

3    **was called as a witness and having first been duly sworn**

4    **testified as follows:**

5                    THE COURT:  Counsel may proceed.

6                    MR. MCMULLEN:  First of all, I don't want

7    Mr. Stanton to feel left out, so I want to enter the first

8    page of his bio and the issues we discussed with respect to

9    redacting --

10                   THE COURT:  Yes.  Yes.  Absolutely.

11                   MR. MCMULLEN:  -- will not be visible.

12                   THE COURT:  Absolutely.  We don't put out

13   peoples' personal identifiers.  Anybody's.  And so we'll make

14   sure that that's taken care of.  And I think we're all set.

15   I think you've got those materials.

16                       **DIRECT EXAMINATION**

17   **QUESTIONS BY MR. MCMULLEN:**

18   Q.    Mr. Stanton, I think you need -- I don't see

19   Mr. Stanton.

20   A.    I'm here.

21                   THE COURT:  He's probably hiding behind his

22   picture.  I mean, I think he -- you are there, right,

23   Mr. Stanton?

24                   THE WITNESS:  I am here, Your Honor.  Can you see

25   and/or hear me?

                        UNREDACTED TRANSCRIPT

*TESTIMONY OF EDWARD STANTON, III*                                     213

1              THE COURT:  We can see you.

2              MR. MCMULLEN:  I can hear you.

3              THE COURT:  -- your resume.  I think that's the

4    issue, so...

5              MR. MCMULLEN:  We could minimize that and move it

6    to the side.

7              THE COURT:  That's fine.

8              THE WITNESS:  Can you see me now, Your Honor?

9              THE COURT:  Yes, we can.  Thank you.

10             MR. MCMULLEN:  Hold on, Your Honor.  I still

11   can't see Mr. Stanton.

12             THE COURT:  He's down here in box number, looks

13   like, ten.

14             MR. MCMULLEN:  Your Honor, I see him now.

15             THE COURT:  Okay.

16   BY MR. MCMULLEN:

17   Q.     Mr. Stanton, I'm sure you need no introduction, but

18   would you briefly introduce yourself to the Court.

19   A.     Sure.  Edward L. Stanton the third.  I am the Monitor

20   in this case.  Was appointed back in December of 2018.  I

21   have served in that capacity.  I'm also an attorney with

22   Butler Snow law firm in the Memphis office and have been in

23   that role with this law firm since 2017, for a little over

24   three years.

25             And prior to that, I served as the presidentially

                        UNREDACTED TRANSCRIPT

1   appointed United States attorney from 2010 through 2017 for

2   the Western District of Tennessee.  And prior to then,

3   Mr. McMullen, I served nearly eight years as in-house counsel

4   on the commercial litigation team for Federal Express

5   Corporation or FedEx.

6          Prior to then, I served as an associate, training with

7   a law firm of Armstrong Allen here in Memphis.  And before

8   then I'd served as an assistant city attorney for the City of

9   Memphis and began my legal career with law offices of Charles

10  Carpenter and Associates back in 1997.

11  Q.     Okay.  Mr. Stanton, as your role as the Monitor,

12  you've dealt a lot with the City with respect to RFAs,

13  requests for authorities and dealing with the issues that

14  have arisen; is that correct?

15  A.     That's correct.

16  Q.     And a lot of those involve situations where both the

17  City and you sometimes would debate back and forth what was

18  the proper course of action in light of the Consent Decree

19  and what was not the proper course of action in light of the

20  Consent Decree; is that correct?

21  A.     I'm not sure I'd say debate.  The City would send over

22  an RFA, request for authority or authorization, and I would

23  try to promptly turn around my response.  Obviously, the City

24  would share their points, but I'm not sure there was a lot of

25  debate.  More so in writing, I would provide my response to

1    the request.

2   Q.      In doing that -- and I want to bring up a couple of

3   incidents to give the Court an indication of some type issues

4   that we would run into.  You had recalled a citizen sent an

5   unsolicited document, where the citizen had photographed two

6   people and overheard them talking about causing disruption at

7   a -- at the Grizzlies.  I think it may have been the opening

8   game or at a Grizzlies game.  And that information was sent

9   to me, and I sent that information to you.  Do you recall

10  that RFA?

