1

1    IN THE UNITED STATES DISTRICT
     FOR THE WESTERN DISTRICT OF TENNESSEE
2                WESTERN DIVISION

3   ================================================

4   ACLU OF TENNESSEE, INC.,

5                Plaintiff,

6   vs.                              No. 2:17-cv-02120-JPM

7   THE CITY OF MEMPHIS,

8                Defendant.

9   _____

10

11                  MODIFICATION HEARING

12       BEFORE THE HONORABLE JON PHIPPS MCCALLA

13            (Via Zoom Videoconference)

14                     Thursday
                  18th of June, 2020
15

16

17

18

19

20

21

22

23            CANDACE S. COVEY, RDR, CRR
24               OFFICIAL REPORTER
             FOURTH FLOOR FEDERAL BUILDING
25            MEMPHIS, TENNESSEE 38103


                UNREDACTED TRANSCRIPT

```
 1              A P P E A R A N C E S

 2

 3        Court-Appointed Monitor/Special Master:

 4              MR. EDWARD L. STANTON, III
                Butler Snow, LLP
                6075 Poplar Avenue
 5              Suite 500
                Memphis, TN 38119
 6              (901) 680-7369

 7              MR. GADSEN WILLIAM PERRY
                MR. JIM LETTEN
 8              Butler Snow, LLP
                201 St. Charles Avenue
 9              Suite 2700
                New Orleans, LA 70170
10              (504) 299-7777

11

12        Appearing on behalf of the Plaintiffs:

13              MR. THOMAS H. CASTELLI
                MS. STELLA YARBROUGH
14              American Civil Liberties Union
                Foundation of Tennessee
15              210 25th Avenue North
                Suite 1000
16              PO Box 120160
                Nashville, TN 37212
17              (615) 320-7142

18

19

20        Appearing on behalf of the Defendant:

21              MR. BRUCE MCMULLEN
                MR. R. MARK GLOVER
                MS. JENNIE V. SILK
22              MS. MARY WU TULLIS
                Baker Donelson Bearman
23              Caldwell & Berkowitz - Memphis
                165 Madison Avenue
24              Suite 2000
                Memphis, TN 38103
25              (901) 577-2356
```

                        UNREDACTED TRANSCRIPT

1                      **W I T N E S S   I N D E X**

2     <u>WITNESS</u>                                        <u>PAGE</u>     <u>LINE</u>

3     EDWARD STANTON, III
              Continued Direct Examination By        10       5
4             Mr. McMullen
              Cross Examination By Mr. Castelli       12       1
5
      JOHN HENEGAN
6             Direct Examination by Mr. Letten        20       5
              Voir Dire Examination By Mr. Glover     33       16
7             Continued Direct Examination by         38       15
              Mr. Letten
8
      MICHAEL RALLINGS
9             Direct Examination By Mr. McMullen      54       6

10    DONALD CROWE
              Direct Examination by Mr. Glover        138      5
11            Cross Examination by Ms. Yarbrough      191      1
              Cross Examination by Mr. Perry          197      3
12            Redirect Examination by Mr. Glover      202      19

13    ERIC DAIGLE
              Direct Examination by Ms. Silk          208      6
14

15

16

17

18

19

20

21

22

23

24

25

                          UNREDACTED TRANSCRIPT

1                        **E X H I B I T   I N D E X**

2    **EXHIBIT NUMBER**                              **PAGE   LINE**

3    13      Memo from Mr. Stanton to City         7      6
             Dated 8/21/19
4
     14      Memo from Ms. Tullis to               7      12
5            Mr. Stanton dated 6/17/20

6    15      Collective Exchange                   8      19

7    16      Curriculum Vitae for Mr. Stanton      9      9

8    17      Withdrawn                             41     18

9    18      Independent Review                    78     8
             Charlottesville, VA Report
10
     19      Order, Judgment and Decree            110    24
11
     20      MPD Policy and Procedures             147    5
12           Body Cam Policy

13   21      Proposed Modified Order,              154    18
             Judgment and Decree
14
     22-ID   MPD Recent Investigations             172    19
15
     23      Report                                209    23
16
     24-ID   NATO Open Source Handbook             232    10
17

18

19

20

21

22

23

24

25

1                      Thursday

2                      June 18, 2020

3          The Zoom Modification hearing in this case began on

4     this date, Thursday, 18th day of June, 2020, at 9:00 a.m.,

5     when and where evidence was introduced and proceedings were

6     had as follows:

7

8                      ----------------------

9

10         THE COURT:  All right.  We were in the

11    examination of the Monitor.  And I want to make sure we have

12    everyone there.  I think I do.

13              Mr. McMullen, I can see you.  Are we ready to

14    proceed?

15              MR. MCMULLEN:  We're ready to proceed, Your

16    Honor.  As a preliminary matter, Defendant's Exhibit 12,

17    13 and the other items that we dealt with that we did not

18    produce, the three e-mails, we would like to move them into

19    evidence.  12 and 13.  And then the RFA that contained the

20    three e-mails, we would like to move them into evidence late

21    after an acceptable redaction by the Court.

22              THE COURT:  That's fine.  And let's make sure.

23    As to 12, I'm going to look at that briefly.  But of course,

24    that's the focus group project, as I understand it.  So let

25    me see 12 just to be sure.  It's -- I marked 12.  So

                    UNREDACTED TRANSCRIPT

6

```
1    Mr. Sample, I'm just going to check them because we did

2    mark -- we want to make sure we have them sequentially

3    correct, and that's what we're checking right now.  So if

4    you'll hand me 12, Mr. Sample.

5                 MR. MCMULLEN:  And it's Defendant's 12, Your

6    Honor.

7                 THE COURT:  Well, there are only court numbers,

8    so once it's introduced, it will bear that number.  But let's

9    make sure we've got the right thing because we had marked

10   as 12 the focus group project.  And so that's already got a

11   number.  And so you'll have to be number -- you'll have a

12   sequential number.  It will be 13 is what I'm saying.

13                So we have what was originally submitted by the

14   City as 12, just to help us with the numbering.  It is now

15   becoming 13, and it starts with memorandum August 21, 2019 to

16   the City of Memphis from the independent Monitor,

17   Mr. Stanton.  I want to make sure we're together on that; is

18   that -- that is correct, right?

19                MR. MCMULLEN:  That is correct.

20                THE COURT:  Okay.  I'm going to hand that to

21   Mr. Sample to make sure.  Mr. Sample, do we have that marked

22   now?

23                THE CASE MANAGER:  We will.

24                THE COURT:  That way we'll have it.  And then

25   let's go to what will be the new 13.  And we'll make sure
```

UNREDACTED TRANSCRIPT

```
 1   we've got that.  And it looks like that may be the -- some of

 2   the June 17, 2020 e-mails, I think it is.  And that had a

 3   redaction, which was going to occur.  And that's the one you

 4   were pointing out you were redacting, right, Mr. McMullen?

 5               MR. MCMULLEN:  Yes, Your Honor.

 6               (WHEREUPON, the above-mentioned document was

 7   marked as Exhibit Number 13.)

 8               THE COURT:  So we will mark the unredacted

 9   version as temporary 14.  That will be temporary 14.  And the

10   redacted version, we will never actually record the

11   unredacted one.  That will be 14.

12               (WHEREUPON, the above-mentioned document was

13   marked as Exhibit Number 14.)

14               THE COURT:  So wait just one second.  I have to

15   make a couple of notes here.  Okay.  We've got new 13 and we

16   have new 14, which of course, I'm going to show is redacted.

17   And I understand we'll get that.  So 14.  And I'm just going

18   to indicate it begins with -- hopefully we've got the correct

19   beginning point, June 17, 2020 for 21.  Ms. Tullis to the

20   Monitor, Mr. Stanton, and it's got other materials.

21               If it's not correct, we'll want some input to get

22   it correct.  Okay.  So I've got 13 and 14, the new 13 and 14.

23   And I'm sorry, Mr. McMullen.  You may have had a 15 there.

24   Let me check on that.  Is there another one that we need?

25               MR. MCMULLEN:  Yes, Your Honor.
```

1          THE COURT:  Okay.  What is our exhibit that's

2    following our new 14, which, of course, was the e-mail?

3          MR. MCMULLEN:  Defendant's 13.

4          THE COURT:  So it will become our 15.  And I just

5    need that one, and we'll make sure we've got it.  And that

6    will be marked -- this is from Wiseman to Mr. Glover,

7    attachments, and it says, "Mr. Stanton asked that I forward

8    you the attached correspondence."  And there was some

9    attached correspondence from Mr. Glover to Mr. Stanton; is

10   that the correct one?

11         MR. MCMULLEN:  Yes, Your Honor.

12         THE COURT:  Of course, it's got attached to it an

13   August 29, 2019 letter from Mr. Stanton to Mr. Glover.  So

14   we're going to put a sticker on that one.  I'm going to

15   reflect that, as I've indicated, collective exhibit.  And it

16   starts with this initial e-mail, Wiseman to Mr. Glover,

17   August 29, 2019.  Okay.  That's a collective.  And that will

18   be our 15.  And then is there another one?

19         (WHEREUPON, the above-mentioned document was

20   marked as Exhibit Number 15.)

21         MR. MCMULLEN:  Yes, Your Honor.  Defendant's

22   Number 20.

23         THE COURT:  Okay.  And that will be become --

24         MR. MCMULLEN:  And we have the redaction to do on

25   that because I think it has some personal phone numbers or

UNREDACTED TRANSCRIPT

9

1   cell numbers on it.

2           THE COURT:  Yes.  And so that will become our 16.

3   And it's partly described.  It has Mr. Stanton's -- it's

4   really a CV, a bio CV for Mr. Stanton; is that correct?

5           MR. MCMULLEN:  That's correct, Your Honor.

6           THE COURT:  Okay.  That's 16.  And we'll put a

7   sticker on that one.  And is there a 17 at this time, or does

8   that cover our initial ones?

9           (WHEREUPON, the above-mentioned document was

10  marked as Exhibit Number 16.)

11          MR. MCMULLEN:  That covers everything, Your

12  Honor.

13          THE COURT:  Perfect.  Absolutely.  And then I'm

14  handed the exhibit as they come up.  So I don't -- I'm trying

15  not to get too much clutter up here.  All right.  I think

16  we're all set then.

17          Mr. McMullen, if you have some additional

18  questions for the Monitor, please proceed.

19

20

21

22

23

24

25

                    UNREDACTED TRANSCRIPT

*TESTIMONY OF EDWARD STANTON, III*                                    10

1                          *  *  *

2                     **EDWARD STANTON, III,**

3    **was called as a witness and having first been duly sworn**

4    **testified as follows:**

5                    <u>CONTINUED DIRECT EXAMINATION</u>

6    <u>QUESTIONS BY MR. MCMULLEN:</u>

7    Q.    Mr. Stanton, you were a part of the mediation between

8    the ACLU and the City; is that correct?

9              THE COURT:  We all know that mediation matters

10   are not admitted, and the rule is clear on that, so if it

11   relates to mediation, we just simply need to be careful about

12   how we approach that.  The statements made by a party during

13   mediation are protected.  Otherwise, people would never talk

14   during mediation, I can assure you of that.  So with that

15   guidance --

16             MR. MCMULLEN:  I understand, Your Honor.  I don't

17   intend to get into --

18             THE COURT:  Sure.

19             MR. MCMULLEN:  -- the substance of what was said

20   in the mediation.

21             THE COURT:  Thank you very much.

22   BY MR. MCMULLEN:

23   Q.    Mr. Stanton --

24   A.    Yes.  Mr. McMullen, yes, I was a part -- I actually

25   served as the mediator for the mediation of the parties in

                         UNREDACTED TRANSCRIPT

*TESTIMONY OF EDWARD STANTON, III*                                    11

1    the last month, yes.

2    Q.      Is it true both parties, everybody spent a lot of

3    hours in the mediation?

4                THE COURT:  It's irrelevant.  It's irrelevant and

5    not the type of thing that's ever allowed in any case.  It

6    would not be persuasive or relevant on any point.  I don't

7    question that everybody worked hard, but it has no

8    evidentiary value in the hearing.  I am concerned that we

9    open -- that there would be an attempt to open a door that

10   the rules clearly exclude.  Wait just one second.  I need...

11               MR. MCMULLEN:  I understand, Your Honor.

12               THE COURT:  Okay.  I think everybody is familiar

13   with the rule on that.

14               MR. MCMULLEN:  Rule 8, Your Honor.

15               THE COURT:  That's exactly right.

16               MR. MCMULLEN:  I understand.  I'll withdraw the

17   question.

18               THE COURT:  Sure.

19               MR. MCMULLEN:  I have no further questions for

20   Mr. Stanton.

21               THE COURT:  No problem.

22               Let's see if there are any questions by ACLU.

23               MR. CASTELLI:  Yes, Your Honor, a couple of

24   questions.  Thomas Castelli for the ACLU.

25                        **CROSS EXAMINATION**

UNREDACTED TRANSCRIPT

*TESTIMONY OF EDWARD STANTON, III*                                          12

1    **QUESTIONS BY MR. CASTELLI:**

2    Q.      Good morning, Mr. Stanton.

3    A.      Good morning.

4    Q.      Can you look at the -- I believe it has now been

5    marked as trial Exhibit 14, which it requires some redaction,

6    so I'm not going to put it up.  But in particular, it's the

7    letter that Mr. McMullen was questioning you about yesterday

8    afternoon regarding this issue surrounding the Memphis

9    Grizzlies and the conversation that was overheard.

10   A.      Yes.

11   Q.      You've got that in front of you?

12   A.      Yes.

13   Q.      I just wanted to clarify.  I got a little confused

14   from the examination yesterday.  Looking at the second page

15   of that letter at the very top, my understanding is that your

16   conclusion was that the information, the receipt of the

17   information did not actually violate Section I.  Can you read

18   that top paragraph and let me know if that is correct.

19   A.      Yes.  The top of page 2?

20   Q.      Yes.

21   A.      Sure.  Paragraph begins, "In my view, MPD's receipt of

22   information shared by Mr. Morris would not violate

23   Section I."

24           MR. CASTELLI:  So this is Exhibit 14, Your Honor.

25           THE COURT:  Yes, sir.

UNREDACTED TRANSCRIPT

*TESTIMONY OF EDWARD STANTON, III*                                                13

1   BY MR. CASTELLI:

2   Q.      Okay.

3   A.      I'll start back in.  "In my view, MPD's receipt of

4   information shared by individual would not violate Section I.

5   This individual did nothing more or less than MPD officers

6   could have done themselves consistent with Section I, had

7   they been sitting at the restaurant instead of this

8   individual."

9   Q.      Thank you.  And so your issue here and the reason you

10  denied the request for authority was Section H of the Decree;

11  is that correct?

12  A.      That's in the next paragraph, yes.  I explained that.

13  Section H which prevents information, to the extent

14  information being shared.  That's correct.

15  Q.      Okay.  And as your --

16          THE COURT:  Come on in, guys.  Tech people are

17  working a little late today.  It's fine that they've arrived.

18  Okay.  Thank you.

19          MR. CASTELLI:  Is the Court ready, Your Honor?

20          THE COURT:  I'm fine.  I was fine but they need

21  permission to approach and correct some tech issues.

22          MR. CASTELLI:  Yes.

23          THE COURT:  We're fine.  Go right ahead.

24  BY MR. CASTELLI:

25  Q.      And to your knowledge, Mr. Stanton, has there been any

1   disruptions at any Grizzly games subsequent to that request

2   for authority?

3   A.    No.  Not to my knowledge.

4   Q.    All right.

5          MR. CASTELLI:  Those are my questions, Your

6   Honor.

7          THE COURT:  All right.  Well, Mr. Stanton, I

8   suppose you get a chance to ask yourself a question or two,

9   if you want to, for further explanation.  Kind of odd but you

10   do.  We've had this come up before.  You don't actually have

11   to pose the question, but is there anything else that you

12   need to add to clarify your testimony?  Not necessary but, of

13   course, there's a mechanism for you to do that.

14          MR. STANTON:  I believe, Your Honor, I would just

15   like to, for point of clarification, the letter that's been

16   referenced of October the 11th that I just read from and some

17   of the other items that was referenced by the City on

18   yesterday, I'd just like -- I think it's worth noting the

19   point that those were all prior to the November 2019 opinion

20   of this Court.  I gave a greater clarification on Section I,

21   H and others of the Consent Decree.  Just so the Court can

22   take note of the time.

23          THE COURT:  Certainly.  And that's absolutely

24   correct.  And it's interesting how this has come up.  It's

25   certainly not necessarily inappropriate to do that.  But once

*TESTIMONY OF EDWARD STANTON, III*                              15

1   there is a ruling of the Court, then that is the answer on

2   certain of these questions.

3            And so the fact that that process, which always

4   takes the time for deliberation occurred is -- and there may

5   have been some discourse before that, is in most respects

6   really not relevant in the case.  I understand there's an

7   argument that might have some relevance, but it has minimal

8   relevance once matters are resolved.

9            But I think that covers that.  And I think that

10  was the point about October 11th and to the degree that

11  October 11th's letter might in any way disagree or be

12  different from or need clarification as a result of the

13  subsequent court order, it's the subsequent court order that

14  is understandably, hopefully for everyone, relevant in the

15  matter.

16           Okay.  Well, anything else then, Mr. Stanton,

17  other than that?

18           MR. STANTON:  No, Your Honor.  I pass the

19  witness.

20           THE COURT:  All right.  Absolutely.  Well, if

21  there's any other question for the Monitor, we can address

22  that at a later point in time.  I think we're ready then.

23           We do have a witness that's waiting for the

24  Monitor.  And I see him -- I see his presence on the screen.

25           Mr. Stanton, are you calling this witness, or is

1   someone else handling this witness?

2          MR. STANTON:  Your Honor, Mr. Jim Letten, the

3   deputy monitor will be handling the next witness.

4          THE COURT:  Okay.  Thank you very much.  We'll

5   let Mr. Letten come forward.

6          MR. LETTEN:  Good morning, sir.

7          THE COURT:  Good morning.  We need to let our

8   witness then come forward.  Who will our next witness be,

9   Mr. Letten?

10          MR. LETTEN:  Yes, Your Honor, may it please the

11   Court.  I think --

12          THE COURT:  I see my witness.  Now we need to let

13   the examining individual be on the screen.  Yes, it looks

14   like you're muted, according to my screen.  So if you'll

15   touch the upper left or right.

16          MR. LETTEN:  Yes, sir.

17          THE COURT:  There you go.  If we get an echo, it

18   usually indicates that there are two instruments that are

19   working simultaneously.  And so we want to make sure that

20   we're only using one.  That's why you get an echo on

21   occasion.  So we're going to try that one more time, and let

22   counsel announce who he will be calling.  I'm going to listen

23   for that.  If we're getting an echo, we'll find the second

24   instrument and disconnect it.

25          MR. LETTEN:  Yes, sir.  Your Honor, I'm having --

UNREDACTED TRANSCRIPT

1   if I could have a minute.  I'm having difficulty because I'm

2   using my telephone camera, my video and also my screen.  So I

3   left the meeting to try and remedy that problem.

4            THE COURT:  And now you're good.  Now you're

5   good.

6            MR. LETTEN:  But I'm having trouble hearing Your

7   Honor.

8            THE COURT:  Well, that's not so bad as long as we

9   can hear you, but can you hear me now?

10            MR. LETTEN:  Excuse me, sir.  Would Your Honor

11   give me just a second so I can reconnect, and I'm trying to

12   fix an audio problem we have.

13            THE COURT:  Please go right ahead.

14            MR. LETTEN:  Thank you, sir.

15            MR. GLOVER:  May it please the Court, just for

16   the court reporter's purpose, I'll go ahead and say this is

17   Mark Glover, who'll be -- rather than Bruce McMullen, I'll be

18   examining on behalf of the City.  Just so the court reporter

19   will have that information when we begin.

20            THE COURT:  I'm just going to check and make sure

21   that Mr. Glover can hear me.  Just to make sure I don't have

22   a mic problem.

23            MR. GLOVER:  Your Honor, I can hear you very

24   well.

25            THE COURT:  Thank you.

UNREDACTED TRANSCRIPT

 1              MR. LETTEN:  Yes, sir.  I'm trying to reopen the

 2   meeting.

 3              THE COURT:  Mr. Henegan, can you hear me okay?

 4              THE WITNESS:  Yes, sir.  Yes, Your Honor, I can.

 5   Thank you very much.

 6              THE COURT:  We're fine.  We're just going to

 7   wait, and we'll get this worked out.

 8              Mr. Sample, how are we doing with our examiner?

 9              THE CASE MANAGER:  He's still unable to

10   communicate directly with us, Your Honor.

11              THE COURT:  Okay.  Can we send him a second

12   invitation?

13              THE CASE MANAGER:  I can do that.

14              THE COURT:  We're going to send a second

15   invitation to our examining attorney, and that's probably

16   going to take care of it.

17              THE CASE MANAGER:  It's been sent, Your Honor.

18              THE COURT:  Okay.  We've sent that second

19   invitation, and hopefully that will help us out there.

20              And we're going to let IT in the back come up

21   close so we can solve the issue up here since I've got a few

22   minutes to take care of that question.

23              We're going to take about a five-minute break

24   because it looks like we need to give a chance for everything

25   to get straightened out.  So I'm going to actually go back to

19

 1    mute, and I will go off video.  And we'll come back in five

 2    minutes and see if we can't get that taken care of.

 3                    (Short break.)

 4                    THE COURT:  All right.  It looks like we do have

 5    everyone here.  And counsel for, of course, the Monitor's

 6    team, we'll let you call your next witness, and we're going

 7    to get our witness sworn in.

 8                    MR. LETTEN:  Thank you, sir.  And once again,

 9    thank you for the Court's indulgence in taking care of that

10    technical problem.

11                    THE COURT:  Glad to.

12                    MR. LETTEN:  The monitoring team would call to

13    the witnesses stand expert witness John Henegan.

14                    THE COURT:  Okay.  Mr. Henegan, if you'll raise

15    your right hand, Mr. Sample is going to administer the oath.

16

17

18

19

20

21

22

23

24

25

                          UNREDACTED TRANSCRIPT

1                          *   *   *

2                         **JOHN HENEGAN,**

3   **was called as a witness and having first been duly sworn**

4   **testified as follows:**

5                    **DIRECT EXAMINATION**

6   **QUESTIONS BY MR. LETTEN:**

7   Q.      Mr. Henegan, would you please state and spell your

8   name for the record, please.

9   A.      My name is John Clark Henegan.  My last name is

10  spelled H-E-N-E-G-A-N.

11  Q.      Thank you, sir.

12              THE COURT:  How do you spell Clark?

13              THE WITNESS:  C-L-A-R-K.

14              THE COURT:  Okay.  Sometimes it has an e on it.

15  How do you spell John?

16              THE WITNESS:  J-O-H-N.

17              THE COURT:  And of course, I spell it

18  differently, so that's the reason we ask everybody to spell

19  their full name.

20              THE WITNESS:  Yes, Your Honor.

21              THE COURT:  No problem.  Counsel may proceed.

22              MR. LETTEN:  Thank you, sir.

23  BY MR. LETTEN:

24  Q.      Mr. Henegan, what's your profession?  How are you

25  employed presently?

                    UNREDACTED TRANSCRIPT

1  A.      I'm an attorney.

2  Q.      And you're employed with the Butler Snow firm, Butler

3  Snow LLP?

4  A.      Yes.

5  Q.      All right.  Thank you, sir.  Can you tell us where you

6  were born and where you were raised, Mr. Henegan?

7  A.      I was born in Mobile, Alabama in 1950.  I was raised

8  -- my first memories are -- I was raised in Memphis,

9  Tennessee from the time that I was 2 until the time that I

10 was 12.  My mother died then, and I moved to McComb,

11 Mississippi and lived with my aunt, who is my mother's oldest

12 sister and -- my aunt and uncle.  And I lived there until I

13 graduated from high school.

14       And then after that, I returned to McComb one summer

15 and have lived at different places, primarily Jackson,

16 Mississippi, New York City, Washington -- actually Arlington,

17 Virginia and then back to Jackson, Mississippi.

18 Q.      Can you tell us where you went to undergrad?

19 A.      I went to the University of Mississippi.  I enrolled

20 there in the fall of 1968.  And I graduated in the spring of

21 1972 with a degree, a bachelor of arts degree, a double major

22 in English and philosophy.

23 Q.      And did you go to law school immediately thereafter,

24 sir?

25 A.      No.  I actually sat out a year and got married.  I

1   worked for about six months, and then my wife and I went to

2   Europe for four months and then returned to the United States

3   in May and enrolled in law school at the University of

4   Mississippi Law Center.  That's the technical name of it.

5   But the University of Mississippi law school in the summer of

6   1973.  And I graduated in May of 1976 from the University of

7   Mississippi Law Center.

8   Q.      So when you got your juris doctorate, did you graduate

9   with honors, sir?

10  A.      I did.  I was second in my class, and I was editor in

11  chief of the law journal.

12  Q.      During your time in law school when you were editor in

13  chief of the Mississippi Law Journal, can you tell us a

14  little bit about the case notes, comments, articles you wrote

15  about, the subject matter of those?

16  A.      My -- you had to write on to be a member of the law

17  journal at that time.  And my case note was on a Alabama case

18  that addressed the-- Alabama federal district court case

19  that addressed the First Amendment right to gather the news,

20  which was a novel concept at that time.  And that case note

21  was accepted, and it was published in the Mississippi Law

22  Journal.

23          My other publication while I was on the journal was a

24  comment, which was called a comment, written by students

25  which was required before we could get credit for having

1  worked on the law journal.  And that addressed the comment --

2  excuse me -- the rights of minority shareholders in a closely

3  held corporation.  It did not relate to the First Amendment.

4  There were comments written by students that we edited in

5  different capacities of research done that addressed First

6  Amendment issues that were pertinent and going on in

7  Mississippi at the time.

8  Q.    So it's fair to say that your deep interest in the

9  First Amendment was rooted in law school; is that correct?

10  A.    Well, it actually began before that.  And I think I

11  mentioned that the first time that I was on the stand with

12  the Court in this case.  Actually, when I was in

13  undergraduate school, I was the -- I was an officer and a

14  contributor to a magazine called Images.  And the chancellor

15  of Mississippi, after the magazine was printed and was about

16  to be mailed, refused to allow the magazine to be published.

17  And the students who were on the board of the magazine for

18  Images, we went to the Northeast Mississippi Rural Legal

19  Services, and we filed a suit asking -- against the

20  University of Mississippi, asking that the magazine be

21  published.  So that was really my first interest in these

22  issues.

23  Q.    All right, sir.  Now, let's go right into your

24  practice after you graduated from law school.  Tell us about

25  your brief couple of positions that you held as a

1   practitioner right out of law school.

2   A.      Well, immediately out of law school, I was a law

3   clerk, judicial law clerk, to Honorable Charles Clark, who is

4   a circuit judge on the United States Court of Appeals for the

5   Fifth Circuit.  And he lived in Jackson, so the clerks, at

6   least back then, lived in the same city that the judge they

7   clerked for lived.  And so I returned to Jackson,

8   Mississippi, and we lived in Jackson for a year, from August

9   of 1976 until August of 1977.  And as I said, I clerked for

10  Judge Clark for one year.

11  Q.      And after that, sir, where did your practice take you?

12  Did you leave the south for a while?

13  A.      I did.  In October of 1977 I joined a law firm in New

14  York City and was admitted -- took and was admitted to the

15  New York bar, and I worked in New York City for two years.

16  And then I went to their Washington, D.C. office and worked

17  there for about a year and a half with the same law firm.

18          And in that regard, the work -- the subject matter

19  area, I primarily worked for three or four clients, all who

20  were in the telecommunications industry.  And there were

21  different components of First Amendment issues that arose

22  during that representation.  And just to -- one was the

23  Noerr-Pennington doctrine, the right to petition the

24  Government.  And another one was the compelled speech

25  doctrine.

1   Q.     Now, after that, did you find yourself in government

2   service, specifically working for the governor of

3   Mississippi?

4   A.     Yes.  In February of 1981, late February, I think it's

5   February the 20th, is when I went on the payroll.  I began

6   working for the Honorable William F. Winter, who was the

7   governor of Mississippi.  My wife and I moved from Arlington,

8   Virginia, and we returned to Jackson, Mississippi.  And I

9   became the governor's chief of staff.

10  Q.     All right, sir.  Did that involve any -- did the

11  public service involve anything involving or touching or

12  intersecting with First Amendment or other issues involving

13  communications law?

14  A.     It involved policy making.  It involved drafting

15  legislation.  It involved dealing, working with the

16  legislature with respect to legislation that addressed a wide

17  subject matter.  Possibly -- it also involved giving

18  recommendations to the governor about whether certain bills

19  implicated First Amendment issues, whether it be approved or

20  not.  And that -- specifically that was a liquor advertising

21  deal that the legislature had passed.

22         And another example of some legislation that I worked

23  on was that during his administration, the Mississippi Public

24  Records Act of 1983 was adopted, and I worked on revisions to

25  that legislation and then with both houses of the legislature

*TESTIMONY OF JOHN HENEGAN*                                    26

1    in that being adopted.

2    Q.      All right, sir.  Mr. Henegan, when did you start with

3    Butler Snow, the firm you're practicing with right now?

4    A.      On January 1 of 1984.  And I continuously -- I

5    apologize -- but I've been continuously employed with Butler

6    Snow, LLC since that time.  It was originally Butler, Snow,

7    O'Mara, Stevens & Cannada, and it was a partnership.  And

8    then as most firms have done, we shortened the name and

9    changed to a limited liability company.  And I was a partner

10   in that firm, and then became a member when we had the

11   transition to our present organization and present name.

12   Q.      Can you tell the Court just a little bit about how you

13   hit the ground running in 1984 in terms of the nature of your

14   practice there and whether you were involved with the media

15   companies and other types of publishing groups?

16   A.      I became immediately involved in representing the

17   media, the largest newspaper in Mississippi with respect to

18   open meetings and public records legislation, became

19   defending and participating in defending different newspapers

20   in defamation and privacy actions.  The -- began advising the

21   Mississippi Press Association, members of the Mississippi

22   Press Association on First Amendment-related issues of just a

23   wide variety.

24           And over the course of time, acquired new clients who

25   were sued in the state of Mississippi for defamation or

UNREDACTED TRANSCRIPT

```
 1   invasion of privacy.  These were national book publishers,
 2   national magazines.  I became a member of the Media Law
 3   Resource Center.  I believe that was in 19 -- the first
 4   meeting that they held that I attended was in 1984, in the
 5   fall of 1984.  And every year since then, with the exception
 6   of about maybe five years, I've met with the defense counsel
 7   section of that organization and participated in seminars and
 8   meetings that we've had.  As I say, every year except maybe
 9   about five.  And usually when I didn't make those years, that
10   was because of either an illness or because of a trial
11   conflict.
12   Q.     So sir, going back and looking at your practice to
13   today over the years, has your practice in First Amendment
14   and related law resulted in your routinely publishing
15   articles and making presentations, doing workshops, in
16   essence, all over the United States?
17   A.     I have done a couple of workshops outside Mississippi,
18   which they were national workshops in privacy and defamation.
19   Most of the workshops I've been -- that I've done have been
20   in the state of Mississippi.  And they've been either on
21   behalf of the Mississippi Press Association at different
22   locations in the state of Mississippi, or they have been
23   cosponsored with organizations such as the University of
24   Mississippi School of Journalism, which I think was the most
25   recent one that I've participated in.  That may have been
```

UNREDACTED TRANSCRIPT

1    last year.  I don't remember whether it was 2018 or 2019.

2           With respect to publications, I routinely publish

3    articles that are in the Fourth Estate, which is the

4    Mississippi Press Association quarterly newsletter.  And I am

5    asked to publish by the executive director about certain

6    topics that are of interest to the members.  And these

7    articles are not only directed to the news side of the house,

8    but they're directed to the business side of the house.

9           And with respect to advertisements that are being

10   published that are received from customers and with respect

11   to campaign ads that might be published, they're being

12   submitted for publication.  And there are different state

13   campaign laws that apply to the rights and obligations of

14   newspapers in publishing those kind of ads, so I give legal

15   advice about that.

16          I give legal advice to the reporters, to the editors,

17   to reporters who are covering the news, to reporters who are

18   going on crime scenes and trying to take information related

19   to what's happening at a crime scene.  Or just the whole --

20   reporters who are appearing in court, who are confronted with

21   prior restraint issues.  So that's the legal advice side.

22          I think I've strayed a little bit from the

23   publications.  I do want to mention we have a hotline for the

24   Mississippi Press Association, and any member of the Press

25   Association can call in to our hotline.  It's -- the initial

1   communication is by an e-mail, and they send us materials

2   that they want to get legal advice on and ask that they give

3   us a deadline.  And we try to get -- we generally get back

4   with them within four hours.  Sometimes it may take 24 hours.

5          So the other publication that I have done is with the

6   Media Law Resource Center in New York City.  In 1988 they

7   selected me to be the author of the Mississippi section on

8   the law of defamation.  And I have -- that has been published

9   on an annual basis, is updated every year and has been

10  published every year since 1988 through the present.

11  Q.     All right.  Mr. Henegan, perhaps my last question in

12  this series of questions, I think, and for the Court, have

13  you been involved in the enforcement of consent decrees prior

14  to your engagement here?

15  A.     Yes.  And I believe I mentioned this the prior time

16  that I was on the stand, but in connection with representing

17  different media clients in Mississippi, I have in connection

18  with filing open meetings lawsuits and public record

19  lawsuits.  I have obtained consent decrees on behalf of

20  different newspapers in different parts of the state.  So I

21  have actually participated in the drafting of consent decrees

22  and the approval process that's necessary with the Court in

23  that area.

24  Q.     Thank you, sir.  Now, are you testifying here today as

25  a member of the monitoring team specifically as the subject

UNREDACTED TRANSCRIPT

1   matter expert in constitutional First Amendment issues?

2   A.      Yes, I am.

3   Q.      And have you been in that capacity as subject matter

4   expert since December of 2018 when the Monitor and the team

5   was appointed by His Honor?

6   A.      Yes.

7   Q.      Now, as the Monitor's First Amendment subject matter

8   expert for the team, are you prepared to render an expert

9   opinion on and address the City's and MPD's proposed changes

10  that are set forth in a couple of documents?  One of which is

11  the joint notice.

12              MR. LETTEN:  Which, I believe, Your Honor, is in

13  the record.  It is MT Demonstrative F, as in foxtrot.

14  BY MR. LETTEN:

15  Q.      Is that correct, sir?

16  A.      Yes.

17  Q.      And also three proposed definitions, which you're

18  going to testify about and the proposed modified order.

19              MR. LETTEN:  Which, I believe is, for the record,

20  Your Honor, that's a demonstrative also.  That's

21  MT Demonstrative G, as in golf.

22  BY MR. LETTEN:

23  Q.      Is that right, sir?

24  A.      Yes.

25              THE COURT:  Demonstratives should be marked as

 1   exhibits and submitted, and so we need to do that.

 2                   MR. LETTEN:  Yes, sir.  These are -- even though

 3   they're part of the record, we would offer these, Your Honor,

 4   and move these, with this Court's permission.

 5                   THE COURT:  Right.  We just need to make sure

 6   that we have them as part of the hearing record, and so I'll

 7   let you figure that out.

 8                   MR. LETTEN:  Yes, sir.  Thank you, sir.

 9                   THE COURT:  If you have a reference to a

10   particular document and a page ID number, then we can pull

11   those and mark them.  Just keep that in mind.  You may want

12   somebody working on that while we go ahead.

13                   MR. LETTEN:  Yes, sir.

14   BY MR. LETTEN:

15   Q.      Now, Mr. Henegan, I'll refer you to the joint notice

16   of filing, which is Consent Decree Demonstrative F, which

17   I've just mentioned.  I don't know if we need to pull that up

18   just yet.  But in your role, the question about in your role

19   as First Amendment expert, will you be offering your opinion

20   with regard to 17 proposed changes, which are summarized in

21   that document, in that joint notice?

22   A.      Yes, I will.

23                   THE COURT:  Right.  And you're referring to

24   Document 327 in the record, which begins at page ID 9951; is

25   that correct?

                        UNREDACTED TRANSCRIPT

 1              MR. LETTEN:  Yes, sir, that is, Your Honor.

 2  That's Document ECF Document 327.  That's correct, sir.

 3              THE COURT:  Right.  Exactly.  And we just need to

 4  make sure that everybody can find that.  Sure.  Go ahead.

 5              MR. LETTEN:  Yes, sir.

 6  BY MR. LETTEN:

 7  Q.      And also, sir, will that testimony also include your

 8  opinions on the parties' joint submission, that includes some

 9  items that the parties were not able to agree upon to-date?

10  A.      Yes.

11  Q.      All right.  Did you also consider additional

12  submissions in the proposed modified Consent Decree beyond

13  those?  Specifically, sir, did you consider and will you

14  testify about three of the new proposed definitions in

15  Section B, as in bravo, of the Decree and which are used and

16  thus incorporated by reference in remaining provisions, which

17  we'll talk about?

18  A.      Yes, I will.

19  Q.      First, sir, let's get into the definitions, if we

20  will.  I'd like to refer you to --

21              MR. GLOVER:  Your Honor, at this point -- excuse

22  me for my interruption.  I'd like to make an objection, if I

23  may, respectfully, and a motion.  And it is basically this.

24  While -- and I say this with all due respect.  I believe

25  Mr. Henegan to be an outstanding lawyer, and he is by

1    reputation.  The groundwork laid for his testimony was that

2    he is a lawyer who practices in First Amendment areas, not

3    necessarily --

4              THE COURT:  Excuse me.  Do you wish to conduct

5    voir dire?

