1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TENNESSEE
 2                        WESTERN DIVISION
 3  ─────────────────────────────────────────────────────
    ACLU OF TENNESSEE, INC.,
 4
              Intervening Plaintiff,
 5
    vs.                              NO. 2:17-cv-02120-JPM-jay
 6
    CITY OF MEMPHIS, TENNESSEE
 7
              Defendant.
 8  ─────────────────────────────────────────────────────
 9                  MODIFICATION HEARING
10                      BEFORE THE
11             HONORABLE JON PHIPPS McCALLA
12              (via Zoom Videoconference)
13
14                    June 19, 2020
15                     Day 3 of 4
16
17
18
19
20     CATHERINE J. PHILLIPS, FAPR, RMR, CMRS, FPR
                   OFFICIAL REPORTER
21            FOURTH FLOOR FEDERAL BUILDING
                MEMPHIS, TENNESSEE 38103
22
23
24
25
```

                    UNREDACTED TRANSCRIPT

```
 1              A  P  P  E  A  R  A  N  C  E  S

 2

        COURT-APPOINTED MONITOR/SPECIAL MASTER:
 3
                EDWARD L. STANTON, III, ESQUIRE (Lead)
 4              OF:  Butler Snow, LLP
                     6075 Poplar Avenue, Suite 500
 5                   Memphis, TN 38119
                     901.680.7369
 6                   edward.stanton@butlersnow.com

 7      MONITOR TEAM:

 8              JIM LETTEN, ESQUIRE
                GADSEN WILLIAM (WILL) PERRY, ESQUIRE
 9              RACHEL LEVINSON-WALDMAN, ESQUIRE
                JOHN HENEGAN, ESQUIRE
10

11

        APPEARING ON BEHALF OF THE PLAINTIFFS:
12
                THOMAS HAUSER CASTELLI, ESQUIRE
13              STELLA M. YARBROUGH, ESQUIRE
                OF:  American Civil Liberties Union
14                   Foundation of Tennessee
                     210 25th Avenue N., Suite 1000
15                   P.O. Box 120160
                     Nashville, TN 37212
16                   615.320.7142 x-303
                     tcastelli@aclu-tn.org
17

18

         APPEARING ON BEHALF OF THE DEFENDANT:
19
                BRUCE McMULLEN, ESQUIRE
20              R. MARK GLOVER, ESQUIRE
                JENNIE VEE SILK, ESQUIRE
21              MARY WU TULLIS, ESQUIRE
                OF:  Baker Donelson Bearman
22                   Caldwell & Berkowitz - Memphis
                     165 Madison Avenue, Suite 2000
23                   Memphis, TN 38103
                     901.577.2356
24                   bmcmullen@bakerdonelson.com
                     mglover@bakerdonelson.com
25                   jsilk@bakerdonelson.com
                     mtullis@bakerdonelson.com
```

UNREDACTED TRANSCRIPT

I N D E X

                                                          PAGE

PROCEEDINGS                                                 4

WITNESS:  DIRECTOR MICHAEL RALLINGS
     DIRECT EXAMINATION (CONT.) BY MR. McMULLEN    8
     CROSS-EXAMINATION BY MR. CASTELLI              13
     CROSS-EXAMINATION BY MR. STANTON               37
     REDIRECT EXAMINATION BY MR. McMULLEN           49

WITNESS:  MAJOR DARREN GOODS
     DIRECT EXAMINATION BY MR. McMULLEN             54
     CROSS-EXAMINATION BY MR. CASTELLI              90

WITNESS:  ZAYID SALEEM
     DIRECT EXAMINATION BY MR. GLOVER              108
     CROSS-EXAMINATION BY MR. CASTELLI             132
     CROSS-EXAMINATION BY MR. PERRY                135
     REDIRECT EXAMINATION BY MR. GLOVER            140

WITNESS:  JENNIFER SINK
     DIRECT EXAMINATION BY MR. McMULLEN            142
     CROSS-EXAMINATION BY MR. CASTELLI             171
     CROSS-EXAMINATION BY MR. PERRY                176

CERTIFICATE                                        187


EXHIBITS            (DESCRIPTION)                   PAGE

No. 25                                              87
(City's Proposal Revision of Section I)

No. 26                                             140
(MT Trial Demonstrative D)

No. 27 (under seal) and 27A (front pg only)        160
(RFA- threats to Law Enforcement)

4

```
 1                          Friday

 2                      June 19, 2020

 3

 4        The Modification Hearing in this case began on this

 5   date, Friday, June 19, 2020, at 9:00 a.m., when and where

 6   evidence was introduced and proceedings were had as follows:

 7

 8                   ----------------------

 9

10             THE COURT:  All right.  Mr. Sample will open

11   court.

12             THE CLERK:  This Honorable United States District

13   Court's now in session pursuant to adjournment.  Presiding is

14   the Honorable Jon Phipps McCalla.  God save the United States

15   and this Honorable Court.

16             THE COURT:  All right.  We're ready to proceed.

17             And, Director, we're going to -- Ms. Silk is

18   going to proceed with the examination, I believe -- well, I'm

19   not sure.  I'm not sure who is right now.

20             COURT STAFF:  Her microphone is not on, Judge.

21             THE COURT:  Counsel may proceed when you're

22   ready.  We need to make sure we're not muted.

23             Mr. Castelli, can you hear me?

24             MR. CASTELLI:  I can hear you, Your Honor.

25             THE COURT:  Okay.  I was making sure everybody is
```

UNREDACTED TRANSCRIPT

1    ready.

2              All right.  And, Director, are you all set?

3              He's muted right now.

4              THE CLERK:  They have to answer the invitation.

5              THE COURT:  You have to answer the invitation on

6    your computer and that will allow us to hear you.

7              Try that one more time.  Somebody's working on it

8    for the Director right now.

9              And, Ms. Silk, can we hear you okay?

10             COURT STAFF:  She needs to do the same thing.

11             THE COURT:  Yes, we have some people who need to

12   answer their invitation.  I think it's connecting now.

13             Ms. Silk, can you hear us now?

14             MS. SILK:  Yes, Your Honor.  Can you hear me?

15             THE COURT:  Yes.  We're fine.  I think there may

16   have been a few invitations that still need to be replied to.

17             Mr. Castelli, you're okay; right?

18             MR. CASTELLI:  I'm fine, Your Honor.

19             THE COURT:  Okay.

20             MS. SILK:  Your Honor, we are in a conference

21   room and we're connecting via phone.  So we need Mr. Sample

22   to unmute our phone line and then we'll all talk through

23   that.

24             THE CLERK:  It's the 577 number.

25             MS. SILK:  It's the 901-577 number.

```
1              THE COURT:  The 577 number, okay.  And we have

2    two individuals handling hosting today to take some of the

3    pressure off of the -- the demand off one of our computers.

4              Okay.  I think we have Mr. Glover.  I can hear

5    that he's there.  He's masked even though he's by himself, so

6    that's pretty good.

7              DIRECTOR RALLINGS:  Your Honor, can you hear me

8    now?

9              THE COURT:  We can.  I think all the invitations

10   are being answered now.  And I want to make sure McMullen --

11             MR. McMULLEN:  Ours is good.

12             THE COURT:  I think he's good.

13             DIRECTOR RALLINGS:  Your Honor, can you hear me?

14             THE COURT:  Yes, yes.  I think we've got

15   everybody.

16             There's a Baker Donelson mic that has not been

17   activated, and you may want to do that now, if there's an

18   extra one there.

19             MR. STANTON:  I think we're fine, Your Honor, if

20   you can hear me.

21             THE COURT:  We're fine.  We won't worry about any

22   unanswered --

23             COURT STAFF:  Oh, okay.  They're in the same

24   room.

