# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

|                                   |     |                              |
|-----------------------------------|-----|------------------------------|
| ACLU OF TENNESSEE, INC.,          | )   |                              |
|                                   | )   |                              |
|     Plaintiff,| )   |                              |
|                                   | )   | Case No. 2:17-cv-02120-JPM-jay |
| v.                                | )   |                              |
|                                   | )   |                              |
| CITY OF MEMPHIS, TENNESSEE,       | )   |                              |
|                                   | )   |                              |
|     Defendant.| )   |                              |
|                                   | )   |                              |

## OPINION AND ORDER

This cause was before the Court on the City of Memphis's (hereinafter "The City") Motion to Modify the Kendrick Consent Decree, initially filed on October 15, 2018. (ECF No. 124.) The Court held an evidentiary hearing on the Motion beginning on June 17, 2020 and concluding on June 22, 2020. (See Trial Mins., ECF Nos. 338–41.) The City moves the Court pursuant to Federal Rule of Civil Procedure 60(b) to modify the Kendrick Consent Decree. (See ECF No. 124 at PageID 5010; see also Mem. in Supp. of Mot. to Modify, ECF No. 124-1 at PageID 5016.) Since the filing of the Motion, the City has amended its requested modifications. (See Order Grant. City's Mot. to Withdraw, ECF No. 333 at PageID 10210.) The City no longer seeks to vacate the Kendrick Consent Decree in its entirety and only seeks to modify or clarify certain portions of the Decree. (Id.; see also Joint Notice of Proposed Modified Consent Decree, ECF No. 327.)

Intervening Plaintiff American Civil Liberties Union of Tennessee (hereinafter "ACLU-TN"), has agreed to sixteen of the City's proposed modifications. (See ECF No. 327; see also Proposed Modified Decree, ECF No. 327-2.) The ACLU-TN, however, opposes the City's requested modifications of §§ H and I of the Decree. (ECF No. 327 at PageID 9952; see also ACLU-TN Post-Trial Br., ECF No. 349.)

For the reasons set forth below, based on the evidence introduced by the Parties at the hearing and on the Parties' and the Monitor's filings in connection with the City's Motion for Modification, the Court **GRANTS IN PART** and **DENIES IN PART** the City's request to modify the Kendrick Consent Decree. The Court finds that sufficient evidence in the record supports granting the Parties' Jointly Proposed Modifications to the Kendrick Consent Decree. The Court also finds that the City has not provided sufficient evidence demonstrating that a change in factual circumstances warrants modification of §§ I and H of the Decree.

I.    **BACKGROUND**

A.    *The 1976 Kendrick Litigation, Case No. 2:76-cv-00449*

On September 14, 1976, a group of residents of the City of Memphis and the American Civil Liberties Union in West Tennessee filed an action against the City and several city officials. (Case No. 2:76-cv-00449, ECF No. 2.) The Kendrick Complaint asserted that the Memphis Police Department ("MPD") violated the plaintiffs' First, Fourth, Fifth, Sixth, Ninth, and Fourteenth Amendment Rights by establishing a "Domestic Intelligence Unit whose purpose was to investigate and maintain files upon citizens engaged in non-criminal, constitutionally protected activities which were thought to be 'subversive' and/or advocating unpopular or controversial political issues." (Id. ¶ 6.) The plaintiffs alleged that the MPD burned the

Domestic Intelligence Unit's files rather than turning them over to the Court following the filing of the complaint.  (Id. ¶ 9.)

On September 14, 1978, the Court entered a consent Order, Judgment, and Decree, now known as the Kendrick Consent Decree.   (Case No. 2:76-cv-00449, Kendrick Consent Decree, ECF No. 16.)  The Kendrick Consent Decree's "Statement of General Principles" provides:

> The provisions of this Decree prohibit the defendants and the City of Memphis from engaging in law enforcement activities which interfere with any person's rights protected by the First Amendment to the United States Constitution including, but not limited to, the rights to communicate an idea or belief, to speak and dissent freely, to write and to publish, and to associate privately and publicly for any lawful purpose.
>
> Furthermore, even in connection with the investigation of criminal conduct, the defendants and the City of Memphis must appropriately limit all law enforcement activities so as not to infringe on any person's First Amendment rights.

(Id. § A.)  The Kendrick Consent Decree:  (1) prohibits the City and the MPD from engaging in conduct that impermissibly interferes with the exercise of First Amendment Rights; (2) regulates the ways in which the City is permitted to interfere with its citizens' exercise of their First Amendment Rights; and (3) it requires the City to publicize the Decree and familiarize law enforcement personnel with its requirements.  (Id. §§ C–J.)

### B. The Blanchard Case, 17-cv-2120

The instant action was filed on February 22, 2017 by a group of individual plaintiffs who sought to enforce the terms and conditions of the Kendrick Consent Decree.  (Compl., ECF No. 1.)  The plaintiffs alleged that certain activities engaged in by the City violated the Decree.  (See generally id.)  For example, the plaintiffs alleged that the City had created an "escort list" for certain politically active individuals entering Memphis City Hall, a list that named each of the plaintiffs.  (See generally id.)  After the City challenged the individual plaintiff's standing to

enforce the Decree's provisions, on March 2, 2017, the ACLU-TN filed its Motion to Intervene, which the Court granted the same day.  (See ECF Nos. 12 & 15.)

On August 10, 2018, the Court granted in part and denied in part the ACLU-TN's Motion for Summary Judgment.  (ECF No. 120.)  The Court found that the City had violated portions of the Kendrick Consent Decree by gathering "'political intelligence' as defined and prohibited by the Decree" and by "fail[ing] to review and issue written authorizations for at least some lawful investigations of criminal conduct that 'may result in the collection of information about' or 'interfere in any way with' the 'exercise of First Amendment rights.'"  (Id. at PageID 4854–55.)

The Court held a four-day nonjury trial beginning on August 20, 2018 to determine whether the MPD and the City violated the Kendrick Consent Decree in additional ways.  (2018 Trial Mins., ECF Nos. 128–31.)  On October 26, 2018, the Court found that the ACLU-TN had proven by clear and convincing evidence that the City had violated the Kendrick Consent Decree.  (ECF No. 151 at PageID 6242–43.)  In particular, the Court found that the MPD had used an imposter Facebook account under the name "Bob Smith" to infiltrate political activist groups for the purposes of gathering political intelligence in violation of the Kendrick Consent Decree.  (Id. at PageID 6264–66.)  The Court imposed five categories of sanctions on the City for these violations.  (See Order Memorializing Sanctions, ECF No. 152.)  The Court ordered the City to: (1) revise its departmental policies to include a definition of "political intelligence"; (2) establish a training program for members of the MPD on the meaning of political intelligence and instruct the officers that "political intelligence is not permissible as a goal of an investigation nor as a means to an end of an otherwise lawful investigation"; (3) create an approval process for investigations into unlawful conduct that may incidentally result in the gathering or collection of political intelligence, with the City to submit to the Court a proposed authorization mechanism in

compliance with § G of the Decree; (4) create and submit to the Court guidelines for officers on

the use of social media searches and social media collators in compliance with the Decree; and

(5) submit a periodic list of all search terms entered into social media by MPD officers.  (Id. at

PageID 6287–90.)  The Court, with the consent of the parties, appointed Edward Stanton III as

the Independent Monitor to supervise the City's compliance with the Court's Order.  (ECF No.

176.)

　　　　Prior to the trial, on August 15, 2018, the City filed a Motion for Relief from Judgment or

Order.  (ECF No. 124.)  The City sought to vacate or modify the Decree.  (Id.)  On December 20,

2018, the Parties filed a Joint Motion to Stay the City's Motion to Modify and/or Vacate

Judgment, in which they stated their belief that with the Independent Monitor's guidance they

could "significantly narrow, and possibly even eliminate, many of the disputed issues before the

Court."  (ECF No. 175 at PageID 6257.)  All deadlines related to modification were stayed.

(ECF No. 178.)

　　　　On September 25, 2019, the City filed its Sealed Motion for Immediate Modification of

the Kendrick Consent Decree.  (ECF No. 227.)  The City moved the Court to modify or vacate

§ I of the Kendrick Consent Decree.  (Id.)  It argued that a change in factual conditions and

changes in intervening First Amendment case law since entry of the Decree warranted

modification.  (Id.)  Specifically, the City argued that the Decree prevented it from participating

in several information sharing programs and joint law enforcement operations, including the

MGU, CrimeStoppers, the Tennessee Fusion Center, the Joint Terrorism Task Force, and the

Trust Pays Program with Shelby County Schools.  (See ECF No. 227-1 at PageID 7715.)  The

Court denied the Motion on November 13, 2019.  (See Order Deny. Mot. for Immediate

Modification, ECF No. 250.)  The Court held that changed factual circumstances did not warrant

modification of § I and that the Decree did not prohibit the City's participation in those information sharing programs. (See id. at PageID 8411–30.)

On January 2, 2020, the Court held a telephonic scheduling conference and set June 17, 2020 as the date for the evidentiary hearing on the City's Motion for Modification. (See Min., ECF No. 272; see also Scheduling Order, ECF No. 287 at PageID 9086.) Before the hearing, the Parties engaged in several rounds of mediation led by the Independent Monitor, which resulted in sixteen jointly proposed modifications. (ECF No. 327.)

The ACLU-TN could not agree to the City's proposed modification to § I of the Kendrick Consent Decree. The City's proposed modified § I reads:

> The defendants and the City of Memphis shall not encourage, delegate, employ or contract with, or act at the behest of any local, state, federal or private agency, or any person, to plan or conduct any investigation, activity or conduct prohibited by this Decree. In other words, the City may not direct another agency to act as its surrogate to violate the Consent Decree or accept information that the City knows or should reasonably have known was collected in a manner that would violate the United States Constitution.
>
> Under this section, the City may receive information from other entities that does not constitute First Amendment-Related intelligence for a legitimate law enforcement purposes provided that the City may not act upon such information without obtaining an Authorization pursuant to Section G. The City may not act upon or catalog information from other agencies constituting First Amendment-Related intelligence that is unrelated to any legitimate law enforcement purpose. Nothing in this Section precludes the City from receiving tips from non-law enforcement agencies or individuals.

(Trial Ex. 25, City's Proposed Modification to § I, ECF No. 336-4 at PageID 10356.)

The Hearing on the issue of modification began on June 17, 2020 and concluded on June 22, 2020. The Parties then submitted post-hearing briefs. For the first time in its Post-Trial Brief, the City requested an additional modification to § H of the Decree. (See ECF No. 348 at

PageID 11399–40.)  The ACLU-TN opposes this request.  (See ACLU-TN Post Hearing Br.,
ECF No. 349 at PageID 11417–18.)

