# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

---

ACLU OF TENNESSEE, INC.,

      Intervening Plaintiff,

v.                                                                     Case No. 2:17-cv-02120-MSN-jay

CITY OF MEMPHIS, TENNESSEE,

      Defendant.

---

## ORDER DENYING MOTION FOR RECUSAL

---

Before the Court is a Joint Motion for Recusal by Defendant City of Memphis, Tennessee (the "City") and Plaintiff ACLU of Tennessee, Inc. ("ACLU") (collectively, the "Parties"). (ECF No. 540, "Motion.")

One year ago last week, a federal employee, my law clerk, was the victim of an attempted murder following the verdict in a high-profile case. The crime has not been solved. To this day, federal authorities have done little to investigate. In several instances, Government attorneys apparently intervened to impede a thorough federal investigation. The approach of certain individuals in the U.S. Attorney's Office was self-fulfilling; they unilaterally decided, without more, that the attempted murder of my law clerk involved no federal crimes, and therefore, dedication of federal resources to further federal investigation was unwarranted. This is inexplicable and wholly inappropriate.

Motions for recusal are uncommon, but this particular Motion is exceptionally unusual. It concerns no comment or interaction involving the Court in *this* case, but rather statements alleged to have been made after verdict in a previous case following the attempted murder of the law clerk

assigned to that case. *United States v. Martin, et al.*, No. 2:23-cr-20191-SHL (W.D. Tenn.). In *Martin*, an Assistant United States Attorney ("AUSA") not assigned to that case alleged, even though it "was not in response or related to any case," that this Court said the Memphis Police Department ("MPD") is "infiltrated to the top with gang members." Notice of Disclosure of Oral Communications at 3, *Martin*, No. 2:23-cr-20191-SHL (W.D. Tenn. June 13, 2025), ECF No. 846 [hereinafter "Notice"]. Nothing could be further from the truth.

In light of the law concerning recusal and mindful of the Code of Judicial Conduct restricting commentary in certain circumstances, for the sake of clarity, the Court finds it necessary to provide background and context. To be clear, it is not about prosecutorial discretion, with which the Court will not interfere. It is not even about MPD. Rather, it is about the insolence and indifference of certain Government attorneys and the conflict created by their wrongful assertions regarding this Court. Therefore, this Motion concerns not so much the impartiality of the Court regarding MPD as asserted by the movants, but rather the independence of the judiciary in light of threats—internal and external—to the Court. Given these threats, upholding the rule of law in defense of our constitutional republic is the matter at hand. For the reasons set forth below, the Court's impartiality may not "reasonably be questioned," 28 U.S.C. § 455(a), and the Joint Motion for Recusal is hereby **DENIED**.

## **BACKGROUND**

### A. The Court's Preparations for the *Martin* Trial

*United States v. Martin* is a criminal case brought by the United States against former members of the MPD who were indicted for civil rights violations in connection with the death of Tyre Nichols in January of 2023. Trial began on September 9, 2024, and ended on October 3, 2024. Preparations were extensive, as the case was complex, and trial was expected to be lengthy.

In order to accommodate the increased demands trial would place upon the Court, special arrangements were made to hire a temporary law clerk (hereinafter referred to as "R.L."). R.L. had previously clerked for me and agreed to take a leave of absence from his law firm in another state to assist with the *Martin* case and other matters. Because of the short-term nature of his position, a departing law clerk, "K.H.," moved out of her house so R.L. could temporarily stay there. R.L. would not have been in Memphis when he was shot were it not for this special assignment.

### B. The Shooting and Lack of Investigation

Early on the morning of Monday, October 7, 2024, four individuals mounted the front porch of the residence where R.L. was staying. They proceeded directly to the front door. One of the individuals covered the Ring doorbell camera with his hand; another used a handgun to shoot through the glass portion of the front door to gain entry. Immediately after entering the residence, the gunman exited the house with R.L.'s wallet and stole his vehicle from the driveway. The other three waited outside and off-camera. Within a few minutes, the gunman returned, and all four individuals reentered the residence.[1] They proceeded directly to R.L.'s bedroom, pushed open the door, and shot him point-blank. The bullet passed through his body within an inch of his heart. The four individuals departed, having neither disturbed nor stolen anything else.

Two law enforcement reports were generated in the immediate aftermath of the shooting— one for the assault itself, and another for financial crimes after R.L's credit card was used for Kroger and DoorDash purchases. Within a day of the shooting, Marshals made clear to the Court that they would not be involved in the investigation because they did not want to get in MPD's way.

---

[1] Apparently, the ignition key had broken, disabling the vehicle.

