IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TENNESSEE

WESTERN DIVISION

---

ACLU OF TENNESSEE, INC,

Plaintiff,

vs. NO. 2:17-cv-2120

CITY OF MEMPHIS, TENNESSEE,

Defendant.

---

STATUS CONFERENCE

BEFORE THE HONORABLE MARK NORRIS, JUDGE

FRIDAY

29TH OF MAY, 2026

LISA J. MAYO, RDR, CRR
OFFICIAL REPORTER
FOURTH FLOOR FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103

A P P E A R A N C E S

Appearing as the monitoring team:

Mr. Edward L. Stanton, III
Mr. Gadson William Perry
Mr. Samuel Keenan Carter (via Teams)
Mr. Austin Hord
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, TN 3119
901-680-7369

Appearing on behalf of the Plaintiff:

Mr. Lucas Cameron-Vaughn
AMERICAN CIVIL LIBERTIES UNION OF TENNESSEE
P. O. Box 120160
Nashville, TN 37212
404-933-4063

Mr. Timothy A. Cook
Mr. Noah Kaitin
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
617-526-6005

Appearing on behalf of the City of Memphis:

Mr. Bruce McMullen
Ms. Jennie Vee Silk
Ms. Kelsey West McKinney
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
165 Madison Ave, Suite 2000
Memphis, TN 38103
901-577-2356

FRIDAY

May 29, 2026

-----------------------

**THE COURT:** I'm sure we are all systems go. We have Mr. Woloshin here helping us on technical matters. We'll find who we have on virtually momentarily. Let me welcome all of you here for this status conference.

Just for the record, this is *ACLU of Tennessee, Inc. versus City of Memphis*. The Docket Number 2:17-2120, and I want you all to know who these strangers are in the jury box. These are not alternate jurors. They're not remnants from a pending trial. They are two of our externs this summer, one of whom Braden Sallee there waiving at you is at law school at the University of Memphis. And to his right, Michael Golden, who is at Wash U in St. Louis. And they've gotten an eye full, if not a belly full, here in the last two weeks or so since they began their externship, but what a great opportunity for them to see some of the Bar's finest at work here today. And I'll have you, for ease of stenography, identify yourselves momentarily and whom you represent.

I'm going a little overboard with this, but I also have in the audience Dale Viox and his son, Jackson, there. I'm introducing them because Dr. Viox has served

with distinction on the Arlington High School Board for many, many years, and we met each other decades ago in those sorts of capacities when I was otherwise engaged in public service. And I'm not going to embarrass him by showing you the photograph I have, but I have a photograph of his son, Jackson, probably 12 years ago, I haven't quite pinpointed it, where I sound like an old codger and say, you know, he was no more than knee high to a grasshopper. But he just graduated from Arlington High, and I couldn't attend the ceremony but I asked him if he would come down and visit which happened to fall on this auspicious occasion where we have some of west Tennessee's finest and from elsewhere I understand.

So the Vioxes are here to see this as well, and although he's primarily interested in golf and is going to the University of Memphis next year or later this year, you know, he may get the bug for something else based upon your good behavior here today. So thanks for indulging me in those introductions.

Why don't we begin with counsel identifying themselves, introducing themselves and specifying for Ms. Mayo whom you represent as you do so, and we'll include our virtual visitors who appear to be at least two in number.

Mr. Stanton?

**MR. STANTON:** Yes, and good morning.

**THE COURT:** Good morning.

**MR. STANTON:** Your Honor, Edward -- just for the record, Edward Stanton, III, court-appointed independent monitor. Introduction with the monitoring team, to my left is counsel Gadson Will Perry.

**MR. PERRY:** Good morning, Your Honor.

**THE COURT:** And to his left, Austin Hoard, Your Honor.

**MR. HOARD:** Good morning, Your Honor.

**THE COURT:** Good morning, sir.

**MR. STANTON:** We also have counsel -- should have counsel, part of the monitoring team, Keenan Carter participating virtually.

**THE COURT:** Can Keenan Carter hear us? I'm not sure. Mr. Woloshin, let's see if they've got the audio. Oh, there.

**MR. CARTER:** Yes, I can, Your Honor. Good morning.

**THE COURT:** Good morning. Go ahead.

**MR. STANTON:** And I would also like to introduce who is participating virtually the three subject matter experts, Your Honor, the SMEs. There's Dr. Jim Pastor, who is subject matter expert for investigations and audit, Mr. Dan Brown subject matter expert for training,

and last but not least, Ms. Rachel Levinson Waldman who is a social media expert, and I'll say Ms. Waldman has been a part of this team from its inception, and Mr. Brown and Dr. Pastor have joined within the last year as subject matter experts.

**THE COURT:** As to Ms. Waldman who has been with from the beginning as I understand it --

**MR. STANTON:** Yes.

**THE COURT:** And I may be completely misguided, but my sense in reviewing what we've condensed so far, looking at this stack.

**MR. STANTON:** Yes, sir.

**THE COURT:** Is that at least with the modification I think in 2020 or at some point, my sense was Judge McCalla made some modifications to embrace the changes that social media have brought --

**MR. STANTON:** That's exactly right, Your Honor.

**THE COURT:** -- to bear.

**MR. STANTON:** Yes. And Ms. Levinson Waldman is an expert. She's with The Brennan Center which is based in New York, but she's based in the DC office and has extensive experience in this area, and again, one of three subject matter experts that the parties agreed should stay on at this next phase.

**THE COURT:** Well, that's very helpful. I'm

happy to have all of you here. I'm hopeful that we won't need yet another expert taking us into AI in some way. I can only imagine. Yes, sir, Mr. Stanton.

**MR. STANTON:** If I may, Your Honor, just for point of personal privilege, we have some guests with us today as well, Butler Snow and some of our summer associates, just if I may introduce them. Hank Pearson. He is a rising 3L at the University of Tennessee, Winston College of Law.

**THE COURT:** Mr. Pearson.

**MR. STANTON:** Jordan Johnson a rising second year at the University of Memphis. You may find this individual, Helen Hudson, who is a rising 2L at Denver Sturm College of Law, Your Honor, and then last but not least, John Mitchell Brock who is also a rising law student at the University of Memphis so we're happy to have them join us.

**THE COURT:** It's almost as though Mr. Brock, also known as JM, has never left. He did a stint here in Court 4's chambers as well. Please to have all of you. I'm glad you could participate. I know you give some comfort to our current externs and I hope stand as rising stars. And as Jackson keeps hearing about the University of Memphis, University of Memphis Law there may be some epiphany there. But thank you. I'm glad you could all

be here.

**MR. STANTON:** That's the monitoring team and the subject matter experts, Your Honor. Thank you.

**THE COURT:** Thank you very much, Mr. Stanton. And now?

**MR. VAUGHN:** Good morning, Your Honor. My name is Lucas Cameron Vaughn. I am legal director of the ACLU who is plaintiffs in this matter. It's good to see you. I'm going to let my colleagues here introduce themselves.

**THE COURT:** Thank you.

**MR. COOK:** Good morning, Your Honor. Tim Cook from the law firm WilmerHale for ACLU. We're representing the ACLU mostly in respect to an emerging issue under the consent degree that we'll hear more about as this day goes on.

**THE COURT:** Thank you, Mr. Cook.

**MR. KAITIN:** Good morning, Your Honor. Noah Kaitin also for the ACLU.

**THE COURT:** Mr. Kaitin, pleased to have you here. And I know you're all admitted to practice here and you've entered your notices of appearances. I think that one of the reasons the need for this came to mind, among others, I won't call it a flurry of activity, but suddenly there was some activity with the entry of notices of appearance, and I thought, but wait, this is

winding down. We're going into the final phase, or are we. But I'm glad you're here. You've come a fur piece.

You may have inquired -- the firm name jogs my recollection that you may have inquired whether you could attend virtually. I don't know. That may have been yesterday's case. But I'm glad you're here in person instead.

**MR. COOK:** We were planning to be here in person.

**THE COURT:** That's the spirit. Thank you. All right. Ms. McKinney? All right. Take it away. I'm sorry. I'm sorry. Mr. McMullen, you're the boss.

**MR. McMULLEN:** Bruce McMullen on behalf of the City, and I have Jenny Silk also on behalf of the City and Kelsey McKinney on behalf of the City.

**MS. SILK:** Good morning.

**THE COURT:** And on the back row we have the shock collars here. We have Mr. Odell Horton.

**MR. HORTON:** Good to see you, Your Honor.

**THE COURT:** Good to see you, Mr. Horton.

**MR. McMULLEN:** We have --

**MR. THOMAS:** Jimmy Thomas, Your Honor, Senior Legal Advisor MPD.

**THE COURT:** Mr. Thomas, good to see you.

**MR. McMULLEN:** He took over his introduction.

And we have Lexi Hivner from Baker Donelson. She's a newly-minted lawyer at Baker Donelson, and you may know John Hivner, her father.

