**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

|  |  |
|---|---|
| ELAINE BLANCHARD, KEEDRAN FRANKLIN, PAUL GARNER, and BRADLEY WATKINS,<br><br>      *Plaintiffs (dismissed)*,<br><br>  and<br><br>ACLU OF TENNESSEE, INC.<br><br>      *Intervening Plaintiff*,<br><br>    v.<br><br>THE CITY OF MEMPHIS,<br><br>      *Defendant.* | No. 2:17-cv-02120-MSN-jay |

**ACLU-TN'S MOTION FOR AN ORDER TO SHOW CAUSE
WHY THE CITY OF MEMPHIS SHOULD NOT BE HELD IN CONTEMPT**

**TABLE OF CONTENTS**

I.    Introduction................................................................................................1

II.   Background ................................................................................................2

      A.    The *Kendrick* Consent Decree .............................................................2

      B.    The March 28, 2026 No Kings Event......................................................4

      C.    The Event's Aftermath .........................................................................8

III.  Legal Standard ..........................................................................................10

IV.   Argument ...................................................................................................11

      A.    The Court should order the City to show cause why it
            should not be held in contempt for its violations of
            Section F of the Decree at the No Kings event....................................11

      B.    The Court should order the City to show cause why it
            should not be held in contempt for violating Section G
            of the Decree...........................................................................................14

            1.    The City violated Section G.4 because MPD
                  failed to seek an authorization before the No
                  Kings response. ...........................................................................15

            2.    The City violated Sections G.4 and G.6 by issuing
                  the April 16, 2026 authorization. ...............................................17

            3.    The No Kings-related violations, together with the
                  City's stated interpretations of Section G, warrant
                  an order to show cause requiring the City to
                  explain its current interpretation and
                  administration of Section G. .......................................................18

V.    Conclusion .................................................................................................19

## TABLE OF AUTHORITIES

**CASES**

*Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*,
418 F.3d 600 (6th Cir. 2005) ...................................................................13

*Black Lives Matter Seattle-King Cnty. v. City of Seattle*,
466 F. Supp. 3d 1206 (W.D. Wash.)........................................................12

*Boos v. Barry*,
485 U.S. 312 (1988).................................................................................12

*Cole v. City of Memphis*,
108 F. Supp. 3d 593 (W.D. Tenn. 2015)..................................................14

*Downes-Covington v. Las Vegas Metro. Police Dep't*,
2020 WL 7408725 (D. Nev. Dec. 17, 2020)............................................12

*Elec. Workers Pension Tr. Fund of Loc. Union No. 58 v.
Gary's Elec. Serv. Co.*, 340 F.3d 373 (6th Cir. 2003) ...............................11

*Gascho v. Glob. Fitness Holdings, LLC*,
875 F.3d 795 (6th Cir. 2017) ...................................................................10

*Rieth-Riley Constr. Co. v. NLRB*,
2025 WL 3298085 (6th Cir. Nov. 26, 2025).............................................11

*Tracy v. Freshwater*,
623 F.3d 90 (2d Cir. 2010).......................................................................14

*Vodak v. City of Chicago*,
639 F.3d 738 (7th Cir. 2011) ...................................................................13

*Williams v. Vukovich*,
720 F.2d 909 (6th Cir. 1983) ...................................................................10

**OTHER AUTHORITIES**

Action News 5, *Charges Dropped for Three Arrested During
No Kings Protest* (Apr. 15, 2026) .............................................................7

Bill Dries, *No Kings March Ends with Pepper Spray and
Arrests*, Daily Memphian (Mar. 28, 2026) .................................................8

Kaitlyn Miller & Garner Montgomery, *MPD Increasing Patrol
and Adding Specialized Units Ahead of Busy Weekend
Downtown*, Action News 5 (Mar. 27, 2026)...............................................4

– iv –

Memphis Police Dep't, Statement on March 28th "No Kings
    Rally" Incident (Mar. 29, 2026)...............................................................7, 8

Mayor Paul A. Young, Building Together: City of Memphis
    Weekly Newsletter (Apr. 3, 2026, 4:15 P.M. CDT) ...................................8

Plaintiff ACLU of Tennessee, Inc. ("ACLU-TN") respectfully requests that the Court order the City of Memphis (the "City") to show cause why it should not be held in contempt for violations of the Modified *Kendrick* Consent Decree (ECF No. 379) (the "Decree").

## I.      Introduction

Thousands of Memphians gathered on March 28, 2026, to protest their government.  The event, called "No Kings," began peacefully.  But it ended after Memphis Police Department ("MPD") officers used excessive force against protesters with no evident justification or warning.  This response violated the City's commitment and this Court's order that MPD "not disrupt, discredit, interfere with or otherwise harass any person exercising First Amendment rights" or "engage in any action for the purpose of, or reasonably having the effect of, deterring any person from exercising First Amendment rights."  Decree §§ F.1 & F.2.

MPD's actions at the No Kings event follow a long line of First Amendment violations by the City.  The Decree arose after MPD spied on citizens engaged in constitutionally protected activities during the Civil Rights Era.  To resolve claims arising from that conduct and restore public trust, the City agreed to institutional reforms in the 1978 *Kendrick* consent decree and "imposed a higher standard on itself" to protect First Amendment rights.  ECF No. 151 at 38. The Court found the City in contempt of that decree in 2018 for "a significant number of violations," including some stemming from the City's "fail[ure] to familiarize MPD officers" with certain consent decree requirements.  *Id.* at 38–39.

