# Exhibit 1

Edward L. Stanton III
Keenan Carter
Will Perry
**Butler|Snow LLP**

Rachel Levinson-Waldman
Dr. James F. Pastor
Daniel J. Brown
**Subject Matter Experts**

Bruce McMullen
Jennie Vee Silk
Kelsey W. McKinney
**Baker, Donelson, Bearman, Caldwell & Berkowitz, PC**

*VIA EMAIL*

April 1, 2026



PO Box 120160
Nashville TN 37212
(615) 320-7142
aclu-tn.org

> **RE: Formal Demand for Investigation into Violations of the Modified *Kendrick* Consent Decree Arising from the Memphis Police Department's Conduct at the March 28, 2026 "No Kings Day" March**

Dear Independent Monitoring Team:

The American Civil Liberties Union of Tennessee ("ACLU-TN"), as Plaintiff in the matter of *ACLU of Tennessee, Inc. v. City of Memphis, Tennessee*, No. 2:17-cv-02120 (W.D. Tenn.), and as the organization that has stood as guardian of the Kendrick Consent Decree ("Decree") since its inception, writes to formally demand an immediate investigation into the conduct of the Memphis Police Department ("MPD") at the "No Kings Day" march held on March 28, 2026, in downtown Memphis.

The events of that afternoon in which MPD officers deployed pepper spray, physical force, and mass detention against peaceful marchers and designated safety marshals as a demonstration concluded, do not represent merely an isolated use-of-force incident. They represent a potential violation of a binding federal court order and a troubling continuation of the pattern of conduct the Decree has sought to eradicate for nearly five decades. The public has a right to understand what that

Decree is, why it exists, what it demands of MPD, and why it matters when those demands go unmet. We write with both purposes in mind.

## I.    THE HISTORY AND PURPOSE OF THE KENDRICK CONSENT DECREE

The Kendrick Consent Decree was born from one of the most documented and disturbing episodes of domestic police abuse in American history. One that unfolded here in Memphis, and that reached its most tragic conclusion on the balcony of the Lorraine Motel on April 4, 1968.

In the mid-1960s, the Memphis Police Department established a covert Domestic Intelligence Unit ("DIU"), initially used to spy on anti-Vietnam War protesters.[1] But as city sanitation workers began organizing in protest of wages and poor, sometimes fatal, working conditions, then-Mayor Henry Loeb, an avowed segregationist,[2] expanded the surveillance. He sent people undercover to gather intelligence on worker activities and on Dr. Martin Luther King Jr. while he was in Memphis to support the sanitation workers.[3] That surveillance was conducted not just with wiretaps and long lenses, but with officers and informants planted within local organizations, including among sanitation workers who sought union membership.[4]

Throughout the latter part of the 1960s and well into the 1970s, the DIU cast a wider net to include civil rights groups, school teachers, social, civic, and religious college organizations, and a host of other groups.[5]

On April 3, 1968, the day before Dr. King was assassinated, he landed at the Memphis airport. An MPD Inspector ordered officers there for surveillance, "...not

---

[1]    BLACKLISTED: Memphis Police Surveillance and Kendrick v. Chandler – A Timeline - ACLU of Tennessee

[2]    Henry Loeb, 71, Memphis Mayor At Time of King's Assassination - The New York Times

[3]    *Supra* at 1.

[4]    *Id.*

[5]    *Id.*

only because Dr. King was a controversial public figure, but also because he had been meeting with local Black militants while in Memphis on prior visits."[6]

*The Lawsuit That Produced the Decree*

In September 1976, Memphis newspapers exposed the existence of a vast trove of secret police intelligence files the department had amassed over more than a decade.[7] The ACLU-TN (the ACLU of West Tennessee at the time) immediately went to court to prevent the city from destroying those files. When the ACLU-TN's attorney argued for their preservation, comparing what police had done to the Watergate scandal, the city burned the files anyway.[8]

ACLU-TN sued the city, alleging it had violated residents' First Amendment rights by maintaining records that "contained unverified information and gossip which related exclusively to the exercise of lawful and peaceful activities" and "served no lawful or valid law enforcement purpose."[9]

On September 14, 1978, with the consent of the defendants, United States District Judge Robert M. McRae Jr. entered the *Kendrick* Consent Decree. The order was the first of its kind in the nation, prohibiting all officials, future officials, employees, and agencies of the City of Memphis from ever gathering political intelligence "relating to any person's beliefs, opinions, associations or other exercise of First Amendment rights."[10] The Decree also barred electronic surveillance, covert infiltration of organizations, and any law enforcement conduct designed to harass or deter people from exercising their constitutional rights.

