**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

**BLANCHARD ET AL.,**

**Plaintiffs (dismissed),**

**and**

**ACLU OF TENNESSEE, INC.,**

**Intervening Plaintiff,**

**v.** **No. 2:17-cv-02120-MSN-jay**

**THE CITY OF MEMPHIS,**

**Defendant.**

---

**ORDER DENYING MOTION TO SHOW CAUSE**
**AND GRANTING MOTION FOR LIMITED DISCOVERY**

---

Before the Court are two motions: (1) Plaintiff ACLU of Tennessee, Inc ("ACLU")'s Motion for an Order to Show Cause Why the City of Memphis Should Not Be Held in Contempt ("Motion to Show Cause") (Docket Entry ["D.E."] 575) and (2) Plaintiff ACLU's Motion for Limited Discovery Regarding the City of Memphis's Compliance with the Modified *Kendrick* Consent Decree ("Motion for Limited Discovery"). (D.E. 576). Defendant City of Memphis ("City") filed a Response in opposition to both Motions. (D.E. 581). Plaintiff then filed a Reply (D.E. 587). On August 14, 2026, the Court referred the matter to the undersigned Magistrate Judge for determination or for proposed findings and recommendation, as appropriate. (D.E. 589). For

the following reasons, Plaintiff's Motion to Show Cause is **DENIED,** without prejudice, and Plaintiff's Motion for Limited Discovery is **GRANTED**.

## I. BACKGROUND

These Motions were filed in response to the Memphis Police Department ("MPD")'s alleged conduct at the March 28, 2026, Memphis "No Kings" protest and its aftermath, which allegedly violated the *Kendrick* Consent Decree ("Decree").

### A. *Kendrick* Consent Decree

The *Kendrick* Consent Decree, originally entered on September 14, 1978, is a landmark consent agreement between the City of Memphis and the ACLU. *See* (D.E. 379). In it, the City agreed to take proactive steps to make sure that the City did not "disrupt, discredit, interfere with or otherwise harass any person exercising First Amendment rights." (D.E. 379 at 6, § F). The City also agreed to seek prior authorization for police activity that is reasonably likely to interfere with the public exercise of First Amendment rights. (D.E. 379 at 7-10, § G). As part of the Section G authorization, the Director of Police or his designee must issue written findings that, (1) "the investigation does not violate the provisions of this Decree;" (2) the expected collection of information is "unavoidably necessary" to the investigation; (3) "every reasonable precaution has been employed to minimize the collection of information;" and (4) the "investigation employs the least intrusive technique necessary." (*Id.* at 8-9).[1]

To oversee the City's compliance with the Decree, the Court appointed an Independent Monitor. (D.E. 176). However, the Monitor was always intended to be temporary. (D.E. 526-1 at 2). As such, on December 12, 2024, the parties agreed to and submitted a Sustainment Proposal

[1] In 2020, the Decree was modified to reflect the changing technologies available to law enforcement. (D.E. at 379). The currently applicable decree is the Modified Consent Decree. (*Id.*)

focused on ensuring the City's continued compliance with the Decree. (D.E. 526-1). The specific terms of the Sustainment Proposal are discussed in Section III.

**B. March 28, 2026 "No Kings" Protest and Aftermath**

On March 28, 2026, protesters gathered for a "No Kings" protest in Memphis, Tennessee. (D.E. 575). Although the protesters marched without the required permit, the Memphis Police Department stands accused of having used excessive force to make the protesters disperse, allegedly pepper-spraying peaceful protesters without provocation. (D.E. 575 at 5, 9, 12). Video footage from the event shows a police officer pushing an individual to the ground. (D.E. 575 at 9). Another officer is shown pepper-spraying a protestor, even though the person's hands are raised in surrender. (*Id.*). No evidence suggests that these MPD actions were preceded by a warning or other order for the protestors to disperse. (D.E. 575 at 12). This alleged conduct, if true, would violate Section F.1 and F.2 of the Consent Decree. *See* (D.E. 379 at 6-7). Additionally, MPD obtained no Section G authorization before responding to the protest. (D.E. 575-3 at 3).[2]