11  A.      I do have a recollection, Mr. McMullen.  I can't

12  recall the exact details, but I do recall some of those

13  specifics that you just referenced.

14  Q.      Okay.  And with respect to that, I think my question

15  was to you because quite frankly, I wasn't sure after

16  reading -- looking through the Consent Decree, reading

17  through the Consent Decree, whether the City could act upon

18  that information, whether the Memphis police could act upon

19  that information.  And the second question was whether MPD

20  could share that information with the Grizzlies' security

21  staff.  Do you recall those two questions?

22  A.      Sounds very familiar.  But again, can you tell me

23  when, how long ago that was, Mr. McMullen, that RFA.  It

24  seems like that was a while back.

25  Q.      October 2018 -- 2019.  October 2019.

UNREDACTED TRANSCRIPT

*TESTIMONY OF EDWARD STANTON, III*                                    216

1   A.      Okay.  Yeah.  It's been some months, so that puts

2   somewhat in context.  But yes, I have a -- some recollection.

3   I can't remember all of the details, but I do remember the

4   City reaching out.  I believe you were the City attorney at

5   the time with questions with regard to that RFA, yes.

6   Q.      In the document, some of it is sealed.  I have a copy

7   of it and it has been filed under seal, Mr. Stanton.  You

8   have access to it.  It made reference to specific names, and

9   it had a photograph.  So I think the Court wisely has it

10  under seal.

11          But the document was from a citizen that basically

12  said, "Would you happen to know anyone in security with the

13  Memphis Grizzlies?"  That was sent to me.  "I was eating

14  lunch today by myself in a T-shirt and shorts at a

15  restaurant, and I listened to two people discussing their

16  plan to shut down the Grizzlies game."  And I've sent a RFA

17  to you.

18  A.      I'm sorry.  Can you give me just one second.  I want

19  to make sure I'm with you on the same page.  And if you don't

20  mind, I apologize.  My -- someone is going to get my readers.

21  My eyes aren't what they used to be.  So can you tell me

22  literally what page you're on and maybe just give me just a

23  moment to make sure I can see and read it exactly where you

24  are.

25  Q.      It's under seal.

1  A.     I have -- I believe I have the document in front of

2  me.  I'm just trying to make sure if you can tell me where

3  you're reading from, which page, so I can...

4              MR. CASTELLI:  I'm sorry.  If I may, Your Honor,

5  is this a document that was filed and provided before the

6  hearing?  Is there a reference number so I can follow along?

7              THE COURT:  That's fair.  Is this a document that

8  can be readily referenced by Mr. Castelli, and can you give

9  us the reference, the ID number.

10             MR. MCMULLEN:  They're e-mailing it to

11  Mr. Castelli.

12             THE COURT:  Okay.  Do we have -- we want to make

13  sure that we have the document here, and I think we may.

14             MR. PERRY:  I want to be clear.  This is not one

15  of the exhibits that the City submitted?

16             THE COURT:  Okay.

17             MR. MCMULLEN:  No.

18             MR. PERRY:  Would you copy us on that e-mail that

19  you're sending to Mr. Castelli?

20             MR. MCMULLEN:  Yes.

21             THE COURT:  Yeah.  Just copy everybody on the

22  e-mail, and we'll have it almost instantly.  We'll pull it

23  from the back.  It will come in in a moment.

24             MR. MCMULLEN:  Mr. Stanton, let me know when

25  you're able to see the document.

 1              THE COURT:  If we need to, we can take a short

 2    break.  Would that be useful?

 3              MR. PERRY:  If the Court would indulge, Your

 4    Honor, I think that may be a good idea.  I still don't have

 5    the document.

 6              THE COURT:  I think it's often much easier for

 7    you to find it than someone else.  So what we'll do is we'll

 8    take literally a five-minute break, and we'll resume in five

 9    minutes and also let us get the document from the back.  So

10    five minutes, I'm going to disconnect -- just not disconnect,

11    but I'm actually going to mute, and I'm going to go off on

12    video.  Five minutes.

13              (Short break.)