6              MR. GLOVER:  I would like to conduct voir dire.

7              THE COURT:  I think that's probably the thing to

8    do.  And counsel actually should have probably tendered him,

9    and then we should allow you to have voir dire.

10             MR. GLOVER:  Thank you, Your Honor.

11             THE COURT:  So let's do that.

12             MR. GLOVER:  Thank you, Your Honor.

13             THE COURT:  Sure.  Of course, that's -- go right

14   ahead, Mr. Glover.  Absolutely, you're entitled to make

15   inquiry.

16                    **VOIR DIRE EXAMINATION**

17   **QUESTIONS BY MR. GLOVER:**

18   Q.    Have you ever worked as an expert who's offered expert

19   testimony in a court of record on a First Amendment issue?

20   A.    I have never been a forensic witness on that subject

21   matter.

22   Q.    Has any court of record ever recognized you as a

23   witness with expertise which qualified you to give First

24   Amendment law opinions?

25   A.    I have never been retained as a forensic witness to

1    offer expert testimony in that area, and so the answer is no.

2    Q.     All right, sir.  You are familiar as a practicing

3    lawyer with the rules about the expert witness role and

4    limitation in offering legal opinions as opposed to opinions

5    that are related to technical, scientific or experiential

6    matters that are outside the province of the normal court.

7    In other words, the prohibition on giving legal opinions as

8    an expert opinion?

9    A.     I'm not sure what you're referring to.  I'm familiar

10   with Daubert, and I'm familiar with the rules, the Federal

11   Rules of Evidence related to, you know, 702 and 703.  I do

12   think I have specialized knowledge in this area.  And I do

13   think that I've used a methodology that's appropriate for

14   examining the proposed language in the Consent Decree and

15   providing opinions that might be of value to the Court in

16   connection with the issues that are before the Court.  I was

17   not asked to prepare an expert report in connection with this

18   litigation.  I don't know if that's responsive to your

19   questions.

20   Q.     It is in part, but I guess my question is -- and I'm

21   trying to understand how you intend to testify because

22   perhaps I may have misunderstood.  But you're familiar and

23   agree with the concept that because the Judge's special

24   knowledge on the law is presumed to be sufficient.  A

25   witness, either a lay witness or an attorney, do you agree,

*TESTIMONY OF JOHN HENEGAN*                                                35

1   is not normally allowed to give opinions on what the law is

2   or what the Judge ought to decide in a case?

3   A.      I'm certainly not going to suggest to Judge McCalla

4   how he should decide this case.

5   Q.      But you understand that the ultimate issue in this

6   case and which depends on this motion is whether or not

7   proposed modifications should be allowed and then whether the

8   particular modifications are appropriate or should be

9   different.  And you would agree that that's something that

10  Judge McCalla is capable of reviewing and looking at, do you

11  not?

12  A.      Yes, absolutely.

13  Q.      Do you claim to have any additional legal knowledge

14  with regard to the language of this Consent Decree or of the

15  First Amendment generally that is greater than what you think

16  the Court already has and would aid the Court in that way?

17          MR. LETTEN:  Your Honor, I'm going to object to

18  the form of that question on the basis of the counsel's

19  assertion that the witness believes that he has knowledge

20  beyond that which the Court has, and that's never been

21  suggested.  That is not contemplated under Rule 702 or 703.

22          This witness is simply being tendered as an

23  expert in the First Amendment and First Amendment law, and we

24  expect to elicit from this witness, respectfully, Your Honor,

25  his reactions to and his opinions about certain proposals and

UNREDACTED TRANSCRIPT

1    whether or not those comport with his understanding of the

2    First Amendment.  He will never purport to opine on what the

3    ultimate Court's decision should be in this matter.  And so I

4    just want the record to be clear on that.

5            THE COURT:  Well, I think that is clear.  I don't

6    think that Mr. Glover is indicating that that's the problem.

7            Go ahead, Mr. Glover.

8            MR. GLOVER:  Thank you, Your Honor.  I'm sorry.

9    On this video, and I apologize, if I ever talk over the

10   Court, I apologize, it's because of my inarticulate ability

11   to deal with the video as opposed to intending to be rude.

12   And so I apologize that I just did that.

13           But what I -- and I understand the objection and,

14   in fact, I am not seeking that.  I am trying to determine

15   what opinions this witness has by virtue of his expertise

16   that can reasonably be viewed to assist the Court in reaching

17   the determination it has to have.  In my assertion is that,

18   if it is nothing more than what the Court already knows, as a

19   constitutional law scholar, then it's really lawyer argument

20   coming from a witness now.

21           THE COURT:  I understand what you're saying.  And

22   of course, everybody is familiar with the fact that

23   generally, what Mr. Glover says is correct.  At the same

24   time, the Monitor's team did have available Mr. Henegan as it

25   proceeded through certain analogies.  And in that sense, it

1    may be helpful to understand the team's perspective.

2              Of course, I agree with you that the Court will

3    decide this.  And the Court has a fair amount of experience

4    in the First Amendment -- a lot of experience in the First

5    Amendment area.  And with all due deference to Mr. Henegan, I

6    don't think he even believes at all that we will be making a

7    decision based on his presentation as to what the law is in

8    this area.

9              Now, I think it does help the Court to understand

10   the role that Mr. Henegan played with the team.  And I think

11   that we have broad discretion.  This is not a jury trial.  I

12   understand the objection.  And basically, we're dealing with

13   the 700 series of rules, dealing with 703 and the basis of

14   the opinion in part.  We're also dealing with a complex

15   relationship in terms of team analysis.  That is of some

16   interest to the Court.  Not that it's going to affect the

17   Court's ultimate determination in terms of certain legal

18   issues.

19             So what I'm going to do is I'm going to allow the

20   inquiry.  We can give it what weight that we need to give it,

21   understanding the limitations in this system.  In other

22   systems where we have issues of foreign law, we are allowed

23   to receive declarations, as the law of England or France or

24   Germany or Japan or China.  This is not that situation.  And

25   I think that, Mr. Letten, you understand that, right?

*TESTIMONY OF JOHN HENEGAN*                                              38

1          MR. LETTEN:  Yes, sir.

2          THE COURT:  Okay.  I'm not exactly sure -- I'm

3    going to let you go ahead because there may be issues that

4    you want to cover.  And I think it relates to analysis as to

5    the proposed modifications; is that right?

6          MR. LETTEN:  That's precisely correct, sir.

7          THE COURT:  Okay.  Well, I understand that.  And

8    I also agree with Mr. Glover that the Court will make the

9    ultimate decisions here.  But it's really a different

10   question, and I'm going to let you pursue it.

11         MR. LETTEN:  Thank you, sir.  So with that, we'll

12   have tendered the witness as an expert.  And with the Court's

13   permission, we will proceed.  Thank you, sir.

14         THE COURT:  All right.

15                 **CONTINUED DIRECT EXAMINATION**

16   **QUESTIONS BY MR. LETTEN:**

17   Q.    Mr. Henegan, first, sir, I'll, in my next series of

18   questions, I'm going to refer to three of the definitions

19   which have been proposed, and we'll talk about those in which

20   the Monitor and you as First Amendment expert have done an

21   analysis of and considered.  So I'll ask you to examine an

22   exhibit.

23         MR. LETTEN:  And if our tech folks will pull up

24   Exhibit MT Demonstrative Exhibit G, as in golf, which is

25   originally ECF 327-1.

1          THE COURT:  Sure.

2          MR. LETTEN:  You can pull that up.  All right,

3   sir.

4          Your Honor, this has been made available to the

5   parties.  This has actually, it has been submitted by the

6   parties.

7   BY MR. LETTEN:

8   Q.     Sir, do you recognize this document, Mr. Henegan?

9   A.     I do.

10  Q.     Did you have a chance to examine this document?

11  A.     I did.

12  Q.     This document, is it not, sir, the proposed modified

13  order judgment and Decree submitted by the parties in this

14  matter with its proposed edits and changes to, that the

15  parties suggest the Court accept and make to the Consent

16  Decree, the existing Kendrick Consent Decree; is that

17  correct, sir?

18  A.     Yes, it is.

19  Q.     Now, this document, just for the record --

20         THE COURT:  And this is actually previously

21  marked as Exhibit 6 in the proceeding.  It should be referred

22  to in that way.

23         MR. LETTEN:  Okay.  Exhibit 6.  All right.

24  BY MR. LETTEN:

25  Q.     Now, Mr. Henegan, having done an analysis of the

                    UNREDACTED TRANSCRIPT

1   proposals in that document, that's what we call the clean

2   document.  Did you have occasion to use that as a basis, that

3   very document, that very Exhibit Number 6 and in essence

4   commit to it your, in some instances, where there are

5   proposals, your analysis, your opinions, as a First Amendment

6   expert, and in some cases, suggestions or proposed

7   modifications?

8   A.      Yes, I did.

9   Q.      All right, sir.

10           MR. LETTEN:  I will now and I'll ask our tech

11  folks to pull up a document that has not been admitted yet.

12           I believe that the numbers we've been given by

13  the Court, Your Honor, are MT trial Exhibit 10.  This is --

14           THE COURT:  I'm going to be really clear about

15  this.

16           MR. LETTEN:  Yes, Your Honor.

17           THE COURT:  It doesn't matter what numbers you

18  put on them.  It's the numbers that the Court is using

19  because the record will be indecipherable and confusing.

20           MR. LETTEN:  Yes, sir.

21           THE COURT:  So this is Exhibit 6 in the

22  proceeding, I believe.

23           MR. LETTEN:  If I may get clarification, Your

24  Honor, Exhibit 6 is the one we just did.  This is actually

25  one that's been modified by Mr. Henegan that we would like to

*TESTIMONY OF JOHN HENEGAN*                                              41

1   use separately, if Your Honor would allow it.

2           THE COURT:  That will be the next numbered

3   exhibit.  That's fine.  We just have to keep an orderly

4   process.  And this will be modified, and I want to make sure

5   it's not already marked.  And that will become Exhibit 17.

6   Otherwise somebody --

7           MR. LETTEN:  Will you repeat that?  I've got to

8   get the number.

9           THE COURT:  17.

10          MR. LETTEN:  17.

11          THE COURT:  Okay.  That's fine.  It's just very

12  helpful to keep them in sequential order.

13          MR. LETTEN:  Yes, sir.

14          THE COURT:  And we'll mark that one.

15          MR. LETTEN:  Thank you, Your Honor.

16          THE COURT:  Oh, no problem.  We're going to mark

17  that, Mr. Sample, as 17.

18          (WHEREUPON, the above-mentioned document was

19  marked as Exhibit Number 17.)

20  BY MR. LETTEN:

21  Q.    With the Court's permission, will you examine this

22  document and tell me if you are familiar with it.

23  A.    Yes, I am.  This is a copy of 327-1 that was filed by

24  the parties on the dates there on June the 8th, 2020.  And I

25  took that copy and made proposed modifications or that are in

*TESTIMONY OF JOHN HENEGAN*                                        42

1   track changes in blue.  And they appear in the document

2   wherever there were matters that -- I was asked to look at

3   this from a First Amendment perspective.  And those

4   modifications are inserted and included in the document.  And

5   --

6   Q.     All right, sir.  I'm sorry.  Go ahead.

7   A.     And where I expressed concerns about the language, I

8   tried to express the basis for the concerns in a summary way,

9   and then in certain instances, I suggested proposed

10  alternatives to what appeared in the document, and those

11  appear in the document as well.

12  Q.     All right, sir.  Now, is it fair to say that the

13  observations which you have noted in the document --

14              MR. LETTEN:  By the way, Your Honor, this

15  document has been previously provided to the parties, to

16  counsel.

17              THE COURT:  Right.  Right.

18  BY MR. LETTEN:

19  Q.     Those notations are based upon your First Amendment

20  knowledge, and those notations are the result of and

21  consisting of simply First Amendment analysis with your, in

22  some cases, your suggestions having to do with alternative

23  drafting suggestions, not legal conclusions; is that correct,

24  sir?

25  A.     That's correct.  Let me say this for the Court.  I

UNREDACTED TRANSCRIPT

1   hope that this will be helpful.  In connection with preparing

2   this, I viewed, of course, the original Consent Decree.  I

3   viewed the orders of the Court.  Not only viewed them but I

4   studied them.  Orders 120, 150, 152, 250, 305.

5          I viewed the joint prehearing briefs submitted both by

6   the ACLU and by the City of Memphis.  I also viewed the

7   document that is -- I'm sorry -- I don't recall what the

8   number of it is, but it's Document 327.  It's filed in the

9   record, which was that joint notice, which had the 17

10  proposals in it.  And then I reviewed the proposed modified

11  Decree submitted by the parties jointly, that was 327-1.

12  Q.     All right, sir.

13         MR. LETTEN:  And with that, Your Honor, I have --

14  I'm sorry.

15         MR. GLOVER:  I'm sorry.  I have an objection that

16  I'd like to just renew, but having heard more foundation, I

17  think it may now be a separate motion.  The process that the

18  witness has described is precisely the Court's province.  To

19  review the various documents, to look at the First Amendment

20  and then to give a ruling on what is and isn't appropriate

21  and what should be done.

22         And this witness has testified that what he has

23  done and what he has looked at is exactly the province of the

24  Court, except he's doing it without the benefit that the

25  Court has of all the testimony from the trial and the prior

*TESTIMONY OF JOHN HENEGAN*                                                44

1  involvement in the case.  So I just renew my objection to the

2  tender of his evidence that's now in this Exhibit 17 and any

3  oral testimony he may give about it.

4           MR. LETTEN:  Your Honor, the Monitor is prepared

5  to respond unless the Court is prepared to rule.

6           THE COURT:  No.  Go ahead and respond.

7           MR. LETTEN:  Your Honor, this witness was

8  appointed by this Court as part of the monitoring team to

9  augment the Monitor's mission and the Monitor's very mission,

10  Your Honor, in a matter that solely involves the protection

11  of the First Amendment of the Constitution of the United

12  States.  This mission is -- can only be carried out by the

13  Monitor by virtue of having the benefit of an expert in First

14  Amendment, not just First Amendment law, but in the First

15  Amendment in all of its aspects.

16           In this case, Your Honor, the Monitor can only

17  advise this Court as the eyes and ears of this Court

18  regarding suggestions, modifications made by one or the other

19  party or in some cases both, with the benefit of someone like

20  Mr. Henegan who understands intimately the First Amendment,

21  its history, its application.

22           In this case, Your Honor, without the benefit of

23  the impressions of a First Amendment expert or these

24  submissions by the parties, the Monitor would be virtually

25  unable to carry out his mission with the Court of being the

1    eyes and ears of the Court and advising the Court of some of

2    the either the criticisms of some of the proposed changes.

3    Perhaps suggested other changes, in some cases agreeing with

4    those, which, of course, is the case with some of these.  And

5    simply providing an opinion about both the efficacy and

6    appropriateness of some of those.  And maybe in some cases

7    how some of these things can be done maybe a little bit

8    better.  A little bit more comporting with the First

9    Amendment.

10            And so we believe this is not just appropriate,

11   but this is imminently appropriate.  And this work product is

12   tantamount to an expert's report.

13            THE COURT:  Well, the fact is that Mr. Glover has

14   the better argument here.  The Court, with all due respect,

15   does not rely on individuals who are not advocates in the

16   case and filing briefs to determine what the law is in this

17   area.  Doesn't want to sound like courts don't listen.  We

18   do, but normally in the adversarial process, the information

19   and the argument comes from the parties and not from an

20   expert submitting this type of information.

21            Now, what we're going to do, and it's just --

22   this is a little awkward.  I will tell you that if we had a

23   jury, I would exclude the witness because it would be

24   confusing under 403, and it would be an inappropriate

25   submittal of a method for resolution of legal matters to the

*TESTIMONY OF JOHN HENEGAN*                                                    46

1   jury.  The Court is not unaware of those limitations and is

2   not going to be influenced in any inappropriate way by

3   letting this record be developed.

4           I was somewhat interested in how the Monitor

5   reached the Monitor's conclusions, and this might shed some

6   light in that regard.  However, I agree that Mr. Glover's

7   position is the correct one in terms of analysis.  But

8   because of the posture of the case and because frankly, the

9   Court would like to have a complete record as opposed to

10  having proffers submitted, I think we should allow the

11  testimony to be developed and let Mr. Glover have an

12  opportunity to cross examine, if he wishes to do so.

13          So with that understanding, I'm going to allow

14  you to go ahead and complete the record on this issue.  But I

15  hope I've been clear that the objection raised by the City in

16  this circumstance is certainly an appropriate objection.

17          So Mr. Glover, I think we ought to complete the

18  record here, in case there's ever some issue about that.  But

19  other than that, I don't know that there's another purpose in

20  this matter.

21          Mr. Glover, anything else from you on this point?

22          MR. GLOVER:  I think I understand Your Honor's

23  ruling, and I understand it's not exactly in the nature of an

24  offer of proof but a similar kind of situation.

25          THE COURT:  Correct.

1              MR. GLOVER:  But rather than interrupt anymore,

2    I'd like to just have a standing objection to -- because Your

3    Honor knows when a witness is offering legal analysis and

4    when he isn't.  And I don't want to interrupt the record by

5    each time he gives an opinion making the same objection.  So

6    I will do that if I need to, but may I have a standing

7    objection to all the testimony about what the law provides

8    these sections should do?

9              THE COURT:  You may.  And essentially you have

10   prevailed on your motion, but we're completing the record.

11   That's the Court's view on that.

12             MR. GLOVER:  Thank you.

13             THE COURT:  Certainly.  So we're going to handle

14   it in that way.

15             Counsel may proceed.

16             MR. STANTON:  Your Honor, if I may and I

17   apologize as the Monitor.  If I may, Your Honor, I hear the

18   Court loudly and clearly, and I believe that this is -- I

19   know we're maybe 15 minutes or so off of our first break, but

20   I believe this is something in the interest of time that we

21   can clear up if we have just a few moments, five minutes or

22   at our next break, Your Honor, with regard to proceeding.

23             THE COURT:  Well, I tell you what.  Let's take a

24   15 regular break, 15-minute regular break at this time for

25   the morning.  In fact, we'll make it -- add three minutes to

*TESTIMONY OF JOHN HENEGAN*                                        48

1    that, so it will be an 18-minute break, and we'll come back

2    at 25 until the hour.  And that may be time well spent.

3              So this is our morning break at this time.  And I

4    think we will -- I'm going to disconnect, not leave the

5    event, but I'm going to put it on mute and disconnect the

6    video.  So 17 minutes from now, we'll revisualize everyone.

7    Thank you.

8              (Short break.)

9              THE COURT:  All right.  We have everybody back.

10   We've had a break.  And we'll go back to Mr. Letten, and

11   Mr. Letten, where are we on this matter?

12             MR. LETTEN:  (No verbal response.)

13             MR. STANTON:  I'm sorry, Judge McCalla.  We

14   couldn't hear you.  Can you hear me?

15             THE COURT:  Let me check and see, Mr. Castelli.

16   Can you hear me, Mr. Castelli?

17             MR. CASTELLI:  (No verbal response.)

18             MR. GLOVER:  The City is unable to hear you

19   either.

20             THE COURT:  I am not on mute.  Okay.  Mr. Sample,

21   I'm going to disconnect and connect again.  I just

22   disconnected and reconnected.  Did that work?

23             MR. LETTEN:  Yes.  It's showing Judge McCalla is

24   unmuted.

25             THE COURT:  Well, obviously, we need to get that

1   fixed.  Where's our person here from IT?

2              THE CASE MANAGER:  You should be unmuted now,

3   Judge.

4              THE COURT:  We're going to try one more time.

5   Mr. Castelli?  No, they cannot hear.  One more time.  Going

6   to try that.  No, Mr. Castelli, we're not getting through.

7              THE CASE MANAGER:  I'm showing you're unmuted,

8   Your Honor.

9              THE COURT:  I am too.  You can stay here,

10  Mr. Sample, it doesn't matter.  Let's try that.  Is that

11  better?

12             THE CASE MANAGER:  Let me see if we can turn mine

13  up, Judge.

14             MR. LETTEN:  Do we have audio?

15             THE COURT:  I can hear everyone.  We'll go on and

16  tell them I can hear everyone.  We'll try one more time.

17             Okay.  Mr. Sample, go ahead and tell them I can

18  hear everyone and we're waiting.

19             We had to go back in and change what we were

20  doing.  So I think we're all ready.  And IT is going to stay

21  a little closer with us today.

22             Okay.  Well, Mr. Letten, we're back to you again.

23             MR. LETTEN:  Yes, sir.

24             MR. GLOVER:  Your Honor?

25             MR. STANTON:  Your Honor, I'm sorry.  I'm going

1    to turn it back over to Mr. Letten.  One, I just want to say

2    thank you for indulging us for the brief recess here.  In

3    light of Mr. Glover's objection and renewed objection but

4    more importantly, Your Honor, this Court's ruling and

5    analysis of the scope and nature of Mr. Henegan's testimony,

6    I've instructed Mr. Letten with the examination to narrowly

7    modify that line of questioning.  So Mr. Letten has a few

8    other brief questions.  But with regard to being judicious

9    with our time and mindful, Your Honor, that testimony will be

10   narrowly tailored this morning.  And I will turn it back over

11   to Mr. Letten, if that's okay.

12            THE COURT:  Absolutely.  Well, thank you so much.

13            Mr. Letten, yes, sir, looks like you have a short

14   exam, so thank you.

15            MR. LETTEN:  I do.  Thank you, sir.

16   BY MR. LETTEN:

17   Q.    Mr. Henegan, do you understand you're still under

18   oath?

19   A.    I do.

20   Q.    All right, sir.  Now, very briefly, as the subject

21   matter expert in First Amendment matters to the team, during

22   the entire duration of your assignment with the team, have

23   you been available at all times, every day, literally every

24   week to consult with the Monitor himself, with the members of

25   the monitoring team on any and all issues involving the First

UNREDACTED TRANSCRIPT

1    Amendment, any and all proposals that may have been made or

2    suggested by either of the parties and any and -- and provide

3    analyses and opinions to the Monitor to inform his opinions

4    regarding those things?

5    A.      Yes, I have.

6    Q.      Have you also had the opportunity to meet when asked

7    with and communicate with the parties at various times and/or

8    to review some of their suggestions and in some cases to

9    share either with the Monitor or indirectly with the parties

10   what your opinions are?

11   A.      Yes.

12           MR. LETTEN:  With that, Your Honor, I -- let me

13   ask you one more question.

14   BY MR. LETTEN:

15   Q.      Have you been available to the parties and also the

16   Monitor at all times to consult, to analyze and to provide

17   opinions regarding proposals for the Consent Decree and any

18   language that might involve First Amendment issues?

19   A.      Yes, I have.

20   Q.      And to your knowledge, has the Monitor relied on you

21   and your analyses in fashioning recommendations to the Court

22   as well as the analyses and opinions of the other subject

23   matter experts in their respective fields?

24   A.      Yes, I believe he has.

25           MR. LETTEN:  Thank you, sir.  I believe that does

1    it, Your Honor.

2                  THE COURT:  Certainly.

3                  Mr. Glover, cross examination?

4                  MR. GLOVER:  Thank you, Your Honor.  And I think

5    my cross examination depends in part upon whether there's

6    been a tender of Exhibit 17 that contains a good number of

7    narrative comments and explanations and legal analyses by

8    Mr. Henegan or whether that's being withdrawn.  If it's being

9    withdrawn, I have questions.  If it's in the record, even as

10   a tender, I'd like to cross examine Mr. Henegan on those

11   representations.

12                 MR. STANTON:  That's withdrawn, Mr. Glover.

13                 THE COURT:  Exactly.

14                 MR. GLOVER:  I have no questions, Your Honor.

15                 THE COURT:  We're going to mark 17 as now

16   withdrawn.

17                 (Whereupon, Exhibit 17 was withdrawn.)

18                 THE COURT:  It's going to leave a -- it's still

19   going to exist as a withdrawn item, so we'll go to 18 for our

20   next number.  It's not -- otherwise, it would be very

21   confusing later on to somebody looking at the record.  Okay.

22                 MR. STANTON:  Thank you, Your Honor.

23                 THE COURT:  Let me ask if the ACLU, any questions

24   here?

25                 MR. CASTELLI:  No, Your Honor.  In light of that

1   clarification with Exhibit 17, we have no questions.

2               THE COURT:  Okay.  Well, will there be any

3   additional evidence or any additional witnesses presented by

4   the Monitor and the Monitor's team?

5               MR. STANTON:  No, Your Honor.  That concludes the

6   monitoring team's report and presentation at this time.

7               THE COURT:  All right.  Is the City prepared to

8   proceed with any witnesses that you wish to call?

9               MR. GLOVER:  Your Honor, we will and Mr. McMullen

10  will be calling the first witness, who is going to be

11  Director Rallings, who we'll bring in the room now, and I'll

12  trade chairs with Mr. McMullen.

13              THE COURT:  Certainly.  That's fine.  All right.

14  And I see Mr. McMullen, and I'm looking for my witness on the

15  screen.

16              Director, do we have you at this time?

17              MR. MCMULLEN:  Not yet, Your Honor.

18              THE COURT:  Okay.  That's fine.

19              Director, you've been called as a witness, and so

20  always good to see you, but I need to have your raise your

21  right hand, and Mr. Sample will administer the oath.

22

23

24

25

UNREDACTED TRANSCRIPT

*TESTIMONY OF MICHAEL RALLINGS*                                      54

1                              *   *   *

2                          **MICHAEL RALLINGS,**

3   was called as a witness and having first been duly sworn

4   testified as follows:

5               THE COURT:  Counsel may proceed.

6                      **DIRECT EXAMINATION**

7   QUESTIONS BY MR. MCMULLEN:

8   Q.    Director Rallings, I want you to introduce yourself.

9               MR. MCMULLEN:  Your Honor, could you bear with

10  us.  We've got some audio feedback.  We're trying to correct

11  it.

12              THE COURT:  Certainly.  Go right ahead.

13  BY MR. MCMULLEN:

14  Q.    Director Rallings, would you please introduce yourself

15  to the Court.

16  A.    Yes.  My name is Michael Rallings.  I'm the director

17  of police services for the Memphis Police Department.

18  Q.    By way of background, can you briefly go over your

19  career in law enforcement, your exposures and your

20  experiences?

21  A.    Yes.  So I have been a law enforcement officer for

22  approximately 30-plus years now.  I've served in the position

23  as police director since 2016.  I'm scheduled to retire in

24  ten months.  And throughout my law enforcement career, I've

25  had a very broad and vast training experience.

*TESTIMONY OF MICHAEL RALLINGS*                                               55

1          I started as a patrol officer, working undercover as a

2    narcotics agent.  I have served in uniform patrol.  I was

3    sent to the Training Academy and stayed at the Training

4    Academy and the Firearms Training Unit for probably ten

5    years, to include being promoted to sergeant, to lieutenant

6    and as training commander.  I've served in the detective

7    bureau.  I've served as a field supervisor.  I've served as a

8    precinct commander.

9          And I've been a part of the MPD command staff since

10   2009 when Director Larry Godwin promoted me to deputy chief

11   for our supervised Uniform Patrol District 1.  I've

12   supervised Uniform Patrol District 2.  I've supervised

13   Special Operations, and I have again served as the director

14   of police services since 2016 for the Memphis Police

15   Department.

16   Q.    Give us the benefit of some of the training that

17   you've had outside of Memphis Police Department with certain

18   law enforcement agencies on becoming more efficient, better

19   in the use of tools for effective law enforcement.

20   A.    Yes, sir.  Well, the first thing I have to talk about

21   is my 30-and-a-half years serving in the United States

22   military.  I joined active duty in 1984 after high school.  I

23   served in the infantry and military police, but I also

24   completed 26 years in the United States Army Reserve as a

25   leadership instructor.  I also taught advanced courses in

1   military police and leadership courses for the military.

2        So my military career has given me a remarkable

3   foundation for the work that I do today.  And I can't, you

4   know, recount all the training I've had in the military.

5   Plus I've been able to serve in the military in law

6   enforcement.  I joined the police department in 1990, so I've

7   been able to serve in the police department at the same time.

8        So as a police officer because of my time at the

9   Training Academy, I'm certified in a vast amount of things

10  through the Tennessee P.O.S.T. Commission, such as use of

11  force, less-lethal munitions, crowd control and civil

12  disturbance.  You know, basic firearms, advanced firearms,

13  anti-terrorism.

14       And so I have continued training as of, you know, last

15  year where I attended the FBI National Executive Institute.

16  One -- a fortunate thing about that is I've been able to sit

17  and talk to a number of law enforcement leaders.  Also the

18  vice president of the United States, Vice President Pence.

19  Former Attorney General Jeff Sessions.  Current Attorney

20  General William Barr.  You know, Director Comey, former

21  director of the FBI, I've sat in his office.  And we've

22  talked about, you know, current events and crime.  The

23  current director, Director Wray.  You know, the governor of

24  Tennessee.  I mean, it's just the list goes on and on.  So

25  I've been afforded an amazing opportunity to work with law

*TESTIMONY OF MICHAEL RALLINGS*                                            57

1    enforcement leaders from not all over across the nation but

2    also the world.

3          And so I think I do bring something to the table.  Not

4    just a vast understanding of what it's like to be a law

5    enforcement executive in a large city, but what it's like to

6    be an African-American executive in a city that is

7    predominantly African-American.  So I'm a Memphian.  I think

8    I bring a lot to the table.  And I'm just happy to serve in

9    this capacity, especially during these uncertain times.

10   Q.    Let's talk about the Memphis Police Department

11   organization.  Could you give the Court a brief description

12   of how large the Memphis Police Department is and its

13   different departments and how they function, just a brief

14   overview.

15   A.    Yes.  So the Memphis Police Department is probably the

16   27th largest law enforcement agency in the nation.  We're

17   certainly the largest law enforcement agency in the state of

18   Tennessee.  Today we have approximately 2,056 commissioned

19   police officers, but we have just about 3,000 employees to

20   include our dispatchers, our school crossing guards and our

21   other civilian employees, our police service technicians and

22   also the police reserves.

23         We have 50-plus recruits still in the academy.  So

24   upon their graduation, we probably will be approximately 2100

25   commissioned police officers.  The Memphis Police Department

1   is a full-service organization.  Each year you have

2   approximately 1.6 million calls come into our 911 call

3   centers.  Officers dispatched on probably 940,000 calls.

4   Those calls generally involve anywhere from 1.6 million to

5   2.5 million officers having encounters with citizens due to

6   the high volume of calls and the nature of calls.

7         Each year we are taking in approximately 108,000

8   incident reports.  I think last year 118,000 were filed, but

9   if you look at the average, it's an average of 108,000

10  incident reports filed every year.  Probably around 35,000

11  traffic crashes.  We answer almost every call that comes into

12  the call center either through 911 or through the 544-COPS

13  nonemergency number.

14        So we consider ourselves, again, to be a full-service

15  police department in one of the most challenged cities in the

16  nation, just due to the volume, the frequency, the rate and

17  severity of violent crime.  Of course, also the challenge of

18  property crime.

19  Q.      And you talk about some of the things that you do.

20  How many criminal investigations do y'all do a year?

21  A.      So when I talked about those incident reports filed,

22  118,000 filed last year, those are all criminal complaints.

23  Well, some of them may be memos that may not turn out to be

24  criminal, but you know, I would dare say at least a hundred

25  thousand of those are -- end up being some type of criminal

1   offense that will warrant some type of investigation or

2   review.

3   Q.     Tell me about how important technology is, even though

4   the police department is about 20 -- well, about 2,000

5   officers.  You serve as -- first of all, how many citizens in

6   Memphis in your service area?

7   A.     Yeah.  So if you think about the City of Memphis, I

8   think, according to the latest census, we're talking about

9   650,000 citizens.  But when you talk about the number of

10  people that travel through the city, the importance of the

11  city in the United States, a distribution center is rather

12  amazing.  I think I looked at some statistics where we're

13  responding to interstate shootings.  And I think the

14  statistics reported that anywhere from 70 million to

15  77 million people travel through the interstates.  If you

16  think we're very kind of oddly situated in that we're

17  bordered by Mississippi, Arkansas.  Memphis is in the middle.

18       So the extremely large volume of tourism, but also

19  large volume of individuals traveling through our highways

20  and byways, through our rails, through our airports, et

21  cetera.  So Memphis is an important city in the nation.  Not

22  including the traffic up and down the main corridor from, you

23  think, St. Louis all the way down to New Orleans as far as

24  intertravel on the Mississippi River.

25  Q.     Geographically, how big a area is Memphis that you are

*TESTIMONY OF MICHAEL RALLINGS*                                60

1   responsible for patrolling and keeping safe?

2   A.      Well, that's a great question.  You know that we're --

3   have done a small amount of de-annexation, but last I

4   checked, I think we're anywhere from 324 to 340 square miles.

5   So the volume of Memphis, the size of the city, given the

6   travel time from one end of the city to the other is

7   enormous.  And a lot of people try to compare Memphis to

8   other cities, but if you're not comparing the geographical

9   area we have to respond to, the population, the crime and the

10  lack of density, you're not making a fair comparison.

11          So we have enormous challenges just by the size of the

12  city.  And you know, we're understaffed by in what I say is

13  400-plus officers, 400 to 500 officers.  So you know, very

14  challenged in Memphis.  One of the most impoverished

15  metropolitan areas in the nation.  I think we only can

16  compare to probably New Orleans.

17          And I think as a result of all those challenges, given

18  the amount of ZIP codes that we have where a large percentage

19  of the population lives in poverty.  The challenges in

20  education, housing, healthcare, all are exasperated in our

21  efforts to keep Memphis safe and combat crime and also try to

22  keep the community safe.

23  Q.   Do you know any city by comparison with a similar

24  population and what their geographical area for patrolling

25  is?

UNREDACTED TRANSCRIPT

1  A.     Yeah.  I think in conversations, there's only one city

2  in Florida that probably comes close.  And I'm trying to -- I

3  can't remember the name right now.  But I've read a number of

4  reports on their challenges.  And maybe Sarasota or some

5  other city, but there are only a handful when you talk about

6  the geographical size and then the amount of police officers,

7  the volume of calls and then again the geographical area that

8  we -- and the poverty of the individuals or ZIP codes where

9  70 percent or more of the population lives at or below the

10  poverty line.

11  Q.     In a city like Philadelphia, do you know what the

12  square miles that patrols for the City of Philadelphia?

13  A.     Yeah, I think when you talk about Philadelphia and New

14  York and I don't have access to Google right now, but you

15  know, we can pull it up.  I've been to Philadelphia.  I know

16  the police commissioner.  Philly, I think, is much smaller.

17         Boston is one that comes to mind.  Actually, I can

18  remember.  Boston is 60 square miles.  Boston has a similar

19  population.  The demographics are obviously very different.

20  The socioeconomic conditions are obviously very different.

21  But Boston has about the same amount of people.  60 square

22  miles.  I'd love to have to police Boston.

23         I think you hear a lot of people talking now about

24  Camden, New Jersey.  I mean, Camden, I think is like six

25  square miles, and so our city lacks density.  You've heard

1  the mayor, the COO talk about it, where Memphis grew through

2  annexation, but the police department did not necessarily

3  grow.  The stretch on city services are enormous.  And again,

4  you know, Memphis is just a very unique city.  Uniquely

5  situated in the middle of the country and definitely has its

6  own unique set of challenges.

7  Q.     How important is the use of technology in 21st century

8  policing and particularly here with you in Memphis?

9  A.     Well, I think that's an interesting question.  And

10 definitely how it applies to the Consent Decree.  So when I

11 think about technology, I was born in 1966.  So when I just

12 look at the explosion of technology, you know, I didn't grow

13 up with a cell phone.  I bought the first cell phone when I

14 was an adult, and we were just blown away about the

15 technology.  I think I didn't see the first one until 1990.

16 And it was a brick.  It was the size of a laptop.

17        And so when we talk about no cell phones, no Internet,

18 no facebook, no Twitter, no Instagram, no all the other

19 sources that we talk about, especially when we look at the

20 aftermath of 9/11, I think facebook didn't explode until

21 2012.  And every day there's some new technology coming on

22 board.  And if we think about, you know, this tablet that I'm

23 testifying on, my grandchildren have no idea that this did

24 not exist, but nobody had a PC until, you know, much later

25 on.

1          So this is all modern technology.  And I think that

2    when you ask what the people of Memphis have demanded, we

3    have -- the city council instituted ascensional camera

4    program because affluent neighborhoods were buying their own

5    kind of SkyCop cameras and putting them up.  And that was

6    obviously a concern that neighborhoods that lacked affluence

7    could not afford these cameras.

8          Well, this program has exploded to where we have, you

9    know, received, you know, almost $2 million worth of camera

10   donations from neighborhoods, and when you put a value on the

11   number of cameras that have been implemented and put up by

12   the ascensional camera program, in the last few years, we've

13   put up, you know, 70 cameras every year, you know, 20 -- you

14   know, 210 cameras, and I think we're working on installing

15   another 70.  The county commission allocated $125,000 per

16   county commission district to install cameras, and that's

17   just cameras.  That's not including the other technology that

18   the neighborhoods are putting up to keep themselves safe.  We

19   know that there is a proliferation of surveillance cameras.