25             THE COURT:  Everybody's good.
```

7

1              All right.  Counsel may proceed.  We'll resume

2    with -- hopefully, more or less, where we were yesterday.

3              Yes, ma'am.  Yes, sir.

4              MR. McMULLEN:  Director Rallings -- we would like

5    to call Director Rallings back to the stand, Your Honor.

6              THE COURT:  Yes, exactly.  And, Director, of

7    course you've already been sworn in so you don't have to be

8    sworn in again.

9              Counsel may proceed.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*DIRECT - DIRECTOR MICHAEL RALLINGS*                    8

1                     DIRECTOR MICHAEL RALLINGS,

2     having been previously duly sworn, testified as follows:

3                     DIRECT EXAMINATION (CONT.)

4     BY MR. McMULLEN:

5     Q.      Director Rallings, we left off, you were explaining

6     incident reports and the fact that you get about 118,000 a

7     year.

8             Can you briefly just reiterate what you said before we

9     recessed yesterday.

10    A.      Yes.  Last year, in 2019, the Memphis Police

11    Department received approximately 118,000 incident reports.

12    Over the last four-year period we received approximately

13    108,000.  So 108,000 is the average, but we received 118,000

14    last year.  We've received up to 130,000 in a particular

15    given year.

16    Q.      Do each of these incident reports require some level

17    of investigation to determine whether they are a valid crime

18    taking place or something that was -- that you all would not

19    be involved in?

20    A.      Yes, they do.  Probably the only exception is a report

21    taken incident to an arrest.  But, you know, even an arrest

22    could require some additional investigation.

23    Q.      Is there anywhere in the police department who could

24    categorize these reports to determine the extent that it may

25    result in the collection of information about the exercise of

UNREDACTED TRANSCRIPT

1    First Amendment rights?

2    A.      I don't think that's possible.

3    Q.      Tell me why you don't think that is possible.

4    A.      Well, I mean, first, just the volume of incident

5    reports.  But the other issue is -- and I have to give you a

6    hypothetical.

7           So let's say an officer responds to a call where

8    there's been patio equipment, a lawn chair, stolen from the

9    porch of a residence.  Officer responds, activates the

10   body-worn camera.  The victim has political signs supporting

11   a particular campaign, or they're expressing their First

12   Amendment Rights with a particular expression supporting a

13   particular group.

14          Well, in my understanding of the Consent Decree, the

15   officer is already collecting this information about this

16   person, then they're going to interview the victim.  They're

17   going to get personal identifiable information.  The victim

18   could show up in a tee shirt that says something that could

19   be -- the officer goes into the home, they could be ingesting

20   something on some type of media, social media, news, internet

21   site, or there could be a number of individuals present that

22   are there and maybe expressing something that the officer

23   captures.

24          And so the officer would be indexing.  The body-worn

25   camera is going to be saved pursuant to our policy.  If it

*DIRECT - DIRECTOR MICHAEL RALLINGS*                              10

1    has evidentiary value, it will be maintained almost

2    indefinitely.  So it's very difficult.  Not only could

3    this -- some of this information be captured on the body-worn

4    camera, it could also be captured on the officer's in-car

5    video system.

6         We know that during the campaign there were a number

7    of reports of individuals whose campaign signs were stolen.

8    And so this information would be placed, the victim, the

9    complainant, the type of information that was removed or

10   stolen.  We've seen a number of signs posted throughout the

11   city.  There's been complaints of individuals taking them

12   down that support a particular political agenda or expression

13   of First Amendment rights.

14        So, again, I just think that there are a number of

15   incidents that could occur where this information would be

16   captured.

17        There are some individuals call the police on

18   individuals that are protesting.  And when those officers

19   respond, per policy, their cameras are supposed to be on.

20   And some of those individuals express their beliefs to the

21   officers and they're in close proximity and sometimes they

22   express their disdain or lack of pleasure of a police officer

23   being there.

24        But when a citizen calls the police, it is our job to,

25   you know, investigate it and respond to if it's appropriate.

1    Q.      In all fairness, Director Rallings, if someone called

2    the police on a protest, you would know right away that

3    that's going to be something that may result in the

4    collection of information about the exercise of First

5    Amendment rights, isn't it?

6    A.      No, sir.  Because we can respond and nobody could be

7     there.

8    Q.      Right.

9    A.      A number of false calls.

10   Q.      But you're kind of on notice it's a protest.

11           But I want to focus more on the regular call to a

12   house for something unrelated to that, and you may see -- as

13   you said before, you may see campaign signs or slogans or

14   some political speech and a sign at that residence.

15           Are those the tougher things to identify on the front

16   end?

17   A.      Yes.

18   Q.      And would you benefit from some clarification from the

19   Court about whether those are the ones that fall within that

20   bucket of under G-1, may result in collection of information

21   about the exercise of First Amendment rights?

22   A.      Yes.

23   Q.      And would you benefit from that being codified or put

24   in the Consent Decree so that when you posted pursuant to

25   Section J -- could you read Section J.

UNREDACTED TRANSCRIPT

1  A.      Of the original Consent Decree?

2  Q.      Yes.

3  A.      Hang on one second.  Let me locate it.

4  Q.      Director Rallings, can you read off your screen --

5  A.      Well, let me try to -- it will be better for me to

6  read off here.  So I'm on Section J, dissemination and

7  posting --

8  Q.      Yes.

9  A.      -- of the Decree?

10 Q.      Un-huh.

11 A.      All right.  Section J, dissemination and posting of

12 the Decree.  The defendants and the City of Memphis shall

13 familiarize each of its law enforcement personnel with the

14 contents of this Decree, in the same manner in which those

15 personnel are instructed about other rules and conduct

16 governing such personnel.  In addition, defendants and the

17 City of Memphis shall disseminate and make known the contents

18 of this Decree through publication, public postings, and

19 other means.

20 Q.      So you think -- and if I understand your testimony,

21 you would -- it would be some benefit of codifying the

22 Court's ruling on these different aspects of the Decree that

23 are unclear to you and your personnel?

24 A.      Yes.

25 Q.      And codifying them in a modified Decree would give you

*DIRECT - DIRECTOR MICHAEL RALLINGS*                    13

1   some clarity and put it in one document for posting under J.

2   A.      Yes.  But, also, we need to codify it in policy.  I

3   don't think it's reasonable to think that an officer is going

4   to go to the Decree every time when they are governed by

5   policy and procedure.  So a modification of DR, I think, 137

6   would be also required in making sure that the officers

7   clearly understand of what they are supposed to do, and they

8   have access to the Decree as required by the Decree that we

9   posted.

10  Q.      Chief Rallings, you have read through the proposed

11  modified order judgment on the Decree, post modifications?

12  A.      Yes.

13  Q.      Okay.  And I know you had studied it over months.  But

14  based on what you've read, is it your belief that your police

15  department can be effective with those modifications?

16  A.      With modifications, I do believe we could be

17  effective.

18  Q.      And, particularly, those modifications in that

19  document, the proposed Exhibit 21.

20  A.      Yes.

21          MR. McMULLEN:  Your Honor, I have no further

22  questions at this time.  I'll tender the witness.

23          THE COURT:  All right.  Mr. Castelli.

24          MR. CASTELLI:  Thank you, Your Honor.

25                      CROSS-EXAMINATION

1    BY MR. CASTELLI:

2    Q.      Good morning, Director Rallings.  I just want to go

3    over some of your testimony from yesterday and this morning.

4    And I think it may be helpful if we can start with what is

5    the Court's original order in this case, which is the ECF

6    Number 151.  And if I'm allowed to share my screen, I can

7    pull that up.

8              THE COURT:  Certainly.

9    BY MR. CASTELLI:

10   Q.      And I am specifically looking at Page ID Number 6242

11   in that document.

12             And, Director, can you see this on your screen?

13   A.      All right.  Let me try.

14   Q.      Okay.

15   A.      Yes.

16   Q.      All right.  Thank you, sir.

17             THE COURT:  You may need to make that a little

18   smaller, and that will let it be seen in its entirety.  I

19   think that may help.

20             MR. CASTELLI:  Is that better or --

21             THE WITNESS:  It doesn't help me, Judge.  I may

22   have to read a written document.

23             THE COURT:  That's fine.

24             MR. GLOVER:  Give us a second, Your Honor.  We're

25   trying to put the actual written document in front of him as

UNREDACTED TRANSCRIPT

*CROSS - DIRECTOR MICHAEL RALLINGS*                          15

 1   well.

 2                  THE COURT:  That's fine.  Thank you.

 3                  THE WITNESS:  I can read it enough, Judge, to

 4   proceed.  I just don't want to be so close to the screen that

 5   it's on top of my head.

 6   BY MR. CASTELLI:

 7   Q.      I'll maybe ask -- I'll just ask you a couple of

 8   questions while your counsel finds the written document,

 9   generally about it so you don't need to read it.  But --

10   A.      Okay.  We have it.

11   Q.      Okay, great.  So, Director Rallings, you're familiar

12   with this order from the Court; that's correct?

13   A.      Correct.

14   Q.      And this one of the things I believe you testified

15   yesterday, that you have reviewed, in your efforts to

16   determine what your officers can and cannot do under the

17   Consent Decree; is that right?

18   A.      Okay.  Can you repeat the question?

19   Q.      Yes.  I believe you testified yesterday that this is

20   one of the documents -- one of the orders that you have

21   looked at when trying to understand the Consent Decree; is

22   that correct?

23   A.      Correct.

24   Q.      All right.  So I just want to walk through here on the

25   Page ID Number 6242.  At the bottom of the page there's some

1   findings by the Court about where the Court found that the

2   City of Memphis had violated the Consent Decree.

3       If you look from page 2 is the first one, is conducted

4   political intelligence as specifically defined and forbidden

5   by the Consent Decree.

6       Do you see that?

7   A.     I do.

8   Q.     Okay.  And then we're going to move to the next page,

9   and there are six more findings there.  I won't read all of

10  them.

11      But do you agree that those were the seven total

12  findings by the Court where the City had violated the Consent

13  Decree?

14  A.     I agree that those were the findings of the Court

15  where the City violated the Consent Decree.

16  Q.     Okay.  So with that in mind, I would like for you to

17  look at what's been marked as Exhibit 21 -- actually,

18  admitted as Exhibit 21 in this hearing.  And I want to ask

19  you a few questions about that document.

20  A.     Okay.  I have it.

21  Q.     Okay.  And I've got it on my screen.  Is that visible

22  to you and to the Court?

23  A.     Well, that's too small, but I do have the document in

24  front of me.

25  Q.     Okay, great.  I enlarged it a little bit, but I want

*CROSS - DIRECTOR MICHAEL RALLINGS*                                 17

1  to make sure everybody can see the part.

2       So I believe you, in your direct testimony, you

3  discussed some of the definitions here that have been --

4  these proposed modifications by the parties to the Court.

5       And one of which was the First Amendment-related

6  intelligence, or the modifications to what was originally

7  political intelligence; is that right?

8  A.    That's correct.

9  Q.    All right.  And so am I correct it's your testimony

10 that these charges would be beneficial to you and your

11 department, because it would allow for better understanding

12 by your police officers of what is political intelligence or

13 First Amendment-related intelligence?

14 A.    I think my testimony was that it would be better, but

15 there's still some gray area inside of that.

16 Q.    Sure.  And you would provide training to your officers

17 to try to help them understand any gray areas that may exist

18 in this Consent Decree; is that correct?

19 A.    Correct.

20 Q.    Much like you provide training to your officers on

21 other constitutional requirements, like, for example, the

22 Fourth Amendment requirement that officers get a warrant

23 based on probable cause.

24 A.    Correct.

25 Q.    Okay.  Now, looking at this -- these proposed changes,

*CROSS - DIRECTOR MICHAEL RALLINGS*                              18

1    would you agree with me that the finding by the Court in this

2    case back in October 2018, that the City had engaged in

3    political intelligence, that these amendments don't change

4    that finding; correct?

5    A.      Correct.

6    Q.      All right.  And that the Decree, if these

7    modifications were made, would still prohibit the City from

8    gathering, indexing, filing, maintaining, or storing or

9    disseminating information about people's beliefs or

10   associations or exercise of speech and expression; is that

11   right?

12   A.      That is my understanding.

13   Q.      Okay, great.  And so moving on in this document to

14   definitions number 7 and 8.  Again, it's Exhibit 21 for the

15   record.

16           I believe it's your testimony that these -- adding

17   these additional definitions for social media undercover

18   account will update the language of the Decree and help with

19   you and your officers' understanding of how this type of

20   technology would work under the Decree's requirements?

21   A.      I agree.

22   Q.      Okay.  And I think you also testified about other

23   technological advances, like the use of body-worn cameras or

24   Blue CRUSH cameras.

25           Is it your testimony that putting language in the

*CROSS - DIRECTOR MICHAEL RALLINGS*                                    19

1   Decree specifically about those cameras would help with the

2   officers' understanding of how this Decree affects those

3   technologies?

4   A.      Correct.

5   Q.      All right.  But you agree with me that the changes in

6   the Decree to add things about social media or cameras would

7   not actually allow your officers to use that technology to

8   gather information that's prohibited by the Decree; correct?

9   A.      Correct.

10  Q.      Moving to Section G of this Exhibit 21, Page ID 9976.

11          There was some testimony on direct about adding this

12  concept of having designees to assist you, I guess, in

13  authorizing investigations where there may be some gathering

14  of information about First Amendment activity.  Is what your

15  understanding of what Section G -- some of the changes in

16  Section G?

17  A.      Let me review it quickly.

18  Q.      Sure.

19  A.      Item 7 talks about a designee, that's correct.

20  Q.      All right.  And would that change allow you to have

21  other members of your command staff that can step in when

22  you're not available to authorize these investigations under

23  that section?

24  A.      Correct.

25  Q.      Okay.  I want to turn to Section I of the Decree,

1    which I believe you discussed on your direct.  Can you tell

2    me, again, what your understanding of Section I of the

3    Consent Decree is?  And I'm happy to put that up.

4    A.     So you're not talking about the modifications, you're

5    going back to the original Decree or the Judge's ruling?

6    Q.     Let's go back to the original Decree that is

7    Exhibit 19.  And I will pull that up.

8           Now, it is your understanding that there have been no

9    proposed modifications by the parties jointly to Section 9?

10   Is that your understanding?

11   A.     I think it was my understanding that y'all did not

12   agree.  But let me go back and look at the -- let me go back

13   and look.

14          Yeah.  So according to the modification, it says the

15   parties were unable to reach an agreement on modified

16   language for Section I.  So "I" remains for the Court's

17   determination.

18   Q.     Okay.  Well, all of it, we'll agree, remains for the

19   Court's determination of whether to accept the parties'

20   proposals or make any changes at all.

21          But particularly with Section I, we just haven't

22   proposed jointly anything to the Court; is that correct?

23   A.     Can you repeat that question?

24   Q.     Yeah.  I just -- and I think you've answered it, so

25   I'll just move on.

UNREDACTED TRANSCRIPT

*CROSS - DIRECTOR MICHAEL RALLINGS*                                    21

1          Can you tell me, again, what your understanding, based

2    on the language in the Consent Decree that's in front of you,

3    and on your reading of the various orders from the Court,

4    about what your officers are prohibited from doing under

5    Section I of the Decree?

6    A.     So that's rather confusing, because as I interpret "I"

7    as it was originally proposed in the 1978 agreement, it would

8    say we can't.  And so -- but I would have to go back and

9    review the Judge's order that brought about clarification.

10          And I'm not clear, because I have a U.S. Attorney,

11   former U.S. Attorney, a former City Attorney, that don't

12   agree, that had to have clarification by the Judge.

13          So I've been very consistent in my testimony that I'm

14   not a lawyer, I'm not a former U.S. Attorney, I'm not a

15   former City Attorney, and that I still have concerns and

16   there's still confusion.  So I wanted it perfectly clear that

17   I am still confused and I will wait on the guidance from the

18   Court on how we should proceed.

19   Q.     Okay.  Well, let's look at the ECF Document Number

20   250, that order from this Court denying the City of

21   Memphis's --

22               THE COURT:  I don't have access to CM/ECF.

23               MR. CASTELLI:  Do we need a minute to get that in

24   front of the Court?

25               THE COURT:  I'm fine.  I have a hard copy, I

*CROSS - DIRECTOR MICHAEL RALLINGS*                    22

1    just -- we're having an issue on accessing CM/ECF.  And we've

2    got that now also.

3              MR. CASTELLI:  Okay.

4    BY MR. CASTELLI:

5    Q.     Okay.  So, Director, you've reviewed this order, ECF

6    Document 250?

7    A.     I'm trying to make sure I have the right one in front

8    of me.  So this is 1 of 49, 11/13/19.  I have it in front of

9    me.

10   Q.     All right.  And is this one of the orders that you've

11   reviewed?

12   A.     Yes, it's one of the 100 pages I've reviewed.

13   Q.     Okay.  And so let's -- you see there's a highlighted

14   section here on your screen?

15   A.     Well, I wish I could see it.  Can you refer me to a

16   page and I'll try --

17   Q.     Yes.  My apologies.  The page of the document is 36.

18   The Page ID Number, which is in the top right-hand corner, is

19   8417.

20   A.     Okay.  I'm with you on that.

21   Q.     Okay.  And there's a paragraph in the middle of the

22   page.  I'll let you read that quickly, if you would, and then

23   I'll have some questions about it.

24   A.     Sure.  So I'm on page 36 and will start with the

25   highlighted section you have.

*CROSS - DIRECTOR MICHAEL RALLINGS*                                    23

1    Q.       You don't need to read it aloud.   Just read it to

2    yourself so you're familiar with it and let me know when

3    you're done and I'll ask you some questions.

4    A.       Okay.

5    Q.       And just let me know when you're done reading.

6    A.       Sure.  I read that section, but I will be fearful to

7    not review that entire section.   Because taken out of

8    context, I think context is important.   So I just -- you

9    know, I'd rather have time to go back and figure out exactly

10   what we're talking about, unless you want to explain it and

11   help me out a little bit.

12   Q.       Well, let me ask you some questions.  And if you don't

13   feel like you can answer them without reading the entire

14   document, or the context, you can give me that answer and

15   that's perfectly fine.

16            THE COURT:  It might be useful to just go to the

17   next paragraph also.  It does provide a little more context.

18   BY MR. CASTELLI:

19   Q.       Okay.  Absolutely.  Director Rallings, if you want to

20   read the next paragraph.

21   A.       Sure.  Just give me a few seconds, please.

22            Okay.  I've read it.

23   Q.       Okay.  So going back to the highlighted paragraph

24   there -- well, I guess maybe I'll start with, Director

25   Rallings, can you tell me does this -- do these paragraphs

                          UNREDACTED TRANSCRIPT

1   help you understand what requirements are on yourself and

2   your officers from Section I of the Decree?

3   A.      So it does help.  But I think the issue of political

4   intelligence still needs some clarification.  I think I've

5   been very clear in my testimony that even in the modification

6   I still have concerns.

7   Q.      Okay.  But just with regard to the information that

8   the department can receive, would you agree with me that

9   order from this Court interpreting Section I, that this order

10  says that the City -- the Decree would require the City to

11  reject only information that constituted political

12  intelligence, that is unrelated to a legitimate law

13  enforcement activity?  Is that the language there?

14  A.      That is the language.

15  Q.      Okay.  And then this section would require the City to

16  vet only information that implicates Section G of the Decree.

17  And the Court explains that is information gathered as part

18  of a legitimate law enforcement investigation that

19  incidentally -- or may incidentally implicate protected First

20  Amendment activities; is that correct?

21  A.      That is the reading of the document I see before me.

22  Q.      So you were talking in your testimony earlier about, I

23  believe there was around an average of 100,000 incident

24  reports that are received a year?

25  A.      So an average over the last four years should be

1  approximately 108,000.  In 2019, we received approximately

2  118,000.

3  Q.      And do you have any knowledge of how many of those

4  were concerning anything to do with free speech activities?

5  A.      I have no knowledge.

6  Q.      Okay.  And those incidents, are those reports from

7  individual citizens or residents of the city or county, or

8  other agent -- law enforcement agencies?  Is it a

9  combination -- that was a pretty bad question.  Let me start

10 over.

11         I guess I'll just ask it this way, Director Rallings,

12 where do these incident reports come from?  What is the

13 source?

14 A.      So any incident that is believed to occur within the

15 City of Memphis could be reported.  And sometimes incidents

16 are reported that did not occur in the City of Memphis, and,

17 therefore, the investigation will determine if that incident

18 needs to be sent to another jurisdiction or the victim needs

19 to be directed to another law enforcement agency.

20 Q.      So some of these incident reports are going to come

21 from individual members of the citizenry; correct?

22 A.      Correct.

23 Q.      And can some of these incident reports be generated

24 by, say, information received from another law enforcement

25 agency?

*CROSS - DIRECTOR MICHAEL RALLINGS*                              26

1  A.      Yes.  But normally it is a victim or some other

2  complainant.  But another law enforcement agency could be a

3  complainant.  A law enforcement officer could be a victim in

4  an incident report generated.  Or an law enforcement officer

5  could be a complainant.

6  Q.      Would an incident report be generated if a law

7  enforcement officer observed someone committing a crime,

8  would that cause an incident report to be generated?

9  A.      Generally, if an arrest resulted in that, yes.  But

10 the officer could generate a memo or an incident report based

11 on something that was observed by the officer.  Generally,

12 the officer would try to locate a victim.

13         For instance, if there was a window broken out of a

14 vehicle and the officer was unable to detain the individual

15 that he or she thought was responsible for that particular

16 crime, the officer still would try to locate a victim.

17 Q.      So whenever these incidents reports are generated,

18 from whatever source they may come from, there is an officer

19 that is going to look at the information received and make a

20 decision about how or whether to pursue any type of

21 investigation; is that right?

22 A.      Yes.

23 Q.      Okay.  And that would be an officer that is trained on

24 this particular Decree; correct?

25 A.      I think the Decree clearly requires that all MPD

*CROSS - DIRECTOR MICHAEL RALLINGS*                              27

1  officers receive training on the Consent Decree.  And I know

2  that our City Attorney has spent a considerable amount of

3  time working through in-service training.  The Decree is

4  posted on our kiosk.  And DR-137 is part of policy, so that

5  would be a correct statement, based on our requirements under

6  the Consent Decree.

7  Q.      I want to ask you a few questions about a program you

8  mentioned, I think yesterday, called -- I think I got it

9  right, Trust Pays, P-A-Y-S; is that correct?

10 A.      Correct.

11 Q.      All right.  And my understanding from your testimony

12 is that is kind of a program for students or faculty to

13 report maybe criminal acts or threats to the police that

14 happened in and around the school system?

15 A.      So Trust Pays is a program ran by CrimeStoppers.  And

16 Trust Pays will allow anonymous tips to be made.  And,

17 really, they try to focus on the school system.

18      So what Trust Pays does is encourages students to

19 report incidents of an individual that may have a gun, drugs,

20 stolen items, et cetera, via their person, adult, via a law

21 enforcement officer that could be assigned to the school, via

22 a teacher, principal in the school.  And those some anonymous

23 tips can be rewarded.

24      I think it was my testimony that there were 111 tips

25 in 2019.  That those resulted, I think, in 90 confiscations.

*CROSS - DIRECTOR MICHAEL RALLINGS*                           28

1    And I think since its implementation, 187 guns have been

2    recovered.

3           In 2019, eight guns were recovered, ten Tasers, ten

4    fake guns, 20 knives, and 42 drugs.  And CrimeStoppers had a

5    record number of tips in 2019, and I don't recall exactly

6    what that information was.  But I do know 22 homicides were

7    solved as a result of CrimeStoppers tips.

8    Q.    So let's focus on the stats you just gave us about the

9    Trust Pays, 100 -- I think you said 118 tips were received?

10   A.    187 guns --

11   Q.    I'm sorry.

12   A.    -- since the program started.

13   Q.    Okay.

14   A.    I said there was 111 tips that came in in 2019,

15   according to CrimeStoppers.

16   Q.    Okay.  My apologies.

17          And all of the arrests, the number of guns recovered,

18   drugs recovered, knives that you listed, those would all be

19   criminal investigations; is that correct?

20   A.    Yes, on the guns, knives, Tasers, fake guns, et

21   cetera, would be a criminal investigation.

22   Q.    When one of these tips comes in, there's officers that

23   review the tip to see whether or not it's something that can

24   be acted upon?

25   A.    There is a review process for the tips.  But I cannot

*CROSS - DIRECTOR MICHAEL RALLINGS*                              29

1  account for if a tip is received in Germantown High School, I

2  have no knowledge of what the Germantown Police or Shelby

3  County Sheriff's Office would do with that tip.

4      CrimeStoppers -- anyone could call into CrimeStoppers

5  in Shelby County and the tip be acted upon.

6  Q.     Sure.  But -- so if tips were called in about schools

7  that are within the limits of the City of Memphis, would

8  those tips then go to your department?

9  A.     The school system is no longer the Memphis City School

10 System.  It's the Shelby County School System.  They have 99

11 security officers.  Many of them are retired Memphis Police

12 officers.  And there are also a number of Shelby County

13 Sheriff deputies assigned to schools.

14     So those tips could be investigated by the Shelby

15 County Sheriff's Office, Shelby County School Security, or

16 the Memphis Police Department.

17 Q.     Okay.  So the Memphis Police Department may

18 investigate some of these tips?

19 A.     Correct.

20 Q.     All right.  And so someone from the Memphis Police

21 Department would then have to review what -- the information

22 in the tip and decide whether or not it is something that

23 needs to be followed up on or investigated.

24 A.     That is a possibility; however, it does not preclude

25 the administration -- if there's a tip that some kid has a

*CROSS - DIRECTOR MICHAEL RALLINGS*                                    30

1    backpack with a gun, a school administrator could intervene

2    quickly to prevent a school shooting or an accidental

3    shooting, and then summons the police if that actually turned

4    out to be a threat.

5    Q.     Okay.  So with CrimeStoppers, is that the same thing,

6    though, that the tip would be received -- if it was something

7    that Memphis Police Department was going to investigate,

8    someone would review that tip from CrimeStoppers and decide

9    the best place for that to go in order to be -- in order for

10   there to be some short of action taken on that tip?

11   A.     So you are correct in that a tip would be received and

12   would be reviewed and routed to the appropriate investigative

13   entity for review.

14              COURT REPORTER:  Judge?

15              THE COURT:  Do we need something?

16              COURT REPORTER:  Yes.  Someone is typing in the

17   microphone, and when the Director is speaking, I'm having a

18   hard time hearing him.

19              THE COURT:  Someone apparently is typing next to

20   their microphone, and we need them to not do that.  So if

21   your mic is open and you're typing, then you need to sort of

22   relocate your keyboard.

23              Okay.  I can hear fine, but the court reporter

24   needed a clarification on the typing issue.

25              Okay.  Counsel, go right ahead.  I'm sorry, we

  1   just wanted to make sure we have a very solid record here,

  2   which -- in terms of transcription.

  3                 MR. CASTELLI:  Absolutely.  Thank you, Your

  4   Honor.

  5   BY MR. CASTELLI:

  6   Q.      Director, yesterday you talked about the Fusion Center

  7   and the reports that are generated by the Fusion Center?

  8   A.      Correct.

  9   Q.      All right.  And are these reports that you personally

 10   review when they come in?

 11   A.      It's too many reports for me to personally review.  I

 12   try to review as many as I can, and I definitely encourage my

 13   staff to review as many as they possibly can.

 14   Q.      And are those available to every member of law

 15   enforcement in the Memphis Police Department, or do they only

 16   go to certain people?

 17   A.      So I get reports from the Tennessee Fusion Center.  I

 18   think I'm signed up to receive those reports.  Those reports

 19   could be disseminated to members of the police department.

 20           But if you recall my testimony yesterday, the reports

 21   have a number of different levels of classifications.  Some

 22   are unclassified.  Some are law enforcement sensitive.  Some

 23   are classified and then there could be reports generated that

 24   I'm not privy to because I do not possess a top secret

 25   clearance that probably would not be distributed by the

*CROSS - DIRECTOR MICHAEL RALLINGS*                                    32

1   Tennessee Fusion Center, but could be distributed in some

2   other means.

3          So I can't say -- answer that question in the

4   affirmative.  I can say that the reports could be distributed

5   to members of the Memphis Police Department.

6   Q.      But somebody has to make that affirmative decision

7   then to distribute a particular report to other officers.

8   A.      Correct.  Unless they are signed up to receive reports

9   directly from the Tennessee Fusion Center.

10  Q.      And do you know or do you track who is signed up to

11  receive those reports?

12  A.      No, sir, that is controlled by Tennessee Fusion.  You

13  would have to talk to them about that.

14  Q.      So when you review these reports, do you read them to

15  see whether or not the information in them might apply in

16  some way to the Memphis Police Department and the City of

17  Memphis?

18  A.      Correct.

19  Q.      So some of that information in there may be applicable

20  to Nashville or Knoxville or somewhere else in the state; is

21  that correct?

22  A.      I allow those agencies to make that determination.

23  Some of the information is just awareness.  So it's no

24  different than receiving a subscription to the Commercial

25  Appeal.  You know, every article may not be of interest, but

UNREDACTED TRANSCRIPT

*CROSS - DIRECTOR MICHAEL RALLINGS*                        33

1   it is there for you to consume.

2          There is a high volume of reports that are being

3   distributed, meaning our awareness.  So, again, I wish I had

4   time to review all of them, but, unfortunately, I just don't

5   have time.  So for me to say without reviewing all those

6   reports, it's difficult.  But the information is accessible.

7   And it could, you know, contain something that is valuable.

8          And other members could review those reports and

9   advise me or the command staff if there was something in a

10  report that could be valuable to other members of the Memphis

11  Police Department.

12  Q.     Have you found in some instances that some reports

13  might not contain information that's particularly useful to

14  you?

15  A.     I, actually, am a police nerd, so I actually think

16  that most of the information is rather valuable.  I choose

17  not to follow other news sources, social media, et cetera.  I

18  try to spend myself ingesting, you know, information that is

19  regarding law enforcement so we could improve our operations

20  and keep our community safe.

21  Q.     But you would agree that not every report is going to

22  have things that would maybe lead to solving a crime or some

23  other function of the police department?

24  A.     I would agree narrowly.  And here's an example.

25  There's been several reports put out by the FBI or the

1   Department of Homeland Security that just recapped an

2   individual that had been arrested for support of some

3   terrorist organization.  Those reports are for awareness so

4   that we are alert to the possibility that someone could be

5   providing funds to a terrorist organization.

6        It has no investigative value based on that individual

7   being arrested; however, it does show that all throughout the

8   nation the threat of individuals supporting terrorist

9   organizations is still present.

10  Q.     So there may be instances where you might see

11  something in a report and then send that to someone to say we

12  need to open some kind of actual criminal investigation on an

13  issue?  Has that happened?

14  A.     I would have to go back and review all of those.  And

15  I don't -- to this date, I don't think so.  I think a better

16  example would be that information came out that there was

17  some actors that could plant -- planting explosive devices on

18  known protest sites.  Our immediate reaction was to deploy

19  our bomb sniffing dogs on the sites, to make sure that our

20  citizens were safe.

21        We often do these things quietly.  But, again, the

22  Memphis Police Department are always ready to receive

23  information that we could get into use immediately to keep

24  our citizens safe.  And thank goodness we have not had a

25  bombing incident, although we respond to a number of

1   suspected bombs each year where we recover probably around a

2   tenth of possible explosive devices.  So the threat of

3   bombing is present and we act on information received and try

4   to keep our citizens safe.

5   Q.      And an investigation into a threat of a bombing would

6   be considered a criminal investigation?

7   A.      Well, it could.  So if someone bought a dummy hand

8   grenade from an Army surplus store, you can order them off

9   the internet that, you know, you could sit on your desk, that

10  talk about pull in case of a complaint.  It's a prank, it's a

11  joke, but somebody may look at that and think it's a real

12  device.

13          So when you respond to those calls where someone may

14  think it is a real device and it turns out to be a dummy

15  device, that would not result in a criminal investigation,

16  although that matter must be properly investigated, because

17  we take every call seriously.  And if someone thinks that

18  they've found a device that could be explosive, that could be

19  a danger to our citizens and we respond and investigate.

20  Q.      Let me make sure I'm clear.  I mean, I guess the

21  investigation into any type of threat of use of an explosive

22  device, whether or not it turns out that there is proof of a

23  crime, that investigation is into whether a crime is being

24  committed; that's correct, isn't it?

25  A.      Well, I think we're talking about two different

*CROSS - DIRECTOR MICHAEL RALLINGS*                                      36

1   things.   A call that someone found a possible explosive

2   device is not necessarily a criminal investigation until we

3   determine that it is an explosive device.

4          For instance, you know, individuals have brought

5   explosive devices back from World War II, Korea, and Vietnam.

6   If a deceased service member had one in the attic that was

7   located by grandchildren, it's just a found device.  That is

8   not necessarily a criminal investigation.

9          If information is revealed, that investigation could

10  be turned into a criminal investigation.  But it's just on

11  whether the number of things that are found in backyards and

12  attics and garages that, you know, may not have a criminal

13  nexus.

14  Q.    But you would have to investigate in order to

15  determine whether there is criminal nexus in these instances;

16  correct?

17  A.    I think that's very well said.  So of the 118,000

18  incident reports that are filed, the same thing is

19  applicable.  We respond, we review, we determine if it is a

20  criminal matter.  Because some matters don't raise to the

21  level of a crime being committed.

22  Q.    And sometimes those investigations, like I believe you

23  just said, you might, after the investigation, determine

24  there is no crime and close the investigation; correct?

25  A.    I think that is a correct statement.

*CROSS - DIRECTOR MICHAEL RALLINGS*                            37

 1              MR. CASTELLI:  Your Honor, if you'd give me a

 2  moment to look over my notes.  I may be almost done.

 3              THE COURT:  Certainly.  That's fine.  Take a

 4  moment.

 5              MR. CASTELLI:  All right.  Your Honor, I think

 6  those -- that concludes my questioning of the witness.

 7              Thank you, Director Rallings.

 8              THE COURT:  Certainly.  And --

 9              THE WITNESS:  Thank you.

10              THE COURT:  -- we don't necessarily have any

11  questions from the Monitor, but there could be.

12              Are there any questions that the Monitor, or one

13  of his team, would like to ask while we have the Director

14  available?  Mr. Stanton?

15              MR. STANTON:  Good morning.  Thank you, Your

16  Honor.  Just very briefly, just a few points of clarification

17  for Director Rallings, if that's okay, Your Honor?

18              THE COURT:  Certainly.

19                        CROSS-EXAMINATION

20  BY MR. STANTON:

21  Q.     Good morning, Director Rallings.

22  A.     Good morning, Mr. Stanton.

23  Q.     Good to see you, sir.  I just wanted to just follow

24  back up on a couple of items that were discussed yesterday

25  with Mr. McMullen.  And it relates to Section I of the

*CROSS - DIRECTOR MICHAEL RALLINGS*                                    38

1   Consent Decree, Director, and particularly with Judge

2   McCalla's order dated November 13, 2019.

3          There were a couple of places, one is the

4   participation in the Joint Terrorism Task Force, or Tennessee

5   Fusion Center, that was referenced yesterday.

6          And I wanted to just ask you, Director, do you have an

7   understanding or have you been advised as to whether or not

8   the Memphis Police Department has received information from

9   the Tennessee Fusion Center?

10  A.     Mr. Stanton, there is a section in the Judge's order

11  that references that.  And, you know, obviously, I talked

12  about reviewing a hundred pages of documents.  And I would

13  definitely rather refer to that particular section so I don't

14  misstate what the Judge has ordered.  So if you could direct

15  me to that section.

16  Q.     Yes, sir.  And, again, this is just for clarification

17  purposes, but that's a great idea.  If we could go to, again,

18  Document 250, which is the Court's order.  I'd like to go to

19  Page ID 8420.  And that's page 39 of the order, 39 of 49.

20         Just, briefly, just for the record, I want to -- the

21  Court was pretty clear in its order.  I just want to make

22  sure that the Director's been made aware of the Court's

23  order.

24         So if you would -- well, you see we just -- the title

25  there says City Participation in the Joint Terrorist Task

1   Force and/or the Tennessee Fusion Center.  And if we could

2   just flip over to Page 40, or Page ID 8421.

3   A.      I have it, sir.

4   Q.      Okay.  And the second sentence of the first paragraph,

5   let me scroll up to Page 40.  Okay.  And you can just

6   highlight where it begins Further and procedure.

7           Okay.  And I'll just -- if you could look over that.

8   And only thing, Director, I just wanted to just point for

9   clarification purposes is that Judge McCalla's order

10  addresses whether or not Tennessee Fusion Center or Joint

11  Terrorism Task Force information can be received from these

12  entities by the Memphis Police Department.

13          And so I'll just ask you directly.  Would you agree,

14  looking at this -- and, again, of course you mentioned you're

15  not an attorney and you do a lot of reading and obviously you

16  have a very difficult job with providing law enforcement and

17  safety for the citizens of our community.  So I just wanted

18  to point out here and we can move on, that Judge McCalla's

19  order, you're right, there may have been some ambiguities

20  just, but I think just with something that Mr. McMullen

21  brought up yesterday with regard to receiving information,

22  Tennessee Fusion Center clearly addresses that issue.

23          And then we'll just also highlight -- and I'm just

24  asking you to look at this, Director.  And if you disagree,

25  please let me know.  But the last sentence of that paragraph

*CROSS - DIRECTOR MICHAEL RALLINGS*                              40

1    begins with, it would therefore.  Highlight that.

2          And there's a statement, Director, that says, it would

3    therefore not be correct to argue that the Decree prevents

4    the City and other law enforcement agencies reporting

5    criminal terrorist threats or other significant public safety

6    concerns.

7          So unless there's a disagreement at all, I think we

8    can move on.  There's one other place as it relates to

9    CrimeStoppers, but I just wanted, Director, for you to take a

10   look --

11              MR. McMULLEN:  Objection.  I don't know if you've