## II.    TRIAL TESTIMONY

### A.  Dr. Rachel Levinson-Waldman

Dr. Rachel Levinson-Waldman was the first witness called at the Hearing.  (See June 17,
2020 Tr., ECF No. 334 at PageID 10721–91.)  Levinson-Waldman is a member of the
Monitoring Team and a lawyer who currently works for the Brennan Center for Justice at New
York University School of Law.  (See id. at PageID 10721, 10723, 10733.)  She is an expert in
government surveillance techniques, and her scholarship focuses on the "balance of information
sharing between the Government and the people in [] democratic society . . . ."  (Id. at PageID
10732:9-11.)

Levinson-Waldman's testimony provided an overview of the use of social media by law
enforcement both at the federal and state levels.  She provided an overview of federal agencies'
social media investigative guidelines and policies.  (See id. at PageID 10741–42: 22-25, 1-5; see
also Trial Ex. 3.)  Levinson-Waldman expressed her concerns regarding the FBI's social media
policies, which the City used as a model for its proposed social media policies submitted to the
Court in December 2019.  (June 17, 2020 Tr., ECF No. 344 at PageID 10743:11-13, 10746:11-
19.)  The FBI policies permit social media investigations that "are not criminally predicated,"
that do not require "individualized suspicion of wrongdoing" and that "use [] fairly intrusive
surveillance and other investigative techniques."  (Id. at PageID 10743:14-20.)

Levinson-Waldman testified about her experience as a member of the Monitoring Team.
For example, Levinson-Waldman detailed the ways in which the MGU uses social media

accounts, especially undercover accounts, as part of its criminal investigations.  (Id. at PageID 10756–57.)

Levinson-Waldman testified to the different types of social media accounts used by law enforcement.  (See id. at PageID 10780–10782.)  Levinson-Waldman differentiated between an "impersonator account" (an account that impersonates a real person or persona) and a "fictious account" (along the lines of the "Bob Smith" account).  (See id. at PageID 10781.)  The latter of those accounts is not an undercover account.  (Id. at PageID 10781:15-20.)  As a matter of "good policy and accountability," undercover accounts should be "subject to oversight and supervision."  (Id. at PageID 10782:7-12.)

Levinson-Waldman expressed her concerns over the City's and the ACLU-TN's proposed modifications to the Kendrick Consent Decree.  Specifically, she testified to the problems with the City's proposed definition of "legitimate police purpose" and the proposed modifications to § G of the Decree.  (See id. at PageID 10762–63.)  Levinson-Waldman particularly took issue with the proposed definition's use of the term "threat assessment" and the reference to "cyberbullying" included in paragraph 8 of the Parties' proposed modification to § G.  (Id. at PageID 10763:3-18)

Levinson-Waldman also testified to her concerns with the Parties' proposed definition of First Amendment-related intelligence.  (Id. at PageID 10786–87.)  She expressed her concern with the language "solely due to or on the basis of various exercises of the First Amendment." (Id. at PageID 10788:21-25, 10789:1-8.)  In her opinion, adding the language "in whole or in part" before that phrase would better preserve the intent of the Decree.  (See id. at PageID 10789:2-8.)

*B.  Dr. Theron Bowman*

Dr. Theron Bowman was the second witness called at the Hearing.  (See June 17, 2020 Tr., ECF No. 344 at PageID 10792–851.)  Dr. Bowman is a police practices expert.  (Id. at PageID 10793:1-3; see also Bio and Resume, Trial Ex. 7.)  He has over thirty-seven years of law enforcement experience and is the Monitoring Team's police practices expert.  (ECF No. 344 at PageID 10793:6-7, 10802:17-20, 10803:8-14.)

Dr. Bowman explained the purpose of consent decrees.  (Id. at PageID 10807–12.) Consent decrees are rare and affect less than twenty U.S. police departments.  (Id. at PageID 10808:17-20.)  A consent decree indicates that a police agency has "agreed to subject itself to a set of standards to bring it into compliance with an area that is problematic and typically extralegal."  (Id. at PageID 10808:21-25.)  Higher standards apply to police departments bound by such decrees, and such departments establish new "best practice[s]."  (Id. at PageID 10809:5-12.)

Dr. Bowman expressed his opinion with regards to several of the City's proposed modifications.  (Id. at PageID 10813–815.)  Dr. Bowman testified that the inclusion of the language "and/or ensuring the safety of the public and law enforcement personnel" to the proposed definition of legitimate law enforcement purposes is problematic.  (Id. at PageID 10814:1-16.)  Including the safety of law enforcement personnel as a legitimate law enforcement purpose would encompass "officer-created jeopardy situations," whereby an officer can "legitimize[]" a situation they created even though it would otherwise be an impermissible law enforcement purpose.  (Id. at PageID 10814:17-25, 10815:1-5.)  Dr. Bowman suggests removing this language and adding "while adhering to law and agency policy designed to protect privacy,

free speech, association and other civil rights and civil liberties of all people." (Id. at PageID 10815:6-11.)

Dr. Bowman questioned the City's rationales for modifying the Kendrick Consent Decree. (See City's Pre-Trial Br., ECF No. 324.) Dr. Bowman stated that there exists no large body of generally accepted modern police practices. (ECF No. 344 at PageID 10816.) The body of knowledge is "not coherent" and requires "looking at the unique circumstances for a particular city or circumstance," which is especially true for a city subject to a consent decree. (Id. at PageID 10816:10-25, 10817:5.) Social media is just "one form of open source information, and most of what's out there on social media has no legitimate law enforcement value whatsoever." (Id. at PageID 10817:13-17.) There is no dispute that technology has an important place in policing, and that the Kendrick Consent Decree predates many of these advances in technology. (See generally id. at PageID 10834–35.)

Dr. Bowman testified that open source information has a specific meaning and described the four categories of open source information available to law enforcement. (See generally ECF No. 344 at PageID 10818–20.) To Dr. Bowman, the Kendrick Consent Decree does not prohibit the MPD's use of all types of open source information. (Id. at PageID 10820:12-16.)

Dr. Bowman also testified that § I of the Decree does not prevent the City's continued participation in the Joint Terrorism Task Force, the MGU, or any other multi-agency groups of the MPD. (Id. at PageID 10821–22.) In Dr. Bowman's opinion, very little of the information shared by such agencies with the MPD would implicate the Decree. (Id. at PageID 10822:1-15.)

The City questioned Dr. Bowman regarding information received from the Tennessee Fusion Center. (Id. at PageID 10827–30; see Tennessee Fusion Center Bulletin, Trial Ex. 8.)

Dr. Bowman generally testified that the MPD should vet that information before distributing it to MPD officers in the way the MPD deems appropriate. (ECF No. 344 at PageID 10829–30.)

C.      *David McGriff*

David McGriff was the third witness called at the Hearing. (See June 17, 2020 Tr., ECF No. 344 at PageID 10852–83.) McGriff is a Deputy Commissioner with the Tennessee Department of Children's Services. (Id. at PageID 10852:15-15.) McGriff was previously the Deputy Commissioner and Chief of Staff for the Tennessee Department of Safety & Homeland Security. (Id. at PageID 10853:9-11, 10856:15-21.) He has forty-four years of law enforcement experience. (Trial Ex. 9.)

McGriff is a member of the Monitoring Team. (Id. at PageID 10859:1-2, 20-23.) He directs the audit of the City's police practices to bring them into compliance with the Kendrick Consent Decree and has helped craft the Monitor's audit and compliance plan for the City. (Id. at PageID 10860:3-12; see also Audit and Compliance Plan, Trial Ex. 10.) The audit and compliance plan for the City will be modified following the issuance of this Opinion and Order. (ECF No. 344 at PageID 1062–63.)

The City questioned McGriff on the value of Tennessee Fusion Center Bulletins. (See id. at PageID 10867–71.) McGriff testified that Fusion Center bulletins are compiled from several sources "via Teletype or Internet by other law enforcement agencies" and from social media. (Id. at PageID 10868:4-10.) The source of the information is not evident from the bulletins' face. (Id. at PageID 10868:17-20.) An MPD officer attempting to determine where the information came from could "call the Fusion Center and speak to one of the [Fusion Center's] intel analysts that put[] these bulletins together . . . ." (Id. at PageID 10869:6-13.) For longer bulletins, this would be time consuming. (Id. at PageID 10878:24-25, 10879:1-4.)

Typically, Fusion Center bulletins include information about individuals who have outstanding arrest warrants, provide descriptions of criminal suspects, or contain "be-on-the-lookout" alerts. (Id. at PageID 10871:23-25, 10872:1-8.) This information is received from "agencies within the state or from out of state about nonspecific type[s] [of] information [rather] than" detailed reports. (Id. at PageID 10873:2-6.) Some bulletins are "[t]hreat assessment" bulletins. (Id. at PageID 10876:2-21.) Fusion Center intel analysts prepare the bulletins and receive training on how to compile and verify the information they receive. (Id. at PageID 10874:3-22.) The bulletins are designed to inform Tennessee law enforcement about potential threats to public safety. (Id. at PageID 10877:7-10.) Law enforcement agencies assess the value of this information for themselves and are not required to accept the information. (Id. at PageID 10080:18-25, 10882:2-9.)

D.      Dr. Sheila Peters

Dr. Sheila Peters was the fourth witness called at the Hearing. (See ECF No. 344 at PageID 10884–902.) Dr. Peters is an associate professor of psychology at Fisk University and is a licensed psychologist. (Id. at PageID 10884:22-24.) She currently works for the monitoring team as part of the Monitor's community engagement plan. (Id. at PageID 10886:23-25.) She updated the Court on her progress towards completing her involvement in the community engagement plan.[1]

E.      Independent Monitor Edward Stanton III

Independent Monitor Edward Stanton III was the fifth witness called to testify. (See June 17, 2020 Tr., ECF No. 344 at PageID 10903–926; see also June 18, 2020 Tr., ECF No. 345 at

---

[1] The input of the community is an important part of the Kendrick Consent Decree litigation. Such input, while extremely valuable, does not constitute evidence in this proceeding. (See ECF No. 293 at PageID 9098.) Dr. Peters's final report, Community Engagement: Focus Groups on Policing and the Kendrick Consent Decree, was filed on August 26, 2020. (ECF No. 368.)

PageID 10939–48.)  Stanton was the United States Attorney for the Western District of Tennessee from 2010 to 2017.  (Id. at PageID 10905:1-5.)