3

On October 8, 2024, K.H.'s father went to the residence to assess damage and begin repairs. While there, he discovered blood on the front door that MPD had overlooked. He contacted MPD, after which an officer was dispatched to "swab" the blood for a sample.

On October 19, 2024, K.H. returned to the residence and discovered a spent bullet on the bed where R.L. had slept.[2] MPD had overlooked it. K.H. called MPD, and an officer returned to retrieve the bullet.[3]

Within two weeks of the shooting, on October 21, 2024, the Odell Horton Federal Building received damage resulting from what were later determined to be high-powered rifle shots. Bullets were fired through court windows on the ninth floor and the U.S. Marshal's window on the tenth floor. Later that day, in my capacity as Chair of the Facility Security Committee, I investigated whether windows on the eighth floor (where the U.S. Attorney's office is located) had also been hit.[4] While there, I encountered Criminal Chief Beth Boswell. As the employer of R.L., the victim and my law clerk, I inquired why no one had interviewed me about his shooting. She responded that the U.S. Attorney's Office would not be involved but offered to arrange for me to meet with MPD about it instead.

---

[2] It is perhaps worth noting that this was also the bedroom that K.H. used when she lived at the residence.

[3] On December 5, 2024, K.H. found another spent bullet on the front door mat that had also been overlooked by MPD. To be clear, I recognize that MPD has a near-impossible task given their staffing shortages. *See* Darrell Greene, *FOX13 takes a look at MPD's efforts to recruit more officers*, FOX13 (Sept. 18, 2025), https://www.fox13memphis.com/news/fox13-takes-a-look-at-mpds-efforts-to-recruit-more-officers/article_c262159c-3f18-494a-ba45-c63be1ed8fbd.html ("Estimates by the Memphis Police Association say that MPD needs at least 500 officers to fill the staffing shortages.").

[4] Inexplicably, this incident was written up to General Services Administration (GSA) as "property damage" rather than reported as a crime.

This was unsatisfactory for several reasons. First, critical evidence had been overlooked by MPD at the scene of the crime. Second, MPD was itself the subject of an ongoing pattern or practice investigation by the Department of Justice.[5]  Third, MPD leadership and officers were sometimes defendants in other matters pending in my Court. Most importantly, though, it did not seem to me at the time that federal authorities had conducted an appropriately thorough investigation in the first instance.  No one had contacted me or the victim's in-chambers coworkers. Nor had they interviewed family members who traveled to Memphis while R.L. was hospitalized.

On October 22, 2024, I met with Judge Parker, along with Chief Deputy U.S. Marshal Edge and Federal Protective Service Officer Scott Simpson.  At that time, Chief Deputy Edge advised that there would not be a federal investigation.  That same day, R.L. sent a text to Deputy U.S. Marshal File requesting assistance in contacting MPD about the stolen credit cards.  File responded that the Marshals were no longer involved in the case, and he would not provide any assistance. *See* Fig. 1.

---

[5] The pattern or practice investigation was opened on July 27, 2023.  U.S. Dep't of Just., *Justice Department Announces Pattern or Practice Investigation of the City of Memphis and the Memphis Police Department* (July 27, 2023), https://www.justice.gov/archives/opa/pr/justice-department-announces-pattern-or-practice-investigation-city-memphis-and-memphis.  The results of that investigation were published on December 4, 2024, finding extensive systemic constitutional and statutory violations.  U.S. Dep't of Just., *Justice Department Finds Civil Rights Violations by Memphis Police Department and City of Memphis* (Dec. 4, 2024), https://www.justice.gov/archives/opa/pr/justice-department-finds-civil-rights-violations-memphis-police-department-and-city-memphis.  Those findings were then retracted on May 21, 2025.  U.S. Dep't of Just., *The U.S. Department of Justice's Civil Rights Division Dismisses Biden-Era Police Investigations and Proposed Police Consent Decrees in Louisville and Minneapolis* (May 21, 2025), https://www.justice.gov/opa/pr/us-department-justices-civil-rights-division-dismisses-biden-era-police-investigations-and.



*Figure 1.* Text exchange between R.L. and Deputy File.

Shortly thereafter, on October 31, 2024, I met with Chief Deputy Edge, Deputy U.S. Marshal Jess Ivie, and Deputy U.S. Marshal File. File had been identified as the threat investigator who had allegedly interviewed R.L. after the shooting. Contrary to what I had understood, Deputy

File informed me that he had not interviewed R.L. When I inquired as to the reason, the Marshals confirmed that Boswell advised them that there was "no federal nexus" justifying an investigation. Until that meeting, I had been unaware that Boswell had authority over the Marshals or that she could unilaterally determine what they could investigate. It seemed to me that Boswell and the U.S. Marshals had talked each other into doing nothing to thoroughly investigate the attempted murder of my law clerk.