**THE COURT:** Thank you for connecting those dots. Small world. One big happy family. This is great. We've got a lot of talent around the table.

In anticipating how best to proceed, I think the better part of valor is to begin with Mr. Stanton, and I asked as recently as yesterday perhaps, you know, if he could help condense, which he did in a masterful way, but for the record, let's take our time and get the stage properly set because I need to know not only where we are but where we're headed and what needs to be done under present circumstances to get us there.

Mr. Stanton, the floor is yours.

**MR. STANTON:** If I may?

**THE COURT:** Yes, you may, certainly.

**MR. STANTON:** Again, Your Honor, may it please the Court, a couple of things. I want to just say first thanks for taking this opportunity to -- this was I think well needed, and as you mentioned there was as one point we thought we were landing the plane, and as the Court noted, there's been an uptick in activity. So I think this is certainly well taken, the status conference.

Several developments that I want to share with the

Court and obviously -- and thanks for your indulgence. I know that was somewhat maybe a lot to unpack. Even as recently as last night the parties have been working, I would say, in a collaborative manner to try to get through some I guess issues, and obviously there are some items that I think the Court will have to maybe address. But I always kind of like to start with kind of where we started and some of the orders appointing myself as the monitor and this monitoring team and just some of the language that Judge McCalla used. But in essence, he said he was directing us to ensure compliance with the decree, to provide closer guidance on what constitutes -- constitutes First Amendment related intelligence, and to supervise implementation over the five sanctions imposed on the City. And so that's just kind of an interesting backdrop keeping that in mind.

Judge McCalla would often tell me that, Mr. Stanton, you and your team, you're the eyes and ears of the court in serving as the independent monitor. And ultimately our job is to ensure the tenets and protections within the modified Kendrick decree would ultimately -- I believe the goal here is to be engrained within the fabric and culture, Your Honor, of the Memphis Police Department and ultimately being fully institutionalized.

And so I do want to say at the outset that the City

has made some progress. For instance, they've identified compliance officers, MPD personnel and subject matter experts who I've introduced earlier. They've all been engaged in this transition process. Training. Some of the things again that the City is doing, training is occurring. Audits are being conducted, Section G authorizations are being reviewed, and the framework contemplated by the sustainment proposal is being implemented.

Your Honor, now that said, it's the monitoring team's belief that the City is not yet ready to enter into the sustainment period of the sustainment proposal. The goal remains for the monitoring team, our team -- Your Honor mentioned landing the plane to end, but we can't do that, end our job, until the City has demonstrated full compliance and the ability to navigate and manage its obligations independently. And just in my view, Your Honor, that point has not been reached yet.

So the transition period, I'll start there. That began after the Court adopted the sustainment proposal nearly 18 months ago. Judge McCalla signed off in January 2025 sustainment proposal order, and since that time, during this period, the City has designated two compliance officers namely who Mr. Thomas is here, James Thomas. There has been some turnover with his -- the

second compliance officer, and obviously the City will address where that stands and even the most recent compliance officer. But to some degree that seems to have caused some impediment with moving forward. Again, Mr. Thomas has been cooperative and resourceful, but he also has other full-time duties, and we think that once that second compliance officer is fully engaged and on board, that's going to help navigate in moving things forward in a prompter way.

The monitoring team acknowledges that the City has identified as I mentioned the three experts under the sustainment proposal. Those experts have been doing, we believe, an excellent job in their roles. There was, as I mentioned, the two newer subject matter experts, Dr. Pastor with investigations and audit and Dan Brown for training. So there was some learning curve in getting up to speed as Ms. Waldman was and has been on board from the beginning. But they have jumped right in. They're working closely with Mr. Thomas. They being all of the subject matter experts.

Since October of last year of 2025, Your Honor, the transition has been -- we started a testing phase, and we went from kind of a ramp-up of educational phase and getting the subject matter experts, the newer ones, on board, but trying to see what we could do as we handed

the baton off to the subject matter experts and communicating with the compliance officers. And so we moved or attempted to move -- and I say "we", the monitoring team, more in a guidance and oversight role as opposed to on the ground every week. We had previously been in close communication with the City, but again, trying to hand the baton in this testing phase to see if gradually handing those duties over to again the subject matter expert and the compliance officers. And just based on what we've seen and what's in our report, Your Honor, the City, we just don't believe that they're there just yet. They're working but additional work remains necessary.

So to help measure the progress -- I'm going to ask my colleague to just put on the screen -- there's something we just call it a report card. We did share, Your Honor, this report card with counsel for both parties, but I will call the Court's attention just to the report card which is kind of the meat of to your question where we are and where we're headed and potential next steps and any issues with getting full compliance.

**THE COURT:** Let me see which screen. There we go. While we cue this up, Mr. Stanton, do you know whether I have a hard copy of this?

**MR. HOARD:** It should be Exhibit 1 to the first report before the condensed report. If not we can you --

**MR. STANTON:** Do you see it, Your Honor? We'll just bring you another copy.

**THE COURT:** Really I just did that as a test.

**MR. STANTON:** Yes, sir.

**THE COURT:** Meet the Court's every need. I'm old fashioned that way. I do the best I can with all the virtual and electronics, but there's no substitute for paper as my externs have heard me say. Thank you. Okay. We have it on the projector, the ELMO.

**MR. STANTON:** Ready to proceed when you are, Your Honor.

**THE COURT:** You may proceed.

**MR. STANTON:** And so what you'll find, Your Honor, the report card, and we're calling it the first quarter report, it's somewhat of a mix results, the Q1 report card. So we'll start with -- and these are all -- this is not just the monitoring team freelancing but these are all -- every bullet point is verbatim exact language and the goals and tenets of the sustainment proposal order.

So we'll start with the first score and it's engagements with the public. The score there is, as you can see, unsatisfactory. And as you can tell there's --

we've implemented a four scale level, four-level scale rather, and that is excellent, satisfactory, needs improvement, and unsatisfactory. So in this category, it's unsatisfactory. We've had conversations with the City, but if you just look, Your Honor, at each of the five bullet points here -- and this is again where the compliance officer there should be working with the ACLU as well as the subject matter experts but this was something that was very -- having been on the ground for several years now after the appointment by Judge McCalla, but this was something that was very important to the Court, engaging with the public. And so at one point when we served, the monitoring team as an example, we had a website. There were public events at the Ben Hooks Public Library. I know we've had public forums at Mississippi Boulevard Church and other places, public places. But that was a very important component of explaining what this consent decree and the modified decree what it is and sometimes, maybe as equally important, what it's not.

So this is, you know, the first score here. And when you look through this, the City to their credit, they did mention that a public meeting was scheduled but in light of -- we'll get to that -- but in light of the No Kings March, it has not been rescheduled. I'm sure

they'll address that. They have implemented their own website, but it needs to have some other items, we believe, such as the sustainment proposal linking documents and making it interactive. One of the ways we utilize the website that we have, I think it was MemphisPDmonitor.com, was that if individuals have questions, if individuals had complaints, concerns, at every court matter or status conference we would publicize those and we would -- early on when we launched the website, Your Honor, we could see the traffic. You could tell how much interaction that people are -- so just measurable items, so having a well-grounded website is important. I know the City is working in that regard.

But again, not to go through all of these but just that's the concern is that at this point it's just unsatisfactory, and the City is committed to again updating. Even the first bullet point, host annual public meetings in each police precinct, I'm not sure and I'll let the City speak, but we're unaware that any of those have occurred. I've talked about the website. So needs work there and -- for that score, Your Honor.

**THE COURT:** Could you see the number of hits decline, I mean the access to the website that you mentioned, the traffic on it. Has there been a noticeable decline.

**MR. STANTON:** Yeah, I will say the website that we control that I mentioned, it has been a dip. We have again tried to hand over the reigns and say people should be reaching out if we're going to go through this sustainment order directly to the City on its own website. So the answer to your question, Your Honor, yes, we did see a decline over the past few years. I can't speak to what the City, if they've seen an uptick or just even to the degree that individuals know what means or methods that they share with the community that they have a new website up so they can address that.

I can tell you when we first launched it we had a tremendous amount of activity, and it was quite frankly a place where people felt safe. They said, hey, well we'll -- we have this complaint or we'll send you this e-mail. Sometimes it was anonymous and we couldn't necessarily follow up, but we found it a valuable tool. Some people would just go in and just look without making comments. But to answer your question, we did see a downtick within the past couple of years as far as activity at least on our website.