The City reaffirmed its commitment to the Decree in 2020,[1] but MPD's actions at the No Kings event show that the City and MPD have not internalized its principles.  As the evidence

---

[1] The City sought relief from certain provisions in the 1978 consent decree in 2020, but it expressly abandoned its request for relief from the provisions that are at issue here.  *See* ECF No. 378 at 1–2 (recounting revision history).

submitted with this motion shows, MPD's use of force was without any apparent warning or evident justification.  To prevent future violations and to relieve the chilling effect on political protest that MPD's actions caused, the Court should open contempt proceedings and, if appropriate, issue further coercive relief.

The Court should also require the City to show cause as to two other violations. Section G of the Decree requires authorization for MPD conduct that is reasonably likely to interfere with First Amendment rights.  The City violated that provision by failing to seek authorization before its No Kings response and by issuing a broad, prospective authorization after the event that lacks the written findings that the Decree requires.  Those violations, together with the City's stated interpretation of Section G, also warrant an order requiring the City to explain its interpretation and administration of Section G.

ACLU-TN does not seek this relief lightly.  Individual missteps happen during institutional reform, and ACLU-TN does not intend to turn every act of individual misconduct into a contempt proceeding.  But the City's response at the No Kings event was far more than missteps by individual officers.  It was coordinated police action against Memphians who were engaged in core First Amendment activity—something that never should have happened if MPD had internalized the Decree's principles.  And the City's response since the event—including blaming the protesters and refusing to admit that any violation occurred—raises serious questions about the City's commitment to the Decree.  Contempt proceedings are necessary now to protect the Decree's integrity and ensure the City complies with it.

## II.   Background

### A.   The *Kendrick* Consent Decree

The *Kendrick* Consent Decree arose from a decade-long undercover intelligence scheme during the Civil Rights Movement.  *See* ECF No. 378 at 2–3.  MPD had maintained secret

intelligence files on political activists and then destroyed those files to avoid judicial scrutiny.

*Id.* The parties agreed to a consent decree to resolve litigation based on that misconduct. *See*

Order, *Kendrick v. Chandler*, No. C 76-449 (W.D. Tenn.), Dkt. 16 (reproduced as Appendix A to

ECF No. 151 in this action) ("*Kendrick* Decree").

The *Kendrick* Decree's express purpose was to

> [p]rohibit the defendants and the City of Memphis from engaging in
> law enforcement activities which interfere with any person's rights
> protected by the First Amendment to the United States Constitution
> including, but not limited to, the rights to communicate an idea or
> belief, to speak and dissent freely, to write and to publish, and to
> associate privately and publicly for any lawful purpose.

*Id.* § A. It addressed "four categories of prohibited conduct: (1) political intelligence,

(2) electronic surveillance for political intelligence, (3) covert surveillance for political

intelligence, and (4) harassment and intimidation." ECF No. 151 at 15 n.5. In each area,

"Memphis … imposed a higher standard on itself" to protect First Amendment rights. *Id.* at 38.

The *Kendrick* Decree led to meaningful reforms, but the City has regressed. During the

Black Lives Matter protests in the mid-2010s, the City and MPD spied on political activists

again, this time on social media. ACLU-TN sued, and—following discovery and an evidentiary

hearing—the Court found the City in contempt. ECF No. 151. The Court imposed sanctions,

including several policy reforms and independent monitoring. ECF No. 152. The Court adopted

a sustainment framework in early 2025 to wind down monitoring, *see* ECF No. 526 (adopting

ECF No. 520), and the parties remain in that framework's transition period.[2]

---

[2] The parties planned for the transition period to end in the third quarter of 2025, ECF No.
520 at 3, but as discussed at the May 29, 2026 status conference and in the report card that the
Monitor submitted before that conference, the City has failed to complete the conditions
necessary to move out of the transition period. The Monitor remains in place.

The parties also agreed to modify the *Kendrick* Decree in 2020 to reflect modern technologies. ECF Nos. 378, 379. The current Decree—which, as relevant here, was entered following agreement between the parties—maintains many of the *Kendrick* Decree's key provisions. Among other things, the Decree prohibits harassment and intimidation, stating that the City "shall not disrupt, discredit, interfere with or otherwise harass any person exercising First Amendment rights," or "engage in any action for the purpose of, or reasonably having the effect of, deterring any person from exercising First Amendment rights." Decree § F. It also requires authorization for certain police conduct:

> Any police officer conducting or supervising a lawful investigation of criminal conduct, which investigation is reasonably likely to result in the collection of information about the exercise of First Amendment rights or interfere in any way with the exercise of such First Amendment rights, must immediately bring such investigation to the attention of the Memphis Director of Police or a designee of the Director of Police for review and authorization.

*Id.* § G.4. "[T]he Director of Police or his/her designee" must then "review the factual basis for the investigation and the investigative techniques to be employed" and "issue a written authorization" only upon making "written findings" that four conditions are met. *Id.* § G.6.