*History Repeats: 2017 and Beyond*

The Decree was supposed to close a chapter. Instead, Memphis reopened it.

---

[6]    [Findings on MLK Assassination | National Archives](Findings on MLK Assassination | National Archives)

[7]    *Supra* at 1.

[8]    *Id.*; *and see* https://go.gale.com/ps/i.do?id=GALE%7CA688496054&sid=googleScholar&v=2.1&it=r&linkaccess=abs&issn=00224642&sw=w&p=AONE&userGroupName=anon%7E2f8485&aty=open-web-entry

[9]    *Supra* at 1.

[10]    *See supra* at 1.

In March 2017, ACLU-TN filed suit after it was discovered that the city had created a list of names requiring a police escort when visiting City Hall, based on people's participation in Black Lives Matter demonstrations and other political movements. A Memphis Police sergeant had posed on Facebook under the pseudonym "Bob Smith" to befriend and gather intelligence on political activists through social media.

The Court found the City in contempt of the Decree in 2018 and ordered the appointment of an Independent Monitor and this Monitoring Team to oversee MPD's compliance.

In 2020, the Decree was updated and expanded to address modern surveillance technologies including social media, body-worn cameras, and digital intelligence gathering. That is the Modified *Kendrick* Consent Decree that governs MPD today.

In December 2024, the United States Department of Justice, following a comprehensive pattern-or-practice investigation, found that MPD engages in a systemic pattern of unconstitutional and discriminatory policing.

*What the Decree Requires*

The Modified *Kendrick* Consent Decree is a binding federal court order. It is not a set of recommendations. It is not aspirational. It is the law governing how MPD may interact with people engaged in constitutionally protected activity in the City of Memphis.

In plain terms, the Decree requires the following of MPD:

**The Decree prohibits interference with First Amendment rights.** Section A states that the City of Memphis may not engage in law enforcement activities that "interfere with any person's rights protected by the First Amendment," including the rights to "speak and dissent freely" and "to associate privately and publicly for any lawful purpose." This prohibition applies to all officers, employees, and agents of the City in every interaction, at every demonstration, at every moment.

**The Decree prohibits harassment and intimidation.** Section F prohibits MPD from disrupting, interfering with, or harassing any person exercising First Amendment rights, and from taking any action "for the purpose of, or reasonably having the effect of, deterring any person from exercising First Amendment rights."

It expressly forbids photographing or recording the names of attendees at lawful demonstrations for the purpose of maintaining a record of who was there. It permits officers to be present at First Amendment assemblies only for genuine public safety purposes, and only so long as that presence does not have the effect of harassment or intimidation.

**The Decree requires Director-level authorization for investigations that touch First Amendment activity.** Section G requires that any investigation "reasonably likely to result in the collection of information about the exercise of First Amendment rights" must be brought to the Director of Police or a designee for review. Authorization may only be granted in writing, for periods not exceeding ninety days, and only upon specific written findings that the investigation is lawful, that interference with First Amendment rights is unavoidably necessary, that every precaution to minimize that interference has been taken, and that the least intrusive technique available is being used.

**The Decree restricts the retention and dissemination of information gathered at First Amendment assemblies.** Section H prohibits MPD from maintaining personal information about individuals for the purpose of First Amendment-related intelligence. It limits the retention of body-worn camera footage from protests and assemblies to instances involving evidence of criminal activity or officer misconduct. It prohibits the intentional saving and cataloguing of video or images that would constitute political intelligence. And it prohibits sharing such information with any other agency except a government law enforcement agency engaged in a lawful criminal investigation.

**The Decree prohibits joint operations that facilitate violations.** Section I prohibits MPD from cooperating with, delegating to, or acting at the behest of any local, state, federal, or private agency to conduct activities that are themselves prohibited by the Decree.

**These are not new rules.** They have been the law governing MPD's conduct for nearly five decades.

## II.    WHAT HAPPENED ON MARCH 28, 2026, AND WHY IT LIKELY VIOLATES THE DECREE

On March 28, 2026, thousands of Memphis residents gathered at Robert R. Church Park for the city's third "No Kings Day" demonstration. Following the gathering, participants proceeded on a march route down Beale Street and onto Dr. Martin

Luther King Jr. Avenue, with the march set to conclude where it began at Robert R. Church Park. Designated safety marshals, who are volunteers tasked with maintaining order and ensuring participant safety, accompanied the march throughout.