Potentially more problematic, though, is the MPD's response to these allegations. In the aftermath of the protest, the Chief of Police issued an authorization for MPD officers to monitor all "publicly available social media platforms" for the next 90 days "to identify emerging threats, assess the potential for unrest, and ensure public safety." (D.E. 575-4 at 2). This authorization may violate Sections G.4 and G.6 of the Consent Decree. *See* (D.E. 379). As outlined above, Section G requires several specific written findings to be included in such authorizations. However, the MPD authorization in question features no actual analysis of these elements. (D.E. 575-4 at 2). Although the authorization form lists Section G elements, this appears to be nothing more than a *pro forma* compliance measure. (*Id.*). The ACLU contends that this procedure is indicative of broader

[2] The City asserts that none was required. (D.E. 575-3 at 3).

concerns with how the City is "interpreting and applying the Decree" and seeks to hold the City in contempt. (D.E. 575 at 13).

## II. MOTION TO SHOW CAUSE

### A. Legal Standard

"Contempt is serious." *Gascho v. Glob. Fitness Holdings, LLC*, 875 F.3d 795, 799 (6th Cir. 2017). Accordingly, "[c]ontempt is a measure of last resort, not first resort." *Id.* The Sixth Circuit has cautioned that "courts must exercise the contempt sanction with caution and use the 'least possible power adequate to the end proposed.'" *Id.*

For this reason, a party seeking civil contempt sanctions must demonstrate by *clear and convincing* evidence that the opposing party knowingly violated a "definite and specific order of the court." *Id.* (emphasis added). This is no light burden. Indeed, "[c]ontempt cannot be based on 'a decree too vague to be understood,' but is instead reserved for those who 'fully understand[ ]' the meaning of a court order and yet 'choose[ ] to ignore its mandate.'" *Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). And "when deciding whether a court order is 'definite and specific,' courts must construe any ambiguity in favor of the party charged with contempt." *Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996). This is because it would be "unfair for courts to hold a party in contempt unless that party was disobeying a clear and unequivocal court command." *Gascho*, 875 F.3d at 800. After the moving party makes out his prima facie case of contempt, the burden shifts to the contemnor to demonstrate why he is unable to comply with the court's order. *United States v. Rylander*, 460 U.S. 752, 757 (1983).

### B. Analysis

The Decree at issue here is the oldest consent decree in the country. (D.E. 574 at 46). The Decree is also unique in its perpetual existence and scope. (D.E. 574 at 31–32). Both parties admit

that the Decree and resulting Sustainment Proposal are complex and ambiguous in places. *See, e.g.*, (D.E. 574 at 34) ("[T]he consent decree is complex[.]"); (D.E. 574 at 39) ("[The consent decree is] living and we're negotiating still the meaning of it."). And both sides remain uncertain about some of the Decree's dictates. The parties cannot even agree, for instance, on whether they are in the Transition or Sustainment Period of the Sustainment Proposal. *See, e.g.*, (D.E. 574). Despite that, the City seems to be making reasonable, albeit flawed, efforts to comply with the Decree. At a recent status conference, Mr. Thomas, one of the City's compliance officers, describes the process of implementing the Decree as follows,

> "It is a lot of work. There is not a day that goes by that I don't consult on a consent decree issue, multiple times sometimes on things we can do. And the City, at least the Memphis Police Department, is doing its absolute best to try and comply with the consent decree."

(D.E. 574 at 58).

Although the MPD's conduct at the No Kings protest likely fell below the standard imposed by the Decree, there is no clear and convincing evidence at this stage that the MPD knowingly violated the Decree. For one thing, because there has been no discovery, the record contains little evidence relating to the events of March 28, 2026. Additionally, as analyzed above, "contempt cannot be based on a decree too vague to be understood," and "courts must construe any ambiguity in favor of the party charged with contempt." *Int'l Longshoremen's Ass'n*, 389 U.S. at 76; *Grace*, 72 F.3d 1236 at 1241. Legitimate questions remain about the Decree's scope and requirements. Most fundamentally, Section G of the Decree applies to police "investigations," but the parties do not agree that responding to a protest qualifies as an investigation.[3] This ambiguity must be construed in favor of the City. *See Grace*, 72 F.3d at 1241.