14              THE COURT:  All right.  I see that Mr. Stanton is

15    back, so I assume everything is resolved.

16              THE WITNESS:  Thank you, Your Honor, I -- we just

17    got -- there was additional e-mails that the City sent, so

18    we're downloading those.  But I'm here, Your Honor, and ready

19    to move forward to the extent I can.  I'm sure Mr. McMullen

20    will --

21              MR. PERRY:  Your Honor, we have two e-mails and a

22    letter that the City just forwarded us.  We are printing

23    those now, and we will have them shortly.

24              THE COURT:  Okay.  Just tell us when you're

25    ready, Mr. Stanton.  There's no rush.  We'll wait until we're

1  all set.

2              THE WITNESS:  Yes, sir.  Will do.  Thank you,

3  Your Honor.

4              THE COURT:  No problem.

5              (Short break.)

6              THE COURT:  There is one thing about the

7  documents.  It does contain the identity of some people and a

8  photograph that we would not disclose because it's a personal

9  identifier and many reasons that would typically not be

10  disclosed.  And so a redacted version may be capable of being

11  prepared, and that will be our objective to do that.  But we

12  will not be including certain individual -- any individuals'

13  names except, of course, the Monitor, which is -- and of

14  course, the counsel for the City, who was chief legal officer

15  for the City at the time.  So I don't think there's any

16  problem in disclosing their identities.  But that's how we

17  should probably proceed on that.  And so we will proceed when

18  Mr. Stanton says that we're set.

19              THE WITNESS:  Thank you, Your Honor.  I believe

20  that we're set.  I just received the documents, and they're

21  in front of me.  They are e-mails from the City.

22              THE COURT:  Do you want to take a minute to take

23  a quick look at them and then just tell me when you're set.

24              THE WITNESS:  Yes, Your Honor.

25              MR. PERRY:  Your Honor, I think we're ready to

UNREDACTED TRANSCRIPT

*TESTIMONY OF EDWARD STANTON, III*                                   220

1  go.

2              THE COURT:  All right.  Counsel may proceed with

3  the questions for the Monitor.  I don't really want there to

4  be any --

5              MR. MCMULLEN:  I'm sorry.

6              THE COURT:  I don't want there to be any

7  confusion.  We should not identify individuals other than

8  Mr. Stanton and, of course, Mr. McMullen in these -- from

9  these materials.  And there are numerous reasons that we

10 should not do that.  We certainly don't want to discourage

11 citizens from reporting information to the authorities under

12 any circumstance.  And so we are not going to be disclosing

13 those -- that identity.  All right.

14             Counsel may proceed.

15 BY MR. MCMULLEN:

16 Q.    Mr. Stanton, you've had an opportunity to review the

17 documents?

18 A.    A brief opportunity, Mr. McMullen, but yes, I have had

19 them printed, and they're in front of me.

20 Q.    Yeah.  And does that refresh your recollection of the

21 RFA conversation we had by e-mail?

22 A.    It does, Mr. McMullen, yes.

23 Q.    Okay.  I'm going to just describe without reading in

24 detail the message that I got.  And anything you want to add,

25 I don't want to misrepresent what it says.  But essentially

```
1    someone contacted me and advised -- asked me if I knew

2    anybody who knew anybody in Memphis Grizzlies security.  And

3    he indicated he was eating lunch, and he overheard two people

4    talking about going to the Grizzlies game and shutting it

5    down.  They made some other references, and he took a picture

6    of the two individuals, and he sent it to me; is that a fair

7    description, Mr. Stanton?

8    A.     That sounds fair, Mr. McMullen.

9    Q.     Okay.  And then --

10              THE COURT:  Mr. McMullen, I think you need to

11   turn your camera on.

12              MR. MCMULLEN:  Oh, I'm sorry.

13              THE COURT:  It's all right.

14              MR. MCMULLEN:  I'm sorry.

15              THE COURT:  Perfect.  Perfect.  Thanks so much.

16              MR. MCMULLEN:  All right.

17   BY MR. MCMULLEN:

18   Q.     And then I sent an e-mail to you October 4th, and it

19   was addressed to you, Mr. Perry, and Mr. Letten.  "I received

20   this tip from a personal friend tonight.  Because of how the

21   information was acquired, I am requesting permission to pass

22   it along to MPD to provide safety for the fans at the game.

23   Please review and respond."

24              Do you see that document?

25   A.     I do.
```

1   Q.      And then I got an e-mail from you a few minutes later,

2   a little over 30 minutes later.  "Received.  Will review and

3   advise."