20         Our officers take all their reports on a smart phone.

21   So we fully embrace technology.  When they take a report on

22   their smart phone, they have access to all the law

23   enforcement databases that Tennessee law enforcement has

24   access to.  They can run driver's license checks.  They can

25   run warrant checks.  When they take a report and once that

*TESTIMONY OF MICHAEL RALLINGS*                                        64

1    report is pretty much submitted, it's geocoded, so we know

2    where the crime occurred.  We know what time the crime

3    occurred or likely time, and we know what type of crime.  And

4    that's what Blue CRUSH is all about.  You know, pretty much

5    using statistical history to predict crime.  And so we can

6    prevent crime.

7         But technology is fully engrained in the Memphis

8    Police Department.  If you think about it, I have two cell

9    phones.  I have a desktop, a laptop, a iPad, and that's just

10   to keep up with the demands of this job.  So technology is an

11   integral part of what we do, and I haven't even got into the

12   records management system where we maintain these records.

13        So if we're doing a hundred thousand reports a year,

14   in the last four years, that's 400,000 reports.  That's not

15   including digital evidence that's being maintained.  Physical

16   evidence that's being kept up with.  We have a brand new

17   state-of-the-art 911 call center that we unveiled.  The call

18   center is receiving information.  That information is being

19   placed in our CAD system.  And we're working with fire.

20        So technology has been fully embraced, and I just

21   don't see it going away.  I just hope that we can modify the

22   Decree so we could make sure that we can fully embrace it and

23   make sure the Decree allows us to do and work with modern

24   technology.

25   Q.    What would you say to someone that -- chief of police

TESTIMONY OF MICHAEL RALLINGS                                              65

1    that would tell you just doing paper and pencil

2    investigations are effective today?

3    A.      Yeah.  So I'd tell them that I want to be hired in

4    Mayberry, so when I leave here, I'll be looking for that town

5    that can operate on paper and pencil.  I don't think there's

6    any modern police agency that could operate on paper and

7    pencil.  The only time our officers probably take paper is

8    when they may be taking notes.  We're even evolving our

9    tickets to an electronic ticketing system.  So they still

10   write some paper tickets.

11         If the computer system goes down, if we have a problem

12   because the smart phones are just a cell phone.  If there's a

13   -- the network goes down, they may have to take a paper

14   report.  But it really hampers things.  So again, we know

15   that there is paper.  We print a lot of paper.  We take

16   notes, but it is not how we fight crime.

17         So if you think about being strategic, being timely

18   and accurate, the embracing of technology across law

19   enforcement circles has definitely allowed us to better serve

20   the public.  And better allow us to keep our community safe.

21   Q.      And I want to go back to something you said.  The

22   request for SkyCops and more camera technology has been

23   coming from the underserved communities in Memphis?

24   A.      Oh, without a doubt.  So if you think about just the

25   demand for SkyCops, and I think our city council did an

*TESTIMONY OF MICHAEL RALLINGS*                                    66

1   amazing job appropriating.  We appropriate about $400,000

2   every single year just for the ascensional camera program.

3         But we also have a Neighborhood Watch crime prevention

4   grant program.  We have an outstanding staff that works with

5   communities, teaches them how to apply for the grant.  And I

6   think last I checked, we've given away over $300,000, or I

7   think it's way more than that to neighborhoods.  And here's

8   what the neighborhoods have used the money for.  We take

9   Cooper-Young, for instance, which is one of the first that

10  really wanted to install their own camera system.

11  Cooper-Young received somewhere around $10,000.  They

12  installed their own camera system that they manage.

13        Other neighborhoods have installed cameras.  They've

14  bought laptop computers.  They've done neighborhood

15  beautification.  They've done after-school programs.  And

16  many of them recently have taken the money from the

17  neighborhood life crime prevention grant and invested in a

18  SkyCop or some other camera because what I hear from the

19  people of Memphis is that they are concerned about crime.

20  They want to feel safe, and they are happy to have -- to

21  partner with the Memphis Police Department to do so.  And

22  it's evident in the proliferation of the cameras and what

23  people are asking for.

24  Q.    Let's talk about body-worn cameras.  What has been the

25  reception from the police force and from the citizens with

UNREDACTED TRANSCRIPT

1    respect to the body-worn cameras?

2    A.      That's a great question.  I asked an officer years ago

3    when we first started deploying the cameras, when the

4    technology was new.  Memphis Police Department at one time

5    was the largest -- we had the largest deployment of the Axon

6    2 Flex (sic) body-worn camera.  We're still a very large

7    deployment.  I think we've deployed 2,000 cameras to our

8    officers, to detectives, to supervisors, to our -- all of our

9    specialized units.

10          So it was an enormous undertaking.  And the last I

11   checked, there were millions and millions of videos.

12   Millions of hours or 500,000 hours or several -- Chief Crowe

13   could explain all that.  But there's just an enormous amount

14   of data with the implementation of body-worn cameras.

15          And here's what the officer told me.  He broke it down

16   very simply.  He said the record -- body-worn camera keeps us

17   straight, and it keeps them straight.  Because when you

18   remind a citizen that may be a little irate or, you know,

19   could be upset or could be, you know, venting their

20   frustration on the person they call to show up to help them,

21   that when you remind them that, you know, this conversation

22   is, you know, being recorded on your body-worn camera, that

23   they tend to calm down.

24          The public needs to know that, you know, we

25   investigate these complaints, and if we look and, you know,

1   we find that the officer violated policy, it's a great tool

2   to hold the officer accountable.  But more than often, the

3   body-worn camera exonerates the officer, and when we review

4   the body-worn camera, we show the body-worn camera to an

5   individual that may have made an allegation of a policy

6   violation, that often, you know, we all agree that it

7   wasn't -- the evidence or the charge is not supported by the

8   evidence.

9          So the body-worn cameras are great.  I think they're

10  just expensive.  Each year we spend about $2 million on the

11  body-worn cameras.  But I think it's an investment well worth

12  its cost.  Because we know that without them, you don't have

13  that independent witness, and that's what I want to end up on

14  body-worn cameras.  Independent witness that gives us one

15  snapshot.  Not the whole picture, but it does give us a

16  piece.

17  Q.     And is it important with the body-worn cameras that

18  they are always on because -- and not just turned on when

19  there's an incident?  Explain to the Court why it's important

20  to see things leading up to the incident or whether that's

21  important to see things leading up to the incident, rather

22  than having them activated when something happens.

23  A.     So I want to make sure I understand you.  But let me

24  explain this, and this may answer your question.  The

25  body-worn camera, when activated, when we first got the

*TESTIMONY OF MICHAEL RALLINGS*                          69

1    body-worn cameras, they have a 30-second pre-roll, meaning

2    that when I activate my body-worn camera, the camera is

3    always on.  When you power it on, it's always on.  It's just

4    not actively recording.  But the camera has a 30-second

5    pre-roll, meaning that it will go back 30 seconds prior.

6          Well, after the -- after a couple of incidents, we

7    expanded that time to a 60-second pre-roll so we can capture

8    more of it.  But it's not practical for a body-worn camera to

9    be on the entire time.  First of all, the battery doesn't

10   allow that.  You know, the officer works an eight-hour shift,

11   but because we're so short staffed, my officers may work a

12   12, or they may -- I work a 12.  So my body-worn camera

13   couldn't survive a single shift with me.  But if an officer

14   works a 12-hour shift, the body-worn camera will only last

15   for eight hours.  So it's not practical to keep the body-worn

16   camera on, and our policy says that when an officer

17   encounters a member of the public, the body-worn camera

18   should be on.

19   Q.     But what about the pre-roll , and kind of explain to

20   the Court what the pre-roll is.  When you turn the body cam

21   on, it goes back in time 60 seconds; is that fair to say?

22   A.     Yes.  That's exactly what it means.

23   Q.     And is it -- is it important information in that

24   pre-roll 60 seconds that allows you to put incidents in

25   context?

*TESTIMONY OF MICHAEL RALLINGS*                                    70

1   A.      It could be.  So you know, when you talk about

2   body-worn cameras, you know, I don't want to record an

3   officer eating his lunch or using the bathroom or having an

4   intimate conversation with the spouse or, you know, some

5   important issue that they're discussing with their family.  I

6   mean, everything should not be recorded.  You know, it's not

7   reality TV.  It's a body-worn camera.  It's a tool.

8          So the body-worn camera should be used when the

9   officer is, you know, dispensing some type of official duty.

10  And the policy says is that when they're interacting with the

11  public.  But there are times where there could have been an

12  emergency situation where officers responds to it that the

13  officer has tried to activate the body-worn camera.  It is a

14  button.  They miss the button.  The camera has fell off.

15         And so it's not a perfect device.  I think about it as

16  a cell phone, where people will say I called you, and so I

17  didn't get the call.  It didn't come through.  Well, it's not

18  perfect technology.  It's very reliable, but again, it's not

19  perfect technology.  And I think it's not practical for a

20  body-worn camera or in-car video system to be on the entire

21  time because we couldn't handle that much data, nor do I

22  think it's a reasonable ask.

23  Q.      Let me ask you about social media and how that is used

24  when it comes to being -- MPD being prepared and being on

25  alert so that they can provide public safety.

UNREDACTED TRANSCRIPT

 1  A.      Well, I think there is no time like the present.  What

 2  we've seen in the last three weeks, where we have seen in the

 3  nation unravel on social media, we saw the horrific murder of

 4  Mr. George Floyd, and we've seen the aftermath of that.  So

 5  if you think about that started from a cell phone video that

 6  was shared on social media, shared with law enforcement that

 7  ignited a spark across the entire world, where we're talking

 8  about racism and equality, police brutality, justice, use of

 9  force.  It has sparked this conversation from a cell phone.

10          So you think about the social media, social media is

11  critical.  And we talk about the social media being a

12  treasure-trove of information.  I just say that it is lost

13  treasure in the Memphis Police Department because we often --

14  there is so much confusion of whether we can access it, where

15  we can't access it.  I've read over, you know, the Decree.

16  And there are, I think, two orders that have been issued or

17  requests to modify.  So my officers are not certain whether

18  they can or they cannot.  I'm not certain.

19          And so when you talk about social media, I'm not

20  certain if I can watch the reporter who's embedded with

21  activists marching around and broadcasting it in real time.

22  There was an article, I think I may have asked our lawyers

23  about, that was written in the Commercial Appeal.  It had all

24  of the activists in there that they interviewed.  A picture

25  that told about them.  And I said oh, my God.  I don't even

1  know if I can look at this because if I print it, if I save

2  it, if I e-mail it, am I indexing, filing, disseminating?

3          And so there's a lot of confusion. I'm confused. And

4  I have a team of lawyers around me. Then I know that the

5  little poor officer in the street is confused, and they're

6  just not sure. So I think that, you know, there's a

7  practical application. I was reviewing a number of things,

8  and I think that, you know, the original order is 7 pages

9  from 1978. And everything in there is -- I don't know if we

10  can do it.

11          And I've read a number of things, but again, social

12  media is here to stay. When we talk about crimes,

13  individuals will commit crimes. They will post it on

14  Facebook Live while they're doing the crime. They will --

15  threats. We respond to about a hundred threats every single

16  year to schools, churches, businesses, government officials

17  and other. And those threats happen in the middle of the

18  night. Some of them happen before school starts, and we have

19  to react quickly. And so most of those come in to us via

20  some social media post that some parent has shared with us.

21  And again, you know, I tell my folks --

22  Q.     Those threats, do they rise to the level of criminal

23  threat where y'all can arrest them? Or tell me about some of

24  the threats that come to you all through social media from

25  parents or other agencies and the value of getting that

1   information or nonvalue of getting it.

2   A.      I think it's critical that the parents give us

3   information.  And the kids.  So let's start with the kids.  I

4   was talking to Buddy Chapman a couple of days ago about Trust

5   Pays.  So I think since the inception of Trust Pays, that

6   they received, you know, somewhere around 1200 tips.  Last

7   year, I think it was over a hundred tips.  90 of them proved

8   to be beneficial, where guns were recovered, drugs, stolen

9   property, knives, and it may have prevented some violent act

10  that occurred in schools.

11          But some of the tips didn't turn out to be anything,

12  but they had to be investigated.  So they didn't turn out to

13  be something that resulted in a criminal charge.  Of the

14  hundred-plus threats that we received last year, I think

15  there were only 38 arrests.  This year -- and I can't

16  remember the number because it's skewed because school has

17  been shut down, you know, there is -- I think we only had 30

18  arrests, probably somewhere around 80-plus complaints.  But

19  again, I don't have that in front of me.  A large number of

20  complaints that don't always result in some type of criminal

21  charge, but I think it's very important that we are able to

22  quickly investigate those.  We share information.  You know,

23  we have to alert the schools, and sometimes the schools alert

24  us that there is a potential threat.

25  Q.      So when the schools alert you all, the schools have

*TESTIMONY OF MICHAEL RALLINGS*                                    74

1  their own security force; is that true?

2  A.      That's correct.

3  Q.      And when they alert y'all to a veiled threat that

4  doesn't rise to the criminal level, do you know how they

5  often get that information?

6  A.      Sometimes.  I mean, you know, sometimes they find a

7  note that's been written by a child.  A child gives a note to

8  a teacher, but often it's a post on social media that's

9  shared.  Thank goodness that, you know, people take threats

10 seriously.

11         So we've spent, since 9/11, I think the slogan is, "If

12 you see something, say something."  And in the aftermath of

13 almost every situation, school shootings, the Boston Marathon

14 bombing, the attacks we've seen in malls, in Walmarts, there

15 was something posted on social media that someone either

16 failed to act or they acted on, alerted law enforcement so we

17 can intervene.

18 Q.      And a lot of these posts do not rise to the level of

19 criminal activity that you could prosecute?

20 A.      Not always.  Obviously, I don't know the details of

21 every single threat.  I just kind of keep up with the big

22 numbers.  But I can tell you that we're talking about an

23 average of a hundred every single year that our team will

24 work with Shelby County Sheriff's Office, Shelby County

25 Schools, the Federal Bureau of Investigation to investigate.

*TESTIMONY OF MICHAEL RALLINGS*                                    75

1    You know, 38 arrests last year.  And you know, the highest

2    number of threats are threats to schools.  And I think,

3    threats to businesses.  And we've seen that over and over

4    again.  If you think about the shooting at Walmart was a

5    disgruntled employee that went in and end up turning into an

6    active shooter situation right down the street in

7    Mississippi.

8          And so I've told my team over and over again, if you

9    get a threat, you take that threat seriously.  You

10   investigate that threat.  But if it's something that we need

11   to, you know, work on on the back end, we will.  But my fear

12   is that an officer that takes a literal interpretation of the

13   Consent Decree may hesitate or may not be able to get

14   information to the appropriate people, and it could result in

15   some type of tragic incident.  That is my fear.  And I think

16   I've said that from day one.  My fear is strictly public

17   safety and keeping people safe.  And the officers are

18   confused.

19   Q.     You used the term Trust Pays.  Can you tell us what

20   that is?

21   A.     So Trust Pays -- and FYI, I hope I don't step on

22   Director Buddy Chapman's toes.  Trust Pays was a program that

23   was established a number of years ago.  And the Trust Pays

24   allows -- you know, it was really set up for kids.  Kids,

25   school-age children to be able to report anonymously some

*TESTIMONY OF MICHAEL RALLINGS*                              76

1    type of threat to the school.  And so what they can do is

2    they can alert a teacher.  They can alert a responsible

3    adult.  They can call in a tip to CrimeStoppers.  And

4    actually, they can get paid.

5         So I think when I -- I'm just trying to remember.

6    I've got a lot of stats in my head.  But Trust Pays, you

7    know, 111 tips last year.  And I think that eight guns, ten

8    Tasers, ten fake guns, 20 knives and 42 drugs were actually

9    taken off the street via Trust Pays.  And then CrimeStoppers,

10   we know CrimeStoppers had a record number of tips.  They've

11   solved at least 22 homicides.  Helped us close, you know,

12   over 200-plus crimes.

13        So between CrimeStoppers and Trust Pays, the programs

14   that we do in school with youth, the Youth Crime Watch in

15   schools, where they can alert a school officer or our Shelby

16   County Sheriff's Office so we can intervene, those programs

17   are very important.

18   Q.    Let's talk about a protest or event that threatens

19   public safety.  Did you have an opportunity to look at the

20   Charlottesville, Virginia postmortem report?

21   A.    Yeah.  I read the Charlottesville report, and then I

22   also, with the FBI NEI, I went to Charlottesville.  So our

23   current special agent in charge of the FBI, we went to the

24   National Executive Institute together.  We were very blessed

25   that we spent an entire week in Charlottesville.  During that

1    week in Charlottesville, we heard from the current chief of

2    police in Charlottesville, who came in right after the

3    protest.  The head of the Virginia State Police was actually

4    one of the key leaders in the response to Charlottesville.

5    He was there, and he definitely shared his experiences with

6    us.

7              Another young man that I went to training with in 2006

8    did a special study on Charlottesville, and so we were able

9    to walk the grounds.  We walked around a number of the

10   monuments that all the activities centered around.  We were

11   on the college campus and, you know, to have almost a

12   moment-by-moment sequence of events that led up to the

13   tragedy that was witnessed in Charlottesville, to also being

14   able to stand at the site where a young lady lost her life,

15   where the vehicle ran through the crowd, to me is very moving

16   and informative.  But the value of the Charlottesville AR is

17   critical.  So when we took down our --

18   Q.    When you say AR, what do you mean?

19   A.    Oh, I'm sorry.  It's an after actions review.

20   Q.    Okay.

21              MR. MCMULLEN:  At this point, Your Honor, we

22   provided a copy of the report to the Court.

23              THE COURT:  Yes.

24              MR. MCMULLEN:  To the Monitor and the ACLU.  May

25   I share my screen and show --

1          THE COURT:  Right.  Do you want to mark that as

2   the next numbered exhibit?

3          MR. MCMULLEN:  Absolutely, Your Honor.

4          THE COURT:  Okay.  We'll mark that as 18.  And we

5   have it right here.  So 18 marked and received.  It's the

6   independent review of the 2017 protest events at

7   Charlottesville, Virginia.  The final report.

8          (WHEREUPON, the above-mentioned document was

9   marked as Exhibit Number 18.)

10          MR. MCMULLEN:  Yes, Your Honor.  I want to go to

11   page 30.

12          THE WITNESS:  Sorry.  You're going to have to

13   take time with me because I can't read that.

14          MR. MCMULLEN:  Okay.  We don't intend for you to

15   read it.  And I'm going to what is Section C, the aftermath

16   report, and you can tell us about it.

17   BY MR. MCMULLEN:

18   Q.    And do you see the highlighted portion?

19   A.    All right.  So I think if I get too close to the

20   screen, that's the top of my head, and I apologize.  So it

21   says "For CPD," and I think that's Charlottesville Police

22   Department.  "The events led to a reassessment of the

23   department's approach to intelligence gathering.  CPD Chief

24   Al Thomas told us that the events of May 13th revealed an

25   operational blind spot.  Thomas noted that CPD lacked

1    advanced capabilities for social media monitoring that may

2    have helped the department anticipate these events.  Chief

3    Thomas moved forward with a request to purchase software

4    capable of pinpointing potential threats, based on social

5    media activity."

6    Q.      That's it.  And I want you to finish telling us about

7    the verbal conversations you had with the command staff in

8    Charlottesville and what you learned, but I did want to --

9    and I do want you to talk about that part of the report, what

10   you call the AR or the after...

11   A.      After actions review.

12   Q.      Yes.  Go ahead.

13   A.      Well, I mean, it's stated right here.  We spent a lot

14   of time talking about -- it wasn't just a need.  It was an

15   obligation of law enforcement to monitor social media.  They

16   were shocked when I told them that Memphis is under a 1978

17   Consent Decree, and it is my contention that we cannot do

18   that.  And so they just said, man, I don't see how you guys

19   are doing it.  And I said I don't see how we're doing it

20   either.  And my fear is something will get through that we

21   could have avoided because everything is posted on social

22   media and shared.  But unfortunately, we can't do what other

23   law enforcement agencies all across the nation are doing.

24           So again, I think it does present an operational blind

25   spot.  You know, we spent an enormous time just talking about

1  how Charlottesville police and others did not see things

2  unfolding and unravelling because of a lack of understanding

3  of how these things are organized and shared on social media.

4  And how an event can grow from, you know, two or three people

5  to 2,000 people in a matter of minutes and quickly overwhelm

6  police resources.  And we saw that in the bridge protest.

7  Q.     I'm glad you brought that up.  Explain to the Court

8  the bridge event and how quickly the crowds swell and the

9  strain and the need for preparation for the police department

10  to be able to protect the crowd.

11  A.     Yeah.

12  Q.     Let's first start out, at a general protest, you're

13  going to have who?  The protesters and you have

14  counterprotesters; is that fair to say?

15  A.     I apologize.  I just was a little distracted.  Someone

16  has posted a picture of some kind of defund the police thing.

17          THE COURT:  That's simply not evidence.  Don't,

18  you know -- you know, we have a fascinating situation in the

19  United States.  We allow people to say a lot of things.  And

20  I know you're, of all people, you've been remarkable in

21  listening to a lot of things; is that a fair question for

22  you, Director?  You've had to hear a lot of things.  Some of

23  them we might not agree with.

24          THE WITNESS:  Oh, sure.  Sure.

25          THE COURT:  Right.  But go right ahead.  I think

1    we're talking about the bridge and overwhelming, and I'm very

2    interested in what you have to say on that.  So go right

3    ahead.

4                    THE WITNESS:  Yes, sir.

5    A.       So my comments were that, you know, within a matter of

6    minutes, we observed the abilities for individuals to

7    organize on social media and a crowd to swell from a couple

8    of hundred to 2,000 in a matter of minutes.

9            And our contention since 2016 was to only be able to

10   make sure we could plan, we could allocate resources to keep

11   people safe.  This has been definitely a challenge, since we

12   have been in this current situation where daily protests all

13   over the city, not knowing the when, the where, the how, but

14   also having the challenge of keeping our citizens safe,

15   protecting them from the threat or trying to protect them

16   from the threat of vehicle rammings, possible bombings or

17   some other nefarious intent carried out by a person that may

18   not unnecessarily believe what they believe.

19           So it's been an enormous challenge.  But that's why we

20   have a permitting process.  But you know, given the current

21   climate, we know that individuals have been allowed to

22   express their First Amendment right without a permit, but it

23   has not made the challenge of keeping them safe any less

24   difficult, if not at some times almost impossible.

25   BY MR. MCMULLEN:

1   Q.      When you have counterprotesters there, can you explain

2   to the Court the difficult situation the police department is

3   in when you have protesters and counterprotesters?

4   A.      Very much so.  I can go back to the 1998 Klan rally.

5   I participated in that rally.  And therefore, we failed to

6   keep protesters, counterprotesters and protesters separate.

7   It ended up in chaos.  Rocks being thrown.  Glass bottles

8   being thrown.  Tear gas was deployed.  And I vowed from that

9   moment, that I would do everything I could do to never allow

10  that to happen again.

11          So if you fast forward to 2013 during the KKK rally,

12  there was talks that the city would go up in flames.  We made

13  sure we kept the counterprotesters and the protesters

14  separated.  We fully deployed, properly deployed somewhere

15  around 400 police officers to keep that event safe.  But

16  again, we had time to plan.  We probably had a 30-day or more

17  notice of the event.  And we made sure we swept and kept

18  everything safe.  If you go to the --

19  Q.      How can y'all tell -- how can MPD tell how many people

20  are going to show up so that they can plan for that or how

21  many counterprotesters are going to show up?  What do you

22  understand, even nationally, the best way to gauge crowds so

23  that you can be prepared and ready to keep the protesters and

24  counterprotesters safe from any violence?

25  A.      Well, in one is we ask that they pull a permit.  And

1   so the permitting process allows us to determine the safety

2   requirements and allows us to, you know, plan adequate

3   resources and plan for any countermeasure that is necessary.

4   Without the permitting process, I rely heavily on the

5   Tennessee Fusion Center.  The Tennessee Fusion Center puts

6   out daily briefs.  They will also provide information on any

7   planned protests in the state of Tennessee.

8        So we can be aware that we saw that something can

9   happen in Nashville that could have an impact on Memphis.

10  Something happened in Minnesota that could have an impact on

11  Memphis.  And so we just need to be aware so we can plan.

12  But you know, sometimes people will share a social media

13  post, and/or other law enforcement will alert us, or a

14  citizen will call 911.  And so -- but the challenge is that

15  because we don't know, it's very difficult to plan.  So we

16  are only reacting to a call or some observation by a police

17  officer.  And often that's kind of too late to put adequate

18  prevention measures in to keep people safe.

19  Q.    When you talk to your counterparts in other

20  jurisdictions that are not under the Consent Decree, what do

21  they do to try to gauge participation in those protests or

22  counterprotests?

23  A.    The first thing they do is look at social media.  They

24  look at the interests of a particular host.  They look at

25  kind of to anticipate -- they look at past events, obviously.

*TESTIMONY OF MICHAEL RALLINGS*                                          84

 1   But they look at social media.  They talk about it.

 2        And I'll give you a great example.  We know that when

 3   Confederate 901 threatened and they did, they came back to

 4   Memphis to protest the taking down of the statutes, we looked

 5   at a similar protest that occurred after Charlottesville

 6   within the state of Tennessee.  I think it was in Smyrna.

 7   The TBI deployed in force, along with Metro Nashville to

 8   support that, and then the former director of TBI, Mark Gwyn,

 9   deployed 200 TBI agents to Memphis so we could make sure that

10   we could keep that particular event safe surrounding the

11   taking down of the Confederate monuments that you're very

12   familiar with.

13   Q.     So again, and if you can't coordinate with those

14   agencies and share information, would it be burdensome or

15   onerous on the police department on trying to keep people

16   safe when you've got another agency, the TBI here with

17   information, and if you're limited in your cooperation with

18   them, would that create an onerous condition for MPD?

19   A.     Without a doubt.  I think the challenge is too great.

20   And so you know, when listeners talk about -- I have to pay

21   attention to things that are not only going on in the United

22   States but across the world.  Vehicle rammings.  You know,

23   we've seen that in Memphis locally.  There have been a couple

24   of situations where individuals have been arrested and

25   charged for driving through.  We haven't had a true ramming,

1  but approaching protesters, driving through, making contact.

2  Luckily, we've only had those handful of incidents.  But I

3  have to be concerned about that.

4      I've been concerned about that since 2016 because

5  that's when you've seen vehicle rammings.  You've seen them

6  in New York.  You've seen them in Nice, France.  You've seen

7  them in Charlottesville.  You've seen them in other parts of

8  the nation.  And so I have to be concerned about that.

9      So law enforcement, being able to share if there's a

10 potential attack of a vehicle ramming, we need to be on the

11 alert.  We just had one during the St. Jude marathon, where a

12 young man from out of town ran through a barricade.  Law

13 enforcement stopped that young man, and if he would have ran

14 into a crowd of those runners, we could have -- it could have

15 resulted in a number of injuries and deaths.

16     So information like that must be shared.  We take it

17 seriously.  We make preparations.  During the MLK50

18 celebration, during the annual MLK March, we make sure that

19 we try to close every avenue of possible attack.  And that we

20 allocate appropriate staff to keep the marchers safe.

21 Q.    When a dignitary comes into town, let's say a

22 president or former president, how many different agencies

23 would you need to coordinate with if they're coming here to

24 Memphis?

25 A.    God.  I mean, I can't count them.  Because what

UNREDACTED TRANSCRIPT

*TESTIMONY OF MICHAEL RALLINGS*                                     86

1   happens is that if you have a -- let's go back to the Vice

2   President Mike Pence visiting back in January.  So we would

3   normally be alerted by the Secret Service, and they will

4   almost activate all available federal agents to support that.

5   So you're talking about Secret Service, ATF, the FBI, DEA,

6   you know, there are individuals in the Department of Homeland

7   Security.  TBI will be involved.  Tennessee Highway Patrol.

8   MPD.  Shelby County Sheriff's Office.  Depending on the

9   venue.  Bartlett, Germantown, Collierville.  I mean, you're

10  talking about almost every available law enforcement agency.

11  Tennessee Department of Homeland Security.  Tennessee Fusion.

12  Tennessee Department of Safety.

13  Q.     Would the Secret Service sometimes, would they give

14  y'all alerts of people who are not wanted, not criminals but

15  that they are keeping an eye on because of that certain

16  dignitary?

17  A.     Yes.

18  Q.     And do you have any way of knowing how they got that

19  information or what they did to put that person on that list?

20  A.     No.

21  Q.     Can you explain to the Court how different levels of

22  clearances allow you to know different levels of information?

23  A.     Good question.  So I'm a member of the Joint Terrorism

24  Task Force.  That requires a background check and a minimum

25  of a secret clearance.  So I was able to transfer my secret

*TESTIMONY OF MICHAEL RALLINGS*                                    87

1   clearance from the United States Army over and go through

2   another background check with the FBI to be part of the JTTF

3   or the JTTF executive committee.  There are higher levels.

4   You know, there's -- I have a secret, but there is top

5   secret.  So the majority of the FBI agents have a top secret

6   clearance.

7          So there's information that they're not allowed to

8   share with me.  They can share classified.  They can share

9   secret information.  They can share unclassified.  But they

10  can't share top secret information.  And when you talk about

11  protecting the president or vice president, that's very, very

12  high level.  And there's some stuff that they're not going to

13  be able to share with me or my staff.

14  Q.     But they would identify to you a person that they were

15  concerned about, but they wouldn't share with you why or how

16  they know; is that the type of information you would get?

17  A.     So I attended a Secret Service course, I think, in

18  2018.  I spent a week in Washington, D.C. working with the

19  Secret Service.  I'm very familiar with their protocols.  So

20  if you talk about protecting the vice president or president

21  of the United States, they don't think they have to tell us

22  their number one goal is to keep the president safe.  I think

23  when you talk about the timeliness, if there's an inbound

24  threat to the president or vice president of the United

25  States, our obligation is to act and keep those individuals

1   safe.

2          So they don't have to share much of anything.  But

3   when they pretty much have us coming in to help protect

4   because there's not enough of them to do the job they need to

5   do to build, to protect the barrier around the president or

6   the vice president, they elicit local law enforcement and

7   other state law enforcement, federal law enforcement to

8   assist.

9          So again, when things are rapidly evolving that

10  they're uncertain, sometimes they're tense.  I don't think

11  it's practical to ask them to do that, nor is it probably

12  safe for the president or vice president to actually ask them

13  to do that.

14  Q.     Without naming the businesses or organizations --

15          MS. YARBROUGH:  I'm sorry to interrupt, Your

16  Honor.  This is Stella Yarbrough from the ACLU.  If you've

17  noticed, Mr. Castelli has lost the hearing.  I think he's

18  having computer issues at home.  Is it possible just to give

19  us a three-minute pause to allow him to --

20          THE COURT:  Sure.  Sure.  We can take a very

21  brief pause.  And probably a good thing to do anyway.  We'll

22  make it five because three is kind of quick.  And so we'll

23  take a break until about six till the hour.  And we will go

24  for another 20 or so minutes.  And a short break also for our

25  witnesses.  Also Director, very short break.  Five-minute

*TESTIMONY OF MICHAEL RALLINGS*                              89

 1  break for everybody.  We'll reconnect in five minutes.  Thank

 2  you so much.

 3              MS. YARBROUGH:  Thank you, Your Honor.

 4              (Short break.)

 5              THE COURT:  I think we have almost everyone.  And

 6  there's our witness.  So we're ready to resume testimony,

 7  Director.

 8              And so counsel may proceed.

 9  BY MR. MCMULLEN:

10  Q.    When we left off, Director Rallings, and I don't want

11  you to name the institutions or businesses, but there are

12  some institutions in this city, which if they were

13  compromised by terrorists or someone wanted to do destruction

14  to the city, it would be dire consequences for the City

15  overall.  Can you talk about the importance of sharing

16  intelligence with those institutions?

17  A.    Well, so not only is there a full-time JTTF, there is

18  a part-time.

19  Q.    When you say JTTF?

20  A.    Joint Terrorism Task Force.

21  Q.    Okay.

22  A.    And a number of the major corporations are part of the

23  part-time.  So there is one particular corporation

24  headquartered in Memphis that is critical to shipping all

25  over the world.  They are providing coronavirus relief,

                     UNREDACTED TRANSCRIPT

1   medical equipment.  And so if you talk about critical

2   infrastructure, they are one of those companies.  So you

3   know, if we go back to 9/11 when all these planes were

4   grounded, not only do they ship -- they ship hearts going to

5   a heart patient.  Other organs and so, you know, there's

6   critical infrastructure that's used by the United States

7   Government that is in private industry.

8         We know that there are a number of critical

9   infrastructures when we talk about in rail, in air, in

10  waterborne that just cannot stop moving.  And so any threat

11  to those infrastructures, in utilities.  If we lost MLG&W.

12  If we lost Valero, that does -- and I didn't mean to call a

13  particular name, but --

14  Q.     But in fairness --

15  A.     But critical infrastructure that is vital to the City,

16  not only supporting a local effort, but is vital and critical

17  to supporting a national level of the ability to ship goods

18  and services.  So you know, since March, we've been talking

19  about essential services and businesses.  And other people

20  are just recognizing those, but they've been essential

21  throughout them becoming a business and are woven into the

22  fabric of the United States of America.

23         MR. MCMULLEN:  Your Honor, I want to lead the

24  witness so that we cannot mistakenly reveal something that

25  shouldn't be revealed.

1          THE COURT:  You're allowed to do so in these

2    circumstances.  That's fine.

3          MR. MCMULLEN:  Thank you.

4    BY MR. MCMULLEN:

5    Q.     Aren't there some institutions here that have certain

6    things on their property that would be very destructive in

7    the wrong hands?

8    A.     I wouldn't use destructive.  I would use catastrophic.

9    Q.     Okay.  And those institutions have their own security

10   force, is that not true?

11   A.     That's correct.

12   Q.     And is it important to you to be able to coordinate

13   and cooperate and share intelligence with those institutions?

14   A.     It's absolutely critical.

15   Q.     And those institutions are not necessarily law

16   enforcement; is that correct?

17   A.     That's correct.

18   Q.     All right.  I want to go back to --

19          MR. MCMULLEN:  Thank you, Your Honor, for

20   allowing me that latitude.

21          THE COURT:  Certainly.

22   BY MR. MCMULLEN:

23   Q.     I want to go back to the bridge incident.  And anybody

24   from Memphis remembers what happened on the bridge and your

25   actions in defusing that.  But I want to state, you know,

1    that the crowd size swelled so quickly.  How could you

2    determine or gauge how big the crowd was going to be?

3    A.       It was impossible.  And I have to say that, you know,

4    that not only we, but the actions of some of the protest

5    leaders allowed us to mitigate that.  But you know, the crowd

6    swelled from, again, 200 individuals that I talked to at

7    FedExForum.  I went to WLOK to do the radio spot, and I heard

8    the crowd growing by the minutes.  200, 400, 600.  To the

9    crowd becoming mobile.

10           And it probably wasn't until I saw, you know, we have

11   a camera on the bridge.  The bridge is critical

12   infrastructure.  That when I saw the number of bodies there

13   and I recognized the danger, I immediately knew that I needed

14   to put myself into the situation to try to mitigate it.

15   Q.       Do you have any opinion on how the crowd grew so

16   quickly?

17   A.       Well, I watched a number --

18                MR. CASTELLI:  Your Honor, I think I need to

19   object to that.  That's pretty speculative.

20                THE COURT:  Exactly.  The objection would be

21   sustained on speculation.  I think that the question can be

22   rephrased to what information specifically do you have about

23   how the crowd quickly grew larger.  But we have to know the

24   basis for it.  There has to be a -- lack of foundation was

25   part of the objection, and I have to sustain that.  So with

```
 1    that explanation, I'm going to let counsel see if we can

 2    rephrase that question.

 3                 MR. CASTELLI:  Thank you.

 4                 MR. MCMULLEN:  Thank you, Your Honor.

 5    BY MR. MCMULLEN:

 6    Q.    Based on your after action report, do you have any

 7    information on how -- what precipitate the crowd growth and

 8    the instructions on where to go and what the agenda was?

 9    A.    Well, and I don't want to -- I can only answer the

10    question honestly.  So individuals on the bridge, you know,

11    were out there for a number of hours.  They showed me how

12    they were communicating.  It was Facebook Live.  It was

13    social media.  A number of them have done interviews where

14    they admitted to it.

15          So there is a great PBS documentary out there.  A

16    number of media interviews where they talked about it.  But

17    individuals on the ground showed me that they were on

18    Facebook Live.  I'm not a social media person.  So I

19    definitely didn't appreciate the value of it.  And that's

20    kind of what we're talking about now.  Just because I

21    personally choose not to use a particular platform doesn't

22    mean it does not have value.

23          So they were able to respond by one, watching the

24    local news that was broadcasting live, but the vast

25    majority -- the news showed up after the protesters got
```

UNREDACTED TRANSCRIPT

*TESTIMONY OF MICHAEL RALLINGS*                                    94

1    there.  They communicated on social media through texts,

2    through e-mail, through Twitter, through other local, you

3    know, groups, and it's all social media.  And I think that's

4    why the value of being able to monitor for a legitimate law

5    enforcement purpose is critical to keep people safe.

6           And I'm just happy nobody died that day.  Some

7    individuals said that it would have been worth losing

8    somebody.  I just can't agree with that.  Nobody died.  The

9    bridge is extremely dangerous.  And you know, that's why we

10   tried to, you know, mitigate that and ask, you know, the

11   state police to take their responsibility over.

12   Q.    Let's talk about -- well, I want to --

13          MR. MCMULLEN:  Your Honor, I want to publish

14   Exhibit Number 8.

15          THE COURT:  Certainly.  Go right ahead.

16          MR. MCMULLEN:  And it's situational awareness

17   from Tennessee Fusion Center.