12   asked him a question.  I'm not sure of the question.

13              THE COURT:  What we'll do is I'm going to sustain

14   the objection.  Let us focus on a question.  And the question

15   I think was, are you aware of the content of the order, and

16   does that answer some of the questions that you had about how

17   it applies, how the Decree applies.

18              Okay.  Go ahead, Mr. Stanton.

19              MR. STANTON:  Thank you, Your Honor.  Thank you,

20   Mr. McMullen.

21   BY MR. STANTON:

22   Q.    My question is, Director, as you look at these two

23   highlighted sections, do you have an opinion of whether or

24   not the City may have received information from the Tennessee

25   Fusion Center or been prohibited from receiving information

1   based on the Judge's order?

2   A.      So I think that's an excellent place to start.  And so

3   the Judge's order, in my interpretation, says, further

4   searching.  It does not require the City to reject all

5   information received from the Joint Terrorism Task Force,

6   which I'm a member of and I've been a member for quite

7   sometime, or the Tennessee Fusion Center, unless -- and

8   that's where the problem starts.  Unless it reviews any and

9   all search information pursuant to G --

10              THE COURT:  Let's go back to that, Director.  Is

11  it clear that you're saying that you don't have to reject the

12  information?  In other words, the assertion by the City that

13  you had to review any and all such information, pursuant to

14  Section G, was incorrect.  Right?

15              THE WITNESS:  Judge, I don't quite understand.  I

16  think I can clarify it.

17              THE COURT:  Let me ask a question on this one if

18  you don't mind.

19              The City was attempting to assert that you had to

20  review all such information pursuant to Section G of the

21  Decree.  Right?  The City was saying that you had to do that.

22  Is that right?

23              THE WITNESS:  I think that's correct, Your Honor.

24              THE COURT:  And then the Court said you did not

25  have to do that.

*CROSS - DIRECTOR MICHAEL RALLINGS*                                    42

 1              THE WITNESS:  Well, Judge, that's what I'm not

 2    certain about because --

 3              THE COURT:  Well, you can be certain now.  Right?

 4    You can know that now.

 5              THE WITNESS:  All right.  If you can --

 6              THE COURT:  I just said you could be certain of

 7    that now.  Is there any question that --

 8              THE WITNESS:  Okay.

 9              THE COURT:  -- you can be certain of that now?

10              THE WITNESS:  No, sir, not according to your

11    correction on my understanding of it.

12              THE COURT:  No.  And that's important.  I think

13    that exchange is useful and I appreciate your comment on

14    that.

15              THE WITNESS:  Thank you, Your Honor.

16              THE COURT:  Absolutely.  You had a fair question.

17              And, Mr. Stanton, does that help clarify that as

18    far as you can tell?

19              MR. STANTON:  It does, Your Honor.  I just want

20    to make sure the record is clear and most importantly that

21    the Director has been advised of what the Court's order

22    actually says, that -- my interpretation is pretty clear of

23    what the City's able to do.  And I just want to make sure --

24    again, the Director's not an attorney -- that the record is

25    clear of what the Court has authorized the City to receive.

1  BY MR. STANTON:

2  Q.      Moving, Your Honor, to the CrimeStoppers.  If we could

3  just stay on the same page -- or, actually, go to page 41.  I

4  know there was some issues or concerns with Mr. McMullen's

5  questions yesterday to the Director.

6          And you'll see there, Section D.  And I'm at Page ID

7  8422, City's Participation in CrimeStoppers.  And if we could

8  flip over to Page ID 8425, which is page 44 out of 49.

9          And there's just two --

10 A.      We're on page 44 of 49.  Okay.  I'm there.

11 Q.      Okay.  And just for clarification purposes, I want you

12 to take a look at the second paragraph, full paragraph, that

13 begins with "In sum."  We'll highlight that.  Just take a

14 moment.  Not the whole thing, just the first sentence.

15 A.      All right.  I have it, sir.

16 Q.      All right.  So as it relates to CrimeStoppers, the

17 Court squarely addressed that the issue of whether the City

18 could receive information from CrimeStoppers.  But as you

19 look at this, the question is, do you have an understanding,

20 Director, of whether the City can receive information of the

21 CrimeStoppers tips?

22          And before answering that, let me also highlight, just

23 to even give more illustration here.  If we could highlight

24 the word "vetting" and just go all the way down to the end

25 "program."

*CROSS - DIRECTOR MICHAEL RALLINGS*                                    44

 1          If you would just take a look at these two highlighted

 2    sections, Director Rallings.  And then if you could share an

 3    opinion of whether or not it's your understanding that

 4    CrimeStoppers tips can be received according to the Court's

 5    order of November 13, 2019?

 6    A.     All right.  Just give me a second, Mr. Stanton, if you

 7    would.

 8    Q.     Yes, sir.  Take your time.

 9    A.     Okay.  I've reviewed that section.  Mr. Stanton, can

10    you repeat your question.

11    Q.     Yes.  After your review this morning, Director, I

12    wanted to see if you have an opinion of whether or not the

13    Memphis Police Department can receive tips from CrimeStoppers

14    under the Consent Decree, or is it prohibited based on the

15    Court's orders you just read?

16    A.     Well, based on the Court Order, it says, Decree only

17    prohibits the City from receiving information from outside

18    law enforcement or private interests that would otherwise

19    violate the Decree.  Section I only outright prohibits the

20    City's receipt of political intelligence.

21          And I think I've been very clear in my testimony that

22    it is the issue of what is political intelligence that I

23    still lack complete clarity on.  So I just --

24          And I apologize, Your Honor, I just can't say that I'm

25    100 percent clear.  Because if I'm not clear on political

*CROSS - DIRECTOR MICHAEL RALLINGS*                              45

1   intelligence, then that kind of muddies the water.  And I

2   think there was mention throughout on doctrine of some

3   possible gray areas.  And that's my concern.  I don't want to

4   be in a gray area that places us in violation, because I am

5   the one that pretty much is responsible for making sure that

6   we maintain compliance with a team of lawyers and a monitor.

7          So, again, excuse my ignorance, but I'm just trying to

8   do the best I can and make sure I understand this completely.

9   And I think that's why the modification is necessary to just

10  help me out.  Again, I'm not a lawyer.  And, you know, this

11  is somewhat confusing.  And I think the clarity would

12  definitely benefit the next chief that comes in who has to

13  make these decisions.  Because I have to make these decisions

14  at 3:00 in the morning, and I don't have a lawyer to talk to.

15  Normally it's me and some little poor investigator on the

16  scene and we're trying to prevent a threat of a school

17  shooting.  You've also addressed that.  But some of the areas

18  are gray areas, and I just want to make sure that we're clear

19  on that.  Because we do not want to violate the order.  We

20  want to protect our citizens.

21  Q.    Thank you, Director.  Very insightful and I appreciate

22  your candor there.

23         I'll move on.  Just one other item that I wanted to

24  refer to, and that is something that's called Request For

25  Authorizations.  We call them RFAs, or Request For Authority.

1           Are you familiar with that process, Director?

2    A.      Yes, sir, I am.

3    Q.      Okay.  And, just for the record, that process is

4    something -- a process that Judge McCalla and the Court

5    implemented and called upon the parties, where some of those

6    realtime issues that you just referenced, Director, and those

7    gray issues, instead of having to file a memo with the Court

8    or a motion, some of those items have to be determined

9    realtime and that's a process that the Court instituted where

10   you and your team, legal team, would reach out to myself as

11   the Monitor for clarification and authority to proceed.  Is

12   that correct?

13   A.      Well, it would be a stretch for me to say that it's

14   realtime.  It's realtime -- it's sometimes.  You know, Public

15   Safety Partnership Symposium is well documented in the order,

16   and we know that there was a substantial delay in getting

17   that.  So, you know, the Monitor, you, and the City Attorney

18   didn't agree, and ultimately the Judge made a decision

19   30 days later.

20           So even authorization is not necessarily realtime.

21   And I'll give you the perfect example.  I spent ten hours on

22   a plane traveling out of the country.  Eleven hours coming

23   back.  There was something going on realtime and there was no

24   way my staff could have got in touch with me, and they could

25   have been required to mitigate a threat.  I'll take a hit on

*CROSS - DIRECTOR MICHAEL RALLINGS*                              47

1   that.   My instruction to my staff is do not allow a child or

2   citizen to be harmed because you can't get in touch with me.

3   If I have to be found in contempt of court, hopefully the

4   judge won't throw me in jail.   But I think the protection of

5   citizens is more important, and then we could deal with the

6   authorization on the back end.

7          So to say that it is realtime would be a stretch.   And

8   I've been on the record over and over again saying that my

9   biggest fear is that something is going to happen that could

10  have been prevented, but because of the restrictions in the

11  order we were not able to intervene.   And I'll tell you what

12  I told the FBI, the Shelby County Sheriff's Office, the

13  Director of the FBI, the Attorney General, that they are

14  going to have to do a better job, federal law enforcement, or

15  other law enforcement intervening in these situations,

16  because I think we're burdened by the Decree and I think it

17  does make our citizens less safe.

18  Q.     Thank you for your testimony, Director Rallings.

19         And with regard to the RFAs, since the Court's ruling

20  in 2019 clarifying -- and we've read and it's very clear of

21  the contours and the tenants of the interpretation of the

22  Consent Decree, are you aware of any request that the City

23  has made to receive information that I, as the Monitor, have

24  rejected or not authorized?

25  A.     The only one that I'm aware to date was the issue

*CROSS - DIRECTOR MICHAEL RALLINGS*                                48

 1   about the PSP Conference.  And I think there may have been a

 2   handful of others, but I am not aware of any -- maybe a

 3   handful.  I would have to review the emails and documents to

 4   ensure.  I kind of focus on the ones that we have approved,

 5   and I know that 16 have been approved.

 6   Q.     And that's fair, Director.  I will tell you, again,

 7   the symposium that you're referencing, that was August of

 8   2019.  And, again, it was November that the Court's order

 9   clarified Section I.  But, again, that's your recollection.

10   That's perfectly fine.

11          And so it sounds like what we heard, for the reason

12   that you just mentioned, some of these gray areas is why you

13   are seeking to have codification of the Consent Decree so,

14   one, there won't be the confusion that you mentioned earlier

15   in your testimony; is that correct?

16   A.     Yes.  I think my testimony was that the modification

17   will make it clearer.

18   Q.     Yes, sir.

19   A.     I think, you know, in my 30 years of law enforcement

20   experience I recognize that there is always opportunity for

21   confusion.  One is the rapid involving technology, the rapid

22   involving situations on the ground that could change.  And

23   what we've witnessed in the last few months with COVID and

24   with the horrific murder of Mr. George Floyd, how things

25   could really rapidly change in not just the United States of

*REDIRECT - DIRECTOR MICHAEL RALLINGS*                          49

1    America, but the world.

2    Q.        And along those same lines, it would also assist, is

3    it your testimony, with the training of the Memphis Police

4    Department to ensure that they're in compliance with the

5    Consent Decree, this complication that you referenced?

6    A.        Yes, sir, without a doubt.   I think the clarification,

7    the codification, and an amended Decree or modified Decree is

8    critical as we move forward with providing protection in a

9    digital environment, and to, again, help the next Director of

10   Police ensure that we are maintaining compliance with the

11   Decree.

12             MR. STANTON:   Your Honor, I have no further

13   questions for Director Rallings.

14             Director Rallings, thank you for service and your

15   testimony.

16             THE COURT:   Certainly.

17             THE WITNESS:   Thank you, sir.

18             THE COURT:   Absolutely.

19             Let's go back to redirect.   Any redirect,

20   Mr. McMullen?

21             MR. McMULLEN:   Yes, Your Honor.   Just a few

22   questions.

23                         REDIRECT EXAMINATION

24   BY MR. McMULLEN:

25   Q.        At the time in which you received clarification and

*REDIRECT - DIRECTOR MICHAEL RALLINGS*                          50

1   which the City Attorney shared with you clarification of the

2   Court's interpretation of certain segments of the Consent

3   Decree, at that time there was some definitions that -- there

4   were some phrases that were not defined, like legitimate law

5   enforcement purposes; is that correct?

6   A.      That is my understanding.

7   Q.      Okay.  And you mentioned -- and then there was some

8   questions about RFAs.  And you have, for the first time, been

9   made aware of an RFA relating to the vetting's form that was

10  prohibited from being -- that was prohibited from you being

11  made aware of; is that correct?

12  A.      Yes, sir.  That is a very --

13  Q.      And you just -- and you just became aware of that

14  during this proceeding here; is that correct?

15  A.      Correct.

16  Q.      Because of the prohibition that we were instructed by

17  the Monitor not to share with you or the FedEx Forum; is that

18  correct?

19  A.      That's correct.

20          MR. McMULLEN:  No further questions, Your Honor.

21          THE COURT:  All right.  And I'm just going to go

22  quickly.  I think we've covered everything.

23          Mr. Castelli, anything else?  I think we've

24  wrapped it up, but I'm going to be sure.

25          MR. CASTELLI:  No other questions, Your Honor.

UNREDACTED TRANSCRIPT

1    Thank you.

2              THE COURT:  I think that does conclude

3    everything.  And, Director, we always appreciate you being

4    here, and thank you so much.  You get to be excused.  Of

5    course, you're welcome to stay on the line if you wish, but I

6    understand this concludes your testimony.  So thanks again.

7    Thank you.

8              THE WITNESS:  Thank you, Judge.

9              THE COURT:  Absolutely.

10             Let me ask who our next witness will be for the

11   City?  And I also want to check with Ms. Silk -- it looks

12   like she did mute herself so she may not be able to unmute

13   it.  Because I wanted to check on our schedule as to our

14   witness who had to be interrupted, and that was Mr. Daigle.

15             Oh, you could.  Okay.  We did get you back on.

16   And I wanted to check on his schedule right now, because we

17   had to break his testimony up.  Is he going to be available

18   early next week so we can complete his testimony?

19             MS. SILK:  Yes, Your Honor.  He told me he

20   cleared the entire day on Monday so he can make himself

21   available at the Court's convenience.

22             THE COURT:  Okay.  And I'll check with Mr. Sample

23   right now.

24             But, Mr. Sample, it looks like we can start at

25   9:00 with him; is that right?

 1              THE CLERK:  Will do.  Yes, sir.

 2              THE COURT:  So we'll clear everything so that we

 3     can conclude everything on Monday.  And he should probably be

 4     our last witness in all likelihood.

 5              All right.  Well, thanks so much.  That sets our

 6     schedule for Monday.

 7              Now, let's go back to Mr. McMullen, I'm assuming.

 8     And who will our next witness be?

 9              MS. SILK:  Mr. McMullen went to get our next

10     witness, who is Major Darren Goods.

11              THE COURT:  Yes.

12              MS. SILK:  And he'll be coming in in just a

13     minute.

14              THE COURT:  I'll tell you what, since that may

15     take a few minutes and staff started early this morning to

16     make sure everything worked smoothly, we're going to take a

17     break until 10:30.  That's a 14-minute break.  This is a

18     restroom break or a break that anyone needs.

19              And, remember, we're going to ask you to leave

20     your mics on, the ones who have their mics on.  So you have a

21     live mic, don't say anything you wish you didn't.  And we

22     will see everybody at 10:30.  Thank you.

23       (Recess was had at 10:16 a.m. and resumed at 10:30 a.m.)

24              THE COURT:  All right.  It's 10:30 and I think

25     we're ready to resume.  We want to make sure we've got voices

1   on everybody who needs to speak.  And so I'm going to do a

2   quick check on that.

3              I take it that, Mr. McMullen, you are conducting

4   the exam.  I want to make sure I can hear you okay.  Do we

5   have you, Mr. McMullen?

6              MR. McMULLEN:  Yes, Your Honor.  I would like to

7   call --

8              THE COURT:  Yes, sir.  Go right ahead.

9              MR. McMULLEN:  Oh, I'm sorry.

10             THE COURT:  No, go right ahead.  We can hear you

11  fine.

12             MR. McMULLEN:  I would like to call Major Darren

13  Goods.

14             THE COURT:  Certainly.  And we're going to have

15  Major Goods raise his right hand, and Mr. Sample is going to

16  swear him in.

17             THE CLERK:  Sir, do you solemnly affirm or swear

18  to tell the truth, the whole truth, and nothing but the truth

19  so help you God?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  Counsel may proceed.

22             MR. McMULLEN:  Thank you, Your Honor.

23

24

25

1                          **MAJOR DARREN GOODS,**

2        having been first duly sworn, was examined as follows:

3                            DIRECT EXAMINATION

4    BY MR. McMULLEN:

5    Q.        Major Goods, would you please introduce yourself to

6    the Court.

7    A.        My name is Darren Goods.  I'm a major with the Memphis

8    Police Department.  I've been with the Memphis Police

9    Department now for almost 35 years.  It will actually be

10   35 years in July of this year, July 13th.  I've worked in

11   various assignments, including uniform patrol, the Robbery

12   Bureau as both a sergeant investigating and as a supervisor.

13   I've also worked the FBI Safety Task Force as an investigator

14   and a supervisor.  I've worked as a supervisor investigator

15   in what is the Project Safe Neighborhood Gun Unit.  I've been

16   a homicide investigator.  I've worked several patrol

17   stations.

18   Tarnish Blue Task Force.  A Ridgeway General Investigative

19   Bureau as a supervisor.  In 2014 I was transferred to the

20   Multi-Agency Gang Unit as a lieutenant.  In roughly about

21   2015 I was elevated to the position of Operations Commander

22   for the Multi-Agency Gang Unit, which is where I currently

23   service.

24   Q.        Is that sometimes referred to as M.G.U.?

25   A.        Yes, sir.

*DIRECT - MAJOR DARREN GOODS*                                    55

1  Q.       Okay.  Could you explain to the Court the

2  configuration of the Multi-Agency Gang Unit, what other

3  agencies are involved, and just a general 1-2-3 understanding

4  of that operation and how it functions.

5  A.       Multi-Agency Gang Unit is comprised of a total of six

6  agencies that governs the Multi-Agency Gang Unit.  And that

7  is the Memphis Police Department -- well, let me back up.

8         The Multi-Agency Gang Unit is governed by a six-member

9  executive board.  Those board members are made up of the

10  department heads of the Memphis Police Department, which is

11  Director Mike Rallings; Shelby County Sheriff's Department,

12  which is Sheriff Bonner; Shelby County District Attorney

13  General's Office, which is Amy Weirich; the FBI

14  Special Agent in Charge, which is Special Agent in Charge

15  Myers; the ATF, I call it Tobacco and Firearms out of the

16  Nashville office, which the Memphis division falls under

17  their purview.  Right now they have an Acting

18  Special Agent in Charge Frank Herrera.  We also have in a

19  sense a Special Agent in Charge that's physically here in

20  Memphis, Chris Rogers with ATF.  The U.S. Attorney's Office,

21  which is Mr. Michael Dunavant.

22         Within the M.G.U. itself, on a daily basis, we have

23  both Memphis Police officers, Shelby County Sheriff deputies,

24  as well as ATF agents that are actually -- we share the same

25  space, share the same building space.

*DIRECT - MAJOR DARREN GOODS*                                    56

1    Q.      So explain that.  Explain that concept when you say

2    y'all share the same space.

3    A.      We are all housed in the same building together.  We

4    have several different types of teams that specialize in

5    certain things.  For instance, we have a NIBIN team, or NIBIN

6    investigative team that deals primarily with guns and bullet

7    casings, crime scene ballistic evidence.

8            Within that team we have an ATF Strike Force.  And

9    they primarily deal with the same thing, any type of

10   gun-related crime.  So they're housed -- they are actually

11   co-located in the actual same office space.

12           And we have other teams within the building as well

13   that include a fugitive team, what we call a strategic

14   investigative team.  These are long-term guys.  We have a

15   crime analysis unit.  We have NIBIN lab.  We have a regional

16   CD -- crimes and intelligence center.  That's also in this

17   same building.

18           And then we also have what we call our Gang Response

19   Team, which are the kind of street-level response team that

20   responds to the gang violence or gang complaints that happen

21   at street level.  Kind of some of your lower level

22   complaints, high crime area, high gun area.

23           But in each one of these teams there's a combination

24   of at least a Memphis Police officer and a Shelby County

25   Sheriff deputy, as well as on the Strike Force we've got the

*DIRECT - MAJOR DARREN GOODS*                                        57

1   ATF.

2   Q.      When you say you have teams in the building, so the

3   Multi-Agency Gang Unit is in a building together, and are you

4   saying they work together like co-workers like --

5   A.      Yes, absolutely.  They all work in the same building.

6   They occupy the same office space.  Kind of a cubicle kind of

7   office so there are multiple cubicles in each particular

8   space, if that makes sense.  And there are deputies and

9   officers and ATF agents all occupying the same space.

10  Q.      So I'm trying to get an analogy that can kind of

11  describe it.  So they're basically almost like a joint

12  venture between the different agencies, and that joint

13  venture operates as an entity of its own.

14  A.      Yes, sir.

15  Q.      Is that a fair description?

16  A.      Yes, sir.

17  Q.      All right.  And so is it practical to screen

18  information from one member of the team who may be from MPD,

19  screen information from that person by the other members of

20  the team?

21  A.      Now, when you say screen, are you talking about if

22  information comes in, let's say to an ATF agent, then if the

23  ATF agent is occupying the same office space with a Memphis

24  Police officer, then they act -- the officers kind of step

25  out of the room so they can review the information?  If

*DIRECT - MAJOR DARREN GOODS*                                    58

 1   that's what you're asking, that is absolutely not practical.

 2   Q.      Okay.  Now, you're aware that Memphis Police

 3   Department is under a Consent Decree.

 4   A.      Yes, sir.

 5   Q.      And as far as you know, do any -- and you know none of

 6   those other agencies are under a Consent Decree.

 7   A.      Correct.

 8   Q.      Does that create -- tell me how you all have been able

 9   to work -- does that create a burden trying -- working in

10   that unit and not being able to operate the other team

11   members in the same fashion?

12               MR. CASTELLI:  Your Honor, that's -- I'm going to

13   object to this line of questioning.

14               THE COURT:  An objection's been made.  Let me

15   hear the objection.  Go ahead, Mr. Castelli.

16               MR. CASTELLI:  I think the question assumes -- I

17   think there's a lack of foundation here for that question.  I

18   think it assumes some facts that the witness hasn't testified

19   to yet.

20               THE COURT:  All right.  I think it probably is

21   lacking in a foundation here, and so I'm going to sustain the

22   objection.  We can address some of the foundational questions

23   and then see if we have a subject that we can proceed with.

24   But it does lack a foundation at this point.

25               Counsel, see if we can lay a foundation for that.

*DIRECT - MAJOR DARREN GOODS*                                  59

1   Inquire if you wish to do so.

2              MR. McMULLEN:  Thank you, Your Honor.

3   BY MR. McMULLEN:

4   Q.     Major Goods, are you aware of the 1978 Kendrick

5   Consent Decree?

6   A.     Yes, sir.

7   Q.     Tell me your understanding of the limitations that MPD

8   has pursuant to the Consent Decree.

9   A.     Basically if there's any type of investigation that

10  involves any people or persons or groups that are involved in

11  political activities, then we are precluded from conducting

12  any kind of investigation on them as it relates to First

13  Amendment issues.

14  Q.     Okay.  Do you know if any other of the other agencies

15  that work in that Multi-Agency Gang Unit also have that

16  prohibition?

17  A.     No, sir.

18             THE COURT:  Any voir dire, Mr. Castelli, that you

19  wish on this question?

20             MR. CASTELLI:  I don't think so at this time,

21  Your Honor.  I may have some questions on cross-examination.

22  I would like to hear more.  Thank you.

23             THE COURT:  Sure.  That's fine.  Sure.

24  BY MR. McMULLEN:

25  Q.     Okay.  Can you explain whether this is a problem with

1    MPD -- the members of MPD who are on the Multi-Agency Gang

2    Unit, if there's difficulty with them functioning on the

3    Multi-Agency Gang Unit having to adhere to the Consent Decree

4    with other agencies who don't, or is there?  Can you explain

5    it?

6    A.    Yes --

7              THE COURT:  Let me -- let us rephrase that

8    question.  Does the Multi-Agency Gang Unit engage in

9    investigating individuals who are not involved or believed to

10   be or have probable cause to believe to be involved in

11   criminal activity?

12             THE WITNESS:  Yes, we do investigate individuals

13   that are involved in criminal activity.  As a matter of fact,

14   every -- any complaint, any type of investigation that we are

15   involved in, there is some type of criminal nexus

16   involvement.

17             THE COURT:  That's very helpful.  That's a good

18   place for us to start.

19             Counsel -- and just so it's -- we all understand,

20   you would -- because you're investigating only criminal

21   activity, you would not initiate, for example, an

22   investigation of someone in a City Councilman's office just

23   because they took a position contrary to the budget for the

24   MPD.

25             THE WITNESS:  Absolutely not, Judge.

*DIRECT - MAJOR DARREN GOODS*                                        61

1              THE COURT:  Okay.  I think that sort of frames it

2     a little bit.  And certainly, Mr. McMullen, go right ahead.

3              But we understand that they initiate inquiries,

4     investigations, when there is some indicia of criminal

5     conduct involved.

6              And did I say that correctly?  Did I say that

7     correctly in this matter?  I'm asking the witness on that.

8              THE WITNESS:  Yes, sir, that is correct.

9              THE COURT:  Okay.  With that framework, go right

10    ahead, counsel.

11    BY MR. McMULLEN:

12    Q.     Okay.  I want to follow up on this.  Everything -- in

13    my understanding from the voir dire from the Court, is that

14    everything that you all investigate has some criminal nexus.

15    Is that a fair -- I think that's a fair paraphrasing of what

16    the Court said, has some criminal nexus.

17    A.     Yes, sir.

18    Q.     Okay.  Do you sometimes receive -- do you ever

19    receive -- and tell me whether -- tell me if any that you --

20    tell me if any problems or hurdles that you encounter, based

21    on your understanding of the Consent Decree, that's operating

22    in the Multi-Agency Gang Unit.

23    A.     Yes, sir.  I guess one of the biggest problems is

24    really the different interpretations of exactly what the

25    Consent Decree kind of allows us, as Memphis Police officers,

*DIRECT - MAJOR DARREN GOODS*                                    62

1   to do and what some of those prohibitions are.

2          I think -- depending on who you're having a

3   conversation with, you're going to get a different

4   interpretation of exactly what that is.  For instance, you

5   may have -- City attorneys may think their interpretation may

6   be that, yes, we can continue to investigate anything of a

7   criminal nature.  In this case, you may have the plaintiff or

8   the ACLU attorney saying something different, even the

9   Monitor.  Or the Monitor takes the position that, you know,

10  there's a lot of things that we're not allowed to do, whether

11  it's of a criminal nature or not.

12         And if you look at -- kind of consider the, I guess,

13  the definition of political intelligence, it kind of runs the

14  spectrum of a lot of different things.  And if you just look

15  at just the verbiage that's in that definition, if I remember

16  correctly, it really doesn't tell us anything.

17              MR. McMULLEN:  What exhibit is that?

18              Your Honor, may I publish Exhibit Number 19?

19              THE COURT:  Yes, sir.  Go right ahead.

20  BY MR. McMULLEN:

21  Q.     And under that definition section, that is page

22  number 4.

23         Okay.  Yes, sir.  Continue on, you were talking about

24  the definition.

25  A.     So the definition of political intelligence, if you

1   look at subset number 4, political intelligence means the

2   gathering, indexing, filing, maintenance storage, or

3   dissemination of information, or any other investigative

4   activities relating to any person's beliefs, opinions,

5   associations, or other exercise of their First Amendment

6   rights.

7           You know, to me, in my layperson, I guess,

8   understanding of that is, if you go strictly by that, then

9   that really limits pretty much anything we do.  We can't

10  receive information from another agency.  We can't provide

11  them with information relative to -- even though it doesn't

12  mention criminal investigation here, it does talk about --

13  there's a clause that says, or any other investigative

14  activities.

15          So if you look at just -- to me, just the strict

16  verbiage that's contained in this definition, then that

17  severely limits anything that M.G.U. can be involved in or

18  the Memphis Police Department as a whole.

19  Q.      How many members of the Memphis Police Department are

20  in the M.G.U.?

21  A.      There are actually 27 officers, commissioned officers,

22  and one civilian employee.

23  Q.      Now, tell me some instances, without naming the names

24  of the potential person, where you all have -- where you all

25  have backed off an investigation because of what you

*DIRECT - MAJOR DARREN GOODS*                                          64

1    interpreted was prohibited by the Consent Decree.  Please

2    don't name names.

3    A.      Yes, sir.  Recently we received a citizen's complaint

4    about a location in the northern section of Memphis, where

5    there was a tremendous amount of gang activity, a lot of

6    shooting, a lot of drug activity.  It was pretty much an

7    open-air drug market, shootings all day, all night.  Just

8    young people just wreaking havoc in the neighborhood.

9            But because of where that location -- that house was

10   located, we knew that there were some individuals that

11   actually lived on that street or frequented that street that

12   does have those political activisms they're involved in.

13           So we just -- because we knew that, after we got the

14   complaint and we did a little research and found it exactly

15   was, because that information came up, then we stopped that

16   investigation.  And then had to go take additional steps to

17   allow -- I mean, to get permission from the Director for us

18   to continue with that investigation.

19           We primarily had to lay out pretty much the complaint,

20   the source of the complaint -- not necessarily the source of

21   the complaint but the type of complaint and the type of

22   criminal activity in order to get -- to receive

23   authorization.  It was sent up the chain of command to get

24   authorization for us to continue that investigation.

25           We completely stopped that investigation all together.

*DIRECT - MAJOR DARREN GOODS*                                        65

1   We didn't share the information with anyone else in the unit,

2   with ATF or anyone else, and just stopped it because of that.

3   Q.        And do you think adding to the confusion was the

4   phrase political intelligence?  How do you think your people,

5   MPD people, interpreted that phrase, political intelligence?

6   A.        I think from the MPD perspective, from our

7   perspective, the guys in the office, they think that

8   political intelligence is gathering information,

9   disseminating information, or filing information on people or

10  persons or groups that are involved in political-action-type

11  activity.

12          So with that being said, you know, that's kind of our

13  interpretation of it.  And when we come across someone,

14  whether they're named in the complaint or whether, you know,

15  we get information that they're involved in criminal

16  activity, even before we do any investigation, we make sure

17  that we get authorization to do such.

18          But, again, if you go back to this definition that's

19  in the Consent Decree, you know, that kind of really opens up

20  the landscape of exactly what political intelligence is.

21              MR. McMULLEN:  I want to go publish Exhibit 21,

22  Your Honor.

23              THE COURT:  Certainly.

24              MR. McMULLEN:  Modified definitions.  Scroll down

25  to number 5.

*DIRECT - MAJOR DARREN GOODS*                          66

1    BY MR. McMULLEN:

2    Q.      You're aware that the City has been working with the

3    ACLU on coming out with the modifications to the Consent

4    Decree?

5    A.      Yes, sir.

6    Q.      And one of those proposed modifications, number 5,

7    is -- the document before you you have the strike-through

8    changing the political intelligence to First

9    Amendment-related intelligence.  And can you just take a

10   moment and read that definition.

11          It's not your first time seeing this definition.

12   A.      No, this isn't.

13   Q.      Do you find that definition is more clear about what

14   type of intelligence that you need authorization to engage

15   in?

16   A.      Yes, sir.  This definition here just kind of takes out

17   a lot of the -- for my understanding, a lot of the ambiguity

18   that's in the original definition.

19   Q.      All right.  And I'm going to go back to something that

20   we were discussing later, and I want to make clear.

21          In M.G.U. do you ever -- do your counterparts, and I'm

22   talking about the other agencies, do they ever -- have you

23   ever seen them produce information that was not germane --

24   that didn't have a criminal nexus, but was for threat

25   assessment or criminal prevention or crime readiness?

*DIRECT - MAJOR DARREN GOODS*                                    67

1   A.      Yes, sir.

2   Q.      Okay.  Can you give an example of that?

3   A.      Recently there was -- I guess with all the protests

4   going on, the ATF sent out I think something called -- from

5   their fusion center or their intel group --

6   Q.      Did that get to M.G.U.?

7   A.      It comes to the ATF agents.

8   Q.      Okay.

9   A.      And then they will say, okay, this is some threats we

10  got towards police officers.  So it's not necessarily

11  Memphis, but these are threats that were made to either shoot

12  police or ambush police and that sort of thing.  So they will

13  push those things out, but that's not -- you know, it's not

14  happening here, it's not something that we act on.

15  Q.      Okay.  And I think from the Court's question, I think

16  what he -- well, the Court can correct me.  I want to get to

17  the heart of y'all investigate crimes with criminal nexus.

18          Do you or your counterpart get other information that

19  maybe -- that may not raise to the level of a crime, kind of

20  it will fall in the category, I think, of threat assessment

21  but not enough of a threat to arrest on, do y'all get that

22  type of information at M.G.U. that will give you a pause on

23  the definition of the First Amendment-related intelligence?

24          I think that will be -- I know that's what I'm trying

25  to determine.

*DIRECT - MAJOR DARREN GOODS*                                    68

1   A.       There's -- the information comes in to us at M.G.U.

2   from various sources, the information to ATF, FBI, TBI, and

3   that sort of thing with certain levels of threat assessments

4   that we do get on an occasional basis.

5   Q.       Okay.  But -- and so -- I understand.  That

6   information comes in.

7            Is it the type of information that M.G.U. -- and I'm

8   separating M.G.U. from MPD.  The type of information that

9   M.G.U. would need to act on?

10  A.       No, sir.

11  Q.       You just get -- it's just information.

12  A.       Yes, sir.

13  Q.       Okay.  So any information the M.G.U. would really act

14  on, is it fair to say -- and I want you to think about it --

15  it would have a criminal nexus?

16  A.       Yes, sir.

17  Q.       All right.  So I want to go next to -- I want to talk

18  about undercover accounts.  And I know that is a broad --

19  that is a broad term.  And, first, I'm going to ask how

20  you -- let's assume undercover accounts --

21           Well, tell me your understanding -- does M.G.U. have

22  undercover accounts?

23  A.       Does M.G.U. as a unit have an undercover account?  No.

24  Q.       Social media account?

25  A.       Yes, sir, I understand.  But do we have -- some of our

DIRECT - MAJOR DARREN GOODS                              69

1   investigators have UC undercover accounts, yes, that they

2   create on their own, that they maintain a password, login,

3   user name, that sort of thing, yes.  But those accounts are

4   strictly for those individual officers.  It is not something

5   where anyone can come in with a login and password and log

6   into kind of a general social media account and access that

7   particular platform.  So the accounts are to the individual

8   officers.

9   Q.     Why would someone in M.G.U. need a -- and I'm going to

10  just kind of phrase a term that I don't think it's been --

11  but let's call that an alias account.

12         Why would someone at M.G.U. need an alias account?

13  A.     Because a lot of the investigations that we're

14  involved in are exceptionally sensitive in nature.  And you

15  don't want to go to the social media platform as Darren

16  Goods, so to speak and --

17  Q.     Why wouldn't you want to go on the platform as Darren

18  Goods?

19  A.     Because then people find out -- if I use my own, just

20  say, whatever social media account to do searches that are

21  involving gang members or some type of crime that we are

22  actively investigating, then when I'm doing those searches

23  and when I'm doing that investigation, that opens me up to

24  potentially the target that we are investigating,

25  identifying -- then they can identify who I am, who my kids

*DIRECT - MAJOR DARREN GOODS*                                    70

1    are, my family, my friends.  And then, you know, there is

2    some -- could be very well catastrophic consequences to that.

3        I'll give an example of just something that happened

4    recently, but we had been able to stop it before it got to

5    that point.

6        We had a Memphis Police officer's wife who was on a

7    social media platform.  And she was engaged in conversation

8    with someone on that platform who identified himself as a

9    gang member in Memphis.  They went back and forth.  And this

10   particular person found out where this young lady worked and

11   started sending threatening messages to her work.  And he

12   also found her home address, and posted her home address, and

13   made threats to harm her and her family.

14       So, it's a situation where one of my officers -- or

15   just say me.  If I'm involved in that investigation, then I

16   certainly don't want those targets to know who I am, where I

17   live, where I work, because I expose my entire family, I

18   expose my friends.  Because there could be some type of

19   violence repercussions.

20   Q.    Okay.  Let's talk -- because I'm going to try to

21   differentiate different types of accounts.

22       Let's say on the alias account that an officer has,

23   that he logs -- he can log into it.  You can't log into it as

24   his boss.  It is his personal account; is that correct?

25   A.    That's correct.

*DIRECT - MAJOR DARREN GOODS*                              71

1   Q.       Okay.   Are those accounts ever used to friend or

2   infiltrate any type of group, or are they used primarily for

3   searching and personal stuff that the officer wants to do?

4   A.       Those accounts are used primarily for searching and

5   looking for evidence of crime and probable cause.

6   Q.       Okay.   On those alias accounts, do you ever plan to

7   join some group under some assumed name just -- and I'm

8   talking about alias accounts.   I'll get to the other types of

9   accounts.   But --

10  A.       Not on alias accounts.

11  Q.       Okay.   Now, you do have some officers in M.G.U. who

12  are -- forget social media accounts.   They are undercover

13  sometimes.

14  A.       Yes, sir.

15  Q.       Okay.   Now do those -- this is the second type of

16  account.   Do those officers have accounts that may be

17  associated with their undercover identity?

18  A.       Yes, sir.

19  Q.       Okay.   And tell me, on those accounts, keeping certain

20  intelligence as close to the vest as possible.

21  A.       Well, those officers have received formal training in

22  undercover operations and they create their undercover

23  account using those things.   And they oftentimes will use

24  their account to friend different gangs, different people

25  that are involved in criminal activity, where there is a

DIRECT - MAJOR DARREN GOODS                                72

1    criminal nexus where they are investigating -- where they are

2    actively investigating some type of alleged crime.   They

3    don't use those accounts just willy-nilly to do searches and

4    that sort of thing.   But they are searching -- when they're

5    on those social media platforms, they are actively involved

6    in the criminal investigation.

7    Q.       And I want to kind of depart a little bit.

8            Now, the search terms that will be -- that can be

9    drawn from that search history, tell me how sensitive those

10   terms are, if they inadvertently get out.   Tell me about the

11   search terms.

12   A.       The search terms from not only the UC account but the

13   alias accounts are very sensitive.   And if they end up in the

14   wrong hands, that can be catastrophic as well.

15           For instance, we may have a situation where we're