The City questioned the Monitor regarding certain Requests for Authorization ("RFAs") submitted by the City to the Monitor for his review and approval in late summer and early fall 2019.  (See id. at PageID 10905–21.)  These RFAs led to the Court's Order Denying the City's Motion for Immediate Modification of the Kendrick Consent Decree.  (Id.; Order Den. Mot. for Immediate Modification, ECF No. 250.)  The Monitor testified that the language of § I is clear, having been clarified by the Court's Order of November 13, 2019.  (See, e.g., ECF No. 344 at PageID 10917:21-25; 10918:1-3, 10921:22-25, 10922:113.)

One of these RFA's involved an October 2019 tip from a private citizen detailing a public safety threat to a Memphis Grizzlies game.  (See Sealed Trial Ex. 14.)  The Monitor found that the MPD's receipt of this information did not implicate § I of the Decree.  (June 18, 2020 Tr., ECF No. 345 at PageID 10942:3-8.)  The Monitor found that the RFA did, however, violate the Decree because sharing this information with a third party would violate § H of the Decree.  (See Monitor's October 11, 2019 Letter, Trial Ex. 14; see also June 18, 2020 Tr., ECF No. 345 at PageID 10942:9-14.)

The Monitor testified regarding two specific instances in which he found the City not to have complied with the Kendrick Consent Decree or the Court's 2018 Order and Opinion.  (See, e.g., ECF No. 344 at PageID 10924:1-7.)  The first arose out of the September 2019 American Federation of State, County and Municipal Employees ("AFSCME") Labor Day Parade.  (Id. at PageID 10924:8-10.)  The second involved the City's noncompliance with the Court's Order

Memorializing Sanctions.[2]  (See id. at PageID 10924:19-24; see also Order Memorializing Sanctions, ECF No. 152.)

### F.  John Henegan

John Henegan was the last member of the Monitoring Team to testify.  Henegan is a lawyer at the law firm Butler Snow LLP.  (ECF No. 345 at PageID 10950:2-4.)  He is the Monitoring Team's First Amendment expert.  (See id. at 10958:24-25, 10959:1-6.)

Henegan testified to the City's proposed changes to the Kendrick Consent Decree.  (See id. at PageID 10967.)  Henegan provided his own marked version of the Parties' Jointly Proposed Modified Decree.  (Id. at PageID 10970:23-25, 10971:1-11.)  The Court sustained the City's objection to Henegan's opinion testimony and will not consider his opinion on the subject.

### G.  MPD Director Michael Rallings

Michael Rallings, Director of the MPD, was the first witness called by the City.  (See ECF No. 345 at PageID 10983–11065; see also June 18, 2020 Tr., ECF No. 346 at PageID 11194–236.)  Director Rallings has served as MPD Police Director since 2016 and has been an MPD officer for over thirty years.  (ECF No. 345 at PageID 10983:16-25.)  He oversees roughly 2,056 commissioned officers and more than 3,000 total employees.  (Id. at PageID 10986:15-22.)

Director Rallings testified to the policing challenges posed in Memphis.  Memphis is considered one of the "most challenged cities in the nation"; the City of Memphis received approximately 118,000 incident reports[3] last year, most of which were criminal in nature, and the "volume, the frequency, [and] the rate and severity of violent crime" in Memphis caused it to earn this designation.  (Id. at PageID 10987:7-25, 10988:1-2.)  Memphis also poses a unique

---

[2] On August 19, 2020, the Court found that the City had not complied with Sanction 5 of the Court's Order Memorializing Sanctions.  (See ECF No. 363.)

[3] Director Rallings clarified that these incident reports are from the Tennessee Incident Based Reporting System and range from misdemeanor reports to felonies.  (Id. at PageID 11061:9-12, 11062:14-20.)

challenge to law enforcement because it is bordered by two states and up to seventy to seventy-seven million interstate travelers travel through the City each year.  (Id. at PageID 10988:11-24.)  Additionally, Memphis's geographic size and its demographics create unique policing problems.  (Id. at PageID 10989:2-22.)

Director Rallings' testimony also stressed the importance of technology to the MPD.  He testified to the MPD's expanded use of neighborhood "SkyCop Cameras."  (See, e.g., id. at PageID 10992:1-19.)  MPD officers issue police reports and access online police databases via their smartphones, and every MPD officer wears a body worn camera.  (Id. at PageID 10992:20-25, 10093:1-21, 10996:2-23.)  To Director Rallings, no "modern police agency [] could operate on paper and pencil." (Id. at PageID 10994:5-7.)

Director Rallings testified to the critical importance of social media to modern policing.  He explained that MPD officers are confused as to when and how they may use social media under the Consent Decree.  (Id. at PageID 11000:10-18.)  To Director Rallings, "social media is here to stay."  (See, e.g., id. at PageID 11001:3-10.)

Director Rallings testified that the MPD is also active in several information sharing programs that are critical to the MPD's public safety mission.  Director Rallings testified to the importance of the Trust Pays program with Shelby County Schools.  (See id. at PageID 11002:2-24.)  Trust Pays tips involve information gathered by third parties on social media.  (See id. at PageID 11003:6-10.)  Director Rallings testified that his "fear is that an officer that takes a literal interpretation of the Consent Decree may hesitate or may not be able to get information to the appropriate people, and it could result in some type of tragic incident."  (Id. at PageID 11004:11-15.)  CrimeStoppers, which has helped solve over 200 criminal cases and at least twenty-two homicides, raises similar issues.  (See, e.g., id. at PageID 11005:9-12.)

Director Rallings testified to the importance of Tennessee Fusion Center bulletins to the MPD. Director Rallings relies heavily on the Tennessee Fusion Center's bulletins because they provide information about something that "can happen in Nashville that could have an impact on Memphis" or that happens in "Minnesota that could have an impact on Memphis." (Id. at PageID 11012:4-18.) Director Rallings' testimony addressed the specific situational awareness bulletin discussed by David McGriff. (See generally id. at PageID 11023–32.) He testified that it would be "unreasonable" for the MPD to track down where every piece information included in these bulletins came from to ensure that the information was not gathered in a way that would violate the Kendrick Consent Decree. (Id. at PageID 11036:15-25.) Director Rallings "narrowly" agreed that some of the information received from the Tennessee Fusion Center does not lead to the opening of a criminal investigation by the MPD. (See June 19, 2020 Tr., ECF No. 346 at PageID 11219:24-25.) To Director Rallings' knowledge, the MPD has never initiated a criminal investigation based on Fusion Center bulletins. (Id. at PageID 11220:14-15.)

Director Rallings testified to the critical need to share information with third party businesses. (See June 18, 2020 Tr., ECF No. 345 at PageID 11018–19.) To Director Rallings, Memphis has critical infrastructures which can only be protected by sharing information with these third parties. (See id.) Rallings testified that it is "absolutely critical" to coordinate with these institutions. (Id. at PageID 11020:12-13.)

Director Rallings also testified to the need to respond to protests and public safety threats posed by political gatherings. (See id. at PageID 11005–08.) Director Rallings' testimony referenced the Charlottesville, Virginia August 2017 rallies and the after-action report on the protests. (See Trial Ex. 18.) The after-action report found that the Charlottesville Police Department operated with an "operational blind spot" because it failed to make use of social

media in the days leading up to the protests.  (ECF No. 345 at PageID 11007:24-25, 11008:1-5.)

Director Rallings fears that <u>Kendrick</u> Consent Decree leaves the MPD with a similar blind spot.

(<u>Id.</u> at PageID 11008:19-25.)  Director Rallings testified that the Charlottesville protests and the

findings of the after-action report are particularly salient to Memphis following the protests that

occurred on the Hernandez De Soto Bridge in 2016.  (<u>See generally</u> <u>id.</u> at PageID 11009–10.)

Rallings testified that before the bridge protests, Memphis activists were communicating via

Facebook Live and other forms of social media.  (<u>Id.</u> at PageID 11022:11-13.)

Director Rallings next testified that he is confused by some of the Decree's language.

(<u>See, e.g.</u>, <u>id.</u> at PageID 11040.)  Director Rallings testified that he and MPD officers are

particularly confused by the meaning of the term "political intelligence." (<u>Id.</u> at PageID

11041:17-23.)  Director Rallings provided as an example officers' confusion over their response

to the 2019 AFSCME Labor Day parade.  (<u>See</u> <u>id.</u> at PageID 11042:2-14.)  Director Rallings

believes that replacing the phrase political intelligence with the phrase First Amendment-related

intelligence would help clarify this confusion.  (<u>Id.</u> at PageID 11058:21-25.)

Director Rallings testified that modification of the Decree could clear up much of this

confusion among MPD officers.  (June 19, 2020 Tr., ECF No. 346 at PageID 11198:20-24.)

Including language from the Court's rulings in MPD policies could help clear up some of his

confusion over the meaning of certain provisions of the Decree.  (<u>Id.</u> at PageID 11199:2-5.)

Director Rallings testified that training MPD officers on the Decree would go a long way to

ensure that officers understand the Decree.  (<u>Id.</u> at PageID 11203:16-24, 11235:2-11.)

With regards to § G, the Director testified that he has found it difficult to approve some

of the investigations requiring review and authorization under the Decree in a timely manner.

Director Rallings testified that, for example, while he was overseas this past year, he was unable

to access his phone and email and could not authorize several investigations. (ECF No. 345 at PageID 11049:2-7.) Rallings testified that he has also found it difficult to determine whether an investigation would implicate the Kendrick Consent Decree or whether it was permitted by the Decree. (See id. at PageID 11053:5-25.) Rallings testified that delegating some of these duties to other MPD officials would be beneficial. (See id. at PageID 11055:10-21; see also June 19, 2020 Tr., ECF No. 346 at PageID 11206:20-24.)

      *H.*      *Deputy Director Donald Crowe*

Donald Crowe testified on the third day of the Hearing. (See June 18, 2020 Tr., ECF No. 345 at PageID 11067–136.) Donald Crowe is the Deputy Chief of Police of the MPD. (Id. at PageID 11067:12.) Deputy Chief Crowe is the Deputy Chief for Information Technology ("IT") for the MPD. (Id. at PageID 11068:16-17.) In his role as Deputy Chief for IT, Deputy Chief Crowe is responsible for all the MPD's computer systems and technology systems, including the MPD's body worn cameras, pole-mounted cameras, the MPD's Realtime Crime Center, and MPD databases. (Id. at PageID 11068:17-22.) He also oversees the MPD's Department of Homeland Security. (Id. at PageID 11068:23-24.)