In the absence of investigation by the Marshals, I spoke with then-AUSA Joe Murphy and indicated that I needed to speak with the FBI. He provided me with the number of Special Agent Tom Barlow. I called and left a voicemail; Barlow never returned my call. Sometime later, I encountered Murphy again and commented that Barlow had not called me back. At that time, Murphy said, "That is inappropriate."

### C. The Government's Motion to Continue the *Martin* Sentencings and Subsequent Notice

On March 28, 2025, Acting U.S. Attorney Reagan Fondren was replaced by Murphy, who was appointed Interim U.S. Attorney. On April 4, 2025, Murphy called R.L., asked a few questions, and said his office would follow up with R.L. when the investigation had concluded.[6]

On May 22, 2025, Murphy emailed my Judicial Assistant, Cindy Migliore, to request a meeting with me and FBI Assistant Special Agent in Charge ("ASAC") Jeremy Baker "about the

---

[6] Murphy indicated that the investigation would "conclude" even though a decision not to further investigate had been made a day after the shooting. Furthermore, R.L. never heard from Murphy or anyone in the U.S. Attorney's Office again.

investigation of the [] shooting." That meeting, planned at the request of the Interim U.S. Attorney,

was then scheduled for May 30, 2025.[7] *See* Figs. 2–4.

> On May 22, 2025, at 7:47 PM, Cindy Migliore
> ██████████████████████████ wrote:
>
> I'll follow-up tomorrow, but just to give you a heads up.
>
> Get Outlook for Android
> _____
> **From:** Murphy, Joe (USATNW) ██████████████████
> **Sent:** Thursday, May 22, 2025 6:07:23 PM
> **To:** Cindy Migliore ██████████████████████
> **Subject:** Meeting with Judge Norris
>
> **CAUTION - EXTERNAL:**
>
> Cindy,
>
> Jeremy Baker, the FBI Assistant Agent in Charge for the FBI's
> Memphis field office, is available to sit down with Judge Norris and
> speak with him about the investigation of the ▒▒▒▒▒▒▒ shooting.
> Could I get some dates and times over the next two weeks that Judge
> Norris could sit down and speak with Jeremy and me?
>
> Let me know and I will see when Jeremy is available.
>
> Thanks,
>
> Joseph C. Murphy, Jr.
> Assistant U.S. Attorney
> Western District of Tennessee
> 167 N. Main Street, Room 800
> Memphis, Tennessee 38103
> Office Phone: ▒▒▒▒▒▒▒▒

*Figure 2.* Email exchange regarding scheduling between Interim U.S. Attorney Murphy and Cindy Migliore.

---

[7] Because the substance of the May 30 meeting was the subject of the June 13 Notice, it is
addressed in the context of that filing.

**From:** Cindy Migliore ██████████████████
**Sent:** Friday, May 23, 2025 9:15 AM
**To:** Murphy, Joe (USATNW) ████████████
**Subject:** [EXTERNAL] Fw: Meeting with Judge Norris

Get Outlook for Android

---

**From:** Mark Norris ███████████████████
**Sent:** Friday, May 23, 2025 5:41:16 AM
**To:** Cindy Migliore ██████████████████
**Subject:** Re: Meeting with Judge Norris

Wednesday, May 28, anytime after 2
Friday, May 30, anytime after 1:45

I'm willing to consider next Tuesday, May 27, as well if need be. This is important.

Mark S. Norris
United States District Judge

On May 22, 2025, at 8:42 PM, Mark Norris
████████████████████ wrote:

This is good news.

Mark S. Norris
United States District Judge

*Figure 3.* Scheduling email exchange continued.



*Figure 4.* Scheduling email exchange continued.

On June 11, 2025, the United States filed a Motion to Continue Sentencing Hearings in

*Martin*.  Motion to Continue Sentencing Hearings, *Martin*, No. 2:23-cr-20191-SHL (W.D. Tenn.

June 11, 2025), ECF No. 840.  That motion incorrectly asserted that:

> [O]n or about May 30, 2025, Judge Norris had an ex parte communication regarding the defendants in this case to some of the management team for the United States Attorney's office. This communication occurred during a meeting in regard to the shooting of the judge's law clerk following the trial and verdict in the Tyre Nichols case.

(*Id.* at PageID 15933.)