**THE COURT:** Okay. Thank you.

**MR. STANTON:** Yes, sir.

So that's the score there, and I'll move, unless the Court has any other questions regarding the first

category --

**THE COURT:** No, sir.

**MR. STANTON:** -- to the second, and that's conduct and oversee required audits and forms. This is a slightly better score. We said needs improvement. The social media compliance team which again was kind of born from this new consent decree, modified consent decree, they are functioning well as we note here, and we certainly want to give the City credit where they are doing and meeting the goals here. And they granted a designee status, so it's not just chief Davis but designee status for audits to the Assistant Chief Hampton, Deputy Chief Brown. And periodic reporting, we just want to make sure that it is -- that it's confirming that periodic reporting is occurring with Chief CJ Davis. And we want to also ensure, and I'm not sure that we've seen this, that specialized units are cooperating and properly recording search terms.

So it's -- I think we're moving in the right direction, but I don't know that the City is there, but that's -- again, it's not necessarily unsatisfactory. It's moving but it needs improvement.

**THE COURT:** Okay.

**MR. STANTON:** The next score, Your Honor -- and I guess there was, I guess, a couple other items why that

store under -- well, strike that. The next score is under conduct officer training. And this is where we feel like -- and I say we, I want to make sure that I incorporate the subject matter experts. This was -- these scores are a reflection of not only the monitoring team and legal counsel but also the subject matter experts who are boots on the ground, and they are dealing with Mr. Thomas and his team on a weekly basis oftentimes. And so they were in agreement, and at the appropriate time, Your Honor, I know you will hear from the subject matter experts, but I wanted to ensure that you were aware that they had weighed in and that's on the assessment of scores.

So trainings are occurring in a satisfactory manner at again the direction of Mr. Thomas. We're getting some good feedback on the presentation not only of Mr. Thomas but former prosecutor, state prosecutor Reginald Henderson. They've kind of taken the lead on training.

Officer Marlus Stokes has been providing the SMEs with weekly summary regarding the training takes place. So again, there's some places where we see training that the City and the police department is doing as they should. There's some other places where we feel like the City can do more or better and, one thing is hiring and evaluating trainers as needed.

It's interesting -- as I mentioned, Mr. Thomas is doing a good job from a training standpoint, but going back to institutionalizing, we want to make sure that he has the backup in that other compliance officer with people retiring, moving, getting promoted, transferring. We want to make sure that we don't lose momentum when you have an excellent instructor or trainer like Mr. Thomas, and also just ensuring -- and again, our subject matter experts will speak to this, but just ensuring the training is effective, it's fresh, it's not just kind of checking the box and, you know, we've been here and done this year after year. And so some improvement certainly is necessary but this is something that, again, was scored as satisfactory.

The next category, Your Honor, is routine supervision. And this is another needs improvement. Compliance officers will conduct random reviews assessments of compliance with the consent decree, and here some random assessments are taking place, but we want to ensure that the compliance officers are placing the focus on undercover social media accounts. And there is a place, ICAC, Internet Crimes Against Children. They're doing that in that regard, Your Honor, but we'd like to see more again under the undercover social media accounts, undercover officers specialized in these units

and audits. So it's moving, but we think there's room for improvement, and therein lies the needs improvement score.

Just a few more scores, Your Honor. Investigate allegations of noncompliance. This is one that was graded as incomplete, and we gave an example here. I don't think this should be a surprise to either party but particularly to the City. Just investigating allegations of noncompliance including those received through the public website. And in this particular case, as an example, right now as we speak and it's in our report, compliance officers are investigating allegations right now, but they have not had an opportunity to complete it.

Now, the City has given us a rationale behind why an investigation of noncompliance, why that has not been completed, and I will defer to them to explain that. But that's -- again, this seems like it's a work in progress. The scores are incomplete. And then the other part to this is that -- and that was something that was very important to Judge McCalla when we first proposed the modified consent decree and even the sustainment proposal order, is making sure that the ACLU is engaged and involved with the result of any such findings. And just it was very important to Judge McCalla that the ACLU, this is not just the monitoring team and the City, but

the ACLU is incorporated with these types of investigations as well as reports, and so I think there can be -- and again, I will say, Your Honor, I know you've got a number of things to unpack and we appreciate your indulgence, but there's literally not only in the last couple months but the last several days been a lot of movement, and you probably have seen it with some of our exhibits.

Again, I think it's always good when individuals can talk and dialogue, and just as recently as yesterday I saw an agreement between the parties. I'm sure they may discuss that. But there was somewhat of an impasse, and it was pleasing to see that, hey, we think we can work together on this and for the better -- for the good of the issues here and move forward.

The engagement with subject matter experts and ACLU, the last score, Your Honor -- and again, all of these tenets, this is straight from the sustainment proposal order. This is a satisfactory, so this is one of the higher scores for the City, and here the compliance officers are routinely meeting with the subject matter experts, sometimes at least twice a month, sometimes even more. Again, that's Mr. Thomas.

But the engagement, as I mentioned earlier, just -- when the requirement here is that the compliance officer

will engage as required with the SMEs and ACLU to review and assess the MPD's compliance with the consent decree, we feel like there can be better engagement, not just with SMEs but also ensuring that the ACLU is in the loop. But this is a score of satisfactory.

**THE COURT:** But not in ACLU's opinion?

**MR. STANTON:** And certainly I know they will --

**THE COURT:** Speak for themselves.

**MR. STANTON:** Yes, sir. This is just the opinion and the review of the monitoring team, what we've been provided with, as well as the experience of the subject matter experts. And -- yeah, and so on the last page here, the compliance officers will facilitate communication between SMEs and ACLU as needed. You know, it's our opinion that there's no routine communication with ACLU, but again, Mr. Thomas has shown himself amenable to routine meetings if again retained counsel can be involved.

**THE COURT:** While you pause momentarily, is there a way we could mute the microphones where Mr. McMullen is situated as they -- there we go. That's better for Ms. Mayo's sake. Thank you, Mr. Stanton.

**MR. STANTON:** And just one last example, you'll see in the last sentence in the last box, Your Honor, just as an example as far as the coordination and keeping

the ACLU in the loop, the monitoring team, we've noted that on April 16th, when Memphis Police Department documented a Section G authorization in relation to the No Kings March, it did not share this information, the Section G authorization, with the ACLU. And there was a letter that was even sent by the ACLU asking questions about Section G and authorization, and so they knew or should have known. And again, that's kind of the plain language here of what's required.

**THE COURT:** Maybe just for the transcript, could you summarize or highlight Section G in a sentence or two, just so that the transcript is self-explanatory.

**MR. STANTON:** Yeah, Section G, Your Honor. I'd love to just get to the actual quote itself.

**THE COURT:** I've learned to become more sensitive to the transcript for others' eyes, particularly at the circuit level. We save everyone as much time, judicial economy as possible.

**MR. STANTON:** Yeah, just in I guess -- if I may, Your Honor, in a nutshell, Section G deals with when investigations may interfere with the exercise of First Amendment rights.

I think a large part of what turns Section G is Subsection Number 4. That comes up frequently, and that is: Any police officer conducting or supervising a

lawful investigation of criminal conduct which investigation is reasonably likely to result in the collection of information about the First Amendment rights or interfere in any way with the exercise of such First Amendment rights, must immediately bring such investigation to the attention of the Memphis Police director or designee or director of police for review and authorization.

And so, what's interesting in this -- and I would point the Court's attention in this particular section, obviously this is not solely Section G, but this is a large part of when Section G is invoked, is when any police officer is conducting or supervising a lawful investigation of criminal conduct. So if there's no criminal conduct, the issue or from our lens, Your Honor, Section G is not applicable. You have to have an investigation of criminal conduct.

We'll hear from the parties. That may be one of the disputes as far as the interpretation or how expansive. There is Section H and F -- I'll go back to F, so intimidation. That's something that -- and I'm I guess pointing to some of the highlights where we've seen potential violations of the Section G, and that's harassment and intimidation prohibited. So any officers that are, again, harassing, that's one of the things that

is at play in the investigation of a potential police officer harassing or intimidating a citizen. I think you may hear from that from the ACLU.

But the other part is it's not so much that -- you have to have a couple things. You have to have the criminal investigation. It has to be related to First Amendment rights. So I think there's even an example if there is just a lawful investigation as it relates to a drug buy, and something that's drug sales or drug activities that's not related to -- reasonably related to First Amendment rights, Section G is not involved.

And then I guess the last component, Your Honor, is just once those items have been identified, there's a question of -- or there's direction as to how long -- how that information is stored, if it's stored up to 90 days, and then the destruction of that evidence. And so -- or the information that's stored. So it's -- those are I guess the highlights of there should be an antenna that goes up if there's First Amendment protections or speech that is involved. There should also be antenna that goes up if there's criminal activity, and I'll give an example.