### B.    The March 28, 2026 No Kings Event

As part of a nationwide political protest, several thousand Memphis residents gathered at Robert Church Park on March 28, 2026. The event began at 2:00 P.M. and was scheduled until 6:00 P.M., with a widely publicized march near the end.[3]

---

[3] Local news aired the event's agenda, including the march, the day before it took place. *See, e.g.*, Kaitlyn Miller & Garner Montgomery, *MPD Increasing Patrol and Adding Specialized Units Ahead of Busy Weekend Downtown*, Action News 5 (Mar. 27, 2026, posted online at 7:34 P.M. EDT), https://tinyurl.com/yv8r7ua3 (agenda aired at 1:29 into the video, with voiceover that "the protest will feature … a march that will start at 4:20 P.M.").

The march began without incident at about 4:50 P.M.  BV at 16:50:15.[4]  Several safety marshals maintained order during the march.  The marshals wore orange safety vests and marched near the beginning and the end of the parade to protect the marchers from counterprotesters and traffic.  K. Williams Decl. ¶ 2; *see, e.g.*, BV at 16:50:15; *id.* at 17:15:40.  The march proceeded west on Beale Street, turned left onto Second Street, and continued to the intersection with Linden Street.  BV at 16:50:15–17:17:19; K. Williams Decl. ¶ 3.

The march proceeded without incident to this point.  Video evidence shows no sign of MPD ordering the march to disperse.  To the contrary, one of the first buildings that the march passed was MPD's Entertainment District Unit on Beale Street.  BV at 16:54:27.  MPD allowed the march to begin with no intervention.

As marchers turned left onto Linden to return to the park, several police cars pulled up behind the protesters.  *See* BV at 17:17:41.  Some officers got out of their cars, BV at 17:17:45, and walked to the front of the march.  *Id.* at 17:20:18.  They then spoke with two safety marshals and Councilman JB Smiley, Jr. while the march paused.  BV at 17:21:20.  Councilman Smiley and an officer both gestured toward the park.  *Id.*  Gary Blevins, the videographer, asked what was happening, and Councilman Smiley indicated that the march would proceed to the park.  BV at 17:21:59; Blevins Decl. ¶¶ 6–7.  As the march neared the park, officers talked to Councilman Smiley again; he again pointed at the park, and officers allowed the march to proceed.  BV at 17:26:56–17:27:18.

---

[4] "BV" refers to the video footage described at paragraph 2 of the Declaration of Gary Blevins, filed with this motion ("Blevins Decl.").  Videos are at https://drive.google.com/drive/folders/1eRYI4i-P9ryueHSCKpA1abQI1mEPBJfi, with the start time of the video indicated in the file name.  For example, video "20260328_165015.mp4" begins at 16:50:15 on March 28, 2026, or 4:50 P.M.  The Declarations of Kaiden Williams ("K. Williams Decl.") and Dai-John-nae Williams ("D. Williams Decl.") filed with this motion provide further firsthand accounts.

By the time most marchers had reached the park, the march's tail end was still proceeding on Linden Avenue. BV at 17:30:28. Many of the last marchers were vulnerable individuals, including parents with young children. K. Williams Decl. ¶ 6. Police cars that had pulled up behind the marchers as they turned on Linden Avenue continued to move toward the march's tail, guiding the march toward the park. BV at 17:31:19. The cars stayed close to the last marchers, advancing as the marchers advanced. *Id.* Several safety marshals joined arms between the last marchers and the police cars to ensure that no one was hurt. *Id.*

Several police officers who had been standing on the corner of Linden Avenue by the park then intervened. BV at 17:31:47. There was no apparent reason. Bodycam video released by the Shelby County District Attorney's Office shows that one officer told the others that safety marshals were "pushing up against the cars." Bodycam at 17:31:38–17:31:50.[5] But the City has produced no evidence corroborating that statement.

Whatever the reason for the response, nothing justified MPD's excessive use of force. An officer forcibly broke through the marshal line and pushed an individual to the ground. BV at 17:31:58. Seconds later, another officer approached the marshal line's left end, calmly shaking a can of pepper spray. BV at 17:31:58; Bodycam at 17:32:01. As he turned the corner to the front of the marshal line, he deployed it in several individuals' faces. Bodycam at 17:32:01–17:32:10. Kaiden Williams, a safety marshal, was trying to help the first marshal that MPD had pushed to the ground. K. Williams Decl. ¶ 9. The officer with pepper spray then grabbed Williams from behind and deployed it at point-blank range until Williams fell to the

---

[5] The bodycam video is described in paragraph 7 of the Declaration of Timothy A. Cook ("Cook Decl.") and is available via hyperlink at https://www.scdag.com/news-releases/das-office-releases-video-related-to-police-response-at-no-kings-rally. Citations are to timestamps shown at the upper right corner of the footage.

ground.  *Id.* at 17:32:10–17:32:17; K. Williams Decl. ¶¶ 10–11.  No public video evidence or witness accounts reveal an order to disperse or even a warning before this excessive use of force.  *See* D. Williams Decl. ¶ 10; Blevins Decl. ¶ 8; K. Williams Decl. ¶ 8; *see also* Bodycam at 17:31:50.