Based on information and belief, and publicly documented recordings, the march was approximately fifty feet from its endpoint when MPD officers inexplicably escalated their behavior toward the attendees. Approximately two dozen officers tackled, beat, maced, and arrested peaceful participants. Among those specifically targeted were several safety marshals. When State Representative Justin J. Pearson stepped forward in an effort to de-escalate the situation and prevent further violence, he was shoved by an MPD officer.

MPD also deployed officers on horseback, who charged at the crowd and continued pushing people. Six individuals were detained. Three people, all identified as safety marshals, were charged with disorderly conduct and obstructing a highway.

On Monday, Memphis Mayor Paul Young placed the officers involved on administrative leave pending an internal investigation.

### *HOW MPD'S CONDUCT APPEARS TO VIOLATE THE DECREE*

The facts described above implicate the Decree in the following specific ways:

**Section A and Section F: Interference, Harassment, and Deterrence.** MPD's forcible intervention, deployed at the moment the march was concluding, with no intervening public safety emergency, constitutes both interference with First Amendment activity and conduct with the purpose and reasonably foreseeable effect of deterring future exercise of those rights. Thousands of march participants, and every Memphis resident who watched the footage, received the message: assemble and march in this city, and this is what awaits you at the end.

**Section F(3): Presence Without Harassment.** The Decree permits MPD officers to be present at First Amendment gatherings for public safety purposes. It does not permit them to charge those gatherings on horseback, deploy chemical agents against safety marshals, or physically shove state legislators attempting to de-escalate a situation MPD itself created. The manner of MPD's aggressive, confrontational, and escalatory intervention exceeded any public safety justification and constituted the kind of harassment and intimidation the Decree prohibits.

**Section G: Failure to Seek Director Authorization.** To the extent MPD's intervention constituted an enforcement action directed at persons engaged in protected First Amendment activity, the Decree required written Director-level authorization before it was undertaken, based on specific findings that interference was unavoidably necessary and that the least intrusive technique was being used. There is no public indication that any such authorization was obtained. The Monitoring Team must determine whether this safeguard, and one of the Decree's most critical protections, was honored or ignored.

**Section H: Recording and Retention of Intelligence.** The Monitoring Team must investigate whether any photographs, body-worn camera footage, or other intelligence gathered at the march has been preserved, catalogued, or shared in ways that violate the Decree's strict restrictions on the maintenance and dissemination of First Amendment-related intelligence.

## III.    RELIEF

ACLU-TN formally demands that the Monitoring Team:

1.  Open an immediate formal investigation into MPD's conduct on March 28, 2026, including the chain-of-command decisions that led to the use of force against peaceful participants and safety marshals as the march approached its conclusion;

2.  Compel MPD to preserve and produce all body-worn camera footage, dash camera footage, surveillance footage, aerial footage, radio communications, command logs, operational plans, and any written or electronic directives related to MPD's response to the march;

3.  Determine whether the Director of Police or a designee issued the written authorization required by Section G before any enforcement action was taken against march participants, and if so, require production of those written findings and assess whether they satisfy the Decree's requirements;

4.  Assess whether the use of physical force, chemical agents, and detention against safety marshals and other participants constitutes harassment and intimidation prohibited by Section F;

5. Determine whether any First Amendment-related intelligence—including photographs, video, or personal information about march attendees, organizers, or elected officials present—was gathered, retained, catalogued, or shared in violation of Section H;

6. Issue a public report of findings promptly and, if violations are confirmed, recommend appropriate remedial measures and sanctions to the Court— including, if warranted, referral for contempt proceedings.

### CONCLUSION

That this incident occurred just days before the 58th anniversary of Dr. Martin Luther King Jr.'s assassination in Memphis only underscores its gravity. The people who marched on March 28, 2026, gathered to exercise the very First Amendment rights Dr. King came to Memphis to defend in the final days of his life. The *Kendrick* Consent Decree was entered into after MPD undermined those rights for many years. The Decree has been violated before, and the Court has found it in contempt of its orders. Yet MPD continues to act as though it is above the law.

We call on the Monitoring Team to fulfill the function for which the Court appointed it: to serve as an independent check on MPD's conduct and to ensure that the protections of the *Kendrick* Consent Decree are not merely words on paper.

Memphis residents exercising their First Amendment rights deserve nothing less.

ACLU-TN will pursue all available remedies under the Decree, including return to the Court, if prompt and thorough action is not taken. We remain available to provide any additional information in support of this demand.

Respectfully submitted,

**Miriam R. Nemeth**
Executive Director
American Civil Liberties Union of Tennessee

**Lucas Cameron-Vaughn**
Interim Legal Director
American Civil Liberties Union of Tennessee