---

[3] Counsel for the City contends, "If there is just a protest out there and police is – and they're not doing an investigation, there's no need to do a Section G. And I think that's the misunderstanding that a Section G is when police is near any protest." (D.E. 574 at 31). Counsel for the ACLU counters,

Lastly, the City contends, and the Court agrees, that an order directing the City to "show cause" why it should not be held in contempt would improperly invert the burden of proof in this case. (D.E. 581 at 6). The ACLU must first present evidence establishing a prima facie case that the City has knowingly acted in contempt of a court order. See *Gascho v. Glob. Fitness Holdings, LLC*, 875 F.3d 795, 799 (6th Cir. 2017). Because contempt is a drastic remedy that must be exercised with caution, it is far preferable to grant limited discovery and further develop the record before holding a party in contempt. *See Gascho*, 875 F.3d at 799.

## III. MOTION FOR LIMITED DISCOVERY

### A. Legal Standard

"There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). However, when it is unclear whether a finding of civil contempt is warranted, district courts generally have broad discretion to order discovery. *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998). To guide the scope of discovery, Federal Rule of Civil Procedure 26(b)(1) provides that:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

---

> [W]ithin the purpose section of how this policy might be enacted, the purpose gives a couple of investigations that would require authorization under Section G, and it says[,] including but not limited to, and the first example is the possibility that a protest group intends to interrupt traffic on the 1-40 bridge. So I think . . . the parties throughout this collaborative process have imagined that things like protests would fit within the Section G protocol so long as the officers have an idea that [a protest], you know, might be coming." (D.E. 574 at 40).

**B. Analysis**

In this case, the ACLU seeks discovery (1) to develop the record on "the nature and extent of the [City's] contumacious conduct" at the protest and (2) to "determine whether the City's current interpretation and application of Section G has caused or is likely to cause additional violations." (D.E. 576 at 3). Specifically, the ACLU seeks to discover:

> the City's current interpretation and administration of Section G authorizations, including which investigations received (and did not receive) Section G authorizations, particularly in the political protest context; whether and how authorizing officials make the "written findings" required by Section G.6; and what level of scrutiny, in practice, Section G authorization requests receive.

(D.E. 576 at 9). Although the ACLU has attempted to obtain bodycam footage and other evidence from the City, the City has only produced a report generated from its own internal investigation. (D.E. 576 at 4–7).

The City argues that the ACLU is not entitled to discovery because the ACLU bypassed the mandatory dispute resolution framework established in the Sustainment Proposal. (D.E. 581 at 1). *See also* (D.E. 526-1). This procedure-based response raises some threshold questions: (1) Is the City in the Sustainment Period of the Proposal? and (2) Does the Sustainment Proposal dispute resolution procedure apply to the ACLU? To resolve these issues, we must turn to the Terms of the Sustainment Proposal.

**1. *Transition Period vs. Sustainment Period***

The Sustainment Proposal features two distinct phases of implementation: (1) the Transition Period and (2) the Sustainment Period. (D.E. 526-1). *See also* (D.E. 526; D.E. 581; D.E. 587). And the procedure for reporting Decree violations differs somewhat between the Transition Period and the Sustainment Period.

Critically, the start of the Sustainment Period is characterized both by a specific date range and by a set of conditions that must be met. (D.E. 526 at 3). The Sustainment Proposal states that the Transition Period "*should* be completed" between July 1, 2025, and September 30, 2025. (D.E. 526-1 at 3) (emphasis added). Because these dates have passed, the City contends it is fully in the Sustainment Period. (D.E. 581 at 2). But as the Sixth Circuit has noted, "the word 'should,' in most cases, is precatory, not mandatory." *United States v. Rogers*, 14 F. App'x 303, 305 (6th Cir. 2001). In other words, the date range in the Proposal sets a target date for implementing certain substantive conditions; the Transition Period will not expire automatically upon the mere passage of time.