4           Do you see that document?

5   A.      I do.

6   Q.      And then about six days later, on October 10th, I sent

7   an e-mail to you, Will Perry and Jim Letten.  "I'm following

8   up on the e-mail below.  We're still waiting on your

9   determination.  The information is not specific about which

10  Grizzlies game will be impacted.  Thankfully, it does not

11  seem that anything happened during Sunday's game October 6th

12  or Tuesday's game October 8th.  Below are the upcoming games:

13  October 14th, 25th, 27th, November 2nd, 4th, 6th.  The season

14  opener is October 25th.  I suspect that would have the

15  largest attendance.  Again, please advise whether MPD can act

16  on this information and/or whether they can pass it along to

17  the Grizzlies security staff."

18          Is that pretty accurate as far as that e-mail sent to

19  you, Mr. Stanton?

20  A.      Yes.

21  Q.      And then you responded to me by letter, and in that

22  letter, I'm not going to read your entire letter, but

23  basically you responded, "The answer to both those questions

24  were no."  And you cited to Section I of the Consent Decree.

25  And quoted, "We can't encourage, cooperate or delegate,

UNREDACTED TRANSCRIPT

 1   employ or contact with or act on behest of any local, state,

 2   federal or private agency or any person to plan or conduct

 3   activity prohibited by the Decree." And you went on to talk

 4   about Section I.

 5          Is that a fair depiction of your response to my

 6   letter? You got several other paragraphs in it that I didn't

 7   read, but is that a fair depiction of your response?

 8   A.     That's a fair depiction of that paragraph, yes.

 9   Q.     Okay. And I guess the point I'm trying to make, I

10   thought there was problems with Section I, and I went to you

11   for authority on it. And I think your letter outlines that

12   you also thought there was problems under Section I with us

13   receiving or sharing that information; is that fair to say?

14   A.     That's fair to say at that time, and I'm looking at

15   the date of this letter, Mr. McMullen, that's October

16   the 11th of 2019.

17   Q.     Right. And both -- you and I both have law degrees,

18   we're well educated, and eventually a similar issue or

19   analogous issue was brought to the Court, and the Court gave

20   us some further guidance on that; is that fair to say?

21   A.     I'd have to see -- the Court did give further guidance

22   as it relates to Section I, that's correct.

23   Q.     Right.

24   A.     About a month later.

25   Q.     About a month later. And I think it's fair to say the

UNREDACTED TRANSCRIPT

*TESTIMONY OF EDWARD STANTON, III*                          224

1   Court guided different from the way I interpreted it and,

2   quite frankly, appear to be the way you interpreted

3   Section I; is that fair to say?

4   A.      I think the Court's guidance speaks for itself.

5   Q.      Okay.  All right.  Is it fair to say that in reading

6   this document, you can have two reasonably informed,

7   intelligent people come up with different opinions as to what

8   it means and what it doesn't mean?

9   A.      I'm not sure I would say it's fair to say.  I mean,

10  you can have two people that have multiple interpretations.

11  If that's what you're asking, sure.

12  Q.      And we'll find the document of the head clerk from the

13  Court.  But it is my understanding now that, based on what

14  the Court has ruled, forwarding this information would be

15  permissible; is that your understanding?

16  A.      Under the guidelines of the Court's orders.  I mean,

17  again, Mr. McMullen, if the Court --

18              THE COURT:  Excuse me.  You're allowed to put the

19  order up.  It's fine.  If you want to.