18   BY MR. MCMULLEN:

19   Q.    Okay.  Director, are you familiar with this document?

20   A.    Yes.

21   Q.    Okay.  Is this something that -- what is it?  Just

22   tell us what it is.

23   A.    It's a situational awareness bulletin dated 12 June,

24   2020 from the Tennessee Fusion Center and the Tennessee

25   Department of Safety & Homeland Security.

UNREDACTED TRANSCRIPT

1  Q.      Okay.  I'm going to give you -- all right.  We're

2  going to give you a hard copy of it.  Maybe it would be

3  easier to read for you.

4  A.      Okay.

5  Q.      Now, on this, could you tell the Court what

6  information you get from this and how you react to this --

7  how you react to this information as the police chief

8  director, police director.

9  A.      Well, so I mean, I think I get a daily set of

10  bulletins from Tennessee Fusion.  So let's just talk about

11  the Fusion Center.  I think there are 80 Fusion Centers

12  across the nation.  They were set up after 9/11 because the

13  aftermath of 9/11 was that our intelligence agencies, our

14  federal agencies, our state and local agents, were not

15  talking to each other.  So Department of Homeland Security

16  makes sure that -- the federal Department of Homeland

17  Security makes sure that these Fusion Centers operate within

18  the guidelines of federal laws, state and local laws.

19  Q.      And this was something done after 9/11?

20  A.      Yes.  Yes, after 9/11.

21  Q.      There was a change of circumstances in the country?

22  A.      Obviously.  We know that -- we did not want -- and

23  remember I'm also military and police, so I had a dual

24  mission.  And I knew the importance of keeping our nation

25  safe and avoiding a 9/11.  And obviously it's worked because

*TESTIMONY OF MICHAEL RALLINGS*                                    96

1    we haven't had another 9/11 moment and hope that we can

2    continue to keep the United States safe.

3         However, when I look at these, I know that it is a

4    professional product.  I've been to the Fusion Center.  I've

5    known each one of the directors of TBI.  The heads of the

6    Department of Safety & Homeland Security.  And I know that

7    they put together a good product.

8         The first thing I look at is the classification, this

9    particular bulletin is unclassified.  It's law enforcement

10   sensitive.  That means that, you know, it's just not

11   necessarily to be published in the Commercial Appeal.  It was

12   made for law enforcement, but it's not classified.  So

13   there's parts of it that could be shared.

14        And I go back to -- when I look at this, I think about

15   the national Day of Rage that was posted on media.

16   Businesses started shutting down.  I was getting all types of

17   calls about what we're going to do.  I said go to work.

18   We're going to try to keep you safe.  And so that's what I

19   look at.

20        So this bulletin says a couple of things.  Scope, key

21   judgment and details.  And so each one of them is situated

22   like that.  It talks about Tennessee implications.  So it

23   focuses on the state.  It's a three-page bulletin.  So I try

24   to ingest this very fast because there's so many of them.  I

25   know the significance of Juneteenth.  And it just talks about

1    situation awareness.

2    Q.     What is the significance of Juneteenth, just briefly?

3    A.     Well, we know that, you know, many in the nation were

4    not told about emancipation until years after emancipation.

5    So Juneteenth celebrates that date where so many others

6    learned about it.  And so Juneteenth has been a celebration

7    in Memphis every single year.  It's a significant day for

8    African-Americans.  And so you know, when you talk about

9    these certain dates that are pivotal in the history of

10   Americans, pivotal in the history of African-Americans, it's

11   just a day to recognize.  So --

12   Q.     Now, June 19th, that will be tomorrow, and so this is

13   a bulletin that you received on June 12th; is that right?

14   A.     Yes.

15   Q.     Now, tell me, is this just something that the rumor --

16   or how do you analyze the credibility of this document?

17   A.     Well, first, I depend on the Tennessee Fusion Center

18   and the Department of Safety & Homeland Security to do their

19   job.  I mean, we've trained with them.  Again, they have

20   standards they have to follow.  And I trust that they're

21   going to put out a product.

22          But I just read the bulletin.  And I think that you

23   have to read the bulletin and know what they are saying.  And

24   normally it's in the first couple of paragraphs.  So first is

25   situation awareness.  And public safety agencies across the

UNREDACTED TRANSCRIPT

1    state in order to inform the significance.

2            So if I know anything about June the 19th, Juneteenth,

3    well, I can learn about it and the potential for civil unrest

4    during some scheduled protests.  So if I've got a protest

5    scheduled, I may make sure that I have additional manpower.

6    That I make sure I advise my officers of the significance of

7    Juneteenth so they're aware of, you know, and they understand

8    why people will respond or how they may respond.

9    Understanding previous violent incidents may provide insight

10   for future violence and vandalism detection by state and

11   local authorities.

12           So they also talk about, you know, First

13   Amendment-protected activities and that TFC safeguards these

14   rights.  And only reports on First Amendment-protected

15   activities or operational planning in the interest of

16   ensuring the safety and security of the public.  I think TFC

17   put some of that language in there just for Memphis.  They're

18   aware that we're under a Consent Decree.  And so they want to

19   remind not only us but everybody else in the state that's our

20   goal.

21           I go to key judgment.  TFC is not aware of any

22   credible, specific intelligence regarding calls for violent

23   action by violent opportunists during these events.  But it

24   assesses with high confidence, and I will highlight that,

25   that violent opportunities are likely.  Violent

1   opportunities, they're a possibility.  They have high

2   confidence that some violent individuals are going to show up

3   and try to take advantage of these events and engage in

4   violence, rioting and/or vandalism during peaceful protests

5   and attempt to incite others to engage in similar activity,

6   which is the same warning that was put out in 2016 when we

7   saw the unrest with law enforcement.  Five officers being

8   killed in Dallas.  Three killed in Baton Rouge.  We just lost

9   Sergeant Verdell Smith in Memphis.

10        And so it's almost the same scenario where there's an

11  opportunity of violence, you need to be on the alert.  You

12  need to plan and be ready.

13  Q.    Now, when I look at this, when I look at this key

14  judgment, I see, not aware of any credible, specific

15  intelligence.  So from my perspective, I'm kind of relaxed.

16  Nothing is really going to happen here.  Now, you pointed out

17  high confidence in the next sentence.  The TFC assesses with

18  high confidence.  Is that code for something?  What does that

19  mean for somebody in the industry?  Is that just one person's

20  opinion?

21  A.    No, no, no.  If you look at it, it's got a C by it.

22  And I don't know what you call that.  But I then go to the

23  bottom, and I tell people, I'm not the smartest person, I

24  just read.  And so C down here, and I'll read exactly what

25  that says.  So I don't have --

1   Q.      It's kind of small.

2   A.      It's very small.  F you miss it, you'll miss a lot.

3   "High confidence generally indicates the TFC's judgments, the

4   Tennessee Fusion Center, are based on high quality

5   information, from multiple sources.  High confidence in a

6   judgment does not imply the assessment is a fact or a

7   certainty; such judgments might be wrong.  While additional

8   reporting and information sources may change analytical

9   judgments, such changes are most likely not to be refinements

10  and not substantial in nature."

11         And so let me just tell people what that means, and

12  I'll give you a great example.  The day of the bridge

13  protest, I was at WLOK listening to the radio.  Before I went

14  to the radio station, there was just a lot of people

15  downtown.  And before that bridge protest exploded, I called

16  my deputy director, and I said, I don't know what's going on,

17  but I need you to put on your uniform, and I need you to come

18  downtown.  He said, what is going on?  I said I don't know,

19  but I just feel something is about to happen.

20         And so a trained, skilled law enforcement officer pays

21  attention to what's going on.  Sometimes you can feel the

22  tension in the air.  You just feel like something's just not

23  right.  So he went in to put on his uniform and come downtown

24  just to say hi to me.  Great.  But thank God he was here

25  because every step I took off the bridge, he took.  Every

1   decision I made, he was involved in.  And it was just a

2   hunch.  That was just a feeling of uneasiness, recognizing

3   that something's not normal.  That we need to probably be

4   aware.

5          And so some people asked me, well, how do you know.  I

6   said I don't know, man, the hair will stand up on the back of

7   my head.  And 90 percent of the time, I am in the ballpark.

8   So I think it's from experience.  It's from ingesting a large

9   amount of information that comes from Fusion.  You know,

10  Charlottesville AARs.  Studying this for a 30-year career in

11  military and law enforcement.  And I just consider myself a

12  subject matter expert.  And then I trust my instincts because

13  I'm a lifelong Memphian.

14         And so some stuff that Tennessee -- that's going to be

15  in these bulletins could be information from a confidential

16  source that they can't tell me about.  It could be top secret

17  information that they can't tell me about.  But their job is

18  to put together a high quality product that I can use as a

19  reference and make plans so that I can provide protection for

20  the citizens of Memphis and our law enforcement officers.

21  Q.    Would it be fair to say you're not necessarily --

22  there's no way for you to tell how they acquired the

23  information, unless you ask, like spent time trying to track

24  it down directly, you might run into a brick wall on that?

25  A.    Yeah.  There's no way.  I think there's a couple of --

1  sometimes there's a reference on page 2.  There's a May 2018

2  where a Revolutionary Abolitionist Movement (RAM) released a

3  video promoting a Capture the Flag campaign.  So often these

4  bulletins will, you know, connect to something that's

5  happened or something that's been posted.  They look at, you

6  know, current events.  And you know, then they list some

7  celebrations.  And again, you know, it keeps us aware.

8  Q.     Do you know whether the Tennessee Fusion Center has

9  social media?  Do they search social media?  Do you know

10  whether they do?

11  A.     So the Tennessee Fusion Center is unique.  There's

12  only one in the state.  The Tennessee Fusion Center.  And F

13  you look at the bulletin, they're kind of code commanded, so

14  to speak.  So part of the Tennessee Fusion Center is TBI.

15  And I think the TBI focuses on a lot of the criminal.  But

16  the Department of Safety & Homeland Security, they are, you

17  know, pushing out the things that when you talk about

18  terrorism.

19  Q.     Threat assessment?

20  A.     Threat assessments, you know.  They pushed out a lot

21  on COVID.  And then TBI will focus on fraud, fugitives,

22  BOLOs, safety.

23  Q.     What is a BOLO?

24  A.     Be on the lookout.  So if we know that someone

25  committed a heinous act in another jurisdiction or made

1   threats to harm law enforcement or there's something we need

2   to be aware of, they'll put out a BOLO so we are aware of a

3   potential threat.  It could be a new drug, a new -- Fentanyl

4   that is very hazardous to law enforcement.

5          And so they just put out a large number of products in

6   -- these situation awareness bulletins are only one of a

7   whole laundry list.  But you can go to their website and pull

8   it up.  They'll tell you what they're about.  They'll tell

9   you what they do, and they really do a great job to me of

10  telling their own story.

11         THE COURT:  All right.  We did indicate that we

12  would stop at 15 after.  We've gone another four or five

13  minutes.  But we need to be mindful of the schedule.  And so

14  it's better to take that lunch break now for those who wish

15  to do that.

16         We can come back at 1:00.  We cut a little bit of

17  time off our break, but it's important.  And staff also has

18  to have a break.  You know we have a court reporter.  We have

19  other staff.  We can't go indefinitely without a break.

20         So we'll be excused until 1 o'clock, at which

21  time we'll resume.  Of course, Director, always good to have

22  you, and we'll ask you to be ready to go at 1:00.  And of

23  course, Mr. McMullen, you'll resume your examination at that

24  time.  So we're going to let everybody be excused.  And we

25  are in recess until 1 o'clock.  And so thank you all very

 1   much.  Thank you.

 2              (Short break.)

 3              THE COURT:  All right.  This is Judge McCalla,

 4   and hopefully we have everyone.  It looks like we don't.  All

 5   right.  Well, maybe we are ready.  Let's make sure.

 6              Mr. McMullen, can you hear us all right?

 7              MR. MCMULLEN:  Yes.  We can hear you clearly,

 8   Your Honor.

 9              THE COURT:  All right.  Well, we've been -- I

10   think we are set then.  I'm looking for the most important

11   person, which is the Director.  There he is, Director.  We're

12   all set to go.

13              THE WITNESS:  Hey, Judge.

14              THE COURT:  Yeah.  You keep moving around on my

15   screen.  I'm glad to you have, absolutely.

16              Counsel?

17              MR. MCMULLEN:  Your Honor, if I can get an

18   agreement from the other party --

19              (Music interruption.)

20              THE COURT:  Okay.  Now mute it out.

21              Okay.  The individual who is attempting to

22   interrupt these proceedings will now be excluded from the

23   meeting.  You're allowed to attend as long as you behave in

24   an appropriate way in a courtroom, which does not of course,

25   allow individuals to engage in personal vocalization, unless

                      UNREDACTED TRANSCRIPT

 1   they're called upon by the Court.  So if we can, that

 2   individual will be removed.  Unfortunately, because this is

 3   an opportunity for every person.  It's an open proceeding,

 4   but of course, it has all the dignity of any court

 5   proceeding, and people are expected to behave in an

 6   appropriate way.  Staff will tell me when they're ready to

 7   go.

 8           All right.  We're going to try this again.  All

 9   right.

10           Mr. McMullen, can you hear me now?

11           He can hear but we cannot hear Mr. McMullen.

12           MR. MCMULLEN:  Your Honor, can you hear me?

13           THE COURT:  Yes, I can.  I think you're the only

14   one in the whole group that can speak now.  We're going to

15   have to unmute the Director.

16           Director, I bet you wish you had -- Director

17   probably wishes he had this kind of control all the time,

18   right, Director?

19           THE WITNESS:  Your Honor, can you hear me?

20           THE COURT:  Absolutely.  We're gradually bringing

21   people back on line.

22           THE WITNESS:  Yes, sir.

23           MR. MCMULLEN:  Okay.  Your Honor, preliminarily,

24   we have two other witnesses that can only go today.  And I

25   was hoping I could get agreement with Mr. Castelli and

*TESTIMONY OF MICHAEL RALLINGS*                          106

1    Mr. Stanton that I got a few more questions to finish up with

2    Director Rallings, and he can come back tomorrow for cross

3    examination and allow us to go on with the other two

4    witnesses that have to be done today.

5              THE COURT:  Sure.  I understand.  Let me ask

6    Mr. Castelli, and I hope we've got it where we can hear you,

7    Mr. Castelli.

8              MR. CASTELLI:  Can you hear me, Your Honor?

9              THE COURT:  Yes, I can.

10             MR. CASTELLI:  Okay.  Great.  No.  I don't have a

11   problem with taking some witnesses out of order and

12   accommodating peoples' schedules.

13             THE COURT:  Absolutely.

14             Mr. Stanton, any issue about that?  Glad to do

15   it.

16             MR. STANTON:  No objection, Your Honor.

17             THE COURT:  Absolutely.  Well, we'll certainly be

18   glad to do that.  And Director, I know that we will be

19   starting tomorrow, assuming that we don't get back to you

20   today.  We'll be starting no later than 9 o'clock, and you

21   know that means, as you know, if you're not early, you're not

22   on time.  You tell them that all the time.  And so we're

23   going to follow the rule that we all are trying to follow.

24             Okay.  Mr. McMullen, I think we're ready to

25   proceed.

*TESTIMONY OF MICHAEL RALLINGS*                                    107

1   BY MR. MCMULLEN:

2   Q.      Director Rallings, we were talking about the Fusion

3   Center bulletin.  And I want to ask you, those are not the

4   only bulletins you receive from law enforcement agencies, are

5   they?

6   A.      No, sir.

7   Q.      Okay.  Now, do you know whether the Fusion Center use

8   social media monitoring in developing the bulletin

9   information?

10  A.      Yeah.  I'm pretty confident that they do.

11  Q.      Okay.  But is it any way -- you mentioned before some

12  level of secrecy, top secret or just secret clearance.  Can

13  you just pick up the phone and call the Fusion Center and ask

14  them how specifically they got the information?

15  A.      So I think that's probably unreasonable, given the

16  nature, the volume of bulletins.  They put out a daily kind

17  of briefing.  I've seen one briefing that had eight, maybe

18  ten bulletins.  And you know, given the nature that they're

19  pushing out so much product right now, I don't think that's

20  reasonable, and I mean, to be able to call the Fusion Center,

21  track down the analyst, expect them to call whoever pushed

22  the product out because you're getting bulletins from the

23  FBI, department of Homeland Security, the Department of

24  Defense, United States Army.  I mean, there are -- and all

25  the other 80 Fusion Centers can submit product.

UNREDACTED TRANSCRIPT

*TESTIMONY OF MICHAEL RALLINGS*                                    108

1         So I think that that is a standard that is rather

2    unreasonable.  I know personally I couldn't do it, given the

3    challenge of performing all my duties.

4    Q.    Now, I want to move along to another area.  There was

5    a phrase that came up that I wasn't really familiar with the

6    definition of.  Officer-created jeopardy.  What does that

7    mean?

8    A.    So that's a good question.  I used to talk quite --

9    talk about this quite a bit when I was an instructor at the

10   academy.  And so here's what I think officer-created jeopardy

11   is.  And I don't want to talk too eye level, but let me just

12   give you a scenario, and then I'll talk about it.

13        Normally I think about it is when an officer may rush

14   into a scenario and place themselves in jeopardy.  For

15   instance, an officer is trying to stop an individual that may

16   be fleeing, and the officer may place themselves in front of

17   a vehicle.  Well, we know that if the vehicle does not stop,

18   that the officer has the decision.  The officer either has to

19   move and jump out of the way, or they can stand their ground,

20   and it's probably going to result in some type of use of

21   force or a use of deadly force.

22        So the courts and trainers and, you know, others that

23   were in these scenarios may look and say that that was

24   officer-created jeopardy.  The officer did not have to step

25   in front of the car.  Well, the Supreme Court has also said

UNREDACTED TRANSCRIPT

1   that an officer has no constitutional obligation to retreat,

2   meaning that if a officer has a reason to be there, they're

3   acting lawfully, they do have opportunity.

4        If I go back to the scenario with St. Jude, where a

5   individual rammed a barricade and officers jumped in front of

6   and were running alongside of the vehicle to stop that

7   individual.  If they had not placed themselves in jeopardy,

8   God forbid what could have happened.  So it's almost a

9   catch-22.

10       I know that California recently passed a higher level

11  of when an officer can use a deadly force than what the

12  Supreme Court pretty much ruled in Graham versus Conner with

13  the reasonableness clause.  So California law is probably

14  where a lot of these new conversations have came from.

15       But another scenario could be in an active shooter

16  situation.  Where a sole officer assigned to a school.  The

17  officer is outside of the school.  The officer hears the

18  report of gunfire.  That officer has been trained to wait for

19  backup before they enter because if you enter alone, that

20  officer could easily be shot and killed.  But the officer has

21  to make an individual decision.  Is a risk to my own personal

22  safety not as important as a risk to me possibly saving the

23  lives of innocent children or school faculty?

24       So some will criticize the decision of the officer and

25  say that the officer placed themselves in jeopardy by

1    entering.  But some others will criticize the officer and say

2    that that's your job.  The officer should have placed

3    themselves in jeopardy.  And there could be a tragic outcome

4    on the other.

5         So you can't define it very narrowly.  It really

6    should be defined and reviewed on a case-by-case basis, given

7    the totality of the circumstances.  But I think for the last

8    -- since Graham versus Conner, most of the decisions of a

9    police officer were pretty much applied to seconds before an

10   officer made the decision to use deadly force, where this new

11   law kind of looks at all the things that led up to the

12   officer making the decision, and it could be used against the

13   police officer or could be used for a police officer.

14        I think it's a slippery slope when you, you know, just

15   define it narrowly because it has very broad implications.

16             MR. MCMULLEN:  Let me -- Your Honor, I want to

17   enter another exhibit.  It was previously submitted as a

18   document, Defense Exhibit 1, and it is a copy of the original

19   Consent Decree.

20             THE COURT:  Certainly, that's fine.  Now, the

21   Consent Decree, the Consent Decree is part of the record, but

22   we'll mark it here.  That's perfectly fine.  And that's 19.

23   And that is the Kendrick Decree from 1978.

24             (WHEREUPON, the above-mentioned document was

25   marked as Exhibit Number 19.)

*TESTIMONY OF MICHAEL RALLINGS*                                        111

1              MR. MCMULLEN:  Okay.  I'd like to share my screen

2    with the Court.

3              THE COURT:  Certainly.

4    BY MR. MCMULLEN:

5    Q.      Director Rallings, you have a copy of that Consent

6    Decree?

7    A.      Yes, I do.

8    Q.      And for ease on your eyes, I gave you a copy.  You can

9    look at it.  You don't have to read it from the screen.  Have

10   you read this Consent Decree before?

11   A.      Yes.

12   Q.      Okay.  Tell me your problems with the Consent Decree

13   as far as confusion and understanding.  And I also want --

14   you can point out certain parts, if you would like, but also

15   tell how it impacts your officers in some of that

16   involvement.

17   A.      Okay.  Well, let me first read it.  And I think it

18   would help out.  So we know that the Consent Decree was --

19   this was stamp filed 1976.  And so I think that the Consent

20   Decree is extremely challenged.

21             THE COURT:  All right.  It was actually 1978.

22   And that's the file stamp on it.  I just think we ought to

23   probably be accurate on the date.  Nothing wrong with that.

24   This is not a chance to say whether you like the Decree or

25   not.  It's a chance to talk about evidentiary matters.

TESTIMONY OF MICHAEL RALLINGS                                    112

1         We might want to refocus that question, provide a

2    little more guidance to the Director because we don't usually

3    ask for narratives, so the rule against narratives is what

4    we're going to follow.  And that means we have to have a

5    question and answer format.

6         Mr. McMullen, let's first follow the normal rule

7    here.  Probably helpful to, frankly, everybody.

8         MR. MCMULLEN:  Okay.  Thank you, Your Honor.

9    BY MR. MCMULLEN:

10   Q.    Chief Rallings, you understand what the Court was

11   saying.  This was actually filed in 1978.  Do you see the --

12   A.    Yeah.  I just misread it.

13   Q.    I want to point you to the second page and under

14   Definition Number 4.  Political intelligence.  Could you

15   explain how the phraseology of that has impacted your police

16   officers or how y'all have dealt with that?

17   A.    Yes.  So the term "political intelligence," as it's

18   defined in the Consent Decree, you know, is still confusing.

19   It says, "means the gathering, indexing, filing, maintenance,

20   storage or dissemination of information," and then it has an

21   "or."  "Or any other investigative activity, relating to a

22   person's beliefs, opinions, associations or other exercise of

23   First Amendment rights."

24   Q.    Tell me some of the struggles that your officers have

25   had with the definition and the actual phrase "political

1    intelligence."

2    A.      I'll give you one in that in one of the complaints

3    where there was a political rally that we were asked to

4    provide security for.  And one of the supervisors made a bad

5    call and saw the political signs come out.  And according to

6    him, when he saw that, he thought that that was something

7    we're not supposed to be involved in.  We're not supposed to

8    participate.  He pulled the police officers off.  And you

9    know, to our disappointment, we were not able to do an

10   adequate job to keep the public safe.

11        But again, it was an honest mistake.  He didn't quite

12   understand, you know.  Political activity gets you wrapped up

13   into the political intelligence.  And so many of our officers

14   are confused about it.

15        So again, I'll share what some of the officers tell me

16   in that, you know, Director, when we go on, even if it's a

17   criminal matter we have to go on social media, people are

18   expressing their beliefs and opinions and their associations

19   shown on their social media pages.  They're expressing their

20   First Amendment right, even if they're talking about, you

21   know, shooting or having guns and having access to guns or,

22   you know, whatever they say could be deemed as a threat, but

23   sometimes it doesn't meet the criminal threshold.  So a lot

24   of officers are confused.

25        I mean, sometimes I may say something to my guys and

1    say, oh, you can do that, and they'll say no, we can't.  I'll

2    say well, we need to talk to the lawyers.  And it takes a

3    team of lawyers and us discussing it and working with our

4    legal advisor to make a determination if it would or would

5    not be a violation of the Consent Decree.

6         So you know, I've read a hundred pages.  The Decree is

7    seven pages.  I think the order was 39 pages, another

8    49 pages, 12 pages on something.  So I'm confused.  So I know

9    if I'm confused and I've been dealing with this since the

10   litigation was filed, that many of my officers are confused.

11   Because I have to have a whole team of lawyers to kind of

12   keep me and make sure I make decisions and I approve

13   investigations that are in compliance with the Decree.

14   Q.    Let's look at some other places in the Decree.  Well,

15   are you clear what Decree means when -- under political

16   intelligence, it says, "relating to any person's belief,

17   opinion, associations or other exercise of First Amendment

18   rights?"

19   A.    No.  I wish I was.

20   Q.    What's the ambiguity to you?

21   A.    Well, so I think I gave an example earlier where I was

22   reading a very well-written article in the Commercial Appeal

23   that was talking about some of our local activists.  It had

24   pictures and descriptions and, you know, what they promoted.

25   So they were expressing their First Amendment right in this

UNREDACTED TRANSCRIPT

 1  particular document.  And when I read it, I thought about it,

 2  and I hit print.

 3         Then I said oh, my God.  And I took it and I shredded

 4  it because I wasn't sure if -- I mean, there was more

 5  information than any document I've ever seen.  That was just

 6  an interview.  But -- and I was, you know, thought about

 7  sending it to my staff and said, you know, wow, this is an

 8  interesting article.  But I said, wait a minute, I can't do

 9  that.  So not only did I shred it, I just, you know, got off

10  of it and deleted it.

11         And then while watching some of the live feeds where,

12  you know, reporters are step by step, there were individuals

13  in the crowd saying that they were going to disrupt.  They're

14  going to the bridge, they're going to do this.  They told us

15  step by step.  But I said, man, I don't know if I can watch

16  this.  I don't want to be found in violation of the Decree.

17         But as a citizen, am I allowed to do something that a

18  citizen can do?  And I'm still confused about that.  Just

19  because I'm a police officer.  Individuals wanted me to come

20  participate in the protest.  I said well, I can't do that.

21  Because some are going to say that I'm surveilling them, that

22  I'm infringing upon their rights because I represent the

23  entire Memphis Police Department.  So it's not because I have

24  not wanted to participate.  I'm fearful that I will violate

25  the Consent Decree in some type of way.

*TESTIMONY OF MICHAEL RALLINGS*                                    116

1        So again, you know, if I'm confused, then I know that

2    there are other officers that are confused.  And I think

3    that -- I know that some officers have said that if there's

4    anything that's got to do with social media, I'm just not

5    going to go look.  But there are other officers that have

6    continued, and I think we've delivered our search terms as

7    required by the Monitor.  But there is a lot of confusion

8    regarding this Decree.

9    Q.    Okay.  Let's talk about -- I want to go to Section I,

10   restriction on joint operations.  Now, just what is your

11   understanding of what is prohibited by the Decree under

12   Section I or allowed by the Decree?

13   A.    Okay.  So there are two things.  One, is I look at the

14   Decree as filed in 1978.  Then I have to go back and review,

15   you know, Judge McCalla's opinion and order that came

16   out 10 of 2018.  I have to go back and look at the order

17   denying immediate modification that came out in November of

18   2019 and then the proposed modification.  So you know, that's

19   a hundred pages of documents right there.

20        But if I look at the order as it is written, to me,

21   it's very clear.  Because again, we didn't think we were

22   violating the order.  But when I go back and read it, I

23   looked at, you know, the Judge's order.  You know, it clearly

24   says that we were.  It says, "The Defendants and the City of

25   Memphis shall not."  "Shall not" is a powerful word.

UNREDACTED TRANSCRIPT

TESTIMONY OF MICHAEL RALLINGS                           117

1   "Cooperate with, delegate, employ or contract with or act on

2   the behest of any local, state, federal or private agency or

3   any person to plan or conduct an investigation, activity or

4   conduct, prohibit -- or conduct prohibited by this Decree."

5   Because political intelligence, the definition is fuzzy, that

6   makes this fuzzy.

7           So if a citizen sends me a text message, I think there

8   was some -- some of our friends shared my cell number on

9   social media.  And some great citizens called in, giving us

10  valuable information regarding an allegation of a criminal

11  act.  I wasn't certain what all I could receive.  Could I

12  receive the social media posts of an incident that where the

13  report as being criminal, but I didn't know that.  Could I

14  receive fliers of a particular event?

15          And each time I would confer with our lawyers and make

16  sure that I was not violating the Decree because outside of

17  the Monitor and the Court, who grants me an approval

18  process?  So the process allows me to approve these

19  investigations.  So do I approve my own investigation, or do

20  I work with the Monitor?  So again, there's still a lot of

21  confusion there.

22          And the examples of the vehicle incidents that

23  happened in the Cooper-Young area are great examples.  They

24  are unfolding in real time.  Activists are calling me.

25  Citizens are calling me.  They're asking to send me evidence

UNREDACTED TRANSCRIPT

1    or send me information to help with the investigation.  But

2    there's just a lot of uncertainty about it, and I would like

3    to clear the ambiguity up.

4           So I know I want, in my last ten months, I don't want

5    to put us back into any additional litigation.  I want to,

6    you know, move on so we can make sure we're in compliance.

7    But again, these are just uncertain times, given the volume

8    of information that's put out on social media during

9    political rallies where individuals are expressing their

10   First Amendment rights.  So just again, just a lot of

11   uncertainty on my part.  I'm sure -- and I'm certain because

12   they told me.  I'm certain on the part of my team and our

13   officers.

14   Q.    Director Rallings, I want to focus your attention on

15   Section G3.  Well, Section G -- let's start with just G.

16   Okay.  Under this section, I think you referred to it before.

17   You have to give direct approval for certain searches.

18   A.    Yes.

19   Q.    Yes.  Is that what you were referring to?  All right.

20   Tell us why that's impractical for you to have to give

21   approval for every -- for searches under Section G.

22   A.    Well, so let's go back to joint operations because we

23   have officers assigned to a number of federal task forces.

24   And we just received a $9 million grant from the Department

25   of Justice for Operation Relentless Pursuit, which is a

1   federal task force.  Those officers are working with federal

2   law enforcement.  Some of them have higher levels of

3   clearance than I have.

4        So there's no way for me to approve information that

5   I'm not cleared to be privy to.  So I'm not sure if I need to

6   pull them out of those task forces because of just the

7   classification issue.  But if we talk about G, where I think

8   I have approved probably 16 investigations, a majority of

9   those have been here in the last three weeks.  That a lot of

10  officers, if they don't quite understand this, they may not

11  know when they need to ask for permission.

12       So when I look at any police officer, any, that means

13  all of them, conducting or supervising a lawful investigation

14  of criminal conduct, which investigation may result, the

15  "may" is a problem.  Because if they look on someone's social

16  media, they may see something that is an exercise of First

17  Amendment rights.  Or so we've got a "may" and we have an

18  "or."  Or interfere in any way with the exercise of such

19  First Amendment rights.

20       If a citizen was alerted that a police officer was

21  looking at their social media page, it's probably going to

22  result in a complaint to the courts.  I think that that's how

23  we got to the Court from one of those initial complaints.

24  "Must, must immediately bring such investigation to the

25  attention of the Memphis director of police for review and

1    authorization."

2         Well, for the week that I was in Ghana, I had spotty

3    cell phone coverage.  I didn't have e-mail.  So there's no

4    way they could have gotten in touch with me in the ten-hour

5    flight to and fro.  You know, I did a self-quarantine for

6    14 days.  I was unavailable to sign, unless I did it

7    electronically.

8    Q.    If we read this as broadly as you've outlined -- first

9    of all, how many criminal investigations do you all have a

10   year?

11   A.    There was 118,000 incident reports filed.  We average

12   108,000 every single year.  So there's an unbelievably large

13   amount of criminal or incident reports filed that could

14   involve some type of crime.  Now, some of those reports are

15   memos, and they may not raise or rise to the criminal level,

16   but they still have to be reviewed.  They have to be saved.

17   They have to be maintained.  And they have to be available

18   for investigation.

19   Q.    If we said it may -- if I read this, it may result in

20   the collection of information about First Amendment rights,

21   and you said 118,000 criminal investigations?

22   A.    118,000 incident reports.

23   Q.    Incident reports.

24   A.    That's not including the 36,000 crash reports that are

25   filed that also have individuals' personal identifiable

                    UNREDACTED TRANSCRIPT

*TESTIMONY OF MICHAEL RALLINGS*                                   121

1   information in those.

2   Q.      So a broad reading of this because it views some

3   potentially ten percent of them may result in collection of

4   information about the exercise of First Amendment rights.  Is

5   it even practical for you to sign off on that many

6   authorizations?

7   A.      I don't think so.  Not -- and I have thought about

8   this quite a bit.  And again, I just don't think it's

9   practical.

10              THE COURT:  I don't want to cut us off on this

11  point.  But no one reading any of these materials would, in

12  any logical analysis, think that 118,000 matters required a

13  signoff.  That is not a possibility.  And it is what they

14  call a straw man.  You're putting up something that --

15              MR. MCMULLEN:  Your Honor --

16              THE COURT:  Mr. Castelli, I'm going to ask

17  Mr. Castelli.

18              Are you saying that, Mr. Castelli?  You have to

19  unmute.

20              MR. CASTELLI:  Your Honor, no.

21              THE COURT:  Well, let's find out.  Let's narrow

22  the issues here.  Mr. Castelli, what's your position in that

23  regard?

24              MR. CASTELLI:  Well, I mean, our position is that

25  those particular investigations that where there is a danger

1    of collecting First Amendment or political intelligence or

2    information about the exercise of First Amendment rights,

3    those are the ones that require approval, not the hundreds of

4    thousands of criminal investigations that I'm sure are going

5    on a year.  So there are definitions in here about what is

6    political intelligence, what is First Amendment rights.

7    Officers are trained on that.  And that would narrow the

8    scope down to those, only those investigations that involve

9    that type of information.

10            And I was unable to object earlier, but I will

11   launch the objection for the record.  I think the premise to

12   that question I would object to because I think there was an

13   assumption of ten percent, and I don't know if that's

14   accurate or not because I don't think we've had any evidence

15   in the record about that.

16            THE COURT:  All right.  I just don't want us to

17   be going on --

18            MR. MCMULLEN:  I understand.

19            THE COURT:  -- a rabbit trail.  It would probably

20   be better to focus -- I don't think anybody disagrees that

21   there can be some improvements made.  I think that's also

22   true.  And so let us go back and rephrase that.  And

23   Director, as I understand it, you have followed the procedure

24   and have authorized some investigations.  But we may need to

25   modernize that approval process; is that correct or

UNREDACTED TRANSCRIPT

1   incorrect?

2            THE WITNESS:  Yes, Your Honor.  I've approved, I

3   think, approximately 16 authorizations since 2018.

4            THE COURT:  Sure.  I mean, I --

5            THE WITNESS:  2019.

6            THE COURT:  I just don't want us to be distracted

7   from the focus of the hearing, which is the motion that there

8   be modification.  But I do understand the concern.  And I

9   certainly -- we're all listening.  So let's go back, and I'm

10  going to let Mr. McMullen sort of refocus that a little bit

11  so it's more narrowly focused.

12           MR. MCMULLEN:  I appreciate that, Your Honor.

13  And I was not trying to set up a straw man with the premise

14  of the question.  I think I said if it was read broadly, and

15  I think it can be read narrowly also.  But I understand what

16  the Court has said.

17           THE COURT:  Sure.  Sure.

18  BY MR. MCMULLEN:

19  Q.    Now, you have so far signed 16 authorizations, but

20  let's talk about it.  You talked about it before, why you

21  feel there's only been 16 authorizations.

22  A.    Yes, sir.  So in talking to our team, there's still a

23  -- even with the great training that our legal advisor has

24  been providing, even with posting the Consent Decree on our

25  kiosk so all of our members can have access to it, even with

TESTIMONY OF MICHAEL RALLINGS                                      124

1   all the media coverage that I'm sure that some of our

2   officers are probably watching the proceedings, there's still

3   confusion on when it's required.

4        As I stated, some officers have just refused to do it.

5   Because you know, we're asking an officer to use their social

6   media account to do, you know, their work or their job.  And

7   I don't think there's any wiggle room in there outside of,

8   you know, probably Internet Crimes Against Children, human

9   trafficking.  Some of the economic crimes that would allow

10  the officer to have another account.  And so it puts the

11  officer in a very difficult situation.

12       So because they understand the difficulty -- and I'm

13  not saying it's impossible, I'm saying it's extremely

14  difficult.  If someone shows me their social media page, it

15  starts out with all types of stuff about them.  Where they're

16  from.  Where they went to school.  Sometimes what they

17  believe in.  You know, if you -- if I have a social media

18  page, it obviously will talk about the Army and being a

19  police officer and maybe some of my own personal views.  It's

20  almost impossible to miss that.

21       And I think that there's still a lot of ambiguity.

22  And I agree with the Court, and I agree with the Monitor and

23  the ACLU in saying that there is room for modification.  I

24  think that's what we're asking for.  Let's clear up some of

25  this language so it's not confusing.

*TESTIMONY OF MICHAEL RALLINGS*                                         125

1      I had a veteran supervisor that was at a event that

2   was approved that was a pertinent event.  So when he saw the

3   political signs come out, he was confused, and he pulled the

4   officers off, thus not serving the individuals that were

5   there.  So you know, at the end of the day, I'm just a

6   practical person.  We have a large volume of policy and

7   procedures that I expect the officer to be familiar with and

8   know where to reference material.