16   investigating, you know, Gang X, or individuals in Gang X

17   that are involved in murders, shootings, robberies, drug

18   sales, selling guns, and we may have someone that is a source

19   that's providing us intel.   And some of those searches, some

20   of those search terms may be terms that our investigators

21   glean from those sources.   And if -- some of these gang

22   members are very technologically savvy.   And if they were --

23   had access to some of those search terms, it probably

24   wouldn't be hard in some cases to figure out who the source

25   is, who that source of information is.   And that could prove

*DIRECT - MAJOR DARREN GOODS*                              73

1  to be catastrophic, not only to the source, the human source

2  they are using, but if one of our investigators is maybe even

3  introduced to a target by a source, that could be

4  catastrophic to him as well.

5       We've got an officer -- a sergeant in our office now

6  who was working a source, a human source, and this source

7  made the mistake and told a very good friend of his, a

8  relative, that he was working with this officer.  Well, it

9  got back to the gang that we were investigating and they

10 killed him.

11 Q.    Oh, wow.

12      All right.  So needless to say, the search terms there

13 are very, very sensitive.

14 A.    Yes.

15 Q.    Okay.  Let's go to what I call the -- I mean, I

16 divided them into different accounts, and I'm going to call

17 this a safe account.  And I'm going to describe it like the

18 Bob Smith account.  Okay?

19      Do you all have any accounts like this where it's just

20 totally a fake account, not an account having to do with an

21 alias that actually is to somebody or what you call a UC

22 account, a true undercover account, do y'all have any

23 accounts like that?

24 A.    No, sir.

25 Q.    And has M.G.U. ever had any accounts like the Bob

DIRECT - MAJOR DARREN GOODS                              74

1   Smith account?

2   A.      No, sir.

3   Q.      Now, I divided these up into three different accounts.

4   Have I missed any form of undercover social media account

5   that M.G.U. uses in fighting crime?

6   A.      No, sir.

7   Q.      All right.  I want to go to Definition 8 in

8   Exhibit 21.  And you see this is the proposed modification

9   that the ACLU and City of Memphis proposed to the Court.  And

10  reading that definition of undercover account, do you think

11  you can effectively operate M.G.U. with that definition?

12  A.      Yes, sir.

13  Q.      And I think I asked you this before, but when you

14  talked about the definition of First Amendment-related

15  intelligence, we took out the phrase political intelligence

16  and we put, really, a number 5.

17          Does that definition provided some clarity?

18  A.      Yes, sir.

19  Q.      Do you think with that definition, not only can you

20  articulate it to the 20 or so members of MPD, but also the

21  other members of M.G.U., don't you think it's important for

22  them to understand the limitations of which y'all are

23  dealing?

24  A.      Yes, because we all are in the office together, we're

25  all working together, and everyone completely has a good

*DIRECT - MAJOR DARREN GOODS*                                     75

1   understanding of these definitions and what we can and can't

2   do.

3   Q.       Now, M.G.U., as I understand it, as you've testified

4   here today, operates -- I mean, y'all really -- everything

5   you do for law enforcement purposes has criminal nexus that

6   get us --

7   A.       Right.

8   Q.       Now, I want to go to definition number 3.  Just take

9   your time and read that definition of legitimate law

10  enforcement purpose.  And that wasn't -- that's not a term in

11  the original Decree.  But I want you to read that definition

12  and tell me whether you would be -- whether that in any

13  way -- whether you could operate M.G.U. sufficiently under

14  that definition of legitimate law enforcement purposes.

15  A.       Yes, sir.

16  Q.       Now, I want to go back to how y'all operate.  Do y'all

17  ever get involved -- does M.G.U. ever get involved when

18  there's, like, a school threat on social media, when someone

19  threatens, you know -- and I'm not talking about a threat

20  arising to the level of tracking down and arrest.  I'm

21  talking about a threat that, like, oh, of something will

22  happen Monday, just wait and see, or something like that.  Do

23  y'all ever get involved in those type of things that don't

24  rise to the level of a criminal threat?

25  A.       Yes, sir.  We get complaints all the time from various

UNREDACTED TRANSCRIPT

*DIRECT - MAJOR DARREN GOODS*                                    76

1   members of Shelby County School System Security Team.   Some

2   of our guys have relationships with the Shelby County Sheriff

3   deputies that are responsible for security of schools.   And

4   we'll get calls and emails and complaints from them that

5   there may be something or some kind of threat that's going to

6   happen, the kids are talking about, or they're posting on

7   social media, that there will be some kind of gang fight or

8   gang shooting or some type of retaliatory criminal acts of

9   violence on a student or a group of students or at this

10  location.   And we will get involved in those and try to

11  figure out, you know, who the actors are, who posted the

12  threat, whether that is a legitimate threat.   If the person

13  who posted the threat has means to carry the threat out.

14  But, yes, we will actively get involved in those.

15          And oftentimes we find out that it's -- sometimes we

16  find out that it just may be a kid that's, you know, just

17  kind of spouting off, so to speak.

18  Q.      And the use of that information may come in from

19  school security or someone else?

20  A.      Yes, sir.   That comes primarily through school

21  security, there's board members, as far as security

22  personnel.

23          And they even have Shelby County Police officers in

24  the school, we get complaints from them, Shelby County

25  Sheriff's deputy, which is a full-time commissioned deputy in

*DIRECT - MAJOR DARREN GOODS*                                    77

1   the schools.

2   Q.      Now, that information you wouldn't really know how

3   they got it -- how that school security force, or whatever,

4   got that information.

5   A.      That's correct.

6   Q.      But if -- assuming -- and I don't think that situation

7   is addressed in the original Consent Decree.  But, you know,

8   there's certain clarification by the Court as to information

9   you can receive and it does not violate the Consent Decree.

10          Do you think you would be comfortable with those

11  clarifications?

12  A.      Yes, sir.

13  Q.      Would it help you if they are -- to use a term in the

14  legal industry, codify.  Would it help you if those were

15  written into the Consent Decree?

16  A.      Yes, sir.  Because if it's codified and it's in there,

17  if it's a clear definition, then it kind of removes all of

18  the different interpretations.  It removes any ambiguity and

19  it gives our officers the clear understanding of what they

20  can and cannot do.

21  Q.      And now y'all will get that information, okay, I'm

22  going to do something to the school.  My understanding, based

23  on the name of your unit, y'all are really interested in

24  gangs.

25          When you get that, do you do a vetting whether this is

UNREDACTED TRANSCRIPT

*DIRECT - MAJOR DARREN GOODS*                              78

1    a gang name or just something else?  And the second part of

2    my question, if you do it that way, do you send it off to

3    another unit when you figure out it's not a gang, or do you

4    keep it?

5            Tell me -- and let's go back to the example.  I'm

6    going to do something at XYZ School.  Some kid on social

7    media.  Not planning to blow up, not planning to shoot

8    nobody, but let's call it veiled threat.  Y'all get that type

9    of information; right?

10   A.     We will get that, yes, sir.

11   Q.     All right.  Walk the Court through that -- because

12   you're a gang unit, so you get that information.  Tell me --

13   walk through how that is handled.

14   A.     So we get that information.  We get that complaint.

15   We'll look at it and then we will assign it to one of our

16   investigators.  We will also assign it to someone involved in

17   our crime analysis unit.  And then collectively --

18   Q.     And person could be a part of any of the agencies that

19   you named.

20   A.     That is correct.  Yes, they will start an immediate

21   investigation, trying to determine the veracity of the

22   complaint, trying to identify not only the target of the

23   complaint, but we also, of course, try to identify the person

24   making the complaint -- that's making the threat.

25           And then we also are looking to see if any of these

*DIRECT - MAJOR DARREN GOODS*                               79

1    people, whether they be the target or the person making the

2    threat, are they affiliated or do they have any kind of gang

3    affiliation.

4            If they do have gang affiliation, then that just

5    simply becomes another part of the investigative process.  If

6    we're not able to determine if they have gang affiliation,

7    that doesn't preclude us from continuing to investigate.

8    Q.      Would you ship it out of M.G.U.?

9    A.      It is really going to depend on the actual complaint.

10   Now, what we uncover or what did we discover in the initial

11   complaint.

12           If it's something that we can handle and just by

13   simply maybe going and talking -- we identified the person

14   making the threat, we talk to the child, talk to the child's

15   parents, and talk to the target or whatever the case may be,

16   then we try to resolve it that way.

17           If we need to conduct a more long-term investigation,

18   then we will do that.  If we need other resources to reach

19   out to maybe a task force or precinct, and say there's a

20   complaint here that there's some kind of shooting or some

21   kind of fight that's going to take place at this school on

22   this day.  And then we find out that that's something that

23   can be handled by the precinct, whether it's gang -- whether

24   there's a gang nexus or not, if it's something that can be

25   handled by the precinct or maybe they can create a direct

*DIRECT - MAJOR DARREN GOODS*                              80

1   patrol to the area, then we will pass it on.  And we will get

2   the precincts to work with us.  So it really kind of depends

3   on the complaint.  It depends on what we're able to uncover

4   during the course of the investigation as far as which

5   direction we go.

6          But we keep a lot of those complaints, and we try to

7   follow them through conclusion.  But we will send those maybe

8   to a precinct if we feel that it's just a veiled complaint

9   and it can be handled by a direct patrol, have the ability

10  around school, after school, before school, or in the

11  neighborhood, then we will -- we have passed it off to the

12  precincts to handle that.

13  Q.     Tell me about the oversight of M.G.U.  Tell me about

14  the hierarchy in the reporting.  Do y'all -- do you report to

15  a board?  Just explain all that to the Court.

16  A.     The Multi-Agency Gang Unit is governed by the

17  six-member executive board that I spoke of, those six

18  agencies.  And then I am the Operations Commander, so I'm

19  responsible for the day-to-day operations of the unit at the

20  direction of the executive board.

21         So we do weekly reports.  We do monthly reports.  We

22  do quarterly reports and we do an annual report.  And the

23  monthly, quarterly, and annual report are all submitted to

24  the executive board for their review.

25         Kind of the weekly reports, we kind of disseminate

*DIRECT - MAJOR DARREN GOODS*                                      81

1   those kind of in-house to kind of see where we are, what type

2   of investigations are we working on, what are the stats.  And

3   we also report them to Shelby County Sheriff's Department as

4   well as the Memphis Police Department.

5   Q.      Let's go back to the original Decree, which is

6   Exhibit 19.  Under I, restriction on joint operations.

7           Now, this is the original Decree.  When you read this

8   Decree, tell me your interpretation of this.  I mean, I know

9   you've read it several times and you've talked about it

10  several times.  But is that -- the way that it's written

11  somewhat give you pause about your whole operation?

12  A.      That maybe we need to close up shop and go home.

13  Q.      Okay.  But tell me what about that phraseology or

14  terminology would make you think that.

15  A.      It pretty much says that we're not allowed to do

16  anything.  We can't share information with anyone.  We can't

17  receive any information from anyone.  And if we just look at,

18  I guess, just the verbiage that's there, the defendants and

19  the City of Memphis shall not encourage, cooperate with,

20  delegate, employ, contract with or act at the behest of any

21  local, state, federal, or private agency, or any person, who

22  plans to conduct any investigation, activity or conduct

23  prohibited by this Decree.

24              THE COURT:  Let me ask this.  Do you engage in

25  investigations of First Amendment activity that's not

*DIRECT - MAJOR DARREN GOODS*                                          82

1   criminally related?

2                  THE WITNESS:  No, sir, we do not.

3                  THE COURT:  Okay.

4                  THE WITNESS:  Not at all.

5                  THE COURT:  Well, let's go back.  I'm not saying

6   we need to keep the language.  I'm just -- let's make sure

7   we're focused on what the prohibitions is.  And I'm going to

8   let counsel redirect that, because it's a little tough to ask

9   the Major something that -- would you go through that,

10  Mr. McMullen, so we can focus on it a little.

11                 MR. McMULLEN:  Yes, Your Honor.

12                 THE COURT:  So we need some -- if this needs to

13  be revised, we need some thoughts about how that might be

14  done.

15  BY MR. McMULLEN:

16  Q.     That is one section that the City and the ACLU has not

17  been able to come to an agreement on the language.

18         What types of things do you think should be in here

19  which would, you know, be kind of clear to you and you can

20  clearly articulate to your commend staff when they see

21  restrictions on joint operations?  Just tell me -- and I

22  know -- I know I want to wordsmith it for you here, but tell

23  me -- just give me a framework of what you would like to --

24  what gives you some comfort in reading that that you can

25  articulate it to the other agencies, you can articulate it to

*DIRECT - MAJOR DARREN GOODS*                                    83

1   your 28 guys of MPD.

2   A.      That is a very good question.  I don't -- just reading

3   this -- first of all, my interpretation of this is that if we

4   went strictly by the letter of this definition, then we are

5   really not allowed to do anything.  Ninety plus or for a vast

6   majority of all the work that we do has some components where

7   we're sharing intelligence, we're sharing information.  It's

8   all of a criminal nature.

9   Q.      Would something in there, like --

10          THE COURT:  Let's just go back and help focus a

11  little bit on that, Mr. McMullen.  Because nothing prohibits

12  anybody from working on a criminal case.  I think there

13  may -- but clearing up confusion is very important.  And so

14  what would help Major Goods in clearing up any confusion.  I

15  mean, I think that's what you're getting at.  Is that right,

16  Mr. McMullen?

17          MR. McMULLEN:  Exactly.  We are not asking the

18  Court to vacate.  We're asking the Court to modify.  And we

19  want to clear it up -- clear up the confusion.  So I was

20  going to suggest some buzz words, and I don't mean to craft

21  the language here through this witness.

22          THE COURT:  I'm going to invite you to go ahead

23  and maybe ask a little more of a leading question.  I'm not

24  pushing you to do that, but I think that's the permission you

25  asked for.

UNREDACTED TRANSCRIPT

*DIRECT - MAJOR DARREN GOODS*                                    84

1              MR. McMULLEN:  Yes, Your Honor.  Yes, that's

2      exactly.

3      BY MR. McMULLEN:

4      Q.     If you had some language in it, is it a fair

5      assumption to the extent -- and I want to -- do we have --

6              MR. McMULLEN:  Okay.  I want to publish some

7      proposed language from Defendant's Exhibit 4.

8              THE COURT:  Yes, sir.

9      BY MR. McMULLEN:

10     Q.     And I know you didn't come here intending to have to

11     interpret language, but it will be helpful, I think, to the

12     Court to understand what's clear for you and your guys in the

13     M.G.U. so they can operate and not being challenged.

14             All right.  So this here, the defendant and City of

15     Memphis shall not encourage, delegate, employ, or contract or

16     act at the behest of any local, state, federal, or private

17     agency or any person, to plan or conduct any investigation,

18     activity, or conduct prohibited by the Decree.

19             Is that -- that's from the original?

20     A.     That's correct.

21     Q.     And in here, there's an in other words explanation.

22     In other words, the City may not direct another agency to act

23     as its surrogate to violate the Decree or accept information

24     that the City knows or should reasonably have known was

25     collected in a manner that would violate the Constitution.

*DIRECT - MAJOR DARREN GOODS*                                    85

1          All right.  Then the second part is, under this

2    section the City may receive information --

3          And this is the part that you want to know what can

4    you do.

5    A.      Yes, sir.

6    Q.      All right.  Under this section, the City may receive

7    information from other entities that does not constitute

8    First Amendment-related intelligence.  And we know --

9               MR. GLOVER:  Does constitute.

10   BY MR. McMULLEN:

11   Q.      Yes.  That does constitute First Amendment-related

12   intelligence for a legitimate law enforcement purpose

13   provided that the City may not act upon such information

14   without obtaining an authorization pursuant to Section G.

15          So back to what the Court has said, articulate

16   understanding, if it's going to involve First

17   Amendment-related intelligence, you get an authorization.

18   A.      Yes, sir.

19   Q.      Okay.  The City may not act upon or catalog

20   information from other agencies constituting First

21   Amendment-related intelligence that is unrelated to any

22   legitimate law enforcement purpose.

23          And, remember, at M.G.U. you said sometimes ATF would

24   come in there with threat assessment information that has

25   nothing to do with First Amendment.  If that may have to do

*DIRECT - MAJOR DARREN GOODS*                                    86

 1   with First Amendment, and this just said you can't catalog or

 2   keep it.

 3   A.      Yes, sir.

 4   Q.      And then the last sentence.  Nothing in this section

 5   shall preclude the City from receiving tips from non-law

 6   enforcement agencies or individuals.

 7           That allowed you to -- would that allow you to feel

 8   comfortable and be able to articulate to your command staff

 9   that they can operate, receiving these tips, receiving this

10   information?  But if it's something that is not to do with --

11   is kind of a threat assessment, no criminal nexus, you don't

12   catalog, keep it, you don't participate in that.

13           Do you think that would be a clearer -- a more

14   articulable section that you could articulate to your command

15   staff and train and teach and they could operate?

16               COURT REPORTER:  I'm sorry, I didn't hear an

17   answer.

18               THE COURT:  I'm sorry.  We couldn't hear the

19   answer there.  It may have been -- I couldn't hear it either.

20   So, Major, I'm sorry, would you repeat your answer or answer

21   initially on that.

22               THE WITNESS:  My answer was yes, sir.

23               THE COURT:  Okay.  We're going -- I think we need

24   to mark what was initially number 4 from the City, this is

25   the revised language that's proposed, as the next numbered

*DIRECT - MAJOR DARREN GOODS*                                    87

 1  exhibit since we've talked about it and we certainly need it

 2  in that context and with the testimony of Mr. Goods.   So

 3  we're going to mark that.

 4              Is there any objection, Mr. McMullen?   We'll make

 5  that 25.

 6              MR. McMULLEN:   No, Your Honor.

 7              THE COURT:   Okay.   We'll mark and receive.

 8              No objection from Mr. Castelli for receiving

 9  that?

10              MR. CASTELLI:   Not to the Court receiving it, not

11  at all.

12              THE COURT:   All right.   So we've marked and

13  received that as 25, and that's the City's -- it's a proposal

14  as to revision of "I" by the City.

15         (No. 25 was marked and received into evidence.)

16  BY MR. McMULLEN:

17  Q.    All right.   Do you think the Multi-Agency Gang Unit

18  has been a valuable crime fighting unit for the City of

19  Memphis?

20  A.    Absolutely.

21              MR. McMULLEN:   Your Honor, if I could take two

22  minutes.

23              THE COURT:   Certainly, that's fine.   Absolutely.

24  Take a look at your notes and we'll see where we are.   And we

25  may take a short break after this, because Mr. Castelli will

DIRECT - MAJOR DARREN GOODS                          88

 1  be next.  And we kind of have a situation where we need a

 2  short staff break here.  So just let me know and tell me if

 3  you've got any more questions, we'll ask those; otherwise,

 4  we'll take a short break.

 5                  Anything else from the City?

 6                  MR. McMULLEN:  Your Honor?

 7                  THE COURT:  Yes, sir.

 8                  MR. McMULLEN:  I have one other question to

 9  Major Goods.

10                  THE COURT:  Certainly.

11  BY MR. McMULLEN:

12  Q.      Major Goods, now we have put forth Exhibit 25.  But

13  you're aware the Court has made some clarifications under

14  Section I that may be different from that language.  You're

15  aware the latitude that those clarifications have given you

16  and M.G.U. as far as being able to participate.

17          And is it your position, whether you take our language

18  or some language from the Court, do you want more clarity for

19  your officers and more clarity about the latitude in which

20  y'all can operate in and where the bumper rails are?

21  A.      Yes.

22                  MR. McMULLEN:  Those are all my questions, Your

23  Honor.

24                  THE COURT:  Okay.  What we're going to do is we

25  are going to take that short break.  I think it's probably

UNREDACTED TRANSCRIPT

1    helpful to everyone.  It will be about an eight to ten-minute

2    break.  I'll come back in eight minutes.  And if everybody's

3    ready, we'll proceed at that time.  But this is a restroom

4    break, and, of course, we will have a lunch break at about

5    12:15.  So we'll see everybody -- remember, leave your mics

6    on.  You have a hot mic, so you may want to step away from

7    your microphone if you confer with someone.

8            All right.  Thank you very much.

9       (Recess was had at 11:31 a.m. and resumed at 11:47 a.m.)

10           THE COURT:  Let me make sure we've got everybody

11   up and get our -- have out witness visible.  Yes, we do.

12   Absolutely.

13           Major, you okay?  They asked to -- they said

14   people were fading just a little bit on their voices at the

15   end.  That's sort of normal.  Just ask everybody to speak up

16   just a little more because the court reporter reported that

17   people were showing they were a little tired and she just

18   wants you to speak up a little bit.

19           Okay.  Mr. Castelli, any questions for

20   Major Goods?

21           MR. CASTELLI:  Yes, Your Honor.

22           I just want to make sure.  Major Goods, is your

23   mic on?

24           THE COURT:  Yes, Major Goods --

25           THE WITNESS:  Yes, sir.  Can you hear me?

*CROSS - MAJOR DARREN GOODS*                                    90

1             MR. CASTELLI:  Okay.

2             THE COURT:  Good.

3             MR. CASTELLI:  Okay.  I just wanted to make sure.

4             THE COURT:  Thank you.

5                      CROSS-EXAMINATION

6    BY MR. CASTELLI:

7    Q.      All right.  Good morning, Major Goods.  Tom Castelli,

8    and we've met before.  I just have a couple of questions I

9    want to review with you.

10            First, just kind of put a place to start.  Would you

11   agree with me that in your experience as a police officer

12   that we ask police officers to know a lot of different types

13   of laws; is that correct?

14   A.      Yes, sir.

15   Q.      You have to know criminal statutes that you're

16   enforcing?

17   A.      Yes, sir.

18   Q.      And you have to know the constitutional provisions,

19   like the Fourth Amendment that might apply to a search

20   warrant?

21   A.      Yes, sir.

22   Q.      All right.  And that's like the U.S. Constitution and

23   the Tennessee Constitution, they're slightly different at

24   some points; is that correct?

25   A.      Yes, sir.

                    UNREDACTED TRANSCRIPT

CROSS - MAJOR DARREN GOODS                              91

1   Q.      All right.  And does the -- how many members of the

2   Memphis Police Department are in the gang unit?

3   A.      27 commissioned, one civilian.

4   Q.      Okay.  So those officers also -- are they also having

5   to understand and know the various policies and practices of

6   the Memphis Police Department?

7   A.      Yes, sir.

8   Q.      All right.  Are there policies that are specific just

9   to the gang unit?

10  A.      No, sir.

11  Q.      Okay.

12  A.      Not that I'm aware of.  No, sir.

13  Q.      All right.  So -- but you would agree there's a lot of

14  different information out there that the police officers have

15  to learn and they have to get training on; correct?

16  A.      Yes, sir.

17  Q.      All right.  Has your unit received training on the

18  Consent Decree?

19  A.      Yes, sir.

20  Q.      Okay.  All right.  You gave us a really thorough

21  description of kind of the types of things the gang unit is

22  interested in, the types of investigations that you do.  Are

23  there times, though, where the gang unit officers are called

24  on to assist other departments in the Memphis Police

25  Department?

*CROSS - MAJOR DARREN GOODS*                                    92

1   A.      Yes, sir.

2   Q.      So they might be called out to maybe provide or be

3   present at, say, a rally or a protest?

4   A.      Yes, sir.

5   Q.      And maybe if there are arrests that happen at that,

6   then gang unit officers have made those arrests?

7   A.      Yes, sir.

8   Q.      And that's not -- they're not really operating at that

9   point as part of the gang unit, are they?

10  A.      No, sir.

11  Q.      Okay.  You had talked about -- given an example in

12  your testimony about a citizen's complaints about gang

13  activity and the, I think, the North Memphis area, where

14  there was drug dealing and shootings that were going on?

15  A.      Yes, sir.

16  Q.      All right.  And I believe, and correct me if I'm

17  wrong, but I believe your testimony was that the problem that

18  came up was that, I guess as you were investigating that, you

19  came upon information that there were people that lived on

20  the street that were involved in some kind of political

21  activity or free speech-related activity?

22  A.      Yes, sir.

23  Q.      Okay.  Were they -- well, first of all, and that led

24  you to try to seek authorization from the Director to

25  continue your investigation.

CROSS - MAJOR DARREN GOODS                                    93

1    A.      Yes, sir.

2    Q.      Do you remember approximately when this situation

3    occurred?

4    A.      I received a complaint probably about three weeks ago,

5    and we had authorization about a week or so ago, and we

6    continue with the investigation.

7            However, the complaint had nothing to do with the

8    individuals that were -- that are involved in the political

9    active activity.  They were not even related to the actual

10   complaint.  The complaint had nothing to do with them.

11           However, because the complaint was on the same street

12   that they live or have relatives to live, we just felt that

13   we needed to get authorization to move forward with the

14   complaint on the other location.

15   Q.      And so these -- whoever they were, these particular

16   individuals' political or ideological beliefs or

17   associations, they had nothing to do with the criminal

18   investigation that you were conducting.

19   A.      Correct.

20   Q.      And they weren't potential witnesses or victims or

21   anything?

22   A.      I guess in the grand scheme of things, if we dig down

23   to the weeds of the investigation, there is a -- there could

24   have been a chance that they were witnesses.  Because, like I

25   said, the complaint was basically there's an open air drug

UNREDACTED TRANSCRIPT

*CROSS - MAJOR DARREN GOODS*                                        94

1    market and gang meetings and congregation.  So I guess at

2    some point they could have been potential witnesses.  But

3    with some of the shots being fired, they potentially could

4    have been a victim as well.  But they were not the target of

5    the actual criminal complaint.

6   Q.     Do you know how long it took from when you requested

7    authorization to when you received that authorization from

8    the Director?

9   A.     Well, the authorization -- about a week before my

10   chief, who we sent it to my chief, I guess it was about a

11   week before he got back with me and said that we could move

12   forward because it was a criminal investigation that did not

13   involve those political individuals.

14  Q.     Okay.  Can you explain how you came to know that these

15   particular individuals lived on that street or in that area?

16  A.     Because we made an arrest in the past, a young man who

17   is actively involved in some of these political activities,

18   he was in a vehicle, we conducted a traffic stop, and he

19   pulled into a driveway at one of the locations on that

20   particular street.  He eventually -- he tried to run.  He was

21   eventually arrested.  And he was charged with felon drug

22   possession.

23        And while we were out there conducting that

24   investigation, there were other people that came out and

25   began to stream, video stream us live that we were conducting

CROSS - MAJOR DARREN GOODS                                95

1    the investigation.  We also served a search warrant for drugs

2    on another house on that street where those people were --

3    had some connections with family members that were actively

4    involved in some level of political activism.

5          So we were aware that -- but we made the arrests, we

6    served the search warrant.  So we were aware of that when we

7    got the information about the complaint, and it was actually

8    in the same area as those activists were living with those

9    connections is how -- is why we stopped it and asked for

10   authorization to proceed with the investigation.

11   Q.     So the individuals that were involved in whatever

12   political activity were just -- were they just known to

13   members of your team, or did you -- how did you know that

14   they were involved in any particular type of activity?

15   A.     Once we made the arrest on the one individual, once he

16   got out of the car and tried to run, he was apprehended.  We

17   realized who he was.  And when they took him into custody,

18   the supervisor called me and explained to me who the subject

19   was and that they had him in custody.  I did notify my chain

20   of command who the subject was, what the specifics

21   surrounding his arrest was.  So that's how we knew who he

22   was.  We had no idea who he was before the traffic stop.

23   They determined who he was after he was actually taken into

24   custody.  He's an individual that's kind of well known as one

25   of the political activists in this area.

*CROSS - MAJOR DARREN GOODS*                                    96

1        The activist who was videotaping us live, the officers

2   actually saw him out there, so we knew who he was.

3        The location where we executed the search warrant, we

4   did not know that that particular location was connected to

5   any activist, until we were done with the actual searching,

6   but not during the course of the search warrant.

7   Q.     Okay.  Also, earlier in your testimony you had talked

8   about -- I think Mr. McMullen had asked you about threat

9   assessments.  Is that something the gang unit is involved in

10  in formulating or making these threat assessments?

11  A.     No, sir.

12  Q.     Do you have an understanding of what type of threats

13  are being assessed in a threat assessment?

14  A.     The ones that we get are normally talking about

15  threats against police, threats -- either shootings or

16  looting and rioting and that sort of thing.  And then they

17  normally reference another city or another agency where there

18  have been shootings -- I mean, where there are those types of

19  activities.  And it's just kind of a situational awareness

20  kind of thing.

21  Q.     But kind of a situation of there have been threats of

22  violence against officers in another city, you just need to

23  be aware in case you come across information of similar

24  threats of violence in your area?

25  A.     Yes, sir.

                    UNREDACTED TRANSCRIPT

CROSS - MAJOR DARREN GOODS                            97

1   Q.      Okay.   Another discussion you had with Mr. McMullen

2   was the undercover accounts.   And I want to try to clarify a

3   few things just so I know I understand what your testimony

4   was.

5          I think Mr. McMullen used a term of aliases account.

6   Can you tell me what that definition means to you, what alias

7   account means to you.

8   A.      An alias account is a social media account that

9   someone will create and kind of use it kind of in a name

10  other than their own.   And kind of use that -- like, our guys

11  will kind of use that to just kind of do some searches.   Some

12  of the search terms, during our investigations, they kind of

13  use that.

14  Q.      All right.   Are those types of accounts -- I mean,

15  what I'm taking from that is it might just be something you

16  create that's got, you know, a fake name and information, but

17  you're just using it for, kind of, those searches.   It's not

18  something you would use to -- as part of an undercover

19  identity; is that right?

20  A.      That is correct.

21  Q.      All right.   So there would be another type of account

22  that might have more thought and time put in to help create

23  an undercover identity for an officer; is that right?

24  A.      Yes, sir.

25  Q.      Okay.   There was some testimony earlier in the week

*CROSS - MAJOR DARREN GOODS*                                          98

1   about -- that you may or may not have been present for --

2   about social media accounts where someone is actually

3   impersonating a real person.  So if I create an account that

4   was -- and try to say I was Major Goods, that would be me

5   impersonating you through a social media account.

6           Does M.G.U. run any type of accounts like that?

7   A.      No, sir.

8   Q.      Okay.  So, really, just talking about these kind of

9   alias accounts that are used for searches, and then these

10  more maybe structured and fully-realized undercover accounts

11  that are used in the police work of trying to solve -- or

12  trying to infiltrate or do the undercover work; is that

13  right?

14  A.      Yes, sir.

15  Q.      Okay.  You had mentioned that, like, one of the

16  reasons for these alias accounts for the searches, that there

17  might be some exposure there when you are doing the searches?

18  A.      Yes, sir.

19  Q.      Okay.  Can you just explain to me what -- someone

20  that's using an account to search for information on social

21  media, how somebody could learn that they're doing that,

22  they're making those searches?

23  A.      Yes, sir.  There's one social media platform that if

24  you are searching -- let's say, for instance, you aren't

25  Darren Goods and you're searching Darren Goods.  And then at

1   some point Darren Goods, me, I'm going to get a notification

2   from the social media platform that it's going to tell me

3   that -- it's going to suggest that I reach out to you because

4   I may want to friend you, and send you a friend request so

5   that you can be one of my friends on my social media

6   platform.

7           So if I'm using my real name, real social media

8   account, and I'm doing these searches, and James -- I'm

9   searching James Bond, James Bond at some point is going to

10  get a message from this social media platform saying that,

11  hey, you may know Darren Goods and you might want to friend

12  him.  And then James Bond realizes -- looks at Darren Goods'

13  page, and realizes I'm a police officer, and then he is

14  doing -- he's involved in a lot of criminal activity.  Then

15  that absolutely not only exposes me, but it exposes every

16  friend, every family member, every person that are my friends

17  to James Bond.  If that makes sense.

18  Q.    No, that's very helpful.  And to follow up on that, I

19  would imagine it would also tip that person off that maybe

20  they're under some kind of investigation.

21  A.    Absolutely.

22  Q.    Okay.  That's extremely helpful.

23          Those types of accounts that you might use to, I

24  guess, create some kind of obfuscation of who is searching,

25  are those also used to, like, actually engage individuals on

1  social media?

2  A.      We don't initiate any engagement, but if -- using the

3  alias accounts.  But if someone wants to be a friend with us,

4  then we're going to friend them.  And if they want to engage

5  in conversation with us, then there are times when we will do

6  that.

7          But the UC accounts are primarily used where --

8  there's a lot of drugs being sold on the internet on social

9  media, a lot of guns are being sold, there's human

10  trafficking.  And we may be searching someone that we got a

11  complaint on that may be selling drugs.  And we may engage

12  them to try to buy drugs or try to buy guns or to try to buy

13  a human, try to buy people for sex or whatever the case may

14  be.

15  Q.      Have you reviewed the proposed modifications?  I think

16  you looked at it with Mr. McMullen.

17  A.      Some of it, yes, sir.

18  Q.      Yeah.  And that's been marked and admitted as

19  Exhibit 21.  I'm going to pull it up to my screen.

20          All right.  Major Goods, can you see that on your

21  screen, or do you have a copy of it in front of you?

22  A.      Yeah, I can see.  Which pages are you on?

23  Q.      I am on -- if you look at the top right-hand corner,

24  there's a Page ID that says 9974.  It's Section E-2 of the

25  Decree.

*CROSS - MAJOR DARREN GOODS*                                        101

1   A.      Yes, sir.

2   Q.      So have you reviewed that before today, Section 2, A

3   and B?

4   A.      Yes, I have looked over this.  Yes, sir.

5   Q.      All right.  And just -- I guess before I ask about

6   this document, just one more foundational question.

7           These undercover accounts, whether they're under --

8   the undercover or the alias accounts these are things you're

9   using to investigate crimes; correct?

10  A.      That is correct.

11  Q.      All right.  And so is it your opinion or your

12  testimony that these proposed changes would allow you to

13  continue to utilize that tool in criminal investigations?

14  A.      Yes, sir.

15  Q.      You'll see that in subsection A there there's, I

16  guess, some caveats here, that says that if protected

17  information is gathered and not necessary for the criminal

18  investigation, that it will be -- it won't be retained.

19          Is that your understanding?

20  A.      Yes, sir.

21  Q.      All right.  And that, also, that there will be some

22  supervisory controls on these accounts to make sure that no

23  one is using them for an unauthorized purpose or to

24  infiltrate free speech groups or political groups; is that

25  correct?

*CROSS - MAJOR DARREN GOODS*                                    102

1   A.      Yes, sir.

2   Q.      All right.  And that is not something that you would

3   want the gang unit doing in the first place; correct?

4   A.      Absolutely correct, yes, sir.

5   Q.      All right.  Thank you.  I'll take that off the screen

6   for now.

7           You testified a little -- a minute or earlier today

8   about some relationships that the gang unit may have with the

9   schools.  I think specifically that there are fears or some

10  kind of intelligence that there may be a gang fight or some

11  kind of gang violence in a particular school.  Am I getting

12  that right?

13  A.      Yes, sir.

14  Q.      So those communications with the school system, those

15  would be about potential crimes; correct?

16  A.      Yes, sir.

17  Q.      Okay.  I want to put another document on the screen.

18  It is the Judge's Order, ECF Number 250.

19          All right.  Major, do you have that in front of you

20  now?

21  A.      Yes, sir.

22  Q.      All right.  Have you reviewed this order before?  Do

23  you recognize this?

24  A.      I actually just scanned through it, but I have not

25  read line for line, no, sir.

*CROSS - MAJOR DARREN GOODS*                                    103

1  Q.      Okay.  So when you were testifying earlier about your

2  understanding of how Section I of the Decree affected the

3  gang unit, this was not something that you really had the

4  benefit of having firm knowledge about?

5  A.      Well, I did scan through a portion of that where it

6  kind of talked about, I guess, I don't know if this is a

7  ruling or I don't know if this is a proposal, that came from

8  the bench.  So I did kind of peruse through it.  But if you

9  want to ask me a question specifically to that, I would

10 simply ask that you direct me to that section and give me an

11 opportunity to review it before I have to answer.

12 Q.      Absolutely.  If you'll look at page 36 of the

13 document, also Page ID Number 8417, for the record.

14         Feel free to take a minute to review.  The specific

15 paragraphs are probably the one in the middle, that I've

16 highlighted on your screen, that starts "therefore", and then

17 next paragraph, I believe, is also -- adds context to that.

18 A.      (Reviewing document.)  Okay.

19 Q.      And so does that -- have you ever had the opportunity

20 to review or read those specific findings or rulings by this

21 Court before today?

22 A.      I did kind of peruse through this.  But, like I said,

23 I didn't read this entire document, but I did kind of read

24 through this section.

25 Q.      I mean, is it fair to say, though, when you were

1    testifying earlier about your interpretation of Section I,

2    that this document was not something that you were relying

3    on?

4    A.     That's correct.

5                 MR. CASTELLI:  Okay.  Those are my questions,

6    Your Honor.

7                 THE COURT:  All right.  I am going to go to the

8    Monitor.  Are there any questions by the Monitor?

9                 MR. STANTON:  No, Your Honor, no questions for

10   this witness.

11                THE COURT:  All right.  Any redirect by counsel

12   for the City, Mr. McMullen?

13                MR. McMULLEN:  No, Your Honor.

14                THE COURT:  All right.  Well, that does -- then,

15   Major, glad to have with us today again, and we're going to

16   let you be excused.  And, again, thanks so much.  We'll let

17   you be excused.

18                I'm going to -- our lunch break is actually

19   coming up right now.  We've typically taken about a 45-minute

20   lunch break.  We'll come back at 1:00.

21                I understand that we still have two potential

22   witnesses.  And is that still correct, Mr. McMullen?

23                MR. McMULLEN:  Yes, that's correct, Your Honor.

24                THE COURT:  Okay.  I was looking to see -- I

25   don't know if Ms. Sink's going to testify or not.  Has that

                        UNREDACTED TRANSCRIPT