Deputy Chief Crowe testified to the importance of technology to the MPD and modern law enforcement. Deputy Chief Crowe testified that the use of video systems and surveillance equipment is a crucial part of the MPD's public safety mission. (Id. at PageID 11069:2-15.)

He also testified that issues remain over MPD officers' ability to make use of certain equipment and technologies under the Decree. (See, e.g., id. at PageID 11070:16-22.) Questions arose regarding the MPD's use of the Blue CRUSH camera[4] located outside of Memphis City

---

[4] Blue CRUSH cameras are pole-mounted cameras mounted throughout Memphis. They have three cameras located inside a single box, and one of the cameras has a pan-tilt-zoom functionality. (Id. at PageID 11072.) This allows the camera operator to move the camera to track emergent situations. (Id. at PageID 11072–73.) The video feed is livestreamed to the MPD's Realtime Crime Center. (Id. at PageID 11073.)

Hall. (Id. at PageID 11071:7-13.) The City Attorney, Jennifer Sink, instructed the MPD, based on the Independent Monitor's response to an RFA, to disconnect the camera's pan-tilt-zoom feature where several gatherings involving First Amendment activities took place. (Id. at PageID 11073:9-16.) According to Deputy Director Crowe, losing this feature limited the ability of police to respond to dangerous situations. (Id. at PageID 11074:1-19.)

A second issue raised by Deputy Director Crowe's testimony involved the MPD's use of body worn cameras. (See id. at PageID 11076:8-19, 11078:3-10.) Deputy Director Crowe testified that adding language to the Decree directly relating to the use of body worn cameras would greatly improve MPD officers' understanding of the permissibility of such cameras. (Id. at PageID 11078:11-25.) Having a "clear and concise" body worn camera policy that is "simple and easy to apply in the field" would greatly aid MPD officers. (Id. at PageID 11079:1-6.)

Deputy Director Crowe testified that incorporating provisions of this Court's Orders into the Decree would help officers fulfill their duties while abiding by the tenets of the Decree. (Id. at PageID 11080:7-22.) He testified that having a definition of legitimate law enforcement purpose would be of critical importance to MPD officers. (Id. at PageID 11082:8-22.) He also testified that clarifying the permissibility of the use of social media in purely online crimes, such as cybercrimes and child pornography investigations, would greatly aid MPD officers' understanding of the Decree. (Id. at PageID 11096:1-14.) He testified that changing "political intelligence" to "First Amendment-Related intelligence" would also be beneficial. (Id. at PageID 11086:24-25, 11087:13.)

Like other witnesses, Deputy Director Crowe testified to the extent to which the term "assessments" and "threat assessments" qualify as a legitimate law enforcement activity. (See

<u>id.</u> at PageID 11091:23-25, 11092:114.)  He testified that having the ability to conduct threat assessments would greatly help MPD personnel.  (<u>Id.</u> at PageID 11092:4-14.)

      *I.      Major Darren Goods*

The City's third witness called to testify was Major Darren Goods.  (June 19, 2020 Tr., ECF No. 346 at PageID 11240–92.)  Major Goods has been an MPD officer for over thirty-five years.  (<u>Id.</u> at PageID 11240:7-18.)  He has been the Operations Commander for the MGU since 2015.  (<u>Id.</u> at PageID 11240:19-23.)

The MGU is a multi-agency law enforcement unit governed by a six-member executive board that includes the Director of the MPD, the Shelby County Sheriff, the Shelby County District Attorney General, the FBI Special Agent in Charge, the head of the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the United States Attorney for the Western District of Tennessee.  (<u>Id.</u> at PageID 11240:8-21.)  The MGU is the law enforcement equivalent of a joint venture.  (<u>Id.</u> at PageID 11243:2-16.)  All MGU investigations have "some type of criminal nexus" or arise out of criminal activity.  (<u>Id.</u> at PageID 11246:14-16.)  The MGU does not investigate individuals for purely political reasons.  (<u>Id.</u> at PageID 11246:19-25.)

Major Goods testified to MPD's officers confusion regarding the applicability of the Decree to their investigations.  (<u>Id.</u> at PageID 11248:2-16.)  Major Goods specifically pointed to one instance in which MGU officers "stopped [an] investigation altogether" because, in the course of investigating gang activity, officers realized that the individuals who "lived on that street or frequented that street" were political activists, although the activists had nothing to do with the investigation  (<u>Id.</u> at PageID 11250:3-25, 11279:7-9.)

Major Goods testified to the MGU's extensive use of social media accounts.  Many MGU officers create social media accounts without MGU supervision.  (<u>Id.</u> at PageID 11255:1-8.)

These "alias accounts" are designed both to protect undercover officers from detection by suspects when searching social media and to avoid tipping off the suspect to the investigation. (Id. at PageID 11255:9-25, 11256:1-2, 11285:18-21.)  An alias account uses a different name from the officer's name but does not use an undercover persona.  (See id. at PageID 11283:5-20.)

MGU officers also use social media accounts based on their undercover personas.  (Id. at PageID 11257:15-18.)  The officers, who receive formal undercover operations training, "use their account[s] to friend different gangs[] and people that are involved in criminal activity," and any social media search has a "criminal nexus."  (Id. at PageID 11257:21-25, 11258:1-6.)  MGU officers do not use accounts like the "Bob Smith" account.  (Id. at PageID 11259:19-25, PageID 11260:1-2.)  The MGU does not use impersonator accounts.  (Id. at PageID 11284:6-7.)  Nor are undercover social media accounts unsupervised.  (See id. at PageID 11287:21-25, 11288:1.)

Darren Goods testified to his confusion over § I's limitations.  Major Goods testified that he interprets § I in a restrictive manner.  (See id. at PageID 11267:15-23.)  Prior to his testimony, Major Goods had not relied on the Court's November 2019 Order on § I.  (Id. at PageID 11289:25, 11290:1-4.)

*J.     Zayid Saleem*

Zayid Saleem was the City's fifth witness.[5]  (See June 19, 2020 Tr., ECF No. 346 at PageID 11293–327.)  Saleem is a Senior Assistant City Attorney for the City of Memphis and is currently serving as the Police Legal Advisor for the MPD.  (Id. at PageID 11294:13-15.)  He has worked with the MPD since late 2010.  (Id. at PageID 11295:16.)

Saleem is largely responsible for the training of MPD officers, police executives, and legal advisors on legal issues surrounding policing.  (Id. at PageID 11296:10-19.)  Saleem has

---

[5] The City's expert witness, Eric Daigle, was the fourth witness called by the City, but he completed his testimony on the final day of the Hearing.  The Court provides a summary of his testimony last.

been deeply involved in understanding the limitations of the <u>Kendrick</u> Consent Decree and communicating these limitations to officers.  (<u>Id.</u> at PageID 11298:1-25, 11299:1-6.)  The MPD's in-service training program in connection with the <u>Kendrick</u> Consent Decree began in January 2020, starting with the training of MPD command staff and followed by training of MPD lieutenants.  (<u>Id.</u> at PageID 11299:7-16.)  This training program incorporates the Court's interpretations of the Decree.  (<u>Id.</u> at PageID 11322:21-25, 11323:1.)  Saleem stated that it would be "impossible to do en masse training" for all MPD officers on "something this complex."  (<u>Id.</u> at PageID 11299:17-22.)  He testified that most officers go to the kiosk to read the Decree to understand its tenets.  (<u>Id.</u> at PageID 11301:18-22.)

Saleem testified to the MPD's confusion over the term "legitimate law enforcement purpose."  (<u>Id.</u> at PageID 11303.)  To Saleem, having the Parties' proposed definition incorporated into the Decree would aid in officers' understanding of the Decree.  (<u>Id.</u> at PageID 11303:7-25.)  He testified that adding the language that an officer should reject information or should request authorization pursuant to § G only if they "reasonably should know" the tip or information would implicate First Amendment-related intelligence or political intelligence would help MPD officers better comply with the Decree.  (<u>Id.</u> at PageID 11306:18-23.)  As with several other witnesses, Saleem detailed officers' confusion over the 2019 AFSCME Labor Day parade as an example of the need to further clarify the Decree.  (<u>See id.</u> at PageID 11308–09.)

K.      *Jennifer Sink*

Jennifer Sink is the Chief Legal Officer for the City of Memphis.  (<u>Id.</u> at PageID 11328:23-24.)  Sink is directly involved in the City's efforts to comply with the <u>Kendrick</u> Consent Decree.  (<u>See id.</u> at PageID 11221–32.)

Sink testified to the RFA procedure and several specific requests she submitted to the Monitor for review. (<u>See, e.g.</u>, <u>id.</u> at PageID 11337:3-25.) She referred to an RFA dated May 28, 2020, in which the Tennessee Fusion Center identified an individual's tweet which said, "[W]e need to kill all cops for sport." (<u>Id.</u> at PageID 11339:15-23.) She testified that in her opinion whether the MPD could receive this information fell into the Decree's "gray area."[6] (<u>See</u> <u>id.</u> at PageID 11340:2-12.) The Monitor promptly authorized the RFA. (<u>Id.</u> at PageID 11342:16-18, 11363:2-7.) A similar RFA from the same day involved a social media post that called for "burning down all the police precincts in Memphis." (<u>Id.</u> at PageID 11343:10-11.)

Sink testified that she believes the phrase "cooperate with" as used in § I of the Decree is unclear. (<u>Id.</u> at PageID 11351:15-23.) Sink testified that the use of this language in the "context of a joint multi-agency task force or unit" would "seem inherently [to mean] that doing something jointly" is a form of "cooperating with" outside agencies. (<u>Id.</u> at PageID 11351:17-19.)

L.    *Eric Daigle*

Eric Daigle, the City's policing expert, testified on June 18, 2020 and June 22, 2020. (<u>See</u> June 18, 2020 Tr., ECF No. 345 at PageID 11137–79; <u>see also</u> June 22, 2020 Tr., ECF No. 343 at PageID 10624–71.) Daigle is an attorney in Connecticut. (ECF No. 345 at PageID 11139.) He operates the Daigle Law Group, a consulting group that provides guidance and operation oversight to police departments, correctional facilities and security groups. (<u>Id.</u> at PageID 11139:25, 11140:1-6.) Daigle was a Connecticut state trooper for ten years. (<u>Id.</u> at PageID 11140:17-22.) He has served as a member of the monitoring team for the Oakland

---

[6] The Court made clear that this is <u>not</u> something the Decree, and more specifically § I of the Decree, would prevent the City from receiving and acting on in a timely fashion. (<u>See</u> <u>id.</u> at PageID 11340:20-22.)