On June 13, 2025, the Government filed its Notice disclosing statements I was alleged to have made at the May 30 meeting and in a prior conversation with Boswell on October 21, 2024.[8] The Notice correctly set forth the status of the *Martin* case, the guilty pleas by defendants Mills and Martin, the jury verdict against defendants Bean, Haley, and Smith, and the scheduled sentencing dates of all defendants. *See generally* Notice. However, Paragraph 2 of the Notice incorrectly recites the date of R.L's shooting as October 8, 2024; in fact it took place on October 7, 2024.[9] The description of the nature of the attack and R.L.'s injuries is otherwise accurate. Paragraph 3 correctly indicates that I "was extremely concerned about the well-being of the clerk victim and desirous that the perpetrators be held accountable," MPD "believe[d] that a group of juveniles committed the offenses," and I was "reasonabl[y] frustrat[ed] with the police investigation." Notice at 2.

Because Paragraph 4 is incorrect almost in its entirety, it is worth quoting in full:

> Federal investigators, to include the USMS, and the FBI, concluded that there was no federal nexus for the shooting, and the U.S. Attorney's Office concurred with that decision. A meeting was scheduled with the Judge for May 30, 2025, to explain this decision, with the following persons in attendance: Joseph C. Murphy, Jr., Interim United States Attorney, Stuart Canale, Acting First Assistant United States attorney, Beth Boswell, Criminal Chief, and Jeremy Baker, ASAC for FBI for the

---

[8] In fact the Notice just says "[s]hortly after the Oct. 8, 2024, shooting." Notice at 3. Elsewhere, in a July 7, 2025 letter to counsel, AUSA David Pritchard indicates the alleged comment regarding gang involvement was made "[s]ometime between [October 21, 2024,] and Nov. 15, 2024." Letter to Counsel of July 7, 2025, at 2, *Martin*, No. 2:23-cr-20191-SHL (W.D. Tenn. July 7, 2025), ECF No. 895. Among the many issues with these two filings, one stands out here: the lack of specificity as to the date of my conversation with Boswell. In fact, it took place on October 21, 2024, as evidenced by the timestamp on the photos I took of bullet holes elsewhere in the building.

[9] This error is repeated elsewhere in the Government's other filings. *See* Letter to Counsel of July 7, 2025 at 2, *Martin*, No. 2:23-cr-20191-SHL (W.D. Tenn. July 7, 2025) (reciting the shooting date as October 8, 2024); United States' Omnibus Response to Defendants' Motion for New Trial at 2, *Martin*, No. 2:23-cr-20191-SHL (W.D. Tenn. July 21, 2025), ECF No. 904.

Memphis office.  The purpose of the meeting was to explain why investigators determined there was no federal nexus and why this Office would not be charging any federal crimes against any of the suspects in relation to the shooting of the clerk.

Notice at 2.  As set forth above, the meeting of May 30, 2025, was *never* described to me or to anyone else as scheduled for the purpose of explaining that federal investigators "concluded there was no federal nexus for the shooting" or that "the U.S. Attorney's Office concurred with that decision."  *Id.*  Nor was the meeting called to "explain why . . . [the U.S. Attorney's] Office would not be charging any federal crimes against any of the suspects in relation to the shooting of the clerk."  *Id.*  Rather, as set forth above and indicated by the email from Interim U.S. Attorney Joe Murphy to my Judicial Assistant, the stated purpose was "about the investigation of the [] shooting."  *See* Fig. 2.  No mention was made, nor was I led to believe, that anyone other than Murphy and ASAC Baker would be in attendance.

At the outset, I thanked ASAC Baker for coming to see me, particularly because the FBI agent I called at Murphy's suggestion had never responded.  Upon telling him that I had never received a response, he said, "I know."  I then asked why and how he would know that, and he told me that then-Acting U.S. Attorney Reagan Fondren had instructed the agent not to return my call.

Because Paragraph 5 wholly mischaracterizes the subsequent conversation, it is also worth setting forth in full:

> During the meeting Judge Norris indicated that his theory or belief was that at least one of the defendants in the above styled case was in a gang and that the gang was responsible for the shooting of his clerk. He stated his belief that the intended target of the shooting was his former female clerk who lived at the residence. He indicated that the defendant/defendants had seen the former female clerk during the trial in the courtroom.