There was a Section G authorization last year where Planned Parenthood, there was notice that there was an actor who was pretty much admitted or word was it he was

going to block entrance for anyone to come in or out of the Planned Parenthood center here in Memphis. That's obviously criminal if you're an investigation -- potentially criminal, and so there was Section G authorization noted to go in, I believe review social media accounts and things of that nature. But that is where, again, the antenna goes up, the flag goes up as to this implicates the modified consent decree.

And so that's where, again, we want officers, the training that Mr. Thomas is doing every week, that our subject matter experts, that when some of these things pop up, First Amendment or lawful criminal -- that there is -- or you're checking Facebook accounts or social media accounts, that with this training you should know that these are things I need to report, these are things I need to get authorization from the -- I'm sorry, the police chief or his or her designee. And then there's certain manner -- mechanisms, rather, as to how that information is stored and, maybe of equal importance, how it is destroyed, and it's all set out in Section G.

But those are, I guess, some of the highlights, Your Honor, where we see it. You can't use, again, intimidation, harassment. It speaks to what's prohibited. But the lawful -- I'll just say it's one of the things that Judge McCalla wanted to ensure that this

was not a chilling effect or handcuffs on the Memphis Police Department where they can't conduct lawful criminal investigations. And so this is not all investigations. This is lawful criminal investigations where First Amendment rights may be implicated. If the First Amendment rights aren't implicated, you know, Section G is not -- at least that part of it, is not triggered.

**THE COURT:** So I'm curious as I learn more about this, whether there's any vagueness somehow that has caused any particular difficulties. When I look at the language, with the exercise that -- which may interfere in any way with the exercise of First Amendment rights, is pretty broad. And so I'm imagining that the default here under that, given what might be vague, is notice has to be given. And so the better part of valor is to give notice in any event so that that's done. But then how long do they have to wait to act on it, or do they just provide notice and go ahead do what they think?

**MR. STANTON:** They can, and sometimes it's on the spot. It's retroactively. Your point is well taken, Your Honor, but I guess that's why I think it's important before you get to in any way or interfere in any way with exercise because that is pretty broad. But the first line of that same paragraph that says, "any police

officer conducting or supervising a lawful investigation of criminal conduct." So if you don't have an investigation, a lawful investigation of criminal conduct, that is -- because otherwise you're right, anything -- it could be very, very broad, but I think that's kind of the narrowing scope.

**THE COURT:** So if you don't have a lawful investigation underway or if you do have. To your point just now, it qualifies the mandate, which is -- again, I only have a part of it in front of me. It only applies where a lawful investigation is underway is what you're saying.

**MR. STANTON:** Yes, Your Honor.

**THE COURT:** Okay. All right. What if there's not a lawful investigation underway, it's just an ordinary night on the beat?

**MR. STANTON:** That's right. Now, it could very quickly turn -- I want to be clear, and, Mr. McMullen, if you want to --

**THE COURT:** If you don't mind --

**MR. McMULLEN:** Can you -- I don't know if you can unmute me.

**THE COURT:** No, I can hear you.

**MR. McMULLEN:** Yeah, I think you narrowed in on it. And I want to say, look, this originated in a 1976

consent decree, and I won't get into it. When it's my time to talk, I'll get into it. But this is -- I think this is the oldest consent decree in the country at this point. And we went through -- we I think -- a lawsuit was filed nine years ago, and so this has been litigated and discussed and evaluated over the last nine years. And I think the Court has zeroed in on it. If there is a lawful investigation, if the police department will say we're going to investigate this, like the Planned Parenthood situation in which Mr. Stanton referenced to and people out there protesting, it can implicate First Amendment rights. Then there's a Section G authorization that goes to the chief for approval to do that.

If there is just a protest out there and police is -- and they're not doing an investigation, there's no need to do a Section G. And I think that's the misunderstanding that a Section G is when police is near any protest. That's not it. It's a lawful investigation. And if you zero in on Section 4 as Mr. Stanton pointed out, that is what operates the Section G, and I think it is a misunderstanding.

And, Your Honor, I'd like to say, I think Mr. Stanton has been in this about, what, five or six years?

**MR. STANTON:** Closer to seven, yeah.

**MR. McMULLEN:** Seven. I've been in it nine years, and it is -- as Mr. Stanton said, you don't want to handcuff the police. The world has changed. Google became a thing in the '80s, okay. This consent decree went into effect in '76 or in 1976. So adapting that has been a challenging process forward, but I think the Court has zeroed in on when a Section G should be sent.

**THE COURT:** Okay. And Mr. McMullen, I was going to ask Mr. Stanton but since you raised the subject about the oldest consent decree in the country, how many consent decrees are there? And when I say how many others are there, I don't know to what extent this consent decree is modeled after others. So when I say how many similar consent decrees, I'm just curious how many other municipalities or entities are under a similar regiment.

**MR. McMULLEN:** None. None under similar regiment. Where this consent decree is different from the ones that you see -- I can tell you just historically most consent decrees last about ten years, okay, before they go through the process of sustainment proposal and this and that and the consent decree is gone. But this consent decree is unique.

It started out really based on the police department spying on African-American organizations like NAACP, and

it started when you would take a photograph and put it in a file, and that's why it was written that way. And you know, with everything that was going on with Martin Luther King being killed here and stuff, and then it was the FBI and various organizations doing that. When the records were asked for from the Memphis Police Department, I think Wyatt Chandler was mayor at that time, the Memphis police chief took all the records out to the zoo, to the incinerator and burned them, and the judge didn't think kindly of that as you wouldn't if Ms. Silk did that. And the judge invoked the consent decree.

And the parameters of the consent decree -- and I don't think Mr. Stanton would disagree with me -- is narrower than the Constitution. That's a -- that's the misunderstanding that I think most people don't get. The consent decree requires things that the U.S. Constitution does not. So it's narrower than the U.S. Constitution, and that's why I said there's no other consent decree like this where you're operating with constraints narrower than the Constitution. And so that's how we kind of got here and I think you've identified Section G.

But I also want to -- because something else is going to come up, and Mr. Stanton can talk about it. If we go to Section D2, threat assessments, that's a

situation where you don't have to do a Section G. Let's say a dignitary, the president or the Pope is coming to town or whatever, then there are social media searches on threat assessments. The police department can't be blind as to what's going on in social media, and so there are threat assessments, but that doesn't require a Section G. It's just when you read it, it's the retention of that information. And remember it goes back to '76 when they were taking pictures of who were involved in the NAACP and who were involved in different civil rights movement and retaining that information and keeping files. So that's where that originated from.

So there are instances where the police department can use social media for threat assessments. I mean, if the federal judges were convening and having a picnic out in Overton Park, the police department can use social media and see who is doing what in order to protect it.

So the consent decree is complex in that we were trying to -- I think the Court -- when I say we, I think Mr. Stanton, the Court, was trying to make today's everyday technology fit into something that predated any of it.

**THE COURT:** So I'm sorry to -- but I think ultimately -- and I want you to be able to respond to what he's just said, and ACLU as well, but as you talk

I'm thinking of so many things, one of which is what I knew in my previous life. I think they called it the operations center. I'm also thinking of Operation Blue Crush and different things. It's probably apples and oranges. But somewhere near the eye institute on the second floor, big office full of cameras where --

**MR. McMULLEN:** Real Time Crime Center.

**THE COURT:** Real Time Crime. Thank you. It's been a while. So that's surveillance, and, I mean, that could be a center for concern, but only if they're retaining it, only if they're taking screenshots of what they're seeing of the judges picnicking in Overton Park. Am I right? I mean, is that sort of a hot spot for potential real time crime?

**MR. McMULLEN:** Yes. Yes, Your Honor. And we got really granular in this because the police department's got cameras all over the place. So you and I walk by a camera, that's freedom of association. That's a constitutional right. So we got into that, and I think Judge McCalla landed on if it's not an oscillating camera, fixed cameras, because if you and I walk to lunch, that's freedom of association. And if police department is, saying, okay, Mr. McMullen and Mr. Norris are associating, how do we deal with those issues when modern day policing heavily utilize cameras

to provide for public safety.

So a lot of those issues were -- and obviously you've read it I can tell, and you're saying this is not just black and white. And having a police department of 2,000 people, trying to train them on this document that you got highly educated people just kind of going through it. So I think the Court has nailed how there's not recalcitrance on the part of MPD. There's a lot of misunderstanding that's going on.