Immediately after Williams fell, another individual calmly pleaded with the officer to stop, with his hands raised in surrender.  Bodycam at 17:32:19–17:32:24.  The officer deployed pepper spray in that person's face too, and other officers surrounded and handcuffed him.  Bodycam at 17:32:25–17:32:38.  These are just examples—MPD used force against dozens of protesters that day.  *See, e.g.*, BV at 17:32:21; D. Williams Decl. ¶¶ 7–9.  Several other officers appeared as the intervention started, and officers on horseback appeared shortly after.  BV at 17:42:42.  This rapid deployment shows that MPD had prepared for a response.

MPD arrested three people.[6]  All charges were later dropped, and four police officers were placed on leave.[7]  MPD also detained other protesters but did not charge them.  For example, Dai-John-nae Williams was detained and kept in a police car without aid for the pepper spray but was eventually returned to Robert Church Park.  *See* D. Williams Decl. ¶¶ 9, 11–13.

MPD's excessive and unjustified response caused both physical and mental distress.  Several individuals required medical assistance because of the pepper spray, including Kaiden Williams.  K. Williams Decl. ¶ 11.  And there can be no doubt that MPD's response had a

---

[6] Memphis Police Dep't, Statement on March 28th "No Kings Rally" Incident (Mar. 29, 2026), https://tinyurl.com/5n7avsc6.

[7] Action News 5, *Charges Dropped for Three Arrested During No Kings Protest* (Apr. 15, 2026), https://tinyurl.com/mw7a7r72;  Ex. 2 at 2.

chilling effect on political protest.  A photograph of Kaiden Williams crumpling in response to pepper spray became the headline photo of what had otherwise been a peaceful political protest.[8]

### C.    The Event's Aftermath

MPD has taken no responsibility for its response at the No Kings event.  The day after the event, MPD blamed the protesters, suggesting that MPD's response was justified because the City had not issued a march permit.[9]  But that does not excuse tackling and pepper spraying peaceful protesters.  Indeed, all public evidence shows that MPD acquiesced to the march by allowing it to begin (almost directly in front of a police station) and proceed for nearly forty minutes, until the march was within fifty feet of its conclusion.  And no public evidence or witness account indicates that MPD gave an order to disperse or a warning immediately before intervening.

The City has also refused to meaningfully engage with ACLU-TN's efforts to address clear violations of Section F of the Decree at the No Kings event.  ACLU-TN asked the City to provide information about MPD's actions on April 1, 2026.  *See* Ex. 1.[10]  Today—more than two months later—the City has produced no video evidence from the event to ACLU-TN.[11]  The City represented that it was investigating MPD's response, but it refused to allow ACLU-TN to meet

---

[8] *See* Bill Dries, *No Kings March Ends with Pepper Spray and Arrests*, Daily Memphian (Mar. 28, 2026), https://tinyurl.com/32t4c2hk.

[9] Memphis Police Dep't, Statement on March 28th "No Kings Rally" Incident (Mar. 29, 2026), https://tinyurl.com/5n7avsc6; *see also* Mayor Paul A. Young, Building Together: City of Memphis Weekly Newsletter (Apr. 3, 2026, 4:15 P.M. CDT), https://tinyurl.com/4ja5s35t.

[10] "Ex." refers to exhibits to the Declaration of Timothy A. Cook, filed with this motion.

[11] After nearly two months of negotiations facilitated by the Monitor, the parties appeared to reach an agreement about the production of bodycam footage the evening before the May 29, 2026 status conference.  Both the Monitor and ACLU-TN reported the progress to the Court, ECF No. 574 at 11:2–6, 66:19–24, and the City said nothing in response.  The City then sought to impose additional (and unreasonable) conditions on the release of the videos immediately after the conference ended—before the parties even left the courtroom.  *See* Ex. 6 at 7–10 (recounting negotiations).  No agreement has been reached.  Cook Decl. ¶ 9.

with the investigators. Cook Decl. ¶ 5. And while the City repeatedly represented that it would investigate the likely Decree violations by June 15, 2026, the report that the City produced on that date—more than two months after the event—addressed only four officers' unauthorized uniform patches and one's failure to file a report.[12] Ex. 7. Based on the information that the City has provided to ACLU-TN, it appears that the total remedial action that MPD has taken related to the No Kings event is four negative Observed Behavior Reports in officers' files, one written reprimand, and a one-day suspension without pay for one officer. *Id.* This after-the-fact, individual officer discipline does not even address, let alone cure, the City's Decree violations.

Aside from denying responsibility, the City's responses raise serious concerns about how it is interpreting and applying the Decree. The City has refused to acknowledge that there was *any* Decree violation at the No Kings event, including of the provisions barring harassment and intimidation. Cook Decl. ¶ 8. That position is at odds with the public evidence. The City has also admitted that "[t]here was no Section G authorization obtained prior to [the No Kings] event." Ex. 2 at 2. It claims that none was required, *id.*, but that is at odds with Section G's plain text and with the parties' prior interpretations of Section G, which requires authorization for responses to political protests that might impede traffic. *See, e.g.*, ECF No. 520-2 (draft policy statement attached to the parties' joint sustainment proposal stating that "Examples of an investigation that would require authorization under Section G include, but are not limited to . . . . The possibility that a protest group intends to interrupt traffic on the I-40 bridge").