Substantively, the Sustainment Proposal provides that the City will appoint two Compliance Officers and three Subject Matter Experts ("SMEs") to oversee the City's continued compliance with the Decree. (D.E. 526-1 at 3). The Proposal further requires that these experts be "fully trained . . . by the end of the Transition Period." (*Id.*). However, the City currently has only one compliance officer. (D.E. 590 at 13). And, during a May 29, 2026, status conference, the Independent Monitor stated that the City is not yet equipped to move into the Sustainment Period: "It's our recommendation, the monitoring team, that the sustainment proposal should not begin at this time, that more work as we can tell needs to be done, maybe some items fine tuned." (D.E. 574 at 47). Because the City does not have two fully trained compliance officers, the ACLU asserts that the City is in the Transition Period. (D.E. 587 at 2). Ultimately, even the Independent Monitor seems unsure of the Proposal's current stage. (D.E. 574 at 47) ("[I]f you want to call it the sustainment period, I think we're somewhere between transitional and sustainment, but I want the Court to know . . . we're not in a position to recommend to the Court [that] the City is able to move forward without the monitoring team").

Relevant to this dispute is the legal doctrine of substance over form. *See, e.g.*, *Frank Lyon Co. v. United States,* 435 U.S. 561, 562 (1978) (holding that substance is more important than form in financial transactions). Applying this doctrine, the Court will likely find the City in the Transition Period until it has trained the requisite number of compliance officers. However, the Court may leave that issue for another day because the "Procedure for Sustainment SME Reporting of Deficiencies" does not bind the ACLU.

**2. *Procedure for Sustainment SME Reporting of Deficiencies***

The Sustainment Proposal provides a mandatory reporting procedure—titled the "Procedure for Sustainment SME Reporting of Deficiencies—for Subject Matter Experts who "need[] to raise concerns about a potential deficiency in MPD's obligations under the Modified Consent Decree." (D.E. 526-1 at 11–12). However, given its title, this procedure applies only during the Sustainment Period, and the City likely has not reached that period. (D.E. 526-1). More to the point, by its express terms, this procedure applies only to SMEs. In its Response, the City writes that "the Sustainment Proposal does not contemplate the ACLU raising issues to the City directly." (D.E. 581 at 2–3). This may be true, but the Sustainment Proposal also does not prohibit ACLU involvement, especially before the Sustainment Period begins. *See* (D.E. 526-1). For this reason, and for the reasons stated above regarding the need to develop the record before ordering a party in contempt, the Court will grant limited discovery in this matter.

**C. Terms of Discovery**

The ACLU requests a discovery schedule with the following terms: "Compliance discovery shall open upon the Court's order granting this motion and end 90 days later.

During compliance discovery:

(1) The parties may serve up to ten requests for production under Federal Rule of Civil Procedure 34 and five interrogatories under Federal Rule of Civil Procedure 33. The

time to respond in Rules 34(b)(2)(A) and 33(b)(2) will be shortened to 21 days from service.

(2) The parties may take up to five depositions under Federal Rule of Civil Procedure 30 of up to four hours each.

(3) The parties may seek third-party discovery under Federal Rule of Civil Procedure 45, with any requests for production or depositions counting against the limits above."

(D.E. 576 at 9). The City has not objected to any specific terms of this discovery schedule, only the general availability of discovery. Accordingly, the Court agrees that the schedule and scope of discovery are reasonable and orders that the limited discovery as described in this Order begin **September 23, 2026**, and conclude **December 22, 2026**.

## IV. CONCLUSION

For the reasons set forth above, it is **ORDERED** that Plaintiff ACLU's Motion to Show Cause (D.E. 575) be **DENIED**, without prejudice, and Plaintiff ACLU's Motion for Limited Discovery (D.E. 576) be **GRANTED**.

IT IS SO ORDERED, this, the 8th day of September 2026.

**s/Jon A. York**
UNITED STATES MAGISTRATE JUDGE

**NOTICE:**

**IF DESIRED, AN APPEAL OF THIS ORDER TO THE PRESIDING DISTRICT COURT JUDGE MUST BE FILED WITHIN FOURTEEN (14) DAYS OF THE SERVICE OF A COPY OF THIS ORDER. *SEE* 28 U.S.C. § 636(b)(1)(C); LOCAL RULE 72(g)(2). FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER AND/OR FORFEITURE OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**