20              THE WITNESS:  I think that would be a great idea.

21              MR. MCMULLEN:  We're trying to get it up.

22  BY MR. MCMULLEN:

23  Q.      And I think those are the Court's words.  "And

24  therefore, reading the two sections of the Monitor's

25  August 21st -- August 2019 interpretation of I together, the

UNREDACTED TRANSCRIPT

1  Court disagrees with the City's broad reading of the

2  Monitor's interpretation of Section I limitation.  The better

3  reading of the Monitor's interpretation, which better

4  comports with the purpose and protection of the Kendrick

5  Consent Decree would require the City to reject outright only

6  information constituting political intelligence that is

7  unrelated to any legitimate law enforcement activity as

8  prohibited by Section 8 of the Consent Decree.  Section I

9  further requires the City to vet only information that

10  implicates Section G of the Decree, that is, information

11  gathered as a part of a legitimate law enforcement

12  investigation that incidentally or may incidentally implicate

13  protected First Amendment rights."

14       So based on that guidance from the Court, you do agree

15  your response would have been different to me, provided this

16  information?

17  A.     Sure.  This is an order of the Court.  And the Court

18  was clear in what you just read, Mr. McMullen.

19  Q.     And my only point is you have two people who have been

20  living with this Consent Decree for a while, and they had a

21  different interpretation of what Section I said; is that a

22  fair assessment?

23            THE COURT:  Well, I don't think it matters.  I

24  think what matters is what the final ruling was on it.  I

25  mean, I think it's obvious that there was a difference there.

*TESTIMONY OF EDWARD STANTON, III*                                    226

1              MR. MCMULLEN:  I agree, Your Honor.

2              THE COURT:  Okay.

3              MR. MCMULLEN:  And the point I was trying to

4    make --

5              THE COURT:  Sure.

6              MR. MCMULLEN:  -- for my modification is to make

7    the Consent Decree understandable and readable to a

8    layperson.  And that's the point I'm trying to make, not that

9    either of us are right.

10             THE COURT:  Right.

11             MR. MCMULLEN:  The only interpretation that

12   matters was yours, Your Honor.  Thank you.

13             THE COURT:  Well, hopefully we get it right.

14   BY MR. MCMULLEN:

15   Q.    All right.  And so Mr. Stanton, do you think the

16   Consent Decree would be clearer if we were able to codify

17   some of the Court's language, which gave us guidance and put

18   it in the Consent Decree so that it's one document that

19   everybody can look to to know how they can operate under the

20   Consent Decree?

21   A.    Well, I would tell you, Mr. McMullen, I think since

22   the Court's order has come down, it's pretty clear as to in

23   my mind how to interpret Section I.  If this is incorporated

24   to your point about being codified, I don't know that there

25   is a downside to declaring purposes, but as I said to the

                      UNREDACTED TRANSCRIPT

1   Monitor today, it's the Judge and the orders of the Court

2   that are very clear as to the purview of Section I of what's

3   allowed and what's not.

4   Q.      Okay.  And let me ask you about joint operations,

5   Section I.  You were in law enforcement before you started

6   your career with Butler Snow.  Were you involved in a lot of

7   joint operations as the US attorney?

8   A.      I was.  And obviously led an office of individuals

9   involved with joint operations, yes.

10  Q.      Is that considered a best practice where agencies to

11  work together and engage in joint operations to achieve

12  crime-fighting public safety or determine due threat

13  assessment?

14  A.      When you use the term "best practices," I will defer

15  to what we heard from Dr. Bowman earlier.  I would say it was

16  a common practice.  Best practices may mean a number of

17  different things, so I'm not sure that I would use that term.

18  As the expert mentioned earlier, that can mean a number of

19  different things.  But I would say it was certainly common

20  for joint and collaborative efforts from a law enforcement

21  standpoint.

22  Q.      Do you think it was effective practice?

23  A.      For the most part, sure.

24  Q.      Okay.

25              MR. MCMULLEN:  And I want to also pull up our

UNREDACTED TRANSCRIPT

*TESTIMONY OF EDWARD STANTON, III*                                    228

 1   Exhibit 12.   12 and 13.   Both are under seal right now, and

 2   we'll just publish it to the Court.   I think they have it.

 3                  Mr. Perry, do you have that document?

 4                  MR. PERRY:   Defense Exhibit 12, yes.

 5   BY MR. MCMULLEN:

 6   Q.      And without reading through this, everything in this

 7   document, are you familiar with this document, Mr. Stanton?