9      There's a large volume of T.C.A., Tennessee Code

10  Annotated.  So they need to know the ordinances of the City

11  of Memphis.  State law.  Federal law.  And the policies of

12  the Memphis Police Department.  And make sure they understand

13  the Decree that still, in my humble opinion, is outdated and

14  is very difficult to apply to modern technology.

15     That is part of the difficulty because we're trying to

16  apply something that was written prior to.  When they talk

17  about wire intercepts and wiretaps, that's where the FBI was

18  going in and some law enforcement were drilling holes in

19  walls, placing wiretaps in phones, recording people with tape

20  recorders.  That has nothing to do with somebody posting a

21  video on Facebook Live.  And I think it's just, you know,

22  with the Internet, with social media, cell phones, I just

23  think that there's a lot of room for improvement.

24     And it is my wish as the director of the police

25  department that we fully comply to the Consent Decree.

UNREDACTED TRANSCRIPT

1   However, I've still got to make sure that a officer with, you

2   know, one year on the job who's in the squad car that is

3   being presented with information, that they understand when

4   they need to ask for authorization on an investigation.  When

5   they need to push pause and ask for a supervisor or when they

6   just need to absolutely leave because it is something that

7   could infringe upon the rights of individuals or shield

8   their expression of a First Amendment right.  And there is

9   confusion.

10  Q.      Let me ask you.  Under Section G, investigations and

11  stuff are 24/7 police investigations.  Do you think you would

12  benefit from the ability to designate people in your command

13  staff --

14  A.      Without a doubt.

15  Q.      -- to execute those authorizations?

16  A.      Without a doubt.  I've had a large number of officers

17  that have been under quarantine and a large amount of

18  officers that have tested positive for COVID.  And you know,

19  God forbid I get it, but I could be totally unavailable to

20  respond to these things.  And someone else should be

21  designated to approve these.

22          The deputy director of the Memphis Police Department

23  is my number two person.  He has all the authority that I

24  have.  And in my absence, he has the ability to make calls,

25  that if I'm not available, my cell phone don't work or if I'm

1   in a airplane a thousand miles away, someone else has to be

2   able to make those decisions.  Even the president of the

3   United States has a vice president.  There is a chain of

4   command.  And I think it's only reasonable to ask that that

5   modification be made.

6   Q.      Okay.  And I know we're kind of on a time crunch, but

7   have you had a chance to read the proposed modified Consent

8   Decree?

9   A.      Yes, I have.

10  Q.      And I think there are some proposals, except for

11  Section I, which there wasn't agreement.  There was not an

12  agreement on between the City and the ACLU.

13  A.      Yes.

14  Q.      I want to ask you about if you go to the second page.

15  A.      Are we on the modification?

16  Q.      Yes.

17          MR. MCMULLEN:  Your Honor, I'd like to publish on

18  my screen Exhibit 6.

19          THE COURT:  That's fine.  You can post 6.

20          MR. MCMULLEN:  Proposed modified order.

21          THE COURT:  There's been an Exhibit 17, and then

22  there's Exhibit 6.  Let's see if they're the same.

23  Exhibit 6?  Sure.

24  BY MR. MCMULLEN:

25  Q.      Director Rallings, I want you to first read the

UNREDACTED TRANSCRIPT

1   proposed definitions of legitimate law enforcement purpose.

2   A.       All right.  So that would be Item 3?

3   Q.       Yes.

4   A.       Under definitions?

5   Q.       Yes.

6   A.       And it says, "Legitimate law enforcement purpose means

7   an activity conducted for the purpose of furthering the

8   prevention of crime and/or ensuring the safety of the public

9   and law enforcement personnel, while adhering to law and

10  agency policy designed to protect the privacy, free speech,

11  association, and other civil rights and civil liberties of

12  all people."

13  Q.       Do you agree with that definition of legitimate law

14  enforcement purpose?

15  A.       I do.

16  Q.       In reading that definition, are you clear as to what

17  a -- is it clear to you as to what a legitimate law

18  enforcement purpose is?

19  A.       Yes.

20  Q.       Okay.  And this is one of the additions to the Consent

21  Decree.  Do you think it will be helpful to you in

22  understanding your prohibition in the Consent Decree?

23  A.       Yes.

24  Q.       I would like you to look at Number 5, I believe, First

25  Amendment-related intelligence, a phrase that the

UNREDACTED TRANSCRIPT

*TESTIMONY OF MICHAEL RALLINGS*                                    129

1   modification is proposing that would replace the phrase

2   political intelligence.  And could you go ahead and look at

3   that definition.

4   A.      Well, I think that the new definition would say -- it

5   would strike out political.  That would help, you know, clear

6   up the confusion that we may have seen in the Labor Day

7   parade.  First Amendment-related intelligence is -- and

8   there's some strike-out here.

9   Q.      You can look on your screen.

10  A.      Okay.  That's better.  "First Amendment-related

11  intelligence is the gathering, indexing, filing, maintenance,

12  storage or dissemination of information or any other

13  investigative activity, which is undertaken due to or on the

14  basis of a person's beliefs, opinions, associations or the

15  content of the speech or expression protected by the First

16  Amendment."

17  Q.      Is that definition of First Amendment-related

18  intelligence, do you feel like that's instructive on the type

19  of intelligence that the Consent Decree is designed to

20  protect?

21  A.      Well, I think it's better than the political.  I think

22  it, you know, still will require, you know, some more

23  explanation because of basically what I said about just all

24  that's on a number of individuals' social media, but I do

25  think it's a step in the right direction.  So the way I would

*TESTIMONY OF MICHAEL RALLINGS*                                    130

1    take it is that, you know, what we've said from the very,

2    very start, that we respect any individual's right to

3    protest, any individual's right to express their First

4    Amendment rights.  And we're going to protect that.  And

5    that's all we've done.  We've been very consistent in that.

6         In that the only thing we want to do is ensure that

7    those gatherings are done lawfully.  And the Supreme Court

8    has said that law enforcement can put restrictions on the

9    time, the place that these events are going to occur and some

10   other restrictions just to protect public safety.  I think

11   the courts have said that.  And we will fully comply with the

12   courts.  That's why we have a permitting process.

13        I think this helps.  This will clear up some of the

14   ambiguity, but I still think that we still have challenges in

15   making sure that this is applicable to today's modern

16   technology and how people communicate and operate today.

17             MR. MCMULLEN:  Your Honor, I'm about finished.

18   But I do want to go down a line of questioning that Your

19   Honor spoke to earlier.

20             THE COURT:  Right.  Do you want to take a break

21   and go to your witnesses and let the Director come back?  Is

22   that what you need to do?

23             MR. MCMULLEN:  Yeah.  But I do want to finish off

24   with one line of questioning about the volume of

25   investigations.

UNREDACTED TRANSCRIPT

*TESTIMONY OF MICHAEL RALLINGS*                                    131

1              THE COURT:  Sure.

2              MR. MCMULLEN:  And I'm mindful of the Court.

3              THE COURT:  Sure.

4              MR. MCMULLEN:  I'm not trying to make a straw man

5     argument, but I'm going to try to get this question framed

6     such that I can make my point.

7              THE COURT:  Sure.  That's fine.  And if there's

8     an objection, I think Mr. Castelli can now -- will be able to

9     speak.  We've been working on making sure we can hear people.

10    Go right ahead.  Go right ahead.

11    BY MR. MCMULLEN:

12    Q.    You have about 118,000 criminal investigations a year;

13    is that --

14    A.    118 incident reports are filed.  I can't say that each

15    one of those rise to the level of a criminal investigation.

16             THE COURT:  Right.  And I think we all -- and

17    that deserves a little clarification.  And I know that we've

18    all been around the subject so long that we may forget that

19    others may not know.  But Director, you get a lot of

20    incident-related reports.  That would be everyone you got,

21    whether somebody called and said they had a missing dog or a

22    cat or whether they had a missing child or they were

23    reporting a homicide.  That would be everything; is that

24    right?

25             THE WITNESS:  Not quite, Your Honor.

*TESTIMONY OF MICHAEL RALLINGS*                                    132

1          THE COURT:  Okay.

2          THE WITNESS:  So the people that call 911 or call

3    the nonemergency number, 545-COPS, those are calls for police

4    service.  And they're put into the CAD system, computer-aided

5    dispatch, and an event is created.  So the dispatch system is

6    one totally different.  So 1.6 million calls came into the

7    911 call center last year.  Officers were dispatched on

8    940,000 calls.

9          So when I talk about an incident report that's

10   filed, we're governed by TIBRS, Tennessee Incident Based

11   Reporting System.  And then there are TIBRS offenses that we

12   report to TBI.  TIBRS will dictate when a report can be taken

13   and if it will be considered a criminal offense.  For

14   instance, every year there are 5,000 incidents of aggravated

15   assault.  10,000 incidents of Internet partner violence.

16         And then when we get into the burglaries, the

17   robberies, the rapes, the homicides, the shopliftings.  I

18   mean, it's just a unbelievable large amount.  So when I say

19   an incident report is filed, that's where a citizen contacted

20   the police department, and a police officer took an offense

21   report and entered that offense report into our records

22   management system.

23         Of those 118,000 taken last year, on average, you

24   know, 10,000 to 15,000 are memos that may not quite reach the

25   level before they can be approved as an incident report.  But

1   a memo can be changed into an incident report.  Normally an

2   incident report is not changed into a memo.  So I can almost

3   say with confidence that at least a hundred thousand of those

4   reports are legitimate TIBRS offenses that we are governed

5   by, you know, TBI to report.

6            Then there's the National Incident Base Reporting

7   System, that's NIBRS, that is really ran by the FBI.  The FBI

8   try and get all states to be NIBRS compliant, where we all

9   report the same way.  And they use a lot of data to pull the

10  uniform crime report, for instance, is one tool that they

11  use.  So I can confidently say that at least 100,000 of those

12  are true offenses, and that it is not related to calls for

13  service.

14           THE COURT:  And I understand that a little better

15  for all of us and me particularly.  Then the range of the

16  incidences would be from what we might call misdemeanor

17  reports.  I don't know if that's right or not, all the way up

18  to the most serious felony; is that right or wrong?

19           THE WITNESS:  Yes, that's correct.  That's

20  correct, Judge.

21           THE COURT:  Okay.  And not to -- just to fill

22  that out a little bit more.  Would you give us an example of

23  some of the lesser crimes or lesser-investigated activities

24  versus some of the greater ones.  Just examples so people

25  will understand --

1              THE WITNESS:  Yes, sir.

2              THE COURT:  -- the scope of it.

3              THE WITNESS:  A great example -- a great

4    question.  So let's take you mentioned a missing child.  So

5    if a police officer calls and responds to a report of a

6    missing child, the officer will, you know, kind of run down a

7    series of questions and attempt to locate the child, you

8    know, within a matter of minutes.  But then the officer is

9    going to generate an offense report.  And you know, we want

10   people to report missing children.

11             So once that officer generates that missing

12   person's report, it generates a whole 'nother range of

13   response.  We may end up calling out our CART team.  We

14   recently were certified as one of the only handful of

15   agencies that are certified to actually go and find missing

16   children and be in compliance with everything.  Another

17   offense report is if an officer makes an arrest.  Every

18   arrest requires an offense report.

19             So if an officer makes a shoplifting arrest, they

20   have to file a police report.  If a citizen calls and says

21   that their lawn mower was stolen from a storage area, that

22   that would be a theft report.  If their front door was kicked

23   in and a TV taken, that would be a burglary report.  If

24   someone shot into their home, that could be an aggravated

25   assault.  It could also be a vandalism offense.  And then

*TESTIMONY OF MICHAEL RALLINGS*                                    135

1    obviously there are homicide, or we may call it a DOA

2    unknown.  And then there's a DOA known.  So if there's a

3    patient that is under a doctor's care that's elderly, very

4    ill and, you know, the likelihood of them passing is there,

5    and they pass, the officer may take a DOA known.  A hospice

6    patient, an officer may take a DOA known, where they're under

7    a doctor's care.  The doctor has signed a letter.

8              So there are just a whole very, very large number

9    of reports.  We generally track Part I offenses.  And then

10   when we look at violent crime, we're looking at murder, rape,

11   robbery, and I think your aggravated assault offenses.  But

12   within those, there are other offenses, aggravated assault,

13   aggravated assault DV, shoplifting.  And so there are just so

14   many offenses in there.  And I hope I was able to answer your

15   question.

16             THE COURT:  I think it's helpful for context so

17   that Mr. McMullen can ask the next question, Mr. McMullen.

18   And do you want to continue or -- whenever you want to take a

19   break for your next witness, you just let me know.

20             MR. MCMULLEN:  Can I pick up this line of

21   questioning with him tomorrow and we take a break?  Take the

22   other witnesses out of turn?

23             THE COURT:  I think that's a good idea because

24   we're concerned about --  I know you're concerned about

25   getting our two witnesses off and on.

1    Director, I don't think this means that

2  Mr. McMullen is putting you in a secondary position.  He let

3  you go first, but I think we're going to let you be excused.

4  Should we let the Director be excused for the rest of the

5  day, Mr. McMullen?

6              MR. MCMULLEN:  Yes, Your Honor.

7              THE COURT:  All right.  Well, we're very glad to

8  have you, and of course, we talked about the fact that be

9  ready to proceed for a test of the system at about 10 till or

10  15 till the hour.  And then, of course, we'll start right on

11  time.  We're going to conduct that test because of the

12  technology just to be sure we're good.  Always good to see

13  you, Director.

14              THE WITNESS:  Yes, sir.

15              THE COURT:  And thank you so much.

16              THE WITNESS:  Nice to see you too, sir.

17              THE COURT:  Let you step aside.

18              And we're going to go to -- how much time do you

19  need, Mr. McMullen?  You just tell me.

20              MR. MCMULLEN:  Five minutes.  Five minutes, Your

21  Honor.

22              THE COURT:  That's fine.  And we'll start the

23  witness.  We're going to take a ten-minute break because this

24  will be part of the staff's break.  And so it'll be a

25  10-minute break.  We'll come back at about 8 minutes after

UNREDACTED TRANSCRIPT

 1   the hour.  So thank you so much.  We'll see everybody in 10

 2   minutes.  Thank you.

 3                (Short break.)

 4                THE COURT:  I think we may have everyone.  I'm

 5   not sure.

 6                Mr. Glover, are you handling this matter?

 7                MR. GLOVER:  I'm handling this witness, Your

 8   Honor.

 9                THE COURT:  All right.  And I think I see a

10   witness.  Do I see a witness there?

11                MR. GLOVER:  I believe you see Deputy Chief Don

12   Crowe.

13                THE COURT:  I see him.  I've seen him before.  So

14   I'm just checking to make sure we have everybody, including

15   the Monitor.  There we go.  We have everyone now.  All right.

16                Mr. Glover, who do you wish to call as your next

17   witness?

18                MR. GLOVER:  Your Honor, at this time, the City

19   would like to call Deputy Director Don Crowe from the Memphis

20   Police Department.

21                THE COURT:  Yes.  And deputy Director, if you'll

22   raise your right hand, Mr. Sample is going to swear you in.

23

24

25

1                              *   *   *

2                          DONALD CROWE,

3      **was called as a witness and having first been duly sworn**

4      **testified as follows:**

5                          **DIRECT EXAMINATION**

6      **QUESTIONS BY MR. GLOVER:**

7      Q.     Deputy Chief Crowe, would you state your full name for

8      the record and spell it for the court reporter, please.

9      A.     Yes, sir.  Donald Crowe, C-R-O-W-E.

10     Q.     All right, sir.  And what is your position with the

11     Memphis Police Department?

12     A.     I am a deputy chief for the Memphis Police Department.

13     Q.     When did you join the Memphis Police Department?

14     A.     1988.

15     Q.     Can you briefly describe your progression through the

16     ranks and the positions you've held.

17     A.     Yes, sir.  So I graduated from the Memphis Police

18     Department Training Academy in 1988.  Immediately went to the

19     Uniform Patrol Division of the Memphis Police Department,

20     basically driving a marked squad car.  While a patrolman for

21     the Memphis Police Department I did different assignments

22     through the year 2000.  Promoted to the rank of sergeant.

23     Was assigned to the detective bureau.

24            The year 2005 I was promoted to the rank of

25     lieutenant, and I became a supervisor in the detective

1   bureau.  In the year 2013 I was promoted to the rank of

2   major.  Again, went to a uniform patrol station to command

3   the patrol station.  Then in 2013 I transferred back to the

4   detective division as a major to command detective unit.

5          2016 I promoted to the rank of lieutenant colonel and

6   became the commander of investigative services for the

7   Memphis Police Department.  And then in 2017, I promoted to

8   the rank of the deputy chief for the Memphis Police

9   Department.

10  Q.     All right, sir.  Thank you for that.  So is it fair to

11  say that all of your professional career has been with the

12  Memphis Police Department?

13  A.     Yes, sir.

14  Q.     And what -- when you became the deputy chief in 2017,

15  what were your primary responsibilities?

16  A.     I was appointed deputy chief for information

17  technology for the Memphis Police Department.  So information

18  technology encompasses anything IT related for the Memphis

19  Police Department.  That includes all of our computer systems

20  and all of our technology as it relates to body-worn cameras,

21  pole-mounted cameras, realtime crime center and management of

22  all of our databases.

23  Q.     Is Homeland Security under your area as well?

24  A.     Yes, sir.

25  Q.     Okay.  Are those still your responsibilities today?

*TESTIMONY OF DONALD CROWE*                                    140

1   A.      Yes, sir.

2   Q.      Okay.  In your experience, Deputy Chief Crowe, is the

3   use of a video system or video systems, which you supervise

4   for the police department, what you would consider a crucial

5   part of the Memphis Police Department's public safety

6   protocol and mission?

7   A.      Yes, sir.

8   Q.      Okay.  Is this true, as far as you know from your

9   activities with other agencies, is this true across the

10  country in most agencies?

11  A.      Yes, sir.  So I've had the pleasure of assisting other

12  agencies across the country.  And we always discuss and look

13  at their camera program, discuss and look at ours.  And that

14  does include the video cameras in the field, but it also

15  includes the body-worn camera program.

16  Q.      All right.  Just for background, you were present,

17  were you not, during the initial trial in 2018 when the City

18  was found to be in violation of what we call the Kendrick

19  Consent Decree?

20  A.      Yes, sir.

21  Q.      And so you have been involved in matters relating to

22  attempts to come into compliance and understand our

23  responsibilities, at least from that day forward; is that

24  correct?

25  A.      That's correct.

UNREDACTED TRANSCRIPT

1   Q.      And so have you had quite a number of officers and

2   even command staff consult with you about issues and

3   questions they might have about the applicability of the

4   Kendrick Consent Decree in various cases?

5   A.      Yes, sir.

6   Q.      We're going to ask you some about that, but I want to

7   ask you if you have it, do you have a copy of the original

8   Consent Decree, Kendrick Consent Decree that's been marked as

9   an exhibit in this case.  Number 19, it's already been

10  admitted in the case.

11  A.      I do not have a copy with me.

12  Q.      All right.  I'm going to hand you a copy so you'll

13  have that for reference.  So this is Exhibit 19.  And are you

14  familiar with that Decree?

15  A.      Yes, sir.

16  Q.      Since that ruling I think we talked about you have had

17  officers question you in light of Judge McCalla's

18  enlightening us on the clear meaning of many of the

19  provisions of that document.  You've been asked to give

20  information to other officers about how you believe certain

21  scenarios would be affected by that Decree; is that correct?

22  A.      That is correct, yes.

23  Q.      Do you recall there being a situation that came up in

24  connection with security cameras?  And I don't know if this

25  is the Blue CRUSH camera.  I'll let you tell me.  But a

1  camera that points down toward the plaza in front of City

2  Hall that's adjacent to the Federal Building.

3  A.      Yes, sir.

4  Q.      And is there a Memphis Police Department camera there

5  that's under your agency's supervision?

6  A.      Yes, sir.

7  Q.      Okay.  Do you recall after the trial of this case in

8  one of the issues of trying to ensure compliance with your

9  agency's part, your group's part of the Decree, a question

10  arose about the fact that that's an area where there are

11  always a lot of public gatherings for people who are

12  expressing their First Amendment rights, correct?

13  A.      Yes, sir.

14  Q.      Did you have occasion to have the city chief legal

15  officer make inquiry about if that camera could remain on and

16  in use when there was a known First Amendment activity going

17  on at the time?

18  A.      Yes, sir.

19  Q.      Okay.  Do you recall what response or do you recall

20  how the chief legal officer for the City tried to resolve

21  that?

22  A.      Yes, sir.

23  Q.      And what, to your knowledge, did she do?

24  A.      The chief legal officer asked us to disconnect the

25  pan, tilt, zoom on that camera and only use the fixed cameras

1   on it and also to disconnect the pan, tilt, zoom on the

2   security cameras attached to the building at 170 North Main.

3   Q.      Do you know whether that was done in response to

4   advice that you were told came from the Monitor?

5   A.      Yes, sir.  It was.

6   Q.      Okay.  Let me just make sure I understand the

7   technology.  Tell me how that camera in particular functions

8   from a technological standpoint.  You talk about pan, tilt,

9   zoom.  What was that camera capable of doing before it was

10  modified?

11  A.      Yes, sir.  So on the civic plaza, where the State

12  Building used to be, the County Building, Memphis Police

13  Department headquarters, the Federal Building and also City

14  Hall.  On the trolley tracks, we have a Blue CRUSH camera

15  mounted on a pole, and that is identical to the cameras that

16  you see throughout Memphis in that it would be a gray box

17  mounted on a pole.  And on that gray box would be a blinking

18  blue light and markers indicating that that camera belongs to

19  the Memphis Police Department.

20          Typical of the configuration, it has three cameras

21  inside the enclosure.  Two of those cameras are fixed, in

22  that they are pointed.  And once they're pointed, they cannot

23  be moved unless you drive a truck out there and physically

24  move the camera.  The third camera in that configuration is

25  typically a pan-tilt-zoom camera.  So the camera operator can

1    move the camera to whatever direction is needed.  Also to try

2    to zoom in, if needed.

3    Q.    So if I understand this correctly, would it be

4    possible for someone in, say, the Real Time Crime Center to

5    have a live feed into that camera, if they chose to do so and

6    then operate that zoom and pan and tilt feature of the

7    camera?

8    A.    Correct.

9    Q.    Okay.  And after receiving the advice through the

10   chief legal officer or the city attorney that came from the

11   Monitor, what steps did you take with regard to the

12   availability of those features on the camera?

13   A.    Sure.  So we ordered our camera team to contact the

14   vendor and on that particular camera to disconnect the pan,

15   tilt, zoom feature of it.  And also to change the recording

16   time on the recorder inside the enclosure.

17   Q.    All right.  So I can understand what effect that would

18   or wouldn't have, if I were, for example, standing down in

19   that plaza participating in a gathering expressing our First

20   Amendment right and I reached into my pocket and drew

21   something out like my phone, but from a distance, it's not

22   always possible to identify what an object is, before that

23   pan, tilt, zoom was disabled, could the RTC officer looking

24   at the feed zoom in to see what I had in my hand?

25   A.    Yes, sir.

1    Q.      And hopefully try to identify what it was and whether

2    it was anything dangerous?

3    A.      Yes, sir.

4    Q.      After that function was disabled, can we do that now?

5    A.      No, sir.

6    Q.      Okay.  So if someone draws an article from his or her

7    pocket or purse, it is not now possible for us to use the

8    zoom feature to try to identify the object; is that right?

9    A.      Correct.

10   Q.      And is it possible for us to tilt around and follow

11   someone who's walking who may have taken that object out of

12   their pocket or purse?

13   A.      No, sir.

14   Q.      Okay.  Do you have a view as a law enforcement officer

15   about -- and in charge of the technology section whether that

16   affects the Memphis Police Department's ability to keep the

17   public safe, based on your experience?

18   A.      Yes, sir.  I do.

19   Q.      What is your view?

20   A.      So the role of the Real Time Crime Center in these

21   situations is to support the commander that's on the ground.

22   Be a support unit for them.  The commander on the ground

23   needs us to help identify an object in someone's hand or a

24   dangerous situation.  That's what we would want to do so that

25   an officer does not have to get close enough to identify a

1  dangerous situation on their own.  So it's about trying to

2  keep the public safe.

3  Q.     All right.  Moving on to other situations involving

4  cameras, are the body-worn cameras and is the body-worn

5  camera program under your direction?

6  A.     Yes, sir.

7  Q.     Okay.  I believe that there was submitted prior to the

8  beginning of this trial a set of documents by the Defendant,

9  one of which has not yet been entered into evidence, but when

10  tendered, it was marked Defendant's Exhibit 16.

11        And once I ask the witness to look at it, I would like

12  to mark it as the next sequential trial exhibit, which is the

13  Memphis Police Department body-worn camera policy.

14        So I'm going to hand you this document, which will not

15  be marked for purposes of this trial Defendant's 16 but for

16  purposes of people locating it who had a pretrial production,

17  that's how it was marked.  Do you recognize the document I've

18  handed you?

19  A.     Yes, sir.

20             MR. GLOVER:  Can we pull it up on to the screen

21  please, so it can be viewed.

22  BY MR. GLOVER:

23  Q.     Can you identify that as being the Memphis Police

24  Department body-worn camera policy?

25  A.     Yes, sir.  It is.

1          MR. GLOVER:  Your Honor, I'd like to move that

2    into evidence as the next numbered exhibit.

3          THE COURT:  That's fine, it will be marked and

4    received as 20.

5          (WHEREUPON, the above-mentioned document was

6    marked as Exhibit Number 20.)

7    BY MR. GLOVER:

8    Q.     You testified about people raising issues or concerns

9    about how to interpret the Decree in certain circumstances.

10   Have there been questions arise with regard to when and when

11   not to have a body-worn camera filming, activated so that

12   it's filming when people may be exercising their First

13   Amendment right, whether it's a gathering to express First

14   Amendment speech or a protest or the First Amendment covers

15   even real and association.  So has that question come up from

16   officers about how they're supposed to deal with their

17   body-worn cameras when they suspect or believe they're

18   witnessing a First Amendment activity?

19   A.     Yes, sir.

20   Q.     And what kind of questions have come up about that?

21   A.     Mostly supervisors that ask those questions about the

22   body-worn cameras.  It is how does the body-worn camera and

23   the Kendrick Decree affect each other, and what is allowed

24   and what is not allowed in the Consent Decree.

25   Q.     As it now stands, of course, the Kendrick Decree,

1   being a document which came about in 1978, it doesn't

2   specifically reference body-worn camera, does it?

3   A.      Correct.

4   Q.      Just like it doesn't specifically reference social

5   media platforms or the Internet, does it?

6   A.      Correct.

7   Q.      Okay.  So have you been required to seek advice at

8   times about whether the Kendrick Decree would affect what are

9   otherwise the stated policies on keeping body-worn cameras in

10  operation under the policies that have been marked as the

11  most recent exhibit?

12  A.      Yes, sir.

13  Q.      Okay.  Are you aware that there was a -- because of

14  your responsibility for this area, were you made aware that

15  there was a filing in court during this monitoring process

16  where various scenarios were discussed --

17          MR. GLOVER:  And although this is a document

18  under seal, Your Honor, so I'll be careful before I go any

19  further.

20  BY MR. GLOVER:

21  Q.      -- where there was kind of an advisory discussion from

22  the Monitor team of how cameras, body-worn cameras, might be

23  affected by this policy; are you aware of that?

24  A.      Yes, sir.

25  Q.      And have you had a reference to that?

1    A.      I have not seen the filing, no, sir, but I've had

2    discussions about it.

3    Q.      Okay.  And are you aware that it indicated that there

4    were -- that the monitoring team was of two different views

5    on that point?

6    A.      Correct.

7    Q.      So you were not able to get clarity from that, at

8    least, about what is the best way to proceed with the

9    body-worn camera policy?

10   A.      Exactly.  Yes, sir.

11   Q.      You're aware, are you not, that we've been attempting,

12   the City has, to reach agreements and have successfully

13   reached tentative agreements that we put before this Court

14   with the ACLU about how to deal with a number of issues where

15   there was lack of clarity or questions about the Consent

16   Decree.  And one of those that has been addressed in those

17   discussions has now been put before the Court is one that

18   deals directly with how one would respond to the body-worn

19   camera situation when at a First Amendment event; is that

20   right?

21   A.      Yes, sir.

22   Q.      Would that provision, in your opinion, create

23   additional clarity for us to instruct our officers to make

24   sure they're in compliance?

25   A.      It would.  Yes, sir.

*TESTIMONY OF DONALD CROWE*                                      150

1  Q.      From the standpoint of good law enforcement, as you

2  see it, in the technology area, is it important that if you

3  have a body-worn camera policy, it's clear and concise, and

4  the officers are supposed to abide by it at all times?

5  A.      Yes, sir.  We strive for something that's clear,

6  simple and easy to apply in the field.

7  Q.      And without the clarification that we're seeking from

8  the Court, is it your view that it could leave an officer in

9  a position of trying to determine whether what he is seeing

10 or what she is seeing is a First Amendment event or is not a

11 First Amendment event, you know, right of associations in the

12 First Amendment.  Various kinds of speech are included.  And

13 that that clarity would allow you to enforce the policy and

14 ensure compliance with the Decree in a more concrete and

15 direct way?

16 A.      Yes, sir.

17 Q.      Okay.  Have officers or their supervisors come to you

18 to ask for clarification about questions on social media use?

19 A.      Yes, sir.

20 Q.      As it relates to their lack of certainty about their

21 own readings of the Consent Decree?

22 A.      Yes, sir.

23 Q.      Okay.  Do you -- how do you respond to them, and what

24 do you tell them to do to gain clarity?

25 A.      I always refer them back to the Kendrick Decree, which

1   is posted on the MPD support page.  And I want them to read

2   it themselves.  I refer them to departmental regulation 138

3   that talks about compliance with the Decree and political

4   intelligence.  Then I refer them to the 2018 ruling by Judge

5   McCalla here in Memphis, rule clarification.  Then I do my

6   best to explain what I understand about it.

7   Q.     All right.  Do you believe it would be helpful in your

8   opinion in training your officers to have Judge McCalla's

9   good explanations incorporated into some of the language of

10  the Decree so that when posted as the Decree requires it to

11  be posted, so officers can look at it, they can see that

12  clarity in the document itself?

13  A.     Yes, sir.  I believe it would.

14  Q.     Okay.  The Consent Decree does have provisions in it,

15  does it not, that require that the Decree be posted, made

16  available, distributed to officers and taught, correct?

17  A.     Yes, sir.

18  Q.     So does that provision give you a desire to

19  incorporate as many of the Judge's clarifications into the

20  document itself so that officers can get that clarity

21  straight from the posted document?

22  A.     Yes.

23  Q.     In your own attempts to understand questions that may

24  arise from applications of the Decree, do you find that you

25  spend more time referring to the Decree or to Judge McCalla's

UNREDACTED TRANSCRIPT

1  rulings?

2  A.        To the 2018 ruling.

3  Q.        Okay.  And why is that?

4  A.        Because it has more language, more information about

5  current technology and current practices that we do than what

6  the Kendrick Decree does.

7  Q.        Do you have a view as to whether having that kind of

8  clear language about specific technologies in the Decree

9  itself would be of benefit to the police force?

10 A.        I know it would.  Yes, sir.

11 Q.        Okay.  Thank you.  I'm going to ask you to look back

12 at the Kendrick Consent Decree again.  And refer you to the

13 paragraph that defines political intelligence, which is

14 paragraphed in the definition Section B4.  Do you see that?

15 A.        Yes.

16 Q.        Is that something that you've referred to and pored

17 over a number of times in connection with your duties during

18 the last two years?

19 A.        Yes, sir.

20 Q.        You understand that there has been some clarification,

21 as you indicated, through the Judge's rulings, right?

22 A.        Yes, sir.

23 Q.        And in one ruling in particular, I think he used some

24 language that may have related to legitimate law enforcement

25 purposes, correct?

1    A.      Correct.

2    Q.      And so you are able to read that definition now with

3    the teaching we've gotten from that ruling involving

4    legitimate law enforcement purposes.  But legitimate law

5    enforcement purposes, is it defined in the Consent Decree, as

6    it now stands?

7    A.      No, sir.

8    Q.      Would it be helpful to you, as one of the senior

9    police officers in enforcing this Decree's compliance, to

10   have a definition of legitimate law enforcement in the Decree

11   itself?

12   A.      Yes, sir.  It would.

13   Q.      Do you know whether that is part of what the

14   discussion has been with the ACLU about arriving at a

15   mutually agreeable term to accomplish that?

16   A.      Yes, sir.  It is.

17   Q.      All right.  And have you reviewed that particular term

18   as it is proposed in the submitted proposed joint Decree to

19   be able to inform the Court now whether that definition would

20   add clarity and in your opinion allow you to enforce the

21   performance of the Decree within the department better?

22   A.      Yes, it would.

23   Q.      Okay.

24           MR. GLOVER:  Your Honor, I would like to, if I

25   could, introduce a document now that, while it may seem

```
 1   duplicative, I don't think it really is.  It is the proposed

 2   modified order judgment and Decree in a form that we have

 3   submitted to the Court as Defendant's proposed Exhibit

 4   Number 3, and it is a redline copy --

 5               THE COURT:  Right.  I think --

 6               MR. GLOVER:  -- of the proposed modified Decree

 7   so that we can see what the original Decree would look like

 8   and what the proposed modification would do in terms of

 9   changes if they or any of them are accepted by the Court.

10               THE COURT:  That's fine and it is helpful.  I

11   have no reason we shouldn't do that.  Seeing no objections --

12               MR. GLOVER:  Right.

13               THE COURT:  -- we're going to mark that as 21.

14   This is a redline and it is a little easier to follow.

15   Absolutely.

16               MR. GLOVER:  Thank you.

17               THE COURT:  Marked and received as 21.

18               (WHEREUPON, the above-mentioned document was

19   marked as Exhibit Number 21.)

20   BY MR. GLOVER:

21   Q.    Back on the definition of political intelligence

22   that's in the existing Decree, we've had other witnesses

23   testify and you haven't been in the room, but that they find

24   some of the language in this Decree to be problematic in

25   their interpretation.  One of the problems appears to arise
```

UNREDACTED TRANSCRIPT

 1  from the portion that talks about any other investigative

 2  activity.  There's an enumerated list of activity that would

 3  be political intelligence.  Then there's one that says any

 4  other investigative activity.  Is that a phrase about which

 5  you think we could benefit from additional explanation from

 6  the Court in the form of modified language?

 7  A.     Yes, sir.  So when a policeman reads that, it's vague

 8  enough that the policeman does not quite understand it.  It's

 9  prohibited.

10  Q.     In your knowledge has this caused some police officers

11  to refrain from doing some kinds of social media searches

12  that you think they probably could do under the Judge's

13  ruling, but their reference to this language has caused them

14  not to do so?

15  A.     When they ask me that question, I always tell them to

16  err on the side of caution.  If there's any question at all

17  about if it would be a violation under the Kendrick Decree,

18  not to proceed.

19  Q.     Has another section of that language in the original

20  Decree, which talks about any other investigative activity,

21  quote, relating to any person's beliefs, opinions or

22  associations, has that come up in your discussions with

23  officers about whether that broadens the restriction to the

24  point that they might not be able to look at platforms like

25  facebook that in and of themselves are designed for First

1   Amendment expression?

2   A.      Yes.

3   Q.      And so is that something that -- and not for a moment

4   setting up straw man because that's not what -- the Judge has

5   ruled that we're not able to do that.  But would it be

6   helpful in administering this order and in enforcing it and

7   its compliance within the department to have clarification of

8   that issue?

9   A.      Yes, sir.  It would.

10  Q.      Is that something that has been dealt with with the

11  ACLU in discussions to try to come up with proposed language

12  that would satisfy our need for clarity and still protect the

13  rights of the citizens of Memphis and their civil liberties?

14  A.      Yes, sir.

15  Q.      And is that part of the language that's in this newly

16  marked exhibit that reflects the redlines showing what's in

17  and what's out of the proposed Decree?

18  A.      Yes.

19          THE COURT:  Right.  Normally, what we would do if

20  we were in court in person is that those portions that you're

21  discussing would be put up on the screen so that everyone can

22  see.

23          MR. GLOVER:  Right.

24          THE COURT:  I think that's probably useful, and

25  it probably is useful to everybody.  That's exactly -- thank

UNREDACTED TRANSCRIPT

1   you so much.  Because I know a lot of people want to see what

2   you're talking about.

3           MR. GLOVER:  All right.  First, if we could,

4   Ms. Tullis, if you could just pull the front page up so that

5   people viewing can see that we're dealing with a document

6   that's entitled Proposed Modified Order Judgment and Decree.

7   BY MR. GLOVER:

8   Q.      And if I understand it correctly and I think that I do

9   the proposed modified language is obviously in blue, that

10  indicates that this is new language that isn't in the

11  existing Decree.  And everywhere in this document where you

12  see blue language, it is language that was not previously in

13  the original Kendrick Decree; is that correct?

14  A.      Yes.

15  Q.      Okay.  When we see red and strikeouts, that is

16  language that was in the Decree that under this proposal

17  would no longer be in the Decree; is that correct?

18  A.      Yes, sir.

19  Q.      Okay.  So let's go down to the definition that we just

20  talked about of political intelligence.  We'll look at that

21  section.  And is it pulled up on the screen?  Paragraph under

22  definition Section B, Number 5.

23  A.      Yes, sir.

24  Q.      One of the changes that is proposed, is it not, is

25  changing the name of that subparagraph from political

1  intelligence to First Amendment-related intelligence?

2  A.     Yes, sir.

3  Q.     Does that have any genesis in misconstruing

4  misconceptions that officers may have had about what is and

5  isn't political intelligence?