```
 1   been decided?  It's not essential, I'm just curious.

 2              MR. McMULLEN:  That has been decided.  She's

 3   going to testify.

 4              THE COURT:  Okay.  So that gives us --

 5              MR. McMULLEN:  She's going to testify.

 6              THE COURT:  No problem.  That gives us two more

 7   witnesses this afternoon as I understand it.  Is that

 8   correct?

 9              MR. McMULLEN:  Yes.

10              THE COURT:  All right.

11              MR. McMULLEN:  And I don't expect either one to

12   be very long.

13              THE COURT:  Okay.  That's helpful.  So what we'll

14   do is we'll see everybody at one.  Remember, you have a live

15   mic.  And so we'll see everybody at one.  Thanks very much.

16     (Recess was had at 12:13 p.m. and resumed at 1:01 p.m.)

17              THE COURT:  It is one minute after one so I think

18   we are ready to proceed.

19              Okay.  You've blocked me from coming on.  You're

20   being really careful here, guys, but you've got to undo that.

21              COURT STAFF:  Sorry about that, Judge.

22              THE COURT:  That's okay.  I think you've still

23   stopped this.  There we go.  I think we're good now.  Okay.

24   I think we're all set.

25              And let me go to -- it looks like I'm going to
```

UNREDACTED TRANSCRIPT

1    Mr. Glover.   Is that right, Mr. Glover?

2              MR. GLOVER:   I'll be handling this witness, Your

3    Honor.

4              THE COURT:   All right.   And so who will our next

5    witness be?

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*DIRECT - ZAYID SALEEM*                                             107

 1                MR. GLOVER:  If Your Honor please, the City would

 2    like to call to the stand Zayid Saleem.  And I'll ask him to

 3    spell his name if the Court allows.

 4                THE COURT:  Oh, please.  Absolutely.

 5                MR. GLOVER:  Would you actually spell your entire

 6    name, please.

 7                THE WITNESS:  Good afternoon, Your Honor.

 8                THE COURT:  Good afternoon.

 9                THE WITNESS:  Zayid, Z-A-Y-I-D.  Saleem,

10    S-A-L-E-E-M.

11                THE COURT:  Counsel may proceed.

12                MR. GLOVER:  What is your title?

13                THE WITNESS:  I am a Senior Assistant City

14    Attorney.  And I'm assigned to the Memphis Police Department

15    where I serve as Police Legal Advisor.

16                THE COURT:  I'm sorry.  We need to let Mr. Saleem

17    be sworn in so I think we're all set.

18                I was working on your camera angle there,

19    Mr. Saleem.  There you go.  You may want to change that

20    slightly so we can see you a little better.  That's better.

21    Thanks so much.

22                If you'll raise your right hand.  Mr. Sample's

23    going to swear you in.

24                THE CLERK:  Do you solemnly affirm or swear that

25    you will tell the truth, the whole truth, and nothing but the

*DIRECT - ZAYID SALEEM*                                                108

1    truth so help you God?

2                    THE WITNESS:  I do.

3                    THE COURT:  Counsel.

4                         ZAYID SALEEM,

5        having been first duly sworn, testified as follows:

6                        DIRECT EXAMINATION

7    BY MR. GLOVER:

8    Q.      You spoke your name before we swore you in.  Do you

9    swear that that was the correct spelling of your name?

10   A.      Indeed.

11   Q.      All right.  Thanks.

12           Would you state your title, please.

13   A.      I am a Senior Assistant City Attorney with the City

14   Attorney's Office.  I am assigned to the Memphis Police

15   Department where I serve as Police Legal Advisor.

16   Q.      All right.  And, Mr. Saleem, are you actually embedded

17   in the police department in the sense that your office is

18   with the Memphis Police Department?

19   A.      Indeed, my office is within the Memphis Police

20   Department headquarters.

21   Q.      All right.  And can you briefly tell us, before we get

22   into your current position, your educational background.

23   A.      Yes, sir.  I received my bachelor's from LeMoyne-Owen

24   College in business administration.  I received my J.D. from

25   University of Memphis School of Law.

*DIRECT - ZAYID SALEEM*                                                    109

1   Q.       What year was your J.D.?

2   A.       2007 I believe.

3   Q.       All right.  And then tell us a little about your

4   employment history.

5   A.       I worked -- let's see.  After college I worked at a

6   law firm, where I was a runner.  And then I took a position

7   with the City, where I worked within the City Attorney's.  I

8   was assigned to claims.  I handed investigative claims on

9   behalf of the City.  I then left and went to law school.

10  When I returned -- when I graduated from law school and

11  passed the Bar, I was offered a position with the City of

12  Memphis.

13  Q.       All right.  And how long have you been, as we say,

14  embedded with the police department as the City Attorney who

15  resides in the police department office?

16  A.       I believe late 2010, early 2011.

17  Q.       Can you tell me what your responsibilities -- your

18  current responsibilities are in terms of your position as the

19  City Attorney embedded within the Memphis Police Department.

20  A.       Well, I handle day-to-day operations within the

21  department.  I advise the Police Director, his command staff,

22  other management level officials within the department on a

23  whole host of issues.  I also assist in developing policies,

24  identifying best practices.  I also train officers at the

25  police training academy, either specialized training or doing

UNREDACTED TRANSCRIPT

*DIRECT - ZAYID SALEEM*                                                    110

1   in-service training.

2   Q.       All right.  Can you tell the Court a little bit about

3   any credentials or service opportunities you have with

4   organizations that meld with your experience as a teacher.

5   A.       Yes, sir.  I'm a member of the International

6   Association of Chiefs of Police.  I am also a member, a board

7   member of the Legal Officers Session within IACP.  I'm a

8   member of the Tennessee Association with Chiefs of Police.

9   I'm also member of the Major City Chiefs.

10           Within that confine, I have done training maybe for

11  the last five years.  I train police executives, other police

12  legal advisors and officers on a whole host of policing

13  issues.  I've also done the same with TAPD, where I've made

14  presentations to police chiefs and other police officials

15  across the State of Tennessee.

16           I believe my last certification might have been in

17  2019.  I attended an FBI office partner engagement training

18  session where I was certified in criminal intelligence theory

19  and its applicability to law enforcement.

20  Q.       Thank you.  You mentioned the IACP as well as a number

21  of other associations of police chiefs of various

22  jurisdictions.  Do those positions and that involvement give

23  you access to or you're exposed to different policies and

24  procedures that different police forces utilize?

25  A.       Absolutely.  Being a board member of the legal

1    officers section within IACP, I actually help train on

2    different policies.  I'm exposed to different policies, best

3    practices.  I actually am on a board within IACP regarding

4    criminal intelligence, which is helping me in designing

5    policies that IACP will push forward with members.

6            So I am familiar with and I've been exposed to all

7    types of policies relevant to policing.

8    Q.     All right.  And, Mr. Saleem, you're aware that there

9    has been introduced as evidence in trial as Exhibit Number

10   21, what's called the Proposed Modified Order of Judgment and

11   Decree.  Are you familiar with that?

12   A.     Yes, sir, I am.

13   Q.     All right.  And based on your comments about your

14   background in police policies, were you integrally involved

15   in the discussions on behalf of the City Attorney's office

16   and with the police department on the negotiations that

17   resulted in the agreement with the ACLU about particular

18   language that we would suggest to the Court for consideration

19   in a modified Decree?

20   A.     Yes, sir, I have been.

21   Q.     All right.  And was that a fairly intensive process

22   where you were part of the consultation on behalf of the City

23   as we worked towards this day?

24   A.     Yes, sir, it has been.

25   Q.     All right.  Has it also been a part of your role

1   during the last 20 months to advise the police department as

2   best you could on the new understanding of the Kendrick

3   Consent Decree as informed by the ruling of the Court at the

4   trial, and subsequent rulings of the Court, in a couple of

5   different occasions, where His Honor has expanded the -- his

6   assistance has been given on particular questions that have

7   arisen?

8   A.      Yes, sir.  I've been involved in that process and as

9   information has been provided by the Court or by the Monitor,

10  that information is provided to me and then I discuss that

11  with the police department.

12  Q.      All right.  When you say you discuss it with the

13  police department, you've got how many officers in the police

14  department?

15  A.      I believe there's almost 2,000 officers in the

16  department.

17  Q.      So how, in general, have you gone about having

18  discussions or dispensing information that relate to new

19  evolving understandings that we have, after being informed by

20  the Court, about the applicability of the Kendrick Decree in

21  particular situation?

22  A.      Those conversations are had at a higher level.  That's

23  when I deal with the Director, his command staff.  It may

24  even involve some management, different divisions within the

25  police department.  But most dialog happens at the higher

*DIRECT - ZAYID SALEEM*                                               113

1    level and that information is then filtered down.

2    Q.      Have you, in fact, had conversations with the Director

3    and command staff as new information has been added to what

4    we know about interpretation -- correct interpretation of the

5    Consent Decree?

6    A.      Yes, sir.

7    Q.      Okay.  Now, you've indicated 2,000 officers in the

8    police department.  Have we ever just called everybody in at

9    once to have a training or a conversation en masse about what

10   we know now about the Kendrick Consent Decree?

11   A.      So there is in-service training that is used to train

12   the departments department-wide.  In-service training did

13   begin in January of 2020, which started off with the command

14   level.  And then each level of department from management

15   down to lieutenant, to sergeants, some training has been

16   provided as relates to the Consent Decree.

17   Q.      But I guess my point is, because officers have duties,

18   just like right now they're extremely busy and working

19   overtime, this is done on a rolling basis and not an en masse

20   training session; is that right?

21   A.      It would be impossible to do en masse training for

22   something this complex.

23   Q.      All right.  Let me explore a couple of the things

24   here.  I understand or I learned during my representation

25   here that there are some things that go out that are not

*DIRECT - ZAYID SALEEM*                                          114

1    considered training, they're just, like, bulletins that go

2    out to various parts of the department, or modules that can

3    be sent in a short snippet to bring people up to date on

4    certain things.

5         Is that any part of what you've employed in trying to

6    convey the understanding of the Consent Decree to either the

7    command staff or the officers in general?

8    A.    For the command staff it's going to be meetings,

9    basically, of the Consent Decree.  Department-wide, trying to

10   train department-wide on the Consent Decree through a

11   bulletin or maybe a three-minute video is just not doable.

12   Q.    All right.  You have, though, begun through in-service

13   training modules, face-to-face training that will eventually

14   cover everybody in the police department; is that correct?

15   A.    Yes, sir.  So the in-service training started, as I

16   indicated, in January of this year.  Started at the high

17   level.  And the last session of training was for sergeants.

18        Due to COVID there's been a delay.  And, in fact, the

19   training is extensive.  So training began in January, and we

20   probably felt the entire department until October.  So due to

21   COVID we've been delayed, but the training is still ongoing.

22   Q.    In connection with your position embedded within the

23   physical space of the police department, have you had

24   occasion for members of command staff, or others, to make

25   inquiries to you about how to help understand and navigate

*DIRECT - ZAYID SALEEM*                                                  115

1   provisions of the Consent Decree that they did not find the

2   ability to do on their own?

3   A.      I have been pulled aside numerous times.  I actually

4   stopped counting.  It can be questions from the Director.  It

5   can be questions from a chief.  It can be questions from a

6   supervisor.  Officers in the field have pulled me aside to

7   discuss the Consent Decree.

8           This has been ongoing.  And so I've taken questions on

9   the phone.  I've taken questions in person.  There is a great

10  deal of discussion, I think, had about the Consent Decree and

11  how to properly comply with its contents.

12  Q.      Do you find that because there is obviously a

13  provision within the Decree itself that says that it must be

14  posted on the kiosk, that some folks are still going to the

15  kiosk and looking at the original 1978 Decree and not finding

16  the clarity that we may have if they were able to thoroughly

17  review all the Judge's opinions and orders?

18  A.      Absolutely.  The Consent Decree is on

19  internal posted -- posted.  Officers can go look at it at any

20  time.  And so you can't really control when an officer goes

21  and looks at it and maybe makes his own judgments or own

22  conclusions about the intent of the Consent Decree.

23  Q.      And so in your position as a representative of the

24  City Attorney's office embedded within the police department,

25  and responsible, at least in part, for training on this

*DIRECT - ZAYID SALEEM*                                          116

1   Consent Decree, and all policies of the police department,

2   would you find it to be a great benefit to have the new

3   understanding and some clarifications from the Court actually

4   incorporated into the body of the Decree that is posted?

5   A.      Without a doubt, absolutely, yes, it would be very

6   helpful as I attempt to instruct the department on the

7   Consent Decree.

8   Q.      All right.  And just by way of an example, I'd like to

9   put up on the screen and publish, if we could, a document

10  you've viewed before today, Document 250, which is the order

11  of Your Honor denying Defendant's City of Memphis sealed

12  motion for immediate modification of the Consent Decree.  And

13  I'm going to be referring to Pages ID 8424 and 8425.  So if

14  we could go to the bottom of 8424.

15          And not as testimony from a lawyer but as an

16  explanation for where we are, this is an order that addresses

17  a number of issues raised.  But in particular in this portion

18  it appears to be addressing the CrimeStoppers question that

19  the City raised to the Court.  Do you see that?

20              MR. GLOVER:  If you could highlight the section

21  that starts "the Kendrick Decree only bars" towards the

22  bottom of the page.

23  BY MR. GLOVER:

24  Q.      So I'm first going to direct you to this language

25  where the Court gave guidance on applicability of the

1   Kendrick Decree to the CrimeStoppers program.

2   A.      Yes, sir.

3   Q.      I'm going to read.  Tell me if I -- you can follow me.

4   The Kendrick Decree only bars the collection, maintenance,

5   and dissemination of political intelligence by the City.  Do

6   you see that?

7           The next sentence says, only political intelligence

8   received via CrimeStoppers that has no relevant connection to

9   legitimate law enforcement ends must be outright rejected by

10  City.  Do you see that?

11  A.      Yes, sir.

12  Q.      All right.  Has it caused you any concern in

13  adequately answering questions that the Decree, the Consent

14  Decree, does not presently have a definition of a legitimate

15  law enforcement purpose?

16  A.      Yes, sir, it does.

17  Q.      And so would you believe that it would aid your

18  ability to accurately teach what the Court has instructed us

19  if the Consent Decree could contain a definition of

20  legitimate law enforcement purpose?

21  A.      Having this definition included in the Decree would

22  absolutely aid me in instructing officers on what it means.

23  Q.      Have you had some discussions in which you have come

24  to the understanding that not all police officers have the

25  same clear understanding of what is encompassed and not

1   encompassed within legitimate law enforcement?

2   A.      Exactly.  There's confusion about that.

3   Q.      Okay.  And then I'm going to read further.

4   Ms. Tullis, we're going to go onto the next page.

5           But it says, continue on page 43, the next sentence

6   is, and while some criminal investigations represent a gray

7   area, thus requiring additional vetting of the information's

8   source, the Court is not persuaded that an anonymous tip

9   provided by the Memphis Police Department with information

10  regarding imminent or ongoing criminal activities would

11  require any significant vetting under Section G of the

12  Decree.

13          You've read it and understand that; correct?

14  A.      Yes, sir.

15  Q.      And we appreciate that guidance, do we not?

16  A.      Yes, sir.

17  Q.      Then it goes on to say in the next paragraph starting,

18  "In sum".  In sum, Section I of the Decree only prohibits the

19  City from receiving information from outside law enforcement

20  or private entities that would otherwise violate the Consent

21  Decree.  Section I only outright prohibits the City's

22  receipts of political intelligence or information relating to

23  First Amendment-protected activities gathered as a result of

24  this investigation, lacking any legitimate law enforcement

25  purpose.

*DIRECT - ZAYID SALEEM*                                           119

1        Again, the use of law enforcement -- legitimate law

2   enforcement purpose; correct?

3   A.       Yes, sir.

4   Q.       And some clarity from the Court in this definition in

5   the Decree would be helpful, would it not?

6   A.       Absolutely.

7   Q.       Okay.   And the next sentence is the one I really want

8   to focus on.   It says, vetting and authorization pursuant to

9   Subsection G would only be required for tips received via

10  CrimeStoppers that incidentally implicate First

11  Amendment-protected activities or political intelligence.

12       So in connection with being able to properly follow

13  the Court's instructions as stated there, has your experience

14  in trying to understand and teach the Decree been that we

15  need and would request some clarification about what

16  incidentally implicate would mean?

17  A.       Yes, sir.   Absolutely.

18  Q.       Okay.   Let me give you a hypothetical that -- I

19  understand that folks ask you these questions in class, but

20  if someone from the area that deals with CrimeStoppers said

21  to you, Mr. Saleem, what I'd like to know -- I see what

22  you've told us about the Court's order, what I'd like to know

23  is how would I know when I get a tip from an anonymous source

24  through CrimeStoppers whether they got it in a way that

25  incidentally implicates First Amendment-protected activity?

*DIRECT - ZAYID SALEEM*                                                    120

1   Do you see that?  How would you answer that question?

2   A.      The officer would have to do whatever -- ask whatever

3   necessary questions they could to try to ascertain whether or

4   not that information was received -- how it was received

5   basically.  And if they can make that determination, then,

6   you know, they move forward.

7           But, ultimately, it's difficult oftentimes to get,

8   from someone who's dropping a tip off to the department, how

9   it was obtained.  So I would hate to have that officer reject

10  the information because they were not able to ascertain how

11  that person got the information.  So it's difficult.

12  Q.      And you're aware, are you not, because you

13  participated in the discussion, that there is a proposed new

14  definition that replaces the definition of political

15  intelligence, and now it is entitled First Amendment-related

16  intelligence?

17  A.      Yes, sir, I have reviewed that.

18  Q.      In an attempt to impose the standard of reasonably

19  should know and the like, in order -- and is it your

20  testimony that that is, in part, to try to address the kind

21  of question that may be left in a gray area about this issue?

22  A.      That language would definitely aid that officer trying

23  to make that decision.

24  Q.      And you're aware that the ACLU has come to an

25  understanding with the City about a proposal for language

1  that would, we all believe, keep the intention of the Consent

2  Decree intact, while addressing that otherwise somewhat gray

3  area?

4  A.      Yes, sir.  And I think that that agreement, the

5  language, would definitely help officers learn exactly how

6  they can comply with the Decree.

7  Q.      Would you find that as a person who's studied police

8  procedures across the country and is responsible for teaching

9  something that would be more readily teachable and

10 understandable for the nonlawyer police you have to work

11 with?

12 A.      Indeed.  You want to be able to provide guidance

13 that's easy for an officer to execute.

14 Q.      All right.  We also have heard testimony in this case,

15 and I will ask if you are aware of it, about a situation in

16 which the City was, relatively recently, deemed by the

17 Monitor Team to be in violation of the Decree relating to a

18 Labor Day March.

19 A.      Yes, sir.

20 Q.      And you're familiar with that incident, at least after

21 the fact you were familiar with it?

22 A.      Yes, sir, I am.  And it was before training was given,

23 yes, sir.

24 Q.      All right.  And so -- and let me say, there is a

25 continuing unfolding understanding, and greater understanding

*DIRECT - ZAYID SALEEM*                                          122

1    as time goes on, about the proper interpretation of the

2    Decree; is that correct?

3    A.      Yes, sir.

4    Q.      Each subsequent ruling from the Court has helped

5    informed that; right?

6    A.      Indeed it has.

7    Q.      Okay.  And so tell me what this Labor Day March

8    incident represented.  What happened?

9    A.      So I understand that the officers were assigned to

10   this event.  It was a parade, I believe.  And the goal of the

11   officers there was to provide safety as the individuals

12   crossed different streets and marched in the street.  So it

13   was a public safety event.

14          I think what actually went down was they started

15   seeing political signs and candidates who were running for

16   office.  And based upon their understanding of the Consent

17   Decree, when they saw those signs and saw those tee-shirts,

18   they freaked out and felt like this was not an event that

19   they should be at and they backed out and left the scene.

20   Q.      And you would agree with me that that was not an

21   appropriate response or the correct understanding of the

22   Decree; is that right?

23   A.      It was not the correct response.

24   Q.      Okay.  And would you -- do you have a belief as the

25   trainer that a modification of that definition to move away

UNREDACTED TRANSCRIPT

*DIRECT - ZAYID SALEEM*                                         123

1    from the term political intelligence and to a First

2    Amendment-related intelligence term would help clarify the

3    meaning and help avoid those kinds of misunderstandings?

4    A.      It would indeed change the focus of those officers.

5    Taking the word politics out of the entire equation would be

6    helpful.  When you put a perspective of First Amendment, it

7    changes the thinking of those officers, or should.  And the

8    training will help clarify those issues.

9    Q.      All right.  And unlike some of the witnesses that have

10   been on the stand, because you are a lawyer, you have read

11   and have a fairly clear, you believe, understanding of what

12   Judge McCalla has now ruled in clarification of the Decree;

13   right?

14   A.      Yes, sir.

15   Q.      All right.  But there are officers who are still

16   asking questions about things like social media; is that

17   right?

18   A.      Yes, they do.

19   Q.      And is social media addressed, the term social media

20   addressed in the Consent Decree?

21   A.      And, see, that's where a lot of the conversation comes

22   from with officers.  The mere fact that, you know, the

23   document was written in '78, social media didn't exist, so

24   how are you making this connection that social media applies

25   to the Consent Decree.  And so it has to be explained that

*DIRECT - ZAYID SALEEM*                                           124

1    this was -- this determination was made by the Court.  And so

2    that's how you have to address that particular issue with

3    those officers who raise those questions.

4    Q.     All right.  And, again, the Decree itself requires

5    that you post it and available to officers on the kiosk;

6    correct?

7    A.     Yes.

8    Q.     And in view of that fact, do you have an opinion about

9    whether police officers would better understand our new

10   realization of this Decree's meaning if the Court could

11   address what we've experienced as confusion in the language

12   of the Decree itself?

13   A.     Codifying the Consent Decree with the Court's finding

14   would bring a great deal of clarity to the document, the

15   Consent Decree, and to those officers who are reading it.

16   Q.     What kind of -- does the confusion about social media

17   involve questions of whether particular searches would be

18   considered a legitimate law enforcement purpose?

19   A.     I've had officers tell me, look, the moment I look at

20   social media I may violate the Consent Decree, because I'm a

21   political -- you know, you look at someone's page, it has all

22   their causes.  It's an expression.  And so a lot of officers

23   just take the jump and say, well, if I look at social media,

24   I'm violating the Decree.  And that's a lot of the

25   conversation that's had.  And so based upon that, a lot of

*DIRECT - ZAYID SALEEM*                                              125

1   officers will shy away from using social media to look -- to

2   handle their investigation.  They may be looking for a

3   witness or things of that nature.

4   Q.     All right.  Tell me about that, because I don't have

5   any social media accounts, that I know of.  And something

6   like Facebook, if an officer referred to a Facebook account,

7   is it likely to have information -- you know, open source

8   information that identifies their associations in terms of

9   who has friended them, who are they talking to?

10  A.     So I don't have a Facebook account either.  But based

11  on the research that I've done and looking at the policies

12  and knowing social media, those connections are there.  Your

13  friends, your network, your political leaning, your internet

14  activity that you're involved in, all of that's contained

15  within social media such as Facebook.

16  Q.     And so would it, in your view, be a step toward

17  creating mixed impressions that you heard about, that you

18  can't even look at social media, if the Decree could define

19  social media and address that issue directly?

20  A.     Yes, sir.

21  Q.     Were you present -- strike that.

22         I now have lost track of my days, as I have since the

23  first of the COVID thing, since every day runs together.  But

24  it was either yesterday or the day before, I believe, the

25  Monitor Team put on a witness, Dr. Theron Bowman?

*DIRECT - ZAYID SALEEM*                                          126

1   A.       I saw a lot of his testimony, yes, sir.

2   Q.       Okay.  Do you recall that that representative of the

3   Monitor Team talked about his view of the need to vet

4   information that comes from outside sources, like through FBI

5   or other law enforcement agencies, in order to ensure that it

6   doesn't violate the Decree in the way it was pulled together?

7   Do you recall his testimony generally on that point?

8   A.       Yes, I do.

9   Q.       And without regard to whether that was an opinion,

10  obviously the Court's the only one that matters on those

11  issues, is that an example of the kind of, sometimes, lack of

12  clarity or difference of opinion you hear when people are

13  trying to study and understand what they can receive and what

14  they cannot receive?

15  A.       It is, sir.

16  Q.       Okay.  Having reviewed in whole Exhibit 21, which

17  deals with the proposed change that we're asking His Honor to

18  consider for clarification of the Decree, at any time was it

19  your purpose or the City's purpose, to your knowledge, to

20  modify or reduce the protections of civil liberties that are

21  incorporated in the original Decree?

22  A.       Absolutely not.

23  Q.       Is it instead the intention to try to give clarity and

24  teaching enforcement, and, in fact, to be able to clearly

25  mandate compliance in a way that's reasonable for our police

1  officers?

2  A.      Let me say this, I've probably taught law enforcement

3  from the chief of police on down to your new recruit.  My

4  goal as an instructor is to be able to provide clear and

5  unambiguous guidance and understanding of the Consent Decree.

6  I want to be able to provide instruction that leaves no room

7  for an individual to misinterpret the guidelines of the

8  Decree.  I want to make the material as clear and easy to

9  apply for anyone in the field.  And I think that the

10 modifications that we've agreed to will aid, not only myself

11 in teaching this particular material, but anyone else who

12 comes and teaches this material to the department.  It

13 provides exactly what we need in terms of a better blueprint

14 for training.  And I think that the language will definitely

15 aid in helping explain and teach officers about the Consent

16 Decree, its goals, and what we are allowed and what we are

17 not allowed to do.

18 Q.      All right.  I want to direct you to a provision that

19 I'm not sure anyone has directly talked about in the proposal

20 that we submitted to His Honor.  And in exhibit, Trial

21 Exhibit 21, the Proposed Modified Decree, there is, under

22 Section F, Subsection 4.  And if we could publish that on the

23 screen.  And then highlight it.

24         Mr. Saleem, you are aware or you understand that when

25 the City entered into this Decree, it was agreeing to bind

1  itself to protections of civil liberties by means that may

2  even exceed those that are required just by the Constitution.

3  You realize that?

4  A.      Yes, sir.

5  Q.      Do you also understand that there are, under

6  Constitutional law, some principles of First -- related First

7  Amendment, that may involve municipalities ability to still

8  impose some time, manner, and place restrictions, according

9  to case law --

10 A.      Yes, sir.

11 Q.      -- upon exercising those rights?

12 A.      Reasonable time, place, and manner restrictions.

13 Absolutely.

14 Q.      And would part of the purpose for asking the Court to

15 consider such an inclusion here to clarify that even though

16 we are agreeing to be bound by principles beyond those

17 required by the Constitution, you agree that we would still

18 maintain the right to do things like impose a reasonable and

19 constitutional curfew, or set aside separate areas for

20 protesters and counter protesters so that they don't clash,

21 things of that type?

22 A.      That's the law that every city has the ability to

23 enforce, so I think it should also be included.

24 Q.      We're not trying to state what the law is in a

25 document so much.  We're trying to clarify that and agreeing

*DIRECT - ZAYID SALEEM*                                                    129

1    to be bound by more strict requirements than the

2    Constitution, that this would still be retained under the

3    agreement of the ACLU and the City of Memphis.

4    A.       Yes, sir, I do support that language.

5    Q.       There's also been testimony to the effect that there

6    has been some confusion, among others things, about body-worn

7    cameras and whether the Memphis Police Department should do

8    something different in their First Amendment-related activity

9    about turning off body cameras, or even being there.  You

10   know, you told me about Labor Day Parade.

11          So there's a Subsection 3 that's proposed to the Court

12   for consideration for inclusion in this document that makes

13   it explicit that the police department may be present at

14   gatherings of persons exercising their First Amendment

15   rights; is that right?

16   A.       That is correct, sir.

17   Q.       But then it goes on to say, as long as the Memphis

18   Police Department's present is not for the purpose of, or may

19   reasonably have the effect of, harassment or intimidation.

20   A.       It does say that.  And the purpose of officers being

21   present at those type of events is for public safety.

22   Q.       And in your view, does that clarify some of the

23   questions that have come up with officers about whether they

24   should even be at a certain place, at a certain time, where

25   First Amendment events are occurring?

*DIRECT - ZAYID SALEEM*                                      130

1   A.      And it does affect the times the officers would stay

2   on.

3   Q.      During your time in the last -- I would say limit to

4   the last two years, because that's the length of time since

5   we're had the education from the Court about the true meaning

6   and purpose of the Decree.  Have you engaged in conversations

7   with lawyers and the City Council's Office, and otherwise,

8   where we were still having difficulty in understanding

9   exactly how to apply the language of the Decree and the

10  ruling of the Court to discrete specific circumstances?

11  A.      I have.  You're referring to the attorneys

12  representing the City in this matter?

13  Q.      Right.

14  A.      Yes, sir.

15  Q.      Okay.  And so has it been your goal, in helping to

16  advise on crafting some of the proposed language, because now

17  the ACLU and the City have agreed upon to address many of

18  those areas where we found lack of clarity or gray area, so

19  the Court could speak on them directly in a revised and

20  modified Decree?

21  A.      Yes.

22  Q.      Okay.  And in whole, do you have any hesitance in

23  saying that the Decree that has been proposed, in terms of

24  modification, if adopted by the Court, would enable you to

25  fulfill your role in teaching the correct interpretation of

*DIRECT - ZAYID SALEEM*                                                  131

1    this Decree?

2    A.       Yes.  As I testified earlier, my goal is to be able to

3    present the material to the officers and provide a clear

4    understanding of the Consent Decree.  And I think that what

5    we've come up with, the agreement with the parties, is a very

6    good start to that process.

7    Q.       Just to be clear, I mean, there are things -- if all

8    we were looking for is ease of application and freedom of the

9    police to do things, there are a lot of things that we would

10   have tried to do and ask for; is that correct?

11   A.       Yes, sir.

12   Q.       But we entered into these discussions, not for that

13   purpose but to try to memorialize what the Court has