Police Department in Oakland, California and has consulted for law enforcement agencies subject to consent decrees. (Id. at PageID 11147:18-19, 11148:3-17.)

Daigle disagreed with Dr. Bowman's opinion that the term "prevention of crime" includes public safety and the safety of law enforcement officers. (See id. at PageID 11154.) Specifically, he testified that "information threat assessment analysis," which deals with evaluating and ensuring public safety, is not necessarily related to crime prevention. (Id. at PageID 11154:11-18.) To Daigle, intelligence gathering and threat assessment are necessary to ensure "that individuals who want to express their First Amendment right can do so with all the required protections of the law." (Id. at PageID 11166.)

Daigle also testified to the changes in law enforcement practices since the Consent Decree was entered in 1978. (See, e.g., id. at PageID 1156–57, 11164.) Daigle testified that technology has changed the way police departments operate and that social media has profoundly affected policing. (See id. at PageID 11157–58.) Daigle, for example, testified that cameras are now a major part of policing, and that "everybody believes there's a benefit in recording and having video recording because it makes things easier to discuss later." (Id. at PageID 11174:14-17.) Daigle testified that "any reasonable interaction with law enforcement or security industry . . . would tell you that social media is a treasure-trove of information." (Id. at PageID 11158:18-209.)

Daigle elaborated on officers' use of social media. (See June 22, 2020 Tr., ECF No. 343 at PageID 10629.) He views social media in three levels. (See id. at PageID 10629:1-2.) "[A]pparent/overt use" is "where the law enforcement officer's identification does not need to be concealed in any way." (Id. at PageID 10629:7-12.) Daigle calls the second level "discreet use"; it involves "no interaction between the law enforcement officer and any member of the public

maintaining the social media account." (Id. at PageID 10629:22-25, 10630:1-6.)  The third and

most invasive level under Daigle's system is "covert use" which involves the use of another

name or identity and requires the "most intensive guidelines or supervision controls[.]"  (Id. at

PageID 10630:10-23.)  Daigle provided little guidance on how best to implement these criteria.

(See id. at PageID 10631:3-8.)  Daigle equated training police officers on these three levels to

training officers regarding the different levels of Fourth Amendment protections.  (Id. at PageID

10632:3-10.)

Daigle testified that police should have broad authority to respond to First Amendment

gatherings and protests.  (See id. at PageID 10633–38.)  It is Daigle's view that law enforcement

should be present at all protests or First Amendment events, regardless of their content or their

size, to ensure the safety of the public and law enforcement.  (See generally id.)

Daigle believes that it is a best police practice to "share personal information . . .

collected in the course of a criminal investigation with a private entity like a security force of a

private company."  (Id. at PageID 10638:13-19.)  Daigle testified that modern policing requires

interagency information sharing.  (Id. at PageID 10641.)

## III.     LEGAL STANDARD

"A consent decree is essentially a settlement agreement subject to continued judicial

policing."  Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir. 1983).  A consent decree shares

the "attributes of both a contract and of a judicial act."  Id. (citing United States v. ITT Cont'l

Banking Co., 420 U.S. 223, 236 n.10 (1975)).  "It is both 'a voluntary settlement agreement

which could be fully effective without judicial intervention' and 'a final judicial order . . .

plac[ing] the power and prestige of the court behind the compromise struck by the parties.'"

Vanguards of Cleveland v. City of Cleveland, 23 F.3d 1013, 1017 (6th Cir. 1994) (quoting

Williams, 720 F.2d at 920).  Because a consent decree "memorializes the bargained for position

of the parties," it "should be strictly construed to preserve the bargained for position of the

parties."  Williams, 720 F.2d at 920.  The "scope of a consent decree must be discerned within its

four corners, and not by reference to what might satisfy the purposes of one of the parties to it or

by what might have been written had the plaintiff established his factual claims and legal

theories in litigation."  Vanguards, 23 F.3d at 1017 (quoting Firefighters Local Union No. 1784

v. Stotts, 467 U.S. 561, 574 (1984)) (internal quotation marks omitted).

"Once approved, the prospective provisions of a consent decree operate as an injunction."

Id. at 1018 (quoting Williams, 720 F.2d at 920) (internal quotation marks omitted); see also

Waste Mgmt. of Ohio, Inc. v. City of Dayton, 132 F.3d 1142, 1145 (6th Cir. 1997).  The court

"retain[s] jurisdiction over the decree during the term of its existence" to "protect the integrity of

the decree with its contempt powers" and to "modify the decree should 'changed circumstances'

subvert its intended purpose."  Williams, 720 F.2d at 920.  Despite the contractual nature of a

consent decree, the court is "not bound under all circumstances by the terms contained within the

four corners of the parties' agreement."  Lorain NAACP v. Lorain Bd. of Educ., 979 F.2d 1141,

1148 (6th Cir. 1992).

Federal Rule of Civil Procedure 60(b) governs the modification of consent decrees.  See

Rufo v. Inmates of Suffolk Cty. Jail, 502 U.S. 367, 378 (1992).  The Rule provides six grounds

by which a party, upon motion, may be relieved of "a final judgment, order, or proceeding."

Fed. R. Civ. P. 60(b)(1)–(6).  Under Rule 60(b)(5), a party may seek relief from a final judgment,

order or proceeding on the grounds that "the judgment has been satisfied, released, or

discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it

prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5).

The "party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." <u>Rufo</u>, 502 U.S. at 383. "Modification of a consent decree may be warranted" under Rule 60(b)(5): (1) "when changed factual conditions make compliance with the decree substantially more onerous"; (2) "when a decree proves to be unworkable because of unforeseen obstacles"; or (3) "when enforcement of the decree without modification would be detrimental to the public interest." <u>Vanguards</u>, 23 F.3d at 1018 (quoting <u>Rufo</u>, 502 U.S. at 367).

Courts should take a flexible approach to modification of institutional reform decrees. <u>Horne v. Flores</u>, 557 U.S. 433, 450 (2009); <u>see also</u> <u>Rufo</u>, 502 U.S. at 381; <u>Lorain</u>, 979 F.2d at 1149 (6th Cir. 1992). Courts must employ a flexible approach to modification of institutional reform consent decrees because they "remain in force for many years, and the passage of time frequently brings about changed circumstances . . . that warrant reexamination of the original judgment." <u>Horne</u>, 557 U.S. at 448. Such decrees implicate "sensitive federalism concerns" and involve dynamics not found in other types of litigation. <u>Id.</u>; <u>see also</u> <u>Missouri v. Jenkins</u>, 515 U.S. 70, 99 (1995). Binding later local officials to their predecessors' decisions may "improperly deprive future officials of their designated legislative and executive powers." <u>Horne</u>, 557 U.S. at 449 (quoting <u>Frew v. Hawkins</u>, 540 U.S. 431, 441 (2004)). The court must "defer to local government administrators" when modifying institutional reform decrees because such individuals have the "'primary responsibility for elucidating, assessing, and solving' the problems of institutional reform . . . ." <u>Rufo</u>, 502 U.S. at 392 (quoting <u>Brown v. Board of Education</u>, 349 U.S. 294, 299 (1955)).

Modification is not warranted in all circumstances. <u>Rufo</u>, 502 U.S. at 383. "Rule 60(b)(5) provides that a party may obtain relief from a court order when 'it is no longer equitable

that the judgment should have prospective application,' not when it is no longer convenient to live with the terms of a consent decree." Id.

If the moving party demonstrates that changed factual circumstances warrant modification, the court must determine whether "the proposed modification is suitably tailored to the changed circumstances." Id. at 391. "[T]hree matters should be clear." Id. First, "a modification must not create or perpetuate a constitutional violation." Id. Second, "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor." Id. Third, "[t]he court should not 'turn aside to inquire whether some of [the provisions of the decree] upon separate as distinguished from joint action could have been opposed with success if the defendants had offered opposition.'" Id. at 392 (quoting United States v. Swift & Co., 286 U.S. 106, 116–17 (1932)).

## IV.     ANALYSIS

> A.     *The ACLU-TN and the City's Jointly Proposed Modifications to the* Kendrick *Consent Decree*

The Parties agree on sixteen proposed modifications to the Kendrick Consent Decree. (See ECF Nos. 309 & 327.) The analytical framework used to determine whether the parties can stipulate to modifications of a consent decree is a novel issue. This is especially true in the context of institutional reform consent decrees. The Court begins with the proposition that only the original parties to the decree, or their assignees, have standing to enforce its terms. See Evoqua Water Techs., LLC v. M.W. Watermark, LLC, 940 F.3d 222, 228 (6th Cir. 2019) ("A consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it." (quoting Williams, 720 F.2d at 920)). Because the ACLU-TN has standing to

enforce the terms of the <u>Kendrick</u> Consent Decree, it has the corollary power to consent to modifications of the Decree.

Although the ACLU-TN has the authority to agree to such modifications, because the <u>Kendrick</u> Consent Decree is a final court judgment, the Court cannot accept the Parties' agreed to modifications if the proposed changes do not comply with Rule 60(b). <u>See</u> <u>Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland</u>, 669 F.3d 737, 741 (6th Cir. 2012) ("[A] district court is not merely an instrument of a consent decree or of the parties' stipulations with respect to it . . . ."); <u>see also</u> <u>Ne. Ohio Coal. For the Homeless v. Husted</u>, No. 2:06–CV–896, 2013 WL 4008758, at *4 (S.D. Ohio Aug. 5, 2013) ("Despite the contractual nature of a consent decree, however, this Court is not merely an instrument of a consent decree and the decree is nonetheless subject to Rule 60(b) . . . because it is a judicial decree that is subject to the rules generally applicable to other judgments and decrees." (quoting <u>Ne. Ohio Coal. For the Homeless v. Husted</u>, 969 F.3d 580, 601–02 (6th Cir. 2012)) (internal quotation marks omitted)).  Although the Parties to the Agreement may have standing to propose modifications to the terms of the agreement, the Court still must determine whether the Parties have met their burden for modification under Rule 60(b)(5).  <u>See</u> <u>Cleveland Firefighters</u>, 669 F.3d at 741.  Under Rule 60(b), the Court may only grant the stipulated modifications to the <u>Kendrick</u> Consent Decree if, based on the evidentiary record before it, the Parties have demonstrated that "changed factual conditions make compliance with the decree substantially more onerous," the decree "proves to be unworkable because of unforeseen obstacles," and if "enforcement of the decree without modification would be detrimental to the public interest."  <u>Vanguards</u>, 23 F.3d at 1018 (quoting <u>Rufo</u>, 502 U.S. at 367).  Here, the Parties have met this burden.