Notice at 2–3.  Boswell chimed in immediately after ASAC Baker's comment to say that there was "no nexus" between R.L.'s shooting and any federal law.  I did not then indicate—nor have I

12

ever indicated—that it was *my* theory or belief that any defendant was affiliated with a gang or otherwise connected to the shooting of R.L.[10]  Rather, because Boswell asserted at the May 30 meeting that the shooting was just a random burglary by juveniles, we disagreed about what was captured on the Ring video and how it could be construed.  I responded to Boswell's burglary theory by saying that, given the lack of investigation, for all any of us knew, it could just as easily have been a targeted attack; i.e., an equally plausible theory.  Assertions to the contrary are of Boswell's own making.[11]

Paragraph 6 is also wholly incorrect.  Boswell indicates that in our conversation of October 21, 2024 (which she states was sometime "[s]hortly after the . . . shooting"), I said that I would not and "could not meet with any member of the [MPD] . . . as MPD is 'infiltrated to the top with gang members.'"  Notice at 3.  To put it bluntly, I never said that.

At or immediately after the May 30, 2025, meeting, as I challenged whether Boswell had sufficiently investigated bases for a federal interest or nexus, she stated to me that she was unaware of any financial crimes or the report generated regarding those crimes after the shooting.  I subsequently provided her with that report on June 9, 2025; she responded by email on June 11, 2025, to the effect that, despite the report, there was still no federal interest.  Further, she opined that "this would not be a crime of violence."  Fig. 5.

---

[10] Somewhat ironically, the *only* suggestion in the record that a *Martin* defendant was affiliated with a gang was raised by the Government.  *See* Letter to Counsel of July 7, 2025 at 3, *Martin*, No. 2:23-cr-20191-SHL ("Previously provided in discovery at US_00046715 to US_00046724 is the statement of Defendant Mills that Defendant Haley was recognized by gang members.").  I had never before seen that statement in the record, nor was the suggestion anywhere else to be found.

[11] At first, I thought what we had here was, perhaps, a "failure to communicate."  *See* COOL HAND LUKE (Jalem Productions 1967) ("The Captain: What we've got here is failure to communicate.").  That no longer appears to be the case.



**From:** Boswell, Beth (USATNW) <‌█████████████>
**Sent:** Wednesday, June 11, 2025 10:35 PM
**To:** Mark Norris ███████████████████
**Cc:** joe.murphy████████████████████
**Subject:** RE:██████ Credit Cards/Door Dash

**CAUTION - EXTERNAL:**

Judge Norris

    The suspect ██████ ██████████████ was charged with the Aggravated Assault, Especially Aggravated Burglary and Auto Theft with Report #███████████ and ████████████. It looks like the information from the report you had (██████████) was combined and investigated under ████████████. The state arrest report was submitted to the AG office on 5-28-2025. The other 3 suspects have not been identified yet, but it looks like the case is still active. Also, there were 3 separate NIBIN hits from the casings recovered.

    I have reviewed the statute that you referenced in regard to the use of the credit card. Referring back to the juvenile delinquency statute, the state juvenile court has jurisdiction over this crime, we have no proof of any services prior accessed for the juvenile, and this would not be a crime of violence. Therefore, we would not be able to proceed with charges as to this portion of the crime for a juvenile. Thanks.

Beth

**From:** Mark Norris ██████████████████
**Sent:** Monday, June 9, 2025 2:55 PM
**To:** Boswell, Beth (USATNW) ██████████████████
**Subject:** [EXTERNAL] ████████ Credit Cards/Door Dash

Mark S. Norris

*Figure 5.* July 11 email exchange with Boswell.

At no time during the May 30 meeting did the Government's attorneys question my statements, seek clarification, or express any discomfort with our communications. Nor did they do so at any time thereafter until June 11 and June 13.

## **STANDARD OF REVIEW**

As a background principle, the Sixth Circuit has indicated that "a judge is presumed to be impartial, and the party seeking disqualification 'bears the substantial burden of proving

otherwise.'" *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 352 (6th Cir. 2007) (quoting *United States v. Denton*, 434 F.3d 1104, 1111 (8th Cir. 2006)). "The burden is not on the judge to prove that he is impartial." *Id.* (citing *In re McCarthey*, 368 F.3d 1266, 1269 (10th Cir. 2004)).

"Due process guarantees 'an absence of actual bias' on the part of a judge." *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). That guarantee is upheld by a standard requiring recusal "when, objectively speaking, the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *United States v. Liggins*, 76 F.4th 500, 505 (6th Cir. 2023) (quoting *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (per curiam) (internal quotation marks omitted)). Thus courts evaluating a motion for recusal based on the Due Process Clause—which "demarks only the outer boundaries of judicial disqualifications," *id.* at 505 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009))—ask whether, "as an objective matter, 'the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias.'" *Williams*, 579 U.S. at 8 (quoting *Caperton*, 556 U.S. at 881 (internal quotation marks omitted)).