I will point out this -- I mean, no disrespect to the ACLU but they have been -- you know, Tom Castelli was part of the early negotiations, Stella Yarbrough, and then Lucas came along later. So it's been handed off a lot of times on the -- on that side and there's loss of institutional knowledge when you do that. So that's part of what is given the rub here. I mean, Mr. Stanton has been here seven years and I've been on it nine, I think. So we've kind of had more consistent people on it.

**THE COURT:** All right. Yes, sir, Mr. Stanton.

**MR. STANTON:** I was just going to answer one item that you asked Mr. McMullen, and certainly the ACLU, I'm sure they have comments. But one of the things you posed was how many else -- how many other district or police departments. That's one of the things in some of Judge McCalla's prior orders he talked about this is --

even in our work we don't have a go-by. We can't look at Denver or the Dallas Police Department. This is pretty cutting edge unless something has changed, and our subject matter experts can weigh in, but I'm not sure that there's anything like this in the country. One of the things that Judge McCalla said in some of his previous orders is that anytime you're the first at something, yes, it's going to be challenging to kind of navigate and deal with it, but he envisioned this being something that could be a model for other cities and jurisdictions because this is something that, as Mr. McMullen did provide, that this is going extra, providing extra protections and safeguards. But what Judge McCalla said was but that's the bargain that the City signed up for when they entered into this consent decree and when Judge McRae had some serious concerns about burning files and documents.

So that's just a little bit more context. To answer your question, no, we don't have -- we can't look to another jurisdiction and say, hey, they're doing it this way. And in fact, what Judge McCalla believed, envisioned, would people look here to Memphis, west Tennessee and say, hey, this is something unique that's going on. But the bottom line is these extra protections are afforded to the citizens because that's the bargain

that the City engaged with the ACLU, and so the judge said we're going to hold the City accountable.

And that's I guess the last thing that Bruce mentioned -- Mr. McMullen mentioned that this is old. Well, it's modified, so it's not that old any more just with the modified consent decree.

**THE COURT:** I wonder if Judge McRae took this up at the outset in this very courtroom. He certainly eviscerated me a time or two when I was standing at the podium in this very courtroom. But nobody here would know. We have his image back there on the back wall with Judge Horton and Judge Gibbons, but interesting. It's the same clock that was on the wall when he eviscerated me. Of course, I got my retribution at the Circuit in Cincinnati. Anyway, I digress. I apologize. Yes, sir.

**MR. KAITIN:** Your Honor, if I could stand for my evisceration?

**THE COURT:** Nonsense.

**MR. KAITIN:** Just a few very narrow points on sort of what we've been talking about here. The first thing we'd like to address is there has been an increase in issues, and the fact that there may be disputes between the parties has absolutely nothing to do with handoffs of responsibility. The ACLU is well-versed in this agreement. We also emphasized that this is still a

valid decree. The parties wrote it, and what we've been trying to do in recent times is work together cooperatively to come to a mutual understandings of this decree. This is not something that is happened in the past. It's an ongoing. It's living and we're negotiating still the meaning of it.

I would also just like to make again two very narrow points. First, on Section G, Your Honor, we were talking a little bit about the lawfulness of an investigation. I'd just like to direct the Court to the first sentence of Section G under Paragraph 1. And it says, if you'll allow me, "investigations of intelligence gathering which are reasonably unlikely to result in the collection of information about the exercise of First Amendment rights or interfere in any way with the exercise of such First Amendment rights are permissible and require no special authorization under Section G. So that --

**THE COURT:** That addresses it.

**MR. KAITIN:** That safe harbor language is there, and I'd just like to direct the Court that it's not the lawfulness of the investigation. Lawfulness appears in Section G(f), and that's the section that directs law enforcement officers to seek approval through the Section G process. And I think a more natural way to read the lawfulness in that section is that obviously if an

officer is conducting an unlawful investigation, that officer is not going to be talking to their supervisor about it. It's an unlawful investigation. So I don't think lawfulness carries much -- as much weight in the context of the safe harbor which is investigations that are reasonably likely to interfere with First Amendment rights.

And just to that end also, Your Honor, as part of the sustainment proposal, and this is on the docket, there is an example of a draft policy memo for how this approval process could happen. This is Document 522 on Page 2. And it's just an example, Your Honor, but just in terms of how the parties have worked collaboratively on this, one within the purpose section of how this policy might be enacted, the purpose gives a couple of examples of investigations that would require authorization under Section G, and it says including but not limited to, and the first example is the possibility that a protest group intends to interrupt traffic on the I-40 bridge.

So I think Section G we've all -- you know, the parties throughout this collaborative process have imagined that things like protests would fit within the Section G protocol so long as the officers have an idea that, you know, might be coming. Unless the Court has

anything else --

**THE COURT:** Thank you. That's very helpful.

Mr. Stanton, you've been very indulgent with my interruptions and digressions, but it's helpful to put some meat on some of the bones.

**MR. STANTON:** I think you're right at the heart of -- and this took us months if not the better part of a year of definitions when we presented this before Judge McCalla because it is challenging, and so for this Court to pick it up in very short order, we appreciate your efforts, Your Honor.

**THE COURT:** I'm honored to do so.

**MR. STANTON:** And stand ready if there's any additional insights we could provide, historical context.

**THE COURT:** I'm sure there will be.

**MR. STANTON:** We're willing to do that. Also, Your Honor, if I may just for the record, it appears that I may have on the last score on the report card, there are two scores that we gave the City, and I think I lumped them both in. There was a satisfactory, and this is, just for the record, engagement with subject matter experts and ACLU. I think I said satisfactory, but there's two scores and unsatisfactory. So I just wanted to cleanup the record. It speaks for itself, but I may have misspoke by simply just saying satisfactory.

**THE COURT:** I thought you said that was one of the higher scores and I was thinking, well, ACLU disagrees. They may say it's one of the lower scores, but we'll let them speak to that. Okay. No, I appreciate that.

**MR. STANTON:** So, Your Honor, just kind of to wrap things up, at least at this point, you know, I really want to, at least from the monitoring team's lens, want to move where the City can actually -- we can hand this off and, again, the compliance officers and subject matter experts can work and meet these tenets where we're having not only items addressed but being accomplished, and we're just not there yet. We want to make sure that the framework is there, but it's not fully yet institutionalized again becoming a part of the fabric and culture that I think Judge McCalla envisioned even with the previous consent decree. And so that's why at this point, it's our recommendation, the monitoring team, that the sustainment proposal should not begin at this time, that more work as we can tell needs to be done, maybe some items fine tuned.

I think the City's moving in the right direction, but there is obviously, as I mentioned, unsatisfactory, needs improvement. The report card is not where it needs to be.

Next steps I would say, Your Honor, is just that perhaps early Quarter 3 of this year will give enough time for us to come back and provide the next report card and assessment. Again, interested to hear from the City and the other compliance officer that's going to work with Mr. Thomas. I really think that's going to help hopefully move the needle with some additional bench strength.

Also, it looks like even training can be better. I think that we'll hear from our -- one of our subject matter experts, Mr. Brown, but just want to make sure that this doesn't become just kind of a check-the-box annual training for police officers. But there really should -- if this is really being institutionalized, the antenna should go up, flag should go up when certain things come across. And we understand that police officers have a tough job, so this is -- Judge McCalla was very sensitive to not encroach upon or have a chilling effect upon the officers or even the training where it's kind of shunned here we go again with this consent decree deal, can we check the box and move on, but really more so that it's embraced. And if it's done right with the right training, if some of the training -- we find out that some of the -- we kind of rewind back as an example, Your Honor. Certain scores were being -- or

questions were being missed across the board consistently, and so we had to figure out what's going on. Is it the training or the way the question is asked.

So those types of things have just not necessarily -- I don't want to say kind of death by PowerPoint where you're just checking a box and say let me get the score and get out of here. But those are some of the things that we would like to see over the next several weeks. And by hopefully Quarter 3, early in the quarter, Your Honor, we're in a position to report back.

**THE COURT:** As a practical matter when you say Q3, as early as July? I mean, I sense as I continue to get up to speed and listening to what's being said that we need to meet perhaps in the near term more regularly. That's not to say -- I don't want to create a lot of busy work but more regularly. And when you say Q3, as early as July?

**MR. STANTON:** Yeah. That's a mis -- am I getting my quarters -- maybe later in Quarter 3 or early Quarter 4 probably would give enough time. So, yes, certainly not suggesting in the next five weeks, Your Honor, or four weeks that we report back to the Court.

**THE COURT:** All right. I just wanted to clarify that a little bit.

**MR. STANTON:** Thank you.

**THE COURT:** And this is good. This is fine. Catching on. And one of the takeaways, I want to be in a position where the Court can be as helpful as possible in all the proper senses that may apply. I know there's a lot of negotiating that goes on and the work that you're doing to comply with the order, and there are limitations on the extent to which any Court can get involved in those things, but at the end of the day it's the consent decree the Court is here to make sure is properly enforced. And I want you all to feel free to bring to the Court's attention any problems along the way short of our meetings. If you need to submit something, feel free to do so, and if it's overwhelming, I'll call y'all back in here and try to sort that out. So I just wanted to say that as well.