The City's concerning conduct does not stop there. On April 16, 2026, the City issued a Section G authorization that it claims relates to its investigation into MPD's actions at the No

---

[12] The report also refers to one officer's "violation of DR-104 Personal Conduct" without stating the basis for that finding. Ex. 7 at 8.

– 9 –

Kings event.  *See* Ex. 3.  But the scope of that authorization is much broader and forward-looking.  In addition to authorizing a review of "current MPD video of the protest" for "an administrative investigation," it ***also*** authorizes MPD to monitor "[a]ll Social Media Platforms" against any member of the public "to identify emerging threats" and "assess the potential for unrest" for 90 days.  *Id.* at 1 (leaving "Subjects of Investigation" field blank).  The authorization includes no specific "written findings" by the Chief of Police or her designee, as required by Section G.6 of the Decree.  And the recitation of the facts in the request for the authorization is wrong.  For example, it claims that MPD responded to the march "at approximately 1715 hours" and attempted "to clear the roadway for approximately 40 minutes," *id.*, but footage shows officers intervening at 5:32 P.M., *see* Bodycam at 17:32:01; BV at 17:31:47—far less than the "40 minutes" that the authorization request claims.  Put simply, the April 16 authorization appears to be a blank check for MPD to monitor social media ***in the future*** that is based on incorrect facts and that lacks the "written findings" that the Decree requires.

Combined with the plain Section F violations during the No Kings event, the City's responses and actions since March 28 paint a picture of institutional noncompliance with the Decree.  Contempt proceedings are necessary to hold the City to its commitments.

## III.    Legal Standard

A consent decree carries the force of a court order and is enforceable through contempt. *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983).  A party seeking civil contempt must establish by clear and convincing evidence that (1) the court order at issue imposed a clear and definite obligation, (2) the respondent had knowledge of the order, and (3) the respondent violated it.  *Gascho v. Glob. Fitness Holdings, LLC*, 875 F.3d 795, 800 (6th Cir. 2017).  The movant must make a prima facie showing of noncompliance sufficient to warrant requiring the respondent to appear and demonstrate why it should not be held in contempt.  *Elec. Workers*

*Pension Tr. Fund of Loc. Union No. 58 v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003). If such a showing is made, the court may issue an order to show cause to require the respondent to answer. *See, e.g.*, *Rieth-Riley Constr. Co. v. NLRB*, 2025 WL 3298085, at *5 (6th Cir. Nov. 26, 2025). The burden then shifts to the respondent to show that it took "all reasonable steps" to comply with the decree. *Gary's Elec. Serv. Co.*, 340 F.3d at 379 (citation omitted). If the respondent cannot carry that burden, a contempt finding and sanctions are warranted.

IV.   **Argument**

   A.   **The Court should order the City to show cause why it should not be held in contempt for its violations of Section F of the Decree at the No Kings event.**

MPD's response at the No Kings event violated Sections F.1 and F.2 of the Decree. The Court should order the City to show cause why these violations are not contumacious.

Section F imposes clear and definite obligations on the City (including MPD) that prohibit "harassment and intimidation" based on First Amendment expression. ECF No. 120 at 4–5 & n.2 (summarizing provisions). Section F.1 addresses harassment and states that "[t]he defendants and the City of Memphis shall not disrupt, discredit, interfere with or otherwise harass any person exercising First Amendment rights." Section F.2 addresses intimidation and states that "[t]he defendants and the City of Memphis shall not engage in any action for the purpose of, or reasonably having the effect of, deterring any person from exercising First Amendment rights." These provisions' plain text shows that they are not limited to surveillance activities, which is consistent with the Decree's overarching purpose of prohibiting the City "from engaging in law enforcement activities which interfere with any person's rights protected by the First Amendment," Decree § A, regardless of what those "law enforcement activities" are. The City indisputably knew of these Decree provisions before the No Kings event. *See, e.g.*, ECF No. 520 at 4 (sustainment framework requiring "officer trainings" on the Decree).

– 11 –

MPD's conduct at the No Kings event violated Sections F.1 and F.2. The No Kings march was core First Amendment expression, *see, e.g.*, *Boos v. Barry*, 485 U.S. 312, 318 (1988), which is the heart of what Section F protects. MPD's conduct "disrupt[ed]" and "interfere[d]" with it. Decree § F.1. MPD allowed the march to proceed for nearly forty minutes with no evident order to disperse.[13] To the contrary, video evidence and witness accounts suggest that MPD affirmatively allowed the march to continue on Linden Avenue to Robert Church Park. BV at 17:21:20–17:27:18; Blevins Decl. ¶ 6–7; K. Williams Decl. ¶ 3. Then, at the tail end of the march—and without any clear warning or public justification reflected in the record—MPD forcefully intervened. It used takedowns, pepper spray, and arrests. The protest effectively ended after this use of force, and MPD's use of force displaced the protest's political message and transformed the event's public narrative.