 8   A.      I am.  Obviously, it's dated August 21st of 2019.  So

 9   not quite a year old, but yes, I'm familiar with it.  It's

10   been a while since I've laid eyes on it.

11   Q.      And this document was in part and parcel had another

12   RF request for authorization; is that correct?

13   A.      Yes.  There appears to be -- if you're talking about

14   Exhibit 12, there appears to be, yeah, three questions that I

15   responded to that were posed from the City.

16   Q.      Right.  And without reading through all of the

17   documents, it represented a 2019 PS Peace Symposium on

18   violent crime where there were going to be a number of

19   executives from the DOJ, FBI, DEA, ATF and USMS.  Is that a

20   fair characterization to the RFA that I sent to you?

21   A.      Yes.

22   Q.      And I did a list behind the scenes.  MPD will be

23   responsible for event security.  Five to six officers each

24   day.  And then --

25   A.      And I'm sorry, Mr. McMullen.  Can you tell me where

                      UNREDACTED TRANSCRIPT

*TESTIMONY OF EDWARD STANTON, III*                                    229

1   you're looking at.

2   Q.        E-mail July 16, 2019, at 8:13.

3   A.        Which exhibit is this, Mr. McMullen?

4   Q.        A12.

5   A.        Pardon me?

6   Q.        Sub A on Exhibit 12.  Page ID 10095.

7   A.        Yes.  I'm with you.  Thank you.

8   Q.        Okay.  Is that a fair characterization of that

9   document?

10  A.        Yes.  What you just read, that's a fair depiction of

11  the statement that you just read and what's on this document.

12  Q.        And I said later in the last paragraph, "We anticipate

13  the need for a lot of coordination with various agencies.

14  Because of those involved, we expect the FBI Secret Service

15  to have a security force on the ground (or the air.  I don't

16  know the extent of their technology.)  As you may expect, the

17  expectation is that the agencies will share intelligence with

18  MPD, and they will expect the same.  The intel they share

19  with MPD may be obtained through methods that are prohibited

20  by the Consent Decree.  We would like to know if we have your

21  approval to coordinate with the agencies and benefit from

22  intel they may have to share in planning for the symposium."

23            Is that an accurate reading of my request?

24  A.        It appears to be.

25  Q.        Okay.  And in your response, page 84 -- no, I'm sorry.

*TESTIMONY OF EDWARD STANTON, III*                                    230

1   Page 0089 Bates stamp.

2   A.      Is this still a part of Exhibit 12 from the City?

3   Q.      Yes.  It's your letter dated August 21st.  I'm sorry.

4   Page ID 10089.

5               MR. CASTELLI:  Was that the first page of the

6   exhibit, Mr. McMullen, so I'm on the same page?

7               MR. MCMULLEN:  Yes.

8               MR. CASTELLI:  Okay.  Thank you.

9               THE WITNESS:  Okay.  I'm with you.

10  BY MR. MCMULLEN:

11  Q.      And in your response, your response to our question

12  was, "Basically we were limited in what we could do as far as

13  coordinating with them."

14          Is that a fair depiction?

15  A.      I think that's right, yes.

16  Q.      Okay.  And ultimately both you and I sought guidance

17  where guidance should be sought when we have issues like

18  that.  And we ultimately got a ruling on that; is that fair

19  to say?

20  A.      That's a fact that the Court gave guidance and a

21  ruling.  That's what we'd adhere to going forward, yes.

22  Q.      And so my point to you is that reading the Consent

23  Decree without having the Court's guidance there, it is a

24  point where two knowledgeable, well-informed, educated

25  individuals can interpret it differently; is that a fair

TESTIMONY OF EDWARD STANTON, III                           231

1   statement?

2   A.      I mean, I think if you have two individuals --

3   multiple individuals can certainly have multiple

4   interpretations of any document or...

5   Q.      Have members of the monitoring team had different

6   interpretations of different documents or different of what

7   is meant by different things in the Consent Decree?