6  A.     Yes, sir.  It does.

7  Q.     Do you find that the use of the word "political" seems

8  to take people off in the wrong direction at times?

9  A.     Yes, sir.

10  Q.     Okay.  And do you have an opinion about whether even

11  just changing the title would prevent that initial

12  misunderstanding when people begin to read the Decree?

13  A.     I believe it would.

14  Q.     All right.  And you'll see that what is stricken in

15  this document in red is the "relating to any" language.  And

16  it changes the proposed language to "which is undertaken due

17  to or on the basis of a person's beliefs, opinions,

18  associations or the content of the speech or expression

19  protected by the First Amendment."

20         Do you see that?

21  A.     Yes, sir.

22  Q.     Is that a definition, if accepted by the Court, that

23  you could teach and enforce within the police department?

24  A.     Yes, sir.  We could.

25  Q.     Does it remove the ambiguity that you find has caused

1   questions to arise within the police force?

2   A.      I think it provides clarity.  Yes, sir.

3   Q.      Do you see on the following page under Definition 6,

4   there is a definition.  It's all in blue.  It's actually

5   Number 7.  I'm sorry.  Number 7.  Social media is defined.

6   A.      Yes, sir.

7   Q.      Do you find that the absence of any reference to

8   social media in the original Decree caused confusion and

9   caused some officers not to actually utilize social media in

10  investigations that otherwise would have called for it?

11  A.      Yes, sir.

12  Q.      Okay.  Do you have a view as to whether the insertion

13  of this particular definition would aid you in helping to

14  ensure that the police force complies with the spirit of the

15  Decree and carries out investigations in conformity with its

16  intended purpose?

17  A.      Yes, sir.  I believe it will.

18  Q.      Okay.  Without changing that, if it were not changed,

19  do you believe you would continue to experience difficulties

20  with teaching new officers how and when to use and not use

21  social media?

22  A.      Yes, sir.

23  Q.      Okay.  And once again, we do post and teach on the

24  Decree, do we not?

25  A.      Yes, sir.

TESTIMONY OF DONALD CROWE                                      160

1   Q.      So if we put a change, if the Judge allows a change of

2   any kind, this, or any others, it would then be part of the

3   posted, what the officers are required to review and

4   understand, and part of what is taught?

5   A.      Yes, sir.

6   Q.      The next section, Subsection 8 is the definition of

7   undercover accounts.  That was not in the Decree before; is

8   that right?

9   A.      Correct.

10  Q.      Most of the time we have been talking in this case

11  about undercover account, it's related to someone who's

12  conducting -- a police officer who's conducting a search in

13  an undercover social media account, correct?

14  A.      Correct.

15  Q.      And since no social media existed at the time of 1978,

16  any understanding of undercover account would not have

17  necessarily taken into account social media use of undercover

18  accounts, correct?

19  A.      Right.

20  Q.      Does this definition of undercover account actually

21  reference the social media so that it clarifies the

22  application of the various restrictions of the Decree to

23  people who are undercover on a social media account?

24  A.      Yes, sir.  It does.

25  Q.      And are you comfortable that the assertion of this

UNREDACTED TRANSCRIPT

1    Decree would aid the department in teaching and enforcing

2    compliance with the terms of this Decree by actually having

3    that term defined?

4    A.     Yes, sir.

5    Q.     The next change on there is First Amendment-related

6    intelligence.  It initially read political intelligence,

7    Subsection C, directly under the paragraph we were just

8    discussing.  The conversation we had earlier about the

9    confusion that the word "political" seemed to be causing

10   within the department is addressed in this proposed change,

11   correct?

12   A.     Yes, sir.

13   Q.     And can you explain why, to the Judge, why you think

14   this would be a change that would continue to protect the

15   civil liberties that are anticipated in this Decree, while

16   clarifying to the police officers what we're talking about?

17   A.     Yes, sir.  So I think it takes the language from the

18   2018 ruling and puts it in a common sense format that our

19   officers can understand and our supervisors can understand.

20   Q.     All right.  In your view was it the intention of the

21   City or as far as you know, the effect of the changes that

22   we've talked so far should in any way reduce any of the

23   protections of Memphians' civil liberties that were

24   originally anticipated and articulated in the Kendrick

25   Consent Decree?

*TESTIMONY OF DONALD CROWE*                                         162

1   A.      No, sir.

2   Q.      So we are looking for clarity as opposed to change in

3   concept; is that correct?

4   A.      Correct.

5   Q.      Okay.

6   A.      We're looking for clarity for the officers.

7   Q.      All right.  Thank you.

8           These have been covered by other witnesses and will be

9   covered by future witnesses, but if you'll look down at

10  Section D2, I'd like for you to comment on that one.  It

11  says, "The Memphis Police Department may view information

12  posted to social media for legitimate law enforcement

13  purposes."

14          And that's -- we have a proposed definition for that,

15  correct?

16  A.      Yes, sir.

17  Q.      "So long as it does not improperly catalog and

18  disseminate that information pursuant to Section H.  This

19  viewing of information posts to social media includes

20  conducting threat assessments."

21          Do you see that?

22  A.      Yes, sir.

23  Q.      There has been some comment to the effect that the

24  discussion of threat assessments, assessments being included

25  might not be an appropriate part of law enforcement,

UNREDACTED TRANSCRIPT

1   legitimate law enforcement activities.  Can you tell me what

2   the police department is talking about when they talk about a

3   threat assessment?

4   A.      Yes, sir.  So we ask our Homeland Security team to do

5   threat assessments for certain events.  And a very good

6   example would be the St. Jude marathon, where we know we have

7   30,000 runners participate in the marathon.  Approximately

8   50,000 people attend downtown.  We want to know the

9   likelihood of an event occurring that would cause harm to the

10  participants in that.

11  Q.      All right.  And so do you believe that that's a proper

12  police function that should be considered part of legitimate

13  law enforcement purposes?

14  A.      Yes, sir.  We do.

15  Q.      Okay.  You'll see that the language talks about the

16  nature of social media and some of the events that occur in

17  social media, and is it your testimony, do you have testimony

18  about whether this is an attempt to put into the order the

19  clarification that the Judge has made in his various rulings

20  about how the Decree would apply in the social media era?

21  A.      Yes, sir.

22  Q.      Okay.  Is it your intention to reduce the civil rights

23  of any of our citizens by putting in or altering this

24  language?

25  A.      No, sir.  Our goal is to comply with the Consent

*TESTIMONY OF DONALD CROWE*                                              164

1    Decree.

2    Q.      Okay.  Subsection E below that, other than a typo, it

3    takes out entitled Prohibition Against Covert Surveillance

4    for First Amendment-Related Intelligence.  So this -- correct

5    me if I'm wrong -- it changes the title to reflect the

6    hoped-for and anticipated change of the definition of

7    political intelligence to another name, right?

8    A.      Yes, sir.

9    Q.      And it talks about -- it inserts a definition for the

10   purpose of First Amendment-related intelligence in place of

11   the reference to political intelligence.  But do you view

12   that paragraph as just a housekeeping issue, not a change in

13   tenor but a housekeeping issue to reflect what our requested

14   change is in the definitions would carry into other parts of

15   the Decree?

16   A.      Yes, sir.

17   Q.      Okay.  There is a section, Subsection 2 of F, that

18   talks about undercover accounts; do you see that?

19   A.      Yes, sir.

20   Q.      Okay.  The question I have for you is this.  You said

21   you've read through Judge McCalla's opinions and rulings?

22   A.      Yes, sir.

23   Q.      And you've tried to advise officers to do the same?

24   A.      (Nodded head affirmatively.)

25   Q.      Is this Subsection 2 the attempt of the City of

1   Memphis and the ACLU to agree on some language that would

2   incorporate into the Decree itself the rationale and ruling

3   of the Court?

4   A.     Yes, sir.  It is.

5   Q.     And we understand, of course, that the Court is the

6   final arbiter of what language would suit his ruling, but the

7   intent of putting this in, is it your testimony was to try to

8   bring in to the Decree an understanding of the Court's view

9   of how this would apply in an age of social media, where

10  people sometimes become involved in undercover activities on

11  the Internet?

12  A.     Yes, sir.

13  Q.     There's a protective provision then added -- I'm sorry

14  -- on the next page on Subsection B, where it talks about a

15  requirement that the police department implement supervisory

16  controls to ensure all undercover social media accounts are

17  not being used or created to violate the Consent Decree or

18  otherwise infiltrate or identify groups expressing their

19  First Amendment rights; do you see that?

20  A.     Yes, sir.

21  Q.     And we're not shying away from this.  We recall that

22  during trial, the Court found that one, at least one

23  officer's views of this social media account would have

24  violated that provision.  And this makes clear that we

25  commit, does it not, that we commit to implementing

 1   supervisory controls to ensure that that kind of thing does

 2   not happen again?

 3   A.     Yes, sir.

 4   Q.     Okay.

 5          MR. GLOVER:  And again, it seems like I'm

 6   skipping.  Your Honor, I am, and it's just because some

 7   witnesses speak to some provisions of this.  Other witnesses

 8   speak to other provisions, and we don't want to duplicate

 9   that conversation with four or five different witnesses.

10   BY MR. GLOVER:

11   Q.     But if you would turn over with me to Section G8,

12   which is a couple of pages over.

13   A.     Yes, sir.

14   Q.     I want to ask you about your view of the need for a

15   provision like Subsection 8.  You're aware from your

16   supervisory position in the Memphis Police Department that

17   the Memphis Police Department has officers who engage in

18   activities, such as the Internet Crimes Against Children

19   division, correct?

20   A.     Yes, sir.

21   Q.     And is it your understanding that much of the

22   nefarious activity that tends to happen with regard to things

23   like child pornography or human trafficking occurs through

24   communications on the Internet?

25   A.     Yes, sir.

1   Q.      And was part of the request and discussion with the

2   ACLU about this provision an attempt to say there are some

3   kinds of crimes that happen almost exclusively on the

4   Internet, but we have a need to more or less constantly

5   monitor to prevent those kinds of -- those examples of crimes

6   against children but also intrusions into private networks,

7   you know, cybercrimes, things like that that are

8   intrinsically Internet related and that we would ask the

9   Court to consider a provision that would let those kinds of

10  investigations be ongoing without individual Subsection G

11  authorization, but with a requirement that the Director

12  review and audit those periodically to ensure that nobody's

13  running afoul of the intention of the Decree; is that right?

14  A.      It is.

15  Q.      And is that a matter that you believe comes from the

16  fact that just that is an almost continuous need to be

17  monitoring for those kinds of activities?

18  A.      Absolutely.  Yes, sir.

19  Q.      Okay.  Thank you.  Over on Section H, Item 3.  I'm

20  going to ask you to talk about that for a moment.  This is --

21  three and four are all new sections.  And I'd ask you whether

22  the original Kendrick Decree, to your knowledge, had any

23  provisions in it that specifically talked about modern

24  technology cameras with things like the pan, tilt, zoom we

25  talked about earlier, or whether it just talks generically

1   about information.

2   A.      Just talks generically about information.

3   Q.      Are paragraphs 3 and 4 the negotiated attempts of the

4   parties, to your knowledge, to simply address and bring

5   discussion of those specific technologies into the Decree and

6   subject those things to the protections of the Decree but

7   clarify when and how those protections intersect with this

8   modern technology that's described here?

9   A.      That is correct.

10  Q.      Is it the police department's intention to try to

11  reduce the protections that were provided by the original

12  Consent Decree by incorporating this language?

13  A.      No, sir.

14  Q.      Okay.  And does it specifically address, for example,

15  two things we talked about, the pan-tilt-zoom function on the

16  camera, correct?

17  A.      Yes, sir.

18  Q.      And the use of body-worn cameras?

19  A.      Yes, sir.

20  Q.      And we talked about pan, tilt, zoom.  I'm not sure I

21  talked with you enough about the body-worn camera provision.

22  But would this proposal, if accepted or even accepted on a

23  modified basis by the Court, allow the use of body-worn

24  cameras in all circumstances, as long as we comply with our

25  previously marked policies on body-worn cameras generally?

UNREDACTED TRANSCRIPT

1   A.      Yes, sir.  It would.

2   Q.      And it would prevent an officer from having to decide

3   am I or am I not now witnessing a First Amendment act.  They

4   would just be required to follow the body-worn camera policy,

5   period, right?

6   A.      Correct.

7   Q.      Okay.  And my question to you, to your knowledge, have

8   our body-worn camera policies been shared with the ACLU so

9   that they can see what those are?

10  A.      Yes, sir.  They have.

11  Q.      And have any questions been raised about deficiencies

12  that you know of with the policies not -- we're not saying

13  they might not want to see something different, but they have

14  not objected to this provision in the Consent Decree,

15  correct?

16  A.      Correct.

17  Q.      Okay.  You are -- on the next subsection, I, you are

18  aware, are you not, that the Memphis Police Department

19  engages in joint operations with a number of other agencies,

20  correct?

21  A.      Yes, sir.

22  Q.      And I think that we've had enough testimony about the

23  specifics of many of them, but that includes the FBI; is that

24  right?

25  A.      Right.

*TESTIMONY OF DONALD CROWE*                                    170

1   Q.      The DEA?

2   A.      Yes, sir.

3   Q.      The sheriff's department?

4   A.      Yes, sir.

5   Q.      Name me a few others.

6   A.      Secret Service, U.S. Marshals Service.

7   Q.      And when we are involved in those joint operations,

8   you are aware, are you not, that in one ruling the Judge

9   made, and you indicated you've read them, he actually

10  addressed and gave some instruction about how the Decree does

11  and does not implicate some of those joint activities,

12  correct?

13  A.      Yes, sir.

14  Q.      If one of the monitor team's experts has testified

15  that his belief is that one would need to vet any information

16  that comes from other agencies when in a joint operation,

17  before we could accept it to make sure it's compliant with

18  our Consent Decree in the way it was gathered, would that

19  create some ambiguity to you that would need the Judge to

20  bring his ruling into the body of the Decree for clarity?

21  A.      Yes.

22  Q.      Would that be helpful to you in understanding how to

23  instruct folks on what they can and can't accept or act upon

24  when it comes from another agency or the public?

25  A.      Yes, sir.

 1   Q.      Okay.

 2                 MR. GLOVER:  Your Honor, we have something that I

 3   want to get into that's a little bit out of line because

 4   we've gone through portions of the Decree, but we have a

 5   demonstrative exhibit we would like to pull up on the screen

 6   and have Chief Crowe talk about some specific things that

 7   have actually happened.

 8                 THE COURT:  Sure.

 9                 MR. GLOVER:  In the police department.  And it's

10   kind of a PowerPoint, where he can talk about where real-life

11   situations where things have happened that what we, at least,

12   believe is a lack of clarity in the original Decree --

13                 THE COURT:  I understand.

14                 MR. GLOVER:  -- manifested themselves in police

15   operations.

16                 THE COURT:  I understand.

17                 MR. GLOVER:  May I please ask that we pull that

18   demonstrative up on the screen.

19                 THE COURT:  You may.  And what we're going to do

20   though is because we need to preserve the record on that, we

21   are going to make sure that we have marked the demonstrative.

22   I understand it's a demonstrative.  And it's not necessarily

23   received into evidence, but it needs to be marked for

24   identification --

25                 MR. GLOVER:  Right.

*TESTIMONY OF DONALD CROWE*                                        172

1          THE COURT:  -- as 22.  And we just need to make

2    sure that we have that.  I'm not sure we do right now.

3          MR. GLOVER:  All right.  For clarity, we do.  We

4    have distributed it before trial, and it's submitted to the

5    Court.  Defendant's proposed Number 17.

6          THE COURT:  Okay.

7          MR. GLOVER:  Which would now be the demonstrative

8    that we would be looking at.

9          THE COURT:  We can get 17.  So we're going to put

10   it down as marked at least for ID.  Right now it's ID only.

11   For the people who are not familiar with that, that means

12   that it's not submitted as evidence, at least at this point

13   in time.  But it is received to show what is being shown,

14   what is being looked at so that everyone would know what was

15   being looked at.

16          It's going to be Recent Investigations, I think,

17   is the title.  MPD Recent Investigations June 10, 2020.  So

18   we'll mark it that way.

19          (WHEREUPON, the above-mentioned document was

20   marked for Identification as Exhibit Number 22.)

21          MR. GLOVER:  Thank you, Your Honor.

22          THE COURT:  Certainly.

23   BY MR. GLOVER:

24   Q.    Deputy Chief Crowe, would you look at this -- and I

25   know it's hard.  Someone else is going to be moving the page

                          UNREDACTED TRANSCRIPT

1   while you're doing the talk.  But would you move to the first

2   substantive section of that presentation and describe to the

3   Court what this PowerPoint reflects and the incident that

4   gave rise to the questions that came up about the Consent

5   Decree in this incident?

6   A.      Sure.  So most of this PowerPoint was built in 2019.

7   The PowerPoint was built around times that we were meeting

8   with the monitoring team, having conference calls with the

9   monitoring team discussing the Consent Decree.  And I would

10  see these reports of these incidents, and it would dawn on me

11  that this is related to the discussion we were going.  So we

12  were trying to figure out the best way to present these to

13  the monitoring team to continue the discussion.

14          The first incident here is a kidnapping that occurred

15  in Poplar Bluff, Missouri, April 10th, 2019.  What you're

16  seeing here is called an Nlets message, that's N-L-E-T-S,

17  Nlets message.  You can read through there, it shows the date

18  that it was sent.  The time it was sent.  And then it was

19  sent to all law enforcement agencies statewide in the state

20  of Missouri, the state of Arkansas and the state of

21  Tennessee.

22          And it reads, "possible kidnapping/abduction of a

23  female at gunpoint.  Poplar Bluff, Missouri."  Gives the

24  victim's name.  Gives her description.  Mid to late 20s.

25  Taken against her will by at least two suspects.  Suspects

1    are operating two different vehicles.  It has the vehicle

2    description of a maroon Chevrolet Impala with Tennessee tags

3    and a silver passenger vehicle with Tennessee license plate.

4    And it says it's believed that the vehicles are in route to

5    Memphis area.

6          The only suspect information possible may be a

7    nickname, and it provides that nickname for the suspect.  And

8    it goes on to say that the suspects are armed and dangerous.

9    If contact is made to stop and hold all the suspects for the

10   Poplar Bluff, Missouri Police Department.

11         So when our communications bureau receives these Nlets

12   messages, they immediately broadcast them on every radio

13   channel that the Memphis Police Department operates, with the

14   goal of being every police officer that hears the broadcast

15   can be on the look out for the suspect.

16   Q.     All right.  And in fact, was this received and acted

17   upon by one of our officers?

18   A.     Yes, sir.  It was.

19   Q.     Can you let the Court know how that unfolded?

20   A.     Yes.  If you'll go to the next slide, please.  So what

21   we had was a uniform patrol lieutenant that was on duty and

22   heard the kidnapping broadcast dispatched over his radio

23   frequency.  Broadcast included an alias nickname of the

24   primary suspect and a notation that the victim and suspect

25   may be headed to Memphis.  So the first thing our MPD

1   lieutenant did -- now, you have to realize he's driving a

2   marked squad car.  He's in the field.  This is not a

3   detective sitting in his office.  Laptop and other

4   technology.

5          So our lieutenant called the Poplar Bluff, Missouri

6   Police Department to verify the broadcast to see if the

7   victim had been located.  And to see if there was any

8   additional information and how he could assist the Poplar

9   Bluff, Missouri Police Department.  Through the phone

10  conversation, our police lieutenant learned that this was an

11  intimate partner domestic violence kidnapping and that it was

12  at least two hours old now and that the Poplar Bluff Police

13  Department had learned the suspect's name from the suspect's

14  facebook page but the Poplar Bluff, Missouri Police

15  Department did not know his true, correct name.

16          All right.  Next slide.  Our Memphis Police

17  Department lieutenant started checking MPD databases to try

18  and match the nickname to a true name in order to identify

19  the suspect and get a possible location the suspect may be

20  headed to.  But the lieutenant was not successful in matching

21  the nickname to a true and correct name.  Then the police

22  lieutenant used his personal facebook account to view the

23  suspect's facebook account.  And that was based upon the

24  information provided by the Poplar Bluff, Missouri Police

25  Department.  While viewing the suspect's facebook account,

1   the MPD lieutenant recognized that one of the suspect's

2   friend's facebook account was a retired MPD officer.

3           So our lieutenant did what any prudent officer

4   would do.  He called the retired MPD officer.  He knew him.

5   Had his phone number for him.  F you'll go to the next slide,

6   please.  Through the phone conversation with the retired MPD

7   officer, our lieutenant learned that the suspect is his

8   cousin.  Yet retired officer did not know the suspect's true

9   and correct name.  He knew the suspect's mother's name.

10  Provided that to our MPD lieutenant.

11          Our MPD lieutenant then used other databases the

12  Memphis Police Department has, and by searching the mother,

13  he was able to identify the suspect and get the suspect's

14  true name and his biographical information.  And our

15  lieutenant then compared an arrest booking photo with the

16  name he believed was correct to the photo on the facebook

17  account that the Poplar Bluff, Missouri Police Department had

18  provided.  He then compared the two.

19          If you'll go to the next slide.  Our MPD

20  lieutenant then called the Poplar Bluff, Missouri Police

21  Department, provided them with the true and correct name of

22  the suspect and all the biographical information the police

23  department needed for their investigation.  This included the

24  name, address, date of birth, all of that.  It included a

25  phone number.

1          After a little while, the Poplar Bluff Police

2    Department called the lieutenant back, and they confirmed

3    that the MPD lieutenant had provided the true and correct

4    name.  That the person he identified was the suspect

5    responsible for this kidnapping.  Again, confirmed that the

6    victim had not been located, and she was still in danger.

7          Next slide.  Next slide, please.  Based upon the

8    information exchanged between the Memphis Police Department

9    and the Poplar Bluff, Missouri Police Department, the Poplar

10   Bluff Police Department was able to alert the Arkansas State

11   Police.  The Arkansas State Police stopped the suspect

12   vehicle in Trumann, Arkansas.  They rescued the victim that

13   was still in the car.  She did confirm that she had been

14   kidnapped, and they were able to arrest and take the suspect

15   into custody.

16   Q.    All right.  Chief Crowe, in addition to this being

17   what appears to be good police work by the lieutenant who was

18   in his squad car, did this raise, at the time, issues about

19   whether it was clear that proper Kendrick Decree requirements

20   were followed in both accepting information from the Missouri

21   agency without making an inquiry as to how they received or

22   why they were looking at this gentleman's facebook page?  We

23   shared information with a retired police officer to try to

24   gain additional information.

25         So there was some information sharing with a nonpolice

UNREDACTED TRANSCRIPT

1   agency.  And then there was sharing of information with the

2   Arkansas authorities, who were able to make the arrest.  Not

3   to suggest that the intent of the original Consent Decree was

4   to prevent anything like this, but to just raise concerns

5   about the need to have some more clarity and definition and

6   information in the Decree to make clear that this kind of

7   police work would not be prohibited so that that officer

8   would not hesitate to act in this prudent way when some

9   unfolding event is occurring?

10  A.      Exactly.  That's why we wanted to share it with the

11  Monitor.

12  Q.      And there was no question that this officer did not

13  seek or obtain a Subsection G authorization from the director

14  before he accessed facebook to look at the account of this

15  suspect, right?

16  A.      That is correct.

17  Q.      But if it was a violation, it was a violation, but he

18  did not seek director approval, right?

19  A.      Right.

20  Q.      Okay.  And so in your view, has the negotiated set of

21  provisions and definitions that were incorporated into what

22  we proposed to the Court clarify how a situation like this

23  would be handled under the Consent Decree?

24  A.      I think it will.  Yes, sir.

25  Q.      All right.  Let's look at the next scenario, if we

1   could, please.

2   A.        This investigation that we're highlighting was on

3   August the 5th, 2019.  The investigation began when an

4   81-year-old female was the victim of a purse snatching in the

5   parking lot of a local grocery store here in Memphis.  She

6   was knocked to the ground.  She was injured, and she was

7   transported to the hospital by ambulance.

8         The suspect fled the scene in a car.  The car was

9   occupied by other occupants.  The first officers on the scene

10  were officers from our Uniform Patrol Division.  They were

11  the first ones to make the scene.

12          If you'll go to the next slide, please.  Our

13  patrol officer did a great job in investigating the crime.

14  He went to the grocery store there and asked to see their

15  video surveillance from their parking lot.  And when he saw

16  the video surveillance, he thought he might have recognized

17  one of the female suspects from previous encounters.  So that

18  officer, without any advice or discretion or anything, began

19  using his personal social media account to try and locate the

20  female suspect on line.  And this is within an hour of the

21  purse snatch robbery occurring.

22          The officer did discover the female suspect on

23  line.  Based upon the technology of social media, he was able

24  to develop what part of town the suspect was in.  This

25  officer passed that on to plain-clothes detectives.  The

1    plain-clothes detectives went to the area where the suspect

2    was thought to be and the task force, and they did spot the

3    suspect vehicle that was used in the purse snatching at the

4    grocery store.

5            They were able to stop the suspect vehicle and

6    take three suspects into custody.  One female and two male.

7    And inside the suspect's vehicle was evidence that connected

8    them to three additional robberies.  So this was a fourth

9    robbery in their spree.  All the robberies had targeted

10   elderly females in parking lots.

11   Q.     This particular officer used the social media app.

12   It's not facebook, but it was something more related to a

13   social media account where folks actually identify where they

14   are, location information is voluntarily put on this shared

15   site; is that correct?

16   A.     Correct.

17   Q.     And so when he looked at his personal account because

18   he participated in that social media platform, he could see

19   this woman he recognized and actually see in general where

20   she was, correct?

21   A.     Correct.

22   Q.     Okay.  And so no authorization from the director was

23   requested.  No one above this patrol officer instructed him

24   to do this, but he used the information that he had and his

25   own personal knowledge and his own personal account to follow

UNREDACTED TRANSCRIPT

1    up and ultimately located this suspect; is that correct?

2    A.      That is correct.

3    Q.      All right.  In your opinion, does the language that

4    the ACLU and the City of Memphis have negotiated attempt to

5    clarify what would be required of an officer in a situation

6    like this and incorporate the learnings we have from Judge

7    McCalla's rulings about legitimate law enforcement purposes

8    so that it would now be clear to an officer what he or she

9    should or shouldn't do in this situation?

10   A.      Absolutely.

11   Q.      All right.  Let's go to the next situation.

12   A.      The next incident we want to discuss is a series of

13   conversations or an exchange of a conversation that was

14   shared with the Memphis Police Department on July 6th, 2019.

15   It was shared by one of our local shopping malls.  Shared by

16   management at the local shopping mall, where they sent this

17   to a precinct commander that they had received it from their

18   mall operations center, which is in a different part of the

19   country.

20          Their mall operations center monitors threats to all

21   the malls that they manage.  When they perceive a threat to a

22   mall, they share it with local mall management.  Local mall

23   management here in Memphis shared it with the Memphis Police

24   Department and expected the Memphis Police Department to act

25   upon it.

UNREDACTED TRANSCRIPT

1   Q.      And what did the Memphis Police Department do?

2   A.      As you can see, it's a threat to shoot people and kill

3   people at a shopping mall here in Memphis.  And then it set

4   off a discussion about whether or not we could try and

5   identify or view any other texts or exchange of information

6   and identify who the suspects in this case were.

7           Ultimately the mall op center provided us with the

8   name or a potential name for the person that posted this.  We

9   were not able to find it on our own.  And once they provided

10  us with that name, we did use databases to learn that the

11  potential suspect was not in the vicinity.  He was in another

12  state.

13          So we contacted the local law enforcement agency in

14  that state, asked them to go by the suspect's house,

15  interview him and conduct a threat assessment as to whether

16  he would be targeting a Memphis shopping mall or a shopping

17  mall in their local area.

18  Q.      Did that result, to your knowledge, in a conclusion by

19  the officers who responded in that other state that this

20  person was not a legitimate threat?

21  A.      Correct.

22  Q.      All right.  So this implicates or is a discussion that

23  came up within the police department was whether this

24  implicated Subsection I, correct?

25  A.      Correct.

1  Q.     Because we are receiving information from, I believe

2  it was -- was it the Simon mall?

3  A.     Yes.

4  Q.     Security group and they have their own internal

5  security staff, correct?

6  A.     Correct.

7  Q.     And they conduct, we believe, online searches about

8  threats that may be coming to malls, but we don't know

9  exactly how or why or what they're thinking about when they

10 do it, right?

11 A.     Yes.

12 Q.     And so in this particular case, right or wrong, we

13 accepted that information.  And ultimately someone was able

14 to defuse the situation and determine that this individual

15 was not a threat.  Not to imply whether the existing Decree

16 would have allowed this or not, but would the proposals that

17 have been made by the ACLU and Memphis, as recognizing and

18 looking at the Judge's rulings about legitimate law

19 enforcement purpose, would it, in your opinion, clarify how

20 we behave in a circumstance like this if we had the

21 clarifying language that we are seeking and have tendered to

22 the Court?

23 A.     Correct.

24 Q.     Okay.  Let's look at the next situation, that

25 scenario.

1   A.      As we move from that last one to this one, I'm going

2   to remind everyone that the date of the last one was

3   July 6th.

4   Q.      Okay.

5   A.      Seems that these events are always clustered around

6   holidays.  The next event we want to discuss is

7   December 26th, 2019, so the day after Christmas.  Again, this

8   was another late evening notification by a local shopping

9   mall here in Memphis.  That their operations center had saw a

10  Twitter post, and on that account, it says so who shooting

11  up, names the mall.  This year.

12          And immediately, as soon as the mall operation center

13  reported that to local mall management, local mall management

14  reported it to the Memphis Police Department and asked us to

15  investigate it.  And always with these things, the first

16  thing we want to do is get additional uniformed officers to

17  the mall.  We want to have a larger than normal visible

18  presence there to deter and detect anything that might be

19  occurring.

20          Then we want to start the investigation into this.

21  This investigation was requested by a precinct colonel that

22  we take some -- take action on this.  This particular message

23  that was given to us provided the account name, the person

24  that posted this on Twitter.  So we were able to use that

25  account name the mall provided us to identify the person that

1   posted it.

2   Q.      Were you able to contact that person?

3   A.      Yes, sir.  We sent Memphis detectives and a Memphis

4   crime scene intervention team officer to his house.  We

5   followed what we typically do when we get these types of

6   threats.  We want to interview the person that made the post.

7   We want to interview his family members.  We want to conduct

8   an investigation.

9   Q.      All right.  Was this resolved?

10  A.      Yes, sir.  It was that night.

11  Q.      All right.  Thank you.  Now, did this raise questions

12  that caused discussion about whether we were entitled to

13  receive and act upon the Twitter account information that was

14  sent to us by a non law enforcement security staff?

15  A.      Yes, sir.

16  Q.      All right.  And without regard to whether the existing

17  Decree would have allowed this or not and whether in the

18  future it should be allowed or not, in your opinion, does the

19  language that has been proposed to the Court enlighten us and

20  incorporate some of the Judge's reasoning, so as to make

21  clear how we should behave in a situation like this one?

22  A.      Absolutely, it does.

23  Q.      All right.  Do you have one more?

24  A.      Yes, sir.  One more.

25  Q.      Okay.

1  A.      Next slide, please.  This is a murder investigation

2  that took place on February 16th, 2020.  I would note that

3  it's after the Valentine's Day holiday.  This occurred on a

4  Sunday morning at about 2 a.m. in the morning.  It started

5  when officers from our fuelling station were called to a

6  wounding.  Officers located a female.  She was in the street.

7  She was bleeding.  She had stab wounds to her arm, to her

8  head.  One report described her hand was almost severed or

9  amputated from her body.

10         We learned that she had flagged down a passing

11  motorist, screaming for help.  The passing motorist called

12  911 for her.  The officers were interviewing her.  She

13  advised that her husband was the person responsible for

14  attacking her.  And that she had ran out of the house,

15  leaving her 18-year-old daughter in the house with her

16  husband.

17         This victim was transported to the Regional One

18  hospital here in Memphis in critical condition.  Officers

19  responded to the house.  They entered the house.  They found

20  the 18-year-old daughter in a bedroom unresponsive.  She also

21  had stab wounds and lacerations to her face, her neck, her

22  upper torso and her arms.  Paramedics were summoned to the

23  scene, but she was pronounced deceased on the scene.

24         So immediately, we believed the suspect to be on foot

25  in the area.  The officers did a great job investigating it.

1    They called for the aviation unit, our K-9 officers, the dog

2    officers to conduct an area search, but the suspect was not

3    located.  The adult female victim that was transported did

4    provide investigators with her husband's name or at least the

5    name she knew her husband by.  But their attempt to identify

6    him and get a positive identification on him were

7    unsuccessful.  They could not find him in any local database

8    that we have.  They could not verify his identity.

9          One of the investigators went and used the name that

10   the wife provided and went to facebook and found that the

11   suspect did have a facebook page in the name the wife

12   provided, but again, there was no positive match to any known

13   person in Memphis.  Officers were able to take that facebook

14   photograph to the victim in the hospital.  She was able to

15   identify her husband as the person that attacked her and

16   killed her 18-year-old daughter.

17         MPD detectives were able to use that information, put

18   out a media release and identified the suspect's sister and

19   made contact with the suspect's sister to try and locate him

20   to try and get him to turn himself in.  And again, this

21   started on Sunday at 2 a.m.  By Sunday afternoon they had a

22   media release, a warrant issued, and that way, the entire

23   Memphis community could be on the look out for the murder

24   suspect.

25   Q.    Was he apprehended?

1   A.      Yes, he was.

2   Q.      Was he apprehended in what way?

3   A.      He was apprehended here in Memphis before he had a

4   chance to flee the City.

5   Q.      All right.  And in this case, did the officer who was

6   seeking a way to get a photograph to be able to get a

7   positive ID on this suspect, did he or she seek approval from

8   the Director to look at the facebook page of this individual?

9   A.      No.

10  Q.      And she -- they shared this information with the wife,

11  who had been injured, showed that information to her, and

12  then the media was given a copy of the photograph that came

13  from a facebook page; is that right?

14  A.      That's correct.

15  Q.      And ultimately the work that was done resulted in the

16  successful apprehension of this person, but had there been

17  concern when this was all evaluated about whether there was

18  clarity on the appropriateness of the steps taken with regard

19  to social media in particular and sharing the information

20  with the media of the photograph under the terms of the

21  Consent Decree?

22  A.      Correct.

23  Q.      Is this one of the kinds of items that led the police

24  department to discuss with the ACLU possible clarifications

25  of the Decree that would incorporate the Judge's opinions and

1  statements about legitimate law enforcement activities so

2  that officers would have clarity on when and how they could

3  act?

4  A.      Yes, sir.

5              MR. GLOVER:  You can take that down now.

6  BY MR. GLOVER:

7  Q.      Based on your attempts to ensure compliance with the

8  Kendrick Consent Decree and to assist officers in doing that,

9  do you have -- have you reached a conclusion as to whether

10  operation under the existing Decree without modification

11  would be detrimental to the public interest because of the

12  lack of clarity we seem to have on some issues?

13  A.      Yes, sir.

14  Q.      Do you have an opinion as to whether more specificity

15  around the areas that you've testified to would remove those

16  ambiguities and allow us to be a better law enforcement

17  agency?

18  A.      It will.  Yes, sir.

19  Q.      All right.  Have you read through the entire proposed

20  modified Decree and the new section in it and come to any

21  conclusion about whether those proposed modifications answer

22  the majority of the lack of clarity questions that have come

23  up to you in discussions with officers?

24  A.      I have read the whole thing, and I think it does, sir.

25  Q.      All right.  And do you ask the Court to seriously

1  consider accepting those proposed joint modifications to the

2  Decree?

3  A.     Yes, sir.  What worries me is not the officers that

4  ask questions.  It worries me the officers that don't ask

5  questions.  Because I think just ignoring that part of a

6  potential investigation, I think, for some of the officers

7  rather than trying to clarify, they just say we'll just

8  investigate without it and maybe just back away.

9  Q.     All right.

10                MR. GLOVER:  I have no further questions, Your

11  Honor.

12                THE COURT:  Cross examination, ACLU?

13                MS. YARBROUGH:  Yes, Your Honor.  I'll be

14  handling the cross examination of Deputy Director Crowe.

15                THE COURT:  Okay.  You may want to raise your

16  camera just a bit.

17                MS. YARBROUGH:  I'm trying not to have -- the

18  camera is located at the bottom of the laptop screen.

19                THE COURT:  You're fine.  It's up to you.  It's

20  entirely up to you.

21                MS. YARBROUGH:  Okay.  I have a book that can

22  help us, I think.

23                THE COURT:  That way we can see you a little more

24  clearly.  Thank you.  I think we're ready to go.

25                        **CROSS EXAMINATION**

                      UNREDACTED TRANSCRIPT

1   **QUESTIONS BY MS. YARBROUGH:**

2   Q.      So, I wanted to ask you, Deputy Director Crowe, about

3   some of the changes that you discussed with Mr. Glover.  He

4   asked about a number of revisions to the Decree that would

5   allow for the Memphis Police Department to use new

6   technologies that may or may not have been contemplated under

7   the original Decree.  And you would agree that none of those

8   particular changes, especially regarding the use of social

9   media or new camera technology would allow for the Memphis

10  Police Department to no longer follow the original terms of

11  the Kendrick Decree, correct?

12  A.      (No verbal answer.)

13  Q.      And I'm sorry, I did not hear your answer.  I didn't

14  know if that was an issue or with my audio or not; is that

15  correct?