14   indicated is the intention of this Decree.

15   A.       We want to comply with the Consent Decree and make

16   sure that our officers are educated, as best that they can

17   be, so that they will understand the Consent Decree and be

18   compliant with it.

19   Q.       You're aware that there is one suggested provision,

20   the definition of undercover accounts, and thereby introduce

21   into this Decree the very concept of an undercover account;

22   correct?

23   A.       Yes, sir.

24   Q.       Okay.  And you're the person in charge of helping

25   crafting policy, you realize there's a commitment in that

*CROSS - ZAYID SALEEM*                                                    132

1   Decree that we would undertake to craft policy designed to

2   ensure that those accounts are not misused.

3   A.      Absolutely.

4   Q.      And you're willing to undertake that effort with the

5   guidance of the Monitor Team and the Court?

6   A.      I would do so immediately.

7              MR. GLOVER:  Thank you, Your Honor.  I have no

8   further questions of this witness.

9              THE COURT:  Cross-examination, ACLU?

10             MR. CASTELLI:  Yes.  Thank you, Your Honor.

11                      CROSS-EXAMINATION

12  BY MR. CASTELLI:

13  Q.      Good afternoon, Mr. Saleem.  A couple questions.

14          Would you agree with me that no matter what

15  modifications that may be made to this, or, really, any other

16  document, training is going to be key in helping officers

17  under the restrictions on their conduct in place because of

18  the Decree?

19  A.      Absolutely, sir.

20  Q.      Yeah.  And, so, basically -- I mean, my understanding

21  of your testimony today is there's kind of a commitment that

22  that training is going to be provided to the officers on the

23  Decree.

24  A.      It will be.

25  Q.      And has been, if I'm understanding your testimony.  I

*CROSS - ZAYID SALEEM*                                                    133

1    don't want to shorten you there.  You've been doing this for

2    almost --

3    A.        Training --

4    Q.        -- ten years now.

5    A.        Well, training officially started in January, and it

6    is ongoing.  And as you see here, I think a part of the

7    training that I gave was the fact that litigation is still

8    ongoing.  And so as soon as changes are incorporated, if

9    changes are incorporated, whatever comes of this, that

10   information will be relayed to the officers.

11   Q.        And it's my understanding, also, that a point of your

12   role with the police department in kind of administering and

13   ensuring the Decree is understood, would be answering

14   questions from command staff, or sounds like pretty much any

15   officer, but mainly command stuff, about how the Decree

16   should work or how it might relate to certain situations?

17   A.        Yes, sir --

18   Q.        Is that -- sorry, I didn't mean to interrupt you.

19             And part of that would also be correcting any kind of

20   misconceptions or misunderstandings about the Decree?

21   A.        That's part of it, yes, sir.

22   Q.        And I guess maybe an example of that may have been

23   this Labor Day Parade, where there was pretty obvious

24   misinterpretation or misunderstanding of what the Decree

25   required?

1   A.      Yes, sir.  And that's kind of an example of things

2   happening rapidly in the field.  Unfortunately, that officer

3   took steps on his own, and so it never made it up to my level

4   or a higher level.

5   Q.      And I think Mr. Glover covered this somewhat, but I

6   want to kind of be more specific.  But the goal with the

7   proposed modifications that the parties have made to the

8   Court, I think you stated earlier is not to try to lessen the

9   protections that the Decree offered; is that correct?

10  A.      Not at all.  Not at all.  Yes, sir.

11  Q.      So you're familiar with the hearing on the enforcement

12  of the Decree back in August of 2018?

13  A.      You mean the trial?

14  Q.      The trial, yes.

15  A.      Yes, sir.

16  Q.      Were you with Memphis in your role that you're in now

17  at that point in time?

18  A.      I was in my role at that time during that time.  Yes,

19  sir.

20  Q.      And you're familiar with the Bob Smith account and the

21  facts surrounding that account?

22  A.      I learned of those facts during that time period.

23  Q.      Yeah.  And you're familiar with this Court's order

24  finding that that in part was in violation of the Decree?

25  A.      Yes, sir.

1  Q.      And you would agree with me that none of the proposed

2  changes would allow the use of a Bob Smith account or

3  undercover account in the manner that that account was used?

4  A.      I clearly understand that, yes, sir.

5  Q.      Okay.  And the same with -- the Court made findings

6  that the City had gathered political intelligence in

7  violation of the Decree.  And you would agree that none of

8  these changes would have made that okay, to gather that

9  political intelligence.

10 A.      I agree.

11           MR. CASTELLI:  Your Honor, if I could have just a

12 moment to kind of look through my notes.

13           THE COURT:  Certainly.

14           MR. CASTELLI:  I may be done with my questions.

15           THE COURT:  Certainly.  Take your time.

16           MR. CASTELLI:  I'm done with my questioning.

17 Thank you, Mr. Saleem.

18           THE COURT:  All right.  Any questions from

19 counsel for the Monitor?

20           MR. PERRY:  Good afternoon, Your Honor.  I have a

21 few questions.

22           THE COURT:  Yes, sir.

23                    CROSS-EXAMINATION

24 BY MR. PERRY:

25 Q.      Good afternoon, Mr. Saleem.

*CROSS - ZAYID SALEEM*                                      136

1    A.       Good afternoon, sir.

2    Q.       Good to see you again.

3             I want to understand a little bit more about the

4    logistics of training.  I got to observe some of your

5    training, and I just want to make sure I understand how that

6    proceeds.

7             You mentioned that in-service training kind of

8    proceeds on a rolling basis; is that right?

9    A.       It starts at the beginning of the year and it's broken

10   down by ranks.  So the beginning of the in-service will be

11   the hierarchy of the department.  Then it goes down to first

12   rank of supervision, which is lieutenants.  Then it breaks

13   down to sergeants.  And then the rest of the training is for

14   all patrol officers.

15   Q.       And your training -- and correct me if I'm wrong here.

16   Your training kind of evolves as the understanding the

17   Consent Decree has evolved in this case; is that right?

18   A.       Well, there was -- there was presentation that was, I

19   believe, approved for training.  And utilizing that material

20   we started training, yes, sir.

21   Q.       Okay.  And I guess what I'm getting at here is, so,

22   for example, when you're training on the Consent Decree,

23   before Judge McCalla's order last November, we didn't have

24   that understanding.  And then once we had it, that's

25   incorporated into the training.  Is that right?

1  A.       Yes, sir.  If I'm not mistaken, yes, sir.

2  Q.       Okay.  Is there a mechanism -- since the training

3  proceeds in a rolling basis, is there a mechanism for, like,

4  circling back to the groups of officers that may have missed

5  the training before the understanding evolved?

6  A.       So that's kind of tricky.  What I anticipate or what I

7  can foresee is new development, in terms of the Consent

8  Decree, will first be made to the command staff level and

9  trickle down from there.  But it's almost --

10          The Consent Decree is not something that I can shoot

11  an email out and say, hey, look, these are the new changes,

12  let's follow these rules.  It's much more complex than that.

13  And so sending out bulletins wouldn't cover that, I don't

14  think.  But we would find a way to get the material out so

15  the officers are aware of the development in the Consent

16  Decree.

17  Q.       In the Consent Decree -- well, let me back up.  I

18  think I heard you say, when you were talking to Mr. Glover,

19  that certain conversations, because they're complex, you have

20  with the command staff and other high level members of MPD,

21  and then they filter that information down; is that right?

22  A.       It goes through the chain of command.  So I may be

23  instructed to do that discussion or dialog.  So I would -- so

24  to follow up with your question, it starts off at that higher

25  level.  But what I can see is if changes were made to the

1    Consent Decree, that potentially will be posted on our

2    website and probably sent out department-wide.  If that's

3    what you're asking.  If we made changes tomorrow how would we

4    get that out?  It would probably be posted -- it would be

5    posted and then it would be sent out department-wide.

6    Q.      Okay.

7    A.      With instructions to follow.

8    Q.      With instructions you said?

9    A.      With instructions to follow, yes, sir.

10   Q.      I see.  Mr. Glover went through some language in ECF

11   Number 250 with you in Judge McCalla's order from last

12   November.  I'm not going to go back through that language

13   with you.  I just want to know have any of your discussions

14   with command staff specifically concerned that language?  And

15   it might be helpful, let me pull it up.

16           Can we pull up MT Trial Demonstrative D.

17           Mr. Saleem, so for example -- and, again, I know that

18   you've been doing this for years.  I just want to know, so

19   for example, have you said, now that we've got Judge

20   McCalla's order, that order clearly states that the City must

21   reject outright only information constituting political

22   intelligence that is unrelated to any legitimate law

23   enforcement activities?

24   A.      What was your question?

25   Q.      Is that a part of your Consent Decree training?  Or if

REDIRECT - ZAYID SALEEM                                        139

1   it's not -- and I understand that your training has to evolve

2   based on what happens with the Consent Decree.  So if it's

3   not in your training, then in your conversations with command

4   staff or whoever are the higher up at MPD?

5   A.      No, those conversations have been had.  I think the

6   problems come when you're dealing with so many different

7   officers.  Part of reason why we're asking for modification

8   is for -- because the next question is to what's legitimate

9   law enforcement activity?  So it's part of the reason why

10  we're seeking to have this language added to the Consent

11  Decree.  Because you talk about one thing, but then the

12  questions come from another angle.  And so the conversations

13  are being had, and at the same time new questions come or

14  arise, and so it's a constant conversation that is had.

15          Because, again, I can present this to an officer, walk

16  away from that officer, and that officer may, you know, on

17  his own, make their own findings about what it really says.

18          So the conversations are being had, the instruction is

19  being given, but that does not necessarily negate the fact

20  that other officers are going to have questions when they're

21  presented with it and make conclusions on their own.

22              MR. PERRY:  Okay.  I understood that.  I think

23  that's all I've got.

24              THE COURT:  We are going to mark the

25  demonstrative, since it was used, as Exhibit 26 unless

*REDIRECT - ZAYID SALEEM*                                                140

1    there's some reason not to.

2              MR. PERRY:  Thank you, Your Honor.

3              THE COURT:  Certainly.  That way we can tell what

4    we're talking about.  26, and that's the trial demonstration

5    D, demonstrative D, three excerpts.

6         (No. 26 was marked and received into evidence.)

7              MR. PERRY:  Thank you, Your Honor.

8              THE COURT:  No problem.  Any redirect in this

9    matter?

10             MR. GLOVER:  Just briefly.  Just briefly from the

11   City, Your Honor.

12                        REDIRECT EXAMINATION

13   BY MR. GLOVER:

14   Q.    In the same vein of the conversations you've had with

15   Mr. Perry, where people walk away from the conversation and

16   then have a different interpretation, isn't it common in your

17   teaching that people focus on issues that are in front of

18   them at the time, and teaching in principle, they hear it,

19   but it's only when the issue arises that they sometimes

20   finally focus on that particular issue?

21   A.    That's fair.

22   Q.    And since we have this Decree posted, the officers

23   often go back and answer that question by looking at the

24   posted Decree; is that correct?

25   A.    They do.

UNREDACTED TRANSCRIPT

1  Q.      And it's still got the '78 language; correct?

2  A.      It still has the 1978 language, sir.

3               MR. GLOVER:  That's all I have, Your Honor.

4               THE COURT:  All right.  If there's nothing else

5  then, Mr. Saleem, thank you very much and we're going to let

6  you be excused.  Thank you so much.

7               THE WITNESS:  Thank you, Your Honor.

8               THE COURT:  Certainly.  Mr. Glover, are you

9  handling our next witness, or is Mr. McMullen?

10              MR. GLOVER:  I am not.  Mr. McMullen will do

11 that, and I'll change chairs with him.  But it will be Chief

12 Legal Officer of the City, Jennifer Sink.

13              THE COURT:  Sure.  What we'll do is, in order to

14 slightly switch, we'll just take about a five-minute quick

15 break so that you can switch around.

16              Do not disconnect.  And, remember, you're still

17 on a live mic.  And we'll take a very short break for anybody

18 who needs that.

19   (Recess was had at 1:51 p.m. and resumed at 1:55 p.m.)

20              THE COURT:  I think we have everyone.  And so I

21 think I'm looking for my witness there.  There she is.

22              Counsel.  Mr. McMullen, who will your next

23 witness be?

24              MR. McMULLEN:  Your Honor, I'd like to call the

25 Chief Legal Officer for the City of Memphis, Jennifer Sink.

*DIRECT - JENNIFER SINK*                                          142

1                 THE COURT:  All right.  And, Ms. Sink, we're

2      going to let you raise your right hand and Mr. Sample will

3      swear you in.

4                 THE CLERK:  Do you solemnly affirm or swear that

5      you will tell the truth, the whole truth, and nothing but the

6      truth so help you God?

7                 THE WITNESS:  I do.

8                 THE COURT:  Counsel may proceed.

9                           JENNIFER SINK,

10       having been first duly sworn, was examined as follows:

11                        DIRECT EXAMINATION

12     BY MR. McMULLEN:

13     Q.     Ms. Sink, will you please introduce yourself to the

14     Court.

15     A.     My name is Jennifer Sink.  Spelled J-E-N-N-I-F-E-R.

16     Last name, S as in Sam-I-N-K.

17     Q.     Okay.  Where did you get your education?

18     A.     I have a Bachelor from Florida State University in

19     Political Science and I have a law degree from Southern

20     Illinois University.

21     Q.     Okay.  And how long have you been a lawyer?

22     A.     Since 2003.

23     Q.     Okay.  And your current position is what?

24     A.     I'm the Chief Legal Officer for the City of Memphis.

25     Q.     And prior to that, what was your position?

1   A.      I've been in this role -- I was appointed in January

2   of 2020.  Prior to that, I was in the role of the Deputy

3   Director for the -- or Deputy Director City Attorney.

4   Q.      Okay.  And in that role what did you do?

5   A.      In the deputy role?

6   Q.      Yes.

7   A.      In the deputy role I was a deputy to the Chief Legal

8   Officer, and primarily focused on providing legal counsel and

9   advice to the various divisions of city government, as well

10  as the Mayor, and had some involvement with City Council

11  matters as well.

12  Q.      And that included the Memphis Police Department as

13  well?

14  A.      Yes.  Yes, the Memphis Police Department is a division

15  of the City of Memphis.

16  Q.      And so since January 2020 you've been the Chief Legal

17  Officer.

18  A.      Yes.

19  Q.      Now, explain to me -- give me a brief description of

20  the City Legal Department and what its functions are.

21  A.      Okay.  The City Legal Department has approximately 64

22  employees.  One of its primary responsibilities is to provide

23  legal representation for the City.  But we also have other

24  departments within the law division, such as, the permits

25  office, and claims department, and City prosecutors, for

*DIRECT - JENNIFER SINK*                                            144

1   example.

2          The role of the City is not just to handle -- the

3   legal division doesn't just handle litigation for the City,

4   but we handle a myriad of legal issues.  The lawyers within

5   the division can provide advice and counsel to all the

6   various divisions, boards, and commissions of the city.

7   Q.      Okay.  And you heard the testimony earlier of Zayid

8   Saleem.  How is he connected with you in this organization?

9   A.      Mr. Saleem is an employee with the legal division.  He

10  is a Senior Assistant City Attorney.  And he is serving as

11  the legal advisor for the Memphis Police Department.  And so

12  he reports directly to me, but he also reports directly to

13  Director Mike Rallings.  And he is providing legal advice and

14  counsel to the Memphis Police Department, and that is his job

15  and his role.

16  Q.      Okay.  And is that his only job and role?

17  A.      It really is.  I mean, within that role he does many

18  different things.  He explained he does training, but he's

19  also responsible for, you know, being -- keeping apprised of

20  all the current legal issues, if there are any current --

21  like a court of appeals decision or anything like that.  I

22  mean, part of his job is to keep the police department

23  informed about changes in the law, keeping current on the

24  law.  He's also very involved in drafting policies and

25  procedures and training the officers on the policies.

1   Q.      And during his testimony he used the term embedded.    I

2   think the term embedded, he was embedded in the police

3   department.  What does that mean?

4   A.      It means that he literally has an office in the police

5   department, and he works on a daily basis with those

6   officers.  And it is unique compared to -- other divisions

7   don't have a legal advisor who is -- who serves in a role

8   like that.

9           We have -- all of our attorneys provide legal

10  assistance to the divisions.  But the police department is

11  unique that they have somebody committed to providing legal

12  advice and counsel.

13  Q.      You have been in the City Attorney's office since the

14  trial involving this Consent Decree; is that correct?

15  A.      Yes.  I've been working in the City Attorney's office

16  since January of 2016.

17  Q.      Okay.  And you have been intimately involved with the

18  Consent Decree and the trial and --

19  A.      Yes.

20  Q.      -- the training and the results of it.

21  A.      Yes.  From the beginning.

22  Q.      Okay.  And Mr. Saleem has -- has Mr. Saleem also been

23  intimately involved?

24  A.      Yes.

25  Q.      Tell me about your communication were Mr. Saleem.  Do

*DIRECT - JENNIFER SINK*                                                    146

1   you talk to him once a month, once a week, email him, do

2   y'all have meetings?  Tell me about that communication.

3   A.      Well, I speak with Mr. Saleem sometimes multiple times

4   a day.  It depends on the situation.  But he is part of my

5   team.  I mean, he is part of my division.  And so we are in

6   regular communication.

7           But I also regularly communicate with Director

8   Rallings and his deputy directors.

9   Q.      Okay.  And so not only Mr. Saleem, are you involved in

10  giving legal advice to Director Rallings?

11  A.      I am.

12  Q.      How often do you meet with Director Rallings?

13  A.      Well, at least once a week.

14  Q.      Okay.  Why do you know once a week?  Explain that.

15  A.      Well, because the Mayor has, as part of his

16  organization, what he calls a senior leadership team.  And

17  that is comprised of, I believe it's eight people, including

18  myself as the Chief Legal Officer, the other chiefs that are

19  part of the City government, and the Chief of Police.  And so

20  we regularly have a meeting every Monday morning to discuss

21  pertinent issues that we're all dealing with or needs to

22  be --

23              COURT REPORTER:  Excuse me, Judge.

24              THE COURT:  Excuse me.  Wait just one second.

25  We're having an issue with the reporter.

UNREDACTED TRANSCRIPT

 1              COURT REPORTER:  Someone's on top of the

 2    microphone.

 3              THE COURT:  Is someone obstructing the

 4    microphone?

 5              COURT REPORTER:  I didn't hear her answer.

 6              THE COURT:  That's okay.  We'll handle that.

 7    We're going to let you start over on your answer in just a

 8    moment.

 9              MR. McMULLEN:  Your Honor, can you hear us?

10              THE COURT:  Oh, I'm fine, I can hear everyone.

11    It's the court reporter who's having an issue.  And that's

12    very important, they're supposed to speak up and tell us so

13    that we have a clear, clean transcript.

14              I think we've got it squared away now.  The court

15    reporter is ready.  And I'm sorry, we're going to go back and

16    start that answer again.  It was quite interesting.  And you

17    may as well do a little bit of it again.  Thank you.  You

18    were talking about organization, which is very interesting.

19              THE WITNESS:  I think the question -- was the

20    question about meeting with Director Rallings?

21    BY MR. McMULLEN:

22    Q.    The question was how often do you meet with Director

23    Rallings.

24    A.    Okay.  I meet with Director Rallings at least once a

25    week, and that is because of a meeting that has been

*DIRECT - JENNIFER SINK*                                          148

1    established by Mayor Strickland.  As part of his

2    organization, he has what we calls a senior leadership team,

3    and that is his chiefs, so to speak.  Chief Legal Officer,

4    Chief of Operations, Chief Financial Officer, for example,

5    and, of course, that includes the Chief of Police.  And every

6    Friday morning we meet for about three hours and discuss --

7    every single one of us discusses pertinent legal -- or not

8    legal, pertinent issues that are going on with each one of

9    us, things that we want to discuss as a team.

10           And so I -- so at a minimum I know that I meet with

11   Director Rallings at least once a week.  He hears from me and

12   I hear from him.

13   Q.    Okay.  Are there some issues that Mr. Saleem will

14   handle and respond to them, and if he has an issue with them,

15   where does he go next?  Does he go to someone in your

16   organization?  Where does he go next?  Or does he go straight

17   to you?

18   A.    I believe that, typically, Mr. Saleem comes straight

19   to me.  There is a Deputy City Attorney that also is

20   involved, and it's probably one or the other.

21   Q.    Okay.  Now, you were a part of -- one of the

22   architects, along with the ACLU and other -- and the

23   Monitor -- well, not the Monitor, the ACLU, in coming up with

24   a modified Consent Decree?

25   A.    Yes, I was directly involved in the drafting of the

UNREDACTED TRANSCRIPT

1   proposed modification.

2   Q.      Okay.  And why do you -- why were you in favor of

3   modifying the Consent Decree?  Could you give the Court some

4   indication of what type gray area issues that rise to your

5   level that you had to handle and why -- and why, if it is,

6   the reason you want the Consent Decree modified.

7   A.      Okay.  Let me start with the premises that the primary

8   goal for the modification was to create clarity for the

9   officers, other City employees, as well as citizens; to add

10  the modernization, that we have the context, given the

11  numerous changes since this was written in 1978; and also to

12  codify the numerous court rulings; and also, you know, the

13  instruction we got through the Monitor Team about the

14  language in the Decree, and applying it in modern day

15  context.

16          The types of -- since we've had the trial and we got

17  the preliminary ruling in 2018, we have spent a lot of time

18  trying to make sure that we understood the Decree and that we

19  are complying with the Decree and properly training our

20  officers on the Decree.  And there's been numerous

21  discussions involved in that.

22          And we have gotten to a point, I believe, where we

23  have -- at least I have a lot more clarity about how to deal

24  with modern -- day-to-day situations and how to apply those

25  facts to the Consent Decree.

*DIRECT - JENNIFER SINK*                                        150

1          But the Decree, standing alone, is confusing.  It

2    doesn't contain language that's part of our modern day

3    vernacular and modern day policing, such as cameras,

4    body-worn cameras, social media.

5          Other aspects of it is there's been some very

6    important instructions from the Court that include some terms

7    that are modern terms but are not included in this Decree,

8    such as, legitimate law enforcement purpose.

9          So, really, our goal was not to, in any way, strip the

10   language of the Decree, but to be consistent with the spirit

11   and the passion of the Decree, but allow for something that

12   we could comply with.

13   Q.     And the Decree is a legal document.

14   A.     It is a legal document, yes.

15   Q.     Would it be fair to say that some of the terms are

16   terms commonly used in legal phrasing by lawyers?

17   A.     In the current version or --

18   Q.     No, in the original version.

19   A.     Oh, in the original version, yes.

20   Q.     And that was -- and it was written when?

21   A.     It was entered in 1978.

22   Q.     Now, I want you to explain to the Court part of your

23   challenge.  While you and Mr. Saleem are trained lawyers, the

24   people who have to execute within this Consent Decree, how

25   many lawyers are actually police officers that you're aware

1  of?

2  A.      I'm not aware of any.

3  Q.      And I think it's been spoken in the record -- and I

4  want you to just explain to the Court the process, even with

5  the RFA process that you go through -- explain the RFA

6  process.

7  A.      So the RFA process, the request for authorization, is

8  something that evolved about four or five months, I think,

9  after the Monitor Team was appointed.  Where we were coming

10 to the Monitor Team with a lot of questions.

11      And what developed was a process that has been

12 actually very helpful, and the Monitor developed this

13 process, that we would provide something in writing about

14 what was our question and outline it.  And then we would

15 receive a response in writing, and sometimes there would be

16 some, you know, oral communication in between.

17      But the RFAs have changed a lot over time, as we came

18 to really understand better and better how to apply the

19 modern context just amongst the lawyers.

20      But even since the Court's November 2019 order, I

21 believe that we still submitted 11 or more requests for

22 authorizations to the Monitor Team -- and some of those had

23 multiple components to it -- in order to either assure

24 ourselves that we were correct in what we thought we were

25 allowed to do and not allowed to do, or because we really

*DIRECT - JENNIFER SINK*                                         152

1    needed clarification because we were unclear.

2          And it's really -- there's just the gray areas.

3    Increasingly, the gray areas are with regard to social media

4    and the type of things that are posted that are not clearly

5    criminal implications --

6    Q.    Can you give us some real -- give the Court some real

7    examples of those?

8    A.    Yes.  In fact, fairly recently, in late May, I was

9    contacted by Mr. Saleem who advised that the Tennessee Fusion

10   Center had sent some information to the Memphis Police

11   Department, and it was a --

12               MR. McMULLEN:  I don't want to stop your train of

13   thought.

14               Your Honor?

15               THE COURT:  Yes.

16               MR. McMULLEN:  I would like to publish

17   Defendant's --

18               Okay.  I would like to show the Court -- it's

19   under seal.  It is the RFA Defendant's 11.

20               THE COURT:  All right.

21               MR. McMULLEN:  Document 330-1.  We submitted it

22   as a proposed exhibit, Defendant's Number 11.

23               THE COURT:  Okay.  330-1, sure.

24               MR. McMULLEN:  And it is under seal.  If we could

25   only publish --

                        UNREDACTED TRANSCRIPT

*DIRECT - JENNIFER SINK*                                              153

1              THE COURT:  I can look at it.

2              MR. McMULLEN:  Okay.

3              THE COURT:  I think if it's -- I've got it right

4   here 330-1.  At least I should have it.

5              Can you print it, Mr. Sample.

6              THE CLERK:  Yes.

7              MR. McMULLEN:  It's the thing that Mr. Castelli

8   had.

9              THE COURT:  Right.  It just takes a second and

10  we'll have it.  I've got it.  I've got it right here.  I've

11  got it up on my computer and I've got a hard copy.

12  BY MR. McMULLEN:

13  Q.    Okay.  Ms. Sink, could you go ahead and finish

14  explaining.

15  A.     Okay.  So this is -- it was on May 28th.  And what the

16  information that we received was from the Tennessee Fusion

17  Center that a person, who they identified as being from

18  Memphis, had issued a tweet.  And the context of this was

19  that after the killing of George Floyd, and there was, you

20  know, the national level protests that were going on.  But

21  that's the background.

22         And the tweet said, we need to kill all cops for

23  sport.

24         And the question that was posed to me by Mr. Saleem,

25  you know, via Memphis Police Department, via Mr. Saleem was

1    what do we do about this information?  Can we investigate

2    this?

3            And if that type of information, where you've got

4    somebody who has issued a tweet and it says something like

5    this, we need to kill all cops for sport, really raises

6    questions about, is this somebody -- does this have criminal

7    implications or not?

8            And this has a gray area, where you're really walking

9    a line between it's implicating First Amendment speech and

10   potentially -- or, I'm sorry, criminal implications or does

11   it?

12           To me, that is the most complex scenario that we have

13   to address.

14   Q.    But what about the side that someone's saying, look,

15   they're saying we need to kill cops?  That's criminal.

16   That's criminal.  There should be no hesitation on

17   investigating it.

18   A.    Well, I think that there are -- if there are

19   reasonable -- legal minds can disagree.

20              THE COURT:  I'm not sure on that one, that any

21   legal mind would realistically disagree.  That's simply

22   saying that we need to commit a crime.

23              And did you find that difficult or not?

24              THE WITNESS:  Well, Your Honor, I did ask the

25   Monitor for clarification to determine whether or not this

*DIRECT - JENNIFER SINK*                                      155

1    was something that we could act upon.

2                    THE COURT:  Right.

3                    THE WITNESS:  And so I got a response from the

4    Monitor.  But I did want to make sure that this was

5    something -- that was the type of situation that was not

6    going to run afoul of the Consent Decree.

7                    THE COURT:  Sure.  Sure.

8    BY MR. McMULLEN:

9    Q.    Were there any -- explain some of the other gray area

10   issues that you've gotten?

11   A.    Well, we -- well, we've gotten other types of similar

12   social media posts that will come from citizens, for example,

13   that are sent to Memphis Police Department.  And the question

14   becomes, you know -- again, it's a constant reevaluation to

15   make sure that we are following the right process and

16   handling it in a correct manner.

17                   THE COURT:  And I want to ask a question just so

18   I understand it.  It looked like -- and I think it's

19   certainly no harm in asking, generally speaking, I'm not

20   criticizing that.

21                   How quickly were you able to get a response to

22   your inquiry, for the record?  I can see it, but it's a

23   sealed document so no one else can.

24                   THE WITNESS:  How quickly did they respond?

25                   THE COURT:  Yes.

                         UNREDACTED TRANSCRIPT

 1              THE WITNESS:  Okay.  I sent this on May 28th at

 2  6:46 p.m.  Now, subsequent to that I sent a second request a

 3  couple of hours later.  And then on the next day, at 9:54

 4  p.m., I got a response.  And, actually, the response

 5  included -- there was a response to both requests for

 6  authorization.

 7              THE COURT:  Right.  I'm sorry.  Help me again on

 8  that one, just on the timing, so we're got it down right.

 9              I've got the first one on -- I just want to

10  follow up.  Would you just follow that through for us.  And I

11  think that -- I just want to be sure that the record

12  accurately reflects how that was handled.

13              THE WITNESS:  All right.

14              THE COURT:  What I'm showing is that there was

15  a -- you go through them.  I need to let you do that.

16              THE WITNESS:  All right.  I sent the email on May

17  the 28th at 6:46 p.m.  I received a response on May 29th at

18  9:54 p.m.

19              THE COURT:  Okay.  And thank you.  I just thought

20  it was important for you to be able to tell us that.

21              THE WITNESS:  And what I was explaining, Your

22  Honor, is that after my initial email, about an hour later, I

23  had to send another email to the Monitoring Team.  And the

24  response I received on May the 29th addressed both of those

25  emails.

1    THE COURT:  Okay.

2  BY MR. McMULLEN:

3  Q.    The second email you sent to the Monitor Team, that

4  was for another RFA?

5  A.    It was.  And it was -- it was kind of similar but not

6  the same, but the police department had received on the -- as

7  a private message on the official Memphis Police Department

8  Facebook page, a snapshot of somebody's social media post.

9    And that particular post was more -- in my mind, more

10 clear about the criminal implications, because it referred to

11 burning down all the police precincts in Memphis.

12    But I thought it was prudent at the time to send the

13 request just to verify that this information coming from a

14 third party, a citizen, not a law enforcement, but us having

15 no means of knowing who sent it or how they got it, how that

16 Consent Decree implicated -- was implicating that situation.

17    And so, ultimately, the Monitor responded that we

18 could act upon it and we could share it.  And that Section G

19 authorization would be required.

20 Q.    Okay.  That's something that is recent.  Do you have

21 any other examples of gray areas that you can think of?

22 A.    You know, there have been other types of nonsocial

23 media examples.  We've had some -- we had a situation where

24 we were setting up, like, a testing site for COVID-19.  And

25 there was a question that came up about could -- there was a

1    testing site on Pior Lane and the police asked me, can they

2    use cameras and drones in the testing site?  So that was

3    another type of request for authorization that was submitted

4    to the Monitor.

5                    THE COURT:  I'm sorry, wait just one second.

6                    We're going to mark -- I think we're going to

7    mark, under seal, is this okay, Mr. McMullen, the memo that

8    we just went over.  Because I think it is important.  It was

9    your 11, and we'll give it a number 27, and so that's clear.

10   It is under seal because of some personal information