The Court is especially cognizant that it must take a flexible approach to modifying institutional reform consent decrees.  See Horne, 557 U.S. at 450.  The significant testimony from MPD command staff and leadership demonstrates the need to update the Kendrick Consent Decree to protect the bargain struck by the Parties to the Decree in 1978 while also recognizing that law enforcement needs to effectively protect the public in a changing world.  The competing interests of the First Amendment rights of the citizens of Memphis and the need for effective policing and public safety would be served by the jointly proposed modifications.  The Parties' post-trial briefing demonstrates the significant evidence in the record supporting the need for these jointly proposed modifications as well as the Parties' reasons for each modification.[7]  (See City's Post-Trial Br., ECF No. 348 at PageID 11380–400; see also ACLU-TN's Post-Trial Br., ECF No. 349 at PageID 11411–16.)

The record demonstrates that astonishing technological change has occurred since the entry of the Consent Decree in 1978.  The advent of social media, the development of body worn cameras and pole cameras and other new technologies have dramatically changed the way law enforcement agencies operate in the United States.  Most, if not all, of the Parties' jointly proposed modifications respond to the need to update the Kendrick Consent Decree to allow the MPD to effectively make use of these important technologies while protecting Memphians' First Amendment rights.

Replacing the word "political intelligence" with First Amendment-related intelligence also does not affect the Decree's core values.  As many of the witnesses testified, MPD officers are confused as to the meaning of the term "political intelligence."  If MPD officers better

---

[7] The Court excludes from this section the City's Proposed Modifications to § H of the Kendrick Consent Decree, as the ACLU-TN opposes this suggested modification to the Decree.  (See id. at PageID 11399–400.)

understand the protections of the Kendrick Consent Decree, they will be better prepared to abide by its terms. The Court is satisfied that the term "First Amendment-Related intelligence" is an adequate substitute for the term "political intelligence" and protects the Kendrick Consent Decree's core values.

The Court recognizes that the Monitoring Team raised several concerns with the Parties' proposed modifications. Dr. Rachel Levinson-Waldman expressed her concerns with the term "threat assessments." See supra Sec. III.A. She also expressed concerns over the inclusion of the term cyberbullying in Paragraph 8 of § G and the inclusion of certain language in the definition of First Amendment-Related Intelligence. Id. Dr. Bowman also raised concerns regarding the definition of "legitimate law enforcement purpose." See supra Sec. III.B. The training, guidance and instruction of MPD officers on the limitations imposed on the MPD by the Kendrick Consent Decree will ensure that these concerns are not realized. The Monitoring Team's primary role going forward is to craft the City of Memphis's social media investigative guidelines and develop MPD training protocols to implement these guidelines. This responsibility provides the Monitoring Team with the opportunity to put in place structures to prevent such abuses.

B.      Section I of the Kendrick Consent Decree

Section I currently reads: "The defendants and the City of Memphis shall not encourage, cooperate with, delegate, employ or contract with, or act at the behest of, any local, state, federal or private agency, or any person, to plan or conduct any investigation, activity or conduct prohibited by this Decree." (Kendrick Consent Decree § I, Opinion and Order, ECF No. 151 at

PageID 6285.)  The City's proposed modification to the <u>Kendrick</u> Consent Decree reads as follows:

> The defendants and the City of Memphis shall not encourage, ~~cooperate with,~~ delegate, employ or contract with, or act at the behest of, any local, state, federal or private agency, or any person, to plan or conduct any investigation, activity or conduct prohibited by this Decree.  **In other words, the City may not direct another agency to act as its surrogate to violate the Consent Decree or accept information that the City knows or should reasonably have known was collected in a manner that would violate the United States Constitution.**
>
> **Under this section, the City may receive information from other entities that does constitute First Amendment-Related intelligence for a legitimate law enforcement purpose provided that the City may not act upon such information without obtaining an Authorization pursuant to Section G.  The City may not act upon or catalog information from other agencies constituting First Amendment-Related intelligence that is unrelated to any legitimate law enforcement purpose.  Nothing in this [s]ection precludes the City from receiving tips from non-law enforcement agencies or individuals**.

(Trial Ex. 25, ECF No. 336-4 at PageID 10356 (emphasis in original).)  The City's proposal would therefore remove the phrase "cooperate with" from the first paragraph of § I, would add a line to the first paragraph of § I interpreting the section's limitations on joint operations, and would allow the City to accept First Amendment-related intelligence from other agencies, if accepted for a legitimate law enforcement purpose, so long as such information sharing is authorized pursuant to the review and authorization procedure codified by § G of the Decree. (<u>Compare</u> <u>id.</u> with ECF No. 151 at PageID 6285.)

Before addressing the City's proposed modifications to § I, the Court notes that much of the City's confusion over the meaning of § I arises out of a lack of training and top-down supervision by MPD legal advisors and officials.  The Monitor's Post-Trial Brief summarizes this point well.  (<u>See generally</u> Independent Monitor's Post-Trial Br., ECF No. 350.)  Most, if not all, of the situations where MPD officers experienced confusion over their ability to participate in joint operations or engage in criminal investigations with other law enforcement entities did

not implicate § I of the Decree.  For example, as Major Goods' testimony demonstrates, it is unlikely that any information received by the MGU from outside law enforcement agencies would implicate § I or would require significant vetting under § G of the Decree.  The MGU's investigations necessarily have a "criminal nexus," and purely criminal investigations do not implicate § I's restrictions on joint operations.  The same goes for the City's investigations of cross-border criminal acts that require interagency information sharing and cooperation, as detailed by the testimony of Deputy Director Crowe.  (See Trial Ex. 22.[8])  All of those investigations targeted purely criminal conduct and therefore did not implicate § I's and the Decree's prohibitions.

The record also demonstrates that the City has not properly instructed officers on the interpretation of § I provided by the Court in the November 13, 2019 Order Denying the City's Motion for Immediate Modification.  The Order was clear that the Kendrick Consent Decree, and § I more specifically, "require[s] the City to reject outright *only* information constituting political intelligence that is unrelated to any legitimate law enforcement activities."  (Trial Ex. 26, ECF No. 250 at PageID 8417 (emphasis in original).)  Section I "does not prohibit the police from receiving information gathered as the result of legitimate criminal investigations, supported by reasonable suspicion or probable cause, and unrelated to any protected First Amendment activities."  (Id. at PageID 8417.)  The testimony of the several members of the MPD at the Hearing demonstrates that confusion exists regarding the scope of § I.  This confusion should have been eliminated by the November 2019 Order.  (See, e.g., June 19, 2020 Tr., ECF No. 346 at PageID 11227–28.)  The City has not adequately relayed the Court's rulings to MPD officers.

---

[8] This exhibit was listed for identification only and is not substantive evidence.  The content was provided to the Court through the testimony of Deputy Director Donald Crowe of the MPD.

Moreover, given that the City has yet to implement the audit and compliance program approved by the Court or to draft social media policy guidelines for use by MPD officers, it is not appropriate to modify § I based solely on confusion caused by City officials' failure to educate MPD officers on the proper interpretation and implementation of the <u>Kendrick</u> Consent Decree.

MPD officers receive a wide variety of training on complex legal issues. The record does not support the conclusion that providing officers with additional training on the <u>Kendrick</u> Consent Decree would be ineffective or would fail to clear up officer confusion over the Decree's prohibitions.

Despite these findings, the Court will address the merits of each of the City's proposed modifications.

        *1.*        *Meaning of the Phrase "Cooperate With"*

At the Hearing, several officers of the MPD testified that they were confused or unclear as to the meaning of the term "cooperate with" as used in § I. (<u>See, e.g.</u>, City's Post-Trial Brief, ECF No. 348 at PageID 11404.) The City seeks to remove this phrase to clear up any confusion regarding § I's limitations on the City's participation in joint operations. (<u>See id.</u> at 11401.) The Court finds that (1) the meaning of the phrase "cooperate with" is not overly broad or confusing, and that (2) when read in the context of § I, the phrase "cooperate with" does not prevent the City from participating in joint operations with outside law enforcement agencies.

As stated above, consent decrees have the qualities of both contracts and judicial orders. <u>See</u> <u>Williams</u>, 720 F.2d at 920. The interpretation of a consent decree's terms is governed by principles of contract law, and because a consent decree is a federal judgment, federal common law applies. <u>See</u> <u>Evoqua</u>, 940 F.3d at 239–40 (Bush, J., concurring) ("The above-stated rules of

federal consent decree interpretation have been stated by the Supreme Court as principles of federal common law."). "In the absence of controlling federal law, contractual interpretation of the Consent Judgment is governed by [the forum state's] law." Id. at 229 (citing Sault Ste. Marie Tribe of Chippewa Indians v. Engler, 146 F.3d 361, 372 (6th Cir. 1998)). In this case, the Court looks to Tennessee law as the source of federal common law. See Sault Ste. Marie, 146 F.3d at 372 ("Because this [consent decree] was formed in the State of Michigan, it is interpreted under Michigan law.").

When construing contractual terms, "[the court's] task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." Planters Gin Co. v. Fed'l Compress & Warehouse, Co., Inc., 78 S.W.3d 885, 889–90 (Tenn. 2002) (quoting Guiliano v. Cleo, Inc., 995 S.W.2d 88, 95 (Tenn. 1999)) (internal quotation marks omitted). Contractual terms and provisions "must be interpreted in the context of the entire contract[,] . . . for one clause may modify, limit, or illustrate another." D & E Constr. Co., Inc. v. Robert J. Denley Co., Inc., 38 S.W.3d 513, 519 (Tenn. 2001) (quoting Frizzell Constr. Co. v. Gatlinburg, L.L.C., 9 S.W.3d 79, 85 (Tenn. 1999)) (internal quotation marks omitted); see also Vanguards, 23 F.3d at 1017 (The "scope of a consent decree must be discerned within its four corners . . . .").