But most recusals are governed even more strictly than this—according to "common law, statute, or the professional standards of the bench and bar." *Liggins*, 76 F.4th at 505 (quoting *Bracy v. Gramley*, 520 U.S. 899, 904 (1997)). And, accordingly, the Parties here invoke such a statute: 28 U.S.C. § 455(a).[12] Section 455(a) says that a judge "of the United States shall

---

[12] The Court notes that the second and third paragraphs of section II.A of the Parties' Motion (ECF No. 540 at PageID 15676–77) are taken almost entirely from Chief Judge Lipman's Order Granting Motions for New Trial in *Martin* without proper citation thereto. Order Granting Motions for New Trial at 8, 10–11, *Martin*, No. 2:23-cr-20191-SHL (W.D. Tenn. Aug. 28, 2025), ECF No. 919.

disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[13]

When a judge's impartiality may reasonably be questioned is determined not according to "the

subjective view of a party," *United States v. Dandy*, 988 F.2d 1344, 1349 (6th Cir. 1993) (citation

omitted), but by "an objective standard: a judge must disqualify himself 'where a reasonable

person with knowledge of all the facts would conclude that the judge's impartiality might

reasonably be questioned.'" *Burley v. Gagacki*, 834 F.3d 606, 616 (6th Cir. 2016) (quoting *United*

*States v. Adams*, 722 F.3d 788, 837 (6th Cir. 2013)).  *See also Ragozzine v. Youngstown State*

*Univ.*, 783 F.3d 1077, 1079 (6th Cir. 2015) (quoting *Hughes v. United States*, 899 F.2d 1495,

1501 (6th Cir. 1990)) ("[A] judge [must] recuse 'if a reasonable, objective person, knowing all of

the circumstances, would have questioned the judge's impartiality.'"); *United States v. Sammons*,

918 F.2d 592, 599 (6th Cir. 1990) (quoting *Browning v. Foltz*, 837 F.2d 276, 279 (6th Cir. 1988))

("The standard is an objective one; hence, the judge need not recuse himself based on the

'subjective view of a party' no matter how strongly that view is held.").  Section 455(a) requires

recusal in light of remarks or conduct "reveal[ing] such a high degree of favoritism or antagonism

as to make fair judgment impossible."  *Liteky v. United States*, 510 U.S. 540, 555 (1994).

Further, a judge evaluating a motion for recusal under Section 455 is "not require[d] . . . to

'accept as true the allegations made by the party seeking recusal.'" *Garrett v. Ohio State Univ.*,

60 F.4th 359, 368 (6th Cir. 2023) (quoting *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 353

(6th Cir. 2007)).  Instead, a district court "make[s] the necessary factual findings and decide[s]

whether the facts warrant disqualification." *Scott*, 234 F. App'x at 353–54 (citation omitted).  In

evaluating a motion for recusal under Section 455, "the judge is free to make credibility

---

[13] Notably, Chief Judge Lipman did *not* find a violation of Section 455 in the Order
Granting Motions for New Trial.

determinations, assign to the evidence what he believes to be its proper weight, and to contradict the evidence with facts drawn from his personal knowledge." *Id.* at 354 (citation omitted). "Where the question is close, the judge must recuse himself." *Dandy*, 998 F.2d at 1349 (citing *Roberts v. Bailar*, 625 F.2d 125, 129 (6th Cir. 1980)). But "there is as much obligation upon a judge not to recuse himself when there is no occasion as there is for him to do so when there is." *Garrett* 60 F.4th at 372 (quoting *Easley v. Univ. of Mich. Bd. of Regents*, 853 F.2d 1351, 1356 (6th Cir. 1988)). As the Sixth Circuit has explained, "needless recusals exact a significant toll," particularly where mid-litigation reassignment would disrupt proceedings and encourage forum shopping. *Id.* at 371 (citation omitted).

## ANALYSIS

In brief, the Parties seek my recusal in the present case because I am assumed to have said that MPD is "infiltrated to the top with gang members." *See generally* ECF No. 540. And, in fairness to the Parties, that allegation has, until now, gone entirely unrebutted. There will, most probably, be some who wonder why I can't just say, "I never said that, I'm not biased against MPD, end of story." Though I am presumed to be impartial, I believe that response to be insufficient because of the public's interest. An order of such limited scope would not adequately demonstrate the extent to which it is unreasonable to question my impartiality.[14] This Order, then, is written chiefly to show two things: first, that my reasons for recusal in the *Martin* case had little,

---

[14] A related concern is whether I ought to be opining officially on any of these matters at all. A federal judge faced with a recusal motion is in an unusual position, however. Canon 3(A)(6) of the Code of Judicial Conduct says that "[a] judge should not make public comment on the merits of a matter pending or impending in any court." Code of Judicial Conduct, Canon 3(A)(6) (2019). But it goes on to say that "[t]he prohibition on public comment on the merits does not extend to public statements made in the course of the judge's official duties." *Id.* Even setting aside the question about whether this commentary really goes to the merits of the *Martin* case—and I certainly think it does not—the present discussion is surely undertaken "in the course of [my] official duties" otherwise.

if anything at all, to do with MPD, and second, that it would be unreasonable to treat Boswell's Notice as reliable given the facts set forth above. If the standard is one of reasonableness, suffice it to say that her actions have been anything but.