So we'll be thinking about an early Q4 date to get back together unless people tell me we need to do otherwise. Mr. Stanton, would the next -- what would you recommend to segue here to the City and then ACLU or to any of the experts?

**MR. STANTON:** That's exactly the protocol that Judge McCalla would use after my -- we'll turn to the City and then the ACLU and then certainly to the subject matter experts.

**THE COURT:** Okay. Fine. Thank you very much.

**MR. STANTON:** Thank you.

**THE COURT:** Mr. McMullen?

**MR. McMULLEN:** Your Honor, there's a lot of context, and if I were ever on a bench, I would not want to be you in this situation. There's a lot of context.

As you know, consent decrees are not designed to last in perpetuity. They're to remedy a wrong. I think the case is John B. versus Emers, but I can give you the cite on it. So I started that off to say we're the oldest consent decree in the country, okay, and it has been around forever. So I want to put that in context.

Now, with Judge McCalla, we went through the -- with Judge McCalla, first once we got the apparatus set up, we went through the transition period, and now we're in the sustainment period. And I'm not sure -- and from the sustainment period, I think we changed SMEs for the sustainment period, and so we're in the sustainment period. And so it was designed to go to a point where the police department would build some of these things into how it operated and go on.

And I'm not sure -- this is the first I'm hearing from Mr. Stanton that we're going back out of the sustainment period. Now, I don't know if that's the Court's ruling or if that was a slip of the tongue. When I look at the report card, it's a report card -- it says

Kendrick Consent Decree Sustainment Period Report Card. So I do want that addressed maybe by Mr. Stanton. Are we now taking out of the sustainment period?

**THE COURT:** And the Court has not heard that. I think what I heard was Mr. Stanton saying we're going to be in the sustainment period perhaps longer than had been anticipated when this Court -- when this matter was transferred to this Court so that -- it's just going to take more time than perhaps had been anticipated by Mr. Stanton's office to get through the sustainment period, but he can clarify that. Mr. Stanton, do you want --

**MR. STANTON:** I think that's right, Your Honor, and I don't -- the bottom line is that the City is not prepared in the monitoring team's estimation to completely have the monitoring team to withdraw and hand it over to the compliance officers and to the SMEs. And so that full boarding, if you want to call it the sustainment period, I think we're somewhere between transitional and sustainment, but I want the Court to know we're calling it a sustainment period, Mr. McMullen. That means something from the standpoint of the monitoring team and our team that we are -- our job is done and it's completed, and that's why we have the report card to say we're not in a position to recommend

to the Court the City is able to move forward without the monitoring team.

**MR. McMULLEN:** Okay. And it's not to question Mr. Stanton, but the word sustainment period means something. Legally it is a process. Transition means something. And the City wants to be on notice if we've gone back to the transition period, then we need to be briefed on that. If the sustainment period is going to be longer, that's up to the monitor when we get out from under the sustainment period. So I just want to make sure that that was -- that was very clear.

The other thing hopefully going forward with the monitor, we saw this report card yesterday. So we had no input on it. Obviously I see there was input by the ACLU. So they may have had input on this report card before. So this is the first part. That's why there's some things on here that I think were identified that probably need to be discussed.

So this is our -- we first saw the report card yesterday. We had no input on this. So it is what it is, and we can address it, but it is up to the court.

**THE COURT:** Let's hear from Mr. Stanton on that.

**MR. STANTON:** Just very briefly, Your Honor. I'm not sure -- so the City received the report card at the same time that the ACLU did and it was a courtesy.

We could have simply provided this to the Court without sharing it with the parties, and ultimately we're the eyes and ears of the Court. But I'm not sure what Mr. McMullen is referencing as far as got input from the ACLU, but the input that we received was from the subject matter experts. We didn't consult with or get any guidance from the ACLU. Again, they got this report card when you got it. And it's been fluid, Your Honor.

In fact, you know when you got the report card, so nothing I guess untoward or intentional, but I just for the record want to clarify that we did not consult with or seek guidance from the ACLU. This is completely an independent review and assessment.

**MR. McMULLEN:** Let me be clear. I'm taking Mr. Stanton at his word. I'm just looking at the report card, and I see unsatisfactory, I think the Court pointed out that, ACLU of Tennessee, and I just made the assumption that they got that information -- got some input from ACLU. And if I'm wrong, I'm wrong, but only thing I have is this document.

So I don't have any inside information or whatever, and when I see SME satisfactory, I made the assumption that there was some contact with SMEs about what they were doing. When I see ACLU unsatisfactory, I am --

**MR. CARTER:** If I may?

**MR. McMULLEN:** -- I am tethered to this document. Did Mr. Stanton say he didn't have any --

**MR. CARTER:** May I --

**MR. McMULLEN:** Wait, wait.

**THE COURT:** Just a moment.

**MR. McMULLEN:** If Mr. Stanton say he didn't have any input, I take him for his word. Mr. Stanton wouldn't say anything untrue.

**THE COURT:** Let's see here. We have one of our virtual participants.

**MR. STANTON:** Mr. Carter. He's a part of Butler Snow.

**THE COURT:** Mr. Carter, yes, can you hear me all right?

**MR. CARTER:** I can. I can. If I may just interject. The report card lists every item that the sustainment proposal says that the City will do. In the sustainment proposal it says that the City will actively engage with the SMEs. The monitoring team and the SMEs graded them as satisfactory because they started biweekly meetings about six weeks ago.

The sustainment proposal also says that the City will actively engage with the ACLU of Tennessee. There has been zero engagement. So the monitoring team and the SMEs graded that as an unsatisfactory because it's

something that has not happened yet. But everything in that -- on the report card is something that the City has agreed to do. So I'm just clarifying those grades because it seems like there was some confusion there.

**THE COURT:** So I have a question, Mr. Carter, that the City has agreed to do certain things, but how is it that you report the City has not done certain things? Because I think Mr. McMullen's position is that they're being judged unfairly in certain regards, and it's a fine point, but just for the record.

**MR. CARTER:** I think if Mr. McMullen were to stand up again he would agree that there has been zero engagement between the City and the ACLU of Tennessee during the first quarter of this -- of 2026 which is the period of the report card.

**THE COURT:** Let's pause for a moment. I want him to confer with his client and cocounsel, and given the time lag here with electronic communications, I'll ask him to respond to that.

**MR. McMULLEN:** I think when Stella Yarbrough was involved, I think Mr. Thomas said there was regular contact with Stella Yarbrough. That's why I kind of brought up the timeline of involvement. There has been significant transition in the ACLU's ranks, and I think this is the third general counsel. I think Lucas is the

third general counsel that has been involved in this.

And so at our last hearing -- I mean, we were here with Ms. Yarbrough, and Mr. Lucas was there at some of them and some not. So my point is the City's been open to any engagement with ACLU. Well, I won't talk for the ACLU, but the City has not been ignoring the ACLU.

**THE COURT:** This is not unusual that these things happen in transition, but go ahead.

**MR. McMULLEN:** And the sustainment proposal, if you look at it, it says engagement with subject matter experts and ACLU, and then it say -- it says compliance officer will engage as required with the SMEs. And so I think these are clarifications I think if in our perfect world from the City's standpoint before the report card is released and we're graded, we would have an opportunity to point out this was as required, a standard that was in the sustainment proposal.

And so to grade us unsatisfactory, I don't know that ACLU -- I don't know if they ever said they tried to reach out to us and we did not -- if there was some requirement. So once --

**THE COURT:** Or was it just simply that they said, well, we haven't heard from the City in a long time, and maybe that's because Ms. Yarbrough was gone. And Mr. Vaughn, did you replace Ms. Yarbrough

technically?

**MR. VAUGHN:** Yes, Your Honor.

**THE COURT:** I'm going to give you a chance to speak to this, too, but this is not unusual. It's the human factors that, you know, sometimes complicate things.

**MR. McMULLEN:** And Your Honor, Mr. Vaughn has been excellent. This is not to say that it's something he didn't do, but this was in the sustainment proposal as required. And that puts it on the City. If they needed to talk to the ACLU about something, they can do it. If the ACLU needed to talk to the City about something.

And once again, this is not flame spraying anybody involved, but as I said at the top of this, and I think Mr. Stanton said it also, we were doing something nobody has ever done. So there's no roadmap to this. There's no XYZ, and we're doing something with evolving technology. I mean, when we started this AI wasn't what it was, okay. And now we have evolving technology and we're trying to do that, and technology is changing every 18 months.