MPD's conduct also "reasonably ha[d] the effect" of "deterring [the public] from exercising First Amendment rights." Decree § F.2. It is well established that the use of crowd control weapons, like the pepper spray that MPD used here, chills speech. *See, e.g.*, *Black Lives Matter Seattle-King Cnty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1213–14 (W.D. Wash.) (holding that tear gas and projectiles would "chill a person of 'ordinary firmness' from protesting"); *Downes-Covington v. Las Vegas Metro. Police Dep't*, 2020 WL 7408725, at *7 (D. Nev. Dec. 17, 2020). MPD's use of pepper spray and forceful arrests at a peaceful protest—with no evident need or provocation—will undoubtedly deter future protests in Memphis. Moreover, when MPD intervened at the No Kings event, it hit protest safety marshals first. MPD's use of force on protesters who were visibly aligned with protest leadership sent a particularly pernicious

---

[13] MPD claims to have instructed some individuals to stay on the sidewalks, but the public record shows no warning given to the full crowd.

message—help lead a peaceful protest here, and you may be met with force. That is the message that the Decree was intended to prevent. *See* Decree § A.

The City has offered several excuses for why it thinks MPD's conduct did not violate the Decree, but all fail. *First*, as explained above, the City and MPD have suggested that the protesters are to blame because the march component lacked a permit. That does not explain why MPD suddenly and violently intervened nearly forty minutes after the march began and when it was within feet of its conclusion. And even if that were the reason for MPD's intervention, it would be unlawful. Unpermitted marches enjoy substantial First Amendment protection, and police may not arrest or use force against protesters in an unpermitted march without providing clear dispersal orders to the affected individuals. *See, e.g.*, *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 611–12 (6th Cir. 2005) (finding strict liability offense for taking part in an unpermitted march unconstitutional); *Vodak v. City of Chicago*, 639 F.3d 738, 746 (7th Cir. 2011) (requiring dispersal order to affected individuals to find probable cause for arrest); *see also* ECF No. 120 at 25. The public record shows no indication that MPD gave a dispersal order to the affected protesters here. *Second*, the City claims that it intervened to mitigate traffic disruptions. *See, e.g.*, Ex. 3 at 1. But no video shows traffic on the road at the time of MPD's intervention, undercutting any claim of traffic danger. And again, the march was nearly over. *Third*, one officer asserted on bodycam footage that the safety marshals were pushing against police cars immediately before he led the intervention. Bodycam at 17:31:38–17:31:50. But neither the City nor MPD has made that claim to ACLU-TN, and the City has produced no evidence that would corroborate it.

And even if MPD could show that *some* intervention was justified, nothing justified the force that MPD used. Both the Decree and the First Amendment require that infringements on

– 13 –

First Amendment rights use the least restrictive means to accomplish the City's goal. *See, e.g.,* Decree § A ("the City of Memphis must appropriately limit all law enforcement activities so as not to infringe on any person's First Amendment rights"); *Cole v. City of Memphis*, 108 F. Supp. 3d 593, 603 (W.D. Tenn. 2015). MPD's use of force and pepper spray here—without apparent warning or exhausting (or even trying) less disruptive methods, and without limiting the response to specific individuals engaged in unlawful behavior—was vastly disproportionate to address any of the justifications that the City has advanced. *Cf. Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010) (use of pepper spray "constitutes a significant degree of force" and should not be used "lightly or gratuitously").

MPD's excessive use of force to disrupt the No Kings event displaced protesters' political message and violated Sections F.1 and F.2 of the Decree. The Court should order the City to show cause why it should not be held in contempt for these violations.

**B.      The Court should order the City to show cause why it should not be held in contempt for violating Section G of the Decree.**

MPD has also violated Section G in at least two specific ways. First, MPD violated Section G.4 by failing to obtain a Section G authorization for its response to the No Kings event; and second, MPD violated Sections G.4 and G.6 by issuing the overbroad April 16, 2026 authorization and failing to support it with the specific written findings that Section G.6 requires. Those two violations are enough to warrant an order to show cause why the City should not be held in contempt. And the City's insistence that it did nothing wrong, coupled with its stated positions about when Section G applies and what Section G.6 requires, also warrants an order requiring the City to explain its current interpretation and administration of Section G.

Section G imposes clear and definite obligations on the City for "investigation[s] of criminal conduct" that are "reasonably likely to result in the collection of information about the

– 14 –

exercise of First Amendment rights or interfere in any way with the exercise of such First Amendment rights." Decree § G.4; *see also id.* § G.1 (explaining when authorization is **not** required, i.e., "[i]nvestigations and intelligence-gathering which are reasonably unlikely to result in the collection of information about the exercise of First Amendment rights, or interfere in any way with the exercise of such First Amendment rights"). "Any police officer conducting or supervising" such an investigation "must immediately bring such investigation to the attention of the Memphis Director of Police or a designee of the Director of Police for review and authorization." *Id.* § G.4. The "Director of Police or his/her designee shall review the factual basis for the investigation and the investigative techniques to be employed." *Id.* § G.6. She then "shall issue a written authorization for an investigation for a period not to exceed ninety (90) days only if" she "makes written findings" in each of four areas. *Id.* The written findings must establish that the investigation does not violate the Decree; that "[t]he expected collection of information about, or interference with, First Amendment rights is unavoidably necessary for the proper conduct of the investigation"; that "[e]very reasonable precaution has been employed to minimize the collection of information about, or interference with, First Amendment rights"; and that "[t]he investigation employs the least intrusive technique necessary to obtain the information." *Id.* As with Sections F.1 and F.2, these two provisions are largely unchanged from the 1978 *Kendrick* decree, *see* ECF No. 327-2 at PageID 9976–77, and the City (and MPD) had notice of the provisions before the No Kings event.