8   A.      Sure.  From time to time.  Again, everyone has

9   different backgrounds, different expertise.  You have some

10  lawyers, nonlawyers, law enforcement backgrounds.

11  Absolutely.  There again, with multiple people looking at the

12  same documents, oftentimes or sometimes there could be

13  varying degrees of interpretations, yes.

14  Q.      Do you feel that the public will benefit if the

15  Consent Decree is written in a manner that incorporates some

16  of the -- codified some of the Judge's interpretation in

17  different sections and written in a manner that is clear?

18          MR. PERRY:  Objection, Your Honor.  Mr. McMullen

19  has already asked Mr. Stanton that question, and he's already

20  answered it.

21          THE COURT:  It has been asked and answered.

22          MR. MCMULLEN:  I'll move on, Your Honor.

23          THE COURT:  Sure, thank you.

24  BY MR. MCMULLEN:

25  Q.      Let's -- since you've been monitoring, you have gotten

UNREDACTED TRANSCRIPT

1   complaints or -- from the public about MPD since you have

2   been a monitor; is that correct?

3   A.     I have received complaints since I've been the Monitor

4   regarding the Memphis Police Department, yes.

5   Q.     Can you give an estimate how many complaints have you

6   received?

7   A.     That is hard to say.  If you're talking about in

8   writing, certainly you and your team, Mr. McMullen, have

9   attended the community forums.  There are a number of

10  individuals who had complaints or concerns there.  Others

11  have -- we've met with, and so some have been in writing;

12  others have been verbally one-on-ones, as well as at the

13  community forums.  So are you talking in writing or just in

14  general?

15  Q.     In general, in any form.  In writing, in person, in

16  any form.

17  A.     I would have to say certainly more than 50 and

18  somewhere between 50 and 150.  It's somewhat hard to quantify

19  but maybe an average of a hundred since I've been the

20  Monitor.

21  Q.     Would it be fair to say out of that hundred

22  complaints, there have only be two incidents where you feel

23  that warrant going to the Judge for a possible divergence

24  from his order or from the Consent Decree?

25  A.     I think the record is clear that there were -- that's

 1  part of our public filings or items that we've filed in our

 2  pretrial reports.  Yes.  There have been two times that we

 3  felt that the City ramified on the Consent Decree or

 4  diverged, as you said, from the Consent Decree, yes.

 5  Q.      Or the Court ordered.  One had to do with the Court's

 6  order, right?

 7  A.      That's correct.

 8  Q.      And then one incident had to do with the Consent

 9  Decree, and that had to do with the Labor Day parade; is that

10  correct?

11  A.      That's correct.

12  Q.      Do you find that largely most of the other

13  98 complaints are for things that really don't implicate the

14  Consent Decree?

15  A.      I wouldn't say that, no.

16  Q.      Well, there have only been two that you've raised

17  to -- well, two that you've raised to us that got to the

18  level that we had to go to court.  That's all I know of.

19  A.      Yeah.  Well, let me give you an example.  One of those

20  that you mentioned violated the Court's order.  That wasn't a

21  complaint from a citizen.  That was a review by the

22  monitoring team and basically a response from the City to

23  some questions that I had as the Monitor as it relates to

24  social media searches.  So that's why again, you can't

25  quantify or qualify that it's solely two complaints out of a

1    hundred.

2    Q.      You're right.  You're absolutely right.  That one

3    matter before the Court was from you, and so it was only one

4    complaint that arose related to the Consent Decree, not two?

5    A.      No.  Again, that's not correct.  As an example, there

6    were multiple complaints as it relates to, you mentioned the

7    Labor Day parade.  And so I would not walk down a path of

8    just assuming that because we didn't act or that something

9    was not brought to the Court's attention that those

10   complaints were not valid.

11          And I will tell you that there are a number of times

12   that we've received complaints and as I've shared this -- and

13   again, this is on record at the public forums, many of the

14   items or some of the items that we've heard from citizens

15   they were outside of, I would say, the purview of what the

16   Court has instructed itself and the monitoring team, our

17   scope and role.

18          So we heard complaints, but sometimes -- and you've

19   heard this yourself, Mr. McMullen, is outside the purview of

20   what the Court has instructed us to do.