16              THE COURT:  Chief Crowe, can you hear us okay?

17              MR. GLOVER:  That was my fault.  I muted the

18  phone.  It's my fault.  So he heard the question, and he can

19  answer again.

20              THE COURT:  Sure.  Go right ahead.

21  A.      My answer would be correct, ma'am.  Yes, ma'am.

22  BY MS. YARBROUGH:

23  Q.      Thank you.  So specifically, none of those additions

24  or changes would allow the Memphis Police Department to

25  gather, maintain or store or share information that would be

UNREDACTED TRANSCRIPT

1   First Amendment-related information, right?

2   A.      Correct.

3   Q.      And so for example, none of those changes would allow

4   the Memphis Police Department to conduct or gather

5   intelligence as it did with the fake Bob Smith facebook

6   account, right?

7   A.      I'm sorry.  Say that again.

8   Q.      None of those changes, for example, would allow

9   Memphis Police Department to gather intelligence in the same

10  way that it previously did with the fake facebook Bob Smith

11  account, right?

12  A.      That is correct.  Yes, ma'am.

13  Q.      And it would allow Memphis Police Department -- the

14  changes would allow Memphis Police Department to use

15  body-worn cameras, but it wouldn't, for example, allow them

16  to surveil an individual at a protest merely for protesting,

17  right?

18  A.      Correct.  Yes, ma'am.

19  Q.      And it wouldn't allow them to store that footage or

20  catalog it in order to put together a list of who would be

21  present at that protest?

22  A.      That is correct, ma'am.

23  Q.      I'd like to ask you about some of the different

24  scenarios that you posed where officers were able to use

25  social media to successfully investigate criminal activity.

 1   So for example, in the kidnapping case involving information

 2   from Missouri.  At all times, the information that the

 3   officer received from different organizations was related to

 4   solving a crime, right?

 5   A.      Correct.

 6   Q.      And the information he received was not First

 7   Amendment-related material?

 8   A.      Correct.

 9   Q.      And that he was able to use social media in order to

10   track down a potential suspect?

11   A.      Yes, ma'am.

12   Q.      And he was not prevented from doing so by the Decree?

13   A.      Correct.

14   Q.      And that would be essentially the same with the other

15   scenarios we provided, that the information being exchanged

16   was related to criminal activity, right?

17   A.      Yes, ma'am.  I think some of the concern officers have

18   is when they open that facebook page, what will be there.

19   They don't know if the potential suspect's facebook page will

20   be full of political intelligence-related information, First

21   Amendment-protected information or if that facebook page will

22   just be full of criminal information.

23   Q.      You agree then that some of the modifications that

24   you've reviewed would clarify that?

25   A.      Yes, ma'am.

1  Q.      Okay.  And that social media could be used to

2  investigate or for purposes of legitimate law enforcement

3  activity, correct?

4  A.      Yes, ma'am.

5  Q.      Okay.  I'd like to talk to you a little bit about some

6  of the other concerns related to information sharing between

7  Memphis Police Department and some of the other agencies that

8  the police department frequently works with.  To your

9  knowledge, Memphis Police Department hasn't had to dismantle

10 any of those groups, correct?

11 A.      Correct.

12 Q.      And that Memphis Police Department officers are still

13 members of those groups?

14 A.      Correct.

15 Q.      And that the groups are still functioning, still

16 making arrests, investigating criminal activity?

17 A.      Yes, ma'am.

18 Q.      And can you think of any specific instances where

19 intelligence that was collected by such a group and shared,

20 you know, amongst Memphis Police Department members had to be

21 turned away because it didn't comply with the Decree?

22 A.      I can't think of a specific instance.  But I know the

23 conversation always occurs, but it usually occurs after the

24 information is shared, rather than when the information.

25 Does that make sense?

1  Q.      Sure.  To your knowledge when that conversation

2  occurred, have officers sought authorization through

3  Section G?

4  A.      No, ma'am.

5  Q.      So one of those groups that often exchanges

6  information with the Memphis Police Department would include

7  CrimeStoppers, right?

8  A.      Yes, ma'am.

9  Q.      Okay.  And CrimeStoppers would be -- it's an anonymous

10 tip service so that people can call or contact the police

11 department through an app or a website and submit tips

12 related to crimes?

13 A.      That is correct.

14 Q.      And when members of the CrimeStoppers team receive

15 those tips, they typically vet the tips for accuracy to see

16 if they're -- well, let me stop there.  The members of the

17 CrimeStoppers team typically vet the tips that they receive,

18 right?

19 A.      I don't think I would call it that they vet the tip,

20 but they try and match the tip to a specific crime.  So

21 they're not trying to determine if the tip is accurate or

22 not, but they're trying -- a lot of times the tipster will

23 know the specific crime.  Sometimes they just have a very

24 generic description.  So it has to be matched to the crime so

25 it can be given to the correct detective, detective bureau.

1    Q.      Okay.  So then they would match it up to a known crime

2    and then send it to the correct department or detective?

3    A.      Correct.

4    Q.      And that turnaround is typically pretty fast, right,

5    between receiving the tip and then sending it on?

6    A.      Yes, ma'am.

7    Q.      Would you say typically within a couple of hours?

8    A.      Yes, ma'am.

9    Q.      And only the tips that lead to arrests are the ones

10   that end up being paid out, right?

11   A.      Correct.

12   Q.      And so you would say that the vast majority of

13   information that you receive through CrimeStoppers would be

14   related to criminal activity?

15   A.      Yes, ma'am.

16   Q.      And that because of the Decree, you have not had to

17   stop using CrimeStoppers or stopped taking tips from

18   CrimeStoppers?

19   A.      Correct.  We have not.

20              MS. YARBROUGH:  If I could have just one moment,

21   Your Honor, I believe those are all my questions.

22              THE COURT:  Certainly.  Take your time.

23              MS. YARBROUGH:  I think we're good.  Thank you.

24              THE COURT:  All right.

25              Any questions from the Monitor for Chief Deputy

*TESTIMONY OF DONALD CROWE*                                           197

1    Crowe?

2              MR. PERRY:  Yes, Your Honor, not very many.

3                        **CROSS EXAMINATION**

4    **QUESTIONS BY MR. PERRY:**

5    Q.    Chief Crowe, how are you?

6    A.    Very good, sir.  How are you?

7    Q.    I'm well.  It's good to see you again.  Ms. Yarbrough

8    asked you about Exhibit 17.

9              MR. PERRY:  Can you pull that, Exhibit 17.

10   That's the recent investigations that Chief Crowe was talking

11   about.

12   BY MR. PERRY:

13   Q.    Chief Crowe, I'm not going to take you all the way

14   through that again, but I counted five recent investigations

15   that you mentioned.  One was about kidnapping; is that right?

16   A.    Yes, sir.

17   Q.    One was about robbery; is that right?

18   A.    Yes, sir.

19   Q.    One was about shootings and killings at a mall; is

20   that right?

21   A.    Two were.  Yes, sir.

22   Q.    Then there was a second, a mall threat about shooting

23   up the mall; is that right?

24   A.    Correct.

25   Q.    And then the final one was a murder, that's correct?

UNREDACTED TRANSCRIPT

1        THE COURT:  All right.

2  A.     Yes, sir.

3        THE COURT:  All right.  Now, we're looking at

4  Exhibit 22?  So yes, sir.  Go right ahead.

5        MR. PERRY:  Thank you.  Thank you, Your Honor.

6        THE COURT:  Certainly.

7        MR. PERRY:  Trial Exhibit 22.  Thank you, Your

8  Honor.

9  BY MR. PERRY:

10 Q.     So you agreed with Ms. Yarbrough those are all crimes;

11 is that right?

12 A.     Yes, sir.

13 Q.     And so you understand that the Consent Decree does not

14 prohibit the police department from investigating those

15 incidents and those types of incidents because they're

16 crimes; is that right?

17 A.     It does not prohibit us from investigating them, but

18 the detectives have concerns about what methods they can use

19 to investigate them.

20 Q.     Okay.  And I think I heard you also say to

21 Ms. Yarbrough that, you know that it's a crime, but if you

22 get on social media, maybe other information comes up like

23 maybe you incidentally run into First Amendment-related

24 information or political intelligence.  Maybe you

25 incidentally run into that, and that's what the police

 1 | officers are nervous about; is that right?

 2 | A.     Yes, sir.

 3 | Q.     Okay.

 4 |            MR. PERRY:  I want to pull up -- I believe the

 5 | original Consent Decree is Exhibit 19, trial Exhibit 19.  Can

 6 | we pull up the original Consent Decree.  I tell you what.  We

 7 | have it as one of our exhibits if not.

 8 |            THE COURT:  It's marked.  Right, it's been marked

 9 | as 19 in the case.

10 |            MR. PERRY:  I thought it was 19, Your Honor.

11 |            THE COURT:  It is.  It is.

12 |            MR. PERRY:  Just pull up Demonstrative E.  It's

13 | the same thing.  Demonstrative E is the same thing.

14 |            There we are.  Scroll up.  See that?  Let's go to

15 | Section G there.  Just keep scrolling.  I'll tell you when to

16 | stop.  Thank you.

17 |            Scroll down a little bit more.  The other

18 | direction.  All right.  Stop right there.  Okay.

19 | BY MR. PERRY:

20 | Q.     Chief Crowe, you can see that on the screen, that's

21 | Section G of the original Consent Decree; do you see that?

22 | A.     Yes, sir.

23 | Q.     And so I'm just going to read part of G1 there.  It

24 | says, "Any police officer conducting or supervising the

25 | lawful investigation of criminal conduct" and we were just

1    talking about criminal investigations; is that right?

2    A.      Yes, sir.

3    Q.      "Any police officer conducting or supervising such an

4    investigation which investigation may result in the

5    collection of information about the exercise of First

6    Amendment rights or interfere in any way with the exercise of

7    First Amendment rights must immediately bring such

8    investigation to the attention of the Memphis director of

9    police for review and authorization."

10           Did I read that correctly?

11   A.      Yes, sir.  You did.

12   Q.      So in fact, the original Consent Decree, before any of

13   the edits that have been offered by the parties laid out a

14   procedure for police to follow when there was a criminal

15   investigation that might incidentally implicate First

16   Amendment rights; is that correct?

17   A.      Yes, sir.

18   Q.      Okay.  I want to ask a couple more questions.  This is

19   a little bit different.  You also just spoke a little bit

20   with Mr. Glover and then again with Ms. Yarbrough about

21   vetting.  Ms. Yarbrough asked you specifically about

22   CrimeStoppers.  And you have some concerns about, you know,

23   the vetting that the Consent Decree requires you to do; is

24   that right?

25   A.      Yes, sir.

1   Q.      Okay.

2               MR. PERRY:  I'd like to pull up -- let's pull up

3   ECF 250.  All right then.  That's page ID, it's page 417.

4   Scroll.  Yeah.  That's it.  Right there.

5   BY MR. PERRY:

6   Q.      Chief Crowe, can you see with me that paragraph that

7   starts "therefore."  Reading these two sections of the

8   monitor's, can you see that paragraph with me?

9   A.      Yes, sir.  I can.  I'm having a little trouble reading

10  the print, but I do see the paragraph.

11  Q.      Okay.  There we go.  We'll make that a little bit

12  bigger; is that better?

13  A.      Yes, sir.  Thank you.

14  Q.      I'm going to go to the last sentence in that

15  paragraph.

16              MR. PERRY:  Can we highlight that starts with

17  Section 1 at the bottom of that Section I right there.  Can

18  you highlight that.  There you go.  Just that sentence there.

19  BY MR. PERRY:

20  Q.      I'm going to read that, and Chief Crowe, tell me if I

21  read this correctly.  "Section I further requires the City to

22  vet only information that implicates Section G of the Decree,

23  that is, information gathered as part of a legitimate law

24  enforcement investigation that incidentally or may

25  incidentally implicate protected First Amendment activity,"

UNREDACTED TRANSCRIPT

*TESTIMONY OF DONALD CROWE*                                          202

1    did I read that correctly, Chief Crowe?

2    A.      Yes, sir.  You did.

3    Q.      So now you've got direction, you have Section G that's

4    got clear instructions about what happens if you do the

5    criminal investigation that may incidentally implicate First

6    Amendment rights.  And now you've got direct instruction from

7    Judge McCalla, this is the only information you need to vet.

8    You only need to vet information that implicates Section G.

9    That's all you've got to do.  It's right there in black and

10   white in the Court's order; is that right?

11   A.      Yes, sir.

12           MR. PERRY:  All right.  That's all I've got.

13           THE COURT:  Certainly.

14           Is there any redirect, Mr. Glover?

15           MR. GLOVER:  There is, Your Honor, very briefly.

16           THE COURT:  Sure.

17           MR. GLOVER:  If we could pull that exhibit back

18   up or that court ruling back up.

19                        **REDIRECT EXAMINATION**

20   **QUESTIONS BY MR. GLOVER**:

21   Q.      While she's doing that, you've already testified,

22   haven't you, that part of what we're asking is that the

23   wisdom of the court ruling and explanation in these various

24   decrees be brought into the language of the Consent Decree

25   itself; is that right?

                    UNREDACTED TRANSCRIPT

1   A.      That is correct.

2   Q.      Okay.  I'm going to have a question about it here.

3   The part that had been highlighted earlier that says,

4   Section I further requires the City to vet only information

5   that implicates Section G of the Decree, that is, information

6   gathered as part of a legitimate law enforcement

7   investigation, and then it goes on.  Now, is there a

8   definition in the existing Consent Decree of legitimate law

9   or -- excuse me -- legitimate law enforcement investigation?

10  A.      I don't believe there is.

11  Q.      Is that part of what we're seeking with this

12  modification?

13  A.      Correct.

14  Q.      All right.  And then the statement that Judge McCalla

15  made that incidentally -- excuse me.  I've got a screen

16  that's got a picture blocking some of this document.

17          MR. GLOVER:  Would you make it a little smaller,

18  so I can see the whole thing here.

19  BY MR. GLOVER:

20  Q.      All right.  It says, "Section I further requires the

21  City to vet only information that implicates Section G of the

22  Decree."  Now, Section G in the Decree doesn't even talk

23  about social media searches that would not be of a criminal

24  nature, right?

25  A.      Correct.

1  Q.     It doesn't let the Director authorize investigations

2  that are situation awareness or looking at how many folks we

3  need to put around the St. Jude marathon or questions about

4  when someone, you know, is going to have a First Amendment

5  event, how to determine how many officers to have present

6  because those aren't criminal investigations, right?

7  A.     That's correct.

8  Q.     And we're not aware of a mechanism in the current

9  Decree to allow an investigation that might implicate First

10 Amendment rights that isn't criminal in nature, right?

11 A.     Correct.

12 Q.     Okay.  And when the Judge indicates that something may

13 incidentally implicate protected First Amendment rights, has

14 there been some concern, without a little further

15 clarification, officers are believing that facebook and other

16 social media, by their very nature, are created to have

17 people express themselves on them?

18 A.     Correct.

19 Q.     And that if we don't get some clarification, we

20 technically may be in a situation that you're going to

21 incidentally implicate protected First Amendment activities

22 any time you look at someone's facebook page?

23 A.     That's correct, sir.

24 Q.     And that in situations where it may be a situation

25 awareness or public safety issue rather than a criminal

1   investigation, we would not have a mechanism, at least in the

2   Decree, to clearly allow access to that information because

3   the Subsection G only deals with or on its face at least

4   appears only to deal with criminal investigations?

5   A.      That's our understanding.  Yes, sir.

6   Q.      Okay.

7   A.      And this document, I believe, is one of Judge

8   McCalla's rulings.

9   Q.      It is.

10  A.      Which the majority of our Memphis officers have not

11  read or have access to.  The rulings are not posted.

12  Q.      You have instructed them to read when they've asked

13  you specific questions?

14  A.      Correct.

15  Q.      Is it your view that we would be benefitted by that

16  learning being incorporated into the language of the Decree

17  that we have to teach?

18  A.      Yes, sir.  One document that officers can refer to.

19  Q.      Thank you.

20          MR. GLOVER:  I have no further questions, Your

21  Honor.

22          THE COURT:  All right.  Well, we appreciate you

23  being with us today, Deputy Chief Crowe, and I think that

24  concludes your testimony.  So good to see you again.  We're

25  going to let you be excused.

206

1          We're going to take a short break at this time

2     simply for the staff.  It's going to be about ten minutes.

3     And of course, if somebody needs more, they'll let me know.

4     Then we'll come back for our next witness.  I understand our

5     next witness is -- well, let me make sure who our next

6     witness is going to be, Mr. Glover.

7              MR. GLOVER:  The next witness will be our expert,

8     Mr. Eric Daigle.

9              THE COURT:  Right.  That's what I understand.  So

10    about ten minutes and we'll see everybody at that time.

11    Thank you all very much.

12              (Short break.)

13              THE COURT:  All right.  We need to check and see

14    if we have sound, and the answer is we do not.  Mr. Castelli?

15              MR. CASTELLI:  Yes.

16              THE COURT:  We're just testing.  We have had a

17    little issue about how we need to control everything.  I

18    think we're good there.  All right.

19              We have our witness there.  How are you today?

20              THE WITNESS:  Good afternoon, Your Honor.

21              THE COURT:  Now I know I can hear you.  So now

22    I'm just waiting on the examiner to show up.

23              MS. SILK:  Hi, Your Honor, this is Jennie Silk.

24    I will be conducting the exam.

25              THE COURT:  Oh, you're going to have -- all

UNREDACTED TRANSCRIPT

207

1  right.  You confused me.  I didn't know who was going to

2  handle that, Ms. Silk.  Sorry about that.  Then we do have

3  everyone.  Counsel, Ms. Silk, who will our next witness be?

4             MS. SILK:  We would like to call our next

5  witness, Mr. Eric Daigle.

6             THE COURT:  All right.  Mr. Daigle, if you will

7  raise your right hand, Mr. Sample is going to administer the

8  oath.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    *   *   *

2                    **ERIC DAIGLE,**

3  **was called as a witness and having first been duly sworn**

4  **testified as follows:**

5                    THE COURT:  Counsel may proceed.

6                    **DIRECT EXAMINATION**

7  <u>QUESTIONS BY MS. SILK:</u>

8  Q.      Hello, Mr. Daigle.  Can you please spell your full

9  name for the court reporter.

10 A.      Sure.  My name is Eric Daigle.  E-R-I-C, Eric.  And

11 Daigle, D-A-I-G-L-E.

12 Q.      Great.  Thank you.  And what is your occupation?

13 A.      I'm an attorney.

14 Q.      And I'm going to go ahead and admit the report that

15 you created for this case and is docketed as Document

16 Number 3 of 6 as an exhibit.  Do you have a copy of that?

17                   THE COURT:  Right.  Reports are normally not

18 received if there's opposition by counsel opposite, but if

19 there's no opposition, they can be.  And the reason is, of

20 course, that they are reports only, and they are not received

21 typically as evidence.  I don't have any problem with that,

22 but I do need to, on that circumstance, need to hear from

23 Mr. Castelli if there's an objection.  If there's no

24 objection, we'll simply receive it.

25                   MR. CASTELLI:  Not in this type of proceeding,

*TESTIMONY OF ERIC DAIGLE*                                            209

1  Your Honor.  I think that the Court will give the report the

2  weight it wants to give it, and I don't have a problem with

3  it being admitted, so we know what we're talking about if the

4  report comes up in conversation with the witness.

5              THE COURT:  That's perfectly fine.  And I assume

6  there's no objection from the Monitor.

7              MR. STANTON:  (No verbal response.)

8              THE COURT:  You're still on mute.  I can see that

9  you're indicating there's no objection.  And Mr. Sample, if

10  you have to unmute on your equipment because of the way that

11  we need to make sure everybody -- okay.  Can you unmute

12  yours?  We're really just testing.  Yours is not unmuted.

13             MR. STANTON:  Okay.  Yeah.  I think we were

14  locked at one point, Your Honor.  Based on Mr. Castelli's --

15  no objection from the monitoring team, based on the reasons

16  outlined by Mr. Castelli.

17             THE COURT:  No problem.  And of course, I simply

18  usually go over the rule, the basic rule so that everybody

19  knows were making an exception to the rule.  That's perfectly

20  fine.  All right.

21             Counsel, that's marked and received as 23.  And

22  counsel may proceed.

23             (WHEREUPON, the above-mentioned document was

24  marked as Exhibit Number 23.)

25             MS. SILK:  Thank you, Your Honor.

1   BY MS. SILK:

2   Q.      If you could please scroll to the page of your report

3   where your CV begins, I think that would just be helpful for

4   everyone.  And I believe that's page 37.  Okay.  Mr. Daigle,

5   you said that you are an attorney.  And where did you obtain

6   your degree?

7   A.      I obtained my juris doctorate degree from Quinnipiac

8   University in Hamden, Connecticut.

9   Q.      And where did you go to undergrad?

10  A.      Central Connecticut State University in New Britain,

11  Connecticut.

12  Q.      Are you here to testify today regarding the changes in

13  factual conditions related to police practices, police use of

14  technology, social media and interagency collaboration?

15  A.      Yes.

16  Q.      How long have you been licensed as an attorney?

17  A.      Approximately 19 years.

18  Q.      In which state or states?

19  A.      Just the state of Connecticut.

20  Q.      Okay.  And you're currently a practicing attorney?

21  A.      Yes.

22  Q.      Could you please describe for the Court the nature of

23  your law practice, which I believe it says here is Daigle Law

24  Group, LLC?

25  A.      Yes.  Daigle Law Group is a unique firm in its

1   application, it's not just legal, as you would know it.  But

2   also as a consulting application, we provide guidance and

3   operational oversight for police departments, corrections and

4   security across the country as it directly relates to

5   practice and application of policy, training and management

6   application on a daily basis.

7   Q.     And how long have you -- I'm assuming that you are

8   the -- you said you're the managing member of Daigle Law

9   Group.  How long have you ran Daigle Law Group?

10  A.     Daigle Law Group was formed in May of 2010.

11  Q.     Okay.  And what did you do before Daigle Law Group?

12  A.     Before Daigle Law Group, I was a litigation attorney

13  with the firm of Halloran & Sage in Hartford, Connecticut,

14  where my focus was municipal operations for the New England

15  regions, specifically in law enforcement application.

16  Q.     Okay.  And prior to that?

17  A.     Prior to that I spent ten years with the Connecticut

18  State Police.  Spent my career mostly in the investigative

19  entity.  While I actually always say I over-achieved myself

20  out of a good job and got my degree, both undergrad and legal

21  degree, juris doctorate while I was employed with the

22  Connecticut State Police.

23  Q.     Wonderful.  And prior to the Connecticut State Police,

24  did you serve in the military?

25  A.     I did, yes.  I started my military career as a

*TESTIMONY OF ERIC DAIGLE*                                              212

1    reservist, but I was activated for -- I was sent to active

2    duty for Operation Desert Shield and Operation Desert Storm

3    as a military police officer.

4    Q.      So were you deployed?

5    A.      Yes.

6    Q.      Thank you so much for your service.

7    A.      Thank you.

8    Q.      Now let's talk a little bit more about some of the

9    specialized training that you have received that has informed

10   your expertise in police practices and use of technology.

11   What kind of special training have you had?

12   A.      Over the career obviously, during like many of the

13   witnesses that testified, during your law enforcement career,

14   you continually have updated training.  I spent most of my

15   career in investigations, specifically what we call major

16   crime, which us a homicide unit.  So most of my investigation

17   training in that time was related to crime scene interview

18   interrogation.  The aspects relating to conducting those

19   forms of investigation.  Cold case and, lack of a better

20   term, serial killer type investigations.

21          Once I entered into the legal realm, I began to obtain

22   additional training in areas of significance at that time,

23   which were mainly use of force and use of force related.  And

24   so I have certificates in continuous external training

25   related to use of force investigation, such as a Force

1    Science certificate.  I have achieved the advanced specialist

2    moniker for Force Science video investigation.

3        I'm also a certified civilian oversight with an

4    organization called NACOLE.  A certified litigation

5    specialist with an organization called Americans for

6    Effective Law Enforcement.  And during that time, I've also

7    maintained law enforcement certifications.  So that requires

8    here in the state of Connecticut to have continued update,

9    what we call inservice training or update training, so that

10   you can be recertified every three years, which I've

11   maintained, you know, since my -- since I left the state

12   police in 2020 -- 2002, sorry.

13   Q.    Great.  Are you a member of any particular

14   professional associations or organizations that are related

15   to law enforcement and policy and practice?

16   A.    Yes.  I'm not only a member, but I'm also acting

17   certain positions with a lot of the key law enforcement

18   organizations across the country.  You're looking at the CV,

19   so I'll just go in order.  So the FBI Law Enforcement

20   Executive Development Association, which is one of the three

21   nonprofit branches of the FBI academy.  I've been their

22   general counsel and an instructor for that organization since

23   January of 2007.  I've been a member of the International

24   Association of Chiefs of Police for approximately 16 years.

25   Having served on their legal officer section, I also have

1    made my way through as the chairman of the legal officer

2    section.  During my -- over my tenure with the IACP, I'm

3    proud to have been selected multiple times to remain as a

4    member of the civil rights committee for the IACP.  And I'm

5    often selected to assist in policy development and/or issue

6    development.

7          For example, one of the things that will be relevant

8    to these proceedings is approximately eight years ago when

9    the recording police and the litigation cases started to

10   arise on recording police and the First Amendment issues

11   associated with the right of citizens to record police I was

12   placed on a committee to develop the policy in roll call

13   training to instruct officers across the country on the legal

14   obligation of citizens to be able to record them.

15         I maintain multiple involving committees related to

16   the development of what we call model policies.  IACP has

17   actually moved away from model policies to now what we call

18   concept papers, so that there is just more operational

19   information provided to the police chiefs instead of just,

20   you know, a cold policy.  A little bit of explanation.  Kind

21   of like a white paper to explain the thought process.

22         I've been involved in National Tactical Officers

23   Association for many years.  I'm currently the legal section

24   chair for the National Tactical Officers Association.  The

25   Connecticut Chiefs of Police Association, I'm on the board of

1    directors.  And I've been a member of the Police Foundation.

2         Americans for Effective Law Enforcement.  Since

3    January 2009, I've been on the board of directors for that

4    legal application.  What's important with Americans for

5    Effective Law Enforcement is it's a research-based

6    organization that looks to gather information and knowledge

7    to submit to law enforcement executives and officers across

8    the country dealing with all sorts of related issues and

9    constitutional-based issues.  There is an extensive library

10   that's maintained by the Americans for Effective Law

11   Enforcement that we govern as the board of directors,

12   including a amicus brief team that evaluates cases going to

13   the Supreme Court for interpretation of their effect on

14   constitutional operations for law enforcement and best

15   practices.

16   Q.    Okay.  Great.  Now, when you -- just for the court

17   reporter, you used an acronym, IACP.  What does that stand

18   for?

19   A.    Yeah.  Sorry about that.  International Association of

20   the Chiefs of Police.

21   Q.    Okay.  Great.  And you stated that you were the

22   chairman of the IACP at one point; is that correct?

23   A.    I was the chairman of the legal officer section.  So

24   within IACP, there are sections that are directly related to

25   expertise, for lack of a better term, so there is a

1    psychological section, a physician section, a legal section.

2    And the purpose of those sections is for the expertise of

3    those sections to assist in supporting law enforcement

4    executives in the development of practice and policies as it

5    relates to the specialty of that section.

6    Q.      When were you the chairman of that division of the

7    IACP?

8    A.      2014 through 2016.

9    Q.      And was that -- what was the emerging issue in law

10   enforcement during that time?

11   A.      Oh, I think you're talking about the Ferguson, the

12   death of Michael Brown and the resulting president's task

13   force for 21st century policing.  As being the chairman of

14   the legal officer section, you also have a unique opportunity

15   as a quasi counsel for the president of the IACP, which, you

16   know, is solely representing the interest of all police

17   executives in the country.

18          And so I had the ability to be involved in the outcome

19   and the process that was followed by the president's task

20   force to evaluate police operations in this country, starting

21   in December of 2014 through its report in March of 2015.

22   Q.      Great.  I'd like to ask you, have you ever published

23   any articles or blogs?

24   A.      Yes.  Hundreds unfortunately.  We -- as a firm, we

25   produce a Tuesday morning article every week that goes out to

1    the country on current legal issues.  Whether it's Fourth

2    Amendment, First Amendment, whatever the -- whatever we find

3    to be a relevant issue, either just ruled upon by a Court of

4    Appeals or the Supreme Court.  And also issues directed at

5    current trends that officers or police executives need to be

6    aware of or just sometimes just a reminder, so...

7    Q.     Do you do any teaching or lecturing in the field of

8    police practices related to technology, First Amendment,

9    social media, those type of things?

10   A.     Yeah.  So I do extensive training in law enforcement.

11   I have for the past 15 years.  I average probably about 80 to

12   a hundred days a year doing some form of training.  You know,

13   as the issues arise across the country, training changes as

14   to the needs of our law enforcement executives.  So I would

15   say that First Amendment really started to become a training

16   platform about six to eight years ago when we started dealing

17   with the First Amendment interpretations of recording police

18   and the issues of challenges with wiretapping statutes and

19   those type of challenges.  Also after Occupy in 2012, crowd

20   control and First Amendment protections became a hot topic.

21          So it was at that time where we started to do training

22   programs, general training programs for law enforcement

23   officers, but more importantly, I kind of travel the circuit

24   for police executives.  Every state has a chiefs of police

25   association.  You've heard a lot of the witnesses talk about

UNREDACTED TRANSCRIPT

*TESTIMONY OF ERIC DAIGLE*                                          218

1    their time in the FBI National Academy, and the NA has

2    retrainers.  And then there's the IACP conference and other

3    types of national training programs for law enforcement

4    executives, where we have focused pretty much for the last

5    four or five years on First Amendment-related issues,

6    specifically the issues that have topics of discussion.

7        So crowd control, crowd management, First Amendment

8    protections of citizens, recording police, social media,

9    First Amendment rights and the manner in which how to conduct

10   investigations, both criminal and administrative

11   investigations, dealing with these First Amendment issues as

12   the juris prudence or First Amendment law starts to get

13   worked out in a more detailed, specific arena across the

14   country.

15   Q.    Great.  Thank you.  Now, have you ever served on any

16   monitoring teams that monitor any law enforcement agencies in

17   the United States?

18   A.    Yes, ma'am.  I have.  I served on the monitoring team

19   for Oakland Police Department for a period of six years.

20   Q.    And what was the nature of your involvement there?

21   A.    As you've heard other witnesses testify, you usually

22   have an experienced scope of your assignment.  I was assigned

23   stop data.  And also internal affairs and use of force

24   functions, based on the agreement that the Oakland Police

25   Department had with the plaintiff's counsels in that matter.

*TESTIMONY OF ERIC DAIGLE*                                     219

1  Q.     Okay.  And have you ever consulted as an expert on any

2  other case?

3  A.     I have spent a majority of my time working as a

4  consulting expert for agencies that are under consent

5  decrees.  So as you know, in a consent decree, what everybody

6  here is familiar with, there could be multiple sides of a

7  consent decree.  So in the ones that were very prominent,

8  2012 through even now, I had a side where DOJ, Department of

9  Justice, might be one of the parties and where the judge or

10 the monitoring team worked for the judges or party, and then

11 you had the entity itself.

12         I've worked for Virgin Islands, Puerto Rico, Niagara

13 Falls, New York as the consultant for the department to try

14 to manage their policies, procedures, operations, training,

15 to get them to comply with the requirements of the agreement

16 that they were under and trying to get them, assist them in

17 -- to meeting the agreement requirements.

18 Q.     Great.  And have you also worked in an expert capacity

19 on any other litigation other than this case?

20 A.     Yes.  To this date I started doing expert cases about

21 2012.  I have about 30.  Actually, I think there's 30 in the

22 documents that are here.  But we're probably up to about --

23 things are coming in pretty quickly nowadays.  So 30-plus

24 cases.

25         Most of those range and are involved in three

1    different areas.  So you have plaintiff cases, and you have

2    criminal cases, where officers have been arrested or charged

3    by a district attorney.  And then you have defendant's cases.

4    And most of those areas at this point involve use of force,

5    deadly force, officer-involved shootings, tactical

6    operations.

7           I do have a series of cases out of Louisiana on crowd

8    control, First Amendment issues.  And recently some cases out

9    of St. Louis involving crowd control or crowd management

10   application by the police department.

11   Q.     Okay.  Great.  Thank you.  Now I want to refer back to

12   the first part of this document, which is your actual report

13   that you created.  What documents did you review in

14   preparation for your -- in preparing this report and for your

15   testimony today?

16   A.     Yes, ma'am.  So the information that I reviewed is

17   what was listed on page 3 of that document.

18   Q.     Okay.

19   A.     Do you want me to go through the order of that?

20   Q.     No, that's not necessary.  I just wanted to direct it

21   to everyone's attention.  And after you completed this report

22   and in preparation for your testimony, did you arrive at a

23   conclusion regarding whether the Consent Decree should be

24   modified to account for the changed factual circumstances

25   since 1978 relating to technology, the First Amendment and

1   the way people communicate today?

2   A.      Yes, I did.

3            MS. SILK:  Your Honor, at this time I tender this

4   witness as an expert in the field of law enforcement use of

5   technology, social media and law enforcement best practices

6   related to First Amendment activity.

7            THE COURT:  Any voir dire?  Any voir dire by the

8   ACLU?

9            MR. CASTELLI:  I just want to make sure I'm

10  clear.  My understanding is that the subject matter that the

11  expert's going to testify is about the technology use and

12  information by law enforcement.  He's not here to provide a

13  legal opinion on whether the, you know, what the legal

14  standard for modification is or anything of that.  I just

15  want to make sure we're not going to have the same issue that

16  we had earlier with Mr. Henegan's testimony.

17           THE COURT:  Sure.  Absolutely.  I think your

18  question has been heard by our witness.  Perhaps he can

19  respond.

20           THE WITNESS:  Yes, Your Honor.  My expertise is

21  the practice aspect, which is taking the relevant standards

22  and applying them to policies for guidance and supervision,

23  management of the issues that are being addressed.  And then

24  also the process of training both officers and command staff

25  of what is considered to be the practices that they should

1    meet in order to ensure lack of violation of the

2    constitutional rights.

3              THE COURT:  Okay.  Any other questions,

4    Mr. Castelli?  I believe it's not one where he's going to

5    render or attempt to render an opinion as to any specific

6    legal issue that confronts the Court but rather we'll focus

7    on the practice and the practices of departments and, of

8    course, the evolution of these types of policing practices in

9    digital age.  Do you want to ask a question or two?

10             MR. CASTELLI:  Given that that's the scope of the

11   witness's testimony, I don't think I need to ask any further

12   questions other than the ones that counsel for the City have

13   already asked.

14             THE COURT:  Sure.

15             MR. CASTELLI:  Regarding his qualifications.

16             THE COURT:  Mr. Perry, are there any questions

17   from the Monitor?

18             MR. PERRY:  No, Your Honor.  We think this is a

19   matter that's kind of uniquely to soon to be addressed by the

20   parties.  We don't have a position on Mr. Daigle's fitness to

21   be an expert.

22             THE COURT:  I understand.  The witness is

23   accepted as an expert in the areas outlined in his report.

24   And so counsel may proceed.

25             MS. SILK:  Thank you, Your Honor.

*TESTIMONY OF ERIC DAIGLE*                                    223

1   BY MS. SILK:

2   Q.      Mr. Daigle, when you were engaged as an expert by the

3   City, at that time was the City seeking to also vacate or set

4   aside the Consent Decree as well or in the alternative modify

5   the Consent Decree?

6   A.      That was my understanding, yes.

7   Q.      So when you wrote your expert disclosure, did you

8   write it in support of the City's efforts to vacate the

9   Decree at that time?

10  A.      Vacate, yes.

11  Q.      And now that the ACLU of Tennessee and the City have

12  agreed to a number of proposed modifications to the Consent

13  Decree, you're aware that the City no longer seeks to vacate

14  the Decree?

15  A.      I am aware of that, yes.

16  Q.      Okay.  And so are there any -- is there any part of

17  your report that is now mooted by the City's withdrawal of

18  its motion to vacate?

19  A.      I don't believe so.

20  Q.      Okay.  Now, I referred to the proposed modified

21  Consent Decree, and that is trial Exhibit 21.  Do you have a

22  copy of that, Mr. Daigle?

23  A.      Yes, ma'am.

24  Q.      Okay.  It's the redlined version, and we're going to

25  share that on our screen here so everyone can see it.  Have

UNREDACTED TRANSCRIPT

1   you reviewed this document?

2   A.      I have, yes.

3   Q.      Some of the proposed addition to the Consent Decree by

4   the parties that we've heard testimony on several times is

5   found in the definition Section B.  And it's B3.  It's the

6   definition of legitimate law enforcement purpose.  And we've

7   read it several times here.  I just would like for you to

8   please talk about what type of activities are conducted for

9   legitimate law enforcement purposes?

10  A.      I believe the -- my initial review of this definition

11  seemed to fit the need as it clears -- the purpose -- I

12  thought it could probably use a little bit of clarity on also

13  conducting criminal investigations.  Other than I do agree

14  that with the party's position that a legitimate law

15  enforcement purpose would be to further the prevention of

16  crime and to ensure the safety of the public and law

17  enforcement personnel.

18          I thought the only addition I would have added would

19  be also for criminal investigation.  I know it's covered in

20  other areas of the agreement.  Just to be -- again, it's

21  important, as many witnesses have said, that we're trying to

22  ensure a standard that can be met by officers on patrol.  And

23  so the more clarity that we can get would provide more

24  clarity in the form of a policy and training to the officers.