11   contained therein.  And I'm going -- I wasn't trying to cut

12   off our witness.  I know, Ms. Sink, we need to get that done.

13   And then you're telling us about this other event.

14                    Any problem with marking that, Mr. McMullen?

15   We'll put that under seal.  No issue, Mr. McMullen?  I'm just

16   checking with counsel.

17                    MR. McMULLEN:  No, Your Honor.

18                    THE COURT:  Okay.

19                    MR. McMULLEN:  I don't have any problem.

20                    THE COURT:  All right.  I'm going to check also

21   with the Monitor, because -- Monitor's counsel, because it's

22   sort of sensitive.

23                    MR. STANTON:  Thank you, Your Honor.  Is it

24   possible -- could we publish just the first page, the

25   Monitor's response?  I don't think that first page has

1   sensitive information in it.

2           THE COURT:  We could.  I'm looking at it.

3           MR. McMULLEN:  Your Honor, I would object to

4   that.  It takes it out of context.

5           THE COURT:  Well, I think the question is not

6   that we would not mark the document, but that we would have a

7   public submittal of the second -- of the first page.  The

8   entire exchange will be under seal.  And then, hopefully,

9   with a chance to do some proper redaction maybe -- I mean,

10  it's a little bit of an issue there -- but we might be able

11  to unseal everything except some briefly redacted material.

12          Is that an objection or is that okay?

13          MR. STANTON:  That sounds great to me, Your

14  Honor.

15          THE COURT:  And I know that -- ACLU, is that

16  satisfactory to ACLU?

17          MR. CASTELLI:  Yes.  Yes, Your Honor.

18          THE COURT:  Okay.  What we're going to do is

19  actually mark the entire document under seal as 27, and then

20  we're actually -- to make it very clear so we can't mess it

21  up -- well, we usually make them a 27A, which is the

22  public -- the published first page.  So it will say 27, and

23  then 27A will be listed as a separate one, but we'll have to

24  show that they were related.  So it's 27A.

25          Now, I want to make sure everybody here can get

1    that done.  So I'm going to hand it back.  I'm actually going

2    to pull the top cover sheet off.  And then we have got 27A,

3    that page.  And then we've got 27, which is under seal, the

4    whole document.

5                    Okay.  Good deal.  That will make the record much

6    cleaner.  Thank you all, both, very much.

7        (No. 27 (under seal) and 27A was marked and received into

8                                evidence.)

9                    THE COURT:  Thank you.

10                   And, Ms. Sink, we're not trying to -- we're just

11   trying to get the record straight here so...

12                   THE WITNESS:  I understand.

13                   MR. McMULLEN:  Okay.  And we're going to publish

14   the first page of that document; right?

15                   THE COURT:  Yes.  We can -- everybody indicates

16   that can be published.  Can y'all -- we'll set ours up too.

17   I'm setting mine up right now.

18                   MR. McMULLEN:  Let's go ahead and put that on the

19   screen.

20                   Your Honor, may I continue?

21                   THE COURT:  Oh, absolutely.  Yes, sir.

22   BY MR. McMULLEN:

23   Q.    At some point, Ms. Sink, the rest of the document will

24   be published in some form redacted.  But this is the

25   Monitor's response to the question and --

*DIRECT - JENNIFER SINK*                                            161

1    A.      Yes.

2    Q.      Is it fair to say that the understanding of the

3    Consent Decree has been evolving for everybody involved?

4    Meaning everybody's becoming more educated and more in tune

5    as the Court has offered guidance?

6    A.      Yes.

7    Q.      Can you point to an example of that.

8    A.      Yes.  Myself included, I would say.

9            Well, I mean, I think --

10   Q.      Do you have a hard copy?

11   A.      I do have a hard copy.  I mean, this evolved itself,

12   kind of outlines, really, some of the -- what has occurred

13   with regard to understanding.  Mr. Stanton makes a point, he

14   says, you're correct, that the receipt of information from

15   the Tennessee Fusion Center potentially implicates Section I

16   of the Consent Decree.  He goes on to quote Section I.

17           And says, my team and I previously understood

18   Section I to create the onus on the City to verify that any

19   information it received from public or private entities and

20   individuals satisfied the same standard as information

21   lawfully collected by the City itself.  And he quotes his own

22   opinion from August 2019.

23           And then he goes on to really outline that that

24   opinion changed -- or that Judge McCalla shed light on this.

25   And says, but Judge McCalla since has explained that the City

1   must, quote, reject outright all information constituting

2   political intelligence that is unrelated to any legitimate

3   law enforcement activity.  End quote.  And he cites an

4   order -- I believe this is a November 2019 order.  And goes

5   on to say, to do analysis of the information based upon that.

6   And says, that the information received is a concern of

7   threat of violence against law enforcement officers.  And

8   even if that information constitutes political intelligence,

9   it's necessarily related to legitimate law enforcement

10  activities, that the City may act on this information and

11  share it with other law enforcement agencies.

12        And then he goes on to explain in here -- I won't read

13  all that unless you want me to.  But that this information is

14  also implicated by Section G.

15        And, ultimately, says -- and towards the bottom, it's

16  highlighted -- for that reason although the City may act on

17  or share the information, it must also follow the

18  authorization and review requirements of Section G for any

19  action related to that information.

20  Q.    So I'm glad we made that a public exhibit.

21        So even in this letter -- and I'm not being in any way

22  critical, because I have had interpretations that people

23  haven't agreed with.  But even in here, you give an example

24  of even lawyers at some point having confusion until the

25  Court made clarification?

*DIRECT - JENNIFER SINK*                                          163

1   A.      Well, I think that the letter, it was a helpful

2   analysis for me on the one hand.  But, also, it does kind of

3   outline that the history of one section of the Consent Decree

4   that has been analyzed and how we've come to understand what

5   it means in the context of these day-to-day actual

6   applications.  So that's what this is reflecting.

7   Q.      And at the time there was not a definition in the

8   Consent Decree as to what a legitimate law enforcement

9   activity was, was there?

10  A.      No.

11  Q.      Okay.  In the modification -- we'll go to the

12  modification.

13          As part of modifying the Consent Decree, the ACLU and

14  the City have now included a definition of legitimate law

15  enforcement activities.

16  A.      Yes.

17  Q.      And you and Mr. Saleem and your team worked hard at

18  negotiating that with the ACLU.

19  A.      Yes.

20  Q.      Okay.  Also, I do want to point out in this

21  definition, and I want to talk about a part of this RFA that

22  is not public but you spoke to it, when -- I think, and I may

23  be paraphrasing, I want to kill some cops or something.  Do

24  you --

25  A.      Killing cops for sport.

1    Q.      Killing cops for sport.

2            Do you think it's essential in the definition of law

3    enforcement purpose, that you have, you know, that phrase

4    that you don't stop the law enforcement purpose -- you don't

5    stop it after the word crime -- let's read through it.

6            Legitimate law enforcement purpose means any activity

7    conducted for the purpose of furthering the prevention of

8    crime and/or ensuring public safety and law enforcement

9    personnel while adhering to the law.  And the agent and

10   policy is designed to protect privacy, free speech,

11   association, and other civil rights and civil liberties.

12   A.      Of all people.

13   Q.      Of all people.

14           And is that why you felt it was important to list law

15   enforcement personnel as well as citizens?

16   A.      Yes.  First and foremost, we thought it would be

17   beneficial and important to have a definition of legitimate

18   law enforcement purpose that everyone agreed upon or that

19   could come up to as a definition.

20           But the legitimate law enforcement purpose does

21   include ensuring safety of the public and law enforcement

22   personnel.  That is part of what law enforcement does.

23   Q.      Okay.  Next, I want to focus your attention to

24   Section I of the Consent Decree.  Exhibit 19.

25           And this section is entitled Restriction on Joint

1   Operations.  And that is the one section that there was no

2   full agreement with the ACLU.

3   A.      Correct.

4   Q.      Although, I think we're pretty close.  But I want to

5   put up the language that the City proposes, and that would be

6   Exhibit 25.

7           Can you go through this language and explain to the

8   Court why certain things you felt should be included and

9   certain things you felt should not be included and the

10  thinking behind it at this point.

11  A.      Certainly.  So the blue on here reflects the language

12  that would be additional language we're proposing be added to

13  Section I.  And there's two words that we are proposing be

14  stricken from Section I, and that's in the red line.

15          So I'll start with that.  To delete the "cooperate

16  with" language.  And the reason for that is we found that

17  there are questions coming up about what the word "cooperate"

18  means, especially in the context of a joint multi-agency task

19  force or unit.  The words "cooperate with" seem

20  inherently that doing something jointly, you are cooperating

21  with each other.  So we're asking that to be removed because

22  of the confusion that causes and the issues that have -- or

23  questions that have come up with regard to that.

24          The rest of the language is really designed to attempt

25  to codify, in summary form, the ruling that we received from

 1   the Court that would help us to understand or explain what is

 2   allowed and what's not allowed.

 3          So under the first paragraph, beginning the phrase,

 4   "in other words", we are really reiterating, I think, a point

 5   that everybody certainly does know, which is that the City

 6   cannot ask another agency to do something that it otherwise

 7   would not be allowed to do under this Consent Decree.

 8          The second component of that, though, is we did make a

 9   reference to not violating the United States Constitution as

10   opposed to violating the Consent Decree.

11          And the reason for that is because of the fact that

12   the other joint agencies are not bound by the Consent Decree

13   that we're working with.  What is of -- ensuring that nobody

14   would be violating the U.S. Constitution seemed to be the

15   more instructive language for this section.

16          The second section -- or paragraph, rather, here

17   incorporates some important language that would incorporate

18   other aspects of our proposed modifications.  For example, we

19   have a reference here to First Amendment-related

20   intelligence, which we proposed.  We've also incorporated the

21   term legitimate law enforcement purpose, which has been

22   proposed.  And it more clearly provides for framers of what

23   can and cannot occurr under the Consent Decree as a whole.

24          The last sentence in particular was really meant to be

25   instructive with regard to things like CrimeStoppers, or just

*DIRECT - JENNIFER SINK*                                                    167

1   concerned citizens or third parties who are just kind of

2   unsolicited providing information that they're receiving to

3   the City of Memphis Police Department, because they think

4   that it's something we should be aware of.

5   Q.      Okay.  And you've worked with this modified Consent

6   Decree for a while --

7   A.      I'm sorry.  I wanted to say one more thing.  The last

8   paragraph, also, does, I think, provide some clarity with

9   regard to obtaining authorization in Section G.  And also

10  provides some clarity with regard to Section H, which is not

11  something that we spent a lot of time talking about, but

12  deals with, you know, the disseminating and cataloging of

13  information.

14  Q.      All right.

15  A.      Sorry about that.

16  Q.      No problem.  It's your testimony.

17          Having reviewed the modified proposed order -- the

18  modifications to the Consent Decree, taking Section I out, we

19  haven't had an agreement on that -- well, putting Section I

20  as you proposed in, do you think you'll be in a position, you

21  and Mr. Saleem, to give clear directives to the police

22  department and clearly -- it will be a document that they

23  could clearly understand what the do's and don'ts are and be

24  able to really execute without hesitation and doubt?

25  A.      Yes.  I believe that this is going to provide clarity.

*DIRECT - JENNIFER SINK*                                           168

1   I believe it is still consistent with the spirit of the

2   intent of the Consent Decree, and consistent with the rulings

3   and instructions and guidance that we received from the

4   Court.  And our goal is compliance.  And we -- our goal is to

5   make sure that the officers understand the Consent Decree.

6   Q.    Okay.  And in all fairness to you, when you were

7   Deputy City Attorney, when you got -- you got almost

8   100 percent of the questions came to you first, some of

9   extreme interpretations, some of them very conservative

10  interpretations, you've had the whole gamut of questions from

11  MPD; is that correct?

12  A.    I did.  You know, during that tenure it was all also

13  relatively new, so I was deputy during the trial.  And we had

14  a lot of conversations and meetings after the Court's first

15  ruling.  And we've never [inaudible] that, but I certainly

16  was heavily involved in talking to police and trying to help

17  them understand it and apply it with modern -- not modern,

18  but, you know, day-to-day fact situations.

19  Q.    In all fairness, all of them came to you and you

20  vetted them before it went to the City Attorney at that time.

21  A.    That's true, yes.

22  Q.    Okay.  So some of them didn't even get to that level

23  because there was such extreme interpretation from officers

24  who were not lawyers?

25  A.    That's true.

*DIRECT - JENNIFER SINK*                                                169

1   Q.      Okay.  So you seen them run the gamut.

2   A.      I have.

3   Q.      Okay.  And do you think with this modification -- and

4   I know this may be speculation, but do you think -- first of

5   all, over time understanding had gotten better.  Would you

6   agree with that?

7   A.      Yes, I would agree, for sure.

8   Q.      And you get fewer issues than you did originally?

9   A.      We do.  We do get fewer issues.  And then you have, I

10  think, situations where -- are unique or maybe there is kind

11  of a crisis, so to speak.

12          So, for example, when COVID first came up, there was a

13  lot of new things going on.  And so I think there was a lot

14  of questions about it.  And not just from police officers, I

15  get questions from other divisions of City government who

16  we've not spent as much effort training on.  But then when

17  you have a situation like the very -- a period of time where

18  you've got daily protests going on or daily First Amendment

19  issues going on, I think in those situations you tend to see

20  more questions come up.  And the questions really are geared

21  at trying to make sure that they are in compliance.

22  Q.      And I want to go back to that RFA that's been marked

23  as Exhibit Number 25, because I don't think I did a good job

24  articulating.  It was getting to the bottom of --

25  A.      27?

*DIRECT - JENNIFER SINK*                                           170

1    Q.      Yes.  Why you thought the information from the Fusion

2    Center saying, let's kill all cops, would not be something

3    that is obviously criminal that you act upon right there.

4            Was there some concern as to -- based on original

5    reading of "I", of information that you got from outside

6    sources couldn't be considered, regardless of what it said,

7    that was one --

8    A.      There was some concern, or, perhaps, also just wanting

9    an assurance, but the source of it was a concern.  Also, in

10   this instance, I had been told specifically that this

11   information was obtained through youth by the Fusion Center

12   through a social media collator.  That raised some concerns

13   for me.

14           And then in the context of it being said as well,

15   given the -- all the unrest and frustration with regards to

16   the current events, making that statement also led me to want

17   to make sure that -- I personally felt like it was a gray

18   area that I wanted to have resolved.

19   Q.      And then your focus was on how the information was

20   obtained by the Fusion Center, not --

21   A.      Yes.  And I made a point of -- I made that point to

22   the Monitor.  I wanted that to be clear that that's what we

23   had been told specifically with regard to this.

24   Q.      But we know today from the Court that they can act on

25   that.

UNREDACTED TRANSCRIPT

*DIRECT - JENNIFER SINK*                                           171

1  A.      Yes.

2              MR. McMULLEN:  Okay.  I have no further

3  questions, Your Honor.

4              THE COURT:  Certainly.  Certainly.

5              Mr. Castelli, any questions for this witness?

6              MR. CASTELLI:  I have just a few, Your Honor.

7              THE COURT:  Certainly.

8                         CROSS-EXAMINATION

9  BY MR. CASTELLI:

10  Q.      Good afternoon, Ms. Sink.

11  A.      Hello.

12  Q.      I just -- if you could look at maybe Exhibit 27.  I

13  just want to make sure, for the record, that the record is

14  correct.  Because if you look at the first page -- and we can

15  publish that, so I'll pull it up.

16          Okay.  That is the first page of the exhibit, 27; is

17  that correct?

18  A.      I believe so, yes.

19  Q.      And so -- and correct me if I'm wrong, but I thought

20  when you were testifying you said that the date -- this is

21  kind of minor, but I just want to make sure the record's

22  clear -- that the date of the Monitor's response was

23  May 29th.  And I see May 28th.  So I just want to make sure

24  that we're looking at the same document.

25              MR. McMULLEN:  You're correct, Tom, that was an

 1  error.

 2            THE WITNESS:  I apologize.

 3  BY MR. CASTELLI:

 4  Q.      No, I just wanted to make sure, because I didn't want

 5  the record to be wrong.

 6  A.      Thank you.  I apologize.

 7  Q.      So Mr. Stanton got back to you pretty quickly then on

 8  this, within a few hours it looks like.

 9  A.      Right.

10  Q.      Okay.  I just wanted to make sure, because the Monitor

11  was there and I wasn't, that it's not an incorrect document.

12          And I don't want to pull up the reference to the

13  Judge's order in ECF Number 250, that's the order you thought

14  provided the clarity that you could indeed accept this

15  information, even though you didn't maybe know exactly how it

16  was obtained, because the information itself didn't violate

17  the Decree.

18  A.      Yes.  Right.  And part of that is the Decree itself,

19  but also making sure that there might be -- like, you're

20  saying that it must reject outright only information

21  constituting political intelligence that is unrelated to any

22  legitimate law enforcement activities.

23          So while understanding conceptually what the Judge had

24  ruled, wanting to make sure, in part, that definitions of

25  legitimate law enforcement activities and for the context of

*DIRECT - JENNIFER SINK*                                        173

1   this tweet.

2   Q.      Okay.  I'm going to end that.

3           And you also agree -- I asked several witnesses this

4   question so I'll ask you, do you agree that the proposed --

5   the joint proposed changes that we've made to the Court do

6   not affect the protections afforded by the Decree to people

7   that are in the City of Memphis?  Do you agree with that?

8   A.      I'm sorry, can you repeat that.

9   Q.      Yeah.  The proposed modifications, jointly proposed

10  modifications do not actually diminish any of the protections

11  that were provided by the original language of the Decree.

12  A.      No, do not.  That's certainly not the intention.

13  Q.      And then I also asked Mr. Saleem a similar question

14  and I'll ask you.  But part of your role as the Chief Legal

15  Officer with regard to the Decree is to answer questions that

16  some of your City officials may have about how the Decree

17  operates; is that correct?

18  A.      Yes.

19  Q.      And so going forward, and in the past, your role would

20  also be to correct any misinterpretations or

21  misunderstandings about how the Decree operates?

22  A.      Yes.

23  Q.      Okay.  And have you been directly involved in any of

24  the training that has been occurring, or is that Mr. Saleem's

25  business?

1  A.       I'm not directly involved in the in-service.  When we

2  were operating, you know, in 2019, 2018, that timeframe, when

3  we weren't doing -- I guess it's not in-service training, but

4  when we were training and communicating with Director

5  Rallings and command staff about the Consent Decree, I was

6  involved in that.

7          In other words, we were training -- we were providing

8  training and information about the Consent Decree prior to

9  when the in-service, the formal in-service training began in

10  January of year by Mr. Saleem.

11  Q.      And then on top of the formal training starting and

12  in-service training, you, in your role, sounds like, would be

13  available to the Director, you know, weekly to answer and

14  field any questions that may arise about how the Decree

15  applies in specific situations.

16  A.       I'm certainly available.  I think that -- again,

17  amongst the police department, most of the officers are going

18  to be inclined to first ask their commanding officer, who, if

19  they're unable to answer it, will in turn either ask someone

20  up the chain from them or go to directly to Zayid Saleem,

21  which is the more likely scenario.

22          But I certainly do have the Director or deputy

23  directors reach out to me directly on occasion.  But they

24  often will -- like I said, either they go commanding officer

25  level or the commanding officers typically will go see

*DIRECT - JENNIFER SINK*                                                       175

1    Mr. Saleem.  Because he is the designated legal advisor for

2    the Memphis Police Department.

3    Q.      And I want to share -- or publish, I think it's been

4    marked as Exhibit 25, which is the City's proposed Section I.

5            Ms. Sink, do you have that in front of you or can you

6    see it on the screen?

7    A.      I can, yes.

8    Q.      You had mentioned the strike-through, the one

9    strike-through here where the language is being removed from

10   the original Decree.  The "cooperate with" language.

11           Can you explain to me, again, what the issue is with

12   that language.

13   A.      The word "cooperate", there has been some questions

14   raised about that word.  Which when you have a joint effort,

15   inherently, part of being a -- part of -- a joint part of

16   something is that you are going to cooperate with each other.

17   And that term has caused some confusion and questions about

18   is that term in and of itself prohibitive of joint

19   operations.

20   Q.      But the other terms, you haven't had any confusion

21   about encourage, delegate, employ, or contract with?

22   A.      I think those are clearer.

23   Q.      Okay.

24   A.      And I think that it is certainly clear that a

25   restriction under the Decree is that we cannot ask another

*DIRECT - JENNIFER SINK*                                          176

1   agency, even one that we may be in a joint operation with, to

2   act as our surrogate for the purpose of violating the Consent

3   Decree or doing something we would not be allowed to do under

4   the Consent Decree.

5              MR. CASTELLI:  All right.  Those are my

6   questions, Your Honor.

7              Thank you, Ms. Sink.

8              THE WITNESS:  Thank you.

9              THE COURT:  Certainly.  Let me go to counsel for

10  the Monitor.  Any questions there?

11             All right.  Mr. Perry.

12             MR. PERRY:  Thank you, Your Honor.

13             THE COURT:  Certainly.

14                       CROSS-EXAMINATION

15  BY MR. PERRY:

16  Q.    Mr. Castelli actually made the clarification.  The

17  first thing that I wanted to talk about was the timing.  Can

18  we pull up 27A, just that first page.  Just that first page

19  there.  Yes.

20        And I just wanted to be clear.  Ms. Sink, you have the

21  full exhibit there with you; right?  We've only published the

22  first page of it, but you've got the full exhibit there?

23  A.    I do.

24  Q.    Okay.  So I just want to confirm.  Your first email on

25  May 28th was sent at 6:46; is that right?

1   A.      Yes.

2   Q.      And then your second email was sent about an hour

3   later at 7:40 p.m.; is that right?

4   A.      Yes.

5   Q.      And Mr. Stanton responded to you at 9:54 p.m. that

6   same evening; right?

7   A.      Yes.

8   Q.      So it's --

9   A.      And I misspoke earlier on that date, so I apologize.

10  Q.      No, thank you, and I appreciate that.  I know that

11  wasn't intentional.  I just wanted to make it clear that it

12  was a delay of two hours and not a day.

13  A.      It was a very quick turnaround.

14  Q.      Thank you.  I want to talk a little bit about what I

15  think you've described to Mr. McMullen as the evolving

16  understanding of Section I.

17          And I think you're right, in this RFA you see -- can

18  we make that a little bit larger?  The sentence that starts

19  with "my team and I previously understood."  Did we lose it?

20  There we are.  I want to highlight "my team and I previously

21  understood."

22          Ms. Sink, do you see the portion that I'm talking

23  about, my team and I previously understood, Section I?

24  A.      Yes.

25  Q.      Okay.  That opinion that we gave you all in August of

1  2019, and that's cited there; is that right?

2  A.      Yes.

3  Q.      And then Mr. Stanton explained that Judge McCalla

4  explained in Order ECF 250 that this is the understanding of

5  it, and that Judge McCalla's order is also cited there; is

6  that right?

7  A.      Yes -- I'm sorry, can you repeat that?

8  Q.      Sure.  Judge McCalla's order, the ECF 250, that's

9  Judge McCalla's order from November 2019; is that right?

10  A.      Yes.

11  Q.      And so I just want to clarify, as we talk about an

12  evolving understanding of Section I, you had had that

13  understanding since November of 2019.

14  A.      I was familiar with the order, yes.

15             MR. PERRY:  That's all I've got.  Thank you, Your

16  Honor.

17             THE COURT:  All right.  Redirect?

18             MR. McMULLEN:  No questions, Your Honor.

19             THE COURT:  All right.  Well -- yes, sir, I'm

20  sorry.  No questions?

21             MR. McMULLEN:  No questions.

22             THE COURT:  I'm looking to see if someone on your

23  right was saying something.

24             MR. McMULLEN:  I'm looking at my witness board

25  making sure we were done.

1          THE COURT:  No problem.

2          Well, Ms. Sink, thank you for being with us today

3     and we appreciate your testimony, and we are going to let you

4     be excused at this time.  Of course, you can remain on if

5     you'd like.  So thank you very much.  Thank you.

6          THE WITNESS:  Thank you.

7          THE COURT:  All right.  Will there be any other

8     evidence presented by the City of Memphis at this time?

9          MR. McMULLEN:  No, Your Honor.  We plan to pick

10    up with Eric Daigle on Monday.  And I imagine that will

11    conclude all of our proof at that time.

12         THE COURT:  All right.  And now we're going to go

13    to ACLU.  And, Mr. Castelli, do you now contemplate that you

14    will be calling any witnesses -- I know that everybody knows

15    the information on "I" is very important.  Will you be -- and

16    I'm not suggesting you call anybody.  I just want to make

17    sure everybody understands that we're getting to the last

18    opportunity to present anything on any of the disputed issues

19    or any issues you wish to present on.

20         Will you be calling any witnesses in this case?

21         MR. CASTELLI:  No, I don't believe we will be

22    calling any witnesses.  I believe we've gotten the testimony

23    we thought we needed from the Monitoring Team and from the

24    City's personnel through the cross-examination.  So I don't

25    think we will need to call any witnesses.

 1              The only thing I think maybe, and I know that the

 2     Monitor had mentioned this the other day, that after

 3     Mr. Daigle's testimony concludes there may be a member of the

 4     Monitoring Team, maybe Mr. Bowman who may be called to

 5     discuss some of the concepts Mr. Daigle discussed.  So we

 6     would want to reserve that right to call Mr. Bowman for that

 7     purpose.  But, otherwise, I don't think we will be

 8     introducing any new witnesses.

 9              THE COURT:  Certainly.  And let's go to

10     Mr. Stanton.

11              Mr. Stanton, will the Monitoring be presenting

12     any additional information -- I think everybody knows the

13     issues that we need to address, and so this will be the last

14     chance.

15              Do you intend to call anyone else, other

16     Mr. Bowman, who I understand you may call; is that correct?

17              MR. STANTON:  That's correct, Your Honor.  No one

18     else outside of Dr. Bowman, that's correct.

19              THE COURT:  Will Dr. Bowman be ready to proceed

20     immediately after Mr. Daigle concludes?

21              MR. STANTON:  Yes, Your Honor.

22              THE COURT:  Okay.  That sounds good.

23              Now, at the end of that it is not only a

24     tradition in law, but often a requirement that the parties

25     present their closing arguments or submit final briefs.

1          The nature of this hearing is such that a brief

2    closing discussion may be appropriate.

3          And I'm going to start with the City, since they

4    actually have the burden here, and ask do you wish to make --

5    and I'm talking about relatively brief, but you can also put

6    things on the screen if you wish -- a brief closing argument?

7    I would say brief is less than -- 30 minutes or less.  You're

8    not required to.  Your preference may be to submit something

9    in writing.

10          But, Mr. McMullen, how do you wish to proceed at

11    that point?

12          MR. McMULLEN:  Actually, Your Honor, we thought

13    about that.  We would like to do both, just a brief

14    summation, and follow that with a submission to the Court.

15          THE COURT:  All right.  And that sounds fine.

16          About how much time do you think before you would

17    be able to submit the paper brief?  And make sure you choose

18    an amount of time that's adequate but pretty close in time.

19    It's easier to do things --

20          MR. McMULLEN:  Three days.

21          THE COURT:  How many days?

22          MR. McMULLEN:  Three.

23          THE COURT:  Three?  I'm impressed.  I'm

24    impressed.  It's not as quick as --

25          MR. McMULLEN:  Mr. Glover's trying to speak.

UNREDACTED TRANSCRIPT

 1              MR. GLOVER:  Mr. Glover would like to say that as

 2    soon as Mr. McMullen said that, all of the younger lawyers

 3    that have to write the brief laughed.

 4              THE COURT:  I'll tell you what, if you ask for

 5    three, I'm going to give you five.  I think you may want some

 6    transcript on some of this.  But if you let them know today,

 7    our reporters can get busy on that.  And so we'll say five

 8    days, and we'll revisit that on Monday.  I think five days is

 9    a -- five days will actually be five business days.  In your

10    case, because it's five days, that will put you coming in on

11    the following Monday after completing the closing argument.

12              And then, Mr. Castelli, you're responding really.

13    Of course, there will be a chance, also, for the Monitor to

14    submit materials.  But you would typically, because you're

15    defending in a sense, I mean, we've switched roles here in

16    terms of burden, you would usually respond -- and I could

17    give you either five days or three days if you're as quick as

18    Mr. McMullen, whichever one you want.

19              MR. CASTELLI:  I think I'll take the five days,

20    Your Honor.

21              THE COURT:  That's fine.

22              MR. CASTELLI:  I'm not going to look that gift

23    horse in the mouth.

24              THE COURT:  No problem.

25              MR. CASTELLI:  Yes, I think five days will be

183

1    great.

2                    THE COURT:  And because we're going to do Monday

3    to Monday, because since there's a short time, we're not

4    going to count those weekends, that will put you then --

5    they'll come in on the Monday after next Monday, and you'll

6    have the following Monday.

7                    We want to turn this around as quickly as

8    practical, but I think everybody understands that being

9    thorough and careful is more important than being extremely

10   fast.

11                   Now, the Monitor also has an opportunity to

12   submit.  It's kind of interesting.  And I want to get the

13   Monitor's thoughts in terms of when you would like to make a

14   submittal.  Technically, you could do it at any time and

15   wouldn't have to wait on anyone.  So what's your thought?

16                   MR. STANTON:  Thank you, Your Honor.  I believe

17   that, just listening to the schedules the Court has laid out,

18   it may be best and effective if we submit on the same date as

19   the ACLU, Mr. Castelli, that second Monday.

20                   THE COURT:  Yes.

21                   MR. STANTON:  If that pleases the Court.

22                   THE COURT:  That's completely satisfactory.  And

23   I'm going to hope that there's not anything necessary from

24   the City after that.  But if there is, you would have that

25   three-day period to make that next submittal.  It would be

1   brief.  It would be short anyway.

2              So that gives us a five-day period, a five-day

3   period, both of those add up to actually sevens days because

4   they're in a week.  And then the next one will be due on the

5   Thursday, at the end of that Thursday of that second full

6   week.  So I think that covers the briefing schedule.

7              MR. McMULLEN:  Your Honor?

8              THE COURT:  Yes.

9              MR. McMULLEN:  Your Honor, as you've pointed out,

10  this is a complex and different type of proceeding, almost

11  like three parties involved.  I think -- and, Tom, you can

12  answer, with the exception of Subsection I, I think the ACLU

13  and the City can submit a joint brief on that and I think the

14  diversion between the parties is Section I.

15             Mr. Castelli, do you --

16             MR. CASTELLI:  Yeah, I think that's true.  But I

17  don't know -- I mean, I think we have different reasons for

18  wanting the proposed modifications so I don't know.  I

19  mean -- I would imagine also there's a lot of -- I mean, I

20  don't know, really, how to divvy up the space on all of these

21  issues.  But, certainly, I would want to include all of them.

22  But, I don't know.  Whatever's more helpful with the Court.

23             THE COURT:  Well, I think the schedule is okay.

24  And I think that obviously there's going to be agreements

25  with the parties, and, of course, we know the modification of

185