The meaning of the term "cooperate with" is not ambiguous. The plain and ordinary meaning of the word "cooperate" is to "act or work with another or others [or] act together or in compliance" with or to "associate with another or others for mutual benefit." Cooperate, Miriam-Webster Dictionary, (11th ed. 2016); see also Cooperate, Oxford English Dictionary, (2d ed. 1989) (defining the intransitive verb "cooperate" as "[t]o work together, act in conjunction (*with* another person or thing, *to* an end or purpose, or *in* a work)" (emphasis in original)). The

35

City's assertion that the term cooperate is overbroad and prevents the City from participating in joint operations ignores the context of the phrase. Under § I, the City shall not "cooperate with . . . any local, state, federal or private agency, or any person, *to plan or conduct any investigation, activity or conduct prohibited by this Decree*." (Kendrick Consent Decree § I, Opinion and Order, ECF No. 151 at PageID 6285.) The term "cooperate with," when read in context of this limiting phrase, therefore only prohibits the MPD from cooperating with other agencies to violate or to plan to violate the Decree. Conduct prohibited by the Decree includes the gathering of, maintenance of, or dissemination of First Amendment-related intelligence. Such conduct is necessarily wholly unrelated to the investigative activities of the MPD's joint operations, all of which deal exclusively with investigations into purely criminal conduct. And, as the November 2019 Order made clear, purely criminal investigations do not implicate the Decree's protections. (See ECF No. 250 at PageID 8417–18.)

The City's concerns are therefore not supported by the plain meaning of the term "cooperate with" as used in § I of the Kendrick Consent Decree. When read in its proper context, the term in no way prevents the City from cooperating with any other agency for criminal investigative purposes. It only limits joint operations where the City's participation would be violating the Decree or where the City engages in operations or shares information for the purpose of violating the Decree. The record does not demonstrate that the activities of the MPD undertaken in connection with ongoing joint operations would violate the Kendrick Consent Decree's ban on the gathering, maintenance, or dissemination of First Amendment-related intelligence.

>    2.    *Addition of the Line: "In other words, the City may not direct another*
>    *agency to act as its surrogate to violate the Consent Decree or accept information*
>    *that the City knows or should reasonably have known was collected in a*
>    *manner that would violate the United States Constitution.*

The City's additional request to add language to the first paragraph of § I fails as a matter of law.  "A proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor."  Rufo, 502 U.S. at 391; see also Doe v. Briley, 511 F. Supp. 2d 904, 924 (M.D. Tenn. 2007).  The Kendrick Consent Decree requires the City to do more than the First Amendment requires.  (See, e.g., Opinion and Order, ECF No. 151 at PageID 6276 ("The Court recognizes that the City granted its residents privacy rights above and beyond those guaranteed by the Constitution, but that may be the Consent Decree's intended purpose.").) Accepting the City's modification would permit the City to violate the Decree when it shares information with other law enforcement agencies.  The proposed modification would rewrite § I only to prevent the City from receiving information from outside law enforcement agencies that violates the Constitution irrespective of whether the receipt of such information violates the Kendrick Consent Decree.  The City's proposed rewriting of § I is especially troubling given that the testimony at the Hearing demonstrates the growing importance, and volume, of information sharing between law enforcement agencies.  (See, e.g., June 22, 2020 Tr., ECF No. 343 at PageID 10640–41.)  The possibility of allowing MPD officers to receive information gathered in violation of the Decree, so long as it was gathered by an outside law enforcement agency in the first instance, would substantially erode the core protections of the Decree.

That said, "[a]lthough state and local officers in charge of institutional litigation may agree to do more than that which is minimally required by the Constitution to settle a case and avoid further litigation," the Court must still "keep the public interest in mind in ruling on a request to modify based on a change in conditions making it substantially more onerous to abide

by the Decree." Rufo, 502 U.S. at 392. The City has not demonstrated that changed circumstances warrant reducing the protections afforded citizens of Memphis by rewriting § I of the Decree to meet the constitutional floor. Nor has the City demonstrated that § I imposes such an onerous burden on the MPD that it would detrimentally affect the MPD's ability to keep the public safe.

The City has also not provided sufficient evidence demonstrating that information received as a result of investigations conducted by MPD joint operations or received via third party information sharing programs such as Trust Pays and CrimeStoppers requires such onerous vetting to warrant a reduction of the protections afforded citizens of Memphis by the Kendrick Consent Decree. For example, the MGU, as already stated, engages exclusively in gang-related criminal investigations. MGU officers do not investigate First Amendment-related activities. Little to none of its activities will require review and authorization pursuant to § G. Furthermore, investigations by groups such as the Joint Terrorism Task Force are not likely to implicate § I of the Decree. It is unlikely that an investigation into potential terrorist threats in Tennessee or Shelby County would implicate an individual's First Amendment rights.[9] The City has not presented evidence to the Court suggesting otherwise.

The MPD's regular receipt of situational awareness bulletins from the Tennessee Fusion Center also does not warrant modification of § I. The City has not demonstrated that the MPD's inability to receive First Amendment-related intelligence in these bulletins would detrimentally impact the MPD's ability to fight crime and ensure public safety. At the Hearing, Director

---

[9] The Court recognizes that some terrorist-related investigations may implicate First Amendment-related intelligence. For example, an investigation into a religious or sociopolitical group with ties to terrorism may implicate the target individuals' First Amendment rights. But that is exactly why modification of § G is so important. Allowing the Director to delegate individuals to review and authorize such investigations alleviates the burden placed on the MPD to vet such information.

Rallings could not recall a single instance in which the MPD opened a criminal investigation based on information received via a Fusion Center bulletin. (See June 19, 2020 Tr., ECF No. 346 at PageID 11220:14-20.)

The types of information contained in Tennessee Fusion Center bulletins would not ordinarily implicate First Amendment-related intelligence. (See June 19, 2020 Tr., ECF No. 346 at PageID 11219:24-25.) The City's examples of the types of information typically found in Fusion Center bulletins also would not require any review and authorization pursuant to § G. (See, e.g., id. at PageID 11220:14-20.) Information such as "be-on-the-lookout" notices or alerts that a criminal suspect may be travelling through Shelby County are purely criminal matters that would not implicate the Decree's protections. (See June 17, 2020 Tr., ECF No. 344 at PageID 10871:23-25, 10872:1-8.) Moreover, the MPD is not required to receive these bulletins, and it would be difficult to conclude that the MPD's need to receive generalized, nonspecific, non-crime-related information presented in bite-sized bulletins warrants modification of the Kendrick Consent Decree. (See id. at PageID 10873:2-6, 10880:18-25, 10882:2-9.)

The MPD's need to participate in information sharing programs such as Trust Pays or CrimeStoppers programs also do not warrant modification. The information received via the Trust Pays program with Shelby County Schools generally detail threats to the safety of individuals or threats of future criminal activity that have led to the confiscation of guns, drugs, and other illegal contraband. (See, e.g., June 18, 2020 Tr., ECF No. 345 at PageID 11002:5-10; June 19, 2020 Tr., ECF No. 346 at PageID 11213:18-23, 11214:17-21.) MPD officers already vet these tips for credibility, and any additional vetting for the very few tips that may implicate First Amendment-related intelligence would not be so onerous as to unduly burden the MPD's ability to protect Shelby County Schools. (See ECF No. 346 at PageID 11214:22-25, 11215:1-

25.)  The same reasoning applies to the CrimeStoppers program.  (See, e.g., id. at PageID 11216:5-13.)

In summary, the City has not met its burden to demonstrate that changed factual circumstances warrant modification of § I, or that § I's protections should be rewritten to meet the constitutional floor.  The burden placed on the City by § I does not warrant such a departure from the current language of the Decree, and the Court's Orders clarifying its limitations demonstrate that little to no information received from the MPD as part of their membership in information sharing programs implicates § I's limitations.

       3.      *The City's Ability to Receive First Amendment-Related Intelligence from Other Law Enforcement Agencies and Third Parties (Paragraph 2 of the City's Proposed Modification)*

The City's third proposed change to § I confuses more than it clarifies.  The term First Amendment-related intelligence is defined by the Parties' Jointly Proposed Modification: "'First Amendment-Related Intelligence' is the gathering, indexing, filing, maintenance, storage, or dissemination of information or any other investigative activity which is undertaken due to or on the basis of a person's beliefs, opinions, associations or the content of the speech or expression protected by the First Amendment."  (Trial Ex. 6, ECF No. 327-1 at PageID 9960 ¶ 5.)  Under the City's proposed § I, the City would be able to receive First Amendment-related intelligence so long as it vets the information pursuant to § G of the Decree and so long as it uses the information for a legitimate police purpose.  (See Trial Ex. 25, ECF No. 336-4 at PageID 10356.)

Allowing the City to receive and use First Amendment-related Intelligence for legitimate police purposes provides no more added clarity than did the Court's most recent order interpreting § I and, if accepted, would contravene the purposes of the Kendrick Consent Decree. Adding this language would allow the MPD to receive First Amendment-related intelligence,

that is, information gathered "due to or on the basis of a person's beliefs, opinions, associations or the content of the speech or expression protected by the First Amendment," so long as it is used for a legitimate police purpose.  But this directly conflicts with the Court's October 26, 2018 Opinion and Order, in which the City was found to have violated the Decree:

> The Consent Decree, however, is clear and unequivocal in its language. Understood in its entirety, the Consent Decree bans investigative activity into the exercise of First Amendment Rights by Memphis residents. Political Intelligence is impermissible as the means of investigation, as the ends of investigation, or as an intermediate step in a larger investigation

(ECF No. 151 at PageID 6260.)  Allowing the City to accept First Amendment-related intelligence (the equivalent of political intelligence), regardless of whether it was vetted by MPD officers pursuant to § G, would allow the City to use such intelligence as a "means of investigation" or as "an intermediate step in a larger investigation."  (Id.)  Just like the City's September 2019 request to vacate § I, this proposed modification would "eviscerate the core goals of the Kendrick Consent Decree."  (See ECF No. 250 at PageID 8428.)

That is not to say that § I prevents the City from receiving information that may implicate First Amendment-related activities or intelligence.  For example, if a political activist group is being investigated by the FBI, and the FBI sends information about that group to the MPD, that information may result in the City's collection of First Amendment-related intelligence.  The City may receive that information, so long as it is reviewed and authorized pursuant to § G of the Decree, which requires the MPD to ensure (1) that the information is related to a criminal investigation and (2) that it was not gathered in violation of the Decree.  (See § G Kendrick Consent Decree, ECF No. 151 at PageID 6283.)

Using the Court's example, if the FBI did not gather that information "due to or on the basis of a person's beliefs, opinions, associations or the content of the speech or expression

protected by the First Amendment," then the MPD could receive the information. If the

information constitutes First Amendment-related intelligence, the City must reject it or otherwise

violate the Decree. Under the City's proposed modification to § I, the City would not be

required to reject outright information that was gathered in the course of an investigation that

was due to or based solely on the target's "beliefs, opinions, associations or the content of the

speech or expression protected by the First Amendment" so long as the MPD *ultimately* used the

information for a legitimate police purpose. Allowing the use of First Amendment-related

intelligence not initially gathered for a legitimate police purpose would permit a post-gathering

removal of taint from the information. The City's modification would eviscerate § I's

protections by allowing the City to use First Amendment-related intelligence from an outside law

enforcement agency so long as that intelligence might eventually be connected to a legitimate

police purpose. Such conduct would violate the Decree.