So for the sake of clarity: as to the *Martin* case, I did not recuse because of any personal bias against anyone or anything. I recused because of the apparent bias of others against the Court. It had become clear to me that certain individuals in the U.S. Attorney's Office were personally adverse to me. They instructed the U.S. Marshals not to investigate the attempted murder of my law clerk. They instructed the FBI not to return my calls. And they requested a meeting with me to discuss "the investigation of the [] shooting," only to later mischaracterize it as a meeting called to inform me that there would not be any further federal investigation. Moreover, statements that neither I nor anyone else at the May 30 meeting made were attributed to me in Boswell's Notice.[15] Incredibly, these individuals have taken the initiative to transform my efforts to encourage an appropriate investigation of the attempted murder of my law clerk into something else entirely.

Much has been made of various hypotheses being my "theory or belief." But I had no particular theory or belief, chiefly because no one had done even a minimal amount of work to investigate whether there was a federal interest (*not* a nexus to the *Martin* case) in the first place. It seemed entirely inappropriate to me then, and more so now, that by October 22, 2024 (a mere 15 days after the shooting), it had already been determined that there would be no further investigation. How could there be certainty regarding a lack of federal interest if insufficient

---

[15] Moreover, it never would have occurred to me that the May 30 meeting could have qualified as an ex parte communication, as alleged in the Government's Motion to Continue Sentencing Hearings. Motion to Continue Sentencing Hearings at 1, *Martin*, No. 2:23-cr-20191-SHL. Indeed, it has been customary practice for decades for the U.S. Attorney to visit the judges' chambers regularly to evaluate the performance of the AUSAs. Further, the meeting requested by Murphy was not called to discuss the *Martin* case.

investigation was undertaken?[16]  Due consideration had not been given to the possibility that the perpetrators could be held responsible for a number of federal crimes if the facts were investigated and developed.  *See, e.g.*, 18 U.S.C. § 1114 ("Whoever kills or attempts to kill any officer or employee of the United States . . . while such officer or employee is engaged in or on account of the performance of official duties . . . shall be punished . . . .").  The federal carjacking statute, 18 U.S.C. § 2119, and accompanying caselaw had been largely ignored.  And, as evidenced above, despite Boswell's assertion that she had reviewed MPD's investigation, she was unaware of MPD's financial crime report.  *See* Fig. 5.  I had to send it to her, and did so on June 9, 2025.  She did not seriously investigate the possibility that the use of R.L.'s stolen credit cards could constitute federal wire fraud.  *See* 18 U.S.C. § 1343.  Moreover, no one had monitored the status of the MPD investigation.  Boswell advised that charges had been filed against juveniles, but the Court now understands that those were later dropped.  Importantly, one of the triggers for the Federal Juvenile Delinquency Act ("FJDA") is that a competent state authority "refuses to assume jurisdiction over [a] juvenile with respect to . . . [an] alleged act of juvenile delinquency."  18 U.S.C. § 5032.[17]  It

---

[16] A careful review of the *Martin* record reveals an interesting contradiction.  In the Letter to Counsel of July 7, 2025, the Government states that "[o]n October 25, 2024, the USMS prepared a Report of Investigation on the shooting of R.L. [and] [t]hat report is included . . . ." Letter to Counsel of July 7, 2025 at 3, *Martin*, No. 2:23-cr-20191-SHL.  But three days earlier, Chief Deputy Edge had advised me that there would not be a federal investigation.  And, in fact, the Report of Investigation was not a federal investigative document at all, merely an acknowledgement that MPD had opened an investigation.  Apparently, contrary to what the Letter says, it was also not included with the Letter to Counsel.

[17] Throughout this back-and-forth with Boswell and others, I remained mindful of respecting prosecutorial discretion.  At no point did I pressure or instruct charges to be brought against anyone.  I mentioned the statutes above only in the hopes that some investigating might be done to determine whether there was a sufficient "federal nexus" in the first instance.

did not appear that Boswell or those acting at her direction had monitored the state court proceedings to keep the FJDA avenue open or the victim, my law clerk, informed.