And so I think a lot of what you might be hearing has to do with the understanding of it. And I understand Mr. Vaughn -- just the actual understanding of it. And I heard the other gentleman -- I forget his name -- talk

about that Section G is for criminal investigation, but I couldn't -- I didn't really follow but I think he was saying -- he brought up the bridge protest which we all know about the bridge protest. I was City Attorney when the bridge protest. And that was one of the examples we put in with Judge McCalla on how we would handle something like that again. So it has been a work in progress. Once again the City hasn't been recalcitrant.

But I do have a question. This report card is only for -- what period of time was it for? Can I ask Mr. Stanton that? Is this for a month or is this for the entire quarter?

**MR. STANTON:** The quarter, yeah, first quarter of '26.

**MR. McMULLEN:** The first quarter of '26, okay.

Now, I will say this to the City's credit, and I think Mr. Vaughn would agree with this, any time the ACLU reached out to us, we -- Zoom calls, we --

**THE COURT:** Let me ask that question just as a practical matter. Different roles being what they are, if the ACLU needs to reach out to the City, well, that -- I presume that means on the one hand Mr. Vaughn would reach out to Mr. McMullen?

**MR. McMULLEN:** Yes.

**THE COURT:** Okay.

**MR. McMULLEN:** He would not reach out to Mr. Stanton necessarily. And if we reached out to Ms. Yarbrough or Mr. Vaughn, we would not necessarily involve Mr. Stanton's team if it's something we're discussing, which goes back to why I read the report, assuming that they got some information from the ACLU, because they wouldn't have been privy to conversations back and forth with us and the ACLU unless it rose to a level where we would have to go to the monitor on a disagreement about something.

**THE COURT:** And similarly, if Mr. Carter, for example, needed to or felt the need to communicate with the City, would it be inappropriate for Mr. Carter or any of the other experts to contact Jimmy Thomas?

**MR. McMULLEN:** No, no. There are no limitations on Mr. Stanton's team. They can contact -- they can contact anybody individually. It doesn't require the other side being present. Matter of fact, they're the only people involved that can have an ex-parte conversation with the Court.

**THE COURT:** I vetted that thoroughly early on for reasons you and I both understand.

**MR. McMULLEN:** And so I have no idea how many times Mr. Carter has spoken to the ACLU, and that's why I made that assumption when I looked in the report because

Mr. Vaughn can attest to how many times he's communicated with the City and whether the City was responsive to his communication as well as his predecessor.

**THE COURT:** To close that loop, Mr. Carter, did you reach out to Mr. Vaughn to determine whether the City was being responsive?

**MR. CARTER:** Your Honor, this is what the monitoring team did: The monitoring team had a Q1 review, a Zoom with Mr. Thomas, the City's compliance officer, and we went through each category and asked what he did and what he didn't do with regard to each category. So the scores -- the score that's the subject of the current conversation about dialogue with the ACLU specifically was the monitoring team asking Mr. Thomas about that.

So again, so there was city input. There was a conversation and a dialogue on May 11th. Mr. McMullen participated in that call. Ms. Silk participated in that call. We went through every category that's on the report card, and after that we met with the SMEs and then we -- and discussed these categories as well, and then we collaboratively issued the grades that are in the report card.

**THE COURT:** All right. That's helpful. That's helpful.

**MR. McMULLEN:** And Mr. Thomas is here, and as I've said before, they've had unfettered access to Mr. Thomas, and as he's standing here, I have no idea what he's going to say.

**MR. THOMAS:** Judge, I don't mind listening to other lawyers talk about what I do every day but I just want to make some clarifications. I do disagree somewhat with the report card, but every factor in there at least to the representations I made are true in regard to we have not been satisfactorily holding these public forums. Now, there's a number of reasons for that. I'm only one man. We had a staff initially of another lawyer and a law school graduate who is also a police officer but she -- both of those individuals left the police department.

So rather than argue about whether or not we are in compliance or whether or not the report card is unfair, you know, I meet with the -- I mean, with the subject matter experts biweekly or by e-mail every day. I think what we should do, I'll be happy to give the ACLU my cellphone number so that they can reach out to me and talk to me, but if it's going to be something that we're going to have to litigate, then we're going to have to go through the Baker team.

Our view is we would rather have a collaborative

process to try to get in compliance with the consent decree or make sure we're doing everything within the consent decree rather than fight about it for two hours in court about what we haven't done. It is a lot of work. There is not a day goes by that I don't consult on a consent decree issue, multiple times sometimes on things we can do. And the City, at least the Memphis Police Department, is doing its absolute best to try and comply with the consent decree.

As far as the training goes, Mr. Henderson and I teach that class 50 weeks a year. We treat it like a law school class where it's done with a Socratic method, so we mandate participation from the officers, and I think it works well. Perhaps the class could be updated a little bit. We have -- often have things that happen that give rise to other incidents. You have new laws that come into play like 39-17-307, the blocking of a passageway or highway. Does that trump First Amendment speech, does it not, does First Amendment speech get a pass when it violates the law, things of that nature. And we bring those up every class period.

So our position is we certainly want to make it work rather than just argue about what one party didn't do.

**THE COURT:** Excellent. I appreciate that, Mr. Thomas.

**MR. VAUGHN:** Your Honor, may I please respond?

**THE COURT:** Yes. I'm looking here just briefly, and I certainly do want you to respond. I'm getting a few requests for a bio break, but go ahead. Go ahead. We can --

**MR. VAUGHN:** We can take a recess and I can come back.

**THE COURT:** Maybe we should do that so that everyone can give you their full attention. Some are otherwise distracted. All right. Let's just say ten minutes or whatever is required. Thank you. Stand in recess.

(Brief Recess.)

**THE COURT:** The matters that needed to be attended to were attended to, but probably the most important thing in my case is I wasn't tongue tied but I was flip flopped. I said in response to Mr. McMullen's question where are we, and I said we were in sustainment. We're in transition on our way to sustainment, and I didn't mean to misspeak.

**MR. McMULLEN:** Yeah, to that --

**THE COURT:** I think I had it reversed in my stream of consciousness. We're right where you thought we were on our way to where you want to be. We haven't gotten to the end phase yet, and I think I reversed it

according to Dr. Ruddman, my law clerk.

**MR. STANTON:** Yes.

**MR. McMULLEN:** Right. The sustainment proposal started in July 1, 2025.

**THE COURT:** Well, that's what we need to clarify because Mr. Stanton might say we're still in transition. Do you want to clarify this for me?

**MR. McMULLEN:** Before Mr. Stanton says that, I want to focus the Court at Document 526 because there's an order adopting the sustainment period by Judge McCalla in that. And in that order, it outlines it. And so we've been in the sustainment period for, what, six months -- since the third quarter. This is the first report card that we've gotten for this last quarter, but according to the Court's order and the agreement with everybody, we've been in the sustainment proposal.

**THE COURT:** I might not have misspoken. It's just that I've downloaded so much information in my brain that maybe I got lucky and said it correctly.

**MR. STANTON:** I --

**MR. McMULLEN:** And just -- I'm sorry. One other thing. And on Page 13, that was respectfully submitted the sustainment proposal on December 3, 2024, and that is Stella Yarbrough, Bruce McMullen and Ed Stanton, submitted by. And so we were under the impression --

**THE COURT:** We're in sustainment.

**MR. McMULLEN:** We're deep in sustainment period. We haven't gotten report card -- or the sustainment period doesn't contemplate a report card, but then we got one this last quarter, but we didn't get any the quarter before. So we assume we had an A plus in all those quarters.

**THE COURT:** So I stand corrected in correcting myself.

**MR. STANTON:** Your Honor, your assessment -- and I'll ask Mr. Perry to speak, but is completely accurate in that we are en route as opposed to have drawn the line. And I think based on the report card certain things that should have been done per the transitional period have not been done, but again, it's a work in progress. But I think Mr. Perry wanted to -- did you want to add anything?

**MR. PERRY:** I agree with really in substance with what Mr. McMullen is saying and what Mr. Stanton said. Judge, I think this is really a debate about semantics. I think it's exactly as you said. We're on route to where everyone wants to be but we're not there yet. I think the best indication of that is the document that Mr. McMullen pointed to, the very first paragraph of the Court's sustainment order discusses a transition

period and envisions that it will end by September 2025, by some of the things that are contemplated in that document have not yet occurred. I think that's the rub of everything.

**MR. McMULLEN:** Well, this document has a timeline, and if those things hadn't occurred in September 2025, we should have been on notice. So our point is we have been operating pursuant to the Court's order that we were -- and pursuant to the timeline on Page 3, sustainment and the sustainment proposal, we've been operating there, and that's why the report card -- that's why we're kind of on our heels on that. And we're going to ask the Court to respond to that because now it's clear there's a misunderstanding. The monitors thought we were in a transition period, and we thought pursuant to the Court's order we were deep into the sustainment period.

**THE COURT:** So one of the things I'm going to do in shortly moving towards bringing this to conclusion today is to work with our monitor, work with Mr. Stanton to address some of these and facilitate resolution. We need clarification. And fortunately it's not as though we have any motions before the Court, and in the, you know, spirit of the collaborative process that's been mentioned, we hope to avoid that kind of controversy, but

that's where Mr. Stanton and his team come in. And I have more flexibility if you will to work with him to work with you all and through proper channels to make sure we're on the proper track.

But yes, sir, Mr. Stanton?

**MR. STANTON:** And I would just add, Your Honor -- and certainly I look forward to working with the Court. But just as an example to Mr. McMullen's point, even in the document that he's referencing in the order, two of the subject matter experts that the City, that all of us agreed to, all of the parties agreed to, the City decided they wanted to go in a different direction, and so we lost time during the transitional period because we had to get two new experts. And they've done a great job, but again, if you can imagine, two experts, subject matter experts who had been involved institutional knowledge from the beginning, the last seven years, along with our team and the City decides to go in a different direction.

So again, I think your analysis as we're moving in that direction of the sustainment, but I think the City will concede that there was a ramp-up period for the new SMEs. They decided -- that was their -- certainly they had the wherewithal to go in a different direction for the subject matter experts, but we lost ground by the

replacement. So that's just an example of we thought we would be one place, we've had some turns and twists, and that's why we don't believe we are in sustainment but working our way or the City is working its way there.

**THE COURT:** Things happen, human factors, and this is helpful. I didn't recall whether Mr. Cook or Mr. Vaughn wanted to be heard further. Where I'm ultimately moving after you are heard from, if you wish to be, is to wrapping this up. I think selfishly I could stay here ad infinitum. There's so much more to learn. You've helped me focus some of my interests, some of what I've read will now take on additional meaning as I go back and scrutinize where we are. But I'm hoping to avoid motions, you know, any controversy that gets in the way of moving us along that timeline. Not to say that I don't enjoy a little controversy from time to time. That's what I'm here for.

But what would the ACLU like to add for the good of the order before we adjourn?

**MR. VAUGHN:** Yes. Thank you, Your Honor. ACLU of Tennessee would like to point out that I believe we're discussing two different things, and I would really like to get to the original question that was asked about whether there was any voluntarily -- voluntary engagement during the first quarter.

So there is a sustainment proposal, Your Honor, which I was actually at the hearing for that. I've been working on this case for at least two years, and I actually filed my notice of appearance in October of 2024. I also worked with Tom Castelli nearly ten years ago on this case and worked with Stella Yarbrough for nearly four years on this case.

**THE COURT:** Yeah, but you've stepped up. I mean, she was senior to you and running the show, but now you're running the show.

**MR. VAUGHN:** That's correct, Your Honor.

**THE COURT:** Yes.

**MR. VAUGHN:** And then so we have the sustainment proposal where under that proposal they're supposed to be giving us the documents they're required to communicate such as a Section G authorization, and they did not do that in the first quarter. They had a Section G authorization. They didn't communicate it to us. When Stella left, she sent an e-mail copying everyone involved in this case with my e-mail on it and directing them to communicate with me, yet the City has not done so. And then we have a different issue with potential conversations about litigation that the City also has not been responsive to.

But just stepping back, I just wanted to note that

the ACLU is the organization with the sole authority to enforce this decree regardless of the sustainment proposal that was adopted by the Court, and we do expect a motion to be filed soon, Your Honor, and I'm going to let Mr. Cook speak more about that.

**THE COURT:** Mr. Cook.

**MR. COOK:** Your Honor, so one issue that I previewed when we were making appearances this morning was that we are here assisting the ACLU with respect to this emerging issue, the events of the No Kings protest on March 28th. We believe that there were some serious violations of the consent decree at that event.

There were protesters who basically had completed a march for about 40 minutes. They were within 50 feet of the conclusion of that March. The MPD used force to break up a line of safety marshals. MPD pepper sprayed some of the safety marshals at point-blank range with no audible warning and, as far as we can tell, no cause.

Now, we have been working with the City to try to understand what happened, to get access to evidence, and that's what we were able to do with the agreement that Mr. Stanton referred to last night. We are now going to be able to get access to the body cam footage to understand what happened there. From what we've seen and what we've heard about the City's positions, the City has

so far taken the position that there was no violation at all at this event.

We do think we're headed today potential motion practice on this, and the motion that we would envision is a motion for an order to show cause basically to understand the City's position and to seek additional remedies if necessary to ensure that events like that don't happen again. Obviously there is a chilling effect from the police responding in such a way to a political protest that discourages further protests in the City or further attendance at protests in the City.

What we've discussed with the City, with the monitoring team is that we will wait until an investigation, that the City has told us will be complete by June 15th, to assess next steps. So we're not asking for any action by the Court on this now, but we may be at a point in the relatively near future where we may be back filing a motion related to this. If we do, the remedies that the ACLU is going to be seeking for this are remedies to prevent this type of thing from happening again, which may involve remedies expanding the scope of the monitoring team's responsibilities, expanding the term of the monitoring team's appointment.

So that may have an impact on the issues we've talked about today. We're in a somewhat unusual position

because we just don't have that motion filed yet because we're waiting on the City's investigation, but I want you to know that that is where we're headed, and that's potential coming down the road relatively soon and should be certainly teed up by a status conference at the beginning of Q4 as Mr. Stanton has suggested.

**THE COURT:** As the clerk of the Senate used to say, notice.

**MR. COOK:** Thank you, Your Honor.

**THE COURT:** Yes, sir, Mr. McMullen.

**MR. McMULLEN:** Your Honor, I've got one request. Can we respond to the report card? Can the City respond to the report card on the record? Because I think there's some confusion about the report card and some things that I think the Court has learned today on it, and so we would like to respond on the record about the report card.

**THE COURT:** So we have two options. One, would be that the record reflect this to have been a draft and that you work with Mr. Stanton and his team to update, finalize it, and submit. That would be one way of doing it. And I don't know whether Mr. Stanton thinks that's a practical way or if we should do it here in open court.

**MR. STANTON:** I think I'd like to see the other -- what's the second option?

**THE COURT:** The second option is to just let the rough side drag and let Mr. McMullen argue it here in open court and see what happens.

**MR. McMULLEN:** We want to do it in writing. Your Honor, we want to do a record in writing because what happens in these things -- you've been in -- you understand being in a public setting, things go on paper and then they --

**THE COURT:** It becomes part of --

**MR. McMULLEN:** It becomes the truth. There was some report in another case I was in that was a fact until it wasn't a fact. And so I'd rather respond on the record so if someone who is not in this case -- and I would like to point to what Mr. Cook said, he's heard some things about some things. So to make sure that things are in the record, we would like to respond on the record.

**THE COURT:** That's fine.

**MR. STANTON:** No objection from the monitoring team, Your Honor.

**THE COURT:** Okay.

**MR. COOK:** Just for the ACLU, there are elements -- we largely agree with the report card, but there are a few elements that if we had the opportunity to weigh in, we would comment on as well. We would ask

for an opportunity to respond if the City is going to have one.

**THE COURT:** Turnabout is fair play. All right. We'll do that.

**MR. COOK:** Thank you, Your Honor.

**THE COURT:** We'll do that. I think we've reached a point not of no return but a point of departure here. I'll work further with Mr. Stanton based upon my enhanced understanding and noodle through some issues that remain. We'll work towards -- formally work towards setting another status conference in early Q4. I won't say that yet today. Let me work with Mr. Stanton a little bit more and see what else needs to be attended to. We're on notice of potential things to come, and we'll see where those lead.

Well, I think it's been very productive from my standpoint and it's important work, and we'll get it done. And thank you for your attention, and if there's nothing further, you're all free to go.

**MULTIPLE ATTORNEYS:** Thank you, Your Honor.

(Court adjourned.)

C E R T I F I C A T E

I, LISA J. MAYO, do hereby certify that the foregoing 71 pages are, to the best of my knowledge, skill and abilities, a true and accurate transcript from my stenotype notes of the STATUS CONFERENCE on 29th day of May, 2026, in the matter of:

ACLU OF TENNESSEE, INC

vs.

CITY OF MEMPHIS, TENNESSEE

Dated this 06/10/2026

S/Lisa J. Mayo

LISA J. MAYO, RDR, CRR
Official Court Reporter
United States District Court
Western District of Tennessee