### 1. The City violated Section G.4 because MPD failed to seek an authorization before the No Kings response.

The City concedes that it did not seek a Section G authorization before its response to the No Kings event. Ex. 2 at 2. That alone is sufficient for a contempt finding.

The City's sole excuse is that its deployment to the No Kings event was not an "investigation" that is governed by Section G, *see, e.g.*, *id.* at 2–3, but that contradicts the plain language of the Decree, its purpose, and MPD's prior stated understandings. First, by deploying dozens of officers to monitor behavior at a political protest—clad in tactical vests, armed with pepper spray, and prepared to make mass arrests—MPD was conducting an "investigation." Police were present, looking for criminal conduct, and prepared to respond. Indeed, considering the Decree's stated purpose to "prohibit . . . law enforcement activities which interfere with any person's rights protected by the First Amendment," Decree § A, it would make no sense to exclude a mass police response to large-scale political protest—which is core First Amendment activity—from Section G's procedural safeguards.

The parties' earlier positions also show that the Decree required a Section G authorization for the No Kings response. The parties' joint Sustainment Proposal from December 2024 attached a draft "Standard Operation Procedure (SOP) for Section G Authorizations" that "MPD has been working on." ECF No. 520 at 15 n. vii. An "[e]xample[]" of an investigation that would require authorization under Section G" in that draft SOP was "[t]he possibility that a protest group intends to interrupt traffic on the I-40 bridge." ECF No. 520-2 at PageID 15552. Even if the plain text of Section G.4 were ambiguous as applied here—and as explained above, it is not—this prior admission about Section G's scope is dispositive, particularly considering MPD's reliance on traffic disruptions to explain its response at the No Kings event. *See, e.g.*, Ex. 2 at 3; Ex. 3 at 1.

MPD's account of its response also reinforces that a Section G authorization was required. MPD's April 16, 2026 Section G authorization states that it "responded to a disturbance" around 5:15 P.M. at the corner of Second and Beale Street. Ex. 3 at 1. To explain

– 16 –

MPD's decision "to detain people," the requesting officer wrote that "several participants moved into the roadway and began to obstruct traffic." *Id.* On MPD's telling, its officers arrived to respond to what they considered unlawful conduct, assessed the facts, and detained members of the public. Even if MPD's presence at the No Kings protest earlier in the day did not require a Section G authorization (which it did), MPD's actions after "respond[ing]" to "a disturbance" at the march constituted an "investigation of criminal conduct" that did. The Court should therefore issue an order to show cause for this violation of Section G.4.

### 2. The City violated Sections G.4 and G.6 by issuing the April 16, 2026 authorization.

MPD's April 16, 2026 authorization also fails to comply with Section G.4 and G.6. The April 16 authorization uses the No Kings event as an excuse to authorize MPD "to monitor publicly available social media platforms to identify emerging threats, assess the potential for unrest, and ensure public safety through timely and informed resource deployment" for ninety days. Ex. 3 at 1.[14] It identifies no "Subjects of Investigation," leaving that form field blank. *Id.* It also contains errors, as explained above. *See supra* at 10 (inconsistency between response time and "40 minutes" of commands). The "Requesting Investigator" dated the request on April 16, 2026, and the Chief of Police's designee signed the authorization the same day. *Id.* at 1–2. The authorizing signature includes no specific findings—just a reproduction of the four types of findings required by the Decree. *Id.* at 1.

---

[14] In discussions, the City has claimed that the authorization covers **only** MPD's investigation of what happened at the No Kings event. That is wrong. The next sentence of the authorization makes clear that the backward-looking component of the authorization is separate from the forward-looking component: "***In addition***, we are also reviewing current MPD video of the protest and conducting an administrative investigation." Ex. 3 at 1 (emphasis added).

This authorization violates Sections G.4 and G.6. The vague, forward-looking investigation of unspecified targets falls far short of Section G.4's requirement for officers to seek authorization for specific investigations. And the lack of specific "written findings" for each of the four issues listed in Section G.6 contravenes the Decree's express terms. The requirement of "written findings" cannot be satisfied by a single signature beneath a reproduction of the issues on which findings must be made. *See, e.g.*, ECF No. 197-1 at PageID 6859 (Monitoring Team commenting on an earlier draft form that "[w]ithout specific findings supporting the authorization, no record will exist to ensure consistency and compliance"). This is another reason to issue an order to show cause for violations of Section G.

> **3.   The No Kings-related violations, together with the City's stated interpretations of Section G, warrant an order to show cause requiring the City to explain its current interpretation and administration of Section G.**

The two Section G violations above are sufficient on their own to warrant an order to show cause, but the Court should also order the City to explain its current interpretation and administration of Section G. The record here raises serious questions about whether the City is applying Section G as the Decree requires.

The City has taken positions that are difficult to square with Section G's text. For example, it contends that no Section G authorization was required before MPD's No Kings response, even though officers were responding to conduct that the City now characterizes as unlawful, Ex. 3 at 1, and even though the response was likely to interfere with protected First Amendment activity. In discussions with ACLU-TN, the City has also contended that Section G.6 does not require specific written findings to support an authorization. But that cannot be reconciled with Section G.6's express requirement that the Director or designee make "written findings" on each of four issues before issuing an authorization.

– 18 –

The April 16 authorization reinforces these concerns. It is broad, forward-looking, and untethered to any identified target. It authorizes monitoring of "[a]ll Social Media Platforms" for ninety days, leaves the "Subjects of Investigation" field blank, and contains no specific written findings supporting the authorization. Ex. 3 at 1. It also relies on an account of the No Kings event that the public record does not support. *See supra* at 10. And as the Monitoring Team's recent report card noted, the City did not provide the April 16 authorization to ACLU-TN, *see* ECF No. 574 at 25:1–9, hampering ACLU-TN's oversight of MPD's compliance.

Taken together, the two No Kings-related violations, the City's asserted (and incorrect) Section G interpretation, the deficiencies in the April 16 authorization, and the City's failure to provide authorizations to ACLU-TN suggest that MPD is treating the authorization process as a formality rather than as the substantive safeguard the Decree requires. The Court should therefore order the City to show cause not only for the specific violations addressed above, but also for its current interpretation and administration of Section G.

## V.    Conclusion

ACLU-TN respectfully requests that the Court issue an order requiring the City to show cause why it should not be held in contempt for violating (1) Sections F.1 and F.2 of the Decree through MPD's response at the No Kings event; (2) Section G.4 for MPD's failure to seek authorization before the No Kings response; and (3) Sections G.4 and G.6 for the City's issuance of the April 16, 2026 authorization. ACLU-TN further requests that the Court order the City to explain its current interpretation and administration of Section G and show cause why it does not violate the Decree. While there is ample evidence to hold the City in contempt for at least the specific violations described above now, the order-to-show-cause framework will enable the parties to build a complete factual record (as explained in ACLU-TN's Motion for Limited Discovery, filed with this motion) and will afford the City a full and fair opportunity to explain

– 19 –

its noncompliance before the Court determines whether sanctions are warranted.  If the Court

finds the City in contempt, ACLU-TN will request coercive relief sufficient to bring the City into

compliance with the Decree, including, but not limited to, extended monitoring and training.

Dated: June 23, 2026                          Respectfully submitted,


                                             /s/ Timothy A. Cook
Lucas Cameron-Vaughn                         Timothy A. Cook (Mass. BBO No. 682115)
ACLU FOUNDATION OF TENNESSEE                 Timothy J. Perla
P.O. Box 120160                              Noah Kaitin
Nashville, TN 37212                          Elizabeth Bedrick
(615) 320-7142                               Amanda Clarke
lucas@aclu-tn.org                            WILMER CUTLER PICKERING
                                                HALE AND DORR LLP
                                             60 State Street
                                             Boston, MA 02109
                                             (617) 526-6000
                                             tim.cook@wilmerhale.com
                                             timothy.perla@wilmerhale.com
                                             noah.kaitin@wilmerhale.com
                                             liz.bedrick@wilmerhale.com
                                             amanda.clarke@wilmerhale.com

                                             Charles T. Cox Jr.
                                             WILMER CUTLER PICKERING
                                                HALE AND DORR LLP
                                             2100 Pennsylvania Avenue NW
                                             Washington, DC 20037
                                             (202) 663-6000
                                             charlie.cox@wilmerhale.com

                                             *Counsel for Intervening
                                             Plaintiff ACLU-TN*

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2026, the foregoing was served via the Court's ECF system to the following counsel of record:

Bruce A. McMullen
Jennie Vee Silk
Mary Wu Tullis
Kelsey W. McKinney
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
2000 First Horizon Building
165 Madison Avenue
Memphis, TN 38103

*/s/ Timothy A. Cook*
Timothy A. Cook

## CERTIFICATE OF CONSULTATION

Counsel for ACLU-TN, including Timothy A. Cook, Timothy J. Perla, Charles T. Cox Jr., Noah Kaitin, Elizabeth Bedrick, Amanda Clarke, and Lucas Cameron-Vaughn consulted with counsel for the City, including Bruce A. McMullen, Jennie Vee Silk, and Kelsey E. McKinney, throughout May and June 2026 about issues addressed in this motion, including videoconferences with the Monitoring Team on May 12, 2026, and May 19, 2026; in-person communications after the status conference on May 29, 2026; and many email exchanges through June 4, 2026, *see, e.g.*, Ex. 6. On June 22, 2026, counsel for ACLU-TN emailed counsel for the City, including Mr. McMullen and Ms. Silk, stating the exact relief that ACLU-TN seeks in this motion and offering to confer further by phone or video any time between 9:30 A.M. and 11:00 A.M. CDT or between 12:30 P.M. and 2:00 P.M. CDT. *See* Ex. 8. As of 2:00 P.M. CDT, the City's counsel have not responded.

*/s/ Timothy A. Cook*
Timothy A. Cook