21   Q.      That's exactly my point.  And you find a lot of that

22   was because it wasn't a really good understanding of the

23   Consent Decree and the prohibitions within the Consent

24   Decree; would you agree with that?

25              THE COURT:  That's just simply calling for

UNREDACTED TRANSCRIPT

1   speculation about why an individual who's not here may have

2   made a statement.  So it probably wouldn't be beneficial to

3   the Court to simply speculate about why people did or did not

4   do something.

5              MR. MCMULLEN:  Thank you.  I'll withdraw.

6              THE COURT:  Sure.  That's fine.  We are looking

7   at that time.  And I said, we would stop very close to 5:00.

8   Would you prefer to try to wrap up in the next couple

9   minutes, which I'm not requiring at all or come back at

10  nine o'clock tomorrow and then wrap up as to Mr. Stanton, and

11  then we have a witness from Mr. Stanton's team who will be

12  ready to proceed at that time?  Which is your preference,

13  Mr. McMullen?

14             MR. MCMULLEN:  Your Honor, if I can come back at

15  nine o'clock in the morning.

16             THE COURT:  That's fine.  That's no problem at

17  all.  And I think -- we will go then with Mr. Stanton.

18  Mr. Stanton, we'll let you finish tomorrow morning at 9:00.

19  Then I'm going to ask as I did on every other occasion, once

20  Mr. Stanton concludes his testimony and then once the last

21  witness for the Monitor's team concludes, who will the

22  witness -- who are the witnesses that the City will call?  I

23  know we've gone over this, but I think it's always useful at

24  the end of the day to make sure we know the sequence of those

25  witnesses.  Sometimes it changes a little bit and so --

236

1              MR. MCMULLEN:  Your Honor, we will start off with

2    Director Rallings.  Deputy Chief Don Crowe.  Expert Eric

3    Daigle.  And then Major Darren Goods.  Zayid Saleem.

4    Jennifer Sink.  That will be our lineup, Your Honor.

5              THE COURT:  All right.  And that's very, very

6    helpful.  And that also allows Mr. Castelli to think about

7    whether he'll be able to conclude his case through the

8    witnesses that are presented.  I won't ask him right now

9    because we have basically eight witnesses on for tomorrow.

10   And that's probably going to take us through the day, in all

11   likelihood.

12             All right.  Well, thank you all very much, and

13   Mr. Sample will adjourn the Court for the day, and we'll

14   be --

15             MR. PERRY:  Your Honor, may I raise one point

16   before we adjourn?

17             THE COURT:  Absolutely.  Yes, sir.

18             MR. PERRY:  If the City intends to use any

19   documents that are not in the exhibits that have been

20   submitted, can they send those to us now so that we're not

21   scrambling tomorrow to print documents the way that we have

22   been the last few minutes?

23             THE COURT:  Yes.  That's okay.  And I know,

24   Mr. McMullen, is that a problem?  Can we go ahead and get any

25   documents?

UNREDACTED TRANSCRIPT

237

1          MR. MCMULLEN:  No, it's not, Your Honor.

2          THE COURT:  Okay.  Well, we'll look forward to

3    that.  That will speed things along.  All of you, thank you

4    all very much.  And Mr. Sample.

5          THE CASE MANAGER:  Yes, Your Honor, the Court

6    stands in adjournment.

7              (Adjournment.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

238

1                          **C E R T I F I C A T E**

2

3

4          I, CANDACE S. COVEY, do hereby certify that the

5     foregoing 238 pages are, to the best of my knowledge, skill

6     and abilities, a true and accurate transcript from my

7     stenotype notes of the Zoom Modification Hearing on the

8     17th day of June, 2020, in the matter of:

9

10

11    ACLU OF TENNESSEE, INC.

12    vs.

13    CITY OF MEMPHIS

14

15    Dated this 24th day of June, 2020.

16

17

18

19                         _____S/Candace S. Covey_____

20                         CANDACE S. COVEY, LCR, RDR, CRR
                           Official Court Reporter
21                         United States District Court
                           Western District of Tennessee
22

23

24

25

                        UNREDACTED TRANSCRIPT