25  Q.      Okay.  And so you'll agree -- do you agree with the

```
 1  statement that there are types of law enforcement activities,

 2  legitimate law enforcement activities that are unrelated to

 3  the prevention of crime?

 4  A.      That are -- I'm sorry.  One more time.  I apologize.

 5  Q.      Sure.  Let me rephrase.  You heard testimony yesterday

 6  that this definition should be modified to be limited to the

 7  furthering of -- furthering the prevention of crime.  And my

 8  question to you is, are there any other law enforcement

 9  activities that are unrelated to the prevention of crimes

10  that are legitimate law enforcement activity?

11  A.      Oh, yes.  Absolutely, yes.  You know, specifically

12  that's where I think the provision of ensuring the safety of

13  the public and law enforcement come into play, like you've

14  heard from multiple witnesses.  The aspect of information

15  threat assessment analysis, you know, things that occur that

16  there's a duty and obligation to just evaluate for the

17  purposes of ensuring the safety of citizens and law

18  enforcement personnel.

19  Q.      Thank you.  Now, you mentioned earlier that the IACP

20  has moved away from what you called model practices and moved

21  towards a standard.  I can't remember what you called it.

22  Was it white papers or?

23  A.      Yeah.

24  Q.      Concept papers?

25  A.      Yeah.  They now call it the issues and concept papers.
```

1  Q.      And who has access to those type of concept papers?

2  A.      Well, I believe that there are -- so there is a

3  website on the International Chiefs of Police called the

4  model policy or policy center application.  There are some

5  that are actually open to the public.  And especially ones

6  that are of great concern to the public.  And then every

7  police executive or anyone who has a membership withheld to

8  IACP can have access to those papers.

9  Q.      And so can you explain for the Court and for the

10 parties how a law enforcement agency would draw on that body

11 of knowledge and for what purpose?

12 A.      Well, the best way would be for what we've talked

13 about, and that is policy development.  In determining best

14 practices in the industry.  You know, when you develop --

15 part of my firm is a policy development section where we

16 write policy manuals across the country and have actually

17 written the model manual for the State of Tennessee with the

18 Tennessee chiefs of police association.  The key is that you

19 have to -- those policies have to be based on what we would

20 call best practices, and those best practices come from

21 multiple areas.  And papers such as these written by

22 organizations such as the IACP will draw upon those best

23 practices, which would include multiple different areas so

24 that police executives will have some basis in order to put

25 together their policies and procedures.

UNREDACTED TRANSCRIPT

*TESTIMONY OF ERIC DAIGLE*                                      227

1   Q.      Thank you.  Now, I'd like to shift the conversation to

2   talk specifically about social media and law enforcement's

3   use of social media.

4   A.      Okay.

5   Q.      Mr. Daigle, can you tell us how the nature of policing

6   has changed since entry of the Consent Decree in 1978, as it

7   relates to social media.

8   A.      Well, I think when you heard the other witnesses

9   testify and those of us that have been involved in law

10  enforcement, you know, 30 years, it didn't exist back then.

11  And we've watched technology enter society, and at the same

12  time we've watched that technology become a part of our

13  everyday interaction.  Those of us that have been around for

14  a while, you know, remember the times where we did take

15  information down with a paper and pencil, but the challenge

16  as it came through was that the increase of technology has

17  been so significant.  And social media became the way in

18  which society would interact with each other.

19          And when I talk to law enforcement officers,

20  investigators today, the mechanisms that they're using to

21  investigate threats and crimes are just totally different

22  than what we did 25 years ago.  The old days of interviewing

23  witnesses and knocking on doors and hours and hours of

24  surveillance, well, that has been morphed into a new world of

25  social interaction where communication and interaction and

UNREDACTED TRANSCRIPT

1    posting of opinions and documents and photos and videos are

2    now at a touch of a fingertip on a cell phone.  And that has

3    completely changed the way.

4         Interesting when preparing for this, you know, these

5    types of discussions always make us think about different

6    areas.  And I kind of -- I just wanted to see what the social

7    media statistics was.  So if you look at Amazon's statistics,

8    and there's a website, and I'll give you the link because you

9    can obviously vet it for whether it's important.  Multiple

10   websites report on social media.  And this was

11   www.brandwatch.com, which was an Amazon social media

12   statistics.  You know, 7.8 million (sic) people in the

13   worldwide population.  There are 3.725 billion active social

14   media users.  The websites, the stats show that every person

15   has about 7.6 social media accounts.  I would interpret that

16   to be different social media accounts.

17        And the interesting part for me, having three children

18   was that the daily amount of time spent by citizens in this

19   country on social media was about 142 minutes a day.  I think

20   that's very significant.  The one thing that we can

21   definitely guarantee that that has continued to increase over

22   the years.  It was not in existence in 1978.  But I was seven

23   years old, so I'm just going to go with that it wasn't in

24   existence when I became a police officer in 1992.  And it

25   wasn't -- it was just beginning to get into existence when I

1   left the state police in 2002.  And we've seen such a

2   dramatic increase with all aspects of law enforcement, both

3   operationally and administratively as it comes to social

4   media and its implications.

5   Q.      Thank you.  Now, did you hear the testimony of the

6   monitoring team's police practices expert yesterday,

7   Dr. Theron Bowman?

8   A.      I heard some of his testimony, yes.  Not all of it

9   though.

10  Q.      Okay.  And with respect to his assertion that social

11  media -- and I'm paraphrasing here -- but social media does

12  not contain a treasure-trove of information, resources and

13  tips with regard to criminal investigations.  Do you agree

14  with that assertion?

15  A.      I do not agree with Dr. Bowman's assertion.  In fact,

16  I think he took that out of my report because I actually use

17  that phrase in paragraph 26 of my report.  Because I do

18  believe and I think that any reasonable interaction with law

19  enforcement or security industry in a whole would tell you

20  that social media is a treasure-trove of information.  And I

21  kind of joke on the aspect of when I interact with major

22  crime investigators that are doing the job now that I did

23  20 years ago and we ask them, you know, what did you do?  Did

24  you go out interview people?  Did you go out and collect

25  evidence, fingerprints, DNA, what did you do?  Tell me about

1   the stuff that we like to hear about, the work, the hard

2   police work done.  And when they come back and say well, we

3   found a video of it on social media.  That's it.  That's what

4   you did.

5          And so those are the challenges where the things are

6   different nowadays because, as I put in my report, social

7   media has a lot of, a lot of treasure-trove applications,

8   meaning photos, relationships, accomplices, content,

9   information sharing.  Most people that are sharing on social

10  media are doing so without concern of who's looking at it or

11  why they're looking at it.

12         There's hundreds and hundreds of cases where

13  individuals have been arrested, and we're just -- we're even

14  seeing that as of today, with all the reports on crowd issues

15  and protests across the country.  And different things that

16  are reported that are coming.  It's all information coming

17  off of social media.

18  Q.    Great.  And yesterday Mr. Bowman referenced a

19  handbook, the NATO Open Source Intelligence Handbook of 2001.

20         MS. SILK:  And we e-mailed a copy of what we

21  believe to be that document to the Court last night.  And I

22  would ask if we could show it, publish it, please.  And then

23  I would like to move it into evidence.

24         THE COURT:  Okay.  The NATO Open Source

25  Intelligence Book.  We have that.  It's obviously hearsay.

 1   And there are several ways that hearsay documents like this

 2   can be used.  But the first question is, is there any

 3   objection because often these types of materials are

 4   referenced but not received.  I'm not saying it wouldn't be

 5   appropriate to receive it.  I simply want to know how ACLU

 6   views the receipt of this document.  It can be used in

 7   several ways.

 8           MR. CASTELLI:  Yeah, Your Honor, I don't think we

 9   would object to it be marked for ID purposes.  I believe it

10   was referenced yesterday in testimony.

11           THE COURT:  Sure.

12           MR. CASTELLI:  And so if it's helpful to

13   reference it today in rebuttal testimony, that's fine with

14   us.  I don't know that it needs to be admitted as evidence

15   because as the Court just noted, it's not really evidentiary.

16   It's more of a -- and I don't think that the City is

17   intending to move this in as evidence.  But that would be our

18   objection.

19           THE COURT:  Sure.  We'll certainly mark it.  I'll

20   check with -- also with the Monitor, but it will certainly be

21   marked for identification.  I think that's important.  So

22   without objection, we'll mark it as 24 for identification.

23   It's possible that it might be capable of being received, but

24   I think as it's being presented, it's being presented as a

25   secondary source in the matter; is that correct from the

*TESTIMONY OF ERIC DAIGLE*                                          232

1  City?

2            MS. SILK:  Yes, Your Honor.  And that's perfectly

3  acceptable with us.  We just wanted to just show the -- a

4  couple pages from the document --

5            THE COURT:  Sure.

6            MS. SILK:  -- on page 5.

7            THE COURT:  Certainly fine.  And of course --

8  yes, ma'am.  Go right ahead.

9            MS. SILK:  Okay.

10           (WHEREUPON, the above-mentioned document was

11 marked for Identification as Exhibit Number 24.)

12 BY MS. SILK:

13 Q.    So Mr. Daigle, have you had a chance to look at this

14 document?

15 A.    I reviewed it.  I cannot say I studied all 57 pages of

16 them, but I did review it when you sent it to me, yes.

17 Q.    Fair enough.  And then, on the cover page, it says

18 it's dated November 2001; is that correct?

19 A.    I did see that, yes.

20 Q.    Okay.  And then on page 5, there's a section on the

21 Internet that begins on page 5.  And I just wanted to see if

22 you can read the last sentence of the first paragraph.

23 A.    Yes, I can read it.

24 Q.    We're going to highlight it.

25           THE COURT:  That's interesting.  Probably not the

                    UNREDACTED TRANSCRIPT

1   proper use of a secondary source.  And I think my witness

2   knows that.  So we're going to see if that can be rephrased.

3                MS. SILK:  Okay.  No worries, Your Honor.  Just

4   one question.

5   BY MS. SILK:

6   Q.      Do you find this book to be current or outdated?

7   A.      Well, I would say outdated just because it's dated

8   2001.  And there is much more information relevant to the

9   Internet and all of its workings, as we sit here in 2020.

10  Q.      And is this NATO handbook relevant at all today to

11  policing and technology?

12  A.      I would hope not.

13  Q.      One last question on this, I'll move on.  Did facebook

14  exist in 2001?

15  A.      Great question.  I don't think so.  Because I don't

16  think I had one at that time.  That's about all I can -- for

17  the purpose.

18  Q.      Okay.  Fair enough.  Okay.  I would like to go back to

19  our trial Exhibit, 21 which is the redlined proposed modified

20  order judgment and Decree.

21  A.      Yes, ma'am.

22  Q.      And in terms of social media and its inclusion in this

23  new version of -- this proposed new version of the Decree, I

24  want to see if we can talk about specific sections of this

25  proposed modified Decree.  Specifically, I want to talk about

1    Section D2.  Do you have that in front of you?

2    A.      I do, yes.

3    Q.      Okay.  And it says, "The Memphis Police Department may

4    view information posted to social media for legitimate law

5    enforcement purposes, so long as it does not improperly

6    catalog and disseminate that information pursuant to

7    Section H.  This viewing of information posted to social

8    media includes conducting threat assessments."

9          We've read this several times today, so I'm not going

10   to continue to read it aloud, but in your opinion, is it

11   important for modern-day law enforcement to be able to view

12   social media for legitimate law enforcement purposes, so long

13   as it does not improperly catalog and disseminate that

14   information?

15   A.      Yes.  I think that the parties have done a good job of

16   identifying, you know, the structure of how that should

17   occur.  And so I would agree with that statement, yes.

18   Q.      Okay.  And is it fair to say that new technology like

19   social media is a changed factual condition that did not

20   exist since 1978?

21   A.      It is fair to say that, yes.

22   Q.      If the Consent Decree remains unmodified and is

23   interpreted literally, without allowance for social media use

24   by law enforcement for legitimate law enforcement purposes,

25   in your opinion, could that affect the public interest

1    detrimentally?

2    A.      It could.  And it probably will, especially since the

3    rate of technology enhancement and usage in law enforcement

4    and by society is increasing at such a high level.  We're all

5    having difficulty maintaining an actual clear practice to

6    guide officers on how to use certain areas.

7            So while that's difficult in and of itself waiting for

8    courts to interpret different areas of the First and the

9    Fourth Amendment and also looking at new technology that's

10   coming out, and you all know that, you know, there is a new

11   social media app every day that allows a broader evaluation

12   and a broader -- an expansive ability to share all sorts of

13   information.

14           We're looking at a lot of different technology across

15   the country and especially in the AI technology, where

16   individuals are, you know, with both Amazon and all of the

17   Siri, all the types of technology increases are putting

18   challenges on both sides.  And so it is very important in

19   this area that at least the agreement comes up to the current

20   standards because we know that those standards will continue

21   to develop as technology and law develops around it.

22   Q.      Great.  Thank you.  Now, in the same vein as we're

23   talking about social media, I'd like to look at Section G of

24   this document, which is investigations which may interfere

25   with the exercise of the First Amendment right.  In the very

1   first proposed paragraph there in blue, it's the first

2   sentence says, "Investigations and intelligence gathering,

3   which are reasonably unlikely to result in the collection of

4   information about the exercise of First Amendment rights or

5   interfere in any way with the exercise of such First

6   Amendment rights are permissible and require no special

7   authorization under Section G."

8           Do you see that?

9   A.      Yes.

10  Q.      What is the importance of the inclusion of

11  intelligence gathering in this document, the allowance for

12  intelligence gathering?

13  A.      The allowance for intelligence gathering is always

14  important, especially, as the witnesses have testified to,

15  there is threat assessment in multiple areas, and it's

16  just -- it's not threat assessment as much for law

17  enforcement nowadays, it's threat assessment for society.

18  And to make sure that the proper resources are available to

19  address the issues for the protection of those that are

20  peacefully and legally using their First Amendment right.

21          And one of the things that is difficult and most of

22  the witnesses that testified over the past two days, you

23  know, the chief having talked about Charlottesville, and when

24  you don't have the proper resources available, then you're

25  always behind in the reaction.  And that could put you at a

UNREDACTED TRANSCRIPT

1    disadvantage, which also can put the safety of the citizens

2    of Memphis, who are just there to express their First

3    Amendment desires, could put them in harm's way.  And that's

4    really what we're trying to do here is ensure that

5    individuals who want to express their First Amendment right

6    can do so with all the required protections of the law.

7    Q.      Great.  And further down in Section G, specifically

8    paragraph 8 of Section G.  Do you see that paragraph?

9    A.      I do, yes.

10   Q.      Okay.  Are there certain crimes that occur primarily

11   or exclusively on the Internet?

12   A.      Yes.  The more the Internet expands, and I think Chief

13   Crowe talked a little bit about that.  And I believe maybe

14   even some of the witnesses yesterday talked about that.  I

15   mean, the more that the Internet is the basis of how

16   interaction occurs and how opinions are portrayed, how

17   threats are delivered and also having to do -- I think the

18   one, the most significant law enforcement spending his time

19   on, as Chief Crowe said, is obviously that doing -- having to

20   do with child pornography and the issues having to do with

21   interstate movement of children and different areas as it

22   applies to identity theft.  Those are significant areas where

23   the Internet becomes the catalyst for that crime.

24   Q.      Great.  Thank you.  Now, while in Section G, I want to

25   go backwards and talk about the proposed modification whereby

1    the Director would be allowed to have a designee to authorize

2    these types of investigations.  Are you familiar with that,

3    beginning on paragraph 5?

4    A.     Yes, ma'am.

5    Q.     In your opinion, is it important for the director of a

6    police department the size of Memphis Police Department to

7    have a designee or various designees to do a number of things

8    but specifically authorize these investigations?

9    A.     I think it's very important.

10   Q.     Why so?

11   A.     You know, especially using a department the size of

12   Memphis with all that's going on, you know, that designee is

13   important.  And I think as the Director testified himself,

14   you know, he's unavailable, or I'm sure he has many, many

15   things going on during the day.  I think it would actually be

16   more beneficial for the protection of First Amendment rights

17   if there were specific designees assigned because there would

18   be more time and energy that could be spent by that designee,

19   and the Director would have some confidence in the

20   individuals that they would put in charge of that.

21          But they would be able to spend a little bit more time

22   probably working with all parties and the monitoring team as

23   they work their way through these analysis to actually start

24   to develop some consistency.  I assume in most departments, a

25   chief of police, a director, a colonel having that direct

1    contact from the investigator in the field to the top of the

2    org chart is a very, very difficult standard.  And I'm sure

3    he takes it very seriously.  And I think he would be -- not

4    to speak for him because he spoke for himself.  But I think

5    having a designee who is going to spend specific time dealing

6    with these issues would allow for some consistency and

7    continuous -- more importantly, I think it would allow for

8    continuous evaluation of the issues that are being faced by

9    the department, so that they can continue to develop and work

10   with the parties to address the issues that are coming up.

11        Because what is occurring today will change.  It

12   always does.  And when one thing changes, we're always having

13   to catch up and adjust, and it is always a time lag between a

14   new type of expression, a new type of application to a policy

15   and training on that.  And usually what happens is that the

16   lag is so long that we get in harm's way, either legally or

17   criminally, and we could have dealt with that if we were able

18   to put more resources on it along the way.

19   Q.    Thank you.  Mr. Daigle, how has the nature of

20   undercover police work changed since 1978?

21   A.    Well, I think you just -- as I said when I started, it

22   has dramatically changed.  And from the outside looking in

23   because obviously I'm not working in that, but it is my

24   responsibility across the country to advise police executives

25   and write policies and procedures that govern how these

1   investigators are doing their job to ensure that we are

2   putting some sound principles in place that will maintain the

3   protection of peoples' constitutional rights.

4          You know, the old days of hiding in the bushes and

5   surveillance teams and listening devices and recording

6   machines and all of those undercover operations have

7   developed into the fact that if social media is -- or let's

8   just call it what it is, social networking is a form of

9   networking that is now done via multimedia application, then

10   in the olden, you know, 20, 30 years ago, networking was done

11   in person.  It was done in cafes.  It was done in bars.  It

12   was done in a different application.

13          Now it's done on technology.  It's done on social

14   media.  It's done on apps, on undercover apps.  It's done on

15   blogging and websites.  And so because the manner in which

16   the action occurs means that law enforcement has to react to

17   the manner in which they investigate it.  And so as the way

18   the crimes occur changes, so does the mechanisms on how the

19   crimes are investigated.

20   Q.     Great.  Thank you.  And have you reviewed Section E of

21   this document?

22   A.     Yes, ma'am.

23   Q.     Okay.  And in your opinion, are the additions that the

24   parties have proposed in Section E related to undercover

25   accounts, are those in line with other police departments

1   across the country?

2   A.      Yes.  And I think actually here that the parties have

3   an opportunity to actually set some standards.  And I know

4   that's something that all the parties are interested in, even

5   the Judge.  And that is as we develop practices for

6   undercover accounts and social media, it also is important to

7   cover -- to develop policies and best practices to govern

8   that.

9          And so I think what the parties have done here is to

10  basically take the way that we used to do, you know,

11  undercover confidential informants is the same way that's

12  been proposed to do an undercover account on social media.

13  And the important part of that is to have some guidelines and

14  also some accounting for how it occurs and some mechanisms to

15  ensure that the organization has got some control over who,

16  what and when it is using a social media account for an

17  undercover application.

18  Q.      And in this document, Subsection B, is it your opinion

19  that in B, the City and the ACLU have agreed that those

20  protections need to be implemented regarding undercover

21  social media accounts?

22  A.      Yes.  You did agree and I would agree with you because

23  it is important that in all operational standards that there

24  is a checks and balance system to ensure that there is -- and

25  more importantly that the desires of the Director, the

1   desires of the parties but more importantly, that the

2   operations of the department are meeting the constitutional

3   standards that are available.

4   Q.       Great.  And I would like to now talk about -- kind of

5   shift and talk about law enforcement's use of physical

6   technology as opposed to social media and Internet,

7   specifically the use of cameras.  How has law enforcement's

8   use of cameras changed since entry of this Consent Decree?

9   A.       Well, they've become, you know, very prolific and

10  specifically after 2014, when the shooting death of Michael

11  Brown when the ACLU requested that, you know, the articles

12  that were put out there was -- it's the future of police

13  transparency that every officer will have a camera.  And I

14  think that that's continued on.

15          And I will tell you that back then, I was in favor and

16  I am still in favor of the use of body-worn cameras for the

17  purposes of all the things that the Director talked about

18  this morning and the fact that they offer both protections to

19  citizens and the protections to the department.  And I think

20  there are just a -- they're a tool.  They're not the truth.

21  They're a part of the investigation.  They definitely have

22  limitations.  But I think that both sides, that both the

23  citizens and the police department -- police officers feel a

24  level of comfort knowing that some form of recording is

25  occurring during the interaction that can be used later for

1    evaluation purposes.

2    Q.      In your opinion, without the proposed modification

3    related to body-worn cameras, could that detrimentally affect

4    the public?

5    A.      Yes.  And I would say this is one of the areas where

6    the history is clear that it's not 1978 anymore because

7    obviously, the equipment and the mechanisms that we use are

8    significant, and they're only getting more significant on a

9    day-to-day basis.  And I think it would really be a benefit

10   to society to understand more.

11          I encourage my police executives across the country to

12   really sit down with their communities and tell them about

13   the body-worn cameras and what they do.  And how that is such

14   a beneficial tool that can be used for both the benefit of

15   society and the department.

16   Q.      Great.  Now, is there any kind of inherent problem

17   with having a policy, like a body-worn camera policy and

18   having an exception to that policy for, say, First

19   Amendment-related activity?

20   A.      Well, the problem with any exception, and I'll take

21   the question at the first level, if you'll let me, and that

22   is the problem with any exception is that just like we're all

23   used to, there's a rule and then there's an exception.  And

24   then there's an exception.  And the difficulty is, remember,

25   we were trying to make it so that the men and women on the

1   street understand what they're supposed to do and when

2   they're supposed to do it.  I truly believe that the majority

3   of them will do whatever we tell them to do, but we have to

4   be able to provide them the guidance necessary where they

5   understand it.

6            And so when you start to get into a rule that the rule

7   that we have in a national standard for body-worn cameras is

8   if you have it and you're interacting with society, you want

9   to turn it on.  Well, once you start getting exceptions to

10  turning it on, now you're increasing discretion.  And you're

11  increasing the need for evaluation and analysis and decision

12  making and all of those things.  You have a long history of

13  becoming detrimental.  And basically the best way to describe

14  it is as much detrimental as inconsistent.  And when things

15  are inconsistent, they're all over the place.  And we can't

16  rely on the fact that good evidence or good documentation of

17  an incident is guaranteed to occur.

18  Q.    Great.  Thank you.  And on the topic of cameras, what

19  has changed about law enforcement's use of stationary cameras

20  and pole cameras since 1978, specifically the proliferation

21  of cameras?

22  A.    We live in a society now where there is a camera

23  everywhere.  Whether it's a Ring Doorbell or a camera owned

24  by a government entity or a camera owned by a business.  We

25  live in a world where anyone who walks around not believing

*TESTIMONY OF ERIC DAIGLE*                                    245

1    they're being recorded is probably not paying attention.

2          So we have to sit back and ask ourselves why is there

3    so much recording and increase in technology to recording.

4    And I think, you know, the answer that I would come back with

5    is because everybody feels that their recording is somehow

6    protecting their rights, whether it's their right to own

7    property or their right to have a business or their right to

8    walk freely or their right to protest.

9          And so you know, here comes law enforcement, and I

10   think what I found very encouraging in the City of Memphis is

11   how much interaction and collaboration there was between the

12   Government and society, business, neighborhood organizations.

13   I found that to be amazing, almost as if it was a college

14   campus.  And I think that shows that there is a benefit, that

15   everybody believes there's a benefit in recording and having

16   video recording because it makes things easier to discuss

17   later.  To identify challenges, to identify good, bad and

18   indifferent.  And I think as we continue on, I don't know how

19   much more we can put out there in the world of technology and

20   cameras, but I guarantee you it's going to continue in

21   addition versus subtraction.

22   Q.    Great.  And does the parties' proposed modification to

23   Section H3 related to cameras and H4, for that matter,

24   cameras and body-worn cameras.  In your opinion, are these

25   modifications adequate and sufficient and consistent with the

 1    best practices, while allowing for the protection of the

 2    First Amendment rights of the citizens of Memphis?

 3    A.      I believe they are.  I believe that, you know, we

 4    really started to see the -- the first issue with protests in

 5    law enforcement with cameras really was Oakland Police

 6    Department in 2012 with the Occupy.  And at that point they

 7    were one of the first organizations to have under -- they

 8    were under a Consent Decree at the time.  Still are.

 9            But they were one of the first entities in the country

10    to do a full deployment of cameras.  And after the Occupy of

11    2012, that led to significant litigation, use-of-force

12    issues.  There was thousands of hours of video based on

13    body-worn cameras worn by officers.

14            And if you read any of the studies that came out after

15    Ferguson protests, after Occupy and then Baltimore, the

16    significance of the body-worn camera and the significance of

17    the recordings and even media's recording of these incidents

18    is just to ensure that everything goes the way it's supposed

19    to go.  And so we live in an age where, you know, years ago

20    we had to tell officers, you know, that it's a constitutional

21    right for you to be recorded by citizens.  And we made

22    policies called the recording police policies about that

23    right.  And it's also the same right of the officers to have

24    recordings.

25            So it's really getting to a concept of you record me,

UNREDACTED TRANSCRIPT

1   I record you, but the benefit is across the board for

2   operations and effectiveness.  And then as you talked about,

3   there's also the need for documentation of evidence and

4   threat assessment that is becoming more significant, as some

5   of these protests have become a little more violent across

6   the years.

7   Q.      Thank you.  I want to turn your attention to Section H

8   of the proposed modified Consent Decree.  That's the section

9   on maintenance and dissemination of information.  Do you have

10  it in front of you?

11  A.      Yes, ma'am.

12  Q.      In your experience, has the way that law enforcement

13  agencies and municipalities -- has the way that they store

14  and manage information about citizens, about cases, about

15  incidents, has that changed since 1978?

16  A.      Sure.  I mean, all of the witnesses from both the

17  monitoring team and the City have talked about the data

18  systems and the extensive dispatch systems and record systems

19  that we now have.  You know, when we were -- when I started

20  teaching, you know, First Amendment crowd control issues, you

21  know, two decades ago, we would talk about keeping files on

22  different groups and different individuals and how that was

23  not allowed.  And so this is really the same concept, but

24  it's just got to address the way in which documents are now

25  stored and information is now stored on a technology system

1   owned by a department.

2   Q.      Thank you.  Did you have the opportunity to review the

3   request for authority that the City submitted to the Monitor

4   on October 4th, 2019, when the then city attorney received a

5   tip from a personal friend, where he overheard two people

6   discussing their purported plans to disrupt a Memphis

7   Grizzlies basketball game?

8   A.      I did, yes.

9   Q.      Okay.  And do you recall, did the Monitor permit the

10  City to act on that information and share it with the

11  Grizzlies?

12  A.      My recollection is he did not.

13  Q.      Is that best practice for a legal officer of the City

14  to not share that type of information with a private entity?

15  A.      You mean legal officer -- do you mean by --

16          MR. PERRY:  Your Honor, this is Will Perry for

17  the Monitor.  I'm going to object.  This has been made plain

18  several times now.  That's a tip, that's and RFA that was

19  decided before the Court's opinion in November of 2019.  I

20  don't think the question or the answer are relevant.

21          THE COURT:  It's no longer relevant.  Objection

22  sustained.  We do need to talk about our schedule.  And I'm

23  going to check first with my witness or our witness,

24  definitely.  We usually have been stopping on a regular time,

25  which is 5 o'clock here, 6 o'clock where you are because this

```
 1    is a public hearing, and we have to maintain regular hours.

 2    We don't usually run extremely late.  It looks to me like

 3    that the cross examination would leave us little hope of

 4    finishing very quickly.

 5              What is your availability at all early tomorrow

 6    or at any time tomorrow?  And I understand that was an issue,

 7    but I thought I'd simply ask.

 8              THE WITNESS:  Yes, Your Honor.  I appreciate it.

 9    I'm currently on a project in Oregon with a flight leaving

10    out of Oregon early tomorrow morning to go back to the east

11    coast, which is a great long travel day.  So that is the

12    issue that I'm faced with, sir.

13              THE COURT:  Okay.  And so I'll understand a

14    little more clearly.  Where are you right now?

15              THE WITNESS:  I am currently in Corvallis,

16    Oregon.

17              THE COURT:  Okay.  Corvallis, Oregon.  And when

18    You will arrive back in --

19              THE WITNESS:  I have a flight out.

20              THE COURT:  Go ahead, tell me.  I'm sorry.

21              THE WITNESS:  Sorry, Judge.  I have a flight out

22    of here tomorrow morning at 8 a.m. to San Francisco.  And San

23    Francisco to Boston, Massachusetts.  That is a long travel

24    day, but that's unfortunately my travel day tomorrow.

25              THE COURT:  No, I understand.  Let me ask counsel
```

UNREDACTED TRANSCRIPT

1   for the City.  I think you probably have another 20 to 30

2   minutes, is that what you think?  Or maybe it's much, much

3   less.

4           MS. SILK:  Your Honor, I would estimate 15

5   minutes at the most.

6           THE COURT:  All right.

7           And I'm going to ask Mr. Castelli.  I assume you

8   have questions?

9           MR. CASTELLI:  I do, Your Honor.  I would imagine

10  probably about 15 to 20 minutes of cross examination.  Not

11  terribly long, but still.

12          THE COURT:  Let me check with the staff.  That's

13  actually the most important thing.  What's our situation for

14  our reporter?

15          THE COURT REPORTER:  I am okay to stay, Your

16  Honor.  Thank you.

17          THE COURT:  The reason we ask, in New York, of

18  course, I know that when we're there, they have certain

19  strict rules about court reporting, which are certainly fine.

20  But our court reporter has been kind enough to say she will

21  stay another 30 minutes.  We will need to conclude in that

22  time period.

23          And so I'm going to ask the City to limit your

24  inquiries to not more than ten minutes.  And I will have to

25  call time on you.  So I think your witness can meet that

UNREDACTED TRANSCRIPT

*TESTIMONY OF ERIC DAIGLE*                                              251

 1  deadline, can you?

 2              THE WITNESS:  Yes, Your Honor.

 3              THE COURT:  You may want to try to do that.  I've

 4  been asked for a three-minute break though because the staff

 5  needs a short break.  So we're going to take a three-minute

 6  break.  We'll come back in three minutes.  Thank you all very

 7  much.

 8              (Short break.)

 9              (Court resumed via telephone conference.)

10              THE COURT:  This is Judge McCalla.  Let's just

11  check and see who we have so far.  Who do we have?

12              MR. STANTON:  Your Honor, this is Ed Stanton and

13  Will Perry, and I just texted the number to Mr. McMullen and

14  Mr. Castelli, so they should be dialling in.

15              THE COURT:  Okay.  That's fine.  As soon as we

16  get them, we will actually adjourn for the day, and we will

17  schedule a time for the witness to complete probably on

18  Monday.

19              MR. STANTON:  Yes, sir.

20              THE COURT:  We're going to go back on mute for a

21  minute and wait for people to beep in.  Thank you.

22              MR. STANTON:  Yes, sir.

23              THE COURT:  That's fine.

24              MS. SILK:  Hello, this is Jennie Silk for the

25  City.

                        UNREDACTED TRANSCRIPT

1          THE COURT:  All right.  Ms. Silk, we've got one

2  more to check in, and we've got the Monitor's team on, so

3  we'll be ready to go in just a minute.

4          MS. SILK:  Great, thank you.

5          MR. CASTELLI:  It's Thomas Castelli.

6          THE COURT:  All right.  Mr. Castelli, I think

7  you're almost the last one on the board today.  We've got

8  Ms. Silk.  We have you for the City; is that right?

9          MS. SILK:  That's correct, Your Honor.

10          THE COURT:  All right.  And we have the Monitor.

11  And we have Mr. Stanton, right?

12          MR. STANTON:  That's correct, Your Honor.

13          THE COURT:  We're learning about our technology,

14  and I think we should have stopped at 5:00.  What we're going

15  to do is we'll have -- we have a backup plan, and we

16  shouldn't have this problem again.  But what we needed to do

17  really anyway was to go ahead and recognize that we should

18  conclude for the day.

19          And we'll simply let -- Ms. Silk, we'll let you

20  work out a time for our witness to complete his examination.

21  If that's possible, on Monday, that would be good.  Of

22  course, I don't think it will be practical for tomorrow.  But

23  will you just let us know what's going to work out well for

24  our witness and for you?

25          MS. SILK:  Yes, Your Honor.

UNREDACTED TRANSCRIPT

253

 1              THE COURT:  There's a technology issue that we'll

 2    just have to overcome.  The systems work really quite well

 3    considering it's our first time out with it.  Now, anything

 4    else then?  You will get a new invitation tomorrow.  You

 5    should be able to get that by 8:30.

 6              THE CASE MANAGER:  They'll have it before I leave

 7    today.

 8              THE COURT:  Well, you'll have it, exactly.

 9    You'll have it before we leave today, but I mean, you should

10    be looking for it.  We will test everybody at a quarter till,

11    except me probably, and make sure that everything is working

12    fine.  And then we have a new step to make sure that this

13    doesn't happen again.  It's called Nathan.  He's right here.

14              And what we'll do is we'll double host it, and

15    that should eliminate any issue.  So we're learning something

16    every day.  I think y'all have been great on this.  The court

17    reporter tells me that our sound has been exceptionally good.

18    So we should all feel good about that.  So really I'm more

19    than willing to hear from everybody.  I'm not sure what else

20    we can do.  Always interested to hear from the Monitor

21    because he always has good ideas.

22              Anything else, Mr. Stanton, from you?

23              MR. STANTON:  Nothing further, Your Honor.  We do

24    appreciate the patience and the accommodation from you and

25    your team.  I think, under the circumstances, things have

UNREDACTED TRANSCRIPT

254

1   gone extraordinarily well from the technology.  The only

2   other question I would have for the monitoring team, Your

3   Honor, is just schedule for tomorrow.  Understanding that

4   Mr. Daigle will pick back up sometime on Monday that we work

5   out.  I know Director Rallings.  If the City could draw a

6   road map of what we can expect tomorrow.

7              THE COURT:  Absolutely.  And we'll go back to

8   Ms. Silk, and maybe she can enlighten us.  Hopefully

9   Mr. McMullen has also come in on the line by now.  Ms. Silk,

10  can you enlighten as to the rest of the schedule for

11  tomorrow?  I think we have a preliminary view of that, but

12  can you give us the rest of it?

13             MS. SILK:  Yes, Your Honor.  The lineup from the

14  City has not changed.  We intend to put Director Rallings on

15  first to conclude his examination and cross examination.  And

16  then, as you mentioned, Mr. Daigle unfortunately is not going

17  to be available tomorrow, so we'll pick him up on Monday.

18  After Director Rallings, we'll hear from Major Darren Goods

19  and Zayid Saleem, and we will possibly hear from the City's

20  chief legal officer, Jennifer Sink.

21             THE COURT:  All right.  Well, that's -- I'm sure

22  we're going to conclude before the end of the day.  I think

23  we'll probably make good time tomorrow, and then we'll work

24  out the rest of the schedule.  And if there's anybody else,

25  Mr. Castelli, from you, you will let me know.  Is there

UNREDACTED TRANSCRIPT

255

1   anybody else you anticipate at this time?

2                   MR. CASTELLI:  No, Your Honor.  I believe Chief

3   Crowe was able to answer the questions that we thought we

4   might need another witness to talk about.  So we will not be

5   calling Lieutenant Collard as we thought we might need to.

6   So I think once the City finishes with their witnesses, we'll

7   have all the proof we think we need, and we should be able --

8   other than Mr. Daigle, obviously, we'll need to finish his

9   examination.

10                  THE COURT:  That sounds fine.

11                  MR. CASTELLI:  But that should be it tomorrow.

12                  THE COURT:  I am going to check back with the

13  Monitor.  Do you anticipate anybody who would come on to

14  answer any further questions?  It would be sort of in the

15  context of rebuttal although it's not exactly.  But do you

16  think that anybody else will need to then be recalled to

17  clarify anything?

18                  MR. STANTON:  I don't think that -- there's a

19  slight possibility, Your Honor, Dr. Bowman very briefly, just

20  depending on the remainder of Mr. Daigle's testimony, but if

21  there's anyone at this point, it may be a very brief

22  testimony from Dr. Bowman.

23                  THE COURT:  All right.  Well, that's a good

24  schedule.  We look forward to checking in with everybody at

25  least at a quarter till.  Of course, Mr. Sample will be in

UNREDACTED TRANSCRIPT

256

1  charge of the check-in.  Then we will resume promptly at

2  nine o'clock.  And we promise you that Nathan will be here

3  all day.  All right.  Thank you all very much.

4           (Adjournment.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

# C E R T I F I C A T E

    I, CANDACE S. COVEY, do hereby certify that the foregoing 257 pages are, to the best of my knowledge, skill and abilities, a true and accurate transcript from my stenotype notes of the Zoom Modification Hearing on the 18th day of June, 2020, in the matter of:


ACLU OF TENNESSEE, INC.

vs.

CITY OF MEMPHIS


Dated this 25th day of June, 2020.


                                                            S/Candace S. Covey

                                    CANDACE S. COVEY, LCR, RDR, CRR
                                    Official Court Reporter
                                    United States District Court
                                    Western District of Tennessee