```
 1    the Decree, the burden rests on the City.  So I understand

 2    where we're going.  I think the schedule's a pretty good one.

 3    And we can talk about it further in time if we need to.

 4              Okay.  Now, that means we will see everyone on

 5    Monday.  And we'll do the same thing we did before, we will

 6    start a test at least a quarter till, and that will be the

 7    plan.  I readily expect that we will finish certainly that

 8    day and probably fairly early in the afternoon, if we go that

 9    long.

10              So anything else then?  I'm going to go back,

11    again, to the City, anything else from the City at this time?

12              MR. McMULLEN:  No, Your Honor.

13              THE COURT:  Okay.  Anything else from

14    Mr. Castelli, from ACLU?

15              MR. CASTELLI:  No, Your Honor.

16              THE COURT:  Anything else from the Monitor's Team

17    at this time?

18              MR. STANTON:  Nothing further, Your Honor.

19              THE COURT:  All right.  At some point we will get

20    your feedback on the technology, but it's been -- it's been

21    very helpful.  We can see and hear you extremely well.  So I

22    hope it's worked okay.  But we'll get feedback on that at the

23    end of the proceeding after -- we don't want to jinx

24    ourselves, so we'll wait till the end of this proceeding.

25              Thank you all very much, and you may now --
```

UNREDACTED TRANSCRIPT

186

1    actually, now you can sign off and the Court's going to do

2    the same.   Thank you.

3              MR. McMULLEN:   Thank you.

4              THE COURT:   Yes, absolutely.

5                        (Adjournment.)

UNREDACTED TRANSCRIPT

1                              C E R T I F I C A T E

2

3

4           I, CATHERINE J. PHILLIPS, Fellow of the Academy of

5     Professional Reporters, Registered Merit Reporter, Certified

6     Manager of Reporting Services, Florida Professional Reporter,

7     do hereby certify that the foregoing 186 pages are, to the

8     best of my knowledge, skill, and abilities, a true and

9     accurate transcript from my stenotype notes of the Zoom

10    Videoconference Hearing on the 19th day of June, 2020, in the

11    matter of:

12

13    ACLU

14    vs.

15    CITY OF MEMPHIS

16

17    Dated this 25th day of June, 2020.

18

19    S/ CATHERINE J. PHILLIPS, FAPR, RMR, CMRS, FPR
      Official Court Reporter
20    United States District Court
      Western District of Tennessee
21

22

23

24

25

                          UNREDACTED TRANSCRIPT