In summary, the Court finds that the City has not met its burden of demonstrating that § I

should be modified. The City's continued confusion over § I can be attributed to inadequate

training of MPD officers rather than to the opacity of the language of the Decree.

C.      *Section H of the* <u>Kendrick</u> *Consent Decree*

The City moves the Court to modify § H, a request the City raised for the first time in its

Post-Trial Brief. (<u>See</u> ECF No. 348 at PageID 11399–400.) The City proposes the following

changes to § H.2.:

> The defendants and the City of Memphis shall not disseminate personal
> information **for the purpose of First Amendment-Related Intelligence** about
> any person collected in the course of a lawful investigation of criminal conduct to
> any other person, except that such information may be disseminated ~~to another~~
> ~~government law enforcement agency then engaged in a lawful investigation~~
> ~~of criminal conduct~~ **for a legitimate law enforcement purpose.**

(See City's Reply Brief, ECF No. 355 at PageID 11511–12 (emphasis in original).)  The City relies on the testimony of Director Rallings to support its assertion (1) that changed circumstances require modification and (2) that § H as currently written threatens public safety. (Id. at PageID 11508–12.)  The record does not support these assertions.

First, § H does not prevent the City of Memphis from sharing all information about criminal suspects with third parties.  Section H prevents the City of Memphis and the MPD from "disseminat[ing] *personal information* about any person collected in the course of a lawful investigation of criminal conduct . . . ."  (See Kendrick Consent Decree § H, ECF No. 151 at PageID 6284.)  The Court has not yet construed the meaning of "personal information."  (See Order on Summary Judgment, ECF No. 120 at PageID 4887; see also ECF No. 151 at PageID 6268–69.)  The Court begins with the ordinary meaning of "personal information."  See Planters Gin, 78 S.W.3d at 889–90.  "Personal" means "of, relating to, or affecting a person as a private individual (rather than as a member of a group or the public, or in a public or professional capacity)."  Personal, Oxford English Dictionary (2d ed. 1989); see also Personal, Miriam Webster Dictionary (11th ed. 2016) ("of, relating to, or affecting a particular person"). "Information" means "knowledge obtained from investigation, study, or instruction." Information, Miriam Webster Dictionary (11th ed. 2016).  Taken together and read in the context of information gathered as a result of a police investigation, personal information is any knowledge relating to, or affecting a person as a private individual obtained as the result of an investigation.

The City broadly reads personal information to include *any* information relating to the individual, including his or her name.  (See City's Post-Trial Br., ECF No. 348 at PageID 11400.)  The Court does not interpret this provision so broadly.  The ACLU-TN provides a more

reasonable definition.  (See ACLU-TN Post-Trial Br., ECF No. 349.)  Section H must be read in the context of the purpose of the Kendrick Consent Decree, which specifically was written to protect citizens of Memphis's First Amendment rights.[10]  See D & E Constr., 38 S.W.3d at 519; see also United States v. Am. Trucking Ass'n, 310 U.S. 534, 543–44 (1940) (noting that a court's power to interpret the text of a statute is not limited to a "superficial examination" of the text but also includes looking to the purpose of the statute as a whole).

Personal information would not include the name of an individual or other descriptive or identifying characteristics such as the individual's height or weight.  But information related to citizens of Memphis's exercise of their First Amendment rights would constitute personal information.  For example, the City could not send information to a third party about an individual's political affiliation, her religious beliefs, or information completely unrelated to the City's need to share the information in furtherance of a legitimate law enforcement purpose.  Personal information would also include personally identifiable information, such as a telephone

---

[10] The Court recognizes that when interpreting the terms of a consent Decree, it should "focus only within the four corners of the consent decree."  Shy v. Navistar Int'l Corp., 701 F.3d 523, 530 (6th Cir. 2012).  The General Principles of the Kendrick Consent Decree, which are codified in the Decree, guide the Court's determination of the "purpose" of the Decree and its effect on interpretation of the Decree's terms:

> The provisions of this Decree prohibit the defendants and the City of Memphis from engaging in law enforcement activities which interfere with any person's rights protected by the First Amendment to the United States Constitution including, but not limited to, the rights to communicate an idea or belief, to speak and dissent freely, to write and to publish, and to associate privately and publicly for any lawful purpose.

> Furthermore, even in connection with the investigation of criminal conduct, the defendants and the City of Memphis must appropriately limit all law enforcement activities so as not to infringe on any person's First Amendment rights.

((Case No. 2:76-cv-00449, Kendrick Consent Decree, ECF No. 16.)

number, address, or other information beyond that which is necessary to respond to a potential criminal threat.[11]

While the definition of personal information still allows the name and description of an individual to be sent by the MPD to third parties, the City's requested modification goes too far. The City has also already travelled down this road. The Court found that the City had violated § H of the Decree because it had shared individuals' personal information with third parties for the purpose of political intelligence. (See ECF No. 120 at PageID 4887; ECF No. 151 at PageID 6269.) Additionally, the City has not provided sufficient evidence demonstrating that changed factual circumstances warrant modification of § H. The City points to Director Rallings' testimony, in which he asserts that Memphis has key infrastructures that need to be protected. (See Tr., ECF No. 345 at PageID 11018–20; see also Reply Br., ECF No. 355 at PageID 1150–51.) But that does not demonstrate how the need to protect Memphis infrastructure has changed since entry of the Decree; it only demonstrates that Memphis has key infrastructure that may be the targets of criminal activity. It is not clear that Memphis was not already a key point of interstate travel and transportation at the time the City consented to the Kendrick Consent Decree.

The City's assertion that 9/11 is a changed factual circumstance warranting modification is also not persuasive. Other courts have found the reality of the threat of terrorism following

_____

[11] The Court finds that some federal privacy statutes help in crafting this definition. For example, in the context of the Family Education Rights and Privacy Act, which was designed to "protect the privacy interests of students and their parents," schools and agencies cannot release "personally identifiable information," which is defined, per Code of Federal Regulations, as "the student's name, a family member's name, the address of the student or family member, personal identifiers such as the student's social security number or student number, and personal characteristics or other information that would make the student's identity traceable." United States v. Miami Univ., 294 F.3d 797, 806 & 806 n.9 (6th Cir. 2002). The Kendrick Consent Decree, however, does not use the term "identifiable," making some of this information not necessarily applicable to the Decree's definition of personal information.

9/11 to be a quintessential example of changed circumstances under Rufo.  See Handschu v. Special Servs. Div., 273 F. Supp. 2d 327, 337 (S.D.N.Y. 2003)[12] ("Within the context of the first Rufo prong, it remains to consider whether the changed circumstances crystallized by the events of 9/11 warrant revision of the Handschu Guidelines as they presently exist.  I conclude without difficulty that the answer to that question must be in the affirmative.").  The Court agrees that 9/11 was a tragic event that changed American society, and American policing, forever.  But it does not become a fallback justification to modify a Consent Decree to reduce the rights of Memphians, specifically their right not to have sensitive, personal information transmitted to unknown (and not politically accountable) third parties.[13]

Moreover, the City has not demonstrated why sharing personal information with private third parties is necessary to keep Memphians safe.  Nothing prevents the City and the MPD from responding to criminal threats themselves.  (See City's Reply Br., ECF No. 355 at PageID 11509–10; see also City's Post-Trial Br., ECF No. 348 at PageID 11399–400; ECF No. 345 at PageID 11020.)  The MPD could easily respond to a threat to avoid a catastrophic situation, a task they are uniquely qualified to perform.  The City's request would appear to delegate a significant amount of authority to third party security forces, which is antithetical to the notion of public accountability in policing.

---

[12] The Handschu litigation dealt with police investigations of political groups, but the modification proceedings came on the heels of 9/11 and were filed in New York City, the epicenter of the tragic events of 9/11. Such facts do not readily apply to Memphis, a city different in kind from New York City, especially given that New York City was only two years removed from the terrorist attacks on the World Trade Center.  See id. at 333.

[13] Scholars have cautioned against the chilling effects that information sharing and police surveillance justified by atrocities like 9/11 can have on individuals' First Amendment rights.  See, e.g., Matthew Wasserman, First Amendment Limitations on Police Surveillance: The Case of the Muslim Surveillance Program, 90 N.Y.U. L. REV. 1786, 1795–98 (2015) (discussing how the New York Police Department's surveillance of Muslim Americans in the years following the 9/11 terrorist attacks had chilling effects on their First Amendment rights).

Finally, enforcement of § H's ban on the sharing of personal information, as now construed by the Court, would not be detrimental to the public interest. (See Post-Trial Reply Br., ECF No. 11509–10.) The City may still share information relevant to a police investigation that does not disclose the types of information about an individual referenced above. The City could share the name or the descriptive characteristics of the suspect with third parties, but could not, for example, provide information about his or her home address, political affiliations, religion, or any information that is extraneous to the limited legitimate law enforcement purpose for which the individual's information is being shared. As such, the City under § H as currently written can respond to criminal threats to key infrastructures in Memphis.

In summary, the Court finds that the City has not met its burden of demonstrating that § H requires modification under Rufo. The Section does not prevent the City from sharing information with third parties that is necessary to prevent a "catastrophic" event. It does prevent the sharing of information that is unrelated to the legitimate law enforcement purpose for which it shares any information that relates to an individual's First Amendment rights, such as, for example, information about their political, religious, associational or free-speech related activities. Moreover, the City cannot demonstrate that changed circumstances warrant modification of § H, especially in light of the Court's interpretation of § H's restrictions on the sharing of personal information with third parties.

## V. CONCLUSION

For the reasons set out above, the Court **GRANTS** the City's Motion as to the Proposed Joint Modifications to the Kendrick Consent Decree. The Court **DENIES** the Motion as to the City's request to modify §§ I and H of the Kendrick Consent Decree. An amended Judgment

and Decree shall be filed as an attachment to this Opinion and Order (<u>see</u> ECF No. 378-1) and shall also be filed separately as an Amended Judgment in both this case and in <u>Kendrick v. Chandler</u>, No. 2:76-cv-00449 (W.D. Tenn. Sept. 10, 1976).

     **SO ORDERED**, this 21st day of September, 2020.

     /s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT COURT JUDGE