The first red flag for me was that Boswell had reportedly instructed the U.S. Marshals not to pursue further federal investigation given these or potentially other federal crimes. My hope for some progress was temporarily revived, however, upon Interim U.S. Attorney Murphy's effort to bring ASAC Baker in for an update on the status of the investigation which the U.S. Marshals had led me to believe was no longer underway. For some reason, though, that meeting was overtaken by Boswell to say something entirely different. Then came the Notice on June 13, 2025. All of this led me to conclude that some personnel in the U.S. Attorney's Office were adverse to me.

In *Martin*, the record had to speak for itself. The Court must never become a party to the conflict or appear to sit in judgment of its own injury. Where its independence is threatened, it does not have the luxury of reacting defensively—that is, district court judges should not ordinarily punch back.[18] Defending and upholding the rule of law is our first responsibility. To ensure that Boswell's mischaracterizations about me did not hijack the *Martin* proceedings and impede sentencing in that case, I recused.

There is, however, a reasonable limit to how far it is possible to let such flapdoodle fly.[19] I do not harbor any bias toward MPD. It has never been *my* theory or belief that the *Martin* defendants or any other MPD officers have gang affiliations. And, in light of the "significant toll"

---

[18] *See* The Federalist No. 78, at 523 (Alexander Hamilton) (Cooke ed., 1961) ("It proves incontestably, that the judiciary is beyond comparison the weakest of the three departments of power; that it can never attack with success either of the other two; and that all possible care is requisite to enable it to defend itself against their attacks.").

[19] Jonathan Swift, *The Examiner No. 14* (Sept. 11, 1710) ("Falsehood flies, and truth comes limping after it, so that when men come to be undeceived, it is too late; the jest is over, and the tale hath had its effect.").

that "needless recusals" place upon the judiciary, *Garrett*, 60 F.4th at 371, it would be inappropriate to allow Boswell's mischaracterizations in *Martin* to affect this case or any other case.  "[A] reasonable person with knowledge of all the facts would [not] conclude that [my] impartiality might reasonably be questioned.'"  *Burley*, 834 F.3d at 616 (citation omitted).

This Motion comes at a moment of an unusually high number of threats to the independence of the judiciary.  Here I refer not only to the manner of the judiciary's portrayal in the media or the vitriol with which the judiciary is often attacked, but to true, physical threats.  The undersigned serves as Chair of the Court's Facility Security Committee.  Though it would be imprudent, if not inappropriate, for me to comment on specific threats, I know whereof I speak, as does the U.S. Attorney's Office, the U.S. Marshals Service, and the Federal Protective Service, for whom this Court has great respect.  I also serve on the Federal Judges Association's Committee on the Independence of the Judiciary, and we are actively engaged in doing what we can to educate and inform the public of the harm such threats pose to our constitutional republic.  Perhaps ironically, as the events set forth above unfolded, I was given responsibility for presenting a panel discussion on the impact of threats to the judiciary at the Sixth Circuit Judicial Conference in Memphis on September 3, 2025.  The matter here before the Court is a case study of that very topic.

Threats directed toward members of the judiciary, actual or implied, strike at the heart of judicial independence.  They manifest in many ways; sometimes through overt acts, but also as a result of inaction.  Upholding the rule of law depends upon judges who are free to decide cases according to law, without fear of reprisal or undue influence.  When intimidation or coercion is manifest, whether through political interference, personal threat, or the appearance of indifference by federal officers or law enforcement, the appearance and reality of impartial justice may also be

imperiled. Such acts threaten to erode public confidence in the courts and also threaten the constitutional balance among the branches of government. That is why they must be properly and thoroughly investigated and understood. The absence of proper and thorough investigation leaves open to speculation the origin of the threat and, perhaps, the motives of those who appear to tolerate such threats through inaction or obfuscation.

In his 2024 Year End Report, Chief Justice Roberts addressed such threats:

> I also echo the words of Chief Justice Charles Evans Hughes, who remarked—in the aftermath of a significant prior threat to judicial independence—that our three branches of government "must work in successful cooperation" to "make possible the effective functioning of the department of government which is designed to safeguard with judicial impartiality and independence the interests of liberty."

John G. Roberts, Jr., 2024 Year End Report on the Federal Judiciary 8 (2024). It is hoped that such successful cooperation will soon be restored.

## **CONCLUSION**

For the reasons set forth above, the presumption of impartiality has not been rebutted, and the Joint Motion for Recusal is hereby **DENIED**.

**IT IS SO ORDERED**, this 17th day of October, 2025.

*s/ Mark Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE